# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-691 (MN) |
| | ) | |
| AVADEL PHARMACEUTICALS PLC, | ) | ██████████████ |
| AVADEL US HOLDINGS, INC., AVADEL | ) | |
| SPECIALTY PHARMACEUTICALS, LLC, | ) | |
| AVADEL LEGACY PHARMACEUTICALS, | ) | |
| LLC, AVADEL MANAGEMENT | ) | |
| CORPORATION and AVADEL CNS | ) | |
| PHARMACUEITCALS LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S INITIAL INFRINGEMENT CHART

Pursuant to the Scheduling Order (D.I. 31) and paragraph 4.c. of the Delaware Default Standard for Discovery, Plaintiff Jazz Pharmaceuticals, Inc. ("Jazz Pharmaceuticals") hereby provides to Defendants Avadel Pharmaceuticals PLC, Avadel US Holdings, Inc., Avadel Specialty Pharmaceuticals, LLC, Avadel Legacy Pharmaceuticals, LLC, Avadel Management Corporation, and Avadel CNS Pharmaceuticals LLC ("Avadel") its initial claim charts relating each of the asserted claims of U.S. Patent Nos. 8,731,963 ("the '963 patent"), 10,758,488 ("the '488 patent"), 10,813,885 ("the '885 patent"), 10,959,956 ("the '956 patent"), and 10,966,931 ("the '931 patent") (collectively, "the patents-in-suit") to Avadel's product.

Jazz Pharmaceuticals has prepared these claim charts based on information and discovery currently available to it.  Fact discovery remains open and expert discovery has not yet begun in this case.  Further, Jazz Pharmaceuticals' investigation into the infringement of the asserted claims of the patents-in-suit continues, and fact depositions have not yet begun.  In addition, although Avadel has produced to Jazz Pharmaceuticals its New Drug Application ("NDA") No. 214755 ("Avadel's NDA"), Avadel has yet to produce any additional documents relating to the development and testing of its proposed sodium oxybate product as described in Avadel's NDA ("Avadel's NDA Product").  Jazz Pharmaceuticals does not yet have access to samples of Avadel's NDA Product.  Jazz Pharmaceuticals contends that testing of Avadel's NDA Product, as well as potential testimony from Avadel and others, will show that Avadel's NDA Product meets certain limitations related to the asserted claims of the patents-in-suit.  Further, claim-construction exchanges and briefing have not yet begun, and the Court has not yet construed the claims of the patents-in-suit.  Jazz Pharmaceuticals therefore reserves all rights to modify or supplement these contentions where appropriate as discovery in this case progresses and after the Court construes the asserted claims.  Jazz Pharmaceuticals further reserves the right to assert additional or alternative claims.  In the event that a claim limitation is deemed to be missing under a literal infringement analysis (*e.g.*, due to claim construction), Jazz Pharmaceuticals also reserves the right to demonstrate the presence of a substantial equivalent of such limitation and to pursue infringement under the doctrine of equivalents.  Accordingly, Jazz Pharmaceuticals reserves the right to amend these contentions where appropriate, as discovery in this case continues and/or in light of Avadel's claim-construction contentions, Avadel's non-infringement positions and/or invalidity contentions, and/or this Court's claim constructions.

These claim charts are made pursuant to Federal Rule of Evidence 502 and the Protective Order in this case.  To the extent that they contain any information that may be protected from discovery under the attorney-client privilege, the work-product doctrine, the common-interest privilege, or any other applicable privilege or immunity, such disclosure is inadvertent and does not constitute a waiver of any such privilege or immunity.

The claim charts set forth below are based solely on Jazz Pharmaceuticals' current knowledge and belief, as based on the information concerning Avadel's NDA Product that is currently available to Jazz Pharmaceuticals given the limited discovery that has occurred to date in this action.

As described herein, Avadel's NDA Product literally or the by doctrine of equivalents infringes each of the asserted claims of the patents-in-suit.

## II.    Avadel's NDA Product will infringe the asserted claims of United States Patent No. 10,758,488

As set forth in the claim chart below, Avadel's filing of Avadel's NDA constitutes infringement of ████████ of the '488 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of ████████ of the '488 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

| '488 Patent | Avadel's NDA Product |
|---|---|
| 1. A formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, wherein: | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

Avadel's proposed package insert states that Avadel's NDA Product  "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also* AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654. |
| a. the sustained release portion comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

- 27 -

| '488 Patent | Avadel's NDA Product |
|---|---|
| | The active pharmaceutical ingredient in Avadel's NDA Product is sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  *See* AVDL_00044220-260; AVDL_00044788; AVDL_00045633. |

| '488 Patent | Avadel's NDA Product |
|---|---|
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate, a pharmaceutically acceptable salt of GHB.  AVDL_00044788; AVDL_00045647; AVDL_00012142. |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  | ████████████████████████████ |
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████<br><br>████████████████████████████<br><br>████████████████████████████<br><br>████████████████████████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | ████████████████████████████████████████ |
| | ████████████████████████████████████████ |
| | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| b. the immediate release portion comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '488 Patent | Avadel's NDA Product |
|---|---|
| selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, | ███████████████████████<br><br>███████████████████████ |
| and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of the gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>███████████████████████<br><br>███████████████████████ |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>███████████████████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |

| '488 Patent | Avadel's NDA Product |
|---|---|



| '488 Patent | Avadel's NDA Product |
|---|---|



| '488 Patent | Avadel's NDA Product |
|---|---|



| '488 Patent | Avadel's NDA Product |
|---|---|
|  | |

| '488 Patent | Avadel's NDA Product |
|---|---|



| '488 Patent | Avadel's NDA Product |
|---|---|



| '488 Patent | Avadel's NDA Product |
|---|---|
| █████████████████████████████████ | ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████ |
| 6. The formulation of claim 1 | *See* claim 1. |
| comprising a calcium, lithium, potassium, sodium or magnesium salt of gammahydroxybutyrate or mixtures thereof. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478. |
|  |  |
| 7. The formulation of claim 6 | *See* claim 6. |

| '488 Patent | Avadel's NDA Product |
|---|---|
| comprising a sodium salt of gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.

Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)."  AVDL_00052478. |
|  |  |

| '488 Patent | Avadel's NDA Product |
|---|---|
| ██████████████████████████████████████ | ██████████████████████████████████████ |
| | |
| 10. An oral dosage form comprising | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is in an oral dosage form.<br><br>████████████████████████████████████████<br><br>Avadel's proposed package insert states that its NDA Product is to be taken "orally." AVDL_00052478. |
| the formulation of claim 1 | *See* claim 1. |
| | |
| ████████████████████████████████████████ | ████████████████████████████████████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|



| '488 Patent | Avadel's NDA Product |
|---|---|



| '488 Patent | Avadel's NDA Product |
|---|---|
| | |
| 12. A formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions: | Avadel's NDA Product will literally meet this limitation. This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's proposed package insert states that Avadel's NDA Product "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also* AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654. |
| a. wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate, a pharmaceutically acceptable salt of GHB.  AVDL_00044788; AVDL_00045647; AVDL_00012142. |
| b. wherein the sustained release portion comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '488 Patent | Avadel's NDA Product |
|---|---|
| selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient, | The active pharmaceutical ingredient in Avadel's NDA Product is sodium oxybate, a pharmaceutically acceptable salt of GHB.  *See* AVDL_00044220-260; AVDL_00044788; AVDL_00045633. |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  | ███████████████████████████████ ███████████████████████ |
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>███████████████████████████████<br><br>███████████████████████████████ |
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>███████████████████████████████<br><br>███████████████████████████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | ██████████████████████████████████████ |
| | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '488 Patent | Avadel's NDA Product |
|---|---|
| water at a temperature of 37° C. and a paddle speed of 50 rpm; and | |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | ████████████████████████████████████████<br><br>████████████████████████████<br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>██████████████████████████████████████████<br><br>██████████████████████████████████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | <br><br><br><br><br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |

III.    **Avadel's NDA Product will infringe the asserted claims of United States Patent No. . 10,813,885**

As set forth in the claim chart below, Avadel's filing of Avadel's NDA constitutes infringement of ████████ of the '885 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of ████████ of the '885 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

| '885 Patent | Avadel's NDA Product |
|---|---|
| 1. A formulation comprising a sustained release portion comprising about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxy-butyrate and pharmaceutically acceptable salts of gammahydroxybutyrate, | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████████████<br>████████████████████████████████████████<br>████████████████████████████<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>████████████████████████████████████████<br>████████████████████████████████████████<br>███████ |
| wherein:  the sustained release portion comprises a functional coating and a core, the functional coating is deposited over the core; the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████████████<br>████████████████████████████████████████<br>████████████████████████████████ |

| '885 Patent | Avadel's NDA Product |
|---|---|
| | The active pharmaceutical ingredient in Avadel's NDA Product is sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  *See* AVDL_00044220-260; AVDL_00044788; AVDL_00045633. |

| '885 Patent | Avadel's NDA Product |
|---|---|
| the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; and | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '885 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '885 Patent | Avadel's NDA Product |
|---|---|
| | ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ <br><br> Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| | |

██████████████████████████████████████████████████████████

| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '885 Patent | Avadel's NDA Product |
|---|---|
| | |

| '885 Patent | Avadel's NDA Product |
|---|---|
| | |
| 5. The formulation of claim 1, | *See* claim 1. |

| '885 Patent | Avadel's NDA Product |
|---|---|
| comprising a calcium, lithium, potassium, sodium or magnesium salt of gammahydroxybutyrate or mixtures thereof. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478. |
| | |
| 6. The formulation of claim 5, | *See* claim 5. |
| comprising a sodium salt of gamma-hydroxybutyrate | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478. |
| | |

| '885 Patent | Avadel's NDA Product |
|---|---|
| ████████████████ | ████████████████ |
| 8. The formulation of claim 1, | *See* claim 1. |
| further comprising an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gammahydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.  Avadel's NDA Product contains an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gammahydroxybutyrate.  *See* AVDL_00044220-260; AVDL_00044786-791; AVDL_00012133-291. |
|  |  |
| 9. The formulation of claim 8, | *See* claim 8. |
| wherein the immediate release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma- | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '885 Patent | Avadel's NDA Product |
|---|---|
| hydroxybutyrate or mixtures thereof. | The immediate release portion of Avadel's NDA Product contains a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof.  *See* AVDL_00044220-260; AVDL_00044786-791; AVDL_00012133-291. |
|  |  |
| 10. The formulation of claim 9, | *See* claim 9. |
| wherein the immediate release portion comprises a sodium salt of gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

The immediate release portion of Avadel's NDA Product contains a sodium salt of gamma-hydroxybutyrate.  *See* AVDL_00044220-260; AVDL_00044786-791; AVDL_00012133-291. |
|  |  |
| 11. The formulation of claim 8, | *See* claim 8. |
| wherein the immediate release portion is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

The immediate release portion of Avadel's NDA Product is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension.  *See* AVDL_00044220-260; AVDL_00044786-791; AVDL_00012133-291. |
|  |  |
| 12. The formulation of claim 8, | *See* claim 8. |

| '885 Patent | Avadel's NDA Product |
| --- | --- |
| | |

| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
| --- | --- |



**IV.    Avadel's NDA Product will infringe the asserted claims of United States Patent No. 10,959,956**

As set forth in the claim chart below, Avadel's filing of Avadel's NDA constitutes infringement of ███████████████ of the '956 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of ███████████████ of the '956 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

| '956 Patent | Avadel's NDA Product |
|---|---|
| 1. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611.<br><br>Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy."  AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| comprising delivering to the patient a formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502 |

| '956 Patent | Avadel's NDA Product |
|---|---|
| pharmaceutically acceptable salts of gamma-hydroxybutyrate, | ███████████████████████████████<br><br>Avadel's proposed package insert states that Avadel's NDA Product "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also* AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654.<br><br>████████████████████████████ |
| wherein:  a. the sustained release portion comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>█████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
| pharmaceutically acceptable salts of gamma-hydroxybutyrate | The active pharmaceutical ingredient in Avadel's NDA Product is sodium oxybate.  *See* AVDL_00044220-260; AVDL_00044788; AVDL_00045633. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gammahydroxybutyrate; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g.  AVDL_00044788; AVDL_00045647; AVDL_00012142. |

- 87 -

| '956 Patent | Avadel's NDA Product |
|---|---|
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|
| | <br><br><br><br><br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| b. the immediate release portion comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of the total gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| of 37° C. and a paddle speed of 50 rpm; and | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████<br><br>████████████████<br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| of 37° C. and a paddle speed of 50 rpm. | |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ██████████████████████████████████████████████<br><br>██████████████████████████████<br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| ███████████████████████████████████████████████████████████████████████████████████████████████████████ | |

| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|
| ███████████████████ | ███████████████████ |
| 6. The method of claim 1 | *See* claim 1. |
| wherein the formulation comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478. |
|  |  |
| 7. The method of claim 6 | *See* claim 6. |
| wherein the formulation comprises a sodium salt of gamma-hydroxybutyrate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478. |
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|
| | |
| 11. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611.  Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | narcolepsy." AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| comprising delivering to the patient a formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions: | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502<br><br>████████████████████████████████████████<br><br>Avadel's proposed package insert states that Avadel's NDA Product "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also* AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654.<br><br>████████████████████████████████████████<br><br>████████████████████████████████████████ |

- 107 -

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ████████████████████████████████████████ ████████ |
| a. wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. ████████████████████████████████████████ Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate. AVDL_00044788; AVDL_00045647; AVDL_00012142. ████████████████████████████████████████ |
| b. wherein the sustained release portion comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gammahydroxybutyrate and a functional coating deposited over a | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. ████████████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
| core comprising the at least one pharmaceutically active ingredient, | Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00044788; AVDL_00045647; AVDL_00012142. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ███████████████████████████████████████████████████████████████████████ |
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.  ███████████████████████████████████████████████████████████████████████ |
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.  ███████████████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | <br><br><br><br><br><br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 3 7° C. and a paddle speed of 50 rpm; and | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
|  |  |
| 12. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611.  Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy."  AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| comprising delivering to the patient a formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, wherein: | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502.<br><br>█████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | Avadel's proposed package insert states that Avadel's NDA Product "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also* AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654. |
| a. the sustained release portion comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ |
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. ████████████████████████████████████████ ████████████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | ████████████████████████████████████████ |
| the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████████████<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g sodium oxybate, a pharmaceutically acceptable salt of GHB.  AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>████████████████████████████████████████ |
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| b. the immediate release portion further comprises one or more pharmaceutically acceptable excipients selected from the group consisting of copovidone, plasacryl, hydroxypropyl cellulose, hydroxypropyl methylcellulose and hydroxymethyl cellulose, and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of total gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | <br><br><br><br><br><br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ██████████████████████████ <br><br> Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| | |
| ████████████████████ | ████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|
| 17. The method of claim 12, | *See* claim 12. |
| wherein the formulation comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof. | The use of Avadel's NDA Product will literally meet this limitation. This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate. AVDL_00012168; see also AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478. |
|  |  |
| 18. The method of claim 17, | *See* claim 17. |
| wherein the formulation comprises a sodium salt of gamma-hydroxybutyrate. | The use of Avadel's NDA Product will literally meet this limitation. This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate. AVDL_00012168; see also AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478. |

| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|-------------|----------------------|



| '956 Patent | Avadel's NDA Product |
|---|---|
| ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ | |
| | |
| 25. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493.

Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611. Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with |

- 137 -

███████████████████████████████████████████

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | narcolepsy."  AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| comprising delivering to the patient a formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions: | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502<br><br>██████████████████████████████████<br><br>Avadel's proposed package insert states that Avadel's NDA Product  "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also* AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654.<br><br>██████████████████████████████████ |

██████████████████████

| '956 Patent | Avadel's NDA Product |
|---|---|
| a. wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and about 10% by weight of one or more pharmaceutically acceptable excipients selected from the group consisting of copovidone, plasacryl, hydroxypropyl cellulose, hydroxypropyl methylcellulose and hydroxymethyl cellulose; | The use of Avadel's NDA Product will literally, or by the doctrine of equivalents, meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| wherein the sustained release portion comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gammahydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient, | The use of Avadel's NDA Product will literally meet this limitation. This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>███████████████████████████████████████████<br>███████████████████████████████████████████<br>████████████████████████████<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate, a pharmaceutically acceptable salt of GHB. AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>███████████████████████████████████████████<br>███████████████████████████████████████████<br>████████<br><br>███████████████████████████████████████████<br>███████████████████████████████████████████<br>████████████████<br><br>███████████████████████████████████████████<br>███████████████████████████████████████████ |

██████████████████████████

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ███████████████████████████████████████████ <br> ███████████████████████████████████████████████ <br> ███████████████████████████████████████████████ |
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. <br> ███████████████████████████████████████████ <br> ███████████████████████████████████████████████ |
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ████████████████████████████████████████████████████<br>████████████<br><br>████████████████████████<br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████████████████<br><br>████████████████████████████████████████ |

- 143 -

████████████████████

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ███████████████████████████<br><br><br><br><br><br><br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | The use of Avadel's NDA Product will literally meet this limitation. This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>███████████████████████████<br><br>███████████████████████████<br><br>███████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |

**V.      Avadel's NDA Product will infringe the asserted claims of United States Patent No. 10,966,931**

As set forth in the claim chart below, Avadel's filing of Avadel's NDA constitutes infringement of ████████ of the '931 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of ████████ of the '931 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

| '931 Patent | Avadel's NDA Product |
|---|---|
| 1. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611.  Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy."  AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| comprising delivering to the patient a formulation comprising a sustained release portion comprising about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502 |

| '931 Patent | Avadel's NDA Product |
|---|---|
| pharmaceutically acceptable salts of gamma-hydroxybutyrate, | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g.  AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| wherein:  the sustained release portion comprises a functional coating and a core, the functional coating is deposited over the core; the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

| '931 Patent | Avadel's NDA Product |
|---|---|
| salts of gamma-hydroxybutyrate; | The active pharmaceutical ingredient in Avadel's NDA Product is sodium oxybate.  *See* AVDL_00044220-260; AVDL_00044788; AVDL_00045633. |

| '931 Patent | Avadel's NDA Product |
|---|---|
| the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; and | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37°C. and a paddle speed of 50 rpm. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '931 Patent | Avadel's NDA Product |
|---|---|
| | |

| '931 Patent | Avadel's NDA Product |
|---|---|
| | ███████████████████████████<br><br>███████████████████████████<br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| | |
| 2. The method of claim 1, | *See* claim 1. |

| '931 Patent | Avadel's NDA Product |
|---|---|
| wherein the sustained release portion releases about 60% to about 90% of its gamma-hydroxybutyrate by about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37°C. and a paddle speed of 50 rpm. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '931 Patent | Avadel's NDA Product |
|---|---|
| | ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product |

| '931 Patent | Avadel's NDA Product |
|---|---|
| | releases about 60% to about 90% of its gamma-hydroxybutyrate by about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| | |

| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|
|  |  |
| 5. The method of claim 1, | *See* claim 1. |

| '931 Patent | Avadel's NDA Product |
|---|---|
| wherein the sustained release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478. |
|  |  |
| 6. The method of claim 5, | *See* claim 5. |
| wherein the sustained release portion comprises a sodium salt of gamma-hydroxybutyrate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478. |
|  |  |

| '931 Patent | Avadel's NDA Product |
|---|---|
| ███████████████████████ | ███████████████████████████████████████████████████ |
| 8. The method of claim 1, | *See* claim 1. |
| wherein the formulation further comprises an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product contains an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate.  *See* AVDL_0044220-260; AVDL_00044786-791.<br><br>████████████████████████████████████████ |
|  |  |
| 9. The method of claim 8, | *See* claim 8. |

| '931 Patent | Avadel's NDA Product |
|---|---|
| wherein the immediate release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)."  AVDL_00052478. |
|  |  |
| 10. The method of claim 9, | *See* claim 9. |
| wherein the immediate release portion comprises a sodium salt of gamma-hydroxybutyrate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)."  AVDL_00052478. |
|  |  |

| '931 Patent | Avadel's NDA Product |
|---|---|
| 11. The method of claim 8, | *See* claim 8. |
| wherein the immediate release portion is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

The immediate release portion of Avadel's NDA Product is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension.  *See* AVDL_00044220-260; AVDL_00044786-791; AVDL_00012133-291. |
|  |  |

| '931 Patent | Avadel's NDA Product |
| --- | --- |
| | |

| '931 Patent | Avadel's NDA Product |
|---|---|
| | |

| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
| --- | --- |
|  |  |

| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|
|  |  |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 7, 2021, copies of the foregoing were caused to be served

upon the following in the manner indicated:

Daniel M. Silver, Esquire                                    *VIA ELECTRONIC MAIL*
Alexandra M. Joyce, Esquire
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801
*Attorneys for Defendants*

Kenneth G. Schuler, Esquire                                  *VIA ELECTRONIC MAIL*
Marc N. Zubick, Esquire
Alex Grabowski, Esquire
Sarah W. Wang, Esquire
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
*Attorneys for Defendants*

Herman Yue, Esquire                                          *VIA ELECTRONIC MAIL*
Bornali Rashmi Borah, Esquire
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY  10020
*Attorneys for Defendants*

Daralyn J. Durie, Esquire                                    *VIA ELECTRONIC MAIL*
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111
*Attorneys for Defendants*

Kira A. Davis, Esquire                                       *VIA ELECTRONIC MAIL*
Katherine E. McNutt, Esquire
DURIE TANGRI LLP
953 East 3rdStreet
Los Angeles, CA  90013
*Attorneys for Defendants*

                                                  */s/ Jeremy A. Tigan*

                                                  _____
                                                  Jeremy A. Tigan (#5239)

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-691 (MN) |
| | ) | |
| AVADEL CNS PHARMACEUTICALS LLC, | ) | ███████████████████ |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC. and | ) | |
| JAZZ PHARMACEUTICALS IRELAND | ) | |
| LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 21-1138 (MN) |
| v. | ) | |
| | ) | |
| AVADEL CNS PHARMACEUTICALS LLC, | ) | ███████████████████ |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC. and | ) | |
| JAZZ PHARMACEUTICALS IRELAND | ) | |
| LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 21-1594 (MN) |
| v. | ) | |
| | ) | |
| AVADEL CNS PHARMACEUTICALS LLC, | ) | ███████████████████ |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' FINAL INFRINGEMENT CONTENTIONS**

Pursuant to the Court's December 21, 2021 Scheduling Order (D.I. 72 in C.A. No. 21-691; D.I. 29 in C.A. No. 21-1138; D.I. 16 in C.A. No. 21-1594), and the Court's April 19, 2022 Order, Plaintiffs Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (together, "Jazz Pharmaceuticals") hereby provide to Defendant Avadel CNS Pharmaceuticals, LLC ("Avadel") their Final Infringement Contentions for the asserted claims of U.S. Patent Nos. 8,731,963 ("the '963 patent"), 10,758,488 ("the '488 patent"), 10,813,885 ("the '885 patent"), 10,959,956 ("the '956 patent"), 10,966,931 ("the '931 patent"), 11,077,079 ("the '079 patent"), and 11,147,782 ("the '782 patent") (collectively, "the patents-in-suit").

Jazz Pharmaceuticals has prepared these contentions based on information and discovery currently available to it. Fact discovery remains open and expert discovery has not yet begun in this case. Further, Jazz Pharmaceuticals' investigation into the infringement of the asserted claims of the patents-in-suit continues, and fact depositions have not yet begun. In addition, although Avadel has produced to Jazz Pharmaceuticals its New Drug Application ("NDA") No. 214755 ("Avadel's NDA"), Avadel has yet to produce all additional documents relating to the development and testing of its proposed sodium oxybate product as described in Avadel's NDA ("Avadel's NDA Product" or "FT218"). Further, claim-construction briefing has not yet begun, and the Court has not yet construed the claims of the patents-in-suit. Jazz Pharmaceuticals therefore reserves all rights to modify or supplement these contentions where appropriate as discovery in this case progresses and after the Court construes the asserted claims. Jazz Pharmaceuticals further reserves the right to assert additional or alternative claims. In the event that a claim limitation is deemed to be missing under a literal infringement analysis (*e.g.*, due to claim construction), Jazz Pharmaceuticals also reserves the right to demonstrate the presence of a substantial equivalent of such limitation and to pursue infringement under the doctrine of equivalents. Accordingly, Jazz Pharmaceuticals reserves the right to amend these contentions where appropriate, as discovery in this case continues and/or in light of Avadel's claim-construction contentions, Avadel's non-infringement positions and/or invalidity contentions, and/or this Court's claim constructions.

These contentions are made pursuant to Federal Rule of Evidence 502 and the Protective Order in this case. To the extent that they contain any information that may be protected from discovery under the attorney-client privilege, the work-product doctrine, the common-interest privilege, or any other applicable privilege or immunity, such disclosure is inadvertent and does not constitute a waiver of any such privilege or immunity.

The contentions set forth below are based solely on Jazz Pharmaceuticals' current knowledge and belief, as based on the information concerning Avadel's NDA Product that is currently available to Jazz Pharmaceuticals.

As described herein, Avadel's NDA Product literally or the by doctrine of equivalents infringes each of the asserted claims of the patents-in-suit.

## II.     Avadel's NDA Product will infringe the asserted claims of United States Patent No. 10,758,488

As set forth in the claim chart in Section II(B) below, Avadel's filing of Avadel's NDA constitutes infringement of ████████ of the '488 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of ████████ of the '488 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

### A.     Avadel's Non-Infringement Arguments Lack Merit[7]

#### 1.     "Sustained Release Portion"

##### (a)     Avadel Infringes Even Under its Proposed Construction

Avadel contends in its Final Non-Infringement Contentions that "Jazz cannot meet its burden of establishing that FT218 has a 'sustained release' portion under Avadel's proposed construction."  Avadel 4-1-22 Contentions at 7.  The parties' constructions are set forth below.

| Disputed Term | Avadel Construction | Jazz Construction |
|---|---|---|
| "sustained release" (Avadel)<br><br>"sustained release portion" (Jazz) | a gradual, extended release, as opposed to releasing a majority of the drug within an | Plain and ordinary meaning, i.e., the portion of the formulation that is not |

---

[7]     In its Final Non-Infringement Contentions, Avadel collectively refers to the '488 patent, the '885 patent, the '956 patent, and the '931 patent as the "Sustained Release Patents." Avadel does not assert any non-infringement positions against these patents *individually*, but instead offers purported rationales as to why its NDA Product (referred to as "FT218" in the Final Non-Infringement Contentions) does not infringe the Sustained Release Patents *collectively*.  Although Jazz Pharmaceuticals responds to Avadel's non-infringement contentions for the Sustained Release Patents in the context of the '488 patent, Jazz's contentions apply equally to each of the other "Sustained Release Patents," and Jazz incorporates the foregoing into each of Sections III-V below.

| | hour upon exposure to intestinal pH | immediate release and that releases over a period of time |
|---|---|---|

As an initial matter, and as will be set forth more fully in Jazz Pharmaceutical's Opening *Markman* Brief (due to be filed on May 27, 2022), Avadel's proposed construction seeks to read a limitation into the plain and ordinary meaning of "sustained release portion" that is not supported by the language of the claims, the patent specification, its prosecution history, or the extrinsic record. Avadel nonetheless argues that its NDA Product "contains a delayed release portion," and that alleged "statements made by Jazz to distinguish the prior art during prosecution of the '488 Patent confirm that a delayed release portion is distinct from, and cannot qualify as, the claimed 'sustained release' portion." Avadel 4-1-22 Contentions at 8. No statement made during prosecution of the '488 patent disavowed claim scope or warrants reading a limitation into the plain and ordinary meaning of "sustained release portion." Moreover, during prosecution of the '488 patent, the applicants made clear that the sustained release portion of the claimed formulations is the portion of the formulation that is not immediate release and that instead releases over a period of time; the period of time was not specified. *See* '488 Patent Application File History, 03-06-20 Response to Office Action at 8-9 ("Sustained release formulations . . . provide for a more gradual, but extended release of the drug over a period of time. Such a formulation could start releasing the drug shortly after dosing, or there could be a lag before the drug starts to release."); *see also id.*, 03-05-20 Allphin Declaration at ¶ 10 (explaining that the claimed formulations exhibit "sustained release over a period of time"). Accordingly, the Court should evaluate whether Avadel's NDA Product comprises an infringing "sustained release portion" under Jazz Pharmaceutical's proposed construction.

But even if the Court were to adopt Avadel's proposed construction, Avadel's non-infringement contention based thereupon still fails.





- 45 -









**B.** **Avadel's NDA Product Will Infringe Each Asserted Claim of the '488 Patent**

As set forth in the chart below, each element of each asserted claim will be met by Avadel's NDA Product.

| '488 Patent | Avadel's NDA Product |
|---|---|
| 1. A formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, wherein: | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's proposed package insert states that Avadel's NDA Product "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also* AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270890-911. |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  | ████████████████████████████████ |
| a. the sustained release portion comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. ███████████████████████████████████████████████████████████████ The active pharmaceutical ingredient in Avadel's NDA Product is sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  *See* AVDL_00044220-260; AVDL_00044788; AVDL_00045633. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  | ██████████████████████ |
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. ██████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|
| the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate, a pharmaceutically acceptable salt of GHB.  AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>████████████████████████████████ |
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | <br><br><br><br><br><br><br><br><br><br><br><br><br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |

| '488 Patent | Avadel's NDA Product |
|---|---|
| b. the immediate release portion comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of the gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '488 Patent | Avadel's NDA Product |
|---|---|
| of 37° C. and a paddle speed of 50 rpm; | |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  | ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████ <br><br> ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ <br><br> Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. <br><br> ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |

| '488 Patent | Avadel's NDA Product |
|---|---|



| '488 Patent | Avadel's NDA Product |
|---|---|
| | |

| '488 Patent | Avadel's NDA Product |
| --- | --- |



| '488 Patent | Avadel's NDA Product |
|---|---|



| '488 Patent | Avadel's NDA Product |
|---|---|



| '488 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | |
| 6. The formulation of claim 1 | *See* claim 1. |
| comprising a calcium, lithium, potassium, sodium or magnesium salt of gammahydroxybutyrate or mixtures thereof. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260. |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478; AVDL_01270891. |
| | |
| 7. The formulation of claim 6 | *See* claim 6. |
| comprising a sodium salt of gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478; AVDL_01270891. |
| | |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ |
| | |
| 10. An oral dosage form comprising | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is in an oral dosage form.<br><br>████████████████████████████████████████████████<br><br>Avadel's proposed package insert states that its NDA Product is to be taken "orally." AVDL_00052478; AVDL_01270891. |

| '488 Patent | Avadel's NDA Product |
|---|---|
| the formulation of claim 1 | *See* claim 1. |
|  |  |



| '488 Patent | Avadel's NDA Product |
|---|---|



| '488 Patent | Avadel's NDA Product |
|---|---|
| | |
| | |
| 12. A formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions: | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

Avadel's proposed package insert states that Avadel's NDA Product "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also*

| '488 Patent | Avadel's NDA Product |
|---|---|
| | AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270903-04. |
| a. wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  | Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate, a pharmaceutically acceptable salt of GHB.  AVDL_00044788; AVDL_00045647; AVDL_00012142. <br><br> ██████████████████████████████████ |
| b. wherein the sustained release portion comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient, | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. <br><br> ██████████████████████████████████ <br><br> The active pharmaceutical ingredient in Avadel's NDA Product is sodium oxybate, a pharmaceutically acceptable salt of GHB.  *See* AVDL_00044220-260; AVDL_00044788; AVDL_00045633. <br><br> ██████████████████████████████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  | ███████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ |
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. ███████████████████████████████████████████████████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | ███████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████. |
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | ███████████████████████████████████████████<br>███████████████████████████████████<br><br>█████████████████████████████<br>█████████████████████████████<br>█████████████████████████████<br>█████████████████████████████<br>█████████████████████████████<br>█████████████████████████████<br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>███████████████████████████████████████<br>███████████████████████████████████████<br><br>███████████████████████████████████████<br>███████████████████████████████████████ |

| '488 Patent | Avadel's NDA Product |
| --- | --- |
| | |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  | ████████████████████████<br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████ |

| '488 Patent | Avadel's NDA Product |
|---|---|
| | |

| '488 Patent | Avadel's NDA Product |
|---|---|
|  | <br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |

### III.   Avadel's NDA Product will infringe the asserted claims of United States Patent No. 10,813,885

As set forth in the claim chart below, Avadel's filing of Avadel's NDA constitutes infringement of ███████ of the '885 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of ███████ of the '885 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

As set forth above, Avadel's Final Non-Infringement Contentions for the '488 patent appear to apply to the '885 patent.  Jazz Pharmaceuticals therefore incorporates its response to Avadel's Final Infringement Contentions (set forth in § II(A) above) herein.

| '885 Patent | Avadel's NDA Product |
|---|---|
| 1. A formulation comprising a sustained release portion comprising about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxy-butyrate and pharmaceutically acceptable salts of gammahydroxybutyrate, | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>████████████████████████████████<br><br>████████████████████████████████ |

| '885 Patent | Avadel's NDA Product |
|---|---|
| wherein:  the sustained release portion comprises a functional coating and a core, the functional coating is deposited over the core; the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The active pharmaceutical ingredient in Avadel's NDA Product is sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  *See* AVDL_00044220-260; AVDL_00044788; AVDL_00045633. |

| '885 Patent | Avadel's NDA Product |
|---|---|
| | ███████████████████████████████ ███████████████████████████████ ███████████████████████████ <br><br> ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ |
| the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; and | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. <br><br> ███████████████████████████████ ███████████████████████████████ <br><br> ███████████████████████████████ ███████████████████████████████ |
| the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '885 Patent | Avadel's NDA Product |
|---|---|
| in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | |

| '885 Patent | Avadel's NDA Product |
|---|---|
| | |

| '885 Patent | Avadel's NDA Product |
|---|---|
|  | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
|  |  |

| '885 Patent | Avadel's NDA Product |
|---|---|
|  | |

| '885 Patent | Avadel's NDA Product |
|---|---|


| '885 Patent | Avadel's NDA Product |
|---|---|
| | |

| '885 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '885 Patent | Avadel's NDA Product |
|---|---|
| | |
| 5. The formulation of claim 1, | *See* claim 1. |

| '885 Patent | Avadel's NDA Product |
|---|---|
| comprising a calcium, lithium, potassium, sodium or magnesium salt of gammahydroxybutyrate or mixtures thereof. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478; AVDL_01270891. |
|  |  |
| 6. The formulation of claim 5, | *See* claim 5. |
| comprising a sodium salt of gamma-hydroxybutyrate | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478; AVDL_01270891. |
|  |  |

| '885 Patent | Avadel's NDA Product |
|---|---|
| ███████████████████ | ███████████████████ |
| 8. The formulation of claim 1, | *See* claim 1. |
| further comprising an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gammahydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product contains an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gammahydroxybutyrate.  *See* AVDL_00044220-260; AVDL_00044786-791; AVDL_00012133-291. |
|  |  |
| 9. The formulation of claim 8, | *See* claim 8. |
| wherein the immediate release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma- | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '885 Patent | Avadel's NDA Product |
|---|---|
| hydroxybutyrate or mixtures thereof. | The immediate release portion of Avadel's NDA Product contains a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof.  *See* AVDL_00044220-260; AVDL_00044786-791; AVDL_00012133-291. |
| | |
| 10. The formulation of claim 9, | *See* claim 9. |
| wherein the immediate release portion comprises a sodium salt of gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The immediate release portion of Avadel's NDA Product contains a sodium salt of gamma-hydroxybutyrate.  *See* AVDL_00044220-260; AVDL_00044786-791; AVDL_00012133-291. |
| | |
| 11. The formulation of claim 8, | *See* claim 8. |
| wherein the immediate release portion is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The immediate release portion of Avadel's NDA Product is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension.  *See* AVDL_00044220-260; AVDL_00044786-791; AVDL_00012133-291. |
| | |

| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '885 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|



| '885 Patent | Avadel's NDA Product |
|---|---|
| | |

IV.     **Avadel's NDA Product will infringe the asserted claims of United States Patent No. 10,959,956**

As set forth in the claim chart below, Avadel's filing of Avadel's NDA constitutes infringement of ▮▮▮▮▮▮▮▮▮ of the '956 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of ▮▮▮▮▮▮▮▮ of the '956 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

As set forth above, Avadel's Final Non-Infringement Contentions for the '488 patent appear to apply to the '956 patent.  Jazz Pharmaceuticals therefore incorporates its response to Avadel's Final Infringement Contentions (set forth in § II(A) above) herein.

| '956 Patent | Avadel's NDA Product |
|---|---|
| 1. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_01270890-911.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_01270890-911; AVDL_00045591-5611.<br><br>Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy."  AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_01270890-91.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| comprising delivering to the patient a formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, | Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502; AVDL_01270890-911.<br><br>█████████████████████████████████<br>█████████████████████████████████<br>█████████████████████████████████<br><br>Avadel's proposed package insert states that Avadel's NDA Product "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also* AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270903-04.<br><br>█████████████████████████████████<br><br>█████████████████████████████████<br><br>█████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | ████████████████████████████████████████ |
| wherein:  a. the sustained release portion comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. <br><br> ████████████████████████████████████████ <br><br> The active pharmaceutical ingredient in Avadel's NDA Product is sodium oxybate.  *See* AVDL_00044220-260; AVDL_00044788; AVDL_00045633. <br><br> ████████████████████████████████████████ <br><br> ████████████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | ███████████████████████ <br><br> ██████████████████████████████ ██████████████████████████████ ██████████████████████████████ ██████████████████████████████ <br><br> ██████████████████████████████ ██████████████████████████████ ██████████████████████████████ |
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. <br><br> ██████████████████████████ <br><br> ██████████████████████████ |

████████████████

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ██████████████████████████████ |
| the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gammahydroxybutyrate; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. ███████████████████████████████████████████ Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g.  AVDL_00044788; AVDL_00045647; AVDL_00012142. ███████████████████████████████████████████ |
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. ███████████████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | ███████████████████████ |
|  | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| b. the immediate release portion comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of the total gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ████████████████████████████████████████████████████████ |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | <br><br><br><br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| | |
| 2. The method of claim 1, | *See* claim 1. |
| wherein the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 7 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37°C. and a paddle speed of 50 rpm. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | <br><br><br><br><br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 7 hours when tested in a dissolution apparatus 2 when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| | |

| '956 Patent | Avadel's NDA Product |
| --- | --- |



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|
| ████████████████████████ | ████████████████████████ |
| | |
| 6. The method of claim 1 | *See* claim 1. |
| wherein the formulation comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.

Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478; AVDL_01270891. |
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|
| 7. The method of claim 6 | *See* claim 6. |
| wherein the formulation comprises a sodium salt of gamma-hydroxybutyrate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478; AVDL_01270891. |

| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|
| ⬛ | ⬛ |
|  |  |
| 11. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_01270890-91.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_01270890-911.  Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | sleepiness (EDS) in adults with narcolepsy." ███████████████████████████ ████████████████████████ ██████████████████████████████████████ ██████████████████████████████ |
| comprising delivering to the patient a formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions: | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502; AVDL_01270890-911.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Avadel's proposed package insert states that Avadel's NDA Product  "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also* AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270903-04.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ██████████████████████████████<br>██████████████████████████████<br>██████████████<br><br>██████████████████████████████<br>██████████████████████████████<br>██████████████████████████████<br>██████████████████████████████<br>██████████████████████████████<br>██████████████████████████████ |
| a. wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>██████████████████████████████<br>██████████████████████████████<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate. AVDL_00044788; AVDL_00045647; AVDL_00012142. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ██████████████████████████████████████████████████████████████████████████████████████████████████ |
| b. wherein the sustained release portion comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gammahydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient, | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████████████████████████████████████████████████████<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>████████████████████████████████████████████████████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|
| |  Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 3 7° C. and a paddle speed of 50 rpm; and | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.  |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|
| |  |
| | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| | |
| 12. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_01270890-91.

Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_01270890-911.  Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | sleepiness (EDS) in adults with narcolepsy."  AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_01270890-91.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| comprising delivering to the patient a formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, wherein: | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502; AVDL_01270890-911.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502; AVDL_01270890-911.<br><br>███████████████████████████████████<br><br>Avadel's proposed package insert states that Avadel's NDA Product  "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also* AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270903-04. |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | ███████████████████████████████████<br><br>███████████████████████████████████<br><br>███████████████████████████████████ |
| a. the sustained release portion comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>███████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
| pharmaceutically acceptable salts of gamma-hydroxybutyrate; | |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ██████████████████████████████████████ |
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>██████████████████████████████████████<br><br>██████████████████████████████████████ |
| the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>██████████████████████████████████████<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g sodium oxybate, a pharmaceutically acceptable salt of GHB.  AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>██████████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ███████████████████████████████████████████████████████████████ ████ |
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| b. the immediate release portion further comprises one or more pharmaceutically acceptable excipients selected from the group | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| consisting of copovidone, plasacryl, hydroxypropyl cellulose, hydroxypropyl methylcellulose and hydroxymethyl cellulose, and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of total gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation; | |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | <br><br><br><br><br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | |



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



Case 1:21-cv-01594-GBW   Document 189-1   Filed 03/10/23   Page 269 of 746 PageID #: 4892

| '956 Patent | Avadel's NDA Product |
|---|---|



- 158 -

| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |
| 17. The method of claim 12, | *See* claim 12. |
| wherein the formulation comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; see also AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478; AVDL_01270891. |
|  |  |
| 18. The method of claim 17, | *See* claim 17. |
| wherein the formulation comprises a sodium salt of gamma-hydroxybutyrate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; see also AVDL_00044788; AVDL_00045633; AVDL_00044220-260. |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  | Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478; AVDL_01270891. |
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|



| '956 Patent | Avadel's NDA Product |
|---|---|
| ███████████████████ | ███████████████████ |
| 25. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_01270890-91.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_01270890-911.  Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy."  AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_01270890-91.  Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| comprising delivering to the patient a formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions: | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.  Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502; AVDL_01270890-911.  █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Avadel's proposed package insert states that Avadel's NDA Product  "contains a blend of immediate-release and controlled-release granules" providing various doses of sodium oxybate, which is a pharmaceutically acceptable salt of GHB.  AVDL_00052490; *see also* AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270903-04. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | |
| a. wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and about 10% by weight of one or more pharmaceutically acceptable excipients selected from the group consisting of copovidone, plasacryl, | The use of Avadel's NDA Product will literally, or by the doctrine of equivalents, meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| hydroxypropyl cellulose, hydroxypropyl methylcellulose and hydroxymethyl cellulose; | ████████████████████████████████<br>████████████████████████████████<br>████████████████████████████████<br>████████████████████████████████<br>████████████████████████████████ |
| wherein the sustained release portion comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gammahydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient, | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████<br>████████████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate, a pharmaceutically acceptable salt of GHB.  AVDL_00044788; AVDL_00045647; AVDL_00012142. |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ▮▮▮▮▮▮ <br><br> ▮▮▮▮▮▮▮▮▮ |
| wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. <br><br> ▮▮▮▮▮▮▮ <br><br> ▮▮▮▮▮▮▮. |
| and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. <br><br> ▮▮▮▮▮▮▮ |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | ███████████████████████████████████████<br>██████████████████<br><br>████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>████████████████████████████<br><br>Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| c. the formulation releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>██████████████████████████████████████████████<br>████████████████████████<br><br>██████████████████████████████████████████<br>████████████████████████ |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
| |  Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.  |

| '956 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '956 Patent | Avadel's NDA Product |
|---|---|
| | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that Avadel's NDA Product releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |

### V.   Avadel's NDA Product will infringe the asserted claims of United States Patent No. 10,966,931

As set forth in the claim chart below, Avadel's filing of Avadel's NDA constitutes infringement of ███████ of the '931 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of ████████ of the '931 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

As set forth above, Avadel's Final Non-Infringement Contentions for the '488 patent appear to apply to the '931 patent.  Jazz Pharmaceuticals therefore incorporates its response to Avadel's Final Infringement Contentions (set forth in § II(A) above) herein.

| '931 Patent | Avadel's NDA Product |
|---|---|
| 1. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_01270890-91.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_01270890-911.  Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy."  AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_01270890-91.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| comprising delivering to the patient a formulation comprising a sustained release portion comprising about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages delivering Avadel's NDA Product to patients.  *See* AVDL_00052477-502; AVDL_01270890-911. |

| '931 Patent | Avadel's NDA Product |
|---|---|
| gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, | ██████████████████████████████████████<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g.  AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>██████████████████████████████████████<br><br>██████████████████████████████████████<br><br>██████████████████████████████████████ |

| '931 Patent | Avadel's NDA Product |
|---|---|
|  | ███████████████████████████████████████████ ████████████ |
| wherein:  the sustained release portion comprises a functional coating and a core, the functional coating is deposited over the core; the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████████████████████<br>████████████████████████████████████████████████<br>████████████████████████████████████████████<br>██████████████████████████████████████<br><br>The active pharmaceutical ingredient in Avadel's NDA Product is sodium oxybate.  *See* AVDL_00044220-260; AVDL_00044788; AVDL_00045633.<br><br>████████████████████████████████████████████████<br>████████████████████████████████████████████████<br>████████████████████████████████████████████████<br>██████████████████████████<br><br>████████████████████████████████████████████████<br>████████████████████████████████████████████████<br><br>████████████████████████████████████████████████ |

████████████████████████████

| '931 Patent | Avadel's NDA Product |
|---|---|
|  | ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ |
| the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; and | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ |

| '931 Patent | Avadel's NDA Product |
|---|---|
| the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37°C. and a paddle speed of 50 rpm. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '931 Patent | Avadel's NDA Product |
|---|---|
| | |

| '931 Patent | Avadel's NDA Product |
|---|---|
| | ████████████████████████████████ |
| | Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential third parties, will show that the sustained release portion of Avadel's NDA Product releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm. |
| ████████████████████████████████████████████████████████████████ | |

| '931 Patent | Avadel's NDA Product |
|---|---|
|  | |

| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|-------------|----------------------|



| '931 Patent | Avadel's NDA Product |
|---|---|
|  |  |
| 5. The method of claim 1, | *See* claim 1. |

| '931 Patent | Avadel's NDA Product |
|---|---|
| wherein the sustained release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)."  AVDL_00052478; AVDL_01270891. |
|  |  |
| 6. The method of claim 5, | *See* claim 5. |
| wherein the sustained release portion comprises a sodium salt of gamma-hydroxybutyrate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)."  AVDL_00052478; AVDL_01270891. |
|  |  |

| '931 Patent | Avadel's NDA Product |
|---|---|
| ███████████████ | ███████████████████████████████████████ |
| 8. The method of claim 1, | *See* claim 1. |
| wherein the formulation further comprises an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product contains an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate.  *See* AVDL_0044220-260; AVDL_00044786-791.<br><br>████████████████████████████████████ |
| | |
| 9. The method of claim 8, | *See* claim 8. |

| '931 Patent | Avadel's NDA Product |
|---|---|
| wherein the immediate release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478; AVDL_01270891. |
|  |  |
| 10. The method of claim 9, | *See* claim 9. |
| wherein the immediate release portion comprises a sodium salt of gamma-hydroxybutyrate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will contain sodium oxybate, which is also known as sodium 4-hydroxybutanoate, gamma-hyroxybutyric acid sodium salt, 4-hydroxybutyric acid sodium salt, sodium gamma-hydroxybutyrate, and sodium 4-hydroxybutyrate.  AVDL_00012168; *see also* AVDL_00044788; AVDL_00045633; AVDL_00044220-260.<br><br>Avadel's proposed package insert states that the active ingredient in Avadel's NDA Product is "sodium oxybate" which "is the sodium salt of gamma-hydroxybutyrate (GHB)." AVDL_00052478; AVDL_01270891. |
|  |  |

| '931 Patent | Avadel's NDA Product |
|---|---|
| 11. The method of claim 8, | *See* claim 8. |
| wherein the immediate release portion is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension. | The use of Avadel's NDA Product will literally meet this limitation. This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

The immediate release portion of Avadel's NDA Product is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension. *See* AVDL_00044220-260; AVDL_00044786-791; AVDL_00012133-291. |
|  |  |

| '931 Patent | Avadel's NDA Product |
|-------------|----------------------|



| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|



| '931 Patent | Avadel's NDA Product |
|---|---|



**VI.     Avadel's NDA Product will infringe the asserted claims of United States Patent No. 11,077,079**

As set forth in the claim chart below, Avadel's filing of Avadel's NDA constitutes infringement of ██████████████████ of the '079 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of ██████████████ of the '079 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

**A.     Avadel's Non-Infringement Position Lacks Merit**

**1.     The Claims Are Not Limited to "Resinate Compositions"**

In its Final Non-Infringement Contentions, Avadel argues that, ██████████████████████████████████████ ██████████████████████████████████████ This contention is based upon an erroneous claim construction and therefore lacks merit.

The parties' claim constructions for the term "controlled release component" are set forth below:

| Disputed Term | Avadel Construction | Jazz Construction |
|---|---|---|
| "controlled release component" | Resinate compositions characterized by having at least one of the active components having a release over a period of at least about 2 to about 8 hours | A formulation component with an active pharmaceutical ingredient having a release over a period of at least about 2 to about 8 hours |

As will be set forth more fully in Jazz Pharmaceutical's Opening *Markman* Brief (due to be filed on May 27, 2022), Avadel's proposed construction seeks to read a limitation ("resinate compositions") into the meaning of "controlled release component," which is not supported by the language of the claims, the patent specification, its prosecution history, or the extrinsic record.





██████████████████████████████████████████████

**B.       Avadel's NDA Product Will Infringe Each Asserted Claim of the '079 Patent**

As set forth in the chart below, each element of each asserted claim will be met by Avadel's FT218 product.

| '079 Patent | Avadel's NDA Product |
|---|---|
| 1. A method of treating narcolepsy in a patient in need thereof, the method comprising: | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product will treat narcolepsy in a patient in need thereof. *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_00102530-32; AVDL_00102548-49; AVDL_01270890-91.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552; AVDL_01270890-911.<br><br>Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy."  AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_00102530-32; AVDL_00102548-49; AVDL_01270890-91. |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| administering a single daily dose to the patient, the single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.  Avadel's NDA Product will be administered in a single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552; AVDL_01270890-911.  Specifically, Avadel's proposed package insert as well as its NDA states, and instructs and encourages, that Avadel's NDA Product should be taken "as a single dose at bedtime" and is in the form of ███████████████████ AVDL_00052477; AVDL_00052479; AVDL_00102530-33; *see also* AVDL_00045594-5611; AVDL_01270890-911.  Avadel's investigator's brochure for its NDA Product also instructs and encourages administering a single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate to a patient.  AVDL_00090505-573. |
| wherein the administering comprises:  opening a sachet containing a solid oxybate formulation, mixing the formulation with water, and orally administering the mixture to the patient, | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.  ███████████████████████████████████  Avadel's NDA states that Avadel's NDA Product will include sodium oxybate contained within ██████ stick packs.  AVDL_00045665.  These stick packs are sachets. |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | ████████████████████████████████████████████████████████████████████████████████<br><br>Avadel's proposed package insert instructs and encourages users to "suspend dose in ████████████████████████████████ and that Avadel's NDA Product is to be taken "orally."  AVDL_00102530; AVDL_00102532; *see also* AVDL_00052477-79; AVDL_00052490; AVDL_00052495; AVDL_00052502; AVDL_01270890-92.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages suspending Avadel's NDA Product in water prior to dosing orally.  *See* AVDL_00090505-573. |
| wherein the oxybate formulation comprises an immediate release component and a controlled release component. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product comprises an immediate release component and a controlled release component.  *See* AVDL_00044786-791; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426; AVDL_01270890-911.<br><br>Avadel's proposed package insert states that Avadel's NDA Product contains "granules for extended-release oral suspension" providing various doses of sodium oxybate, which comprises gamma-hydroxybutyrate.  AVDL_00102550; *see also* AVDL_00052490; AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270903-04.<br><br>████████████████████████████████████████████████████████ |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | |
| | |
| 2. The method of claim 1, | *See* claim 1. |
| wherein the orally administering occurs at night. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '079 Patent | Avadel's NDA Product |
|---|---|
|  | The administration of Avadel's NDA Product is instructed to occur at night. *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552; AVDL_00090505-573; AVDL_01270890-911.<br><br>Avadel's proposed package insert instructs and encourages the use of Avadel's NDA Product at night.  AVDL_00052477-79; AVDL_00102530-33; AVDL_01270890-92. |
|  |  |

| '079 Patent | Avadel's NDA Product |
|---|---|
| ████████████████████ | ████████████████████████████████████████████████ |
| 6. The method of claim 1, | *See* claim 1. |
| wherein the amount of oxybate administered to the patient is 35 mEq, 45 mEq, or 70 mEq of oxybate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The amount of oxybate administered to a patient by the use of Avadel's NDA Product is 35 mEq, 45 mEq, or 70 mEq of oxybate.  AVDL_00102530-33; AVDL_00052477-79; AVDL_01270890-92.<br><br>According to Avadel's proposed package insert, Avadel's NDA Product will be administered at doses of 4.5 g, 6 g, 7.5 g, and 9 g oxybate.  AVDL_00102530-33; AVDL_00052477-79; AVDL_01270890-92.<br><br>A 4.5 g dose of sodium oxybate is 35.7 mEq oxybate.  '079 Patent at 20:17-18.  As the relationship between grams and milliequivalents are proportional, this means that:  6 g dose of |

| '079 Patent | Avadel's NDA Product |
|---|---|
|  | sodium oxybate is equal to 47.6 mEq oxybate; 7.5 g dose of sodium oxybate is equal to 59.5 mEq oxybate; and a 9 g dose of sodium oxybate is equal to 71.4 mEq of oxybate.  Thus, the administration of Avadel's NDA Product will literally meet this limitation. |
|  |  |
| 7. The method of claim 1, | *See* claim 1. |
| wherein the mixture is a suspension. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

Avadel's NDA Product is an "oral suspension."  AVDL_00102530-33; AVDL_00052477; AVDL_00052479; AVDL_00052495; AVDL_00090514; AVDL_00090524; AVDL_00045656; AVDL_01270890-92; AVDL_01270909. |
|  |  |

| '079 Patent | Avadel's NDA Product |
|---|---|
| ███████████████ | ███████████████ |
| | |
| 10. A method of treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof, the method comprising: | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_00102530-32; AVDL_00102548-49; AVDL_01270890-91.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552; AVDL_01270890-911.  Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy."  AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | AVDL_00052477-78; AVDL_00052493; AVDL_00102530-32; AVDL_00102548-49; AVDL_01270890-91.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| administering a single daily dose to the patient, the single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate, | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will be administered in a single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552; AVDL_01270890-911.<br><br>Specifically, Avadel's proposed package insert as well as its NDA states, and instructs and encourages, that Avadel's NDA Product should be taken "as a single dose at bedtime" and is in the form of ████████████████████████████████ 4.5 g, 6 g, 7.5 g, or 9 g doses."  AVDL_00102532; AVDL_00102550; *see also* AVDL_00052477; AVDL_00052479; AVDL_00102530-33; AVDL_00045594-5611; AVDL_01270890-911.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages administering a single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate to a patient.  AVDL_00090505-573. |
| wherein the administering comprises:  opening a sachet containing a solid oxybate formulation, mixing the formulation with water, and orally | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '079 Patent | Avadel's NDA Product |
|---|---|
| administering the mixture to the patient, | Avadel's NDA Product will be administered by opening a sachet containing a solid oxybate formulation, mixing the formulation with water, and orally administering the mixture to the patient.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552; AVDL_00090505-573; AVDL_00045655-668; AVDL_01270890-911.<br><br>Avadel's NDA states that Avadel's NDA Product will include sodium oxybate contained within ███████ stick packs.  AVDL_00045665.  These stick packs are sachets.<br><br>██████████████████████████████████<br>██████████████████████████████████<br>██████████████████████████████████<br><br>██████████████████████████████████<br>██████████████████████████████████<br>██████████████████████████████████<br><br>██████████████████████████████████<br>██████████████████████████████████<br>██████ |
| wherein the oxybate formulation comprises an immediate release component and a controlled release component. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product comprises an immediate release component and a controlled release component.  *See* AVDL_00044786-791; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426; AVDL_01270890-911.<br><br>Avadel's proposed package insert states that Avadel's NDA Product contains "granules for extended-release oral suspension" providing various doses of sodium oxybate, which |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | comprises gamma-hydroxybutyrate.  AVDL_00102550; *see also* AVDL_00052490; AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270903-04. |
| | |

| '079 Patent | Avadel's NDA Product |
|---|---|
| 11. The method of claim 10, | *See* claim 10. |
| wherein the orally administering occurs at night. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product is instructed to occur at night.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552; AVDL_00090505-573; AVDL_01270890-911.<br><br>Avadel's proposed package insert instructs and encourages the use of Avadel's NDA Product at night.  AVDL_00052477-79; AVDL_00102530-33; AVDL_01270890-92. |
|  |  |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | |
| 15. The method of claim 10, | *See* claim 10. |
| wherein the amount of oxybate administered to the patient is 35 mEq, 45 mEq, 60 mEq, or 70 mEq of oxybate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '079 Patent | Avadel's NDA Product |
|---|---|
|  | The amount of oxybate administered to a patient by the use of Avadel's NDA Product is 35 mEq, 45 mEq, or 70 mEq of oxybate.  AVDL_00102530-33; AVDL_00052477-79; AVDL_01270890-92.<br><br>According to Avadel's proposed package insert, Avadel's NDA Product will be administered at doses of 4.5 g, 6 g, 7.5 g, and 9 g oxybate.  AVDL_00102530-33; AVDL_00052477-79; AVDL_01270890-92.<br><br>A 4.5 g dose of sodium oxybate is 35.7 mEq oxybate.  '079 Patent at 20:17-18.  As the relationship between grams and milliequivalents are proportional, this means that:  6 g dose of sodium oxybate is equal to 47.6 mEq oxybate; 7.5 g dose of sodium oxybate is equal to 59.5 mEq oxybate; and a 9 g dose of sodium oxybate is equal to 71.4 mEq of oxybate.  Thus, the administration of Avadel's NDA Product will literally meet this limitation. |
|  |  |
| 16. The method of claim 10, | *See* claim 10. |
| wherein the mixture is a suspension. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is an "oral suspension."  AVDL_00102530-33; AVDL_00052477; AVDL_00052479; AVDL_00052495; AVDL_00090514; AVDL_00090524; AVDL_00045656; AVDL_01270890-92; AVDL_01270909. |
|  |  |



| '079 Patent | Avadel's NDA Product |
|---|---|

### VII.   Avadel's NDA Product will infringe the asserted claims of United States Patent No. 11,147,782

As set forth in the claim chart below, Avadel's filing of Avadel's NDA constitutes infringement of █████████ of the '782 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of █████████ of the '782 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

### A.   Avadel's Non-Infringement Position Lacks Merit

#### 1.   The Claims Are Not Limited to "Resinate Compositions"

In its Final Non-Infringement Contentions, Avadel asserts that its NDA Product will not infringe any asserted claim of the '782 patent on the purported basis that ████████████████████████████████████  Like its contention for the '079 patent, this contention is based upon an erroneous claim construction and therefore lacks merit.

The parties' claim constructions for the term "modified release particles" are set forth below:

| Disputed Term | Avadel Construction | Jazz Construction |
|---|---|---|
| "modified release particles" | Particles that are resinate compositions characterized by having at least one of the active components having a release over a period of at least about 2 to about 8 hours | Plain and ordinary meaning, i.e., particles containing an active pharmaceutical ingredient with a release profile that is different from that of an immediate release particle |

As will be set forth more fully in Jazz Pharmaceutical's Opening *Markman* Brief (due to be filed on May 27, 2022), Avadel's proposed construction seeks to read a limitation ("resinate compositions") into the meaning of "modified release particles," which is not supported by the language of the claims, the patent specification, its prosecution history, or the extrinsic record.



### 3.     Avadel's NDA Product Satisfies the "Unit Dose" Limitation of Claims 14-24

Avadel next contends that its NDA Product "does not infringe Claims 14-24 of the '782 Patent at least because Jazz has failed to demonstrate that FT218 includes a 'unit dose' of a formulation of gamma-hydroxybutyrate. The '782 Patent does not provide a meaning for the term 'unit dose,' and Jazz's contentions as to this limitation are vague . . . ." Avadel 4-1-22 Contentions at 36. This contention lacks merit for several reasons.

*First*, to the extent Avadel contends that the term "unit dose" requires claim construction or has some meaning other than its plain and ordinary meaning, Avadel has waived any right to propose a construction and/or base a non-infringement contention upon its undisclosed claim construction. Indeed, Avadel initially proposed that the term "unit dosage form" be construed on February 18, 2022, but then withdrew the term for construction on March 3, 2022, without having proposed a construction. Avadel has waived any ability to construe the term now.



### 4.     Avadel's NDA Product Satisfies the "Blood Concentration" Limitation of Claims 11, 12, and 19

Avadel further contends that its NDA Product "does not infringe ▮▮▮▮▮▮▮▮▮▮ the '782 patent at least because Jazz has failed to demonstrate that FT218 meets the requirement of providing the recited blood concentrations." Avadel 4-1-22 Contentions at 37. Without support, Avadel asserts that "the limitations recite a range of gamma-hydroxybutyrate blood concentrations that are likely fatal in humans." *Id.* A person of ordinary skill in the art would recognize that ▮▮▮▮▮▮▮▮▮▮ of the '782 patent include a typographical error and should recite a blood concentration ranging from "10 mg/L to about 40 mg/L," "15 mg/L to about 30 mg/L," and "15 mg/L to about 30 mg/L," respectively. *See* '782 patent at 22:26-32. ▮▮▮▮▮▮▮▮▮

**B.    Avadel's NDA Product Will Infringe Each Asserted Claim of the '782 Patent**

As set forth in the chart below, each element of each asserted claim will be met by Avadel's FT218 product.

| '782 Patent | Avadel's NDA Product |
|---|---|
| 1. A formulation of gamma-hydroxybutyrate comprising: | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is a formulation of gamma-hydroxybutyrate.  *See* AVDL_00044786-791; AVDL_00045591-611; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426; AVDL_01270890-911. |
| a plurality of immediate release particles comprising gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is a formulation that contains a plurality of immediate release particles comprising gamma-hydroxybutyrate.  *See* AVDL_00044786-791; AVDL_00045591-611; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426; AVDL_01270890-911.<br><br>Avadel's proposed package insert states that Avadel's NDA Product contains "granules for extended-release oral suspension" providing various doses of sodium oxybate, which comprises gamma-hydroxybutyrate.  AVDL_00102550; *see also* AVDL_00052490; AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270903-04.<br><br>███████████████████████████████████████ |

| '782 Patent | Avadel's NDA Product |
|---|---|
| a plurality of modified release particles comprising gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is a formulation that contains a plurality of modified particles comprising gamma-hydroxybutyrate.  *See* AVDL_00044786-791; AVDL_00045591-611; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426; AVDL_01270890-911.<br><br>Avadel's proposed package insert states that Avadel's NDA Product contains "granules for extended-release oral suspension" providing various doses of sodium oxybate, which comprises gamma-hydroxybutyrate.  AVDL_00102550; *see also* AVDL_00052490; AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270903-04. |

| '782 Patent | Avadel's NDA Product |
|---|---|
|  | ███████████████████████████████████ |
| a viscosity enhancing agent; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. ███████████████████████████████████ ███████████████████████████████████ |
| and an acid; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. ███████████████████████████████████ ███████████████████████████████████ |
| wherein the viscosity enhancing agent and the acid are separate from the immediate release particles and the modified release particles. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| | |
| | |

| '782 Patent | Avadel's NDA Product |
|---|---|



| '782 Patent | Avadel's NDA Product |
|---|---|
| | |
| 6. The formulation of claim 1, | *See* claim 1. |
| wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552; AVDL_01270890-911.<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate. AVDL_00044788; AVDL_00045647; AVDL_00012142. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| | Avadel's proposed package insert as well as its NDA states that Avadel's NDA Product is in doses of 4.5 g, 6 g, 7.5 g, and 9 g.  AVDL_00052477; AVDL_00052479; AVDL_00102530-33; AVDL_01270890; AVDL_01270892; AVDL_01270909; *see also* AVDL_00045594-5611. |
| | |
| 7. The formulation of claim 1, | *See* claim 1. |
| wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 4.0 g, about 6 g, about 7.5 g or about 9 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 4.0 g, about 6 g, about 7.5 g or about 9 g of sodium gamma-hydroxybutyrate.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552; AVDL_01270890-911.

Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate. AVDL_00044788; AVDL_00045647; AVDL_00012142.

Avadel's proposed package insert as well as its NDA states that Avadel's NDA Product is in doses of 4.5 g, 6 g, 7.5 g, and 9 g.  AVDL_00052477; AVDL_00052479; AVDL_00102530-33; AVDL_01270890; AVDL_01270892; AVDL_01270909; *see also* AVDL_00045594-5611. |
| | |
| 8. The formulation of claim 1, | *See* claim 1. |
| wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| about 6 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate.  AVDL_00044788; AVDL_00045647; AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; AVDL_01270890; AVDL_01270892; AVDL_01270909; *see also* AVDL_00045594-5611. |
|  |  |
| 9. The formulation of claim 1, | *See* claim 1. |
| wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium ganima-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate.  AVDL_00044788; AVDL_00045647; AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; AVDL_01270890; AVDL_01270892; AVDL_01270909; *see also* AVDL_00045594-5611. |
|  |  |
| 10. The formulation of claim 1, | *See* claim 1. |
| wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate.  AVDL_00044788; AVDL_00045647; AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; AVDL_01270890; AVDL_01270892; AVDL_01270909; *see also* AVDL_00045594-5611. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| | |

| '782 Patent | Avadel's NDA Product |
|---|---|
| ████████████████████████████████████████ | |
| | |
| 13. The formulation of claim 1, | *See* claim 1. |
| wherein the formulation is a multiparticulate composition. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| | Avadel's NDA Product is a multiparticulate composition.  *See* AVDL_00045655-668; AVDL_00045669-671; AVDL_00045630-654; AVDL_00045679-693; AVDL_00048882-896; AVDL_00050317-333; AVDL_00090505-573; AVDL_00102530-552. |
| | Specifically, Avadel's NDA shows that Avadel's NDA Product is a multiparticulate composition made up of Immediate-Release pellets and Controlled-Release coated pellets among other excipients.  AVDL_00045661; AVDL_00045665-667; AVDL_00045632; AVDL_00045680; AVDL_00048888; AVDL_00048895; AVDL_00050323; AVDL_00050330; AVDL_00090525; AVDL_00102550. |
| | |
| 14. A unit dose comprising a formulation of gammahydroxybutyrate, wherein the formulation comprises: | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| | Avadel's NDA Product is a formulation of gamma-hydroxybutyrate.  *See* AVDL_00044786-791; AVDL_00045591-611; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426; AVDL_01270890-911. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| |  |
| a plurality of immediate release particles comprising gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

Avadel's NDA Product is a formulation that contains a plurality of immediate release particles comprising gamma-hydroxybutyrate.  *See* AVDL_00044786-791; AVDL_00045591-611; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426; AVDL_01270890-911.

Avadel's proposed package insert states that Avadel's NDA Product contains "granules for extended-release oral suspension" providing various doses of sodium oxybate, which comprises gamma-hydroxybutyrate.  AVDL_00102550; *see also* AVDL_00052490; AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270903-04.

 |
| a plurality of modified release particles comprising gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| | Avadel's NDA Product is a formulation that contains a plurality of modified particles comprising gamma-hydroxybutyrate.  *See* AVDL_00044786-791; AVDL_00045591-611; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426; AVDL_01270890-911.<br><br>Avadel's proposed package insert states that Avadel's NDA Product contains "granules for extended-release oral suspension" providing various doses of sodium oxybate, which comprises gamma-hydroxybutyrate.  AVDL_00102550; *see also* AVDL_00052490; AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654; AVDL_01270903-04. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| a viscosity enhancing agent; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| and an acid; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| wherein the viscosity enhancing agent and the acid are separate from the immediate release particles and the modified release particles. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| | ██████████████████████████████████████ |
| | |

| '782 Patent | Avadel's NDA Product |
|---|---|



| '782 Patent | Avadel's NDA Product |
|---|---|



| '782 Patent | Avadel's NDA Product |
|---|---|
| ██████████████████████████████ | ██████████████████████████████ |
| 20. The unit dose of claim 14, | *See* claim 14. |
| wherein the unit dose comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

The unit dose of Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552; AVDL_01270890-911.

Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate.  AVDL_00044788; AVDL_00045647; AVDL_00012142.

Avadel's proposed package insert as well as its NDA states that Avadel's NDA Product is in doses of 4.5 g, 6 g, 7.5 g, and 9 g.  AVDL_00052477; AVDL_00052479; AVDL_00102530-33; see *also* AVDL_00045594-5611; AVDL_01270890-911. |
| | |
| 21. The unit dose of claim 14, | *See* claim 14. |
| wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

The unit dose of Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate.  AVDL_00044788; |

| '782 Patent | Avadel's NDA Product |
|---|---|
| | AVDL_00045647; AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; AVDL_01270890; AVDL_01270892; AVDL_01270909; *see also* AVDL_00045594-5611. |
| | |
| 22. The unit dose of claim 14, | *See* claim 14. |
| wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The unit dose of Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate.  AVDL_00044788; AVDL_00045647; AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; AVDL_01270890; AVDL_01270892; AVDL_01270909; *see also* AVDL_00045594-5611. |
| | |
| 23. The unit dose of claim 14, | *See* claim 14. |
| wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The unit dose of Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate.  AVDL_00044788; AVDL_00045647; AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; AVDL_01270890; AVDL_01270892; AVDL_01270909; *see also* AVDL_00045594-5611. |
| | |

| '782 Patent | Avadel's NDA Product |
|---|---|
| 24. The unit dose of claim 14, | *See* claim 14. |
| wherein the unit dose is a sachet. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The unit dose of Avadel's NDA Product will be administered by using a sachet.  *See* AVDL_00052477-502; AVDL_00090505-573; AVDL_00045655-668; AVDL_00102530-552; AVDL_01270890-911.<br><br>Avadel's NDA states that Avadel's NDA Product will include sodium oxybate contained within ▮▮▮▮▮ stick packs.  AVDL_00045665.  These stick packs are sachets.  AVDL_00090528-29.  Avadel's proposed package insert also states that its NDA Product "contains either 7 or 30 packets of [Avadel's NDA Product], a mixing cup, Prescribing Information and Medication Guide, and Instructions for Use."  AVDL_00102550; *see also* AVDL_00052495; AVDL_00052502; AVDL_01270909-10. |

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

*Attorneys for Plaintiffs Jazz Pharmaceuticals,*
*Inc. and Jazz Pharmaceuticals Ireland Limited*

May 6, 2022

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 6, 2022, copies of the foregoing were caused to be served upon

the following in the manner indicated:

Daniel M. Silver, Esquire                                         *VIA ELECTRONIC MAIL*
Angela C. Whitesell, Esquire
Alexandra M. Joyce, Esquire
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801
*Attorneys for Defendant*

Kenneth G. Schuler, Esquire                                   *VIA ELECTRONIC MAIL*
Marc N. Zubick, Esquire
Alex Grabowski, Esquire
Sarah W. Wang, Esquire
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
*Attorneys for Defendant*

Herman H. Yue, Esquire                                         *VIA ELECTRONIC MAIL*
Bornali Rashmi Borah, Esquire
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY  10020
*Attorneys for Defendant*

Sarah Propst, Esquire                                              *VIA ELECTRONIC MAIL*
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
*Attorneys for Defendant*

Yi Ning, Esquire                                                      *VIA ELECTRONIC MAIL*
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
*Attorneys for Defendant*

Daralyn J. Durie, Esquire                                    *VIA ELECTRONIC MAIL*
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111
*Attorneys for Defendant*

Kira A. Davis, Esquire                                       *VIA ELECTRONIC MAIL*
Katherine E. McNutt, Esquire
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA  90013
*Attorneys for Defendant*

*/s/ Jeremy A. Tigan*
_____

Jeremy A. Tigan (#5239)

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 21-1138 (MN) |
| AVADEL PHARMACEUTICALS PLC, AVADEL US HOLDINGS, INC., AVADEL SPECIALTY PHARMACEUTICALS, LLC, AVADEL LEGACY PHARMACEUTICALS, LLC, AVADEL MANAGEMENT CORPORATION and AVADEL CNS PHARMACEUTICALS LLC, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 21-1594 (MN) |
| AVADEL PHARMACEUTICALS PLC, AVADEL US HOLDINGS, INC., AVADEL SPECIALTY PHARMACEUTICALS, LLC, AVADEL LEGACY PHARMACEUTICALS, LLC, AVADEL MANAGEMENT CORPORATION and AVADEL CNS PHARMACEUTICALS LLC, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' INITIAL INFRINGEMENT CHART**

Pursuant to the paragraph 4.c. of the Delaware Default Standard for Discovery, Plaintiffs Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (together, "Jazz Pharmaceuticals") hereby provides to Defendants Avadel Pharmaceuticals PLC, Avadel US Holdings, Inc., Avadel Specialty Pharmaceuticals, LLC, Avadel Legacy Pharmaceuticals, LLC, Avadel Management Corporation, and Avadel CNS Pharmaceuticals LLC ("Avadel") its initial claim charts relating each of the asserted claims of U.S. Patent Nos. 11,077,079 (the "'079 patent") and 11,147,782 (the "'782 patent") (collectively, "the patents-in-suit") to Avadel's product.

Jazz Pharmaceuticals has prepared these claim charts based on information and discovery currently available to it. Fact discovery remains open and expert discovery has not yet begun in this case. Further, Jazz Pharmaceuticals' investigation into the infringement of the asserted claims of the patents-in-suit continues, and fact depositions have not yet begun. In addition, although Avadel has produced to Jazz Pharmaceuticals its New Drug Application ("NDA") No. 214755 ("Avadel's NDA"), Avadel has yet to produce any additional documents relating to the development and testing of its proposed sodium oxybate product as described in Avadel's NDA ("Avadel's NDA Product"). Jazz Pharmaceuticals contends that testing of Avadel's NDA Product, as well as potential testimony from Avadel and others, will show that Avadel's NDA Product meets certain limitations related to the asserted claims of the patents-in-suit. Further, claim-construction exchanges and briefing have not yet begun, and the Court has not yet construed the claims of the patents-in-suit. Jazz Pharmaceuticals therefore reserves all rights to modify or supplement these contentions where appropriate as discovery in this case progresses and after the Court construes the asserted claims. Jazz Pharmaceuticals further reserves the right to assert additional or alternative claims. In the event that a claim limitation is deemed to be missing under a literal infringement analysis (*e.g.*, due to claim construction), Jazz Pharmaceuticals also reserves the right to demonstrate the presence of a substantial equivalent of such limitation and to pursue infringement under the doctrine of equivalents. Accordingly, Jazz Pharmaceuticals reserves the right to amend these contentions where appropriate, as discovery in this case continues and/or in light of Avadel's claim-construction contentions, Avadel's non-infringement positions and/or invalidity contentions, and/or this Court's claim constructions.

These claim charts are made pursuant to Federal Rule of Evidence 502 and the Protective Order in this case. To the extent that they contain any information that may be protected from discovery under the attorney-client privilege, the work-product doctrine, the common-interest privilege, or any other applicable privilege or immunity, such disclosure is inadvertent and does not constitute a waiver of any such privilege or immunity.

The claim charts set forth below are based solely on Jazz Pharmaceuticals' current knowledge and belief, as based on the information concerning Avadel's NDA Product that is currently available to Jazz Pharmaceuticals given the limited discovery that has occurred to date in this action.

As described herein, Avadel's NDA Product literally or by the doctrine of equivalents infringes each of the asserted claims of the patents-in-suit.

I.      **Avadel's NDA Product will infringe the asserted claims of United States Patent No. 11,077,079**

As set forth in the claim chart below, Avadel's filing of Avadel's NDA constitutes infringement of ████████████████ of the '079 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of ████████████████ of the '079 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

| '079 Patent | Avadel's NDA Product |
|---|---|
| 1. A method of treating narcolepsy in a patient in need thereof, the method comprising: | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product will treat narcolepsy in a patient in need thereof. *See* AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_00102530-32; AVDL_00102548-49.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552.<br><br>Specifically, Avadel's proposed package insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy." AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_00102530-32; AVDL_00102548-49.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| administering a single daily dose to the patient, the single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will be administered in a single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552.<br><br>Specifically, Avadel's proposed package insert as well as its NDA states, and instructs and encourages, that Avadel's NDA Product should be taken "as a single dose at bedtime" and is in |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | the form of ███████████████████████ AVDL_00052477; AVDL_00052479; AVDL_00102530-33; *see also* AVDL_00045594-5611.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages administering a single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate to a patient.  AVDL_00090505-573. |
| wherein the administering comprises:  opening a sachet containing a solid oxybate formulation, mixing the formulation with water, and orally administering the mixture to the patient, | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will be administered by opening a sachet containing a solid oxybate formulation, mixing the formulation with water, and orally administering the mixture to the patient.    *See*  AVDL_00052477-502;   AVDL_00045591-5611;   AVDL_00102530-552; AVDL_00090505-573; AVDL_00045655-668.<br><br>Avadel's NDA states that Avadel's NDA Product will include sodium oxybate contained within ████████ stick packs.  AVDL_00045665.  These stick packs are sachets.  AVDL_00090528-29. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████<br><br>Avadel's  proposed  package  insert  instructs  and  encourages  users  to "suspend  dose  in ███████████████████████████ and that Avadel's NDA Product is to be taken "orally."  AVDL_00102530; AVDL_00102532; *see also* AVDL_00052477-79; AVDL_00052490; AVDL_00052495; AVDL_00052502.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages suspending Avadel's NDA Product in water prior to dosing orally.  *See* AVDL_00090505-573. |

| '079 Patent | Avadel's NDA Product |
|---|---|
| wherein the oxybate formulation comprises an immediate release component and a controlled release component. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product comprises an immediate release component and a controlled release component.   *See*  AVDL_00044786-791;  AVDL_00045630-654;  AVDL_00052477-502; AVDL_00102530-552;  AVDL_00045669-671;  AVDL_00012133-291;  AVDL_00016275-426.<br><br>Avadel's proposed package insert states that Avadel's NDA Product contains "granules for extended-release oral suspension" providing various doses of sodium oxybate, which comprises gamma-hydroxybutyrate.  AVDL_00102550; *see also* AVDL_00052490; AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654. |
|  |  |

| '079 Patent | Avadel's NDA Product |
|---|---|
| 2. The method of claim 1, | *See* claim 1. |
| wherein the orally administering occurs at night. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product is instructed to occur at night.  *See* AVDL_00052477-502;  AVDL_00045591-5611;  AVDL_00102530-552;  AVDL_00090505-573.<br><br>Avadel's proposed package insert instructs and encourages the use of Avadel's NDA Product at night.  AVDL_00052477-79; AVDL_00102530-33. |
|  |  |

| '079 Patent | Avadel's NDA Product |
|---|---|
| ██████████████████████████████████████████████████ | ██████████████████████████████████████████████████ |
| 6. The method of claim 1, | *See* claim 1. |
| wherein the amount of oxybate administered to the patient is 35 mEq, 45 mEq, or 70 mEq of oxybate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The amount of oxybate administered to a patient by the use of Avadel's NDA Product is 35 mEq, 45 mEq, or 70 mEq of oxybate.  AVDL_00102530-33; AVDL_00052477-79. |

| '079 Patent | Avadel's NDA Product |
|---|---|
|  | According to Avadel's proposed package insert, Avadel's NDA Product will be administered at doses of 4.5 g, 6 g, 7.5 g, and 9 g oxybate.  AVDL_00102530-33; AVDL_00052477-79.<br><br>A 4.5 g dose of sodium oxybate is 35.7 mEq oxybate.  '079 Patent at 20:17-18.  As the relationship between grams and milliequivalents are proportional, this means that:  6 g dose of sodium oxybate is equal to 47.6 mEq oxybate; 7.5 g dose of sodium oxybate is equal to 59.5 mEq oxybate; and a 9 g dose of sodium oxybate is equal to 71.4 mEq of oxybate.  Thus, the administration of Avadel's NDA Product will literally meet this limitation. |
|  |  |
| 7. The method of claim 1, | *See* claim 1. |
| wherein the mixture is a suspension. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is an "oral suspension."  AVDL_00102530-33; AVDL_00052477; AVDL_00052479;  AVDL_00052495;  AVDL_00090514;  AVDL_00090524; AVDL_00045656. |
|  |  |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | |
| 10. A method of treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof, the method comprising: | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The administration of Avadel's NDA Product will treat cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof.  *See* AVDL_00045593; AVDL_00045600;  AVDL_00045606;  AVDL_00045610;  AVDL_00052477-78; AVDL_00052493; AVDL_00102530-32; AVDL_00102548-49.<br><br>Avadel's proposed package insert for its NDA Product instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552.  Specifically, Avadel's proposed package |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | insert as well as its NDA states the proposed indication for the use of its NDA Product is "cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy." AVDL_00045593; AVDL_00045600; AVDL_00045606; AVDL_00045610; AVDL_00052477-78; AVDL_00052493; AVDL_00102530-32; AVDL_00102548-49.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages the administration of Avadel's NDA Product for the treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy in patients.  *See* AVDL_00046937; AVDL_00046980; AVDL_00090505-573. |
| administering a single daily dose to the patient, the single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate, | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product will be administered in a single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552.<br><br>Specifically, Avadel's proposed package insert as well as its NDA states, and instructs and encourages, that Avadel's NDA Product should be taken "as a single dose at bedtime" and is in the form of ███████████████████████ 4.5 g, 6 g, 7.5 g, or 9 g doses."  AVDL_00102532; AVDL_00102550; *see also* AVDL_00052477; AVDL_00052479; AVDL_00102530-33; AVDL_00045594-5611.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages administering a single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate to a patient.  AVDL_00090505-573. |
| wherein the administering comprises:  opening a sachet containing a solid oxybate formulation, mixing the | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '079 Patent | Avadel's NDA Product |
|---|---|
| formulation with water, and orally administering the mixture to the patient, | Avadel's NDA Product will be administered by opening a sachet containing a solid oxybate formulation, mixing the formulation with water, and orally administering the mixture to the patient.   *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552; AVDL_00090505-573; AVDL_00045655-668.<br><br>Avadel's NDA states that Avadel's NDA Product will include sodium oxybate contained within ▮▮▮▮▮ stick packs. AVDL_00045665. These stick packs are sachets. AVDL_00090528-29. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>Avadel's proposed package insert instructs and encourages users to "suspend dose in ▮▮▮▮▮▮▮▮▮ and that Avadel's NDA Product is to be taken "orally."  AVDL_00102530; AVDL_00102532; *see also* AVDL_00052477-79; AVDL_00052490; AVDL_00052495; AVDL_00052502.<br><br>Avadel's investigator's brochure for its NDA Product also instructs and encourages suspending Avadel's NDA Product in water prior to dosing orally.  *See* AVDL_00090505-573. |
| wherein the oxybate formulation comprises an immediate release component and a controlled release component. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product comprises an immediate release component and a controlled release component.   *See* AVDL_00044786-791; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426.<br><br>Avadel's proposed package insert states that Avadel's NDA Product contains "granules for extended-release oral suspension" providing various doses of sodium oxybate, which comprises |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | gamma-hydroxybutyrate.  AVDL_00102550; *see also* AVDL_00052490; AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654. |
| | |
| 11. The method of claim 10, | *See* claim 10. |
| wherein the orally administering occurs at night. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

The administration of Avadel's NDA Product is instructed to occur at night.  *See* AVDL_00052477-502;  AVDL_00045591-5611;  AVDL_00102530-552;  AVDL_00090505-573. |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | Avadel's proposed package insert instructs and encourages the use of Avadel's NDA Product at night.  AVDL_00052477-79; AVDL_00102530-33. |



| '079 Patent | Avadel's NDA Product |
|---|---|
| ███████████████████ | ██████████████████████████████████████████ |
| | |
| 15. The method of claim 10, | *See* claim 10. |
| wherein the amount of oxybate administered to the patient is 35 mEq, 45 mEq, 60 mEq, or 70 mEq of oxybate. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The amount of oxybate administered to a patient by the use of Avadel's NDA Product is 35 mEq, 45 mEq, or 70 mEq of oxybate.  AVDL_00102530-33; AVDL_00052477-79.<br><br>According to Avadel's proposed package insert, Avadel's NDA Product will be administered at doses of 4.5 g, 6 g, 7.5 g, and 9 g oxybate.  AVDL_00102530-33; AVDL_00052477-79.<br><br>A 4.5 g dose of sodium oxybate is 35.7 mEq oxybate.  '079 Patent at 20:17-18.  As the relationship between grams and milliequivalents are proportional, this means that:  6 g dose of sodium oxybate is equal to 47.6 mEq oxybate; 7.5 g dose of sodium oxybate is equal to 59.5 mEq oxybate; and a 9 g dose of sodium oxybate is equal to 71.4 mEq of oxybate.  Thus, the administration of Avadel's NDA Product will literally meet this limitation. |

| '079 Patent | Avadel's NDA Product |
|---|---|
| | |
| 16. The method of claim 10, | *See* claim 10. |
| wherein the mixture is a suspension. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is an "oral suspension."   AVDL_00102530-33; AVDL_00052477; AVDL_00052479;       AVDL_00052495;       AVDL_00090514;       AVDL_00090524; AVDL_00045656. |
| | |

| '079 Patent | Avadel's NDA Product |
|---|---|
|  |  |

## II.  Avadel's NDA Product will infringe the asserted claims of United States Patent No. 11,147,782

As set forth in the claim chart below, Avadel's filing of Avadel's NDA constitutes infringement of ████████ of the '782 patent under 35 U.S.C. § 271(e)(2)(A), and Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims.

Avadel's NDA Product (described in NDA No. 214755) contains each and every limitation of ████████ of the '782 patent literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Jazz Pharmaceuticals reserves the right to base its contentions on additional information in Avadel's production, deposition transcripts, interrogatory responses, responses to requests to admit, and/or any other pleadings, as well as expert discovery.  In particular, Jazz Pharmaceuticals reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding infringement.

| '782 Patent | Avadel's NDA Product |
|---|---|
| 1. A formulation of gamma-hydroxybutyrate comprising: | Avadel's NDA Product will literally meet this limitation. This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is a formulation of gamma-hydroxybutyrate. *See* AVDL_00044786-791; AVDL_00045591-611; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426. |
| a plurality of immediate release particles comprising gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation. This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is a formulation that contains a plurality of immediate release particles comprising gamma-hydroxybutyrate. *See* AVDL_00044786-791; AVDL_00045591-611; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426.<br><br>Avadel's proposed package insert states that Avadel's NDA Product contains "granules for extended-release oral suspension" providing various doses of sodium oxybate, which comprises gamma-hydroxybutyrate. AVDL_00102550; *see also* AVDL_00052490; AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654.<br><br>███████████████████████████████████████ |
| a plurality of modified release particles comprising gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation. This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is a formulation that contains a plurality of modified particles comprising gamma-hydroxybutyrate. *See* AVDL_00044786-791; AVDL_00045591-611; |

| '782 Patent | Avadel's NDA Product |
|---|---|
|  | AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426. |
| a viscosity enhancing agent; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| | ████████████████████████████████ |
| and an acid; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████<br>████████████████████████████████ |
| wherein the viscosity enhancing agent and the acid are separate from the immediate release particles and the modified release particles. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>████████████████████████████████<br>████████████████████████████████<br>████████████████████████████████ |

| '782 Patent | Avadel's NDA Product |
|---|---|
|  | ████████████████████████████████████████ |
|  |  |

| '782 Patent | Avadel's NDA Product |
|---|---|



| '782 Patent | Avadel's NDA Product |
|---|---|
| ███████████████████ | ███████████████████ |
| 6. The formulation of claim 1, | *See* claim 1. |
| wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552.<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate. AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>Avadel's proposed package insert as well as its NDA states that Avadel's NDA Product is in doses of 4.5 g, 6 g, 7.5 g, and 9 g.  AVDL_00052477; AVDL_00052479; AVDL_00102530-33; see *also* AVDL_00045594-5611. |
| | |
| 7. The formulation of claim 1, | *See* claim 1. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 4.0 g, about 6 g, about 7.5 g or about 9 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 4.0 g, about 6 g, about 7.5 g or about 9 g of sodium gamma-hydroxybutyrate.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552.<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate.  AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>Avadel's proposed package insert as well as its NDA states that Avadel's NDA Product is in doses of 4.5 g, 6 g, 7.5 g, and 9 g.  AVDL_00052477; AVDL_00052479; AVDL_00102530-33; see *also* AVDL_00045594-5611. |
|  |  |
| 8. The formulation of claim 1, | *See* claim 1. |
| wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate.   AVDL_00044788; AVDL_00045647; AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; see *also* AVDL_00045594-5611. |
|  |  |
| 9. The formulation of claim 1, | *See* claim 1. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate.   AVDL_00044788; AVDL_00045647; AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; see *also* AVDL_00045594-5611. |
|  |  |
| 10. The formulation of claim 1, | *See* claim 1. |
| wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate.   AVDL_00044788; AVDL_00045647; AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; see *also* AVDL_00045594-5611. |
|  |  |

| '782 Patent | Avadel's NDA Product |
|---|---|
| | |
| 13. The formulation of claim 1, | *See* claim 1. |
| wherein the formulation is a multiparticulate composition. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| | Avadel's NDA Product is a multiparticulate composition.   *See*  AVDL_00045655-668; AVDL_00045669-671; AVDL_00045630-654; AVDL_00045679-693; AVDL_00048882-896; AVDL_00050317-333; AVDL_00090505-573; AVDL_00102530-552.<br><br>Specifically, Avadel's NDA shows that Avadel's NDA Product is a multiparticulate composition made up of Immediate-Release pellets and Controlled-Release coated pellets among other excipients.   AVDL_00045661; AVDL_00045665-667; AVDL_00045632; AVDL_00045680; AVDL_00048888; AVDL_00048895; AVDL_00050323; AVDL_00050330; AVDL_00090525; AVDL_00102550. |
| | |
| 14.  A  unit  dose  comprising  a formulation                         of gammahydroxybutyrate,       wherein the formulation comprises: | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is a formulation of gamma-hydroxybutyrate.  *See* AVDL_00044786-791; AVDL_00045591-611; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426. |
| a  plurality  of  immediate  release particles      comprising      gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>Avadel's NDA Product is a formulation that contains a plurality of immediate release particles comprising  gamma-hydroxybutyrate.   *See*  AVDL_00044786-791;  AVDL_00045591-611; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426.<br><br>Avadel's  proposed  package  insert  states  that  Avadel's  NDA  Product  contains  "granules  for extended-release oral suspension" providing various doses of sodium oxybate, which comprises |

| '782 Patent | Avadel's NDA Product |
|---|---|
| | gamma-hydroxybutyrate.  AVDL_00102550; *see also* AVDL_00052490; AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654. |
| a plurality of modified release particles comprising gamma-hydroxybutyrate; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.

Avadel's NDA Product is a formulation that contains a plurality of modified particles comprising gamma-hydroxybutyrate.  *See* AVDL_00044786-791; AVDL_00045591-611; AVDL_00045630-654; AVDL_00052477-502; AVDL_00102530-552; AVDL_00045669-671; AVDL_00012133-291; AVDL_00016275-426.

Avadel's proposed package insert states that Avadel's NDA Product contains "granules for extended-release oral suspension" providing various doses of sodium oxybate, which comprises gamma-hydroxybutyrate.  AVDL_00102550; *see also* AVDL_00052490; AVDL_00045594; AVDL_00012170; AVDL_00016371; AVDL_00045630-654. |

| '782 Patent | Avadel's NDA Product |
|---|---|
| a viscosity enhancing agent; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| and an acid; | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |
| wherein the viscosity enhancing agent and the acid are separate from the immediate release particles and the modified release particles. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery. |

| '782 Patent | Avadel's NDA Product |
|---|---|
|  |  |

| '782 Patent | Avadel's NDA Product |
|---|---|



| '782 Patent | Avadel's NDA Product |
|---|---|



| '782 Patent | Avadel's NDA Product |
|---|---|
| ███████████████████████████████████ | ███████████████████████████████████ |
| 20. The unit dose of claim 14, | *See* claim 14. |
| wherein the unit dose comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The unit dose of Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate.  *See* AVDL_00052477-502; AVDL_00045591-5611; AVDL_00102530-552.<br><br>Specifically, the formulation will contain 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate. AVDL_00044788; AVDL_00045647; AVDL_00012142.<br><br>Avadel's proposed package insert as well as its NDA states that Avadel's NDA Product is in doses of 4.5 g, 6 g, 7.5 g, and 9 g.  AVDL_00052477; AVDL_00052479; AVDL_00102530-33; see *also* AVDL_00045594-5611. |
|  |  |
| 21. The unit dose of claim 14, | *See* claim 14. |
| wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The unit dose of Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate.  AVDL_00044788; AVDL_00045647; |

| '782 Patent | Avadel's NDA Product |
|---|---|
|  | AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; see *also* AVDL_00045594-5611. |
|  |  |
| 22. The unit dose of claim 14, | *See* claim 14. |
| wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The unit dose of Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate.  AVDL_00044788; AVDL_00045647; AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; see *also* AVDL_00045594-5611. |
|  |  |
| 23. The unit dose of claim 14, | *See* claim 14. |
| wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate. | Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The unit dose of Avadel's NDA Product comprises an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate.  AVDL_00044788; AVDL_00045647; AVDL_00012142; AVDL_00052477; AVDL_00052479; AVDL_00102530-33; see *also* AVDL_00045594-5611. |
|  |  |

| '782 Patent | Avadel's NDA Product |
|---|---|
| 24. The unit dose of claim 14, | *See* claim 14. |
| wherein the unit dose is a sachet. | The use of Avadel's NDA Product will literally meet this limitation.  This is supported by Avadel's document production, and may be further supported by additional fact discovery that has not yet occurred, and/or by evidence obtained and/or generated as part of expert discovery.<br><br>The unit dose of Avadel's NDA Product will be administered by using a sachet.  *See* AVDL_00052477-502; AVDL_00090505-573; AVDL_00045655-668; AVDL_00102530-552.<br><br>Avadel's NDA states that Avadel's NDA Product will include sodium oxybate contained within ███████████ stick packs.  AVDL_00045665.  These stick packs are sachets.  AVDL_00090528-29. ███████████████████████████████████████████ |

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000

December 7, 2021

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2021, copies of the foregoing were caused to be served

upon the following in the manner indicated:

Daniel M. Silver, Esquire                                   *VIA ELECTRONIC MAIL*
Alexandra M. Joyce, Esquire
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
*Attorneys for Defendants*

Kenneth G. Schuler, Esquire                                 *VIA ELECTRONIC MAIL*
Marc N. Zubick, Esquire
Alex Grabowski, Esquire
Sarah W. Wang, Esquire
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
*Attorneys for Defendants*

Daralyn J. Durie, Esquire                                   *VIA ELECTRONIC MAIL*
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
*Attorneys for Defendants*

Kira A. Davis, Esquire                                      *VIA ELECTRONIC MAIL*
Katherine E. McNutt, Esquire
DURIE TANGRI LLP
953 East 3rdStreet
Los Angeles, CA 90013
*Attorneys for Defendants*


                                                   */s/ Jeremy A. Tigan*

                                                   _____

                                                   Jeremy A. Tigan (#5239)

EXHIBIT 4

!IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 21-691-MN |
| | ) | |
| AVADEL CNS PHARMACEUTICALS, LLC, | ) | |
| | ) | ████████████████ |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, | ) | |
| | ) | |
| | ) | |
| | ) | C.A. No. 21-1138-MN |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | ████████████████ |
| AVADEL CNS PHARMACEUTICALS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, | ) | |
| | ) | |
| | ) | C.A. No. 21-1594-MN |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | ████████████████ |
| AVADEL CNS PHARMACEUTICALS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## AVADEL'S FINAL INVALIDITY CONTENTIONS

1

Pursuant to Paragraph 4(d) of the Default Standard for Discovery and the Scheduling Order entered in the above-captioned actions on December 21, 2021 (*see* D.I. 72),[1] Defendant Avadel CNS Pharmaceuticals, LLC ("Defendant" or "Avadel"), hereby provide Plaintiffs Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (collectively, "Jazz" or "Plaintiffs") its final invalidity contentions regarding the asserted claims of U.S. Patent Nos. 8,731,963 (the "'963 patent"); 10,758,488 (the "'488 patent"); 10,813,885 (the "'885 patent"); 10,959,956 (the "'956 patent"); 10,966,931 (the "'931 patent"); 11,077,079 (the "'079 patent"); and 11,147,782 (the "'782 patent") (collectively the "Patents-in-Suit"). Avadel's document production accompanying these contentions was served contemporeously herewith.

## I.    GENERAL STATEMENTS

Avadel submits these final invalidity contentions based upon information presently available. Discovery is ongoing and the terms of the asserted claims have not yet been construed by the Court. Therefore, Avadel reserves the right to supplement, alter, amend, and/or modify these contentions based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction by the Court, or as a result of Jazz's asserted claims and contentions.

On September 7, 2021, Jazz provided Avadel with its Initial Infringement Contentions for the '963 patent ("REMS Patent"), and for the '488 patent, the '885 patent, the '956 patent, and the '931 patent (collectively, the "Sustained Release Patents"). In those Initial Infringement Contentions, Jazz asserted that FT218, as described in Avadel's New Drug Application ("NDA")

---

[1] All matters listed in the caption above are proceeding on a coordinated schedule. All docket cites are to matter C.A. No. 21-691-MN unless otherwise noted.

No. 214755 ("Avadel's NDA") will infringe ███████████████████████████████

████████████████████████████████████████████████

On December 7, 2021, Jazz provided Avadel with its Initial Infringement Contentions for the '079 and '782 patents (collectively, the "Resinate Patents").  In those Initial Infringement Contentions, Jazz asserted that FT218, as described in Avadel's NDA, will infringe ███████████

██████████████████████████████████████

To the extent that Jazz is permitted to assert additional claims not presently identified in their initial infringement contentions, Avadel reserves the right to address the invalidity of such claims.  Avadel's invalidity positions in these contentions may be in the alternative and do not constitute any concession by Avadel for purposes of claim construction or infringement.  *See, e.g.*, *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000).  Furthermore, these contentions are provided without prejudice to Avadel's right to introduce at trial any subsequently-discovered evidence or expert opinions relating to currently-known facts and to produce and introduce at trial all evidence, whenever discovered, relating to the proof of subsequently-discovered facts.  Moreover, facts, documents, and things now known may be imperfectly understood and, accordingly, such facts, documents, and things may not be included in the following contentions.  Avadel reserves the right to refer to conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, expert opinion testimony, documents, and things notwithstanding the written statements herein.  Avadel further reserves its right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, documents, and things that are not currently recalled but might be recalled at some time in the future.

Avadel objects to the disclosure of information that is protected by the attorney-client privilege, the attorney work-product immunity, the common interest privilege, or any other applicable privilege or immunity.  To the extent that Avadel inadvertently discloses information that may be protected from discovery under the attorney-client privilege, the attorney work-product immunity, the common interest privilege, or any other applicable privilege or immunity, such inadvertent disclosure does not constitute a waiver of any such privilege or immunity.

The information set forth below is provided without waiving: (1) the right to object to the use of any statement for any purpose, in this action or any other action, on the grounds of privilege, relevance, materiality, or any other appropriate grounds; (2) the right to object to any request involving or relating to the subject matter of the statements herein; or (3) the right to revise, correct, supplement, or clarify any of the statements provided below at any time.  Avadel further reserves the right to amend and/or supplement these contentions in accordance with the Federal Rules of Civil Procedure and/or the Rules of this Court.  Avadel reserves the right to allege the invalidity of the asserted claims on bases other than those disclosed herein.

## II.    REMS PATENT

### A.    Background

On September 7, 2021, Jazz provided Avadel with its Initial Infringement Contentions pursuant to Paragraph 4(c) of the Delaware Default Standard for the '963 patent.  Jazz asserted that "Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation" of FT218 will infringe ███████████ of the '963 patent.[2]

On October 13, 2021, Avadel provided Jazz with its Initial Invalidity Contentions for the '963 patent.

[2] As addressed below, it is unclear what Jazz actually accuses with respect to the REMS Patent.

4

specifically adapted for use in connection with the ***claimed method***".[4]  Jazz is wrong, but for purposes of these contentions, Avadels note that Jazz's theory would render the claims invalid as indefinite under *IPXL Holdings*.

           **2.**       **Response to Jazz on Invalidity of the '963 Patent Under 35 U.S.C. § 112**

In response to Avadel's contention that the claims of the '963 patent are indefinite for improperly claiming both a system and a method, Jazz argues that the claims are instead directed to a method "limited to performance on a particular type of apparatus."  Jazz's Final Validity Contentions at 40.  This is yet another attempt to re-write the asserted claims as if they were method claims.  This is precisely the problem.  The preamble of each claim clearly states that they are directed to a ***system***, yet Jazz continues to refer to them as describing a ***method***.  As the Federal Circuit explained in *IPXL Holdings*, this manner of claiming is improper and renders the claims invalid as indefinite.  *IPXL Holdings*, 430 F.3d at 1384.

## III.    SUSTAINED RELEASE PATENTS

    **A.**    **Background**

On September 7, 2021, Jazz provided Avadel with its Initial Infringement Contentions pursuant to Paragraph 4(c) of the Delaware Default Standard for the '488 patent, the '885 patent, the '956 patent, and the '931 patent.  In those Initial Infringement Contentions, Jazz asserted that FT218, as described in Avadel's NDA, will infringe ████████████████████████████████

████████████████████████████████████████████████████████████████

(collectively the "Sustained Release Patents").

On October 13, 2021, Avadel provided Jazz with its Initial Invalidity Contentions for the Sustained Release Patents.

---

[4] Emphases added unless otherwise indicated.

On April 1, 2022, Jazz provided Avadel with its Responses to Avadel's Invalidity Contentions for the Sustained Release Patents.

In view of Jazz's Initial Infringement Chart, Avadel's Initial Invalidity Contentions, and Jazz's Response to Avadel's Invalidity Contentions, the following invalidity contentions address the asserted claims of the Sustained Release Patents.

### B.    Prior Art

At this time, Avadel contends that at least the following prior art references anticipate and/or render obvious, either alone or in combination, the asserted claims of the '488, '885, '956, and '931 patents (collectively, the "Jazz Sustained Release Patents").

1.    U.S. Patent No. 6,514,531, issued February 4, 2003 ("Alaux 2003");

2.    U.S. Patent No. 5,594,030, issued January 14, 1997 ("Conte 1997");

3.    U.S. Patent No. 6,913,768, issued July 5, 2005 ("Couch 2005");

4.    HANDBOOK OF PHARMACEUTICAL EXCIPIENTS, Fifth Edition, 2006 ("HANDBOOK OF PHARMACEUTICAL EXCIPIENTS 2006");

5.    Hu, et al., *Preparation and in vitro/in vivo evaluation of sustained-release metformin hydrochloride pellets*, European Journal of Pharmaceutics and Biopharmaceutics, 64 (2006) 185–192 ("Hu 2006");

6.    Jones, *Pharmaceutical Applications of Polymers for Drug Delivery*, Rapra Review Reports, Volume 15, Number 6, (2004) ("Jones 2004");

7.    Lecomte, et al., *Blends of enteric and GIT-insoluble polymers used for film coating: physicochemical characterization and drug release patterns*, Journal of Controlled Release, 89 (2003) 457-471 ("Lecomte 2003");

8.    U.S. Patent Publication No. 2006/0210630 ("Liang 2006");

9.      Majeed, *Formulation, Drug Release and Animal Bioavailability for an Oral Controlled-Release Dosage Form of Propranolol Hydrochloride*, St. John's University, Ph.D. 1986 ("Majeed 1986");

10.     Miller, et al., *Aqueous Polymeric Film Coating*, College of Pharmacy, University of Texas at Austin, Austin, Texas, U.S.A. (2008) ("Miller 2008");

11.     European Patent No. 2 034 970, issued March 18, 2009 ("Monteith 2009");

12.     Savaşer, et al., *Preparation and in vitro evaluation of sustained release tablet formulations of diclofenac sodium*, Il Farmaco 60 (2005) 171–177 ("Savaşer 2005");

13.     Tabandeh, et al., *Preparation of Sustained-Release Matrix Tablets of Aspirin with Ethylcellulose, Eudragit RS100 and Eudragit S100 and Studying the Release Profiles and their Sensitivity to Tablet Hardness*, Iranian Journal of Pharmaceutical Research (2003) 201-206 ("Tabandeh 2003");

14.     U.S. Patent No. 6,623,730, issued September 23, 2003 ("Williams 2003");

15.     Bai, Hydrodynamic Investigation of USP Test Apparatus II, 96 J. PHARM. SCI. 2327, 2328 (2007) ("Bai 2007").

**C.      Priority Date**

The '488 patent issued on September 1, 2020 and was filed on July 2, 2018.  The '488 patent is a continuation of U.S. Appl. No. 13/071,369 ("'369 application"), now abandoned, which claims priority to Provisional Application No. 61/317,212, filed on March 24, 2010.  For the reasons discussed in Section III.F, the asserted claims of the '488 patent are not entitled to claim priority to the '369 application, and should be entitled to a priority date no earlier than July 2, 2018.

29

The '885 patent issued on October 27, 2020 and was filed on June 30, 2020.  The '885 patent is a continuation of U.S. Appl. No. 16/712,260, now U.S. Patent No. 10,987,310, which is a continuation of U.S. Appl. No. 16/025,487, now the '488 patent.  For the reasons discussed in Section III.F, the asserted claims of the '885 patent are not entitled to claim priority to the '369 application, and should be entitled to a priority date no earlier than June 30, 2020.

The '956 patent issued on March 30, 2021 and was filed on December 24, 2020.  The '956 patent is a continuation of U.S. Appl. No. 16/916,677, now the '885 patent.  For the reasons discussed in Section III.F, the asserted claims of the '956 patent are not entitled to claim priority to the '369 application, and should be entitled to a priority date no earlier than December 24, 2020.

The '931 patent issued on April 6, 2021 and was filed on December 24, 2020.  The '931 patent is a continuation of U.S. Appl. No. 16/916,677, now the '885 patent.  For the reasons discussed in Section III.F, the asserted claims of the '931 patent are not entitled to claim priority to the '369 application, and should be entitled to a priority date no earlier than December 24, 2020.

### D.     The Sustained Release Patents are Invalid Under 35 U.S.C. § 103

For the reasons set forth below, as well as set forth in the claim charts attached as Appendices B-E, the asserted claims of the Jazz Sustained Release Patents are invalid as obvious over the prior art.

Under 35 U.S.C. § 103(a), an applicant is not entitled to a patent "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious" to a POSA at the time the invention was made.  The relevant factual inquiries include:

(a) determining the scope and content of the prior art;

(b) ascertaining the differences between the prior art and the claims at issue;

(c) resolving the level of ordinary skill in the pertinent art; and

30

(d) evaluating evidence of secondary considerations.

*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).  The Supreme Court reiterated the applicability of the *Graham* factors in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).

Claim 1 of the '488 patent recites:

> A formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, wherein:
>
> a. the sustained release portion comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gammahydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;
>
> b. the immediate release portion comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of the gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation;
> c. the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;

31

> d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm.

The other claims of the Jazz Sustained Release Patents similarly recite dosage forms comprising a sustained release formulation made up of a functional coating deposited over a core, with the core comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate ("GHB") and pharmaceutically acceptable salts of GHB, and the functional coating comprising one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating.  The sustained release formulation has a dissolution profile wherein greater than about 40% of the GHB is released by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm.

Some of the claims of the Jazz Sustained Release Patents impose additional limitations, such as an immediate release portion wherein the combined immediate and sustained release portions release "at least about 30% of the gamma-hydroxybutyrate by one hour" and "greater than about 90% of gamma-hydroxybutyrate" by 6, 7, or 8 hours when tested in dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm.  *See, e.g.*, '488 patent claims 1, 2, 3; '885 patent claims 1, 13, 14, 15; '956 patent claims 1, 2, 3, 13, 14; '931 patent claims 1, 14, 15.  Other claims of the Jazz Sustained Release Patents impose limitations such as the sustained release portion releasing about 10% or less of its GHB by about 1 hour and about 60% to about 90% of its GHB by about 6 hours when tested in dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm.  *See, e.g.*, '488 patent claims 4, 11; '885 patent claims 2, 3; '956 patent claims 4, 10, 15; '931 patent claims 2, 3.

Jazz appears to assert that the "sustained release" and "functional coating" limitations are satisfied so long as a dosage form satisfies the *in vitro* release characteristics recited in the asserted claims. *See, e.g.*, 9/7/21 Jazz's Initial Infringement Chart at 27-37. Utilizing that view of the subject limitations, the asserted claims of the Jazz Sustained Release Patents are obvious over Liang et al., U.S. Patent Publication No. 2006/0210630 ("Liang 2006"). Specifically, Liang 2006 discloses gamma hydroxybutyric acid ("GHB") formulations made up of an immediate release portion and a delayed/controlled release portion. As in the Jazz Sustained Release Patent claims, Liang 2006's delayed/controlled release formulations are made up of a functional coating deposited over a core, with the core comprising gamma-hydroxybutyric acid salts and the functional coating comprising a pH sensitive enteric release coat such as a methacrylic acid-methyl methacrylate co-polymer.

A POSA would have been motivated to formulate a once-nightly dose of sodium oxybate composition at the time. A POSA would have arrived at the claimed amounts of GHB and the percentage of methacrylic acid-methyl methacrylate co-polymer in the coating through routine experimentation, with an expectation to succeed in achieving the claimed dissolution profile.

### 1.     Liang 2006

Liang 2006 discloses immediate release and delayed/controlled release components of GHB. Liang 2006 states that GHB is "highly soluble, hygroscopic, and strongly alkaline, and the therapeutic dose is normally very high." Liang 2006 at ¶ 5. Liang 2006 discloses that "the immediate release dose can be equivalent of, higher than, or lower than, the one or more delayed release doses." *Id.* at ¶ 39. "It is contemplated that the delayed release dose amount, which is used to replace the second nightly dose (currently as a solution) in the current treatment of narcolepsy patients, can be the same as the immediate release dose amount, although the bioavailability is

lower further along the GI tract, or even at a reduced dose amount, since the patients do not need to wake up and take a separate second nightly dose to go back to sleep." *Id*. at ¶ 40.

Liang 2006 describes that the delayed/controlled release components in the form of particles (e.g., beads, granules, minitabs, or pellets) containing GHB as the core that provide for delayed/controlled release lease of the drug.  For these delayed/controlled release components, Liang 2006 discloses that the GHB core is surrounded by a barrier coat to control the migration of GHB from the core.  The barrier coat is in turn surrounded by an enteric release coat that will allow release of the GHB at a predetermined pH after ingestion.

### a.      Barrier Coat

In describing the delayed/controlled release portion of the formulations, Liang 2006 explains that the barrier coat can be applied to a GHB core.  Liang teaches that suitable coating materials for the barrier coat include, but are not limited to, cellulosic polymers such as ethylcellulose.  Liang 2006 at ¶ 74.  In addition, a pore former may also be used, but importantly, whether one is used at all and the amount will determine the function of the barrier coat:  "For example, if the pH sensitive delayed/controlled release particles are intended for immediate release after entering the targeted site in the GI tract, high amounts of pore formers (e.g., as high as about 50% by weight of the barrier coat) can be used.  If the pH sensitive delayed/controlled release particles are for controlled release after entering the targeted site in the GI tract, little or ***no*** pore formers are used (e.g., no more than about 25% by weight of the barrier coat)."  Liang 2006 at ¶ 76.  Example 4 discloses the barrier coat of the immediate release core, containing the following unevaporated solids: 73.9 g of ethylcellulose, 1.72 g of PV7 [sic] K90, and 8.1 g triethyl citrate.  Example 4 also discloses that "[f]or a slower release core, PVP K90 is used at lower levels or ***can be omitted***."  Liang 2006 at ¶ 101.  Thus, the barrier coat in Example 4 discloses about 2.1% by weight of the pore former.

### b.    pH Sensitive Enteric Coat

Liang 2006 also describes a pH sensitive enteric coat that is applied to the barrier coat. Suitable materials for the pH sensitive enteric coat "include, but are not limited to, methacrylate-based coating materials such as polymers of methacrylic acid and methacrylates."  Liang 2006 at ¶ 82.  And suitable materials for targeting drug release to each region of the gastrointestinal tract were "known in the art, such as Eudragit E 100 or Eudragit E PO (stomach), Eudragit L 30 D-55 and Eudragit L 100-55 (duodenum), Eudragit L 12.5 and Eudragit L 100 (jejunum), Eudragit S 100 (ileum), and Eudragit FS 30 D (colon)."  Liang 2006 at ¶ 86.  Of the Eudragits disclosed by Liang 2006, Eudragit L 12.5, Eudragit L 100, Eudragit S 100, and Eudragit FS 30D are "methacrylic acid-methyl methacrylate co-polymers."[5]  According to Liang 2006, there was a preference for pH sensitive enteric release coats that release or dissolve in the upper GI tract, such as the duodenum or the jejunum, because it would allow for better absorption of the drug.  *Id.* at ¶ 87.

Liang 2006 discloses four examples (Examples 6a-6d) of the pH sensitive enteric coat, which is sprayed onto a barrier coat covering the GHB core.  All four examples have around 90% Eudragit in the enteric coating, and target different portions of the intestine by virtue of the type of Eudragit used—each of which dissolves at different pHs and therefore would dissolve at different portions of the intestine.  Examples 6a and 6b target the upper intestine (duodenum and jejunum, respectively), and Examples 6c and 6d target the lower intestine, *i.e.*, colon. The

---

[5] Eudragit L 12.5 and L 100 (both targeting jejunum) are methacrylic acid-methyl methacrylate co-polymers (1:1), Eudragit S 100 (targeting colon) is a methacrylic acid-methyl methacrylate co-polymer (1:2), and Eudragit FS 30 D targeting colon) is a methyl acrylate, methyl methacrylate, methacrylic acid co-polymer (7:3:1).  *See* Rowe et al., HANDBOOK OF PHARMACEUTICAL EXCIPIENTS (5th ed.) at 554, 557 ("HPE"); Eudragit at a Glance.  Eudragit L 30 D-55 and L 100-55 (both targeting duodenum) are methacrylic acid, ethyl acrylate co-polymers (1:1).

examples also use different barrier coats: Examples 6a and 6b are sprayed onto the barrier coat from Example 4 (described above), while Examples 6c and 6d are sprayed onto the barrier coat from Examples 3 and 5, respectively.

### c.     Dissolution Testing

Liang 2006 reports the dissolution profiles of Examples 6a, 6c, and 6d, but not Example 6b. As discussed above, these examples contained the pH sensitive enteric coat, barrier coat, and GHB core. The Examples were tested using USP Apparatus 2 at a paddle speed of 75 rpm in media at time points that approximated the time in the digestive system (*i.e.*, two hours in an acidic stomach environment followed by four hours in a neutral intestinal environment). Example 6a, which corresponds to Figure 3, reproduced below, uses a pH 1.1 media from 0-2 hours followed by a pH 6.8 buffer from 2-6 hours.[6]



Figure 3

---

[6] According to Jazz's Declaration of Clark Allphin submitted on April 20, 2020 in U.S. Patent Appl. No. 16/025,487, "the release profile in DI water would be substantially similar" to the release profile in physiological media. *See, e.g.*, Declaration at 1 n.1.

### d.       Pharmacokinetic Study

Liang 2006 also reports the results of a pharmacokinetic ("PK") study in which Examples 6a, 6c, and 6d, and an immediate release control formulation were administered to dogs. Liang 2006 reports better relative bioavailability was achieved for the controlled release formulation of Example 6a (around 50% of the immediate release control) compared to the formulation tested in Examples 6c and 6d (around 25%).

Figure 7, reproduced below, shows the mean GHB concentration over time for each of the tested formulations compared to the immediate release control.  Figure 7 shows that each of Examples 6a, 6c, and 6d released most of the GHB by 8 hours, while the immediate release control released all the GHB by 6 hours.  Based on the PK study, Liang 2006 concluded that "[t]he results show that the lower in the GI, the lower the bioavailability (BA); i.e., absorption is higher at upper GI."  Liang 2006 at ¶ 115.  Liang 2006 therefore concluded that  "[p]referably, the pH sensitive enteric release coat releases/dissolves in the upper GI tract of an animal, which will allow for better absorption of the drug," and more preferably, in the "duodenum or the jejunum."  *Id.* at ¶ 86.

37



The table below summarizes Examples 6a-6d from Liang:

| Exs. | Barrier Coat | Enteric Coat | Target Area | Target pH | Related Figure | Relative BA* |
|------|------|------|------|------|------|------|
| 6a | Example 4 | Eudragit L30-55 | Duodenum | > 5.5 | 3 | 53% |
| 6b | Example 4 | Eudragit L 100 | Jejunum | > 6–7 | N/A | N/A |
| 6c | Example 3 | Eudragit FS 30 D | Colon | > 7 | 2 | 27% |
| 6d | Example 5 | Eudragit FS 30 D | Colon | > 7 | 1 | 22% |

* Relative bioavailability is compared to an immediate release control

## 2.   A POSA Would Have Been Motivated to Formulate a Once-Nightly Dose of Sodium Oxybate Composition

The Background of the Jazz Sustained Release Patents notes a shortcoming with regard to the prior art Xyrem formulation:  "Due to the high doses required and very short half-life of sodium oxybate, optimal clinical effectiveness in narcolepsy typically requires dosing of the drug twice during the night."  '488 Patent at 2:59-64.  A POSA would have been motivated, as of the priority date of the Jazz Sustained Release Patents, to replace Xyrem®'s twice-nightly dosage with an oral pharmaceutical dosage form of GHB that could be taken once a night.  Thus, Liang 2006 notes that "in the treatment of narcolepsy, a twice-nightly dosage regimen can be reduced to a single dose with the compositions of the present invention."  Liang 2006 at ¶ 1.  Such a dosage form would be more convenient than Xyrem®, which requires patients to take an initial dose at bedtime and wake up four hours later to take a second dose.  *See* '488 Patent at 2:51-67.  A once-nightly formulation of GHB would allow patients to sleep through the night.  *See, e.g.*, Alaux 2003 (describing a controlled release formulation for a sleep aid drug in order to "sustain release over a period compatible with the desired time of sleep").

Motivation for a POSA to develop "longer acting" formulations of GHB to "reduc[e] the need for more frequent administration" for narcoleptic patients would have come from at least Williams 2003.  Williams 2003 states that "in the treatment of narcoleptic patients, patients were found to benefit from two, or even three, doses of GHB during the night instead of a single dose which left patients wide awake before their planned awaking time."  Williams 2003 at 3:45-49.  Although increasing the dosage prolonged sleep duration from two to four hours, Williams 2003 taught that it would still "be desirable to develop new compositions and methods to deliver therapeutic amounts of GHB in vivo that were longer acting, reducing the need for more frequent administration.  Such formulations would have many advantages, including increased compliance,

39

reduced medical care, and less intrusion, for example, allowing patients under treatment with narcolepsy and alcoholism to sleep uninterrupted." *Id.* at 3:53-60.

A POSA would also have been motivated to formulate a sodium oxybate composition in which the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from GHB and pharmaceutically acceptable salts of GHB. *See, e.g.*, Liang 2006 at ¶¶ 14, 39, 40. For example, Conte 1997 disclosed "examples of delayed release compositions of the present invention," which included tablets of 1000 mg of GHBNa. Conte 1997 at Exs. 1, 2.

### 3. A POSA Would Have Arrived at the Claimed Percentage of Methacrylic Acid-Methyl Methacrylate in the Coating Through Routine Experimentation

It would have been obvious for a POSA to arrive at a "functional coating compris[ing] one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating." *See, e.g.*, *Purdue Pharma Products L.P. v. Par Pharmaceutical, Inc.*, 642 F. Supp. 2d 329, 372 (D. Del. 2009) (finding obviousness when a prior art reference "discloses the active ingredient at issue, in an even smaller list, without so much as a hint that its use is uncommon" and describes "controlled release coatings comprising either hydrophobic water-insoluble, acrylic polymers or polymethacrylates such as Eudragit, just as claimed in the [asserted claims].")

#### a. The Prior Art Taught the Use of Methacrylic Acid-Methyl Methacrylate Co-Polymer in the Functional Coating

The prior art taught that the use of methacrylic acid-methyl methacrylate co-polymer in a functional coating was a commonplace method for achieving a desired dissolution profile for controlled release formulations.

- Majeed 1986 explains that a common type of controlled release coating includes a blend of water soluble (*e.g.*, pH-responsive Eudragits) and water insoluble polymers. Majeed 1986 shows that the mechanism by which such coatings release drugs is the creation of "pores produced by soluble portion of polymer membrane," *i.e.*, the pH-responsive Eudragits.



Majeed 1986 states that a common type of controlled release coating includes a blend of water soluble (*e.g.*, pH responsive Eudragits) and water insoluble polymers. Majeed 1986 lists examples of polymers that can be used as cellulose acetate phthalate, hydroxypropyl methylcellulose phthalate, carboxymethyl ethylcellulose, **Eudragit L, and Eudragit S**. Majeed 1986 specifically discloses that Eudragit L 12.5 and L100 are poly(methacrylic acid, methylmethacrylate) and soluble at a pH >6.0.

- Monteith 2009 tests formulations of phenylephrine decongestants and states that: "An example of such enteric coating comprises hydroxypropyl methylcellulose phthalate, polyvinyl acetate phthalate or **methacrylic acid co-polymers**.

41

Commercially available preparations include ***Eudragit® L-100***, which dissolves at pH 6.0, and ***S-100***, which dissolves at pH 7.0, used as a mixture."

- THE HANDBOOK OF PHARMACEUTICAL EXCIPIENTS 2006 explains that the primary use for polymethacrylates are for oral capsules and tablet formulations. They may act as enteric coating agents and/or for sustained release, and a POSA would understand that these coatings could be mixed to different extents in order to achieve different release profiles. It also teaches how to select the right type of Eudragit, including the claimed methacrylic acid-methyl methacrylate co-polymer. "***Eudragit L, S and FS types*** are used as ***enteric coating agents because they are resistant to gastric fluid***… Eudragit RL, RS, RD 100, NE 30 D and NE 40 D are used to form water insoluble film coats for sustained-release products. Eudragit RL films are more permeable than those of Eudragit RS, and films of varying permeability can be obtained by mixing the two types together."

- Jones 2004 similarly has a helpful guide for selection of the different Eudragits, including the claimed methacrylic acid-methyl methacrylate co-polymers (Eudragit L and Eudragit S).

| Table 1  Chemical Structure and Properties of Commercial Polymethacrylates | | | |
|---|---|---|---|
| Chemical Name | Trade Name | Properties | Applications |
| Poly (butyl methacrylate, (2-dimethyl aminoethyl) methylacrylate) 1:2:1<br>$R^1, R^3 = CH_3$<br>$R^2 = CH_2CH_2N(CH_3)_2$<br>$R^4 = CH_3, C_4H_9$ | Eudragit E | Cationic polymer.<br>Soluble in gastric juices and weakly acidic buffer solutions pH~5. | Film coatings. |
| Poly(methacrylic acid, methacrylate)<br>1:1<br>1:2<br>$R^1, R^3 = CH_3$<br>$R^2 = H$<br>$R^4 = CH_3$ | Eudragit L<br>Eudragit S | Anionic copolymers. Soluble in neutral to weakly alkaline solutions (pH~6-7) and form salts with alkali. Soluble in intestinal pH. | Enteric coatings; resistant to gastric juices. |
| Poly(ethyl acrylate, methylmethacrylate, trimethylaminoethyl methacrylate chloride)<br>1:2:0.1<br>1:2:0.2<br>$R^1 = H, CH_3$<br>$R^2 = CH_3, C_2H_5$<br>$R^3 = CH_3$<br>$R^4 = CH_2CH_2N(CH_3)_3^+Cl^-$ | Eudragit RS<br><br><br>Eudragit RL | Water insoluble copolymer.<br><br><br>Water permeable films.<br>Water impermeable films. | Water insoluble, used as film coats for sustained release. |

- Miller 2008 is a review that includes distinct sections for "enteric release," or coatings that "dissolve rapidly in the intestinal tract" and "sustained release" or coatings that aim to provide "a constant rate of drug release (and absorption)." The Eudragit polymers that were developed by the 1960s are now "widely used for enteric coating applications." The most common polymers for sustained release coatings are "insoluble cellulose derivatives, insoluble polymethacrylates, as well as polyvinylacetate." Miller 2008 also states that there are four types of Eudragit polymers with enteric release capabilities, three of which are the claimed methacrylic acid-methyl methacrylate co-polymers:  "There are four types of Eudragit polymers with enteric release capabilities: Eudragit L 100-55 (also marketed by BASF as Kollicoat MAE 100P), *Eudragit L 100, Eudragit S 100*, and *Eudragit FS 30 D*."

43

> **b.** **The Prior Art Taught the Use of Methacrylic Acid-Methyl Methacrylate Co-Polymer That Are from About 20% to about 50% by Weight of the Functional Coating**

It would further have been obvious to use methacrylic acid-methyl methacrylate co-polymers that comprise from about 20% to about 50% by weight of the functional coating. Formulators frequently use these polymers in amounts that fall within the claimed range, and the selection of the recited percentage would have been a matter of routine optimization.

- Couch 2005 discloses sustained release delivery of amphetamine salts in which Eudragit L100, a methacrylic acid-methyl methacrylate co-polymer, is around 45.5% by weight of the functional coating. *See, e.g.*, Couch 2005 at Ex. 6.

- Monteith 2009 discloses formulations with sustained release over 12 hours in order to reduce administration frequency for a nasal decongestant drug. One method to achieve this sustained release may be with a pH sensitive "erodible" layer comprising methacrylic acid-methyl methacrylate co-polymers. Table 6 discloses a methacrylic acid-methyl methacrylate co-polymer forming 1-50%.

- Tabandeh 2003 discloses in Figure 3 a Eudragit S100 formulation of aspirin with 10, 20, and 30% polymer content.

> **4.** **A POSA Would Have a Reasonable Expectation of Success to Achieve the Claimed Dissolution Profile**

> **a.** **The Claimed Dissolution Profile Was Known in the Art**

The claimed dissolution profile of "the sustained release portion releas[ing] greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 ℃ and a paddle speed of 50 rpm" was described as desirable and disclosed in a number of prior art references. In addition, the sustained release portion releasing 10% or less of its GHB by about 1 hour and about 60% to about 90% of

its GHB by about 6 hours when tested in dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm was also disclosed in a number of prior art references. Further, the claimed dissolution profile of "wherein the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour [and greater than about 90% of its GHB by 6, 7, or 8 hours] when tested in dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm" was described as desirable and disclosed in a number of prior art references.

- Conte 1997 teaches controlled release compositions of GHB for treating alcoholism. Conte 1997 found that pharmaceutical compositions of GHB having a controlled release component with a nucleus in the form of granules or tablets comprising an active principle dispersed in a cellulosic matrix consisting of, for example, ethylcellulose, and optionally a film coating consisting of co-polymers of acrylic and methacrylic acid esters exhibited controlled release characteristics. The formulations were tested using USP apparatus 2 at a speed of 110 rpm at a temperature of 37 °C in distilled water (pH adjusted with 1 N HCl). Table 3 and Figure 3 of Conte 1997 shows a dissolution profile with near-constant release over an 8-hour period.

| TABLE 3 | | | |
|---|---|---|---|
| | 3.7% | 4.5% | 8.2% |
| 1st hour | 35.1 | 29.7 | 16.0 |
| 2nd hour | 57.4 | 52.9 | 38.3 |
| 3rd hour | 70.1 | 65.1 | 57.1 |
| 4th hour | 77.1 | 73.6 | 67.1 |
| 6th hour | 88.2 | 88.2 | 82.6 |
| 8th hour | 92.2 | 93.1 | 91.8 |

45



Conte 1997 found "that the right coupling between a tablet or a granule realized as described and the filming matrix based on Eudragit® can substantially reduce the GHBNa in vitro release.  In this way, we pass from 100% active principle release with the presently available formulations on the market, to formulations having an active principle release reduced to about ¼ after the first hour and reaching a 90% release of the same not before 8 hours."

- Hu 2006 shows sustained formulations of metformin with "excellent" dissolution release profiles.  The formulations were tested using USP apparatus 2 at 50 rpm at a temperature of 37 °C in different media including distilled water (*see* image below; no pH given).  Formulations F-2 and F-3 released around 40-60% of the metformin at 4 to 6 hours, in a near-constant release with around 10% released within the first hour and 100% within 8 hours.



- Similarly, Savaser 2005 describes sustained release formulations of diclofenac sodium approximating a "target profile" of: after 2 h: % 35 ± 15; after 4 h: % 60 ± 15; after 8 h: % 90 ± 15. The formulation best fitting the "target profile" also "exhibited the best-fitted formulation into the zero order kinetics." The formulations were tested using a USP apparatus 2 device at 50 rpm with a temperature of 37 °C in phosophate buffered water (0.1 N HCl for first hour and then 7.5 pH).



Fig. 1. The dissolution profiles of DS from commercial tablets and HPMC—containing tablets prepared with dry method. F, code of formulation; PYS, commercial tablet.

- Lecomte 2003 states that "two different polymers can be blended to provide a large spectrum of physiochemical properties by varying the polymer blend ratio. In the present study, a gastrointestinal tract (GIT)-insoluble polymer (ethyl cellulose, EC) was dissolved together with an enteric polymer (methacrylic-acid-ethyl acrylate co-polymer 1:1, Eudragit L [sic]), in ethanol to coat multiparticulate pharmaceutical dosage forms." The formulations in Lecomte 2003 were tested using a USP apparatus 2 at a speed of 100 rpm and temperature of 37 °C in a medium of 0.1 M HCl & phosphate buffered water (pH 7.4). 0:100 to 50:50 ethylcellulose:Eudragit L coating ratio provides dissolution profiles that meet the claimed dissolution limitations at 1 hour, 4-6 hours, 6 hours, and 8 hours.



Fig. 1. Effect of the EC:Eudragit™ L ratio (given in the figure) on propranolol HCl release from coated pellets in: (a) 0.1 M HCl, 10% coating level; (b) 0.1 M HCl, 20% coating level; (c) phosphate buffer pH 7.4, 10% coating level; and (d) phosphate buffer pH 7.4, 20% coating level.

- Monteith 2009 discloses dissolution profiles for various formulations using apparatus 2 at 50 rpm in simulated gastric fluid for 1 hour followed by pH 6.8 for the remainder of the study.

48



## Figure 4

### b.    The Claimed Dissolution Profile Encompasses a Broad Range

The claimed in vitro dissolution profile of the sustained release formulation—having greater than about 40% of the GHB in the sustained release portion released by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm (and additionally, 10% or less of the GHB in the sustained release portion by about 1 hour and about 60% to 90% of its GHB by about 6 hours)—broadly captures the dissolution profiles of immediate release and sustained release formulations.  Similarly, the claimed in vitro dissolution profile of the formulation—having at least about 30% of the formulation's GHB released by one hour and/or greater than about 90% of the formulation's GHB by 6, 7, or 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm—broadly captures immediate release formulations in addition to formulations containing both an immediate and sustained release component.  This case is similar to *Purdue Pharma*, 642 F. Supp. 2d at 372, in which the Court found that "[d]eveloping a controlled release formulation of tramadol that would fall within the claimed ranges and would be suitable for once-a day dosing would have been obvious to one of skill in the art" based on

49

disclosures in the prior art of dissolution profiles that were necessary in order to achieve in vitro dissolution profiles that would be deemed suitable for purposes of seeking once-a-day dosing.

- All the tested formulations in Liang 2006 have greater than about 40% of the GHB in the sustained release portion released by about 4 to about 6 hours when tested in a dissolution apparatus 2. For Example 6a (which corresponds to Figure 3, reproduced below), a pH 1.1 media was used from 0-2 hours, and then a pH 6.8 buffer (correlating to the pH of the targeted upper intestine) was used from 2-6 hours[7]. For Examples 6c and 6d (which correspond to Figures 2 and 1 respectively, with Fig. 2 reproduced below), a pH 1.1 media was used from 0-2 hours, a pH 6.0 buffer (correlating to the pH of the upper intestine) was used from 2-3 hours, and then a pH 7.5 buffer (correlating to the pH of the targeted colon) was used from 3-6 hours. The use of the buffers is used to approximate the dissolution of the delayed/controlled release portion in different portions of the intestine. The examples in Liang 2006 also meet the other claimed dissolution profiles of releasing 10% or less of the GHB in the sustained release portion by about 1 hour and about 60% to about 90% of the GHB in the sustained release portion by about 6 hours. The examples in Liang 2006 (including the immediate release formulations, which correspond to Figure 4, reproduced below) also meet the dissolution profiles of releasing at least about 30% of the formulation's GHB by one hour and greater than about 90% of the formulation's GHB by 6, 7, or 8 hours when tested in a dissolution apparatus 2.

---

[7] According to Jazz's Declaration of Clark Allphin submitted on April 20, 2020 in U.S. Patent Appl. No. 16/025,487, "the release profile in DI water would be substantially similar" to the release profile in physiological media. *See, e.g.*, Declaration at 1 n.1.

| Exs. | Barrier Coat | Enteric Coat | Target Area | Target pH | Related Figure | Relative BA* |
|------|-------------|-------------|-------------|-----------|----------------|--------------|
| 6a | Example 4 | Eudragit L30-55 | Duodenum | > 5.5 | 3 | 53% |
| 6b | Example 4 | Eudragit L 100 | Jejunum | > 6–7 | N/A | N/A |
| 6c | Example 3 | Eudragit FS 30 D | Colon | > 7 | 2 | 27% |
| 6d | Example 5 | Eudragit FS 30 D | Colon | > 7 | 1 | 22% |

* Relative bioavailability is compared to an immediate release control





Figure 2



Figure 1



- All the formulations in Conte 1997 (with either no or varying amounts of a film coating) also had greater than about 40% of the GHB in the sustained release portion released by about 4 to about 6 hours when tested in a dissolution apparatus

52

2. *See* Table 3 and Figure 3 below.  Conte 1997 also shows formulations that release at least about 30% of the formulation's GHB by one hour and greater than about 90% of the formulation's GHB by 6, 7, or 8 hours.

| TABLE 3 | | | |
|---|---|---|---|
| | 3.7% | 4.5% | 8.2% |
| 1st hour | 35.1 | 29.7 | 16.0 |
| 2nd hour | 57.4 | 52.9 | 38.3 |
| 3rd hour | 70.1 | 65.1 | 57.1 |
| 4th hour | 77.1 | 73.6 | 67.1 |
| 6th hour | 88.2 | 88.2 | 82.6 |
| 8th hour | 92.2 | 93.1 | 91.8 |



FIG.3



- All the formulations in Hu 2006 also met the claimed dissolution profile of greater than about 40% of the active ingredient in the sustained release portion released by about 4 to about 6 hours when tested in a dissolution apparatus 2, no matter what was in the coating, the amounts of Eudragit in the coating, the amount of talc in the coating, or the media that was used.



Fig. 1. Effects of talc amounts on the drug dissolution in distilled water.

Fig. 2. Effects of coating amounts of Eudragit® NE30D on the release of talc-modified pellets in distilled water.

54



Fig. 3. Comparison of drug dissolution profiles for pellets coated with three formulation in different media: (A) 0.1 M HCl, (B) distilled water, (C) pH 6.8 PBS.

- The majority of the formulations in Savaser 2005 also depict that the majority of the tested formulations met the claimed dissolution profile of greater than about 40% of the active ingredient in the sustained release portion released by about 4 to about 6 hours when tested in dissolution apparatus 2. At least seven of the ten formulations tested met the claimed dissolution profile.



Fig. 1. The dissolution profiles of DS from commercial tablets and HPMC—containing tablets prepared with dry method. F, code of formulation; PYS, commercial tablet.

In conclusion, the claimed dissolution profile would encompass a broad range of release profiles, including immediate release.

Given the foregoing, the claimed subject matter would be obvious because a POSA would have been motivated to and had a reasonable expectation of success in formulating a once-nightly dose of sodium oxybate composition with an immediate release and sustained release component, the sustained release component made up of a functional coating deposited over a core, and the functional coating comprising one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating. It would be a matter of routine experimentation for a POSA to use the claimed co-polymer in the claimed amounts to achieve the claimed dissolution profile. The claimed dissolution profile, *i.e.*, wherein the sustained release portion releases greater than about 40% of the GHB by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37°C and a paddle speed of 50 rpm, and 10% or less of its GHB by about 1 hour, and about 60% to about 90% of its GHB by about 6 hours; and wherein the formulation releases at least about 30% of the GHB by one hour and greater than about 90% of the GHB by 6, 7, or 8 hours when tested in dissolution apparatus 2

in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm was known in the art and/or broadly encompasses immediate release formulations.

###### 5. Response to Jazz on the Definition of a POSA with Respect to the Sustained Release Patents

Jazz states in its Final Validity Contentions that it objects to Avadel's "failure to identify or define the level of ordinary skill in the relevant art for the Sustained Release Patents, or the POSA for the Sustained Release Patent." Jazz's Final Validity Contentions at 40 n.10. Avadel disagrees that it needs to provide a specific definition of a POSA in the field(s) of the Sustained Release Patents. Rather, Avadel has made reasonable assumptions, to the extent necessary and appropriate, as to the knowledge and expertise of such a person and has used that understanding of the level of ordinary skill to prepare its Initial Invalidity Contentions.

Nonetheless, Avadel's definition of a POSA in the field(s) of the Sustained Release Patents is as follows. Avadel contends that a POSA, as of the priority dates of the Sustained Release Patents, would have had the skills, education, and expertise of a team of individuals working together to formulate a sustained release drug product. Such a team would have included individuals with doctoral degrees in chemistry, biochemistry, pharmaceutics, pharmaceutical sciences, chemical engineering, biochemical engineering or related fields, with at least two years of post-graduate experience in developing sustained release drug products, or master's or bachelor's degrees in similar fields of study, with a commensurate increase in their years of postgraduate experience. Such a team also would have been familiar with a variety of issues relevant to developing sustained release drug formulations, including, among other things, pharmacokinetics, pharmacodynamics, drug delivery, and other pharmaceutical characteristics. The team also would have included or had access to an individual with a medical degree with

experience in treating sleep disorders, and particularly of narcolepsy with cataplexy.  Avadel reserves the right to refine its definition of a POSA during the course of the litigation.

### 6.    Response to Jazz on Invalidity of the Sustained Release Patents Under 35 U.S.C. § 102

For the reasons set forth below, as well as set forth in the claim charts attached as Appendices B-E, Claims 1-12 of the '488 Patent, Claims 1-15 of the '885 Patent, Claims 1-20, 23-25 of the '956 Patent, and Claims 1-15 of the '931 Patent (the "Asserted Claims of the Sustained Release Patents") are invalid as anticipated over Liang 2006.

In its response to Avadel's Initial Invalidity Contentions, Jazz in its Final Validity Contentions does not dispute that Liang 2006 discloses every limitation present in the claims of the Sustained Release Patents other than (1) the "claimed functional coating"; and (2) the "claimed dissolution profiles."  Jazz's Final Validity Contentions at 72, 75; *see also* Avadel's Initial Invalidity Contentions at Appendices B-E (showing that Liang 2006 discloses each limitation of the claims of the Sustained Release Patents).

But as discussed below, Liang 2006 discloses, either expressly or inherently, the "claimed functional coating" and the "claimed dissolution profiles."  Thus, Liang 2006 anticipates, either expressly or inherently, the Asserted Claims of the Sustained Release Patents.

### a.    Liang 2006 Discloses the Claimed Functional Coating

The claims of the Sustained Release Patents all require a functional coating "wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating."  *See, e.g.*, '488 Patent at Claim 1.

Liang 2006 discloses this limitation.  Liang 2006 discloses that the "pH sensitive enteric coat of the current invention are pH sensitive coating materials known in the art," and may include,

58

"but are not limited to, methacrylate-based coating materials such as polymers of methacrylic acid and methacrylates (e.g., Eudragit L 100-55, Eudragit L 30-D55, Eudragit L 100, Eudragit S 100, Eudragit L30-D55, Eudragit L 100, Eudragit S 100, Eudragit FS 30 D)."  Liang 2006 at ¶ 82. Liang 2006 also discloses that "[p]referably, the pH sensitive delayed/controlled release particles are prepared by coating the barrier-coated immediate release core with an appropriate pH sensitive coating material targeting to a specific region in the GI tract of an animal.  The weight gain of the pH sensitive enteric coating is from about 10% to about 70% of the final enteric-coated particle weight."  *Id.* at ¶ 85.  A POSA would have understood from the description of the method of making the "delayed/controlled release particles" in Liang 2006 that starting with a barrier-coated immediate release core and adding the pH sensitive enteric coating in the range disclosed would result in a "functional coating compris[ing] one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating."  Specifically, a POSA would have understood that the formulations in Liang 2006 where "the weight gain of the pH sensitive enteric coating is from about 10% to about 70% of the final enteric-coated particle weight," would result in formulations where the weight of the methacrylic acid-methyl methacrylate co-polymers falls within the range of about 20% to about 50% by weight of the functional coating.  Liang 2006 therefore provides sufficient disclosure such that a POSA would have at once envisaged formulations with the claimed functional coating.

Jazz argues in its Final Validity Contentions that Liang 2006 teaches away from the "functional coating"[8] limitation because it discloses that the "'Enteric Coating Solution'

---

[8] In its Final Validity Contentions, Jazz implicitly construes "a functional coating" to be synonymous with a single coating which is the "enteric coating" in Liang 2006.  *See, e.g.*, Jazz's Final Validity Contentions at 73-74 ("In the only exemplary formulations set forth in Liang 2006 in which methacrylic acid-methyl methacrylate co-polymers are used, the co-polymer comprises over ninety percent of the functional coating.").  Jazz's interpretation of this claim term is raised

comprise[s] of over 90 percent Eudragit L 100." Jazz's Final Validity Contentions at 58; *see also id.* at 76 ("methacrylic acid-methyacrylate co-polymers in the coating solution (over 90%)"). But Jazz's argument misses the point. Liang 2006 does not, as Jazz contends, teach away from the use of a methacrylic acid-methyl methacrylate co-polymer at the recited concentrations. A POSA would understand that an example disclosing an enteric coating solution of over 90 percent Eudragit L 100 would not mean that that the Eudragit L 100 is about 90% by weight of the functional coating. Rather, the 90% of Eudragit L 100 figure reflects the amount in the enteric coating *solution*; the final percent of Eudragit L 100 by weight in the functional coating will depend on the amount of enteric coating added. Moreover, Liang 2006 teaches that a POSA can "vary[] the thickness and/or types of the barrier coats" and/or vary "[t]he amount of pore formers used in the barrier coats" in order to optimize the properties of the formulation. Liang 2006 at ¶¶ 76, 77. Liang 2006 also discloses that "[f]or a slower release core, PVP K90 is used at lower levels or can be omitted." *Id.* at ¶ 101. Therefore, Liang 2006's discussion of an enteric coating solution does not teach away from the limitation a "functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating," as Jazz contends.

### b.   Liang 2006 Discloses the Claimed Dissolution Profiles

The claims of the Sustained Release Patents all require that "the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when

---

for the first time in its Final Validity Contentions, and is contrary to the term's plain and ordinary meaning. To the extent that the claim term "a functional coating" requires claim construction, Avadel contends that the ordinary meaning in light of the intrinsic evidence is one or more coatings that control the rate of release of the drug. *See, e.g.*, '488 Patent at 12:7 ("In one embodiment, a functional coating composition as disclosed herein may control, at least in part, the rate of release of the drug to be delivered from the CR core into the gastrointestinal tract.").

tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm." *See, e.g.*, '488 Patent at Claim 1. Some of the claims also require that "the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm." *See, e.g.*, *id.* Some of the claims also require that "the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm." *See, e.g.*, *id.*; *see also id.* at Claim 2 (same limitation, but by 7 hours); *id.* at Claim 3 (same limitation, but by 6 hours). Some of the claims also require that "the sustained release portion releases about 60% to about 90% of its gamma-hydroxybutyrate by about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm." *See, e.g.*, *id.* at Claim 4. Some of the claims also require that "the sustained release portion releases about 10% or less of its gamma-hydroxybutyrate by about 1 hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm." *See, e.g.*, *id.* at Claim 11.

Initially, Jazz lacks written description support for those limitations, as detailed *infra* Section III.E. But to the extent that Jazz contends that its specification does have written description support, Liang 2006 anticipates.

Further, Jazz contends that FT218 satisfies limitations to "the sustained release portion releases . . . *its* gamma-hydroxybutyrate" based on what appears to be extrapolation from the total amount of sodium oxybate released over a given time period, without regard to where it came

from.  *See, e.g.*, Jazz's 09/07/2021 Initial Infringement Chart at 30-32.[9]  To the extent that Jazz's

supposition is appropriate, Liang 2006 anticipates.

A POSA would have also known how to test the formulations from Liang 2006 using a

dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm.

To the extent pertinent, a POSA would have been motivated to do so because "[d]issolution testing

is one of the several tests that pharmaceutical companies typically conduct on oral dosage

formulations (e.g., tablets) to determine compliance and to release products for distribution and

sales."  Bai 2007 at 2328.  A POSA also would be motivated to do so because "USP Dissolution

Test Apparatus II is the most commonly and widely used apparatus specified by the USP."  *Id*.  A

POSA likewise would have been motivated to follow the USP to adhere to CGMP procedures, and

also would have known that for purposes of such testing, the dissolution medium is "maintained

at constant temperature of 37°C by either a water bath or a heating jacket."  *Id*.  And a POSA also

would have known that "as required by the USP," the apparatus would be agitated "so that the

paddles rotate at 50 rpm."  *Id*.  A POSA also would have been aware that "deionized water" is a

medium representing "the typical case for this test."  *Id*. at 2330.  Indeed, the Examples in Liang

2006 were tested using USP Apparatus 2 at a paddle speed of 75 rpm in physiological media, and

according to Jazz, the use of physiological media would result in a "substantially similar" release

profile as DI water for the claimed invention.  *See, e.g.*, Jazz's Declaration of Clark Allphin

submitted on April 20, 2020 in U.S. Patent Appl. No. 16/025,487 at n.1 (noting that "profiles were

measured in physiological media, the release profile in DI water would be substantially similar, as

---

[9] To the extent that the claim term "its gamma-hydroxybutyrate" requires claim construction,
Avadel contends that the ordinary meaning in light of the intrinsic evidence is the GHB that is
released from the "sustained release portion" of the formulation, and not from any other portion or
source.

we have observed with other studies involving similar formulations tested in physiological media as well as DI water," despite not specifying paddle speed)).

In any event, testing a preferred formulation from Liang 2006 using a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm would necessarily and inevitably result in the dissolution profiles recited in the claims of the Sustained Release Patents, *i.e.*, where "the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours," where "the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour," where "the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 6," "7," or "8 hours," where "the sustained release portion releases about 60% to about 90% of its gamma-hydroxybutyrate by about 6 hours," and/or where "the sustained release portion releases about 10% or less of its gamma-hydroxybutyrate by about 1 hour." *See, e.g.,* '488 Patent at Claim 1, Claim 2, Claim 3, Claim 4, Claim 11.

In its Final Validity Contentions, Jazz disputes that Liang 2006 meets the claimed dissolution profile limitations. *See* Jazz's Final Validity Contentions at 75-77. First, Jazz contends that "none of the formulations disclosed in Examples 6a, 6c, or 6d in Liang 2006 meet the limitations of any claim in the Sustained Release Patents." Jazz's Final Validity Contentions at 75. Jazz alleges that "the formulations of Examples 6c and 6d contain far more methacrylic acid-methyl methacrylate co-polymers in the coating solution (over 90%) than what is claimed in the Sustained Release Patents." *Id.* at 76. As an initial matter, Jazz is wrong that the formulations disclosed in Example 6 of Liang 2006 do not fall within the formulations recited in the Sustained Release Patents. But even were Jazz correct, the Liang 2006 disclosure would satisfy the subject limitations – thus, even if Liang taught 90% methacrylic acid-methyl methacrylate co-polymers in the coating solution, that is "about 20% to about 50%" because it includes at least 40-50%. Put

another way, the subject limitation does not recite "no more than 50%," which Jazz appears to erroneously contend.  As a result, Liang 2006 would have taught a POSA that the formulations claimed in the Sustained Release patents would have resulted in the recited dissolution profiles.

Second, Jazz contends that "the pharmacokinetic data disclosed in Liang 2006 were not generated from Liang 2006's ***claimed*** formulations" because "the data presented in Figure 7 of Liang 2006 . . . were not generated from pharmacokinetic studies of GHB formulations comprised of both immediate release and sustained release portions."  Jazz's Final Validity Contentions at 76 (emphasis in original).  Jazz's argument is misdirected when the limitation at issue is directed to an *in vitro* dissolution profile, not an *in vivo* one, and Avadel does not rely on Figure 7 of Liang 2006 regarding an in vitro dissolution profile of GHB formulations comprising both immediate release and sustained release portions.  Further, Jazz's reliance on arguments applicants made during prosecution of patents that were ultimately assigned to Avadel is misplaced.  *Id.* at 76-77. For the reasons set forth below in Section III.D.8., Jazz has not demonstrated that arguments made during prosecution of patents ultimately assigned to ***Avadel***[10] are inconsistent with Avadel's invalidity positions regarding ***Jazz's*** Sustained Release Patents in this litigation.  The formulations disclosed in Liang 2006 teach each and every aspect of the claimed formulation, including the claimed functional coating and dissolution profiles.

---

[10] Any reference to an assignment to Avadel means an assignment to Avadel or a subsidiary or affiliate thereof.

7.     **Response to Jazz on Invalidity of the Sustained Release Patents Under 35 U.S.C. § 103**

a.     **The Sustained Release Patents are Obvious Over Liang 2006**

Even if the claims of the Sustained Release Patents were found not to be anticipated by Liang 2006, the claims of the Sustained Release Patents would have been obvious in light of Liang 2006 and the knowledge of a POSA.

As an initial matter, for the reasons set forth below in Section III.D.8., Jazz's contention that arguments made during prosecution of patents ultimately assigned to *Avadel* are inconsistent are not "fatal to [Avadel's] contentions" regarding the claims in *Jazz's* Sustained Release Patents, either factually or as a matter of law.  *See, e.g.*, Jazz's Final Validity Contentions at 58, 71, 72, 77, 80.  Jazz's reliance on arguments applicants made during prosecution of patents that were ultimately assigned to Avadel is misplaced.  *Id.* at 71-72; *see also id.* at 58, 59.  For the reasons set forth below in Section III.D.8., Jazz has not demonstrated that arguments made during prosecution of patents ultimately assigned to *Avadel* are inconsistent with Avadel's invalidity positions regarding *Jazz's* Sustained Release Patents in this litigation.

As discussed above, Jazz does not dispute that a POSA would have been motivated to look to Liang 2006 given the various attributes of that reference, including the fact that it addresses the same problem addressed by the ostensible inventors of the Sustained Release patents.  Jazz also does not dispute that Liang 2006 discloses each and every limitation present in the claims of the Sustained Release Patents other than (1) the "claimed functional coating"; and (2) the "claimed dissolution profiles."  Jazz's Final Validity Contentions at 72, 75; *see also* Avadel's Initial Invalidity Contentions at Appendices B-E (showing that Liang 2006 discloses each limitation of the claims of the Sustained Release Patents).  Further, these limitations are disclosed in the prior art, and to the extent Jazz contends Liang 2006 does not disclose those limitations, a POSA would

65

Dated: May 6, 2022                              Respectfully submitted,


                                                By: /s/ Daniel M. Silver
                                                Daniel M. Silver (#4758)
                                                Alexandra M. Joyce (#6423)
                                                405 N. King Street, 8th Floor
                                                Wilmington, DE 19801
                                                MCCARTER & ENGLISH, LLP
                                                 (302) 984-6331
                                                dsilver@mccarter.com
                                                ajoyce@mccarter.com


                                                Kenneth G. Schuler (*admitted pro hac vice*)
                                                Marc N. Zubick (*admitted pro hac vice*)
                                                Sarah W. Wang (*admitted pro hac vice*)
                                                Alex Grabowski (*admitted pro hac vice*)
                                                LATHAM & WATKINS LLP
                                                330 N. Wabash Avenue, Suite 2800
                                                Chicago, IL 60611
                                                Telephone: (312) 876-7700
                                                Email: kenneth.schuler@lw.com
                                                Email: marc.zubick@lw.com
                                                Email: sarah.wang@lw.com
                                                Email: alex.grabowski@lw.com


                                                Herman Yue (*admitted pro hac vice*)
                                                Bornali Rashmi Borah (*admitted pro hac vice*)
                                                LATHAM & WATKINS LLP
                                                1271 Avenue of the Americas
                                                New York, NY 10020
                                                (212) 906-1200
                                                Email: Herman.Yue@lw.com
                                                Email: Rashmi.Borah@lw.com


                                                Yi Ning (*admitted pro hac vice*)
                                                LATHAM & WATKINS LLP
                                                140 Scott Drive
                                                Menlo Park, CA 94025
                                                (650) 328-4600
                                                Email: sunnie.ning@lw.com


                                                Daralyn J. Durie (*admitted pro hac vice*)
                                                DURIE TANGRI LLP
                                                217 Leidesdorff Street
                                                San Francisco, CA 94111

(415) 365-6666
ddurie@durietangri.com

Kira A. Davis (*admitted pro hac vice*)
Katherine E. McNutt (*admitted pro hac vice*)
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499
kdavis@durietangri.com
kmcnutt@durietangri.com

*Attorneys for Avadel*

EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-691-MN |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1138-MN |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1594-MN |
| AVADEL CNS PHARMACEUTICALS, LLC, | ▮▮▮▮▮▮▮▮▮▮▮▮ |
| Defendant. | |

**AVADEL'S FINAL NON-INFRINGEMENT CONTENTIONS**

Pursuant to the Scheduling Order entered in the above-captioned actions on December 21, 2021 (*see* D.I. 29),[1] Defendant Avadel CNS Pharmaceuticals, LLC ("Avadel"), hereby provides Plaintiffs Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (collectively "Jazz" or "Plaintiffs") its final Non-Infringement Contentions regarding the asserted claims of U.S. Patent

---

[1] All matters listed in the caption above are proceeding on a coordinated schedule.  All docket cites are to matter C.A. No. 21-cv-1138-MN unless otherwise noted.

Nos. 8,731,963 (the "'963 patent"); 10,758,488 (the "'488 patent"); 10,813,885 (the "'885 patent"); 10,959,956 (the "'956 patent"); 10,966,931 (the "'931 patent"); 11,077,079 (the "'079 patent"), and 11,147,782 (the "'782 patent") (collectively the "Asserted Patents").

## I.   INTRODUCTION

### A.   Asserted Claims

On September 7, 2021, Jazz provided Avadel with its Initial Infringement Contentions pursuant to Paragraph 4(c) of the Delaware Default Standard for the '963 patent, the '488 patent, the '885 patent, the '956 patent, and the '931 patent.  In those Initial Infringement Contentions, Jazz asserted that  FT218, as described in Avadel's New Drug Application ("NDA") No. 214755 ("Avadel's NDA"), will infringe ███████████████████████████████ ██████████████████████████████████████████ (collectively the "Sustained Release Patents").  Jazz further asserted that "Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation" of FT218 will infringe ████████ █████████████████████████t (the "REMS Patent").[2]

On December 7, 2021, Jazz provided Avadel with its Initial Infringement Contentions for the '079 and '782 patents (collectively, the "Resinate Patents").  In those Initial Infringement Contentions, Jazz asserted that FT218 will infringe ██████████████████████████████ ████████████████████.

### B.   Avadel's FT218 Product

Avadel's FT218 product is a formulation of sodium oxybate designed to treat excessive daytime sleepiness (EDS) or cataplexy in adults with narcolepsy.  Unlike Jazz's sodium oxybate products, which are twice-nightly formulations that require patients to wake up in the middle of

---

[2] As addressed below, it is unclear what Jazz actually accuses with respect to the REMS patent.

the night, FT218 is a revolutionary ***once-nightly*** formulation of sodium oxybate that avoids interrupting the patient's nighttime sleep.  Because narcolepsy is a sleep disorder, waking up in the middle of the night for treatment is counterintuitive and presents a major problem for patients. FT218 therefore meets a significant need that is unmet by Jazz's twice-nightly sodium oxybate products.

FT218 is a composition of sodium oxybate containing an immediate release portion ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████   ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████



FT218 will be dispensed through a Risk Evaluation and Mitigation Strategy ("REMS") to ensure that the product is distributed safely.  The REMS for FT218 will be called the LUMRYZ REMS. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███ ████ ████████ ██ ███ ███████ ██████ ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

### C.      Reservation of Rights

Avadel provides these Final Non-Infringement Contentions based on information that is currently available to it.  Avadel reserves the right to supplement and/or amend these Final Non-Infringement Contentions under the Local Rules or any other applicable Rules or order of the Court based upon, among other things, Plaintiffs' Final Infringement Contentions, newly discovered or

newly understood grounds for non-infringement obtained through discovery, the Court's construction of the asserted claims, and/or as discovery proceeds in this case, including based on expert discovery disclosures and on any discovery materials that have not yet been produced or provided, upon fact and expert depositions, or upon further investigation.  For example, no depositions have yet been conducted in this case, and Avadel reserves the right to rely on evidence developed during fact depositions as evidence of non-infringement.

Avadel's Final Non-Infringement Contentions are also limited by the information provided by Jazz in its Initial Infringement Contentions and Plaintiffs' responses to Avadel's discovery requests, many of which are deficient or incomplete.  Indeed, Jazz's Initial Infringement Contentions and discovery responses are wholly inadequate, and although Avadel has pointed out to Plaintiffs a large number of deficiencies, Jazz has not remedied them.  Avadel reserves the right to supplement these Final Non-Infringement Contentions after Jazz provides complete and proper contentions and discovery responses.

These Final Non-Infringement Contentions are also made pursuant to Rule 502 of the Federal Rules of Evidence.  To the extent that these Final Non-Infringement Contentions contain any information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, the common-interest privilege, the joint-defense privilege, or any other applicable privilege, doctrine, or immunity, the disclosure of such in these Final Non-Infringement Contentions is inadvertent and does not constitute a waiver of any such privilege, doctrine, or immunity.  The information set forth herein is provided without waiving: (1) the right to object to the use of any statement for any purpose at trial or a deposition in this or any other action on any appropriate grounds; (2) the right to object to any discovery or other request for information

involving or based upon any statements made herein; or (3) the right to revise, correct, supplement, or clarify any of the statements made herein at any time.

Additionally, the Final Non-Infringement Contentions set forth herein for the independent claims of the Asserted Patents are incorporated by reference into the Final Non-Infringement Contentions for any asserted claims that depend from such independent claims, as if such contentions were fully set forth therein.  Further, the division of claim elements, and any parenthetical references, are not intended to be a modification of the claim language or an admission that the claims should be so construed, but rather is done for purposes of convenience of reference.  These Final Non-Infringement Contentions respond to Jazz's Initial Infringement Contentions, and do not act to affirm or admit narratives provided by Jazz.

In providing these Final Non-Infringement Contentions, Avadel reserves and does not waive any and all claims, contentions, or arguments regarding the factual and/or legal details of these Contentions.  These Final Non-Infringement Contentions are not designed to represent all evidence supporting non-infringement; rather, where specifics are provided, they provide examples of the manner in which the accused product does not infringe the asserted claims of the Asserted Patents.  All citations to evidence are illustrative, and Avadel reserves the right to rely upon other portions of cited documents, or additional documents to support non-infringement, including all documents relied upon by Plaintiffs as purportedly showing infringement.  Any omission of other specific citations or evidence does not constitute waiver of any right to rely upon such additional evidence at a later date, including for purpose of trial.

## II.   AVADEL'S FT218 PRODUCT DOES NOT INFRINGE THE SUSTAINED RELEASE PATENTS

6

### A. Jazz's Contentions Do Not Establish That Avadel's FT218 Contains a "Sustained Release" Portion as Claimed

All the asserted claims of the Sustained Release Patents recite a "sustained release" limitation. As an initial matter, Jazz's Initial Infringement Contentions are vague, incomplete, and unintelligible as to this limitation, and do not satisfy the disclosure requirements under the Local Rules or establish that the subject limitation is satisfied. Jazz has also set forth no evidence for its conclusory assertion that this limitation is met under the doctrine of equivalents. As explained below, Jazz cannot meet its burden of establishing that Avadel infringes the asserted claims of the Sustained Release Patents either literally or under the doctrine of equivalents at least because FT218 does not contain a "sustained release" portion under either party's proposed construction of this term.[3]

| Disputed Term; Patents and Claims | Avadel's Proposed Construction | Jazz's Proposed Construction |
|---|---|---|
| "sustained release" (Avadel)<br><br>"sustained release portion" (Jazz)<br><br>'488 Patent Claims 1-12, '866 Patent Claims 1-15; '956 Patent Claims 1-20, 23-25; '931 Patent Claims 1-15 | a gradual, extended release, as opposed to releasing a majority of the drug within an hour upon exposure to intestinal pH | Plain and ordinary meaning, i.e., the portion of the formulation that is not immediate release and that releases over a period of time |

#### 1. Avadel Does Not Infringe The "Sustained Release" Portion Limitation Under Avadel's Proposed Construction

Jazz cannot meet its burden of establishing that FT218 has a "sustained release" portion under Avadel's proposed construction. As used in the asserted claims of the Sustained Release

---

[3] As set forth in Avadel's Invalidity Contentions dated October 13, 2021, the asserted claims of the Sustained Release Patents are invalid. Because invalid claims cannot be infringed, Avadel's FT218 does not infringe any of the asserted claims of the Sustained Release Patents for this separate reason.

Patents, "sustained release" describes "a gradual, extended release, as opposed to releasing a majority of the drug within an hour upon exposure to intestinal pH." ████████████████

████████████████████████████████████████████████████████

████████████████████████████████

   ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

   ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████   ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

   Avadel's FT218 product does not have a "sustained release" portion and cannot meet this limitation of the asserted claims of the Sustained Release Patents. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



Jazz's contentions do not articulate any basis for infringement under Avadel's proposed construction (which reflects the meaning advanced by Jazz during prosecution to distinguish the prior art). *See, e.g.*, Jazz's Initial Infringement Contentions at 27. Instead, Jazz merely asserts, in conclusory fashion, that "Avadel's NDA uses the terms 'controlled release' and 'sustained release' interchangeably," and that "Avadel's proposed package insert states that Avadel's NDA Product 'contains a blend of immediate-release and controlled-release granules.'" *See, e.g.*, Jazz's Initial Infringement Contentions at 27. Jazz's conclusory citations to these documents—which do not refer or relate to how the term "sustained release" is used in the asserted claims of the Sustained Release Patents—does not show infringement under Avadel's proposed construction.



12

As an initial matter, Jazz's contentions as to this limitation are vague, incomplete, and unintelligible, and do not satisfy the disclosure requirements under the Local Rules or establish that the subject limitation is satisfied.  Jazz has also set forth no evidence for its conclusory assertion that this limitation is met under the doctrine of equivalents.

13



14





## III. THERE IS NO INFRINGEMENT OF THE ASSERTED CLAIMS OF THE REMS PATENT

As noted *supra*, Jazz asserts that Avadel will infringe claims 1-23, 25, and 28 of the REMS patent.[4] Jazz contends that "Avadel's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Avadel's NDA will constitute direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims." Jazz's Initial Infringement Contentions at 2.

Avadel disputes that Jazz's infringement contentions establish infringement of claims 1-23, 25, and 28 of the REMS patent. Avadel does not infringe the asserted claims of the REMS Patent under either party's claim construction for at least the reasons described below.

| Disputed Term; Patent and Claims | Avadel's Proposed Construction | Jazz's Proposed Construction |
|---|---|---|
| "[single]/[central] computer database" | One and only one computer database, having the recited functionality | No construction necessary |

---

[4] As set forth in Avadel's invalidity contentions dated October 13, 2021, the asserted claims of the REMS Patent are invalid. Because invalid claims cannot be infringed, Avadel does not infringe any of the asserted claims of the REMS Patent for this separate reason.

| '963 patent claims 1, 4, 5, 7-9, 14, 21-23, 25 | | |
|---|---|---|
| "reconcile inventory/reconciling inventory/cycle counted and reconciled"<br><br>'963 patent claims 1, 20, 23, 28 | Checking whether there is a mismatch between the aggregate amount of a drug reported in physical inventory and the aggregate amount in the database | No construction necessary |
| "database query that identifies that the narcoleptic patient is a cash payer/ database queries . . . for identifying: that the narcoleptic patient is a cash payer . . ."<br><br>'963 patent claims 1, 23, 25 | Plain and ordinary meaning, which is the query identifies that the form of payment used by the patient was physical currency | No construction necessary |

## A. Jazz's Contentions Do Not Establish Infringement Under § 271(e)(2)(A)

Jazz has not established an act of infringement under § 271(e)(2)(A).

### 1. Avadel Does Not Infringe the REMS Patent Under Avadel's Proposed Construction of the Asserted Claims

The asserted claims of the REMS Patent are properly construed as directed to systems and not to methods. As set forth in Avadel's motion for judgment on the pleadings,[5] because the REMS Patent is directed to a system and not a method, it was not properly Orange-Book listed. There is no infringement under 35 U.S.C. § 271(e)(2)(A) for a patent like the REMS Patent, which claims neither a drug nor its use. Jazz's infringement contentions thus cannot establish infringement under § 271(e)(2)(A).

---

[5] D.I. 21, C.A. No. 21-691-MN, and all other filings related to that motion, the full contents of which are incorporated herein as though fully set forth.

### 2. Avadel Does Not Infringe the REMS Patent Under Jazz's Proposed Construction of the Asserted Claims

In its opposition to Avadel's motion for judgment on the pleadings (D.I. 43 C.A. No. 21-691-MN), Jazz identified purported method steps that it contended were required by the asserted claims of the REMS Patent. *See infra*. Performing those steps is not in fact claimed in the asserted claims of the REMS Patent, and for that reason, Avadel believes that Jazz will not obtain a construction that their performance is required to infringe. Additionally, during the parties' claim term exchange, Jazz did not propose ***any*** terms for construction, tacitly conceding that the asserted claims do not require re-writing to add the non-existent methods steps that Jazz included in its opposition brief. Avadel is thus aware of no explanation for Jazz's assertion of infringement under § 271(e)(2)(A).

### B. Jazz's Contentions Do Not Establish Direct or Indirect Infringement of the Asserted Claims of the REMS Patent

Jazz has not established that there is direct or indirect infringement with respect to the asserted claims of the REMS Patent.

### 1. Avadel Does Not Infringe the REMS Patent Under Avadel's Proposed Construction of the Asserted Claims

The asserted claims of the REMS Patent are properly construed as directed to systems and not to methods. Jazz's infringement contentions cite the "use, distribution and/or administration of Avadel's NDA Product" as the purportedly infringing conduct, claiming that such use, distribution, and/or administration of the drug "(e.g., by Avadel, doctors, pharmacies, other healthcare professionals, and/or patients) pursuant to Avadel's REMS Program will meet, literally or under the doctrine of equivalents, each limitation in claim 1 and will constitute direct infringement of claim 1." Jazz Initial Infringement Contentions at 3. Jazz has known that Avadel contends the REMS Patent covers systems and not methods since at least Avadel's July 23, 2021

18

motion for judgment on the pleadings (D.I. 21, C.A. No. 21-691-MN), and yet Jazz, in its September 7, 2021 infringement contentions, accused  only actions—use, distribution, and/or administration.  Jazz has identified no factual basis in its contentions that Avadel will use any system having the required elements of the asserted claims.  Jazz has also not identified what action it contends constitutes infringement under 35 U.S.C. § 271(a) in the event that the claims of the REMS Patent are system claims, and has also failed to meet its burden in that regard.

Because indirect infringement requires an act of direct infringement, Jazz's failures to plausibly allege direct infringement under Avadel's proposed construction render Jazz's indirect infringement contentions likewise deficient.  Jazz also has not identified facts constituting the additional elements of either induced infringement or contributory infringement.

### 2.     Avadel Does Not Infringe the REMS Patent Under Jazz's Proposed Construction of the Asserted Claims

Even under Jazz's proposed construction, there is no direct or indirect infringement.  If, as Jazz contends, the REMS Patent "claims methods of using a computer-implemented system . . . .," then Jazz has also failed to identify an act of direct infringement by or attributable to a single actor. Jazz vaguely alleges that the "use, distribution and/or administration of Avadel's NDA Product (e.g., by Avadel, doctors, pharmacies, other healthcare professionals, and/or patients) pursuant to Avadel's REMS Program will meet, literally or under the doctrine of equivalents, each limitation in claim 1 and will constitute direct infringement of claim 1."  Jazz's Initial Infringement Contentions at 3. But even assuming *arguendo* that the individual steps of the method were carried out by actors on Jazz's non-exhaustive list of possible actors, that would not constitute direct infringement unless all steps were performed by the same actor or the actions fit within some other accepted mode of proving direct infringement, neither of which Jazz alleges.  Indeed, Jazz does not identify that any actor allegedly performs any particular step, let alone that any single actor

19

allegedly performs all of the steps of any asserted claim under Jazz's proposed construction.  For example, in its opposition to Avadel's motion for judgment on the pleadings, Jazz identified the following as method steps (all bullet points are quotes from Jazz's opposition, D.I. 43, C.A. No. 21-691-MN):

- Identifying "a physician or other prescriber of the company's prescription drug and information to show that the physician or other prescriber is authorized to prescribe the company's prescription drug"

- Reconciling "inventory of the prescription drug before the shipments for a day or other time period are sent."

- Identifying any "indicator of a potential misuse, abuse or diversion by the narcoleptic patient."

- Notifying "the physician that is interrelated with the narcoleptic patient" if any indicators of misuse are detected.

- "Selectively block[ing] shipment of the prescription drug to the patient" based upon identification of abuse potential.

- "Shipp[ing] to the narcoleptic patient if no potential misuse, abuse or diversion is found."

- Identifying "an insurer to be contacted for payment for prescription drugs of an associated patient."

- Identifying "a current pattern or an anticipated pattern of abuse of the prescription drug."

Performing these steps is not in fact claimed in the asserted claims of the REMS Patent, and for that reason, Avadel believes that Jazz will not obtain a construction that their performance is a requirement to infringe.  But assuming *arguendo* that they were, Jazz's infringement contentions do not identify any individual who allegedly performs these steps, much less a single actor that performs all of them.  Nor has Jazz even attempted to articulate any basis for attributing the actions of various actors to Avadel.  Given the circumstances, Avadel reserves the right to dispute any allegation that Jazz makes later in the case on this issue and preserves its ability to

argue that Jazz has waived its ability to later advance such a contention.  Jazz's infringement contentions thus do not establish an essential element of Jazz's burden to show infringement if these claims are method claims.

Because indirect infringement requires an act of direct infringement, Jazz's failures to plausibly describe a factual basis for direct infringement under Jazz's proposed construction render Jazz's indirect infringement contentions likewise deficient.  Jazz also has not identified facts constituting the additional elements of either induced infringement or contributory infringement, including identification of an entity that direct or controls the performance of all the method steps or the existence of a joint enterprise.

### C.       Jazz's Contentions Do Not Establish That the LUMRYZ REMS Contains a [Single]/[Central] Computer Database

Avadel does not infringe the asserted claims of the REMS Patent at least because the LUMRYZ REMS does not contain a single/central computer database.  As an initial matter, Jazz's contentions as to this limitation are vague, incomplete, and unintelligible, and do not satisfy the disclosure requirements under the Court's practices or establish that the subject limitation is satisfied.  Jazz has also set forth no evidence for its conclusory assertion that all limitations are met under the doctrine of equivalents.  In order to properly assert a doctrine of equivalents theory, Jazz needed to provide detail on an element-by-element basis, which it has not done.

### 1.       The LUMRYZ REMS Does Not Contain a "[Single]/[Central] Computer Database" and Thus Does Not Infringe the REMS Patent Under Avadel's Proposed Construction

Avadel proposes to construe this term to mean "one and only one computer database, having the recited functionality." █████████████████████████

███████████████████████████████████████

███████████████████████████████████████

21



Avadel's REMS system therefore does not meet this claim limitation, either literally or under the doctrine of equivalents.

That the LUMRYZ REMS does not have a single/central computer database also means that multiple other claim elements of the asserted claims of the REMS Patent are not satisfied, as those claim elements repeat the requirement for a single/central database and/or address functionality of the claimed (but not present) single/central computer database. As an illustrative example, several dependent claims, including, *e.g.*, claims 4, 8, 14, and 22 impose further limitations on the single/central computer database. Because the LUMRYZ REMS lacks the

recited single/central computer database, the additional elements likewise are necessarily not present.   For that reason, too, there is no infringement of the REMS Patent.

> 2.   **The LUMRYZ REMS Does Not Infringe the REMS Patent Under Jazz's Proposed Construction of "[Single]/[Central] Computer Database"**

Jazz states that no construction is necessary and therefore does not propose an alternative to Avadel's construction.   But the plain language of the subject claim terms establishes the requirement for a single database and forecloses relying on multiple databases to establish the presence of this limitation in Avadel's REMS system.   All of Avadel's non-infringement arguments set forth above apply equally even should the Court determine that it is not necessary to construe this claim.

███ ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████As an initial matter, Jazz's contentions as to this limitation are vague, incomplete, and unintelligible, and do not satisfy the disclosure requirements under the Court's practices or establish that the subject limitation is satisfied.   Jazz has also set forth no evidence for its conclusory assertion that all limitations are met under the doctrine of equivalents. In order to properly assert a doctrine of equivalents theory, Jazz needed to provide detail on an element-by-element basis, which it has not done.

██████████████████████████████████████████████████

█████████████████████████████████████████████████



### E. Jazz's Contentions Do Not Establish That the LUMRYZ REMS Has the Recited "Reconcile Inventory/Reconciling Inventory/Cycle Counted and Reconciled" Functionality

Avadel does not infringe the asserted claims of the REMS Patent at least because the LUMRYZ REMS does not have the functionality to reconcile inventory in accordance with these claim terms. As an initial matter, Jazz's contentions as to this limitation are vague, incomplete, and unintelligible, and do not satisfy the disclosure requirements under the Court's practices or establish that the subject limitation is satisfied. Jazz has also set forth no evidence for its conclusory assertion that all limitations are met under the doctrine of equivalents. In order to properly assert a doctrine of equivalents theory, Jazz needed to provide detail on an element-by-element basis, which it has not done.

### 1. The LUMRYZ REMS Does Not Have the Recited Inventory Reconciliation Functionality and Thus Does Not Infringe the REMS

**Patent Under Avadel's Proposed Construction**

Avadel proposes to construe these terms to mean "[c]hecking whether there is a mismatch between the aggregate amount of a drug reported in physical inventory and the aggregate amount in the database." █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████  ███████████████████████████████████████████████

████████████████████████████████████████████  ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████  ███████████████  █████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████  ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████



For the reasons set forth above, the LUMRYZ REMS does not literally meet this limitation. Jazz has also set forth no evidence for its conclusory assertion that this limitation is met under the doctrine of equivalents. Further, Jazz is precluded from asserting that this limitation is met under the doctrine of equivalents as a result of pharmacy audits or other steps to track the amount of drug in a pharmacy's possession. The "inventory reconciliation" limitation was amended in claim 1 to overcome a rejection over the prior art disclosing tracking the amount of drug in an order ('963 File History, 07/25/2013 Amendment, Applicant Remarks, at 11), and Jazz is thus estopped from asserting infringement over claim scope through the doctrine of equivalents. Furthermore, Jazz's attempts to essentially eliminate this import of this claim term are belied by the PTAB's reliance on it during the IPR proceedings.

2. **The LUMRYZ REMS Does Not Infringe the REMS Patent Under Jazz's Construction of the Inventory Reconciliation Limitations**

Jazz states that no construction is necessary and therefore does not propose an alternative to Avadel's construction or explain what the term could mean other than Avadel's proposed definition.  Furthermore, the plain language of this claim term requires that the REMS system perform a comparison between the physical inventory and the amount of product as reflected in the database.  All of Avadel's non-infringement arguments set forth above apply equally even should the Court determine that it is not necessary to construe this claim.

F. **Jazz's Contentions Do Not Establish That the LUMRYZ REMS Performs a "Database Query That Identifies That the Narcoleptic Patient Is a Cash Payer/Database Queries . . . for Identifying: That the Narcoleptic Patient Is a Cash Payer . . ."**

Avadel does not infringe the asserted claims of the REMS Patent at least because the LUMRYZ REMS does not have the functionality to perform these steps.  As an initial matter, Jazz's contentions as to this limitation are vague, incomplete, and unintelligible, and do not satisfy the disclosure requirements under the Court's practices or establish that the subject limitation is satisfied.  Jazz has also set forth no evidence for its conclusory assertion that all limitations are met under the doctrine of equivalents.  In order to properly assert a doctrine of equivalents theory, Jazz needed to provide detail on an element-by-element basis, which it has not done.

1. **The LUMRYZ REMS Does Not Have the Recited Database Query Functionality and Thus Does Not Infringe the REMS Patent Under Avadel's Proposed Construction**

Avadel proposes that these terms have their plain and ordinary meaning, which is the recited database query identifies that the form of payment used by the patient was physical currency. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

27



For the reasons set forth above, the LUMRYZ REMS does not literally meet this limitation. Jazz has also set forth no evidence for its conclusory assertion that this limitation is met under the doctrine of equivalents.  Further, Jazz is precluded from asserting that this limitation is met under the doctrine of equivalents by queries other than ones specifically identifying whether the narcoleptic patient is a cash payer.  During prosecution, Jazz specifically amended the asserted

28

claims to include this "cash payer" limitation in order to overcome an Examiner rejection over the prior art (*see* '963 patent File History, 12/31/13 Amendment), and Jazz is thus foreclosed from asserting infringement with regard to said limitation by way of the doctrine of equivalents.  And once again, Jazz's attempt to effectively eliminate this claim term is belied by the PTAB's reliance on it during the IPR proceedings.

> ### 2.      The LUMRYZ REMS Does Not Infringe the REMS Patent Under Jazz's Construction of the Database Query Limitations

Jazz states that no construction is necessary and therefore does not propose an alternative to Avadel's construction or explain what the term could mean other than Avadel's proposed definition.  Furthermore, the plain language of this claim requires determining whether the narcoleptic patient is paying in cash.  All of Avadel's non-infringement arguments set forth above apply equally even should the Court determine that it is not necessary to construe this claim.

> ### G.      Jazz's Contentions Do Not Establish That the LUMRYZ REMS Possesses an "Exclusive Database"

Avadel does not infringe Claims 4 and 21 of the '782 Patent at least because Jazz has failed to demonstrate that FT218 includes an "exclusive database."  The '782 patent does not provide a meaning for the term "exclusive database," and Jazz's contentions as to this limitation are vague, incomplete, and unintelligible, and do not satisfy the disclosure requirements under the Court's practices or establish that the subject limitation is satisfied.  In particular, Jazz's infringement contentions with respect to claim 4 assert that the LUMRYZ REMS will include a "single database"—which as set forth above, it will not—"that is an exclusive database" with no explanation to support its conclusory assertion.  Nor has Jazz asserted that this claim limitation of claim 4 may be met under the doctrine of equivalents, much less provide a detailed explanation, on an element-by-element basis, for how this limitation would allegedly be met under the doctrine of equivalents.  With respect to claim 21, Jazz's infringement contentions once again assert, in

conclusory fashion, that the limitations of the claim, including the "exclusive database limitation" are met by the LUMRYZ REMS.  Nor has Jazz provided any explanation for its assertion that the limitations of claim 21, including the "exclusive database" limitation, are met under the doctrine of equivalents, much less provide a detailed explanation, on an element-by-element basis, for how this limitation would allegedly be met under the doctrine of equivalents.

## IV.   AVADEL'S FT218 PRODUCT DOES NOT INFRINGE THE RESINATE PATENTS

All of the asserted claims of the Resinate Patents recite either a "controlled release component" or "modified release particles" limitation.  As an initial matter, Jazz's contentions as to these limitations are lacking, vague, and confusing, and do not satisfy the disclosure requirements under the Court's practices or establish that the subject limitations are satisfied.  Jazz has also set forth no evidence for its conclusory assertions that these limitations are met under the doctrine of equivalents.  As explained below, Jazz cannot meet its burden of establishing that Avadel infringes the asserted claims of the Resinate Patents either literally or under the doctrine of equivalents at least because FT218 does not contain either a "controlled release component" or "modified release particles" under either party's proposed construction.[6]

| Disputed Terms; Patents and Claims | Avadel's Proposed Construction | Jazz's Proposed Construction |
| --- | --- | --- |
| "controlled release component"  '079 Patent Claims 1-3, 5-12, and 14-18 | Resinate compositions characterized by having at least one of the active components having a release over a period of at least about 2 to about 8 hours | A formulation component with an active pharmaceutical ingredient having a release over a period of at least about 2 to about 8 hours |
| "modified release particles"  '782 Patent Claims 1-24 | Particles that are resinate compositions characterized by having at least one of the | Plain and ordinary meaning, i.e., particles containing an active pharmaceutical |

_____

[6] As set forth in Avadel's Invalidity Contentions dated January 14, 2022, the asserted claims of the Resinate Patents are invalid.  Because invalid claims cannot be infringed, Avadel's FT218 does not infringe any of the asserted claims of the Resinate Patents for this separate reason.

| | active components having a release over a period of at least about 2 to about 8 hours | ingredient with a release profile that is different from that of an immediate release particle |
|---|---|---|

### A. Jazz's Contentions Do Not Establish That FT218 Satisfies the "Controlled Release Component" Limitation of the '079 Patent

#### 1. Avadel Does Not Infringe the '079 Patent Under Avadel's Proposed Construction of "Controlled Release Component"

Independent claims 1 and 10 of the '079 patent require the presence of a "controlled release component."  Under Avadel's proposed construction, a "controlled release component" is construed as "resinate compositions characterized by having at least one of the active components having a release over a period of at least about 2 to about 8 hours."





---

[7] Jazz does not contend that FT218's IR meet the "controlled release component" limitation.  *See e.g.*, December 7, 2021, Plaintiff's Initial Infringement Chart, at 5, 11-12 (citing the immediate release and controlled release components of FT218 as meeting the limitation "wherein the oxybate formulation comprises an immediate release component and a controlled release component").



**B.      Jazz's Contentions Do Not Establish That Avadel's FT218 Satisfies the "Modified Release Particles" Limitation of the '782 patent**

**1.      Avadel Does Not Infringe the '782 Patent Under Avadel's Proposed Construction**

Independent claims 1 and 14 of the '782 Patent require the presence of "modified release particles."    Under Avadel's proposed construction, the term "modified release particles" is properly construed as "particles that are resinate compositions characterized by having at least one of the active components having a release over a period of at least about 2 to about 8 hours."



FT218 therefore does not infringe independent claims 1 and 14 of the '782 patent.  Because the remaining asserted claims of the '782 patent depend from claims 1 and 14 and incorporate this limitation, FT218 does not infringe those claims for the same reasons.



### C.    Jazz's Contentions Do Not Establish That Avadel's FT218 Satisfies the "Unit Dose" Limitation of Claims 14-24 of the '782 patent

Avadel does not infringe Claims 14-24 of the '782 Patent at least because Jazz has failed to demonstrate that FT218 includes a "unit dose" of a formulation of gamma-hydroxybutyrate. The '782 patent does not provide a meaning for the term "unit dose," and Jazz's contentions as to this limitation are vague, incomplete, and unintelligible, and do not satisfy the disclosure requirements under the Court's practices or establish that the subject limitation is satisfied.  In particular, Jazz's infringement contentions only assert that FT218 is "a formulation of gamma-hydroxybutyrate" without providing any explanation for how FT218 allegedly meets the "unit dose" requirement.  Nor has Jazz asserted that this claim limitation may be met under the doctrine

of equivalents, much less provide a detailed explanation, on an element-by-element basis, for how this limitation would allegedly be met under the doctrine of equivalents.

**D.    Jazz's Contentions Do Not Establish That Avadel's FT218 Satisfies the "Blood Concentration" Limitations of Claims 11, 12, and 19 the '782 patent**

Avadel does not infringe Claims 11, 12, and 19 of the '782 patent at least because Jazz has failed to demonstrate that FT218 meets the requirement of providing the recited blood concentrations of gamma-hydroxybutyrate.  Claim 11 requires providing gamma-hydroxybutyrate "blood concentration ranging from 10 mg/mL to about 40 mg/mL" while claims 12 and 19 require providing gamma-hydroxybutyrate "blood concentration ranging from 15 mg/mL to about 30 mg/mL."  Jazz's contentions as to these limitations are vague, incomplete, and unintelligible, and do not satisfy the disclosure requirements under the Court's practices or establish that the subject limitation is satisfied, at least because the limitations recite a range of gamma-hydroxybutyrate blood concentrations that are likely fatal in humans.

Dated: April 1, 2022

*Of Counsel*:

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
Sarah W. Wang
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
kenneth.schuler@lw.com
marc.zubick@lw.com
alex.grabowski@lw.com
sarah.wang@lw.com

Herman Yue
Bornali Rashmi Borah
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Herman.Yue@lw.com
Rashmi.Borah@lw.com

Daralyn J. Durie
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
(415) 365-6666
ddurie@durietangri.com

Kira A. Davis
Katherine E. McNutt
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499
kdavis@durietangri.com
kmcnutt@durietangri.com

McCARTER & ENGLISH, LLP

/s/ *Daniel M. Silver*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Counsel for Defendant Avadel CNS Pharmaceuticals, LLC*

EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-691 (MN) |
| | ) | |
| AVADEL PHARMACEUTICALS PLC, | ) | ████████████████ |
| AVADEL US HOLDINGS, INC., AVADEL | ) | |
| SPECIALTY PHARMACEUTICALS, LLC, | ) | |
| AVADEL LEGACY PHARMACEUTICALS, | ) | |
| LLC, AVADEL MANAGEMENT | ) | |
| CORPORATION and AVADEL CNS | ) | |
| PHARMACUEITCALS LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**JAZZ PHARMACEUTICALS' SECOND SET OF REQUESTS FOR
THE PRODUCTION OF DOCUMENTS AND THINGS (NOS. 7-56)**

Plaintiff Jazz Pharmaceuticals, Inc. ("Jazz Pharmaceuticals"), by and through its undersigned attorneys, hereby requests that Defendants Avadel Pharmaceuticals plc, Avadel US Holdings, Inc., Avadel Specialty Pharmaceuticals, LLC, Avadel Legacy Pharmaceuticals, LLC, Avadel Management Corporation, and Avadel CNS Pharmaceuticals LLC produce for inspection and copying, pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the District of Delaware, all documents and tangible things that are set forth in each of the following Requests, within thirty (30) days of these Requests, at the offices of Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, New York, New York 10010, or as otherwise agreed by counsel.

## DEFINITIONS AND INSTRUCTIONS

Jazz Pharmaceuticals incorporates the definitions and instructions set forth in its First Set of Requests for the Production of Documents and Things (Nos. 1-6) as if set forth in full herein.

Jazz Pharmaceuticals provides the following additional definitions:

1.      "Patents-in-suit" means United States Patent Nos. 8,731,963, 10,758,488, 10,813,885, 10,959,956, and 10,966,931.

2.      "REMS" means risk evaluation and mitigation strategies for distribution of pharmaceutical products.

3.      "Defendants' REMS" means any REMS or portion(s) thereof, including (without limitation) drafts, considered at any time by Defendants for use in connection with the distribution, administration, and/or use of Defendants' NDA Product.

4.      "Label" and "labeling" mean any proposed or approved label, package insert, Medication Guide, REMS, or similar information to be included with Defendant's NDA Product.

### DOCUMENTS AND THINGS REQUESTED

**Request for Production No. 7:**

A complete copy of NDA No. 214755, including (without limitation) all amendments, supplemental filings, and additions thereto, without restriction as to date.

**Request for Production No. 8:**

All communications between Avadel and any third party, including (without limitation) the FDA, concerning NDA No. 214755, including communications concerning all amendments, supplemental filings, and additions thereto, without restriction as to date.

**Request for Production No. 9:**

All documents, things, and communications concerning Avadel's timeline for the submission of NDA No. 214755 and any amendments, supplements, or additions thereto, including (without limitation) documents and things pertaining to Avadel's estimation(s) of the timing and/or likelihood of approval of Defendants' NDA No. 214755.

- 2 -

**Request for Production No. 10:**

All communications between Avadel and any third party, including (without limitation) the FDA, concerning Defendants' NDA Product or any other once-nightly sodium oxybate product that Avadel (or anyone on Avadel's behalf) has made, tested, developed, or considered developing.

**Request for Production No. 11:**

All documents, things, and communications concerning the formulation and properties of Defendants' NDA Product.

**Request for Production No. 15**:

All documents, things, and communications concerning Avadel's decision to pursue the development of or to seek FDA approval to market Defendants' NDA Product or any other once-nightly sodium oxybate product that Avadel (or anyone on Avadel's behalf) has made, tested, developed, or considered developing.

**Request for Production No. 16**:

All documents, things, and communications, including (without limitation) with the FDA, concerning any statement by, or on behalf of, Avadel pursuant to 21 U.S.C. § 355(b)(2)(B) relating to NDA No. 214755.

**Request for Production No. 17**:

All documents, things, and communications, including (without limitation) with the FDA, concerning any patent certification by, or on behalf of, Avadel pursuant to 21 U.S.C. § 355(b)(2)(A) relating to NDA No. 214755.

**Request for Production No. 18**:

All documents, things, and communications concerning the Patents-in-suit.

**Request for Production No. 19**:

All communications between Avadel and any third party, including (without limitation) the FDA, concerning U.S. Patent No. 8,731,963.

**Request for Production No. 20**:

All documents, things, and communications concerning any analysis or opinion (including any legal opinion), whether written or oral, conducted or rendered by or for Avadel relating to Defendants' NDA Product, Xyrem®, and/or the Patents-in-suit.

**Request for Production No. 21**:

All documents, things, and communications concerning the approval status of NDA No. 214755.

**Request for Production No. 22**:

All documents, things, and communications concerning any deficiencies, information requests, or complete response letters from the FDA relating to NDA No. 214755.

**Request for Production No. 23**:

All documents, things, and communications, including (without limitation) research notebooks, research summaries, and reports concerning any analysis of Defendants' NDA Product or any once-nightly sodium oxybate product that Avadel (or anyone on Avadel's behalf) has made, tested, developed, or considered developing, that relates to the formulation development, bioequivalence, stability, and/or dissolution testing referenced in NDA No. 214755.

**Request for Production No. 24**:

All documents, things, and communications concerning any analysis of the ingredients and amounts of ingredients used for the formulation of Defendants' NDA Product or any other once-nightly sodium oxybate product that Avadel (or anyone on Avadel's behalf) has made, tested, developed, or considered developing.

**Request for Production No. 25**:

All documents, things, and communications concerning any study, *in vitro* or *in vivo*, that compares Defendants' NDA Product to Xyrem® or any other sodium oxybate-containing product.

**Request for Production No. 26**:

All documents, things, and communications that compare Defendants' NDA Product to any claim of the Patents-in-suit.

**Request for Production No. 27:**

Documents sufficient to identify each of Avadel's current or prospective process(es) and/or procedure(s) for manufacturing Defendants' NDA Product, including information sufficient to identify the types and quantities of the ingredients and materials used as well as the instruments, machines, and/or equipment used in such current or prospective process(es) or procedure(s).

**Request for Production No. 28:**

All documents, things, and communications concerning Avadel's labeling.

**Request for Production No. 29:**

All documents, things, and communications concerning the use and/or administration of Defendants' NDA Product for the treatment of cataplexy or excessive daytime sleepiness ("EDS") in patients with narcolepsy.

**Request for Production No. 30:**

All documents, things, and communications concerning the indication(s) for which Avadel intends its NDA Product to be used.

**Request for Production No. 31:**

All documents, things, and communications considered or relied on by Defendants in designing, developing, or implementing any of Defendants' REMS or any other program designed to prevent, restrict, or regulate access to Defendants' NDA Product.

**Request for Production No. 32:**

Documents, things, and communications sufficient to identify the steps, elements, and/or requirements of each version of any REMS that Defendants considered and/or developed for use in connection with Defendants' NDA Product.

**Request for Production No. 33**:

All documents, things, and communications between Defendants and any third party, including (without limitation) the FDA, relating to Defendants' REMS or any other program designed to prevent, restrict, or regulate access to Defendants' NDA Product or any other sodium oxybate product.

**Request for Production No. 34**:

All documents, things, and communications concerning any actual or proposed communications with any patient, prescriber, physician, nurse, pharmacist, pharmacy, other medical care worker, customer, or potential customer concerning Defendants' NDA Product.

**Request for Production No. 35**:

All documents, things, and communications concerning any actual or proposed communications with any patient, prescriber, physician, nurse, pharmacist, pharmacy, other medical care worker, customer, or potential customer concerning Defendants' REMS.

**Request for Production No. 36**:

All documents, things, and communications concerning any requests for proposals from any person or entity concerning Defendants' REMS or any other program designed to prevent, restrict, or regulate access to Defendants' NDA Product.

**Request for Production No. 37**:

All documents, things, and communications concerning any comparison of features or qualities of Defendants' REMS to any REMS for any other sodium oxybate product, including (without limitation) any redlines or side-by-side comparisons of Defendants' REMS to any REMS for any other sodium oxybate product.

**<u>Request for Production No. 38</u>:**

Documents sufficient to show any efforts or steps Defendants (or any third party on Defendants' behalf) have taken to create, design, develop, and implement Defendants' REMS or any other program designed to prevent, restrict, or regulate access to Defendants' NDA Product.

**<u>Request for Production No. 39</u>:**

Any agreement(s) between Defendants and any third party concerning Defendants' REMS or any other program designed to prevent, restrict, or regulate access to Defendants' NDA Product, or any REMS for any other sodium oxybate product, and all documents, things, and communications concerning any such agreement(s).

**<u>Request for Production No. 40</u>:**

Documents, things, and communications sufficient to identify the roles of each individual that is and was involved in creating NDA No. 214755 (including (without limitation) organizational charts).

**<u>Request for Production No. 41</u>:**

Documents, things, and communications sufficient to identify the roles of each individual that is and was involved in creating Defendants' NDA Product (including (without limitation) organizational charts).

**<u>Request for Production No. 42</u>:**

Documents, things, and communications sufficient to identify the roles of each individual that is and was involved in creating Defendants' REMS program (including (without limitation) organizational charts).

**<u>Request for Production No. 43</u>:**

All documents and things relating to any alleged bioequivalence of Defendants' NDA Product to Xyrem®.

**<u>Request for Production No. 44</u>:**

All documents, things, and communications concerning any agreements between or among Avadel and any third party relating to Xyrem®.

**<u>Request for Production No. 45</u>:**

All documents, things, and communications concerning any agreements between or among Avadel and any third party relating to Defendants' NDA Product.

**<u>Request for Production No. 46</u>:**

All documents, things, and communications concerning any agreements between or among Avadel and any third party relating to this litigation.

**<u>Request for Production No. 47</u>:**

All documents, things, and communications concerning any agreements between or among Avadel and any third party relating to the Patents-in-suit.

**<u>Request for Production No. 48</u>:**

All documents, things, and communications concerning any analysis or opinion of whether the manufacture, importation, use, offer for sale, or sale of Defendants' NDA Product would infringe any of the claims of the Patents-in-suit.

**<u>Request for Production No. 49</u>:**

All documents, things, and communications that Avadel contends affect, limit, or bear on the validity, infringement, or interpretation of any of the claims of the Patents-in-suit.

**Request for Production No. 50:**

All documents, things, and communications that Avadel intends to rely on concerning the level of ordinary skill in the art, or the definition of a person of ordinary skill in the art, relevant to any of the claims of the Patents-in-suit.

**Request for Production No. 51:**

All documents, things, and communications concerning any attempts by Avadel to design around and/or avoid infringing any claim of the Patents-in-suit.

**Request for Production No. 52:**

All documents, things, and communications concerning Avadel's actual, planned, or proposed marketing of Defendants' NDA Product including (without limitation) any draft or final sales catalogs, promotional materials, marketing materials, or materials intended for distribution to patients or health care professionals or to display at trade shows or other public events related thereto.

**Request for Production No. 53:**

All documents, things, and communications concerning any plans, efforts, and/or attempts to market nightly ████████████ 4.5 g, 6 g, 7.5 g, or 9 g of Defendants' NDA Product, including all documents concerning any FDA approved indication for each of those strengths.

**Request for Production No. 54:**

All documents, things, and communications concerning any analyses, projections, predictions, forecasts, or estimates of sales or revenues that Defendants' NDA Product may generate if approved by the FDA.

**Request for Production No. 55**:

All documents, things, and communications concerning any analyses, projections, predictions, forecasts, or estimates of sales or revenues related to the impact of Defendants' NDA Product on the market for sodium oxybate if approved by the FDA.

**Request for Production No. 56**:

All documents, things, and communications concerning any business plan or strategic plan relating to the development, marketing, or sale of Defendants' NDA Product.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000

August 25, 2021

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiff Jazz Pharmaceuticals, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 25, 2021, copies of the foregoing were caused to be served

upon the following in the manner indicated:

Daniel M. Silver, Esquire                                                    *VIA ELECTRONIC MAIL*
Alexandra M. Joyce, Esquire
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801
*Attorneys for Defendants*

Kenneth G. Schuler, Esquire                                            *VIA ELECTRONIC MAIL*
Marc N. Zubick, Esquire
Alex Grabowski, Esquire
Sarah W. Wang, Esquire
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
*Attorneys for Defendants*

Daralyn J. Durie, Esquire                                                  *VIA ELECTRONIC MAIL*
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111
*Attorneys for Defendants*

Kira A. Davis, Esquire                                                       *VIA ELECTRONIC MAIL*
Katherine E. McNutt, Esquire
DURIE TANGRI LLP
953 East 3rdStreet
Los Angeles, CA  90013
*Attorneys for Defendants*


                                                          */s/ Jeremy A. Tigan*

                                                          _____

                                                          Jeremy A. Tigan (#5239)

# Exhibit 7

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

**FINAL**

October 8, 2022
Herve Guillard, Ph.D

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
------------------------------------------
JAZZ PHARMACEUTICALS, INC.,

     Plaintiff,

V.

AVADEL PHARMACEUTICALS PLC,
AVADEL US HOLDINGS, INC., AVADEL
SPECIALTY PHARMACEUTICALS, LLC,
AVADEL LEGACY PHARMACEUTICALS,
LLC, AVADEL MANAGEMENT
CORPORATION and AVADEL CNS
PHARMACEUTICALS LLC,

     Defendants.

CASE NO. 1:21-cv-00691-MN
------------------------------------------
REMOTE VIDEO DEPOSITION OF
Herve Guillard, Ph.D
October 8, 2022
Lead: Frank Calvosa, Esquire
Firm: Quinn Emanuel


FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING  1-800-825-3341

Page 2

    Virtual videotaped deposition of HERVÉ
GUILLARD, Ph.D., a witness herein, called by
the Plaintiffs for examination, taken pursuant
to the Federal Rules of Civil Procedure, by and
before Alyssa A. Repsik, a notary public in and
for the Commonwealth of Pennsylvania, held by
videoconference with all parties appearing
remotely from their respective locations, on
Saturday, October 8, 2022, at 4:05 a.m. EST.

Page 3

APPEARANCES

FOR THE PLAINTIFFS
Frank C. Calvosa, Esq.
Abigail E. Clark, Esq.
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Frankcalvosa@quinnemanuel.com
Abigailclark@quinnemanuel.com

Philip Arnold, Esq.
QUINN EMANUEL URQUHART & SULLIVAN, LLP
90 High Holborn
London
Wc1V 6LJ
United Kingdom
Philiparnold@quinnemanuel.com

Page 4

APPEARANCES (Continued)

FOR THE DEFENDANTS
Marc N. Zubick, Esq.
Herman H. Yue, Esq.
LATHAM & WATKINS
330 North Wabash, Suite 2800
Chicago, IL 60611
Marc.zubick@lw.com
Herman.yue@lw.com

Daralyn J. Durie, Esq.
DURIE TANGRI
217 Leidesdorff Street
San Francisco, CA 94111
Ddurie@durietangri.com

Also Present:  Greg Siman
          Sabine Contri, Interpreter

JANE ROSE REPORTING
   74 Fifth Avenue
   New York, New York 10011
   800.825.3341
   Alyssa A. Repsik, Court Reporter
   Joseph Salinas, Videographer

Case 1:21-cv-01594-GBW   Document 189-1   Filed 03/10/23   Page 497 of 746 PageID #: 5120

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

FINAL ▮▮▮▮

October 8, 2022
Herve Guillard, Ph.D

Page 5

## TABLE OF CONTENTS

WITNESS                         PAGE
Hervé Guillard, Ph.D.
  By Mr. Calvosa..........................5

Reporter Certificate.....................142

Errata...................................144

E X H I B I T S

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| PTX 33 | LinkedIn Page | 9 |
| PTX 34 | ▮▮▮ Projet Slideshow | 30 |
| PTX 35 | June 11, 2014 R&D Report | 40 |
| PTX 36 | March 10, 2016 R&D Report | 67 |
| PTX 37 | Flamel Memo | 75 |
| PTX 38 | March 19, 2018 E-mail | 83 |
| PTX 39 | 7/24/18 Meeting Notes | 89 |
| PTX 40 | NDA Task Force Meeting | 95 |
| PTX 41 | 2018 Study Report | 108 |
| PTX 42 | '062 Patent | 115 |
| PTX 43 | March 2012 Patent Publication | 132 |
| PTX 44 | Laboratory Notebook | 133 |

Page 6

```
 1         P R O C E E D I N G S
 2         THE VIDEOGRAPHER:  This
 3  deposition is being taken via remote
 4  connection.  All participants are attending
 5  remotely, including the court reporter and the
 6  videographer.  The deposition video-recording
 7  quality is relying on the witness' individual
 8  bandwidth.
 9         Here begins Media No. 1, Volume 1,
10  in the deposition of Hervé Guillard in the
11  matter of Jazz Pharmaceuticals versus Avadel
12  Pharmaceuticals.
13         Today's date is October 8, 2022.
14  The time is 4:08 a.m.  I am Joseph Salinas, the
15  videographer.  The court reporter is Alyssa
16  Repsik from Jane Rose Reporting, New York, New
17  York.
18         Counsel, please identify or state
19  yourselves and state whom you represent,
20  beginning with the noticing party in this
21  deposition.
22         MR. CALVOSA:  Good morning.
23  This is Frank Calvosa on behalf of Plaintiffs.
24  And with me is -- of Quinn Emanuel and with me
25  is Abigail Clark, also of Quinn Emanuel.  And
```

Page 7

```
 1  we are both remote.  And in the room with the
 2  witness and the defending attorneys is Philip
 3  Arnold from Quinn Emanuel London.
 4         MR. ZUBICK:  Good morning.
 5  This is Marc Zubick from Latham & Watkins
 6  representing Avadel and the witness.  With me
 7  from Latham is Herman Yue.  And from Durie
 8  Tangri is Daralyn Durie, as well as Craig Siman
 9  from Avadel.
10         VIDEOGRAPHER:  Will the court
11  reporter please swear in the witness.
12         (Thereupon Sabine Contri was
13  sworn to act as interpreter during the taking
14  of the deposition.)
15         HERVÉ GUILLARD, Ph.D., a witness
16  herein, having been first duly sworn, was
17  examined and testified as follows:
18         EXAMINATION
19  BY MR. CALVOSA:
20     Q.   Good morning.  Can you please state
21  your name for the record.
22     A.   Hervé Guillard.
23     Q.   And it's Dr. Guillard?
24     A.   Yes, Dr. Hervé Guillard.
25     Q.   And can you please state your home
```

Page 8

```
 1  address?
 2     A.   38 Rue, R-U-E, Saint-Gervais,
 3  G-E-R-V-A-I-S, 69008, L-Y-O-N, France.
 4     Q.   Have you ever been deposed before?
 5     A.   Never.
 6     Q.   I'll just go over how this is going
 7  to work today.
 8         I'll be asking you a series of
 9  questions and I'll try to go as slow as I can
10  in doing so.  If you don't understand my
11  question, please let me know.  And you have to
12  give verbal answers today when I ask my
13  questions.  Do you understand that?
14     A.   Yes.
15     Q.   And if you provide an answer to the
16  question without asking for clarification, then
17  is it fair for me to assume that you understood
18  the question?
19     A.   Yes.
20     Q.   Is there any reason that you can't
21  provide truthful and accurate testimony today?
22     A.   No, I can't see a reason.
23     Q.   And I do want to thank you for
24  joining us today and making yourself available
25  for the deposition.  I'll try to be as quick as
```

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

FINAL 

October 8, 2022
Herve Guillard, Ph.D

Page 9

1  I can as we go along today so that way you can
2  have your Saturday back.
3      A.   Thank you.
4      Q.   My colleague Philip Arnold is in the
5  room with you today.  He'll be handing you some
6  documents to look at as I ask you the
7  questions.
8          So why don't we go ahead and we'll
9  put the first one in now.  This will be PTX
10  No. 33, which is just a label I'll use to
11  identify some documents.
12          (Deposition Exhibit No. PTX 33
13  was marked for identification.)
14  BY MR. CALVOSA:
15      Q.   Do you have this document in front
16  you, Doctor?
17      A.   Yes.
18      Q.   Do you recognize what PTX 33 is?
19      A.   Yes.  It's my LinkedIn profile.
20      Q.   Do you know when the last time you
21  updated your LinkedIn profile was?
22      A.   I do not remember.
23      Q.   Looking through your LinkedIn
24  profile, is this an accurate representation of
25  both your experience and education?

Page 10

1          THE INTERPRETER:  Did you say
2  education?
3          MR. CALVOSA:  Education, yes.
4          THE WITNESS:  Yes, regarding
5  my education, the information is accurate.
6  BY MR. CALVOSA:
7      Q.   Okay.  And is the same true of the
8  professional experience provided in the
9  LinkedIn profile?
10      A.   Yes, it is a summary, but the
11  summary is accurate.
12      Q.   Can you please tell me where you
13  currently work?
14      A.   Yes, I work for consultant firm
15  called Regimbeau in Lyon.
16      Q.   What do you do there?
17      A.   I'm a patent engineer.
18      Q.   What are the job responsibilities of
19  a patent engineer like yourself?
20      A.   My responsibilities are to draft
21  patent applications, to monitor examination
22  proceedings in the different countries where
23  these applications are filed, and to be
24  involved in litigation proceedings.
25      Q.   The applications that you draft, do

Page 11

1  any of those go into the United States Patent
2  Office?
3      A.   Yes, some applications are under
4  examination in the U.S.
5      Q.   And are you familiar with what's
6  called an office action from the United States
7  Patent Office during the prosecution of a
8  patent application?
9      A.   I, indeed, know of this type of
10  official letter.
11      Q.   Have you reviewed office actions
12  from the United States Patent Office?
13          MR. ZUBICK:  And, Dr.
14  Guillard, you can answer that question, but
15  I'll just caution you not to reveal the
16  substance of any communications you've had with
17  lawyers.
18          THE WITNESS:  Very well.
19          Very well, so I have been brought to
20  examine official letters.
21  BY MR. CALVOSA:
22      Q.   And have you prepared responses to
23  office actions from the U.S. Patent Office?
24          MR. ZUBICK:  Same objection,
25  Dr. Guillard.

Page 12

1          THE WITNESS:  I'm not European
2  IP counsel or French IP counsel, so I -- I have
3  drafted answers, but these answers have been
4  reviewed by qualified people.
5  BY MR. CALVOSA:
6      Q.   That's PTX 33.  If you go to the
7  second job listed on the first page at Cabinet
8  Tripoz; do you see that?
9      A.   Yes.
10      Q.   The second line there that begins
11  with response, does that translate into English
12  to say response to office actions from offices
13  such as the France, European, United States and
14  Canadian patent office?
15      A.   I didn't quite understand the
16  meaning of your question.
17          INTERPRETER:  I think it's a
18  bit of translation.  It's a bit confusing.
19  BY MR. CALVOSA:
20      Q.   The first bullet point there that
21  begins with response, does that summarize some
22  of the work you've done responding to office
23  actions from the United States Patent Office?
24      A.   It means that I participated in
25  drafting the answers, which were then reviewed

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

FINAL 

October 8, 2022
Herve Guillard, Ph.D

Page 13

1   by European counsel before being sent on to
2   U.S. attorney.
3       Q.   You used to work at Avadel
4   Pharmaceuticals; right?
5       A.   I've worked, indeed, at Avadel.
6       Q.   And before Avadel was called Avadel,
7   it was called Flamel; right?
8       A.   Yes, that's right.
9       Q.   When I say "Avadel" today, I'm going
10  to be using it to refer to both Avadel and
11  Flamel, that entire time period.  Okay?
12      A.   Very well.
13      Q.   When did you begin working at
14  Avadel?
15      A.   I first started working for Avadel
16  in 2004, March 2004.
17      Q.   When did you stop working at Avadel?
18      A.   In June 2019.
19      Q.   Why did you stop working at Avadel?
20      A.   Because I was terminated.
21      Q.   Okay.  Do you know why you were
22  terminated?
23      A.   Because there was a social
24  termination plan.
25           MR. CALVOSA:  I'm sorry, I

Page 14

1   missed what the interpreter said.
2           THE INTERPRETER:  Because
3   there was a social termination plan.
4   BY MR. CALVOSA:
5       Q.   Do you know if there's a document
6   summarizing why you were terminated?
7       A.   Yeah, as part of the termination
8   proceedings, the reasons for it were mentioned.
9       Q.   Okay.  Do you know who Thorsteinn
10  Thorsteinsson is?
11          THE INTERPRETER:  I'm not sure
12  I've gotten the name right.
13          MR. CALVOSA:  Thorsteinn
14  Thorsteinsson.
15          THE WITNESS:  No.
16  BY MR. CALVOSA:
17      Q.   So you don't know whether
18  Mr. Thorsteinsson was part of your termination
19  decision?
20      A.   Today this name doesn't mean
21  anything to me.
22      Q.   Do you know who Greg Divis is?
23      A.   He was Avadel's former manager.
24      Q.   And now he's the chief executive
25  officer?

Page 15

1       A.   To my knowledge, yes.
2       Q.   Have you ever seen a document
3   prepared by Mr. Thorsteinsson and provided to
4   Mr. Divis regarding why you should be
5   terminated?
6       A.   To my knowledge, no.
7       Q.   Okay.  Back to PTX 33, your LinkedIn
8   profile, I want to start with the first
9   description of your work at Avadel.
10           The first activity there that refers
11  to industrial property, is that another way of
12  saying intellectual property?
13      A.   Yes.
14      Q.   And intellectual property, that
15  regards patents?
16      A.   Yes.
17      Q.   The first sub-bullet there says
18  "Analysis in monitoring of the patent portfolio
19  of competing companies"; right?
20      A.   Yes, that's what it states.
21      Q.   Those were part of your
22  responsibilities at Avadel?
23      A.   I am a scientist and I had an
24  activity in R&D and, as part of my R&D
25  activity, I was also analyzing and monitoring

Page 16

1   the patent portfolio of competing companies
2   under this provision of the person in charge of
3   intellectual property.
4       Q.   Have you ever heard of Jazz
5   Pharmaceuticals?
6       A.   Yes, indeed.
7       Q.   Was Jazz Pharmaceuticals one of the
8   competing companies that you were monitoring?
9       A.   Yes.
10      Q.   I want to skip a line and then go to
11  where it begins with "in collaboration."  That
12  describes your job responsibility at Avadel of
13  in collaboration with attorneys participating
14  in responses to official letters from the
15  European patent office and the U.S. Patent
16  Office and also drafting patent applications;
17  right?
18           MR. ZUBICK:  Dr. Guillard, you
19  can answer that question, but I'll, again,
20  caution you not to reveal the substance of any
21  communications you had with lawyers.
22           THE WITNESS:  Yes, this is
23  what is written.
24  BY MR. CALVOSA:
25      Q.   And the next bullet, as part of your

Jazz Pharmaceuticals v.          FINAL          October 8, 2022
Avadel Pharmaceuticals          ▮▮▮▮▮▮          Herve Guillard, Ph.D

Page 17

1  job responsibilities, you worked on the
2  development of Galenic, G-A-L-E-N-I-C,
3  formulations for the sustained release of
4  active ingredients; is that right?
5      A.   It is not the last point because it
6  goes on on the next page, but it was indeed
7  part of my role and actually my main
8  responsibility.
9      Q.   Okay.  Have you ever heard of FT218?
10     A.   There's a project I worked on.
11     Q.   And the FT218 project was the
12  development of a once nightly formulation of
13  sodium oxybate; right?
14     A.   Yes, that was the goal of the
15  project.
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 18

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3          This was a project that I worked on.
4  BY MR. CALVOSA:
5      Q.   If you turn now to the second page
6  of PTX 33, the first bullet there says that as
7  part of your job responsibilities, you worked
8  on the drafting of regulatory dossiers for
9  clinical studies and the approval dossier for
10  new drug testing; right?
11     A.   So I was involved in the drafting of
12  these documents for the project relating to the
13  description of the formulation and the
14  pharmaceutical development.
15     Q.   Your work on the New Drug
16  Application, did that relate to FT218?
17     A.   Yes, the approval filed for a new
18  drug related to FT218.
19     Q.   And here it says the New Drug
20  Application was submitted in 2020; right?
21     A.   This is what is written, yes.
22     Q.   You had left Avadel in June of 2019.
23  Did you continue to work with them as a
24  consultant or in any other capacity up until
25  the time of the New Drug Application submission

Page 19

1  in 2020?
2      A.   No, not at all.
3      Q.   Okay.  You just know that it was --
4  the New Drug Application was submitted in 2020
5  based on public information such as press
6  releases?
7      A.   Yes.  This is a project I worked on
8  for many years and that is dear to my heart so
9  I followed it from far away, and so this comes
10  from public information.
11     Q.   You're proud of the work that you
12  did on FT218, I take it?
13     A.   Of course.  The first thing I think
14  that it is a great success where others have
15  failed.
16     Q.   You have patents related to FT218;
17  right?
18          THE INTERPRETER:  I'm sorry.
19  I didn't get the beginning.
20  BY MR. CALVOSA:
21     Q.   You have patents related to FT218;
22  right?
23     A.   Not personally, but patents have
24  been granted in which I am the inventor.
25     Q.   And have you read those patents?

Page 20

1      A.   I was involved in drafting the
2  applications, but I did not monitor this
3  closely until granting.
4      Q.   Based on your involvement in
5  drafting the applications, you were -- let me
6  ask you another question.
7          Do you know what a patent
8  specification is?
9      A.   I am going to talk about the time
10  when I was involved.  At the time I knew, when
11  I was involved in drafting, what the
12  specifications were.
13     Q.   And you understand that the patent
14  specifications that you drafted, that's the
15  part of the patent, up until the claims, that
16  provides a description of the invention?
17     A.   Yes, I understand.
18     Q.   Do you have any reason to believe
19  that the specifications for the patents that
20  you're named as an inventor for Avadel are
21  inaccurate?
22     A.   I was involved in the drafting as a
23  scientist.  I reviewed the document as a
24  scientist.  But I have no reason to believe
25  that there is anything inaccurate in this.

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

FINAL

October 8, 2022
Herve Guillard, Ph.D

Page 21

1    Q.   From a science -- from a scientist's
2 perspective, you believe that the information
3 in the specifications for the patents that
4 you're named inventor on for Avadel are
5 accurate; right?
6    A.   I was Galenic formulator in the
7 patent.  There are other -- there's scientific
8 information from other fields for which I am
9 not skilled enough to take a stand.
10    Q.   From the -- from the perspective of
11 the Galenic formulation information, the
12 specifications, you believe that's accurate;
13 right?
14    A.   To my knowledge, yes.
15    Q.   Okay.  And we've used that word a
16 couple times today, Galenic, G-A-L-E-N-I-C.
17         Can you tell me what a Galenic
18 formulation is?
19    A.   It's a formulation based on the
20 active principle that meets the targets that
21 were set.
22    Q.   Does it have to do with how the
23 active ingredient is absorbed by the human
24 body?
25    A.   Galenic is formulation work which

Page 22

1 may meet targets such as pharmacokinetic
2 profile.
3    Q.   And that involves how a drug is
4 absorbed in the human body; right?
5    A.   The PK profile depends on this and
6 the formulation has to meet the pharmacokinetic
7 goal that has been set.
8    Q.   From a formulator's perspective, one
9 of the ways to see if it's meeting that goal or
10 target that you mentioned is to do dissolution
11 testing; right?
12    A.   Dissolution tests are in vitro tests
13 that have two main objectives; one which has to
14 do with the quality of the product, and the
15 second one, which is to roughly simulate in
16 vivo behavior.
17    Q.   What did you mean by "in vitro" in
18 your answer?
19    A.   It is a lab test, and in this case,
20 in dissolution equipment.
21    Q.   And what did you mean by "in vivo"
22 in your answer?
23    A.   It's the behavior after
24 administration in a living being.
25    Q.   So one of the two goals of the

Page 23

1 dissolution testing that you mentioned is to
2 perform the experiment in a lab test, in your
3 case, dissolution equipment, and then simulate
4 how that would act in vivo after the
5 administration in a living being; right?
6         MR. ZUBICK:  Objection to
7 form.
8         THE WITNESS:  What I said was
9 the test allows to have an approximate
10 simulation of what takes place in vivo.
11 BY MR. CALVOSA:
12    Q.   The actual testing in vivo, were you
13 responsible for that during your work at
14 Avadel?
15    A.   Not at all.
16    Q.   Did you review the results -- let me
17 ask again.
18         Did you review the results of the
19 pharmacokinetic testing on FT218?
20    A.   I saw them, and I was given their
21 conclusions.
22    Q.   Did you understand the results and
23 the conclusions when you were presented with
24 them for the pharmacokinetic testing?
25    A.   I am not the pharmacokinetics

Page 24

1 expert, so I did not understand the whole
2 approach followed by the team, █████████████
3 ██████████████████████████
4    Q.   The dissolution testing that we
5 talked about for FT218, did you personally run
6 the experiments in the lab?
7    A.   I was responsible for a team of
8 technicians and, in the lab, was present during
9 the testing, but I did not conduct the testing
10 myself.
11    Q.   Would the testing be recorded in
12 laboratory notebooks?
13    A.   Yes, the work conducted by
14 technicians is recorded in the lab notebooks.
15    Q.   And does the technician who does the
16 work sign the lab notebook?
17         THE INTERPRETER:  Excuse me.
18 I'm not sure I heard specific technician.
19         MR. CALVOSA:  Sure.
20 BY MR. CALVOSA:
21    Q.   The technician that would do the
22 dissolution study, would they put their
23 signature on the laboratory notebook pages that
24 recorded the work?
25    A.   The technician who conducted the

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

FINAL ████████

October 8, 2022
Herve Guillard, Ph.D



Page 113

1    sorry about that.
2              Going off the record at 10:50 a.m.
3              (A recess was taken.)
4              THE VIDEOGRAPHER:  Going on
5    the record at 11:04 a.m.
6    BY MR. CALVOSA:
7

Page 115

1    to be one of your patents that's assigned to
2    Avadel?
3         A.   I have knowledge of the patent
4    application, not of the packaged patents, but
5    it was an application in which I was the
6    author.
7         Q.   Okay.  And do you see the
8    application number on 103878 next to the
9    parentheses 21 Application No. 15/655924?
10        A.   Yes.
11             MR. CALVOSA:  And just for the
12   record, clarifying I'm marking this document
13   Avadel 00103878 through 103988 as PTX 42.
14             (Deposition Exhibit No. PTX 42
15   was marked for identification.)
16   BY MR. CALVOSA:
17        Q.   Doctor, was this one of the
18   applications -- sorry.
19             Was Application No. 15/655924 one of
20   the applications that you drafted?
21        A.   I was involved in the drafting of
22   this application.
23        Q.   And did you review the full
24   application before it was submitted to the
25   patent office?

Page 114

1         A.   You have to refer to the dissolution
2    profile, which defines the release of the
3    active principle.
4              You should always refer to the
5    composition and the profile to see what type of
6    release is observed.
7         Q.   With respect, Doctor, that was not
8    my question.
9              My question was,
22             MR. CALVOSA:  Philip, can we
23   get out AVDL_00103878, and that goes 103988.
24   BY MR. CALVOSA:
25        Q.   And, Doctor, do you recognize this

Page 116

1         A.   I read the full application knowing
2    that I checked the accuracy of the information
3    on the parts that I had written.
4         Q.   And you understand that the
5    application consisted of the specification that
6    is part of this PTX 42 that we're looking at?
7         A.   Yes.
8         Q.   And at the time that was filed with
9    the U.S. Patent Office, did you believe
10   everything in there to be true and accurate?
11        A.   As I said, I read the whole
12   application and I reviewed the parts that I had
13   drafted.  So I have no reason to doubt the
14   accuracy.
15        Q.   And sitting here today, October 8,
16   2022, do you have any reason to believe
17   anything within PTX 42 is inaccurate?
18        A.   Today I have no reason to doubt the
19   accuracy.
20        Q.   If you turn to Column 47 on Bates
21   No. 103951, and I want to focus beginning at
22   Line 55 on examples.
23        A.   Yes.
24        Q.   And I specifically want to focus on
25   from Column 47, Line 55, to the bottom of

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

FINAL

October 8, 2022
Herve Guillard, Ph.D

Page 117

```
1      Column 50, Examples 1 and 1 BIS, B-I-S?
2          A.   Examples 1 and 1 BIS are on two
3      different pages?
4          Q.   It goes from Column 47 to Column 50,
5      the two different examples, Example 1 and
6      Example 1 BIS.
7          A.   Yes.
```

Page 119

Page 118

Page 120

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

FINAL

October 8, 2022
Herve Guillard, Ph.D

Page 121



Page 123

```
1    11, you provide some information about what
2    different release terms mean?
3              MR. ZUBICK:  Objection to
4    form.
5              THE WITNESS:  Yes, this
6    paragraph defines some terms.
7    BY MR. CALVOSA:
8        Q.    Okay.  And here, you say, "A
9    modified release portion includes a portion of
10   a formulation or dosage form that lends to or
11   supports a particular modified release pharmaco
12   characteristic regardless of the physical
13   formulation in which the modified release
14   portion is integrated."
15             Do you see that?
16       A.    Yes.
17       Q.    And then a couple lines down on
18   Column 18, Line 22, you say, "More
19   specifically, MR solid oral dosage forms
20   include both extended release and delayed
21   release products."
22             Do you see that?
23             MR. ZUBICK:  Objection to
24   form.
25             THE WITNESS:  Yes, it is
```

Page 122

Page 124

```
1    written.
2    BY MR. CALVOSA:
3        Q.    Okay.  And then you say, "A delayed
4    release product is one that releases a drug all
5    at once at a time other than promptly after
6    administration."
7              And you continue, "For delayed
8    release coatings, our use is to delay the
9    release of the drug substance until the dosage
10   form is passed through the acidic medium of the
11   stomach."
12             Do you see that?
13       A.    Yes.
14       Q.    Okay.  And then separately for the
15   extended release you say, "An extended release
16   product is formulated to make the drug
17   available over an extended period after
18   ingestion, thus allowing a reduction in dosing
19   frequency compared to a drug presented as a
20   conventional dosage form, e.g., a solution or
21   an immediate release dosage form."
22             Right?
23       A.    Yes.
24       Q.    And then you say, "For oral
25   applications, the term "extended release" is
```

```
22       Q.    Can you turn back to Column 18 of
23   PTX 42 and that appears on the Bates 103936?
24       A.    Yes.
25       Q.    And do you see, beginning at Line
```

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

Jazz Pharmaceuticals v.                          FINAL                          October 8, 2022
Avadel Pharmaceuticals                                                          Herve Guillard, Ph.D

---

Page 125

1    used interchangeably with "sustained release,"
2    "prolonged release" or "controlled release."
3         Right?
4              MR. ZUBICK:  Objection to
5    form, mischaracterizes the document.
6              Hang on a second.  So Frank, I don't
7    know how we do this.  I'm not trying to
8    implicate what the witness is hearing, but what
9    you asked is not matching what's being read by
10   Sabine because she's reading from the document.
11   Now I don't know if it was intentional, but you
12   did not read what the document said word for
13   word.
14             So can you ask it again?  And then
15   Sabine, please read exactly what he says.
16             MR. CALVOSA:  What did I --
17   hold on.  Let me read it again.
18             MR. ZUBICK:  Yep.
19   BY MR. CALVOSA:
20        Q.   For oral application -- so let me
21   restart again.
22             And then you say here in Column 18,
23   "For oral applications, the term "extended
24   release" is used interchangeably with the term
25   "sustained release," "prolonged release" or

---

Page 126

1    "controlled release"; right?
2              MR. ZUBICK:  Same objection.
3    That's not what the document says.
4              THE WITNESS:  It says "usually
5    interchangeable," which means that it is --
6    this interchangeability is not used by all the
7    people who use these terms.
8              MR. CALVOSA:  That is
9    excellent coaching, by the way.  But as long as
10   we've opened the door, it applies both ways.
11             In any event, we'll go back to that.
12   BY MR. CALVOSA:
13        Q.   So you say in here -- now I
14   understand what the issue is.
15             You say in the application, "For
16   oral applications, the term "extended release"
17   is usually interchangeable with "sustained
18   release," "prolonged release," or "controlled
19   release"; right?
20             MR. ZUBICK:  And I'll just
21   object to the colloquy.
22             THE WITNESS:  So it says that
23   for oral application, the term "extended
24   release" is used usually, but not by all who
25   use it, for -- interchangeably for sustained

---

Page 127

1    release, prolonged release, controlled release.
2    BY MR. CALVOSA:
3         Q.   Can you show me where, by column and
4    line number, where it says "but not by all that
5    use it"?
6              MR. ZUBICK:  Objection to
7    form.
8              THE WITNESS:  I see the word
9    "usually," so unless I'm mistaken in the
10   translation, it doesn't mean always.
11   BY MR. CALVOSA:
12        Q.   Are you aware that Jazz
13   Pharmaceuticals has sued Avadel for patent
14   infringement?
15             MR. ZUBICK:  Dr. Guillard, you
16   can answer that.  I'm just going to caution you
17   not to disclose the substance of any
18   communications you had with lawyers.
19             THE WITNESS:  I know there is
20   a suit.
21   BY MR. CALVOSA:
22        Q.   Okay.  Do you know when that suit
23   was filed, what year?
24             MR. ZUBICK:  Same instruction,
25   Dr. Guillard.  You can answer, but I'll caution

---

Page 128

1    you not to disclose the substance of
2    communications with lawyers.
3              THE WITNESS:  I have no
4    information on this subject.
5    BY MR. CALVOSA:
6         Q.   Okay.  I'll tell you the suit was
7    filed in 2021.  You wrote this application
8    before the year 2021; right?
9         A.   Yes, because it was filed in 2017.

---

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

FINAL

October 8, 2022
Herve Guillard, Ph.D

Page 129

Page 130

5          MR. ZUBICK:  And,
6    Dr. Guillard, I'm going to instruct you not to
7    answer that question as phrased because it
8    calls for privileged information.
9          MR. CALVOSA:  You can't
10   instruct him not to answer.  You can instruct
11   him not to reveal any attorney-client
12   communications.  I didn't ask him if he talked
13   to an attorney.  I said, did you ever tell
14   anybody?
15         Obviously to the extent -- to the
16   extent you talked to an attorney about this,
17   I'm going to instruct you not to answer.
18         MR. ZUBICK:  I mean, that's
19   one way we can do it.  You could also ask him
20   if he ever talked to someone who wasn't an
21   attorney but --
22         MR. CALVOSA:  I asked my
23   question so let's do a proper objection if you
24   want to object.
25         MR. ZUBICK:  I think it was a

Page 131

1    proper objection.
2          MR. CALVOSA:  No, it wasn't.
3          MR. ZUBICK:  It -- okay.  I'm
4    happy to do it.
5          Dr. Guillard, I instruct you not to
6    reveal the substance of any communication you
7    had with counsel.  If there are other
8    non-attorneys who you spoke to that you know
9    didn't themselves speak to counsel, you can
10   answer with respect to those communications.
11         (Translation.)
12         MR. CALVOSA:  Let me re-ask
13   the question so it's clear and then he can give
14   the same instruction.
15   BY MR. CALVOSA:

Page 132

8    BY MR. CALVOSA:
9          Q.  Do you remember earlier today we
10   talked a couple times about you reviewing some
11   of Jazz's patents?
12         A.  We've talked about them.  I do not
13   remember the circumstances in which we talked
14   about them, but --
15         Q.  Sure.
16         MR. CALVOSA:  Philip, can you
17   hand him U.S. 2012/0076865.  And this is not
18   Bates-stamped so I'm just going to identify it
19   for the record.
20         It's Jazz Patent Application
21   Publication No. U.S. 2012/007865, publication
22   date of March 29, 2012, signs to Jazz
23   Pharmaceuticals.
24         And that will be PTX 43.
25         (Deposition Exhibit No. PTX 43

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

FINAL ███████████

October 8, 2022
Herve Guillard, Ph.D

---

Page 133

1  was marked for identification.)
2  BY MR. CALVOSA:
3      Q.   And my question for us is do you
4  know whether this is one of the Jazz patent
5  documents that you reviewed?
6      A.   It is one of the Jazz patents that I
7  reviewed during the development of FT218.
8      Q.   Okay.  You can put that aside for
9  now.
10         MR. CALVOSA:  And Philip, what
11  we're going to do now is let's get
12  AVDL_01311432, and that goes through 1311469.
13  And this is a portion of a French laboratory
14  notebook that Avadel produced.  So we have the
15  French version, a certification of translation,
16  and then the English version, and I'll mark
17  them all together as PTX 43 -- 44.
18         (Deposition Exhibit No. PTX 44
19  was marked for identification.)
20         MR. CALVOSA:  And, Marc, maybe
21  you can confirm for me you have the French
22  portion, the certification of translation page,
23  and then the English version?
24         MR. ZUBICK:  I have the French
25  version.  I have the certificate of

---

Page 134

1  translation, and I have the English version.
2         MR. CALVOSA:  Okay.
3         MR. ZUBICK:  And it looks like
4  the witness has the same.
5         MR. CALVOSA:  Great.  Thank
6  you for doing that.
7  BY MR. CALVOSA:
8      Q.   And, Doctor, you can refer to either
9  the French version or the English version,
10  whichever is easier for you, or both.
11      A.   Very well.
12      Q.   This first page of PTX 44 on
13  1311432, does this appear to be an Avadel
14  laboratory notebook?
15      A.   Yes.
16      Q.   And you're familiar with these
17  laboratory notebooks through your work at
18  Avadel?
19      A.   Yes.
20      Q.   And if you turn to Page 1311433, and
21  let me just correct for the record, these are
22  excerpts from the laboratory notebook so it's a
23  cover page and signature page which are 1311432
24  through 131143 [sic], and then certain pages of
25  the notebook, 68 to 71, which are AVDL_01311468

---

Page 135

1  to 1311469.
2      A.   Very well.
3      Q.   And do you -- do you see here on
4  131143 it has the subject as FT218 ████?
5      A.   Yes.
6      Q.   And then it has the department as
7  formulation?
8      A.   Yes.
9      Q.   And then it has the technical
10  managers listed there as Vincent Roque and
11  Florian Dumas, or --
12      A.   Yes.
13      Q.   And based on your testimony earlier,
14  the technical managers were the ones who were
15  doing the hands-on work in the lab?
16         THE INTERPRETER:  Sorry, I
17  didn't get that.
18  BY MR. CALVOSA:
19      Q.   Sorry.  Based on your testimony
20  earlier, the technical managers were the ones
21  who were doing the hands-on work in the lab?
22      A.   Yes.
23      Q.   And both the technical managers
24  signed the notebook here?
25      A.   Yes.

---

Page 136

1      Q.   And then there's the line manager,
2  and that's listed as you?
3      A.   Yes.
4      Q.   And you signed the laboratory
5  notebook as well?
6      A.   Yes.
7      Q.   And you were the supervisor of the
8  technical managers?
9      A.   Yes.
10      Q.   And what does your signature
11  throughout this laboratory notebook signify?
12      A.   It means that I reviewed what was
13  written, that I finished the review of the
14  whole notebook.
15      Q.   And when you signed it, did you
16  believe the information in the notebook to be
17  accurate?
18      A.   To my knowledge, yes.
19      Q.   And if you turn to Page 1311468 --
20      A.   Yes.
21      Q.   The title of the study that's being
22  done here -- or let me ask you this.
23  ███████████████████████████

---

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

FINAL

October 8, 2022
Herve Guillard, Ph.D

Page 137



Page 139

1      Q.    Doctor, you can put that document
2  aside.
3         Sitting here today, do you have any
4  agreements with Avadel?
5      A.    What type of agreement?
6      Q.    Do you have any consulting
7  agreements with Avadel?
8      A.    Yes.
9         MR. CALVOSA:  Okay.  Counsel,
10  we request production of that consulting
11  agreement.  It's fine.
12         MR. ZUBICK:  Yeah, same --
13  same deal as before; put it in writing and
14  we'll respond.
15         MR. CALVOSA:  Sure.  We'll
16  respond.  That's fine.
17  BY MR. CALVOSA:
18      Q.    Are you being compensated in any way
19  for your testimony today?
20      A.    Yes, I will receive compensation.
21      Q.    Do you own any Avadel stock?
22      A.    I own Avadel stock that I received
23  when I was employed at Avadel.
24      Q.    Do you know the approximate value of
25  that stock today?

Page 138

Page 140

1      A.    It's not something that I follow
2  regularly.  I know that the share is worth a
3  few dollars.
4      Q.    Do you know how many shares you own?
5      A.    I don't know very precisely, but I
6  would say about 8,000.
7      Q.    And I forgot to ask earlier, I
8  apologize, what -- what degrees do you have?
9  Post-high school education, what are your
10  qualifications?
11      A.    A degree in chemical engineering,
12  university diploma of additional studies on
13  materials, and a Ph.D. in physical chemistry.
14      Q.    And how many years total of
15  formulation development experience do you have?
16      A.    The experience acquired at Flamel,
17  so between 2004 and 2019, so 15 years.
18         MR. CALVOSA:  Then barring
19  anything else from your counsel, I have no
20  further questions at this time.  But see if --
21         MR. ZUBICK:  Just give us two
22  minutes off the record and we'll come back.
23         MR. CALVOSA:  Sure.
24         THE VIDEOGRAPHER:  Going off
25  the record at 12:21 p.m.

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

**FINAL**

October 8, 2022
Herve Guillard, Ph.D

---

Page 141

1          (A recess was taken.)
2          THE VIDEOGRAPHER:  Going on
3    the record at 12:22 p.m.
4          MR. ZUBICK:  Okay.  Thank you,
5    Dr. Guillard.  I have no questions.
6          Frank, you were muted for a second,
7    I think.
8          MR. CALVOSA:  Go ahead.  We
9    can go off the record.
10         THE VIDEOGRAPHER:  All right.
11   Going off the record at 12:23 p.m.
12         - - -
13         (Thereupon, the deposition was
14   concluded at 12:23 p.m.  Signature was not
15   waived.)
16         - - -
17
18
19
20
21
22
23
24
25

---

Page 143

1     IN WITNESS WHEREOF, I have hereunto set my
2    hand and affixed my seal of office this 12th
3    day of October 2022.
4
5
6
7
8
9         /S/ Alyssa A. Repsik
10        _____
11        Alyssa A. Repsik, Notary Public
12        Court Reporter
13        Notary Public
14        Allegheny County
15        My Commission Expires March 3, 2024
16        Commission Number 129614
17
18
19
20
21
22
23
24
25

---

Page 142

1    COMMONWEALTH OF PENNSYLVANIA  )
2                                  ) SS
3    COUNTY OF ALLEGHENY           )
4
5              CERTIFICATE
6
7     I, Alyssa A. Repsik, a notary public in and
8    for the Commonwealth of Pennsylvania, do hereby
9    certify that the witness, HERVÉ GUILLARD,
10   Ph.D., was by me first duly sworn to testify
11   the truth, the whole truth, and nothing but the
12   truth; that the foregoing deposition was taken
13   at the time and place stated herein; and that
14   the said deposition was recorded
15   stenographically by me and then reduced to
16   typewriting under my direction, and constitutes
17   a true record of the testimony given by said
18   witness.
19
20    I further certify that I am not a relative,
21   employee or attorney of any of the parties, or
22   a relative or employee of either counsel, and
23   that I am in no way interested directly or
24   indirectly in this action.
25

---

Page 144

1         INSTRUCTIONS FOR ERRATA
2
3
4    NOTARY PUBLIC SIGNATURE
5    Not required unless agreed upon by counsel
6    that notary public signature is required.
7
8
9
10   Please return a copy of the signed errata within
11   30 days of receipt, unless otherwise agreed upon
12   by counsel.  Once we receive one signed errata, we
13   will distribute an electronic copy to all parties.
14
15
16   RETURN A SIGNED COPY VIA FAX, EMAIL OR MAIL TO:
17        FAX: 1-800-825-9055
18        EMAIL: janerose@janerosereporting.com
19
20   Jane Rose Reporting
21   Administrative Offices
22   PO Box 542
23   Luck, WI  54853
24
25

---

Jazz Pharmaceuticals v.
Avadel Pharmaceuticals

FINAL

October 8, 2022
Herve Guillard, Ph.D

Page 145

1    ACKNOWLEDGMENT OF THE DEPONENT
2
3
4        I, Herve Guillard, Ph.D, do hereby certify that
5    I have read the foregoing pages and that the same
6    is a correct transcription of the answers given
7    by me to the questions therein propounded, except
8    for the corrections or changes in form or substance,
9    if any, noted in the attached Errata Sheet.
10
11   _____  _____
12   (DATE)   Herve Guillard, Ph.D
13
14
15   Signed and subscribed to before me this
16   _____ day of _____, 2022.
17
18   _____
19      Notary Public
20
21
22
23
24
25

Page 146

1    PAGE   LINE   CHANGE       REASON
2    ____ / ____ / _____ / _____
3    ____ / ____ / _____ / _____
4    ____ / ____ / _____ / _____
5    ____ / ____ / _____ / _____
6    ____ / ____ / _____ / _____
7    ____ / ____ / _____ / _____
8    ____ / ____ / _____ / _____
9    ____ / ____ / _____ / _____
10   ____ / ____ / _____ / _____
11   ____ / ____ / _____ / _____
12   ____ / ____ / _____ / _____
13   ____ / ____ / _____ / _____
14   ____ / ____ / _____ / _____
15   ____ / ____ / _____ / _____
16   ____ / ____ / _____ / _____
17   ____ / ____ / _____ / _____
18   ____ / ____ / _____ / _____
19   ____ / ____ / _____ / _____
20   ____ / ____ / _____ / _____
21   ____ / ____ / _____ / _____
22   ____ / ____ / _____ / _____
23   ____ / ____ / _____ / _____
24   ____ / ____ / _____ / _____
25   ____ / ____ / _____ / _____

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | C.A. No. 21-691-GBW |
| v. | ████████████████ |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., *et al.,* | |
| Plaintiffs, | C.A. No. 21-1138-GBW |
| v. | ████████████████ |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., *et al.,* | |
| Plaintiffs, | C.A. No. 21-1594-GBW |
| v. | ████████████████ |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |

**AVADEL'S RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR**
**ADMISSION (NOS. 1-68)**

## GENERAL OBJECTIONS

Defendant Avadel CNS Pharmaceuticals, LLC ("Avadel" or "Defendant") makes the following General Objections to Plaintiffs Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited ("Jazz" or "Plaintiffs") First Set of Requests for Admission (Nos. 1-68):

1.      The following General Objections form a part of, and are hereby incorporated by reference into, the response to each and every Request.  Nothing in those responses, including any failure to recite a specific objection in response to a particular interrogatory, should be construed as a waiver of any of these General Objections.

2.      The General Objections and Definitions from Defendant's Responses and Objections to Plaintiffs' First, Second, and Third Requests for Production of Documents and Things and Defendant's Responses and Objections to Plaintiffs' First Set of Interrogatories are incorporated herein by reference.

## SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS

2



3



4



ME1 43042784v.1



ME1 43042784v.1



7



8



9



10



11



ME1 43042784v.1



13



**REQUEST FOR ADMISSION NO. 18**

Admit that Defendant's NDA Product comprises sodium gamma-hydroxybutyrate.  *See, e.g.,* AVDL_00012168.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Avadel incorporates its General Objections as and for its objections to Request No. 18.

Subject to and without waiving the foregoing General and Specific Objections, Avadel admits this Request.

**REQUEST FOR ADMISSION NO. 19**

Admit that the active ingredient in Defendant's NDA Product is sodium oxybate.  *See, e.g.*, AVDL_00052478.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Avadel incorporates its General Objections as and for its objections to Request No. 19.

Subject to and without waiving the foregoing General and Specific Objections, Avadel admits this Request.

14

**REQUEST FOR ADMISSION NO. 20**

Admit that the proposed package insert for Defendant's NDA Product states that "[s]odium oxybate is the sodium salt of gamma-hydroxybutyrate (GHB)." *See, e.g.*, AVDL_00052478.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Avadel incorporates its General Objections as and for its objections to Request No. 20.

Subject to and without waiving the foregoing General and Specific Objections, Avadel admits that the language quoted in this Request appears in the document bearing Bates Number AVDL_00052478, and that the same language appears in the proposed package insert, as submitted by Avadel to the FDA and tentatively approved by the FDA.  Other than as expressly admitted, this Request is denied.

**REQUEST FOR ADMISSION NO. 21**

Admit that Defendant's NDA Product is composed of Immediate-Release pellets (IR pellets) and Controlled-Release coated pellets (CR coated pellets).  *See, e.g.*, AVDL_00044787.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Avadel incorporates its General Objections as and for its objections to Request No. 21. Avadel additionally objects to this Request to the extent it seeks information that is protected by the attorney-client privilege, attorney work product doctrine, common interest doctrine, or any other applicable privilege, protection, or immunity.  Avadel objects to this Request as vague, ambiguous, and incapable of reasonable ascertainment at least because the term "composed of" is vague and ambiguous.

Subject to and without waiving the foregoing General and Specific Objections, Avadel admits that the cited document uses the terms "Immediate-Release pellets" and "Controlled-Release pellets" to describe components of Avadel's NDA product, as those terms are used in the

context of the document cited in this Request.  Other than as expressly admitted, this Request is denied.

**REQUEST FOR ADMISSION NO. 22**

Admit that Defendant's NDA Product contains a total sodium oxybate dose of 4.5 g, 6 g, 7.5 g, or 9 g.  *See, e.g*., AVDL_00044787.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Avadel incorporates its General Objections as and for its objections to Request No. 22. Avadel additionally objects to this Request to the extent it seeks information that is protected by the attorney-client privilege, attorney work product doctrine, common interest doctrine, or any other applicable privilege, protection, or immunity.

Subject to and without waiving the foregoing General and Specific Objections, Avadel admits this Request.



17



ME1 43042784v.1



19



20

ME1 43042784v.1



21

ME1 43042784v.1



22



ME1 43042784v.1



**REQUEST FOR ADMISSION NO. 38**

Admit that Defendant's NDA Product is an oral suspension. *See, e.g.*, AVDL_00012133.

**RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

Avadel incorporates its General Objections as and for its objections to Request No. 38.

Avadel additionally objects to this Request to the extent it seeks information that is protected by

the attorney-client privilege, attorney work product doctrine, common interest doctrine, or any

other applicable privilege, protection, or immunity.  Avadel objects to this Request as vague,

ambiguous, and incapable of reasonable ascertainment at least because the term "oral

suspension," as used in the Request is vague and ambiguous.

Subject to and without waiving the foregoing General and Specific Objections, Avadel

admits that its NDA Product is "[f]or extended-release oral suspension: LUMRYZ is ▮▮▮▮▮

████████████████████████ 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate."
AVDL_01329986.  Other than as expressly admitted, this Request is denied.

**REQUEST FOR ADMISSION NO. 39**

Admit that Defendant's NDA Product is a powder for oral suspension.  *See, e.g.,*
AVDL_00012138.

**RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

Avadel incorporates its General Objections as and for its objections to Request No. 39.
Avadel additionally objects to this Request to the extent it seeks information that is protected by
the attorney-client privilege, attorney work product doctrine, common interest doctrine, or any
other applicable privilege, protection, or immunity.  Avadel objects to this Request as vague,
ambiguous, and incapable of reasonable ascertainment at least because the term "oral suspension"
as used in the Request, is vague and ambiguous.

Subject to and without waiving the foregoing General and Specific Objections, Avadel
admits that its NDA Product is "[f]or extended-release oral suspension: LUMRYZ is ████████
████████████████████████ 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate."
AVDL_01329986.  Other than as expressly admitted, this Request is denied.

**REQUEST FOR ADMISSION NO. 40**

Admit that Defendant's NDA Product is intended for oral administration.  *See, e.g.,*
AVDL_00012138.

**RESPONSE TO REQUEST FOR ADMISSION NO. 40:**

Avadel incorporates its General Objections as and for its objections to Request No. 40.
Avadel additionally objects to this Request to the extent it seeks information that is protected by
the attorney-client privilege, attorney work product doctrine, common interest doctrine, or any

other applicable privilege, protection, or immunity.  Avadel objects to this Request as vague, ambiguous, and incapable of reasonable ascertainment at least because the term "oral administration," as used in the Request, is vague and ambiguous.

Subject to and without waiving the foregoing General and Specific Objections, Avadel admits that its NDA Product is "[f]or extended-release oral suspension: LUMRYZ is ████ ████████████████████████████████ 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate." AVDL_01329986.  Other than as expressly admitted, this Request is denied.





**REQUEST FOR ADMISSION NO. 43**

Admit that NDA No. 214755 states that Defendant's NDA Product's "PK profiles exhibited a sustained release profile with a long absorption, equivalent exposure, a lower overall Cmax than equivalent doses of the reference product Xyrem®, ███████████████████

███████████████████████

**RESPONSE TO REQUEST FOR ADMISSION NO. 43:**

Avadel incorporates its General Objections as and for its objections to Request No. 43. Avadel additionally objects to this Request on the ground that it mischaracterizes the document it purports to cite from.

Subject to and without waiving the foregoing objections and General Objections, Avadel admits that the language quoted in this Request appears in the document bearing Bates Number AVDL_00012157.  Other than as expressly admitted, this Request is denied.

28



29



ME1 43042784v.1



31



**REQUEST FOR ADMISSION NO. 52**

Admit that Defendant's NDA Product is indicated for the treatment of cataplexy and excessive daytime sleepiness in adults with narcolepsy.  *See, e.g*., AVDL_00045593.

**RESPONSE TO REQUEST FOR ADMISSION NO. 52:**

Avadel incorporates its General Objections as and for its objections to Request No. 52. Avadel additionally objects to this Request to the extent it seeks information that is protected by the attorney-client privilege, attorney work product doctrine, common interest doctrine, or any other applicable privilege, protection, or immunity. Avadel objects to this Request on the ground that it mischaracterizes the document it purports to cite from.

Subject to and without waiving the foregoing General and Specific Objections, Avadel admits that the proposed package insert for Avadel's NDA Product "is indicated for the treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy." AVDL_01329987. Other than as expressly admitted, this Request is denied.

**REQUEST FOR ADMISSION NO. 53**

Admit that the proposed package insert for Defendant's NDA Product states that Defendant's NDA Product "is indicated for the treatment of cataplexy and excessive daytime sleepiness (EDS) in adults with narcolepsy." *See, e.g.,* AVDL_00052477.

**RESPONSE TO REQUEST FOR ADMISSION NO. 53:**

Avadel incorporates its General Objections as and for its objections to Request No. 52. Avadel additionally objects to this Request on the ground that it mischaracterizes the document it purports to cite from. Avadel objects to this Request as vague, ambiguous, and incapable of reasonable ascertainment at least because the term "proposed package insert" is vague and ambiguous.

Subject to and without waiving the foregoing General and Specific Objections, Avadel admits that the proposed package insert for Avadel's NDA Product states that Avadel's NDA Product "is indicated for the treatment of cataplexy or excessive daytime sleepiness (EDS) in

33

adults with narcolepsy."  AVDL_01329987.  Other than as expressly admitted, this Request is denied.

34



35



36



37

ME1 43042784v.1



38

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████

## REQUEST FOR ADMISSION NO. 62

Admit that the proposed package insert for Defendant's NDA Product states that, to administer Defendant's NDA Product, "[t]ake LUMRYZ as a single dose at bedtime." *See, e.g.*, AVDL_00052477.

## RESPONSE TO REQUEST FOR ADMISSION NO. 62:

Avadel incorporates its General Objections as and for its objections to Request No. 62. Avadel additionally objects to this Request as vague, ambiguous, and incapable of reasonable ascertainment at least because the terms "proposed package insert" and "administer," as used in the Request, are vague and ambiguous.  Avadel objects to this Request on the ground that it mischaracterizes the document it purports to cite from.

Subject to and without waiving the foregoing General and Specific Objections, Avadel admits that the language quoted in this Request appears in the document bearing Bates Number AVDL_00052477.  Avadel denies that the quoted language appears in the proposed package insert, as submitted by Avadel to the FDA and tentatively approved by the FDA.  Avadel refers to that document with respect to its contents.  Other than as expressly admitted, this Request is denied.

## REQUEST FOR ADMISSION NO. 63

Admit that the proposed package insert for Defendant's NDA Product states that, to administer Defendant's NDA Product, "[p]repare each dose prior to bedtime; suspend each dose in ███████████████████████████████████." *See, e.g.*, AVDL_00052477.

**RESPONSE TO REQUEST FOR ADMISSION NO. 63:**

Avadel incorporates its General Objections as and for its objections to Request No. 63. Avadel additionally objects to this Request as vague, ambiguous, and incapable of reasonable ascertainment at least because the terms "proposed package insert" and "administer," as used in the Request are vague and ambiguous.  Avadel objects to this Request on the ground that it mischaracterizes the document it purports to cite from.

Subject to and without waiving the foregoing General and Specific Objections, Avadel admits that the language quoted in this Request appears in the document bearing Bates Number AVDL_00052477.  Avadel denies that the quoted language appears in the proposed package insert, as submitted by Avadel to the FDA and tentatively approved by the FDA.  Avadel refers to that document with respect to its contents.  Other than as expressly admitted, this Request is denied.

40

██████████████████████████████████████████████

██████████████████████████████████

**REQUEST FOR ADMISSION NO. 65**

Admit that NDA No. 214755 states that Defendant's NDA Product "is taken only once at bedtime, ███████████████████████████████████████

███████████████

**RESPONSE TO REQUEST FOR ADMISSION NO. 65:**

Avadel incorporates its General Objections as and for its objections to Request No. 65. Avadel additionally objects to this Request on the ground that it mischaracterizes the document it purports to cite from.  Avadel objects to this Request on the ground that it mischaracterizes the document it purports to cite from.

Subject to and without waiving the foregoing objections and General Objections, Avadel admits that the language quoted in this Request appears in the document bearing Bates Number AVDL_00090528.  Other than as expressly admitted, this Request is denied.

█████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████

████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████



42



43

Dated: October 28, 2022

*Of Counsel*:

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
Sarah W. Wang
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
kenneth.schuler@lw.com
marc.zubick@lw.com
alex.grabowski@lw.com
sarah.wang@lw.com

Herman Yue
Franco Benyamin (DE #6755)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Herman.Yue@lw.com

Daralyn J. Durie
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
(415) 365-6666
ddurie@durietangri.com

Kira A. Davis
Katherine E. McNutt
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499
kdavis@durietangri.com
kmcnutt@durietangri.com

McCARTER & ENGLISH, LLP

*/s/ Daniel M. Silver*

Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Counsel for Defendant*

44

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-691-GBW <br><br> ███████████████ <br> ████████████ |
| JAZZ PHARMACEUTICALS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-1138-GBW |
| JAZZ PHARMACEUTICALS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-1594-GBW |

**OPENING EXPERT REPORT OF STEVEN R. LITTLE, Ph.D.**

**TABLE OF CONTENTS**

**Page**

I.    EXPERT QUALIFICATIONS ........................................................................1

    A.    Educational and Professional Background ............................................1

    B.    Honors and Awards................................................................................4

    C.    Prior Expert Testimony .........................................................................4

    D.    Compensation .......................................................................................5

II.   SUMMARY OF OPINIONS .........................................................................6

III.  LEGAL FRAMEWORK FOR MY OPINIONS...............................................7

IV.   OPINIONS .....................................................................................................8

    A.    Avadel's NDA Product Meets All Limitations of, and Therefore Infringes,
the Asserted Claims of the '488 Patent .................................................9

        1.    The '488 Patent, Claim 1 ...........................................................9

            (a)    Avadel's NDA Product is "[a] formulation comprising
immediate release and sustained release portions, each
portion comprising at least one pharmaceutically active
ingredient selected from gamma-hydroxybutyrate and
pharmaceutically acceptable salts of gamma-
hydroxybutyrate" ..........................................................10

            (b)    Avadel's NDA Product comprises a "sustained release
portion [that] comprises a functional coating and a core,
wherein the functional coating is deposited over the core,
wherein the core comprises at least one pharmaceutically
active ingredient selected from gamma-hydroxybutyrate
and pharmaceutically acceptable salts of gamma-
hydroxybutyrate" ..........................................................14

            (c)    The sustained release portion of Avadel's NDA Product
comprises a "functional coating [that] comprises one or
more methacrylic acid-methyl methacrylate co-polymers
that are from about 20% to about 50% by weight of the
functional coating"........................................................23

            (d)    Avadel's NDA Product comprises a "sustained release
portion [that] comprises about 500 mg to 12 g of at least
one pharmaceutically active ingredient selected from

gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"....................................................24

(e)    Avadel's NDA Product comprises a "sustained release portion [that] releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm".................25

(f)    Avadel's NDA Product comprises an "immediate release portion [that] comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate" ...........................................................29

(g)    Avadel's NDA Product comprises an "amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion [that] is about 10% to 50% by weight of the gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation" ...............................30

(h)    Avadel's NDA Product "releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"......................................31

(i)    Avadel's NDA Product "releases at least about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"......................................32

███████████████████████████████████████████

11.    The '488 Patent, Claim 12 ........................................................................42

      (a)    Avadel's NDA Product comprises "[a] formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions" ............................43

      (b)    Avadel's NDA Product comprises an "immediate release portion [that] comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate" ..............................................44

      (c)    Avadel's NDA Product comprises a "sustained release portion [that] comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient" ...............................45

      (d)    The sustained release portion of Avadel's NDA Product comprises a "functional coating [that] comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating" ........................................................................45

      (e)    Avadel's NDA Product comprises a "sustained release portion [that] releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm" ..................46

      (f)    Avadel's NDA Product "releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm" ..................46

      (g)    Avadel's NDA Product "releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ......................................46

B.    Avadel's NDA Product Meets All Limitations of, and Therefore Infringes, the Asserted Claims of the '885 Patent ..................................................................47

iii

1.      The '885 Patent, Claim 1 ...........................................................47

        (a)     Avadel's NDA Product comprises "[a] formulation
                comprising a sustained release portion comprising about
                500 mg to 12 g of at least one pharmaceutically active
                ingredient selected from gamma-hydroxybutyrate and
                pharmaceutically acceptable salts of gamma-
                hydroxybutyrate" ...........................................................47

        (b)     Avadel's NDA Product comprises a "sustained release
                portion [that] comprises a functional coating and a core, the
                functional coating is deposited over the core; the core
                comprises at least one pharmaceutically active ingredient
                selected from gamma-hydroxybutyrate and
                pharmaceutically acceptable salts of gamma-
                hydroxybutyrate" ...........................................................48

        (c)     The sustained release portion of Avadel's NDA Product
                comprises a "functional coating [that] comprises one or
                more methacrylic acid-methyl methacrylate co-polymers
                that are from about 20% to about 50% by weight of the
                functional coating" .......................................................48

        (d)     Avadel's NDA Product comprises a "sustained release
                portion [that] releases greater than about 40% of its
                gamma-hydroxybutyrate by about 4 to about 6 hours when
                tested in a dissolution apparatus 2 in deionized water at a
                temperature of 37° C. and a paddle speed of 50 rpm" .................48

C.     Avadel's NDA Product Meets All of the Formulation Claim Limitations of the Asserted Claims of the '956 Patent .................................................56

    1.     The '956 Patent, Claim 1 ........................................................56

         (a)     Avadel's NDA Product comprises "a formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate" ..............................................57

         (b)     Avadel's NDA Product comprises a "sustained release portion [that] comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate" ..............................................57

         (c)     The sustained release portion of Avadel's NDA Product comprises a "functional coating [that] comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating" ..............................................58

         (d)     Avadel's NDA Product comprises a "sustained release portion [that] comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate" ..............................................58

         (e)     Avadel's NDA Product comprises a "sustained release portion [that] releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm" ..............................................58

         (f)     Avadel's NDA Product comprises an "immediate release portion [that] comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and

pharmaceutically acceptable salts of gamma-
hydroxybutyrate" ...................................................................59

(g)     Avadel's NDA Product comprises an "amount of gamma-
        hydroxybutyrate and pharmaceutically acceptable salts of
        gamma-hydroxybutyrate in the immediate release portion
        [that] is about 10% to 50% by weight of the total gamma-
        hydroxybutyrate and pharmaceutically acceptable salts of
        gamma-hydroxybutyrate in the formulation" ..............................59

(h)     Avadel's NDA Product "releases at least about 30% of its
        gamma-hydroxybutyrate by one hour when tested in a
        dissolution apparatus 2 in deionized water at a temperature
        of 37° C. and a paddle speed of 50 rpm" ......................................59

(i)     Avadel's NDA Product "releases greater than about 90% of
        its gamma-hydroxybutyrate by 8 hours when tested in a
        dissolution apparatus 2 in deionized water at a temperature
        of 37° C. and a paddle speed of 50 rpm" ......................................60

10.     The '956 Patent, Claim 11 ........................................................................64

(a)     Avadel's NDA Product comprises "a formulation of at least
        one pharmaceutically active ingredient selected from
        gamma-hydroxybutyrate and pharmaceutically acceptable
        salts of gamma-hydroxybutyrate, comprising immediate
        release and a solid sustained release portions" ..............................65

(b)     Avadel's NDA Product comprises an "immediate release
        portion [that] comprises about 55 mg to 12 g of at least one
        pharmaceutically active ingredient selected from gamma-

hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate" ............................................................65

(c)    Avadel's NDA Product comprises a "sustained release portion [that] comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient" ............................................65

(d)    The sustained release portion of Avadel's NDA Product comprises a "functional coating [that] comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating" ........................................................66

(e)    Avadel's NDA Product comprises a "sustained release portion [that] releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm" ..................66

(f)    Avadel's NDA Product "releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm" ..................66

(g)    Avadel's NDA Product "releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm" ......................................67

D.    Avadel's NDA Product Meets All of the Formulation Claim Limitations of the Asserted Claims of the '931 Patent ..................................................67

1.    The '931 Patent, Claim 1 ........................................................67

(a)    Avadel's NDA Product comprises "a formulation comprising a sustained release portion comprising about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate" ........................................................68

(b)    Avadel's NDA Product comprises a "sustained release portion [that] comprises a functional coating and a core, the functional coating is deposited over the core; the core

comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate" ........................................................................68

(c)     The sustained release portion of Avadel's NDA Product comprises a "functional coating [that] comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating" ........................................................................69

(d)     Avadel's NDA Product comprises a "sustained release portion [that] releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm" ..................69

E.     Avadel's NDA Product Meets All of the Formulation Claim Limitations of the Asserted Claims of the '079 Patent ....................................................76

1.     The '079 Patent, Claim 1 ...........................................................76

    (a)  Avadel's NDA Product comprises "a solid oxybate formulation . . . wherein the oxybate formulation comprises an immediate release component and a controlled release component" .................................................................................76



F.  Avadel's NDA Product Meets All Limitations of, and Therefore Infringes, the Asserted Claims of the '782 Patent ..................................................87

  1.  The '782 Patent, Claim 1 ..............................................................87

    (a)  Avadel's NDA Product comprises "a formulation of gamma-hydroxybutyrate" ...............................................88

    (b)  Avadel's NDA Product comprises "a plurality of immediate release particles comprising gamma-hydroxybutyrate" .......................................................88

    (c)  Avadel's NDA Product comprises "a plurality of modified release particles comprising gamma-hydroxybutyrate"................88

    (d)  Avadel's NDA Product comprises "a viscosity enhancing agent." ...........................................................90

    (e)  Avadel's NDA Product Comprises "an acid." ..............................92

    (f)  Avadel's NDA Product comprises a "viscosity enhancing agent and [an] acid [that] are separate from the immediate release particles and the modified release particles." ...................92

[redacted]

12. The ’782 Patent, Claim 14 ....................................................................99

(a) Avadel’s NDA Product comprises “[a] unit dose comprising a formulation of gamma-hydroxybutyrate” ................99

(b) Avadel’s NDA Product comprises “a plurality of immediate release particles comprising gamma-hydroxybutyrate” ................................................................101

(c) Avadel’s NDA Product comprises “a plurality of modified release particles comprising gamma-hydroxybutyrate”...............101

(d) Avadel’s NDA Product comprises “a viscosity enhancing agent.” ..........................................................................101

(e) Avadel’s NDA Product comprises “an acid.”..............................101

(f) Avadel’s NDA Product comprises a “viscosity enhancing agent and [an] acid [that] are separate from the immediate release particles and the modified release particles.” ..................102

[redacted]

V.     SUPPLEMENTATION ................................................................................................107

VI.    TRIAL EXHIBITS....................................................................................................107

VII.   CONCLUSION..........................................................................................................107

I, Steven R. Little, Ph.D. submit this Opening Expert Report in support of Plaintiffs Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (together, "Jazz") in this action.

## I.     EXPERT QUALIFICATIONS

### A.     Educational and Professional Background

1.     Attached as Exhibit 1 is a current copy of my curriculum vitae, which includes my degrees, positions, honors, awards, publications, invited talks at universities as well as national and international conferences, presentations, and service through active membership in a wide variety of scientific societies and as a peer reviewer for a wide variety of scientific journals.

2.     I received my Ph.D. in Chemical Engineering from the Massachusetts Institute of Technology (MIT) as a National Science Foundation Graduate Research Fellow.  I received the American Association for Advancement of Science's (AAAS) Excellence in Research Award for my thesis research.  I received my Bachelor of Engineering in Chemical Engineering at Youngstown State University where I graduated Summa Cum Laude with minors in both Chemistry and Mathematics.

3.     I am currently the Chair of the Department of Chemical Engineering as well as the William Kepler Whiteford Endowed Professor of Chemical Engineering, Bioengineering, Pharmaceutical Sciences, Immunology, Ophthalmology and the McGowan Institute for Regenerative Medicine at the University of Pittsburgh.  I am also the Director of the Controlled Release and Biomimetic Research Laboratories at the University of Pittsburgh.  In September 2021, I was appointed to the special rank of "Distinguished Professor" by the Chancellor of the University of Pittsburgh, which is the University's highest honor for faculty and recognizes extraordinary, internationally-recognized scholarly attainment in the field.

4.     As Chair of the Department of Chemical Engineering, my responsibilities include serving as the Executive Director of all major functions of the Department, such as the Chemical

Engineering research enterprise of the faculty as well as oversight of the instruction of all chemical engineering graduate and undergraduate courses and other educational activities.

5.      As a member of the faculty of the Department of Chemical Engineering, Bioengineering, Pharmaceutical Sciences, Immunology, Ophthalmology and the McGowan Institute for Regenerative Medicine at the University of Pittsburgh, my responsibilities include instruction of courses including Biomaterials, Introduction to Controlled Release Systems, and Fundamentals of Transport Processes (aka Transport Phenomena) including mass transport issues such as diffusive and convective mass transport processes.

6.      As Director of the Controlled Release and Biomimetic Research Laboratories at the University of Pittsburgh, my responsibilities include serving as the principal investigator on over $25M of research activities over the past fifteen years in the area of controlled release systems and sustained release systems.  The laboratories consists of approximately 10-15 full- and part-time researchers, including research assistant professors, post-doctoral associates, Ph.D. students, master's students, and undergraduate researchers.  My work is funded by the National Institutes for Health, the National Science Foundation, the US Food and Drug Administration, the U.S. Army, the U.S. Department of Defense, the Defense Advanced Research Projects Agency (DARPA), the American Heart Association, the Commonwealth of Pennsylvania, the Arnold and Mabel Beckman Foundation, the Wallace H. Coulter Foundation, the Camille and Henry Dreyfus Foundation, Research to Prevent Blindness, several industrial sources, and several internal Centers and Institutes.

7.      I was previously elected and served in the position of Representative of Special Interest Groups on the Board of Directors of the Society for Biomaterials (an international organization) by the Society's membership.  In this capacity, I was responsible for overseeing the

direction of the Divisions of the society (called "Special Interest Groups"), their educational programs, the annual program for its national and international conferences in the area of controlled release and drug delivery, and the promotion of controlled release and drug delivery research, amongst other things.  I have also been previously appointed as the Representative of the Board of Directors for Focus Groups in the Controlled Release Society, which established Focus Groups in the areas of Oral Drug Delivery, Ocular Drug Delivery, Nanomedicine and Nano-Scale Drug Delivery, Gene Delivery and Gene Editing, Biomimetic Drug Delivery, Immuno Drug Delivery, and Transdermal and Mucosal Drug Delivery.

8.      Since 2004, I have published over 100 peer-reviewed publications and peer reviewed book chapters in the areas of controlled release, sustained release, and immediate release in well-known journals such as Journal of Controlled Release, Proceedings of the National Academy of Sciences, Advanced Materials, Pharmaceutical Research, Molecular Pharmaceutics, Angewandte Chemie, Journal of Materials Chemistry, Journal of the American Chemical Society, Biomaterials, Journal of Biomedical Materials Research Part A, Journal of Molecular Medicine, and Science, Advances.  I have been invited to speak over 80 times about my research at national and international venues.

9.      Since 2004, I have been the primary inventor on over 30 issued and pending patents (with 3 of these being licensed for use by industry to date).

10.     I am also a co-founder of Qrono Inc. Controlled Release Solutions, a specialty pharmaceutical company focused upon treatments for head and neck cancer.  I am also a co-founder of Oraxis Inc., a startup focused upon treatments for inflammatory diseases and disease of destructive inflammation.

**B.      Honors and Awards**

11.      I have received a number of national and international awards, including the 2021 Distinguished Service Award from the Controlled Release Society, the 2015 Curtis McGraw Research award by American Society Engineering Education ("ASEE"; the only winner in the US in all engineering disciplines), Research to Prevent Blindness' Innovative Ophthalmology Research Award Winner in 2014, one of only two Chemical Engineering "Camille Dreyfus Teacher-Scholars" in 2012, both a Phase I and Phase II Wallace H. Coulter Translational Research Award Winner (2010 and 2013), the only recipient (worldwide) of the Society for Biomaterials Young Investigator Award in 2012, the only recipient (worldwide) of the Controlled Release Society's Young Investigator Award in 2019, one of only 16 "Beckman Young Investigators" by the Arnold and Mabel Beckman Foundation in 2008, the American Heart Association Career Development Award, and the recipient of a K-Award from the United States National Institutes for Health.

12.      I currently stand as the only individual in University history to receive all three "Chancellor's Distinguished Awards" (Distinguished Research in 2012, Distinguished Teaching in 2013, and Distinguished Service in 2019).  I also have been elected as a Fellow of the Biomedical Engineering Society (BMES), a Fellow of the American Institute for Medical and Biological Engineering (AIMBE), a Fellow of the Controlled Release Society (CRS), and a Fellow of the American Institute for the Advancement of Science (AAAS).  In June of 2022, I was elected to the status of Fellow to the National Academy of Inventors (one of the four U.S. National Academies).

**C.      Prior Expert Testimony**

13.      Within the past four years, I have testified as an expert in the following matters:

- *Jean A. Downie et al vs Atrium Medical Corporation.,* No. 226-2013-CV-00155 (S.D.N.H.).

- *Horizon Therapeutics v Alkem Laboratories.,* No. 1:18-cv-01014-RGA (D. Del.).

- *NOF v. Nektar* – IPR2019-01394, IPR2019-01397, IPR2019-01398.

- *Merck Sharp & Dohme Corp. v. Sun Pharmaceutical Industries Ltd.*, No. 1:19-cv-00319-RGA (D. Del.).

- *Merck Sharp & Dohme Corp. v. Mylan Pharmaceuticals Inc. et al.*, No. 1:19-cv-01489-RGA (D. Del.).

- *Merck Sharp & Dohme Corp. v. Aurobindo Pharma, Ltd. et al.*, No. 1:20-cv-01099-RGA (D. Del.).

- *Chiesi USA, Inc. et al v. Aurobindo Pharma USA, Inc. et al*, No. 3:19-cv-18756-ZNQ-LHG (D.N.J.).

-  *Azurity Pharmaceuticals, Inc. v. Amneal Pharmaceuticals LLC*, No. 3:21-cv-08717-FLW-DEA (D.N.J.).

- *Alkermes, Inc. et al. v. Teva Pharmaceuticals USA, Inc*. – No. 2:20-cv-12470-MCA-MAH (D.N.J).

- *Janssen Pharmaceuticals, Inc. et al v. Mylan Laboratories Limited et al*, No. 3:20-cv-13103-GC-LHG (D.N.J.).

- *Fresenius Kabi USA, LLC and Fresenius Kabi Swissbiosim GmbH v. Chugai Seiyaku Kabushiki Kaisha, Genentech, Inc. and Hoffmann-La Roche Inc.*, IPR 2021-01288, IPR 2021-01336, IPR 2021-01542.

- *Azurity Pharmaceuticals, Inc. v. Alkem Laboratories Ltd.*, No. 1:19-cv-02100-MSG (D. Del.).

- *Azurity Pharmaceuticals, Inc. v. Alkem Laboratories Ltd.*, No. 1:20-cv-1094-MSG (D. Del.).

- *Modoral Brands Inc. v. Swedish Match North America et al*, No. 2:21-cv-05013-SB-MRWx (C.D. Cal.).

**D.      Compensation**

14.      Compensation for my time on this case is my standard rate of $1200 per hour.

Payment is in no way contingent upon the substance of my testimony or the outcome of this case.

## II.     SUMMARY OF OPINIONS

15.     I understand from counsel and a review of documents provided to me in connection with this case that Avadel CNS Pharmaceuticals, LLC ("Avadel") has submitted New Drug Application ("NDA") No. 214755 ("Avadel's NDA") to the U.S. Food and Drug Administration ("FDA"), seeking approval to market a proposed sodium oxybate product ("Avadel's NDA Product" or "FT218").

16.     I understand from counsel that Jazz has asserted certain United States Patents in this case against Avadel.  My report concerns U.S. Patent Nos. 10,758,488 ("the '488 patent," Exhibit 2), 10,813,885 ("the '885 patent," Exhibit 3), 10,959,956 ("the '956 patent," Exhibit 4), 10,966,931 ("the '931 patent," Exhibit 5), 11,077,079 ("the '079 patent," Exhibit 6), and 11,147,782 ("the '782 patent," Exhibit 7).  I sometimes refer to the '488, '885, '956, and '931 patents, collectively, as the "Sustained Release Patents."

17.     Counsel has asked me to provide my opinions as to whether Avadel's NDA Product meets the claim limitations of, and therefore infringes, ████████████████████ ████████████████████████████████████████████████████████████. Counsel has also asked me to provide my opinions as to whether Avadel's NDA Product meets certain claim limitations of the ██████████████████████████ ██████████████████████████████ For the reasons set forth below, it is my opinion that Avadel's NDA Product literally meets all claim limitations of, and therefore infringes, the ████████████████████████████████████ ████████████████████████████ It is further my opinion, for the reasons set forth below, that Avadel's NDA Product meets the claim limitations of the '956 patent, ██████████ ████████████████████████████████████████████████████████ that I address in my report.

18.     I am also prepared to serve in a teaching capacity to discuss scientific principles relating to the above-listed patents, my areas of expertise, the level of ordinary skill in the art at the relevant times (for the Sustained Release Patents, March 24, 2010, and for the '079 and '782 Patents, February 18, 2015 or February 18, 2016), and background relating to the issues discussed herein.

## III.     LEGAL FRAMEWORK FOR MY OPINIONS

19.     I understand from counsel that a two-step analysis is used to determine whether a patent claim is infringed.  I understand that the first step is to determine the proper meaning and scope of the asserted claims, which to the extent terms are disputed, is done by the Court.  I have applied the Court's claim construction of the relevant disputed terms to my opinions.  I have further applied an agreed-upon construction between the parties to my opinions.  For other terms, I understand from counsel that I am to use the plain and ordinary meaning of that term to a person of ordinary skill in the art at the time of the patent's filing date, and I have done so in my report.

20.     I understand from counsel that the second step of the infringement analysis is to compare the claims as construed to the accused product to determine whether it satisfies the claim elements.  It is also my understanding that to find infringement of a patent claim, the Court must find that the accused products would meet each element of the asserted claims, either literally or under the "doctrine of equivalents."  As relevant to my opinions in this case, I understand that a claim element is met literally if the claim element can be found in the accused product.  My report does not discuss the "doctrine of equivalents" and I have no opinions under that doctrine.

21.     I understand from counsel that there are also legal standards guiding the determination of a person of ordinary skill in the art, or "POSA."  I understand from counsel that

7

determining the relevant field of art is threshold to a determination of who is a POSA for purposes of the claimed inventions.  I further understand from counsel the patent claims and specification inform the relevant field of art, and that other relevant factors include:  (1) the type of skill required to understand the disclosure of the subject patent; (2) the type of art applied to the claims by the USPTO; and (3) the nature of the problem confronting the inventor.

22.      I understand from counsel that factors informative of what type and level of skill would describe a POSA include:  (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field.  I further understand from counsel that not all such factors may be present in every case, and that one or more of these or other factors may predominate in a particular case.

## IV.    OPINIONS

23.      Attached as Exhibit 8 is a list of materials I considered in reaching the opinions expressed in this report.  I have also relied on my training and professional experience in forming these opinions.

24.      I use the following definition of a POSA in my opinions:  someone who has at least a Ph.D. in Pharmaceutical Sciences, Chemistry, or Chemical Engineering (or related field) and 2 to 4 years' experience in the field of drug delivery technology or a similar technical field.  Alternatively, such a person may have had a lower educational level (such as a M.S. or even a B.S. academic degree) in one of those fields with commensurately more experience formulating pharmaceuticals and drug delivery.  It is further my opinion that a POSA may rely on individuals with knowledge and experience in the treatment of narcolepsy.

25.      As noted above, relevant to my opinions, I understand from counsel and my review of the Court's *Markman* Opinion that the Court has construed the first three claim terms

as set forth in the chart below, and that the parties have agreed to the meaning of the fourth claim term as set forth in the chart below.  I otherwise apply the plain and ordinary meaning, to a POSA, of the claim terms and limitations that I address below.

| Claim Term | Court's Construction |
|---|---|
| "sustained release portion" ('488 patent; '885 patent; '956 patent; '931 patent) | Plain and ordinary meaning, i.e., the portion of the formulation that is not immediate release and that releases over a period of time |
| "controlled release component" ('079 patent) | Compositions characterized by having at least one of the active components having a release over a period of at least about 2 to about 8 hours |
| "modified release particles" ('782 patent) | Plain and ordinary meaning, i.e., particles containing an active pharmaceutical ingredient with a release profile that is different from that of an immediate release particle |
| "by about 4 to about 6 hours" ('488 patent; '885 patent; '956 patent; '931 patent) | Plain and ordinary meaning, which is at any point prior to approximately 4 hours or at any point prior to approximately 6 hours |

Ex. 9, *Markman* Opinion.

    **A.**    **Avadel's NDA Product Meets All Limitations of, and Therefore Infringes, the Asserted Claims of the '488 Patent**

    **1.**    **The '488 Patent, Claim 1**

26.    Claim 1 of the '488 patent is reproduced below:

1. A formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, wherein:

        a.    the sustained release portion comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of

gamma-hydroxybutyrate wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;

b.   the immediate release portion comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of the gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation;

c.   the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;

d.   the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm.

**(a)     Avadel's NDA Product is "[a] formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

█  ███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████  As explained below, Avadel's NDA Product comprises

a "sustained release portion" under the Court's construction of that term: "plain and ordinary

meaning, i.e., the portion of the formulation that is not immediate release and that releases over a

period of time."  Avadel's NDA Product is a formulation that comprises immediate release and

sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate (i.e., sodium gamma-hydroxybutyrate, also called sodium oxybate).

> **(i)  Avadel's NDA Product comprises a pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate**

28.     Avadel's NDA identifies sodium oxybate, which is a pharmaceutically acceptable salt of gamma-hydroxybutyrate, as the active pharmaceutical ingredient (or "drug substance") in Avadel's NDA Product.  For example, the Composition portion of the Description and Composition of the Drug Product Section of Avadel's NDA identifies sodium oxybate as the "drug substance" in Avadel's NDA Product.  Ex. 10, 3.2.P.1. Description and Composition of the Drug Product at 2. Composition (AVDL_00044787-788).  The labeling included with Avadel's tentative approval letter from the FDA also states that Avadel's NDA Product contains sodium oxybate, which is "the sodium salt of gamma-hydroxybutyrate."  Ex. 11, Tentative Approval Letter, Package Insert (AVDL_1329986-987).  I have also reviewed certain of Avadel's Responses to Jazz's Requests for Admissions (Nos. 1-68) that are relevant to my report.  I understand from counsel that these are discovery requests that allow Avadel to admit certain information, for example, about its NDA Product that it will not later contest in this litigation.  In those Responses, Avadel has admitted that the above quoted language ("the sodium salt of gamma-hydroxybutyrate") "appears in the proposed package insert, as submitted by Avadel to the FDA and tentatively approved by the FDA."  Ex. 12, Avadel's RFA Responses at Response to RFA No. 20.

29.     For all of these reasons, it is my opinion that Avadel's NDA Product meets this first portion of the claim limitation.

### (ii) Avadel's NDA Product is "[a] formulation comprising immediate release and sustained release portions" of sodium oxybate

30.     It is my opinion that Avadel's NDA Product comprises both immediate release and sustained release portions of sodium oxybate.  In reaching this opinion, I have applied the Court's construction of "sustained release portion," i.e., "the portion of the formulation that is not immediate release and that releases over a period of time."



32.     Avadel's witnesses likewise testified that Avadel's NDA Product comprises two different portions; one of which is immediate release and the other of which is "sustained release" under the Court's construction.  For example, Avadel's Vice President of Technical Operations, Dr. Jason Vaughn, testified on behalf of Avadel as its corporate witness that "the finished product as a whole . . . includes both an immediate-release and a controlled release portion . . . ." Ex. 15, Vaughn Dep. Tr. at 35; *see also* Ex. 15, Vaughn Dep. Tr. at 63 ("It's

Avadel's understanding that FT218 is comprised of both immediate-release and controlled release particles, correct? . . . Yes, it is -- contains immediate-release pellets as well as controlled release pellets . . . Q.  Okay. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

Additionally, a consultant Avadel hired during the development of its NDA Product, Dr. Thorsteinn Thorsteinsson, and who participated in writing portions of Avadel's NDA, testified that Avadel's NDA Product "has actually two components to it.  One component is immediate-release and the other one controlled release."  Ex. 16, Thorsteinsson Dep. Tr. at 16; *see also* Ex. 16, Thorsteinsson Dep. Tr. at 17-18 (consultant to Avadel), 59 (prepared portions of NDA).  In my opinion, this testimony further demonstrates that Avadel's NDA Product contains both an immediate release portion, as well as a portion of the formulation that is not immediate release and that releases over a period of time.

33.     Although Avadel's NDA uses the terms "CR" and "controlled release," it is my opinion that the "CR coated pellets" meet the "sustained release portion" claim limitation of claim 1 as that phrase has been construed by the Court.  In other words, it is my opinion that the "CR coated pellets" are the portion of Avadel's formulation that is not immediate release and that releases over a period of time.

13

34.     To start, and as explained above, I do not see any dispute from Avadel that its NDA Product is comprised of two portions: one that is immediate release and another that is not immediate release.

35.     Furthermore, the Court's *Markman* Opinion states that the specific time period and test for determining whether the "sustained released portion" are met, are "expressly identified" and "expressly set forth in the claims."  Ex. 9, *Markman* Opinion at 5-6.  As discussed below, testing of Avadel's NDA Product under the "express" conditions of claim 1 also demonstrates that Avadel's NDA Product meets the "sustained release portion" of claim 1 as construed by the Court.  *See infra* at ¶¶ 62-68.

36.     For all of these reasons, it is my opinion that Avadel's NDA Product meets this second portion of the claim limitation.

>          **(b)     Avadel's NDA Product comprises a "sustained release portion [that] comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

37.     As explained above, Avadel's NDA Product comprises a "sustained release portion."  *See supra* at ¶¶ 30-36.  For the reasons set forth below, it is my opinion that Avadel's NDA Product comprises a sustained release portion that "comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core contains at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate."

38.     Based upon my review of Avadel's Non-Infringement Contentions, Avadel does not dispute that the active pharmaceutical ingredient in its NDA Product is sodium oxybate,

14

which is a pharmaceutically acceptable salt of GHB.  My opinions addressing this portion of the claim limitation are set forth above (*see supra* at ¶¶ 28-29), and I incorporate them here.











48.    *Third*, Avadel has publicly disclosed to the U.S. Securities and Exchange Commission that the "core" of the Micropump® coated drug pellets that it employs for its NDA Product includes the active ingredient:



Ex. 24, Flamel Technologies November 2016 Corporate Presentation (available at https://www.sec.gov/Archives/edgar/data/1012477/000162828016021495/flamelcorporatepresentat.htm) (last accessed, January 16, 2023) at 30.

██  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

50.     For all of these reasons, it is my opinion that Avadel's NDA Product meets this

first portion of the claim limitation

        **(ii)     The sustained release portion of Avadel's NDA Product comprises the claimed "functional coating"**

██  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

██  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



54.     For all of these reasons, it is my opinion that Avadel's NDA Product meets this second portion of the claim limitation.

---

2   The same disclosure may be found in the specification of each Sustained Release Patent.

      (c)      **The sustained release portion of Avadel's NDA Product comprises a "functional coating [that] comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating"**

55.     As explained above, the sustained release portion of Avadel's NDA Product

comprises a "functional coating." ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████

██    ████████████████████████

██████████████████████████████

███████████████████████████████████

█████████████████████████████████

███████████████████████████████████

█████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████

██████████████████████████████████

████████████████████████████████

█████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

████████████████████████████

████   ███████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████

████   ████████████████████████████████

████████████████

   **(d)     Avadel's NDA Product comprises a "sustained release portion
        [that] comprises about 500 mg to 12 g of at least one
        pharmaceutically active ingredient selected from gamma-
        hydroxybutyrate and pharmaceutically acceptable salts of
        gamma-hydroxybutyrate"**

59.     As explained above, Avadel's NDA Product comprises a "sustained release

portion."  And I understand from Avadel's Non-Infringement Contentions that Avadel does not

dispute that, assuming its NDA Product comprises a sustained release portion, then that portion

of Avadel's NDA Product comprises about 500 mg to 12 g of at least one pharmaceutically

active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of

gamma-hydroxybutyrate.  I agree.  In particular, the sustained release portion of Avadel's NDA

Product comprises ███████████████████ of sodium oxybate, which is a pharmaceutically

acceptable salt of GHB.

60.     Avadel's NDA states, and Avadel admits in its RFA Responses, that Avadel's

NDA Product contains a total sodium oxybate dose of 4.5 g, 6 g, 7.5 g, or 9 g.  *See, e.g.*, Ex. 10,

3.2.P.1. Description and Composition of the Drug Product at 1. Description of the Dosage Form

(AVDL_00044787); Ex. 12, Avadel's RFA Responses at Response to RFA No. 22.  And as

explained above, ████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

24

███████████████████████████████████████

███████████████████████

61.     For all of these reasons, it is my opinion that Avadel's NDA Product meets this

claim limitation.

(e)     **Avadel's NDA Product comprises a "sustained release portion [that] releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

62.     As explained above, Avadel's NDA Product contains a "sustained release

portion." ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████

███    ████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████





The Jazz patent that Dr. Guillard referred to at his deposition is a published U.S. Patent Application No. 2012/0076865 (the "'865 Publication"). Ex. 20, Guillard Dep. Tr. at 133-138. The '865 Publication states on the first page that it was filed on March 24, 2011 and that it claims priority to Provisional application No. 61/317,212, filed on March 24, 2010. *See* Ex. 28, '865 Publication at Cover page.[3] The Sustained Release Patents claim priority to the same provisional application. *See, e.g.*, Ex. 2, '488 patent (Cover page).

---

[3]   I understand from counsel that the '865 Publication was produced in this litigation at JPION00073965-990 (Ex. 29).



68.   For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

      **(f)**     **Avadel's NDA Product comprises an "immediate release portion [that] comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**



71.     For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

> **(g)      Avadel's NDA Product comprises an "amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion [that] is about 10% to 50% by weight of the gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation"**

███████████████████████████████████████████████████████

███████████████████████

73.     For all of these reasons, it is my opinion that Avadel's NDA Product meets this

claim limitation.

> **(h)     Avadel's NDA Product "releases at least about 30% of its
> gamma-hydroxybutyrate by one hour when tested in a
> dissolution apparatus 2 in deionized water
> at a temperature of 37° C. and a paddle speed of 50 rpm"**

██   ████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██   ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

██   ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

██      ████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████

78.     For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(i)     Avadel's NDA Product "releases at least about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

██      ████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██      ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████



83.     For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

84.     Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 1 of the '488 patent.





34







### 6.     The '488 Patent, Claim 6

108.    Claim 6 of the '488 patent is reproduced below:

6. The formulation of claim 1 comprising a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof.

37

109.     As explained above, Avadel's NDA Product meets all of the claim limitations of claim 1.  And I understand from Avadel's Non-Infringement Contentions that Avadel does not dispute that its NDA Product meets the additional limitation of claim 6.  I agree.  In particular, and as explained above, Avadel's NDA Product comprises the sodium salt of gamma-hydroxybutyrate.  *See supra* at ¶¶ 28-29.

110.     For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 6 of the '488 patent.

111.     Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 6 of the '488 patent.

### 7.     The '488 Patent, Claim 7

112.     Claim 7 of the '488 patent is reproduced below:

> 7. The formulation of claim 6 comprising a sodium salt of gamma-hydroxybutyrate.

113.     As explained above, Avadel's NDA Product meets all of the claim limitations of claims 1 and 6.  And I understand from Avadel's Non-Infringement Contentions that Avadel does not dispute that its NDA Product meets the additional limitation of claim 7.  I agree.  In particular, and as explained above, Avadel's NDA Product comprises the sodium salt of gamma-hydroxybutyrate.  *See supra* at ¶¶ 28-29.

114.     For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 7 of the '488 patent.

115.     Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 7 of the '488 patent.



### 9. The '488 Patent, Claim 10

120.    Claim 10 of the '488 patent is reproduced below:

> 10. An oral dosage form comprising the formulation of claim 1.

121.    As explained above, Avadel's NDA Product meets all of the claim limitations of claim 1.  And I understand from Avadel's Non-Infringement Contentions that Avadel does not dispute that its NDA Product meets the additional limitation of claim 10.  I agree.

122.    Avadel's NDA Product is an oral dosage form.  This is confirmed by Avadel's NDA.  For example, the Description of the Dosage Form portion of the Description and Composition of the Drug Product Section of Avadel's NDA states that Avadel's NDA Product, "Sodium Oxybate for Extended-Release Oral Suspension, also called FT218 during its

39

development, is a once-nightly sodium oxybate formulation containing sodium oxybate

microparticles to be suspended ███████████████████████████

████████████████████████████████████████████

███████████████████████ Likewise, the Pharmaceutical Development portion of the Drug

Product Section of Avadel's NDA states that the "route of administration" targeted for Avadel's

NDA Product is "Oral."  Ex. 13, 2.3.P.2. Drug Product, Pharmaceutical Development

(AVDL_00045632).

123.    Further, the labeling included with Avadel's tentative approval letter from the

FDA states that Avadel's NDA Product is an "oral suspension" that is to be taken "orally."  Ex.

11, Tentative Approval Letter, Package Insert (AVDL_01329986-988).  And, citing to a portion

of the labeling (i.e., AVDL_01329986) in its RFA Responses, "Avadel admit[ted] that its NDA

Product is '[f]or extended-release oral suspension: LUMRYZ is ██████████████████

████████████████████ 4.5 g, 6 g, 7.5 g, or 9 g of sodium oxybate.'  AVDL_01329986."  Ex. 12,

Avadel's RFA Responses at Responses to RFA Nos. 38-40.

124.    Avadel further admitted in its RFA Responses that the Manufacturing Process

Description portion of the Drug Product Section of its NDA states "that the manufacturing

process for Avadel's NDA Product includes "[f]illing of the Sodium Oxybate for Extended-

Release Oral Suspension, █████████████████████████████████████

████████████████████████ And that language does appear in Avadel's NDA.  *See*

Ex. 30, 2.3.P.3. Drug Product, Manufacture at 3.3.2. Manufacturing Process Description

(AVDL_00045665).

125.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the

additional claim limitation of claim 10 of the '488 patent.

126.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 10 of the '488 patent.





**11.    The '488 Patent, Claim 12**

134.    Claim 12 of the '488 patent is reproduced below:

1. A formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-

hydroxybutyrate, comprising immediate release and a solid sustained release portions:

    a.   wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate;

    b.   wherein the sustained release portion comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient; wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;

    c.   the formulation releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and

    d.   the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm.

    **(a)    Avadel's NDA Product comprises "[a] formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions"**

135.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 27-36), and I incorporate those opinions here.

136.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

       **(b)**     **Avadel's NDA Product comprises an "immediate release portion [that] comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

137.    I understand from Avadel's Non-Infringement Contentions that Avadel does not dispute that it meets this claim limitation.  I agree. ███████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████████

███████████

138.    Avadel's NDA states, and Avadel admits in its RFA Responses, that Avadel's NDA Product contains a total sodium oxybate dose of 4.5 g, 6 g, 7.5 g, or 9 g.  *See, e.g*., Ex. 10, 3.2.P.1. Description and Composition of the Drug Product at 1. Description of the Dosage Form (AVDL_00044787); Ex. 12, Avadel's RFA Responses at Response to RFA No. 22.  And as explained above, Avadel's NDA states that Avadel's NDA Product is made up of two portions—the IR pellets and the CR ████████████████████████

████████████████████████████████

███████████████████████████████████

████████████████████

139.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

      **(c)**    **Avadel's NDA Product comprises a "sustained release portion [that] comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient"**

140. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

141.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

      **(d)**    **The sustained release portion of Avadel's NDA Product comprises a "functional coating [that] comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating"**

142.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 55-58), and I incorporate those opinions here.

143.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

        **(e)**      **Avadel's NDA Product comprises a "sustained release portion [that] releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

144.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 62-68), and I incorporate those opinions here.

145.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

        **(f)**      **Avadel's NDA Product "releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

146.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 74-78), and I incorporate those opinions here.

147.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

        **(g)**      **Avadel's NDA Product "releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm."**

148.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 79-83), and I incorporate those opinions here.

149.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

150.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 12 of the '488 patent.

**B.      Avadel's NDA Product Meets All Limitations of, and Therefore Infringes, the Asserted Claims of the '885 Patent**

**1.      The '885 Patent, Claim 1**

151.    Claim 1 of the '885 patent is reproduced below:

1. A formulation comprising a sustained release portion comprising about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, wherein:

> the sustained release portion comprises a functional coating and a core, the functional coating is deposited over the core;

> the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate;

> the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; and

> the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm.

> **(a)      Avadel's NDA Product comprises "[a] formulation comprising a sustained release portion comprising about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

152.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 27-36, 59-61), and I incorporate those opinions here.

153.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(b)** **Avadel's NDA Product comprises a "sustained release portion [that] comprises a functional coating and a core, the functional coating is deposited over the core; the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

154.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 37-54), and I incorporate those opinions here.

155.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(c)** **The sustained release portion of Avadel's NDA Product comprises a "functional coating [that] comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating"**

156.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 55-58), and I incorporate those opinions here.

157.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(d)** **Avadel's NDA Product comprises a "sustained release portion [that] releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

158.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 62-68), and I incorporate those opinions here.

159.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

160.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 1 of the '885 patent.





**5.      The '885 Patent, Claim 5**

173.    Claim 5 of the '885 patent is reproduced below:

5. The formulation of claim 1, comprising a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof.

174.    As explained above, Avadel's NDA Product meets all of the claim limitations of claim 1.  My opinions for the additional claim limitation of claim 5 are set forth above (*see supra* at ¶¶ 28-29, 108-111), and I incorporate those opinions here.

175.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 5 of the '885 patent.

176.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 5 of the '885 patent.

### 6.     The '885 Patent, Claim 6

177.    Claim 6 of the '885 patent is reproduced below:

6. The formulation of claim 5, comprising a sodium salt of gamma-hydroxybutyrate.

178.    As explained above, Avadel's NDA Product meets all of the claim limitations of claims 1 and 5.  My opinions for the additional claim limitation of claim 6 are set forth above (*see supra* at ¶¶ 28-29, 112-115), and I incorporate those opinions here.

179.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 6 of the '885 patent.

180.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 6 of the '885 patent.

### 7.     The '885 Patent, Claim 8

181.    Claim 8 of the '885 patent is reproduced below:

8. The formulation of claim 1, further comprising an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate.

182.    As explained above, Avadel's NDA Product meets all of the claim limitations of claim 1.  My opinions for the additional claim limitation of claim 8 are set forth above (*see supra* at ¶¶ 28-32), and I incorporate those opinions here.

183.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 8 of the '885 patent.

184.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 8 of the '885 patent.

### 8.   The '885 Patent, Claim 9

185.   Claim 9 of the '885 patent is reproduced below:

> 9. The formulation of claim 8, wherein the immediate release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof.

186.   As explained above, Avadel's NDA Product meets all of the claim limitations of claims 1 and 8.  My opinions for the additional claim limitation of claim 9 are set forth above (*see supra* at ¶¶ 28-32, 108-111), and I incorporate those opinions here.

187.   For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 9 of the '885 patent.

188.   Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 9 of the '885 patent.

### 9.   The '885 Patent, Claim 10

189.   Claim 10 of the '885 patent is reproduced below:

> 10. The formulation of claim 9, wherein the immediate release portion comprises a sodium salt of gamma-hydroxybutyrate.

190.   As explained above, Avadel's NDA Product meets all of the claim limitations of claims 1, 8, and 9.  My opinions for the additional claim limitation of claim 10 are set forth above (*see supra* at ¶¶ 28-32, 112-115), and I incorporate those opinions here.

191.   For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 10 of the '885 patent.

192.   Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 10 of the '885 patent.

### 10.    The '885 Patent, Claim 11

193.    Claim 11 of the '885 patent is reproduced below:

> 11. The formulation of claim 8, wherein the immediate release portion is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension.

194.    As explained above, Avadel's NDA Product meets all of the claim limitations of claims 1 and 8.  And I understand that Avadel does not dispute that its NDA Product meets the additional limitation of claim 11.  I agree.  In particular, Avadel's NDA Product comprises an immediate release portion that is a powder formulation that is reconstituted into a liquid suspension.

195.    My opinions regarding the oral liquid suspension are set forth above (*see supra* at ¶¶ 120-126), and I incorporate them here.  Those same opinions also support that the immediate release portion of Avadel's NDA Product, ██████████████████████████████ ███████████████████████████████████ before the oral suspension is made.  *See supra* at ¶ 123 (citing Avadel's labeling and Avadel's RFA Responses).  ███████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████

196.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 11 of the '885 patent.

197.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 11 of the '885 patent.





C.   **Avadel's NDA Product Meets All of the Formulation Claim Limitations of the Asserted Claims of the '956 Patent**

214.   I understand from counsel and from my review of the patent that the claims of the '956 patent are method of treatment claims. I have not been asked to offer an opinion on the method claim limitations. Instead, I have only been asked to offer opinions as to whether Avadel's NDA Product meets the formulation-related claim limitations of the '956 patent that I specifically address below. As set forth below, it is my opinion that Avadel's NDA Product does meet those limitations.

1.   **The '956 Patent, Claim 1**

215.   Claim 1 of the '956 patent is reproduced below:

1. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof comprising delivering to the patient a formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, wherein:

   a.   the sustained release portion comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;

   b.   the immediate release portion comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of the

total gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation;

c.   the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;

d.   the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm.

**(a)   Avadel's NDA Product comprises "a formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

216.   My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 27-36), and I incorporate those opinions here.

217.   For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(b)   Avadel's NDA Product comprises a "sustained release portion [that] comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

218.   My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 37-54), and I incorporate those opinions here.

219.   For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

> **(c)** **The sustained release portion of Avadel's NDA Product comprises a "functional coating [that] comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating"**

220.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 55-58), and I incorporate those opinions here.

221.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

> **(d)** **Avadel's NDA Product comprises a "sustained release portion [that] comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

222.    My opinions for this claim limitation are set forth above (*see supra* at 59-61), and I incorporate those opinions here.

223.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

> **(e)** **Avadel's NDA Product comprises a "sustained release portion [that] releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

224.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 62-68), and I incorporate those opinions here.

225.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

      **(f)**      **Avadel's NDA Product comprises an "immediate release portion [that] comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

226.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 69-71), and I incorporate those opinions here.

227.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

      **(g)**      **Avadel's NDA Product comprises an "amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion [that] is about 10% to 50% by weight of the total gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation"**

228.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 72-73), and I incorporate those opinions here.

229.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

      **(h)**      **Avadel's NDA Product "releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

230.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 74-78), and I incorporate those opinions here.

231.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

      **(i)**       **Avadel's NDA Product "releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

232.     My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 79-83), and I incorporate those opinions here.

233.     For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

234.     Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 1 of the '956 patent.







### 6.    The '956 Patent, Claim 6

251.    Claim 6 of the '956 patent is reproduced below:

> 6. The method of claim 1 wherein the formulation comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof.

252.    As explained above, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 1.  My opinions for the additional claim limitation of claim 6 are set forth above (*see supra* at ¶¶ 28-29, 108-111), and I incorporate those opinions here.

253.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 6 of the '956 patent.

254.    Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 6 of the '956 patent.

### 7.    The '956 Patent, Claim 7

255.    Claim 7 of the '956 patent is reproduced below:

> 7. The method of claim 6 wherein the formulation comprises a sodium salt of gamma-hydroxybutyrate.

256.    As explained above, Avadel's NDA Product meets all of the formulation-related claim limitations of claims 1 and 6.  My opinions for the additional claim limitation of claim 7 are set forth above (*see supra* at ¶¶ 28-29, 112-115), and I incorporate those opinions here.

257.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 7 of the '956 patent.

258.    Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 7 of the '956 patent.





**10.**   **The '956 Patent, Claim 11**

267.   Claim 11 of the '956 patent is reproduced below:

11. A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof comprising delivering to the patient a formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions:

   a.   wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate;

   b.   wherein the sustained release portion comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient, wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;

   c.   the formulation releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 3 7° C. and a paddle speed of 50 rpm; and

64

d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm.

**(a)     Avadel's NDA Product comprises "a formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions"**

268.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 27-36), and I incorporate those opinions here.

269.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(b)     Avadel's NDA Product comprises an "immediate release portion [that] comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

270.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 137-139), and I incorporate those opinions here.

271.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(c)     Avadel's NDA Product comprises a "sustained release portion [that] comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient"**

272.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 37-54, 59-61), and I incorporate those opinions here.

65

273.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(d)    The sustained release portion of Avadel's NDA Product comprises a "functional coating [that] comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating"**

274.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 55-58), and I incorporate those opinions here.

275.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(e)    Avadel's NDA Product comprises a "sustained release portion [that] releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

276.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 62-68), and I incorporate those opinions here.

277.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(f)    Avadel's NDA Product "releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

278.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 74-78), and I incorporate those opinions here.

279.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

> **(g)**   **Avadel's NDA Product "releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

280.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 79-83), and I incorporate those opinions here.

281.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

282.    Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 11 of the '956 patent.

> **D.    Avadel's NDA Product Meets All of the Formulation Claim Limitations of the Asserted Claims of the '931 Patent**

283.    I understand from counsel and from my review of the patent that the claims of the '931 patent are method of treatment claims.  I have not been asked to offer an opinion on the method claim limitations.  Instead, I have only been asked to offer opinions as to whether Avadel's NDA Product meets the formulation-related claim limitations of the '931 patent that I specifically address below.  As set forth below, it is my opinion that Avadel's NDA Product does meet those limitations.

> **1.    The '931 Patent, Claim 1**

284.    Claim 1 of the '931 patent is reproduced below:

> 1.   A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof comprising delivering to the patient a formulation comprising a sustained release portion comprising about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, wherein:
>
>> the sustained release portion comprises a functional coating and a core, the functional coating is deposited over the core;

the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate;

the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; and

the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37°C. and a paddle speed of 50 rpm.

**(a)** **Avadel's NDA Product comprises "a formulation comprising a sustained release portion comprising about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

285.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 27-36, 59-61), and I incorporate those opinions here.

286.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(b)** **Avadel's NDA Product comprises a "sustained release portion [that] comprises a functional coating and a core, the functional coating is deposited over the core; the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"**

287.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 37-54), and I incorporate those opinions here.

288.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

> **(c)** **The sustained release portion of Avadel's NDA Product comprises a "functional coating [that] comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating"**

289.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 55-58), and I incorporate those opinions here.

290.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

> **(d)** **Avadel's NDA Product comprises a "sustained release portion [that] releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm"**

291.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 62-68), and I incorporate those opinions here.

292.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

293.    Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 1 of the '931 patent.





### 5.   The '931 Patent, Claim 5

306.   Claim 5 of the '931 patent is reproduced below:

5. The method of claim 1, wherein the sustained release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof.

307.   As explained above, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 1.  My opinions for the additional claim limitation of claim 5 are set forth above (*see supra* at ¶¶ 28-29, 108-111), and I incorporate those opinions here.

308.   For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 5 of the '931 patent.

309.   Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 5 of the '931 patent.

### 6.   The '931 Patent, Claim 6

310.   Claim 6 of the '931 patent is reproduced below:

6. The method of claim 5, wherein the sustained release portion comprises a sodium salt of gamma-hydroxybutyrate.

311.   As explained above, Avadel's NDA Product meets all of the formulation-related claim limitations of claims 1 and 5.  My opinions for the additional claim limitation of claim 6 are set forth above (*see supra* at ¶¶ 28-29, 112-115), and I incorporate those opinions here.

312.   For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 6 of the '931 patent.

313.   Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 6 of the '931 patent.

### 7.     The '931 Patent, Claim 8

314.    Claim 8 of the '931 patent is reproduced below:

8. The method of claim 1, wherein the formulation further comprises an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate.

315.    As explained above, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 1.  My opinions for the additional claim limitation of claim 8 are set forth above (*see supra* at ¶¶ 28-32), and I incorporate those opinions here.

316.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 8 of the '931 patent.

317.    Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 8 of the '931 patent.

### 8.     The '931 Patent, Claim 9

318.    Claim 9 of the '931 patent is reproduced below:

9. The method of claim 8, wherein the immediate release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof.

319.    As explained above, Avadel's NDA Product meets all of the formulation-related claim limitations of claims 1 and 8.  My opinions for the additional claim limitation of claim 9 are set forth above (*see supra* at ¶¶ 28-32, 108-111), and I incorporate those opinions here.

320.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 9 of the '931 patent.

321.    Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 9 of the '931 patent.

### 9. The '931 Patent, Claim 10

322. Claim 10 of the '931 patent is reproduced below:

> 10. The method of claim 9, wherein the immediate release portion comprises a sodium salt of gamma-hydroxybutyrate.

323. As explained above, Avadel's NDA Product meets all of the formulation-related claim limitations of claims 1, 8, and 9. My opinions for the additional claim limitation of claim 10 are set forth above (*see supra* at ¶¶ 28-32, 112-115), and I incorporate those opinions here.

324. For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 10 of the '931 patent.

325. Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 10 of the '931 patent.

### 10. The '931 Patent, Claim 11

326. Claim 11 of the '931 patent is reproduced below:

> 11. The method of claim 8, wherein the immediate release portion is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension.

327. As explained above, Avadel's NDA Product meets all of the formulation-related claim limitations of claims 1 and 8. My opinions for the additional claim limitation of claim 11 are set forth above (*see supra* at ¶¶ 193-197), and I incorporate those opinions here.

328. For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 11 of the '931 patent.

329. Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 11 of the '931 patent.





████████████████████████████████████████

**E.    Avadel's NDA Product Meets All of the Formulation Claim Limitations of the Asserted Claims of the '079 Patent**

346.    I understand from counsel and from my review of the patent that the claims of the '079 patent are method of treatment claims. I have not been asked to offer an opinion on the method claim limitations. Instead, I have only been asked to offer opinions as to whether Avadel's NDA Product meets the formulation-related claim limitations of the '079 patent that I specifically address below. As set forth below, it is my opinion that Avadel's NDA Product does meet those limitations.

**1.    The '079 Patent, Claim 1**

347.    Claim 1 of the '079 patent is reproduced below:

> 1. A method of treating narcolepsy in a patient in need thereof, the method comprising:
>
>> administering a single daily dose to the patient, the single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate, wherein the administering comprises:
>>
>> opening a sachet containing a solid oxybate formulation,
>>
>> mixing the formulation with water, and
>>
>> orally administering the mixture to the patient, wherein the oxybate formulation comprises an immediate release component and a controlled release component.

> **(a)    Avadel's NDA Product comprises "a solid oxybate formulation . . . wherein the oxybate formulation comprises an immediate release component and a controlled release component"**

348.    Avadel's NDA Product is a "solid oxybate formulation." Oxybate is another term for gamma hydroxybutyrate, or GHB. And as explained above, Avadel's NDA Product comprises sodium oxybate as its active ingredient. *See supra* at ¶¶ 28-29.

76

349.    As further explained above, Avadel's NDA Product is a solid oxybate formulation comprised of an immediate release component and a controlled release component.  *See supra* at ¶ 31.  Based on Avadel's Non-Infringement Contentions, I understand that Avadel disputes whether its NDA Product comprises a "controlled release component."  As explained below, it is my opinion that it does.

350.    I understand that the Court construed "controlled release component" to mean "compositions characterized by having at least one of the active components having a release over a period of at least about 2 to about 8 hours."  Ex. 9, *Markman* Opinion at 9-11.  I









[REDACTED]

361.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

362.    Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 1 of the '079 patent.

### 2.    The '079 Patent, Claim 7

363.    Claim 7 of the '079 patent is reproduced below:

7. The method of claim 1, wherein the mixture is a suspension.

82

364.    As explained above, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 1.  My opinions for the additional claim limitation of claim 7 are set forth above (*see supra* at ¶¶ 120-126), and I incorporate those opinions here.

365.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 7 of the '079 patent.

366.    Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 7 of the '079 patent.







**5.    The '079 Patent, Claim 10**

377.    Claim 10 of the '079 patent is reproduced below:

10. A method of treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof, the method comprising:

administering a single daily dose to the patient, the single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate, wherein the administering comprises:

opening a sachet containing a solid oxybate formulation,

mixing the formulation with water, and

orally administering the mixture to the patient, wherein the oxybate formulation comprises an immediate release component and a controlled release component.

**(a)    Avadel's NDA Product comprises a "solid oxybate formulation . . . wherein the oxybate formulation comprises an immediate release component and a controlled release component."**

378.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 348-361), and I incorporate those opinions here.

379.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

380.    Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 10 of the '079 patent.

6.  **The '079 Patent, Claim 16**

381.    Claim 16 of the '079 patent is reproduced below:

16. The method of claim 10, wherein the mixture is a suspension.

382.    As explained above, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 10.  My opinions for the additional claim limitation of claim 16 are set forth above (*see supra* at ¶¶ 120-126), and I incorporate those opinions here.

383.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 16 of the '079 patent.

384.    Accordingly, in my opinion, Avadel's NDA Product meets all of the formulation-related claim limitations of claim 16 of the '079 patent.





**F.     Avadel's NDA Product Meets All Limitations of, and Therefore Infringes, the Asserted Claims of the '782 Patent**

      **1.     The '782 Patent, Claim 1**

393.   Claim 1 of the '782 patent is reproduced below:

1. A formulation of gamma-hydroxybutyrate comprising:

        a plurality of immediate release particles comprising gamma-hydroxybutyrate;

        a plurality of modified release particles comprising gamma-hydroxybutyrate;

        a viscosity enhancing agent; and

        an acid;

        wherein the viscosity enhancing agent and the acid are separate from the immediate release particles and the modified release particles.

**(a)    Avadel's NDA Product comprises
"a formulation of gamma-hydroxybutyrate"**

394.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 28-29),

and I incorporate those opinions here.

395.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this

claim limitation.

**(b)    Avadel's NDA Product comprises "a plurality of immediate
release particles comprising gamma-hydroxybutyrate"**

396.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 28-31),

and I incorporate those opinions here.

397.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this

claim limitation.

**(c)    Avadel's NDA Product comprises "a plurality of modified
release particles comprising gamma-hydroxybutyrate"**

398.    I understand from my review of the *Markman* Opinion that the Court construed

"modified release particles" to have its "[p]lain and ordinary meaning, i.e., particles containing

an active pharmaceutical ingredient with a release profile that is different from that of an

immediate release particle." Ex. 9, *Markman* Opinion at 12-14.  I further understand from

Avadel's Non-Infringement Contentions that Avadel disputes whether its NDA Product meets

this claim limitation.  As explained below, I disagree.



404.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(d)    Avadel's NDA Product comprises "a viscosity enhancing agent."**



408.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(e)     Avadel's NDA Product Comprises "an acid."**

409.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 367-372), and I incorporate those opinions here.

410.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(f)     Avadel's NDA Product comprises a "viscosity enhancing agent and [an] acid [that] are separate from the immediate release particles and the modified release particles."**

92





414.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

415.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 1 of the '782 patent.

### 2.    The '782 Patent, Claim 2

416.    Claim 2 of the '782 patent is reproduced below:

> 2. The formulation of claim 1, wherein the viscosity enhancing agent is selected from the group consisting of xanthan gum, microcrystalline cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, carboxymethylcellulose sodium, hydroxypropyl cellulose and mixtures thereof.

417.    As explained above, Avadel's NDA Product meets all of the claim limitations of claim 1.  My opinions for the additional claim limitation of claim 2 are set forth above (*see supra* at 405-408), and I incorporate those opinions here.

418.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 2 of the '782 patent.

419.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim

limitations of, and therefore infringes, claim 2 of the '782 patent.







### 6.    The '782 Patent, Claim 6

433.    Claim 6 of the '782 patent is reproduced below:

> 6. The formulation of claim 1, wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate.

434.    As explained above, Avadel's NDA Product meets all of the claim limitations of claim 1.  My opinions for the additional claim limitation of claim 6 are set forth above (*see supra* at ¶ 60), and I incorporate those opinions here.

435.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 6 of the '782 patent.

436.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 6 of the '782 patent.

### 7.    The '782 Patent, Claim 7

437.    Claim 7 of the '782 patent is reproduced below:

> 7. The formulation of claim 1, wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 4.0 g, about 6 g, about 7.5 g or about 9 g of sodium gamma-hydroxybutyrate.

96

438.     As explained above, Avadel's NDA Product meets all of the claim limitations of claim 1.  My opinions for the additional claim limitation of claim 7 are set forth above (*see supra* at ¶ 60), and I incorporate those opinions here.

439.     For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 7 of the '782 patent.

440.     Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 7 of the '782 patent.

### 8.     The '782 Patent, Claim 8

441.     Claim 8 of the '782 patent is reproduced below:

> 8. The formulation of claim 1, wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate.

442.     As explained above, Avadel's NDA Product meets all of the claim limitations of claim 1.  My opinions for the additional claim limitation of claim 8 are set forth above (*see supra* at ¶ 60), and I incorporate those opinions here.

443.     For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 8 of the '782 patent.

444.     Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 8 of the '782 patent.

### 9.     The '782 Patent, Claim 9

445.     Claim 9 of the '782 patent is reproduced below:

> 9. The formulation of claim 1, wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate.

446.    As explained above, Avadel's NDA Product meets all of the claim limitations of claim 1.  My opinions for the additional claim limitation of claim 9 are set forth above (*see supra* at ¶ 60), and I incorporate those opinions here.

447.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 9 of the '782 patent.

448.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 9 of the '782 patent.

**10.    The '782 Patent, Claim 10**

449.    Claim 10 of the '782 patent is reproduced below:

> 10. The formulation of claim 1, wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate.

450.    As explained above, Avadel's NDA Product meets all of the claim limitations of claim 1.  My opinions for the additional claim limitation of claim 10 are set forth above (*see supra* at ¶ 60), and I incorporate those opinions here.

451.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 10 of the '782 patent.

452.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 10 of the '782 patent.

**11.    The '782 Patent, Claim 13**

453.    Claim 13 of the '782 patent is reproduced below:

> 13. The formulation of claim 1, wherein the formulation is a multiparticulate composition.

454.    I understand from Avadel's Non-Infringement Contentions that Avadel does not dispute that its NDA Product meets the additional limitation of claim 13.  I agree.  In particular,

and as explained throughout this report, Avadel's NDA demonstrates that Avadel's NDA Product is a multiparticulate composition made up of IR particles and MR particles, among other excipients.

455.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 13 of the '782 patent.

456.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 13 of the '782 patent.

### 12.    The '782 Patent, Claim 14

457.    Claim 14 of the '782 patent is reproduced below:

14. A unit dose comprising a formulation of gamma-hydroxybutyrate,

wherein the formulation comprises:

a plurality of immediate release particles comprising gamma-hydroxybutyrate;

a plurality of modified release particles comprising gamma-hydroxybutyrate;

a viscosity enhancing agent; and

an acid;

wherein the viscosity enhancing agent and the acid are separate from the immediate release particles and the modified release particles.

**(a)    Avadel's NDA Product comprises "[a] unit dose comprising a formulation of gamma-hydroxybutyrate"**

458.    As explained above, Avadel's NDA Product comprises a formulation of gamma-hydroxybutyrate.  *See supra* at ¶¶ 28-29.

459.    Based on Avadel's Non-Infringement Contentions, I understand that Avadel disputes whether its NDA Product meets the "unit dose" portion of this claim limitation.  In particular, Avadel states that it "does not infringe Claims 14-24 of the '782 Patent at least

99

because Jazz has failed to demonstrate that FT218 includes a 'unit dose' of a formulation of gamma-hydroxybutyrate." Ex. 17, Avadel Non-Infringement Contentions at 36.  As explained below, I disagree.



461.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(b)    Avadel's NDA Product comprises "a plurality of immediate release particles comprising gamma-hydroxybutyrate"**

462.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 28-31), and I incorporate those opinions here.

463.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(c)    Avadel's NDA Product comprises "a plurality of modified release particles comprising gamma-hydroxybutyrate"**

464.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 398-404), and I incorporate those opinions here.

465.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(d)    Avadel's NDA Product comprises "a viscosity enhancing agent."**

466.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 405-408), and I incorporate those opinions here.

467.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

**(e)    Avadel's NDA Product comprises "an acid."**

468.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 367-372), and I incorporate those opinions here.

469.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

(f)     **Avadel's NDA Product comprises a "viscosity enhancing agent and [an] acid [that] are separate from the immediate release particles and the modified release particles."**

470.    My opinions for this claim limitation are set forth above (*see supra* at ¶¶ 411-414), and I incorporate those opinions here.

471.    For all of these reasons, it is my opinion that Avadel's NDA Product meets this claim limitation.

472.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 14 of the '782 patent.





486.     As explained above, Avadel's NDA Product meets all of the claim limitations of claims 14 and 17.  My opinions for the additional claim limitation of claim 18 are set forth above (*see supra* at ¶¶ 424-428), and I incorporate those opinions here.

487.     For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 18 of the '782 patent.

488.     Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 18 of the '782 patent.

### 17.     The '782 Patent, Claim 20

489.     Claim 20 of the '782 patent is reproduced below:

> 20. The unit dose of claim 14, wherein the unit dose comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate.

490.     As explained above, Avadel's NDA Product meets all of the claim limitations of claim 14.  My opinions for the additional claim limitation of claim 20 are set forth above (*see supra* at ¶ 60), and I incorporate those opinions here.

491.     For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 20 of the '782 patent.

492.     Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 20 of the '782 patent.

### 18.     The '782 Patent, Claim 21

493.     Claim 21 of the '782 patent is reproduced below:

> 21. The unit dose of claim 14, wherein the unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate.

494. As explained above, Avadel's NDA Product meets all of the claim limitations of claim 14. My opinions for the additional claim limitation of claim 21 are set forth above (*see supra* at ¶ 60), and I incorporate those opinions here.

495. For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 21 of the '782 patent.

496. Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 21 of the '782 patent.

### 19. The '782 Patent, Claim 22

497. Claim 22 of the '782 patent is reproduced below:

> 22. The unit dose of claim 14, wherein the unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate.

498. As explained above, Avadel's NDA Product meets all of the claim limitations of claim 14. My opinions for the additional claim limitation of claim 22 are set forth above (*see supra* at ¶ 60), and I incorporate those opinions here.

499. For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 22 of the '782 patent.

500. Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 22 of the '782 patent.

### 20. The '782 Patent, Claim 23

501. Claim 23 of the '782 patent is reproduced below:

> 23. The unit dose of claim 14, wherein the unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate.

502.     As explained above, Avadel's NDA Product meets all of the claim limitations of claim 14.  My opinions for the additional claim limitation of claim 23 are set forth above (*see supra* at ¶ 60), and I incorporate those opinions here.

503.     For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 23 of the '782 patent.

504.     Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 23 of the '782 patent.

### 21.     The '782 Patent, Claim 24

505.     Claim 24 of the '782 patent is reproduced below:

24. The unit dose of claim 14, wherein the unit dose is a sachet.

506.     As explained above, Avadel's NDA Product meets all of the claim limitations of claim 14.  And as explained above, Avadel's NDA Product will be packaged in stick packs.  *See supra* at ¶ 460.

507.     A "sachet" is a sealed form of packaging that stores individual unit doses of a drug product.  Sachets commonly consist of folded paper or foil.  It is my opinion that the "stick packs" used to package Avadel's NDA Product are "sachets."

510.    For all of these reasons, it is my opinion that Avadel's NDA Product meets the additional claim limitation of claim 24 of the '782 patent.

511.    Accordingly, in my opinion, Avadel's NDA Product meets all of the claim limitations of, and therefore infringes, claim 24 of the '782 patent.

## V.    SUPPLEMENTATION

512.    I reserve the right to supplement or amend my opinions in response to any opinion or order from the Court, opinions expressed by Avadel's experts, or in light of additional evidence, testimony, discovery, or other information that may be provided to me after the date of this report.

513.    I also reserve the right to offer additional testimony, if necessary, concerning the subject matter of the patents discussed in this report.

514.    In addition, I expect that I may be asked to consider and testify about issues that may be raised by Avadel's fact witnesses and technical experts at trial or in their reports.  It may also be necessary for me to supplement my opinions as a result of ongoing discovery, Court rulings, and testimony at trial.

## VI.    TRIAL EXHIBITS

515.    I may rely on visual aids and demonstrative exhibits that demonstrate the bases for my opinions.  These visual aids and demonstrative exhibits may include, for example, documents cited in this report, interrogatory responses, deposition testimony and exhibits, as well as charts, photographs, diagrams, videos, and animated or computer-generated videos.

## VII.    CONCLUSION

516.    As set forth above, it is my opinion that Avadel's NDA Product literally meets all claim limitations of, and therefore infringes, the '488 patent, claims 1-8 and 10-12, the '885 patent, claims 1-6 and 8-15, and the '782 patent, claims 1-10, 13-18, and 20-24.  It is further my

opinion that Avadel's NDA Product literally meets the claim limitations of the '956 patent, claims 1-8, 10, and 11, the '931 patent, claims 1-6 and 8-15, and the '079 patent, claims 1, 7-10, and 16-18, that I address in my report.

Dated: January 17, 2023

Steven R. Little, Ph.D.

EXHIBIT 10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | |
| AVADEL CNS PHARMACEUTICALS, LLC, | C.A. No. 21-691-GBW |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | |
| AVADEL CNS PHARMACEUTICALS, LLC, | C.A. No. 21-1138-GBW |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | |
| AVADEL CNS PHARMACEUTICALS, LLC, | C.A. No. 21-1594-GBW |
| Defendant. | |

## OPENING EXPERT REPORT OF DR. CORY BERKLAND

I.      INTRODUCTION

1.      I, Dr. Cory Berkland, have been retained as a consulting expert by counsel for Avadel CNS Pharmaceuticals, LLC ("Avadel") in connection with the above-captioned litigation between Jazz Pharmaceuticals, Inc. ("Jazz") and Avadel.

2.      The following written report concerns testing conducted at my direction for the purposes of this litigation.

3.      In directing the testing described in this report I have considered the materials identified in Exhibit A.

II.     BACKGROUND AND QUALIFICATIONS

4.      Below, I summarize my education and professional experience.   My education and experience are described more fully in the attached *curriculum vitae* as Exhibit B.

5.      I am currently appointed as the Solon E. Summerfield Distinguished Professor of Pharmaceutical Chemistry and of Chemical and Petroleum Engineering at the University of Engineering at the University of Kansas.  I also have an appointment in the Chemistry Department at the University of Kansas that allows me to serve as an advisor for their graduate students.  I also assisted in designing the BioEngineering Graduate Program at the University of Kansas and am the former director of the Biomolecular Engineering track within the BioEngineering Program.

6.      I received a Ph.D. in Chemical and Biomolecular Engineering from the University of Illinois in 2003, a M.S. in Chemical Engineering from the University of Illinois in 2001, and a B.S. in Chemical Engineering from Iowa State University in 1998.

7.      I have been teaching courses for nearly 20 years to undergraduate and graduate students at The University of Kansas in the areas of pharmaceutical formulation and drug delivery.

8.      I have worked in the pharmaceutical formulation space for over 20 years and am experienced in the practice of pharmaceutical formulation and drug delivery.  I currently research drug formulation, therapeutic design and synthesis, and biomaterials.  I have extensive experience in the area of pharmaceutical processing, formulation, and analysis.

9.      I have published approximately 200 peer-reviewed papers and have presented my research at numerous national and international research conferences and to companies, including 85 invited presentations.  I have given distinguished lectures such as the Nagai Foundation Distinguished Lectureship in Japan and a lectureship at the Center of Excellence in Nanotechnology at the Massachusetts Institute of Technology.  I serve or have served on the editorial advisory board for several peer-reviewed journals: the *Journal of Pharmaceutical Sciences*, *Journal of Pharmaceutical Innovation*, *Molecular Pharmaceutics,* and *Therapeutic Delivery*.  I also serve on advisory boards for the Center for Cancer Engineering at The Ohio State University, the Drug Discovery and Development of Experimental Therapeutics program and the National Institutes of Health Pharmaceutical Aspects of Biotechnology training grant program at The University of Kansas.

10.     I have received funding for my research from the National Institutes of Health, the National Science Foundation, the Department of Defense, the Defense Threat Reduction Agency, the PhRMA Foundation, the Coulter Foundation, the American Heart Association, the Cystic Fibrosis Foundation, the Juvenile Diabetes Research Foundation, several other philanthropic organizations, and multiple pharmaceutical companies.

11.     I have been granted multiple patents and have co-founded companies including Orbis Biosciences, Inc., Savara Pharmaceuticals, Inc., Orion BioScience, Inc., and Bond Biosciences, Inc.  I have also held executive positions at each of these companies.  I was the Chief Scientific

3

Officer and member of the Board of Directors at Orbis Biosciences, Inc.  I was also a member of the Scientific Advisory Board and was previously the Chief Technology Officer at Savara Pharmaceuticals, Inc.  I am also currently the Chief Executive Officer and member of the Board of Directors at Bond Biosciences, Inc.

12.     I am an active participant in multiple professional societies including the American Institute of Chemical Engineers, the Controlled Release Society, the American Chemical Society, and the American Association of Pharmaceutical Scientists.  I have also been elected Fellow of the American Institute for Medical and Biological Engineering and was elected to the National Academy of Inventors.  As part of these organizations, I have helped organize and lead (as a chair or co-chair) scientific sessions, including sessions on drug formulation and delivery.

13.     I have received numerous awards in recognition of research, including the Controlled Release Society Young Investigator Award and the Coulter Translational Research Award.  The Controlled Release Society award is given to a current Controlled Release Society member under the age of 40 who has made outstanding contributions in the science of controlled release.  The Coulter Translational Research Award is a grant given to researchers who are developing a product as part of their research.  At The University of Kansas, I have received major research awards such as the University Scholarly Achievement Award, the Jim Baxendale Commercialization Award, the Leading Light Award, and the Miller Professional Development Award for Research, and I was named a Bellows Scholar in the School of Engineering at The University of Kansas.  I have also received the W.T. Kemper Fellowship for teaching excellence at The University of Kansas.

14.     I have worked as a consultant in the pharmaceutical industry advising on formulation research and development to multiple major pharmaceutical and biotechnology companies.  I have also worked at Sofinnova Ventures during a six-month sabbatical in 2014.

4

### III.    SUMMARY OF EXPECTED TESTIMONY

15.     I have been retained by counsel for Avadel to formulate and analyze certain formulations in connection with the above-captioned litigation.

16.     If called at trial, I expect to explain the procedures and methods used in the generation of the data described in this report.  At trial, I may rely on exhibits and/or demonstratives, including any of the materials referenced in this report.  I have not prepared any exhibits or demonstratives at this time, but I expect to do so pursuant to the schedule entered by the Court.

17.     I reserve the right to supplement or amend any of my statements upon receipt of any new information made available to me, including any depositions that have yet to be taken or based on the definitions of any claim terms to be construed by the Court in this case.  I also reserve the right to offer rebuttal testimony to any evidence or argument presented by Jazz or Jazz's experts, or otherwise raised by counsel or the Court in relation to this report.

### IV.    COMPENSATION AND OTHER EXPERT TESTIMONY

18.     I am being compensated for the time I spend consulting on this matter at my usual consulting rate of $750 per hour.

19.     I have testified as an expert at trial or by deposition during the previous five years, and a list of prior testimony is attached as Exhibit C.

## V.      MATERIALS AND METHODS

### A.      Liang Formulation

20.     I reviewed the Liang reference (United States Patent Application Publication No. 2006/0210630 A1).

21.     I was asked by counsel to make a formulation in accordance with the teachings of the Liang reference ("Liang Formulation"), that has "one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating."

22.     I used sodium acetate in place of sodium oxybate, which I understand has been used by Jazz as a substitute for sodium oxybate.  *See* April 20, 2020 Allphin Declaration at ¶ 2.

23.     The Liang Formulation containing a methacrylic acid-methyl methacrylate co-polymer (Eudragit L-100 in Liang Example 6(b)) was made by preparing sodium acetate millispheres that were then coated with an ethylcellulose coat and then coated with an enteric coat.

24.     The certificates of analysis for the materials used to prepare the millispheres and coat them is listed hereto as Exhibit D.

25.     The equipment used to prepare the millispheres and coat them is listed hereto as Exhibit E.

### 1.      *Sodium acetate millispheres*

26.     The sodium acetate millispheres were made with proportions following Example 1 Table 1 24A of Liang.[1]  Example 2 of Liang states that the "immediate release core can be made by techniques or processes or equipments known in the art, including but are not limited to dry

---

[1] The asterisk in Table 1 is explained in Liang Table 2 as "[r]emoved partially or completely during preparation."

6

blending, milling, dry granulation, wet granulation, pelletization, direct pelletization, extrusion, melt-extrusion, spheronization, drug layering . . . ."  Liang at ¶ 95.

| TABLE 1 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ingredients | PD0231-25 | PD0231-24A | PD0231-24B | PD0231-24C | PD0231-19 | PD0231-17A | PD0231-16 | PD0231-15A | PD0231-12 | PD0231-10A |
| Sodium gamma-hydroxybutyrate | 80 | 80 | 84 | 80 | 80 | 80 | 80 | 90 | 40 | 80 |
| Avicel PH101 | 10 | 15 | 10 | 10 | 20 | 10 | 15 | 10 | 58 | — |
| Talc | 9 | 5 | 5 | 9 | — | — | — | — | — | — |
| Magnesium stearate | 1 | — | 1 | 1 | — | — | — | — | — | — |
| SMCC 50 | — | — | — | — | — | — | — | — | — | 15 |
| Emcompress | — | — | — | — | — | 10 | 5 | — | — | — |
| HPMC E5 | — | — | — | — | — | — | — | — | 2 | — |
| PVP K30 | — | — | — | — | — | — | — | — | — | 5 |
| Lactose | — | — | — | — | — | — | — | — | — | — |
| Water | 10* | 11.3* | 11.3* | 5.5* | 11.3* | 15* | 15* | 12* | 10.5* | 9* |
| Ethanol | — | — | — | — | — | — | — | — | — | 9* |

27.    The granular sodium acetate tri-hydrate was milled in a Retsch ZM1 centrifugal grinder at low speed and 1 mm grater screen to give a fine powder.

28.    For each batch of millispheres prepared, the amount of milled sodium acetate (240 g), Avicel PH 101 (45 g), and Talc (15 g) were weighed and placed in the mixing bowl and mixed on #1 mixing speed for 5 minutes with a Hobart N50 mixer.

| Each Batch of Sodium Acetate Millispheres | | |
|---|---|---|
| **Ingredient** | **Batch Amount** | **Proportion** |
| Sodium acetate | 240 g | 80% |
| Avicel PH101 | 45 g | 15% |
| Talc | 15 g | 5% |
| Total | 300 g | |

29.    Water was added to the mix using a spray bottle.  Five to 10 g of water was added slowly with mixing at #1 mixing speed.  When the material was wetted and mixed for 5-10 minutes, the

7

setting was moved to #2 for several minutes and the powder observed.  This sequence was repeated every 5-10 minutes over 50 minutes to allow for equilibration.  At about 55-60 g of water added, the granulation was at a small ball stage and no sticking to the walls of the mixing bowl was observed.  The granulation was stopped and taken for extrusion.

30.     Extrusion was conducted using a Nica E-140 extruder.  The material was extruded through a 1.5 mm round hole screen onto a paper lined tray.  The feeder was operated at 50 rpm and the extrusion head was operated at 32 rpm.  The length of the extrudate was about ¼ to ¾ inch.

31.     The extruded material was added to the spheronizer (Luwa Corporation QJ-230) whose crossed v shape grid plate was rotating at 1,000-1,150 rpm.  The progress of the spheronization was followed by observing the pellets by capturing some on a spatula.

32.     After 2-3 minutes, the millispheres were emptied onto a paper lined tray and allowed to air dry overnight.  The millispheres were sieved (Fisher Scientific, Standard Sieves) for each batch through standard sieves (20, 18, 16, 14, 12, and 10 mesh screens) and the millispheres in 18-12 mesh screens were collected from each batch.  For those batches which produced some larger spheres, the material was recovered from the spheronizer and re-extruded and air dried for a short time and spheronized again.  The granulation, extrusion, and spheronization was repeated five times to generate the millispheres for coating studies.

## 2.    *Ethylcellulose coating of sodium acetate millispheres*

33.     The sodium acetate millispheres were coated with an ethylcellulose coating following Example 4 of Liang.  *See* Liang ¶ 100 ("Uncoated pellets from Example 2 (600 g) were charged into a fluid bed coater.").  No pore former was used following paragraphs 77 and 101 of Liang.  A Glatt Corporation UniGlatt Wurster Fluidized Bed Coater was used.  A 3% weight gain was targeted for the ethylcellulose-coated sodium acetate millispheres.  *See* Liang ¶ 100.

8

Example 4

Barrier Coats of the Immediate Release Core

[0099]   Ethylcellulose Coating Solution:

| | |
|---|---|
| Ethylcellulose | 73.9 g |
| PV7 K90 | 1.72 g |
| Triethyl citrate | 8.1 g |
| Isopropyl alcohol | 1000 g |
| Ethyl alcohol | 1000 g |

34.     The ethylcellulose 45 cP ("ethylcellulose") coating solution was prepared as follows: weigh 70 g of the ethylcellulose 45 cP and 7 g of the triethyl citrate.  These were added to a 2 Liter Erlenmeyer flask and 900 mL (707.4 g) of isopropyl alcohol and 100 mL water were added with stirring on a stir plate.  When all the polymer had dissolved, the ethylcellulose coating solution was ready to be applied to the millispheres.  Sufficient ethylcellulose coating solution was prepared and applied to achieve 3% coating weight on the millispheres.

| Ethylcellulose Coating Solution | | |
|---|---|---|
| Ingredient | Solution Amount | Percent |
| Ethylcellulose | 70 g | 90.91% |
| Triethyl citrate | 7 g | 9.09% |
| Total EC coating | 77 g | |

35.     980 g of the sodium acetate millispheres were loaded into the body of the UniGlatt fluid bed coater, the fluidizing air turned on and the inlet temperature adjusted to 60 °C, the atomization air adjusted to 1.5 bar, and the fluidizing air volume adjusted to achieve a rapid flow of millispheres into the expansion chamber, and the millispheres were allowed to warm to the inlet temperature before spraying coating.  The base coat on the millispheres was applied by use of a peristaltic pump

9

at 10 g/min of the ethylcellulose 45 cP coating solution.  The progress of the ethylcellulose coating was recorded.  At the end of the run, the spraying was stopped, the inlet temperature turned off, and the ethylcellulose-coated millispheres dried as the temperature returned to room temperature.  The ethylcellulose-coated millispheres were then weighed and instead of gaining weight the weight was less due to loss of residual water from the millispheres during the coating process.

36.    The ethylcellulose-coated millispheres were dried in the UniGlatt Coater at 60 °C until the weight stabilized at 2 hours.  After the drying step, the hot ethylcellulose-coated millispheres were stored in a plastic bag.  All subsequent coatings were run on the weight-stabilized ethylcellulose-coated millispheres.

37.    The amount of ethylcellulose coat applied was estimated by the theoretical amount of solids coated and the final weight of ethylcellulose coated millispheres.  The value of ethylcellulose coat applied to the millispheres was 4.31 %.

### 3. *Enteric coating of sodium acetate millispheres*

38.    The ethylcellulose-coated sodium acetate millispheres were coated with an enteric coating following Example 6(b) of Liang.  *See* Liang ¶ 108 ("The EC-coated immediate release core from Example 4 was further coated with enteric solution (2) . . . .").  A 14% weight gain was targeted for the ethylcellulose and enteric-coated sodium acetate millispheres.  *See* Liang ¶ 85 ("The weight gain of the pH sensitive enteric coating is from about 10% to about 70% of the final enteric-coated particle weight.").

**[0105]**   Enteric Coating Solution 2 (Jejunum):

| | |
|---|---|
| Eudragit L 100 | 390 g |
| Talc | 24 g |
| Triethyl citrate | 34 g |
| Isopropyl alcohol | 2460 g |
| Acetone | 377 g |
| Deionized water | 390 g |

39.    The enteric coating solution was prepared as follows:  weigh 75 g of Eudragit L-100, 7.5 g triethyl citrate and add to a 2 Liter Erlenmeyer flask.  Add 1,358 mL (1067.5 g) of isopropyl alcohol.  After the Eudragit L-100 had dispersed well, 62.5 g water was added and stirred until the Eudragit L-100 had dissolved, at which point 37.5 g of Talc was added and stirred to keep the talc in suspension. Acetone was not used, since it is flammable.

| Enteric Coating Solution | | |
|---|---|---|
| **Ingredient** | **Amount** | **Proportion** |
| Eudragit L100 | 75 g | 62.5% |
| Talc | 37.5 g | 31.25% |
| Triethyl citrate | 7.5 g | 6.25% |
| Total enteric coating | 120 g | |

40.    The UnitGlatt coater was set up with 700 g of ethylcellulose-coated millispheres with the inlet set at 60 °C and good fluidization of the millispheres as before and warmed to the inlet temperature.  Coating was performed at 10 g/min with sufficient enteric coating solution prepared to achieve the desired coating weight.  The weight gain of the enteric coating was determined by subtracting the initial weight from the final weight of dried millispheres.  It was determined that the weight gain of the enteric coating was 12.7%.

11

###### 4.    *Final calculated amounts*

41.    The amounts of each solid ingredient in the final ethylcellulose and enteric-coated sodium acetate millispheres were as follows.

42.    The ethylcellulose-coated sodium acetate beads have a total weight of 766 grams.  Because the ethylcellulose coating has a weight gain of 4.31% (33 grams / 766 grams), the sodium acetate millispheres have a total weight of 733 grams and ethylcellulose coating of 33 grams.

43.    700 grams of the ethylcellulose coated beads were loaded into the E L-100 coating step.

44.    Thus, the proportion of the sodium acetate millispheres and ethylcellulose coating are as follows:

|  | Proportion | Amount |
|---|---|---|
| Sodium      Acetate Millispheres | 95.69% | 669.84 g |
| Ethylcellulose coating | 4.31% | 30.16 g |

| Sodium Acetate Millispheres | | |
|---|---|---|
| Ingredient | Proportion | Amount |
| Sodium acetate | 80% | 535.87 g |
| Avicel PH101 | 15% | 100.48 g |
| Talc | 5% | 33.49 g |
| Total millispheres | | 669.84 g |

| Ethylcellulose coating solution | | |
|---|---|---|
| **Ingredient** | **Proportion** | **Amount** |
| Ethylcellulose | 90.91% | 27.42 g |
| Triethyl citrate | 9.09% | 2.74 g |
| Total EC coating | | 30.16 g |
| Total EC coating + millispheres | | 700 g |

45.     Because the enteric coating has a weight gain of 12.7% (101.83 grams / 801.83 grams), the enteric coating weight is 101.833 grams.  Thus, the proportion of the enteric coating is as follows:

| Ingredient | Proportion | Amount |
|---|---|---|
| Eudragit L100 | 62.5% | 63.64 g |
| Talc | 31.25% | 31.82 g |
| Triethyl citrate | 6.25% | 6.37 g |
| Total enteric coating | | 101.83 g |
| Total EC + millispheres | | 700 g |
| Total enteric + EC + millispheres | | 801.83 g |

46.     The Liang Formulation as a whole, therefore, has the following amounts:

| Ingredient | Amount |
|---|---|
| Sodium acetate millispheres | 669.84 g |
| Ethylcellulose coating | 30.16 g |
| Enteric coating | 101.83 g |
| Eudragit L-100 amount | 63.64 g |

13

| Ethylcellulose coating and Enteric coating | 131.99 g |
|---|---|

47.   The percent of Eudragit L-100 amount in the coating layers (ethylcellulose and enteric combined) is therefore 48.2% (63.64 g / 131.99 g).

**B.    Dissolution Testing**

48.   I was asked by counsel to test the Liang Formulation using "a dissolution apparatus 2 in deionized water at a temperature of 37 °C. and a paddle speed of 50 rpm."

49.   The study included dissolution of the Liang Formulation and analysis of sample time-points for acetate content.

**1.    *Instrument Parameters***

50.   The dissolution testing was run in triplicate on a USP Setup 2 with paddle speed at 50 rpm with temperature of 37 °C, and 4 mL samples were collected by a programmable fraction collector into plastic cups.  One mL aliquots were taken for analysis of sodium acetate.

51.   The colorimetric assay was analyzed on a Molecular Devices Spectramax Plus UV plate reader, using a basic endpoint protocol at 450 nm.  A Corning #3635 acrylic UV 96 well plate was used.

**2.    *Method:  Dissolution***

52.   The Liang Formulation was calculated to contain 66.83% (535.87 g / 801.83 g) sodium acetate.

53.   120 mg of beads in 900 mL of dissolution media would thus result in a sodium acetate concentration of 1 mM if all sodium acetate is released.

54.   120 mg of beads in 900 mL = 0.133 mg/mL x 0.66 = 0.08778 g/L Na Acetate MW 82.0343 = 1.07 mM.

14

55.     The three dissolution flasks (A, B, C) were filled with 900 mL of deionized water.  120 mg of the Liang Formulation was added to each of the three dissolution flasks and the timer was started.  4 mL samples were automatically taken at 0.5, 1, 1.5, 2, 3, 4, 5, 6, 7, and 8 hours.

56.     From those 4 mL samples, 1-mL aliquots were taken for the colorimetric assay analysis. The pH of each dissolution media was measured at 0.5, 1, 4, and 8 hours.

### 3.     Method:  Acetate Assay

57.     Acetate colorimetric assay kit components were prepared according to the kit instructions. The acetate standards were prepared in the supplied acetate assay buffer and added to plate wells in duplicate.  The 1-mL aliquots from the triplicate dissolution flasks (A, B, C) were diluted 1/10 in the acetate assay buffers in wells in duplicate (resulting in A1, A2, B1, B2, C1, and C2).  Each well contained 50 μL (5 μL of tested sample and 45 μL of acetate assay buffer).  After addition of the reaction mix, the plate was covered and shaken for 30 seconds then incubated at room temperature (in the plate reader) for 40 minutes.  The plate was then read at 450 nm and sample concentrations calculated from the standard curve generated.

## VI.     RESULTS

58.     Dissolution Flask A:

| Dissolution (hours) | nmole/well | | | mM | | | % Release |
|---|---|---|---|---|---|---|---|
| | A1 | A2 | Average | A1 | A2 | Average | |
| 0 | 0.496 | 0.471 | 0.484 | 0.0992 | 0.0942 | 0.0967 | 9.0 |
| 0.5 | 1.01 | 0.88 | 0.95 | 0.2020 | 0.1760 | 0.189 | 17.7 |
| 1 | 2.054 | 2.051 | 2.053 | 0.4108 | 0.4102 | 0.4105 | 38.4 |
| 1.5 | 2.964 | 2.698 | 2.831 | 0.5928 | 0.5396 | 0.5662 | 52.9 |
| 2 | 3.905 | 3.533 | 3.719 | 0.7810 | 0.7066 | 0.7438 | 69.5 |
| 3 | 4.121 | 4.173 | 4.147 | 0.8242 | 0.8346 | 0.8294 | 77.5 |

15

| 4 | 4.095 | 4.373 | 4.234 | 0.8190 | 0.8746 | 0.8468 | 79.1 |
| 5 | 4.326 | 3.914 | 4.12 | 0.8652 | 0.7828 | 0.824 | 77.0 |
| 6 | 4.557 | 4.355 | 4.456 | 0.9114 | 0.8710 | 0.8912 | 83.3 |
| 7 | 4.459 | 5.304 | 4.882 | 0.8918 | 1.0608 | 0.9763 | 91.2 |
| 8 | 4.31 | 4.512 | 4.411 | 0.8620 | 0.9024 | 0.8822 | 82.4 |



59.    Dissolution Flask B:

| Dissolution (hours) | nmole/well | | | mM | | | % Release |
|---|---|---|---|---|---|---|---|
| | B1 | B2 | Average | B1 | B2 | Average | |
| 0 | -0.154 | 0.5 | 0.173 | -0.031 | 0.1000 | 0.0345 | 3.2 |
| 0.5 | 1.08 | 1.055 | 1.07 | 0.216 | 0.2110 | 0.2135 | 20.0 |
| 1 | 2.472 | 2.224 | 2.348 | 0.4944 | 0.4448 | 0.4696 | 43.9 |
| 1.5 | 3.198 | 2.797 | 2.998 | 0.6396 | 0.5594 | 0.5995 | 56.0 |
| 2 | 3.708 | 3.501 | 3.605 | 0.7416 | 0.7002 | 0.7209 | 67.4 |
| 3 | 4.245 | 4.24 | 4.243 | 0.8490 | 0.8480 | 0.8485 | 79.3 |
| 4 | 4.33 | 4.295 | 4.313 | 0.8660 | 0.8590 | 0.8625 | 80.6 |

16

| 5 | 4.177 | 4.395 | 4.286 | 0.8354 | 0.8790 | 0.8572 | 80.1 |
| 6 | 4.557 | 4.396 | 4.477 | 0.9114 | 0.8792 | 0.8953 | 83.7 |
| 7 | 4.032 | 4.575 | 4.304 | 0.8064 | 0.915 | 0.8607 | 80.4 |
| 8 | 4.431 | 5.254 | 4.843 | 0.8862 | 1.0508 | 0.9685 | 90.5 |



60.    Dissolution Flask C:

| Dissolution (hours) | nmole/well | | | mM | | | % Release (Theoretical) |
|---|---|---|---|---|---|---|---|
| | C1 | C2 | Average | C1 | C2 | Average | |
| 0 | .462 | 0.527 | 0.495 | 0.0924 | 0.1054 | 0.0989 | 9.2 |
| 0.5 | 0.966 | 1.341 | 1.15 | 0.1932 | 0.2682 | 0.2307 | 21.6 |
| 1 | 1.728 | 1.745 | 1.737 | 0.3456 | 0.349 | 0.3473 | 32.5 |
| 1.5 | 2.568 | 2.766 | 2.667 | 0.5136 | 0.5532 | 0.5334 | 49.9 |
| 2 | 3.348 | 3.339 | 3.344 | 0.6696 | 0.6678 | 0.6687 | 62.5 |
| 3 | 4 | 4.836 | 4.418 | 0.8000 | 0.9672 | 0.8836 | 82.6 |
| 4 | 4.202 | 4.067 | 4.135 | 0.8404 | 0.8134 | 0.8269 | 77.3 |
| 5 | 4.335 | 4.211 | 4.273 | 0.8670 | 0.8422 | 0.8546 | 79.9 |

17

| 6 | 4.539 | 4.405 | 4.472 | 0.9078 | 0.8810 | 0.8944 | 83.6 |
| 7 | 4.685 | 4.566 | 4.626 | 0.9370 | 0.9132 | 0.9251 | 86.5 |
| 8 | 4.659 | 4.688 | 4.674 | 0.9318 | 0.9376 | 0.9347 | 87.4 |



61.    Measured pH of Flasks A, B, C at various time points:

| Time | pH | | |
|---|---|---|---|
| (hours) | A | B | C |
| 0.5 | 5.7 | 6.0 | 6.0 |
| 1 | 6.0 | 6.0 | 6.2 |
| 4 | 5. 2 | 6.4 | 6.1 |
| 8 | 6.0 | 6.1 | 6.5 |

62.    For all three dissolution flasks tested, the Liang Formulation released:

- "greater than about 40% of its [sodium acetate] by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm;" and

18

- "about 60% to about 90% of its [sodium acetate] by about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 ℃ and a paddle speed of 50 rpm."

63.   Liang also discloses that "the immediate release dose can be equivalent of, higher than, or lower than, the one or more delayed release doses."   Liang ¶ 39.  The uncoated sodium acetate millispheres of the Liang Formulation is an immediate release dose, and I would expect them to release more quickly than the coated sodium acetate millispheres of the Liang Formulation.  Thus, based on the results of the dissolution testing of the Liang Formulation, and when, for example, equivalent doses of the immediate release and Liang Formulation are tested, I would expect that:

- "at least about 30% of its [sodium acetate] by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 ℃ and a paddle speed of 50 rpm;"

- "greater than about 90% of its [sodium acetate] by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 ℃ and a paddle speed of 50 rpm;"

- "greater than about 90% of its [sodium acetate] by 7 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 ℃ and a paddle speed of 50 rpm;" and

- "greater than about 90% of its [sodium acetate] by 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 ℃ and a paddle speed of 50 rpm."

1/14/2023
Date

Cory Berkland, Ph.D.

19

EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-691-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1138-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1594-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |

**OPENING EXPERT REPORT OF ROBERT S. LANGER**

# TABLE OF CONTENTS

I. Introduction.................................................................................................................1

II. Scope of the Report....................................................................................................1

III. Qualifications and Experience ..................................................................................2

IV. Compensation ............................................................................................................5

V. Materials Reviewed And Relied Upon .....................................................................6

VI. Legal Standards and Level of Skill ...........................................................................6

    A. Person of Ordinary Skill in the Art ...............................................................6

    B. Law of Anticipation .......................................................................................7

    C. Law of Obviousness .......................................................................................8

VII. Claim Construction ....................................................................................................9

VIII. The Asserted Claims of the Sustained Release Patents Are Inherently Anticipated ........10

    A. The Scope and Content of the Prior Art.......................................................12

        1. Liang 2006 ........................................................................................ 12
            a. Barrier Coat........................................................................... 13
            b. pH Sensitive Enteric Coat..................................................... 13
            c. Dissolution Testing ............................................................... 15

    B. The Asserted Claims of the Sustained Release Patents Are Anticipated by Liang 2006 .............................................................................................16

        1. Preamble ............................................................................................ 16

        2. Immediate Release Claim Limitation ....................................... 17

        3. Dosing Range Limitation.................................................................. 17

        4. Functional Coating Limitation................................................ 18

        5. Dissolution Profile Limitation ................................................. 22
            a. Dissolution Profile Limitations to the Sustained Release Portion........................................................................ 22
            b. Dissolution Profile Limitations to the Entire Formulation .......... 23

IX. The Asserted Claims of the Sustained Release Patents Are Obvious................................26

    A. The Asserted Claims of the Sustained Release Patents Would Have Been Obvious Based on the Prior Art ...........................................................27

        1. A POSA Would Have Been Motivated to Arrive at the Claimed Percentage of Methacrylic Acid-Methyl Methacrylate in the

i

Coating Through Routine Experimentation................................................ 27

    a.    The Prior Art Taught the Use of Methacrylic Acid-Methyl Methacrylate Co-Polymer in the Functional Coating ................. 27

    b.    The Prior Art Taught the Use of Methacrylic Acid-Methyl Methacrylate Co-Polymer That Are from About 20% to about 50% by Weight of the Functional Coating......................... 32

2.    A POSA Would Have Arrived at the Claimed Dissolution Profile Through Routine Experimentation ......................................................... 34

## I.      INTRODUCTION

1.      My name is Dr. Robert S. Langer.  I am currently an Institute Professor (one of twelve Institute Professors, the highest rank awarded to a faculty member) at the Massachusetts Institute of Technology (MIT).  My appointments include those in the Department of Chemical Engineering at MIT, the Department of Biological Engineering, the Institute for Medical Engineering and Science, and the Harvard-MIT Division of Health Sciences and Technology.

2.      I have been retained on behalf of Avadel CNS Pharmaceuticals, LLC ("Avadel") who I understand to be the defendant in the patent litigations identified in the caption of this report, to provide my opinions regarding the validity of certain claims of U.S. Patent Nos. 10,758,488 (the "'488 patent"); 10,813,885 (the "'885 patent"); 10,959,956 (the "'956 patent"); and 10,966,931 (the "'931 patent") (collectively, the "Sustained Release Patents").

3.      My opinions are based on my review of relevant documents and information, my experience in the fields of pharmaceutical development and drug delivery, particularly as applied to pharmaceutical products, and my understanding of the relevant legal framework as explained to me by counsel for Avadel.

## II.     SCOPE OF THE REPORT

4.      This report sets forth the opinions as to which, if asked, I will testify at trial with respect to the validity of the Sustained Release Patents.

5.      Counsel informed me that Jazz has asserted the following claims from its Sustained Release Patents:  claims 1-12 of the '488 patent; claims 1-15 of the '885 patent; claims 1-20 and 23-25 of the '956 patent; claims 1-15 of the '931 patent (collectively, the "Asserted Claims of the Sustained Release Patents").  Therefore, I have only provided my opinions as to the Asserted Claims of the Sustained Release, but I can provide opinions and analysis of the remaining claims of the Sustained Release if called upon to do so.

1

6.      In addition, if asked, I may respond to the opinions and testimony of Plaintiffs Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited's ("Jazz") witnesses regarding issues within my area of expertise.  I reserve the right to supplement or amend my opinions in response to opinions expressed by Jazz's experts, or in light of any additional evidence, testimony, discovery or other information relating to the aforementioned issues that may be provided to me after the date of this report.

7.      In addition, I expect that I may be asked to consider and testify about issues that may be raised by Jazz's experts at trial.  To illustrate my opinions at trial, I may also rely on demonstratives, which have not yet been prepared.

## III.    QUALIFICATIONS AND EXPERIENCE

8.      In addition to the brief summary provided below, I have attached my most recent curriculum vitae as Appendix A to this report, which summarizes my educational background, research and publications, honors and awards, and other credentials relevant to my qualifications as an expert in this case.

9.      I have authored or co-authored over 1,500 articles and also have over 1,400 issued or pending patents worldwide, one of which was cited as the outstanding patent in Massachusetts in 1988 and one of 20 outstanding patents in the United States.  My patents have been licensed or sublicensed to over 400 pharmaceutical, chemical, biotechnology and medical device companies. A number of these companies were launched on the basis of these patent licenses.

10.     I served as a member of the United States Food and Drug Administration's (FDA) SCIENCE Board, the FDA's highest advisory board, from 1995 through 2002 and as its chairman from 1999 through 2002.

11.     During my career, I have received over 190 major awards.  For example, in 2022, I received the Balzan Prize for my contributions to biomaterials for nanomedicine and tissue

2

engineering.  In 2021, I received the BBVA Foundation Frontiers in Knowledge Award, which recognizes world-class research and artistic creation, prizing contributions of singular impact for their originality and significance.  In 2020, I was awarded the Maurice-Marie Janot Award Laureate for my contributions to the field of pharmaceutics, biopharmaceutics, and pharmaceutical technology.  In 2019 I received the Dreyfus Award in Chemical Sciences, and in 2017 the Kabiller prize in Nanosciences and Nanomedicine.  I received the 2015 Queen Elizabeth Prize for Engineering, the largest engineering prize in the world.  In 2014, I received the Kyoto Prize for advanced Technology (Japan's highest award for global achievement) and the Breakthrough Prize in Life Sciences which recognizes excellence in research aimed at curing intractable diseases and extending human life (the largest science-based prize in the world).  I received the 2013 Wolf Prize in Chemistry and the 2012 Priestley Medal, the highest award of the American Chemical Society. I am one of three living individuals to receive both the United States National Medal of Technology and Innovation (2011) and the United States National Medal of Science (2006), the two highest scientific honors bestowed in the United States.  I received the 2002 Charles Stark Draper Prize, considered the equivalent of the Nobel Prize for engineers and the world's most prestigious engineering prize, from the National Academy of Engineering.  I am also the first engineer to receive the Gairdner Foundation International Award; 96 recipients of this award have subsequently received a Nobel Prize.  Among numerous other awards that I have received are the Dickson Prize for Science (2002), Heinz Award for Technology, Economy and Employment (2003), the Harvey Prize (2003), the John Fritz Award (2003) (given previously to inventors such as Thomas Edison and Orville Wright), the General Motors Kettering Prize for Cancer Research (2004), the Dan David Prize in Materials Science (2005), the Albany Medical Center Prize in Medicine and Biomedical Research (2005; the largest prize in the U.S. for medical research), the

Max Planck Research Award (2008), the Prince of Asturias Award for Technical and Scientific Research (2008), the 2008 Millennium Prize, the Warren Alpert Foundation Prize (2011) and the Terumo International Prize (2012). I was inducted into the National Inventors Hall of Fame in 2006. In 1998, I received the Lemelson-MIT prize, the world's largest prize for invention for being "one of history's most prolific inventors in medicine." I was elected in 1989 to the National Academy of Medicine and in 1992 to both the National Academy of Engineering and to the National Academy of Sciences. I am one of very few people ever elected to all three United States National Academies and the youngest in history (at age 43) to ever receive this distinction.

12.     I have been named by Forbes Magazine (1999) and Bio World (1990) as one of the 25 most important individuals in biotechnology in the world. I was named by Discover Magazine (2002) as one of the 20 most important people in this area. I was selected by Forbes Magazine (2002) as one of the 15 innovators worldwide who will reinvent our future. Time Magazine and CNN (2001) named me as one of the 100 most important people in America and one of the 18 top people in science or medicine in America. I was selected by Parade Magazine (2004) as one of 6 "Heroes whose research may save your life." In both 2018 and 2019, I was named the Number 1 Translational Researcher in the world by Nature Biotechnology. I have served, at various times, on at least 15 boards of directors and 30 Scientific Advisory Boards of such companies as Wyeth, Alkermes, Moderna, Mitsubishi Pharmaceuticals, Warner-Lambert, and Momenta Pharmaceuticals.

13.     I have received honorary doctorates from the ETH (Switzerland), the Technion (Israel), the Hebrew University of Jerusalem (Israel), the Universite Catholique de Louvain (Belgium), the University of Liverpool (England), the University of Nottingham (England), the University of Western Ontario (Canada), Université Laval (Canada), Hanyang University (South

Korea), National Institute of Astrophysics, Optics and Electronics (Mexico), Universidad de Santiago de Compostela (Spain), University of Limerick (Ireland), the University of New South Wales (Australia), Albany Medical College, Pennsylvania State University, Uppsala University (Sweden), Macau University of Science and Technology (Macau), Hong Kong University of Science and Technology (Hong Kong), Yale University, Harvard University, Columbia University, Rensselaer Polytechnic Institute, Northwestern University, the University of Maryland, Drexel University, Mount Sinai School of Medicine, Williamette University, Bates College, Boston University, Carnegie Mellon University, Ohio State University, University of Illinois, Gerstner Graduate School at Memorial Sloan Kettering Cancer Center, Ben Gurion University, Olin College of Engineering, Alfred University, Tel Aviv University and the University of California at San Francisco Medal. I received my Bachelor's Degree from Cornell University in 1970 and my Sc.D. from the Massachusetts Institute of Technology (MIT) in 1974, both in Chemical Engineering.

14.     Additional details concerning the professional positions which I have held and other details of my professional qualifications, including publications that I have written either alone or in association with others, are set out in Appendix A.

15.     The proceedings in which I have given expert deposition or trial testimony in the last five years are listed in Appendix B to this report.

**IV.     COMPENSATION**

16.     I am being paid my standard consulting fee of $2,000 per hour for my services and am being reimbursed for reasonable out-of-pocket expenses incurred as a result of my work on this case. My compensation is not in any way contingent upon the outcome of any litigation. I have no financial or personal interest in the outcome of this litigation.

## V.      MATERIALS REVIEWED AND RELIED UPON

17.     The documents I reviewed and/or relied upon in forming my opinions expressed in this report are listed in Appendix C attached to this report.  I have also relied upon and applied my personal knowledge, skill, training, experience, and knowledge in the field.  All of the materials and information I relied on are of a type reasonably relied on by people in my field.  I reserve the right to supplement this report to address any additional information or discovery that may become available.

## VI.     LEGAL STANDARDS AND LEVEL OF SKILL

18.     I have been informed of the legal standards applicable to patent validity.  I have relied upon these legal standards, as explained by counsel for Avadel, in forming my opinions set forth in this report.

### A.      Person of Ordinary Skill in the Art

19.     I understand from counsel that the Sustained Release Patents must be read from the perspective of a person of ordinary skill in the relevant art at the time the invention was made.  I understand that the person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant art at the time of the invention.

20.     I understand that for the Sustained Release Patents, Jazz has claimed priority to March 24, 2010.  I have been asked by counsel to consider this date as the time of the purported invention of the Sustained Release Patents for purposes of my opinion, including regarding the level of skill in the art.

21.     In my opinion, a POSA at the time of the purported invention of the Sustained Release would likely have had a doctorate degree (Sc. D, Ph.D. or Pharm.D.) in pharmaceutical sciences or a related field and around one year of relevant experience, or a Master's Degree with many years of experience in the pharmaceutical or related industries.  A POSA would typically be

6

a member of an inter-disciplinary team of scientists involved in drug research and development and would have direct access to other scientists with skills in, among other things, pharmacokinetics, pharmacodynamics, drug delivery, and other pharmaceutical characteristics. The team also would also have included or had access to an individual with a medical degree with experience in treating sleep disorders, and particularly of narcolepsy.

22.     At the time of the purported invention of the Sustained Release, I was a person of at least ordinary skill in the art, and I worked directly with and supervised other such persons in the field of pharmaceutical sciences.  For this report, I have been asked to opine on issues related to formulation and pharmaceutical sciences.

23.     In addition, I reserve the right to supplement this definition of a POSA to address any arguments presented by Jazz.

24.     I have been informed that a POSA is aware of all prior art available as of the priority date.  Where relevant, I note whether there would be any difference in the understanding of the POSA based on the different possible priority dates.

**B.      Law of Anticipation**

25.     I understand from counsel that a patent claim is invalid if it is "anticipated" by a prior art publication. I also understand that a prior art publication anticipates a patent claim if that prior art publication "expressly or inherently" discloses each element of the patent claim.  I also understand from counsel that a specific disclosure in the prior art which is within a claimed range anticipates the entire range, and similarly, a disclosure in the prior art of one member of a group anticipates the entire group.

26.     I further understand that under the principle of "inherent anticipation," a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference.  Inherent

7

anticipation does not require a person of ordinary skill in the art to recognize the inherent disclosure in the prior art at the time the prior art is created.

### C.   Law of Obviousness

27.   I understand that a patent claim is invalid if the claimed subject matter, as a whole, would have been obvious to a person of ordinary skill in the art prior to the priority date.  I understand that such a showing must be made by clear and convincing evidence.  I further understand from counsel that the first three factors to be considered in an obviousness inquiry are: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims; and (3) the level of ordinary skill in the pertinent art.  I also understand that when a patent claims a genus, that claim is obvious if a single embodiment falling within the scope of the claims is obvious.  I understand genus claim to mean one that covers not just one specific invention but a class of related inventions.

28.   I understand that a patent claim is invalid for obviousness if the differences between the claimed subject matter and the prior art are such that the claimed subject matter as a whole would have been obvious to a POSA at the time the claimed invention was made.  I understand that prior art includes printed patents and publications, patents and patent applications filed before the priority date of the patent-in-suit, and knowledge available to the POSA before the priority date of the patent-in-suit.

29.   I understand that prior art is pertinent to the obviousness inquiry where it is from the same field of endeavor as the claimed invention (even if it addresses a different problem) or, alternatively, if the reference is reasonably pertinent to the problem faced by the inventor(s).

30.   I also understand that in order to find obviousness based on combining prior art references, a POSA must have been motivated to combine the known elements in the way the alleged invention does.  I understand that motivation may come from the prior art, background

knowledge of a POSA, the nature of the problem to be solved, market demand, or common sense. I understand that that the subject matter of a patent is obvious if the prior art creates a reasonable expectation of success in producing the claimed subject matter from the viewpoint of a POSA at the time the claimed invention was made. I understand that a reasonable expectation of success does not require a certainty of success.

31.     I understand that when there are a finite number of identified, predictable solutions, it would be obvious for a POSA to pursue those options within his or her technical grasp, and each of those options would be obvious.

32.     I further understand that another factor to be considered in an obviousness inquiry is sometimes referred to as secondary considerations.

## VII.   CLAIM CONSTRUCTION

33.     I understand from counsel that the word "a" in a patent claim has a defined meaning in patent law, and that it means "one or more." I further understand that a claim construction opinion has been issued in this case. My opinion in this report is based on the court's ruling and the parties' agreement to the construction of the following terms:

| Claim Term | Patent and claims | Adopted Construction |
|---|---|---|
| "sustained release portion" | '488 patent claims 1, 4, 5, 11, 12; '885 patent claims 1-4; '956 patent claims 1, 4, 5, 10, 11, 12, 15, 16, 24, 25; '931 patent claims 1-6 | Plain and ordinary meaning, i.e., the portion of the formulation that is not immediate release and that releases over a period of time |
| "by about 4 to about 6 hours" | '488 patent claims 1, 12; '885 patent claim 1; '956 patent claims 1, 11, 12, 25; '931 patent claim 1 | Plain and ordinary meaning, which is at any point prior to approximately 4 hours or at any point prior to approximately 6 hours |

## VIII.   THE ASSERTED CLAIMS OF THE SUSTAINED RELEASE PATENTS ARE INHERENTLY ANTICIPATED

34.     I have reviewed the Sustained Release Patents and have an understanding of the subject matter they disclose and the scope of the asserted claims.  For purposes of this section and section IX, I have been asked by counsel to accept Jazz's position that the priority date for the Asserted Claims of the Sustained Release Patents is March 24, 2010.

35.     I understand from counsel that Jazz asserted that FT218, as described in Avadel's NDA, will infringe claims 1-12 of the '488 patent; claims 1-15 of the '885 patent; claims 1-20 and 23-25 of the '956 patent; and claims 1-15 of the '931 patent.  Claims 1 and 12 of the '488 patent, claim 1 of the '885 patent, claims 1, 11, 12, 25 of the '956 patent, and claim 1 of the '931 patent are independent claims.  All the other claims depend on one of the independent claims.

36.     Claim 1 of the '488 patent is representative of these claims, and it is reproduced below:

> A formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, wherein:
>
> a. the sustained release portion comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gammahydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate; and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;

10

b. the immediate release portion comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of the gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation;

c. the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;

d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm.

37.     The other Asserted Claims of the Sustained Release Patents similarly recite dosage forms comprising a sustained release formulation made up of a functional coating deposited over a core, with the core comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate ("GHB") and pharmaceutically acceptable salts of GHB, and the functional coating comprising one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight the functional coating.  The sustained release formulation has a dissolution profile wherein greater than about 40% of the GHB is released by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm.

38.     Some of the Asserted Claims of the Sustained Release Patents impose additional limitations, such as an immediate release portion wherein the combined immediate and sustained release portions release "at least about 30% of the gamma-hydroxybutyrate by one hour" and "greater than about 90% of gamma-hydroxybutyrate" by 6, 7, or 8 hours when tested in dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm.  *See, e.g.*,

11

'488 patent claims 1, 2, 3; '885 patent claims 1, 13, 14, 15; '956 patent claims 1, 2, 3, 13, 14; '931 patent claims 1, 14, 15. Other Asserted Claims of the Sustained Release Patents impose limitations such as the sustained release portion releasing about 10% or less of its GHB by about 1 hour and about 60% to about 90% of its GHB by about 6 hours when tested in dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm. *See, e.g.*, '488 patent claims 4, 11; '885 patent claims 2, 3; '956 patent claims 4, 10, 15; '931 patent claims 2, 3.

### A.   The Scope and Content of the Prior Art

#### 1.   Liang 2006

39.   Liang 2006 is a United States Patent Application Publication (No. 2006/0210630 A1) and is titled "Controlled Release Compositions of Gamma-Hydroxybutyrate." The publication is cited on the face of the Sustained Release Patents. In Liang 2006, the named inventors describe immediate release and delayed/controlled release components of GHB. Liang 2006 states that GHB is "highly soluble, hygroscopic, and strongly alkaline, and the therapeutic dose is normally very high." Liang 2006 at ¶ 5. Liang 2006 discloses that "the immediate release dose can be equivalent of, higher than, or lower than, the one or more delayed release doses." *Id.* at ¶ 39. "It is contemplated that the delayed release dose amount, which is used to replace the second nightly dose (currently as a solution) in the current treatment of narcolepsy patients, can be the same as the immediate release dose amount, although the bioavailability is lower further along the GI tract, or even at a reduced dose amount, since the patients do not need to wake up and take a separate second nightly dose then go back to sleep." *Id.* at ¶ 40.

40.   Liang 2006 describes that the delayed/controlled release components in the form of particles (e.g., beads, granules, minitabs, or pellets) containing GHB as the core that provide for delayed/controlled release of the drug. *Id.* at ¶ 26. For these delayed/controlled release

components, Liang 2006 discloses that the GHB core is surrounded by a barrier coat.  *Id.*  The barrier coat is in turn surrounded by an enteric release coat.  *Id.*

### a.   Barrier Coat

41.     In describing the delayed/controlled release portion of the formulations, Liang 2006 explains that a barrier coat can be applied to a GHB core.  *Id.*  Liang teaches that suitable coating materials for a barrier coat include, but are not limited to, cellulosic polymers such as ethylcellulose.  *Id.* at ¶ 74.  In addition, a pore former may also be used, but importantly, whether one is used at all and the amount will determine the function of the barrier coat:  "For example, if the pH sensitive delayed/controlled release particles are intended for immediate release after entering the targeted site in the GI tract, high amounts of pore formers (e.g. as high as about 50% by weight of the barrier coat) can be used.  If the pH sensitive delayed/controlled release particles are for controlled release after entering the targeted site in the GI tract, little or ***no*** pore formers are used (e.g. no more than about 25% by weight of the barrier coat)."  *Id.* at ¶ 76 (emphasis added).  Example 4 discloses the barrier coat of the immediate release core, containing the following unevaporated solids: 73.9 g of ethylcellulose, 1.72 g of PV7 [sic] K90, and 8.1 g triethyl citrate.  *Id.* at ¶ 99.  Example 4 also discloses that "[f]or a slower release core, PVP K90 is used at lower levels or can be omitted."  *Id.*  at ¶ 101.

### b.   pH Sensitive Enteric Coat

42.     Liang 2006 also describes a pH sensitive enteric coat.  Suitable materials for the pH sensitive enteric coat "include, but are not limited to, methacrylate-based coating materials such as polymers of methacrylic acid and methacrylates."  *Id.* at ¶ 82.  And suitable materials for targeting drug release to each region of the gastrointestinal tract were "known in the art, such as Eudragit E 100 or Eudragit E PO (stomach), Eudragit L 30 D-55 and Eudragit L 100-55 (duodenum), Eudragit L 12.5 and Eudragit L 100 (jejunum), Eudragit S 100 (ileum), and Eudragit

FS 30 D (colon)." *Id.* at ¶ 86.  Of the Eudragits disclosed by Liang 2006, Eudragit L 12.5, Eudragit L 100, Eudragit S 100, and Eudragit FS 30D are known to include "methacrylic acid-methyl methacrylate co-polymers."[1]  According to Liang 2006, there was a preference for pH sensitive enteric release coats that release or dissolve in the upper GI tract, such as the duodenum or the jejunum, because it "will allow for better absorption of the drug." *Id.* at ¶ 87.

43.    Liang 2006 discloses four examples (Examples 6a-6d) of the pH sensitive enteric coat, which is sprayed onto a barrier coat covering the GHB core.  All four examples have Eudragit in the enteric coating solution.

44.    Example 6a describes coating an ethyl cellulose (EC)-coated immediate release core with an enteric coating solution (1) (shown below) to 40%, 45%, or 50% weight gains. *Id.* at ¶¶ 104, 107.

[0104]   Enteric Coating Solution 1 (Duodenum):

| | |
|---|---|
| Eudragit L 30 D-55 | 840 g |
| Triethyl citrate | 12 g |
| Talc | 24 g |
| Deionized water | 324 g |

45.    Example 6b describes coating an EC-coated immediate release core with an enteric coating solution (2) (shown below) to 40%, 45%, or 50% weight gains. *Id.* at ¶¶ 105, 108.

---

[1] Eudragit L 12.5 and L 100 (both targeting jejunum) are methacrylic acid-methyl methacrylate co-polymers (1:1), Eudragit S 100 (targeting ileum) is a methacrylic acid-methyl methacrylate co-polymer (1:2), and Eudragit FS 30 D (targeting colon) is a methyl acrylate, methyl methacrylate, methacrylic acid co-polymer (7:3:1).  *See* HANDBOOK OF PHARMACEUTICAL EXCIPIENTS (Raymond C. Rowe et al., eds., 5th ed. 2006) ("HPE 2006") at 554, 557.  Eudragit L 30 D-55 and L 100-55 (both targeting duodenum) are methacrylic acid, ethyl acrylate co-polymers (1:1).  *Id.*

[0105]   Enteric Coating Solution 2 (Jejunum):

| | |
|---|---|
| Eudragit L 100 | 390 g |
| Talc | 24 g |
| Triethyl citrate | 34 g |
| Isopropyl alcohol | 2460 g |
| Acetone | 377 g |
| Deionized water | 390 g |

46.   Example 6c and 6d respectively describe coating immediate release core with an Opadry AMB-coat and an immediate release core with neutralizing agent-containing barrier coats with the same enteric coating of solution (3) (shown below). *Id.* at ¶¶ 106, 109-10.  Both examples describe enteric coatings to 40%, 45%, or 50% weight gains.  *Id.*

[0106]   Enteric Coating Solution 3 (Colon):

| | |
|---|---|
| Eudragit FS 30 D | 540 g |
| Triethyl citrate | 9 g |
| Talc | 45 g |
| Deionized water | 304 g |

### c.    Dissolution Testing

47.   Liang 2006 reports the dissolution profiles of Examples 6a, 6c, and 6d, but not Example 6b.  The Examples were tested using USP Apparatus 2 at a paddle speed of 75 rpm in media.  *See id.* at Figs. 1, 2, 3.  Example 6a, which corresponds to Figure 3, reproduced below, uses a pH 1.1 media from 0-2 hours followed by a pH 6.8 buffer from 2-6 hours.  *See id.* at ¶ 17, Fig. 3.  I discuss the relationship between the dissolution tests conducted in physiological media and the claimed dissolution profiles conducted in DI water in *infra* ¶¶ 96-101 (relying on Ms. Vivian Gray's report).

15



Figure 3

**B.     The Asserted Claims of the Sustained Release Patents Are Anticipated by Liang 2006**

48.     I have not opined on whether the Asserted Claims of the Sustained Release Patents are adequately described or enabled by the Sustained Release Patents.  However, I have been instructed by counsel to assume for the sole purpose of the analysis below that the Asserted Claims of the Sustained Release Patents are adequately described and enabled by the Sustained Release Patents.  I have no opinion with respect to the correctness of that instruction.  In view of this instruction and my analysis below, the Asserted Claims of the Sustained Release Patents would have been anticipated by Liang 2006.  I have attached Appendix D showing the disclosure of each limitation of the Asserted Claims of the Sustained Release Patents in Liang 2006.

**1.     Preamble**

49.     The preamble of claim 1 of the '488 patent is representative of the preambles for the Asserted Claims of the Sustained Release Patents: "A formulation comprising immediate release and sustained release portions, each portion comprising at least one pharmaceutically active

16

ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate."

50.    Because Liang 2006 teaches an oral pharmaceutical dosage form of GHB "comprising an immediate release component of [GHB], and one or more delayed/controlled release components of [GHB]," Liang 2006, at claim 1, the preamble is disclosed in Liang 2006 to the extent it is limiting.

### 2.    Immediate Release Claim Limitation

51.    Claim 1(b) of the '488 patent is representative of the Asserted Claims of the Sustained Release patents:

> b. the immediate release portion comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of the gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation;

52.    Liang 2006 discloses that "[t]he immediate release component comprises from about 20% to about 100% by weight of one or more gamma-hydroxybutyric acid salts and optionally one or more pharmaceutically acceptable excipients."  Liang 2006 at ¶ 52.  Further, "the immediate release dose can be equivalent of, higher than, or lower than, the one or more delayed release doses."  Id. at ¶ 39.  Thus, a POSA would understand Liang 2006 to disclose the immediate release particle limitations.

### 3.    Dosing Range Limitation

53.    Claim 12(a) of the '488 patent is representative of this type of limitation.  It additionally requires that the immediate release portion "comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient."

54.     Liang 2006 discloses that "[t]he immediate release component comprises from about 20% to about 100% by weight of one or more gamma-hydroxybutyric acid salts and optionally one or more pharmaceutically acceptable excipients."  Liang 2006 at ¶ 52.  Liang 2006 further describes that "a daily dose of 4.5 to 9 grams of Xyrem® is prescribed to narcolepsy patients," *id.* at ¶ 5, that "a twice-nightly dosage regimen can be reduced to a single dose with the compositions of the present invention," *id.* at ¶ 1, and that "[w]ith the compositions of the present invention, a patient does not need to wake up at night to take a second dose then go back to sleep." *Id.* at ¶ 12.  Xyrem® was known to be an immediate release formulation of GHB to be "taken at bedtime while in bed and again 2.5 to 4 hours later."  *See* XYREM® (sodium oxybate) oral solution label at Dosage and Administration at pages 22-23 ("Xyrem 2005 Label").  Liang 2006 therefore discloses that the immediate release dose could be 4.5 to 9 grams, which falls within the claimed dosing range.

### 4.     Functional Coating Limitation

55.     The Asserted Claims of the Sustained Release Patents all require a functional coating "wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating" (*see, e.g.*, '488 patent claim 1), and also "wherein the one or more methacrylic acid-methyl methacrylate co-polymers comprise from about 30% to about 45% by weight of the functional coating" (*see, e.g.*, '488 patent claim 9).  Liang 2006 inherently discloses this claimed functional coating.

56.     Based on Jazz's Sustained Release Patents, a POSA would understand the term "functional coating" to have the meaning "[t]he coating composition works to preserve the integrity of the unit dosage form post administration and serves to facilitate controlled release of drug from the CR core."  *See, e.g.*, '488 patent col. 11, ll. 56-59.

18

57.     I was instructed by counsel that "a" as used in a patent claim means "one or more." Thus, a functional coating means "one or more" such coatings.

58.     I understand from counsel that Jazz has admitted in its contentions that a "functional coating" comprises the enteric coating solution of Liang 2006. *See* Responses to Avadel's Validity Contentions at 56 ("And in the only exemplary formulations set forth in Liang 2006 in which methacrylic acid-methyl methacrylate co-polymers are used, the co-polymer comprises over ninety percent of the functional coating.").  I understand that given Jazz's admission, and taking Jazz's admission as true, the "functional coating" comprises at least an enteric coating.

59.     However, Jazz's Sustained Release Patents do not limit a functional coating to an enteric coating. *See, e.g.*, '488 patent at col. 9, ll. 38-40 ("The functional overcoat works to control delivery of drug from the controlled release core and maintain the structural integrity of the dosage form over time."); *id.* at col. 11, ll. 56-59 ("The coating composition works to preserve the integrity of the unit dosage form post administration and serves to facilitate controlled release of drug from the CR core."); *id.* at col. 14, ll. 5-8 ("The functional coating composition as disclosed herein may be applied to a CR core at a weight that facilitates a suitable combination of sustained drug release and dosage form structural integrity.").

60.     Liang 2006 discloses that the "pH sensitive enteric coat of the current invention are pH sensitive coating materials known in the art," and may include, "but are not limited to, methacrylate-based coating materials such as polymers of methacrylic acid and methacrylates (e.g., Eudragit L 100-55, Eudragit L 30-D55, Eudragit L 100, Eudragit S 100, Eudragit L30-D55, Eudragit L 100, Eudragit S 100, Eudragit FS 30 D)."  Liang 2006 at ¶ 82.  The function of the enteric coat is to "enable[] targeted delivery of the particles to a specific region of the GI tract" and "provide[] a time delay in the release of the gamma-hydroxybutyric acid salts from the pH

19

sensitive delayed/controlled release particles of the current invention." *Id.* at ¶ 81. Liang 2006 also discloses a "barrier coat" that is "applied to the pH sensitive delayed/controlled release particles" as a "barrier, and a neutralization zone when a neutralizing agent is used, between the immediate release core and the enteric coat." *Id.* at ¶ 71. It goes on to disclose that the coat can optionally act as a "controlled release coat to control the rate of release of gamma-hydroxybutyric acid salts from the immediate release core." *Id.* at ¶ 73. For example, the amount of pore former can be modified or eliminated in the barrier coat to control the release of GHB. *See* Liang 2006 at ¶¶ 76, 77, 101. Because the enteric coat and the barrier coat function to preserve the integrity of the unit dosage form and facilitate controlled release of the gamma-hydroxybutyric acid, a POSA would consider both the enteric coat and the barrier coat to be a "functional coating." Thus, for the purposes of prior art analysis of Liang 2006, the sustained release portion of claim 1a of the '488 patent should encompass the coating as a whole which is the combination of the enteric coat and the barrier coat, both of which are "functional coatings."

61.     Liang 2006 also discloses that "[t]he weight gain of the pH sensitive enteric coating is from about 10% to about 70% of the final enteric-coated particle weight." *Id.* at ¶ 85. A POSA would have understood from the description of the method of making the "delayed/controlled release particles" in Liang 2006 that starting with a barrier-coated immediate release core and adding the pH sensitive enteric coating in the range disclosed would result in a "functional coating compris[ing] one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating."

62.     For example, Example 4 discloses adding an ethylcellulose ("EC") coating (a functional coating) to the immediate release particles (600 g) disclosed in Example 2, at a weight gain of 3%, 6% or 9.2%. Liang 2006 at ¶¶ 99-100. As a non-limiting example, the immediate

release particle (600 g) with an EC coating with a weight gain of 9.2% would result in an EC coating of 60.8 g (600 g * 9.2%), such that the EC-coated immediate release particle is 660.8 g (600 g + 60.8 g).

63.     Liang 2006 further disclosed that the weight gain of the pH sensitive enteric coating (a functional coating) can be from about 10% to about 70% of the final enteric-coated particle weight. *Id.* at ¶ 85. As a non-limiting example, the EC-coated immediate release particle (660.8 g) with an enteric coating with a weight gain of 10% would result in an enteric coating of 73.4 g (660.8 g * 10%), such that the enteric- and EC-coated immediate release particle is 734.2 g (73.4 g + 660.8 g).

64.     Example 6(b) describes coating an EC-coated immediate release core with enteric coating of solution (2) (shown below) to 40%, 45%, or 50% weight gains. *Id.* at ¶¶ 105, 108; *supra* ¶ 45. The deionized water, isopropyl alcohol, and acetone are known to evaporate in the process of coating. I was instructed by counsel to calculate the weight of the Eudragit in the enteric coating, assuming that all of the DI water, isopropyl alcohol, and acetone evaporate in the process of coating. In this example, the Eudragit L 100 would make up about 87% of the weight of the enteric coating. *Id.* at ¶ 105. 390 g/ (390 g + 24 g + 34 g) =87%.

[0105]   Enteric Coating Solution 2 (Jejunum):

| | |
|---|---|
| Eudragit L 100 | 390 g |
| Talc | 24 g |
| Triethyl citrate | 34 g |
| Isopropyl alcohol | 2460 g |
| Acetone | 377 g |
| Deionized water | 390 g |

65.     When using the non-limiting examples described above in paragraphs 62 to 64, and based on instructions from counsel, I understand that a POSA would consider each of the functional coatings together to determine the overall weight and proportion of polymer for the

21

functional coating.  Thus, the functional coating considered as a whole (the 60.8 g of EC coating and 73.4 g of enteric coating) would be 134.2 g, *supra* ¶¶ 62-63.  Because the proportion of Eudragit L-100 is 87% of the weight of the enteric coating, Eudragit L-100 would make up 63.86 g of the enteric coating (73.4 g * 87%).  The methacrylic-acid methyl methacrylate co-polymer (Eudragit L-100) thus is 47.6% by weight of the functional coating (63.86 g of Eudragit L-100 / 134.2 g of functional coating).

| Non-Limiting Example in Liang 2006 | |
|---|---|
| Immediate Release Particle | 600 g |
| EC coating (first part of functional coating) | 60.8 g |
| Enteric coating (second part of functional coating) | 73.4 g |
| 87% Eudragit L-100 in enteric coating | 63.86 g |
| Functional coating | 134.2 g |
| % Eudragit L-100 in functional coating | (63.86 / 134.2) = 47.6% |

66.     Liang 2006 therefore inherently discloses a formulation that comprises "one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coat."   Liang 2006 also inherently discloses a formulation that comprises "one or more methacrylic acid-methyl methacrylate co-polymers . . . from about 30% to about 45% by weight of the functional coating" because 47.6% of the functional coating is "about 45%."  I have been instructed by counsel that "about" typically means plus or minus 10%.

### 5.     Dissolution Profile Limitation

#### a.     Dissolution Profile Limitations to the Sustained Release Portion

67.     The Asserted Claims of the Sustained Release Patents all require at least that "the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of

37 °C and a paddle speed of 50 rpm." *See, e.g.*, '488 patent claim 1.  Some of the claims also require that "the sustained release portion releases about 60% to about 90% of its gamma-hydroxybutyrate by about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C. and a paddle speed of 50 rpm." *See, e.g.*, *id.* at claim 4.  Under Jazz and the Court's construction of "sustained release" to mean "plain and ordinary meaning, *i.e.,* the portion of the formulation that is not immediate release and that releases over a period of time," as discussed below, Liang 2006 inherently discloses the above claimed dissolution profile of the "sustained release portion."

68.    I have reviewed and rely on the reproduction of the dissolution testing of the sustained release portion of Liang 2006's formulation conducted by Dr. Cory Berkland.   Dr. Berkland's report shows that the testing of the sustained release portion of Liang 2006's formulation showed that in each and every instance, more than 40% of the GHB in the sustained release portion is released prior to about 4 hours or prior to about 6 hours under the claimed dissolution conditions, and that about 60% to about 90% of the GHB in the sustained release portion is released by about 6 hours under the claimed dissolution conditions.  These results show that the claimed dissolution profile is necessarily present in the tested formulation of Liang 2006 (based on Example 6(b)).

### b.    Dissolution Profile Limitations to the Entire Formulation

69.    Dr. Berkland's report also shows that the claims directed to the dissolution profile of the entire formulation are also anticipated by at least one formulation disclosed by Liang 2006. Some of the Asserted Claims of the Sustained Release Patents require that "the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C. and a paddle speed of 50 rpm." *See* '488

patent claims 1, 12, 13; '956 patent claims 1, 11, 12, 25; '885 patent claim 13; '931 patent claim 13; *see also* Appendix D.

70.     Liang 2006 inherently discloses the above claimed dissolution profiles. I rely on Dr. Berkland's conclusion that when equivalent doses of the immediate release and Liang Formulation are tested, in each and every instance, the formulation releases "at least about 30% of its [GHB] by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm." Berkland Report at ¶ 63. Immediate release formulations typically release the majority of their drug by about one hour *in vitro*. Liang 2006 at Figs. 4-6; ¶¶ 112-13; FDA Guidance for Industry, Dissolution Testing of Immediate Release Solid Oral Dosage Forms, at 3. Thus, a POSA would understand that, based on Dr. Berkland's data and conclusions, Liang 2006 necessarily and inherently discloses at least one formulation where the formulation as a whole releases at least about 30% of its GHB by one hour under the claimed dissolution conditions.

71.     Some other claims also require that the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 6 to 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm. *See* '488 patent claims 1, 12 (by 8 hours), claim 2 (by 7 hours), claim 3 (by 6 hours); '885 patent claim 13 (by 8 hours), claim 14 (by 7 hours), claim 15 (by 6 hours); '956 patent claims 1, 11, 12, 25 (by 8 hours), claims 2, 13 (by 7 hours), claims 3, 14 (by 6 hours); '931 patent claim 13 (by 8 hours), claim 14 (by 7 hours), claim 15 (by 6 hours).

72.     Liang 2006 inherently discloses the above claimed dissolution profiles. I rely on Dr. Berkland's conclusion that when equivalent doses of the immediate release and Liang Formulation are tested, in each and every instance, the formulation releases "'greater than about

24

90% of its [GHB] by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm; and 'greater than about 90% of its [GHB] by 7 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm; greater than about 90% of its [GHB] by 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm.'" Berkland Report at ¶ 63. Immediate release formulations typically release the majority of their drug by about one hour *in vitro*. Liang 2006 at Figs. 4-6; ¶¶ 112-13; FDA Guidance for Industry, Dissolution Testing of Immediate Release Solid Oral Dosage Forms, at 3. Thus, a POSA would understand that, based on Dr. Berkland's data and conclusions, Liang 2006 discloses at least one formulation where the formulation as a whole releases greater than about 90% of its GHB by 6, 7, or 8 hours under the claimed dissolution conditions.

73.     Dr. Berkland's report shows that the testing of formulations disclosed in Liang 2006 using a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm results in the dissolution profiles recited in the Asserted Claims of the Sustained Release Patents, *i.e.*, where "the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours," where "the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour," where "the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 6," "7," or "8 hours," and where "the sustained release portion releases about 60% to about 90% of its gamma-hydroxybutyrate by about 6 hours." *See, e.g.*, '488 patent claim 1, claim 2, claim 3, claim 4.

74.     The only claimed dissolution profile limitation that is not inherently anticipated by Liang 2006, based on Dr. Berkland's testing, is the limitation to "the sustained release portion releases about 10% or less of its gamma-hydroxybutyrate by about 1 hour when tested in a

dissolution apparatus 2 in deionized water at a temperature of 37 °C. and a paddle speed of 50 rpm." *See, e.g.*, '488 patent claim 11.  However, as discussed below, that limitation would have been obvious.

## IX. THE ASSERTED CLAIMS OF THE SUSTAINED RELEASE PATENTS ARE OBVIOUS

75.    The Asserted Claims of the Sustained Release Patents would have been obvious over Liang 2006 in view of the general knowledge in the art.

76.    Liang 2006 is relevant prior art because it is directed to the same field (*i.e.*, formulations of GHB) as the subject matter of the Sustained Release Patents and also is reasonably pertinent to the problem facing the inventors.  The Sustained Release Patents describe the problem to be solved as addressing the "require[d] dosing of [sodium oxybate] twice during the night." '488 patent at col. 2 ll. 58-63.  Liang 2006 is in the same field and directed to the same problem.

77.    Specifically, Liang 2006 discloses gamma hydroxybutyric acid ("GHB") formulations made up of an immediate release portion and a delayed/controlled release portion. As in the Asserted Claims of the Sustained Release Patent, Liang 2006's delayed/controlled release formulations are made up of a functional coating deposited over a core, with the core comprising gamma-hydroxybutyric acid salts and the functional coating comprising a pH sensitive enteric release coat such as a methacrylic acid-methyl methacrylate co-polymer.  I have attached Appendix D showing the disclosure of each limitation of the Asserted Claims of the Sustained Release Patents in Liang 2006.

78.    In my opinion, a POSA would have arrived at the claimed amounts of GHB and the percentage of methacrylic acid-methyl methacrylate co-polymer in the coating through routine experimentation, with an expectation to succeed in achieving the claimed dissolution profile.

Thus, the claimed subject matter of the Sustained Release Patents would have been obvious to a POSA as of March 24, 2010.

**A.    The Asserted Claims of the Sustained Release Patents Would Have Been Obvious Based on the Prior Art**

79.     I have not opined on whether the Asserted Claims of the Sustained Release Patents are adequately described or enabled by the Sustained Release Patents.  However, I have been instructed by counsel to assume for the sole purpose of the analysis below that the Asserted Claims of the Sustained Release Patents are adequately described and enabled by the Sustained Release Patents.  I have no opinion with respect to the correctness of that instruction.  In view of this instruction and my analysis below, the Asserted Claims of the Sustained Release Patents would have been obvious over Liang 2006.

**1.    A POSA Would Have Been Motivated to Arrive at the Claimed Percentage of Methacrylic Acid-Methyl Methacrylate in the Coating Through Routine Experimentation**

80.     As described below, it is my opinion that it would have been obvious to a POSA to arrive at a "functional coating compris[ing] one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating" (*see, e.g.*, '488 patent claim 1) in view of Liang 2006 and the general knowledge of the art through routine experimentation.

**a.    The Prior Art Taught the Use of Methacrylic Acid-Methyl Methacrylate Co-Polymer in the Functional Coating**

81.     A POSA would have understood that the use of methacrylic acid-methyl methacrylate co-polymer in a functional coating was a commonplace method for achieving a desired dissolution profile for controlled release formulations.

82.     As discussed above, Liang 2006 describes a pH sensitive enteric coat that is applied to the barrier coat.  Suitable materials for the pH sensitive enteric coat "include, but are not limited to, methacrylate-based coating materials such as polymers of methacrylic acid and methacrylates." *Id.* at ¶ 82.  And suitable materials for targeting drug release to each region of the gastrointestinal tract were "known in the art, such as Eudragit E 100 or Eudragit E PO (stomach), Eudragit L 30 D-55 and Eudragit L 100-55 (duodenum), Eudragit L 12.5 and Eudragit L 100 (jejunum), Eudragit S 100 (ileum), and Eudragit FS 30 D (colon)."  *Id.* at ¶ 86.  Of the Eudragits disclosed by Liang 2006, Eudragit L 12.5, Eudragit L 100, Eudragit S 100, and Eudragit FS 30D are known to include "methacrylic acid-methyl methacrylate co-polymers."   According to Liang 2006, there was a preference for pH sensitive enteric release coats that release or dissolve in the upper GI tract, such as the duodenum or the jejunum, because it "will allow for better absorption of the drug."  *Id.* at ¶ 87.

83.     For example, Muhammed Majeed, *Formulation, Drug Release and Animal Bioavailability for an Oral Controlled-Release Dosage Form of Propranolol Hydrochloride* (June 1986) (Ph.D. dissertation, St. John's University) 1986 ("Majeed 1986") explains that a common type of controlled release coating includes a blend of water soluble (*e.g.*, pH dependent Eudragits) and water insoluble polymers.   Majeed 1986 at 26-27.  Majeed 1986 shows that the mechanism by which such coatings release drugs is the creation of "pores produced by soluble portion of polymer membrane," *i.e.*, pH-dependent Eudragits.  *Id.* at 26.



84.     Majeed 1986 also discloses enteric-coated beads and lists examples of polymers that can be used include cellulose acetate phthalate, hydroxypropyl methylcellulose phthalate, carboxymethyl ethylcellulose, ***Eudragit L, and Eudragit S***. *Id.* at 28 (emphasis added). Majeed 1986 specifically discloses that Eudragit L 12.5 and L100 are poly(methacrylic acid, methylmethacrylate) and soluble at a pH >6.0. *Id.* at 59, 61-62.

85.     European Patent No. 2 034 970 B1, issued March 18, 2009 ("Monteith 2009") tests formulations of phenylephrine decongestants and states that: "An example of such enteric coating comprises hydroxypropyl methylcellulose phthalate, polyvinyl acetate phthalate or ***methacrylic acid co-polymers***. Commercially available preparations include ***Eudragit® L-100***, which dissolves at pH 6.0, and ***S-100***, which dissolves at pH 7.0, used as a mixture." Monteith 2009 at ¶ 79 (emphasis added).

86.     HPE 2006 is a well-known textbook in the field of pharmaceutical excipients, and a POSA would have been familiar with its content. It explains that the primary use for polymethacrylates is for oral capsules and tablet formulations. They may act as enteric coating agents and/or for sustained release, and a POSA would understand that these coatings could be

29

mixed to different extents in order to achieve different release profiles.  It also teaches how to select the right type of Eudragit, including the claimed methacrylic acid-methyl methacrylate co-polymer.  "***Eudragit L, S and FS types*** are used as ***enteric coating agents because they are resistant to gastric fluid . . .*** Eudragit RL, RS, RD 100, NE 30 D and NE 40 D are used to form water-insoluble film coats for sustained-release products. Eudragit RL films are more permeable than those of Eudragit RS, and films of varying permeability can be obtained by mixing the two types together."  HPE 2006 at 554 (emphasis added).

87.    David Jones, *Pharmaceutical Applications of Polymers for Drug Delivery*, RAPRA REVIEW REPORTS, 15(6) (2004) ("Jones 2004") similarly teaches selection of the different Eudragits, including the claimed methacrylic acid-methyl methacrylate co-polymers (Eudragit L and Eudragit S).  Specifically, Eudragit L and S are known as "enteric coatings" "resistant to gastric juices."  Jones 2004 at 4.

30

| Chemical Name | Trade Name | Properties | Applications |
|---|---|---|---|
| Poly (butyl methacrylate, (2-dimethyl aminoethyl) methylacrylate) 1:2:1 $R^1$, $R^3$ = $CH_3$ $R^2$ = $CH_2CH_2N(CH_3)_2$ $R^4$ = $CH_3$, $C_4H_9$ | Eudragit E | Cationic polymer. Soluble in gastric juices and weakly acidic buffer solutions pH~5. | Film coatings. |
| Poly(methacrylic acid, methacrylate) 1:1 1:2 $R^1$, $R^3$ = $CH_3$ $R^2$ = H $R^4$ = $CH_3$ | Eudragit L Eudragit S | Anionic copolymers. Soluble in neutral to weakly alkaline solutions (pH~6-7) and form salts with alkali. Soluble in intestinal pH. | Enteric coatings; resistant to gastric juices. |
| Poly(ethyl acrylate, methylmethacrylate, trimethylaminoethyl methacrylate chloride) 1:2:0.1 1:2:0.2 $R^1$= H, $CH_3$ $R^2$ = $CH_3$, $C_2H_5$ $R^3$ = $CH_3$ $R^4$ = $CH_2CH_2N(CH_3)_3^+Cl^-$ | Eudragit RS  Eudragit RL | Water insoluble copolymer.  Water permeable films. Water impermeable films. | Water insoluble, used as film coats for sustained release. |

Table 1  Chemical Structure and Properties of Commercial Polymethacrylates

88.     David A. Miller & James W. McGinity, *Aqueous Polymeric Film Coating*, *in* PHARMACEUTICAL DOSAGE FORMS – TABLETS, 399-437 (3rd ed.) (2008) ("Miller 2008") is a book chapter that includes distinct sections for "enteric release," or coatings that "dissolve rapidly in the intestinal tract" and "sustained release" or coatings that aim to provide "a constant rate of drug release (and absorption)."  Miller 2008 teaches that the Eudragit polymers that were developed by the 1960s are now "widely used for enteric coating applications."   Miller 2008 at 408. Additionally, it describes the most common polymers for sustained release coatings to be "insoluble cellulose derivatives, insoluble polymethacrylates, as well as polyvinylacetate." *Id.* at 415.  Miller 2008 also states that there are four types of Eudragit polymers with enteric release capabilities, three of which are the claimed methacrylic acid-methyl methacrylate co-polymers: "There are four types of Eudragit polymers with enteric release capabilities:  Eudragit L 100-55

31

(also marketed by BASF as Kollicoat MAE 100P), *Eudragit L 100, Eudragit S 100*, and *Eudragit FS 30 D*." *Id.* at 412 (emphasis added).

> **b.** **The Prior Art Taught the Use of Methacrylic Acid-Methyl Methacrylate Co-Polymer That Are from About 20% to about 50% by Weight of the Functional Coating**

89.     It is my opinion that a POSA would have been motivated to arrive at the claimed weight percentage of methacrylic acid-methyl methacrylate co-polymers through routine experimentation because formulators have used these polymers in amounts that fall within the claimed range, and the selection of the recited percentage would have been a matter of routine optimization. *See, e.g., infra* at ¶¶ 91-94.  In early formulation development, it is routine for a POSA try a variety of formulations with a few polymers at a range of different percentages.  This would have been considered routine experimentation within the art.

90.     My discussions of the term "functional coating" and what a POSA would understand it to include can be found in paragraphs 55-60.  Even if the functional coating were limited to an enteric coating, the claimed subject matter would have been obvious to a POSA in light of Liang 2006 as of the pertinent date.

91.     Liang 2006 discloses that the "pH sensitive enteric coat of the current invention are pH sensitive coating materials known in the art," and may include, "but are not limited to, methacrylate-based coating materials such as polymers of methacrylic acid and methacrylates (e.g., Eudragit L 100-55, Eudragit L 30-D55, Eudragit L 100, Eudragit S 100, Eudragit L30-D55, Eudragit L 100, Eudragit S 100, Eudragit FS 30 D)."  Liang 2006 at ¶ 82.  A POSA would have been motivated to adjust the percentage of the methacrylic acid-methyl methacrylate in the coating to optimize performance of the formulation.

92.     Liang 2006 also discloses that "[p]referably, the pH sensitive delayed/controlled release particles are prepared by coating the barrier-coated immediate release core with an

appropriate pH sensitive coating material targeting to a specific region in the GI tract of an animal." *Id.* at ¶ 85. Thus, Liang 2006 teaches a delayed/controlled release GHB particle with a functional coating (*see* paragraphs 55-60 above) comprising of a barrier coat and a pH sensitive coating material that can include methacrylic acid-methyl methacrylate copolymers. Because the claimed 20%-50% of the weight of the functional coating covers a range of potential possibilities, a POSA would have been able to arrive at a formulation that falls within the claimed percentage through routine experimentation.

93. U.S. Patent No. 6,913,768 B2, issued July 5, 2005 ("Couch 2005") discloses sustained release delivery of amphetamine salts in which Eudragit L100, a methacrylic acid-methyl methacrylate co-polymer, is around 45.9% by weight of the functional coating (25.25 g/ (25.25 g + 25.25 g + 5.05 g). *See, e.g.*, Couch 2005 at Ex. 6 (below). This calculation assumes that the acetone and methanol evaporate completely in the process of coating. This assumption conforms to Couch 2005's teaching that the coating process resulted in a product of "90% by weight MASL beads and 10% by weight ethyl cellulose Eudragit L100 coating." *Id.* at col. 9, ll. 31-35. (500 g/(500 g + 25.25 g + 25.25g + 5.05g) = 90%)

## Example 6

| | | |
|---|---|---|
| Mixed amphetamine salts loaded beads | 500 | grams |
| Eudragit L100 | 25.25 | grams |
| Ethyl cellulose (Ethocel N-10, Dow Chemical) | 25.25 | grams |
| Triethyl citrate | 5.05 | grams |
| Acetone | 833.4 | grams |
| Methanol | 277.8 | grams |

94. Given the disclosure of methacrylic acid-methyl methacrylate and the use of methacrylic acid-methyl methacrylate co-polymer in the claimed percentage in controlled release

formulations in the prior art, including with GHB, a POSA would have been motivated to test a GHB formulation with methacrylic acid-methyl methacrylate copolymers in the claimed range and would have arrived at least one of the claimed percentage within the range of methacrylic acid-methyl methacrylate in the coating through routine experimentation.

### 2. A POSA Would Have Arrived at the Claimed Dissolution Profile Through Routine Experimentation

95.     I have been asked by counsel to adopt the claim construction of "sustained release" as having a "plain and ordinary meaning, i.e., the portion of the formulation that is not immediate release and that releases over a period of time."  Under that construction, it is my opinion that a POSA would have a reasonable expectation of success to achieve the claimed dissolution profile of "the sustained release portion releas[ing] greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C. and a paddle speed of 50 rpm."  '488 patent claims 1, 12; '885 patent claim 1; '956 patent claims 1, 11, 12, 25; '931 patent claim 1.

96.     I was asked by counsel to review and rely on Ms. Vivian Gray's report on this issue. It is my understanding that Ms. Gray was asked to assume as true the statement in Jazz's Allphin Declaration that the dissolution profiles of release in physiological media and release in D.I. water "would be substantially similar, as we have observed with other studies involving similar formulations tested in physiological media as well as D.I. water."  Gray Report, at ¶¶ 92, 99 (citing The April Allphin Declaration ¶ 2, Footnote 1) ("Jazz's Assertion on Dissolution Testing").  Under Jazz's Assertion on Dissolution Testing, Ms. Gray concluded that a POSA can draw reliable conclusions about how formulations would behave in apparatus 2 with a paddle speed of 50 rpm based on its performance in the same apparatus with a speed of 75 rpm in Liang 2006 and in other prior art references discussed above.  *Id.* at ¶¶ 99-100.

34

97.     Ms. Gray arrived at the conclusion that dissolution testing at the claimed conditions was routine and that the claimed dissolution profile was disclosed in a number of prior art references—at least including Conte, Hu, Savaser, and Lecomte.  Gray Report, at ¶¶ 101-20.  Ms. Gray is an expert in dissolution testing, and I rely on her opinions on the prior art and the Sustained Release Patents.  Thus, I adopt her opinion that "the claimed dissolution profile would have been known where the 'sustained release portion' releases greater than about 40% of its GHB by about 4 to about 6 hours, about 10% or less of its GHB by about 1 hour, and about 60% to about 90% of its GHB by about 6 hours, when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C. and a paddle speed of 50 rpm."  Gray Report, at ¶ 102.

98.     Relying on Ms. Gray's conclusions, a POSA would have had a reasonable expectation of success to achieve the claimed dissolution profile of "the sustained release portion releas[ing] greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C. and a paddle speed of 50 rpm."  Ms. Gray concludes that the claimed dissolution conditions are routine and disclosed in the prior art (Gray Report at ¶¶ 101-20), under Jazz's Assertion on Dissolution Testing (discussed above at paragraph 96) that the dissolution profiles of release in physiological media and release in D.I. water "would be substantially similar."  Thus, a POSA would have been motivated to achieve a formulation with the claimed dissolution profiles with a reasonable expectation of success.

99.     In addition, the sustained release portion releasing 10% or less of its GHB by about 1 hour and about 60% to about 90% of its GHB by about 6 hours when tested in dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm was also disclosed in a number of prior art references.  '488 patent claims 1, 11; '885 patent claim 1; '956

35

patent claims 1, 11, 12, 25; '931 patent claim 1; *see supra* Section VIII.B.5.a.  I adopt Ms. Gray's opinion that "the claimed dissolution profile would have been known where the 'sustained release portion' releases . . . about 10% or less of its GHB by about 1 hour . . . when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C. and a paddle speed of 50 rpm," under Jazz's Assertion on Dissolution Testing (discussed above at paragraph 96) that the dissolution profiles of release in physiological media and release in D.I. water "would be substantially similar."  Thus, a POSA would have been motivated to achieve a formulation with the claimed dissolution profiles with a reasonable expectation of success.

100.    Further, some of the Asserted Claims of the Sustained Release Patents also require that "the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C. and a paddle speed of 50 rpm."  *See* '488 patent claims 1, 12, 13; '956 patent claims 1, 11, 12, 25; '885 patent claim 13; '931 patent claim 13; *see supra* Section VIII.B.5.b.  Liang 2006 discloses that "the immediate release dose can be equivalent of, higher than, or lower than, the one or more delayed release doses."  Liang 2006 at ¶ 39.   I adopt Ms. Gray's conclusion that "the claimed dissolution profile would have been known where the 'sustained release portion' releases . . .  about 10% or less of its GHB by about 1 hour. . . when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C. and a paddle speed of 50 rpm," under Jazz's Assertion on Dissolution Testing (discussed above at paragraph 96) that the dissolution profiles of release in physiological media and release in D.I. water "would be substantially similar."   Gray Report, at ¶ 102.  Additionally, immediate release formulations typically release the majority of their drug by about one hour *in vitro*.  Liang 2006 at Figs. 4-6; ¶¶ 112-13; FDA Guidance for Industry, Dissolution Testing of Immediate Release Solid Oral Dosage Forms, at 3.  Liang 2006 also discloses that "the

immediate release dose can be equivalent of, higher than, or lower than, the one or more delayed release doses." Liang 2006 at ¶ 39. By way of an example only, a formulation of an immediate release component of at least 30% would release at least about 30% of its gamma hydroxybutyrate by one hour in DI water. Thus, a POSA would have been motivated to achieve a formulation with the claimed dissolution profiles with a reasonable expectation of success.

101.    Still other claims require that the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 6 to 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 ℃ and a paddle speed of 50 rpm. *See* '488 patent claims 1, 12 (by 8 hours), claim 2 (by 7 hours), claim 3 (by 6 hours); '885 patent claim 13 (by 8 hours), claim 14 (by 7 hours), claim 15 (by 6 hours); '956 patent claims 1, 11, 12, 25 (by 8 hours), claims 2, 13 (by 7 hours), claims 3, 14 (by 6 hours); '931 patent claim 13 (by 8 hours), claim 14 (by 7 hours), claim 15 (by 6 hours); *see supra* Section VIII.B.5.b. I adopt Ms. Gray's conclusion that "dissolution profiles disclosed in Figures 1 to 3 of Liang have the sustained release portion releasing . . . about 60% to 90% of its GHB by about 6 hours when tested in dissolution apparatus 2 in physiological media," under Jazz's Assertion on Dissolution Testing (discussed above at paragraph 96) that the dissolution profiles of release in physiological media and release in D.I. water "would be substantially similar." Gray Report, at ¶ 93. Immediate release formulations typically release the majority of their drug by about one hour *in vitro*. Liang 2006 at Figs. 4-6; ¶¶ 112-13; FDA Guidance for Industry, Dissolution Testing of Immediate Release Solid Oral Dosage Forms, at 3. Liang 2006 also discloses that "the immediate release dose can be equivalent of, higher than, or lower than, the one or more delayed release doses." Liang 2006 at ¶ 39. By way of an example only, a formulation that contains at least 75% of immediate release dose would meet the claimed dissolution profile in DI water, even assuming that only 60% of the sustained release portion

releases by about 6 hours. (75% + 25%*60% = 90%).  Thus, a POSA would have been motivated to achieve a formulation with the claimed dissolution profiles with a reasonable expectation of success.

Dated: January 17, 2023

Dr. Robert S. Langer

39

# EXHIBIT 12

**Gabriel Brier**

---

| | |
|---|---|
| **From:** | Gabriel Brier |
| **Sent:** | Thursday, February 23, 2023 4:55 PM |
| **To:** | Alex.Grabowski@lw.com |
| **Cc:** | jazzpatentlitigation.lwteam@lw.com; DSilver@McCarter.com; ajoyce@mccarter.com; DDurie@mofo.com; KiraDavis@mofo.com; ABrausa@mofo.com; RWeires@mofo.com; RoseLee@mofo.com; KMcNutt@mofo.com; EBerger@mofo.com; Frank Calvosa; JazzAvadel; jblumenfeld@morrisnichols.com; jtigan@morrisnichols.com; Nick Cerrito; Evangeline Shih; Audra.Sawyer@lw.com |
| **Subject:** | RE: Jazz v. Avadel - Non-Infringement Reports |

Alex,

It is not Jazz's responsibility to come up with a proposal to accommodate Avadel's extremely belated, new non-infringement theory. Avadel has no good cause to raise its new theory now, though Avadel tries its best to create one. Jazz's infringement report tracks its contentions. There is nothing new there, and Avadel's contentions demonstrate that Avadel knew exactly what Jazz's infringement theory was. In fact, Avadel's contentions repeatedly reference and expressly acknowledge Jazz's reliance on "sodium oxybate" for the claim limitations that Avadel now seeks to challenge. Furthermore, Avadel cannot credibly argue that there is anything new, or that it was unaware of, with respect to the accused product—Avadel's own NDA Product, which Avadel has had access to since (and before) this case started. If Avadel had a good faith belief that a certain claim limitation was missing from its own product, then it had a duty to raise that allegedly missing limitation in its contentions. Avadel did not do so.

With respect to claim construction, it is not Jazz that seeks to depart from the plain and ordinary meaning of "gamma-hydroxybutyrate." Instead, Avadel seeks to apparently read in limitations that would exclude any compounds that comprise GHB and also read the claims of all patents in a non-sensical, and non-scientifically supported, manner. If Avadel wanted to make such a proposal, the time for doing so was February 18, 2022. The parties would have then done contentions under Avadel's proposed construction and had 5 months to investigate and exchange proposed constructions and brief the disputed term.

Jazz is now in the middle of responding to Avadel's ten validity expert reports and should not be forced to engage in and brief claim construction, serve new discovery requests, prepare for and depose several Avadel-related witnesses (at least Herve Guillard, Jason Vaugh, and Jennifer Gudeman, and potentially Thorsteinn Thorsteinsson and David Monteith), and serve supplemental infringement reports at the same time. Furthermore, Avadel's new proposed infringement theory and claim construction contradicts certain of Avadel's invalidity theories. Therefore, Jazz's rebuttal reports would also be affected by claim construction.

In short, what Avadel asks Jazz to do is not reasonable and cannot be accomplished under the current schedule or with the current trial date. This type of prejudice is what the *Pennypack* analysis is supposed to protect against. Based on this, Jazz does not see any way that it can propose a modified schedule at this time. If Avadel has a proposal or intends to request an adjournment of the schedule or trial date, please let us know.

Regards,

Gabe

---

**From:** Alex.Grabowski@lw.com <Alex.Grabowski@lw.com>
**Sent:** Thursday, February 23, 2023 1:17 PM
**To:** Gabriel Brier <gabrielbrier@quinnemanuel.com>; Audra.Sawyer@lw.com

**Cc:** jazzpatentlitigation.lwteam@lw.com; DSilver@McCarter.com; ajoyce@mccarter.com; DDurie@mofo.com; KiraDavis@mofo.com; ABrausa@mofo.com; RWeires@mofo.com; RoseLee@mofo.com; KMcNutt@mofo.com; EBerger@mofo.com; Frank Calvosa <frankcalvosa@quinnemanuel.com>; JazzAvadel <jazzavadel@quinnemanuel.com>; jblumenfeld@morrisnichols.com; jtigan@morrisnichols.com; Nick Cerrito <nickcerrito@quinnemanuel.com>; Evangeline Shih <evangelineshih@quinnemanuel.com>
**Subject:** RE: Jazz v. Avadel - Non-Infringement Reports

**[EXTERNAL EMAIL from alex.grabowski@lw.com]**

Gabe,

We disagree with many of your sentiments, and will address them as needed, but we believe that there is a basis for mutual agreement to address Jazz's stated concerns. Your email below also identifies four purported ways in which Jazz would be unduly prejudiced by the introduction of this theory. We disagree. There is no prejudice resulting from our proposal that cannot be cured.

First, you assert that "Avadel's new theory raises a new claim construction issue that would need to be resolved by the Court." We disagree. Avadel's theory is based on the plain and ordinary meaning of "gamma-hydroxybutyrate." That said, if Jazz believes further claim construction proceedings are necessary, we are amenable to them. Please send us Jazz's proposed construction and a proposed schedule for presenting the issue to the Court.

Second, you argue that the new theory would necessitate "additional fact testimony from Avadel's current and former employees." Your email provides no specificity with respect to which witnesses Jazz would seek to additional time with. Please identify those witnesses and the topics of examination so the parties can determine whether an agreement can be reached.

Third, you state that "Jazz would also require a new opening infringement expert report to address this theory." We are amenable to Jazz supplementing its expert report. For example, Avadel would agree to allow Jazz to serve a supplemental report on March 17, which Avadel would respond to by March 31.

Fourth, you contend that this new theory presents a "compressed timeline," while Jazz is responding to Avadel's invalidity reports. We are happy to discuss a modified schedule with respect to the infringement reports. Trial is not until the end of October, so there is ample time left in the schedule to accommodate these reports.

Finally, it bears repeating that Avadel's request to supplement its contentions and present a meritorious non-infringement position is warranted at this juncture. Before Jazz served its opening expert reports, Jazz did not disclose to Avadel that its infringement theories would be premised solely on the argument that the term "gamma-hydroxybutyrate" has something other than its ordinary meaning. Indeed, Jazz's contentions specifically indicated an intent to rely on testing showing the presence of "gamma-hydroxybutyrate." Now that it is clear Jazz intends to rely on a different chemical compound, Avadel promptly notified Jazz of the discrepancy.

Best,
Alex

**Alex Grabowski**

**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.6556

**From:** Gabriel Brier <gabrielbrier@quinnemanuel.com>
**Sent:** Tuesday, February 21, 2023 1:17 PM

**To:** Sawyer, Audra (DC) <Audra.Sawyer@lw.com>
**Cc:** #C-M JAZZ PATENT LITIGATION - LW TEAM <jazzpatentlitigation.lwteam@lw.com>; DSilver@McCarter.com; ajoyce@mccarter.com; DDurie@mofo.com; KiraDavis@mofo.com; ABrausa@mofo.com; RWeires@mofo.com; RoseLee@mofo.com; KMcNutt@mofo.com; EBerger@mofo.com; Frank Calvosa <frankcalvosa@quinnemanuel.com>; JazzAvadel <jazzavadel@quinnemanuel.com>; jblumenfeld@morrisnichols.com; jtigan@morrisnichols.com; Nick Cerrito <nickcerrito@quinnemanuel.com>; Evangeline Shih <evangelineshih@quinnemanuel.com>
**Subject:** RE: Jazz v. Avadel - Non-Infringement Reports

Audra,

Jazz does not agree to Avadel's proposed amendments to its non-infringement contentions due to the extreme delay in attempting to bring this new theory into the case absent any showing of good cause.

Further, any attempt to bring Avadel's new theory into the case would unduly prejudice Jazz at least because: 1) Avadel's new theory raises a new claim construction issue that would need to be resolved by the Court (i.e., whether the use of the phrase "gamma-hydroxybutyrate" in the claims excludes sodium oxybate); 2) if the new theory were allowed into the case Jazz would need additional fact testimony from Avadel's current and former employees; 3) if the new theory were allowed Jazz would also require a new opening infringement expert report to address this theory; and 4) Avadel is attempting to inject a new theory into the case while Jazz is preparing responses to Avadel's 10 opening expert reports on a compressed timeframe.

Given these circumstances, even if Avadel could establish good cause (which it cannot), Jazz would be unduly prejudiced because it would not be possible to address these issues under the current schedule.

Regards,

Gabe

---

**From:** Gabriel Brier
**Sent:** Friday, February 17, 2023 4:38 PM
**To:** Audra.Sawyer@lw.com; Frank Calvosa <frankcalvosa@quinnemanuel.com>; JazzAvadel <jazzavadel@quinnemanuel.com>; jblumenfeld@morrisnichols.com; jtigan@morrisnichols.com; Nick Cerrito <nickcerrito@quinnemanuel.com>; Evangeline Shih <evangelineshih@quinnemanuel.com>
**Cc:** jazzpatentlitigation.lwteam@lw.com; DSilver@McCarter.com; ajoyce@mccarter.com; DDurie@mofo.com; KiraDavis@mofo.com; ABrausa@mofo.com; RWeires@mofo.com; RoseLee@mofo.com; KMcNutt@mofo.com; EBerger@mofo.com
**Subject:** RE: Jazz v. Avadel - Non-Infringement Reports

Audra,

Thank you for providing Avadel's proposed amended non-infringement contentions. We are in the process of reviewing them and consulting with our client and will provide a response to your email below next week.

Regards,

Gabe

---

**From:** Audra.Sawyer@lw.com <Audra.Sawyer@lw.com>
**Sent:** Thursday, February 16, 2023 6:59 PM
**To:** Frank Calvosa <frankcalvosa@quinnemanuel.com>; JazzAvadel <jazzavadel@quinnemanuel.com>; jblumenfeld@morrisnichols.com; jtigan@morrisnichols.com; Gabriel Brier <gabrielbrier@quinnemanuel.com>; Nick Cerrito <nickcerrito@quinnemanuel.com>; Evangeline Shih <evangelineshih@quinnemanuel.com>

3

**Cc:** jazzpatentlitigation.lwteam@lw.com; DSilver@McCarter.com; ajoyce@mccarter.com; DDurie@mofo.com; KiraDavis@mofo.com; ABrausa@mofo.com; RWeires@mofo.com; RoseLee@mofo.com; KMcNutt@mofo.com; EBerger@mofo.com
**Subject:** RE: Jazz v. Avadel - Non-Infringement Reports

<mark>[EXTERNAL EMAIL from audra.sawyer@lw.com]</mark>

Counsel,

Attached are Avadel's amended non-infringement contentions that we intend to attach to our motion for leave to amend on February 28, 2023.  Amendments appear at sections II.C, IV.B. and IV.D.  While we do not believe we are required to amend our contentions simply to rebut Jazz's failure of proof, we are doing so for avoidance of any doubt.  As we indicated during our meet and confer, we do not believe Jazz will be unduly prejudiced by Avadel's proposed amendments.  However, to the extent Jazz contends that it would be prejudiced, please identify any accommodations (*e.g.*, a supplemental opening expert report, changes to the schedule, additional discovery, etc.) that Jazz believes would be necessary to mitigate any alleged prejudice. We are willing to work with Jazz on a reasonable accommodation, and believe that it is prudent for the parties to try to resolve this amongst themselves now, while there is still plenty of time in the schedule for accommodations.

Thanks,

Audra

**From:** Frank Calvosa <frankcalvosa@quinnemanuel.com>
**Sent:** Friday, February 10, 2023 10:51 AM
**To:** Sawyer, Audra (DC) <Audra.Sawyer@lw.com>; JazzAvadel <jazzavadel@quinnemanuel.com>; jblumenfeld@morrisnichols.com; jtigan@morrisnichols.com; Gabriel Brier <gabrielbrier@quinnemanuel.com>; Nick Cerrito <nickcerrito@quinnemanuel.com>; Evangeline Shih <evangelineshih@quinnemanuel.com>
**Cc:** #C-M JAZZ PATENT LITIGATION - LW TEAM <jazzpatentlitigation.lwteam@lw.com>; DSilver@McCarter.com; ajoyce@mccarter.com
**Subject:** RE: Jazz v. Avadel - Non-Infringement Reports

Audra,

Jazz does not understand why Avadel believes it has a basis to introduce new claim construction and non-infringement theories at this late stage of the case.  We are available to meet and confer Monday before noon or Tuesday after 2 pm eastern.  Please let us know which works best for Avadel.

Best,

**Frank Calvosa**
*Partner*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7569 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
frankcalvosa@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended

recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Audra.Sawyer@lw.com <Audra.Sawyer@lw.com>
**Sent:** Wednesday, February 8, 2023 11:58 AM
**To:** JazzAvadel <jazzavadel@quinnemanuel.com>; jblumenfeld@morrisnichols.com; jtigan@morrisnichols.com; Gabriel Brier <gabrielbrier@quinnemanuel.com>; Frank Calvosa <frankcalvosa@quinnemanuel.com>; Nick Cerrito <nickcerrito@quinnemanuel.com>; Evangeline Shih <evangelineshih@quinnemanuel.com>
**Cc:** jazzpatentlitigation.lwteam@lw.com; DSilver@McCarter.com; ajoyce@mccarter.com
**Subject:** Jazz v. Avadel - Non-Infringement Reports

[EXTERNAL EMAIL from audra.sawyer@lw.com]

Counsel,

We write regarding a potential claim construction dispute. In its final infringement contentions concerning the sustained release patents, Jazz asserted that Avadel's LUMRYZ product releases sodium oxybate with respect to what it identified in Dr. Little's report as limitation 1(e) of the '488 patent (for example), and relied on assertions that further testing would show that the alleged "sustained release portion" of Avadel's product releases "gamma-hydroxybutyrate," the compound recited in various pertinent claim elements.  Specifically, Jazz asserted:

> Further, testing of Avadel's NDA Product, as well as potential testimony from Avadel and potential
> third parties, will show that the sustained release portion of Avadel's NDA Product
> releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested
> in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle
> speed of 50 rpm.

Jazz Final Infringement Contentions, at 55.

However, Dr. Little's report contains no testing for gamma hydroxybutyrate.  Instead, Dr. Little's report relies solely on information about the presence of sodium oxybate in Avadel's proposed product and the alleged release of sodium oxybate from Avadel's product.  *See, e.g.*, Little Rpt. at ¶¶ 28-31, 62-68.  That is not evidence of release of "gamma hydroxybutyrate" given the term's plain and ordinary meaning.  The resinate patents suffer from the same deficiency.  Dr. Little refers back to paragraphs 28-31 of his report when purporting to demonstrate that LUMRYZ contains modified release particles containing gamma-hydroxybutyrate as required by the '782 patent.  *See* Little Rpt. ¶¶ 394-36 (referring to paragraphs 28-31).  Likewise, Dr. Little refers only to paragraphs 28-31 of his report when contending that Avadel's LUMRYZ product is administered as a single daily dose comprising "oxybate" (which the specification defines as gamma-hydroxybutyrate) by opening a sachet containing a solid oxybate formulation, as required by the '079 patent.  *See* Little Rpt. ¶¶ 348-349 (referring to paragraphs 28-31).  To the extent that Jazz contends that the terms "gamma hydroxybutyrate" or "oxybate" have anything other than their plain meaning, please identify said meaning and explain why Jazz did not identify those terms in connection with claim construction.

To be clear, Avadel intends to raise Jazz's failure of proof regarding these limitations for each of the asserted patents.  *See* '488 Patent claims 1, 12; '885 patent claim 1; '956 patent, claims 1, 11; '931 patent claim 1; '079 patent claims 1, 10; '782 patent claims 1, 14.  For the sake of clarity, Avadel intends to move to amend its contentions to reflect Jazz's failures to prove infringement for failing to show:

- That Avadel's product meets any limitation of the sustained release patents reciting gamma-hydroxybutyrate or the release of gamma-hydroxybutyrate from any portion (including the alleged "sustained release portion"). *See, e.g.*, 488 patent, limitations 1(e), 1(h), and 1(i).
- That Avadel's product includes a formulation of gamma-hydroxybutyrate comprising a plurality of immediate and modified release particles comprising gamma-hydroxybutyrate as recited in the '782 patent.
- That administering Avadel's product includes administrating a single daily dose of oxybate to a patient by opening a sachet containing a solid oxybate formulation.

If you intend to oppose our motion, please let us know your availability to meet and confer by Friday, February 10th.

Thanks,

**Audra Sawyer**

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.637.3393

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.