IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAZZ PHARMACEUTICALS, INC. and )
JAZZ PHARMACEUTICALS IRELAND )
LIMITED, )
  )
     Plaintiffs, )  C.A. No. 21-1594 (GBW)
  )
     v. )  **PUBLIC VERSION**
  )
AVADEL CNS PHARMACEUTICALS LLC, )  **Confidential Version Filed: July 31, 2023**
  )  **Public Version Filed: August 17, 2023**
     Defendants. )

## JAZZ PHARMACEUTICALS' SECOND AMENDED ANSWER TO AVADEL CNS PHARMACEUTICALS LLC'S COUNTERCLAIMS

Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (collectively, "Jazz Pharmaceuticals"), by their undersigned attorneys, hereby submit their Second Amended Answer to the Counterclaims to their Amended Complaint for Patent Infringement by Defendant Avadel CNS Pharmaceuticals LLC ("Avadel"), dated July 10, 2023 (the "Counterclaims"), as follows. Except as expressly admitted, all allegations are denied.

## AVADEL'S COUNTERCLAIMS

1.    Avadel's Counterclaims arise under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

**ANSWER**: Paragraph 1 states legal conclusions for which no answer is required. To the extent that an answer is required, Jazz Pharmaceuticals admits that this Court has subject matter jurisdiction over Avadel's counterclaims as to US. Patent No. 11,147,782 (the "'782 patent"), denies that Avadel is entitled to any of the relief that it seeks, and, except as so admitted, denies the allegations of paragraph 1.

2.    The Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331 and 1338.

**ANSWER**:  Paragraph 2 states legal conclusions for which no answer is required.  To the extent that an answer is required, Jazz Pharmaceuticals admits that this Court has subject matter jurisdiction over Avadel's counterclaims as to the '782 patent, denies that Avadel is entitled to any of the relief that it seeks, and, except as so admitted, denies the allegations of paragraph 2.

3.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b).

**ANSWER:**  Paragraph 3 states legal conclusions for which no answer is required.  To the extent that an answer is required, Jazz Pharmaceuticals admits that venue is proper to adjudicate this action and, except as so admitted, denies the allegations of paragraph 3.

4.      Counterclaim-Plaintiff Avadel CNS Pharmaceuticals, LLC ("Avadel") is a limited liability company organized and existing under the laws of the State of Delaware and has its principal place of business at 16640 Chesterfield Grove Road, Suite 200, Chesterfield, Missouri 63005.

**ANSWER:**  Jazz Pharmaceuticals admits on information and belief the allegations of paragraph 4.

5.      On information and belief, Counterclaim-Defendant Jazz Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 3170 Porter Drive, Palo Alto, California 94304.

**ANSWER:**  Jazz Pharmaceuticals admits the allegations of paragraph 5.

6.      On information and belief, Counterclaim-Defendant Jazz Pharmaceuticals Ireland Limited (and together with Jazz Pharmaceuticals, Inc., "Jazz") is a corporation organized and existing under the laws of Ireland, having a principal place of business at Waterloo Exchange, Waterloo Road, Dublin, Ireland 4.

**ANSWER:**  Jazz Pharmaceuticals admits the allegations of paragraph 6.

## AVADEL'S PRELIMINARY STATEMENT

7.      Flamel Ireland Limited ("Flamel"), a wholly-owned subsidiary of Avadel Pharmaceuticals plc, owns numerous United States patents that cover Avadel's innovative product FT218, a once-nightly formulation of sodium oxybate for the treatment of excessive daytime sleepiness and cataplexy in adults with narcolepsy.  One of those patents, U.S. Patent No. 10,272,062 (the "'062 patent"), entitled "Modified Release Gamma-Hydroxybutyrate Formulations Having Improved Pharmacokinetics," was filed on July 21, 2017 and issued on April 30, 2019.  Avadel's '062 patent claims priority to several provisional applications with the earliest

provisional application No. 62/365,812 filed on July 22, 2016.  The application that ultimately issued as Avadel's '062 patent was first published on January 25, 2018 as U.S. Publication No. 2018/0021284 (the "'062 patent publication").

**ANSWER:**  Jazz Pharmaceuticals admits on information and belief that Flamel Ireland Limited is a wholly-owned subsidiary of Avadel Pharmaceuticals plc.  Jazz Pharmaceuticals further admits that U.S. Patent No. 10,272,062 (the "'062 patent") is titled, "Modified Release Gamma-Hydroxybutyrate Formulations Having Improved Pharmacokinetics" and lists July 21, 2017 as the filing date of the underlying application number 15/655,924 (the "'924 application").  Jazz Pharmaceuticals further admits that the '062 patent lists a publication date for the '924 application as January 25, 2018 as US 2018/0021284 and further lists April 30, 2019 as the issue date for the '062 patent.  Jazz Pharmaceuticals further admits that the '924 application claims priority to three provisional applications, the earliest of which is provisional application number 62/365,812, for which the '062 patent lists July 22, 2016 as the filing date, and, except as so admitted, denies the allegations of paragraph 7.

8.      Thus, no later than January 25, 2018, Avadel's '062 patent publication disclosed modified release formulations of gamma-hydroxybutyrate ("GHB" with sodium oxybate being its sodium salt) containing methacrylic acid-methyl methacrylate co-polymers, with certain dissolution profiles when tested in deionized water using USP apparatus 2 and where the dissolution medium was maintained at 37°C ± 0.5°C with the rotating paddle speed fixed at 50 rpm.

**ANSWER:**  Jazz Pharmaceuticals admits that the '062 patent lists January 25, 2018 as the publication date of the underlying '924 application, refers to the text of the '062 patent publication for the contents thereof, and, except as so admitted, denies the allegations of paragraph 8.

9.      U.S. Patent No. 10,736,866 (the "'866 patent") is a continuation of Avadel's '062 patent and was filed on February 21, 2019 and issued on August 11, 2020.  The application that gave rise to the '866 patent was first published on June 20, 2019 (the "'866 patent publication"). Thus, no later than June 20, 2019, Avadel's '866 patent publication disclosed claims relating to a sachet formulation of GHB comprising an immediate release component and a controlled release component.

**ANSWER:** Jazz Pharmaceuticals admits that U.S. Patent No. 10,736,866 (the "'866 patent") represents that it is a continuation of the application that issued as the '062 patent and was filed on February 21, 2019.  Jazz pharmaceuticals further admits that the '866 patent lists that it issued on August 11, 2020 and that it lists that the underlying application published on June 20, 2019.  Jazz further refers to the text of the '866 patent publication for the contents thereof, and, except as so admitted, denies the allegations of paragraph 9.

10.     U.S. Patent No. 10,952,986 (the "'986 patent") is a continuation of the '866 patent and was filed on May 23, 2019 and issued on March 23, 2021.  The application that ultimately issued as the '986 patent was first published on September 12, 2019 (the "'986 patent publication").

**ANSWER:** Jazz Pharmaceuticals admits that U.S. Patent No. 10,952,986 (the "'986 patent") lists that it is a continuation of the application that issued as the '866 patent.  Jazz Pharmaceuticals further admits that the '986 patent lists that it was filed on May 23, 2019 and lists that it issued on March 23, 2021.  Jazz Pharmaceuticals further admits that the '986 patent lists that the underlying application was published on September 12, 2019, and, except as so admitted, denies the allegations of paragraph 10.

11.     Thus, no later than September 12, 2019, Avadel's '986 patent publication disclosed claims relating to formulations of GHB comprising an immediate release portion and a modified release portion, as a skilled artisan would understand the plain meaning of those terms, with a suspending or viscosifying agent separate and distinct from the immediate release and modified release portions.

**ANSWER:** Jazz pharmaceuticals admits that the '986 patent lists that the underlying application published on September 12, 2019, refers to the text of the '986 patent publication for the contents thereof, and, except as so admitted, denies the allegations of paragraph 11.

12.     On information and belief, Jazz was aware of the disclosures in Avadel's patent publications since at least January 25, 2018, when Avadel's '062 patent publication was published.  On information and belief, Jazz presumed that at least Example 1 and Example 1bis of Avadel's '062 patent publication disclose the formulation of FT218, Avadel's once-nightly sodium oxybate formulation for the treatment of excessive daytime sleepiness and cataplexy in adults with narcolepsy. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

**ANSWER:**  Jazz Pharmaceuticals admits that the '062 patent lists that the underlying application was published on January 25, 2018.  Jazz Pharmaceuticals further admits on information and belief that Avadel's sodium oxybate product, code named FT218, and commercially marketed as LUMRYZ™, is an embodiment of Example 1 and Example 1bis of the '062 patent, ██████████████████████████████████████ and, except as so admitted denies the allegations of paragraph 12.

13.    On information and belief, Jazz engaged in a pattern and practice of copying Avadel's inventive work by drafting claims based solely on the disclosures in Avadel's patent publications, rather than any commensurate disclosure of Jazz's underlying applications.  Jazz, and the named inventors on the asserted patents, along with others responsible for the prosecution of same, misled the United States Patent and Trademark Office ("PTO") by concealing that they had copied the disclosures set forth in Avadel's patent publications.

**ANSWER:**  Jazz Pharmaceuticals denies the allegations of paragraph 13.

14.    As one example of Jazz's pattern and practice of copying Avadel's work and passing it off as its own, at the time that Avadel's '062 patent publication was published on January 25, 2018, Jazz had not filed any patent applications that gave rise to the patents asserted in Jazz's Amended Complaint in C.A. No. 21-691-GBW, i.e., Jazz's Patent Nos. 10,758,488 (the "'488 patent"), 10,813,885 (the "'885 patent"), 10,959,956 (the "'956 patent"), and 10,966,931 (the "'931 patent") (collectively, the "Sustained Release Patents").  Instead, Jazz was prosecuting the parent application to the Sustained Release Patents, U.S. Application No. 13/071369 (the "Jazz '369 application").  The then-pending claims of the Jazz '369 application were directed to a "controlled release dosage form for oral administration" including "a compressed tablet controlled release core," comprising at least one polymer comprising ethylcellulose, at least one polymeric "pore former," and also recited "providing a time dependent release" measuring release of the drug from time of administration.  *See, e.g.*, Jazz '369 application File History, October 4, 2017 Response to Final Office Action at claim 1.  One dependent claim recited that the "at least one polymeric pore-former is at least one of a polyethylene glycol, poloxamer, polyvinyl alcohol, copovidone, povidone, a water soluble sugar, a water soluble organic acid, such as carboxylic acids and their salts, and a hydroxyalkyl cellulose selected from hydroxyethyl cellulose, hydroxypropyl methylcellulose, and hydroxypropyl cellulose."  *See id.* at claim 16.  The Jazz '369 application claims therefore corresponded to the substance of the specification, which disclosed controlled release dosage forms containing a compressed tablet controlled release core, ethylcellulose, and hydroxypropyl cellulose or poloxamer.  *See, e.g.*, Jazz '369 application at Examples 1-13.

