# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-691-GBW <br><br> **PUBLIC VERSION** |
| JAZZ PHARMACEUTICALS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-1138-GBW |
| JAZZ PHARMACEUTICALS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-1594-GBW |

**OPENING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE
EXPERT TESTIMONY OF DR. CORY J. BERKLAND AND DR. ROBERT S. LANGER**

**TABLE OF CONTENTS**

**Page**

I. NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II. SUMMARY OF ARGUMENT .................................................................................... 1

III. ARGUMENT ................................................................................................................ 2

    A. Legal Standards ................................................................................................ 2

    B. Avadel's Inherent Anticipation Assertions For The Sustained Release Patents' Asserted Claims' "MAMM" Co-Polymer And Deionized Water Dissolution Profiles .......................................................................................... 3

    C. Dr. Berkland's Testimony Regarding His Experiments Should Be Excluded ........................................................................................................... 4

        1. Dr. Berkland did not follow Examples 1 and 2 of Liang .......................... 5

        2. Dr. Berkland did not follow Example 4 of Liang .................................... 6

        3. Dr. Berkland did not follow Example 6(b) of Liang ............................... 9

    D. Dr. Langer's Opinions Reliant Upon Dr. Berkland's Experiments Should Be Excluded .................................................................................................... 10

IV. CONCLUSION ........................................................................................................... 10

# **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ............................................................................................................... 2

*Merck & Cie v. Watson Lab'ys, Inc.*,
   125 F. Supp. 3d 503 (D. Del. 2015), *rev'd on other grounds*,
   822 F.3d 1347 (Fed. Cir. 2016) ..................................................................................... 1, 2, 10

*Pfizer Inc. v. Teva Pharms. U.S.A., Inc.*,
   882 F. Supp. 2d 643 (D. Del. 2012), *aff'd sub nom.*
   555 Fed. App'x 961 (Fed. Cir. 2014) ..................................................................................... 3

*Schering Corp. v. Geneva Pharm.*,
   339 F.3d 1373 (Fed. Cir. 2003) ............................................................................................. 2

*Structural Rubber Prods. Co. v. Park Rubber Co.*,
   749 F.2d 707 (Fed. Cir. 1984) ............................................................................................... 6

*Transclean Corp. v. Bridgewood Servs., Inc.*,
   290 F.3d 1364 (Fed. Cir. 2002) ............................................................................................. 2

*Valeant Int'l (Barbados) SRL v. Watson Pharms., Inc.*,
   No. 10-20526, 2011 WL 6792653 (S.D. Fla. Nov. 8, 2011), *aff'd sub nom.*,
   534 Fed. App'x 999 (Fed. Cir. 2013) ................................................................ 2, 3, 6, 9, 10

### **Statutes**

Fed. R. Evid. 702 ......................................................................................................................... 2

**I.      NATURE AND STAGE OF THE PROCEEDINGS**

Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Ltd. ("Plaintiffs" or "Jazz") move to exclude the testimony of Avadel CNS Pharmaceuticals, LLC's ("Defendant" or "Avadel") expert Dr. Cory J. Berkland regarding the purported reproduction and testing of the Liang[1] prior art reference (A1603-A1644), and the portions of Dr. Robert S. Langer's testimony relying on same (A1106-A1149, A1645-A1673).  The parties are proceeding to a five-day jury trial beginning on February 26, 2024.  This motion seeks exclusion of testimony concerning one of Avadel's twenty-five-plus invalidity defense theories:  alleged inherent anticipation of U.S. Patent Nos. 10,758,488, 10,813,885, 10,959,956, and 10,966,931 (collectively, "the Sustained Release Patents") by Liang.