**ANSWER:** Jazz Pharmaceuticals admits that it filed U.S. Patent Application No. 13/071,369 (the "'369 application") on March 24, 2011 which claimed priority to a provisional application filed on March 24, 2010, refers to the text, claims, and file histories of the '369 application, the '488 patent, the '885 patent, the '956 patent, and the '931 patent for the contents thereof, and otherwise denies the allegations of paragraph 14.

15.     While claim 1 of the Jazz '369 application was originally directed to "a controlled release dosage form for oral administration," the applicant narrowed claim 1 first to a "compressed tablet" and later to include a "compressed tablet controlled release core," in response to rejections finding that claim 1 was obvious over a prior art patent application to Liang *et al.*, U.S. Patent Publication No. 2006/0210630 ("Liang"). *See* Jazz '369 application File History, May 28, 2013 Response to Office Action at claim 1; January 27, 2014 Response to Office Action at claim 1. These narrowing amendments conformed the claims to the disclosure of the Jazz '369 application, which was limited to a compressed tablet dosage form.  Further, the Jazz '369 application had no claims or teachings of dissolution testing or the release profiles resulting from such testing of formulations containing methacrylic acid-methyl methacrylate co-polymers in deionized water using apparatus 2 at a temperature of 37°C and a paddle speed of 50 rpm, as described in Avadel's '062 patent publication.

**ANSWER:** Jazz pharmaceuticals refers to the text, claims, and file history of the '369 application for the contents thereof, and otherwise denies the allegations of paragraph 15.

16.     After Avadel's '062 patent publication was published, however, Jazz let its '369 application become abandoned on November 2, 2018.  Jazz did not file the application that ultimately led to the issuance of the first of the Sustained Release Patent, the '488 patent, until July 2, 2018—approximately six months ***after*** Avadel's '062 patent publication was published.  The application giving rise to the '488 patent was filed and characterized as a continuation of the Jazz '369 application.  Notably, Jazz canceled all 10 original claims that generally recited the four components described *supra*—namely a "compressed tablet" controlled release dosage form, comprising at least one polymer comprising ethylcellulose, at least one polymeric "pore former," and reciting "providing a time dependent release" measuring release of the drug from time of administration.  In stark contrast to its prior set of claims, Jazz deleted each of those four attributes, and replaced them with claims directed to a generic formulation (rather than a compressed tablet) comprising specifically methacrylic acid-methyl methacrylate co-polymers (rather than one polymer comprising ethylcellulose and at least one polymeric "pore former"), and recited a specific dissolution profile defined by tests performed "in a dissolution apparatus 2 in deionized water at a temperature of 37°C and a paddle speed of 50 rpm" (rather than reciting attributes following administration).

**ANSWER:** Jazz Pharmaceuticals admits that it filed U.S. Patent Application No. 16/025,487 (the "'487 application") on July 2, 2018 as a continuation of the '369 application, that

the '487 application issued as the '488 patent on September 1, 2020, refers to the text, claims, and file history of the '488 patent for the contents thereof, and otherwise denies the allegations of paragraph 16.

17.     On information and belief, Jazz drafted the claims that gave rise to the Sustained Release Patents based not on any commensurate disclosure of their underlying application, but solely in view of the disclosures set forth in Avadel's '062 patent publication.  The Sustained Release Patents specification does not disclose dissolution testing or the release profile resulting from such testing of formulations containing methacrylic acid-methyl methacrylate co-polymers in deionized water using apparatus 2 at a temperature of 37°C and a paddle speed of 50 rpm.  As such, the Sustained Release Patents claims as filed and issued are neither described nor supported by its specification as, on information and belief, the claims were instead solely based on Avadel's inventive work disclosed in at least Avadel's '062 patent publication.

**ANSWER:**  Jazz Pharmaceuticals refers to the text, claims, and file histories of the '488 patent, the '885 patent, the '956 patent, and the '931 patent for the contents thereof, and otherwise denies the allegations of paragraph 17.

18.     ███████████████████████████████████████████████████████████████████ Jazz's bad faith with respect to the Sustained Release Patents is additionally reflected in its decision to file suit on the Sustained Release Patents knowing that their subject matter does not apply to FT218.  During prosecution, Jazz repeatedly distinguished the claimed "sustained release" composition from a "delayed release" composition specifically to avoid rejections over a reference to Liang.  *See, e.g.*, Jazz '488 Patent File History, March 6, 2020 Allphin Declaration at ¶¶ 6, 10-11. ██████████████████████████████████

**ANSWER:**  Jazz Pharmaceuticals admits on information and belief that the use of Avadel's sodium oxybate product, code named FT218, and commercially marketed as LUMRYZ™, infringes one or more claims of the '488 patent, the '885 patent, the '956 patent, and the '931 patent, and refers to the text, claims, and file histories of the '488 patent, the '885 patent, the '956 patent, and the '931 patent for the contents thereof.  Jazz Pharmaceuticals further admits

that the '062 patent lists that the underlying application was published on January 25, 2018, ███

███████████████████████████████████ and otherwise denies the allegations

of paragraph 18.

19.     As another example of Jazz's pattern and practice of copying Avadel's work and passing it off as its own, at the time that Avadel's '062 patent publication was published on January 25, 2018, Jazz had not filed the patent application that gave rise to the patent asserted in Jazz's Amended Complaint in C.A. No. 21-1138-GBW—Jazz's Patent No. 11,077,079 (the "'079 patent"). Nor did Jazz file the application that ultimately led to the issuance of the '079 patent at the time Avadel's '986 patent publication published on September 12, 2019.

**ANSWER:**  Jazz Pharmaceuticals admits that the '062 patent lists that the underlying

application was published on January 25, 2018 and that the '986 patent lists that the underlying

application was published on September 12, 2019.  Jazz Pharmaceuticals further admits that U.S.

Patent No. 11,077,079 (the "'079 patent") issued from an application filed on December 10, 2020,

which claimed priority to three earlier-filed applications, including an earliest non-provisional

application filed on February 18, 2016 and an earliest provisional application filed on February

18, 2015, and that the '079 patent is being asserted in C.A. No. 21-1138, and otherwise denies the

allegations of paragraph 19.

20.     Indeed, Jazz did not file the application that ultimately led to the issuance of the '079 patent until December 10, 2020—more than a year *after* Avadel's '986 patent publication was published.

**ANSWER:**  Jazz Pharmaceuticals admits that the '079 patent issued from an application

filed on December 10, 2020, which claimed priority to three earlier-filed applications, including

an earliest non-provisional application filed on February 18, 2016 and an earliest provisional

application filed on February 18, 2015.  Jazz Pharmaceuticals further admits that the '986 patent

lists that the underlying application was published on September 12, 2019, and otherwise denies

the allegations of paragraph 20.

21.     On information and belief, Jazz drafted the claims that gave rise to the '079 patent based not on any commensurate disclosure of its underlying application, but solely in view of the

disclosures set forth in Avadel's '986 patent publication.  The '079 patent specification only discloses embodiments of a formulation for purported once-daily dosing that utilize one or more ion-exchange resins and, indeed, criticizes strategies other than ion-exchange resins.  And yet, Jazz has asserted that one or more claims of the '079 patent would be infringed through the use of Avadel's FT218, which does not include any such ion-exchange resin.  Given Jazz's view of the claim scope of the '079 patent, the '079 patent claims as filed and issued are neither described nor supported by its specification as, on information and belief, the claims were instead solely based on Avadel's inventive work disclosed in at least Avadel's '986 patent publication.

**ANSWER:**  Jazz Pharmaceuticals admits on information and belief that the use of

Avadel's sodium oxybate product, code named FT218, and commercially marketed as

LUMRYZ™, infringes one or more claims of the '079 patent and refers to the text, claims, and

file history of the '079 patent for the contents thereof, and otherwise denies the allegations of

paragraph 21.

22. 

**ANSWER:**  Jazz Pharmaceuticals admits that the '986 patent lists that the underlying

application was published on September 12, 2019, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ and otherwise denies the allegations of paragraph 22.

23.    As yet another example of Jazz's pattern and practice of copying Avadel's work and passing it off as its own, at the time that the '062 patent publication was published on January 25, 2018, Jazz had not filed the patent application that gave rise to Jazz's asserted '782 patent.  Nor did Jazz file the application that ultimately led to the issuance of the '782 patent at the time Avadel's '866 patent publication was published on June 20, 2019.

**ANSWER:**  Jazz Pharmaceuticals admits that the '062 patent lists that the underlying

application was published on January 25, 2018.  Jazz Pharmaceuticals further admits that the '866

patent lists that the underlying application was published on June 20, 2019.  Jazz Pharmaceuticals

further admits that the '782 patent issued from an application filed on March 23, 2021, which

claimed priority to an earliest non-provisional application filed on February 18, 2016 and an

earliest provisional application filed on February 18, 2015, and otherwise denies the allegations

on paragraph 23.

24.     Indeed, Jazz did not file the application that ultimately led to the issuance of the
'782 patent until March 23, 2021—almost two years *after* Avadel's '866 patent publication was
published.

**ANSWER:**  Jazz Pharmaceuticals admits that the '866 patent lists that the underlying

application was published on June 20, 2019.  Jazz Pharmaceuticals further admits that the '782

patent issued from an application filed on March 23, 2021, which claimed priority to an earliest

non-provisional application filed on February 18, 2016 and an earliest provisional application filed

on February 18, 2015, and otherwise denies the allegations of paragraph 24.

25.     On information and belief, Jazz drafted the claims that gave rise to the '782 patent
based not on any commensurate disclosure of its underlying application, but solely in view of the
disclosures set forth in Avadel's '866 patent publication.  The '782 patent specification only
discloses embodiments of a formulation for purported once-daily dosing that utilize one or more
ion-exchange resins and, indeed, criticizes strategies other than ion-exchange resins.  And yet, Jazz
has asserted that one or more claims of the '782 patent would be infringed by Avadel's FT218,
which does not include any such ion-exchange resin.  Given Jazz's view of the claim scope of the
'782 patent, the '782 patent claims as filed and issued are neither described nor supported by its
specification as, on information and belief, the claims were instead solely based on Avadel's
inventive work disclosed in at least Avadel's '866 patent publication.

**ANSWER:**  Jazz Pharmaceuticals admits on information and belief that the use of

Avadel's sodium oxybate product, code named FT218, and commercially marketed as

LUMRYZ™, infringes one or more claims of the '782 patent and refers to the text, claims, and

file history of the '782 patent for the contents thereof, and otherwise denies the allegations of

paragraph 25.

26.

**ANSWER:** Jazz Pharmaceuticals admits that the '986 patent lists that the underlying application was published on September 12, 2019, ████████████████████████████ ████████████ and otherwise denies the allegations of paragraph 26.