**II.     SUMMARY OF ARGUMENT**

Avadel offers an alleged reproduction and testing of Liang for its inherent anticipation defense.  Testimony regarding that alleged reproduction and testing, however, should be excluded because Dr. Berkland did not follow the procedures disclosed by Liang.  "This [District] has previously held that experiments that do not follow the prior art procedure alleged to inherently anticipate cannot show inherent anticipation."  *Merck & Cie v. Watson Lab'ys, Inc.*, 125 F. Supp. 3d 503, 512 (D. Del. 2015), *rev'd on other grounds*, 822 F.3d 1347 (Fed. Cir. 2016) (reversed on on-sale bar grounds).  As explained below, Dr. Berkland deviated from Liang's procedure at every step.  Therefore, Dr. Berkland's testimony, and Dr. Langer's inherent anticipation opinions based thereon, are not based on a reliable foundation and are not relevant to the inherent anticipation inquiry.  The Court should exclude them from presentation to the jury.

---

[1] United States Patent Application Publication No. 2006/0210630 A1 ("Liang").

### III. ARGUMENT

#### A. Legal Standards

Rule 702 requires that expert testimony: be "help[ful to] the trier of fact to understand the evidence or to determine a fact in issue;" be "based on sufficient facts or data;" be "the product of reliable principles and methods;" and "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702. "The Rules—especially Rule 702—place appropriate limits on the admissibility of purportedly scientific evidence by assigning to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 579-80 (1993).

"[A]nticipation by inherent disclosure is appropriate only when the reference discloses prior art that must *necessarily* include the unstated limitation." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373 (Fed. Cir. 2002) (emphasis in original). A party may attempt to show inherent disclosure of a claim limitation by practicing the alleged prior art. *Merck*, 125 F. Supp. at 512.

"'In general, a limitation or the entire invention is inherent and in the public domain if it is the natural result flowing from the *explicit disclosure* of the prior art.'" *Valeant Int'l (Barbados) SRL v. Watson Pharms., Inc.*, No. 10-20526, 2011 WL 6792653, at *5 (S.D. Fla. Nov. 8, 2011), *aff'd sub nom.*, 534 Fed. App'x 999 (Fed. Cir. 2013) (quoting *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003)) (emphasis in original). District courts, including this one, have routinely held that an "experiment that did not follow the [prior art] procedure *is not probative* of what would inevitably occur if the [prior art] procedure were followed," and has more generally held that "experiments that do not follow the prior art procedure alleged to inherently anticipate *cannot show inherent anticipation*." *Merck*, 125 F. Supp. 3d at 512 (D. Del. 2015), *rev'd on other grounds*, 822 F.3d 1347 (Fed. Cir. 2016)

(emphasis added); *see also Pfizer Inc. v. Teva Pharms. U.S.A., Inc.*, 882 F. Supp. 2d 643, 678-80 (D. Del. 2012), *aff'd sub nom.* 555 Fed. App'x 961 (Fed. Cir. 2014) (finding expert's testing that "did not adhere to the requirements of [the prior art] when he attempted to reproduce the chemical process described therein" "not reliable to establish inherent anticipation"); *Valeant*, 2011 WL 6792653, at *5 ("[B]ecause Dr. Adlington did not follow the explicit disclosure of Example 1 of the Mehta patent, his experiment is simply not probative of the issue of inherent anticipation. . . .").

**B.     Avadel's Inherent Anticipation Assertions For The Sustained Release Patents' Asserted Claims' "MAMM" Co-Polymer And Deionized Water Dissolution Profiles**

Each claim of the Sustained Release Patents requires, among other elements, that the claimed formulations comprise a sustained release portion that has a core and a functional coating, wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate ("MAMM") co-polymers that are from about 20% to about 50% by weight of the functional coating. *See, e.g.*, A0031. Each claim also requires certain deionized water dissolution release profiles. *See, e.g.*, *id.* (The "sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C. and a paddle speed of 50 rpm."). In total, there are seven different deionized water dissolution release profiles recited throughout the asserted claims. A0031-A0033, A0063-A0064, A0094-A0096, A0127-A0128.