27.    Thus, on information and belief, after the publication of Avadel's '062 patent publication on January 25, 2018, Jazz began a pattern and practice of drafting claims that were directed to the inventions disclosed in Avadel's published applications rather than the formulations that Jazz had been working on and had been disclosed in its applications.

**ANSWER:** Jazz Pharmaceuticals admits that the '062 patent lists that the underlying application was published on January 25, 2018 and otherwise denies the allegations of paragraph 27.

28.    Additional circumstances confirm that Jazz's asserted patents are but a brazen effort to pass off Avadel's work as its own. Pharmaceutical companies seek intellectual property protection for their own products. Jazz's own public statements echo that precept, explaining that it seeks intellectual property to "protect *our products* and product candidates and related inventions and improvements that we consider important to our business." *See* Jazz Form 10-K for the fiscal year ended December 31, 2020 (Feb. 23, 2021) at 17 (emphasis added). Jazz further represented that "[o]ur owned and licensed patents and patent applications cover or relate to *our products and product candidates*, including certain formulations." *Id.* (emphasis added). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Jazz's about-face makes no sense in terms of protecting any Jazz potential product—that about-face is only explained by Jazz's improper effort to pass off Avadel's innovative work as its own.

**ANSWER:** Jazz Pharmaceuticals refers to its Form 10-K for the fiscal year ended December 31, 2020 for the contents contained therein and otherwise denies the allegations of paragraph 28.

29.    In the case of Jazz's asserted '782 patent and other patents that Jazz has prosecuted since January 25, 2018, Jazz is not seeking patents on its own products; rather, it is seeking unsupported patent claims based on the work performed by its competitor, Avadel, including the work leading up to Avadel's revolutionary FT218.

**ANSWER:** Jazz Pharmaceuticals denies the allegations of paragraph 29.

30.    Jazz has therefore demonstrated a consistent pattern of deliberately patenting work performed and disclosed by Avadel in its patent publications.

**ANSWER:** Jazz Pharmaceuticals denies the allegations of paragraph 30.

### Count I: Declaratory Judgment of Alleged Non-Infringement of the '782 Patent

31.     Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

**ANSWER**:  Jazz Pharmaceuticals incorporates its responses to the preceding paragraphs.

32.     An actual controversy exists between Avadel and Jazz over the alleged infringement of at least one claim of the '782 patent.  Jazz holds itself out as the owner of the '782 patent.  Jazz has alleged that the making, using, offering to sell, selling, and/or importation of FT218 in the United States infringes at least claim 1 of the '782 patent in violation of 35 U.S.C. §§ 271(a), 271(b), and/or 271(c).

**ANSWER**:  Paragraph 32 states legal conclusions for which no answer is required.  To the extent that an answer is required, Jazz Pharmaceuticals admits that a justiciable controversy exists between Avadel and Jazz Pharmaceuticals regarding the '782 patent, that Jazz Pharmaceuticals owns the '782 patent, that the making, using, offering to sell, selling, and/or importation of Avadel's sodium oxybate drug product infringes at least claim 1 of the '782 patent under 35 U.S.C. §§ 271(a), 271(b), and/or 271(c), and, except as so admitted, denies the allegations of paragraph 32.

33.     The making, using, offering to sell, selling, and/or importation of FT218 in the United States would not infringe any valid claim of the '782 patent in violation of 35 U.S.C. §§ 271(a), 271(b), and/or 271(c), either literally or under the doctrine of equivalents.  Avadel hereby seeks a declaration that the making, using, offering to sell, selling, and/or importation of FT218 in the United States does not infringe and/or will not infringe any valid claim of the '782 patent.

**ANSWER:**  Jazz Pharmaceuticals admits that Avadel purports to seek a declaration that the claims of the '782 patent are not infringed, denies that Avadel is entitled to the relief that it seeks, and, except as so admitted, denies the allegations of paragraph 33.

34.     Avadel has not infringed, is not infringing, and will not infringe any valid claim of the '782 patent, directly, indirectly, by inducement, contributorily, literally, under the doctrine of equivalents, or in any other manner.  A judicial declaration is necessary and appropriate so that Avadel may ascertain its rights regarding the '782 patent.

**ANSWER:**  Jazz Pharmaceuticals denies the allegations of paragraph 34.

## Count II: Declaratory Judgment of Alleged Invalidity of the '782 Patent

35.     Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

**ANSWER:**  Jazz Pharmaceuticals incorporates its responses to the preceding paragraphs.

36.     An actual controversy exists between Avadel and Jazz over the invalidity of the '782 patent. Jazz has alleged that the making, using, offering to sell, selling, and/or importation of FT218 in the United States infringes at least claim 1 of the '782 patent in violation of 35 U.S.C. §§ 271(a), 271(b), and/or 271(c).

**ANSWER:**  Paragraph 36 states legal conclusions for which no answer is required.  To the extent that an answer is required, Jazz Pharmaceuticals admits that a justiciable controversy exists between Avadel and Jazz Pharmaceuticals regarding the '782 patent, that the making, using, offering to sell, selling, and/or importation of Avadel's sodium oxybate drug product infringes at least claim 1 of the '782 patent under 35 U.S.C. §§ 271(a), 271(b), and/or 271(c), and, except as so admitted, denies the allegations of paragraph 36.

37.     All claims of the '782 patent are invalid because they fail to comply with one or more requirements of the United States Code Title 35, including, without limitation, one or more requirements of 35 U.S.C. §§ 102, 103, 112, 115, and/or 116.  Avadel expressly reserves all rights to identify and assert additional invalidity positions in this case.

**ANSWER:**  Jazz Pharmaceuticals denies the allegations of paragraph 37.

38.     Avadel hereby seeks a declaration that the claims of the '782 patent are invalid.

**ANSWER:**  Jazz Pharmaceuticals admits that Avadel purports to seek a declaration that the claims of the '782 patent are invalid, denies that Avadel is entitled to the relief that it seeks and, except as so admitted, denies the allegations of paragraph 38.

## Count III: Alleged Inequitable Conduct

39.     Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

**ANSWER:**  Jazz Pharmaceuticals incorporates its responses to the preceding paragraphs.

**Avadel's Background**

40.     Avadel, not Jazz, invented a once-nightly formulation of sodium oxybate.  Jazz is not the true inventor of the subject claims.  It derived the alleged invention from Avadel, and it concealed that fact from the PTO and patent Examiner in order to obtain the '782 patent.  Jazz's deliberate effort to patent the work performed and disclosed by Avadel is not unique to the '782 patent.  As described above, this is consistent with Jazz's pattern and practice with respect to the Sustained Release Patents and the '079 patent.

**ANSWER:**  Jazz Pharmaceuticals denies the allegations of paragraph 40.

41.     During prosecution of the '782 patent, Jazz owed a duty of candor requiring it to disclose to the Examiner all information material to patentability.  This duty included, but was not limited to, a specific duty to tell the Examiner if Jazz copied claims from another patent or application.  Jazz copied various claims in the '782 patent from one of Avadel's prior patent applications.  But Jazz did not disclose its copying to the Examiner, with the specific intent of both hiding the fact that the named Jazz inventors did not invent the subject matter claimed in the '782 patent, and misleading the PTO into issuing the '782 patent.  Had the Examiner known the truth, the PTO would not have issued the '782 patent to Jazz for various reasons, including lack of written description and for lack of novelty under § 102 in light of Avadel's earlier-filed application.  And because it is impossible to conceive of a reason to hide Jazz's copying from the Examiner other than as part of an effort to mislead the Examiner, the natural and most reasonable inference is that Jazz did so with an intent to deceive the PTO.  Jazz's concealment breached its duty of candor to the PTO and renders the '782 patent unenforceable.

**ANSWER:**  Paragraph 41 states legal conclusions for which no answer is required.  To the extent that an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 41.

42.     Avadel has been awarded multiple patents in connection with its revolutionary new once-nightly formulation of sodium oxybate.

**ANSWER:**  Jazz Pharmaceuticals admits on information and belief that certain of Avadel's patents, including U.S. Patent No. 10,272,062 (the "'062 patent"), cover Avadel's sodium oxybate product, code named FT218, commercially marketed as LUMRYZ™, and, except as so admitted, denies the allegations of paragraph 42.

43.     As discussed above, the application which eventually issued as Avadel's '866 patent was filed on February 21, 2019.

**ANSWER:**  Jazz Pharmaceuticals admits that Avadel's '866 patent lists February 21, 2019 as the filing date of the underlying application, U.S. Patent Application 16/281,235.  Jazz

Pharmaceuticals lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of paragraph 43 and, therefore, denies those allegations.

44.     Unlike the specification of Jazz's '782 patent, the specification of Avadel's '866 patent publication contains detailed information regarding modified release formulations of oxybate and methods of using those formulations therapeutically.  For example, whereas Jazz's '782 patent has no figures, no dissolution testing, and no examples in which humans or any other animal were treated, the specification of Avadel's '866 patent contains 90 figures, detailed dissolution testing, and detailed data from *in vivo* studies.

**ANSWER:**  Jazz Pharmaceuticals refers to the text, claims, and file histories of the '782

patent and the application underlying the '866 patent for the contents thereof, and otherwise denies

the allegations of paragraph 44.

45.     As of the February 21, 2019 filing date of the Avadel '866 patent, Jazz had not filed the application leading to the '782 patent—application number 17/210,064 (the "'064 application").  Nor had it filed the parent application to the '782 patent:  application number 17/118,041, filed December 10, 2020, which issued as the '079 patent.  Nor had it filed the grandparent application to the '782 patent: application number 16/448,598 (the "'598 application"), filed June 21, 2019, which was eventually abandoned.  It had filed a great-grandparent application, application number 15/047,586, filed February 18, 2016, that would eventually issue as U.S. Patent No. 10,398,662 (the "'662 patent").  That great-grandparent application, in turn, derived from a provisional application, 62/117,889 (the "'889 provisional application"), which was filed on February 18, 2015.

**ANSWER:**  Jazz Pharmaceuticals admits that the '866 patent lists a filing date of February

21, 2019.  Jazz Pharmaceuticals further admits that U.S. Patent Application 17/118,041 that issued

as the '079 patent was filed on December 20, 2020 and that U.S. Patent Application 16/448,598

was filed June 21, 2019 and is now abandoned.  Jazz Pharmaceuticals further admits that U.S.

Patent Application 15/047,586 that issued as U.S. Patent No. 10,398,662 (the "'662 patent") was

filed on February 18, 2016 and relates back to provisional application number 62/117,889 filed on

February 18, 2015, and otherwise denies the allegations of paragraph 45.

46.     The claims of the Avadel '866 patent first became publicly available when the '866 patent was published by the PTO on June 20, 2019.  Some of the claims were slightly modified during prosecution, and the final version of the claims that are found in the '866 patent became publicly available when an Avadel Response to Final Office Action filed April 17, 2020 was published on August 11, 2020.