Avadel asserts that Liang inherently anticipates the Sustained Release Patents' asserted claims. A1119-A1136, § VIII. Notably, however, the parties agree that Liang does not *expressly* disclose either: (1) the about 20% to about 50% MAMM co-polymer limitation; or (2) the claimed deionized water dissolution release profiles. A1282-A1283, ¶¶ 49-51; A1128, ¶ 57; A1133-A1135, ¶¶ 71-75. Instead, Avadel alleges inherent anticipation for both the about 20% to

3

about 50% MAMM co-polymer limitation and six of the seven claimed deionized water dissolution release profiles. *Id.*[2] While Dr. Langer offers Avadel's inherent anticipation opinions, he relies exclusively on Dr. Berkland's alleged reproduction and testing of Liang for the alleged inherent disclosure of the claimed deionized water dissolution release profiles. *See, e.g.*, A1133, ¶ 70 ("I have reviewed and rely on the reproduction of the dissolution testing of the sustained release portion of Liang 2006's formulation conducted by Dr. Cory Berkland."); A1161, 44:15-18 ("Q. Okay. For your anticipation opinions, you rely on some testing that was done by Dr. Corey [sic] Berkland? A. Correct.").

C.   **Dr. Berkland's Testimony Regarding His Experiments Should Be Excluded**

Avadel concedes that Liang does not expressly disclose any formulation with about 20% to about 50% MAMM co-polymer. A1128, ¶ 57. Liang, therefore, could not possibly disclose any deionized water dissolution release profile for any such formulation. Therefore, Dr. Berkland "was asked by [Avadel's] counsel to make a formulation in accordance with the teachings of the Liang reference ('Liang Formulation'), that has 'one or more methacrylic acid-methyl methacrylate copolymers that are from about 20% to about 50% by weight of the functional coating.'" A1609, ¶ 21. Dr. Berkland purported to make that formulation by "following Example 6(b) of Liang," which according to Liang, builds upon three previous Examples (Examples 1, 2, and 4). A1689, ¶ 0095; A1690, ¶¶ 0100, 0108); *see also* A1609-A1610, ¶ 26; A1611-A1612, ¶ 33; A1613-A1614, ¶ 38 (Dr. Berkland stating that he purportedly followed the same procedure of Examples 1, 2, 4, and 6(b) in Liang).

---

[2] Avadel concedes that Liang does not disclose one of the dissolution profiles, either expressly or inherently. A1135-1136, ¶ 76.

It is undisputed that Example 6(b) of Liang does not disclose using about 20% to about 50% MAMM co-polymers. Instead, Example 6(b) discloses using either 76.4%, 78.2%, 79.7%, or 82.0% of Eudragit L100, a MAMM co-polymer. A1277-A1278, ¶ 42. This modification alone puts Dr. Berkland's experiments outside of inherent anticipation. As explained below, even putting that modification of Example 6(b) aside, Dr. Berkland made several departures from the explicit disclosures of Liang's Examples 1, 2, 4, and 6(b), any one of which is sufficient to render his alleged reproduction and testing irrelevant to alleged inherent anticipation under the law detailed above.[3]

### 1. Dr. Berkland did not follow Examples 1 and 2 of Liang

Examples 1 and 2 of Liang require the production of immediate release cores comprising the active pharmaceutical ingredient ("API") sodium gamma-hydroxybutyrate (a/k/a sodium oxybate). A1689, ¶¶ 0093-0096. But Dr. Berkland did not use sodium gamma-hydroxybutyrate to make the cores when he purportedly followed Examples 1 and 2. Instead, Dr. Berkland used a completely different API; he "used sodium acetate in place of sodium oxybate." A1609, ¶ 22; *see also* A1609-A1610, ¶ 26.[4]

Dr. Berkland admitted, however, that he "didn't see any explicit disclosure in Liang" for using sodium acetate in place of sodium gamma-hydroxybutyrate. A1722, 116:7-25. Instead, Dr. Berkland "relied on the declaration from Allphin to substitute [sodium acetate] for sodium oxybate." *Id.* But the Allphin Declaration is not part of Liang's disclosure or the prior art at all.

---

[3] Only certain of Dr. Berkland's departures from the disclosures of Liang are highlighted below. Jazz reserves the right to, and should the need arise Jazz will, raise other departures and issues with Dr. Berkland's proposed testimony if this defense proceeds to trial.

[4] Notably, Dr. Berkland never even attempted to acquire sodium gamma-hydroxybutyrate for his experiments, despite his "assum[ption]" that Avadel would have access to it. A1727-A1728, 136:21-138:13.