**ANSWER:** Jazz Pharmaceuticals admits that the '866 patent lists June 20, 2019 as the publication date of the underlying '235 application. Jazz Pharmaceuticals lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 46 and, therefore, denies those allegations.

47. Approximately seven months later, on March 23, 2021, Jazz filed the '064 application, which eventually resulted in the '782 patent. Along with Jazz's filing of the '064 application, Jazz filed a Nonpublication Request. Both the '064 application and the Nonpublication Request were signed by Jazz's outside counsel Jason C. Valentine ("Mr. Valentine").

**ANSWER:** Jazz Pharmaceuticals admits that the '064 application was filed on March 23, 2021 and issued as the '782 patent on October 19, 2021, refers to the text, claims, and file history of the '782 patent for the contents thereof, and, except as so admitted, otherwise denies the allegations of paragraph 47.

48. By its Nonpublication Request, Jazz sought to ensure that the '064 application would not be made public, as would ordinarily take place after the expiration of a certain period of time following the filing of the application. As of the March 23, 2021 filing date of the '064 application and the Nonpublication Request, the specification of the '064 application had already been made public at least through the issuance of the '662 patent on September 3, 2019, over a year and a half earlier. While three new paragraphs were added to the specification of the '064 application, Jazz represented to the Examiner that the paragraphs being inserted were "material previously incorporated by reference" and so were also previously publicly available.

**ANSWER:** Jazz Pharmaceuticals admits that the specification of the '064 application had already been made public at least through the issuance of the '662 patent, that the '662 patent issued on September 3, 2019, that an April 15, 2021 preliminary amendment to the '064 application added three paragraphs to the specification of the '064 application that were previously incorporated by reference, and otherwise denies the allegations of paragraph 48.

49. Accordingly, the only reasonable inference that can be drawn from the filing of the Nonpublication Request with respect to the '064 application is that Jazz was seeking to prevent others from learning what claims Jazz was pursuing in the '064 application. Based on Jazz's representation that the three new paragraphs were previously publicly available, those claims were literally the only thing in the "nonpublished" patent application that were not already in the public domain.

**ANSWER:** Paragraph 49 states a legal conclusion for which no answer is required.  To the extent an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 49.

50.    On information and belief, Jazz sought to prevent Avadel in particular from learning that the claims that Jazz was pursuing were largely copied from Avadel's '866 patent.  At least claims 1-4 of the '064 application can be found either in the claims or the specification of Avadel's '866 patent, which was already published and issued when Jazz filed the '064 application.

| Jazz '782 Claims (as first filed in '064 app) | Avadel '866 Patent |
|---|---|
| 1.  1. A formulation of gamma-hydroxybutyrate comprising:<br>an immediate release portion comprising gamma-hydroxybutyrate;<br>A modified release portion comprising gammahydroxybutyrate;<br>a viscosity enhancing agent; and<br>an acid;<br>Wherein the viscosity enhancing agent and the acid are separate from the immediate release portion and the modified release portion. | 1.  A formulation of gamma-hydroxybutyrate comprising:<br>an immediate release portion comprising gamma-hydroxybutyrate;<br>A modified release portion comprising gamma-hydroxybutyrate;<br>A suspending or viscosifying agent selected from…;<br>An acidifying agent selected from…;<br>Wherein the suspending or viscosifying agent and the acidifying agent are separate and distinct from the immediate release portion and the modified release portion; and<br>Wherein the ratio of gamma-hydroxybutyrate in the immediate release portion and the modified release portion is from 10/90 to 65/35. |
| 2.  The formulation of claim 1, wherein the viscosity enhancing agent is selected from the group consisting of xanthan gum, microcrystalline cellulose, hydroxyethyl cellulose, hydroxypropymethyl cellulose carboxymethylcellulose sodium, hydroxypropyl cellulose and mixtures thereof. | *See Claim 1:* a suspending or viscosifying agent selected from the group consisting of xanthan gum, carrageenan gum, gellan gum, guar gum, sodium alginate, calcium alginate, agar, sodium carboxymethyl cellulose, microcrystalline cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, and mixtures thereof… |
| 3.  The formulation of claim 1, wherein the acid is selected from the group consisting of malic acid, citric acid, tartaric acid, boric acid, maleic acid, phosphoric acid, and benzoic acid. | *See Claim 1:* an acidifying agent selected from the group consisting of malic acid, citric acid, tartaric acid, adipic acid, boric acid, maleic acid, phosphoric acid, ascorbic acid, oleic acid, capric acid, caprlic acid, and benzoic acid… |

| Jazz '782 Claims (as first filed in '064 app) | Avadel '866 Patent |
|---|---|
| 4.  The formulation of claim 1, wherein the formulation further comprises a lubricant selected from the group consisting of magnesium stearate, stearic acid, calcium stearate, hydrogenated castor oil, hydrogenated vegetable oil, light mineral oil, mineral oil, polyethylene glycol, sodium benzoate, sodium stearyl fumarate, and zinc stearate. | 4.  The formulation of claim 1, wherein the formulation further comprises a lubricant or glidant selected from the group consisting of magnesium stearate, calcium stearate, zinc stearate, glyceryl monostearate, glyceryl palmitostearate, glycerol behenate, sodium stearyl fumarate, talc, or colloidal silicon dioxide. |

**ANSWER:**  Jazz Pharmaceuticals refers to the text, claims, and file histories of the '064 application and the '866 patent for the contents thereof, and otherwise denies the allegations of paragraph 50.

51.     As is clear from the side-by-side comparison, claims of Jazz's '782 patent are strikingly similar to publicly available claims of Avadel's '866 patent. The similarity is far too close to be accidental. The only reasonable explanation is that Jazz copied Avadel's claims.

**ANSWER:**  Jazz Pharmaceuticals refers to the text, claims, and file history of the '782 patent for the contents thereof, and otherwise denies the allegations of paragraph 51.

52.     The breadth and depth of such copying cannot be the result of happenstance.  On information and belief, Jazz, through its outside and in-house counsel responsible for prosecuting the '064 application, including Mr. Valentine and Phillip McGarrigle ("Mr. McGarrigle"), intentionally copied the Avadel claims.

**ANSWER:**  Jazz Pharmaceuticals refers to the text, claims, and file history of the '782 patent for the contents thereof, and otherwise denies the allegations of paragraph 52.

53.     Jazz and its outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, never disclosed to the Examiner that they had copied claims in Jazz's '064 application from Avadel's '866 patent.

**ANSWER:**  Jazz Pharmaceuticals refers to the text, claims, and file history of the '064 application for the contents thereof, and otherwise denies the allegations of paragraph 53.

54.     Prior to Avadel's publication of its '866 patent, Jazz was pursuing claims explicitly directed to ion exchange resins.  Indeed, Jazz filed the grandparent application to the '782 patent, Jazz's '598 application, on June 21, 2019—a day after Avadel's '866 patent publication became public on June 20, 2019.  Jazz eventually abandoned the '598 application, however, and instead filed (1) the parent application to the '782 patent, which copied Avadel's '986 patent publication and issued as the '079 patent, and (2) the '064 application, which copied Avadel's '866 patent and

issued as the '782 patent.  Reproduced below are the first four claims of Jazz's abandoned '598 application as filed—directed to ion exchange resins—compared with the first four claims in Jazz's '064 application as filed, copying Avadel's '866 patent.

| Jazz '598 Application Claims (as first filed) | Jazz '782 Claims (as first filed version in '064 app) |
|---|---|
| 1.  A pharmaceutical composition comprising a plurality of particles, each comprising oxybate ionically bound to an ion exchange matrix, wherein said composition provides therapeutically effective levels of oxybate for about 2-9 hours after administration of a single dose to a patient in need thereof. | 1.  A formulation of gamma-hydroxybutyrate comprising:<br>an immediate release portion comprising gamma-hydroxybutyrate;<br>A modified release portion comprising gammahydroxybutyrate;<br>a viscosity enhancing agent; and<br>an acid;<br>Wherein the viscosity enhancing agent and the acid are separate from the immediate release portion and the modified release portion. |
| 2.  The composition of claim 1, wherein the resin is an anion-exchange resin. | 2. The formulation of claim 1, wherein the viscosity enhancing agent is selected from the group consisting of xanthan gum, microcrystalline cellulose, hydroxyethyl cellulose, hydroxypropymethyl cellulose, carboxymethylcellulose sodium, hydroxypropyl cellulose and mixtures thereof. |
| 3. The composition of claim 1, wherein oxybate is bound to at least about 65% of the ion exchange sites of the ion exchange matrix. | 3.  The formulation of claim 1, wherein the acid is selected from the group consisting of malic acid, citric acid, tartaric acid, boric acid, maleic acid, phosphoric acid, and benzoic acid. |
| 4.  The composition of claim 2, wherein oxybate is bound to at least about 65% of the ion exchange sites of the ion exchange matrix. | 4. The formulation of claim 1, wherein the formulation further comprises a lubricant selected from the group consisting of magnesium stearate, stearic acid, calcium stearate, hydrogenated castor oil, hydrogenated vegetable oil, light mineral oil, mineral oil, polyethylene glycol, sodium benzoate, sodium stearyl fumarate, and zinc stearate. |

**ANSWER:**  Jazz Pharmaceuticals refers to the text, claims, and file histories of the '598 application, the '064 application, and the '782 patent for the contents thereof, and otherwise denies the allegations of paragraph 54.

55.     During prosecution of the Jazz '064 application that eventually issued as the '782 patent, Jazz filed an Information Disclosure Statement ("IDS") signed by Mr. Valentine on March

30, 2021, that listed 332 references but did not include Avadel's '866 patent, which had published a year and a half earlier on June 20, 2019 and had issued on August 11, 2020.

**ANSWER:**  Jazz Pharmaceuticals refers to the text, claims, and file history of the '064 application for the contents thereof, and otherwise denies the allegations of paragraph 55.

56.     On April 27, 2021, Jazz submitted another IDS signed by Mr. Valentine that listed 23 references, including Avadel's '866 patent. Jazz and Mr. Valentine did not disclose to the Examiner that Avadel's '866 patent was the source of claims in Jazz's '064 application. Nor did they offer any explanation for why they had not disclosed Avadel's '866 patent in Jazz's initial IDS. This suppression of evidence by Jazz and its counsel responsible for prosecution is an affirmative act of egregious misconduct.

**ANSWER:** Paragraph 56 states legal conclusions for which no answer is required.  To the extent an answer is required, Jazz Pharmaceuticals admits that the applicants for the '064 application disclosed Avadel's '866 patent to the PTO in an Information Disclosure Statement filed on April 27, 2021, refers to the text, claims, and file history of the '064 application for the contents thereof, and, except as so admitted, otherwise denies the allegations of paragraph 56.