5

Instead, the Allphin Declaration was submitted to the United States Patent and Trademark Office ("PTO") in April 2020, during the prosecution of the Sustained Release Patents. A1745-A1747. April 2020 is 14 years after the publication of Liang and nine years after the Sustained Release Patents' March 2011 priority date. A0002, A0035, A0066, A0098, A1675.

Dr. Berkland was asked why he changed the API disclosed in Liang. While Dr. Berkland testified that it was "[n]ot exclusively" Avadel's counsel's idea for him to use sodium acetate instead of sodium gamma-hydroxybutyrate, neither of his alleged justifications ("the Allphin declaration" nor Dr. Berkland's "scientific understanding") can substitute for the actual disclosures of Liang. A1727, 135:22-136:20. Missing disclosures from the alleged prior art "may not be supplied by the knowledge of one skilled in the art or the disclosure of another reference." *Valeant*, 2011 WL 6792653, at *4 (citing *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984), and holding no anticipation where the expert "admitted at trial that [the party he worked for] instructed him to modify Example 1" and that he "did not follow the explicit disclosure of Example 1").

The change in API is nowhere to be found in Liang. This change in testing procedure alone warrants exclusion of Avadel's alleged inherent anticipation testimony.

### 2. Dr. Berkland did not follow Example 4 of Liang

Example 4 of Liang requires taking the pellets from Example 2 and coating them with an ethylcellulose ("EC") barrier layer. A1689-A1690, ¶¶ 0099-0101. Example 4 provides the following table of ingredients for the EC barrier layer:

[0099] Ethylcellulose Coating Solution:

| Ingredient | Amount |
|---|---|
| Ethylcellulose | 73.9 g |
| PV7 K90 | 1.72 g |
| Triethyl citrate | 8.1 g |
| Isopropyl alcohol | 1000 g |
| Ethyl alcohol | 1000 g |

6

Example 4 discloses that "[t]he ethylcellulose coating solution was sprayed onto the [Example 2] pellets with a product temperature at 35° C. until 3%, 6% or 9.2% weight gain was reached to yield the EC-coated immediate release core." A1690, ¶¶ 0100-0101.

In his alleged reproduction of Example 4, Dr. Berkland made several modifications that Dr. Berkland admitted are *not* within the explicit disclosure of Liang. Any one of those modifications is sufficient to exclude Dr. Berkland's testimony.

*First*, Liang requires isopropyl alcohol ("IPA") and ethyl alcohol as the EC barrier coating solvents. A1689, ¶ 0099. Dr. Berkland changed these solvents to IPA and water (instead of ethyl alcohol). A1612, ¶ 34. Dr. Berkland testified that he made this change "based on the requirements of the University of Kansas," where his experiments were conducted.[5] A1723, 117:1-7; A1724, 121:25-122:17. In other words, the change in solvents had nothing to do with the explicit disclosures in Liang.

*Second*, Liang requires an EC coating product temperature of 35° C. A1689, ¶ 0099. Dr. Berkland changed the EC coating product temperature to "a few degrees" above 44° C. A1730, 145:12-148:4. Dr. Berkland admitted, however, that "I don't think it explicitly says that anywhere [in Liang to use different product temperatures]." A1730, 145:12-148:4. Dr. Berkland made this change based on an conclusory assertion that "a person reading the parameters in paragraph 100, for example, would understand that that's a working example, and you could

---

[5] In his reply report, Dr. Berkland stated that "[t]he change in solvents was to comply with university policies on explosion risks." A1634-A1635, ¶ 24. Dr. Berkland did not produce any university policy on solvents with his reports (A1724, 124:20-23), and Dr. Berkland's statement is unsupported by anything other than his own say-so. But even if this statement is supported by a relevant university policy, the change in methodology from that disclosed in Liang would still warrant exclusion of Dr. Berkland's analysis and any inherent anticipation opinions relying upon it.

make adjustments. . . ." A1730, 145:12-148:4. In other words, there is no such explicit disclosure in Liang.