57.     On June 18, 2021, the Examiner issued a non-final office action.  The Examiner rejected Jazz's pending claims 1-23 as obvious over U.S. Publication No. 2012/0076865 ("Allphin") and claim 24 as obvious over Allphin and Luhn (non-patent literature, Pharmaceutical Technology Europe, Volume 23, Issue 1, published January 7, 2011).

**ANSWER:**  Jazz Pharmaceuticals refers to the text, claims, and file history of the '064 application for the contents thereof, and otherwise denies the allegations of paragraph 57.

58.     On July 8, 2021, the Examiner conducted an interview with Mr. Valentine, named inventor Clark Allphin ("Mr. Allphin"), and Mr. McGarrigle, in-house counsel for Jazz.  During the interview Jazz argued that the prior art failed to teach "wherein the viscosity enhancing agent and the acid are separate from the immediate release portion and the modified release portion" of claim 1.  Notably, this exact language is found in claim 1 of the '866 patent.  Because they had copied the same from the Avadel '866 patent, Jazz's representatives were aware that such subject matter was, in fact, in the prior art—art that they concealed from the Examiner.  On information and belief, none of Jazz's named inventors, Mr. Allphin or Scott Bura ("Mr. Bura"), or outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, informed the Examiner during the interview of (1) the existence of the '866 patent, (2) that Jazz had copied the claims of the Jazz '064 application from Avadel's '866 patent; and (3) that the prior art did in fact teach a formulation "wherein the viscosity enhancing agent and the acid are separate from the immediate release portion and the modified release portion."

**ANSWER:** Jazz Pharmaceuticals admits that an interview with the Examiner for the '064 application took place on July 8, 2021, refers to the text, claims, and file history of the '064 application for the contents thereof, and, except as so admitted, otherwise denies the allegations of paragraph 58.

59.     Jazz filed a response to the non-final office action on August 2, 2021, which was filed and signed by Mr. Valentine. Jazz amended claims 1 and 14 as shown below:

| Original Claims of the '064 Application | Amended Claims of the '064 Application |
|---|---|
| 1.  A formulation of gamma-hydroxybutyrate comprising:<br>    an immediate release portion comprising gamma-hydroxybutyrate;<br>    a modified release portion comprising gamma-hydroxybutyrate;<br>    a viscosity enhancing agent; and an acid;<br>    wherein the viscosity enhancing agent and the acid are separate from the immediate release portion and the modified release portion. | 1.  A formulation of gamma-hydroxybutyrate comprising:<br>[[an]] a plurality of immediate release ~~portion~~ particles comprising gamma-hydroxybutyrate; a plurality of modified release portion particles comprising gamma-hydroxybutyrate;<br>    a viscosity enhancing agent; and an acid; wherein the viscosity enhancing agent and the acid are separate from the immediate release ~~portion~~ particles and the modified release ~~portion~~ particle. |
| 14.  A unit does comprising a formulation of gamma-hydroxybutyrate, wherein the formulation comprises:<br>    an immediate release portion comprising gamma-hydroxybutyrate;<br>    a modified release portion comprising gamma-hydroxybutyrate;<br>    a viscosity enhancing agent; and an acid;<br>    wherein the viscosity enhancing agent and the acid are separate from the immediate release portion and the modified release portion. | 14.  A unit does comprising a formulation of gamma-hydroxybutyrate, wherein the formulation comprises:<br>[[an]] a plurality of immediate release ~~portion~~ particles comprising gamma-hydroxybutyrate; a plurality of modified release ~~portion~~ particles comprising gamma-hydroxybutyrate; a viscosity enhancing agent; and an acid; wherein the viscosity enhancing agent and the acid are separate from the immediate release ~~portion~~ particles and the modified release ~~portion~~ particles. |

**ANSWER:** Jazz Pharmaceuticals admits that the applicants for the '064 application filed a response to the non-final office action on August 2, 2021 and refers to the text, claims, and file history of the '064 application for the contents thereof, and, except as so admitted, otherwise denies the allegations of paragraph 59.

60.     In its August 2, 2021 Response to Non-Final Office Action, Jazz attempted to overcome the obviousness rejection by arguing that the claims as amended are not obvious in view of the prior art.  In particular, Jazz stated that "the Examiner has not provided a legally sufficient motivation why a POSA would go against the express teachings of *Allphin* and prepare a formulation where a viscosity enhancing agent and an acid are separate from the GHB-containing particles."  8/2/2021 Response to OA at 8.  The Response to Non-Final Office Action signed by Mr. Valentine did not disclose the claim copying or that Avadel's '866 patent was the source of at least the first four claims of Jazz's '064 application.  Instead, the named inventors, Mssrs. Allphin and Bura, and the outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, continued to intentionally withhold this information from the Examiner, thus engaging in affirmative egregious misconduct.  Nor did the named inventors and the outside and in-house counsel responsible for prosecuting the '064 application disclose in this sworn statement that there was art—Avadel's '866 patent—that taught "a formulation where a viscosity enhancing agent and an acid are separate from the GHB-containing particles."

**ANSWER:**  Paragraph 60 states legal conclusions for which no answer is required.  To the extent an answer is required, Jazz Pharmaceuticals admits that the applicants for the '064 application filed a response to the non-final office action on August 2, 2021 and refers to the text, claims, and file history of the '064 application for the contents thereof, and, except as so admitted, otherwise denies the allegations of paragraph 60.

61.     On September 9, 2021 the pending claims of the '064 application were allowed.  In the Reasons for Allowance, the Examiner stated that "Allphin does not teaches [sic] or suggest the viscosity enhancing agent and the acid are separate from the immediate release particles and the modified release particles.  Thus, Allphin does not anticipate nor render obvious the formulation as claimed."  9/9/2021 Notice of Allowance at 2-3.  Again, the named inventors, and the outside and in-house counsel responsible for prosecuting the '064 application failed to disclose that Avadel's '866 patent taught a formulation wherein "the viscosity enhancing agent and the acid are separate from the immediate release particles and the modified release particles," or that the pending claims were copied from Avadel's '866 patent.

**ANSWER:**  Jazz Pharmaceuticals admits that the pending claims for the '064 application were allowed on September 9, 2021 and refers to the text, claims, and file history of the '064 application for the contents thereof, and, except as so admitted, otherwise denies the allegations of paragraph 61.

62.     Jazz's named inventors, Mssrs. Allphin and Bura, and outside counsel, including Mr. Valentine, and in-house counsel, including Mr. McGarrigle, participated throughout the prosecution of the Jazz '064 application that issued as the '782 patent.

**ANSWER:**  Jazz Pharmaceuticals refers to the text, claims, and file history of the '064 application for the contents thereof, and otherwise denies the allegations of paragraph 62.

63.     On information and belief, Jazz's named inventors and outside and in-house counsel responsible for prosecution the '064 application were aware of Avadel's '866 patent and its claims before Jazz's '064 application was filed.

**ANSWER:**  Jazz Pharmaceuticals refers to the text, claims, and file history of the '064 application for the contents thereof, and otherwise denies the allegations of paragraph 63.

64.     Jazz's named inventors, Mssrs. Allphin and Bura, as well as its outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, had a duty to disclose the source of Jazz's '064 application claims and the claim copying to the Examiner under Manual of Patent Examining Procedure 2001.06(d) [R-08.2017] and 37 CFR 11.804 and 78 FR 20179 at 20188.  That duty was independent of a general duty to disclose prior art.  Applicants and their counsel have a separate, independent duty to call the PTO's attention to the fact that they have copied their patent claims from another source.  On information and belief, Jazz's named inventors, Mssrs. Allphin and Bura, as well as Jazz's outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, intentionally withheld this information from the Examiner and failed to comply with their duty of disclosure, with a specific intent to deceive the PTO.

**ANSWER:**  Paragraph 64 states a legal conclusion for which no answer is required.  To the extent an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 64.

65.     A patent applicant has a duty to disclose the true and correct inventors of the claimed invention.  Jazz's named inventors, Mssrs. Allphin and Bura, as well as its outside and inhouse counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, deliberately misled the PTO as to the true and correct inventors, and therefore engaged in affirmative acts of egregious misconduct.  The named inventors of Jazz's '782 patent did not come up with the invention in their claims, but derived this invention from Avadel's already published '866 patent.  On information and belief, Jazz's outside and in-house counsel responsible for prosecuting the '064 application copied, with only slight modifications, at least claims 1-4 of the '782 patent from Avadel's published '866 patent.  Jazz's outside and in-house counsel responsible for prosecuting the '064 application did not tell the patent examiner for the '064 application that they had copied Jazz's '064 application claims from Avadel's published '866 patent, and instead withheld this fact from the examiner.  Nor did the named inventors come up with the underlying once-nightly formulation that is the basis of those claims.  Rather, they copied the invention from the true inventors—Claire Megret, Herve Guillard, and Jean-Francois Dubuisson, who filed Avadel's '866 patent.  Instead, the named inventors, Mssrs. Allphin and Bura, and Jazz's outside and in-house counsel responsible for prosecuting the '064 application, including at least Mssrs. Valentine and McGarrigle, wrongly submitted inaccurate inventor's oaths claiming that the named inventors were the "original inventors or an original joint inventor of a claimed invention in the application" of the subject matter at issue.  *See, e.g.*, MPEP 2157 ("Where

- 23 -

an application names an incorrect inventorship, the applicant should submit a request to correct inventorship under 37 CFR 1.48"). The named inventors, Mssrs. Allphin and Bura, and Jazz's outside and in-house counsel responsible for prosecuting the '064 application, including at least Mssrs. Valentine and McGarrigle, knew of the falsity of the representation, and made such false representation with a specific intent to deceive the PTO.

**ANSWER:** Paragraph 65 states legal conclusions for which no answer is required. To the

extent that an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 65.

### Avadel's Allegation that It is Entitled to A Declaratory Judgment of Unenforceability of the '782 Patent Due to Jazz's Inequitable Conduct

66. As is clear from the similarity of at least the first four published claims in Avadel's '866 patent and at least the first four claims in Jazz's later filed '064 application, at the time of the filing of the '064 application, the named inventors, Mssrs. Allphin and Bura, and/or Jazz's outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, knew of the patent claims from Avadel's '866 patent that were made publicly available in June 2019.

**ANSWER:** Jazz Pharmaceuticals refers to the text, claims, and file history of the '064

application for the contents thereof, and otherwise denies the allegations of paragraph 66.

67. Jazz's outside and in-house counsel responsible for prosecuting the '064 application copied at least the first four claims of Avadel's '866 patent as the basis for at least the first four claims of Jazz's '064 application that issued as the '782 patent. Jazz's named inventors knew that at least the first four claims of Avadel's '866 patent served as the basis for the first four claims of Jazz's '064 application that issued as the '782 patent.