*Third*, Liang requires coating the pellets from Example 2 with EC until 3%, 6%, or 9.2% weight gain was reached. A1690, ¶ 100. But Dr. Berkland changed the EC coating weight "gain" to until 4.31% weight gain was purportedly reached. A1613, ¶ 37. Dr. Berkland agreed, however, that the disclosure in paragraph 100 of Example 4 of Liang does not say "between 3 and 6" percent, but instead discloses only the specific options of "3%, 6%, or 9.2 % weight gain." A1721-A1722, 112:25-113:25; A1690, ¶¶ 0100-0101. Dr. Berkland then admitted that he chose to modify that disclosure of Liang and to use 4.31% weight gain for the EC coating in consultation with Avadel's counsel. A1727, 134:5-135:21. Again, this has nothing to do with the disclosures in Liang.

*Fourth*, Liang requires that the EC coating result in a weight *gain* for the EC-coated core. A1690, ¶ 100. But Dr. Berkland did the *opposite*; his formulation experienced a weight *loss* as opposed to the weight *gain* required by Liang Example 4. A1612-A1613, ¶ 35. Dr. Berkland testified that Liang is "silent" on any disclosure that the addition of the EC barrier coating would result in an observable weight *loss* as opposed to the required weight *gain*. A1729, 143:4-12. A weight loss makes little sense, as adding a coating would not be expected to cause the overall weight to decrease. In fact, to demonstrate just how abnormal a weight loss would be in such a coating process, even Dr. Berkland's own university form assumes a weight gain. The technician carrying out the experiment for Dr. Berkland had to cross out "percent weight gain" on a standard-issue University of Kansas form and write in "percent weight loss." A1729, 143:4-144:20; A1782, P10A; A1714-A1715, 83:10-85:12.

8

As explained above, none of Dr. Berkland's changes to Liang's Example 4 are within Liang's explicit disclosure, which Dr. Berkland purported to be "following" (A1611-A1612, ¶ 33) for the EC barrier coating step. That alone renders Dr. Berkland's testing irrelevant based on the case law discussed above. *See supra* at 2-3. And Dr. Berkland's reliance on Avadel's counsel or the alleged knowledge of a POSA for certain departures from Liang's Example 4 only renders his opinions further unreliable. *Valeant*, 2011 WL 6792653, at *4.

### 3. Dr. Berkland did not follow Example 6(b) of Liang

Example 6(b) of Liang requires taking "[t]he EC-coated immediate release core from Example 4 [and] further coat[ing it] with enteric coating solution (2) to 40%, 45%, 50%, or 60% weight gain. . . ." A1690, ¶¶ 0105, 0108. Example 6 provides the following table for "Enteric Coating Solution 2":

[0105] Enteric Coating Solution 2 (Jejunum):

| | |
|---|---|
| Eudragit L 100 | 390 g |
| Talc | 24 g |
| Triethyl citrate | 34 g |
| Isopropyl alcohol | 2460 g |
| Acetone | 377 g |
| Deionized water | 390 g |

As stated above, Dr. Berkland admittedly did not use the weight gain percentages for Eudragit L100 that are disclosed in Example 6(b). *See supra* at 8-9. But beyond that, Dr. Berkland made additional modifications to Example 6(b) that Dr. Berkland admitted are *not* within the explicit disclosure of Liang.

*First*, Liang requires IPA, acetone, and deionized water as the enteric coating solvents. Dr. Berkland changed these solvents to just IPA and deionized water (no acetone). A1613-A1614, ¶¶ 38-39. Dr. Berkland again relied on the University of Kansas's alleged policies for his choice to change Liang's procedure. A1723, 117:1-7; A1725, 125:5-12. In other words, the change in solvents once again had nothing to do with the explicit disclosures in Liang.

9

*Second*, Liang requires a Eudragit L100:talc ratio of 390g:24g (or 16.25:1) in the enteric coating solution. A1690, ¶ 0105. Dr. Berkland changed the Eudragit L100:talc ratio in the enteric coating solution from 390g:24g (or 16.25:1) to 75g:37.5g (or 2:1). A1613-A1614, ¶¶ 38-39. That is more than an 8-fold change. At deposition, Dr. Berkland could think of no reason why he made that change other than "discussions with counsel" and "dialogue[] about getting in this range of 20 to 50 [%] for the Eudragit [MAMM co-polymer]." A1723, 119:2-22. In other words, Dr. Berkland worked with Avadel's counsel to specifically target and force the alleged inherent anticipation analysis into the claims of the Sustained Release Patents.