**ANSWER:** Jazz Pharmaceuticals denies the allegations of paragraph 67.

68. Jazz's named inventors and outside and in-house counsel responsible for prosecuting the '064 application sought to hide this copying from the Examiner, Avadel, and the public for as long as possible.

**ANSWER:** Jazz Pharmaceuticals denies the allegations of paragraph 68.

69. Jazz's outside and in-house counsel responsible for prosecuting the '064 application attempted to hide the claim copying from the Examiner by filing the March 30, 2021 IDS with 332 references but intentionally omitting from the IDS Avadel's '866 patent that was the source of claims in Jazz's '064 application, even though they knew of Avadel's '866 patent before filing the March 30, 2021 IDS.

**ANSWER:** Jazz Pharmaceuticals denies the allegations of paragraph 69.

70.     Jazz's outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, further sought to hide the claim copying from Avadel and the public by filing a Nonpublication Request.  Jazz's outside and in-house counsel responsible for prosecuting the '064 application knew that if the claims in Jazz's '064 application were public, Jazz's copying of Avadel's claims would be immediately apparent to Avadel, and Avadel would have been able to file a derivation proceeding challenging Jazz's effort to copy its invention.  By hiding the '064 application and the copied claims from public view, Jazz's outside and in-house counsel responsible for prosecuting the '064 application prevented Avadel from filing a derivation proceeding and kept the claim copying and issuance secret.

**ANSWER:**  Jazz Pharmaceuticals denies the allegations of paragraph 70.

71.     Jazz's named inventors, Mssrs. Allphin and Bura, and outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, failed to notify the PTO of the copied claims.  That, combined with Jazz's Nonpublication Request, was the but-for cause of the issuance of at least claims 1-4 of the '782 patent.  On information and belief, the Examiner would not have issued those claims had the Examiner been aware that the invention was copied from the earlier-filed Avadel '866 patent and that Claire Megret, Herve Guillard, and Jean-Francois Dubuisson were the true inventors.

**ANSWER:**  Paragraph 71 states legal conclusions for which no answer is required.  To the

extent that an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 71.

72.     Jazz's named inventors, Mssrs. Allphin and Bura, and outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, did not disclose this claim copying to the PTO.  Instead, they intentionally withheld this claim copying and the true source of claims of Jazz's '064 application from the Examiner who examined the '064 application.  On information and belief, Jazz's named inventors, Mssrs. Allphin and Bura, and outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, withheld this information from the Examiner with the intent to deceive the Examiner into thinking the named inventors of the '782 patent had come up with the original claims from Jazz's '064 application for which they were the purported inventors.  That is the single most reasonable inference because there is no other reason that would explain the fact that Jazz's outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, had copied that prior art directly into the '064 application.  Nor is there any reason Jazz's outside and in-house counsel responsible for prosecuting the '064 application would have filed a Nonpublication Request for a patent application whose text was already published except as part of an effort to conceal the fraud and deceive the Examiner.

**ANSWER:**  Paragraph 72 states legal conclusions for which no answer is required.  To the

extent that an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 72.

73.     That Avadel's '866 patent was the source of claims of Jazz's '064 application and that Jazz's outside and in-house counsel responsible for prosecuting the '064 application, copied claims from Avadel's '866 patent in writing the claims of Jazz's '064 application is but-for

material information to Jazz's '064 application.  Jazz's named inventors, Mssrs. Allphin and Bura, and outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, knew this information, which they withheld, with the specific intent to deceive the PTO.  The withholding of this information was but-for material to prosecution of the '782 patent.

ANSWER:  Paragraph 73 states legal conclusions for which no answer is required.  To the

extent that an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 73.

74.     Jazz's named inventors, Mssrs. Allphin and Bura, and outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, had a duty to disclose the source of the '064 application claims and the claim copying to the Examiner under Manual of Patent Examining Procedure 2001.06(d) [R- 08.2017] and 37 CFR 11.804 and 78 FR 20179 at 20188.  They intentionally withheld this information from the Examiner and failed to comply with his duty of disclosure.

ANSWER:  Paragraph 74 states legal conclusions for which no answer is required.  To the

extent that an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 74.

75.     But for Jazz's named inventors, Mssrs. Allphin and Bura, and outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, withholding the source of the '064 application claims and the claim copying from the Examiner, the Examiner would not have approved at least claims 1-4 of the '782 patent for issuance because those claims were not invented by the named inventors of the '782 patent.

ANSWER:  Paragraph 75 states legal conclusions for which no answer is required.  To the

extent that an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 75.

76.     The '782 patent is unenforceable and void because Jazz's named inventors, Mssrs. Allphin and Bura, and outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, violated the duty of candor and good faith in dealing with the PTO by intentionally and deceptively failing to disclose material information to the PTO during prosecution.

ANSWER:  Paragraph 76 states legal conclusions for which no answer is required.  To the

extent an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 76.

77.     Jazz's named inventors, Mssrs. Allphin and Bura, and outside and in-house counsel responsible for prosecuting the '064 application, including Mssrs. Valentine and McGarrigle, engaged in inequitable conduct during prosecution of the '782 patent by knowingly and intentionally withholding material information about the source of Jazz's patent claims from the PTO, with the specific intent of deceiving the PTO.  But for their knowing and intentional failure

to submit this material information to the PTO, at least claims 1-4 of the '782 patent would not have issued.

**ANSWER:** Paragraph 77 states legal conclusions for which no answer is required. To the

extent an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 77.

78.     In addition to the above, Jazz has conducted acts of inequitable conduct to obtain the '782 patent's parent application, U.S. 17/118,041, which eventually issued as 11,077,079 (the "'079 patent"). The acts of inequitable conduct to obtain the '079 patent were previously described in Avadel's Answer to Jazz's Amended Complaint in C.A. No. 21-1138-GBW. The acts of inequitable conduct to obtain the '079 patent taint all of the patent applications within this patent family, including under the doctrine of infectious unenforceability. Because the patent application that led to the '782 patent is derived from and related to the '079 patent, the '782 patent is unenforceable as a result of inequitable conduct.

**ANSWER:** Paragraph 78 states legal conclusions for which no answer is required. To the

extent an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 78.

### Count IV: Alleged Unclean Hands

79.     Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

**ANSWER:** Jazz Pharmaceuticals incorporates its responses to the preceding paragraphs.

### Avadel's Allegation that It is Entitled to A Declaratory Judgment of Unenforceability of the '782 Patent Due to Jazz's Unclean Hands

80.     As described above, the named Jazz inventors did not actually invent the subject matter of the claims identified herein, instead copying them from work by the true inventors affiliated with Avadel, falsely swore that they were the true and original inventors, and concealed their misconduct from the patent Examiner in order to obtain the '782 patent. Doing so was misconduct by Jazz that has an immediate and necessary relation to the equity Jazz seeks with respect to this litigation. Thus, Jazz is foreclosed from asserting the '782 patent as a result of its unclean hands.

**ANSWER:** Paragraph 80 states legal conclusions for which no answer is required. To the

extent an answer is required, Jazz Pharmaceuticals denies the allegations of paragraph 80.

81.     Avadel seeks a dismissal of the infringement action as to the '782 patent because the unconscionable act of one coming for relief has immediate and necessary relation to the equity that Plaintiffs seek. Jazz's deception before the PTO relates to that relief for all the reasons stated above, namely, that Jazz misled the PTO into issuing the '782 patent by specifically hiding the fact that the Jazz named inventors did not actually invent the subject matter claimed in the subject

claims of the '782 patent.  Indeed, Jazz deceived the PTO as to the true inventor of the claims of the '782 patent and concealed its copying of claims from Avadel's '866 patent.  But for Jazz's deceptive conduct, the '782 patent would not have issued.

**ANSWER:**  Jazz Pharmaceuticals admits that Avadel purports to seek dismissal of the

infringement action as to the '782 patent, denies that Avadel is entitled to the relief that it seeks,

and, except as so admitted, denies the allegations of paragraph 81.

82.     In addition to the above, Jazz has conducted unconscionable acts to obtain the '782 patent's parent application, U.S. App. 17/118,041, which eventually issued as the '079 patent.  The unconscionable acts to obtain the '782 patent were previously described in Avadel's Answer to Jazz's Amended Complaint in C.A. No. 21-1138-GBW.  The unconscionable acts to obtain the '079 patent taint all of the patent applications within this patent family, including under the doctrine of infectious unenforceability.  Because the patent application that led to the '782 patent is derived from and related to the '079 patent, the '782 patent is unenforceable as a result of unclean hands.

**ANSWER:**  Jazz Pharmaceuticals denies the allegations of paragraph 82.

### Count V: Alleged Unjust Enrichment

83.     Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

**ANSWER:**  Jazz Pharmaceuticals incorporates its responses to the preceding paragraphs.

84.     On information and belief, Jazz wrongfully passed off as its own Avadel's inventive work to unlawfully compete with Avadel, and has acted in bad faith in connection with this lawsuit (and the others against Avadel involving FT218), as alleged above in paragraphs 7 to 82 of the Counterclaims.

**ANSWER:**  Jazz Pharmaceuticals denies the allegations of paragraph 84.

85.     On information and belief, Jazz passed off as its own Avadel's inventive work for its own financial benefit, including but not limited to asserting patent claims it copied from Avadel against Avadel.

**ANSWER:**  Jazz Pharmaceuticals denies the allegations in paragraph 85.

86.     Avadel was not reimbursed for the value of the inventive work wrongly copied by Jazz.  Jazz was unjustly enriched by passing off claims it derived from Avadel's work, and using it to assert its patent claims against Avadel and attempt to hinder Avadel's efforts to commercialize FT218.

**ANSWER:**  Jazz Pharmaceuticals denies the allegations of paragraph 86.

- 28 -

87.     Avadel has no adequate remedy at law for the injuries suffered.  Avadel is entitled to equitable relief against Jazz as alleged herein.

**ANSWER:**  Jazz Pharmaceuticals denies the allegations of paragraph 87.

## AVADEL'S PRAYER FOR RELIEF

Jazz Pharmaceuticals denies that Avadel is entitled to any relief on its Counterclaims, either as prayed for in its pleading or otherwise.

## AVADEL'S DEMAND FOR JURY TRIAL

Jazz Pharmaceuticals admits that it is appropriate for there to be a jury trial on all issues so triable.

## JAZZ PHARMACEUTICALS' AFFIRMATIVE DEFENSES

1.     Without prejudice to the denials set forth in this Answer and to the ability to amend this Answer to seek and allege any and all defenses not presently known or that are revealed during the course of discovery or otherwise, Jazz Pharmaceuticals asserts the following affirmative defenses in response to Avadel's Counterclaims:

### I.     Failure to State a Claim

2.     The Counterclaims fail to state any claim for which relief may be granted.

### II.     Judicial Estoppel and Unclean Hands

3.     In Civil Action Nos. Nos. 21-691, 21-1138, and 21-1594, Avadel's counterclaims seeking declaratory judgments of invalidity against Patent Nos. 10,758,488 ("the '488 Patent"), 10,813,885 ("the '885 Patent"), 10,959,956 ("the '956 Patent"), 10,966,931 ("the '931 Patent"), 11,077,079 ("the '079 Patent"), and 11,147,782 ("the '782 Patent") are barred, in whole or in part, under the equitable principles of estoppel and/or unclean hands.