As explained above, none of Dr. Berkland's changes to Liang's Example 6(b) are within Liang's explicit disclosure, which Dr. Berkland purported to be "following" (A1613-A1614, ¶ 38) for the enteric coating step. That alone renders Dr. Berkland's testing irrelevant based on the case law discussed above. *See supra* at 2-3. And Dr. Berkland's reliance on Avadel's counsel and a target of about 20% to about 50% MAMM co-polymers based on the patents-in-suit only renders his opinions further unreliable. *Valeant*, 2011 WL 6792653, at *4.

### D. Dr. Langer's Opinions Reliant Upon Dr. Berkland's Experiments Should Be Excluded

Dr. Langer relied exclusively on Dr. Berkland's purported reproduction and testing of Liang as support for his inherent anticipation opinions. *See, e.g.*, A1133, ¶ 70; A1161, 44:15-18. Dr. Langer's inherent anticipation opinions should therefore be excluded for the same reasons as discussed above. "[E]xperiments that do not follow the prior art procedure alleged to inherently anticipate *cannot show inherent anticipation*." *Merck*, 125 F. Supp. 3d at 512 (emphasis added).

### IV. CONCLUSION

For the forgoing reasons, Dr. Berkland should be precluded from offering testimony regarding his experiments, and Dr. Langer should be precluded from relying on the same.

10

Dated: November 30, 2023

OF COUNSEL:

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ *Jeremy A. Tigan*

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiffs*
*Jazz Pharmaceuticals, Inc. and*
*Jazz Pharmaceuticals Ireland Limited*

11

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 30, 2023, upon the following in the manner indicated:

| | |
|---|---|
| Daniel M. Silver, Esquire<br>Alexandra M. Joyce, Esquire<br>MCCARTER & ENGLISH, LLP<br>Renaissance Centre<br>405 N. King Street, 8th Floor<br>Wilmington, DE  19801<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Kenneth G. Schuler, Esquire<br>Marc N. Zubick, Esquire<br>Alex Grabowski, Esquire<br>Sarah W. Wang, Esquire<br>LATHAM & WATKINS LLP<br>330 North Wabash Avenue, Suite 2800<br>Chicago, IL  60611<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Herman H. Yue, Esquire<br>Franco Benyamin, Esquire<br>LATHAM & WATKINS LLP<br>1271 Avenue of the Americas<br>New York, NY  10020<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Audra Sawyer, Esquire<br>Alan J. Devlin, Esquire<br>Ian Conner, Esquire<br>Denise Laspina, Esquire<br>LATHAM & WATKINS LLP<br>555 Eleventh Street, NW, Suite 1000<br>Washington, D.C.  20004-1304<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |

Daralyn J. Durie, Esquire  
Eric P. Berger, Esquire  
Rebecca E. Weires, Esquire  
Adam R. Brausa, Esquire  
Tannyr Pasvantis, Esquire  
MORRISON & FOERSTER LLP  
425 Market Street  
San Francisco, CA  94105  
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Kira A. Davis, Esquire  
Henry Huttinger, Esquire  
Katherine E. McNutt, Esquire  
Rose S. Lee, Esquire  
MORRISON & FOERSTER LLP  
707 Wilshire Boulevard  
Los Angeles, CA  90017  
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

David F. McGowan, Esquire  
David F. Kowalski, Esquire  
MORRISON & FOERSTER LLP  
12531 High Bluff Drive, Suite 100  
San Diego, CA  92130  
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

Andrew T. Jones, Esquire  
MORRISON & FOERSTER LLP  
2100 L Street, NW, Suite 900  
Washington, D.C.  20037  
*Attorneys for Defendant*

*VIA ELECTRONIC MAIL*

/s/ *Jeremy A. Tigan*

Jeremy A. Tigan (#5239)