### A.      Avadel's Inconsistent Positions Regarding the Jazz Sustained Release Patents

4.      In this litigation, Avadel collectively refers to the '488 Patent, the '885 Patent, the '956 Patent, and the '931 Patent as the "Jazz Sustained Release Patents."

5.      Avadel owns U.S. Patent No. 10,272,062 ("the '062 Patent"), which it prosecuted from July 2017 to April 2019.  *See* Case No. 21-691, D.I. 11 at Counterclaim ¶ 6.  Avadel refers to the patent application that led to the issuance of '062 Patent as the "'062 Application".  *See id.* at ¶ 7.

6.      Avadel has taken the position in this litigation that Jazz drafted the claims of each of the Jazz Sustained Release Patents "***solely based*** on Avadel Ireland's inventive work disclosed in at least the '062 Application."  *See id.* at ¶ 13 (emphasis added); *see also id.* at ¶¶ 14-16.[1]

7.      Avadel has also asserted in this litigation that fourteen alleged prior art references "anticipate and/or render obvious, either alone or in combination, the asserted claims of the . . . Jazz Sustained Release Patents."  Ex. A, Avadel 10-13-21 Contentions at 4-5.

8.      One of the references that Avadel contends "anticipate[s] and/or render[s] obvious" the asserted claims of the Jazz Sustained Release Patents is U.S. Patent No. 5,594,030, which issued to Ubaldo Conte et al. in 1997 (hereafter, "Conte 1997").

9.      During prosecution of the '062 Patent—which Avadel contends is the sole basis for the claims of the Jazz Sustained Release Patents—Avadel argued to the United States Patent and Trademark Office ("USPTO") that Conte 1997 ***would not*** have taught or suggested the use of methacrylic acid-methyl methacrylate co-polymers in a sustained release GHB formulation, as is claimed in each asserted claim of the Jazz Sustained Release Patents.  Instead, Avadel represented to the USPTO that "the coating of Conte [1997]'s compositions comprises copolymers that do not

---

[1]   Jazz Pharmaceuticals denies this claim.

carry free carboxylic groups," and that "Conte [1997] provides no suggestion or rationale that would lead a person of ordinary skill in the art to modify the film coatings disclosed therein and include a polymer having free carboxylic groups," such as the claimed methacrylic acid-methyl methacrylate co-polymers. *See, e.g.*, Ex. B, App. No. 15/655,924, September 4, 2018 Response to Office Action at 12.

10.     During prosecution of the '062 Patent, Avadel further represented to the USPTO that instead of rendering obvious a once-nightly GHB formulation, Conte 1997 would have affirmatively taught away from such an invention.  Avadel represented to the USPTO that "Conte [1997] does ***not*** disclose or suggest a gamma-hydroxybutyrate composition in a unit dose suitable for administration only once-nightly," and that "[b]y requiring multiple doses (2 or more) during the day, and at substantially lower dosages to alleviate addiction symptoms in an awake state, Conte [1997] clearly teaches away."  *Id.* at 12-13 (emphasis in original).

11.     Avadel also relies on U.S. Patent Publication No. 2006/0210630 to Liang et al. (hereafter, "Liang 2006") in support of its assertion in this litigation that the Jazz Sustained Release Patents are invalid.  More specifically, Avadel has taken the position in this litigation that the asserted claims of the Jazz Sustained Release Patents are obvious over Liang 2006, purportedly because the reference "discloses [GHB] formulations made up of an immediate release portion and a delayed/controlled release portion," and "[a]s in the Jazz Sustained Release Patent claims, Liang 2006's delayed/controlled release formulations are made up of a functional coating deposited over a core, with the core comprising gamma-hydroxybutyric acid salts and the functional coating comprising a pH sensitive enteric release coat such as a methacrylic acid-methyl methacrylate co-polymer."  Ex. A, Avadel 10-13-21 Contentions at 20.

12.     But Avadel advanced the exact opposite position during prosecution of the '062 Patent, arguing that Liang 2006 would *not* have rendered obvious a sustained release GHB formulation comprised of a functional coating containing 20-50 percent by weight methacrylic acid-methyl methacrylate co-polymers, as claimed in the Jazz Sustained Release Patents. Specifically, Avadel has represented to the USPTO that "Liang [2006] teaches that the compositions disclosed therein provide 'a convenient once nightly or once daily dose regiment for the oral delivery of one or more gamma-hydroxybutyric salts.'  Thus, Liang [2006] provides no teaching or suggestion that would prompt a person of ordinary skill in the art to modify the coating of the delayed/controlled release component disclosed therein."  *See* Ex. B, App. No. 15/655,924, September 4, 2018 Response to Office Action at 15.

13.     Avadel's position in this litigation and its position before the USPTO are diametrically opposed.  Avadel has taken the position in this litigation that Liang 2006—standing alone—renders the formulations claimed in the Jazz Sustained Release Patents obvious, but Avadel has taken the position before the USPTO that Liang 2006 would provide zero motivation to modify its disclosures to cover a formulation with the characteristics claimed in the Jazz Sustained Release Patents.

14.     Avadel further advocated before the USPTO during prosecution of the '062 Patent that the data presented in Liang 2006 would not have given rise to any reasonable expectation that formulations that differ from those expressly disclosed in Laing 2006 would work for their intended purpose or exhibit any desired pharmacokinetic profile.  Specifically, Avadel advocated that pharmacokinetic targets "could not be predicted" based upon the disclosures of Liang 2006. Ex. B, App. No. 15/655,924, September 4, 2018 Response to Office Action at 18.

15.     Avadel also prosecuted U.S. Patent Nos. 10,736,866 ("the '866 Patent"), 10,952,986 ("the '986 Patent") and 10,973,795 ("the '795 Patent") prior to the initiation of this litigation.  The '866 Patent is a continuation of the '062 Patent, and both the '986 and '795 Patents are continuations of the '866 Patent.  All of these patents therefore contain substantively similar (if not identical) disclosures in their specifications.

16.     Avadel continued to remark upon the Liang 2006 reference during prosecution of the '866 Patent, the '986 Patent, and the '795 Patent.  Specifically, during prosecution of the '795 Patent, Avadel argued that, rather than give rise to any reasonable expectation regarding the properties of GHB formulations that differ from those expressly disclosed in Laing 2006, "**[u]sing Liang [2006] to guess the in vivo pharmacokinetic profile of [another] claimed invention would be pure speculation**."  *See* Ex. C, Application No. 16/419,616, September 17, 2020 Response to Office Action at 10 (emphasis in original).  During prosecution of the '866 Patent, Avadel represented to the USPTO that "because the dosage forms of Liang [2006] differ from the claimed formulation[s], a person of ordinary skill in the art would expect that pharmacokinetic properties would also differ."  *See* Ex. D, Application No. 16/281,235, March 18, 2020 Response to Office Action at 21; *see also id.* at 19 (Avadel further arguing to the USPTO that "a person of ordinary skill in the art would not be prompted by the disclosure of Liang [2006] to modify the dosage forms disclosed therein").  And during prosecution of the '986 Patent, Avadel took the position that "[t]he unpredictability of GHB formulations is not merely academic . . . there is no reasonable predictability with respect to GHB formulations, even if a skilled artisan were trying to copy a formulation exactly.  It's simply too unpredictable."  Ex. E, App. No. 16/420,321, October 1, 2020 Response to Office Action at 9.

17.     In sum, according to Avadel's own sworn statements to the USPTO, a POSA would not have been: (1) motivated to modify the disclosures of Liang 2006 or (2) able to reasonably expect that *any* sustained release formulation of GHB (let alone the claimed formulations of the Jazz Sustained Release Patents, with a functional coating comprised of 20-50 percent by weight methyl methacrylate, methacrylic acid copolymers) would demonstrate the claimed pharmacokinetic profiles based upon the disclosures of Liang 2006.  Avadel has taken the opposite position in this litigation.  *See* Ex. A, Avadel 10-13-21 Contentions at 20-25.

18.     As set forth above, Avadel represented to the USPTO that Conte 1997 and Liang 2006 would not have rendered its GHB formulations obvious during prosecution of Avadel's Patent Application Nos. 15/655,924, 16/281,235, 16/419,616, and/or 16/420,321.  Each of these Patent Applications issued as U.S. Patents (the '062 Patent, the '866 Patent, the '986 Patent, and the '795 Patent, respectively).  Therefore, Avadel derived a benefit from the arguments it made to the USPTO in support of its patent applications.

### B.     Avadel's Inconsistent Positions Regarding the Jazz Resinate Patents

19.     In this litigation, Avadel refers to the '079 Patent and the '782 Patent collectively as "the Jazz Resinate Patents."

### (i).     Avadel's Inconsistent Positions Regarding the '079 Patent

20.     Avadel has taken the position in this litigation that the asserted claims of the '079 Patent "are generally directed to a method of treating narcolepsy with a single-dose oxybate formulation comprising opening a sachet containing a solid oxybate formulation comprising a mixture of immediate release and controlled release components and mixing the formulation with water for oral administration to a patient."  Ex. F, Avadel 1-14-22 Contentions at 9-10.

21.     Avadel has taken the position in this litigation that Liang 2006 anticipates the asserted claims of the '079 Patent. *See id.* at 10-11.

22.     Avadel has also asserted in this litigation that eighteen alleged prior art references "anticipate and/or render obvious, either alone or in combination, the asserted claims of the '079 patent." *Id.* at 4-6.

23.     As set forth below, these arguments are directly contradictory to arguments that Avadel has made before the USPTO.

24.     Avadel asserts in the instant litigation that "Jazz, through its prosecution counsel, copied the claimed invention" of the '079 Patent from Avadel's then-pending Application No. 16/420,321 ("the '321 Application"). *See id.* at 65-69.[2]  The '321 Application subsequently issued as the '986 Patent.

25.     Avadel further asserts that the pending method claim that Jazz allegedly "copied" from the '321 Application into the '079 Patent was comprised of the following elements:

A method of treating a disorder treatable with gamma-hydroxybutyrate in a human in need thereof, the method comprising:

administering a single daily dose to said human, the single daily dose comprising an amount of gamma-hydroxybutyrate equivalent to from 3.0 to 12.0 g of sodium oxybate, wherein the administering comprises

opening a sachet containing a gamma-hydroxybutyrate formulation,

mixing the formulation with water, and

orally administering the mixture.

*See id.* at 68; *see also* Ex. E, App. No. 16/420,321, October 1, 2020 Response to Office Action at 2.

---

[2]  Jazz Pharmaceuticals denies this claim.

26.     In 2020, the USPTO rejected this pending claim of the '321 Application as unpatentable over Liang 2006 in view of U.S. Patent App. Pub. No. 2002/0077334 to Cook et al. ("Cook 2002").  In response to that rejection, Avadel represented to the USPTO that Liang 2006 does "not expressly disclose opening a sachet containing a gamma hydroxybutyrate formulation, mixing the formulation with water and orally administering the mixture."  *See* Ex. E, App. No. 16/420,321, October 1, 2020 Response to Office Action at 8.

27.     Avadel has taken the opposite position in this litigation, arguing that Liang 2006 "discloses that the solid dosage form could be a sachet," and that "Liang 2006 discloses that the formulation could be stirred into a drink, and water is the most common form of drink."  Ex. F, Avadel 1-14-22 Contentions at 10-11.

28.     Avadel has also taken the position in this litigation that, to the extent that Liang 2006 is not found to anticipate claim 1 of the '079 Patent, that claim would "have been obvious to a POSA as of the earliest asserted priority date of the '079 patent [i.e., February 2015]," purportedly because "a POSA would have been motivated to develop a method for treating narcolepsy by administering a single daily dosage of GHB containing an immediate release component and a controlled release component in a sachet form."  Ex. F, Avadel 1-14-22 Contentions at 11-12.

29.     Avadel took the opposite position before the USPTO in October 2020 during prosecution of the '321 Application.  More specifically, Avadel stated to the Patent Office that, at the time of alleged invention for the methods claimed in the '321 Application (2016), the prior art "***teaches away*** from a sachet as currently claimed."  Ex. E, App. No. 16/420,321, October 1, 2020 Response to Office Action at 8 (emphasis in original).  Avadel represented to the USPTO that the prior art disclosed "inherent problems" with sachet formulations and thus would have taught a

POSA to abandon the "problematic" sachet formulation "in favor of a purely liquid formulation." *Id.* Avadel further stated that there would be no reasonable expectation of success of formulating GHB into a sachet because "there are known problems of instability, microbial growth, and/or degradation of the GHB active ingredient into GBL," which Avadel stated would have taught away from a sachet formulation. *Id.* at 8-9. Thus, contrary to Avadel's position in this litigation that a POSA "***would have been motivated*** to develop a method for treating narcolepsy by administering a single daily dosage of GHB containing an immediate release component and a controlled release component in a sachet form" in 2015, Avadel expressly argued to the USPTO that, in 2016, "given the ***teachings away***" in the prior art, the prior art would "fail to provide an apparent reason that would have prompted a person of ordinary skill in the art in the relevant field to combine the elements in the way the claimed invention does with a reasonable expectation of success, as required by the law." *Id.* at 9.

30.     The '321 Application issued as a U.S. Patent after Avadel overcame the obviousness rejection based upon Liang 2006 and Cook 2002. Therefore, Avadel derived a benefit from the arguments that it made to the USPTO.

### (ii).     Avadel's Inconsistent Positions Regarding the '782 Patent

31.     Avadel has taken the position in this litigation that the asserted claims of the '782 Patent are "generally directed to a formulation or a unit dose of GHB with specific viscosity enhancing agents, acid, lubricants, amounts of GHB, or blood concentrations of GHB following administration of the claimed formulation." Ex. F, Avadel 1-14-22 Contentions at 27.

32.     In this litigation, Avadel also contends that the claims of the '782 Patent were written after Jazz Pharmaceuticals allegedly "copied the claims from Avadel's application that led to the issuance of the '866 patent." *Id.* at 71.[3]

33.     Avadel further argues in the present litigation that the asserted claims of the '782 Patent are obvious in view of Liang 2006.  Specifically, Avadel asserts in this case that "Liang 2006 discloses all of the limitations of claim 1 other than a viscosity enhancing agent and acid that are separate from the immediate release and modified release particles." *Id.* at 28.  Avadel further argues that "the addition of an acid and/or a viscosity enhancing agent separate from the immediate and modified release particles was well-known in the art as part of a multi-particulate drug form," and that "a POSA would have been motivated to modify the formulations in Liang 2006 . . . to include an acid and/or viscosity enhancing agent separate from the immediate and modified release particles of GHB with a reasonable expectation of arriving at the claimed formulation." *Id.* at 30.

34.     As set forth below, this argument stands in direct contradiction to representations that Avadel made to the USPTO in March 2020, during the prosecution of Avadel's Patent Application No. 16/281,235 ("the '235 Application"), which led to the '866 Patent.  In March 2020, then-pending claim 1 of the '235 Application was as follows:

> A formulation of gamma-hydroxybutyrate comprising:
>
> > an immediate release portion comprising gamma-hydroxybutyrate;
> >
> > a modified release portion comprising gamma-hydroxybutyrate;
> >
> > a suspending or viscosifying agent . . .
> >
> > an acidifying agent . . .

---

[3]   Jazz Pharmaceuticals denies this claim.

> wherein the suspending or viscosifying agent and the acidifying agent are separate and distinct from the immediate release portion and the modified release portion; and
>
> wherein the ratio of gamma-hydroxybutyrate in the immediate release portion and the modified release portion is from 10/90 to 65/35.

*See* Ex. D, App. No. 16/281,235, March 18, 2020 Response to Office Action at 2.

35.     Avadel contends in the instant litigation that Jazz "copied" this claim into the '782 Patent.  Ex. F, Avadel 1-14-22 Contentions at 70-71.

36.     The USPTO rejected claim 1 of the '235 Application as unpatentable over Liang 2006.  In response to that rejection, Avadel stated to the USPTO that Liang 2006 would not render obvious the claimed formulation, because "Liang [2006]'s only teaching regarding excipients is that they have to be actually part of Liang [2006]'s immediate release and delayed/controlled release components.  As such, nowhere does Liang [2006] disclose or suggest a formulation having a suspending / viscosifying agent and an acidifying agent that are separate and distinct from the immediate release component and the delayed/controlled release component of the formulation."  Ex. D, App. No. 16/281,235, March 18, 2020 Response to Office Action at 18.  Avadel further represented to the USPTO that "a person of ordinary skill in the art would not be prompted by the disclosure of Liang [2006] to modify the dosage forms discussed therein and arrive at the claimed formulation with a reasonable expectation of success."  *Id.* at 19.  This directly contradicts the obviousness arguments Avadel has made in this litigation with respect to the '782 Patent.

37.     The '235 Application issued as a U.S. Patent after Avadel overcame the obviousness rejection based upon Liang 2006.  Therefore, Avadel derived a benefit from the arguments made to the USPTO and set forth above.

 **C.** **Avadel is Estopped, Under Principles of Judicial Estoppel and/or the Doctrine of Unclean Hands, from Seeking Declaratory Judgments that the Asserted Claims of the Jazz Sustained Release Patents and Jazz Resinate Patents Are Invalid As Anticipated or Obvious In View of Its Inconsistent Arguments to the USPTO**

38. As set forth above, Avadel has made invalidity arguments in this litigation that are inconsistent with—and in many cases the exact opposite of—validity arguments that Avadel made under the penalty of perjury to the USPTO.

39. Based upon: (1) Avadel's derivation and validity contentions, (2) the fact that the patent applications to which the inventions claimed in the Jazz Sustained Release Patents and the Jazz Resinate Patents claim priority were filed before Avadel's alleged inventions, and (3) Avadel's positions before the USPTO, Avadel is estopped from raising any arguments pursuant to 35 U.S.C. §§ 102 or 103 against the Jazz Sustained Release Patents and the Jazz Resinate Patents in this case.

40. Avadel gained an advantage by making the aforementioned validity arguments to the USPTO, having overcome the USPTO's obviousness rejections in view of those arguments and obtaining issued U.S. patents as a result.

41. It would be unconscionable to allow Avadel to maintain positions in this litigation that are inconsistent with positions Avadel has taken before the USPTO and from which Avadel derived a clear benefit; namely, the issuance of U.S. Patents from its Patent Application Nos. 15/655,924, 16/281,235, 16/419,616, and/or 16/420,321.

42. Avadel's derived benefits from the grant of the '062, '986, '886, and '795 Patents relate to the subject matter of this litigation because Avadel argues that Jazz copied the novel inventions of the Jazz Sustained Release Patents and Jazz Resinate Patents from the Avadel '062, '986, '886, and '795 Patents, but at the same time argues that Jazz Pharmaceuticals' inventions in the Jazz Sustained Releases Patents and Jazz Resinate Patents are invalid over references that

Avadel overcame during prosecution of the Avadel '062, '986, '886, and '795 Patents by making contradictory arguments earlier in time.

43.     Avadel's inconsistent positions constitute unconscionable and bad-faith actions that directly relate to this litigation, are intended to injure Jazz Pharmaceuticals (and its rights in the Jazz Sustained Release Patents and Jazz Resinate Patents), and affect the balance of equities between Avadel and Jazz Pharmaceuticals.

<div style="margin-left:40%">

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*
_____

</div>

OF COUNSEL:

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Nicholas A. LoCastro
Krista M. Rycroft
Quentin Jorgensen
Catherine T. Mattes
Abigail DeMasi
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000

July 31, 2023

<div style="margin-left:40%">

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiffs*
*Jazz Pharmaceuticals, Inc. and*
*Jazz Pharmaceuticals Ireland Limited*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on July 31, 2023, upon the following in the manner indicated:

Daniel M. Silver, Esquire                                    *VIA ELECTRONIC MAIL*
Alexandra M. Joyce, Esquire
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801
*Attorneys for Defendant*

Kenneth G. Schuler, Esquire                                  *VIA ELECTRONIC MAIL*
Marc N. Zubick, Esquire
Alex Grabowski, Esquire
Sarah W. Wang, Esquire
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
*Attorneys for Defendant*

Herman H. Yue, Esquire                                       *VIA ELECTRONIC MAIL*
Franco Benyamin, Esquire
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY  10020
*Attorneys for Defendant*

Sarah Propst, Esquire                                        *VIA ELECTRONIC MAIL*
Audra Sawyer, Esquire
Alan J. Devlin, Esquire
Ian Conner, Esquire
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
*Attorneys for Defendant*

Daralyn J. Durie, Esquire                           *VIA ELECTRONIC MAIL*
Eric P. Berger, Esquire
Rebecca E. Weires, Esquire
Adam R. Brausa, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Defendant*

Kira A. Davis, Esquire                              *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
Katherine E. McNutt, Esquire
Rose S. Lee, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Defendant*

David F. McGowan, Esquire                           *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, CA  92130
*Attorneys for Defendant*

Andrew T. Jones, Esquire                            *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Defendant*


                                        */s/ Jeremy A. Tigan*
                                        _____
                                        Jeremy A. Tigan (#5239)