**REDACTED PUBLIC VERSION**
**FILED MARCH 4, 2024**

# EXHIBIT 1

**From:** Jones, Andrew T.
**To:** Frank Calvosa; Sawyer, Audra (DC); JazzAvadel
**Cc:** #C-M JAZZ PATENT LITIGATION - LW TEAM; MoFo-Avadel-Jazz; DSilver@McCarter.com; ajoyce@mccarter.com; JTigan@morrisnichols.com; Jack Blumenfeld
**Subject:** RE: Jazz v. Avadel - Limiting Claims and Defenses
**Date:** Monday, February 5, 2024 4:59:46 PM

Counsel,

Pursuant to the agreement between the parties, Avadel discloses the following four defenses (excluding non-infringement) that it intends to present at trial:

- **’488 Patent, Claim 7**
  - Lack of Written Description
  - Lack of Enablement
  - Improper Inventorship
  - Derivation

- **’488 Patent, Claim 11**
  - Lack of Written Description
  - Lack of Enablement
  - Improper Inventorship
  - Derivation

- **’782 Patent, Claim 24**
  - Lack of Written Description
  - Lack of Enablement
  - Improper Inventorship
  - Obviousness in view of Liang in combination with Lebon and the knowledge of a person of ordinary skill in the art

Avadel further discloses the witnesses that it intends to call for its case-in-chief:

Expert witnesses Avadel will call:, William Charman, Alexander Klibanov, Christine Meyer

Fact witnesses Avadel will call (live and/or by deposition): Clark Allphin, Scott Bura, Greg Divis, Philip McGarrigle, Jason Valentine, Jason Vaughn

Expert witnesses Avadel may call: Bruce Corser, Vivian Gray, Joseph Matal*, Gio Traverso

Fact witnesses Avadel may call (live and/or by deposition): Herve Guillard, Claire Megret, Edwin Walsh

*subject to MIL

**Andrew Jones**
andrewjones@mofo.com
T +1 (202) 887-8780
M +1 (202) 498-8850

**From:** Frank Calvosa <frankcalvosa@quinnemanuel.com>
**Sent:** Wednesday, January 31, 2024 12:11 PM
**To:** Audra.Sawyer@lw.com; JazzAvadel <jazzavadel@quinnemanuel.com>

**Cc:** jazzpatentlitigation.lwteam@lw.com; MoFo-Avadel-Jazz <MoFo-Avadel-Jazz@mofo.com>; DSilver@McCarter.com; ajoyce@mccarter.com; JTigan@morrisnichols.com; Jack Blumenfeld <jblumenfeld@morrisnichols.com>
**Subject:** Jazz v. Avadel - Limiting Claims and Defenses

**External Email**

---

Counsel,

Pursuant to the agreement reached between the parties, and solely for purposes of streamlining the issues for trial, Jazz discloses that it intends to assert claims 7 and 11 of the '488 patent and claim 24 of the '782 patent at trial. Further pursuant to parties' agreement, Jazz discloses that it intends to call the witnesses listed below for its case-in-chief:

Expert witnesses Jazz will call: Steven Little and Mark Rainey
Fact witnesses Jazz will call: John Miller, Clark Allphin, PJ Honerkamp, Herve Guillard, Jason Vaughn, David Monteith, Patricia Pound, Greg Divis, David O'Brien, and Scott Macke
Fact witnesses Jazz may call: Jennifer Gudeman, Thorsteinn Thorsteinsson, and Shawn Mindus

Best,

**Frank Calvosa**
*Partner*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7569 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
frankcalvosa@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

==========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

# EXHIBIT 2

Relativity ID : JPION00031909

Custodian : Clark Allphin

Master Date : 8/25/2014 12:00:00 AM

File Name : Flamel Market Intelligence_SGAK_21Aug2014v4.pptx

Original File Path : Personal Folders\Archive\

DTX-0250
Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC
C.A. Nos. 21-691, 21-1138, 21-1594 (GBW)

# Document Provided in Native Format

HIGHLY CONFIDENTIAL

JPION00031909

DTX-0250.0002

# Flamel Market Intelligence: *Once-nightly SXB Micropump formulation*

Sleep PTL Support
Prepared: August 2014



# Background
*Flamel April Press Release and Quarterly Conference Call*

## April 2014 Press Release

***Flamel provides top-line summary for FIH Phase I study***

- **Study Description**
  - Proof-of-concept study of sodium oxybate (SXB) using Micropump technology (MP)
  - N=16 health volunteers
  - 4-way cross-over evaluating 3 different formulations of MP and Xyrem (two 2.25g doses)
  - Extension phase consists of 6g MP formulations
    - 2 formulations moved forward at 6g. 13 patients were evaluable. Profiles for both formulates at 4.5 and 6g were consistent with expectations.
- **Data Released**
  - Topline data announcement from 14 evaluable subjects at 4.5g
  - Onset of action similar to Xyrem
  - $C_{max}$ lower than Xyrem
    - (NOTE: PK success criteria for JZP-386 "… $AUC_{4\text{-}8}$ comprising 25-50% of its total $AUC_{0\text{-}8}$ with similar Cmax and Tmax compared to Xyrem". Flamel did not comment on AUC)
  - Mean blood concentration (mcg/ml) at hours 7 and 8 similar to Xyrem
    - (NOTE: blood concentration at 7 and 8 hours is zero – so these data are not meaningful)

## July 29, 2014 Quarterly Update

- Once-nightly SXB clinical development plan and corresponding timelines outlined
  - *See following slides for further details*
- Flamel cash position
  - Flamel anticipates generating cash-flow and self-funding pipeline development

# Market Intelligence

*Flamel's once-nightly SXB Micropump formulation*

**Reason for Update**

*Provide comprehensive overview and understanding of Flamel's once-nightly SXB Micropump formulation*

**Market Intelligence Focus Areas:**

- Characterize Flamel's anticipated clinical development pathway
- Generate corresponding timeline estimates (e.g., study start/stop, regulatory filings)
- Gain further understanding of underlying Micropump technology
- Collect available clinical data/information to gain insight into molecule's pharmacologic properties and clinical performance
- Provide recommendations relevant to Jazz stakeholder needs

# Market Intelligence is proactively providing updates to several [internal] Jazz stakeholders

| Jazz Stakeholders | Stakeholder Needs |
|---|---|
| **JZP-386 Development Team** | • Awareness and in-depth understanding of development programs for other once-nightly sodium oxybate formulations<br>• Understand potential relevance to JZP-386 development |
| **Sleep PTL** | • Awareness and understanding of sleep pipeline activity, especially in the narcolepsy and cataplexy space |
| **Corporate** | • Insights into external market events that have the potential to impact Jazz's core business units<br>• Provide awareness into other programs for future decision-making and communication<br>• Objective insights to help IR and Corp Comm determine how to respond |

# Summary of findings - Technology

## *Micropump Technology*

- **Current assumption: *Historically, drug formulation issues have challenged the development of multiparticulate (bead) formulations.*** CA1
  - *What we know*: Other drug developers (e.g., Shire) have pursued development of a sodium oxybate delayed release beads but discontinued efforts
  - *What we know*: Shire published (in IP) regional absorption of beads in dogs (funded by Orphan Medical).
  - *Working assumptions*: SXB poses unusual challenges for bead formulations[2]
    - High solubility of SXB requires more polymer coating and may limit polymer choices
    - Huge doses 6-9g of SXB require lots of beads
    - SXB is better absorbed in upper GI and loses absorption in lower GI
    - Critical for any SR SXB to avoid dose dumping (particularly in alcohol)
  - *Unknowns:* Has Flamel fully considered safety concerns (dose dumping, risks if not fully bioavailable, patient variability, food effect)?
  - *Unknowns*: Are Flamel beads retained in the upper GI? If they are, this might be a successful approach to sustained release. If they are not, since absorption decreases later in the GI, the full dose might not be absorbed.
  - *Unknowns*: Does Flamel have a unique and differentiated technology platform? What is the difference between Flamel's bead technology and Shires bead technology? Would Flamel have to license the Shire patent?
  - *Unknowns*: How established is Flamel's Micropump technology? Note: Flamel Micropump technology is used in Flamel's Coreg CR that has been on the US market since 2007 in partnership with GSK
  - See slides 13-16

[1] Flamel corporate presentations [2] Jazz internal discussions

DTX-0250.0007

**Slide 5**

**CA1**      I might revise the headline to something like "Sodium oxybate multiparticulate (bead) formulations pose challenges which Flamel may not fully appreciate"

Clark Allphin, 8/25/2014

# Summary of findings – Once Nightly Formulation

### *Once-nightly formulation*

- **Current assumption: *Historically, drug absorption issues have challenged the development of once nightly SXB.***
  - *What we know:* Jazz has been attempting to develop once nightly SXB for many years and has not been successful
  - *What we know:* Sustained release SXB runs a sensitive balance of duration of effect vs. morning sleepiness. Food effect and patient variability further complicate this delicate balance
  - *What we know:* Two once nightly SXB programs (e.g., Shire, Jazz) discontinued at early stages
  - *What we know:* At present, Flamel has not publically disclosed/released any meaningful clinical data
  - *Working assumptions*: SXB absorption in lower GI is facilitated by active transporters which also absorb byproducts of food digestion (short-chain fatty acids), so food competes for the transporters and delays SXB effect. Flamel study was 2 hours after eating, so Flamel probably has no awareness of the food effect issues of SXB.
  - *Unknowns:* Can Flamel overcome patient variability and food effect?
  - *Unknowns:* Would once nightly dosing of Xyrem achieve clinical efficacy? The tests have never been performed
  - *Unknowns:* Could bead dosing introduce new safety risks? If blood levels stay too high too long, patients will have difficulty driving or working the next day.
  - *Unknowns*: Does Flamel's technology achieve adequate sustained release (PK/PD data is unknown)
  - See slides 13-16

[1] Flamel corporate presentations [2] Jazz internal discussions

# Summary of findings – Clinical and Regulatory

## *Clinical Development / Regulatory Pathway*

- **Current assumption: *505(b)(2) regulatory pathway seems to be a reasonable approval pathway for Flamel to pursue***
  - *What we know*: Flamel has publically stated that they intend to pursue a 505(b)(2) approval pathway[1]
  - *What we know:* No opportunity to claim bioequivalence (by default 1x nightly will have different PK profile)[2]
  - *What we know:* Flamel has yet to meet with the FDA; they have not fully fleshed out their development program
  - *Working assumptions*: Flamel KOL says they plan to perform one phase III trial to obtain indications for EDS and cataplexy. A single Phase III may be sufficient for orphan disease but is getting both indications feasible?
  - *Working assumptions:* Outcomes and study duration likely be similar to Xyrem and what is planned for JXP-386 *Unknowns*: Would an open-label safety study be required? [Working assumption is yes]. Flamel is not planning one.
  - *Unknowns*: Is priority review possible?
  - *See slide 2, 8 and 9*

## *Timeline Estimates*

- **Current assumption: *Flamel's publicly stated timelines appear to be optimistic. Current estimate for the 'best-case scenario' NDA filing is 2H/2017***
  - *Working assumptions*: Flamel's timeline estimates[1,2] are being benchmarked against Jazz's [narcolepsy] expertise and insights gained from JZP-386 development plans
  - *Working assumptions:* Flamel has not performed trials in narcolepsy in the US. Flamel study was in France in healthy normals, so Flamel may be underestimating enrollment time and may be unfamiliar with the need for DEA licenses for all sites (since considered schedule 1 drug). Flamel timelines are likely optimistic considering the logistical and operational challenges for conducting clinical studies in this space[2]
  - *Working assumptions:* It is common for smaller Biotech's to state aggressive timelines (few execute)
  - *See slide 8-9*

[1] Flamel corporate presentations [2] Jazz internal discussions

# Current [incomplete] understanding of Flamel's once-nightly SXB development program

Advisory
Board Meeting
(Aug 2014)
2nd Phase I Study
(Data end-2014)
Plans to Meet
EMA/FDA
(early 2015)
NDA filing date
(End 2016)
Anticipated
Approval
(End 2017)
2014
2015
2016
2017
Q1 Q2 Q3 Q4 Q1 Q2 Q3 Q4 Q1 Q2 Q3 Q4 Q1 Q2 Q3 Q4
Phase 1
Phase 1
Phase 2
Phase 3

- **2 trials** – N = 14 and N = ??
- **Patients**: Healthy volunteers
- **Primary endpoint**: PK endpoints including $C_{max}$, AUC, and others
- **Study design**: 4-way cross-over
  - 3 different doses of MP sodium oxybate (4.5g, 6g, and 7.5g)
  - Compared against two nightly Xyrem doses
- **Criteria for success**: PK/PD comparable to Xyrem (guesstimate)

Phase 2

- **Single** Phase II RCT
- **Patients**: Narcolepsy patients
- **Primary endpoint**: PK and PD endpoints
- **Study design**: Unknown
- **Criteria for success**: TBD

Phase 3

- **Single** Phase III RCT – pivotal efficacy study
- **Patients**: Narcolepsy patients
- **Primary endpoint**: Unknown
- **Study design**: Unknown
- **Criteria for success**: Unknown

*Okava and Jazz analysis based on:*
Flamel corporate presentations, SEC filings, and SAI intelligence

Jazz Pharmaceuticals

# Comparison of **JZP-386** and **Flamel** Development Timelines

Jazz Pharmaceuticals

DTX-0250.00012

# Market Intelligence Conclusions & Recommendations

- Flamel appears to be naïve about the technical challenges of SXB
- Technological, clinical and regulatory challenges remain for Flamel

Next Steps:

- Maintain high awareness of Flamel's activities/development
- Wait until more substantial data is available to determine future actions
- Consider when/if corporate development discussions are desirable

**Market Intelligence will continue to monitor Flamel closely and inform**

# Appendix

11

Jazz Pharmaceuticals

DTX-0250.00014

# Flamel – Company Overview / Profile

Flamel offices:

Based in Lyon, France
Operations in St Louis, Missouri
Manufacturing in Pessac, France

| Leerlink Estimates | FLML Revenue ($M) | FLML GAAP EPS |
|---|---|---|
| 2014E | $59 | ($1.28) |
| 2015E | $179 | $0.96 |
| 2016E | $252 | $1.80 |
| 2017E | $230 | $1.71 |

- Have 1 product launched (Bloxiverz neostigmine), 1 approved and 2 in pivotal trials. Strategy is markets where significant share held by unapproved products while drug delivery is long term
- Recent change of Senior management (no sleep experience; considered 'unimpressive' by sleep KOL advisor)
- Only 1 sleep KOL currently advising them
- As of Aug 2014, Prof. Dauvillier (lead narcolepsy KOL in France) was not familiar with Flamel AK12
- Ad Board for July 2014 was delayed to Aug-Sep
- Flamel has not had discussions with the FDA and according to their US KOL consultant 'is not asking the right questions' (effect of 2 blood level spikes vs. 1 on sleep)
- Outperform rating initiated by Leerink Partners 8/1/14 stating expect Flamel to be cash flow positive in near term. SXB considered long term

**Slide 12**

**AK12** we need to confirm this with Jed.
Windows User, 8/21/2014

# Recent Information Included in Corporate Presentation

## Ongoing Clinical Development

### Sodium Oxybate Micropump® Microparticles

- Sodium oxybate, a Micropump®-based formulation for one single dose before bedtime for patients suffering from narcolepsy, eliminating the need for a second dose.
  - The current dosing regimen for the standard of care, Xyrem® (sodium oxybate), in the U.S. is two equal, divided doses: the first dose at bedtime and the second dose 2.5 to 4 hours later
- Flamel's results of its FIM ("First in Man") clinical study in human subjects, published in April 2014, demonstrated the elimination of the second nighttime dose. The key data for 14 evaluable subjects at a nightly dose of 4.5g (two doses of 2.25g for Xyrem) are:
  - Onset of action similar to Xyrem®;
  - $C_{max}$ lower than Xyrem®; and,
  - Mean blood concentration (µg/ml) at hours 7 and 8 similar to Xyrem®.
- The profiles of two selected formulations at 6g in 13 evaluable subjects were consistent with expectations. The current study will continue to treat subjects at higher doses.
- The elimination of the second dose for narcolepsy patients not only provides more convenience, but may improve the benefit sodium oxybate provides as there will be no disruption to nighttime sleep. The potential for additional benefits, including improved safety, will be studied.

➢ **Given these results, Flamel plans: 1) a second PK study dosing patients up to 7.5g with results expected before year end 2014; 2) a new clinical study in narcoleptics to evaluate certain pharmacodynamic endpoints with results expected around mid-year 2015**

FLAMEL technologies

Jazz Pharmaceuticals

# Details on Flamel's Micropump Technology

- Sustained-release sodium oxybate utilizes Flamel's proprietary Micropump technology
- Micropump technology allows for the delivery of thousands of microparticles ranging in size from 200 and 400 μM in one dose
  - Each particle contains a drug crystal or granule enclosed in a polymer coating that acts as a shell through which the drug can be released under the effect of osmotic pressure
  - Bioadhesive surface – ensures small particles become "lodged" in the intestinal villi of the small intestine, prolonging retention
  - Allows for the tailoring of the exact desirable kinetics required to optimize delivery
    - Can mix microparticles with different release kinetics in different ratios
    - Release kinetics can be modulated by altering the thickness and composition of the polymer coating which will control the rate and duration of drug delivery

- Delayed-release formulations contain coated microparticles at one thickness whereas sustained/slow-release formulations include a mixture of microparticles with variations in polymer thickness and composition to ensure controlled delivery

*Note: Image adapted from the Flamel company website*

# The Micropump platform can deliver drugs via tablets, capsules, sachet and liquids





DTX-0250.00019

# How valid are Flamel's Micropump claims?

## Key Benefits

- Micropump® microparticles allows an extended transit time in the small intestine with a mean plasma residence time extended up to 24 hours, which is especially suitable for short-lived drugs known to be absorbed only in the small intestine;
- Microparticles' design can be potentially adapted to each drug's specific characteristics by modifying the coating thickness and composition (including "Generally Regarded as Safe" (GRAS) excipients encapsulated with the drug) for improved efficacy (i.e., extending therapeutic coverage), reduced toxicity and/or side effects (i.e., reduced $C_{max}$ or peak drug concentration in the plasma; with also reduced intra- and inter-patient variability) and improved patient compliance (once-a-day regimen);
- It is applicable to poorly soluble (< 0.01mg/L) as well as highly soluble (> 500g/L) and to low dose (4 mg) or high dose (1,000 mg) of drugs, while providing good mouth feel and taste masking;
- Micropump® allows the development of extremely precise pharmacokinetic profiles [extended (and/or delayed) release] of single or combination of drugs, in a variety of formats (tablet, capsule, sachet, or liquid), while preserving the targeted release rate over the shelf-life of the product; and,
- Broad and strong IP protection (several patents granted e.g. in the US, EU and Japan)

# Publications on Formulation Absorption

**Review published in DDT • Volume 10, Number 4 • February 2005 Issue – Professor Davis' commentary on Flamel**

– Flamel Technologies have described the design of a proprietary drug delivery system (Micropump® microparticles) that is claimed to be bioadhesive and which allows an extended transit time in the small intestine with mean residence time in the plasma extended up to 24 h (http://www.flamel.com/micropump.htm). This system is stated to be particularly suitable for short-lived drugs known to be absorbed only in the small intestine. However, as far as can be ascertained, the extended intestinal transit has yet to be demonstrated in humans. Indeed, it is hard to find any published evidence to demonstrate that strategies of bioadhesion will change transit through the small intestine of humans (an effect on gastric emptying has been found, as described below). As aforementioned, the transit of food and pharmaceuticals through the small intestine is reasonably constant in humans with a mean value of around three hours. It is little affected by fed state, age, particle size, shape, density or disease condition [9]. This is not too surprising because the small intestine has a role of moving material to the colon by a process of peristalsis. The mucus that lines the intestine has a protective role and a quick turnover. Moreover, the surface of administered particles can be rapidly conditioned by the adsorption of endogenous components such as non-adherent mucus. Notwithstanding, it has been has been postulated that, because of their size, very small particles could perhaps become trapped between the villae of the small intestine (and also in the folds of the stomach). To test this proposal, Brown et al. followed the transit of very small particles (in the ranges of 70–80 μm, 1–10 μm and 500 nm) in the human gut [ 30] using gamma scintigraphy. The results showed that the particles all had similar transit behaviors and that the measured transit times were in broad agreement with those reported previously for conventional multiparticulate systems such as pellets.

Davis Publication



# Sources

- Flamel communications
  - Press releases
  - Corporate investor decks
  - Quarterly and annual reports
  - Earnings calls
- Internal Jazz discussions
  - Market intelligence
  - Regulatory
  - Product development
  - PTL leadership
- External support
  - SAI intelligence (including KOL interviews)
  - Okava, LLC

Jazz Pharmaceuticals

# Flamel Timeline – based on Apr '14 Announcement, Jul'14 Earnings Call, Aug '14 Corporate Presentation

**3Q 2014**

- Advisory Board Meeting planned – KOL bringing in experts in with clinical and pre-clinical expertise to give Flamel insights into the development --- Working with 1 Advisor, Ad Board intended for early Sept.
- Release data from 1st PK (first product) study (??) – direct comparison to Xyrem; head-to-head comparison
- Enter 2nd PK study (dose ranging) – will test at 4.5g, 6g, and 7.5g with 2 MP formulations (includes higher dose)

**4Q 2014**

- 2nd PK study results expected (before end of 2014)
- Enter new Phase II study (larger # of subjects, further evaluate formulations & certain PD endpoints) – not a registration study

**1Q 2015**

- Meet with regulatory authorities (both EMA and FDA?)

**2Q 2015**

- Phase II results (PD data to be released)

**4Q 2015**

- Enter Phase III pivotal efficacy study – required b/c "don't have bioequivalence"
- File first product end of 2015 (with second product being 6-9 months after)

**4Q 2016**

- NDA filing late 2016 - intent to file as 505(b)(2)

# Flamel Market Intelligence:
# *Once-nightly SXB Micropump formulation*

Sleep PTL Support
Prepared: August 2014

# Background
*Flamel April Press Release and Quarterly Conference Call*

## April 2014 Press Release

***Flamel provides top-line summary for FIH Phase I study***

- **Study Description**
  - Proof-of-concept study of sodium oxybate (SXB) using Micropump technology (MP)
  - N=16 health volunteers
  - 4-way cross-over evaluating 3 different formulations of MP and Xyrem (two 2.25g doses)
  - Extension phase consists of 6g MP formulations
    - 2 formulations moved forward at 6g. 13 patients were evaluable. Profiles for both formulates at 4.5 and 6g were consistent with expectations.
- **Data Released**
  - Topline data announcement from 14 evaluable subjects at 4.5g
  - Onset of action similar to Xyrem
  - $C_{max}$ lower than Xyrem
    - (NOTE: PK success criteria for JZP-386 "… $AUC_{4-8}$ comprising 25-50% of its total $AUC_{0-8}$ with similar Cmax and Tmax compared to Xyrem". Flamel did not comment on AUC)
  - Mean blood concentration (mcg/ml) at hours 7 and 8 similar to Xyrem
    - (NOTE: blood concentration at 7 and 8 hours is zero – so these data are not meaningful)

## July 29, 2014 Quarterly Update

- Once-nightly SXB clinical development plan and corresponding timelines outlined
  - *See following slides for further details*
- Flamel cash position
  - Flamel anticipates generating cash-flow and self-funding pipeline development

# Market Intelligence

*Flamel's once-nightly SXB Micropump formulation*

**Reason for Update**

*Provide comprehensive overview and understanding of Flamel's once-nightly SXB Micropump formulation*

**Market Intelligence Focus Areas:**

- Characterize Flamel's anticipated clinical development pathway
- Generate corresponding timeline estimates (e.g., study start/stop, regulatory filings)
- Gain further understanding of underlying Micropump technology
- Collect available clinical data/information to gain insight into molecule's pharmacologic properties and clinical performance
- Provide recommendations relevant to Jazz stakeholder needs



# Market Intelligence is proactively providing updates to several [internal] Jazz stakeholders

| Jazz Stakeholders | Stakeholder Needs |
|---|---|
| **JZP-386 Development Team** | • Awareness and in-depth understanding of development programs for other once-nightly sodium oxybate formulations<br>• Understand potential relevance to JZP-386 development |
| **Sleep PTL** | • Awareness and understanding of sleep pipeline activity, especially in the narcolepsy and cataplexy space |
| **Corporate** | • Insights into external market events that have the potential to impact Jazz's core business units<br>• Provide awareness into other programs for future decision-making and communication<br>• Objective insights to help IR and Corp Comm determine how to respond |



# Summary of findings - Technology

### *Micropump Technology*

- **Current assumption: *Historically, drug formulation issues have challenged the development of multiparticulate (bead) formulations.*** CA1
  - *What we know*: Other drug developers (e.g., Shire) have pursued development of a sodium oxybate delayed release beads but discontinued efforts
  - *What we know*: Shire published (in IP) regional absorption of beads in dogs (funded by Orphan Medical).
  - *Working assumptions*: SXB poses unusual challenges for bead formulations[2]
    - High solubility of SXB requires more polymer coating and may limit polymer choices
    - Huge doses 6-9g of SXB require lots of beads
    - SXB is better absorbed in upper GI and loses absorption in lower GI
    - Critical for any SR SXB to avoid dose dumping (particularly in alcohol)
  - *Unknowns:* Has Flamel fully considered safety concerns (dose dumping, risks if not fully bioavailable, patient variability, food effect)?
  - *Unknowns*: Are Flamel beads retained in the upper GI? If they are, this might be a successful approach to sustained release. If they are not, since absorption decreases later in the GI, the full dose might not be absorbed.
  - *Unknowns*: Does Flamel have a unique and differentiated technology platform? What is the difference between Flamel's bead technology and Shires bead technology? Would Flamel have to license the Shire patent?
  - *Unknowns*: How established is Flamel's Micropump technology? Note: Flamel Micropump technology is used in Flamel's Coreg CR that has been on the US market since 2007 in partnership with GSK
  - See slides 13-16

[1] Flamel corporate presentations [2] Jazz internal discussions

Jazz Pharmaceuticals

**Slide 5**

---

**CA1**      I might revise the headline to something like "Sodium oxybate multiparticulate (bead) formulations pose challenges which Flamel may not fully appreciate"

Clark Allphin, 8/25/2014

# Summary of findings – Once Nightly Formulation

## *Once-nightly formulation*

- **Current assumption: *Historically, drug absorption issues have challenged the development of once nightly SXB.***
  - *What we know:* Jazz has been attempting to develop once nightly SXB for many years and has not been successful
  - *What we know:* Sustained release SXB runs a sensitive balance of duration of effect vs. morning sleepiness. Food effect and patient variability further complicate this delicate balance
  - *What we know:* Two once nightly SXB programs (e.g., Shire, Jazz) discontinued at early stages
  - *What we know:* At present, Flamel has not publically disclosed/released any meaningful clinical data
  - *Working assumptions*: SXB absorption in lower GI is facilitated by active transporters which also absorb byproducts of food digestion (short-chain fatty acids), so food competes for the transporters and delays SXB effect. Flamel study was 2 hours after eating, so Flamel probably has no awareness of the food effect issues of SXB.
  - *Unknowns:* Can Flamel overcome patient variability and food effect?
  - *Unknowns:* Would once nightly dosing of Xyrem achieve clinical efficacy? The tests have never been performed
  - *Unknowns:* Could bead dosing introduce new safety risks? If blood levels stay too high too long, patients will have difficulty driving or working the next day.
  - *Unknowns*: Does Flamel's technology achieve adequate sustained release (PK/PD data is unknown)
  - See slides 13-16

[1] Flamel corporate presentations [2] Jazz internal discussions

# Summary of findings – Clinical and Regulatory

## Clinical Development / Regulatory Pathway

- **Current assumption:** ***505(b)(2) regulatory pathway seems to be a reasonable approval pathway for Flamel to pursue***
  - *What we know*: Flamel has publically stated that they intend to pursue a 505(b)(2) approval pathway[1]
  - *What we know:* No opportunity to claim bioequivalence (by default 1x nightly will have different PK profile)[2]
  - *What we know:* Flamel has yet to meet with the FDA; they have not fully fleshed out their development program
  - *Working assumptions*: Flamel KOL says they plan to perform one phase III trial to obtain indications for EDS and cataplexy. A single Phase III may be sufficient for orphan disease but is getting both indications feasible?
  - *Working assumptions:* Outcomes and study duration likely be similar to Xyrem and what is planned for JXP-386
    *Unknowns*: Would an open-label safety study be required? [Working assumption is yes]. Flamel is not planning one.
  - *Unknowns*: Is priority review possible?
  - *See slide 2, 8 and 9*

## Timeline Estimates

- **Current assumption:** ***Flamel's publicly stated timelines appear to be optimistic. Current estimate for the 'best-case scenario' NDA filing is 2H/2017***
  - *Working assumptions*: Flamel's timeline estimates[1,2] are being benchmarked against Jazz's [narcolepsy] expertise and insights gained from JZP-386 development plans
  - *Working assumptions:* Flamel has not performed trials in narcolepsy in the US. Flamel study was in France in healthy normals, so Flamel may be underestimating enrollment time and may be unfamiliar with the need for DEA licenses for all sites (since considered schedule 1 drug). Flamel timelines are likely optimistic considering the logistical and operational challenges for conducting clinical studies in this space[2]
  - *Working assumptions:* It is common for smaller Biotech's to state aggressive timelines (few execute)
  - *See slide 8-9*

[1] Flamel corporate presentations [2] Jazz internal discussions

# Current [incomplete] understanding of Flamel's once-nightly SXB development program

Advisory
Board Meeting
(Aug 2014)
2nd Phase I Study
(Data end-2014)
Plans to Meet
EMA/FDA
(early 2015)
NDA filing date
(End 2016)
Anticipated
Approval
(End 2017)
2014
2015
2016
2017
Q1
Q2
Q3
Q4
Phase 1
Phase 1
Phase 2
Phase 3

- **2 trials** – N = 14 and N = ??
- **Patients**: Healthy volunteers
- **Primary endpoint**: PK endpoints including $C_{max}$, AUC, and others
- **Study design**: 4-way cross-over
  - 3 different doses of MP sodium oxybate (4.5g, 6g, and 7.5g)
  - Compared against two nightly Xyrem doses
- **Criteria for success**: PK/PD comparable to Xyrem (guesstimate)

- **Single** Phase II RCT
- **Patients**: Narcolepsy patients
- **Primary endpoint**: PK and PD endpoints
- **Study design**: Unknown
- **Criteria for success**: TBD

- **Single** Phase III RCT – pivotal efficacy study
- **Patients**: Narcolepsy patients
- **Primary endpoint**: Unknown
- **Study design**: Unknown
- **Criteria for success**: Unknown

*Okava and Jazz analysis based on:*
Flamel corporate presentations, SEC filings, and SAI intelligence

Jazz Pharmaceuticals

# Comparison of **JZP-386** and **Flamel** Development Timelines



Jazz Pharmaceuticals

DTX-0250.00033

# Market Intelligence Conclusions & Recommendations

- Flamel appears to be naïve about the technical challenges of SXB
- Technological, clinical and regulatory challenges remain for Flamel

Next Steps:

- Maintain high awareness of Flamel's activities/development
- Wait until more substantial data is available to determine future actions
- Consider when/if corporate development discussions are desirable

**Market Intelligence will continue to monitor Flamel closely and inform**



# Appendix

Jazz Pharmaceuticals

11

DTX-0250.00035

# Flamel – Company Overview / Profile

Flamel offices:

Based in Lyon, France
Operations in St Louis, Missouri
Manufacturing in Pessac, France

| Leerlink Estimates | FLML Revenue ($M) | FLML GAAP EPS |
|---|---|---|
| 2014E | $59 | ($1.28) |
| 2015E | $179 | $0.96 |
| 2016E | $252 | $1.80 |
| 2017E | $230 | $1.71 |

- Have 1 product launched (Bloxiverz neostigmine), 1 approved and 2 in pivotal trials. Strategy is markets where significant share held by unapproved products while drug delivery is long term
- Recent change of Senior management (no sleep experience; considered 'unimpressive' by sleep KOL advisor)
- Only 1 sleep KOL currently advising them
- As of Aug 2014, Prof. Dauvillier (lead narcolepsy KOL in France) was not familiar with Flamel AK12
- Ad Board for July 2014 was delayed to Aug-Sep
- Flamel has not had discussions with the FDA and according to their US KOL consultant 'is not asking the right questions' (effect of 2 blood level spikes vs. 1 on sleep)
- Outperform rating initiated by Leerink Partners 8/1/14 stating expect Flamel to be cash flow positive in near term. SXB considered long term



**Slide 12**

**AK12**    we need to confirm this with Jed.
Windows User, 8/21/2014

# Recent Information Included in Corporate Presentation

## Ongoing Clinical Development

### Sodium Oxybate Micropump® Microparticles

- Sodium oxybate, a Micropump®-based formulation for one single dose before bedtime for patients suffering from narcolepsy, eliminating the need for a second dose.
  - The current dosing regimen for the standard of care, Xyrem® (sodium oxybate), in the U.S. is two equal, divided doses: the first dose at bedtime and the second dose 2.5 to 4 hours later
- Flamel's results of its FIM ("First in Man") clinical study in human subjects, published in April 2014, demonstrated the elimination of the second nighttime dose. The key data for 14 evaluable subjects at a nightly dose of 4.5g (two doses of 2.25g for Xyrem) are:
  - Onset of action similar to Xyrem®;
  - $C_{max}$ lower than Xyrem®; and,
  - Mean blood concentration (µg/ml) at hours 7 and 8 similar to Xyrem®.
- The profiles of two selected formulations at 6g in 13 evaluable subjects were consistent with expectations. The current study will continue to treat subjects at higher doses.
- The elimination of the second dose for narcolepsy patients not only provides more convenience, but may improve the benefit sodium oxybate provides as there will be no disruption to nighttime sleep. The potential for additional benefits, including improved safety, will be studied.

➢ **Given these results, Flamel plans: 1) a second PK study dosing patients up to 7.5g with results expected before year end 2014; 2) a new clinical study in narcoleptics to evaluate certain pharmacodynamic endpoints with results expected around mid-year 2015**

FLAMEL technologies | Flamel's Drug Delivery Platforms | July 2014 | 10

Jazz Pharmaceuticals

# Details on Flamel's Micropump Technology

- Sustained-release sodium oxybate utilizes Flamel's proprietary Micropump technology
- Micropump technology allows for the delivery of thousands of microparticles ranging in size from 200 and 400 μM in one dose
  - Each particle contains a drug crystal or granule enclosed in a polymer coating that acts as a shell through which the drug can be released under the effect of osmotic pressure
  - Bioadhesive surface – ensures small particles become "lodged" in the intestinal villi of the small intestine, prolonging retention
  - Allows for the tailoring of the exact desirable kinetics required to optimize delivery
    - Can mix microparticles with different release kinetics in different ratios
    - Release kinetics can be modulated by altering the thickness and composition of the polymer coating which will control the rate and duration of drug delivery

- Delayed-release formulations contain coated microparticles at one thickness whereas sustained/slow-release formulations include a mixture of microparticles with variations in polymer thickness and composition to ensure controlled delivery

*Note: Image adapted from the Flamel company website*

# The Micropump platform can deliver drugs via tablets, capsules, sachet and liquids

# How valid are Flamel's Micropump claims?

## Key Benefits

- Micropump® microparticles allows an extended transit time in the small intestine with a mean plasma residence time extended up to 24 hours, which is especially suitable for short-lived drugs known to be absorbed only in the small intestine;
- Microparticles' design can be potentially adapted to each drug's specific characteristics by modifying the coating thickness and composition (including "Generally Regarded as Safe" (GRAS) excipients encapsulated with the drug) for improved efficacy (i.e., extending therapeutic coverage), reduced toxicity and/or side effects (i.e., reduced $C_{max}$ or peak drug concentration in the plasma; with also reduced intra- and inter-patient variability) and improved patient compliance (once-a-day regimen);
- It is applicable to poorly soluble (< 0.01mg/L) as well as highly soluble (> 500g/L) and to low dose (4 mg) or high dose (1,000 mg) of drugs, while providing good mouth feel and taste masking;
- Micropump® allows the development of extremely precise pharmacokinetic profiles [extended (and/or delayed) release] of single or combination of drugs, in a variety of formats (tablet, capsule, sachet, or liquid), while preserving the targeted release rate over the shelf-life of the product; and,
- Broad and strong IP protection (several patents granted e.g. in the US, EU and Japan)

# Publications on Formulation Absorption

**Review published in DDT • Volume 10, Number 4 • February 2005 Issue – Professor Davis' commentary on Flamel**

– Flamel Technologies have described the design of a proprietary drug delivery system (Micropump® microparticles) that is claimed to be bioadhesive and which allows an extended transit time in the small intestine with mean residence time in the plasma extended up to 24 h (http://www.flamel.com/micropump.htm). This system is stated to be particularly suitable for short-lived drugs known to be absorbed only in the small intestine. However, as far as can be ascertained, the extended intestinal transit has yet to be demonstrated in humans. Indeed, it is hard to find any published evidence to demonstrate that strategies of bioadhesion will change transit through the small intestine of humans (an effect on gastric emptying has been found, as described below). As aforementioned, the transit of food and pharmaceuticals through the small intestine is reasonably constant in humans with a mean value of around three hours. It is little affected by fed state, age, particle size, shape, density or disease condition [9]. This is not too surprising because the small intestine has a role of moving material to the colon by a process of peristalsis. The mucus that lines the intestine has a protective role and a quick turnover. Moreover, the surface of administered particles can be rapidly conditioned by the adsorption of endogenous components such as non-adherent mucus. Notwithstanding, it has been has been postulated that, because of their size, very small particles could perhaps become trapped between the villae of the small intestine (and also in the folds of the stomach). To test this proposal, Brown et al. followed the transit of very small particles (in the ranges of 70–80 µm, 1–10 µm and 500 nm) in the human gut [ 30] using gamma scintigraphy. The results showed that the particles all had similar transit behaviors and that the measured transit times were in broad agreement with those reported previously for conventional multiparticulate systems such as pellets.

Davis Publication



# Sources

- Flamel communications
  - Press releases
  - Corporate investor decks
  - Quarterly and annual reports
  - Earnings calls
- Internal Jazz discussions
  - Market intelligence
  - Regulatory
  - Product development
  - PTL leadership
- External support
  - SAI intelligence (including KOL interviews)
  - Okava, LLC

# Flamel Timeline – based on Apr ‘14 Announcement, Jul’14 Earnings Call, Aug ‘14 Corporate Presentation

**3Q 2014**

- Advisory Board Meeting planned – KOL bringing in experts in with clinical and pre-clinical expertise to give Flamel insights into the development --- Working with 1 Advisor, Ad Board intended for early Sept.
- Release data from 1st PK (first product) study (??) – direct comparison to Xyrem; head-to-head comparison
- Enter 2nd PK study (dose ranging) – will test at 4.5g, 6g, and 7.5g with 2 MP formulations (includes higher dose)

**4Q 2014**

- 2nd PK study results expected (before end of 2014)
- Enter new Phase II study (larger # of subjects, further evaluate formulations & certain PD endpoints) – not a registration study

**1Q 2015**

- Meet with regulatory authorities (both EMA and FDA?)

**2Q 2015**

- Phase II results (PD data to be released)

**4Q 2015**

- Enter Phase III pivotal efficacy study – required b/c “don’t have bioequivalence”
- File first product end of 2015 (with second product being 6-9 months after)

**4Q 2016**

- NDA filing late 2016 - intent to file as 505(b)(2)

# EXHIBIT 3

US 20040234601A1

(19) United States
(12) Patent Application Publication
Legrand et al.
(10) Pub. No.: US 2004/0234601 A1
(43) Pub. Date: Nov. 25, 2004

(54) **MICROPARTICULATE ORAL GALENICAL FORM FOR THE DELAYED AND CONTROLLED RELEASE OF PHARMACEUTICAL ACTIVE PRINCIPLES**

(76) Inventors: **Valerie Legrand**, Lyon (FR); **Catherine Castan**, Orlienas (FR); **Remi Meyrueix**, Lyon (FR); **Gerard Soula**, Meyzieu (FR)

Correspondence Address:
**Finnegan, Henderson, Farabow,**
**Garrett & Dunner, L.L.P.**
**1300 I Street, N.W.**
**Washington, DC 20005-3315 (US)**

(21) Appl. No.: **10/826,690**

(22) Filed: **Apr. 19, 2004**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. PCT/FR02/03443, filed on Oct. 9, 2002.

(30) **Foreign Application Priority Data**

Oct. 9, 2001 (FR) ........................................ 01/12999

**Publication Classification**

(51) **Int. Cl.**[7] .............................. **A61K 9/26**; A61K 9/14

(52) **U.S. Cl.** ........................................................ **424/469**

(57) **ABSTRACT**

The invention relates to a microparticulate system for the delayed and controlled release of active principles (AP) whose absorption window in vivo is essentially limited to the upper parts of the gastrointestinal tract, this system being intended for oral administration. The object of the invention is to provide a system ensuring that the AP is released with certainty by means of a dual mechanism of "time-dependent" and "pH-dependent" release. To achieve this object, the invention proposes a multimicrocapsular oral galenical form which is designed so as to guarantee therapeutic efficacy, and in which the release of the AP is governed by a dual release triggering mechanism that is "time-triggering" and "pH-triggering". This system comprises of microcapsules (200 to 600 μm) comprising a core of AP coated with a film (maximum 40% by weight) comprising a hydrophilic polymer A (Eudragit® L) and a hydrophobic compound B (vegetable wax, melting point=40-90° C.), B/A being between 0.2 and 1.5. These microcapsules have a dissolution behavior in vitro such that, at a constant pH of 1.4, a latency phase of between 1 and 5 hours is observed, followed by a release of the AP, and such that the change from pH 1.4 to pH 6.8 results in a release of the AP without a latency period in vitro.

DTX-1694
Jazz Pharms., Inc. v.
Avadel CNS Pharms., LLC
C.A. Nos. 21-691, 21-1138, 21-1594 (GBW)



120.0
100.0
80.0
% D
60.0
40.0
20.0
0.0
0
2
4
6
8
10
12
14
16
T (h)

FIG 1

120
100
80
% D
60
40
20
0
0
4
8
12
16
20
24
T(h)

FIG 2



FIG 3

# MICROPARTICULATE ORAL GALENICAL FORM FOR THE DELAYED AND CONTROLLED RELEASE OF PHARMACEUTICAL ACTIVE PRINCIPLES

[0001] This application is a continuation-in-part of Application No. ______, which is the National Stage of International Application No. PCT/FR02/03443, filed Oct. 9, 2002, and claims the benefit of FR01/12999, filed Oct. 9, 2001, each of which is incorporated herein by reference.

[0002] The present invention relates to the field of microparticulate systems for the delayed and controlled release of one or more active principles, AP, intended for oral administration.

[0003] The AP envisaged in the present invention are those whose absorption is essentially limited to the upper parts of the gastrointestinal tract located upstream from the colon (upstream from the ileocecal junction), and which represent a large majority of pharmaceutical active principles.

[0004] More precisely, the invention relates to a microparticulate galenical form for delayed and controlled release where the controlled release phase is triggered with certainty by means of a dual mechanism: "time-dependent" release triggered after a certain residence time in the stomach, and "pH-dependent" release triggered by a change in pH when the particles enter the small intestine, which starts without a latency period. The microparticles of the present invention are microcapsules containing at least one active principle (AP)—excluding perindopril—having a particle size of between 100 and 1200 microns and individually coated with a film allowing the delayed and controlled release of the AP.

[0005] Systems for the delayed and controlled release of AP are particularly useful in cases where it is desirable, for reasons of chronobiology, that the AP be "bioabsorbed" at a precise time of day so as to be in phase with the circadian cycle. This approach is appropriate to the treatment of cancer or hypertension, the administration of anti-inflammatory drugs or the regulation of glycemia in the treatment of diabetes. It may be advantageous, for example, for the AP to be bioabsorbed very early in the morning so as to assure therapeutic cover when the patient wakes up, without compelling him to wake up prematurely. To do this, the galenical system ingested by the patient, for example after the evening meal, must allow a delayed release of the AP.

[0006] However, the first rule imposed on the pharmacist is to guarantee that the prescribed drug will be absorbed by the patient. In the case of a delayed release form, it is therefore crucial to have a total guarantee of release of the active principle at a given moment in order to obtain the therapeutic effect. Now, one is obliged to note that delayed release forms cannot ensure with certainty that the AP will be released after a prescribed time. This problem becomes particularly acute in the case where it is vital for the patient that this release does indeed take place, for example in the treatment of cardiovascular diseases or diabetes.

[0007] In fact, delayed release forms are conventionally obtained by coating the AP with a layer of enteric polymer, for example the methacrylic acid/methyl methacrylate copolymer EUDRAGIT® L. This type of enteric coating is known to have a reduced permeability under the acidic pH conditions of the stomach, and to dissolve when the pH increases to a value close to that prevailing in the small intestine, thereby releasing the AP. However, the intraindividual and interindividual variability of the gastric pH conditions and the gastric emptying time do not make it possible to ensure with certainty that the AP will be released after a given time.

[0008] Purely "time-dependent" delayed release systems, i.e. those for which the release of the AP is triggered after a given residence time in the gastrointestinal tract, are not satisfactory either. In fact, because of the intraindividual and interindividual variability of the gastric residence time, the AP may be released after it has passed its absorption window, which, for the majority of AP, is located in the upper part of the gastrointestinal tract. The bioabsorption may thus be very low or even zero.

[0009] In this context it would be particularly advantageous to have a galenical form for the delayed and controlled release of the AP which made it possible to assure with certainty the release of the AP by means of a dual AP release triggering mechanism: "time-dependent" release triggered after a controlled time in the stomach, without a change in pH, and "pH-dependent" release triggered by an increase in the pH when the galenical form enters the intestine. These two AP release triggering factors, in succession, would give the galenical system a high degree of reliability in use. The release of the AP would thus be guaranteed after a preset latency period, even if the variation in pH did not intervene as a trigger, i.e. even if the galenical form did not pass from the stomach into the intestine.

[0010] To minimize the interindividual variability of AP absorption, it is necessary to adjust the latency period preceding the release of the AP into the stomach by considering the physiological conditions of the gastrointestinal tract in man. According to the well-known results of Davis et al., J. of Controlled Release, 2, 27-38 (1985), the gastric residence time of a preparation is very variable, being in the order of 0.5 to 10 hours. It would therefore be particularly advantageous to have a galenical form which released the active principle into the stomach after a given constant latency period within this interval of 0.5-10 hours, so that the action time of the drug would be the same from one individual to another or even from one day to the next for the same individual.

[0011] Moreover, to optimize the bioavailability of AP whose absorption is mainly limited to the upper parts of the gastrointestinal tract, it would be advantageous if the "pH-dependent" release into the intestine were to take place without a latency period, since otherwise the AP would not be released in its absorption window and, consequently, the patient would not be treated.

[0012] Another unique advantage of such a system would be that, by mixing it with a galenical form for immediate release of the AP, or by mixing it with another galenical form for delayed and controlled release of the AP, it would afford release profiles which exhibited several AP release waves (one AP or several identical or different AP) or which, by appropriate adjustment of the different fractions, assured a constant plasma AP concentration level.

[0013] It would also be advantageous for the delayed and controlled release form to consist of a plurality of microcapsules with a diameter below 2000 microns. In fact, for such a form, the dose of AP to be administered is spread over

a large number of microcapsules (typically 10,000 for a dose of 500 mg) and thus has the following intrinsic advantages:

[0014] The residence time of the microcapsules in the upper parts of the gastrointestinal tract can be prolonged, thereby increasing the duration of passage of the AP through the absorption windows and thus maximizing the bioavailability of the AP.

[0015] The use of a mixture of microcapsules with different delayed and controlled release profiles makes it possible to create release profiles which exhibit several release waves or which, by appropriate adjustment of the different fractions, assure a constant plasma AP concentration level.

[0016] The sensitivity to the variability of gastric emptying is reduced because the emptying, which in this case takes place over a large number of particles, is statistically more reproducible.

[0017] Bringing the tissues into contact with a high dose of AP—dose dumping—is avoided. Each microcapsule actually contains only a very small dose of AP. This eliminates the risk of tissue damage due to a local excess concentration of aggressive AP.

[0018] It is possible to combine several galenical forms (immediate and/or delayed and/or prolonged release), containing one or more active principles, in these "multimicrocapsular" systems.

[0019] It is possible to present these microcapsules in the form of sachets, gelatin capsules or tablets. In cases where the dose of AP is high (500 mg or more), the monolithic forms are too large to be swallowed easily. It is then of particular value to have a microparticulate form for delayed and controlled release of the AP, which those skilled in the art can formulate as disintegrating tablets or sachets.

[0020] Finally, it would also be desirable for the coating film around the microcapsules to be thin. In fact, a thick coating would have several adverse consequences:

[0021] (a) the mass fraction of excipient in the galenical form would be too high, making the mass of the drug too large to be swallowed easily and hence, in fine, creating compliance problems that jeopardize the success of the treatment; and

[0022] (b) the microcapsules would take a very long time to manufacture.

[0023] In summary, it would therefore be of particular value to have a microparticulate oral galenical form for the delayed and controlled release of AP which simultaneously possessed the following properties:

[0024] the release of the AP can be triggered in two ways:

[0025] by release dependent on time, also called "time-dependent" release, when the residence time of the particles in the stomach exceeds 5 hours;

[0026] by release dependent on a variation in pH, also called "pH-dependent" release, which starts without a latency period when the system enters the intestine and the pH increases; these two AP release triggering factors, in succession, guarantee that the AP is released after a preset latency period, even if the variation in pH has not intervened as a trigger;

[0027] it consists of a plurality of small microcapsules of coated AP; and

[0028] the mass fraction of coating excipients is limited.

[0029] The delayed or controlled release of AP has formed the subject of numerous studies.

[0030] Thus PCT patent application WO-A-96/11675 describes microcapsules for the oral administration of medicinal and/or nutritional active principles (AP) whose size is less than or equal to 1000 μm. These microcapsules consist of particles coated with a coating material consisting of a mixture of a film-forming polymeric derivative (ethyl cellulose), a hydrophobic plasticizer (castor oil), a surfactant and/or lubricant (magnesium stearate) and a nitrogen-containing polymer (polyvinylpyrrolidone: PVP). These microcapsules are also characterized by their ability to reside for a long time (at least 5 hours) in the small intestine and, during this residence time, to allow absorption of the AP over a period greater than the natural transit time in the small intestine.

[0031] The microcapsules according to said patent application do not provide a solution to the particular problem of the delayed and controlled release of AP with a "time-dependent" and "pH-dependent" triggering of the AP.

[0032] Patent application FR-A-00 14876 describes a drug for the treatment of type II diabetes which comprises several thousand antihyperglycemic microcapsules (metformin) each consisting of a core containing at least one antihyperglycemic, and of a coating film (e.g. stearic acid and ethyl cellulose) applied to the core, which allows prolonged release of the antihyperglycemic in vivo. These microcapsules have a particle size of between 50 and 1000 μm.

[0033] Said patent application FR-A-00 14876 does not indicate how to obtain the delayed and controlled release of AP with a "time-dependent" and "pH-dependent" triggering of the AP.

[0034] European patent application EP-A-0 609 961 discloses oral morphine granules for which the controlled release of the AP accelerates with the increase in pH.

[0035] These granules consist of:

[0036] a sugar core (ϕ=100 to 1700 μm)

[0037] coated with a layer of active ingredient associated with a binder (PVP or hydroxypropyl methyl cellulose: HPMC),

[0038] and an outer envelope based on:

[0039] a polymer that is insoluble independently of the pH (ethyl cellulose or methacrylic acid ester/ammonium methacrylate copolymer: EUDRAGIT® RS or RL),

[0040] an enteric polymer that is insoluble at acidic pH (methacrylic acid/methyl methacrylate copolymer: EUDRAGIT® L),

[0041] a component that is partially soluble at acidic pH (polyethylene glycol, PVP, HPMC, polyvinyl alcohol: PVA),

[0042] optionally a plasticizer (diethyl phthalate)

[0043] and optionally a filler (talcum).

[0044] The mass fractions of AP are e.g. 41%, 38% and 29% and the mass fractions of outer envelope are e.g. 14.1%, 21.5% and 12.3% (by weight).

[0045] Release of the AP takes place at any pH and increases as the pH changes from 1.2 to 7.5. This is therefore a form for prolonged and non-delayed release.

[0046] The article by H. YOSHINO entitled "*Design and evaluation of time-controlled release systems for site-specific oral drug delivery to the GI tract*", published in *Current status on targeted drug delivery to the GI tract*, Capsugel library, Symp. Ser., Short Hills 22/04, London 6/05, Tokyo 14/05, pp 185-190, (1993), describes multiparticulate oral galenical systems for delayed and controlled release induced by an organic acid and by the residence time in the GIT. These systems are made up of 1000 $\mu$m microcapsules consisting of a neutral sugar core coated with a layer of active ingredient mixed with an organic acid (succinic acid), and of an outer layer of methacrylic acid ester/ammonium methacrylate copolymer (EUDRAGIT® RS). The organic acid is described as allowing a rapid release of the AP after the latency phase. This organic acid is transported by the water which has entered the microcapsules through the enteric outer layer. It then works towards modifying the permeability of the coating to allow rapid diffusion of the AP out of the microcapsules. The presence of this acid in intimate contact with the AP can be detrimental to the latter.

[0047] Patent U.S. Pat. No. 6,033,687 describes a formulation consisting of a mixture of two types of granules ($\phi$=1.4 mm) based on diltiazem, namely granules with a short latency period and granules with a long latency period. The release profiles are measured at pH 1. These granules comprise:

[0048] a neutral sugar core ($\phi$=0.5-1.5 mm),

[0049] a layer of diltiazem associated with a binder (hydroxypropyl cellulose, carboxymethyl cellulose, ethyl cellulose, polyvinylpyrrolidone, alginate, EUDRAGIT),

[0050] and a single outer coating based on a lubricant (talcum), two methacrylic acid ester/ammonium methacrylate copolymers (EUDRAGIT® RS and EUDRAGIT® RL), a surfactant (sodium laurylsulfate) and a plasticizer (triethyl citrate).

[0051] In the granules with a short latency period, the mass fraction of the coating represents 12.3%, compared with 30.3% in the granules with a long latency period. However, this technique does not afford long latency periods for film coating rates below 30%. Furthermore, in view of the intraindividual and interindividual variability of the gastric residence time, this "time-dependent" delayed release system may release the AP after it has passed its absorption window. This results in a substantial loss of bioavailability.

[0052] Patent EP-B-0 263 083 describes a microcapsule coating composition that affords a zero-order and reproducible AP release profile. This coating composition is composed of a mixture of:

[0053] a hardening polymer to assure the mechanical strength of the coating, possible examples being ethyl cellulose or methacrylic acid copolymer(s) (EUDRAGIT® E, L, S or RS),

[0054] a lipophilic compound, e.g. stearic acid or paraffin,

[0055] and talcum.

[0056] This coating composition is present in the microcapsules in an amount of e.g. 15 to 35% by weight. The hardening polymer/lipophilic compound ratios are e.g. 44 and 42% respectively in Examples 4 and 5.

[0057] The profiles obtained are profiles without a latency period of variable duration. Said patent neither teaches nor mentions how to obtain a profile with a delayed and controlled release that is triggered at the end of the latency period and/or by a variation in pH.

[0058] Patent application WO-A-01/58424 **A1** discloses "floating" microcapsules coated with an enteric coating based e.g. on EUDRAGIT® L, magnesium stearate, talcum and a plasticizer such as dibutyl sebacate. This coating can be enveloped in a "bioadhesive" film based on chitosan. Like every enteric coating, the aim of the enteric coating according to patent document WO-A-01/58424 is a "pH-dependent" release rather than the conjunction of a "time-dependent" release and a "pH-dependent" release. Furthermore, FIGS. **1** to **3** of said patent application show that the simple objective of"pH-dependent" release is very imperfectly achieved since up to 20% of the AP is released in two hours only at constant acidic pH. As the particles described in said patent application float in the stomach, their gastric residence time is described as increased, so much so that one may even fear the absence of any "pH-triggered" release. Finally, the release would take place in an uncontrolled manner due to the rogue leaks of AP into the stomach.

[0059] European patent application EP-A-1 101 490 relates to a pharmaceutical preparation that is capable of releasing an active principle into the large intestine and more particularly the colon. This preparation can consist of tablets or granules comprising a core and a coating.

[0060] The technical problem underlying said invention is to propose a pharmaceutical form that is capable of allowing the release of a medicinal substance at a target site in the lower part of the small intestine, the ascending colon, the transverse colon or the lower part of the large intestine. Given the fact that the mean residence time in the stomach is 5 hours and that, on average, a further 2 hours are required to reach the lower part of the small intestine, the preparation according to EP-A-1 101 490 is designed so that the medicinal substance is not released for 5 hours under acidic conditions simulating the stomach, and is only released after a latency period of at least 2 hours in a fluid simulating the pH conditions of the intestine (cf. especially claim 7 of EP-A-1 101 490).

[0061] It is therefore apparent that this system aimed at medicinal substances absorbed in the lower parts of the intestine (colon) is not suitable for medicinal substances mainly absorbed in the upper parts of the gastrointestinal tract. Moreover, the system according to European patent application EP-A-1 101 490 does not make provision for release of the AP by means of a dual release triggering mechanism:

[0062] release into the stomach after a constant given latency period within an interval of 0.5-10 hours ("time-dependent" mechanism),

[0063] and release without a latency period after entering the intestine ("pH-dependent" mechanism).

[0064] Finally, the problem of the interindividual or intraindividual variability of the gastric residence time is not solved by the preparation according to EP-A-1 101 490.

[0065] Thus the prior art does not comprise a galenical system that makes it possible to delay and to guarantee with certainty the release of AP preferentially absorbed in the upper parts of the gastrointestinal tract, by means of a dual release mechanism:

[0066] "time-dependent" release after a latency period in the stomach which has the characteristic of being a constant given latency period within an interval of 0.5-10 hours,

[0067] and "pH-dependent" release without a latency period.

[0068] In view of this state of the art, one of the essential objectives of the present invention is to provide a novel multimicroparticulate galenical system for the oral administration of active principles essentially absorbed in the upper parts of the gastrointestinal tract, this system being of the delayed and controlled release type that assures the release of the AP with certainty and hence guarantees the therapeutic efficacy of said system, by means of a dual "time-dependent" and "pH-dependent" release mechanism. These two AP release triggering factors, in succession, guarantee the release of the AP after a preset latency period, even if the variation in pH has not intervened as a trigger.

[0069] One essential objective of the present invention is to propose a galenical form made up of a plurality of microcapsules that makes it possible to escape from the interindividual and intraindividual variability of the gastric emptying time by releasing the AP at pH 1.4 according to a delayed release profile which has a latency period with an adjustable given duration of between 0.5 and 10 hours, followed by a release phase that starts without a latency period.

[0070] One essential objective of the present invention is to propose a galenical form made up of a plurality of microcapsules that makes it possible on the one hand to release the AP according to a delayed release profile at pH 1.4 with a constant given latency period of between 0.5 and 10 hours, and according to a release half-life $t_{1/2}$ of between 0.25 and 35 hours, and on the other hand to release the AP when the pH changes from 1.4 to 6.8, without a latency period and with a $t_{1/2}$ of between 0.25 and 20 hours.

[0071] One essential objective of the present invention is controlled when the pH changes from 1.4 to 6.8.

[0072] One objective of the present invention is to propose a galenical form consisting of a large number of microcapsules, for example in the order of several thousand, this multiplicity statistically assuring a good reproducibility of the AP transit kinetics throughout the gastrointestinal tract, the result being a better control of the bioavailability and hence a better efficacy.

[0073] One essential objective of the present invention is to propose a galenical form made up of a plurality of coated microcapsules that avoids the use of large amounts of coating agent, the mass fraction of coating agent being comparable to that of monolithic forms.

[0074] One essential objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules that makes it possible to present the AP in a form that is easy to swallow, namely a sachet or a disintegrating tablet.

[0075] One essential objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules that makes it possible to mix several different active principles.

[0076] Another objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules each containing a neutral core.

[0077] Having set themselves the above objectives, among others, it was to the inventors' credit to have developed, in order to assure a certain release of AP mainly absorbed in the upper parts of the gastrointestinal tract and a good bioabsorption of pharmaceutical active principles, a multimicrocapsular galenical system which:

[0078] guarantees the absorption of the AP in its absorption window, which is mainly limited to the upper parts of the gastrointestinal tract;

[0079] thereby assures a certain therapeutic efficacy of this system or of this galenical form;

[0080] and has the essential characteristic of a dual triggering of the AP release.

[0081] This represents a major advance compared with the AP controlled release systems known hitherto, in which the release of the AP is triggered by a single factor, namely the residence time in the gastrointestinal tract for some systems and a variation in pH for other systems.

[0082] Thus the invention, which satisfies the objectives laid out above, among others, relates to a microparticulate oral galenical form for the delayed and control release of at least one AP—excluding perindopril—this AP having an absorption window in vivo that is essentially limited to the upper parts of the gastrointestinal tract, said form being designed so as to guarantee its therapeutic efficacy by guaranteeing its absorption in vivo, and being characterized in that:

[0083] the release of the AP is governed by two different triggering mechanisms, one being based on a variation in pH and the other allowing the release of the AP after a predetermined residence time in the stomach,

[0084] and its dissolution behavior in vitro (determined as indicated in the European Pharmacopeia, 3rd edition, under the title: "Dissolution test for solid oral forms": type II dissolutest performed under SINK conditions, maintained at 37° C. and agitated at 100 rpm) is such that:

[0085] at a constant pH of 1.4, the dissolution profile includes a latency phase with a duration less than or equal to 5 hours, preferably of between 1 and 5 hours,

[0086] and the change from pH 1.4 to pH 6.8, during the latency phase, results in a release phase that starts without a latency period.

[0087] In one preferred embodiment of the invention, the microparticulate oral galenical form consists of a plurality of microcapsules containing at least one active principle (AP) mainly absorbed in the upper parts of the gastrointestinal tract—excluding perindopril—these microcapsules being of the type that:

[0088] consist of particles of AP each coated with at least one film, this coating film consisting of a composite material which:

[0089] comprises:

[0090] at least one hydrophilic polymer A carrying groups that are ionized at neutral pH,

[0091] and at least one hydrophobic compound B;

[0092] and represents a mass fraction (% by weight, based on the total mass of the microcapsules) of $\leqq 40$;

[0093] and have a diameter below 2000 microns, preferably of between 200 and 800 microns and particularly preferably of between 200 and 600 microns,

[0094] characterized in that their coating film consists of a composite based on A and B in which:

[0095] the weight ratio B/A is between 0.45 and 1.0, preferably between 0.5 and 1,

[0096] and the hydrophobic compound B is selected from products that are crystalline in the solid state and have a melting point $T_{fB}$ such that $T_{fB} \geqq 40°$ C., preferably $T_{fB} \geqq 50°$ C.

[0097] Advantageously, the microcapsules have a diameter of between 200 and 800 microns, B/A is between 0.5 and 1.0 and the hydrophobic compound B is selected from products that one cristalline in the solid state and have a melting point $T_{FB}$ such that $40°$ C.$\leqq T_{FB} \leqq 90°$ C.

[0098] According to one preferred characteristic of the invention, the hydrophilic polymer A is selected from:

[0099] (meth)acrylic acid/alkyl (e.g. methyl) (meth-)acrylate copolymers (EUDRAGIT® S or L) and mixtures thereof;

[0100] cellulose derivatives, preferably cellulose acetate and/or phthalate, hydroxypropyl methyl cellulose phthalate and hydroxypropyl methyl cellulose acetate and/or succinate;

[0101] and mixtures thereof.

[0102] More preferably, the compound B is selected from the following group of products:

[0103] vegetable waxes, taken on their own or in mixtures with one another;

[0104] hydrogenated vegetable oils, taken on their own or in a mixture with one another;

[0105] mixtures of at least one monoester and of at least one diester and/or of at least one triester of glycerol with at least one fatty acid;

[0106] and mixtures thereof.

[0107] According to the most preferred embodiment of the instant invention, the compound B of the microcapsules' coating film is selected from the groups comprising:

[0108] the products which tradenames (trademarks) are the followings: Dynasan (Hydrogenated palm oil), Cutina (Hydrogenated castor oil), Hydrobase (Hydrogenated soybean oil), Dub (Hydrogenated soybean oil), Castorwax (Hydrogenated castor oil), Croduret (Hydrogenated castor oil), Carbowax, Compritol (Glyceryl behenate), Sterotex (Hydrogenated cottonseed oil), Lubritab (Hydrogenated cottonseed oil), Apifil (Wax yellow), Akofine (Hydrogenated cottonseed oil), Softtisan (Hydrogenated palm oil), Hydrocote (Hydrogenated soybean oil), Livopol (Hydrogenated soybean oil), Super Hartolan (Lanolin), MGLA (Anhydrous milk fat), Corona (Lanolin), Protalan (Lanolin), Akosoft (Suppository bases, Hard fat), Akosol (Suppository bases, Hard fat), Cremao (Suppository bases, Hard fat), Massupol (Suppository bases, Hard fat), Novata (Suppository bases, Hard fat), Suppocire (Suppository bases, Hard fat), Wecobee (Suppository bases, Hard fat), Witepsol (Suppository bases, Hard fat), Coronet, Lanol, Lanolin, Incromega (Omega 3), Estaram (Suppository bases, Hard fat), Estol, Suppoweiss (Suppository bases, Hard fat), Gelucire (Macrogolglycerides Lauriques), Precirol (Glyceryl Palmitostearate), Emulcire (Cetyl alcohol), Plurol diisostearique (Polyglyceryl Diisostearate), Geleol (Glyceryl Stearate), Hydrine et Monthyle;

[0109] as well the additives which codes are the followings: E 901, E 907, E 903 and mixtures thereof;

[0110] and mixtures thereof.

[0111] In practice, the compound can be selected from the group comprising the products which tradenames (trademarks) are the followings : Dynasan P60, Dynasan 116, Dynasan 118, Cutina HR, Hydrobase 66-68, Dub, Compritol 888, Sterotex NF, Lubritab and mixtures thereof.

[0112] According to an interesting embodiment of the invention, the coating film of the microcapsules is free from talc.

[0113] The preferred polymers A are (meth)acrylic acid/alkyl (e.g. methyl) (meth)acrylate copolymers. These copolymers, which are e.g. of the type marketed by RÖHM PHARMA POLYMERS under the registered trade marks EUDRAGIT® L and S series (for example EUDRAGIT® L100, S100, L30D-55 and L100-55), are anionic enteric (co)polymers soluble in aqueous media at pH values above those encountered in the stomach.

[0114] According to another preferred characteristic of the invention, the compound B is selected from the following group of products:

[0115] vegetable waxes, taken on their own or in mixtures with one another, such as those marketed under the marks DYNASAN® P60 and DYNASAN® 116, inter alia;

[0116] hydrogenated vegetable oils, taken on their own or in a mixture with one another, preferably selected from the group comprising hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil and mixtures thereof;

[0117] monoesters and/or diesters and/or triesters of glycerol with at least one fatty acid, preferably behenic acid, taken by themselves or in a mixture with one another;

[0118] and mixtures thereof.

[0119] The AP release triggering mechanism without a variation in pH, after a predetermined residence time in the stomach, results especially from control of the hydration rate of the microcapsules and/or the dissolution rate of one or more components of the microcapsules. For example, and without implying a limitation, the hydration of the microcapsule can be controlled by:

[0120] the presence, in the microcapsules, of hydrophilic products that make it possible to adjust the osmotic pressure or to cause a swelling of the microcapsules;

[0121] regulation of the water permeability of the coating film;

[0122] the creation of a microporosity in the coating film;

[0123] or even the hydration or dissolution of a compound in the coating film.

[0124] One of the decisive advantages of the multimicrocapsular galenical system according to the invention for the delayed and controlled release of AP is that it involves, in vivo, two factors that trigger the release of the AP into the gastrointestinal tract, namely:

[0125] the residence time in the stomach: "time-triggered" release,

[0126] and the variation in pH: "pH-triggered" release.

[0127] These two AP release triggering factors are successive, so they give the galenical system a high degree of reliability in use. The release of the AP is thus guaranteed after a preset latency period, even if the variation in pH has not intervened as a trigger. The problems of interindividual variability are thus overcome. The therapeutic efficacy of the drug comprising such a galenical system is assured by observing a predetermined chronobiology adapted to the intended therapeutic performance.

[0128] In addition, in the case of the AP considered in the present invention whose absorption window is limited to the upper parts of the gastrointestinal tract, it is particularly advantageous if the form for delayed and then controlled release consists of a plurality of microcapsules. In fact, for such a form, the dose of AP to be administered is spread over a large number of microcapsules (typically 10,000 for a dose of 500 mg) and thus has the following intrinsic advantages:

[0129] The residence time of the microcapsules in the upper parts of the gastrointestinal tract can be prolonged, thereby increasing the duration of passage of the AP through the absorption windows and thus maximizing the bioavailability of the AP.

[0130] The use of a mixture of microcapsules with different delayed and controlled release profiles makes it possible to create release profiles which exhibit several release waves or which, by appropriate adjustment of the different fractions, assure a constant plasma AP concentration level.

[0131] The variability of the gastric emptying is reduced because the emptying, which in this case takes place over a large number of particles, is statistically more reproducible.

[0132] Bringing the tissues into contact with a high dose of AP—dose dumping—is avoided. Each microcapsule actually contains only a very small dose of AP. This eliminates the risk of tissue damage due to a local excess concentration of aggressive AP.

[0133] It is possible to present these microcapsules in the form of sachets, gelatin capsules or tablets. In cases where the dose of AP is high (500 mg or more), the monolithic forms are too large to be swallowed easily. It is then of particular value to have a microparticulate form for delayed and controlled release of the AP, which those skilled in the art can formulate as disintegrating tablets or sachets.

[0134] The multimicrocapsular galenical system according to the invention makes it possible to assure with certainty a delayed and controlled release of the AP into the GIT by means of two triggers, and thus to escape the interindividual and intraindividual variability of the gastric emptying conditions, while at the same time being economically viable and easy to ingest (optimized compliance).

[0135] According to one particularly advantageous characteristic of the preferred embodiment, at a constant pH of 1.4, the controlled release phase following the latency phase is such that the release time for 50% by weight of the AP ($t_{1/2}$) is defined as follows (in hours):

| | |
|---|---|
| | $0.25 \leqq t_{1/2} \leqq 35$ |
| preferably | $0.5 \leqq t_{1/2} \leqq 20$ |

[0136] In practice, the release phase of the in vitro AP release profile at a constant pH of 1.4 has an adjustable release half-life.

[0137] According to another valuable characteristic of the preferred embodiment, the release phase following the change from pH 1.4 to pH 6.8, which takes place without a latency period, is such that the release time for 50% of the AP ($t_{1/2}$) is defined as follows (in hours):

| | |
|---|---|
| | $0.25 \leqq t_{1/2} \leqq 20$ |
| preferably | $0.5 \leqq t_{1/2} \leqq 15$ |

[0138] Preferably, the microcapsules according to the invention comprise a single composite coating film AB. This simplifies their preparation and limits the coating rate.

[0139] Preferably, the AP is deposited on a neutral core with a diameter of between 200 and 800 microns, preferably of between 200 and 600 microns.

[0140] Without implying a limitation, the hydrophilic neutral core can contain sucrose and/or dextrose and/or lactose, or it can consist of a cellulose microsphere.

[0141] Advantageously, the microcapsule coating can comprise, in addition to the essential constituents A and B, other conventional ingredients known to those skilled in the art, such as especially:

[0142] colorants;

[0143] plasticizers, for example dibutyl sebacate;

[0144] hydrophilic compounds, for example cellulose and derivatives thereof or polyvinylpyrrolidone and derivatives thereof;

[0145] and mixtures thereof.

[0146] Advantageously, the AP is deposited by the techniques known to those skilled in the art, for example the technique of spray coating in a fluidized air bed onto neutral cores with a diameter of between 200 and 800 microns, preferably of between 200 and 600 microns.

[0147] From the quantitative point of view, the monolayer of coating agent represents at most 40% and preferably at most 30% by weight of the microcapsules. Such a limited coating rate makes it possible to produce galenical units each containing a high dose of active principle without exceeding a prohibitive size as regards swallowing. This can only improve compliance with the treatment and hence its success.

[0148] In qualitative terms, the AP of the microcapsules according to the invention is essentially absorbable in the upper parts of the gastrointestinal tract and is advantageously selected from one of the following families of active substances: antiulcer agents, antidiabetics, anticoagulants, antithrombics, hypolipidemics, antiarrhythmics, vasodilators, antiangina agents, antihypertensives, vasoprotectors, fertility promoters, labor inducers and inhibitors, contraceptives, antibiotics, antifungals, antivirals, anticancer agents, anti-inflammatories, analgesics, antiepileptics, antiparkinsonian agents, neuroleptics, hypnotics, anxiolytics, psychostimulants, antimigraine agents, antidepressants, antitussives, antihistamines and antiallergics.

[0149] Reference may also be made to the list of active principles given on pages 4 to 8 of patent application EP-A-0 609 961.

[0150] Preferably, the AP is selected from the following compounds: metformin, acetylsalicylic acid, amoxicillin, pentoxifyllin, prazosin, acyclovir, nifedipine, diltiazem, naproxen, ibuprofen, flurbiprofen, ketoprofen, fenoprofen, indomethacin, diclofenac, fentiazac, estradiol valerate, metoprolol, sulpiride, captopril, cimetidine, zidovudine, nicardipine, terfenadine, atenolol, salbutamol, carbamazepine, ranitidine, enalapril, simvastatin, fluoxetine, alprazolam, famotidine, ganciclovir, famciclovir, spironolactone, 5-asa, quinidine, morphine, pentazocine, paracetamol, omeprazole, metoclopramide and mixtures thereof.

[0151] The microparticulate oral galenical form according to the invention can be a form selected in the groups comprising a tablet (advantageously a tablet that disperses in the mouth), a powder or a gelatin capsule.

[0152] The microcapsules described above can be used for the manufacture of novel pharmaceutical or dietetic preparations of various AP which have optimized therapeutic or dietetic performance characteristics and are preferably presented in the form of tablets, advantageously disintegrating tablets and even more preferably tablets that disperse in the mouth, powders or gelatin capsules.

[0153] These microcapsules are all the more valuable because they are also perfectly tolerated by the organism, especially by the stomach, and furthermore can be obtained easily and economically.

[0154] The present invention further relates to these novel pharmaceutical or dietetic preparations as such, which are original in their structure, to their presentation and to their composition. Such pharmaceutical or dietetic preparations are administered orally, preferably as single daily doses.

[0155] It is pointed out that it may be of value to mix, in one and the same gelatin capsule, tablet or powder, at least two types of microcapsule whose release kinetics are different but within the framework characteristic of the invention.

[0156] It is also possible to mix the microcapsules according to the invention with a certain amount of AP that is immediately available in the organism.

[0157] It can also be envisaged to associate microcapsules containing different AP.

[0158] In addition, a further subject of the invention is a galenical (pharmaceutical or dietetic) system, preferably in the form of a tablet, advantageously a disintegrating tablet and even more preferably a tablet that disperses in the mouth, a powder or a gelatin capsule, characterized in that it comprises microcapsules such as described above.

[0159] Furthermore, the invention relates to the use of microparticles such as defined above for the preparation of microparticulate oral galenical (pharmaceutical or dietetic) forms, preferably as tablets, advantageously tablets that disperse in the mouth, powders or gelatin capsules.

[0160] Finally, the invention further relates to a method of therapeutic treatment, characterized in that it consists in ingesting, according to a given dosage, a drug comprising microcapsules such as defined above.

[0161] The invention will be explained more clearly by the Examples below, given solely by way of illustration, which afford a good understanding of the invention and show its variants and/or modes of implementation, as well as its different advantages.

## EXAMPLES

[0162] Description of the Figures:

[0163] **FIG. 1** shows the in vitro release profiles of the microcapsules of Example 1 at pH 1.4: —●— and at pH 1.4 for 3 hours and then at pH 6.8 as from T=3 hours: —□— in % by weight (% D) of dissolved metformin as a function of the time T in hours;

[0164] **FIG. 2** shows the in vitro release profiles of the microcapsules of Example 2 at pH 1.4: —●— and at pH

1.4 for 2 hours and then at pH 6.8 as from 2 hours: —□— in % by weight (% D) of acyclovir as a function of the time T in hours;

**[0165]** **FIG. 3** shows the in vitro release profiles of the microcapsules of Example 3 at pH 1.4: —■— and at pH 6.8: —□— in % by weight (% D) of metformin as a function of the time T in hours.

EXAMPLES

Example 1

Preparation of Microcapsules Allowing a Dual-Mechanism Delayed and Prolonged Release of Metformin.HCl

**[0166]** 75 g of metformin.HCl (Chemsource) and 75 g of PVP are dissolved in 1350 g of isopropanol. The solution is sprayed onto 850 g of neutral microspheres (NP Pharm) in a Glatt® GPCG3 spray coater.

**[0167]** 93.3 g of hydrogenated palm oil (Hüls) (B) and 140 g of Eudragit® L100 (Röhm) (A) are dissolved in hot isopropanol. B/A=0.66. The solution is sprayed onto 700 g of previously prepared microparticles. The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

**[0168]** The microcapsules were tested in a type II dissolutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

**[0169]** a) HCl at pH 1.4

**[0170]** b) HCl at pH 1.4 for 3 hours, then $KH_2PO_4$/NaOH buffer medium at pH 6.8

**[0171]** The release profiles are shown in **FIG. 1**.

**[0172]** These profiles are characteristic of a delayed and then prolonged release by means of a dual mechanism: absence of release for 2 hours, followed by a prolonged release without a change in pH, and finally followed by a release accelerated by the change in pH.

Example 2

Preparation of Microcapsules Allowing a Dual-Mechanism Delayed and Prolonged Release of Acyclovir

**[0173]** 75 g of acyclovir and 75 g of the polyvinylpyrrolidone PLASDONE® K29/32 are dissolved in 833 g of isopropanol. The solution is sprayed onto 850 g of neutral microspheres (NP Pharm) in a Glatt® GPCG3 spray coater.

**[0174]** 93.3 g of hydrogenated palm oil (Hüls) (B) and 140 g of EUDRAGIT® L100 (Röhm) (A) are dissolved in hot isopropanol. B/A=0.66. The solution is sprayed onto 700 g of previously prepared microparticles. The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

**[0175]** The microcapsules were tested in a type II dissolutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

**[0176]** c) HCl at pH 1.4

**[0177]** d) HCl at pH 1.4 for 3 hours, then $KH_2PO_4$/NaOH buffer medium at pH 6.8

**[0178]** The release profiles are shown in **FIG. 2**.

**[0179]** The acyclovir release profile obtained at pH 1.4 is characteristic of a delayed and prolonged release by means of a dual release triggering mechanism.

Example 3

Preparation of Microcapsules Allowing a Dual-Mechanism Delayed and Prolonged Release of Metformin.HCl

**[0180]** 105 g of hydrogenated palm oil (Hüls) (B), 30 g of dibutyl sebacate and 165 g of Eudragit® L100 (Röhm) (A) are dissolved in hot isopropanol. B/A=0.64. The solution is sprayed onto 700 g of metformin granules (95.5% metformin/4.5% PVP). The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

**[0181]** The microcapsules were tested in a type II dissolutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

**[0182]** e) HCl at pH 1.4

**[0183]** f) $KH_2PO_4$/NaOH buffer medium at pH 6.8

**[0184]** The release profiles are shown in **FIG. 3**.

**[0185]** These profiles are characteristic of a delayed and then prolonged release by means of a dual mechanism: absence of release for 2 hours at acidic pH and rapid release at neutral pH.

**1**. Microparticulate oral galenical form for the delayed and controlled release of at least one active principle—excluding perindopril—this active principle having an absorption window in vivo that is essentially limited to the upper parts of the gastrointestinal tract,

said form being designed so as to guarantee its therapeutic efficacy by guaranteeing its absorption in vivo,

wherein:

in that the release of the active principle is governed by two different triggering mechanisms, one being based on a variation in pH and the other allowing the release of the AP after a predetermined residence time in the stomach,

in that its dissolution behavior in vitro (determined as indicated in the European Pharmacopeia, 3rd edition, under the title: "Dissolution test for solid oral forms": type II dissolutest performed under SINK conditions, maintained at 37° C. and agitated at 100 rpm) is such that:

at a constant pH of 1.4, the dissolution profile includes a latency phase with a duration less than or equal to 5 hours,

and the change from pH 1.4 to pH 6.8, during the latency phase, results in a release phase that starts without a latency period.

**2**. Galenical form according to claim 1, wherein the dissolution profile includes a latency phase with a duration of between 1 and 5 hours.

**3**. Galenical form according to claim 1, wherein

it comprises "reservoir" microcapsules containing at least one active principle-excluding perindopril—these microcapsules being of the type that:

consist of particles of active principle each coated with at least one film, this coating film consisting of a composite material which:

comprises:

at least one hydrophilic polymer A carrying groups that are ionized at neutral pH,

and at least one hydrophobic compound B;

and represents a mass fraction (% by weight, based on the total mass of the microcapsules) of $\leqq 40$;

and have a diameter below 2000 microns,

the coating film of these microcapsules consists of a composite based on A and B in which: the weight ratio B/A is between 0.45 and 1.0,

and the hydrophobic compound B is selected from products that are crystalline in the solid state and have a melting point $T_{fB}$ such that $T_{fB} \geqq 40°$ C.

**4**. Galenical form according to claim 3, wherein the microcapsules have a diameter of between 200 and 800 microns, wherein the weight ratio B/A is between 0.5 and 1.0 and wherein the hydrophobic compound B is selected from products that are crystalline in the solid state and have a melting point $T_{fB}$ such that 40° C.$\leqq T_{fB} \leqq 90°$ C.

**5**. Galenical form according to claim 3, wherein the hydrophilic polymer A is selected from:

(meth)acrylic acid/alkyl (e.g. methyl) (meth)acrylate copolymers and mixtures thereof;

cellulose derivatives, preferably cellulose acetate and/or phthalate, hydroxypropyl methyl cellulose phthalate and hydroxypropyl methyl cellulose acetate and/or succinate;

and mixtures thereof.

**6**. Galenical form according to claim 3, wherein the hydrophilic polymer A is selected from:

(meth)acrylic acid/ methyl(meth)acrylate copolymers and mixtures thereof;

cellulose acetate and/or phthalate, hydroxypropyl methyl cellulose phthalate and hydroxypropyl methyl cellulose acetate and/or succinate;

and mixtures thereof.

**7**. Galenical form according to claim 3, wherein the compound B is selected from the following group of products:

vegetable waxes, taken on their own or in mixtures with one another;

hydrogenated vegetable oils, taken on their own or in a mixture with one another;

monoesters and/or diesters and/or triesters of glycerol with at least one fatty acid, taken by themselves or in a mixture with one another;

and mixtures thereof.

**8**. Galenical form according to claim 3, wherein the compound B is selected from the following group of products:

vegetable waxes, taken on their own or in mixtures with one another;

hydrogenated vegetable oils, taken on their own or in a mixture with one another;

mixtures of at least one monoester and of at least one diester and/or of at least one triester of glycerol with at least one fatty acid;

and mixtures thereof.

**9**. Galenical form according to claim 7 or **8** wherein the compound B is selected from the group comprising hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil, glyceryl behenate, hydrogenated castor oil, tristearin, tripalmitin, trimyristin , wax yellow, suppository bases or hard fat, anhydrous milk fat, lanolin, glyceryl palmitostearate, glycerylstearate, lauryl macrogolglycerides, cetyl alcohol, polyglycryl diisostearate, diethylene glycol monostearate, ethylene glycol monostearate, Omega 3 and any mixtures thereof.

**10**. Galenical form according to claim 7 or **8** wherein the compound B is selected from the group of hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil, glyceryl behenate, hydrogenated castor oil, tristearin, tripalmitin, trimyristin and any mixtures thereof.

**11**. Galenical form according to claim 3 wherein the compound B is selected from the group comprising

the products which tradenames (trademarks) are the followings: Dynasan, Cutina, Hydrobase, Dub, Castorwax, Croduret, Compritol, Sterotex, Lubritab, Apifil, Akofine, Softtisan, Hydrocote, Livopol, Super Hartolan, MGLA, Corona, Protalan, Akosoft, Akosol, Cremao, Massupol, Novata, Suppocire, Wecobee, Witepsol, Lanolin, Incromega, Estaram, Suppoweiss, Gelucire, Precirol, Emulcire, Plurol diisostearique, Geleol, Hydrine et Monthyle;

as well the additives which codes are the followings: E 901, E 907, E 903 and mixtures thereof;

and mixtures thereof.

**12**. Galenical form according to claim 3 wherein the compound B is selected from the group comprising the products which tradenames (trademarks) are the followings: Dynasan P60, Dynasan 114, Dynasan 116, Dynasan 118, Cutina HR, Hydrobase 66-68, Dub HPH, Compritol 888, Sterotex NF, Sterotex K, Lubritab and mixtures thereof.

**13**. Galenical form according to claim 3 wherein the coating film of the microcapsules is free from talc.

**14**. Galenical form according to claim 1, wherein, at a constant pH of 1.4, the controlled release phase following the latency phase is such that the release time for 50% of the active principle ($t_{1/2}$) is defined as follows (in hours):

$$0.25 \leqq t_{1/2} \leqq 35$$

**15**. Galenical form according to claim 1, characterized in that the release phase following the change from pH 1.4 to pH 6.8, which takes place without a latency period, is such that the release time for 50% of the active principle ($t_{1/2}$) is defined as follows (in hours):

$$0.25 \leqq t_{1/2} \leqq 20$$

**16**. Galenical form according to claim 3, wherein the microcapsules comprise a single composite coating film AB.

**17**. Galenical form according to claim 3, wherein the active principle is deposited on a neutral core with a diameter of between 200 and 800 microns.

**18**. Galenical form according to claim 3, wherein the neutral core contains sucrose and/or dextrose and/or lactose.

**19**. Galenical form according to claim 18, wherein the neutral core is a cellulose microsphere.

**20**. Galenical form according to claim 1, wherein the active principle used belongs to at least one of the following families of active substances: antiulcer agents, antidiabetics, anticoagulants, antithrombics, hypolipidemics, antiarrhythmics, vasodilators, antiangina agents, antihypertensives, vasoprotectors, fertility promoters, labor inducers and inhibitors, contraceptives, antibiotics, antifungals, antivirals, anticancer agents, anti-inflammatories, analgesics, antiepileptics, antiparkinsonian agents, neuroleptics, hypnotics, anxiolytics, psychostimulants, antimigraine agents, antidepressants, antitussives, antihistamines and antiallergics.

**21**. Galenical form according to claim 20, wherein the active principle is selected from the following compounds: amoxicillin, metformin, acetylsalicylic acid, pentoxifyllin, prazosin, acyclovir, nifedipine, diltiazem, naproxen, ibuprofen, flurbiprofen, ketoprofen, fenoprofen, indomethacin, diclofenac, fentiazac, estradiol valerate, metoprolol, sulpiride, captopril, cimetidine, zidovudine, nicardipine, terfenadine, atenolol, salbutamol, carbamazepine, ranitidine, enalapril, simvastatin, fluoxetine, alprazolam, famotidine, ganciclovir, famciclovir, spironolactone, 5-asa, quinidine, morphine, pentazocine, paracetamol, omeprazole, metoclopramide and mixtures thereof.

**22**. Galenical form according to claim 1, which is a form selected in the group comprising: a tablet, a powder and a gelatin capsule.

**23**. Use of the microcapsules as defined in claim 1 for the preparation of microparticulate oral galenical forms as tablets.

**24**. Galenical form according to claim 1 or **23**, which is a tablet that disperses in the mouth.

* * * * *

# EXHIBIT 4

| | |
|---|---|
| Relativity ID : | JPION00466128 |
| Custodian : | No Custodian |
| Master Date : | 7/2/2017 12:00:00 AM |
| File Name : | US8101209_Flamel_Micropump.pdf |
| Original File Path : | Public Docs\ |



US008101209B2

(12) **United States Patent**
**Legrand et al.**

(10) **Patent No.: US 8,101,209 B2**
(45) **Date of Patent: *Jan. 24, 2012**

(54) **MICROPARTICULATE ORAL GALENICAL FORM FOR THE DELAYED AND CONTROLLED RELEASE OF PHARMACEUTICAL ACTIVE PRINCIPLES**

(75) Inventors: **Valérie Legrand**, Lyons (FR); **Catherine Castan**, Orlienas (FR); **Rémi Meyrueix**, Lyons (FR); **Gérard Soula**, Meyzieu (FR)

(73) Assignee: **Flamel Technologies** (FR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1068 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/826,690**

(22) Filed: **Apr. 19, 2004**

(65) **Prior Publication Data**

US 2004/0234601 A1 Nov. 25, 2004

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/492,129, filed as application No. PCT/FR02/03443 on Oct. 9, 2002.

(30) **Foreign Application Priority Data**

Oct. 9, 2001 (FR) ..................................... 01 12999

(51) **Int. Cl.**
***A61K 9/16*** (2006.01)
***A61K 9/50*** (2006.01)

(52) **U.S. Cl.** ........ **424/498**; 424/489; 424/490; 424/494; 424/497; 514/951; 514/963; 514/965

(58) **Field of Classification Search** .................. 424/469, 424/458, 459, 461, 462, 489, 490, 497, 498, 424/501, 494; 514/951, 963, 965
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,845,770 A 11/1974 Theeuwes et al.
3,864,483 A 2/1975 Stein et al.
3,892,769 A 7/1975 Shen et al.
3,914,414 A 10/1975 Stein et al.
3,914,415 A 10/1975 Stein et al.
3,927,216 A 12/1975 Witkowski et al.
3,966,917 A 6/1976 Prasad et al.
3,980,766 A 9/1976 Shaw et al.
4,029,884 A 6/1977 Stein et al.
4,036,227 A 7/1977 Zaffaroni et al.
4,070,494 A 1/1978 Hoffmeister et al.
4,077,407 A 3/1978 Theeuwes et al.
4,111,203 A 9/1978 Theeuwes
4,218,433 A 8/1980 Kooichi et al.
4,308,251 A 12/1981 Dunn et al.
4,321,253 A 3/1982 Beatty
4,434,153 A 2/1984 Urquhart et al.
4,454,309 A 6/1984 Gould et al.
4,461,759 A 7/1984 Dunn
4,486,471 A 12/1984 Samejima et al.
4,503,067 A 3/1985 Wiedemann et al.
4,519,801 A 5/1985 Edgren
4,553,973 A 11/1985 Edgren
4,572,912 A 2/1986 Yoshioka et al.
4,609,374 A 9/1986 Ayer
4,610,686 A 9/1986 Ayer et al.
4,612,008 A 9/1986 Wong et al.
4,624,847 A 11/1986 Ayer et al.
4,639,436 A 1/1987 Junge et al.
4,687,660 A 8/1987 Baker et al.
4,693,896 A 9/1987 Wheatley et al.
4,717,569 A 1/1988 Harrison et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CA 2068366 11/1992
(Continued)

OTHER PUBLICATIONS

Sigma-Aldrich Particle Size Conversion, 2010, http://www.sigmaaldrich.com/chemistry/stockroom-reagents/learning-center/technical-library/particle-size-conversion.html.*

(Continued)

*Primary Examiner* — Michael G Hartley
*Assistant Examiner* — Leah Schlientz
(74) *Attorney, Agent, or Firm* — Patton Boggs LLP

(57) **ABSTRACT**

The invention relates to a microparticulate system for the delayed and controlled release of active principles (AP) whose absorption window in vivo is essentially limited to the upper parts of the gastrointestinal tract, this system being intended for oral administration. The object of the invention is to provide a system ensuring that the AP is released with certainty by means of a dual mechanism of "time-dependent" and "pH-dependent" release. To achieve this object, the invention proposes a multimicrocapsular oral galenical form which is designed so as to guarantee therapeutic efficacy, and in which the release of the AP is governed by a dual release triggering mechanism that is "time-triggering" and "pH-triggering". This system comprises of microcapsules (200 to 600 μm) comprising a core of AP coated with a film (maximum 40% by weight) comprising a hydrophilic polymer A (Eudragit® L) and a hydrophobic compound B (vegetable wax, melting point=40-90° C.), B/A being between 0.2 and 1.5. These microcapsules have a dissolution behavior in vitro such that, at a constant pH of 1.4, a latency phase of between 1 and 5 hours is observed, followed by a release of the AP, and such that the change from pH 1.4 to pH 6.8 results in a release of the AP without a latency period in vitro.

**17 Claims, 2 Drawing Sheets**

U.S. PATENT DOCUMENTS

4,728,512 A 3/1988 Mehta et al.
4,748,023 A 5/1988 Tamas et al.
4,758,579 A 7/1988 Kohl et al.
4,777,049 A 10/1988 Magruder et al.
4,782,043 A 11/1988 Boger et al.
4,792,448 A 12/1988 Ranade
4,814,182 A 3/1989 Graham et al.
4,814,183 A 3/1989 Zentner
4,816,262 A 3/1989 McMullen
4,832,958 A 5/1989 Baudier et al.
4,833,905 A 5/1989 Hill
4,844,905 A 7/1989 Ichikawa et al.
4,861,599 A 8/1989 Springolo et al.
4,892,738 A 1/1990 Takagishi et al.
4,894,240 A 1/1990 Geoghegan et al.
4,902,513 A 2/1990 Carvais
4,904,769 A 2/1990 Rauenbusch
4,952,402 A 8/1990 Sparks et al.
4,985,454 A 1/1991 Leinert
4,999,189 A 3/1991 Kogan et al.
5,004,614 A 4/1991 Staniforth
5,028,434 A 7/1991 Barclay et al.
5,043,167 A 8/1991 Rotini et al.
5,045,321 A 9/1991 Makino et al.
5,051,262 A 9/1991 Panoz et al.
5,071,868 A 12/1991 Leinert
5,084,278 A 1/1992 Mehta
5,091,485 A 2/1992 Noireaux et al.
5,158,636 A 10/1992 Groitzsch et al.
5,186,930 A 2/1993 Kogan et al.
5,206,030 A 4/1993 Wheatley et al.
5,248,516 A 9/1993 Wheatley et al.
5,268,182 A 12/1993 Brinker et al.
5,286,497 A 2/1994 Hendrickson et al.
5,308,862 A 5/1994 Ohlstein
5,393,772 A 2/1995 Yue et al.
5,405,619 A * 4/1995 Santus et al. .................. 424/490
5,405,863 A 4/1995 Barone et al.
5,409,709 A 4/1995 Ozawa et al.
5,409,711 A 4/1995 Mapelli et al.
5,431,922 A 7/1995 Nicklasson
5,445,829 A 8/1995 Paradissis et al.
5,453,436 A 9/1995 Ohlstein
5,464,632 A 11/1995 Cousin et al.
5,472,704 A 12/1995 Santus et al.
5,571,533 A 11/1996 Santus et al.
5,594,016 A 1/1997 Ueno et al.
5,603,957 A 2/1997 Burguiere et al.
5,643,915 A 7/1997 Andrulis, Jr. et al.
5,643,939 A 7/1997 Ohlstein
5,651,990 A 7/1997 Takada et al.
5,656,295 A 8/1997 Oshlack et al.
5,674,529 A 10/1997 Marder et al.
5,760,069 A 6/1998 Lukas-Laskey et al.
5,780,055 A 7/1998 Habib et al.
5,783,215 A 7/1998 Arwidsson et al.
5,804,573 A 9/1998 Silver
5,846,566 A 12/1998 Burguiere et al.
5,858,398 A 1/1999 Cho
5,902,821 A 5/1999 Lukas-Laskey et al.
5,922,769 A 7/1999 Barelli et al.
5,945,123 A 8/1999 Hermelin
5,955,106 A 9/1999 Moeckel et al.
6,019,735 A 2/2000 Kensey et al.
6,022,562 A 2/2000 Autant et al.
6,024,982 A 2/2000 Oshlack et al.
6,033,687 A 3/2000 Heinicke et al.
6,034,091 A * 3/2000 Dante ........................... 514/282
6,043,252 A 3/2000 Bombrun
6,056,968 A 5/2000 Gilbert et al.
6,068,859 A 5/2000 Curatolo et al.
6,077,544 A 6/2000 Debregeas et al.
6,096,341 A * 8/2000 Seth ............................. 424/482
6,096,777 A 8/2000 Feuerstein et al.
6,099,862 A 8/2000 Chen et al.
6,184,220 B1 2/2001 Turck et al.
6,214,854 B1 4/2001 Wang et al.
6,221,377 B1 4/2001 Meyer
6,224,909 B1 5/2001 Opitz et al.
6,228,398 B1 5/2001 Devane et al.
6,248,359 B1 6/2001 Faour
6,264,983 B1 7/2001 Upadhyay
6,274,173 B1 8/2001 Sachs et al.
6,303,146 B1 10/2001 Bonhomme et al.
6,309,663 B1 10/2001 Patel et al.
6,309,668 B1 10/2001 Bastin et al.
6,322,525 B1 11/2001 Kensey et al.
6,358,990 B1 3/2002 Howlett et al.
6,379,706 B2 4/2002 Opitz et al.
6,395,300 B1 5/2002 Straub et al.
6,403,579 B1 6/2002 Heller
6,419,960 B1 7/2002 Krishnamurthy et al.
6,428,488 B1 8/2002 Kensey et al.
6,428,809 B1 8/2002 Abrams et al.
6,432,989 B1 8/2002 Chen
6,462,047 B1 10/2002 Bombrun et al.
6,472,373 B1 10/2002 Albrecht
6,475,521 B1 11/2002 Timmins et al.
6,484,565 B2 11/2002 Shin et al.
6,491,949 B2 12/2002 Faour et al.
6,495,154 B1 12/2002 Tam et al.
6,515,010 B1 2/2003 Franchini et al.
6,558,699 B2 5/2003 Venkatesh
6,627,635 B2 9/2003 Palermo et al.
6,671,904 B2 1/2004 Easterling
6,692,768 B1 2/2004 Ishibashi et al.
6,696,088 B2 2/2004 Oshlack et al.
6,699,506 B1 3/2004 Paillard et al.
6,699,997 B2 3/2004 Hildesheim et al.
6,761,904 B2 7/2004 Bertelsen et al.
6,815,542 B2 11/2004 Hong et al.
6,846,810 B2 1/2005 Martin et al.
6,852,337 B2 2/2005 Gabel et al.
6,903,079 B2 6/2005 Jagtap et al.
6,946,146 B2 9/2005 Mulye
7,022,345 B2 4/2006 Valducci et al.
7,056,942 B2 6/2006 Hildesheim et al.
7,126,008 B2 10/2006 Hildesheim et al.
7,268,156 B2 9/2007 Brook et al.
7,626,041 B2 12/2009 Brook et al.
7,750,036 B2 7/2010 Brook et al.
7,759,384 B2 7/2010 Brook et al.
7,893,100 B2 2/2011 Brook et al.
2001/0004458 A1 6/2001 Opitz et al.
2001/0006650 A1 7/2001 Burnside et al.
2001/0036959 A1 11/2001 Gabel et al.
2001/0036960 A1 11/2001 Decker et al.
2002/0052367 A1 5/2002 Heller
2002/0068085 A1 6/2002 Rudnic et al.
2002/0068740 A1 6/2002 Mylari
2002/0099013 A1 7/2002 Piccariello et al.
2002/0099046 A1 7/2002 Scott
2002/0107279 A1 8/2002 Barone et al.
2002/0115655 A1 8/2002 Mehanna et al.
2002/0143045 A1 10/2002 Hildesheim et al.
2002/0169199 A1 11/2002 Gruber et al.
2002/0176888 A1 * 11/2002 Bartholomaeus et al. .... 424/469
2002/0197327 A1 12/2002 Ulrich et al.
2003/0004205 A1 1/2003 Gabel et al.
2003/0004206 A1 1/2003 Decker et al.
2003/0030878 A1 2/2003 Jong et al.
2003/0035836 A1 2/2003 Shanghvi et al.
2003/0035840 A1 * 2/2003 Li et al. ........................ 424/471
2003/0036559 A1 2/2003 Beyer et al.
2003/0050301 A1 3/2003 Mylari
2003/0050620 A1 3/2003 Odidi et al.
2003/0054041 A1 3/2003 Lemmens et al.
2003/0059474 A1 3/2003 Scott et al.
2003/0064108 A1 4/2003 Lukas et al.
2003/0068371 A1 4/2003 Oshlack et al.
2003/0068392 A1 4/2003 Sackler
2003/0077297 A1 4/2003 Chen et al.
2003/0083286 A1 5/2003 Teng et al.
2003/0099711 A1 5/2003 Meadows et al.
2003/0104052 A1 6/2003 Berner et al.
2003/0104056 A1 6/2003 Rudnic et al.
2003/0118641 A1 6/2003 Maloney et al.

| | | | |
|---|---|---|---|
| 2003/0166702 | A1 | 9/2003 | Kor et al. |
| 2003/0220399 | A1 | 11/2003 | Luskey et al. |
| 2003/0224051 | A1 | 12/2003 | Fink et al. |
| 2004/0010983 | A1 | 1/2004 | Eshpar |
| 2004/0019096 | A1 | 1/2004 | Andronis et al. |
| 2004/0022848 | A1 | 2/2004 | Kikuchi et al. |
| 2004/0022849 | A1 | 2/2004 | Castan et al. |
| 2004/0121015 | A1 | 6/2004 | Chidlaw et al. |
| 2004/0121676 | A1 | 6/2004 | Seko et al. |
| 2004/0126428 | A1 | 7/2004 | Hughes et al. |
| 2004/0152756 | A1 | 8/2004 | Chen et al. |
| 2004/0171584 | A1 | 9/2004 | Millan et al. |
| 2004/0175424 | A1 | 9/2004 | Castan et al. |
| 2004/0186158 | A1 | 9/2004 | Oh |
| 2004/0219208 | A1 | 11/2004 | Kawamura et al. |
| 2004/0219212 | A1 | 11/2004 | Castan et al. |
| 2004/0220250 | A1 | 11/2004 | OhBarth |
| 2004/0223939 | A1 | 11/2004 | Clausen et al. |
| 2004/0228924 | A1 | 11/2004 | Oshlack et al. |
| 2004/0234601 | A1 | 11/2004 | Legrand et al. |
| 2004/0241235 | A1 | 12/2004 | Lebon et al. |
| 2005/0009897 | A1 | 1/2005 | Anderson et al. |
| 2005/0019406 | A1 | 1/2005 | Kerrish et al. |
| 2005/0031546 | A1 | 2/2005 | olomaus et al. |
| 2005/0059667 | A1 | 3/2005 | Wolff |
| 2005/0089572 | A1 | 4/2005 | Kumar et al. |
| 2005/0106249 | A1 | 5/2005 | Hwang et al. |
| 2005/0148779 | A1 | 7/2005 | Chen et al. |
| 2005/0163856 | A1 | 7/2005 | Maloney et al. |
| 2005/0169994 | A1 | 8/2005 | Burke et al. |
| 2005/0175695 | A1 | 8/2005 | Castan et al. |
| 2005/0196459 | A1 | 9/2005 | Castan et al. |
| 2005/0214223 | A1 | 9/2005 | Bartholomaeus et al. |
| 2005/0266078 | A1 | 12/2005 | Jorda et al. |
| 2005/0281748 | A1 | 12/2005 | Hirsh et al. |
| 2006/0013868 | A1 | 1/2006 | Akiyama et al. |
| 2006/0110463 | A1 | 5/2006 | Castan et al. |
| 2006/0165807 | A1 | 7/2006 | Castan et al. |
| 2006/0165809 | A1 | 7/2006 | Guimberteau et al. |
| 2006/0182804 | A1 | 8/2006 | Burke et al. |
| 2006/0275376 | A1 | 12/2006 | Guimberteau et al. |
| 2007/0173464 | A1 | 7/2007 | Guimberteau et al. |
| 2007/0183980 | A1 | 8/2007 | Arkenau-Maric et al. |
| 2007/0207214 | A1 | 9/2007 | Castan et al. |
| 2007/0238774 | A1 | 10/2007 | Brook et al. |
| 2007/0244182 | A1 | 10/2007 | Brook et al. |
| 2007/0259940 | A1 | 11/2007 | Brook et al. |
| 2007/0264326 | A1 | 11/2007 | Guimberteau et al. |
| 2008/0020018 | A1 | 1/2008 | Moodley et al. |
| 2008/0096951 | A1 | 4/2008 | Chen et al. |
| 2008/0193540 | A1 | 8/2008 | Soula et al. |
| 2008/0247959 | A1 | 10/2008 | Bartholomaus et al. |
| 2008/0260844 | A1 | 10/2008 | Soula et al. |
| 2008/0262069 | A1 | 10/2008 | Brook et al. |
| 2009/0041838 | A1 | 2/2009 | Guimberteau et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2391832 | | 3/2001 |
| CN | 1187121 | A | 7/1998 |
| DE | 2 213 180 | | 9/1972 |
| DE | 2 417 465 | | 10/1975 |
| DE | 3 943 242 | | 6/1990 |
| EP | 0 005 129 | | 10/1979 |
| EP | 0 015 381 | | 9/1980 |
| EP | 0 103 991 | | 3/1984 |
| EP | 0 166 287 | | 1/1986 |
| EP | 0 174 726 | | 3/1986 |
| EP | 0 198 769 | | 10/1986 |
| EP | 0 202 051 | | 11/1986 |
| EP | 0 207 041 | | 12/1986 |
| EP | 0 239 361 | | 9/1987 |
| EP | 0 249 587 | | 12/1987 |
| EP | 0263083 | | 4/1988 |
| EP | 0 273 890 | | 7/1988 |
| EP | 0 281 200 | | 9/1988 |
| EP | 0 383 967 | | 8/1990 |
| EP | 0 383 967 | A1 | 8/1990 |
| EP | 0 391 518 | | 10/1990 |
| EP | 0 411 590 | | 2/1991 |
| EP | 0 413 120 | | 2/1991 |
| EP | 0 475 536 | | 3/1992 |
| EP | 0 477 135 | | 3/1992 |
| EP | 0 502 642 | | 9/1992 |
| EP | 0 548 356 | | 6/1993 |
| EP | 0 601 508 | | 6/1994 |
| EP | 0609961 | | 8/1994 |
| EP | 0 624 371 | | 11/1994 |
| EP | 0 647 448 | | 4/1995 |
| EP | 0 709 087 | | 5/1996 |
| EP | 0 793 959 | | 9/1997 |
| EP | 0 953 350 | | 11/1999 |
| EP | 0 953 359 | | 11/1999 |
| EP | 0 968 714 | | 1/2000 |
| EP | 0 974 356 | | 1/2000 |
| EP | 1 062 955 | | 12/2000 |
| EP | 1 069 896 | | 1/2001 |
| EP | 1 086 694 | | 3/2001 |
| EP | 1 101 490 | A1 | 5/2001 |
| EP | 1 123 700 | | 8/2001 |
| EP | 1 293 209 | | 3/2003 |
| FR | 2 313 915 | | 1/1977 |
| FR | 2 634 377 | | 1/1990 |
| FR | 2 670 112 | | 6/1992 |
| FR | 2 725 623 | | 4/1996 |
| FR | 2 759 083 | | 8/1998 |
| FR | 2 811 571 | | 1/2002 |
| FR | 2 816 840 | | 5/2002 |
| FR | 2816840 | | 5/2002 |
| FR | 2 830 447 | | 4/2003 |
| FR | 2830447 | * | 4/2003 |
| FR | 2 837 100 | | 9/2003 |
| FR | 2 842 736 | | 1/2004 |
| GB | 1 598 458 | | 9/1981 |
| GB | 2 163 747 | | 3/1986 |
| GB | 2 202 143 | | 9/1988 |
| JP | 5 807 3359 | A | 5/1983 |
| JP | 61-001613 | A | 1/1986 |
| JP | 61-109711 | A | 5/1986 |
| JP | 6 303 9811 | A | 2/1988 |
| JP | 63-301816 | A | 12/1988 |
| JP | 02 053 721 | | 2/1990 |
| JP | 7252140 | A | 10/1995 |
| JP | 08 073 345 | | 3/1996 |
| JP | 10 509 427 | | 9/1998 |
| JP | 10 324 643 | | 12/1998 |
| JP | 11 269 064 | | 10/1999 |
| JP | 11 322 588 | | 11/1999 |
| JP | 00 256 182 | | 9/2000 |
| WO | WO-87/07833 | | 12/1987 |
| WO | WO-91/16885 | | 11/1991 |
| WO | WO-91/19711 | | 12/1991 |
| WO | WO-91/19712 | | 12/1991 |
| WO | WO-92/01446 | | 2/1992 |
| WO | WO-93/01805 | | 2/1993 |
| WO | WO-94/09762 | | 5/1994 |
| WO | WO-94/27557 | | 12/1994 |
| WO | WO-94/27988 | | 12/1994 |
| WO | WO-95/20946 | | 8/1995 |
| WO | WO-95/28148 | | 10/1995 |
| WO | WO-96/01628 | | 1/1996 |
| WO | WO-96/04908 | | 2/1996 |
| WO | WO-96/08243 | | 3/1996 |
| WO | WO 96/11675 | | 4/1996 |
| WO | WO-96/39127 | | 12/1996 |
| WO | WO-97/06798 | | 2/1997 |
| WO | WO-97/21436 | | 6/1997 |
| WO | WO-97/25066 | | 7/1997 |
| WO | WO-97/40680 | | 11/1997 |
| WO | WO-98/02157 | | 1/1998 |
| WO | WO-98/10754 | | 3/1998 |
| WO | WO-98/24411 | | 6/1998 |
| WO | WO-98/35672 | | 8/1998 |
| WO | WO-98/40053 | | 9/1998 |
| WO | WO-98/42311 | | 10/1998 |
| WO | WO-98/55107 | | 12/1998 |
| WO | WO-99/05105 | | 2/1999 |
| WO | WO-99/11260 | | 3/1999 |
| WO | WO-99/26608 | | 6/1999 |

| | | |
|---|---|---|
| WO | WO-99/32091 | 7/1999 |
| WO | WO-99/47125 | 9/1999 |
| WO | WO-99/47128 | 9/1999 |
| WO | WO-99/49846 | 10/1999 |
| WO | WO-99/52526 | 10/1999 |
| WO | WO-00/00179 | 1/2000 |
| WO | WO-00/03695 | 1/2000 |
| WO | WO-00/04902 | 2/2000 |
| WO | WO-00/15639 | 3/2000 |
| WO | WO-00/18374 | 4/2000 |
| WO | WO-00/24379 | 5/2000 |
| WO | WO-00/28989 | 5/2000 |
| WO | WO-00/32174 | 6/2000 |
| WO | WO-00/40233 | 7/2000 |
| WO | WO 00/50015 | 8/2000 |
| WO | WO-00/50036 | 8/2000 |
| WO | WO-00/61115 | 10/2000 |
| WO | WO-00/78293 | 12/2000 |
| WO | WO-01/08661 | 2/2001 |
| WO | WO-01/10419 | 2/2001 |
| WO | WO-01/21159 | 3/2001 |
| WO | WO-01/32157 | 5/2001 |
| WO | WO-01/32158 | 5/2001 |
| WO | WO-01/47499 | 7/2001 |
| WO | WO-01/51035 | 7/2001 |
| WO | WO-01/51036 | 7/2001 |
| WO | WO 01/58424 | 8/2001 |
| WO | WO-01/74356 | 10/2001 |
| WO | WO-01/78725 | 10/2001 |
| WO | WO-01/87837 | 11/2001 |
| WO | WO-02/00216 | 1/2002 |
| WO | WO-02/22108 | 3/2002 |
| WO | WO-02/24167 | 3/2002 |
| WO | WO-02/30392 | 4/2002 |
| WO | WO-02/34237 | 5/2002 |
| WO | WO-02/39984 | 5/2002 |
| WO | WO-02/053097 | 7/2002 |
| WO | WO-02/056861 | 7/2002 |
| WO | WO-02/066002 | 8/2002 |
| WO | WO-02/072072 | 9/2002 |
| WO | WO-02/080887 | 10/2002 |
| WO | WO-02/092078 | 11/2002 |
| WO | WO-02/094285 | 11/2002 |
| WO | WO-03/007962 | 1/2003 |
| WO | WO-03/013467 | 2/2003 |
| WO | WO-03/013479 | 2/2003 |
| WO | WO-03/013609 | 2/2003 |
| WO | WO-03/015745 | 2/2003 |
| WO | WO-03/020243 | 3/2003 |
| WO | WO-03/024426 | 3/2003 |
| WO | WO-03/024429 | 3/2003 |
| WO | WO-03/028645 | 4/2003 |
| WO | WO-03/028718 | 4/2003 |
| WO | WO-03/030920 | 4/2003 |
| WO | WO-03/033001 | 4/2003 |
| WO | WO-03/035029 | 5/2003 |
| WO | WO-03/035039 | 5/2003 |
| WO | WO-03/077888 | 9/2003 |
| WO | WO-03/082204 | 10/2003 |
| WO | WO-03/084517 | 10/2003 |
| WO | WO-03/084518 | 10/2003 |
| WO | WO-03/092622 | 11/2003 |
| WO | WO-03/092626 | 11/2003 |
| WO | WO-03/094899 | 11/2003 |
| WO | WO-03/094924 | 11/2003 |
| WO | WO-03/097018 | 11/2003 |
| WO | WO-03/103538 | 12/2003 |
| WO | WO-2004/002419 | 1/2004 |
| WO | WO-2004/002472 | 1/2004 |
| WO | WO-2004/004693 | 1/2004 |
| WO | WO-2004/009120 | 1/2004 |
| WO | WO-2004/010983 | 2/2004 |
| WO | WO-2004/010984 | 2/2004 |
| WO | WO-2004/016249 | 2/2004 |
| WO | WO-2004/024126 | 3/2004 |
| WO | WO-2004/026262 | 4/2004 |
| WO | WO-2004/035020 | 4/2004 |
| WO | WO-2004/035090 | 4/2004 |
| WO | WO-2004/037259 | 5/2004 |
| WO | WO-2004/041252 | 5/2004 |
| WO | WO-2004/052346 | 6/2004 |
| WO | WO-2004/054542 | 7/2004 |
| WO | WO-2004/056336 | 7/2004 |
| WO | WO-2004/056337 | 7/2004 |
| WO | WO-2004/064834 | 8/2004 |
| WO | WO-2004/087175 | 10/2004 |
| WO | WO-2005/016313 | 2/2005 |
| WO | WO-2005/016314 | 2/2005 |
| WO | WO-2005/016370 | 2/2005 |
| WO | WO-2005-051322 | 6/2005 |
| WO | WO-2005/051325 | 6/2005 |
| WO | WO-2005/051383 | 6/2005 |
| WO | WO-2005/079760 | 9/2005 |
| WO | WO-2006/056712 | 6/2006 |
| WO | WO-2006/056713 | 6/2006 |
| WO | WO-2006/089843 | 8/2006 |
| WO | WO-2006/125819 | 11/2006 |
| WO | WO-2006/133733 | 12/2006 |
| WO | WO-2006/134018 | 12/2006 |
| WO | WO-2007/054378 | 5/2007 |
| WO | WO-2007/093642 | 8/2007 |

OTHER PUBLICATIONS

Yoshino, H., "Design and Evaluation of Time-Controlled Release Systems for Site-Specific Oral Drug Delivery to the GI Tract," (1993) *Current Status on Targeted Drug Delivery to the GI Tract*, Capsugel Library, Symp. Ser., Short Hills 22/04, London 6/05, Tokyo 14/05, pp. 185-190.

In the U.S. Patent and Trademark Office U.S. Appl. No. 08/544,208 Non-Final Office Action dated Feb. 11, 1999, 7 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 08/753,013 Non-Final Office Action dated Apr. 14, 1997, 4 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/332,463 Final Office Action dated Sep. 21, 2006, 10 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/332,463 Non-Final Office Action dated Dec. 23, 2005, 6 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Advisory Action dated Dec. 10, 2009, 3 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Final Office Action dated Aug. 18, 2009, 8 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Final Office Action dated Nov. 23, 2010, 12 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Final Office Action dated Sep. 10, 2007, 16 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Non-Final Office Action dated Aug. 31, 2010, 4 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Non-Final Office Action dated Feb. 18, 2009, 7 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Non-Final Office Action dated Jan. 21, 2010, 11 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Non-Final Office Action dated Mar. 28, 2006, 14 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/478,420 Final Office Action dated Jul. 1, 2009, 27 pages.

In the U.S. Patent and Trademark Office U.S. Patent and Trademark Office U.S. Appl. No. 10/478,420 Final Office Action dated Aug. 10, 2010, 24 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/478,420 Non-Final Office Action dated Jan. 11, 2010, 29 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/478,420 Non-Final Office Action dated Sep. 30, 2008, 18 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/478,420 Non-Final Office Action dated Jan. 4, 2011, 6 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/492,129 Non-Final Office Action dated Apr. 29, 2009, 12 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/492,129 Non-Final Office Action dated Jul. 26, 2007, 9 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/492,129 Non-Final Office Action dated Mar. 30, 2010, 2 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/492,129 Non-Final Office Action dated Mar. 30, 2010, 9 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/492,129 Non-Final Office Action dated Sep. 8, 2008, 10 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/507,886 Final Office Action dated Jun. 23, 2010, 15 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/507,886 Non-Final Office Action dated Jul. 21, 2009, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,621 Final Office Action dated Aug. 25, 2010, 17 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,621 Final Office Action dated Mar. 30, 2009, 17 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,621 Non-Final Office Action dated Dec. 8, 2009, 16 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,621 Non-Final Office Action dated Feb. 5, 2008, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,643 Final Office Action dated Mar. 25, 2009, 19 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,643 Non-Final Office Action dated Dec. 7, 2009, 16 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,643 Non-Final Office Action dated Feb. 5, 2008, 14 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/522,234 Non-Final Office Action dated Jan. 14, 2008, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/522,252 Final Office Action dated Aug. 19, 2008, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/522,252 Final Office Action dated Mar. 2, 2010, 9 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/522,252 Non-Final Office Action dated Jan. 14, 2008, 10 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/522,252 Non-Final Office Action dated Jul. 6, 2009, 12 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Final Office Action dated Jan. 7, 2009, 9 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Final Office Action dated Jul. 18, 2011, 5 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Non-Final Office Action dated Apr. 30, 2010, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Non-Final Office Action dated Jul. 27, 2007, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Non-Final Office Action dated Oct. 26, 2010, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Non-Final Office Action dated Sep. 15, 2009, 16 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/996,780 Final Office Action dated Oct. 8, 2009, 18 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/996,780 Non-Final Office Action dated Dec. 12, 2008, 18 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/997,836 Non-Final Office Action dated Aug. 19, 2010, 19 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/997,836 Non-Final Office Action dated Aug. 7, 2009, 17 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/997,836 Non-Final Office Action dated Oct. 29, 2008, 14 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/137,261 Final Office Action dated Jan. 15, 2009, 23 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/137,261 Non-Final Office Action dated Apr. 2, 2008, 17 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/439,432 Final Office Action dated Decmeber 22, 2009, 12 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/439,432 Non-Final Office Action dated Jan. 30, 2009, 22 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/439,432 Non-Final Office Action dated Jul. 13, 2011, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/583,940 Final Office Action dated Feb. 4, 2009, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/583,940 Final Office Action dated May 25, 2010, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/583,940 Non-Final Office Action dated Mar. 3, 2008, 9 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/583,940 Non-Final Office Action dated Sep. 2, 2009, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/648,605 Non-Final Office Action dated Apr. 15, 2009, 15 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Final Office Action dated Apr. 29, 2011, 10 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Final Office Action dated Jul. 31, 2009, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Final Office Action dated Jul. 9, 2010, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Non-Final Office Action dated Dec. 26, 2008, 23 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Non-Final Office Action dated Jan. 6, 2010, 7 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Non-Final Office Action dated Nov. 23, 2010, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/723,553 Final Office Action dated Aug. 26, 2008, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/723,553 Final Office Action dated Jun. 8, 2010, 20 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/723,553 Non-Final Office Action dated Nov. 18, 2009, 16 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/723,553 Non-Final Office Action dated Oct. 4, 2007, 7 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,566 Final Office Action dated Dec. 18, 2008, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,566 Final Office Action dated Mar. 16, 2010, 7 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,566 Non-Final Office Action dated Apr. 4, 2008, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,566 Non-Final Office Action dated Jul. 20, 2010, 6 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,566 Non-Final Office Action dated Jul. 24, 2009, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,573 Final Office Action dated Dec. 10, 2008, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,573 Non-Final Office Action dated Mar. 31, 2008, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,581 Final Office Action dated Dec. 10, 2008, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,581 Final Office Action dated Nov. 26, 2008, 7 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,581 Non-Final Office Action dated Apr. 10, 2008, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,581 Non-Final Office Action dated Jul. 29, 2009, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,581 Non-Final Office Action dated Mar. 31, 2008, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,586 Final Office Action dated Dec. 1, 2008, 7 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,586 Non-Final Office Action dated Jul. 29, 2009, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,586 Non-Final Office Action dated Mar. 31, 2008, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/791,466 Final Office Action dated May 9, 2011, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/791,466 Non-Final Office Action dated Aug. 18, 2010, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/802,610 Final Office Action dated May 18, 2010, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/802,610 Non-Final Office Action dated Apr. 16, 2009, 9 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/802,610 Non-Final Office Action dated Nov. 16, 2009, 16 pages.
In the U.S. Patent and Trademark Office, Restriction Requirement in re: U.S. Appl. No. 10/415,850, dated May 15, 2008, 6 pages.
"Product Information, Losartan (potassium salt)," *Cayman Chemical*, 2005; p. 1.
Amidon et al., "A Theoretical Basis for a Biopharmaceutic Drug Classification: The Correlation of in vitro Drug Product Dissolution and in vivo Bioavailability," *Pharmaceutical Research*, 1995; 12(3):413-420.
BASF Fine Chemicals Brochure Technical Information Cremorphor® RH 40, Aug. 1997.
Becker et al., "Current Approaches to Prevent NSAID-Induced Gastropathy—COX Selectivity and Beyond," *British Journal of Clinical Pharmacology*, 2004; 58(6):587-600.
Buri et al., "IV, Voie Orale," *Formes Pharmaceutiques Nouvelles Aspects Technologique, Biopharmaceutique et al.*, 1985; 175-227.

Catella-Lawson et al., "Cyclooxygenase Inhibitors and the Antiplatelet Effects of Aspirin," *New England Journal of Medicine*, 2001; 345(25):1809-1817.

Chou et al., "Conformational studies on copolymers of hydroxypropyl-L-glutamine and L-leucine. Circular dichroism studies," *Biochemistry*, 1972; 11(16):3028-3043.

Coloron Surelease® Aqueous Ethylcellulose Dispersions, 2007.

Corel Pharma Chem—Acrycoat Data Sheet.

Cremophor RH40 Technical Information Data Sheet.

Davis et al., "The Design and Evolution of Controlled Release Systems for the Gastrointestinal tract," *J. Controlled Release*, 1985; 2:27-38.

Evonik Industries: Eudragit® Versatile Polymers of Oral Solid Dosage Formulations. No date on document; last accessed online Aug. 11, 2011.

Evonik Industries: "Guidelines for Formulation Development and Process Technology for Protective Coatings," *Pharma Polymers*, 2009; 1-4.

Flamel Technologies, Press Release, Lyon, France, Oct. 20, 2003.

Gavrilin et al., "A Comparative Study of the Pharmacokinetics and Bioaccessibility of Potassium Losartan in Various Medicinal Forms," *Pharmaceutical Chemistry Journal*, 2002; 36(5):227-228.

Glipizide, Web search for extended release dosage information, Accessed Sep. 23, 2008, Retrieved from the Internet Archive dated Apr. 17, 2001: http://web.archive.org/web20010417064637/http://www.rxlist.com/cgi/generic/glip_ids.htm.

Hayashi, "Preparation and Properties of A-B-A Tri-Block Copolymer Membranes Consisting of *N*-Hydroxyalkyl L-Glutamine as the A Component and L-Alanine as the B Component," *Polymer Journal* (Tokyo, JP), 1985; 17(12):1273-1280.

Beckert et al., "Compression of enteric-coated pellets to disintegrating tablets," *International Journal of Pharmeceutics*, 1996; 143:13-23.

International Search Report from PCT/FR02/01745 dated May 23, 2002.

Jen et al., "Ribavirin dosing in chronic hepatitis C: Application of population pharmacokinetic-pharmacodynamic models," *Clin. Pharmacol. Ther.*, 2002; 72(4):349-361.

JRS Pharma: Lubritab® Brochure.

KSR v. Teleflex, Wikipedia, The Free Encyclopedia, pp. 1-3. (see Footnote 6 at p. 3, lines 14-17).

Kario et al., "Nocturnal Fall of Blood Pressure and Silent Cerebrovascular Damage in Elderly Hypertensive Patients," Advanced Silent Cerebrovascular Damage in Extreme Dippers, *Hypertension*, 1996; 27(1):130-135.

Metformin dosage information. Accessed Sep. 23, 2008, via the internet Archive dated Dec. 17, 2000, at http://web.archive.org/web/*/http://www.odist.com/cgi/generic/metformi_ids.htm.

Nicklasson et al., "Modulation of the tabletting behavior of micorcrystalline cellulose pellets by the incorporation of polyethylene glycol," *European Journal of Pharmaceutical Sciences*, 1999; 9:57-65.

Qingshseng, "Release—Sustained Pellet of Ribavirin," XP002395861, 2004 *Chemical Abstracts*, Data Accession No. 2005:353828, Abstract only.

Specifications and Test Methods of Eudragit® L100-55, 2007.

Tao et al., "Preparation of Ribavirin Sustained—Release Pellets by Centrifugal Granulation Technology," XP002395860, 2005; *Chemical Abstracts*, Database accession No. 2005:500395, Abstract only.

Torriani et al., "Peginterferon Alfa-2a plus Ribavirin for Chronic Hepatitis C Virus Infection in HIV-Infected Patients," *The New England Journal of Medicine*, 2004; 351(5):438-450.

Uchida et al., "Preparation and Evaluation of Sustained Release of Ethyl Cellulose Microcapsules Containing Ampicillin or Amoxicillin Using Rabbits, Beagle Dogs and Humans," *J. Pharmacobio-Dyn.*, 1986; 9(5):13.

Wojcik, "Helix-Coil Transition in Multicomponent Random Copolypeptides in Water. 3. Inclusion of Nearest-Neighbor Interactions and Application to Random Copolymers of (Hydroxybutyl)-$_L$-glutamine, $_L$-Alanine, $_L$-Phenylalanine, $_L$-Lysine, and Glycine," *Macromolecules*, 1990; 23(15):3655-3662.

* cited by examiner



120.0
100.0
80.0
% D
60.0
40.0
20.0
0.0
0
2
4
6
8
10
12
14
16
T (h)

FIG 1

120
100
80
% D
60
40
20
0
0
4
8
12
16
20
24
T(h)

FIG 2

U.S. Patent Jan. 24, 2012 Sheet 2 of 2 US 8,101,209 B2

120
100
80
% D
60
40
20
0
0
2
4
6
8
10
12
14
16
T (h)

FIG 3

JPION00466135

# MICROPARTICULATE ORAL GALENICAL FORM FOR THE DELAYED AND CONTROLLED RELEASE OF PHARMACEUTICAL ACTIVE PRINCIPLES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of application Ser. No. 10,492,129, filed Jul. 19, 2004, currently pending, which is a National Stage of International Application No. PCT/FR02/03443, filed Oct. 9, 2002, which claims the benefit of FR01/12999, filed Oct. 9, 2001. International Application No. PCT/FR02/03443 and FR01/12999 are incorporated herein by reference.

The present invention relates to the field of microparticulate systems for the delayed and controlled release of one or more active principles, AP, intended for oral administration.

The AP envisaged in the present invention are those whose absorption is essentially limited to the upper parts of the gastrointestinal tract located upstream from the colon (upstream from the ileocecal junction), and which represent a large majority of pharmaceutical active principles.

More precisely, the invention relates to a microparticulate galenical form for delayed and controlled release where the controlled release phase is triggered with certainty by means of a dual mechanism: "time-dependent" release triggered after a certain residence time in the stomach, and "pH-dependent" release triggered by a change in pH when the particles enter the small intestine, which starts without a latency period. The microparticles of the present invention are microcapsules containing at least one active principle (AP)-excluding perindopril-having a particle size of between 100 and 1200 microns and individually coated with a film allowing the delayed and controlled release of the AP.

Systems for the delayed and controlled release of AP are particularly useful in cases where it is desirable, for reasons of chronobiology, that the AP be "bioabsorbed" at a precise time of day so as to be in phase with the circadian cycle. This approach is appropriate to the treatment of cancer or hypertension, the administration of anti-inflammatory drugs or the regulation of glycemia in the treatment of diabetes. It may be advantageous, for example, for the AP to be bioabsorbed very early in the morning so as to assure therapeutic cover when the patient wakes up, without compelling him to wake up prematurely. To do this, the galenical system ingested by the patient, for example after the evening meal, must allow a delayed release of the AP.

However, the first rule imposed on the pharmacist is to guarantee that the prescribed drug will be absorbed by the patient. In the case of a delayed release form, it is therefore crucial to have a total guarantee of release of the active principle at a given moment in order to obtain the therapeutic effect. Now, one is obliged to note that delayed release forms cannot ensure with certainty that the AP will be released after a prescribed time. This problem becomes particularly acute in the case where it is vital for the patient that this release does indeed take place, for example in the treatment of cardiovascular diseases or diabetes.

In fact, delayed release forms are conventionally obtained by coating the AP with a layer of enteric polymer, for example the methacrylic acid/methyl methacrylate copolymer EUDRAGIT® L. This type of enteric coating is known to have a reduced permeability under the acidic pH conditions of the stomach, and to dissolve when the pH increases to a value close to that prevailing in the small intestine, thereby releasing the AP. However, the intraindividual and interindividual

variability of the gastric pH conditions and the gastric emptying time do not make it possible to ensure with certainty that the AP will be released after a given time.

Purely "time-dependent" delayed release systems, i.e. those for which the release of the AP is triggered after a given residence time in the gastrointestinal tract, are not satisfactory either. In fact, because of the intraindividual and interindividual variability of the gastric residence time, the AP may be released after it has passed its absorption window, which, for the majority of AP, is located in the upper part of the gastrointestinal tract. The bioabsorption may thus be very low or even zero.

In this context it would be particularly advantageous to have a galenical form for the delayed and controlled release of the AP which made it possible to assure with certainty the release of the AP by means of a dual AP release triggering mechanism: "time-dependent" release triggered after a controlled time m the stomach, without a change m pH, and "pH-dependent" release triggered by an increase in the pH when the galenical form enters the intestine. These two AP release triggering factors, in succession, would give the galenical system a high degree of reliability in use. The release of the AP would thus be guaranteed after a preset latency period, even if the variation in pH did not intervene as a trigger, i.e. even if the galenical form did not pass from the stomach into the intestine.

To minimize the interindividual variability of AP absorption, it is necessary to adjust the latency period preceding the release of the AP into the stomach by considering the physiological conditions of the gastrointestinal tract in man. According to the well-known results of Davis et al., J. of Controlled Release, 2, 27-38 (1985), the gastric residence time of a preparation is very variable, being in the order of 0.5 to 10 hours. It would therefore be particularly advantageous to have a galenical form which released the active principle into the stomach after a given constant latency period within this interval of 0.5-10 hours, so that the action time of the drug would be the same from one individual to another or even from one day to the next for the same individual.

Moreover, to optimize the bioavailability of AP whose absorption is mainly limited to the upper parts of the gastrointestinal tract, it would be advantageous if the "pH-dependent" release into the intestine were to take place without a latency period, since otherwise the AP would not be released in its absorption window and, consequently, the patient would not be treated.

Another unique advantage of such a system would be that, by mixing it with a galenical form for immediate release of the AP, or by mixing it with another galenical form for delayed and controlled release of the AP, it would afford release profiles which exhibited several AP release waves (one AP or several identical or different AP) or which, by appropriate adjustment of the different fractions, assured a constant plasma AP concentration level.

It would also be advantageous for the delayed and controlled release form to consist of a plurality of microcapsules with a diameter below 2000 microns. In fact, for such a form, the dose of AP to be administered is spread over a large number of microcapsules (typically 10,000 for a dose of 500 mg) and thus has the following intrinsic advantages:

- The residence time of the microcapsules in the upper parts of the gastrointestinal tract can be prolonged, thereby increasing the duration of passage of the AP through the absorption windows and thus maximizing the bioavailability of the AP.
- The use of a mixture of microcapsules with different delayed and controlled release profiles makes it possible

to create release profiles which exhibit several release waves or which, by appropriate adjustment of the different fractions, assure a constant plasma AP concentration level.

The sensitivity to the variability of gastric emptying is reduced because the emptying, which in this case takes place over a large number of particles, is statistically more reproducible.

Bringing the tissues into contact with a high dose of AP-dose dumping-is avoided. Each microcapsule actually contains only a very small dose of AP. This eliminates the risk of tissue damage due to a local excess concentration of aggressive AP.

It is possible to combine several galenical forms (immediate and/or delayed and/or prolonged release), containing one or more active principles, in these "multimicrocapsular" systems.

It is possible to present these microcapsules in the form of sachets, gelatin capsules or tablets. In cases where the dose of AP is high (500 mg or more), the monolithic forms are too large to be swallowed easily. It is then of particular value to have a microparticulate form for delayed and controlled release of the AP, which those skilled in the art can formulate as disintegrating tablets or sachets.

Finally, it would also be desirable for the coating film around the microcapsules to be thin. In fact, a thick coating would have several adverse consequences:

(a) the mass fraction of excipient in the galenical form would be too high, making the mass of the drug too large to be swallowed easily and hence, in fine, creating compliance problems that jeopardize the success of the treatment; and

(b) the microcapsules would take a very long time to manufacture.

In summary, it would therefore be of particular value to have a microparticulate oral galenical form for the delayed and controlled release of AP which simultaneously possessed the following properties:

the release of the AP can be triggered in two ways:

by release dependent on time, also called "time-dependent" release, when the residence time of the particles in the stomach exceeds 5 hours;

by release dependent on a variation in pH, also called "pH-dependent" release, which starts without a latency period when the system enters the intestine and the pH increases; these two AP release triggering factors, in succession, guarantee that the AP is released after a preset latency period, even if the variation in pH has not intervened as a trigger;

it consists of a plurality of small microcapsules of coated AP; and

the mass fraction of coating excipients is limited.

The delayed or controlled release of AP has formed the subject of numerous studies.

Thus PCT patent application WO-A-96/11675 describes microcapsules for the oral administration of medicinal and/or nutritional active principles (AP) whose size is less than or equal to 1000 μm. These microcapsules consist of particles coated with a coating material consisting of a mixture of a film-forming polymeric derivative (ethyl cellulose), a hydrophobic plasticizer (castor oil), a surfactant and/or lubricant (magnesium stearate) and a nitrogen-containing polymer (polyvinylpyrrolidone: PVP). These microcapsules are also characterized by their ability to reside for a long time (at least 5 hours) in the small intestine and, during this residence time, to allow absorption of the AP over a period greater than the natural transit time in the small intestine.

The microcapsules according to said patent application do not provide a solution to the particular problem of the delayed and controlled release of AP with a "time-dependent" and "pH-dependent" triggering of the AP.

Patent application FR-A-00 14876 describes a drug for the treatment of type II diabetes which comprises several thousand antihyperglycemic microcapsules (metformin) each consisting of a core containing at least one antihyperglycemic, and of a coating film (e.g. stearic acid and ethyl cellulose) applied to the core, which allows prolonged release of the antihyperglycemic in vivo. These microcapsules have a particle size of between 50 and 1000 μm.

Said patent application FR-A-00 14876 does not indicate how to obtain the delayed 420 and controlled release of AP with a "time-dependent" and "pH-dependent" triggering of the AP.

European patent application EP-A-0 609 961 discloses oral morphine granules for which the controlled release of the AP accelerates with the increase in pH.

These granules consist of:

sugar core (ϕ=100 to 1700 μm)

coated with a layer of active ingredient associated with a binder (PVP or hydroxypropyl methyl cellulose: HPMC),

and an outer envelope based on:

a polymer that is insoluble independently of the pH (ethyl cellulose or methacrylic acid ester/ammonium methacrylate copolymer: EUDRAGIT® RS or RL),

an enteric polymer that is insoluble at acidic pH (methacrylic acid/methyl methacrylate copolymer: EUDRAGIT.® L),

a component that is partially soluble at acidic pH (polyethylene glycol, PVP, HPMC, polyvinyl alcohol: PVA),

optionally a plasticizer (diethyl phthalate)

and optionally a filler (talcum).

The mass fractions of AP are e.g. 41%, 38% and 29% and the mass fractions of outer envelope are e.g. 14.1%, 21.5% and 12.3% (by weight).

Release of the AP takes place at any pH and increases as the pH changes from 1.2 to 7.5. This is therefore a form for prolonged and non-delayed release.

The article by H. YOSHINO entitled "*Design and evaluation of time-controlled release systems for site-specific oral drug delivery to the GI tract*", published in *Current status on targeted drug delivery to the GI tract, Capsugel library, Symp. Ser.,* Short Hills 22/04, London 6/05, Tokyo 14/05, pp 185-190, (1993), describes multiparticulate oral galenical systems for delayed and controlled release induced by an organic acid and by the residence time in the GIT. These systems are made up of 1000 μm microcapsules consisting of a neutral sugar core coated with a layer of active ingredient mixed with an organic acid (succinic acid), and of an outer layer of methacrylic acid ester/ammonium methacrylate copolymer (EUDRAGIT®RS). The organic acid is described as allowing a rapid release of the AP after the latency phase. This organic acid is transported by the water which has entered the microcapsules through the enteric outer layer. It then works towards modifying the permeability of the coating to allow rapid diffusion of the AP out of the microcapsules. The presence of this acid in intimate contact with the AP can be detrimental to the latter.

U.S. Pat. No. 6,033,687 describes a formulation consisting of a mixture of two types of granules (ϕ=1.4 mm) based on diltiazem, namely granules with a short latency period and

granules with a long latency period. The release profiles are measured at pH 1. These granules comprise:

- a neutral sugar core (ϕ=0.5-1.5 mm),
- a layer of diltiazem associated with a binder (hydroxypropyl cellulose, carboxymethyl cellulose, ethyl cellulose, polyvinylpyrrolidone, alginate, EUDRAGIT),
- and a single outer coating based on a lubricant (talcum), two methacrylic acid ester/ammonium methacrylate copolymers (EUDRAGIT®RS and EUDRAGIT®RL), a surfactant (sodium laurylsulfate) and a plasticizer (triethyl citrate).

In the granules with a short latency period, the mass fraction of the coating represents 12.3%, compared with 30.3% in the granules with a long latency period. However, this technique does not afford long latency periods for film coating rates below 30%. Furthermore, in view of the intraindividual and interindividual variability of the gastric residence time, this "time-dependent" delayed release system may release the AP after it has passed its absorption window. This results in a substantial loss of bioavailability.

Patent EP-B-0 263 083 describes a microcapsule coating composition that affords a zero-order and reproducible AP release profile. This coating composition is composed of a mixture of:

- a hardening polymer to assure the mechanical strength of the coating, possible examples being ethyl cellulose or methacrylic acid copolymer(s) (EUDRAGIT®E, L, S or RS),
- a lipophilic compound, e.g. stearic acid or paraffin,
- and talcum.

This coating composition is present in the microcapsules in an amount of e.g. 15 to 35% by weight. The hardening polymer/lipophilic compound ratios are e.g. 44 and 42% respectively in Examples 4 and 5.

The profiles obtained are profiles without a latency period of variable duration. Said patent neither teaches nor mentions how to obtain a profile with a delayed and controlled release that is triggered at the end of the latency period and/or by a variation in pH.

Patent application WO-A-01/58424 A1 discloses "floating" microcapsules coated with an enteric coating based e.g. on EUDRAGIT®L, magnesium stearate, talcum and a plasticizer such as dibutyl sebacate. This coating can be enveloped in a "bioadhesive" film based on chitosan. Like every enteric coating, the aim of the enteric coating according to patent document WO-A-01/58424 is a "pH-dependent" release rather than the conjunction of a "time-dependent" release and a "pH-dependent" release. Furthermore, FIGS. **1** to **3** of said patent application show that the simple objective of "pH-dependent" release is very imperfectly achieved since up to 20% of the AP is released in two hours only at constant acidic pH. As the particles described in said patent application float in the stomach, their gastric residence time is described as increased, so much so that one may even fear the absence of any "pH-triggered" release. Finally, the release would take place in an uncontrolled manner due to the rogue leaks of AP into the stomach.

European patent application EP-A-1 101 490 relates to a pharmaceutical preparation that is capable of releasing an active principle into the large intestine and more particularly the colon. This preparation can consist of tablets or granules comprising a core and a coating.

The technical problem underlying said invention is to propose a pharmaceutical form that is capable of allowing the release of a medicinal substance at a target site in the lower part of the small intestine, the ascending colon, the transverse colon or the lower part of the large intestine. Given the fact that the mean residence time in the stomach is 5 hours and that, on average, a further 2 hours are required to reach the lower part of the small intestine, the preparation according to EP-A-1 101 490 is designed so that the medicinal substance is not released for 5 hours under acidic conditions simulating the stomach, and is only released after a latency period of at least 2 hours in a fluid simulating the pH conditions of the intestine (cf. especially claim 7 of EP-A-1 101 490).

It is therefore apparent that this system aimed at medicinal substances absorbed in the lower parts of the intestine (colon) is not suitable for medicinal substances mainly absorbed in the upper parts of the gastrointestinal tract. Moreover, the system according to European patent application EP-A-1 101 490 does not make provision for release of the AP by means of a dual release triggering mechanism:

- release into the stomach after a constant given latency period within an interval of 0.5-10 hours ("time-dependent" mechanism),
- and release without a latency period after entering the intestine ("pH-dependent" mechanism).

Finally, the problem of the interindividual or intraindividual variability of the gastric residence time is not solved by the preparation according to EP-A-1 101 490.

Thus the prior art does not comprise a galenical system that makes it possible to delay and to guarantee with certainty the release of AP preferentially absorbed in the upper parts of the gastrointestinal tract, by means of a dual release mechanism:

- "time-dependent" release after a latency period in the stomach which has the characteristic of being a constant given latency period within an interval of 0.5-10 hours,
- and "pH-dependent" release without a latency period.

In view of this state of the art, one of the essential objectives of the present invention is to provide a novel multimicroparticulate galenical system for the oral administration of active principles essentially absorbed in the upper parts of the gastrointestinal tract, this system being of the delayed and controlled release type that assures the release of the AP with certainty and hence guarantees the therapeutic efficacy of said system, by means of a dual "time-dependent" and "pH-dependent" release mechanism. These two AP release triggering factors, in succession, guarantee the release of the AP after a preset latency period, even if the variation in pH has not intervened as a trigger.

One essential objective of the present invention is to propose a galenical form made up of a plurality of microcapsules that makes it possible to escape from the interindividual and intraindividual variability of the gastric emptying time by releasing the AP at pH 1.4 according to a delayed release profile which has a latency period with an adjustable given duration of between 0.5 and 10 hours, followed by a release phase that starts without a latency period.

One essential objective of the present invention is to propose a galenical form made up of a plurality of microcapsules that makes it possible on the one hand to release the AP according to a delayed release profile at pH 1.4 with a constant given latency period of between 0.5 and 10 hours, and according to a release half-life $t_{1/2}$ of between 0.25 and 35 hours, and on the other hand to release the AP when the pH changes from 1.4 to 6.8, without a latency period and with a $t_{1/2}$ of between 0.25 and 20 hours.

One essential objective of the present invention is controlled when the pH changes from 1.4 to 6.8.

One objective of the present invention is to propose a galenical form consisting of a large number of microcapsules, for example in the order of several thousand, this multiplicity statistically assuring a good reproducibility of the AP transit

kinetics throughout the gastrointestinal tract, the result being a better control of the bioavailability and hence a better efficacy.

One essential objective of the present invention is to propose a galenical form made up of a plurality of coated microcapsules that avoids the use of large amounts of coating agent, the mass fraction of coating agent being comparable to that of monolithic forms.

One essential objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules that makes it possible to present the AP in a form that is easy to swallow, namely a sachet or a disintegrating tablet.

One essential objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules that makes it possible to mix several different active principles.

Another objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules each containing a neutral core.

Having set themselves the above objectives, among others, it was to the inventors' credit to have developed, in order to assure a certain release of AP mainly absorbed in the upper parts of the gastrointestinal tract and a good bioabsorption of pharmaceutical active principles, a multimicrocapsular galenical system which:

- guarantees the absorption of the AP in its absorption window, which is mainly limited to the upper parts of the gastrointestinal tract;
- thereby assures a certain therapeutic efficacy of this system or of this galenical form;
- and has the essential characteristic of a dual triggering of the AP release.

This represents a major advance compared with the AP controlled release systems known hitherto, in which the release of the AP is triggered by a single factor, namely the residence time in the gastrointestinal tract for some systems and a variation in pH for other systems.

Thus the invention, which satisfies the objectives laid out above, among others, relates to a microparticulate oral galenical form for the delayed and control release of at least one AP-excluding perindopril-this AP having an absorption window in vivo that is essentially limited to the upper parts of the gastrointestinal tract, said form being designed so as to guarantee its therapeutic efficacy by guaranteeing its absorption in vivo, and being characterized in that:

- the release of the AP is governed by two different triggering mechanisms, one being based on a variation in pH and the other allowing the release of the AP after a predetermined residence time in the stomach,
- and its dissolution behavior in vitro (determined as indicated in the European Pharmacopeia, 3rd edition, under the title: "Dissolution test for solid oral forms": type II dissolutest performed under SINK conditions, maintained at 37° C. and agitated at 100 rpm) is such that:
  - at a constant pH of 1.4, the dissolution profile includes a latency phase with a duration less than or equal to 5 hours, preferably of between 1 and 5 hours,
  - and the change from pH 1.4 to pH 6.8, during the latency phase, results in a release phase that starts without a latency period.

In one preferred embodiment of the invention, the microparticulate oral galenical form consists of a plurality of microcapsules containing at least one active principle (AP) mainly absorbed in the upper parts of the gastrointestinal tract-excluding perindopril-these microcapsules being of the type that:

- consist of particles of AP each coated with at least one film, this coating film consisting of a composite material which:
  - comprises:
    - at least one hydrophilic polymer A carrying groups that are ionized at neutral pH,
    - and at least one hydrophobic compound B;
  - and represents a mass fraction (% by weight, based on the total mass of the microcapsules) of ≦40;
- and have a diameter below 2000 microns, preferably of between 200 and 800 microns and particularly preferably of between 200 and 600 microns,

characterized in that their coating film consists of a composite based on A and B in which:

- the weight ratio B/A is between 0.45 and 1.0, preferably between 0.5 and 1,
- and the hydrophobic compound B is selected from products that are crystalline in the solid state and have a melting point $T_{fB}$ such that, $T_{fB} \geqq 40°$ C., preferably $T_{fB} \geqq 50°$ C.

Advantageously, the microcapsules have a diameter of between 200 and 800 microns, B/A is between 0.5 and 1.0 and the hydrophobic compound B is selected from products that one cristalline in the solid state and have a melting point $T_{FB}$ such that 40° C.$\leqq T_{FB} \leqq$90° C.

According to one preferred characteristic of the invention, the hydrophilic polymer A is selected from:

- (meth)acrylic acid/alkyl (e.g. methyl) (meth)acrylate copolymers (EUDRAGIT®S or L) and mixtures thereof;
- cellulose derivatives, preferably cellulose acetate and/or phthalate, hydroxypropyl methyl cellulose phthalate and hydroxypropyl methyl cellulose acetate and/or succinate;
- and mixtures thereof.

More preferably, the compound B is selected from the following group of products:

- vegetable waxes, taken on their own or in mixtures with one another;
- hydrogenated vegetable oils, taken on their own or in a mixture with one another;
- mixtures of at least one monoester and of at least one diester and/or of at least one triester of glycerol with at least one fatty acid;
- and mixtures thereof.

According to the most preferred embodiment of the instant invention, the compound B of the microcapsules' coating film is selected from the groups comprising: the products which tradenames (trademarks) are the followings: Dynasan (Hydrogenated palm oil), Cutina (Hydrogenated castor oil), Hydrobase (Hydrogenated soybean oil), Dub (Hydrogenated soybean oil), Castorwax (Hydrogenated castor oil), Croduret (Hydrogenated castor oil), Carbowax, Compritol (Glyceryl behenate), Sterotex (Hydrogenated cottonseed oil), Lubritab (Hydrogenated cottonseed oil), Apifil (Wax yellow), Akofine (Hydrogenated cottonseed oil), Softtisan (Hydrogenated palm oil), Hydrocote (Hydrogenated soybean oil), Livopol (Hydrogenated soybean oil), Super Hartolan (Lanolin), MGLA (Anhydrous milk fat), Corona (Lanolin), Protalan (Lanolin), Akosoft (Suppository bases, Hard fat), Akosol (Suppository bases, Hard fat), Cremao (Suppository bases, Hard fat), Massupol (Suppository bases, Hard fat), Novata (Suppository bases, Hard fat), Suppocire (Suppository bases, Hard fat), Wecobee (Suppository bases, Hard fat), Witepsol (Suppository bases, Hard fat), Coronet, Lanol, Lanolin, Incromega (Omega 3), Estaram (Suppository bases, Hard fat), Estol, Suppoweiss (Suppository bases, Hard fat), Gelu-

cire (Macrogolglycérides Lauriques), Precirol (Glyceryl Palmitostearate), Emulcire (Cetyl alcohol), Plurol diisostearique (Polyglyceryl Diisostearate), Geleol (Glyceryl Stearate), Hydrine et Monthyle; as well the additives which codes are the followings: E 901, E 907, E 903 and mixtures thereof; and mixtures thereof.

In practice, the compound can be selected from the group comprising the products which tradenames (trademarks) are the followings : Dynasan P60, Dynasan 116, Dynasan 118, Cutina HR, Hydrobase 66-68, Dub, Compritol 888, Sterotex NF, Lubritab and mixtures thereof.

According to an interesting embodiment of the invention, the coating film of the 120 microcapsules is free from talc.

The preferred polymers A are (meth)acrylic acid/alkyl (e.g. methyl) (meth)acrylate copolymers. These copolymers, which are e.g. of the type marketed by RÓHM PHARMA POLYMERS under the registered trade marks EUDRAGIT®L and S series (for example EUDRAGIT® L100, S100, L30D-55 and L100-55), are anionic enteric (co) polymers soluble in aqueous media at pH values above those encountered in the stomach.

According to another preferred characteristic of the invention, the compound B is selected from the following group of products:

- vegetable waxes, taken on their own or in mixtures with one another, such as those marketed under the marks DYNASAN® P60 and DYNASAN® 116, inter alia;
- hydrogenated vegetable oils, taken on their own or in a mixture with one another, preferably selected from the group comprising hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil and mixtures thereof;
- monoesters and/or diesters and/or triesters of glycerol with at least one fatty acid, preferably behenic acid, taken by themselves or in a mixture with one another;
- and mixtures thereof.

The AP release triggering mechanism without a variation in pH, after a predetermined residence time in the stomach, results especially from control of the hydration rate of the microcapsules and/or the dissolution rate of one or more components of the microcapsules. For example, and without implying a limitation, the hydration of the microcapsule can be controlled by:

- the presence, in the microcapsules, of hydrophilic products that make it possible to adjust the osmotic pressure or to cause a swelling of the microcapsules;
- regulation of the water permeability of the coating film;
- the creation of a microporosity in the coating film;
- or even the hydration or dissolution of a compound in the coating film.

One of the decisive advantages of the multimicrocapsular galenical system according to the invention for the delayed and controlled release of AP is that it involves, in vivo, two factors that trigger the release of the AP into the gastrointestinal tract, namely:

- the residence time in the stomach: "time-triggered" release,
- and the variation in pH: "pH-triggered" release.

These two AP release triggering factors are successive, so they give the galenical system a high degree of reliability in use. The release of the AP is thus guaranteed after a preset latency period, even if the variation in pH has not intervened as a trigger. The problems of interindividual variability are thus overcome. The therapeutic efficacy of the drug comprising such a galenical system is assured by observing a predetermined chronobiology adapted to the intended therapeutic performance.

In addition, in the case of the AP considered in the present invention whose absorption window is limited to the upper parts of the gastrointestinal tract, it is particularly advantageous if the form for delayed and then controlled release consists of a plurality of microcapsules. In fact, for such a form, the dose of AP to be administered is spread over a large number of microcapsules (typically 10,000 for a dose of 500 mg) and thus has the following intrinsic advantages:

- The residence time of the microcapsules in the upper parts of the gastrointestinal tract can be prolonged, thereby increasing the duration of passage of the AP through the absorption windows and thus maximizing the bioavailability of the AP.
- The use of a mixture of microcapsules with different delayed and controlled release profiles makes it possible to create release profiles which exhibit several release waves or which, by appropriate adjustment of the different fractions, assure a constant plasma AP concentration level.
- The variability of the gastric emptying is reduced because the emptying, which in this case takes place over a large number of particles, is statistically more reproducible.
- Bringing the tissues into contact with a high dose of AP-dose dumping-is avoided. Each microcapsule actually contains only a very small dose of AP. This eliminates the risk of tissue damage due to a local excess concentration of aggressive AP.
- It is possible to present these microcapsules in the form of sachets, gelatin capsules or tablets. In cases where the dose of AP is high (500 mg or more), the monolithic forms are too large to be swallowed easily. It is then of particular value to have a microparticulate form for delayed and controlled release of the AP, which those skilled in the art can formulate as disintegrating tablets or sachets.

The multimicrocapsular galenical system according to the invention makes it possible to assure with certainty a delayed and controlled release of the AP into the GIT by means of two triggers, and thus to escape the interindividual and interindividual variability of the gastric emptying conditions, while at the same time being economically viable and easy to ingest (optimized compliance).

According to one particularly advantageous characteristic of the preferred embodiment, at a constant pH of 1.4, the controlled release phase following the latency phase is such that the release time for 50% by weight of the AP ($t_{1/2}$) is defined as follows (in hours):

| | |
|---|---|
| | $0.25 \leqq t_{1/2} \leqq 35$ |
| preferably | $0.5 \leqq t_{1/2} \leqq 20$ |

In practice, the release phase of the in vitro AP release profile at a constant pH of 1.4 has an adjustable release half-life.

According to another valuable characteristic of the preferred embodiment, the release phase following the change from pH 1.4 to pH 6.8, which takes place without a latency period, is such that the release time for 50% of the AP ($t_{1/2}$) is defined as follows (in hours):

| | |
|---|---|
| | $0.25 \leqq t_{1/2} \leqq 20$ |
| preferably | $0.5 \leqq t_{1/2} \leqq 15$ |

Preferably, the microcapsules according to the invention comprise a single composite coating film AB. This simplifies their preparation and limits the coating rate.

Preferably, the AP is deposited on a neutral core with a diameter of between 200 and 800 microns, preferably of between 200 and 600 microns.

Without implying a limitation, the hydrophilic neutral core can contain sucrose and/or dextrose and/or lactose, or it can consist of a cellulose microsphere.

Advantageously, the microcapsule coating can comprise, in addition to the essential constituents A and B, other conventional ingredients known to those skilled in the art, such as especially:

- colorants;
- plasticizers, for example dibutyl sebacate;
- hydrophilic compounds, for example cellulose and derivatives thereof or polyvinylpyrrolidone and derivatives thereof;
- and mixtures thereof.

Advantageously, the AP is deposited by the techniques known to those skilled in the art, for example the technique of spray coating in a fluidized air bed onto neutral cores with a diameter of between 200 and 800 microns, preferably of between 200 and 600 microns.

From the quantitative point of view, the monolayer of coating agent represents at most 40% and preferably at most 30% by weight of the microcapsules. Such a limited coating rate makes it possible to produce galenical units each containing a high dose of active principle without exceeding a prohibitive size as regards swallowing. This can only improve compliance with the treatment and hence its success.

In qualitative terms, the AP of the microcapsules according to the invention is essentially absorbable in the upper parts of the gastrointestinal tract and is advantageously selected from one of the following families of active substances: antiulcer agents, antidiabetics, anticoagulants, antithrombics, hypolipidemics, antiarrhythmics, vasodilators, antiangina agents, antihypertensives, vasoprotectors, fertility promoters, labor inducers and inhibitors, contraceptives, antibiotics, antifungals, antivirals, anticancer agents, anti-inflammatories, analgesics, antiepileptics, antiparkinsonian agents, neuroleptics, hypnotics, anxiolytics, psychostimulants, antimigraine agents, antidepressants, antitussives, antihistamines and antiallergics.

Reference may also be made to the list of active principles given on pages 4 to 8 of patent application EP-A-0 609 961.

Preferably, the AP is selected from the following compounds: metformin, acetylsalicylic acid, amoxicillin, pentoxifyllin, prazosin, acyclovir, nifedipine, diltiazem, naproxen, ibuprofen, flurbiprofen, ketoprofen, fenoprofen, indomethacin, diclofenac, fentiazac, estradiol valerate, metoprolol, sulpiride, captopril, cimetidine, zidovudine, nicardipine, terfenadine, atenolol, salbutamol, carbamazepine, ranitidine, enalapril, simvastatin, fluoxetine, alprazolam, famotidine, ganciclovir, famciclovir, spironolactone, 5-asa, quinidine, morphine, pentazocine, paracetamol, omeprazole, metoclopramide and mixtures thereof.

The microparticulate oral galenical form according to the invention can be a form selected in the groups comprising a tablet (advantageously a tablet that disperses in the mouth), a powder or a gelatin capsule.

The microcapsules described above can be used for the manufacture of novel pharmaceutical or dietetic preparations of various AP which have optimized therapeutic or dietetic performance characteristics and are preferably presented in the form of tablets, advantageously disintegrating tablets and even more preferably tablets that disperse in the mouth, powders or gelatin capsules.

These microcapsules are all the more valuable because they are also perfectly tolerated by the organism, especially by the stomach, and furthermore can be obtained easily and economically.

The present invention further relates to these novel pharmaceutical or dietetic preparations as such, which are original in their structure, to their presentation and to their composition. Such pharmaceutical or dietetic preparations are administered orally, preferably as single daily doses.

It is pointed out that it may be of value to mix, in one and the same gelatin capsule, tablet or powder, at least two types of microcapsule whose release kinetics are different but within the framework characteristic of the invention.

It is also possible to mix the microcapsules according to the invention with a certain amount of AP that is immediately available in the organism.

It can also be envisaged to associate microcapsules containing different AP.

In addition, a further subject of the invention is a galenical (pharmaceutical or dietetic) system, preferably in the form of a tablet, advantageously a disintegrating tablet and even more preferably a tablet that disperses in the mouth, a powder or a gelatin capsule, characterized in that it comprises microcapsules such as described above.

Furthermore, the invention relates to the use of microparticles such as defined above for the preparation of microparticulate oral galenical (pharmaceutical or dietetic) forms, preferably as tablets, advantageously tablets that disperse in the mouth, powders or gelatin capsules.

Finally, the invention further relates to a method of therapeutic treatment, characterized in that it consists in ingesting, according to a given dosage, a drug comprising microcapsules such as defined above.

The invention will be explained more clearly by the Examples below, given solely by way of illustration, which afford a good understanding of the invention and show its variants and/or modes of implementation, as well as its different advantages.

## EXAMPLES

Description of the Figures:

FIG. **1** shows the in vitro release profiles of the microcapsules of Example 1 at pH 1.4 —•—, and at pH 1.4 for 3 hours and then at pH 6.8 as from T=3 hours: —□—, in % by weight (% D) of dissolved metformin as a function of the time T in hours;

FIG. **2** shows the in vitro release profiles of the microcapsules of Example 2 at pH 1.4: —•—, and at pH 1.4 for 2 hours and then at pH 6.8 as from 2 hours: —□—, in % by weight (% D) of acyclovir as a function of the time T in hours;

FIG. **3** shows the in vitro release profiles of the microcapsules of Example 3 at pH 1.4: —■— and at pH 6.8: —□—, in % by weight (% D) of metformin as a function of the time T in hours.

## EXAMPLES

### Example 1

Preparation of microcapsules allowing a dual-mechanism delayed and prolonged release of metformin.HCl

75 g of metformin.HCl (Chemsource) and 75 g of PVP are dissolved in 1350 g of isopropanol. The solution is sprayed onto 850 g of neutral microspheres (NP Pharm) in a Glatt® GPCG3 spray coater.

93.3 g of hydrogenated palm oil (Hills) (B) and 140 g of Eudragit® L100 (Róhm) (A) are dissolved in hot isopropanol. B/A=0.66. The solution is sprayed onto 700 g of previously prepared microparticles. The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

The microcapsules were tested in a type II dissolutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

a) HCl at pH 1.4

b) HCl at pH 1.4 for 3 hours, then $KH_2PO_4$/NaOH buffer medium at pH 6.8

The release profiles are shown in FIG. **1**.

These profiles are characteristic of a delayed and then prolonged release by means of a dual mechanism: absence of release for 2 hours, followed by a prolonged release without a change in pH, and finally followed by a release accelerated by the change in pH.

Example 2

Preparation of microcapsules allowing a dual-mechanism delayed and prolonged release of acyclovir

75 g of acyclovir and 75 g of the polyvinylpyrrolidone PLASDONE® K29/32 are dissolved in 833 g of isopropanol. The solution is sprayed onto 850 g of neutral microspheres (NP Pharm) in a Glatt® GPCG3 spray coater.

93.3 g of hydrogenated palm oil (Hüls) (B) and 140 g of EUDRAGIT®L100 (Röhm) (A) are dissolved in hot isopropanol. B/A=0.66. The solution is sprayed onto 700 g of previously prepared microparticles. The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

The microcapsules were tested in a type II dissolutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

c) HCl at pH 1.4

d) HCl at pH 1.4 for 3 hours, then $KH_2PO_4$/NaOH buffer medium at pH 6.8

The release profiles are shown in FIG. **2**.

The acyclovir release profile obtained at pH 1.4 is characteristic of a delayed and prolonged release by means of a dual release triggering mechanism.

Example 3

Preparation of microcapsules allowing a dual-mechanism delayed and prolonged release of metformin.HCl

105 g of hydrogenated palm oil (Hüls) (B), 30 g of dibutyl sebacate and 165 g of Eudragit®L100 (Röhm) (A) are dissolved in hot isopropanol. B/A=64. The solution is sprayed onto 700 g of metformin granules (95.5% metformin/4.5% PVP). The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

The microcapsules were tested in a type II dissolutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

e) HCl at pH 1.4

f) $KH_2PO_4$/NaOH buffer medium at pH 6.8

The release profiles are shown in FIG. **3**.

These profiles are characteristic of a delayed and then prolonged release by means of a dual mechanism: absence of release for 2 hours at acidic pH and rapid release at neutral pH.

The invention claimed is:

**1**. Microparticulate oral pharmaceutical dosage form for the delayed and controlled release of at least one active principle (AP)—excluding perindopril—this active principle having an absorption window in vivo that is essentially limited to the upper parts of the gastrointestinal tract,

wherein the dosage form comprises "reservoir" microcapsules of active principle, each coated with one single, composite coating film,

wherein the single, composite coating film comprises at least one hydrophilic polymer A carrying groups that are ionized at neutral pH, and at least one hydrophobic compound B;

wherein the at least one hydrophobic compound B is selected from the group consisting of hydrogenated vegetable oils, vegetable waxes, wax yellow, wax white, wax microcrystalline, lanolin, anhydrous milk fat, hard fat suppository base, lauroyl macrogolglycerides, cetyl alcohol, polyglyceryl diisostearate, diester or triester of glycerol with at least one fatty acid and mixtures thereof;

wherein the microcapsules have a diameter of between 200 and 800 microns;

wherein the weight ratio B/A is between 0.5 and 1.5;

wherein the release of the active principle is governed by two different triggering mechanisms,

wherein the first triggering mechanism releases the at least one active principle based on a variation in pH,

wherein the second triggering mechanism releases the at least one active principle after a predetermined residence time in the stomach,

wherein the dissolution behavior of the pharmaceutical dosage in vitro is such that:

at a constant pH of 1.4, the dissolution profile includes a latency phase with a duration less than or equal to 5 hours, and a controlled release phase following the latency phase such that the release time for 50% of the active principle ($t_{1/2}$) is between 0.5 hour and 35 hours, and

the change from pH 1.4 to pH 6.8 results in a release phase that starts without a latency period.

**2**. The pharmaceutical dosage form according to claim **1**, wherein the dissolution profile includes a latency phase with a duration of between 1 and 5 hours.

**3**. The pharmaceutical dosage form according to claim **1**, wherein the mass fraction of the coating film (% by weight, based on the total mass of the microcapsules) is less than or equal to 40.

**4**. The pharmaceutical dosage form according to claim **1**, wherein the weight ratio B/A is between 0.5 and 1.0.

**5**. The pharmaceutical dosage form according to claim **1**, wherein the at least one hydrophilic polymer A is selected from the group consisting of: (meth)acrylic acid polymers, alkyl (meth)acrylate polymers, (meth)acrylic acid/alkyl (meth)acrylate copolymers, cellulose derivatives, cellulose acetate phthalate, hydroxypropyl methyl cellulose phthalate, hydroxypropyl methyl cellulose acetate succinate; and mixtures thereof

**6**. The pharmaceutical dosage form according to claim **1**, wherein the at least one hydrophilic polymer A is selected from the group consisting of: (meth)acrylic acid/ methyl (meth)acrylate copolymers, cellulose acetate phthalate, hydroxypropyl methyl cellulose phthalate, hydroxypropyl methyl cellulose acetate succinate; and mixtures thereof

**7**. The pharmaceutical dosage form according to claim **1**, wherein said hydrophobic compound B is selected from the group consisting of: hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil, glyceryl behenate,

hydrogenated castor oil, Carnauba wax, tristearin, tripalmitin, trimyristin, glyceryl palmitostearate, and any mixtures thereof.

**8**. The pharmaceutical dosage form according to claim **7**, wherein said hydrophobic compound B is selected from the group consisting of: hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil, glyceryl behenate, hydrogenated castor oil, tristearin, tripalmitin, trimyristin and any mixtures thereof.

**9**. The pharmaceutical dosage form according to claim **1** wherein the coating film of the microcapsules is free from talc.

**10**. The pharmaceutical dosage form according to claim **1**, characterized in that the release phase following the change from pH 1.4 to pH 6.8, which takes place without a latency period, is such that the release time for 50% of the active principle ($t_{1/2}$) is defined as follows (in hours): $0.5 \leqq t_{1/2} \leqq 20$.

**11**. The pharmaceutical dosage form according to claim **1**, wherein the active principle is deposited on a neutral core with a diameter of between 200 and 600 microns.

**12**. The pharmaceutical dosage form according to claim **11**, wherein the neutral core contains sucrose or dextrose or lactose.

**13**. The pharmaceutical dosage form according to claim **11**, wherein the neutral core is a cellulose microsphere.

**14**. The pharmaceutical dosage form according to claim **1**, wherein the at least one active principle is selected from the group consisting of: antiulcer agents, antidiabetics, anticoagulants, antithrombics, hypolipidemics, antiarrhythmics, vasodilators, antiangina agents, antihypertensives, vasoprotectors, fertility promoters, labor inducers and inhibitors, contraceptives, antibiotics, antifungals, antivirals, anticancer agents, anti-inflammatories, analgesics, antiepileptics, antiparkinsonian agents, neuroleptics, hypnotics, anxiolytics, psychostimulants, antimigraine agents, antidepressants, antitussives, antihistamines and antiallergics.

**15**. The pharmaceutical dosage form according to claim **14**, wherein the active principle is selected from the group consisting of amoxicillin, metformin, acetylsalicylic acid, pentoxifyllin, prazosin, acyclovir, nifedipine, diltiazem, naproxen, ibuprofen, flurbiprofen, ketoprofen, fenoprofen, indomethacin, diclofenac, fentiazac, estradiol valerate, metoprolol, sulpiride, captopril, cimetidine, zidovudine, nicardipine, terfenadine, atenolol, salbutamol, carbamazepine, ranitidine, enalapril, simvastatin, fluoxetine, alprazolam, famotidine, ganciclovir, famciclovir, spironolactone, 5-asa, quinidine, morphine, pentazocine, paracetamol, omeprazole, metoclopramide and mixtures thereof

**16**. The pharmaceutical dosage form according to claim **1**, wherein said pharmaceutical dosage form is selected from the group consisting of: a tablet, a powder and a capsule.

**17**. The pharmaceutical dosage form according to claim **1** which is a tablet that disperses in the mouth.

* * * * *

# EXHIBIT 5

Jazz Pharmaceuticals, Inc. v. Avadel CNS Pharmaceuticals LLC
JTX-0230
C.A. No. 21-691 (GBW), 21-1138(GBW), 21-1594 (GBS)

| R&D REPORT | Page 1 / 91 |
| --- | --- |
| RD218-001v01-1406/HG-sl | June 11, 2014 |

# R&D REPORT

| Department: | FORMULATION | Date: June 11, 2014 |
| --- | --- | --- |

## Sodium Oxybate CR, granules for oral suspension

## Formulation Development Report 2013

**Author:** H. GUILLARD – M. BLAS

**Topic:** Dodo
**Project code:** FT-218

**Distribution:** J.F. Dubuisson, G. Stetsko, C. Mégret, C. Castan, C. Vialas, P. Caisse, F. Nicolas, A. Constancis

**ABSTRACT**

Sodium Oxybate is indicated for the treatment of excessive daytime sleepiness and cataplexy in patients suffering from narcolepsy.
It is currently marketed as an oral solution under the brand name Xyrem®.
Xyrem® should be dosed once prior to bedtime and then requires the patient to wake 2.5 to 4 hours later to take a second dose, which is a huge inconvenience and may jeopardize sleep structure and sleep quality.
Flamel Technologies is developing a new formulation of Sodium Oxybate with the objective to provide a product that is to be taken once at bedtime and allows the patient to sleep continuously for 6 to 8 hours.
The product developed is a powder formulation to be suspended extemporaneously in water just before administration to obtain an oral suspension. It comprises microparticles based on Flamel's Micropump technology which are able to deliver Sodium Oxybate with a controlled release.
For the purpose of a first PK study, three different prototypes have been developed in order to test different kinds of modified release formulations. The three prototypes contain an immediate release fraction and a controlled release fraction but are designed to lead to different in-vivo release profiles.

**Keywords:** Sodium Oxybate, Micropump, Modified Release

Jane Rose Reporting
Guillard Ex. 35
10/08/22

CONFIDENTIAL INFORMATION

AVDL_01002707



| R&D REPORT | Page 2 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## APPROVAL PAGE

**Reference:** R&D

**Title:** Sodium Oxybate CR, granules for oral suspension-Formulation Development Report 2013

**Author:**
Dr. Hervé GUILLARD
Research Scientist
Formulation Department
[signature] Date June 11, 2014

**Author:**
Dr. Maximilien BLAS
Research Scientist
Analytical Research Department
[signature] Date June 12, 2014

**Approved by:**
Dr. Alain CONSTANCIS
Head of Formulation Department
[signature] Date June 13, 2014

**Approved by:**
Dr. Corinne VIALAS
Head of Analytical Research Department
[signature] Date June 12th, 2014



| R&D REPORT | Page 3 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

CONTENT

APPROVAL PAGE .......... 2

1. OBJECTIVES .......... 5

2. TARGETED RELEASE PROFILES .......... 6

3. GENERALITIES ABOUT SODIUM OXYBATE .......... 7

3.1 API SOURCING .......... 7
3.2 API PHYSICAL PROPERTIES .......... 7
3.3 API SOLUBILITY .......... 9
*3.3.1 Solubility in water and organic solvents .......... 9*
*3.3.2 Solubility in dissolution buffers at 37°C .......... 10*
3.4 API STABILITY .......... 11
3.5 API SENSITIVITY TO AIR HUMIDITY .......... 13

4. ANALYTICAL DEVELOPMENT .......... 14

4.1 HPLC ASSAY OF THE API AND ITS DEGRADATION PRODUCTS IN SODIUM OXYBATE FORMULATIONS .......... 14
4.2 WATER CONTENT .......... 19
4.3 RESIDUAL SOLVENTS ASSAY .......... 20
4.4 IN VITRO DISSOLUTION METHOD .......... 21
*4.4.1 Development of a HPLC method .......... 21*
*4.4.2 Dissolution testing at fixed pHs .......... 23*
*4.4.3 Dissolution test mimicking in-vivo conditions .......... 23*
4.5 PARTICLE SIZE DETERMINATION .......... 26

5. FORMULATION DEVELOPMENT .......... 27

5.1 INTRODUCTION .......... 27
5.2 MICROGRANULES OBTAINED BY DRUG-LAYERING ON NEUTRAL CORES (STEP 1) .......... 28
*5.2.1 Microgranules design .......... 28*
*5.2.2 Drug-layering step .......... 28*
5.3 CR MICROPARTICLES .......... 31
*5.3.1 CR microparticles for Target 1 .......... 31*
*5.3.1.1 General considerations .......... 31*
*5.3.1.2 Development of CR microparticles with a pH* equal to 7 .......... 31*
*5.3.1.3 Development of CR microparticles with a pH* equal to 6.9 .......... 35*
*5.3.1.4 Development of CR microparticles with a pH* equal to 6.5 .......... 37*
*5.3.2 CR microparticles for Target 2 .......... 41*
*5.3.2.1 General considerations .......... 41*
*5.3.2.2 Development of microparticles with a bi-layer coating .......... 41*
5.3.2.2.1. First step: coating of the API granules with a non-pH dependent layer ("SR microparticles") .......... 41
5.3.2.2.2. Second step: coating of SR microparticles with a pH-dependent coating .......... 46
*5.3.3 Microparticles stability .......... 49*
*5.3.3.1 CR pH*7 microparticles (PSFT1312) .......... 50*
*5.3.3.2 CR pH*6.9 microparticles .......... 51*
*5.3.3.3 CR pH*6,5 microparticles (PSFT1314) .......... 52*
*5.3.3.4 Bi-layer coated SR/MR pH*6,5microparticles (PSFT1321) .......... 53*
5.4 DEVELOPMENT OF THE FULL COMPOSITION (MIXTURE OF IR AND CR PARTS) .......... 55
*5.4.1 General considerations .......... 55*
*5.4.2 Suspending agent: xanthan gum .......... 55*
*5.4.3 Acidic excipient – development of the reconstitution protocol .......... 55*



*5.4.4 Development of the IR component* ... 58
5.5 FULL COMPOSITIONS: ... 61
*5.5.1 Description of the 3 prototypes selected for the PK study* ... 61
*5.5.2 Full compositions: packaging and stability conditions* ... 61
*5.5.3 Full compositions: manufacturing and characterization* ... 62
*5.5.3.1 Protocol for full compositions manufacturing* ... 62
*5.5.3.2* Sodium Oxybate CR, granules for oral suspension Type 1 (with CR pH*6,9 *microparticles)* ... 62
*5.5.3.3* Sodium Oxybate CR, granules for oral suspension Type 2 (with CR pH*6,5 *microparticles)* ... 64
*5.5.3.4 Sodium Oxybate CR, granules for oral suspension Type 3 (with SR/MR pH*6,5 microparticles)* ... 67
*5.5.4 Full compositions: stability data* ... 69
*5.5.4.1 Stability conditions* ... 69
*5.5.4.2 Sodium Oxybate CR, granules for oral suspension Type 1 (with CR pH*6,9 microparticles) - PSFT1325* ... 70
*5.5.4.3 Sodium Oxybate CR, granules for oral suspension Type 2 (with CR pH*6,5 microparticles) - PSFT1323* ... 73
*5.5.4.4 Sodium Oxybate CR, granules for oral suspension Type 3 (with SR/MR pH*6,5 microparticles) - PSFT1322* ... 75
*5.5.5 Considerations on the content of residual solvents in the full compositions* ... 78
**CONCLUSIONS** ... 79
**FIGURES** ... 81
**TABLES** ... 84
**APPENDICES** ... 86



# 1. OBJECTIVES

Sodium Oxybate is indicated for the treatment of excessive daytime sleepiness and cataplexy in patients suffering from narcolepsy.

It is currently marketed as an oral solution under the brand name Xyrem®.

The recommended starting dose is 4.5 g/day Sodium Oxybate divided into two equal doses of 2.25 g/dose. After a titration period to assess efficacy and tolerability, the dose can be increased up to a maximum of 9 g/day divided into two equal doses of 4.5 g/dose.

Xyrem® should be dosed once prior to bedtime and then requires the patient to wake 2.5 to 4 hours later to take a second dose, which is a huge inconvenience and may jeopardize sleep structure and sleep quality.

Flamel Technologies is developing a new formulation of Sodium Oxybate with the objective to provide a product that is to be taken once at bedtime and allows the patient to sleep continuously for 6 to 8 hours.

The product developed is a powder formulation to be suspended extemporaneously in water just before administration to obtain an oral suspension. It comprises microparticles based on Flamel's Micropump technology which are able to deliver Sodium Oxybate with a controlled release.

Micropump® is an innovative patented technology which allows to obtain small size drug-containing microcapsules coated with a diffusion layer and designed to increase the absorption time of drugs. The microparticles are dispersed in the stomach and pass into the small intestine, where each microparticle, operating as a miniature delivery system, releases the drug at an adjustable rate and over an extended period of time (up to 24 hours). Depending of the diffusion coating used, it is possible to obtain a sustained release over time and/or a delayed release to target specific area of the gastro-intestinal tractus where absorption could be optimised.

For the purpose of a first PK study, three different prototypes have been developed in order to test different kinds of modified release formulations. The three prototypes contain an immediate release fraction and a controlled release fraction but are designed to lead to different in-vivo release profiles.

*This report presents the results obtained during the development work and includes API technical properties characterization, analytical methods set up, formulation design and development on laboratory batches.*

*Data supporting the different process and formulation choices are presented with a focus on the description of the formulations chosen for the clinical pilot study PKFT218-1301.*

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002711

JTX-0230.5



## 2. TARGETED RELEASE PROFILES

The PK of sodium oxybate is complex. In particular the molecule shows a capacity-limited absorption trough transporters and undergoes a saturable first-pass effect. In order to optimize this non-linear absorption of Sodium Oxybate, two targets for the in-vivo release profiles (Figure 1)[1] have been defined by Claire Mégret from the Pharmacokinetics and Biostatistics group.

For the first target, half of the dose is immediately released by the formulation whereas the other half is released three hours after intake.

For the second target, the immediate-release fraction represents 40% of the dose. After 1-hour in vivo lag-time (without release of the API), the remaining 60% of the dose are released over a short duration (with 80% of the API released over around two additional hours).

Figure 1: Targets for in-vivo release profiles

[1] 10/24/2012 and 01/17/2013 Technical Meetings


## 3. GENERALITIES ABOUT SODIUM OXYBATE

Sodium Oxybate is a controlled substance Schedule I.

### 3.1 API Sourcing

Sodium Oxybate raw material has been purchased from two suppliers:

- Euticals Inc. (USA)
- Centaur Pharmaceuticals PVT, LTD (India).

Table 1 summarizes the information concerning the drug sourcing (supplier, batches and quantity purchased).

| Manufacturer | API batch (quantity supplied in g) |
|---|---|
| Euticals | KL Na Oxybate-02 (650g)<br>KL Na Oxybate-03 (540g) |
| Centaur Pharmaceuticals | 250609 (10000g + 1691g) |

Table 1: Sodium Oxybate – manufacturers and quantities

### 3.2 API physical properties

The preparation of Sodium Oxybate formulations implies knowing its physical and thermal properties, its stability and solubility in water and organic solvents used in Micropump process. Furthermore in order to set up the dissolution testing conditions, the solubility at 37°C in pH media from 1.1 to 7 at 37°C is also needed

**General information from literature:**

- *Chemical name:* sodium gamma hydroxy butyrate (Na-GHB), gamma hydroxybutyric acid sodium salt, Sodium Oxybate
- *Formula:* $C_4H_7NaO_3$ - HO-$CH_2$-$CH_2$-COONa
- *Molecular weight:* 126.09
- *Chemical structure:* Figure 2
- *CAS number:* 502-85-2

Figure 2: Sodium Oxybate = sodium salt of gamma hydroxy butyric acid (GHB)

- *pH of a 0,5% GHB solution in water* = 7.8 [2]
- *pKa*=4.7
- *Partition Coefficient*: $Log_P$= 2.58 (Octanol/ Water) [pH: 7.4].
- *Polymorphism:* There is no chiral center in the molecule and polymorphism is not reported in the literature and not observed.

[2] *Ciolino et al. J. Forensic Sci, 2001, vol 46, n°6, p1315-1323*



**API characterization at Flamel:**

- *Crystals size / particle size distribution*: the API is an extremely fine powder very prone to agglomeration. Both the size and the particle size distribution have not been determined due to the very low crystals size and their strong tendency to aggregation.
- *Thermal characterizations:*

Thermo-Gravimetric Analysis (TGA) (Figure 3) and Differential Scanning Calorimetry (DSC) analysis (Figure 4) have been performed to characterize the thermal properties of the raw powder: Sodium Oxybate crystals exhibit an excellent thermal stability up to 200°C and a melting point (148°C) consistent with the data found in the literature (between 146 – 148°C).

Figure 3: Sodium Oxybate analysis by thermogravimetry, with a heat rate of 10°C/min and under air flow

Figure 4: Sodium Oxybate analysis by Differential Scanning Calorimetry, between 40 and 250°C at a heat rate of 10°C/min and under nitrogen flow



## 3.3 API solubility

### *3.3.1 Solubility in water and organic solvents*

The objective of solubility measurements is to identify an appropriate solvent to dissolve or disperse the API for the drug-layering step.

**Solubility in water at room temperature - effect of pH:**

At room temperature, literature data show that Sodium Oxybate is highly soluble in aqueous solutions whatever the pH in the range [4-7] with a solubility increasing with pH (Figure 5). Below pH4, Sodium Oxybate degradation prevents the determination of its solubility.

**Solubility in organic solvents:**

The API solubility in pure organic solvents has been measured by HPLC or estimated in water/organic solvent mixtures (Table 2).
Sodium Oxybate solubility remains low (<20g/l) in pure organic solvent at 25°C with no solubility increase at 40°C.

Ethanol/water mixtures have been considered as potential solubilizing media since ethanol is the organic solvent having the highest solubilizing power towards Sodium Oxybate. At room temperature, mixtures with water contents higher than 40% allow to obtain Sodium Oxybate solutions with a dry content of at least 35%. At 60°C, Sodium Oxybate is fully solubilized at concentrations of 350mg/g in all the mixtures investigated.

Figure 5: Sodium Oxybate solubility at room temperature in water vs pH (pH adjustment with HCl) - US6780889 patent from Orphan Medicals (Jazz)



| T | Medium | Solubility (mg/g) |
|---|---|---|
| Solvent | | |
| 25°C | Acetone | <0.1 |
| | Ethanol | 10.7 |
| | Isopropyl alcohol | 0.3 |
| 40°C | Acetone | <0.1 |
| | Ethanol | 11.5 |
| | Isopropyl alcohol | 0.5 |
| Ethanol/water mixtures (% w/w) | | |
| 25°C | Ethanol / water (80/20) | < 350 |
| | Ethanol / water (60/40) | >350 |
| | Ethanol / water (40/60) | >350 |
| | Ethanol / water (20/80) | >350 |
| 60°C | Ethanol / water (80/20) | > 350 |
| | Ethanol / water (60/40) | >350 |
| | Ethanol / water (40/60) | >350 |
| | Ethanol / water (20/80) | >350 |

Table 2: Sodium Oxybate solubility in different organic solvents at room temperature and 40°Cor 60°C

**Process considerations (see paragraph 5.2.2.):**

From a process point of view, spraying a drug solution is a preferred option compared to a spraying step with a drug suspension: no requirement is necessary for the API particle size distribution and yields are generally higher. Aqueous solutions are preferred as well as room temperature preparations (involving no heating of the spraying solution).
In pure organic solvents, Sodium Oxybate solubility is too low to have a drug-layering process in solution.

Pure water (preferred option) or ethanol/water mixtures (back-up option) can be considered to manufacture the drug-layered microparticles.

### *3.3.2 Solubility in dissolution buffers at 37°C*

In order to define the dissolution conditions, the solubility has also been investigated in buffered solutions at 37°C.

The solubility in buffered solutions (0.1N HCl and 50mM phosphate buffers) has been measured and proves to be higher than 400mg/g in all the media.

The solubility measurements are not relevant because the API solubilization leads to a dramatic increase of the pH of the dissolution medium. For instance:

- the pH of a 0.1N HCl medium at saturation is increased up to 8.4
- the pH of a 50mM pH 6 phosphate buffer at saturation is increased to 8.7.



### 3.4 API stability

**Sodium Oxybate stability in solution (data from literature[3]):**

From the literature, it appears that the main degradation pathway of Sodium Oxybate in aqueous solution is due to an intramolecular esterification occurring in acidic medium leading to lactone formation (Figure 6):

Figure 6: Sodium Oxybate and corresponding lactone

Ciolino et al [3] have studied the effect of pH on the degradation of a Sodium Oxybate solution (0.5% w GHB in water) at room temperature over long durations (Table 3).

| GHB solution pH | Beginning of esterification | Remaining GHB after 220 days at RT (%) |
|---|---|---|
| 2 | Cf Figure 7 | 32 |
| 4 | No esterification during the first 10 days | 72 |
| 5.2 | No esterification during the first 17 days | 85 |
| 6.4 | No esterification during the first 17 days | 95 |
| 7 | stable | |
| 7.8 (in water) | | |
| 12 | | |

Table 3: Stability of Sodium Oxybate solutions (0.5% w in water) at room temperature

No esterification happens at room temperature after 220 days at pH above 7. The speed of degradation increases when pH decreases, with more than 30% of lactone formed after one day at pH 2.

Figure 7: Esterification of GHB (filled circles) in pH 2 buffer (for information, open circles represent the hydrolysis of GBL in pH 2 buffer)

Regarding the API stability in organic solvents, 10mg/ml API solutions in ethanol and methanol prove to be stable over 30 days at room temperature [4].

---

[3] *Ciolino et al. J. Forensic Sci, 2001, vol 46, n°6, p1315-1323*

[4] *Hennessy et al. J. Forensic Sci, Nov 2004, vol 49, n°6*



**Sodium Oxybate stability in solution (experimental data obtained at Flamel):**

As discussed in paragraph 3.3., pure water (preferred option) or ethanol/water mixtures (back-up option) can be considered as solubilizing medium for the drug-layering step. Sodium Oxybate solutions can be sprayed at room temperature or at higher temperatures to improve drying efficiency.

Sodium Oxybate has to be stable for at least 24h in the solubilizing medium for an industrial process.

The stability of Sodium Oxybate in aqueous solutions or water/ethanol mixtures was therefore investigated at room temperature and 60°C. A concentration of 300mg/g was considered (classical API concentration for a drug-layering process in solution).

The effect of pH on API stability in aqueous solutions was also investigated.

At room temperature, no lactone is formed after one day except in the pH5 aqueous solution.

At 60°C, the kinetics for lactone formation is strongly increased with 2% lactone formed in the pH6 solution after 24 hours.

In water/ethanol mixtures, no lactone is formed in both conditions after 24 hours.

| T condition | 300mg/g Sodium Oxybate solution characteristics | Lactone (%) |
|---|---|---|
| RT | Aqueous solution without pH adjustment (pH=9.5) | < 0,1 |
| 60°C | | < 0,1 |
| RT | Aqueous solution containing 0.7mg/g malic acid - pH 7,3 | < 0,1 |
| 60°C | | < 0,1 |
| RT | Aqueous solution containing 13mg/g malic acid - pH 6.0 | < 0,1 |
| 60°C | | 2,0 |
| RT | Aqueous solution containing 58mg/g malic acid - pH 5.0 | 0,7 |
| 60°C | | 12,7 |
| RT | H2O/ethanol 20/80 (% w/w) – API not fully solubilized | < 0,1 |
| 60°C | | < 0,1 |
| RT | H2O/ethanol 40/60 | < 0,1 |
| 60°C | | < 0,1 |
| RT | H2O/ethanol 60/40 | < 0,1 |
| 60°C | | < 0,1 |
| RT | H2O/ethanol 80/20 | < 0,1 |
| 60°C | | < 0,1 |

Table 4: Sodium Oxybate stability at 300mg/g in water and water/ethanol mixture – % of lactone formed after 24h



### 3.5 API sensitivity to air humidity

Sodium Oxybate sensitivity to water uptake has been evaluated by Dynamic Vapor Sorption (DVS Advantage automated vapor sorption analyser from Surface Measurement Systems) at 25°C (Figure 8).

During the relative humidity increase phase, no water uptake is observed below 40% RH. A dramatic uptake is observed for higher relative humidities with more than 50% weight gain at 45%RH.

During the subsequent desorption phase, the pattern is similar except for relative humidities below 45% with some water remaining bound to the crystals.

At 20°C, the sorption pattern is identical.

Figure 8: Sodium Oxybate analysis by DVS – sorption and desorption isotherm at 25°C

From these data, it has been decided in a first approach to perform API handling and manufacturing of the microparticles in relatively dry conditions (RH<40%).


# 4. ANALYTICAL DEVELOPMENT

## 4.1 HPLC assay of the API and its degradation products in Sodium Oxybate formulations

A single HPLC method has been developed for the quantification of Sodium Oxybate and its degradation products in the formulations.

This section of the report gives a description of this method and the main results from its limited qualification. For more information, see the two reports, respectively related to the method development [DR218-001][5] and the limited qualification [RT13-033v2][6].

The HPLC method has been adapted from one method provided by Centaur for related substances analysis in the raw material.

The main degradation product of Sodium Oxybate, depicted Figure 6, is gamma-butyrolactone (Lactone) coming from the intramolecular esterification of Sodium Oxybate. This reaction is catalyzed under acidic conditions. The method developed to characterize the formulations has to be sensitive enough to quantify at least 0.05% of lactone and other degradation products in pellets, microparticles (SR/MR) and in the final product (full composition).

### Chromatographic parameters

The chromatographic parameters are described in Table 5. Every sample preparation is injected at 80µL for the degradation products assay.

For Sodium Oxybate assay a premix of 6 µL of the sample preparation and 9 µL of a phosphate buffer solution 0.05 M pH=2.0 is performed by the injection module. The 15 µL mixture is then injected.

As specified in the analytical development report, the dilution of the sample preparation in an acidic buffer is required to ensure a good repeatability of the chromatographic profile for Sodium Oxybate assay.

| Column | Synergi Hydro RP 80A Packed with Octadecylsilyl silica gel 4.6mm x 250mm 4µm |
|---|---|
| Temperature | 25°C |
| Flow rate | 1.0 mL/min |
| Detection | UV 210 nm |
| Injection volume | Degradation products: 80 µL<br>Sodium Oxybate assay: 15 µL of a premix solution of 6µL of the sample preparation and 9 µL of a phosphate buffer solution 0.05 M pH=2.0.<br>The mixing is performed in the needle seat just before the sample injection. |
| Run time | Degradation products: 30 min<br>Sodium Oxybate assay: 15 min |
| Elution mode | Isocratic |
| Mobile phase | Phosphate buffer solution 0.05 M pH=2.6/Acetonitrile: 99/1 % |

Table 5: HPLC parameters.

[5] DR218-001 – DEVELOPMENT OF THE HPLC ASSAY OF API AND DEGRADATION PRODUCTS IN SODIUM OXYBATE FORMULATIONS (Author: M. BLAS)

[6] RT13-033v2 – LIMITED QUALIFICATION OF THE HPLC ASSAY OF API AND DEGRADATION PRODUCTS IN SODIUM OXYBATE FORMULATIONS ACCORDING TO MTH833 (Author: M. BLAS)



**Quantification of Sodium Oxybate and its related substances:**

For Sodium Oxybate assay, the quantification is performed by external calibration with 3 standards prepared at 5; 7 and 9 g/l in the diluent (mobile phase/methanol 90/10).

The related substances are quantified using the response factor of a dilute standard of lactone (7 mg/L) for the lactone quantification and of Sodium Oxybate (at 7 mg/L) for the other related substances.

**Sample preparation**

To ensure a complete extraction of API and its degradation products, an extraction protocol has been developed for Sodium Oxybate formulations. The procedure is described in Table 6 hereafter for microparticles analysis or for a full composition containing 4.5 g of Sodium Oxybate (in red in the table).

| Extraction protocol for microparticles analysis (full composition containing 4.5 g of API) |
|---|
| In a 50 mL (500mL) volumetric flask: transfer and weight 700 mg of microparticles for 50% API microparticles (). |
| Add 5 mL of mobile phase (**50 mL**) |
| Magnetic stirring for 5 min |
| Add 5 mL of methanol (**50 mL**) |
| Magnetic stirring for 15 min |
| Ultrasonic bath for 1 hour |
| Add about 30mL of the mobile phase (**300 mL**) |
| Magnetic stirring for 15 min |
| Ultrasonic bath for 1 hour |
| Dilute to 50 mL with the mobile phase<br>(**500 mL and dilute to 7 g/L of API in the mobile phase**) |
| Magnetic stirring for 5 min |
| Filtrate on 1 µm and 0.45 µm porosity filters |

Table 6: Extraction protocol for formulation analysis (microparticles and full compositions)



| R&D REPORT | Page 16 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

**Examples of HPLC profiles**

Examples of HPLC chromatograms of a reconstituted formulation for Sodium Oxybate and degradation products assay are presented in Figure 9 and Figure 10.

Figure 9: Chromatogram of a reconstituted formulation for Sodium Oxybate assay (Volume of injection: 15 µL)

Figure 10: Chromatograms of a reconstituted formulation and a reconstituted formulation with 7 mg/L (e.g. 0.1%) of Lactone for the degradation products assay. (Volume of injection: 80 µL)

The retention times of the compounds are listed hereafter (Table 7).

| Compound | Retention time (min) |
|---|---|
| Sodium Oxybate | 7.0 |
| Fumaric acid (Malic acid dehydration) | 8.1 |
| Lactone | 10.0 |
| PVP | 11.0 |
| Unknown from the blank | 11.6 |

Table 7: Retention time of the HPLC peaks observed.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707



**Limited qualification:**

For the assay Sodium Oxybate and degradation products, a limited qualification has been carried out for specificity, response function, linearity of results, trueness, precision (repeatability), limit of detection (LOD), and limit of quantification (LOQ) according to ICH Guidelines Q2(R1). Stress test studies have also been performed.

The main conclusions of the study are described in Table 8 and Table 9 below.

| *Criterion* | *Results* |
|---|---|
| **Specificity** | A Forced degradation study: has been performed on the raw material and on a reconstituted formulation using with different conditions (acidic, oxidative, alkali and heat treatment))<br>For all the stressed conditions studied, purity factors of the drug substance peaks, in chromatograms of stressed samples, were in the range of 999.9 -1000.0 indicating homogenous peaks.<br>This peak homogeneity confirms the non-interference of degradation peaks with Sodium Oxybate thus establishing the selectivity of the method.<br>Based on the experimental chromatograms, there were no significant interactions between the drug substance, degradation products and excipients. |
| **Linearity (of response)** | The response function is linear ($r^2 > 0.999$).<br>No significant difference between the calibration curves with reconstituted formulations and Sodium Oxybate was observed within the range studied (60-140%).<br>There is no matrix effect induced by the presence of the excipients in the formulations. |
| **Linearity (of results)** | The linearity of results was assessed for 6 concentration points between 60 and 140% of the theoretical drug substance contents in test solution.<br>Equation: $y = -0.2148 + 0.9637 X$<br>$r^2 = 0.9989$<br>The slope is close to 1, underlining no significant matrix effect. Besides the origin is close to 0 which indicate no significant systematic bias. |
| **Trueness** | Recovery from 98.2% to 101.3% (Confidence interval)<br>Mean: 99.7% |
| **Precision** | The precision of the method in the reconstituted formulation (full composition of 4.5 g).<br>The relative standard deviation is 0.7% for the quantification of Sodium Oxybate. |

Table 8: Limited qualification results for the Sodium Oxybate assay.



| *Criterion* | *Results* |
|---|---|
| **Specificity** | Based on the experimental chromatograms, there were no significant interactions between the Lactone and excipients. |
| **Linearity (of response)** | *For Lactone assay:* The response functions is linear (r2 > 0.999) over the calibration range tested, e.g. (3.6-35 mg/L or 0.05-0.25% of Sodium Oxybate).and the y-intercept is not significantly different than 0 for the calibration performed with the lactone alone and the reconstituted formulation.<br>No significant difference between the calibration curves with reconstituted formulations and Sodium Oxybate was observed within the range studied (0.05-0.25%) at a risk level of 2%.<br>There is no significant matrix effect induced by the presence of the excipients in the formulations. |
| | *For others degradation products:* the calibration curve of Sodium Oxybate is linear over the range tested (0.05 to 0.50% of the Sodium Oxybate). The y-intercept is not significantly different than 0 for the calibration performed with the lactone alone and the reconstituted formulation.<br>As a result, the degradation products can be assays using the response factor of one dilute Sodium Oxybate standards. |
| **Linearity (of results)** | *For Lactone assay:* The linearity of results was assessed for 5 concentration points between 0.05 and 0.25% of the theoretical drug substance contents in test solution.<br><br>Equation: y = -0.00005 + 0.9498 X<br>$r^2 = 0.9992$<br>The slope is close to 1, underlining no significant matrix effect. Besides the origin is close to 0 which indicate no significant systematic bias. |
| **Trueness** | *For Lactone assay:*<br>. Recovery from 92.2% to 96.4% (Confidence interval)<br>. Mean: 94.5% |
| **Precision** | *For Lactone assay:* 6 independent reconstituted samples containing 0.17% (12 mg/L) of lactone have been analyzed.<br>The relative standard deviation was **1.1%** for the quantification of the Lactone. |
| **Limit of detection (LOD)** | *For Lactone assay:* 0.7 (e.g. **0.01%** of Sodium Oxybate content) |
| | *For others degradation products:* 0.7 (e.g. **0.01%** of Sodium Oxybate content) |
| **Limit of quantification (LOQ)** | *For Lactone assay:* 2.0 (e.g. **0.03%** of Sodium Oxybate content) |
| | *For others degradation products:* 2.1 (e.g. **0.03%** of Sodium Oxybate content) |

Table 9: Limited qualification results for the degradation products.

After the limited qualification research team Venissieux, this method has been implemented at the Analytical Development Team (GMP site, Pessac) where it has been validated for a Phase I study (see Protocol VA CL065[7] and Report VA CL067[8]).

[7] VA CL065 – PROTOCOLE DE VALIDATION DE LA METHODE DE DOSAGE CLHP DU PRINCIPE ACTIF ET DES PRODUITS DE DEGRADATION DANS LES FORMULATIONS FT218 SELON MTH833 (Auteur : S. CLAUSTRE)

[8] VA CL067 – VALIDATION REPORT OF THE API AND DEGRADATION PRODUCTS HPLC ASSAY IN FT218 FORMULATIONS ACCORDING TO MTH833 (Author: S. CLAUSTRE)


## 4.2 Water content

The water content is measured by coulometric Karl Fischer (KF) titration. This method is based on the standard reaction between iodine, sulfur dioxide and water. The iodine is generated electrochemically by anodic oxidation of iodide.

The water is extracted from sample by heating and transferred in the titration cell thanks to the air flow. Once all of the water available has reacted, the reaction is complete. The amount of water in the sample is calculated by measuring the current needed for the electrochemical generation of iodine (I2) from iodide (I–) according to the following reaction: $2I^- \rightarrow I_2 + 2e^-$.

**Effect of Malic acid excipient on water content determination**

The final drug product (full composition) encloses Malic acid as acidic excipient. The impact of the presence of Malic acid on water content measurement has been assessed on the Sodium Oxybate raw material.

The presence of Malic acid induces a moderate bias (+0.4% for 5% w/w of malic acid) on the water content determination due to a dehydration of Malic acid or Sodium Oxybate during the assay performed at high temperature (120°C). Decreasing the oven temperature from 120°C to 100°C did not reduce this phenomenon.

However, thanks to the seal coat used on the immediate release microparticules, there is no intimate Malic acid/Sodium Oxybate in the final drug product and no bias has been observed for the water content determination in the full composition.

**Sample preparation**

The amount of sample analyzed depends on the expected water content and the desired accuracy. A minimum of 0.5 mg water per sample should be measured to have a good accuracy. As the water content of samples is about least 0.5 weight% of water, the sample amount was set at 100 mg. To prepare the sample vial, sample should be precisely weighed directly into the vial and the aluminum seal should be quickly put in place to protect the sample against absorbing or losing water. The cap is then placed securely on the vial to seal it in the oven and prevent the purge gas from leaking.

**Extraction conditions**

A temperature around 120°C has been used in order to extract quantitatively the water contained in Sodium Oxybate microparticles and in the full compositions.

A stirring time of 120 seconds and a gas (air) flow of 100 ccm were chosen for the water evaporation. These parameters enable the extraction of nearly all of the water contained in the sample during the mixing time. They were optimized for a sample weight of 100 mg.

**Suitability test**

For accurate determination of water the initial drift value should be as low as possible and stable before the start of a titration. If the drift is higher than 15 µg/min, precautions should be taken: desiccants should be replaced or regenerated and/or Karl Fischer reagent should be changed.

To check the measurement accuracy of the Karl Fischer coulometer at each sequence two vials which contain 10 µl of water are analyzed: one prior to and one at the end of the sequence.


**Operating conditions**
The Karl Fischer coulometer used is a DL 39 from Mettler Toledo (Table 10).

| | |
|---|---|
| **Sample amount** | 100 mg |
| **Oven temperature** | 120°C |
| **Mixing time** | 120 s |
| **Polarization current** | 5μA |
| **End point** | 80 mV |
| **Maximum titration time** | 600s |
| **Stop parameter** | Relative – drift 15 μg/min |

Table 10: Operating conditions of the Karl Fisher titration.

Three vials are tested. The result is the average of the three of them and is expressed in weight percentage.

After its development at Vénissieux, this method has been implemented at the Analytical Development Team (GM site, Pessac).

### 4.3 Residual solvents assay

The assay of residual solvents (ethanol, acetone and isopropyl alcohol) is performed by using a gas chromatography (GC) analytical method with a headspace injection, and an internal calibration (methanol). This kind of method is recommended by the European Pharmacopoeia (EP) and the United States Pharmacopoeia (USP) for the assay of solvents from class 1 and 2. Concerning the class 3 solvents, only loss on drying methods are advocated by EP and USP. In spite of the fact that ethanol, acetone and IPA are from class 3, a more specific and accurate GC method was chosen.

A gas chromatograph 6890 Hewlet Packard equipped with a FID detection is used. For the separation, a capillary column HP-Innowax (60 m) was chosen. This column contains a polyethylene glycol phase (PEG). The chromatographic parameters are summarized in Table 11. This method has been written as a Standard Operating Procedure (MTH571v02) and approved internally.

The residual solvents are evaluated by a cumulated determination of results obtained for the intermediate products (IR and CR microparticles).



| | |
| --- | --- |
| **Chromatograph** | GC 6890 Hewlett Packard |
| **Column** | L=60 m; Stationary phase: Innowax (0.53mm internal diameter) from Agilent |
| **Vector gas** | Helium |
| **Flow rate** | 7 ml/min |
| **Split ratio** | 10/1 |
| **Temperature injector** | 230°C |
| **Oven temperature** | 50°C during 8 min – 50°C/min up to 210°C – 210°C during 7 min |
| **Detector** | FID |
| **Detector temperature** | 250°C |
| **Injector** | Headspace |

Table 11: Operating conditions of the residual solvents assay

**Sample preparation:**
500 mg of samples (IR or CR microparticles) are added to a vial containing N-methyl pyrrolidone (NMP) and the internal standard (methanol). The vial is then stirred, sonicated about 15 minutes, stirred, heated in the Headspace oven and the gas fraction is injected. NMP enables the extraction of the residual solvents and does not interfere with the chromatography due to his high boiling point.

## 4.4 <u>In vitro dissolution method</u>

### *4.4.1 Development of a HPLC method*

**<u>Generalities:</u>**

The UV spectrum of Sodium Oxybate dissolved at 2-5 and 10g/l in a pH 6.8 50mM phosphate buffer has been measured at 37°C (cf Figure 11).

Sodium Oxybate has a very low absorption in the UV spectrum and absorbs mainly at wavelengths below 240nm. Due to a strong interference of UV absorption of Sodium Oxybate with formulation excipients (e.g. PVP) in this wavelength area, following release kinetics by automated UV spectroscopy is not possible.

Dissolution profiles have therefore been determined by RP-HPLC analysis of Sodium Oxybate amount in samples collected automatically by an automatic collector.

For the full formulations (including immediate-release fraction and excipients for reconstitution of the powder in water), a special protocol for the reconstitution step has been developed (cf paragraph 5.4.3.).



| R&D REPORT | Page 22 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Figure 11: UV spectrum of Sodium Oxybate in pH 6.8 50mM phosphate buffer

**Details about operating conditions:**

Dissolution tests of Sodium Oxybate contained in the granules for oral suspension are performed according to USP <711> "Dissolution test for solid dosage forms" (harmonized with EP< 2.9.3). Operating conditions (Table 12):

| | |
|---|---|
| **Apparatus** | Paddle (Apparatus 2) |
| **Volume** | 500* or 900 mL |
| **Speed** | 100 rpm |
| **Temperature** | 37°C ±0.5°C |
| **Sampling time points** | 0h ; 0.5h ; 1h ; 1.5h ; 2h ; 3h ; 4h ; 6h ; 8h ; 10h ; 12h ; 16h |
| **Quantification** | RP-HPLC using the method for the assay of Sodium Oxybate and degradation products (see paragraph 4.1) |

Table 12: Operating conditions of the dissolution tests.

*To save some API, dissolution testing of microparticles was performed in 500ml instead of 900ml while keeping the same API concentration. It has been checked that the dissolution profile of the microparticles is similar in 500ml or 900ml.

**Calibration:**

External calibrations are performed with a range of 3 standard solutions of Sodium Oxybate and 3 standard solutions of Gamma-butyrolactone.

**Test solution:**

Samples collected during dissolution are injected without any treatment.

**Results:**

The percentage of dissolved Sodium Oxybate is determined by the assay of Sodium Oxybate and Gamma-butyrolactone from the calibration curves. After its development at Vénissieux, this method has been implemented at the Analytical Development Team (GMP site, Pessac) where it has been validated for a Phase I study (see Protocol VA CL066[9] and Report VA 068[10]).

9 VA CL066 – PROTOCOLE DE VALIDATION DE LA METHODE DE DISSOLUTION SUIVI CLHP DES FORMULATIONS FT218 SELON MTH836 (Auteur : S. CLAUSTRE)



**Media for dissolution testing:**

Two kinds of dissolution tests have been developed:

- Dissolution testing at fixed pHs (see paragraph 4.4.2)
- Dissolution testing in a medium mimicking the pH changes occurring along the gastro-intestinal tractus (see paragraph 4.4.3)

### *4.4.2 Dissolution testing at fixed pHs*

In-vitro dissolution testings are performed at different pH representative of the different conditions prevailing along the gastro-intestinal tractus (GIT).

Considering the extremely high unit dose (4.5g) and the strong alkalinity of Sodium Oxybate, the pH of the buffers typically used for dissolution testing has been measured after solubilizing a unit dose in 900ml (Table 13).

| buffer | Buffer pH (experimental data) | Buffer pH after API solubilization |
|---|---|---|
| 50mM potassium phosphate adujsted with NaOH (pH 6,8) | 6,79 | 6,78 |
| 50mM potassium phosphate adjusted with NaOH (pH=6) | 5,97 | 6,02 |
| 50mM potassium phosphate (pH=4,5) | 4,48 | 5,67 |
| 0.1N HCl (pH=1,1) | 1,10 | 1,40 |

Table 13: Buffer pH after solubilizing of 4.5g of Sodium Oxybate in 900ml buffer

The 50mM potassium phosphate buffer is therefore not a good buffer below pH 6. For dissolution testings below pH6, another buffer (i.e. USP acetate buffer) should be used.

### *4.4.3 Dissolution test mimicking in-vivo conditions*

An in-vitro dissolution test has been developed to mimic the pH changes occurring all along the gastro-intestinal tractus. From an acidic medium simulating gastric conditions in fasted or fed state state, the pH of the dissolution medium is progressively increased to simulate the pH evolution in the intestine[11].

After administration, a formulation will transit from the stomach to the intestine then to the caecum and to the colon. The Figure 12 shows the evolution of the mean pH with the transit time post administration in the fasted state or in the fed state (data provided by Claire Mégret from the Pharmacokinetics and Biostatistics group). By plotting the pH vs the transit time after the stomach and the corresponding area of the intestine, one is aware that the transit time in the small intestine (duodenum/jejunum/ileum) is similar in fasted and fed state but pH differs at the beginning of the small intestine (Figure 13).

[10] VA CL068 – VALIDATION REPORT OF THE FT218 FORMULATIONS DISSOLUTION TEST ACCORDING TO MTH 836 (Author: S. CLAUSTRE)

[11] 01/17/2013 and 03/14/2013 Technical Meetings



| R&D REPORT | Page 24 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

pH
Time after administration (h)
pH (Fasted)
pH (Fed)

Figure 12: Evolution of pH with transit time in the GIT post administration in the fasted state or in the fed state

pH
Time after stomach (h)
pH (Fasted)
pH (Fed)
Jejunum
Duod.
Ileum
Caecum
Colon

Figure 13: Evolution of pH with transit time after the stomach in the fasted state or in the fed state

Sodium Oxybate formulations will be administered two hours after a meal. pH conditions in the GIT 2 hours post-meal are not documented in the literature, except for the stomach pH which is acidic again (as in the fasted state). The pH conditions prevailing in the intestine will probably be intermediate between the fasted conditions (lowest possible pH) and the fed conditions (highest possible pH conditions). The Figure 14 illustrates both pH vs time patterns.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002730

JTX-0230.24



| R&D REPORT | Page 25 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Figure 14: Evolution of pH with transit time in the GIT post administration in the fasted state or in the fed state / case of an administration two hours post meal

From PK considerations, the release of the API from the modified release part of the formulation should not happen too soon, in order not to increase the Cmax due to the IR part. To develop the microparticles, we therefore considered the 'worst' case leading to the soonest release (i.e. the pattern with higher pHs corresponding to the fasted state).

Compared to the fasted state, the pH pattern has been slighltly simplified by replacing the 15minutes pH 6 phase by additional 15minutes in the pH 6,2 phase. The corresponding pH pattern described in Table 14 is referred as the 'pseudo' fasted state pattern.

| Dissolution medium - pH | Duration step |
|---|---|
| 0.1N HCl - 1.1 | 15min |
| Phosphate buffer - 6,2 | 1h15 |
| Phosphate buffer - 6,4 | 45min |
| Phosphate buffer - 6,6 | 40min |
| Phosphate buffer - 6,9 | 25min |
| Phosphate buffer - 7,4 | 20min |
| Phosphate buffer - 6,4 | / |

Table 14: Dissolution test to mimic in-vivo conditions – pH pattern corresponding to 'pseudo' fasted state



### 4.5 Particle size determination

Particle size measurements are conducted on bulk microparticles using a Malvern Mastersizer 200 analyzer (laser diffraction technique) equipped with a Scirocco 2000 dry powder dispersion unit. Each measurement is carried out at 0.1 bars using 5 g samples.

The volume mean diameter D(4;3) measured is the average of three determinations.
The particle size distribution span is also determined. Span is a common calculation to quantify distribution width and is calculated as follows:

$$\text{Span} = \frac{D90 - D10}{D50}$$

Friability is evaluated using Flamel's in-house measurement method. It is used to predict potential attrition or damaging issues that could happen during the coating process or further handling of the product. It is measured using the Mastersizer 200 at two different air pressures (0.1 and 2 bars). The calculated decrease in particle diameter after measurement at 2 bars is the friability index expressed in %. The Friability Index is calculated as follows:

$$\text{Friability Index (\%)} = \frac{D(4;3)_{0.1\ bars} - D(4;3)_{2\ bars}}{D(4;3)_{0.1\ bars}} \times 100$$



# 5. FORMULATION DEVELOPMENT

## 5.1 Introduction

As described in paragraph 2 (cf Figure 1), two dissolution targets have been defined.

To meet the first target, the formulation will include an immediate release fraction representing 50% of the Sodium Oxybate dose and a controlled release fraction representing 50% of the Sodium Oxybate dose. The controlled release fraction is designed to fully release the active three hours after intake.

For the second target, the mixture will comprise an immediate release fraction representing 40% of the Sodium Oxybate dose and a controlled release fraction representing 60% of the Sodium Oxybate dose. The controlled release fraction is designed to provide a delayed release (of about one hour after intake) followed by a sustained release over a short duration (with 80% of the API released over around two additional hours).

Considering the high daily dose (4.5 to 9g), the formulations which were developed are powder formulations to be suspended extemporaneously in water just before administration.

They are composed of a first fraction of Immediate-Release microparticles and a second fraction of Controlled-Release microparticles (CR microparticles).

Additional excipients have to be included in the formulations to impart both physical and chemical stability to the aqueous suspension before administration (see paragraph 6.4).

The Micropump microcapsules are manufactured in two main steps (Figure 15):

1. preparation of the drug-loaded microgranules
2. preparation of the microcapsules by coating a diffusion film on the drug loaded microgranules

Figure 15 : Micropump microcapsules

Depending on the composition of the coated film, two kinds of microparticles can be distinguished. Sustained release (SR) microparticles have a diffusion coating whose properties are not dependent on pH: they exhibit a sustained release over time.

Modified release (MR) microparticles have a coating with pH dependent characteristics. The microparticles exhibit a delayed release at acidic pH and a rapid release at neutral pH.

Thus, the release of the drug can be triggered by time and/or pH to ensure drug delivery within the absorption window.



## 5.2 Microgranules obtained by drug-layering on neutral cores (step 1)

The equipment used to manufacture the microgranules is a MiniGlatt or GPC-G1 spray-coater from Glatt in the Würster bottom-spray configuration (spraying upwards through a high air velocity zone inside a vertical tube).

### *5.2.1 Microgranules design*

The drug-loaded microparticles should have the following properties:

- narrow size distribution with a mean diameter as small as possible to have an acceptable mouth feeling since the powder formulation has to be suspended in water prior to administration
- smooth surface and spherical shape
- low friability (see paragraph 4.5)
- and a drug content as high as possible considering the extremely high daily dose (4.5g to 9g).

Small inert cores (Cellets 100 and 127[12]) and high drug-layering levels (up to 85%) have therefore been selected to meet the requirements listed above (low particle size with a drug content as high as possible).

The coating level is expressed as follows:

**Coating level (%)** $$= \frac{\text{Mass of coating excipients}}{\text{Mass of all dry materials}} * 100$$

Ex: Drug-layering level = (Mass of API and binder )/Mass of all dry materials (API, binder and neutral cores) *100

### *5.2.2 Drug-layering step*

Since Sodium Oxybate is highly soluble in water, water is the preferred medium for the drug-layering step. Considering the high drug-layering level targeted (85%), Sodium Oxybate was dissolved in hot water (60°C) to improve drying efficiency in presence of a low amount (10%) of a binder (PVP) with a solution dry content of 35%.

The aqueous drug-layering process carried out on the Miniglatt equipment proved to be difficult to control with a strong tendency of the microparticles to agglomeration. Water was therefore discarded as spraying medium.

Considering Sodium Oxybate solubility in water/organic solvent mixtures (see paragraph 3.3), a 40% water/ 60% ethanol (w/w) mixture was selected to minimize the water content while keeping a high solubilizing power for Sodium Oxybate.

Two different amounts of PVP were tested (5-10%) to determine the minimum quantity of binder necessary to obtain granules with a sufficient mechanical resistance to withstand the subsequent step of Micropump coating.

---

[12] Cellets 100 : Microcrystalline Cellulose Spheres (min 85% within 100-200µm - mean diameter around 160µm), Pharmatrans Sanaq AG
Cellets 127: Microcrystalline Cellulose Spheres (min 85% within 100-160µm - mean diameter around 140µm), Pharmatrans Sanaq AG



The characteristics of the Sodium Oxybate solution for the drug-layering step are:

- Liquid phase: 40% water / 60% ethanol
- Dry content: 35%
- Binder content : 5-10%
- No heating of the solution before spraying
- Coating level: 85%

At the end of the drug-layering step, granules are sieved on 125µm and 400µm to remove very small particles and agglomerates

A preliminary batch made with 10% PVP led to very robust granules with a low friability. To maximize the API content in the granules, the binder percent was therefore decreased to 5%.

As described in the following paragraphs, two different kinds of neutral cores are used for the granules manufacturing (cellets 127 or cellets 100).

For both kinds of neutral cores, an acceptable manufacturing process has been implemented (Table 15 et Table 16) with an excellent manufacturing yield, granules content close to theory without degradation products and the production of robust granules (low friability).

| Batch | 82274304VRE | 82278606PDR | 82587606 | 82588804 | 82712706PDR |
|---|---|---|---|---|---|
| Batch size (g) | 2000 | | | | |
| Manufacturing yield (%) after sieving (125-400µm fraction) | 99 | 98 | 93 | 98 | 96 |
| Assay (%) (theory = 80.8%) | 81.2 | 81.2 | 81.9 | 81.6 | 81.4 |
| Degradation products (%) LOQ=0.05% | Below LOQ | Below LOQ | Below LOQ | Below LOQ | Below LOQ |
| Water content (%) | 0.5 | 0.7 | 0.7 | 0.6 | 0.7 |
| Ethanol content (ppm) | 4500 | 3000 | 3000 | 4000 | 3000 |
| Mean diameter D[4,3] | 270 | 268 | 285 | 266 | 273 |
| Friability (%) | 2 | 0 | 1 | 0 | 1 |

Table 15: Drug-layering – yield and granules characterizations (neutral cores: cellets 127)



| R&D REPORT | Page 30 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

| Batch | 82272104VRE | 82586104FDS |
|---|---|---|
| Batch size (g) | 2000 | |
| Manufacturing yield (%) after sieving (125-400µm fraction) | 99 | 99 |
| Assay (%) (theory = 80.8%) | 81.5 | 81.0 |
| Degradation products (%) LOQ=0.05% | Below LOQ | Below LOQ |
| Water content (%) | 0.5 | 0.7 |
| Ethanol content (ppm) | 4500 | ? |
| Mean diameter D[4,3] | 294 | 293 |
| Friability (%) | 0 | 0 |

Table 16: Drug-layering – yield and granules characterizations (neutral cores: cellets 100)

As shown on picture 1, round-shaped granules are obtained.

82278608PDR : 82278606PDR 125-400µm TP85
sur cellets 127

Picture 1: Granules

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002736

JTX-0230.30



## 5.3 CR microparticles

### *5.3.1 CR microparticles for Target 1*

#### *5.3.1.1 General considerations*

As shown on Figure 1, the CR microparticles for Target 1 should release the API in-vivo 3 hours after administration.

Assuming a pH evolution in the gastro-intestinal tractus (GIT) similar to the one described in Table 14 (pseudo-fasted state), the microparticles are expected to release the API at the end of the intestine where the pH is close to 7.

To obtain such a release profile, microparticles with pH-dependent diffusion coatings (based on the Micropump II technology) are developed.

The Micropump coating is composed of:

- a hydrophobic compound, Lubritab [13]
- a hydrophilic polymer carrying groups that are ionized at neutral pH, commonly an Eudragit polymer [14].

The nature of each component controls the release rate as well as the coating level. Typically, the pH triggering the release (pH*) is set by the choice and mixture of appropriate Eudragit polymers. Two Eudragit polymers are typically used:

- Eudragit L100-55, with a pH*of 5.5
- Eudragit S100, with a pH* of 7.

#### *5.3.1.2 Development of CR microparticles with a pH* equal to 7*

For the development of these microparticles, only Eudragit S100 is used in the Micropump coating.

A. Preliminary batches with 40% Lubritab:

Preliminary batches were manufactured by coating drug-layered microparticles using Cellets 127 as neutral cores by a Micropump II coating composed of a mixture of 40% Lubritab and 60% Eudragit S100. A drying step of 2 hours is performed post-coating to decrease the residual solvents in the coating. The dissolution profiles of microparticles manufactured with a coating level of 35% (and in-process samplings corresponding to coating levels of 23 and 28%) are represented on Figure 16 and Figure 17.

The effect of the coating level on the dissolution profile in 0.1N HCl is shown on Figure 16: the higher the coating level, the slower the release. Microparticles with coating levels of 23 and 28% start releasing the API after less than 3 hours whereas the release only starts after 4 hours for the 35% microparticles. To meet the in-vivo release target, microparticles should not release the API before three hours post-administration. On this basis, only the microparticles with a coating level of 35% have been further investigated.

13 Lubritab, Hydrogenated Vegetable Oil, JRS Pharma

14 Eudragit, Röhm
Eudragit L100-55, Poly(methacrylic acid, ethyl acrylate) 1:1
Eudragit S100



Their dissolution profile was determined in the medium mimicking the in-vivo conditions (pseudo fasted state conditions – see Table 14). As shown on Figure 17, the dissolution profile is close to the target with the microparticles starting to release the API during the pH 7.4 stage.

Figure 16: Dissolution profile in 0.1N HCl medium of CR microparticles 821369 – effect of coating level

Figure 17: Dissolution profile of CR microparticles 82136905 (35% coating level) in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

An acceptable manufacturing process has been implemented with a good manufacturing yield (94%) and microparticles without degradation products. Nevertheless, the residual IPA content in the microparticles (15000ppm for a coating level of 35%) remains high despite the 2-hours drying step. The ICH Q3C (guideline) for class III solvents define an upper limit of 50mg per day which is acceptable without justification: assuming a maximum Sodium Oxybate daily dose of 9g with 4.5g for the modified released fraction, the daily amount of IPA would be around 120mg, i.e. well above the accepted upper limit.


B. Optimization work:

Experiments from a previous project have shown that the amount of residual IPA is linked to the quantity of Eudragit present in the coating: microparticles with a lower amount of Eudragit polymers had a lower content of residual solvents.
According to Flamel's Micropump II patents (US8101209), the ratio Lubritab/Eudragit has to be kept in the range [0.5-1.5]. The coating composition with the highest possible amount of Lubritab is therefore 60%Lubritab/40%Eudragit.

Drug-layered microparticles with Cellets 127 as neutral cores have been coated by a Micropump II coating layer composed of a mixture of 60% Lubritab and 40% Eudragit S100 at coating level of 35%. During the coating process, two in-process samples were taken corresponding to coating levels of 24 and 29%.

The characteristics of the microparticles and of their manufacturing process are summarized in Table 17 for the previous coating composition (40%Lubritab/60%EudragitS100) and the new one (60%Lubritab/40%EudragitS100).

| Batch | 82270903PDR<br>Previous formulation | 82271105PDR<br>New formulation |
|---|---|---|
| Micropump layer (composition) | **40% Lubritab / 60% Eudragit S100** | **60% Lubritab / 40% Eudragit S100** |
| pH* | 7 | 7 |
| Coating level (%) | 35 | 24-29-35 (final product) |
| Manufacturing yield (%) | 97 | 94 |
| Assay (%) | 53,5 | 53,8 |
| Degradation products (%) | <0.1 | <0.1 |
| Water content (%) | 0.4 | 0.3 |
| Residual solvents (ppm) – 2hrs drying at 56°C | **IPA: 14500** / Ethanol: 2000 | Final product - **IPA: 4500** / Ethanol: 2000<br>Sample 29% - **IPA: 3000** / Ethanol: 2500<br>Sample 24%- **IPA: 2000** / Ethanol: 3000 |
| Mean diameter D[4,3] (µm) | 331 | 330 (TP35%) |

Table 17: Characteristics of CR microparticles coated with a 40%Lubritab/60%EudragitS100 coating or a 60%Lubritab/40%EudragitS100 coating – manufacturing process comparison

The coating process for the 60%Lubritab/40%EudragitS100 composition has an excellent manufacturing yield and leads to microparticles without degradation products.
For the same coating level (35%), increasing the Lubritab content from 40% to 60% allows to divide the residual IPA content by a factor 3.

The effect of the coating level on the microparticles dissolution profile in the medium mimicking the in-vivo conditions (pseudo fasted state conditions) is shown on Figure 18. The microparticles with a coating level of 24% have a dissolution profile close to the target.



Figure 18: Dissolution profile of CR microparticles 822711 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) – effect of coating level

In conclusion, increasing the Lubritab content in the Micropump coating allows to:

- Decrease the coating level from 35% to around 25%
- Dramatically decrease the residual IPA content in the microparticles.

Two other batches have been manufactured to determine if the coating level can be further decreased. Results (not shown) from batch 825803 indicate that the dissolution profile is almost similar for coating levels of 22 and 25%. For lower coating levels (15% and 19% from batch 825847), release happens sooner with a smoother transition between the no-release phase and the full release phase (results not shown).
From a PK point of view, it is preferable to have a sharp transition with a full API release occurring very quickly. In this condition, the optimum coating level has been estimated to be in the range 22-25%.

Nevertheless, increasing the Lubritab content in the Micropump coating had a negative effect on the mechanical strength of the diffusion coating. Due to the crystalline nature of Lubritab, coatings with 60% Lubritab are more brittle than classical coatings with 40% Lubritab. We observed an erratic behavior from batch to batch with some batches exhibiting a burst in the dissolution profile whereas others had no burst. A visual observation of the microparticles highlighted a damage of the microparticles correlated with the burst observed on the dissolution profile. It has been demonstrated that such a damage occurred during the coating step. The problem was solved by reducing the atomizing pressure during the coating step form 2 bars to 1.6 bars.

The dissolution profile of the optimized microparticles has been determined at fixed pHs (Figure 19). At pH7, the dissolution profile exhibit a 4 hour lag-time with less than 20% released after 4 hours. At pH 7.5 (0.5 pH unit above pH*), less than 60% of the API is released after 1h. This beahviour is different from the one typically observed for coatings with a mixture of Eudragit L100-55 and S100: in a dissolution medium at pH equal to pH*, the release is very fast and becomes similar to an IR formulation at pH above pH*.



Figure 19: Dissolution profile of MR microparticles 82580303 (coating level = 25%) at fixed pHs

*5.3.1.3 Development of CR microparticles with a pH* equal to 6.9*

The dissolution profile of the microparticles with a pH*7 is close to the target (see Figure 18) but the API release occurs slightly too late.
The impact of decreasing pH* by adding a small amount of Eudragit L100-55 (pH*5.5) in the coating was studied. By replacing 3% of the 40% Eudragit S100 by Eudragit L100-55, the coating composition (60%Lubritab/37%Eudragit S100/3% Eudragit L100-55) has a pH* of 6.9.

Drug-layered microparticles using Cellets 127 as neutral cores have been coated by a Micropump II coating layer composed of a mixture of 60% Lubritab, 37% Eudragit S100 and 3% Eudragit L100-55 at a coating level of 30%. During the coating process, two in-process samples were taken corresponding to coating levels of 20 and 25%.

Figure 20: Dissolution profile of CR microparticles 825892 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) – effect of coating level

The effect of the coating level on the microparticles dissolution profile in the medium mimicking the in-vivo conditions (pseudo fasted state) is shown on Figure 20. The microparticles with a coating level of 25% have a dissolution profile on the target.

A coating level of 25% has therefore been chosen for the final prototype. A schematic view of the selected microparticles is represented on Figure 21.

Figure 21: Composition of CR pH*6.9 microparticles

The dissolution profile of the microparticles has also been determined at fixed pHs (Figure 21). The API release fastens close to pH* with more than 80% of the API released after one hour at pH7.

Figure 22: Dissolution profile of CR microparticles 82713302 (coating level = 25%) at fixed pHs

Two batches were manufactured with a coating level of 25%. The manufacturing process is reproducible with a good manufacturing yield. MR microparticles have similar characteristics with no degradation products, a low water content and low residual solvents content (Table 18).

Microparticles from both batches exhibit similar dissolution profile at fixed pH (Figure 23).



| Batch | 82589204 | 82713303 |
|---|---|---|
| Batch size (g) | 571 | 600 |
| Manufacturing yield (%) | 95.9 | 95.8 |
| Assay (%) | 59,9 | 61,4 |
| Degradation products (%) | <0.05 | <0.05 |
| Water content (%) | 0.5 | 0.5 |
| Residual solvents (ppm) | IPA: 4000 / Ethanol: 3000 | IPA: 3000 / Ethanol: 3000 |
| Mean diameter D[4,3] (µm) | 315 | 314 |

Table 18: Characteristics of CR microparticles 82589204 and 82713303 coated with a 60%Lubritab/37%EudragitS100/3%EudragitL100-55 coating (coating level of 25%) - manufacturing process comparison

Figure 23: Dissolution profile of CR microparticles 82713303 and 82589204 (coating level = 25%) at fixed pHs

#### *5.3.1.4 Development of CR microparticles with a pH* equal to 6.5*

The choice of the formulations for the PK study is based on their dissolution profile in a medium mimicking the pH changes occurring in the GIT. The relevance of such a test to predict the in-vivo behavior of Micropump microparticles has however never been checked.

Another prototype of microparticles has therefore been developed with a pH* of 6.5 significantly lower than the pH* of 6.9 of the type 1 microparticles. Such microparticles are designed to release the API sooner in the GIT.



FLAMEL
technologies

| R&D REPORT | Page 38 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Drug-layered microparticles using Cellets 127 as neutral cores have been coated by a Micropump II coating layer composed of a mixture of 60% Lubritab, 26,7% Eudragit S100 and 13,3% Eudragit L100-55 at a coating level of 30%.

A schematic view of the microparticles is represented on Figure 24.

10,5% Cellets 127
59,5% Drug layer
95% API
5% PVP
30% Micropump II layer
60% Lubritab
26,7% Eudragit S100
13.3% Eudragit L100-55

Figure 24: Composition of CR pH*6.5 microparticles

The dissolution profile of the microparticles in the medium mimicking the in-vivo conditions (pseudo fasted state) is shown on Figure 25. The microparticles release the API much faster than the target and therefore should release in-vivo the API sooner compared to the microparticles with a pH* of 6.9.

MR microparticles 82279003-04 - Pseudo-asted state
120
100
80
60
40
20
0
% dissolved
0
1
2
3
4
5
Time (h)
target
TP30%

Figure 25: Dissolution profile of CR microparticles 82279004 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002744

JTX-0230.38



The dissolution profile of the microparticles has also been determined at fixed pHs (Figure 26). The API release fastens close to pH* and becomes immediate at pHs equal to pH* or higher.

Figure 26: Dissolution profile of CR microparticles 82279004 (coating level = 30%) at fixed pHs

Two batches were manufactured with a coating level of 30%. The manufacturing process is reproducible with a good manufacturing yield. MR microparticles have similar characteristics with no degradation products, a low water content and low residual solvents content (Table 19).

| Batch | 82279004 | 82710904 |
|---|---|---|
| Batch size (g) | 571 | 1000 |
| Manufacturing yield (%) | 96.5 | 96,2 |
| Assay (%) | 56.9 | 59,4 |
| Degradation products (%) | <0.05 | <0.05 |
| Water content (%) | 0.5 | 0.7 |
| Residual solvents (ppm) | IPA: 3500 / Ethanol: 2500 | IPA: 3000 / Ethanol: 2000 |
| Mean diameter D[4,3] (µm) | 316 | 311 |

Table 19: Characteristics of CR microparticles 82279004 and 82710904 coated with a 60%Lubritab/26.7%EudragitS100/13.3%EudragitL100-55 coating (coating level of 30%) - manufacturing process comparison



FLAMEL
technologies

| R&D REPORT | Page 40 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Microparticles from both batches exhibit similar dissolution profile at fixed pH (Figure 27) and in the medium mimicking the in-vivo conditions (Figure 28).

MR microparticles 82710904 vs 82279004 - pH*6.5 - TP30%
% dissolved
Time (h)
0.1N HCl - 82710905
pH 6,2 - 82710905
pH 7 - 82710905
0.1N HCl - 82279004
pH 6.5 - 82279004
pH 6,2 - 82279004
pH 7 - 82279004

Figure 27: Dissolution profile of CR microparticles 82279004 and 82710904 (coating level = 30%) at fixed pHs

MR microparticles 82710905 vs 82279004 MR pH*6.5 TP30% - Pseudo-asted state
% dissolved
Time (h)
82279004
82710905

Figure 28: Dissolution profile of CR microparticles 82279004 and 82710904 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002746

JTX-0230.40



FLAMEL
technologies

### *5.3.2 CR microparticles for Target 2*

#### *5.3.2.1 General considerations*

As shown on Figure 1, the CR microparticles for Target 2 should start releasing the API in-vivo after a one-hour lag-time followed by a sustained release with about 80% of the API released after two additional hours.

2 approaches have been considered.

- **Use of a single layer coating**

Some preliminary results on another API (Metformine) have shown that a dissolution profile close to the target could be obtained by coating Metformine granules (90% API coating on Cellets 90) with a single Micropump layer (80% EC20 / 2%PVP / 2%CrRH40 / 2% Castor Oil) at a 40% coating level.

The use of a single coating layer with non-dependent pH properties would lead to a release only driven by time, therefore not subject to inter-individual variability.

The same approach was applied for the Sodium Oxybate microparticles but proves to be unsuccessful: even for a coating of 40%, 80% of the API is released after 1h30 without latency period. This approach was therefore discarded and another approach was followed.

- **Deposition of a Bi-layer coating**

API granules are first coated by a non-pH dependent sustained-release coating to generate the desired sustained release. In a second step, the microparticles are further coated by a pH-dependent coating to generate the intended one-hour lag-time.

This approach leads to a release profile driven by time but also pH, therefore probably more subject to inter-individual variability due to different pH conditions occurring in the GIT.

#### *5.3.2.2 Development of microparticles with a bi-layer coating*

5.3.2.2.1. First step: coating of the API granules with a non-pH dependent layer ("SR microparticles")

A. Microparticles development on Miniglatt equipment

First trials have been performed on Miniglatt equipment to minimize API consumption. A coating level of 25% has been selected as the maximum coating level to be applied on the drug-layered microparticles since the microparticles have to be further coated by the pH-dependent coating leading to a decrease of the API content in the microparticles.

To further save some API, bigger inert cores (Cellets 100) have been used in the first trials instead of the Cellets 127 selected for the development of the CR microparticles. To have a final particle size similar to drug layered particles obtained by coating Cellets 127 at a drug-layering level of 85%, Cellets 100 have been coated at a drug-layering level of 75%.

The Micropump diffusion coating used for coating the API granules is composed of:

- one insoluble polymer, Ethylcellulose [15]
- one soluble nitrogen-containing polymer, Polyvinylpyrrolidone [16]
- one surfactant, Polyoxyl 40 hydrogenated castor oil [17]
- one plasticizer, Castor oil [18] or Polyethylene glycol[19].

The release profile can be controlled by the nature and proportions of these components.

As a first approach, drug-layered microparticles have been coated by the Micropump coating with the following composition (weight %): 80 Ethylcellulose 20 Std Premium / 8 PVP K29-32 / 4 CremophorRH40 / 8 Castor Oil (reference batch 82132703).

The dissolution profile of the microparticles is on the target as shown on Figure 29.




Figure 29: Dissolution profile of SR microparticles 82132703 in 50mM pH 6.8 phosphate buffer

**Variation of the composition of the coating layer**

In order to decrease the coating level, the effect of the coating composition on the microparticles dissolution profile has been investigated.

- Ethylcellulose-based coating compositions:

Drug-layered microparticles have been coated by different coating compositions with a higher content of hydrophobic excipients:

- 80EC20 / 2PVP / 2CrRH40 / 16CO (=PVP and CrRH40 levels decreased to low values)
- 80EC20 / 8PVP / 12CO (=composition without Cremophor RH40).

Another composition has been tested by replacing Castor Oil by PEG400.

[15] Ethocel Premium 20, Dow Chemical
[16] Plasdone K29-32, ISP
[17] Cremophor RH 40, Degussa
[18] Castor oil, Huileries Garbit
[19] PEG, Uniquema



FLAMEL technologies

| R&D REPORT | Page 43 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

All batches exhibit a dissolution profile faster than the reference batch (Figure 30).

SR microparticles - pH 6.8
% dissolved
Time (h)
Ref batch : 82132703PDR - 80Ec20 / 8PVP / 4CrRH40 / 8HR
82137104VRE - 80Ec20 / 2PVP / 2 CrRH40 / 16HR
82136504PDR - 80Ec20 / 8PVP / 12HR
82136104FDS - 80Ec20 / 8PVP / 4 CrRH40 / 8 PEG400

Figure 30: Dissolution profile in pH 6.8 50mM phosphate buffers of EC-based SR microparticles batches

- Compositions with Cellulose Acetate Butyrate (CAB):

Drug-layered microparticles have also been coated by a composition based on Cellulose acetate butyrate as insoluble cellulosic derivative polymer (80CAB / 10Klucel EF / 10PEG400). Such a coating has already been implemented by Flamel on other projects.

CAB microparticles exhibit a dissolution profile much faster than the reference batch (Figure 31).

SR microparticles - pH 6.8
% dissolved
Time (h)
Ref batch: 82132703PDR - 80Ec20 / 8PVP / 4CrRH40 / 8HR
82138804VRE 80CAB/10Klucel/10PEG400
Target

Figure 31: Comparison of dissolution profile in pH 6.8 50mM phosphate buffers of CAB-based microparticles batch vs EC-based reference batch

**Addition of an acidic component with the API in the drug-layer**

Since the API solubility slightly decreases in acidic media (see Figure 5), an attempt has been made to slowdown the dissolution profile by incorporating an acidic excipient (malic acid) in the drug layer (90% AI / 5%PVP / 5% malic acid).

The dissolution profile of the coated microparticles (batch 82134504) being similar to the coated microparticles without malic acid, the approach of adding malic acid in the drug layer has been rejected.

**Conclusion:** the coating selected for the development of the microparticles on the GPCG1 fluid-bed coater has the following composition (80 Ethylcellulose 20 Std Premium / 8 PVP K29-32 / 4 CremophorRH40 / 8 Castor Oil).

B. Microparticles development on the GPCG1 equipment

In order to minimize the coating level of both subsequent diffusion layers, we chose to continue to use Cellets 100 (with a mean diameter D[4,3] of 160µm) instead of the Cellets 127 (D[4,3)=140µm) used for the microparticles developed for the target 1.

The composition of the SR microparticles is represented on Figure 32.

The release profile of the first microparticles (batch 82273205) manufactured on the GPCG1 fluid bed coater is slightly faster than the target since 80% of the API is released in about 1h30 (see Figure 33). Nevertheless, such a release profile is considered as acceptable.

Figure 32: Composition of SR microparticles



| R&D REPORT | Page 45 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Figure 33: Dissolution profile in pH 6.8 50mM phosphate buffer

Three microparticles batches were manufactured to evaluate the process robustness (Table 20):

- The manufacturing process is reproducible with a good manufacturing yield.
- SR microparticles have similar characteristics with no degradation products, low water content and low residual solvents content.

| Batch | 82273205VRE | 82277003VRE | 82586803VRE |
|---|---|---|---|
| Batch size (g) | 507 | 667 | 1000 |
| Manufacturing yield (%) | 96 | 96 | 97,1 |
| Assay (%) | 61,9 | 61,9 | 60,7 |
| Degradation products (%) | <0.1 | <0,05 | <0,05 |
| Water content (%) | 0.5 | 0,5 | 0,77 |
| Residual solvents (ppm) | Acetone : < 500<br>IPA : < 500<br>Ethanol: 3000 | Acetone : < 500<br>IPA : < 500<br>Ethanol: 2500 | Acetone : NDt<br>IPA : < 500<br>Ethanol: 2500 |
| Mean diameter D[4,3] (µm) | 337 | 334 | 337 |

Table 20: Characteristics of SR microparticles 82273205, 82277003 and 82586803 - manufacturing process comparison

As shown on Figure 33, SR microparticles from the three batches exhibit similar dissolution profiles.



5.3.2.2.2. Second step: coating of SR microparticles with a pH-dependent coating

A. Obtention of a prototype matching the target profile

The microparticles matching target 2 are expected to start releasing the API after a 1-hour lag-time. Assuming a pH evolution in the gastro-intestinal tractus (GIT) similar to the one described in Table 14 (pseudo-fasted state), the microparticles should release the API in an area of the GIT where the pH is close to 6.2.

To obtain such a release profile, the sustained release microparticles are coated by a pH-dependent diffusion coating with a trigger pH (pH*) of 6.5 (coating composition: 60% Lubritab / 26,7% Eudragit S100 / 13,7% Eudragit L100-55). A coating level of 20% has been implemented with an in-process sampling for a coating level of 18%.

The effect of the coating level on the microparticles dissolution profile in the medium mimicking in-vivo conditions (pseudo fasted state) is shown on Figure 34. After a latency period, the microparticles exhibit a release profile similar to the release profile from the sustained release microparticles alone.

Figure 34: Dissolution profile of SR/MR microparticles 82582703PDR (coating level: 18%) and 82582704PDR (coating level: 20%) in medium mimicking in-vivo conditions (pseudo-fasted state conditions): effect of coating level – comparison with dissolution profile corresponding SR microparticles (before coating) 82277003VRE / pH 6.8 phosphate buffer



| R&D REPORT | Page 47 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

The 82582704PDR microparticles with a coating level of 20% have a dissolution profile very close to the target with a one hour lag-time followed by a sustained-release of about 80% in 1h30 (Figure 35).

SR/MR microparticles 825827004 - pseudo-fasted
% dissolved
Time (h)
TP20%
Target

Figure 35: Dissolution profile of SR/MR microparticles 82582704PDR (coating level of 20%) in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

A coating level of 20% has therefore been chosen for the final prototype. A schematic view of the microparticles is represented on Figure 36.

20% Micropump I layer
80% EC20
8% PVP
4 CrRH40
8% Castor Oil
20% Micropump II Coating
60% Lubritab
13.3% Eudragit L100-55
26.7% Eudragit S100
9% Cellets 100
51% API layer
95% API
5% Binder

Figure 36: Composition of SR/MR microparticles with a bi-layer coating

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002753

JTX-0230.47



| R&D REPORT | Page 48 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

The dissolution profile of the microparticles has also been determined at fixed pHs (Figure 37). The API release fastens close to pH* with a sustained-release without latency period at pH above pH*.

Figure 37: Dissolution profile of SR/MR microparticles 82582704 (coating level = 20%) at fixed pHs

B. Reproducibility

Two batches were manufactured with a coating level of 25%. The manufacturing process is reproducible with a good manufacturing yield. SR/MR microparticles have similar characteristics with no degradation products, a low water content and low residual solvents content (Table 21).

| Batch | 82582704 | 82588203 |
|---|---|---|
| Batch size (g) | 625 | 1000 |
| Manufacturing yield (%) | 96 | 98,6 |
| Assay (%) | 49.1 | 48,6 |
| Degradation products (%) | <0.05 | <0.05 |
| Water content (%) | 0,6 | 0,4 |
| Residual solvents (ppm) | Acetone : NDt<br>IPA : 1500<br>Ethanol: 1500 | Acetone : NDt<br>IPA : 3000<br>Ethanol: 2500 |
| Mean diameter D[4,3] (µm) | 365 | 374 |

Table 21: Characteristics of SR/MR microparticles 82582704 and 82588203 - manufacturing process comparison



| R&D REPORT | Page 49 / 91 |
| --- | --- |
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Microparticles from both batches exhibit similar dissolution profile at fixed pH (Figure 38) and in the medium mimicking the in-vivo conditions (Figure 39).

SR/MR microparticles 82582704VRE and 82588203VRE
% dissolved
Time (h)
0.1N HCl - 82582704VRE
0.1N HCl - 82588203VRE
pH 6 - 82582704VRE
pH 6 - 82588203VRE
pH 6.2 - 82582704VRE
pH 6,2 - 82588203VRE
pH 6.8 - 82582704VRE
pH 7 - 82588203VRE

Figure 38: Dissolution profile of SR/MR microparticles 82582704 and 82588203 (coating level = 30%) at fixed pHs

SR/MR microparticles 82582704VRE/82588203 - pseudo-fasted
% dissolved
Time (h)
82582704VRE
82588203VRE
Target

Figure 39: Dissolution profile of SR/MR microparticles 82582704 and 82588203 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

### *5.3.3 Microparticles stability*

Microparticles stability (both chemical stability and dissolution profile stability) was investigated at Room Temperature (RT)-25°C/60%RH and 40°C/75%RH.

Due to recurrent failure of the 25°C/60%RH climatic chamber, it was not possible to control temperature and relative humidity for the first months of the stability experiment. So during the first

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002755

JTX-0230.49



months of the stability, samples were kept at RT (temperature in the range 20-28°C / RH in the range 40-80%).
The control of the relative humidity of the 40°C/75%RH climatic chamber was also out of order at the end of the stability studies. So during around one month, samples were kept at 40°C in the chamber but without humidity control (RH in the range 15-40%).

Table 22 summarizes the exact temperature/relative humidity conditions prevailing during the stability studies performed on the microparticles batches. Stability conditions will be however referred as 25°C/60%RH and 40°C/75%RH in the results summarized below.

| Stability study | Batch (lubricated microparticles) | Microparticles batch | Study start | ICH condition: 25°C/60%RH / effective T and RH | ICH condition: 40°C/75%RH / effective T and RH |
|---|---|---|---|---|---|
| **PSFT1312** | 82580801 | 82580303 | 19/04/2013 | 3months RT without humidity control - 3months 25°C/60%RH | 5.5months 40°C/75%RH - 0.5month 40°C without humidity control |
| **PSFT1314** | 82582201 | 82279004 | 30/04/2013 | ≈3months RT without humidity control - 3months 25°C/60%RH | 5months 40°C/75%RH - 1month 40°C without humidity control |
| **PSFT1321** | 82585001 | 82582704 | 13/05/2013 | 2.5months RT without humidity control - 3.5months 25°C/60%RH | 4.5months 40°C/75%RH - 1.5month 40°C without humidity control |

Table 22: Conditions for microparticles stability studies

For the stability studies, 15-20g of microparticles were packaged in HDPE bottles (Rexam) without heat-sealing the closures and with 2*1g dessicants (Multisorb) in the bottle to be in packaging conditions close to the intended conditions for the IMPD batches.

*5.3.3.1 CR pH*7 microparticles (PSFT1312)*

- Chemical stability (Table 23):

| Batch | 82580801 (microparticles batch: 82580303) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | T0 | 1month 25°C/60 %RH | 2 months 25°C/60 %RH | 3 months 25°C/60 %RH | 6 months 25°C/60 %RH | **1 month 40°C/75 %RH** | **2 months 40°C/75 %RH** | **3 months 40°C/75 %RH** | **6 months 40°C/75 %RH** |
| Assay (%) | 59,7 | 60 | 60,1 | 59,3 | 58,6 | **60,3** | **60,6** | **60** | **59,1** |
| Degradation products: lactone (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | **<0.05** | **<0.05** | **<0.05** | **<0.05** |
| Water content (%) | 0,5 | 0.4 | 0.4 | 0.5 | 0.5 | **0.4** | **0.5** | **0.6** | **0.7** |

Table 23: PSFT1312 stability results

Lactone content remains below the limit of qualification (0.05%) after 6 months in both conditions. There is no significant evolution of the water content after 6 months.

- Dissolution profiles stability:

The dissolution profile of the CR pH*7 microparticles has been determined at 25°C/60%RH and 40°C/75%RH in two media (0.1N HCl and pH6 phosphate buffer). As shown on Figure 40 and Figure 41, there is only a slight and progressive slowdown of the release at 25°C/60%RH. The dissolution



| R&D REPORT | Page 51 / 91 |
| --- | --- |
| RD218-001v01-1406/HG-sl | June 11, 2014 |

slowdown happens more quickly at 40°C/75%RH with a steady dissolution profile after one month and a slight acceleration after 6 months.

PSFT1312 - RT - MR microparticles 82580303
% dissolved
Time (h)
0.1N HCl - T0 stab
0.1N HCl - 1month
0.1N HCl - 2months
0.1N HCl - 3 months
0.1N HCl - 6months
pH 6 - t0 stab
pH6 - 1month
pH6 - 2 months
pH 6 - 3 months

Figure 40: Stability at 25°C/60%RH of CR pH*7 microparticles 82580303: dissolution profile in 0.1N HCl and pH6 50mM phosphate buffer

PSFT1312- 40°C/75%RH - MR microparticles 82580303
% dissolved
Time (h)
0.1N HCl - T0 stab
0.1N HCl - 1month
0.1N HCl - 2months
0.1N HCl - 3 months
0.1N HCl - 6months
pH 6 - t0 stab
pH6 - 1month
pH6 - 2 months
pH 6 - 3 months

Figure 41: Stability at 40°C/75%RH of CR pH*7 microparticles 82580303: dissolution profile in 0.1N HCl and pH6 50mM phosphate buffer

### *5.3.3.2 CR pH*6.9 microparticles*

Microparticles alone have not been followed in stability.

*A full composition with CR pH*6,9 microparticles (batch 82713901) has been manufactured to generate stability data for the IMPD. See paragraph 5.3.3.2 for the full composition characterization and stability data (PSFT1325).*

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL AVDL_01002757

AVDL_01002707

JTX-0230.51



*5.3.3.3 CR pH*6,5 microparticles (PSFT1314)*

- Chemical stability (Table 24):

| Batch | 82582201 (microparticles batch: 82279004) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | T0 | 1month 25°C/60 %RH | 2 months 25°C/60 %RH | 3 months 25°C/60 %RH | 6 months 25°C/60 %RH | **1 month 40°C/75 %RH** | **2 months 40°C/75 %RH** | **3 months 40°C/75 %RH** | **6 months 40°C/75 %RH** |
| Assay (%) | 55,9 | 56,7 | 56,1 | 56,1 | 56,5 | **57,5** | **57** | **55,9** | **56,3** |
| Degradation products: lactone (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | **<0.05** | **<0.05** | **<0.05** | **<0.05** |
| Water content (%) | 0,5 | 0.5 | 0.5 | 0.6 | 0.5 | **0.5** | **0.6** | **0.6** | **0.7** |

Table 24: PSFT1314 stability results

Lactone content remains below the limit of qualification (0.05%) after 6 months in both conditions. There is no significant evolution of the water content after 6 months.

- Dissolution profiles stability:

The dissolution profile of the CR pH*6.5 microparticles has been determined at 25°C/60%RH and 40°C/75%RH in two media (0.1N HCl and pH6 phosphate buffer).

As shown on Figure 42, there is a slight and progressive slowdown of the release at 25°C in 0.1N HCl but the dissolution profile remains unchanged at pH6.
The release slowdown in 0.1N HCl happens more quickly at 40°C/75%RH (Figure 43) with a steady dissolution profile after one month. At pH6, the dissolution profile is unchanged.
The dissolution profile was also determined at pH 6.8 for the 3/6 months stability points (results not shown): in both conditions, the API release is immediate.

Figure 42: Stability at 25°C/60%RH of CR pH*6,5 microparticles 82277904: dissolution profile in 0.1N HCl, pH6 and pH 6.8 50mM phosphate buffer



Figure 43: Stability at 40°C/75%RH of CR pH*6,5 microparticles 82277904: dissolution profile in 0.1N HCl and pH6 and pH 6.8 50mM phosphate buffer

*A full composition with MR pH*6,5 microparticles (batch 82712901) has been manufactured to generate stability data for the IMPD. See paragraph 5.5.3.3 for the full composition characterization and stability data (PSFT1323).*

*5.3.3.4 Bi-layer coated SR/MR pH*6,5microparticles (PSFT1321)*

- Chemical stability (Table 24):

| Batch | 82585001 (microparticles batch: 82582704) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | T0 | 1month 25°C/60 %RH | 2 months 25°C/60 %RH | 3 months 25°C/60 %RH | 6 months 25°C/60 %RH | **1 month 40°C/75 %RH** | **2 months 40°C/75 %RH** | **3 months 40°C/75 %RH** | **6 months 40°C/75 %RH** |
| Assay (%) | 47,7 | 49,1 | 48,4 | 48,9 | 48,5 | **48,2** | **48,9** | **48,4** | **49,1** |
| Degradation products: lactone (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | **<0.05** | **<0.05** | **<0.05** | **<0.05** |
| Water content (%) | 0,3 | 0.5 | 0.5 | 0.7 | 0.5 | **0.5** | **0.7** | **0.6** | **0.7** |

Table 25 : PSFT1321 stability results

Lactone content remains below the limit of qualification (0.05%) after 6 months in both conditions. There is no significant evolution of the water content after 6 months.

- Dissolution profiles stability:

The dissolution profile of SR/MR pH*6.5 microparticles has been determined at 25°C/60%RH and 40°C/75%RH in two media (0.1N HCl and pH6.8 phosphate buffer).
As shown on Figure 44 and Figure 45, a rather steady dissolution profile is obtained between one month and 6months at 25°C/60%RH, and between one month and 3months at 40°C/75%RH. At 40°C/75%RH, the dissolution profile fastens between 3 and 6months.



FLAMEL
technologies

| R&D REPORT | Page 54 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

PSFT1321 - RT - SR/MR microparticles 82582704VRE
% dissolved
Time (h)
0.1N HCl - T0 stab
0.1N HCl - 1month
0.1N HCl - 2months
0.1N HCl - 3 months
0.1N HCl - 6months
pH 6.8 - t0 stab
pH6.8 - 1month
pH 6.8 - 2months
pH 6.8 - 3 months
pH 6.8 - 6 months

Figure 44: Stability at RT of SR/MR pH*6,5 microparticles 82582704: dissolution profile in 0.1N HCl and pH6.8 50mM phosphate buffer

PSFT1321 - 40°C/75%RH - MR microparticles 82582704VRE
% dissolved
Time (h)
0.1N HCl - T0 stab
0.1N HCl - 1month
0.1N HCl - 2months
0.1N HCl - 3 months
0.1N HCl - 6months
pH 6.8 - t0 stab
pH 6.8 - 2months
pH6.8 - 1month
pH6.8 - 3 months
pH6.8 - 6months

Figure 45: Stability at 40°C/75%RH of SR/MR pH*6,5 microparticles 82582704: dissolution profile in 0.1N HCl and pH6.8 50mM phosphate buffer

At pH 6.8, the dissolution profile is unchanged and is similar to the dissolution of the SR microparticles.

*A full composition with SR/MR pH*6,5 microparticles (batch 82712501) has been manufactured to generate stability data for the IMPD. See paragraph 5.3.3.4 for the full composition characterization and stability data (PSFT1322).*

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002760

JTX-0230.54


## 5.4 Development of the full composition (mixture of IR and CR parts)

### *5.4.1 General considerations*

The formulations are to be reconstituted in water just before administration.

For a 4,5g unit dose, a volume of water for reconstitution of 40ml has been chosen in order to have in the suspension to be swallowed a percentage of insoluble matters of around 10%, which might be considered as acceptable for the mouth-feeling sensation.

The following additional excipients are present in the formulations:

- a suspending agent to limit microparticles sedimentation after reconstitution
- an acidic excipient to impart chemical and physical stability to the microparticules during the reconstitution step in water prior to administration
- and lubricant/gliding agent to impart flowability to the mixture

### *5.4.2 Suspending agent: xanthan gum*

For the administration phase, microparticles have to remain in suspension without settling too quickly. Xanthan gum is selected as a suspending aid agent. At a concentration of 0.5% (relatively to the dry formulation), xanthan gum proves to be efficient to maintain the microparticles in suspension for a few minutes.

### *5.4.3 Acidic excipient – development of the reconstitution protocol*

- Choice of the acidic excipient:

Each full formulation contains an IR fraction and a CR fraction.

For a 4,5g unit dose, assuming a 50/50 mixture, each fraction contains 2.25g of API.
By solubilizing 2.25g of Sodium Oxybate in 40ml of water, the pH of the solution increases up to 8 due to the strong alkaline character of the API (Sodium Oxybate is a sodium salt of a weak base).
At such a high pH above the theoretical pH* of the MR microparticles, MR microparticles are not stable due to a solubilization of the Eudragit from the Micropump coating.

To lower the pH of the suspension and therefore ensure the stability of the MR microparticles during the reconstitution step, an acidic excipient has to be included in the formulation.
Malic acid, tartaric acid and citric acid have been tested. To decrease the pH of a Sodium Oxybate solution in water (2.25g in 40ml of water) from 8 to 4, the quantity of excipient to be added is respectively equal to 75% of the API amount, 53% and 71% for malic acid, tartaric acid and citric acid. Tartaric acid proves to be more efficient than malic acid and citric acid to decrease the suspension pH.
However, considering that malic acid is currently used in the Xyrem solution, malic acid is chosen for the development of the full formulation.



- Determination of the quantity of malic acid:

As a first step, the effect of malic acid quantity on the pH of a Sodium Oxybate solution has been studied.

From a pH8 Sodium Oxybate solution in water (corresponding to the solubilization of 2.25g API in 40ml), malic acid has to be added in a quantity equal to:

- 0.25% of the API amount to decrease the solution pH to 7.3
- 4.3% of the API amount to decrease the solution pH to 6
- 20.7% of the API amount to decrease the solution pH to 5
- and 75% of the API amount to decrease the solution pH to 4.

Considering that the pH of the reconstituted formulation has to be below 6.5 (6.5= pH* of the Micropump coating for SR/MR microparticles and MR pH*6,5), a quantity of malic acid of 5 and 10% is selected.

Full compositions are composed of a lubricated mixture comprising:

- IR microparticles corresponding to 2.25g API,
- CR microparticles corresponding to 2.25g API,
- xanthan gum
- malic acid in a quantity equal to 5 or 10% of the API amount in the IR fraction
- 1% Magnesium stearate and 0.5% Silicon dioxide (Aerosil 200) as lubricant and gliding agent.

The following reconstitution protocol is followed to determine the release profile of the compositions:

- a 4.5g unit dose formulation is poured in a 100ml glass bottle
- 40ml of tap water is added
- after closing the bottle, it is shaken vigorously during around one minute
- after a 15 minutes rest, the reconstituted formulation is poured in the dissolution vessel
- 10ml of tap water is added to rinse the bottle and is poured in the dissolution vessel.

After the 15minutes reconstitution step, the pH of the suspension with 5% malic acid is equal to 5.7, whereas the pH of the suspension with 10% malic acid is equal to 5.35.

As a reference, the dry mixture is directly poured in the dissolution vessel.



*Case 1: composition with MR pH*6.5 microparticles (82279004 batch)*

As shown on Figure 46, the dissolution profile of the 2 formulations with 5 and 10% malic acid is very similar to the dissolution profile of the dry mixture.

Based on this result, it has been decided to incorporate malic acid in a quantity equal to 10% of the API amount in the IR fraction in order to have a safety margin.

Figure 46: Dissolution profile of a full sachert composition composed of 2.25g of the dose as IR microparticules and 2.25g of the dose as MR microparticles MR pH*6,5

*Case 2: composition with SR/MR pH*6.5 microparticles (82582704 batch)*

The same experiment was made with formulations incorporating SR/MR pH* 6.5 microparticles. The dissolution profile of a full composition with 10% malic acid is compared to a dry mixture of lubricated microparticles and to the same composition without malic acid.

As shown on Figure 47, the dissolution profile of the reconstituted suspension with 10% malic acid is similar to the dissolution profile of the dry mixture.

Figure 47: Dissolution profile of a full composition composed of 2.25g of the dose as IR microparticules and 2.25g of the dose as SR/MR microparticles pH*6,5 with or without malic acid



Without malic acid, the API release starts without latency period. This can be explained by the pH of the suspension after the 15 minutes reconstitution step (6.4). The pH of the suspension without malic acid was expected to be close to 8 (see above). During the reconstitution step, the IR fraction is supposed to solubilize first leading to a strong increase of the pH, a partial solubilization of the Eudragit could occur with a subsequent decrease of the suspension pH.

Additionaly, it has been checked that the reconstituted formulation is chemically stable (with no lactone formed) during the 15 minutes reconstitution step.

Remark: for the formulation development, we have considered a 15 minutes reconstitution step prior to dissolution testing. We checked that this 15minutes step has no impact on the formulations dissolution profile.
For the PK study, a 5 min interval is chosen for the reconstitution protocol. Making sure that the formulation is stable for 15minutes gives a safety margin for the administration phase of the PK study.
Additionally, from the patient point of view, people are not expected to wait for 15 minutes before taking their medicine. A 5 minutes interval seems more reasonable.

#### *5.4.4 Development of the IR component*

- Physical form :

Due to the low density and flowability of the raw API powder it was chosen for the early development (first pilot PK) to manufacture drug-layered IR microparticles by spray-coating. This approach will be revisited in the future development.

- Interactions between malic acid and Sodium Oxybate

Interactions between the drug-layered microparticles and malic acid in the full composition could lead to stability issues, through the formation of lactone as a degradation product.

The stability of drug-layered microparticles has therefore been evaluated at 40°C/75%RH in presence of a huge amount of malic acid (malic acid quantity equal to 75% of the API amount).
As shown in Table 26, lactone formation happens very quickly in presence of malic acid. Adding desiccants allows to slowdown the API degradation.

| PSFT | Desiccant | Bottle | % malic acid | Lactone content - 1month stability (%) | Lactone content - 2months stability (%) |
|---|---|---|---|---|---|
| 1303 | Without desiccant | Heat sealed Rexam 60ml bottles | 75 | 0,9 | 45 |
| 1304 | With dessicant (2*1g) | | | 0,4 | 7 |

Table 26: Stability of IR microparticle in presence of malic acid with or without dessiccant



- Deposit of a seal-coat on drug-layered microparticles:

To avoid lactone formation in presence of malic acid, a seal-coat could be deposited on the drug-layered microparticles.

Klucel (HPC) was selected as the seal-coat component because:

- the seal-coat layer should not slowdown the solubilization of the API from the IR component. From PK considerations, it is critical that the IR fraction is fully solubilized prior to administration to have a first PK peak similar to the peak occurring after administration of a Xyrem dose
  - As previously discussed, the duration between the reconstitution step and the administration of the suspension should be short enough to be accepted by the patient. The solubilization of the IR part should therefore be as fast as possible.
- Klucel is soluble in organic solvents, such as acetone which is a very poor solvent for Sodium Oxybate.

The solubilization rate from the drug-layered microparticles with Klucel seal-coat (coating level: 10%) was studied after dispersion of a full composition in tap water. After the shaking step, suspension was let to stand without agitation. Samples were taken up to 15 minutes to determine the solubilization profile. As shown on Figure 48, all the API is solubilized after the first minute. The seal-coat layer does not hinder the release of the IR microparticles.

Stability experiments were conducted with the 'optimized' amount of malic acid (10%) and drug-layered microparticles without seal-coat or with seal-coat at two coating levels (5/10%) - (Table 27).

Without desiccant, the seal-coat layer has a positive effect to prevent lactone formation during the first three months. After 6months, the lactone content is similar for all microparticles.
With desiccant, the lactone content is only slightly above the LOQ after 6months even without seal-coat.

For the stability of the IR fraction in presence of 10% malic acid, depositing a seal-coat on the drug-layered microparticles might not be necessary for future development if desiccants are included in the formulation packaging.

Figure 48: Dissolution rate of Sodium Oxybate from IR microparticles with a 10% Klucel seal-coat in a full formulation



| IR microparticles | Desiccant | PSFT | Lactone content (%) | | | | |
|---|---|---|---|---|---|---|---|
| | | | T0 | 1month | 2months | 3months | 6months |
| Without seal-coat | Without desiccant | 1315 | <0.05 | 1,4 | 3,8 | 4,8 | 3,6 |
| | With desiccant (2*1g) | 1316 | | < 0.05 | < 0.05 | < 0,05 | 0,06 |
| With seal-coat (5% Klucel EF) | Without desiccant | 1317 | | 0,4 | 1,1 | 2,6 | 4,4 |
| | With desiccant (2*1g) | 1318 | | <0.05 | <0.05 | < 0,05 | 0,08 |
| With seal-coat (10% Klucel EF) | Without desiccant | 1319 | | 0,1 | 0,7 | 1,5 | 4,7 |
| | With desiccant (2*1g) | 1320 | | <0.05 | <0.05 | 0,06 | 0,08 |

Table 27: Stability of IR microparticles and seal coated IR microparticles in presence of malic acid (with or without desiccant)

*N.B.: only partial stability data were available when final formulations for the first pilot PK had to be selected. On the basis of these available results, it was chosen to deposit a HPC seal-coat on the drug-layered microparticles with a 10% coating level.*

- Reproducibility of seal-coating process:

The robustness of the seal-coating process was evaluated on two batches at two different scales. The manufacturing process is reproducible with a good manufacturing yield. Seal-coated microparticles have similar characteristics with no degradation products, a low water content and low residual solvents content (Table 28).

| Batch | 82583004 | 82711703 |
|---|---|---|
| Batch size (g) | 450 | 1700 |
| Manufacturing yield (%) after sieving (125-400µm fraction) | 96 | 98 |
| Assay (%) | 72,9 | 74,7 |
| Degradation products (%) LOQ=0.05% | Below LOQ | Below LOQ |
| Water content (%) | 0.5 | 0.7 |
| Ethanol content (ppm) | 2000 | 3000 |
| Acetone ppm) | Ndt | Ndt |
| Mean diameter D[4,3] | 280 | 298 |

Table 28: Characteristics of Klucel sela-coated microparticles 82583004 and 82711703 - manufacturing process comparison



## 5.5 Full compositions:

### *5.5.1 Description of the 3 prototypes selected for the PK study*

The denomination of the full compositions selected for the PK study is indicated in Table 29.

| Full composition | Corresponding CR microparticles |
|---|---|
| Sodium Oxybate CR, Granules for oral suspension Type 1 | Type 1 (=CR pH*6,9) |
| Sodium Oxybate CR, Granules for oral suspension Type 2 | Type 2 (=CR pH*6,5) |
| Sodium Oxybate CR, Granules for oral suspension Type 3 | Type 3 (=SR/MR pH*6,5) |

Table 29: Denomination of full compositions prototypes

A schematic description of the microparticles used for each prototype is represented in annex 1. For all prototypes, a dose of 4.5g API per unit has been selected. The composition of a single unit dose of 4.5g is detailed in annex 2 for each prototype.

### *5.5.2 Full compositions: packaging and stability conditions*

Full formulations have been manufactured to generate stability data for the IMPD of the human PK study. Unit doses were therefore packaged in the packaging selected for the PK study:

- CAPE DUMA TWIST-OFF028277 with integrated 2g silica dessiccant
- DUMA TWIST-OFF 035050 HDPE Bottles White 30mL

Due to the high unit dose (4.5g), it has been decided to have a single unit dosing packaging for the formulations analysis (t0) and for the 1 month stability point. For the other stability points, a quantity corresponding to a little more than 2 unit doses per bottle has been packaged in 50ml bottles (DUMA TWIST-OFF 035050 HDPE Bottles White 50mL) to limit the total number of stability bottles.

The following analysis plan has been decided to characterize the full formulations (dissolution testing, assay and degradation products, water content) - Table 30.

| Stability time point | Dissolution testing (pH medium) - Number of vessels | | | | Other analyses (assay, content, water content) | Total units |
|---|---|---|---|---|---|---|
| | 0.1N HCl | 6.8 | Other pH | Pseudo-fasted state | | |
| T0 | 6 | 2 | 2 | 2 | 2 units for the assay and degradation products content<br>1 for the water content | 15 single units |
| T1mois | 6 | 2 | NA | 2 | 2 units for the assay and degradation content<br>1 for the water content | 13 single units |
| Other stability points (bottle units - vessels) | 3 | 1 | NA | 2 | 1 uniform for all analysis | 4 units |
| | 2 units – 4 vessels | | NA | 1 unit – 2 vessels | | |

Table 30: Analysis of the full composition formulations



### *5.5.3 Full compositions: manufacturing and characterization*

#### *5.5.3.1 Protocol for full compositions manufacturing*

The full composition contains an immediate release fraction representing 40 to 50% of the Sodium Oxybate dose (depending on the prototype) and a controlled release fraction.

Aerosil 200 is first added to the components (microparticles, malic acid, xanthan gum) and the mixture is homogenized during 15minutes using a Roue Rhön mixer. In a second step, the mixture is lubricated with magnesium stearate during 15minutes in the Roue Rhön mixer.
The homogenized mixture is then distributed manually in the packaging bottles.

#### *5.5.3.2* Sodium Oxybate CR, granules for oral suspension Type 1 (with CR pH*6,9 *microparticles)*

Full composition:

The full formulation contains an immediate release fraction representing 50% of the Sodium Oxybate dose and a controlled release fraction representing 50% of the Sodium Oxybate dose.

The composition of the full mixture (82713901) is indicated in Table 31. Each single unit dose contains 7.18g of mixture.

| | | 82713901VRE | |
|---|---|---|---|
| **Component** | **batch** | **Quantity (g)** | **Theoritical unit composition (g)** |
| **IR microparticles** | 82711703FDS | 424,99 | 3,096 |
| **Microparticule MR pH*6.9** | 82713303VRE | 509,98 | 3,715 |
| **Malic acid** | 10/12 | 30,89 | 0,225 |
| **Xantural 180** | 9C4345K | 4,93 | 0,036 |
| **Aerosil 200** | MPE00004373 | 4,93 | 0,036 |
| **MgSt** | MPE00005406 | 9,86 | 0,072 |
| | **Quantity** | 985,56 | 7,180 |

Table 31: Mixture composition and single dose unit composition for Type 1 formulation

Full composition analysis:

For the full analysis of the seal-coated IR microparticles and the CR microparticles Type 1, see respectively Table 28 and Table 18.

The dose per unit is close to the theory (4.5g). The water content is low and the degradation product content is below the LOQ (Table 31).

| Batch | 82713901 |
|---|---|
| Assay (%) | 64,1 |
| Dose per unit (g) | 4,59 |
| Degradation products (%) | <0.05 |
| Water content (%) | 0.68 |

Table 32: Type 1 formulation analysis at t0

Dissolution profile of full composition after reconstitution step:
The dissolution profiles of the 6 vessels in 0.1N HCl are very similar showing that there is no inter-unit variability (Figure 49).



FLAMEL
technologies

| R&D REPORT | Page 63 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Sachet composition 82713901 with MR microparticles 82713303
pH*6,9 - 0.1N HCl
% dissolved
Time (h)
vessel 1
vessel 2
vessel 3
vessel 4
vessel 5
vessel 6

Figure 49: Dissolution profile of Type 1 formulation 82713901 in 0.1N HCl

A shorter lag-time is observed when the pH of the dissolution medium is increased (Figure 50). Let's notice that the dissolution profile is not immediate at pH 7 though pH 7 is above pH*.

Sachet composition 82713901 with MR microparticles 82713303
pH*6.9
% dissolved
Time (h)
0.1N HCl
pH 6.5
pH 6,8
pH 7

Figure 50: Dissolution profile of Type 1 formulation 82713901 at fixed pHs

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002769

JTX-0230.63



In the medium mimicking the in-vivo conditions (Figure 51), the formulations exhibit a dissolution profile similar to the target.

Figure 51: Dissolution profile of Type 1 formulation 82713901 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

*5.5.3.3* Sodium Oxybate CR, granules for oral suspension Type 2 (with CR pH*6,5 *microparticles)*

Full composition

The full composition contains an immediate release fraction representing 50% of the Sodium Oxybate dose and a controlled release fraction representing 50% of the Sodium Oxybate dose.

The composition of the full mixture (82712901) is indicated in Table 33. Each single unit dose contains 7.45g of mixture.

| | | 82712901VRE | |
|---|---|---|---|
| **Component** | **batch** | **Quantity (g)** | **Theoritical unit composition (g)** |
| **IR microparticles** | 82711703FDS | 412,22 | 3,096 |
| **Microparticule MR pH*6,5** | 82710904PDR | 530,00 | 3,981 |
| **Malic acid** | 10/12 | 29,96 | 0,225 |
| **Xantural 180** | 9C4345K | 4,96 | 0,037 |
| **Aerosil 200** | MPE00004373 | 4,96 | 0,037 |
| **MgSt** | MPE00005406 | 9,92 | 0,075 |
| | **Quantity (g)** | 992,02 | 7,451 |

Table 33: Mixture composition and single dose unit composition for Type 2 formulation

Full composition analysis:

For the full analysis of the seal-coated IR microparticles and the CR microparticles Type 2, see respectively Table 28 and Table 19.

The dose per unit is close to the theory (4.5g). The water content is low and the degradation product content is below the LOQ (Table 34).



| R&D REPORT | Page 65 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

| Batch | 82712901 |
|---|---|
| Assay (%) | 60,8 |
| Dose per unit (g) | 4,57 |
| Degradation products (%) | <0.05 |
| Water content (%) | 0.4 |

Table 34: Type 2 formulation analysis at t0

Dissolution profile of full composition after reconstitution step:

The dissolution profiles of the 6 vessels in 0.1N HCl are very similar showing that there is no inter-unit variability (Figure 52).

Sachet composition 82712901 with MR microparticles 82710904
pH*6.5
% dissolved
Time (h)
0
20
40
60
80
100
120
0
2
4
6
8
10
12
14
16
vessel 1
vessel 2
vessel 3
vessel 4
vessel 5
vessel 6

Figure 52 : dissolution profile of Type 2 formulation 82712901 in 0.1N HCl

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002771

JTX-0230.65



FLAMEL
technologies

| R&D REPORT | Page 66 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

A shorter lag-time is observed when the pH of the dissolution medium is close to the theoretical pH* (Figure 53). At pH above pH*, the release is immediate.

Sachet composition 82712901 with MR microparticles 82710904
pH*6.5
% dissolved
Time (h)
0.1N HCl
pH 6.2
pH 6.5
pH 6.8

Figure 53: Dissolution profile of Type 2 formulation 82712901 at fixed pHs

In the medium mimicking the in-vivo conditions (Figure 54), the formulations exhibit a short latency period followed by a fast release.

Sachet composition 82712901 with MR microparticules 82710904
% dissolved
Time (h)
82712901 sachet composition

Figure 54: Dissolution profile of Type 2 formulation 82712901 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002772

JTX-0230.66



*5.5.3.4 Sodium Oxybate CR, granules for oral suspension Type 3 (with SR/MR pH*6,5 microparticles)*

Full composition

The full formulation contains an immediate release fraction representing 40% of the Sodium Oxybate dose and a controlled release fraction representing 60% of the Sodium Oxybate dose.

The composition of the full mixture (82712501) is indicated in Table 35. Each single unit dose for contains 8.40g of mixture.

| | | 82712501PDR | |
|---|---|---|---|
| **Component** | **batch** | **Quantity (g)** | **Theoritical unit composition (g)** |
| **IR microparticles** | 82711703FDS | 326,6855 | 2,477 |
| **Microparticule MR pH* 6.9** | 82588203VRE | 735,0425 | 5,573 |
| **Malic acid** | 10/12 | 23,7419 | 0,180 |
| **Xantural 180** | 9C4345K | 5,5381 | 0,042 |
| **Aerosil 200** | MPE00004373 | 5,5381 | 0,042 |
| **MgSt** | MPE00005406 | 11,0762 | 0,084 |
| | **Quantity (g)** | 1107,622 | 8,397 |

Table 35: Mixture composition and single dose unit composition for Type 3 formulation

Full composition analysis:

The dose per unit is close to the theory (4.5g). The water content is low and the degradation product content is below the LOQ (Table 36).

| Batch | 82712501 |
|---|---|
| Assay (%) | 52,8 |
| Dose per unit (g) | 4,42 |
| Degradation products (%) | <0.05 |
| Water content (%) | 0.4 |

Table 36: Type 3 formulation analysis at t0



FLAMEL
technologies

| R&D REPORT | Page 68 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Dissolution profile of full composition after reconstitution step:

The dissolution profiles of the 6 vessels in 0.1N HCl are very similar showing that there is no inter-unit variability (Figure 55).

Sachet composition 82712501PDR with SR/MR microparticles
82588203VRE pH*6.5 - 0.1N HCl
% dissolved
Time (h)
vessel 1
vessel 2
vessel 3
vessel 4
vessel 5
vessel 6

Figure 55: Dissolution profile of Type 3 formulation 82712501 in 0.1N HCl

A shorter lag-time is observed when the pH of the dissolution medium is close to the theoretical pH* (Figure 56). At pH above pH*, the dissolution profile is similar to the dissolution profile of the SR microparticles.

Sachet composition 82712501PDR with SR/MR microparticles
82588203VRE pH*6.5
% dissolved
Time (h)
0.1N HCl
pH 6.2
pH 6.5
pH 6.8

Figure 56: Dissolution profile of Type 3 formulation 82712501 at fixed pHs

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002774

JTX-0230.68



In the medium mimicking the in-vivo conditions (Figure 57), the dissolution profile is very close to the target with a 1hour latency period followed by a sustained release.

Figure 57: Dissolution profile of Type 3 formulation 82712501 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

### *5.5.4 Full compositions: stability data*

The 6 months stability results at 25°C/60%RH and 40°C/75%RH are presented below.

#### *5.5.4.1 Stability conditions*

The 25°C/60%RH climatic chamber being out of order at the time of the experiment, stability has been launched in dessicators with a saturated NaBr aqueous solution to generate the desired relative humidity. Dessicators have been placed in an oven at 25°C. A temperature/relative humidity probe has been placed in each dessicator to register the parameters.

The average temperature and the average relative humidity monitored during one month are reported in Table 37.

| Full composition type | Stability plan | T/HR probe | Stability start | Average temperature °C (SD) | Average relative humidity % (SD) |
|---|---|---|---|---|---|
| 1 | PSFT1325 | VTE81 | 17/07 | 24,9 (<0.1) | 58,7 (0.4) |
| 2 | PSFT1323 | VTE149 | 16/07 | 25,3 (<0.1) | 59.1 (0,3) |
| 3 | PSFT1322 | VTE133 | 16/07 | 25,4 (<0.1) | 60,4 (0,4) |

Table 37: 1 month stability data

Average temperature and relative humidities ate within specifications.

Stability bottles have then been transferred to the climatic chamber once repaired. So all the data presented below are related to formulations stored at 25°C/60%RH during 6months.

The control of the relative humidity of the 40°C/75%RH climatic chamber was out of order at the end of the stability studies. So during 2.5months, samples were kept at 40°C in the chamber but



without humidity control (RH in the range 15-40%). The exact conditions for the stability study at 40°C are therefore 3,5months at 75% RH followed by 2,5months without humidity control.

*5.5.4.2 Sodium Oxybate CR, granules for oral suspension Type 1 (with CR pH*6,9 microparticles) - PSFT1325*

Sachet analysis:

| Batch | 82713901 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | T0 | 25°C/60%RH | | | | 40°C/75%RH | | | |
| | | 1month | 2 months | 3 months | 6 months | 1 month | 2 months | 3 months | 6 months |
| Assay (%) | 64,1 | 61,4 | 63,3 | 63,6 | 63,2 | 61,4 | 63,1 | 63,4 | 62,5 |
| Ded. products (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | 0.07 | 0.08 | 0.12 |
| Water content (%) | 0,5 | 0.6 | 0.5 | 0.5 | 0.6 | 0.5 | 0.7 | 0.8 | 0.9 |

Table 38: Type 1 full composition stability analysis

There is no significant evolution of the water content after 3 months (Table 38). A very slight increase of the lactone content occurs after 6 months at 40°C/75%RH.

Dissolution profiles at fixed pHs:

There is a slight slowdown of the dissolution occurring after 1 month at 25°C/60%RH with no further evolution (Figure 58).

Figure 58: Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at 25°C/60%RH



| R&D REPORT | Page 71 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

The same phenomenon happens at 40°C/75%RH with an increase of the lag-time duration after one month and no further evolution (Figure 59).

PSFT1325 - 40°C/75%RH - batch 82713901 - 0.1N HCl
% dissolved
Time (h)
0.1N HCl - T0 stab
0.1N HCl - 1month
0.1N HCl - 2months
0.1N HCl - 3months
0.1N HCl - 6months
specifications

Figure 59: Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at 40°C/75%RH

For the 2, 3 and 6months stability points, formulations have been packaged with 2 doses per unit (see paragraph 5.5.1).

A remaining single dose unit kept for 6months at 40°C/75%RH has been analyzed: the dissolution profile of the single dose unit is similar to the dissolution profile of the two doses unit (Figure 60).

PSFT1325 - 40°C/75%RH - batch 82713901 - 0.1N HCl
% dissolved
Time (h)
0.1N HCl - T0 stab
0.1N HCl - 6months multiple dose unit
0.1N HCl - 6months single dose unit
specifications

Figure 60: Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at 40°C/75%RH: comparison of single dose unit and two doses unit

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002777

JTX-0230.71



| R&D REPORT | Page 72 / 91 |
| --- | --- |
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Dissolution profiles in medium mimicking in-vivo conditions (pseudo-fasted state):

The dissolution profile of the formulation remains unchanged after 6 months at 25°C/60%RH (Figure 61) and 40°C/75%RH (Figure 62).

Sachet composition 82713901 with MR microparticules 82713303
% dissolved
Time (h)
Target
T0
2months 25°C/60%RH
3months 25°C/60%RH
6months 25°C/60%RH

Figure 61: Dissolution profile stability for type 1 full composition 82713901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 25°C/60%RH

Sachet composition 82713901 with MR microparticules 82713303
% dissolved
Time (h)
Target
T0
1month 40°C/75%RH
2months 40°C/75%RH
3months 40°C/75%RH
6months 40°C/75%RH

Figure 62: Dissolution profile stability for type 1 full composition 82713901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 40°C/75%RH

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002778

JTX-0230.72



*5.5.4.3 Sodium Oxybate CR, granules for oral suspension Type 2 (with CR pH*6,5 microparticles) - PSFT1323*

Full composition analysis:

| Batch | 82712901 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | T0 | 25°C/60%RH | | | | 40°C/75%RH | | | |
| | | 1month | 2 months | 3 months | 6 months | 1 month | 2 months | 3 months | 6 months |
| Assay (%) | 60,8 | 60,7 | 60,9 | 59,2 | 60,7 | 61,0 | 60,3 | 60,3 | 59,8 |
| Ded. products (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | 0.06 | 0.08 | 0.08 | 0.12 |
| Water content (%) | 0.4 | 0,4 | 1,1 | 1,0 | 0,9 | 0,5 | 1,6 | 0.9 | 1,0 |

Table 39: Type 2 full composition stability analysis

There is no significant evolution of the water content after 3 months (Table 39). A very slight increase of the lactone content occurs after 6 months at 40°C/75%RH.

Dissolution profiles at fixed pHs:

There is a slight slowdown of the dissolution profile after 1 month at 25°C/60%RH with no further evolution after 6 months (Figure 63).

Figure 63: Dissolution profile stability for type 2 full composition 82712901 in 0.1N HCl at 25°C/60%RH



At 40°C/75%RH, a slowdown of the dissolution profile is observed after one month with an increase of the lag-time duration with no further evolution after 6 months (Figure 64).

Figure 64: Dissolution profile stability for type 2 full composition 82712901 in 0.1N HCl at 40°C/75%RH

Dissolution profiles in medium mimicking in-vivo conditions (pseudo-fasted state):

The dissolution profile of the formulation remains unchanged after 6 months at 25°C/60%RH (Figure 65) and 40°C/75%RH (Figure 66).

Figure 65: Dissolution profile stability for type 2 full composition 82712901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 25°C/60%RH



Figure 66: Dissolution profile stability for type 2 full composition 82712901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 40°C/75%RH

*5.5.4.4 Sodium Oxybate CR, granules for oral suspension Type 3 (with SR/MR pH*6,5 microparticles) - PSFT1322*

Full composition analysis:

| Batch | 82712501 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | T0 | 25°C/60%RH | | | | 40°C/75%RH | | | |
| | | 1month | 2 months | 3 months | 6 months | 1 month | 2 months | 3 months | 6 months |
| Assay (%) | 52,8 | 53,1 | 54,1 | 52,8 | 53,7 | 53,5 | 53,6 | 52,7 | 53,1 |
| Deg.Products (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | 0.06 | 0.07 | 0.11 |
| Water content (%) | 0.4 | 0.3 | 0.4 | 0.8 | 0.5 | 0.4 | 0.6 | 0.6 | 0.7 |

Table 40: Type 3 full composition stability analysis

There is no significant evolution of the water content after 6 months (Table 40). A very slight increase of the lactone content occurs after 6 months at 40°C/75%RH.



| R&D REPORT | Page 76 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Dissolution profiles at fixed pHs:

There is a progressive slowdown of the dissolution profile at 25°C/60%RH up to 3months with a slight acceleration after 6months (Figure 67).

PSFT1322 - 25°C/60%RH - batch 82712501
% dissolved
Time (h)
0.1N HCl - T0 stab
0.1N HCl - 1month
0.1N HCl - 2months
0.1N HCl - 3months
0.1N HCl - 6months
specification

Figure 67: Dissolution profile stability for type 3 full composition 82712501 in 0.1N HCl at 25°C/60%RH

At 40°C/75%RH, a slowdown of the dissolution profile is observed after one month followed by an acceleration which becomes very sharp after 6months (Figure 68).

PSFT1322 - 40°C/75%RH - SR/MR microparticles 82582704VRE
% dissolved
Time (h)
0.1N HCl - T0 stab
0.1N HCl - 1month
0.1N HCl - 2months
0.1N HCl - 3months
0.1N HCl - 7months
specification
specifications
specifications

Figure 68: Dissolution profile stability for type 3 full composition 82712501 in 0.1N HCl at 40°C/75%RH

Let's notice that the content of one two-doses unit was agglomerated, probably due to a water uptake, showing that the control of the humidity inside the packaging is crucial.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL AVDL_01002782
AVDL_01002707

JTX-0230.76



| R&D REPORT | Page 77 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Dissolution profiles in medium mimicking in-vivo conditions (pseudo-fasted state):

The dissolution profile of the formulation remains unchanged after 6 months at 25°C/60%RH (Figure 69) and 40°C/75%RH (Figure 70).

Sachet composition 82712501 with SR/MR microparticules 82588203
% dissolved
Time (h)
Target
T0
T2months 25°C/60%RH
T3months 25°C/60%RH
T6months 25°C/60%RH

Figure 69: Dissolution profile stability for type 3 full composition 82712501 in medium mimicking in-vivo conditions (pseudo-fasted state) at 25°C/60%RH

Sachet composition 82712501 with SR/MR microparticules 82588203
% dissolved
Time (h)
Target
T0
T1month 40°C/75%RH
T2months 40°C/75%RH
T3months 40°C/75%RH
T6months 40°C/75%RH

Figure 70 : Dissolution profile stability for type 3 full composition 82712501 in medium mimicking in-vivo conditions (pseudo-fasted state) at 40°C/75%RH

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL AVDL_01002783

AVDL_01002707

JTX-0230.77



### *5.5.5 Considerations on the content of residual solvents in the full compositions*

Considering the maximum amount of residual solvents present in Sodium Oxybate microparticles (Table 41), the total amount of class III solvents (Acetone/Ethanol/Isopropyl alcohol PA) has been estimated for a 4.5g daily dose: for the three compositions, this quantity is close to 35mg (Table 42).

| Microparticles | Residual solvent content (ppm) | | |
|---|---|---|---|
| | Ethanol | Acetone | IPA |
| IR sc | 3000 | NDt | Ndt |
| MR pH*6,9 | 3000 | NDt | 4000 |
| MR pH*6,5 | 2500 | NDt | 3500 |
| SR/MR pH*6,5 | 2500 | NDt | 3000 |

Table 41: Residual class III solvents in IR sc microparticles and MR microparticles

| Full composition | Microparticles (g) for a 4.5g daily dose | | Solvents daily quantity for 4.5g (mg) | | | |
|---|---|---|---|---|---|---|
| | Irsc | MR | Ethanol | Acetone | IPA | **Total** |
| Type 1 | 3,10 | 3,72 | 20 | 0 | 15 | **35** |
| Type 2 | 3,10 | 3,98 | 19 | 0 | 14 | **33** |
| Type 2 | 2,48 | 5,57 | 21 | 0 | 17 | **38** |

Table 42: Daily amount of class III solvents in a full composition composition corresponding to a 4.5g daily dose

The ICH Q3C guideline defines a maximum daily amount of residual class III solvents equal to 50mg. This quantity is considered as acceptable without justification.

In our case, the solvents amount per day is below the limit for a 4.5g daily dose, but the quantity would be slightly above the limit for a 9g daily dose (corresponding to the current daily dose with the Xyrem treatment). This point will have to be assessed in the future development work.


## CONCLUSIONS

Based on its Micropump® technology, Flamel Technologies is developing a new oral formulation of Sodium Oxybate with the objective to provide a product that is to be taken once at bedtime and allows the patient to sleep continuously for 6 to 8 hours.

The technical results obtained during the development work are the following:

The first part of the prototype development was dedicated to the selection of the manufacturing process of Sodium Oxybate granules with no degradation and allowing the further coating step being successfully carried out. Taking into account the API characteristics, the API layering onto small neutral cores was performed from a water/ethanol API solution. High drug-layering levels (85%) have been selected to obtain granules as concentrated as possible.

The second part of the formulation development was focused on the coating of the diffusion film on the drug-layered microparticles. PH-dependent coatings have been developed to match the targets.
For the first target, the microparticles should release the API three hours after intake. A single-layer coating composed of Lubritab and a mixture of Eudragit polymers has been developed with a pH* (trigger pH) equal to 6.9. A second prototype with the same coating excipients but a different ratio of Eudragit polymers (pH*=6.5) has been selected to have a formulation that is expected to release the API sooner in the GIT.
For the second target, the API should release the API in a sustained manner (with 80% of the API released over around two hours) after a one-hour lag-time. A bi-layer coating comprising an inner layer designed to provide the sustained release and a pH-dependent outer layer to generate the intended one-hour lag-time has been developed (third prototype).

During the third part, we investigated the full composition preparation: the full composition is a powder formulation to be suspended extemporaneously in water just before administration. It comprises controlled release microparticles, immediate-release microparticles and additional excipients. Malic acid is used in the composition to lower the pH of the 'liquid' preparation and ensure the stability of the controlled-release microparticles during the reconstitution step. The amount of Xanthan gum is selected to slowdown micrparticles settlement in the liquid medium after reconstitution.
To avoid any undesirable interaction between malic acid and the API contained in the IR microparticles, a seal-coat is deposited onto the IR microparticles.

Full compositions are chemically stable with a very low amount of degradation products formed after 6months at 40°C/75%RH. A slowdown of the dissolution profile in 0.1N HCl occurs at 25°C/60%RH and 40°C/75%RH during the first month with no further evolution up to 6months for prototypes 1 and 2. For the third prototype, a slight acceleration of the dissolution profile occurs after one month at 40°C/75%RH.
A dissolution test has been developed to mimic the pH changes occurring along the GIT. In this test, all three prototypes prove to have a stable dissolution profile after 6months at 25°C/60%RH and 40°C/75%RH

A technical transfer has been implemented with the formulation team from Pessac for the manufacturing of the clinical batches. Full compositions identical to the prototypes described in the report have been manufactured at Pessac and tested in a phase 1 PK study (PKFT218-1301).

A work plan has been designed to improve the prototypes tested in the PK study.


| R&D REPORT | Page 80 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

The program is mainly related to:

- the evaluation of other manufacturing techniques for the IR fraction that could allow to decrease formulations cost
- the simplification of the current formulations:
  - evaluation of the necessity of the seal-coat layer on the IR microparticles
  - optimization of the amount of malic acid
- the improvement of the stability of the formulations dissolution profile in 0.1N HCl.

Additionally, it has been asked to the volunteers, during the PK study, to fill a questionnaire in order to evaluate the organoleptic properties of the formulations. Depending on the results of the evaluation, formulation changes might also be implemented if necessary.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002786

JTX-0230.80



## FIGURES

Figure 1: targets for in-vivo release profiles ... 6
Figure 2 : Sodium Oxybate = sodium salt of gamma hydroxy butyric acid (GHB) ... 7
Figure 3: Sodium Oxybate analysis by thermogravimetry, with a heat rate of 10°C/min and under air flow ... 8
Figure 4 : Sodium Oxybate analysis by Differential Scanning Calorimetry, between 40 and 250°C at a heat rate of 10°C/min and under nitrogen flow ... 8
Figure 5 : Sodium Oxybate solubility at room temperature in water vs pH (pH adjustment with HCl) - US6780889 patent from Orphan Medicals (Jazz) ... 9
Figure 6 : Sodium Oxybate and corresponding lactone ... 11
Figure 7 : esterification of GHB (filled circles) in pH 2 buffer (for information, open circles represent the hydrolysis of GBL in pH 2 buffer) ... 11
Figure 8 : Sodium Oxybate analysis by DVS – sorption and desorption isotherm at 25°C ... 13
Figure 9 : Chromatogram of a reconstituted formulation for Sodium Oxybate assay (Volume of injection: 15 µL) ... 16
Figure 10: Chromatograms of a reconstituted formulation and a reconstituted formulation with 7 mg/L (e.g. 0.1%) of Lactone for the degradation products assay. (Volume of injection: 80 µL) ... 16
Figure 11: UV spectrum of Sodium Oxybate in pH 6.8 50mM phosphate buffer ... 22
Figure 12 : evolution of pH with transit time in the GIT post administration in the fasted state or in the fed state ... 24
Figure 13 : evolution of pH with transit time after the stomach in the fasted state or in the fed state ... 24
Figure 14 : evolution of pH with transit time in the GIT post administration in the fasted state or in the fed state / case of an administration two hours post meal ... 25
Figure 15 : Micropump microcapsules ... 27
Figure 16 : dissolution profile in 0.1N HCl medium of CR microparticles 821369 – effect of coating level ... 32
Figure 17 : dissolution profile of CR microparticles 82136905 (35% coating level) in medium mimicking in-vivo conditions (pseudo-fasted state conditions) ... 32
Figure 18 : dissolution profile of CR microparticles 822711 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) – effect of coating level ... 34
Figure 19 : dissolution profile of MR microparticles 82580303 (coating level = 25%) at fixed pHs35
Figure 20 : dissolution profile of CR microparticles 825892 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) – effect of coating level ... 35
Figure 21 : composition of CR pH*6.9 microparticles ... 36
Figure 22: dissolution profile of CR microparticles 82713302 (coating level = 25%) at fixed pHs. 36
Figure 23 : dissolution profile of CR microparticles 82713303 and 82589204 (coating level = 25%) at fixed pHs ... 37
Figure 24 : composition of CR pH*6.5 microparticles ... 38
Figure 25 : dissolution profile of CR microparticles 82279004 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) ... 38
Figure 26 : dissolution profile of CR microparticles 82279004 (coating level = 30%) at fixed pHs 39



Figure 27 : dissolution profile of CR microparticles 82279004 and 82710904 (coating level = 30%) at fixed pHs ... 40
Figure 28 : dissolution profile of CR microparticles 82279004 and 82710904 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) ... 40
Figure 29 : dissolution profile of SR microparticles 82132703 in 50mM pH 6.8 phosphate buffer . 42
Figure 30 : dissolution profile in pH 6.8 50mM phosphate buffers of EC-based SR microparticles batches ... 43
Figure 31 : comparison of dissolution profile in pH 6.8 50mM phosphate buffers of CAB-based microparticles batch vs EC-based reference batch ... 43
Figure 32 : composition of SR microparticles ... 44
Figure 33 : dissolution profile in pH 6.8 50mM phosphate buffer ... 45
Figure 34 : dissolution profile of SR/MR microparticles 82582703PDR (coating level: 18%) and 82582704PDR (coating level: 20%) in medium mimicking in-vivo conditions (pseudo-fasted state conditions): effect of coating level – comparison with dissolution profile corresponding SR microparticles (before coating) 82277003VRE / pH 6.8 phosphate buffer ... 46
Figure 35 : dissolution profile of SR/MR microparticles 82582704PDR (coating level of 20%) in medium mimicking in-vivo conditions (pseudo-fasted state conditions) ... 47
Figure 36 : composition of SR/MR microparticles with a bi-layer coating ... 47
Figure 37 : dissolution profile of SR/MR microparticles 82582704 (coating level = 20%) at fixed pHs ... 48
Figure 38 : dissolution profile of SR/MR microparticles 82582704 and 82588203 (coating level = 30%) at fixed pHs ... 49
Figure 39 : dissolution profile of SR/MR microparticles 82582704 and 82588203 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) ... 49
Figure 40 : stability at 25°C/60%RH of CR pH*7 microparticles 82580303: dissolution profile in 0.1N HCl and pH6 50mM phosphate buffer ... 51
Figure 41 : stability at 40°C/75%RH of CR pH*7 microparticles 82580303: dissolution profile in 0.1N HCl and pH6 50mM phosphate buffer ... 51
Figure 42 : stability at 25°C/60%RH of CR pH*6,5 microparticles 82277904: dissolution profile in 0.1N HCl, pH6 and pH 6.8 50mM phosphate buffer ... 52
Figure 43: stability at 40°C/75%RH of CR pH*6,5 microparticles 82277904: dissolution profile in 0.1N HCl and pH6 and pH 6.8 50mM phosphate buffer ... 53
Figure 44 : stability at RT of SR/MR pH*6,5 microparticles 82582704: dissolution profile in 0.1N HCl and pH6.8 50mM phosphate buffer ... 54
Figure 45 : stability at 40°C/75%RH of SR/MR pH*6,5 microparticles 82582704: dissolution profile in 0.1N HCl and pH6.8 50mM phosphate buffer ... 54
Figure 46 : dissolution profile of a full sachert composition composed of 2.25g of the dose as IR microparticules and 2.25g of the dose as MR microparticles MR pH*6,5 ... 57
Figure 47 : dissolution profile of a full composition composed of 2.25g of the dose as IR microparticules and 2.25g of the dose as SR/MR microparticles pH*6,5 with or without malic acid ... 57
Figure 48 : dissolution rate of Sodium Oxybate from IR microparticles with a 10% Klucel seal-coat in a full formulation ... 59
Figure 49 : dissolution profile of Type 1 formulation 82713901 in 0.1N HCl ... 63
Figure 50 : dissolution profile of Type 1 formulation 82713901 at fixed pHs ... 63
Figure 51 : dissolution profile of Type 1 formulation 82713901 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) ... 64



Figure 52 : dissolution profile of Type 2 formulation 82712901 in 0.1N HCl ... 65
Figure 53 : dissolution profile of Type 2 formulation 82712901 at fixed pHs ... 66
Figure 54 : dissolution profile of Type 2 formulation 82712901 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) ... 66
Figure 55 : dissolution profile of Type 3 formulation 82712501 in 0.1N HCl ... 68
Figure 56 : dissolution profile of Type 3 formulation 82712501 at fixed pHs ... 68
Figure 57 : dissolution profile of Type 3 formulation 82712501 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) ... 69
Figure 58 : Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at 25°C/60%RH ... 70
Figure 59 : Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at 40°C/75%RH ... 71
Figure 60 : Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at 40°C/75%RH: comparison of single dose unit and two doses unit ... 71
Figure 61 : Dissolution profile stability for type 1 full composition 82713901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 25°C/60%RH ... 72
Figure 62 : Dissolution profile stability for type 1 full composition 82713901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 40°C/75%RH ... 72
Figure 63 : Dissolution profile stability for type 2 full composition 82712901 in 0.1N HCl at 25°C/60%RH ... 73
Figure 64 : Dissolution profile stability for type 2 full composition 82712901 in 0.1N HCl at 40°C/75%RH ... 74
Figure 65 : Dissolution profile stability for type 2 full composition 82712901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 25°C/60%RH ... 74
Figure 66 : Dissolution profile stability for type 2 full composition 82712901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 40°C/75%RH ... 75
Figure 67 : Dissolution profile stability for type 3 full composition 82712501 in 0.1N HCl at 25°C/60%RH ... 76
Figure 68 : Dissolution profile stability for type 3 full composition 82712501 in 0.1N HCl at 40°C/75%RH ... 76
Figure 69 : Dissolution profile stability for type 3 full composition 82712501 in medium mimicking in-vivo conditions (pseudo-fasted state) at 25°C/60%RH ... 77
Figure 70 : Dissolution profile stability for type 3 full composition 82712501 in medium mimicking in-vivo conditions (pseudo-fasted state) at 40°C/75%RH ... 77



| R&D REPORT | Page 84 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## TABLES

Table 1 : Sodium Oxybate – manufacturers and quantities ... 7
Table 2 : Sodium Oxybate solubility in different organic solvents at room temperature and 40°Cor 60°C ... 10
Table 3 : stability of Sodium Oxybate solutions (0.5% w in water) at room temperature ... 11
Table 4 : Sodium Oxybate stability at 300mg/g in water and water/ethanol mixture – % of lactone formed after 24h ... 12
Table 5: HPLC parameters ... 14
Table 6 : Extraction protocol for formulation analysis (microparticles and full compositions) ... 15
Table 7 : Retention time of the HPLC peaks observed ... 16
Table 8 : Limited qualification results for the Sodium Oxybate assay ... 17
Table 9 : Limited qualification results for the degradation products ... 18
Table 10 : Operating conditions of the Karl Fisher titration ... 20
Table 11 : Operating conditions of the residual solvents assay ... 21
Table 12 : Operating conditions of the dissolution tests ... 22
Table 13 : buffer pH after solubilizing of 4.5g of Sodium Oxybate in 900ml buffer ... 23
Table 14 : dissolution test to mimic in-vivo conditions – pH pattern corresponding to 'pseudo' fasted state ... 25
Table 15 : Drug-layering – yield and granules characterizations (neutral cores: cellets 127) ... 29
Table 16 : Drug-layering – yield and granules characterizations (neutral cores: cellets 100) ... 30
Table 17 : characteristics of CR microparticles coated with a 40%Lubritab/60%EudragitS100 coating or a 60%Lubritab/40%EudragitS100 coating – manufacturing process comparison ... 33
Table 18 : characteristics of CR microparticles 82589204 and 82713303 coated with a 60%Lubritab/37%EudragitS100/3%EudragitL100-55 coating (coating level of 25%) - manufacturing process comparison ... 37
Table 19 : characteristics of CR microparticles 82279004 and 82710904 coated with a 60%Lubritab/26.7%EudragitS100/13.3%EudragitL100-55 coating (coating level of 30%) - manufacturing process comparison ... 39
Table 20 : characteristics of SR microparticles 82273205, 82277003 et 82586803 - manufacturing process comparison ... 45
Table 21 : characteristics of SR/MR microparticles 82582704 and 82588203 - manufacturing process comparison ... 48
Table 22 : conditions for microparticles stability studies ... 50
Table 23 : PSFT1312 stability results ... 50
Table 24 : PSFT1314 stability results ... 52
Table 25 : PSFT1321 stability results ... 53
Table 26 : stability of IR microparticle in presence of malic acid with or without dessiccant ... 58
Table 27 : stability of IR microparticles and seal coated IR microparticles in presence of malic acid (with or without desiccant) ... 60
Table 28 : characteristics of Klucel sela-coated microparticles 82583004 and 82711703 - manufacturing process comparison ... 60
Table 29 : Denomination of full compositions prototypes ... 61
Table 30 : analysis of the full composition formulations ... 61
Table 31 : mixture composition and single dose unit composition for Type 1 formulation ... 62
Table 32 : Type 1 formulation analysis at t0 ... 62



Table 33 : mixture composition and single dose unit composition for Type 2 formulation .............. 64
Table 34 : Type 2 formulation analysis at t0 .......................................................................... 65
Table 35 : mixture composition and single dose unit composition for Type 3 formulation ............ 67
Table 36 : Type 3 formulation analysis at t0 .......................................................................... 67
Table 37 : 1 month stability data.......................................................................................... 69
Table 38 : type 1 full composition stability analysis .............................................................. 70
Table 39 : type 2 full composition stability analysis .............................................................. 73
Table 40 : type 3 full composition stability analysis .............................................................. 75
Table 41 : residual class III solvents in IR sc microparticles and MR microparticles ..................... 78
Table 42 : daily amount of class III solvents in a full composition composition corresponding to a 4.5g daily dose .......................................................................................................... 78



FLAMEL

| R&D REPORT | Page 86 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## APPENDICES

**Appendix 1:**

Seal coat
Cellets 127
Cellets 100
IR Microparticles Type A
Micropump I
Micropump II
Micropump II
Micropump II
MR pH*6.9
CR Microparticles Type 1
MR pH*6.5
CR Microparticles Type 2
SR/MR pH*6.5
CR Microparticles Type 3

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002792

JTX-0230.86



FLAMEL
technologies

| R&D REPORT | Page 87 / 91 |
| --- | --- |
| RD218-001v01-1406/HG-sl | June 11, 2014 |

50%
IR Microparticles
+
50%
CR Microparticles Type 1
(MR pH*6.9)
=
Sodium Oxybate CR,
Granules for oral suspension
Type 1
50%
IR Microparticles
+
50%
CR Microparticles Type 2
(MR pH*6.5)
=
Sodium Oxybate CR,
Granules for oral suspension
Type 2
40%
IR Microparticles
+
60%
CR Microparticles Type 3
(SR/MR pH*6.5)
=
Sodium Oxybate CR,
Granules for oral suspension
Type 3

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002793

JTX-0230.87



**Appendix 2:**

| Table P.1. Composition of Sodium Oxybate CR, granules for oral suspension Type 1 | | | |
|---|---|---|---|
| Component | Function | Reference to standard | Quantity (g) per bottle - dose = 4.5g |
| **Sodium Oxybate microparticles** | | | |
| Gamma-hydroxybutyric acid, sodium salt | Drug substance | NA | 4.5 |
| Microcrystalline cellulose spheres | Neutral core | Current USPNF | 0.836 |
| Povidone | Binder and excipient in diffusion coating | Current USP | 0.237 |
| Hydrogenated cottonseed oil | Excipient in diffusion coating | Current USPNF | 0.557 |
| Methacrylic acid copolymer: Methacrylic acid - Ethyl acrylate copolymer (1:1) | Excipient in diffusion coating | Current USPNF | 0.028 |
| Methacrulic acid copolymer: Methacrylic acid - Methyl methacrylate copolymer (1:2) | Excipient in diffusion coating | Current USPNF | 0.344 |
| Hydroxypropyl cellulose | Film coating | Current USPNF | 0.310 |
| **Other excipients** | | | |
| Malic acid | Acidifying agent | Current USPNF | 0.225 |
| Xanthan gum | Suspending agent | Current USPNF | 0.036 |
| Colloidal silicon dioxide | Lubricant | Current USPNF | 0.036 |
| Magnesium stearate (1) | Lubricant | Current USPNF | 0.072 |
| Purified water | Solvent | Current USP | Removed during processing |
| Dehydrated alcohol (2) | Solvent | Current USPNF | Removed during processing |
| Acetone | Solvent | Current USPNF | Removed during processing |
| Isopropyl alcohol | Solvent | Current USP | Removed during processing |
| **Total weight** | **NA** | **NA** | **7.180** |

(1) vegetal origin
(2) European pharmacopeia : anhydrous ethanol



**Table P.1. Composition of Sodium Oxybate CR, granules for oral suspension Type 2**

| Component | Function | Reference to standard | Quantity (g) per bottle - dose = 4.5g |
|---|---|---|---|
| **Sodium Oxybate microparticles** | | | |
| Gamma-hydroxybutyric acid, sodium salt | Drug substance | NA | 4.5 |
| Microcrystalline cellulose spheres | Neutral core | Current USPNF | 0.836 |
| Povidone | Binder and excipient in diffusion coating | Current USP | 0.237 |
| Hydrogenated cottonseed oil | Excipient in diffusion coating | Current USPNF | 0.716 |
| Methacrylic acid copolymer: Methacrylic acid - Ethyl acrylate copolymer (1:1) | Excipient in diffusion coating | Current USPNF | 0.159 |
| Methacrulic acid copolymer: Methacrylic acid - Methyl methacrylate copolymer (1:2) | Excipient in diffusion coating | Current USPNF | 0.318 |
| Hydroxypropyl cellulose | Film coating | Current USPNF | 0.310 |
| **Other excipients** | | | |
| Malic acid | Acidifying agent | Current USPNF | 0.225 |
| Xanthan gum | Suspending agent | Current USPNF | 0.037 |
| Colloidal silicon dioxide | Lubricant | Current USPNF | 0.037 |
| Magnesium stearate (1) | Lubricant | Current USPNF | 0.075 |
| Purified water | Solvent | Current USP | Removed during processing |
| Dehydrated alcohol (2) | Solvent | Current USPNF | Removed during processing |
| Acetone | Solvent | Current USPNF | Removed during processing |
| Isopropyl alcohol | Solvent | Current USP | Removed during processing |
| **Total weight** | **NA** | **NA** | **7.451** |

(1) vegetal origin
(2) European pharmacopeia : anhydrous ethanol



**Table P.1. Composition of Sodium Oxybate CR, granules for oral suspension Type 3**

| Component | Function | Reference to standard | Quantity (g) per bottle - dose = 4.5g |
|---|---|---|---|
| Sodium Oxybate microparticles | | | |
| Gamma-hydroxybutyric acid, sodium salt | Drug substance | NA | 4.5 |
| Microcrystalline cellulose spheres | Neutral core | Current USPNF | 0.836 |
| Povidone | Binder and excipient in diffusion coating | Current USP | 0.326 |
| Hydrogenated cottonseed oil | Excipient in diffusion coating | Current USPNF | 0.669 |
| Methacrylic acid copolymer: Methacrylic acid - Ethyl acrylate copolymer (1:1) | Excipient in diffusion coating | Current USPNF | 0.149 |
| Methacrulic acid copolymer: Methacrylic acid - Methyl methacrylate copolymer (1:2) | Excipient in diffusion coating | Current USPNF | 0.297 |
| Hydroxypropyl cellulose | Film coating | Current USPNF | 0.248 |
| Ethycellulose | Excipient in diffusion coating | Current USPNF | 0.892 |
| Polyoxyl 40 Hydrogenated Castor Oil | Excipient in diffusion coating | Current USPNF | 0.045 |
| Castor oil | Excipient in diffusion coating | Current USP | 0.089 |
| **Other excipients** | | | |
| Malic acid | Acidifying agent | Current USPNF | 0.180 |
| Xanthan gum | Suspending agent | Current USPNF | 0.042 |
| Colloidal silicon dioxide | Lubricant | Current USPNF | 0.042 |
| Magnesium stearate (1) | Lubricant | Current USPNF | 0.084 |
| Purified water | Solvent | Current USP | Removed during processing |
| Dehydrated alcohol (2) | Solvent | Current USPNF | Removed during processing |
| Acetone | Solvent | Current USPNF | Removed during processing |
| Isopropyl alcohol | Solvent | Current USP | Removed during processing |
| **Total weight** | **NA** | **NA** | **8.397** |

(1) vegetal origin
(2) European pharmacopeia : anhydrous ethanol



| R&D REPORT | Page 91 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

**MODIFICATIONS HISTORY**

| **Version 01:** | **Year/Month/Day** |
|---|---|
| Creation | |

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002797

JTX-0230.91

# EXHIBIT 6

Jazz Pharmaceuticals, Inc. v.
Avadel CNS Pharmaceuticals LLC
PTX-0052
C.A. No. 21-691 (GBW), 21-1138(GBW), 21-1594 (GBS)

# FT218 – DoDo Project

## ***Sodium Oxybate - "Dose for a Doze"***

FLAMEL
JUST DODO IT

Jane Rose Reporting
Guillard Ex. 34
10/08/22

Flamel Technologies Confidential FT218 DoDo - Technical Meeting 01-17-2013 1

HIGHLY CONFIDENTIAL AVDL_00547180
AVDL_00547180

PTX-0052.1

# Contents

- Summary Reminder & Key assumptions
- Clinical development
- PK analysis
- Formulation
- Patents analysis (FTO)
- Timeline

Flamel Technologies Confidential FT218 DoDo - Technical Meeting 01-17-2013 2

HIGHLY CONFIDENTIAL AVDL_00547181
AVDL_00547180

PTX-0052.2

# Summary reminder

- **Objective**:

  **Development of an extended release powder for oral suspension of sodium oxybate using Micropump®.**

- **Xyrem®** (*Jazz Pharmaceuticals*): only product approved by FDA (2005).
  **Net sales** in 2012: **M$ 380** (was M$233 in 2011, M$142 in 2010 and M$96 in 2009)
  **Dosage:** Two equal doses: 1st dose taken at bedtime and 2nd dose **2.5 to 4 hours later !!**

- **Target Product Profile:**
  - **Dosage form**: Powder for reconstitution
  - **Presentation:** Sachet - 4.5g, 6g, 7.5g and 9g strength
  - **PK:** ER product to provide patients with 7 to 8 hours of continuous sleep, with only one administration at bedtime.
  - **Other:** Easy to use correctly and safely - Reduce the risk of overdose due to dosage

- **Major risk of deviation or issue:**
  - **Schedule I** of Sodium oxybate: -> Long and difficult import/export process.
  - **Narrow safety margin** and **criminal use** : Agencies will be very sensitive.
  - **Food effect** on the PK of sodium oxybate. What impact on our formulations ?

# Key assumptions

1. **Manufacturing of pilot batches in Pessac**

Import in US will be an issue
API from US (EUTICALS)
Manufacturing of Pilot batches (Pessac)
1st PK Pilot study in US
Back-up choice if issue with US API
API from India (CENTAUR)
1st PK Pilot study in France (or in Canada)

2. **Perform the pivotal studies in the US**

API from US (EUTICALS)
Manufacturing of Pivotal batches (US CMO)
Pivotal study in US

3. **Manufacturing of pivotal and commercial batches in US with US API**

4. **Prefer the use of the US API for the whole development.**

Flamel Technologies Confidential FT218 DoDo - Technical Meeting 01-17-2013 4

HIGHLY CONFIDENTIAL AVDL_00547183
AVDL_00547180

PTX-0052.4



Clinical development
Flamel Technologies
Confidential
FT218 DoDo - Technical Meeting
01-17-2013
5

HIGHLY CONFIDENTIAL
AVDL_00547180
AVDL_00547184
PTX-0052.5



Development Plan - Proposition
Current proposition
API from US (EUTICALS)
Manufacturing of Pilot batches (Pessac)
IMPD (France)
1st PK Pilot study in France Dose = 4.5g (3 MR formulations vs. Xyrem®)
2nd PK Pilot study in France Dose escalating
Pre-IND Meeting with FDA (agenda tbd.)
Manufacturing of Pivotal batches (US)
Pivotal study in US
Time
Cost
Strategy
Risk
FDA
Flamel Technologies
Confidential
FT218 DoDo - Technical Meeting
01-17-2013
6



PK Analysis
1- Food Effect
2- Simulated PK profiles
Flamel Technologies
Confidential
FT218 DoDo - Technical Meeting
01-17-2013
7

HIGHLY CONFIDENTIAL
AVDL_00547180
AVDL_00547186
PTX-0052.7

# Reminder: Pharmacokinetics of GHB

## negative food-effect

- **Significant decrease of AUC and Cmax is observed when taken with food, concomitant with a delay of Tmax**

**Table III** Effect of Food on the Pharmacokinetics of Sodium Oxybate

| Parameter | Fasted State ($n = 34$) | Fed State ($n = 34$) |
|---|---|---|
| $AUC_{0-\infty}$ (μg•h/mL) | 289 (109) | 188* (80.0) |
| $C_{max}$ (ng/mL) | 142 (34.2) | 60.1* (20.1) |
| $t_{max}$[a] (h) | 0.75 | 2.00** |
| $t_{1/2}$ (h) | 0.57 (0.30) | 0.68 (0.22) |
| CL/F (mL/min/kg) | 3.7 (1.4) | 6.2 (3.2) |
| $V_z$/F (mL/kg) | 192 (193) | 384 (324) |
| Urinary recovery (%) | 3.8 (2.0) | 3.5 (1.8) |
| $CL_R$ (mL/h) | 490 (251) | 826 (462) |

Data presented as mean ± standard deviation.
a. Median.
*$p < 0.05$. **$p = 0.001$.

*Figure 2. Mean (± SEM) plasma oxybate (GHB) concentration-time profiles in healthy adult females (n = 34) following a single oral dose of 4.5 g sodium oxybate oral solution under fasted and fed conditions.*

*(L.A. Borgen et al. 2003)*

- **After an high-fat meal, the absorption is significantly delayed**

# Reminder: Pharmacokinetics of GHB

## negative food-effect

- **Xyrem® is supposed to be administered at least 2h after meal even if a decrease of AUC is still observed 2h post-fed**

Because food significantly reduces the bioavailability of sodium oxybate, the patient should allow at least 2 hours after eating before taking the first dose of sodium oxybate. Patients should try to minimize variability in the timing of dosing in relation to meals.

2 x 4.5 g, 2h post-fed
2 x 2.25 g, 2h post-fed

*Clinical Pharmacology and Biopharmaceuticals review (OCPB), NDA 21-196*

# Negative Food-Effect

- Depending the fat of the meal, the food effect shows different intensity: we **suppose a competition with fat of food on the transporters**

Concentration (ug/mL)
Time (h)
2h after a standard meal
2h after a light breakfast

*Xyrem, 2 x 2.25g*

*FDA 21-196 Biopharm P1 & P2*

- **Absorption of GHB takes place through transporters:** MCT (-1, -2, -4) monocarboxylates transporters *(Lam & al., 2010)*
- **These transporters are dedicated to the absorption of short-chain fatty acids** *(Ritzhaupt &al. 1998)*

➔ **Negative food effect could be due to competition between GHB and SCFA on the MCT**

HIGHLY CONFIDENTIAL
AVDL_00547180

# Negative Food-Effect

- 2h post fed, a food effect is observed: **How long does it last?**

*Xyrem, 1/2 x 4.5g*

- *FDA 21-196 Biopharm P1 & P2*
- *L.A. Borgen et al. J. Clin. Pharmacology, 2003*

- **2h after the meal, the food-effect is still observed**, at least during 1h (time of absorption for the 4.5 g dose)
- **6h after the meal, the food effect is not observed in the upper part of the GIT** (place of absorption of the 4.5 g dose)

# Negative Food-Effect

- 2h post fed, a food effect is observed: **How long does it last?**
  - The micropump microparticles will be administered 2h after meal and will transit at the same rate than the food: they will be in 2h-post fed conditions during their all transit
  - These "2h-post-fed conditions" will evolved with time
  - Sources of the SCFA:
    - In the fat of the meals (mainly from milk products), absorbed in the small intestine: can directly influence the absorption of GHB
    - Production by anaerobic fermentation of the undigested carbohydrate by enteric bacteria in the large intestine (Gill & al. 2005): can influence the absorption of GHB in the caecum

➔ We assume that the duration of food-effect is mainly related to the duration of the digestion of SCFA in the small intestine

- **Good case:** rapid digestion (4h after ingestion, 2h post-dose): no food effect for the second part of the profile
- **Bad case:** slow digestion: food effect expected for all the profile

➔ **We can't answer witch hypothesis is the right one**

➔ **There is a risk to observed a low concentration of GHB 4h after administration**

# Targeted PK profiles

- **Requirements for the clinical study:**
  - Dose= 4.5 g (vs Xyrem® 2 x 2.25 g)
  - To be compared to Xyrem®:
    - Cmax ≤ Cmax(Xyrem): in order to avoid toxicity
    - Cmin ≥ Cmin(Xyrem): we assume efficacy related to threshold of concentration
  - Performed under therapeutic condition: Post-fed, at bed time.

- Simulations done in the fasted state
  - **Target 1 : Pulsatile profile**
    2 waves 50%/50% of the dose, Tlag= 2,5 - 4h between the waves
  - **Target 2 : Mix IR/SR**
    IR part close to 50%, SR profile with short Tlag and rapid T80%
  - **(Jazz-SR-like):**
    SR profile combined with a part of IR – **NOT Preferred**

HIGHLY CONFIDENTIAL
AVDL_00547180

# Target 1- Pulsatile Profile

- Simulated profile: dose= 4.5 g, **fasted state**
- Xyrem profile: dose = 2 x 2.25 g, 2h-post light breakfast

120
100
80
60
40
20
0
% Dissolved
0
1
2
3
4
5
6
Time (h)
Tlag = 4h
Tlag = 3h
Tlag = 2.5 h

2 x 2.25g, 2h after a light breakfast, FDA 21-196 Biopharm P2
Tlag = 4h
Tlag = 3h
Tlag = 2.5 h
60
50
40
30
20
10
0
Conc (ug/mL)
0
2
4
6
8
10
Time (h)

➔ As expected, the second peak is smaller than the first one due to the smaller absorptivity in the distal part of the GIT and null absorption in colon

➔ A short Tlag leads to higher profile but has higher probability to be impacted by the food-effect (not taken in account in the simulations)

Flamel Technologies Confidential FT218 DoDo - Technical Meeting 01-17-2013 14

HIGHLY CONFIDENTIAL
AVDL_00547180
AVDL_00547193

PTX-0052.14

# Target 2- Mix IR/SR Profile

- Simulated profile: dose= 4.5 g, **<u>fasted state</u>**
- Xyrem profile: dose = 2 x 2.25 g, 2h-post light breakfast

SR (Tlag 1h, T80% 2h)
Patent Jazz, SR
mix 40%IR/60%SR
Patent Jazz, mix IR/SR
% dissolved
Time (h)

mix 40%IR/60%SR
Patent Jazz, mix IR/SR, 4g
Pulsatile profile Tlag = 3h
2 x 2.25g, 2h after a light breakfast, FDA 21-196 Biopharm P2
Conc (ug/mL)
Time (h)

➔ **Our strategy is different from Jazz:**

- mix IR/SR with part of IR close to 50% (i.e 40% IR/60% SR)
- SR with Tlag at least 1h and rapid release (T80% 2h)

Flamel Technologies Confidential FT218 DoDo - Technical Meeting 01-17-2013 15

HIGHLY CONFIDENTIAL AVDL_00547194
AVDL_00547180

PTX-0052.15

# Conclusions

- **Negative food effect** is assumed to be due to a competition between SCFA and GHB on transporters

  **How long does it last ?** We cannot precisely determine the duration of the negative food effect: there is a risk to observe a low concentration of GHB 4h after administration

- **Proposal of prototypes:**
  - **Target 1 : Pulsatile profile**
    - 2 waves 50%/50% of the dose, Tlag= 2,5 - 4h between the waves depending of what is technically possible
  - **Target 2 : Mix IR/SR**
    - IR close to 50% to ensure high first peak
    - SR with Tlag between 1h and 2h, T80% 2h or 3h

HIGHLY CONFIDENTIAL AVDL_00547195
AVDL_00547180

PTX-0052.16

# Formulation development

- API properties
- Preliminary considerations & design

Flamel Technologies Confidential FT218 DoDo - Technical Meeting 01-17-2013 17

HIGHLY CONFIDENTIAL AVDL_00547196
AVDL_00547180

PTX-0052.17

# API Properties : Chemistry

- **Name :**

  Sodium oxybate , GHB, γ-hydroxybutyric acid sodium salt, sodium 4-hydroxybutyrate

- **Chemical structure :**

  Molecular formula : C4H7NaO3
  Molecular weight : 126.09 g/mol

Na+
O-
O
OH

- **pKa :** 4,7 (acid form)

- **Alcaline API** :

  pH of a 0,5% GHB solution in water = 7.8

  *(Ciolino et al. J. Forensic Sci, 2001, vol 46, n°6, p1315-1323)*

Flamel Technologies Confidential FT218 DoDo - Technical Meeting 01-17-2013 18

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547197

PTX-0052.18

# API Properties : Solubility

- **In aqueous media - effect of pH :**

➢ Sodium oxybate is highly soluble whatever the pH in the range [3-7]

➢ API solubility increases with pH

*Note: pH of a 500mg/ml solution in water = 9.8*

GHB solubility (mg/ml)
Solubility (mg/ml)
800
700
600
500
400
300
200
100
0
2
3
4
5
6
7
8
pH

*US6780889 – Orphan Medicals (Jazz)*

- **In organic solvents :**

➢ Solubility in ethanol not known : at least 10g/l – *Hennessy et al. J. Forensic Sci, Nov 2004, vol 49, n°6*

➢ Practically insoluble in methylene chloride

Flamel Technologies Confidential FT218 DoDo - Technical Meeting 01-17-2013 19

HIGHLY CONFIDENTIAL
AVDL_00547180
AVDL_00547198

PTX-0052.19

# API Properties : Stability

- **In Aqueous media pH - effect of pH :**

**Main degradation pathway :** intramolecular esterification in acidic medium leading to lactone formation

A : γ-hydroxybutyric acid
B : γ-butyrolactone

Stability of a 0.5% GHB solution in 0,5M potassium phosphate monobasic buffer – pH adjustment with phosphoric acid or sodium hydroxide :

| GHB solution pH | Beginning of esterification | Remaining GHB after 220 days at RT (%) |
|---|---|---|
| 2 | Cf figure | 32 |
| 4 | > 10 days | 72 |
| 5.2 | > 17 days | 85 |
| 6.4 | > 17 days | 95 |
| 7 | stable | |
| 7.8 (in water) | | |
| 12 | | |

FIG. 4—Hydrolysis of GBL (open circles) and esterification of GHB (filled circles) in pH 2.0 buffer. See text for discussion.

➢ **Good stability at pH ≥7 and Fast degradation at pH 2**

- **In organic solvents : stability over 30 days** of a 10mg/ml API solution in ethanol and methanol *(Hennessy et al. J. Forensic Sci, Nov 2004, vol 49, n°6)*

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547199

PTX-0052.20

# Targeted PK profiles - Reminder

- **Maximum requirements for the commercial product:**
  - Dose= 9 g (vs Xyrem® 2 x 4.5 g)

- **Two types of profiles proposed**
  - **Target 1**
    **Pulsatile profile: with Immediate Release (IR) and Delayed Release particles**
    - 50% IR
    - 50% Delayed-Release, Tlag=3h
  - **Target 2**
    **Mix IR/SR:**
    - IR part around 50%
    - Tlag= 1h and 80% release over two hours

Flamel Technologies Confidential FT218 DoDo - Technical Meeting 01-17-2013 21

HIGHLY CONFIDENTIAL
AVDL_00547180
AVDL_00547200

PTX-0052.21

# Micropump coatings for MR microparticles

- **Release Target 1 : API release 3 hours after intake**

Diffusion coating will be based on the **Micropump II technology**.
*The pH* (triggering API release) will have to be chosen to release the API after the desired in-vivo lag-time.*

- **Release Target 2 : fast release (80% in 2 hours) after a 1h lag-time**

**1st case : Bi-layer** diffusion coating to match the target :

- An external **Micropump II** layer will generate the 1h lag-time
- An internal **Micropump I** layer will allow a sustained release of 80% during two hours after the 1h lag-time

*The pH* (triggering API release) will have to be carefully chosen to allow the sustained release after the desired 1h in-vivo lag-time.*

**2nd case :** single layer coating based on the **Micropump I** technology.
Back-up option (**not preferred** – possible hinderance by the Jazz patent application #US 2012/0076865 if granted)

# GI Tractus : considerations on API release from MP

- Oxybate Formulation intake 2-3 hours after a meal
  →**GIT conditions intermediate between the fasted state and the fed state**

⇒ **Target 1 : API release 3 hours after formulation intake**
Conditions in the GIT area where API should be released (ileum) ~ fasted conditions (pH ~7)

⇒ **Target 2 : API release starts 1 hour after formulation intake**
Conditions in the GIT area where API release should start (duodenum or beginning or the jejunum) ~ between fasted and fed state conditions (pH ~ 5.5 to 6)

**GIT conditions : pH vs transit time in fasted** and **fed** state

# Microparticles design

- **Calculations to determine the minimum drug content of microparticles**

**Assumptions :**

- **Volume of water for reconstitution : ..........................................................80ml**
- **Weight of total API (IR+SR)** :……………………………………………………………**9g**
- **Amount of API (IR microparticles)** : ………………………………………… 4.5g
- **Amount of API (MR microparticles)** :…………………………………………4.5g

*(same IR microparticles used for IR and MR components)*

- **Binder content in drug-layered microparticles** :……………………………**10%**
- **Additional sachet excipients** (% of sachet content):………………………… **25%**
- **Maximum dry content to have an acceptable mouth feeling : ………….. 10%**

*(MR microparticles + neutral cores of microparticles from IR component are considered as the dry matter in the suspension)*

⇒ ***15g of microparticles (IR component + MR component) with 5 g of additional sachet excipients to be dispersed in 80ml of water***

# Microparticles design

- **Calculations to determine the minimum drug content of microparticles**

Considering :

1. the high solubility of sodium oxybate ,
2. the fact that microparticles will have to be small for an acceptable mouth feeling,

**High levels of Micropump coatings will probably have to be deposited on the drug-layered IR microparticles to match the dissolution targets.**

| Micropump Coating level for the MR microparticles (%) | Minimum API content in IR microparticles* (%) |
|---|---|
| 30 | 73 |
| 40 | 80 |
| 50 | 90 |

* To fulfill the requirements listed in the previous slide

➢ **Drug-layered microparticles should have an API content as high as possible.**

HIGHLY CONFIDENTIAL
AVDL_00547180

# MP design : drug-layered microparticles

- **Requirements for microparticles design :**

- Drug-content in drug-layered microparticles will have to be **as high as possible**
- Particles size should be small to have an acceptable mouth feeling for the MR microparticles

→ **Small inert cores vill be used with high-drug-layering levels.**

**Possible options for microparticles design :**

10% Cellets 90
90% Drug layer
90% API
10% Binder

15% Cellets 127
85% Drug layer
90% API
10% Binder

- **Drug-layering process :** aqueous process as a first approach (due to the very high API solubility in water)

- **Drug-layered microparticles will be used :**
  - for the IR component of the formulation
  - as starting material before Micropump coating (for the MR component of the formulation)

Flamel Technologies Confidential FT218 DoDo - Technical Meeting 01-17-2013 26

HIGHLY CONFIDENTIAL AVDL_00547205
AVDL_00547180

PTX-0052.26

# MP design : drug-layered microparticles for IR

- **Parameters to consider :**

- API highly hygroscopic and strongly alkaline:

→ Possible interaction with enteric polymers from the Micropump coating of MR microparticles (could lead to stability issue)

- Possible interaction with some sachet excipients

(ex : Xylitol – cf Jazz Patent US6780889)

⇒ If necessary, a seal coat will have to be deposited onto the drug layer to avoid undesired interactions with sachet excipients and MR microparticles.

Flamel Technologies Confidential FT218 DoDo - Technical Meeting 01-17-2013 27

HIGHLY CONFIDENTIAL AVDL_00547206
AVDL_00547180

PTX-0052.27

# MP design : MR microparticles for Target 1

- **Release Target 1 : API release 3 hours after intake**

➢ Diffusion coating will be based on the **Micropump II technology**.

➢ But , due to the strong alcalinity of API, interactions with the enteric polymers from the Micropump coating are possible (possibly leading to stability issues)

**Solution 1** : Barrier layer between the drug-layer and the Micropump II coating (option followed by Supernus)

**The pH* (triggering API release) will have to be carefully chosen to release the API after the desired in-vivo lag-time.**

**Solution 2** : use of an acidic excipient (i.e. malic acid) in the drug layer

# MP design : MR microparticles for Target 2

- **Release Target 2 : fast release (80% in 2 hours) after a 1h lag-time**

**Bi-layer** diffusion coating to match the target :

- An external **Micropump II** layer will generate the 1h lag-time
- An internal **Micropump I** layer will allow a sustained release of 80% during two hours after the 1h lag-time

**The pH* (triggering API release) will have to be carefully chosen to allow the sustained release after the desired 1h in-vivo lag-time.**

➢ Back-up option : single layer coating based on the **Micropump I** technology.
(**not preferred** – possible hinderance by the Jazz patent application #US 2012/0076865)



Freedom To Operate
Patents and Applications evaluation
Flamel Technologies
Confidential
FT218 DoDo - Technical Meeting
01-17-2013
30

HIGHLY CONFIDENTIAL
AVDL_00547180
AVDL_00547209

PTX-0052.30

# Patent

- **Patent #US 8,193,211** (delivered on June**,** 5th 2012)

**Controlled release compositions of Gamma-Hydroxybutyrate**
**Assignee : Supernus Pharmaceuticals, Inc.** – Rockville – MD (US)
**Expires on :** Sept 13th 2028

| US 8,193,211 claim 1 | No patent infringement |
|---|---|
| 1. A once-daily oral pharmaceutical dosage form, comprising: (a) a liquid immediate release component comprising a gamma-hydroxybutyric acid (GHB) salt, (b) a first delayed release component comprising the GHB salt, and (c) a second delayed release component comprising the GHB salt, wherein the first delayed release component releases GHB in the duodenum and comprises a GHB containing core surrounded by a barrier coat, which in turn is surrounded by an enteric coating comprising a pH sensitive material that dissolves in the duodenum, and wherein the second delayed release component releases GHB in the colon and comprises a GHB containing core surrounded by a barrier coat, which in turn is surrounded by a coating comprising a pH sensitive material that dissolves in the colon. | Remark : our dosage form is not liquid (but the IR component of our formulation will be solubilized after reconstitution)<br><br>1) ***If only one delayed release component***<br><br>2) ***If no barrier coat*** |

**Conclusion**
**No Patent infringement if no barrier layer and/or one single delayed component**

# Patent applications

- **Application #US 2012/0231085 (division of US8,193,211)**

  **Controlled release compositions of Gamma-Hydroxybutyrate**

  **Assignee : Supernus Pharmaceuticals, Inc.** – Rockville – MD (US)

  **Pub. Date :** Sept 13th 2012

  ***Claim1 :*** *An oral pharmaceutical dosage form, comprising (a) an immediate release component comprising gamma-hydroxybutyric acid (GHB), and (b) a delayed release component comprising GHB.*

  ***Claim 2****: An oral pharmaceutical composition, comprising a delayed release component comprising gamma-hydroxybutyric acid (GHB).*

  ➢ **To be checked regularly to see if new claims granted**

- **Application #US 2011/0293729**

  **Novel compositions based on Gamma-Hydroxybutyric acid**

  **Assignee : D&A Pharma** – Paris – (France)
  **Pub. Date :** Dec. 1st, 2011

  ***Claim1 :*** *The present invention relates to a granule of gamma-hydroxybutyric acid or of one of its pharmaceutically acceptable salts, characterized in that it comprises a solid core on which the gamma-hydroxybutyric acid or one of its salts is supported.*

  ➢ **To be checked regularly but probably not hindering (too general)**

# Patent applications

- **Application #US 2012/0076865**

**Controlled release dosage forms for high dose, water soluble and hydroscopic drug substances**

**Assignee : Jazz Pharmaceuticals, Inc.** – Palo Alto – CA (US)

**Pub. Date :** March 29th 2012

***Claim1 :*** *1. A controlled release dosage form for oral administration, the controlled release dosage form comprising: a controlled release formulation comprising at least one drug selected from GHB and pharmaceutically acceptable salts, hydrates, tautomers, solvates and complexes of GHB; and wherein less than 30% of the at least one drug included in the controlled release formulation is released from the controlled release formulation during the first hour after administration.*

> **➢To be checked regularly to see if claims are granted**
>
> **Confirm our preference to focus development on delayed release formulations rather than on sustained release formulations, so we won't infringe a possible Jazz patent if application granted**

HIGHLY CONFIDENTIAL
AVDL_00547180



Timeline
Flamel Technologies
Confidential
FT218 DoDo - Technical Meeting
01-17-2013
34

HIGHLY CONFIDENTIAL
AVDL_00547180
AVDL_00547213

PTX-0052.34



High Level Timeline
2012
2013
2014
2015
2016
Q3-4
Q1-2
Q3-4
Q1-2
Q3-4
Q1-2
Q3-4
Q1-2
Q3-4
Raw material and API sourcing
Development of formulation prototypes
Preliminary stability studies
Batches manufacturing
Regulatory work
1st PK Pilot studies
Stability studies
Adjustment of one formulation prototype
Regulatory work
2nd PK Pilot studies
Stability studies
Scale up & QbD development
Analytical and Tech transfer to CMO
Pivotal batches manufacturing
Regulatory work
Pivotal studies
Pivotal stability studies
NDA writing
NDA filling
Commercial Scale up & Validation
Launch batches manufacturing
Market Approval
Pharmaceutical Development
Clinical Development
Flamel Technologies
Confidential
FT218 DoDo - Technical Meeting
01-17-2013
35

HIGHLY CONFIDENTIAL
AVDL_00547180
AVDL_00547214
PTX-0052.35



Back-up
Flamel Technologies
Confidential
FT218 DoDo - Technical Meeting
01-17-2013
36

HIGHLY CONFIDENTIAL
AVDL_00547180
AVDL_00547215

PTX-0052.36

# Project Team

**PROJECT MANAGER:** Jean-François (Jeff) DUBUISSON

**DIRECTOR of PROJECTS :** You-Ping CHAN

FLAMEL (Directors)

**Formulation:** You-Ping CHAN

**Intellectual Property :** Catherine CASTAN

**Formulation & Analytical Development:** Philippe GORRIA

**Chief Pharmaceutical Officer, Director of Quality & Regulatory Affairs:** Christian KALITA

FLAMEL Venissieux

**Formulation development:** Hervé GUILLARD, (Alain CONSTANCIS)

**Analytical research:** Maximilien BLAS, (Corinne VIALAS)

**PK:** Claire MEGRET, (Florence NICOLAS)

**Clinical trials :** Maryline GUEST

**Tox :** Odile BOUTHERIN FALSON

**Purchasing:** Christelle MANIPOUD

ECLAT

**Operations, VP:** Scott MACKE

**Sales & Marketing, EVP:** Chris KEITH

FLAMEL Pessac

**Quality and Regulatory Affair, Microbiology & validation:** Christophe JUDAS, Philippe RODRIGUES, Frédéric MIRGUET

**Analytical Development:** *Samantha CLAUSTRE*

**Formulation:** *David CHOGNOT*

**Financial Affairs:** Vanessa GASSIOT

HIGHLY CONFIDENTIAL
AVDL_00547180

# EXHIBIT 7

**Jazz Pharmaceuticals, Inc.**

**v.**

**Avadel CNS Pharmaceuticals, LLC**

*Civil Action Nos. 21-691, 21-1138, 21-1594*

# Plaintiff Jazz's Opening Statement

# Chapter 1 – Jazz Becomes an Industry Leader in Sleep Medicine





Dr. Herve Guillard

## Dr. Herve Guillard

- Part of his job at Flamel was **monitoring Jazz's patent portfolio**
- The published application of the '488 patent is one of the Jazz patents **he monitored during the development of FT218**
- Only tested FT218 in DI water because he saw that **Jazz did it first** in Jazz's published patent application
- Had **never** done deionized water testing before

# EXHIBIT 8

**From:** Clark Allphin <Clark.Allphin@jazzpharma.com>
**Sent:** Wednesday, January 16, 2019 2:01 PM
**To:** Christopher Dougherty
**Subject:** RE: From Sandman: Post Meeting Timelines
**Attachments:** image001.png

Thanks, Chris. On CMC call, would prefer to wait for at least one internal team call before going there. Has David Chapman weighed in on this?

As you probably know, we got into once nightly only because Flamel went there first so we had to follow. I still expect it to be a dog in terms of commercial opportunity. Would be good for David to validate the worthiness of another shot on goal.

Clark

---

**From:** Christopher Dougherty
**Sent:** Wednesday, January 16, 2019 1:55 PM
**To:** Clark Allphin
**Cc:** Sean Haggerty
**Subject:** RE: From Sandman: Post Meeting Timelines

Clark,

The change between October 30th and now is interest in their once nightly prodrug formulation, the concept of which they shared at the December meeting (hadn't previously) and is included in the deck I sent you. Additionally, the focus Bill J. previously had on the project was solely on narcolepsy and short-term, not thinking about long-term uses of oxybate outside of narcolepsy. There is also not a lot of optimism about our internal once nightly program.

None of the cons Cuiping highlighted (below) from the meeting on October 30th are applicable:

- Increase in dose, but same amount of liquid so no difference (and they are using flavoring agents as well to mask flavor in their Phase) so not an issue
- Potential for approval via 505(b)2 pathway
- They are working on four formulations for once nightly, our team following the December meeting thinks they have a good shot at achieving their PK

We were catching up on this project in October and still are, but have a plan going forward and you will see comms on that soon.

[REDACTED] They today mentioned they would be happy to set up a call with their CMC consultant – would you like to do that?

Thanks

DTX-0675
Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC
C.A. Nos. 21-691, 21-1138, 21-1594 (GBW)

## Initial Assessment Summary

- Pros:
  - GHB ester prodrug with 0 Na
  - [redacted]
  - PK profile ~ JZP-258, impact on oxybate market
- **Cons:**
  - 1.6x increase in MW thus mass for same molar GHB dose, impact on final dosage form
  - Full NDA package required for an NCE
  - *Unlikely suitable for once nightly regimen but may threat JZP-258 or Xyrem generic*

---

**From:** Clark Allphin
**Sent:** Wednesday, January 16, 2019 4:13 PM
**To:** Christopher Dougherty
**Cc:** Sean Haggerty
**Subject:** RE: From Sandman: Post Meeting Timelines

Hi, Chris. Thanks for some of the context. What's missing is your follow-up from the meeting we had October 30th, where the consensus of the group was we're not interested and your job was to figure out exactly what they wanted from us. At least that's how I recall it. Anyway, seems our interest has increased since then.

Anyway, some questions based on the answers you attached:

1. Can you explain the rationale for selecting delayed release vs. sustained release approach for the formulation?
2. What size particles are you targeting for the formulation?
3. Can you share the simulations of the expected profile with delayed release? What simulation software was used?
4. Can you comment on your approach to meet alcohol ruggedness requirement, which we expect will be imposed, for the delayed release formulation?
5. Although the prodrug may be novel, do you expect it to meet the regulatory definition of NCE for purposes of exclusivity? Can you explain your thinking on basis for that, in light of the fact it is an ester of GHB.

I will for sure have more questions after the team discussion, as I've not gone into their detailed plans yet.

Regards,
Clark

---

**From:** Christopher Dougherty
**Sent:** Wednesday, January 16, 2019 11:49 AM
**To:** Clark Allphin
**Cc:** Sean Haggerty
**Subject:** FW: From Sandman: Post Meeting Timelines

Hey Clark,

Hope you are doing well. Sean and I took this project back over from Bill J. when he left in November. To put it politely, no work had been done from a Corp Dev side in over a year (Bill didn't reply to any of their e-mails following a meeting at JPM last January), so when we took the reins back over, we set up to drive this to a conclusion one way or another.

Devin & Andrew Friedberg stayed in touch with XW during that time, and hosted them back in October for an update. We then just had them in Palo Alto in December, where they presented some new ideas, mainly their concept for a once nightly, which got the team excited (Jeff S., Trudy, Cuiping, Devin, etc. & Jed is also excited). If successful, this would be a once nightly no-low sodium (vs. other assets in development which don't offer both). This formulation would have patent exclusivity into the mid 2030s so would potentially allow for development in indications outside of narcolepsy. They finished their SDE study in Australia and are in the middle of the MDE study and are going to talk to the FDA in April. In talking to our regulatory team, the thinking is they might only need to run a small single safety study and be on the market in the 2022/2023 timeframe (if not with the once nightly, they could potentially with a twice nightly (current formulation) no sodium formulation).

We will keep you in the loop as we move forward. We are going to get a group wide call to discuss next steps.

In the mean, can you send us a list of any questions you have? On the prodrug and or development? I've attached one set of responses from XW that they provided to us ahead of the December meeting which might answer some questions.

Thanks,
Chris

**From:** Clark Allphin
**Sent:** Monday, January 07, 2019 12:43 PM
**To:** Sean Haggerty
**Cc:** Christopher Dougherty; Bill Bennett
**Subject:** RE: From Sandman: Post Meeting Timelines

Hey, Sean – haven't heard back from you or Chris re: deal context. Assume you're all pretty busy with JPM, so will revert later in the week. I also need to confer with a colleague in Tech Ops who is running our current once nightly CMC program, just to see how his experience aligns with the aspirations of XW.

Clark

**From:** Sean Haggerty
**Sent:** Friday, January 04, 2019 5:56 AM
**To:** Bill Bennett; Clark Allphin
**Cc:** Christopher Dougherty
**Subject:** RE: From Sandman: Post Meeting Timelines

Ok great, thanks for the prompt reply Bill!

@Clark, page 4 of Dec deck attached is where we're looking for some of your CMC insight. Product is a Xyrem pro-drug based off valine. October deck has the structure and some physical chemical properties that might be helpful.

Happy to touch base by phone if that would be helpful for you. Just let us know.

Thanks in advance,
Sean

---

**From:** Bill Bennett
**Sent:** Friday, January 04, 2019 8:40 AM
**To:** Sean Haggerty; Clark Allphin
**Cc:** Christopher Dougherty
**Subject:** RE: From Sandman: Post Meeting Timelines

Hi Sean

This would fall to Clark.

Bill

---

**From:** Sean Haggerty
**Sent:** Friday, January 04, 2019 5:34 AM
**To:** Bill Bennett
**Cc:** Christopher Dougherty
**Subject:** FW: From Sandman: Post Meeting Timelines

Hi Bill –

Touching base about Project Sandman, a Xyrem pro-drug we're evaluating. Looking to get some CMC thoughts on Sandman's scale up plan (discussed in attached) and wasn't sure who best from your team could assist in providing us some perspective and could be involved/help moving forward.

Happy to jump on the phone to discuss if easier for you.

Thanks!
Sean

---

**From:** Sean Haggerty
**Sent:** Friday, January 04, 2019 5:30 AM
**To:** Trudy Vanhove; Devin Noblin; Jeffrey Silverman; Lynne Robertson (Jazz Contingent Worker); Philip Jochelson; Cuiping Chen; Andrew Friedberg; Jed Black
**Cc:** Christopher Dougherty
**Subject:** From Sandman: Post Meeting Timelines

Sandman Team –

Happy new year! Passing along a presentation we received from Willie after our mid-December in person meeting that provides more detail on their development plan timing expectations and thinking. To help our thinking on how best to proceed forward working with them, it would be helpful to get your views on this document and if the timelines/regulatory path they present is realistic.

Thanks for the help and don't hesitate to reach out with any questions!

Sean

**Sean B. Haggerty**
Corporate Development
Jazz Pharmaceuticals
2005 Market St | Suite 2100 | Philadelphia, PA 19103
215-832-3732 (w) | 518-225-7740 (m)

**** ATTENTION: CONFIDENTIAL ****

This email message is for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact me by reply email and destroy all copies of the original message. Thank you.

# EXHIBIT 9

**Relativity ID :** JPION00070094

**Custodian :** Clark Allphin

**Master Date :** 6/30/2016 12:00:00 AM

**File Name :** R665-review oxybate once nightly approaches.docx

**Original File Path :** \\us1lssnas04v\LSS\ePS\QSRC\17486\P00019\callphin\OneDrive - Jazzpharma.com\Documents\Projects\JZP...

EXHIBIT
3
10/21/22

DTX-0236
Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC
C.A. Nos. 21-691, 21-1138, 21-1594 (GBW)



|  Technical Memo | R665.00 |
|---|---|
| Review of Oxybate Once Nightly Approaches | |

Background ........ 1

Orphan Medical ........ 1

Jazz early efforts ........ 2

PLE-2 program and follow-on work ........ 4

Oligomers and deuteration ........ 4

Interim work during JZP-386 ........ 5

Re-starting and re-assessing ........ 6

Oxybate once nightly approach ........ 8

Calcium-only, leading to mixed salt ........ 8

Buffering backup program ........ 8

GHB Resinate evaluation ........ 11

Other approaches considered ........ 12

Alternatives to Oxybate ........ 13

Gamma butyrolactone (GBL) ........ 13

Deuterated oxybate or GBL ........ 15

New prodrug ........ 16

Other approaches considered ........ 16

Recommendation ........ 17

**Disclaimer –** This technical memo was drafted in July 2015 and has undergone little modification since, except for addition of references. As of June 2016 when this memo will be finalized, a once nightly program (JZP-324) has been initiated and a backup program (resinate) remains under consideration. This memo reflects the state of understanding before development work commenced and has not been updated with learnings from either experience.

# Background

Jazz and Orphan have conducted several programs aimed at achieving once nightly administration of sodium oxybate. Briefly, the programs and key learnings are summarized in Table 1.

## Orphan Medical

Prior to Jazz acquisition of Orphan Medical, Orphan engaged Shire PLC in development of delayed release beads using Shire's Microtrol technology (dual pulses derived from different pH-triggered enteric

HIGHLY CONFIDENTIAL JPION00070094



coatings on beads). The project was initiated in 2002[1], and prototype formulations were tested in dog in April 2004.[2] The results of dog PK study indicated progressively poorer absorption and higher variability down the GI tract. However, duodenum-targeted beads achieved 53% BA with acceptable variability but poor loading efficiency. A once nightly dose of the best identified formulation would have required 34g of drug product.[3]

Orphan also took the program to SRI International, presumably to explore options beyond Shire's technology. The main approach involved a matrix bead having 50% drug loading, which was then coated with either a rate-controlling or enteric film. High coating weights were required with little improvement on overall drug product mass requirement. The work was incomplete, with no sound conclusions or animal PK study conducted.[4]

**Jazz early efforts**

When Jazz took over Xyrem, a regional absorption study in humans was commissioned. Using a bolus 900mg dose of solid sodium oxybate delivered by Enterion capsule, precise targeting could be achieved. A human 4-way crossover design confirmed the results of the dog study, that absorption is poorer down the GI tract.[5] However, with relative BA of 74% in jejunum and 56% in ileum the absorption is good enough to consider a once-nightly sustained-release formulation of SXB.

Jazz also engaged in limited evaluation of metabolic inhibitors as a means of extending the half-life of GHB. Based on PK simulations and mouse PD assessments, there were no strong leads that could be developed readily.[6] As a result, the once nightly efforts focused on formulation approaches. During the period of 2006-2009, besides developing a pipeline of several 505b(2) and an NCE program, Jazz focused oxybate franchise LCM on expanding into fibromyalgia using an oral solution as the initial dosage form. The once nightly formulation was viewed as LCM for the new indication, so was not vigorously pursued until clinical development using oral solution was almost complete.

---

1 File: Shire Project Update 21-oct-02 in-silico modeling.pdf
2 File: Feasibility study – April 7, 2004.pdf
3 File: Xyrem XR Calculations for Orphan 062804.ppt
4 SRI International, Formulation of Xyrem: pulsatile drug release interim development report, SRI project P13851, January 2015. No final report could be located. File: SRI report pulsatile release formulation GHB.pdf
5 Four way crossover human drug absorption study, investigating the regional absorption of sodium oxybate, compared to an immediate release oral administration, Pharmaceutical Profiles Ltd Study PPL-1035 / 06-004, 2006
6 Liu, Jamieson and Foreman, GHB metabolic inhibitors, GHB prodrugs and GHB receptor agonists – presentation to experimental medicines committee November, 2006.



Technical Memo

R665.00

Review of Oxybate Once Nightly Approaches

Table 1. Chronology of Oxybate Once Nightly Efforts

| Initiated | Program | Form or aspect | Learnings or outcome |
|---|---|---|---|
| 2002 | Shire collaboration | DR beads, enteric | Low BA in dog study, but potentially viable but with high DP mass (~34g); not tested with IR component |
| 2004 | SRI followup | DR matrix beads, enteric | DP mass still a concern, more films are optional; no PK study conducted |
| 2006 | Regional absorption study | Bolus, Enterion capsule | 4-way crossover human PK, 74% BA jejunum, 56% BA ileum, 31% asc colon relative to IR Xyrem |
| 2006 | Metabolic inhibitors | Endogenous, drug-like or approvable | Mouse PD model, no strong leads but some effects |
| 2009 | PLE-2 (SR tablet) | SR tablet | Human PK: High variability, BA in line or slightly lower than expected, pronounced food effect; mean fasted PK matched prediction |
| 2011 | GBL SR | SR softgel (GBL) | Limited absorption window in dog PK study, not viable for duration needed |
| 2011 | GBL oligomers | IR liquid | Activation in GI tract unlikely, systemic exposure deemed likely based on in-vitro evaluation; not attractive |
| 2011 | D-GBL (Concert, later became JZP386) | IR liquid | Human PK: Modest extension in half-life, insufficient alone for QD but possible with formulation |
| 2012 | Prodrug for metabolic extension | IR liquid | (Paper exercise): Mamelak prodrugs unlikely to be absorbed or provide extension of half-life |
| 2013 | Sipper device | Drug/device combo | Design evaluation; viable, but patient market research not favorable |
| 2014 | Inhibition with GHB lookalikes | IR liquid | Rat PK: Potential lead with 1,5-pentanediol / 5-OH valeric acid; no compendial candidates identified |
| 2014 | SR Prodrug for absorption | SR softgel | Paper exercise identified BDO-based prodrugs likely to have good absorption; 2 candidates synthesized |
| 2015 | Initiation of formal Oxybate LCM | N/A | PLE-2 likely failed due to gastric retention, causing high variability; may work well with SR beads |

Note: Between 2006 and 2009, oxybate LCM focused more on expanding into fibromyalgia using oral solution as initial dosage form



**PLE-2 program and follow-on work**

The PLE-2 program took advantage of Shire learnings, human regional absorption data, and PK modeling to arrive at a sustained release tablet as the most preferred formulation. Very high mass efficiency (about 92% drug loading overall) was achieved in the SR tablet. However, a well-powered PK study revealed substantial variability even in the fasted state.[7] Importantly, individual subject data did not track the mean, and certain subjects in the fed state experienced delayed and sometimes biphasic profiles. The mean data, however, was in-line with predictions of the PK model based on in-vitro dissolution data. At the time, the variability was thought to be an inherent property of oxybate. Since recent literature[8] then confirmed that oxybate has carrier-mediated transport and probably paracellular as well, attention was focused on circumventing regional absorption limitations.

GBL was studied as a potential workaround, as an extension of the PLE-2 program. GBL is a prodrug of GHB and, in fact, is absorbed more rapidly than GHB with roughly equimolar bioavailability. A small polar molecule with no charge, GBL might have higher permeability than oxybate anion. SR GBL softgels meeting in-vitro dissolution specifications were site-filled and used in a dog PK evaluation. The results indicated a much more limited region of absorption than oxybate, thus much lower relative BA and shorter duration in-vivo.[9]

**Oligomers and deuteration**

Around the same time, a patent was issued to Metabolix/Tepha based on oligomers of GBL that were shown to produce a sustained GHB profile in mice.[10] Jazz engaged Metabolix with synthesis of oligomers and in-vitro evaluation. The requirement at the time was that there should be no systemic exposure to NCE (ie, oligomers or fragments), which would trigger a tox program more like a systemic-activated prodrug. Instead, the prodrug should cleave in the intestine and release GHB slowly. The in-vitro assessment showed this requirement couldn't be met.[11] In the mouse study, the molecular weight of the oligomer would have been far too high for absorption. Lacking enzymes capable of degrading it in the small intestine, the most plausible explanation for the mouse result was activation by bacteria in large intestine.

In 2011, Concert approached Jazz with deuterated GHB. Rat data were initially promising, but dog PK study funded by Jazz was less so.[12] Nevertheless, Jazz in-licensed the opportunity and this became JZP-386. Human PK results in 2015 showed some extension of half-life, but a degree insufficient to promote

---

[7] CSR Study 08-009

[8] Lam W, et al, Monocarboxylate transporter-mediated transport of gamma-hydroxybutyric acid in human intestinal caco-2 cells, drug metabolism and disposition 38(3): 2010.

[9] Pfeiffer J, PK Summary, MPI Study 1301-004, Technical memo R276, 2011.

[10] Willams SF and Martin DP, Therapeutic uses of polymers and oligomers comprising gamma-hydroxybutyrate, US Patent 6,623,730 B1, 2003.

[11] Allphin C, Evaluation of GBL oligomers for extended release of GHB, Report R295, 2012.

[12] Pfeiffer J, Pharmacokinetics of deuterated GHB in dogs, Technical memo R288, 2011.



once-nightly therapy on its own. Instead, a formulation vehicle would be required. The program is still an option for LCM, and an initial PK estimate indicates that a roughly 70% immediate release and 30% sustained release (3h duration) would meet requirements.[13] During the conduct of JZP-386, four other once-nightly approaches were evaluated with less vigor, as a hedge given the relatively low probability of success of deuteration. These are described next.

**Interim work during JZP-386**

In collaboration with Orphan, a family of prodrugs was patented by Mamelak and ultimately assigned to Jazz.[14] In 2012, an analysis of the structures and "deliverability" was undertaken. Based on in-silico models, the relatively complex prodrugs were predicted to have poor or incomplete intestinal absorption without some activation (ie, breakdown by gut flora). Effecting GHB sustained release through gradual prodrug metabolism in small intestine is deemed an unreliable approach prone to food effects and inter-patient variability. It also doesn't circumvent the poor lower GI absorption of the GHB which is released from the prodrug. Therefore, the Mamelak prodrugs were not progressed to animal studies.

Inspired by patients' willingness to use CPAP devices for sleep, a drug-device combination for Xyrem was conceived. The "sipper" was an in-mouth appliance that delivered SXB solution to saliva, which would be swallowed passively and conceivably exhibit high BA similar to immediate-release. Charged with a dosing syringe to inflate small bladders, the mouthguard-like device would then release Xyrem in the mouth over 4-5 hours while patient slept. While initial engineering assessment indicated feasibility[15], patient market research (conducted in February 2014) did not.

In 2014, the idea of metabolic inhibition was revisited with 1,4-butanediol and the inhibitor fomepizole as well as other diols.[16] Although fomepizole failed to show higher GHB AUC (likely due to enhanced renal clearance of BDO), a solid hit was observed in rat PK studies with 1,5-pentanediol. It is speculated that the metabolic product 5-hydroxyvaleric acid is the GHB lookalike responsible for competition for GHB metabolizing enzymes. Because neither 1,5-pentanediol, 5-hydroxyvaleric acid, nor any other omega-hydroxyacid are approvable without extensive tox, the research is on hold until more short-term options are evaluated.

Along the same lines, a sustained release prodrug could offer better lower GI absorption with less variability than oxybate. Rather than target systemic extension of half-life, the approach looks for better absorption from formulation vehicle. Based on in-silico screening[17], two BDO-based structures were

---

[13] Eller M, "Deuterium session – working session of oxybate LCM", August 28, 2015. Informal communication.
[14] Mamelak M, et al, Gamma-hydroxybutyrate compositions containing carbohydrate, lipid or amino acid carriers, US Patent 7,015,200 B2, 2006.
[15] File: Jazz_Phase1 design_09 05 13.pdf -- Phase 1 design concepts from Speck Design, 2013.
[16] Absorption Systems Study 14JAZZP1
[17] Allphin C, Prodrug evaluation for GHB delivery, technical memo R391, 2014.



identified and synthesized for characterization in 2014. Those could be delivered in sustained-release softgel form, but would be prone to variability in gastric transit, due to the number of softgels required. Furthermore, prodrugs would be NCE and require more tox, though probably less than would be required of potential competitive substrates for metabolism. This approach is suspended as well.

**Re-starting and re-assessing**

In 2014 Flamel announced acceptable PK results with a multiparticulate approach. This triggered a re-assessment of conventional SXB delivery options and, in particular, reconsideration of the cause of PLE-2 failure. A review of external experience with SXB, as divulged in patent applications, indicated mixed results with beads as well as tablets.

Shire, as previously mentioned, tested formulations in a dog PK study[18] which indicated that the shortest duration enteric coat (jejunum-targeted) can provide acceptable BA (53%) and variability, albeit with a heavy drug product mass. On the other hand, ileum-targeted beads had much higher (and unacceptable) variability, and considerably lower bioavailability (27%). Neither beads were dosed with an immediate-release component. The result of late-targeted beads may reflect transit and absorption in large intestine.

D&A developed SR beads of 3-4h duration for alcohol dependence. Limited information disclosed in patent application suggests the beads afforded extension of PK when dosed alone.[19] The duration was effectively extended about 1h and BA relative to oral SXB was 83%. However, the SR beads dumped in presence of a 50% IR dose.

Laboratorio Farmaceutico ("Lab Farm") developed a SR tablet for alcohol treatment, using a combination of matrix tablet coated with a SR film.[20] In single tablet (1000mg SXB) dosing, good extension of PK was achieved with low variability. This example suggests that high variability of PLE-2 may be associated more with the number of tablets administered, rather than the tablet size. Tablets in this example were considerably larger than PLE-2 SR tablets.

The PLE-2 formulation failed more due to individual variability than mean behavior. Although individual profiles did not track the mean, the mean fasted profile was consistent with that expected from the original PK modeling. Furthermore, more detailed modeling suggests remarkably good agreement with both kinds of SR tablets.[21] Below is a fit to the PK model based on (a) setting constant regional BA based

---

[18] Liang L, et al, Controlled release compositions of gamma-hydroxybutyrate, US Patent 8,193,211 B2, 2012
[19] Suplie P and Lecoustey S, Gamma-hydroxybutyric acid granules, US patent application 13/984,922, 2014.
[20] Conte U, et al, Controlled release pharmaceutical compositions based on one or more pharmaceutically acceptable salts of gamma hdyroxybutyric acid, US Patent 5,594,030, 1997.
[21] Allphin C (for Sathyan G), 09-002 (PLE-2) study modeling and simulation, Technical Memo R616, 2015. Group B refers to the EC/HPC SR film, and Group C refers to the EC/P188 film both administered 6g dose in fasted state with no IR component.



on overall BA of dosage form, and (b) relative input time adjustment of 16%. The latter reflects that in-vivo behavior is somewhat slower than in-vitro; hence, a 6h system would behave in-vivo as a 7h one.

The most likely root cause of PLE-2 failure appears to be variable gastric retention of tablets in the fasted state. Single large tablets are passed relatively quickly when administered in fasted state, as evidenced by Lab Farm's results as well as literature studies with large non-disintegrating tablets and capsules.[22] Although single-tablets in fasted state are generally not retained, few studies with multiple (large) tablets have been undertaken. In the fed state, it is well known that even modest-sized tablets are retained for surprisingly long and variable periods. Thus, the unusual fed-state behavior of PLE-2 can easily be explained by gastric retention and should be substantially reduced or eliminated with a multiparticulate dosage form.

If the root cause of PLE-2 variability is gastric retention of the tablets, then a multiparticulate approach may be viable for once nightly.

---

[22] Davis, Hardy and Fara, Transit of pharmaceutical dosage forms through the small intestine, Gut, 1986, 27, 886-892. Capsules larger than the PLE-2 tablets (25x9mm vs about 18x8mm for PLE-2) were studied in several of the trials and found to exhibit relatively low gastric residence and variability between subjects.

## Oxybate once nightly approach

### Calcium-only, leading to mixed salt

The preferred product is a sustained release mixed oxybate salt. In a marketplace of two oxybate once-nightly products, it would differentiate from sodium-oxybate and make for an easier transition from OMSOS. Further differentiation may be expressed in the final dosage form.

The mixed salt, however, involves development of two new API processes and the complexity of integrating these into a sustained release formulation. To speed development time, a staged approach is proposed which ultimately may result in the mixed salt but also affords the possibility of a slightly faster once-nightly single-salt (calcium or sodium).

Calcium oxybate is chosen as the single-salt option, because it may circumvent problems associated with the hygroscopicity of sodium oxybate. These problems may have complicated Shire's development of pellets, resulting in excessive coating requirements, and may have also limited Flamel's progress in their own development. By switching to a non-hygroscopic salt amenable to both compression and extrusion/spheronization, we may gain back some time. Calcium is also the majority salt in the mixed option, and a requirement for the first-line mitigation approach (buffering) should PK results demand it.

1. Develop calcium oxybate API process
2. Develop immediate-release beads using extrusion/spheronization (primary approach) while concurrently developing a process for magnesium oxybate. Place calcium oxybate IR beads on stability and begin screening SR coatings with calcium only. Select a coating and place on stability. Depending on the status of magnesium oxybate process, step 3 may be skipped in the interest of timing.
3. When magnesium oxybate is available, evaluate IR and SR beads containing a 2:1 blend of calcium and magnesium oxybates, using formulation and parameters derived from calcium-only studies. Place those on stability. If difficulty in encountered, there is always the option of moving forward with calcium-only.
4. Scale-up and manufacture an engineering lot of IR beads coated to two film weights corresponding to "fast" and "slow".
5. Manufacture CTM.

Off critical path, the sodium oxybate IR beads could be evaluated. However, PK arms requiring immediate release could be done with either SXB powder or liquid form.

### Buffering backup program

The "main path" development is for a sustained release pellet. This puts more absorption in the ileum than a delayed release bead that Flamel may be developing. In the event that PK variability is still too high or overall BA is too low, then buffering has a better chance of overcoming it.

 Oxybate conventionally is delivered as the fully ionized salt form. Due to the magnitude of the dose, the oxybate itself has substantial buffering capacity relative to the buffering capacity of the total small intestinal fluid. The estimate below, based on literature values, indicates a reasonable estimate of 0.83 mEQ/pH for the overall buffer capacity of small intestine. This stands in contrast to an expected SR dose of about 48 mEQ delivered to small intestine over 5h. Even a worst-case estimate of overall buffer capacity is several-fold less than the oxybate dose. Therefore, if oxybate is delivered as a buffered mixture, it is very likely that this will largely set the pH of its own absorption.

| | Median (range) | Reference/result |
|---|---|---|
| Intestinal volume, ml | 83 (45-319) | Schiller[23] |
| Buffer capacity | 4-13 mEq/L/pH | CMM Perez[24] |
| | 10 mEq/L/pH | Jantratid and |
| Total capacity | 10 * 0.083 = | 0.83 mEq/pH |
| Worst case | 13 * 0.319 = | 4.2 mEq/pH |

The intestine isn't static, though, so bicarbonate diffusion will partially compensate for the lower pH. To overcome that, a nominal pH target of 4.5 (50% ionization) is sought, with the expectation that the actual pH achieved may be 5.5 or so. Based on Caco-2 permeability studies by Lam et al, reducing the pH by 1 unit in the small intestine should double the permeability.[26] The directional influence of pH is expected to be the same for both active (MCT) and passive (paracellular) transport.

Self-buffering of oxybate is achieved by in-situ chelation of a solid acid with calcium oxybate, releasing GHB and retaining the calcium acid salt as precipitated solid. Shown below is the displacement that would occur with tartaric acid and calcium oxybate.

(1) $Ca^{++} (GHB^-)_2$ + Tartaric acid → 2 GHB + $Ca^{++}$ (Tartrate) (s)

Because the calcium tartrate is not available to buffer the intestinal fluid, this is substantially more efficient than simply co-releasing an acid along with an oxybate salt. As a result, 50% ionization can be achieved with a 30% increase in drug product. Another advantage is the actual calcium available for absorption is reduced by 50%. Assuming buffering achieves bioavailability comparable to Xyrem, it becomes mass-efficient when the unbuffered bioavailability is less than about 75%. Since the targeted

[23] Schiller et al, Aliment Pharmacol Ther 2005; 22: 971-979
[24] CMM Perez, J Pharm Pharmacol 2006 Aug 58(8): 1079-89
[25] Jantratid and Dressman, Dissolution technologies August 2009 (FaSSIF-V2 justification)
[26] Lam, Felmlee and Morris, Monocarboxylate transporter-mediated transport of γ-hydroxybutyric acid in human intestinal Caco-2 cells, Drug Metabolism & Disposition 38(3), 2010. See Figure 2.



profile, based on PLE-2 results, is expected to get about 70% bioavailability overall, buffering is considered as a mitigation in case actual BA is much lower or variability is still too high.

Feasibility evaluations have established very good pH control throughout the delivery profile, and have also identified challenges and possible solutions with regard to solid state stability. Premature activation by water is problematic, because the GHB formed is liquid and readily forms GBL which evaporates. Further CMC work is proposed in parallel with "main path" activities so that, if needed, buffering can be implemented with reduced risk and time. These activities include:

- Process feasibility for making buffered IR beads. We anticipate this will require a water-free "mini-tab" approach, but may also evaluate extrusion/spheronization using organic solvents.
- SR coating studies, using same film selected for "main path" SR beads.
- Stability studies to establish packaging and process requirements, particularly with regard to salt form (monohydrate vs hydrates) and hygroscopicity of excipients. For planning purposes, we assume that only anhydrous calcium oxybate will be acceptable.
- In-vitro intestinal permeation studies to establish the effect of pH on permeability, as well as effects of bicarbonate counter-transport.



**GHB Resinate evaluation**

Resinates very small diameter coated beads which can feel like a liquid when given in suspension. They are very patient-friendly, particularly for small-dose drugs given to children. For oxybate, however, a GHB-resinate approach pushes the boundaries of the technology in several ways:

1. The amount of resin needed, theoretically, is at the limit of what has been approved for daily administration (cholestyramine). In that case, the anion-exchange resin is given four times per day, and our product would require patient exposure all at once.
2. Close to 100% theoretical loading is difficult if not impossible to achieve with existing chloride-bearing resins. To achieve a reasonable amount of drug product mass, this would be required and may restrict us to a non-compendial resin (such as hydroxide-bearing resins).
3. Resins work by exchanging anions in the GI tract, liberating the anionic drug originally bound to the resin. The dose of oxybate is far higher than any other drug-resinate, and exceeds the anion capacity of the gut. Therefore, the approach may fail to work in-vivo as expected. There is a possibility that an SR coating may not be required due to this limitation.
4. Resins are normally presented as non-viscous liquids, because the amount of drug-resinate relative to liquid is small. In the case of oxybate SR, the required amount of drug-resinate is such that a large volume of water would be required – about 12 ounces minimum. This is much more than would be required of conventional SR beads, due to the tremendous swelling of resins.

It is difficult to envision how a resinate approach would mitigate PK failure of conventional SR beads, since most literature indicates gastric emptying and small intestinal transit of beads is relatively size-independent. Since oxybate is liberated in anionic form, the regional absorption with a resinate would be expected to be similar to that of a conventional bead. The main advantage of a GHB-resinate might be its intrinsic brake on absorption that's the result of the high molar dose of oxybate and reliance on gut anion exchange. If this effect can be demonstrated, then there is a possibility that a GHB-resinate may be more intrinsically safe toward overdose or potential abuse.



**Other approaches considered**

SR Tablets. If the underlying reason for the tablet variability is due to size and shape rather than number of tablets, then sustained release tablets may be an acceptable alternative to beads. Studies with smaller tablets (5mm diameter rounds) indicate they travel through stomach and small intestine in unison.[27] Nevertheless it is difficult to see the advantage over beads, and would still have more pronounced food effect.

Gastro-retentive tablets require at least a light meal for safe activation. Otherwise, safety risks preclude fasted administration. (In other words, in order to allow rapid enough swelling to avoid premature passage, there's a risk of premature swelling in esophagus.) GR tablets haven't been successfully developed for fasted state, and even in fed state are limited to about 2-3 large tablets. At least 9 large tablets would be required to deliver the expected therapeutic dose of oxybate.

Floating or mucoadhesive beads would prolong release in stomach and possibly in small intestine. However, there is little clinical evidence of successful application of this approach. Many such approaches shown to work in animal studies failed in human experience.[28] Resins, such as cholestyramine, have been shown to prolong gastric residence but with very small doses (25mg).[29] Mucoadhesion for gastric retention may not apply for a large dose of beads required for oxybate. Here a rough calculation may be illustrative. Assuming 50% of stomach surface ($800cm^2$) is occupied with beads of 100-micron diameter ($400cm^2/g$), the total amount of beads eligible for adhesion is only 1g. Depending on whether this is a resin or conventional small-diameter coated bead, this is somewhere between 3% and 7% of the dose. There simply isn't enough stomach surface area to handle an appreciable amount of the oxybate dose!

Ileal braking is an approach for slowing small intestinal transit by co-administering fats or fatty acid in the ileum, triggering a feedback process intended to optimize digestion of dietary components. If it worked, this might be a good fit for oxybate – a modest amount of fat wouldn't add much to the comparatively large oxybate dose. Unfortunately, results are mixed and it doesn't seem a reliable mechanism – what time is extended seems to be due to holdup at ileal-cecal junction (Davis 2005).

Administration of non-caloric gel meal may be an effective means of obtaining the modest amount of gastric retention sought. For meaningful retention, though, the gel would need to be fairly stiff, not

---

27 Khosla R, Davis S, Gastric emptying and small and large bowel tansit of non-disintegrating tablets fasted subjects, Int J Pharm, 52 (1) 1989, 1-10.

28 Davis S, Formulation strategies for absorption windows, Drug Del Technology 10 (4) 2005.

29 Jackson SJ, et al, Effect of resin surface charge on gastric mucoadhesion and residence of cholestyramine, Int J Pharm 205 (1-2), 2000, 173-181.



prone to syneresis (wringing of water), yet digest completely. Although some success has been seen with rat studies[30], lack of any precedence in humans elevates the risk of failure or adverse effects.

## Alternatives to Oxybate

By introducing a once-nightly product that is not GHB, we may be able to compete with another oxybate once nightly product. Several options exist, and selection among them depends on timing and anticipated benefits.

### Gamma butyrolactone (GBL)

GBL is a prodrug of GHB, has undergone NTP tox assessment and is known to convert to GHB within about 2 minutes once absorbed. It has faster absorption than GHB, so much so that – as a prodrug- its Cmax is higher and Tmax is lower than SXB.[31] There have been no reported efficacy trials with GBL, and very limited human PK are available.[32] [redacted] We may credibly introduce GBL in a fashion that competitors couldn't conceive without a GMP method of manufacture that doesn't involve industrial-sourced GBL.

Because GBL has no INN or USAN, we may use naming to further distance the new product from its past and to differentiate it from conventional oxybate. Even within accepted non-INN, GBL has numerous options – 4-butanolide, gamma butyric acid lactone, etc.

Features that potentially distinguish GBL from oxybate include:

- It's a hydrophilic liquid, somewhat unusual for pharmaceutical products
- Much faster absorption in small intestine, about five-fold higher intestinal permeability.[33]
- No cations and likely less incidence of enuresis, because there are no cations
- Maybe less desirable for surreptitious administration in beverages, as the taste of GBL may be more difficult to mask than that of sodium oxybate
- It may have much reduced variability in PK vs. oxybate, because it isn't ionizable, doesn't rely on transporters for absorption and has higher permeability. Dog PK data for IR GBL vs SXB bear this out, although sample size was only 8.

---

[30] Foster KA, et al, Utility of in-situ sodium alginate/karaya gum gels to facilitate gastric retention in rodents, Int J Pharm 434 (2012) 406-412.

[31] Observed in dog PK. See report R276, Figure 1.

[32] Gamma-butyrolactone: Critical Review Report, Expert Committee on Drug Dependence, 36th, 2014. http://www.who.int/medicines/areas/quality_safety/4_3_Review.pdf

[33] Arena C and Fung HL, Absorption of sodium gamma-hydroxybutyrate and its prodrug gamma-butyrolactone: relationship between invitro transport and in-vivo absorption, J Pharm Sci. 1980 Mar;69(3):356-8. Measurements with everted rat intestine clearly demonstrate lack of capacity-limited absorption in regime where GHB has such, and about five-fold higher permeability at 0.4M concentration.



- Because it doesn't rely on transporters, it doesn't have capacity-limited absorption as oxybate does. As it's rapidly converted to oxybate after absorption, its elimination has same limitations as oxybate, of course.
- It may be expected to have a smaller food effect vs. Xyrem as immediate-release, but uncertain if this would be true in once-nightly formulation.
- No first-pass metabolism is expected from GBL. Although first-pass metabolism of GHB is relatively modest in humans (~12%), it may contribute to inter-patient variability. In animal models, particularly rat, GBL has substantially higher bioavailability vs. GHB due to first-pass metabolism.

A substantial amount of formulation effort was undertaken as the follow-on to PLE-2. A candidate was tested in a dog PK study, and found to have low bioavailability and somewhat higher than expected variability. However, careful analysis suggested that GBL was well absorbed in the small intestine and that the variability was associated with variable gastric emptying of the coated softgels.[34] Neither of these aspects may apply as much to humans, where small intestinal transit is longer and the gastric retention of solid dosages forms is of less duration and prevalence for similar sizes.[35] The softgels used were roughly half the size of PLE-2 tablets, and had no tendency to stick together in the finished form.

The desired duration of absorption is around 4h for once nightly, which is within range of oral-cecal transit time in humans. A modest gastric retention would be favorable, as would modest slowing of transit due to "braking" action of GHB itself, if that bears out.[36]

GBL formulation options include:

- SR coated softgels (similar to what was used in dog study)
- SR coated matrix softgels – limit risk of liquid dose-dumping – probably preferred approach
- Matrix softgels – simpler overall, if non-zero order profile acceptable; possibility it may float and exhibit modest retention

---

[34] Pfeiffer J, Simulation of pharmacokinetic profiles after administration of GBL dosage forms, R278, 2011. Three GBL softgels were administered to dogs. In the analysis, Pfeiffer simulated the combined effects of variable retention and the reduced absorption window, and explains very well three starkly different individual PK results. The analysis and data are consistent with complete absorption in small intestine for 2h and no absorption in colon, consistent with the expected transit time in dogs (111 minutes).

[35] Lallo AK, et al, Decoupling the role of image size and calorie intake on gastric retention of swelling-based gastric retentive formulations: pre-screening in the dog model, Int J Pharm 43(1) 2012, 90-100.

[36] Carai 2001 – demonstrated GHB effect on small intestinal motility in mice, which was confirmed by Jazz work with Absorption Systems. Carai determined the effect was Gaba-b mediated. In JPI study with relevant therapeutic dose to mice (200mg/kg), GI transit rate was 60% of normal (saline) vs. 28% of normal for a morphine control. Such an effect, if pertinent to humans, would extend the absorption window in small intestine from about 3.5h to about 5.8h. The effect, though, was not evident in the dog PK study of GBL SR.



- SR beads; however, drug product mass may be higher than otherwise with oxybate beads, still within feasible range. Requires absorption onto solid carrier, results in doubling of product mass. Alternative is microencapsulation, but difficult to do with GBL.
- Core/shell matrix. GBL matrix is overencapsulated with retarding matrix (not containing GBL) – should give more zero order behavior after slight startup lag. Similar to Skye's Geomatrix or Geoclock technologies. This can look like a tablet or a capsule-in-capsule.

Because GBL may have no absorption in the large intestine, a combination with oxybate may be sensible. If release of GBL is followed by oxybate, then extention of absorption into the colon may be effective. Such a pattern may be achieved with a few interesting approaches:

- Calcium oxybate suspended in neat GBL, encapsulated in softgel and coated. The calcium oxybate would exhibit poor solubility initially, but solubility will gradually increase as GBL is released and water is taken into the capsule. Thus, calcium oxybate would dominate at the end of the profile, and GBL at the beginning as desired.
- Magnesium hydroxide or a combination of calcium and magnesium hydroxides suspended in neat GBL, also encapsulated and coated. The drug product nominally is GBL-only, but generates oxybate as it is activated during release. The bases have virtually no solubility initially, so no in-situ formation of oxybate occurs until enough GBL has been replaced by water. Takes advantage of knowledge gained from SOI-2. The base mixture is adjusted so that oxybate generation is sufficient for delivery at the end of release.
- GBL/resinate combination. Hydroxide-bearing anion exchange resin is suspended in GBL during manufacture, forming a GHB-resinate suspended in GBL as the core of the dosage form. SR coating outside the whole dosage form meters release. Initially, release is predominantly GBL because gut anion diffusion through GBL is severely reduced until anion (bicarbonate or chloride) solubility in GBL/water is sufficient within the core. Only then will oxybate release from the resin. Because only a fraction of the dose is presented as GHB-resinate, limitations of anion content in intestinal fluid may be less important vs. a resinate-only approach.

### Deuterated oxybate or GBL

The results of JZP-386 human PK evaluation indicate that a formulation will be required to enable D-SXB to achieve the minimum acceptable target. PK simulation suggests that, because some extension of effect was achieved, the ratio of IR/SR in a deuterated product would be closer to 70/30 rather than the reverse for regular oxybate SR. Development of the deuterated option may proceed on two fronts before a ~mid 2016 decision point anticipating more clarity:

1. Improving and then scaling the process for manufacturing deuterated GBL. This involves a feasibility evaluation of heavy-water chemistry that offers more scalability and reduced cost vs the high-pressure deuterium gas process. Concurrently, the conventional high-pressure



hydrogenation custom synthesis of GBL is undergoing scaleup and validation, which will inform future scaleup of the similar deuterium process if the heavy-water chemistry is not feasible.

2. Exploring feasibility of dosage forms that are unique to the deuterated option and, in particular, take advantage of the IR/SR split. These are options that wouldn't necessarily be evaluated otherwise for regular oxybate. These options include:
    a. Matrix formulations, since zero order is less important if most of the dosage form is immediate-release. PK modeling may reveal that a first- or half-order profile is sufficient.
    b. Resinate formulations, since the SR portion is much lower and within the range of viability for a resin approach.

There is also a possibility of making deuterated-GBL as the API rather than oxybate, or having a combination whereby D-GBL is the immediate-release portion and D-Oxybate is the SR portion.

### New prodrug

For different reasons, regular GBL and deuterated oxybate offer nonclinical advantages over a novel prodrug. However, a new prodrug can be designed for enhanced properties, such as better absorption potential in the small and large intestine. A new prodrug may not qualify for NCE exclusivity status, as ester-based prodrugs are generally excluded. [redacted]

Two candidate prodrugs are based on 1,4-butanediol – the biscarbonate and acetate ester. These were selected based on higher likelihood of lower-GI absorption and also better stability vs. GHB-based prodrugs. Presumably, a prodrug would make sense if conventional oxybate SR formulations show high variability or low bioavailability. Therefore, limited work with new prodrugs would focus on describing absorption relative to oxybate. Caco-2 permeation and rat intestinal permeability would be evaluated.

### Other approaches considered

<u>BDO SR</u> – Although there are two metabolic steps before GHB is made from 1,4-butanediol, the extension of effect is relatively modest. Furthermore, the properties of BDO are similar to GHB and GBL in terms of likely intestinal absorption, so may offer little advantage over GBL in that regard. Finally, Jazz has no "ultra clean" BDO process that might be required if we treat BDO as API.

<u>Competitive substrate (metabolic)</u> – A promising lead was identified in rat PK work, but the compound and others like it are not compendial and would likely require a full tox package. The dose of the substrate is high enough such that tox probably can't be avoided in advance of Ph3 trial. Therefore, the option – even if feasible – likely cannot be implemented in a timing required.

<u>P4HB polymer</u> – rectal installation of P4HB polymer, provided by Metabolix perhaps, would likely result in sustained GHB delivery by action of colonic flora. Bacteria break down P4HB to GHB, and the colon



has higher expression of MCTs to facilitate its absorption. Such an appropriate would be unattractive to patient, needless to say, and likely quite variable. As a possibility for LCM outside of sleep where sustained delivery during the day would be useful, a solid (oral) dosage form of P4HB could be useful.

Other longer-term options, such as combination products with gaba-b agonist, GHB analogues, or combination of true gaba-b and selective GHB-agonist – these are out of scope of this review, as cannot be implemented in required timing.

## Recommendation

A "main path" development of the simplest oxybate sustained-release bead which can be done with competitive timing should be fast-tracked. Development is planned in such a way that a calcium-only option can be implemented in the shortest time if absolutely needed, but a mixed option is ultimately developed with slightly longer but still acceptable timing. The mixed option would consist, most likely, of IR sodium oxbate, and sustained release of a 2:1 blend of calcium and magnesium oxybates.

A parallel alternative program is recommended in the event that orphan exclusivity may preclude launching our own oxybate once-nightly. The fastest implementation may be achieved with GBL in sustained release beads or softgels, which is recommended with the expectation of similar or slighty longer timing than the main path. Meanwhile, continued development of deuteration API process and specific formulation options would be undertaken and evaluated as competitive picture emerges.

Both main programs have backup approaches. The extent of CMC work on backups is limited to rationally reduce implementation time or de-risk introduction, should the backup be required to advance the program. However, backups cannot be developed with equal vigor as main approaches.

| Activity/Program | Role | Key activities proposed now through mid-2016 |
|---|---|---|
| Main path oxybate | Primary oxybate | Develop calcium oxybate API, magnesium oxybate API, calcium oxybate SR beads, and ultimately Ca/Mg SR beads. Deliver CTM for Ph1 trials |
| Buffering evaluation | Backup – implemented if PK variability is still too high or BA is too low | Process feasibility, mini-tab evaluation or water-free processing of extrusion/spheronization; coating studies on buffered beads; stability studies to establish requirements for moisture ingress in packaging; in-vitro intestinal permeation to verify approach. |
| GHB Resinate | Backup and defensive – assess possibility of superior product/█ – unlikely to cure failure of PK from other bead approaches | Coating of resinate beads (flexible and non-flexible films); resin sourcing discussions; animal study or relevant in-vitro modeling to determine whether gut anion limitation is an intrinsic control providing limited Cmax and extended release. |



| Activity/Program | Role | Key activities proposed now through mid-2016 |
|---|---|---|
| GBL SR | Primary non-oxybate | Evaluate options for IR bead; if not feasible, progress softgel encapsulation; evaluate matrix core vs non-matrix, evaluate combination approaches GBL/SXB; remainder dependent on outcome and TPP, leading to Ph1 CTM. |
| Deuteration | Parallel or backup non-oxybate, longer timing | Evaluate heavy-water chemistry, formulation options specific to deuteration; scale-up deuteration process after de-risking by running regular GBL custom synthesis scale-up and validation first. If required, pilot PK supplies may be made with available D-GBL if promising formulations are identified. |
| Prodrug | Backup – invoked if GBL SR fails | Characterize stability, permeability (caco-2 and intestinal segment), and formulation options of two candidate prodrugs. Select one prodrug for scale-up. |

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

ATELIERS DE LA HAUTE-GARONNE (French Corporation) and F2C2 SYSTEMS S.A.S. (French Corporation), : CIVIL ACTION

Plaintiffs,

v.

BROETJE AUTOMATION-USA INC. (Delaware Corporation), BROETJE AUTOMATION GMBH (German Corporation), : NO. 09-598-LPS

Defendants.

- - -

Wilmington, Delaware
Friday, March 21, 2014
*Pretrial Conference*

- - -

BEFORE: HONORABLE **LEONARD P. STARK**, U.S.D.C.J.

APPEARANCES: - - -

YOUNG CONAWAY STARGATT & TAYLOR, LLP
BY: JAMES L. HIGGINS, ESQ.

and

KAYE SCHOLER, LLP
BY: SCOTT G. LINDVALL, ESQ., and
JEFFREY H. HOROWITZ, ESQ.
(New York, New York)

and

Brian P. Gaffigan
Registered Merit Reporter

APPEARANCES: (Continued)

KAYE SCHOLER, LLP
BY: PAUL I. MARGUILIES, ESQ.
(Washington, District of Columbia)

and

KAYE SCHOLER, LLP
BY: MICHELLE MAREK, ESQ.
(Chicago, Illinois)

Counsel for Plaintiffs Ateliers De La Haute-Garonne and F2C2 Systems S.A.S.

DRINKER BIDDLE & REATH, LLP
BY: JOSEPH C. SCHOELL, ESQ.

and

DRINKER BIDDLE & REATH, LLP
BY: PATRICK J. KELLEHER, ESQ., DARREN S. CAHR, ESQ., and CARRIE A. BEYER, ESQ.
(Chicago, Illinois)

Counsel for Broetje Automation-USA Inc. and Broetje Automation GmbH

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE: Pretrial conference was held in open court, beginning at 10:01 a.m.)

THE COURT: Good morning, everyone.

(The attorneys respond, "Good morning, Your Honor.")

THE COURT: I'll have you put your appearances on the record for me pleas.

MR. HIGGINS: Good morning, your Honor. Jim Higgins from Young Conaway on behalf of the plaintiffs. With me today from Kaye Scholar are Scott Lindvall, Jeffrey Horwitz --

MR. LINDVALL: Good morning, Your Honor.

MR. HOROWITZ: Good morning, Judge.

MR. HIGGINS: -- Paul Marguilies and Michelle Marek.

MS. MAREK: Good morning, Your Honor.

THE COURT: Welcome to all of you.

Good morning.

MR. SCHOELL: Good morning, Your Honor. Joseph Schoell of Drinker Biddle & Reath on behalf of the defendants. I'm joined this morning by my colleagues, Patrick Kelleher, Carrie Beyer, and Darren Cahr.

THE COURT: Okay. Welcome.

MR. SCHOELL: Thank you, Your Honor.

THE COURT: Thank you.

All right. So we're here for our pretrial conference for a trial scheduled in April. Happily, you all have filed for me very focused filings and there did not appear to be all that much in dispute so I'm hopeful we can move through things fairly quickly this are morning.

The way I intend to proceed is I pulled out what appeared to be at most five disputed issues that have come up and a number of places that I want to start with. Then after that, we'll go through the rest of the pretrial order, and there are a few issues that are kind of it seems in dispute and I may need a little bit of input from you, and then I will give you all a chance to raise any other issues once we have gone through all that in case I haven't touched on whatever you wish to touch on.

So the first issue that I have pulled out is it was unclear to me if the parties agree that discovery is completed or not. I couldn't quite tell what the dispute, if any, was there. I think that comes up at page 15 of your proposed pretrial order so I'll turn first to AHG to address that for me.

MR. LINDVALL: I believe, Your Honor, that discovery is completed now. The supplemental reports and the additional deposition that Your Honor had ordered, that

has taken place, and I believe discovery is complete as a result.

THE COURT: Mr. Kelleher.

MR. KELLEHER: Your Honor, the only thing left is we had one final supplemental damages expert report to serve in response to the one we received within a few weeks ago. We intend to serve it on Sunday.

THE COURT: You intend to serve it this coming Sunday?

MR. KELLEHER: That's right.

THE COURT: Are you aware of that?

MR. LINDVALL: Yes. I forgot about that, Your Honor. There is no problem with that.

THE COURT: So there is no issue; correct?

MR. LINDVALL: No issue.

MR. KELLEHER: (Nodding yes.)

THE COURT: How about with respect to the question of the prior art to be used at trial? I think maybe we got a letter from Broetje on this. If Broetje believes there is a dispute I need to address, then I will hear that now.

MR. KELLEHER: Your Honor, it was their opening letter back in 2011 that we responded to.

THE COURT: Right. Well, then fine. We'll hear from AHG first if you think I need to decide something on

this.

MR. LINDVALL: Your Honor, this was in, it's D.I. 322. Let me give you a brief history of this. What had happened, Broetje had given us additional prior art and arguments and after the close of discovery, after the close of expert discovery and including some additional prior art, we asked the Court that they narrow down the amount of art that they have. We asked at the pretrial conference which we have as an exhibit to this letter brief. Your Honor recognized that and asked them to narrow it down.

They sent us an e-mail after the pretrial conference, narrowed it down somewhat, but they added some additional arguments on scope of the content of the prior art and they added some different combinations which had never yet been disclosed. It's not in anybody's expert report or anything like that.

So as a result of that, we sent Your Honor this letter, this D.I. 322, and I believe they said they had responded. Somehow we missed that response. I'm not --

THE COURT: There was a response very recently to it, I believe. You don't think you have seen that?

MR. LINDVALL: Yes. I'm not saying they purposely did, but I don't think I have seen that. But we still maintain our position they're untimely.

THE COURT: I can tell you my recollection at

least is their response argued first that this issue came up in January, this January when we had our time together, and that essentially my rulings were that since you didn't renew the issues in D.I. 322 or whatever is the letter you have in front of you that it was untimely and, therefore, it would still be untimely now. Furthermore, that they are now asserting I think maybe six pieces of prior art and that that is narrow enough. Further, that their expert talked about the scope of the prior art by saying state of the art in his expert report. And so all things considered, you have adequate notice and that I should continue to deny whatever relief it is you are asking for.

Do you have any response?

MR. LINDVALL: Well I think this comes down to prejudice probably, Your Honor. And to the extent their expert doesn't get up on the stand and give opinions on what we believe is clearly not in his expert report, well, we're fine with that. I know, Your Honor, we have what is called the Judge Farnan rule, but I think I had mentioned this at the last hearing that we are concerned the defendants' expert report is very sparse, and I'm concerned we're going to be hearing some new opinions. We obviously will have to object, but I hope to avoid any surprises.

I think from that standpoint if they stick with what their expert has in the expert report, we're not going

to have any problem.

THE COURT: All right. Thank you. Mr. Kelleher, do you want to address this?

MR. KELLEHER: Yes, Your Honor. For the record our reply letter was filed as D.I. 382 on March 14.

Your Honor, you pretty much encapsulated the arguments that we made. The phrase "state of the art" is in the expert's report. That is a synonym for scope of the content of the prior art. There is no nondisclosure here. We have no intent to go beyond what our expert opined to in his report or if they ask expert questions at his deposition, but I think we're planning to sticking to his report.

THE COURT: Okay. Fine. Thank you. To the extent there is a request for me to do something from AHG, I'm denying the request. I do think that among other things, the defendant is correct that we found in January the issue was note renewed at that time; and I don't think it's been adequately renewed at this time.

But beyond that, six references is adequately narrowed in the case in which there is two patents and five asserted claims, as I understand it. And the plaintiffs will be free, as will the defendants, to object to any testimony from an expert as being beyond the scope of what was previously disclosed.

I will do the Judge Farnan rule and reserve judgment on that objection; and you will be able to move, renew that objection post-trial; and if you prevail, as we discussed, and a new trial is necessitated, the other side will be charged all the costs associated with the new trial.

So given everything, including the representations we've heard again today from the defendants, I think that adequately takes care of any unfair prejudice or other concerns raised by AHG.

The third issue that I was able to identify is this dispute over sequestering witnesses. First, actually what did not appear to be in dispute is it seems the parties have agreed with respect to AHG's witness Michael Lawrence, the parties seem to agree he will be sequestered but only when Broetje witnesses are testifying regarding fault at Long Beach. Is that agreed to from the Plaintiff?

MR. LINDVALL: Yes, Your Honor.

THE COURT: Is that agreed to from the defendants?

MR. KELLEHER: Yes, Your Honor, as to Long Beach. He is our witness actually. He is our expert witness but he's also a fact witness because he actually works in this field.

THE COURT: Okay. But other than me mischaracterizing whose witness it is, you agree with what I

have said?

MR. KELLEHER: Yes. Fault issues at Long Beach, California, yes.

THE COURT: Okay. Any --

MR. LINDVALL: Yes. I was concerned, fault issues at Long Beach, California. I mean fault issues in general, I think he should be sequestered.

THE COURT: Not just at Long Beach.

MR. LINDVALL: Yes. That was the first time I heard that. I don't think the pretrial order says that.

THE COURT: What is the defendants' view?

MR. KELLEHER: I think the pretrial order actually, Your Honor, did spell out this dispute. They wanted Mr. Lawrence to be sequestered when any witness, at least of any Broetje witness is talking about any fault issues anywhere in the United States or maybe even elsewhere.

We said it should only be with regard to fault issues at Long Beach because that is the only thing he would have personal eyewitness knowledge of, thus, that would be the need to exclude him from the fact witness so his testimony would not be colored by anyone else's. By anyone else in the world. He didn't see it personally.

THE COURT: Do you intend to elicit testimony from Mr. Lawrence about fault issues at some location other

than Long Beach?

MR. KELLEHER: I don't -- no, Your Honor. I don't think so.

THE COURT: Okay. So is there really a ripe dispute on when he would need to be sequestered?

MR. KELLEHER: It does, Your Honor. Because that means when I would have other witnesses on the trial talking about problems all over the world that we had with their product, I wouldn't be able to have my expert here in the courtroom.

THE COURT: Okay. Is that what you were seeking?

MR. LINDVALL: Your Honor, first of all, their expert, there is not going to be opinions about faults or not. This is a patent case and trade dress case, so fault is really a peripheral issue, which I think Your Honor said that you hoped this doesn't turn into a products liability type case.

What we anticipate they will do is Mr. Lawrence, when I examined him during his deposition, since he works at Long Beach, he gave testimony he had only seen one or two faults in ten years of using these cassettes. We plan on using that, obviously, to rebut their story about their being all kinds of faults with our cassettes. And what they would seek to do is have Mr. Lawrence sit through this testimony about all the faults that the cassettes have had

somehow which I think could possibly influence his testimony when I cross-examine him on this because I will be getting his testimony for cross-examination. It may influence his testimony when he hears this testimony from other Broetje witnesses.

THE COURT: I want to make sure I understand that. You think he could somehow inflate his fact testimony about how many faults he saw at Long Beach now that he has heard maybe there is faults at these other facilities?

MR. LINDVALL: I don't know, but it's the same factual issue, and it is not an issue he is giving opinions about, so it is outside his expertise in his expert report. This is purely him acting as an fact witness. As far as I'm concerned, Mr. Lawrence, you have to treat him just as any other fact witness for this particular issue. So anything relating to the faults, which is what he is going to be important to us for, he shouldn't be sitting through the testimony of other Broetje witnesses who talk about any faults or alleged faults with the AHG cassettes. That is my concern.

THE COURT: I understand the concern. Is there anything else you want to add?

MR. KELLEHER: Yes, Your Honor. If they believe they have deposition testimony that they could impeach my expert with if he said that there were now more faults, they

can impeach him regardless of whether or not he is sitting here for other witnesses.

THE COURT: I agree with that. I agree with Broetje on this point. He is a fact witness on whether he has seen faults at the Long Beach facility. He is not a fact witness on whether he has seen faults elsewhere. As I understand it, he has no knowledge about that. And if he were to start testifying about that based on what he saw here at trial, that wouldn't be very probative of anything, and it might very well itself be objectionable. We'll have to see how it comes up on his expert opinion.

He is going to be limited to what he has disclosed in his report. I'm confident that if suddenly he is testifying as a fact witness to more faults at Long Beach than he could recall previously, there is the deposition he could be cross-examined with, and the jury will assess his credibility on that point.

So I will only require Mr. Lawrence to be sequestered to the extent that defendant has agreed to him being sequestered, which is with respect to fact testimony from other witnesses regarding faults, alleged faults at the Long Beach facility.

Now, I do think there is also a dispute about Broetje's proposed corporate representatives. This was an issue that came up years ago, and I guess there is still a

dispute. Let me hear from defendant on that first.

MR. KELLEHER: Yes, Your Honor. We would like to have two of our corporate representatives here in the courtroom: Ken Benczkowski who is the President of Broetje USA and Axel Peters who is the Chief Operating Officer of Broetje Germany.

We think that under Rule 615, because we have designated them as our corporate representatives, they actually cannot be excluded even though they also happen to be witnesses in the case. We cited case law as well as the rule for that proposition. The response we received from the other side does not cite any case law in support of their proposition.

THE COURT: So is it your view that you have unfettered discretion to designate anyone you wish as your corporate representative and then the Court is powerless to exclude them?

MR. KELLEHER: We think, Your Honor, that is the way the Supreme Court and Congress wrote Rule 615, to limit your discretion on this one particular issue.

THE COURT: If I disagree with that interpretation and view it as a discretionary decision, give me a sense of what, if any, prejudice it would cause to your client to have to come up with some other corporate representative.

MR. KELLEHER: Well, Your Honor, the list that we received the other day from AHG as to people they really, really expect to call at trial includes the CEO of the company called Gemcor who is our chief competitor and as well as now AHG's business partner in essence. And my U.S. president from Broetje USA, Ken Benczkowski, used to work at Gemcor for 20 years.

Now, this man Mr. Mangus, he was not deposed in the case. Whatever he might be testifying to was only alluded to in the most skimpy way in interrogatory answers so my corporate representative Mr. Benczkowski will be very helpful in cross-examining Mr. Mangus.

THE COURT: Okay. But what about my question? There are other people who could be the corporate representative, are there not?

MR. KELLEHER: There is no one else who is going to be here from Germany or Broetje USA other than people who are also going to be witnesses.

THE COURT: Are there --

MR. KELLEHER: You're asking if we could.

THE COURT: Right.

MR. KELLEHER: There is a possibility we could, Your Honor, yes.

THE COURT: There are other employees. Are there other officers even?

MR. KELLEHER: Sure, Your Honor.

THE COURT: So what would be the prejudice if I require you to call, to bring one of those folks who is not scheduled to be a fact witness to serve as the corporate representative?

MR. KELLEHER: It would be the extra expense of having that person here and that person being away from the business for a week.

THE COURT: Okay. Thank you. Let me give AHG a chance to speak to this.

MR. LINDVALL: Your Honor, I think Mr. Kelleher actually highlighted the issue that we have. To have Mr. Benczkowski through the testimony of Mr. Mangus is exactly why you sequester witnesses like that. Because whatever Mr. Mangus says, then Mr. Benczkowski can flavor his testimony to be able to effectively try to rebut whatever he says.

The idea is we want witnesses to get up there and testify to the truth and not be somehow tainted or cause them to alter their type of testimony because of what they have heard in the courtroom earlier. This is exactly the situation that we're dealing with here. We have two witnesses that that is what is going to happen with. And they are going to be sitting through our whole case-in-chief and listening to all of our fact witnesses and as a result,

when they get up on the stand, they'll know exactly what the best type of testimony they can give based on what they just heard. Because they're both witnesses on their will call list.

THE COURT: What about the at least policy, though, that a corporate client, of course, he can only be represented through a human being, and they're entitled to have somebody here. Why are they not entitled or why shouldn't I left them at least bring as the corporate representative the person who can best help them prepare their defense and on the fly respond to what happens at trial?

MR. LINDVALL: Well, Your Honor, I think, first of all, I think that there, the Court does have a fair amount of discretion on this. The rule says what it says, but I think just like with a lot of the rules, the Court has a lot of discretion on how they're used.

In this particular situation, Broetje is a fairly large corporation. It has got, I don't know, 1,200, 2,000 employees, something like that. And it would be no problem to bring in another corporate representative. And it would eliminate the possibility of somehow these witnesses' testimony, if they have a problem.

THE COURT: There are two proposed corporate representatives or at least two that we're talking about.

We've mostly talked about the one who I guess used to work with the person on your witness list. What about the other person? Why could he or she not serve as the corporate representative?

MR. LINDVALL: Well, Dr. Peters is also on their will call list. We anticipate that he will be giving testimony on factual issues which will overlap with factual issues that our witnesses will be giving. We're not exactly sure what he is going to be testifying about because he is a fairly new employee. I believe he started with the company in September of 2008. But he still will have testimony that overlaps with what testimony he is going to hear in our case-in-chief. It is the same situation.

THE COURT: Okay. Thank you.

MR. LINDVALL: Thank you.

THE COURT: Mr. Kelleher, is there anything else you want to add on that?

MR. KELLEHER: Nothing to add, Your Honor.

THE COURT: Bear with me for a second.

(The Court and law clerk confer.)

THE COURT: All right. I'm going to give this one a little bit more thought, though I recognize I did come close to ruling on this three years ago in favor of AHG, so I'm not completely objective on this. AHG starts out ahead in my mind, but I am going to give it another look. And I

will let you know certainly before trial and enough in advance of trial that you can make arrangements to bring somebody else, if that is what my ruling is.

MR. KELLEHER: Your Honor?

THE COURT: Yes.

MR. KELLEHER: Can I ask one question about sequestration in general?

THE COURT: Sure.

MR. KELLEHER: I understand witnesses in general will be sequestered when other witnesses are testifying, but what about opening statement and closing argument?

THE COURT: Right. Initially, I leave it to the parties to see if they can work that out. And if you have a dispute, you would obviously have to let me know no later than that morning before opening statements, and I will make a decision.

I don't have a firm practice on that, and I am happy to go with whatever you agree on if you do reach agreement on. I take it that it is not a matter you discussed?

MR. KELLEHER: We hadn't discussed that precise issue.

THE COURT: Well, I will leave it to you all to discuss. Again, if there is a dispute, let me know by the morning of jury selection and I will let you know then.

All right. I'm not sure if these were disputes,

 but a couple other issues on my list.

It seems like the parties were in agreement that there are some nonjury issues to be tried? I believe they are the affirmative defenses of laches, waiver, equitable estoppel, as well as any standing issues and the objectively high likelihood prong of willful infringement.

It seemed that the parties are in agreement that those are issues for the Court. It seemed as if you all think you might want to present some evidence on that, and I infer that if there is evidence to be presented, it's from the same witnesses who are testifying in front of the jury and you would elicit it during your time in front of the jury. But if I'm wrong about any of that, now would be the time to talk about it.

MR. LINDVALL: I believe what you just said is accurate, Your Honor.

THE COURT: All right.

MR. KELLEHER: It would be the same witnesses, Your Honor. I would add there is also the statute of limitations issue which we think ultimately is for you. And you may have seen in the most recent papers in the last couple of days that equitable tolling has suddenly come up and I think as a matter of equity, that probably ultimately is for you.

THE COURT: But you intend to elicit whatever

evidence you think is needed for me to make those decisions as a matter of law as part of the ten hours you requested with the jury here; correct?

MR. KELLEHER: Yes, Your Honor.

THE COURT: Okay. And does any of that change your answer?

MR. LINDVALL: No, Your Honor. In fact, what he just brought up probably is correct. It's something we think you should probably decide: the equitable tolling.

THE COURT: You are not asking for any separate proceeding or time beyond the ten hours you requested?

MR. LINDVALL: No, Your Honor.

THE COURT: That will be fine then.

Then Broetje has requested there be no written filings of any kind during trial. I take it to mean except for pursuant to the deposition designation process. Is AHG agreeable to that or did you want to reserve the right to file other written filings?

MR. LINDVALL: No, I have no problem not preparing briefs in the middle of trial.

THE COURT: All right. Then here is what I will say. Obviously, the depositions, if there are disputes about that, and we'll talk about that a little bit in a minute, that requires you to file a letter with me.

Other than that, if anybody wants to file

anything in writing during trial, you need to have expressed leave from me to do it, or, of course, if I actually affirmatively order you to do something in writing, then, of course, you will have to comply with that.

Any questions about that?

MR. KELLEHER: 50(a) motions, Your Honor, would you want those oral or in writing?

THE COURT: I'll come to that in just a second. But other than that, is there any question about what I said?

MR. KELLEHER: Only, I know there is a procedure for objecting to various exhibits. I think probably you want to handle those orally rather than getting ...

THE COURT: Right. We'll do that orally in the morning. I'll talk about that in just a minute as well.

Okay. Are there any questions about that?

MR. LINDVALL: No, Your Honor.

THE COURT: So on 50(a), I'm glad you raised that. What I want the parties to do is to meet and confer. And by next Thursday, I want to have a submission from you, a joint submission that lays out either your joint proposal or your competing proposals for how I should deal with 50(a) motion, motions for judgment as a matter of law. And among the things I want you to address in your proposal or proposals are whether it will be just oral or oral and in

writing. If it's going to be in writing, the timing for when you are going to get the written submission in. Address also whether the motion, however made, needs to be made precisely when the other side rests or if it could alternatively be made at the next break or at the beginning of the next day or at the end of that day.

Also, to the extent you propose that it be done orally, do you propose that it has to be done or should be done orally with the jury still sitting there and we're at sidebar or if it can be done during a time after the jury had left for the day?

And I also want your views on just how specific you think the motions need to be in order to preserve your rights going forward.

These are all matters that I have handled differently from different trials, and different parties have very different views on it. And I will benefit from having you all talk about that and giving me your specific proposal or proposals by next Thursday.

Are there any questions about that? First, Mr. Lindvall.

MR. LINDVALL: No, Your Honor.

THE COURT: Okay. Mr. Kelleher?

MR. KELLEHER: No, Your Honor.

THE COURT: All right. Thank you. Let me go

through some other portions of the pretrial order. As a general matter, if the parties did not in the pretrial order identify a dispute and I don't talk about it, then what you have agreed on is fine and, of course, will govern as we go forward.

With respect to the uncontested facts, the way I'm going to treat those is any party is free to read some or all of the uncontested facts to the jury but you have to give notice to the other side that you intend to do that and roughly when you intend to do it. And, of course, you will be charged the time it takes to read those to the jury, but you are free to do it if you wish.

In terms of the factual issues to be tried, I think we're in agreement, it's patent infringement, direct and induced infringement. There is five asserted claims of the two patents. There is willful infringement. There is invalidity of anticipation, obviousness, and written description. There is patent damages.

MR. KELLEHER: I'm sorry, Your Honor.

THE COURT: Yes.

MR. KELLEHER: It's indefiniteness rather than written description.

THE COURT: Thank you. Patent damages, the unfair competition, trade dress, infringement, and intentional interference with respect to economic advantage

claims, and any damages from the nonpatent claims. And it is unclear to me whether contributory infringement is part of the trial.

So tell me if I got all of that correct and address whether contributory infringement is part of the trial.

MR. LINDVALL: Your Honor, I believe contributory infringement is part of the trial. And with respect to trade dress, I understand that it encompasses the state unfair competition and also has the intentional interference with economic or prospective economic. That is a state law claim which is really not related to the trade dress. And I believe that's it.

There is also the various damages ones, and there is also punitive damages related to the state law claims.

THE COURT: Is there anything in dispute about what are going to be the factual and legal issues from your perspective? Anything you need me to decide at this time?

MR. LINDVALL: No, I don't believe so, Your Honor. We spent the last week with each other on the jury instructions and I think we really filtered out a lot of the issues.

THE COURT: Okay.

MR. LINDVALL: So I think we're pretty much in

agreement. Mr. Kelleher can speak to it, though.

THE COURT: Okay. And I will give him that opportunity right now. My main focus is whether there is a dispute about what is the dispute that I need to resolve at this time.

MR. KELLEHER: Your Honor, I think contributory infringement, I think that is an issue, but I think it's only for the '339, the apparatus claims rather than the method claims on the other patent.

THE COURT: Can you --

MR. LINDVALL: Right, I believe the contributory infringement is with the -- let me see the verdict form.

MR. KELLEHER: I flipped that. That is the method claims rather.

THE COURT: You believe it only goes to some of the claims of one of the patents, I think.

MR. KELLEHER: I think that is where we ended up, Your Honor.

MR. LINDVALL: Yes. Contributory is with the '339 patent, which is the method claim.

THE COURT: Okay. Then you are in agreement that contributory infringement is part of the trial but only with respect to the method patent; correct, Mr. Lindvall?

MR. LINDVALL: Yes, Your Honor.

THE COURT: Mr. Kelleher.

MR. KELLEHER: Yes, Your Honor.

THE COURT: All right. In terms of your disputes over the legal issues, those are all covered in the jury instructions, and there will be an opportunity during trial to have argument on those legal issues, and that is when I will plan to resolve it.

MR. CAHR: Your Honor, I think there is actually one additional issue that relates to legal issues which is a brand new issue that is not dealt with in the papers that probably we should deal with now.

THE COURT: Okay. Fine.

MR. CAHR: Two days ago, on Wednesday night, for the first time, we were presented with an alternative instruction and a corresponding special interrogatory on the verdict form on equitable tolling. This is an issue that we have never really dealt with before. It never came up before. It's not in the issues of law in the pretrial. It's not disclosed in any of the earlier pleadings, in any of the earlier disclosures.

Because of that, you know, obviously we're somewhat of a loss of how best to deal with this. It's not something -- there are fact findings that underlie this, even though it sounds in equity, that we never have taken any discovery on or anything like that.

We actually just sent a letter last night which

we haven't even had an opportunity to present to the Court. We actually have an extra copy, if you would like us to do that now, but we'll be happy to file it with the Court this morning noting our specific objections.

Ut, one, this is something which we think is far too late because it's highly prejudicial to have this new issue come up this late into the case.

Second of all, we think that it is problematic because it's wrong as a matter of law, you see, because it seeks equitable tolling based on issues that were litigated in courts in France and in Germany which are not identical to the ones here.

Then, third, even if it wasn't too late, and even if it didn't actually apply the wrong law to the wrong facts, the instruction as proposed itself and the verdict interrogatory itself are we think improperly constructed and, in fact, quite probably should be not in front of the jury at all and it should be something that you handle entirely your own.

So that is sort of a legal issue, which I think you are right, I think we largely are in agreement on what legal issues are in play here, and I think you have all of our positions on that. But this is one little twist that just happened a day and-a-half ago that I think you probably should deal with.

THE COURT: The letter you are referring to is a letter that you have or will be sending back to the plaintiffs?

MR. CAHR: We already send it to the plaintiff last night, so that it literally is fresh off the presses, as they say.

THE COURT: Okay.

MR. CAHR: But we would be happy to present it as an objection to the Court, if you would like.

THE COURT: Right. Okay. Well, let me see what the plaintiffs' response is at this point.

MR. LINDVALL: Your Honor, this is just, it's an additional instruction we got in two days ago. It was a day after we put in the jury instructions. Let me give you just a quick little bit of history.

About a week ago, when the Court had said we can go back and revisit the jury instructions as needed, when we got their proposed new jury instructions which we thought would be some minor changes, they basically had rewritten all the invalidity instructions and a lot of others, bringing in, incorporating some of your earlier instructions.

What ensued was basically a marathon between the two parties where we basically went through all of the instructions, met and conferred multiple times. We both added new things. We both took away new instructions. They

added brand new instructions which weren't in their original instructions. It was very much of an intense activity.

This is one instruction that we missed in the last, I guess we got it to them within 24 hours after we filed it. All it is, is an additional instruction. What it does it relates to their statute of limitations defense.

In our instructions that we have we filed with the Court, there is also, there is a delayed discovery instruction in there which is in there, and we also have the reoccurring cause of action type thing where the statute of limitations tolls every time there is a new cause of action.

This is just the third one that California allows which is called equitable tolling which basically says if you have a similar action, which we had in France, which we had trade dress and patent infringement in France and Germany, that has already given them proper notice to maintain any evidence or what have you, statute of limitations.

THE COURT: Is there any evidence with respect to this equitable tolling point that you intend to elicit in front of the jury that you wouldn't otherwise be eliciting with respect to the other issues?

MR. LINDVALL: Your Honor, I think that the evidence, the total evidence is really -- if you look at the decisions, I agree with Broetje on this case. I think

actually it is a better decision for you because it's not really something that the jury should decide whether the case in France is similar to this case. To have the jury be able to make that decision from a factual standpoint is difficult.

THE COURT: I will confess I have not read through all of the jury instructions, but I thought I understood that you have now proposed a jury instruction on this equitable tolling point.

MR. LINDVALL: The only reason we did, Your Honor, is because California has model jury instructions which are extensive. I didn't realize it, but when we saw the case law, I thought, well, this is an equitable relief. We can try it in a JMOL. We don't need to put an instruction in there. When we went back and looked at the instruction, sure enough, they actually have a jury instruction and they said to put it in the verdict form.

So to be safe, we filed this additional instruction and a question in the verdict form which asks the jury how many years or how long so should it be tolled.

THE COURT: But you would also be comfortable with me not instructing the jury and not asking them in an interrogatory about it and deciding it myself.

MR. LINDVALL: Yes, Your Honor. I think that is probably the most appropriate situation because I can't -- I

agree with them it is not something the jury should be deciding. California thinks otherwise, but that is what I think.

THE COURT: Would that take carry of the problem from Broetje's perspective or not?

MR. CAHR: It does take care of the immediate problem. And I think that I would agree with Mr. Lindvall that if it is proper to have this, it is something that shouldn't be in front of the jury, it should be something for you.

We can reserve the debate over whether it is proper for. Since it is something that is going to be decided in equity, we can save the debate over whether or not it is proper until after the trial.

THE COURT: That's what we will do.

MR. CAHR: We reserve that objection.

THE COURT: Fair enough. So to the extent you have other objections, including that it is untimely or otherwise improper, we'll deal with that however we deal with the equitable issues. But when we get to jury instructions, I will expect that there is no debate as to whether or not I should be instructing the jury on equitable tolling. And to the extent we argue about the verdict sheet, I will expect there is no debate over whether I should ask the jury to make a finding with respect to

equitable tolling. It seems the parties are in agreement that the jury will not be asked to do that.

Is there anything further on that point?

MR. CAHR: No, Your Honor. That's fine.

THE COURT: Is there anything further on that point?

MR. LINDVALL: No, Your Honor.

THE COURT: All right. Going back to the pretrial order. On issues regarding witnesses, there was a dispute I think about witnesses testifying with translators.

My thoughts on that are that any witness who feels he or she needs a translator should be permitted to use a translator but the time that it takes to testify with or without a translator is time that will be charged and the time will be charged to the party who is on the clock at that time.

So to try to be concrete about it, if you use a translator during direct examination, then whoever called the witness will be charged for all the time from the time you called them until the direct is over, including whatever time it takes for translation.

If you are cross-examining the other side's witness and that witness needs a translator, then you, the party who is cross-examining the witness, will be charged for all that time, including whatever translation time is

embedded in your examination.

If I find that there is some sort of abuse or appears to be abuse or unfairness going on, I reserve the right in this context and in all contexts to either penalize a side for time or to shift time from one side to the other. But the default would be, as I have indicated, if you feel you need a translator in whole or in part for a certain question or just for cross-examination or for the whole thing, that is a matter that is left up to the discretion of that witness and the time, again, will be charged according to whoever is on their feet asking questions during the examination.

Are there any concerns about that or anything further we should discuss about that?

MR. LINDVALL: No, Your Honor.

THE COURT: Broetje?

MR. KELLEHER: No, Your Honor.

THE COURT: We already talked about objections to expert testimony under the Judge Farnan rule. Are there any questions about that, Mr. Lindvall?

MR. LINDVALL: No, Your Honor.

THE COURT: Mr. Kelleher?

MR. KELLEHER: No, Your Honor.

THE COURT: All right. Another recurring issue is impeachment with prior testimony, depositions typically.

This is another matter I want the parties to meet and confer and next Thursday give me your specific proposals as to how you would like to see how that done during this trial.

So among the things I am asking you to talk about and give me your proposal or proposals on are whether the Court should hear objections that the proposed excerpt of prior testimony doesn't actually show an inconsistency with what the witness just said here in court.

Should I hear objections that the proposed excerpt is insufficiently complete and should be complemented at that time on cross-examination with additional portions of the deposition or, alternatively, should that be left for redirect examination?

Should the Court require there to be some amount of pause, and if so, how much, from the time you identify we're now going to play pages 10 to 11? Should we give enough time for the witness to look at that and review it, proposing counsel to look at it, for the Court to look at it and review it?

And should impeachment by video deposition, if you have them, be used or must it be limited to only impeachment with reading the written transcripts?

So again, this is an issue that I handled in different ways. Often, the parties are able to agree on how to do it. Sometimes they don't. Sometimes this fight comes

out at a very inconvenient time at trial. So in this case, I want you to put your heads together and next Thursday give me your either joint proposal or competing proposals for specifically how to handle that in this trial.

Any questions about that, Mr. Lindvall?

MR. LINDVALL: No, Your Honor.

THE COURT: Mr. Kelleher?

MR. KELLEHER: No, Your Honor.

THE COURT: Okay. A further quick point about witnesses. Examinations are limited to direct, cross, and redirect. We don't allow recross examination.

You need to ask for leave to approach the witness once per witness, and then leave is freely granted.

I encourage transition statements, brief non-argumentative statements to the jury as to who this witness is or what he or she is testifying to. That tends to be very helpful for the jury.

Are there any questions about that or anything else about witnesses? Mr. Lindvall.

MR. LINDVALL: Your Honor, with respect to a witness who we would want to leave the chair and maybe give a demonstration or what you have, would you allow that?

THE COURT: Have them come down from the witness stand?

MR. LINDVALL: Yes.

THE COURT: Yes, you just need to ask for leave, and typically I would grant that.

And if I don't say it, opposing counsel is free to move about the courtroom as necessary. Don't walk right into the jury box, but if you need to move to be able to see a demonstrative or something that's fine.

Are there any questions about that or anything else about witnesses?

MR. KELLEHER: No, Your Honor.

THE COURT: Okay. On deposition designations, I think there was maybe a dispute about depositions that were in foreign language. I continue to believe I think this is the plaintiffs' position, that we will only play or read the question and answer in English. So I guess that would be the translated question and answer.

I don't think the jury needs to see the original French or German or whatever it was. I don't think that the jury is likely to discern anything meaningful from hearing or seeing the foreign language question and answer, and so I'm limiting it just to the English.

Are there any questions about that?

MR. LINDVALL: No, Your Honor.

THE COURT: Are there any questions?

MR. KELLEHER: I understand the ruling, Your Honor. I would just say that sometimes the witnesses, when

they're speaking in the native language, would be gesturing or pointing to things and that might be helpful to the jury. And in the discretion of the party who is playing the clip, when the time counts against us, that we would be, in a good circumstance, able to decide whether or not we should show the native language.

THE COURT: Right. I think that that was opposed by plaintiffs; correct?

MR. LINDVALL: Yes, Your Honor.

THE COURT: All right. So my ruling is with the plaintiffs. Certainly, your objection is noted and is on the record.

In terms of deposition designations, what you all have listed in the pretrial order is the maximum universe of deposition designations, counterdesignations and objections.

MR. LINDVALL: I believe, Your Honor, there is one witness who we had a deposition just recently, Dr. Peters. We have designated. We are still waiting for their counterdesignations and the parties would object. At that point in time, we will give you a replacement.

THE COURT: You would agree to that supplementation to what I have just said; correct?

MR. LINDVALL: Yes, Your Honor.

THE COURT: And you would want that; right?

MR. KELLEHER: We would, Your Honor.

THE COURT: So with that one exception, what is in the pretrial order is the most, the maximum of depositions that will be read or played in terms of designations, counterdesignations.

Also, the objections to any of that, there will be no more objections -- other than Dr. Peters that you all agreed on, there will be no objections beyond what are the objections that you have listed in the pretrial order. And I would expect you will narrow all of that as we get closer to trial, and you will do it according to the process you have set out in the pretrial order which culminates in a letter to me by two days before the time you anticipate playing that witness's testimony or reading that witness's testimony.

You need to make sure to clearly identify for me in the letter, with the attached excerpts, exactly where the remaining objections are. And then I will do my best to get you a ruling by the day before you plan to call that witness by deposition so that you will know what you are going to be able to play or to read.

Regardless of what the rulings are, the amount of time it takes to call that witness by deposition, to get the video up and running, however long it plays, until the next witness is called, all that time will count towards

somebody and we'll look to you all to tell us how to break down that time based on whatever has been designated and counterdesignated.

Are there any questions about depositions?

MR. LINDVALL: No, Your Honor.

MR. KELLEHER: No, Your Honor.

THE COURT: Okay. In terms of exhibits, I view what you have in the pretrial order as the maximum universe of exhibits and objections to exhibits. Exhibits that are on the exhibit list and not objected to on the exhibit list will be received into evidence by operation of the pretrial order once the exhibit is shown to a witness and offered into evidence and the Court says that that it is admitted.

You don't need to formally lay a foundation for those exhibits. And I know there won't by any objection, but we do need to take the time to show the exhibit to a witness, and we do need to go through that formality of offering it into evidence and me saying that it is admitted.

Are there any questions about that?

MR. LINDVALL: Your Honor, first, there is one caveat. I believe that they provided new, some new exhibits just recently. We're going to want to object to those. We'll give you a new sheet on that.

The second one is with respect to opening statements, what I would anticipate, for example, the U.S.

patents that are at issue here, we could use those during opening statement, but I would understand anything not admitted could not be used during opening statement?

THE COURT: Well, if you know it's going to be admitted, either because there are no objections and so you know it is coming in or you have met and conferred, and even though there may be an objection on the pretrial order, you know they will not going to press the objection during the trial, then you are free to use it during opening statement.

MR. LINDVALL: Thank you, Your Honor.

THE COURT: Is there anything else?

MR. KELLEHER: Also, Your Honor, there is some evidence that Your Honor has already ruled on motions in limine that will come in.

THE COURT: Okay. If I have already ruled that evidence is going to be admitted, then that would be fair game in an opening statement as well.

MR. KELLEHER: Thank you.

THE COURT: Any question about that?

MR. HOROWITZ: Not about that, Your Honor, but about your ruling with respect to exhibits.

The one question I still have is even if there is no objection to the exhibit itself, what about if you have an objection to use of that exhibit with that particular witness because of lack of competency, lack of personal knowledge

which is really a substantive objection, doesn't necessarily go to the exhibit itself?

THE COURT: Right. Well, I think the way, if I'm following you, that that would come out is that you are obligated under the pretrial order, and what I was just going to say, to disclose to the other side whatever exhibits you intend to show to a witness as part of the direct examination. And so, for instance, if the defendant sends you the night before, here is all the exhibits we intend to use with Witness X tomorrow, you may have a concern about how they're going to use it. You would need to meet and confer on that that evening. And then if you haven't resolved the issue, you would bring it to my attention that morning before you call the witness. Meaning, the bottom line is it will be rare that an objection like that will come up on the fly during the testimony because through those processes, we should have seen it coming and we should have talked about it.

Does that answer the question?

MR. HOROWITZ: It does entirely. Thank you.

THE COURT: Okay. Thank you. Are there any questions about any of that?

MR. KELLEHER: Nothing else from us.

THE COURT: So I pretty much already said this, but basically through that process of exchanging the proposed exhibits to be used with the witness, and your meeting and

conferring on objections, if you don't -- I'll be available at 8:30 every morning. The jury comes in at 9:00. That is your time to raise with me any objections you have to the admission of any of the exhibits or questions about those exhibits that you anticipate may happen that day with the witnesses for that day.

If you don't try to get my attention on that, then I will say that those objections are waived if you first bring them up later in the day when the witness is on the stand.

We will be charging time for those morning meetings. That will come out of your ten hour allocation. And the way we do that is we charge the time to the party that raises the objection. We don't try to keep track as to who is winning or losing the objection.

If we do happen to notice that one side seems to be abusive of this process, then, of course, we can always reallocate the time.

Before you rest your case, I would advise you that you consult with my deputies to make sure that whatever evidence you believe has been admitted also is evidence that we believe has been admitted.

Are there any questions about any of that, Mr. Lindvall?

MR. LINDVALL: No, Your Honor.

THE COURT: Mr. Kelleher?

MR. KELLEHER: No, Your Honor.

THE COURT: Trial. The order of proof. I couldn't tell if there was an agreement or disagreement on this. Where are we on that?

MR. LINDVALL: Your Honor, there is a disagreement.

THE COURT: All right. Let me hear it then.

MR. LINDVALL: What AHG proposes, in a typical situation, AHG would present what its burden of proof on, for example, infringement and trade dress. And then Broetje would come up and respond to the infringement and trade dress contentions. And then they would give their burden of proof presentation, which would be invalidity and statute of limitations, whatever else the Judge or whatever else they present with their burden of proof. And then AHG gets a chance to rebut their burden of proof items and then that is the end.

Now, what Broetje wants to do, they want to have a fourth session where they get a chance to then come up and say, well, no, what Dr. Kytomaa said about invalidity is wrong for the following reasons. So they really want a second bite at the apple that we wouldn't get. So what we would ask the Court is to really offer the additional situation where there is a burden of proof and the rebuttal to the burden of proof for both parties and that's it.

THE COURT: And what if we were to give you the opportunity at I guess Phase III to present rebuttal on the issues that you do have the burden of proof on? Those things that you started at page 1 on? Would you then oppose, in that instance, the fourth step that Broetje is seeking?

MR. LINDVALL: I guess I wouldn't, Your Honor. It's one of these trials and people are up and down and up and down, but I would not oppose is as long as we have a chance to.

THE COURT: You would not oppose as long as both sides had that same type of opportunity.

MR. LINDVALL: Yes, Your Honor.

THE COURT: Okay. Thank you.

What is defendants' view?

MR. KELLEHER: Your Honor, we would like to do it this way where there is four phases, which I think was in the Google trial that you just finished. We think it is probably the easiest way for the jury to understand the progression of the back and forth, hearing the responses to the assertions being made by each side.

THE COURT: I take it, but to be absolutely clear, you are in agreement then that at let's call it Phase III, not only would AHG have the opportunity to rebut those issues on which you, the defendants, have the burden of

proof, but they would also have a chance to have the last word on the issues that they affirmatively have the burden of proof on at Phase I.

MR. KELLEHER: That's right, Your Honor.

THE COURT: So I think we have an agreement on that fourth phase approach. In fact, that is what I just did in a trial I just finished this week. It seemed to work well and was fair to both sides. So that is how we will proceed, with the four phases.

Mind you, in case you are thinking ahead to closing arguments though, I only allow the three closing arguments. So we'll only hear from the defendant once. The plaintiff will go first and last. I'm not going to allow a fourth closing argument.

All right. Other issues regarding the trial itself. The parties jointly requested ten hours per side. That is granted. And we will keep track of time according to the way that I already described.

In terms of the trial schedule, we're going to begin on Monday, April 7th. I'll be available to meet with the parties at 8:30. The jury is available to us at around 9:30. I only keep the jury here until 4:30 each day other than when they're deliberating. If they unanimously agree to stay beyond 4:30, we let them stay late as they care to.

Our goal is to take only about one hour of

breaks over the course of the day other than the first day. After the first day, we're able to provide lunch to the jurors so we try to keep the lunch break to about a half hour. We try to keep the morning and afternoon breaks each to about 15 minutes.

For lunch, depending on how things are going, we aim for about 12:30. The morning and afternoon breaks could be at any time. It really depends on how things are going.

That's all I had to say about trial, per se. Are there any questions about what I have just said there, Mr. Lindvall?

MR. LINDVALL: No, Your Honor.

THE COURT: Mr. Kelleher?

MR. KELLEHER: I don't think so, Your Honor.

THE COURT: Okay. In terms of jury selection, we'll use the silent struck juror method.

I reviewed your voir dire. I'm happy to see there were very few disputes. I can resolve those. I'll docket the voir dire no later than the morning of jury selection.

The way we do it -- and we may have talked about this three years ago, I don't recall. We bring the jury pool in. They will be seated on the benches in the back of the courtroom. I will read aloud all of those questions. I may have taken some out from what you proposed, but all of

the questions in the final voir dire. I will read all of them. I will tell the jurors to do their best to keep track just in their own minds. No raising hands, no standing up. Just keep track whether they have a "yes" answer to any of my questions. And then I will tell them if they had a "yes" answer to any question, we'll meet with them individually back in my juryroom.

Each side can send back I think probably three people. And I'll make a record with the juror through my questions as to what it is their concerns were. I'll ask a few questions. Then I'll give a chance for a brief follow-up from both sides.

When the juror leaves the juryroom, I'll then turn to both sides and ask if you have a motion to strike for cause.

And then we'll go through the next juror. And we'll do all of that.

Then we'll come back in the courtroom, and we'll continue with the process whereby we'll randomly draw out of those still in the pool 14 potential jurors. We're able to seat them all here in our jury box. And then each side will have three peremptory strikes which we exercise silently through the passing of a clipboard.

And that will leave us with eight jurors, all of them who are considered jurors. None of them are considered

alternatives. If they are all still here, they all get to deliberate.

That is how we do jury selection. Are there any questions about that, Mr. Lindvall?

MR. LINDVALL: No, Your Honor.

THE COURT: Mr. Kelleher?

MR. KELLEHER: Your Honor, on the sequestration of witnesses, are witnesses and/or parties permitted to be here during voir dire?

THE COURT: During voir dire. Well, I would say the same thing I said earlier. Meet and confer on that. If you have an agreement, I'll be fine with it. If you have a dispute, then obviously we will have to talk about it by the morning of jury selection. I don't think I have had the question come up before.

MR. KELLEHER: I'm not sure how big it is, Your Honor. I assume witnesses can still fit.

THE COURT: There will be room. I mean unless you have 100 witnesses.

MR. KELLEHER: We do not.

THE COURT: But the pool will be somewhere between 35 and 65 people, so there will be certainly plenty of room.

MR. KELLEHER: Thank you.

THE COURT: Okay. On the preliminary

instructions, I was happy to see I think there was only one dispute. Did the parties wish to address that one dispute? I think it's at page 3.

MR. LINDVALL: Just one moment, Your Honor.

(Pause.)

MR. LINDVALL: I'm sorry, Your Honor. This is not something that kind of came up highlighted.

So I believe what we're saying, it says when they are in fact purchasing the Broetje party's accused products. Is that what you are looking at?

THE COURT: Yes. Right. There is your proposal in bold.

MR. LINDVALL: And we propose "and/or Broetje is infringing the asserted patents." We just think what we have is a little more clear and lays it out. I'm not quite sure what their issue is with it. We think it's a clarity issue.

THE COURT: We'll hear from Broetje on the AHG proposal there.

MR. KELLEHER: Yes, Your Honor. This relates to the legal issue of whether or not there is preemption of the state tort, tortious interference with respect to business advantage with regard to the Patent Act. California, like many states, requires the act that constitutes interference be independently wrongful. They would like to say that our

acts could be independently wrongful either because they infringe the trade dress, et cetera, or the other theories or they infringe patents.

Our position here, Your Honor, is that that is preempted. Congress has created the cause of action for patent infringement. They set forth what the remedies are in the act. They, for example, do not just permit willy-nilly punitive damages to be awarded which would be available under California state law if they could use patent infringement as the independent wrong whereas with regard to the patent statute, for example, you have to go through exceptional case analysis before you can get punitive damages there.

So we think Congress has framed the entire universe for what kind of remedies are available for patent infringement, and it cannot be the independent wrong in tortious interference.

THE COURT: I think this issue comes up in the jury instructions as well.

MR. KELLEHER: Yes, Your Honor.

THE COURT: So it's not a clarity problem from your perspective. Your objection is to the underlying legal question.

MR. KELLEHER: That is right.

THE COURT: All right. Thank you.

Mr. Lindvall, is there anything you want to say

about that at this time?

MR. LINDVALL: No. I see Mr. Kelleher's position on that. And if you would like to wait until we get to the final jury instructions, we can make our argument then.

THE COURT: Right. You don't think it's imperative that I resolve this question in the context of the preliminary instructions, do you?

MR. LINDVALL: No, Your Honor. Because whatever decisions you make on the final jury instructions will carry over on to this.

THE COURT: Okay. Thank you. So I don't have a decision on that right now. If we resolve the legal question before the preliminary instructions, you will see it reflected here. If we don't, then we'll find some way to avoid the question in the context of a preliminary instructions.

Either way, unless I ask you for something further, I don't need anything further on the preliminary instructions, and we will get it docketed by some time no later than the morning of jury selection.

On the verdict form, it's most likely that we'll just hear argument on any disputed issues at the same time we hear argument on the jury instructions which will be some time during trial, probably in the early part of the trial, but I will endeavor to give you some advanced notice as to

when it is that we're ready to hear argument on the verdict form and on the jury instructions.

Are there any questions about that from the plaintiff?

MR. LINDVALL: No, Your Honor. Just to be clear, so the jury charge and the argument is going to be done during trial with both the verdict and the final instructions; is that correct, Your Honor?

THE COURT: The argument about any of the disputes will happen during trial.

MR. LINDVALL: I see, Your Honor. Okay. Thank you, Your Honor.

THE COURT: Probably after we're done with the jury on a particular day, and it most likely will not be on a Monday. It would be a Tuesday, and I will let you know with as much advance notice as I am able to give you. Got it?

MR. LINDVALL: Yes, thank you.

THE COURT: Any questions?

MR. KELLEHER: Yes, Your Honor. No questions.

THE COURT: Okay. Just a couple more things from me. In terms of post-trial, after we're done with the jury, I will offer you the opportunity if you wish to meet with any jurors who wish to remain behind to talk but I will only do that if both sides agree that they want to do that,

and if both sides agree on the record that they won't use anything that they hear from the jurors as part of their post-trial filings or on any appeal. You don't need to decide any of that now but be prepared for me to ask you those questions after we get the verdict.

And I will also, at that time, direct you all to meet and confer and, with a fairly short turnaround, let me know what, if any, order you believe I can enter on the verdict and what your proposals are for briefing or renewing any motions so that we can try to resolve those without too much delay for you.

So this is just in the nature of advising you to be ready to begin to address those questions soon after we get a verdict from the jury. Are there any questions about what I have just said?

MR. LINDVALL: Your Honor, I just realized there is one issue. On the statute of limitations, we've agreed, for example, equitable tolling is something to be decided by you.

The only issue I can see happen is the statute of limitations is a question on the verdict form. And if the jury finds that, for example, the statute of limitations, we have failed because the statute of limitations, they refused to answer the rest of the questions and Your Honor turns around post-trial and says you know what? The equitable

tolling applied there, so the jury is wrong. It then puts us in a situation we would have to need a completely new trial. I am not sure how we could address this. The only way I can imagine we would address is if Your Honor would rule on that before trial. I hate to bring that up.

THE COURT: Well, another way to address it, which I would ask you all to meet and confer and consider, would be to require the jury to go on and answer the remaining questions regardless of what their view is on the statute of limitations.

MR. LINDVALL: That sounds like a good idea. Thank you.

THE COURT: If there is an agreement on that, then that would take care of it. If there is not, then we can take care of that when we argue the verdict sheet.

MR. CAHR: Just for clarity. Is the proposal then that the jurors be instructed that regardless what they find on that one question, that they continue on? I mean I think that the questions that are on the verdict form are just phrased in terms of dates. So it means --

THE COURT: So I don't have a specific proposal. I just have a conceptual proposal which I'm not making into an order now.

MR. CAHR: Okay.

THE COURT: I can tell you in the trial that

ended yesterday, I guess it was, there was a similar issue on the statute of limitations, and what I did was I made the jury go on to make findings on that substantive claim even though as it turned out they found I think the statute of limitations had expired.

So conceptually what I have in mind is getting the benefit of the jury's views, since they're going to hear the evidence, and then even though logically you and I wouldn't go on to that substantive issue if we found the statute of limitations part of the claim, that we would have benefit of their views on the succeeding questions anyway, which would also be helpful because there is a chance it would change things up due to equitable tolling or for other reasons.

MR. CAHR: Okay.

THE COURT: But, concretely, I leave it to you all. And when we get to talk about the verdict sheet, you will let me know how to implement that if you have an agreement on it.

MR. CAHR: Thank you, Your Honor.

THE COURT: Here is my list of petty things that I don't want any of you to do, and I want you to advise folks on your side not to do. They include don't chew gum, don't suck candy, don't eat. This is all while you are here in my courtroom. You do whatever you want when you are

outside the courtroom.

This applies to you, your clients, your witnesses. If there happens to be a medical or other necessity for an exception to any of that, just approach my staff and I'm sure we will grant leave for exceptions, but if there is no necessity for it, then these things shouldn't happen.

You can drink water. That is fine. Your electronic devices, if you have them in the courtroom, they're only for purposes of aiding what is happening here at trial. You should, in all events, turn off any ringers or noises or buzzers and all that stuff.

Don't wear hats. Don't read a newspaper that everyone can see the newspaper being opened, very ostentatiously, and don't wear sunglasses.

And, yes, all these things have happened at trial. Hopefully, there won't be anything new to add to my list that I'm not thinking of that happens at this trial.

If you make any submissions, though there aren't going to be any written submissions unless I ask for them, but nonetheless if there were for some reason to be a written submission after the trial day or on a weekend, please make sure that you serve a courtesy copy by e-mail either to Mr. Looby or to Mr. Golden so they'll make sure that we see it.

That's it from my list. Are there any additional issues from the plaintiff?

MR. LINDVALL: There is, Your Honor. There is one thing I have experienced in trials is counsel or witnesses making facial expressions. I'm sure you are aware of the issue. If I could get your guidance? But I imagine I know what your guidance is.

THE COURT: What would you imagine my guidance is?

MR. LINDVALL: That the witnesses and attorneys keep a straight face when opposing witnesses. There is no facial expressions to show disbelief or anything like that.

THE COURT: Is there a dispute on that?

MR. KELLEHER: No, Your Honor. I wouldn't want someone chided for doing something that is truly involuntary.

THE COURT: I would say to the extent humanly possible, do your best to keep a straight face regardless of what happens at trial. I will do my best as well. So beyond that, I'm not sure what more I can say on that.

MR. LINDVALL: No, I understand, Your Honor. I just want to bring the issue because in two trials it has happened to me with.

THE COURT: All right. Well, I think it's not going to happen at least as an intentional bad faith effort here.

Is there anything else from plaintiffs?

(Counsel confer.)

MR. LINDVALL: No, Your Honor. I think we're done.

THE COURT: Okay. Anything from defendants?

MR. KELLEHER: A few things Your Honor.

THE COURT: Okay.

MR. KELLEHER: One is logistical. I see the screen that is here.

THE COURT: And let me ask Mr. Looby. I don't believe this is the Court's screen. It may be left over from the last trial.

(Court and deputy clerk confer.)

THE COURT: All right. You will have to talk off-line with my staff. I was under the impression this screen was imported for our last trial. I had not seen it before, I don't think. And it is much smaller than the screen we've used before; and the jury in fact had some trouble seeing it. So I believe we still have access to a bigger screen.

MR. KELLEHER: That is exactly what I was going to be asking about. We'll work it out.

THE COURT: Yes.

MR. KELLEHER: Next question, Your Honor. Concerning the exhibits. You have seen the exhibit list. Both sides I think out of an abundance of caution have an incredible number of exhibits on their list. Some of the

documents themselves are quite big. For example, we have bills of materials from our machine installations that take place at places like Boeing. Those are like 800 pages long.

I don't know, Your Honor, if you actually need and want a printed set of everything that is on both exhibit lists or would be satisfied with getting witness binders and the copies of whatever was used in cross.

THE COURT: Bear with me a second.

(Court and deputy clerk confer.)

THE COURT: As long as both sides are in agreement, because we don't want any unintended disputes as to what the exhibits actually are. As long as you have worked that out and can show each other what the exhibits are, we don't need a set of them at the beginning of the trial.

We'll turn to you once the case is submitted to the jury to give us a complete set for the jury of what has been admitted; and it is helpful as you call each witness to give us two sets of binders so that I and my law clerk can follow along. Just those exhibits.

MR. KELLEHER: Yes. And then, Your Honor, the last issue I have. As you will remember from the last time we were here, after the result in the French case, my client has gone ahead and they're in the process of designing a new cassette that is largely red. As we pointed out to you in

the letter that we submitted a couple weeks ago, their minds have changed about whether they will ever be selling that anywhere other than France. And, in fact, the current thought is assuming the redesign works, they will be selling it worldwide, including in the U.S.

I gather that my opponents want to talk about the red cassette at the trial, even though it hasn't been sold in the United States yet. What I would like to know is if you could please require them in some fairly short period of time to tell me whether they believe this newly designed cassette still infringes any of their rights. I still have not heard that answer.

THE COURT: Okay. What is the plaintiffs' view procedurally on whether I should require you to do that?

MR. LINDVALL: Your Honor, we can do that, but we haven't had a chance to actually inspect the physical cassette. And we would like to wait until we get that opportunity to inspect the cassette.

It was marked. The deposition was taken by telephone. The witness was in Germany. We marked the cassette there in Germany. I don't know if they are received the cassette, but we can send someone from our Chicago office because they're in Chicago, and we can inspect it.

I don't think that is going to be a new product

in dispute but I wouldn't want to commit to that right now, but my feeling is it will not be.

THE COURT: Mr. Kelleher, is there going to be any problem arranging for them to inspect that?

MR. KELLEHER: Your Honor, not as long as we're not charged with committing any act of infringement of we import this new red cassette.

THE COURT: Is that what is going on here? Are you trying to trap them?

MR. LINDVALL: No, no. Absolutely not, Your Honor. I told you I doubt it's going to be a -- we would just like to look at it, the actual physical cassette.

THE COURT: And you would rather have the product imported into the United States so you can look and it rather than sending someone from your side to France, I guess it would be.

MR. LINDVALL: Germany. It would be Germany.

THE COURT: Germany. That would be your preference?

MR. LINDVALL: Well, it's a deposition exhibit so they would have to bring it anyway.

THE COURT: I think you can work this out.

MR. LINDVALL: Yes.

THE COURT: If you can't, get me a letter outlining the dispute by a week from today and I will

resolve it, but it seems to me you should be able to work this out.

MR. LINDVALL: Yes, Your Honor. I believe we will.

THE COURT: Is there anything else?

MR. KELLEHER: Nothing else from me.

THE COURT: All right. Well, I think that takes care of everything for today. We'll look forward to receiving your submissions next week and seeing you at trial in April. We will be in recess.

(Pretrial conference ends at 11:14 a.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Brian P. Gaffigan
Official Court Reporter
U.S. District Court

'

'339 [2] - 26:8, 26:20

/

/s [1] - 63:15

0

09-598-LPS [1] - 1:9

1

1 [1] - 45:4
1,200 [1] - 17:19
10 [1] - 35:16
100 [1] - 49:19
10:00 [1] - 3:4
11 [1] - 35:16
11:14 [1] - 63:11
12:30 [1] - 47:7
14 [2] - 8:5, 48:20
15 [2] - 4:20, 47:5

2

2,000 [1] - 17:20
20 [1] - 15:7
2008 [1] - 18:11
2011 [1] - 5:23
2014 [1] - 1:12
21 [1] - 1:12
24 [1] - 30:4

3

3 [1] - 50:3
322 [3] - 6:3, 6:18, 7:4
35 [1] - 49:22
382 [1] - 8:5

4

4:30 [2] - 46:22, 46:24

5

50(a [3] - 22:6, 22:18, 22:22

6

615 [2] - 14:7, 14:19
65 [1] - 49:22

7

7th [1] - 46:20

8

800 [1] - 60:3
8:30 [2] - 43:2, 46:21

9

9:00 [1] - 43:2
9:30 [1] - 46:22

A

a.m [2] - 3:4, 63:11
able [13] - 9:2, 9:10, 11:9, 16:16, 31:4, 35:24, 37:5, 38:5, 39:21, 47:2, 48:20, 53:16, 63:1
absolutely [2] - 45:22, 62:10
abundance [1] - 59:24
abuse [2] - 34:2, 34:3
abusive [1] - 43:17
access [1] - 59:17
according [3] - 34:10, 39:11, 46:17
accurate [2] - 20:16, 63:13
accused [1] - 50:9
Act [1] - 50:23
act [3] - 50:24, 51:7, 62:6
acting [1] - 12:13
action [4] - 30:10, 30:12, 30:15, 51:5
ACTION [1] - 1:4
activity [1] - 30:2
acts [1] - 51:1
actual [1] - 62:12
add [5] - 12:22, 18:17, 18:18, 20:19, 57:17
added [4] - 6:12, 6:14, 29:25, 30:1
additional [11] - 4:25, 6:4, 6:6, 6:13, 27:8, 29:13, 30:5, 31:18, 35:11, 44:23, 58:2
address [11] - 4:21, 5:20, 8:3, 22:24, 23:3, 25:5, 50:2, 54:13, 55:3, 55:4, 55:6
adequate [1] - 7:11
adequately [3] - 8:19, 8:20, 9:8
admission [1] - 43:3
admitted [8] - 40:13, 40:18, 41:3, 41:5, 41:16, 43:21, 43:22, 60:18
advance [2] - 19:2, 53:16
advanced [1] - 52:25
advantage [2] - 24:25, 50:23
advise [2] - 43:19, 56:22
advising [1] - 54:12
affirmatively [2] - 22:3, 46:2
afternoon [2] - 47:4, 47:7
ago [9] - 5:7, 13:25, 18:23, 27:12, 28:24, 29:13, 29:16, 47:22, 61:1
agree [14] - 4:18, 9:14, 9:25, 13:3, 19:18, 30:25, 32:1, 32:7, 35:24, 38:22, 46:23, 53:25, 54:1
agreeable [1] - 21:17
agreed [7] - 9:13, 9:16, 9:18, 13:19, 24:4, 39:8, 54:17
agreement [15] - 19:19, 20:2, 20:7, 24:14, 26:1, 26:21, 28:21, 33:1, 44:4, 45:23, 46:5, 49:12, 55:13, 56:19, 60:11
ahead [3] - 18:24, 46:10, 60:24
AHG [15] - 4:21, 5:25, 8:15, 9:9, 12:19, 15:2, 16:9, 18:23, 18:24, 21:16, 44:8, 44:9, 44:15, 45:24, 50:18
AHG's [2] - 9:13, 15:5
aiding [1] - 57:10
aim [1] - 47:7
alleged [2] - 12:19, 13:21
allocation [1] - 43:12
allow [4] - 36:11, 36:22, 46:11, 46:13
allows [1] - 30:14
alluded [1] - 15:10
aloud [1] - 47:24
alter [1] - 16:20
alternative [1] - 27:13
alternatively [2] - 23:5, 35:12
alternatives [1] - 49:1
amount [4] - 6:7, 17:15, 35:14, 39:22
analysis [1] - 51:12
AND [1] - 1:2
and-a-half [1] - 28:24
answer [10] - 21:6, 37:14, 37:15, 37:19, 42:18, 48:4, 48:6, 54:24, 55:8, 61:12
answers [1] - 15:10
anticipate [5] - 11:18, 18:6, 39:13, 40:25, 43:5
anticipation [1] - 24:17
anyway [2] - 56:11, 62:21
apparatus [1] - 26:8
appeal [1] - 54:3
appear [2] - 4:6, 9:12
appearances [1] - 3:8
APPEARANCES [2] - 1:15, 2:1
appeared [1] - 4:9
apple [1] - 44:22
applied [1] - 55:1
applies [1] - 57:2
apply [1] - 28:14
approach [3] - 36:12, 46:6, 57:4
appropriate [1] - 31:25
April [3] - 4:4, 46:20, 63:10
argue [2] - 32:23, 55:15
argued [1] - 7:1
argument [9] - 19:11, 27:5, 46:14, 52:4, 52:22, 52:23, 53:1, 53:6, 53:9
argumentative [1] - 36:15
arguments [5] - 6:5, 6:13, 8:7, 46:11, 46:12
arrangements [1] - 19:2
arranging [1] - 62:4
art [10] - 5:18, 6:4, 6:6, 6:7, 6:14, 7:7, 7:9, 8:7, 8:9
asserted [3] - 8:22, 24:15, 50:14
asserting [1] - 7:7
assertions [1] - 45:21
assess [1] - 13:16
associated [1] - 9:5
assume [1] - 49:17
assuming [1] - 61:4
Ateliers [1] - 2:8
ATELIERS [1] - 1:4
attached [1] - 39:17
attention [2] - 42:13, 43:7
attorneys [2] - 3:6, 58:9
AUTOMATION [2] - 1:8, 1:8
Automation [2] - 2:15, 2:16
AUTOMATION-USA [1] - 1:8
Automation-USA [1] - 2:15
available [5] - 43:1, 46:20, 46:21, 51:8, 51:14
avoid [2] - 7:23, 52:15
awarded [1] - 51:8
aware [2] - 5:11, 58:5
Axel [1] - 14:5

B

bad [1] - 58:23
based [4] - 13:8, 17:2, 28:10, 40:2
Beach [12] - 9:16, 9:21, 10:2, 10:6, 10:8, 10:19, 11:1, 11:20, 12:8, 13:5, 13:14, 13:22
bear [2] - 18:19, 60:8
BEFORE [1] - 1:14
begin [2] - 46:20, 54:13
beginning [3] - 3:4, 23:5, 60:14
behalf [2] - 3:11, 3:22
behind [1] - 53:24
believes [1] - 5:20
benches [1] - 47:23
Benczkowski [5] - 14:4, 15:6, 15:11, 16:13, 16:15
benefit [3] - 23:17, 56:7, 56:11
best [7] - 17:2, 17:10, 27:21, 39:18, 48:2, 58:16, 58:17
better [1] - 31:1
between [2] - 29:22, 49:22
BEYER [1] - 2:14
Beyer [1] - 3:24
beyond [7] - 8:10, 8:20, 8:24, 21:11, 39:8, 46:24, 58:18
Biddle [1] - 3:22
BIDDLE [2] - 2:10,

2:12
**big** [2] - 49:16, 60:1
**bigger** [1] - 59:18
**bills** [1] - 60:2
**binders** [2] - 60:6, 60:19
**bit** [4] - 4:13, 18:22, 21:23, 29:15
**bite** [1] - 44:22
**Boeing** [1] - 60:3
**bold** [1] - 50:12
**bottom** [1] - 42:14
**box** [2] - 37:5, 48:21
**brand** [2] - 27:9, 30:1
**break** [3] - 23:5, 40:1, 47:3
**breaks** [3] - 47:1, 47:4, 47:7
**Brian** [2] - 1:24, 63:15
**brief** [4] - 6:3, 6:9, 36:14, 48:11
**briefing** [1] - 54:9
**briefs** [1] - 21:20
**bring** [10] - 16:3, 17:9, 17:21, 19:2, 42:13, 43:9, 47:22, 55:5, 58:20, 62:21
**bringing** [1] - 29:21
**BROETJE** [2] - 1:8, 1:8
**Broetje** [24] - 2:15, 2:16, 5:19, 6:4, 9:15, 10:15, 12:4, 12:18, 13:4, 14:4, 14:6, 15:6, 15:17, 17:18, 21:14, 30:25, 34:16, 44:10, 44:18, 45:5, 50:9, 50:13, 50:18
**Broetje's** [2] - 13:24, 32:5
**brought** [1] - 21:8
**burden** [9] - 44:9, 44:12, 44:15, 44:16, 44:24, 44:25, 45:3, 45:25, 46:2
**business** [3] - 15:5, 16:8, 50:22
**buzzers** [1] - 57:12
**BY** [6] - 1:17, 1:20, 2:3, 2:6, 2:10, 2:13

**C**

**Cahr** [1] - 3:24
**CAHR** [12] - 2:13, 27:7, 27:12, 29:4, 29:8, 32:6, 32:16, 33:4, 55:16, 55:24, 56:15, 56:20
**California** [7] - 10:3, 10:6, 30:13, 31:11, 32:2, 50:23, 51:9
**candy** [1] - 56:24
**cannot** [2] - 14:9, 51:15
**care** [6] - 9:8, 32:6, 46:24, 55:14, 55:15, 63:8
**CARRIE** [1] - 2:14
**Carrie** [1] - 3:24
**carry** [2] - 32:4, 52:10
**case** [22] - 4:15, 8:21, 11:14, 11:17, 14:10, 14:12, 15:9, 16:24, 18:13, 28:7, 30:25, 31:3, 31:13, 36:1, 43:19, 46:10, 51:11, 60:16, 60:23
**case-in-chief** [2] - 16:24, 18:13
**cassette** [9] - 60:25, 61:7, 61:11, 61:17, 61:18, 61:21, 61:22, 62:7, 62:12
**cassettes** [4] - 11:21, 11:23, 11:25, 12:19
**caution** [1] - 59:24
**caveat** [1] - 40:21
**CEO** [1] - 15:3
**certain** [1] - 34:7
**certainly** [3] - 19:1, 38:11, 49:22
**certify** [1] - 63:13
**cetera** [1] - 51:2
**chair** [1] - 36:21
**chance** [9] - 4:14, 16:10, 44:16, 44:19, 45:10, 46:1, 48:11, 56:12, 61:16
**change** [2] - 21:5, 56:13
**changed** [1] - 61:2
**changes** [1] - 29:19
**charge** [2] - 43:13, 53:6
**charged** [8] - 9:5, 24:11, 33:14, 33:15, 33:19, 33:24, 34:10, 62:6
**charging** [1] - 43:11
**chew** [1] - 56:23
**chicago** [1] - 2:7
**Chicago** [3] - 2:14, 61:23
**chided** [1] - 58:14
**Chief** [1] - 14:5
**chief** [3] - 15:4, 16:24, 18:13
**circumstance** [1] - 38:5
**cite** [1] - 14:12
**cited** [1] - 14:10
**cIVIL** [1] - 1:4
**claim** [4] - 25:12, 26:20, 56:3, 56:10
**claims** [9] - 8:22, 24:15, 25:1, 25:16, 26:8, 26:9, 26:14, 26:16
**clarity** [3] - 50:16, 51:20, 55:16
**clear** [3] - 45:23, 50:15, 53:6
**clearly** [2] - 7:17, 39:16
**clerk** [4] - 18:20, 59:11, 60:9, 60:19
**client** [3] - 14:24, 17:6, 60:23
**clients** [1] - 57:2
**clip** [1] - 38:3
**clipboard** [1] - 48:23
**clock** [1] - 33:15
**close** [3] - 6:5, 18:23
**closer** [1] - 39:10
**closing** [4] - 19:11, 46:11, 46:14
**colleagues** [1] - 3:23
**colored** [1] - 10:22
**Columbia** [1] - 2:4
**combinations** [1] - 6:14
**comfortable** [1] - 31:21
**coming** [3] - 5:8, 41:6, 42:17
**commit** [1] - 62:1
**committing** [1] - 62:6
**company** [2] - 15:4, 18:10
**competency** [1] - 41:25
**competing** [2] - 22:22, 36:3
**competition** [2] - 24:24, 25:10
**competitor** [1] - 15:4
**complemented** [1] - 35:10
**complete** [3] - 5:1, 35:10, 60:17
**completed** [2] - 4:19, 4:24
**completely** [2] - 18:24, 55:2
**comply** [1] - 22:4
**Conaway** [1] - 3:11
**CONAWAY** [1] - 1:17
**conceptual** [1] - 55:22
**conceptually** [1] - 56:6
**concern** [3] - 12:20, 12:21, 42:10
**concerned** [4] - 7:20, 7:21, 10:5, 12:14
**concerning** [1] - 59:23
**concerns** [3] - 9:9, 34:13, 48:10
**concrete** [1] - 33:17
**concretely** [1] - 56:16
**confer** [10] - 18:20, 22:19, 35:1, 42:11, 49:11, 54:7, 55:7, 59:1, 59:11, 60:9
**Conference** [1] - 1:12
**conference** [5] - 3:3, 4:4, 6:8, 6:12, 63:11
**conferred** [2] - 29:24, 41:6
**conferring** [1] - 43:1
**confess** [1] - 31:6
**confident** [1] - 13:13
**Congress** [3] - 14:19, 51:5, 51:13
**consider** [1] - 55:7
**considered** [3] - 7:10, 48:25
**constitutes** [1] - 50:24
**constructed** [1] - 28:16
**consult** [1] - 43:20
**content** [2] - 6:13, 8:9
**contentions** [1] - 44:12
**context** [3] - 34:4, 52:7, 52:16
**contexts** [1] - 34:4
**continue** [4] - 7:11, 37:12, 48:19, 55:18
**Continued** [1] - 2:1
**contributory** [7] - 25:2, 25:5, 25:8, 26:6, 26:11, 26:19, 26:22
**copies** [1] - 60:7
**copy** [2] - 28:2, 57:23
**corporate** [13] - 13:24, 14:3, 14:8, 14:16, 14:24, 15:11, 15:14, 16:4, 17:6, 17:9, 17:21, 17:24, 18:3
**corporation** [1] - 17:19
**Corporation** [4] - 1:4, 1:5, 1:8, 1:9
**correct** [9] - 5:14, 8:17, 21:3, 21:8, 25:4, 26:23, 38:8, 38:23, 53:8
**corresponding** [1] - 27:14
**costs** [1] - 9:5
**Counsel** [2] - 2:8, 2:15
**counsel** [4] - 35:18, 37:3, 58:4, 59:1
**count** [1] - 39:25
**counterdesignated** [1] - 40:3
**counterdesignations** [3] - 38:15, 38:20, 39:5
**counts** [1] - 38:4
**couple** [4] - 20:1, 20:22, 53:21, 61:1
**course** [7] - 17:6, 22:2, 22:4, 24:4, 24:10, 43:17, 47:1
**Court** [19] - 6:7, 14:16, 14:19, 17:14, 17:16, 18:20, 20:8, 28:1, 28:3, 29:9, 29:16, 30:8, 35:6, 35:14, 35:18, 40:13, 44:23, 63:15, 63:16
**court** [4] - 3:4, 35:8, 59:11, 60:9
**COURT** [153] - 1:1, 3:5, 3:8, 3:19, 3:25, 4:2, 5:3, 5:8, 5:11, 5:14, 5:17, 5:24, 6:20, 6:25, 8:2, 8:14, 9:18, 9:24, 10:4, 10:8, 10:11, 10:24, 11:4, 11:11, 12:6, 12:21, 13:3, 14:14, 14:21, 15:13, 15:19, 15:21, 15:24, 16:2, 16:9, 17:5, 17:24, 18:14, 18:16, 18:19, 18:21, 19:5, 19:8, 19:12, 19:22, 20:17, 20:25, 21:5, 21:10, 21:13, 21:21, 22:8, 22:14, 22:18, 23:23, 23:25, 24:20, 24:23, 25:17, 25:24, 26:2, 26:10, 26:15, 26:21, 26:25, 27:2, 27:11, 29:1, 29:7, 29:10, 30:19, 31:6, 31:21, 32:4, 32:15, 32:17, 33:5, 33:8, 34:16, 34:18, 34:22, 34:24, 36:7, 36:9, 36:23, 37:1, 37:10, 37:23, 38:7, 38:10, 38:22, 38:25, 39:2, 40:7, 41:4, 41:11, 41:15, 41:19, 42:3, 42:20, 42:23, 44:1, 44:3, 44:7, 45:1, 45:11, 45:14, 45:22, 46:5, 47:13, 47:15, 49:6, 49:10, 49:18, 49:21, 49:25, 50:11, 50:18, 51:17, 51:20, 51:24,

52:6, 52:12, 53:9, 53:13, 53:19, 53:21, 55:6, 55:13, 55:21, 55:25, 56:16, 56:21, 58:8, 58:12, 58:15, 58:22, 59:3, 59:5, 59:8, 59:12, 59:21, 60:8, 60:10, 61:13, 62:3, 62:8, 62:13, 62:18, 62:22, 62:24, 63:5, 63:7
**Court's** [1] - 59:9
**courtesy** [1] - 57:23
**courtroom** [9] - 11:10, 14:4, 16:21, 37:4, 47:24, 48:18, 56:25, 57:1, 57:9
**courts** [1] - 28:11
**covered** [1] - 27:3
**created** [1] - 51:5
**credibility** [1] - 13:17
**cross** [10] - 12:2, 12:3, 13:16, 15:12, 33:22, 33:24, 34:8, 35:11, 36:10, 60:7
**cross-examination** [3] - 12:3, 34:8, 35:11
**cross-examine** [1] - 12:2
**cross-examined** [1] - 13:16
**cross-examining** [3] - 15:12, 33:22, 33:24
**culminates** [1] - 39:12
**current** [1] - 61:3

**D**

**D.I** [4] - 6:3, 6:18, 7:4, 8:5
**damages** [8] - 5:5, 24:18, 24:23, 25:1, 25:14, 25:15, 51:8, 51:12
**Darren** [1] - 3:24
**DARREN** [1] - 2:13
**dates** [1] - 55:20
**days** [4] - 20:22, 27:12, 29:13, 39:13
**DE** [1] - 1:4
**De** [1] - 2:8
**deal** [6] - 22:22, 27:10, 27:21, 28:25, 32:19
**dealing** [1] - 16:22
**dealt** [2] - 27:9, 27:16
**debate** [4] - 32:11, 32:13, 32:21, 32:24
**decide** [6] - 5:25, 21:9, 25:19, 31:2, 38:5, 54:4
**decided** [2] - 32:13, 54:18
**deciding** [2] - 31:23, 32:2
**decision** [5] - 14:22, 19:16, 31:1, 31:4, 52:13
**decisions** [3] - 21:1, 30:25, 52:10
**default** [1] - 34:6
**defendant** [5] - 8:17, 13:19, 14:1, 42:8, 46:12
**defendants** [6] - 3:23, 8:23, 9:7, 9:19, 45:25, 59:3
**Defendants** [1] - 1:10
**defendants'** [3] - 7:21, 10:11, 45:15
**defense** [2] - 17:11, 30:6
**defenses** [1] - 20:4
**DELAWARE** [1] - 1:2
**Delaware** [2] - 1:8, 1:11
**delay** [1] - 54:11
**delayed** [1] - 30:8
**deliberate** [1] - 49:2
**deliberating** [1] - 46:23
**demonstration** [1] - 36:22
**demonstrative** [1] - 37:6
**deny** [1] - 7:11
**denying** [1] - 8:16
**deposed** [1] - 15:8
**deposition** [16] - 4:25, 8:12, 11:19, 12:24, 13:15, 21:16, 35:12, 35:20, 37:10, 38:13, 38:15, 38:18, 39:20, 39:23, 61:19, 62:20
**depositions** [5] - 21:22, 34:25, 37:11, 39:4, 40:4
**deputies** [1] - 43:20
**deputy** [2] - 59:11, 60:9
**described** [1] - 46:18
**description** [2] - 24:18, 24:22
**designate** [1] - 14:15
**designated** [3] - 14:8, 38:19, 40:2
**designation** [1] - 21:16
**designations** [4] - 37:10, 38:13, 38:15, 39:5
**designed** [1] - 61:10
**designing** [1] - 60:24
**devices** [1] - 57:9
**different** [5] - 6:14, 23:16, 23:17, 35:24
**differently** [1] - 23:16
**difficult** [1] - 31:5
**dire** [5] - 47:17, 47:19, 48:1, 49:9, 49:10
**direct** [6] - 24:14, 33:18, 33:20, 36:10, 42:7, 54:6
**disagree** [1] - 14:21
**disagreement** [2] - 44:4, 44:6
**disbelief** [1] - 58:11
**discern** [1] - 37:18
**disclose** [1] - 42:6
**disclosed** [4] - 6:15, 8:25, 13:13, 27:18
**disclosures** [1] - 27:19
**discovery** [7] - 4:18, 4:24, 5:1, 6:5, 6:6, 27:24, 30:8
**discretion** [6] - 14:15, 14:20, 17:15, 17:17, 34:9, 38:3
**discretionary** [1] - 14:22
**discuss** [2] - 19:23, 34:14
**discussed** [3] - 9:4, 19:19, 19:20
**dispute** [24] - 4:6, 4:13, 4:19, 5:20, 9:11, 9:12, 10:13, 11:5, 13:23, 14:1, 19:14, 19:23, 24:3, 25:17, 26:4, 33:10, 37:11, 49:13, 50:2, 58:12, 62:1, 62:25
**disputed** [2] - 4:9, 52:22
**disputes** [6] - 19:25, 21:22, 27:3, 47:18, 53:10, 60:11
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 2:4, 63:16
**docket** [1] - 47:19
**docketed** [1] - 52:19
**documents** [1] - 60:1
**done** [9] - 23:7, 23:8, 23:9, 23:10, 35:3, 53:7, 53:13, 53:22, 59:2
**doubt** [1] - 62:11
**down** [8] - 6:7, 6:10, 6:12, 7:14, 36:23, 40:2, 45:8, 45:9
**Dr** [4] - 18:5, 38:18, 39:7, 44:20
**draw** [1] - 48:19
**dress** [8] - 11:14, 24:24, 25:9, 25:13, 30:16, 44:10, 44:12, 51:2
**drink** [1] - 57:8
**Drinker** [1] - 3:22
**DRINKER** [2] - 2:10, 2:12
**due** [1] - 56:13
**during** [19] - 11:19, 20:12, 21:15, 22:1, 23:10, 27:4, 33:18, 34:11, 35:3, 41:1, 41:3, 41:8, 41:9, 42:15, 49:9, 49:10, 52:24, 53:7, 53:10

**E**

**e-mail** [2] - 6:11, 57:23
**early** [1] - 52:24
**easiest** [1] - 45:19
**eat** [1] - 56:24
**economic** [3] - 24:25, 25:11
**effectively** [1] - 16:16
**effort** [1] - 58:23
**eight** [1] - 48:24
**either** [7] - 22:21, 34:4, 36:3, 41:5, 51:1, 52:17, 57:24
**electronic** [1] - 57:9
**elicit** [4] - 10:24, 20:12, 20:25, 30:20
**eliciting** [1] - 30:21
**eliminate** [1] - 17:22
**elsewhere** [2] - 10:17, 13:6
**embedded** [1] - 34:1
**employee** [1] - 18:10
**employees** [2] - 15:24, 17:20
**encapsulated** [1] - 8:6
**encompasses** [1] - 25:9
**encourage** [1] - 36:14
**end** [2] - 23:6, 44:17
**endeavor** [1] - 52:25
**ended** [2] - 26:17, 56:1
**ends** [1] - 63:11
**English** [2] - 37:14, 37:20
**ensued** [1] - 29:22
**enter** [1] - 54:8
**entire** [1] - 51:13
**entirely** [2] - 28:19, 42:19
**entitled** [2] - 17:7, 17:8
**equitable** [15] - 20:4, 20:22, 21:9, 27:15, 28:10, 30:14, 30:20, 31:8, 31:13, 32:20, 32:22, 33:1, 54:18, 54:25, 56:13
**equity** [3] - 20:23, 27:23, 32:13
**ESQ** [9] - 1:17, 1:20, 1:20, 2:3, 2:6, 2:10, 2:13, 2:13, 2:14
**essence** [1] - 15:5
**essentially** [1] - 7:3
**estoppel** [1] - 20:5
**et** [1] - 51:2
**evening** [1] - 42:12
**events** [1] - 57:11
**evidence** [15] - 20:9, 20:10, 21:1, 30:18, 30:19, 30:24, 40:11, 40:13, 40:18, 41:13, 41:16, 43:21, 56:8
**exactly** [6] - 16:14, 16:21, 17:1, 18:8, 39:17, 59:19
**examination** [9] - 12:3, 33:18, 34:1, 34:8, 34:12, 35:11, 35:13, 36:11, 42:7
**examinations** [1] - 36:10
**examine** [1] - 12:2
**examined** [2] - 11:19, 13:16
**examining** [3] - 15:12, 33:22, 33:24
**example** [7] - 40:25, 44:10, 51:7, 51:11, 54:18, 54:22, 60:1
**except** [1] - 21:15
**exception** [2] - 39:2, 57:4
**exceptional** [1] - 51:11
**exceptions** [1] - 57:5
**excerpt** [2] - 35:6, 35:9
**excerpts** [1] - 39:17
**exchanging** [1] - 42:24
**exclude** [2] - 10:21, 14:17
**excluded** [1] - 14:9
**exercise** [1] - 48:22
**exhibit** [11] - 6:9, 40:10, 40:12, 40:16, 41:23, 41:24, 42:2, 59:23, 60:5, 62:20
**exhibits** [18] - 22:12, 40:7, 40:9, 40:15, 40:21, 41:21, 42:6,

42:9, 42:25, 43:4, 59:23, 59:25, 60:12, 60:13, 60:20
**expect** [4] - 15:3, 32:21, 32:24, 39:10
**expense** [1] - 16:6
**experienced** [1] - 58:4
**expert** [20] - 5:5, 6:6, 6:15, 7:8, 7:10, 7:16, 7:17, 7:21, 7:25, 8:10, 8:11, 8:24, 9:21, 11:9, 11:13, 12:12, 12:25, 13:11, 34:19
**expert's** [1] - 8:8
**expertise** [1] - 12:12
**expired** [1] - 56:5
**expressed** [1] - 22:1
**expressions** [2] - 58:5, 58:11
**extensive** [1] - 31:12
**extent** [7] - 7:15, 8:15, 13:19, 23:7, 32:17, 32:23, 58:15
**extra** [2] - 16:6, 28:2
**eyewitness** [1] - 10:20

## F

**F2C2** [2] - 1:4, 2:8
**face** [2] - 58:10, 58:16
**facial** [2] - 58:5, 58:11
**facilities** [1] - 12:9
**facility** [2] - 13:5, 13:22
**fact** [18] - 9:22, 10:21, 12:7, 12:13, 12:15, 13:4, 13:6, 13:14, 13:20, 16:4, 16:25, 21:7, 27:22, 28:17, 46:6, 50:9, 59:16, 61:3
**facts** [3] - 24:6, 24:8, 28:15
**factual** [6] - 12:11, 18:7, 24:13, 25:18, 31:4
**failed** [1] - 54:23
**fair** [4] - 17:14, 32:17, 41:16, 46:8
**fairly** [5] - 4:7, 17:19, 18:10, 54:7, 61:9
**faith** [1] - 58:23
**far** [2] - 12:13, 28:5
**Farnan** [3] - 7:19, 9:1, 34:19
**fault** [8] - 9:15, 10:2, 10:5, 10:6, 10:15, 10:18, 10:25, 11:14
**faults** [15] - 11:13, 11:21, 11:23, 11:25, 12:8, 12:9, 12:16, 12:19, 12:25, 13:5, 13:6, 13:14, 13:21
**favor** [1] - 18:23
**feet** [1] - 34:11
**few** [5] - 4:12, 5:6, 47:18, 48:11, 59:4
**field** [1] - 9:23
**fight** [1] - 35:25
**file** [4] - 21:18, 21:24, 21:25, 28:3
**filed** [5] - 4:5, 8:5, 30:5, 30:7, 31:18
**filings** [4] - 4:5, 21:15, 21:18, 54:3
**filtered** [1] - 25:22
**final** [5] - 5:5, 48:1, 52:4, 52:10, 53:7
**findings** [2] - 27:22, 56:3
**fine** [10] - 5:24, 7:18, 8:14, 21:13, 24:4, 27:11, 33:4, 37:6, 49:12, 57:8
**finished** [2] - 45:18, 46:7
**firm** [1] - 19:17
**first** [16] - 4:17, 4:21, 5:25, 7:1, 9:11, 10:9, 11:12, 14:1, 17:13, 23:20, 27:13, 40:20, 43:9, 46:13, 47:1, 47:2
**fit** [1] - 49:17
**five** [3] - 4:9, 8:21, 24:15
**flavor** [1] - 16:15
**flipped** [1] - 26:13
**fly** [2] - 17:11, 42:15
**focus** [1] - 26:3
**focused** [1] - 4:5
**folks** [2] - 16:3, 56:23
**follow** [2] - 48:12, 60:20
**follow-up** [1] - 48:12
**following** [2] - 42:4, 44:21
**FOR** [1] - 1:2
**foregoing** [1] - 63:13
**foreign** [2] - 37:12, 37:19
**forgot** [1] - 5:12
**form** [8] - 26:12, 27:15, 31:17, 31:19, 52:21, 53:2, 54:21, 55:19
**formality** [1] - 40:17
**formally** [1] - 40:14
**forth** [2] - 45:20, 51:6
**forward** [3] - 23:14, 24:5, 63:8
**foundation** [1] - 40:14
**four** [2] - 45:17, 46:9
**fourth** [4] - 44:19, 45:5, 46:6, 46:14
**framed** [1] - 51:13
**France** [6] - 28:11, 30:15, 30:16, 31:3, 61:3, 62:15
**free** [5] - 8:23, 24:7, 24:12, 37:3, 41:9
**freely** [1] - 36:13
**French** [4] - 1:4, 1:5, 37:17, 60:23
**fresh** [1] - 29:5
**Friday** [1] - 1:12
**front** [6] - 7:5, 20:11, 20:12, 28:17, 30:21, 32:9
**furthermore** [1] - 7:6

## G

**Gaffigan** [2] - 1:24, 63:15
**game** [1] - 41:17
**GARONNE** [1] - 1:4
**Garonne** [1] - 2:8
**gather** [1] - 61:6
**Gemcor** [2] - 15:4, 15:7
**general** [4] - 10:7, 19:7, 19:9, 24:2
**German** [1] - 37:17
**german** [1] - 1:9
**Germany** [9] - 14:6, 15:17, 28:11, 30:17, 61:20, 61:21, 62:17, 62:18
**gesturing** [1] - 38:1
**given** [3] - 6:4, 9:6, 30:17
**glad** [1] - 22:18
**GmbH** [1] - 2:16
**GMBH** [1] - 1:8
**goal** [1] - 46:25
**golden** [1] - 57:24
**Google** [1] - 45:18
**govern** [1] - 24:4
**grant** [2] - 37:2, 57:5
**granted** [2] - 36:13, 46:17
**guess** [8] - 13:25, 18:1, 30:4, 37:14, 45:2, 45:7, 56:1, 62:16
**guidance** [3] - 58:6, 58:7, 58:8
**gum** [1] - 56:23

## H

**half** [2] - 28:24, 47:3
**handle** [3] - 22:13, 28:18, 36:4
**handled** [2] - 23:15, 35:23
**hands** [1] - 48:3
**happily** [1] - 4:4
**happy** [5] - 19:18, 28:3, 29:8, 47:17, 50:1
**hate** [1] - 55:5
**hats** [1] - 57:13
**Haute** [1] - 2:8
**HAUTE** [1] - 1:4
**Haute-Garonne** [1] - 2:8
**HAUTE-GARONNE** [1] - 1:4
**heads** [1] - 36:2
**hear** [14] - 5:21, 5:24, 14:1, 18:12, 35:6, 35:9, 44:7, 46:12, 50:18, 52:22, 52:23, 53:1, 54:2, 56:7
**heard** [6] - 9:7, 10:10, 12:9, 16:21, 17:3, 61:12
**hearing** [4] - 7:20, 7:22, 37:18, 45:20
**hears** [1] - 12:4
**held** [1] - 3:3
**help** [1] - 17:10
**helpful** [5] - 15:12, 36:17, 38:2, 56:12, 60:18
**hereby** [1] - 63:13
**HIGGINS** [3] - 1:17, 3:10, 3:16
**Higgins** [1] - 3:11
**high** [1] - 20:6
**highlighted** [2] - 16:12, 50:7
**highly** [1] - 28:6
**history** [2] - 6:3, 29:15
**Honor** [118] - 3:7, 3:10, 3:14, 3:18, 3:21, 4:1, 4:23, 4:25, 5:4, 5:13, 5:22, 6:2, 6:9, 6:17, 7:15, 7:18, 8:4, 8:6, 9:17, 9:20, 10:13, 11:2, 11:6, 11:12, 11:15, 12:23, 14:2, 14:18, 15:1, 15:23, 16:1, 16:11, 17:13, 18:18, 19:4, 20:16, 20:19, 21:4, 21:7, 21:12, 22:6, 22:17, 23:22, 23:24, 24:19, 25:7, 25:21, 26:6, 26:18, 26:24, 27:1, 27:7, 29:12, 30:23, 31:11, 31:24, 33:4, 33:7, 34:15, 34:17, 34:21, 34:23, 36:6, 36:8, 36:20, 37:9, 37:22, 37:25, 38:9, 38:17, 38:24, 39:1, 40:5, 40:6, 40:20, 41:10, 41:12, 41:13, 41:20, 43:25, 44:2, 44:6, 45:7, 45:13, 45:16, 46:4, 47:12, 47:14, 49:5, 49:7, 49:17, 50:4, 50:6, 50:20, 51:4, 51:19, 52:9, 53:5, 53:8, 53:11, 53:12, 53:20, 54:16, 54:24, 55:4, 56:20, 58:3, 58:13, 58:19, 59:2, 59:4, 59:22, 60:4, 60:21, 61:15, 62:5, 62:11, 63:3
**HONORABLE** [1] - 1:14
**hope** [1] - 7:23
**hoped** [1] - 11:16
**hopeful** [1] - 4:6
**hopefully** [1] - 57:17
**HOROWITZ** [4] - 1:20, 3:15, 41:20, 42:19
**Horwitz** [1] - 3:13
**hour** [3] - 43:12, 46:25, 47:4
**hours** [4] - 21:2, 21:11, 30:4, 46:16
**human** [1] - 17:7
**humanly** [1] - 58:15

## I

**idea** [2] - 16:18, 55:11
**identical** [1] - 28:11
**identify** [4] - 9:10, 24:3, 35:15, 39:16
**Ill** [2] - 45:2, 45:24
**Illinois** [2] - 2:7, 2:14
**imagine** [3] - 55:4, 58:6, 58:8
**immediate** [1] - 32:6
**impeach** [2] - 12:24, 13:1
**impeachment** [3] - 34:25, 35:20, 35:22
**imperative** [1] - 52:7
**implement** [1] - 56:18
**import** [1] - 62:7
**important** [1] - 12:17
**imported** [2] - 59:14,

62:14
**impression** [1] - 59:13
**improper** [1] - 32:19
**improperly** [1] - 28:16
**IN** [2] - 1:1, 1:2
**Inc** [1] - 2:15
**INC** [1] - 1:8
**include** [1] - 56:23
**includes** [1] - 15:3
**including** [6] - 6:6, 9:6, 32:18, 33:20, 33:25, 61:5
**inconsistency** [1] - 35:7
**inconvenient** [1] - 36:1
**incorporating** [1] - 29:21
**incredible** [1] - 59:25
**indefiniteness** [1] - 24:21
**independent** [2] - 51:10, 51:15
**independently** [2] - 50:25, 51:1
**indicated** [1] - 34:6
**individually** [1] - 48:6
**induced** [1] - 24:15
**infer** [1] - 20:10
**inflate** [1] - 12:7
**influence** [2] - 12:1, 12:3
**infringe** [2] - 51:2, 51:3
**infringement** [18] - 20:6, 24:14, 24:15, 24:16, 24:24, 25:2, 25:5, 25:8, 26:7, 26:12, 26:22, 30:16, 44:10, 44:11, 51:6, 51:9, 51:15, 62:6
**infringes** [1] - 61:11
**infringing** [1] - 50:14
**input** [1] - 4:13
**inspect** [4] - 61:16, 61:18, 61:24, 62:4
**installations** [1] - 60:2
**instance** [2] - 42:8, 45:5
**instructed** [1] - 55:17
**instructing** [2] - 31:22, 32:22
**instruction** [11] - 27:14, 28:15, 29:13, 30:3, 30:5, 30:9, 31:8, 31:14, 31:15, 31:16, 31:19
**instructions** [26] - 25:22, 27:4, 29:14, 29:17, 29:18, 29:20, 29:21, 29:24, 29:25, 30:1, 30:2, 30:7, 31:7, 31:11, 32:21, 50:1, 51:18, 52:4, 52:8, 52:10, 52:14, 52:16, 52:19, 52:23, 53:2, 53:8
**insufficiently** [1] - 35:10
**intend** [10] - 4:8, 5:7, 5:8, 10:24, 20:25, 24:9, 24:10, 30:20, 42:7, 42:9
**intense** [1] - 30:2
**intent** [1] - 8:10
**intentional** [3] - 24:25, 25:10, 58:23
**interference** [5] - 24:25, 25:11, 50:22, 50:24, 51:16
**interpretation** [1] - 14:22
**interrogatory** [4] - 15:10, 27:14, 28:16, 31:23
**invalidity** [4] - 24:17, 29:20, 44:13, 44:20
**involuntary** [1] - 58:14
**issue** [36] - 4:17, 5:14, 5:15, 7:1, 8:18, 9:10, 11:15, 12:11, 12:15, 13:25, 14:20, 16:12, 19:21, 20:20, 26:7, 27:8, 27:9, 27:15, 28:7, 28:20, 34:24, 35:23, 41:1, 42:12, 50:16, 50:17, 50:21, 51:17, 54:17, 54:20, 56:1, 56:9, 58:6, 58:20, 60:22
**issues** [34] - 4:9, 4:12, 4:14, 7:4, 10:2, 10:6, 10:16, 10:19, 10:25, 18:7, 18:8, 20:1, 20:3, 20:5, 20:8, 24:13, 25:18, 25:23, 27:3, 27:5, 27:8, 27:17, 28:10, 28:22, 30:22, 32:20, 33:9, 45:3, 45:25, 46:2, 46:15, 52:22, 58:2
**items** [1] - 44:16
**itself** [6] - 13:10, 28:15, 28:16, 41:23, 42:2, 46:16

## J

**JAMES** [1] - 1:17
**January** [3] - 7:2, 8:17
**Jeffrey** [1] - 3:12
**JEFFREY** [1] - 1:20
**Jim** [1] - 3:10
**JMOL** [1] - 31:14
**joined** [1] - 3:23
**joint** [3] - 22:21, 36:3
**jointly** [1] - 46:16
**JOSEPH** [1] - 2:10
**Joseph** [1] - 3:21
**Judge** [5] - 3:15, 7:19, 9:1, 34:19, 44:14
**judgment** [2] - 9:2, 22:23
**juror** [4] - 47:16, 48:9, 48:13, 48:16
**jurors** [8] - 47:3, 48:2, 48:20, 48:24, 48:25, 53:24, 54:2, 55:17
**jury** [63] - 13:16, 19:24, 20:11, 20:13, 21:3, 23:9, 23:10, 24:8, 24:11, 25:21, 27:4, 28:18, 29:14, 29:17, 29:18, 30:21, 31:2, 31:3, 31:7, 31:8, 31:11, 31:16, 31:20, 31:22, 32:1, 32:9, 32:20, 32:22, 32:25, 33:2, 36:15, 36:17, 37:5, 37:16, 37:18, 38:2, 43:2, 45:19, 46:21, 46:22, 47:15, 47:19, 47:22, 48:21, 49:3, 49:14, 51:18, 52:4, 52:10, 52:20, 52:23, 53:2, 53:6, 53:14, 53:23, 54:14, 54:22, 55:1, 55:8, 56:3, 59:16, 60:17
**jury's** [1] - 56:7
**juryroom** [2] - 48:7, 48:13

## K

**KAYE** [3] - 1:19, 2:3, 2:6
**Kaye** [1] - 3:12
**keep** [9] - 43:14, 46:17, 46:22, 47:3, 47:4, 48:2, 48:4, 58:10, 58:16
**Kelleher** [14] - 3:24, 5:3, 8:2, 16:11, 18:16, 23:23, 26:1, 26:25, 34:22, 36:7, 44:1, 47:13, 49:6, 62:3
**KELLEHER** [66] - 2:13, 5:4, 5:10, 5:16, 5:22, 8:4, 9:20, 10:2, 10:12, 11:2, 11:6, 12:23, 14:2, 14:18, 15:1, 15:16, 15:20, 15:22, 16:1, 16:6, 18:18, 19:4, 19:6, 19:9, 19:20, 20:18, 21:4, 22:6, 22:11, 23:24, 24:19, 24:21, 26:6, 26:13, 26:17, 27:1, 34:17, 34:23, 36:8, 37:9, 37:24, 39:1, 40:6, 41:12, 41:18, 42:22, 44:2, 45:16, 46:4, 47:14, 49:7, 49:16, 49:20, 49:24, 50:20, 51:19, 51:23, 53:20, 58:13, 59:4, 59:6, 59:19, 59:22, 60:21, 62:5, 63:6
**Kelleher's** [1] - 52:2
**Ken** [2] - 14:4, 15:6
**kind** [4] - 4:12, 21:15, 50:7, 51:14
**kinds** [1] - 11:23
**knowledge** [3] - 10:20, 13:7, 41:25
**Kytomaa** [1] - 44:20

## L

**LA** [1] - 1:4
**laches** [1] - 20:4
**lack** [2] - 41:25
**language** [4] - 37:12, 37:19, 38:1, 38:6
**large** [1] - 17:19
**largely** [2] - 28:21, 60:25
**last** [12] - 7:20, 20:21, 25:21, 27:25, 29:5, 30:4, 46:1, 46:13, 59:10, 59:14, 60:22
**late** [4] - 28:6, 28:7, 28:13, 46:24
**law** [13] - 14:10, 14:12, 18:20, 21:2, 22:23, 25:12, 25:15, 27:17, 28:9, 28:14, 31:13, 51:9, 60:19
**Lawrence** [7] - 9:13, 10:14, 10:25, 11:18, 11:24, 12:14, 13:18
**lay** [1] - 40:14
**lays** [2] - 22:21, 50:15
**least** [6] - 7:1, 10:15, 17:5, 17:9, 17:25, 58:23
**leave** [10] - 19:12, 19:22, 22:2, 36:12, 36:13, 36:21, 37:1, 48:24, 56:16, 57:5
**leaves** [1] - 48:13
**left** [6] - 5:4, 17:9, 23:11, 34:9, 35:12, 59:9
**legal** [9] - 25:18, 27:3, 27:5, 27:8, 28:20, 28:22, 50:21, 51:21, 52:13
**LEONARD** [1] - 1:14
**letter** [14] - 5:19, 5:23, 6:9, 6:18, 7:4, 8:5, 21:24, 27:25, 29:1, 29:2, 39:13, 39:17, 61:1, 62:24
**liability** [1] - 11:16
**likelihood** [1] - 20:6
**likely** [3] - 37:18, 52:21, 53:14
**limine** [1] - 41:14
**limit** [1] - 14:19
**limitations** [13] - 20:20, 30:6, 30:11, 30:18, 44:14, 54:17, 54:21, 54:22, 54:23, 55:10, 56:2, 56:5, 56:10
**limited** [3] - 13:12, 35:21, 36:10
**limiting** [1] - 37:20
**Lindvall** [11] - 3:12, 23:21, 26:23, 32:7, 34:20, 36:5, 36:19, 43:24, 47:11, 49:4, 51:25
**LINDVALL** [73] - 1:20, 3:14, 4:23, 5:12, 5:15, 6:2, 6:22, 7:14, 9:17, 10:5, 10:9, 11:12, 12:10, 16:11, 17:13, 18:5, 18:15, 20:15, 21:7, 21:12, 21:19, 22:17, 23:22, 25:7, 25:20, 25:25, 26:11, 26:19, 26:24, 29:12, 30:23, 31:10, 31:24, 33:7, 34:15, 34:21, 36:6, 36:20, 36:25, 37:22, 38:9, 38:17, 38:24, 40:5, 40:20, 41:10, 43:25, 44:6, 44:8, 45:7, 45:13, 47:12, 49:5, 50:4, 50:6, 50:13, 52:2, 52:9, 53:5, 53:11, 53:18, 54:16, 55:11, 58:3, 58:9, 58:19, 59:2, 61:15, 62:10, 62:17, 62:20, 62:23, 63:3
**line** [2] - 42:14, 59:13
**list** [12] - 15:1, 17:4, 18:2, 18:6, 20:1,

40:10, 56:21, 57:18, 58:1, 59:23, 59:25
**listed** [2] - 38:14, 39:9
**listening** [1] - 16:25
**lists** [1] - 60:6
**literally** [1] - 29:5
**litigated** [1] - 28:10
**LLP** [6] - 1:17, 1:19, 2:3, 2:6, 2:10, 2:12
**location** [1] - 10:25
**logically** [1] - 56:8
**logistical** [1] - 59:6
**Looby** [2] - 57:24, 59:8
**look** [9] - 18:25, 30:24, 35:17, 35:18, 40:1, 62:12, 62:14, 63:8
**looked** [1] - 31:15
**looking** [1] - 50:10
**losing** [1] - 43:15
**loss** [1] - 27:21
**lunch** [3] - 47:2, 47:3, 47:6

## M

**machine** [1] - 60:2
**mail** [2] - 6:11, 57:23
**main** [1] - 26:3
**maintain** [2] - 6:24, 30:18
**man** [1] - 15:8
**Mangus** [4] - 15:8, 15:12, 16:13, 16:15
**marathon** [1] - 29:22
**March** [2] - 1:12, 8:5
**MAREK** [2] - 2:6, 3:18
**Marek** [1] - 3:17
**MARGUILIES** [1] - 2:3
**Marguilies** [1] - 3:16
**marked** [2] - 61:19, 61:20
**materials** [1] - 60:2
**matter** [8] - 19:19, 20:23, 21:2, 22:23, 24:2, 28:9, 34:9, 35:1
**matters** [1] - 23:15
**maximum** [3] - 38:14, 39:3, 40:8
**mean** [4] - 10:6, 21:15, 49:18, 55:18
**meaning** [1] - 42:14
**meaningful** [1] - 37:18
**means** [2] - 11:7, 55:20
**medical** [1] - 57:3
**meet** [9] - 22:19, 35:1, 42:11, 46:20, 48:6, 49:11, 53:23, 54:7, 55:7
**meeting** [1] - 42:25
**meetings** [1] - 43:12
**mentioned** [1] - 7:19
**Merit** [1] - 1:25
**met** [2] - 29:24, 41:6
**method** [5] - 26:9, 26:14, 26:20, 26:23, 47:16
**Michael** [1] - 9:13
**Michelle** [1] - 3:16
**MICHELLE** [1] - 2:6
**middle** [1] - 21:20
**might** [4] - 13:10, 15:9, 20:9, 38:2
**mind** [3] - 18:25, 46:10, 56:6
**minds** [2] - 48:3, 61:1
**minor** [1] - 29:19
**minute** [2] - 21:24, 22:15
**minutes** [1] - 47:5
**mischaracterizing** [1] - 9:25
**missed** [2] - 6:19, 30:3
**model** [1] - 31:11
**moment** [1] - 50:4
**Monday** [2] - 46:20, 53:15
**morning** [22] - 3:5, 3:6, 3:10, 3:14, 3:15, 3:18, 3:20, 3:21, 3:23, 4:7, 19:15, 19:24, 22:15, 28:4, 42:13, 43:2, 43:11, 47:4, 47:7, 47:19, 49:14, 52:20
**most** [7] - 4:9, 15:10, 20:21, 31:25, 39:3, 52:21, 53:14
**mostly** [1] - 18:1
**motion** [3] - 22:23, 23:3, 48:14
**motions** [5] - 22:6, 22:23, 23:13, 41:13, 54:10
**move** [4] - 4:7, 9:2, 37:4, 37:5
**MR** [155] - 3:10, 3:14, 3:15, 3:16, 3:21, 4:1, 4:23, 5:4, 5:10, 5:12, 5:15, 5:16, 5:22, 6:2, 6:22, 7:14, 8:4, 9:17, 9:20, 10:2, 10:5, 10:9, 10:12, 11:2, 11:6, 11:12, 12:10, 12:23, 14:2, 14:18, 15:1, 15:16, 15:20, 15:22, 16:1, 16:6, 16:11, 17:13, 18:5, 18:15, 18:18, 19:4, 19:6, 19:9, 19:20, 20:15, 20:18, 21:4, 21:7, 21:12, 21:19, 22:6, 22:11, 22:17, 23:22, 23:24, 24:19, 24:21, 25:7, 25:20, 25:25, 26:6, 26:11, 26:13, 26:17, 26:19, 26:24, 27:1, 27:7, 27:12, 29:4, 29:8, 29:12, 30:23, 31:10, 31:24, 32:6, 32:16, 33:4, 33:7, 34:15, 34:17, 34:21, 34:23, 36:6, 36:8, 36:20, 36:25, 37:9, 37:22, 37:24, 38:9, 38:17, 38:24, 39:1, 40:5, 40:6, 40:20, 41:10, 41:12, 41:18, 41:20, 42:19, 42:22, 43:25, 44:2, 44:6, 44:8, 45:7, 45:13, 45:16, 46:4, 47:12, 47:14, 49:5, 49:7, 49:16, 49:20, 49:24, 50:4, 50:6, 50:13, 50:20, 51:19, 51:23, 52:2, 52:9, 53:5, 53:11, 53:18, 53:20, 54:16, 55:11, 55:16, 55:24, 56:15, 56:20, 58:3, 58:9, 58:13, 58:19, 59:2, 59:4, 59:6, 59:19, 59:22, 60:21, 61:15, 62:5, 62:10, 62:17, 62:20, 62:23, 63:3, 63:6
**multiple** [1] - 29:24
**must** [1] - 35:21

## N

**narrow** [4] - 6:7, 6:10, 7:8, 39:10
**narrowed** [2] - 6:12, 8:21
**native** [2] - 38:1, 38:6
**nature** [1] - 54:12
**necessarily** [1] - 42:1
**necessary** [1] - 37:4
**necessitated** [1] - 9:4
**necessity** [2] - 57:4, 57:6
**need** [24] - 4:13, 5:20, 5:25, 10:21, 11:5, 22:1, 23:13, 25:19, 26:4, 31:14, 34:7, 36:12, 37:1, 37:5, 39:16, 40:14, 40:16, 40:17, 42:11, 52:18, 54:3, 55:2, 60:4, 60:14
**needed** [2] - 21:1, 29:17
**needs** [4] - 23:3, 33:12, 33:23, 37:16
**never** [4] - 6:15, 27:16, 27:23
**New** [2] - 1:21
**new** [19] - 7:22, 9:4, 9:5, 18:10, 27:9, 28:6, 29:18, 29:25, 30:1, 30:11, 40:21, 40:23, 55:2, 57:17, 60:24, 61:25, 62:7
**newly** [1] - 61:10
**newspaper** [2] - 57:13, 57:14
**next** [10] - 22:20, 23:5, 23:6, 23:19, 35:2, 36:2, 39:25, 48:16, 59:22, 63:9
**night** [4] - 27:12, 27:25, 29:5, 42:8
**nilly** [1] - 51:7
**NO** [1] - 1:9
**noises** [1] - 57:12
**non** [1] - 36:15
**non-argumentative** [1] - 36:15
**nondisclosure** [1] - 8:9
**none** [1] - 48:25
**nonetheless** [1] - 57:21
**nonjury** [1] - 20:3
**nonpatent** [1] - 25:1
**note** [1] - 8:18
**NOTE** [1] - 3:3
**noted** [1] - 38:11
**notes** [1] - 63:13
**nothing** [3] - 18:18, 42:22, 63:6
**notice** [6] - 7:11, 24:9, 30:17, 43:16, 52:25, 53:16
**noting** [1] - 28:4
**number** [2] - 4:10, 59:25

## O

**object** [4] - 7:23, 8:23, 38:20, 40:22
**objected** [1] - 40:10
**objecting** [1] - 22:12
**objection** [15] - 9:2, 9:3, 29:9, 32:16, 38:11, 40:15, 41:7, 41:8, 41:23, 41:24, 42:1, 42:15, 43:14, 43:15, 51:21
**objectionable** [1] - 13:10
**objections** [16] - 28:4, 32:18, 34:18, 35:6, 35:9, 38:16, 39:6, 39:7, 39:8, 39:9, 39:18, 40:9, 41:5, 43:1, 43:3, 43:8
**objective** [1] - 18:24
**objectively** [1] - 20:5
**obligated** [1] - 42:5
**obviously** [6] - 7:22, 11:22, 19:14, 21:22, 27:20, 49:13
**obviousness** [1] - 24:17
**OF** [1] - 1:2
**off-line** [1] - 59:13
**offer** [2] - 44:23, 53:23
**offered** [1] - 40:12
**offering** [1] - 40:18
**office** [1] - 61:23
**Officer** [1] - 14:5
**officers** [1] - 15:25
**Official** [1] - 63:15
**often** [1] - 35:24
**once** [5] - 4:15, 36:13, 40:12, 46:12, 60:16
**one** [31] - 5:5, 5:6, 11:20, 14:20, 15:16, 16:3, 18:1, 18:22, 19:6, 26:16, 27:8, 28:5, 28:23, 30:3, 30:13, 34:5, 38:18, 39:2, 40:20, 40:24, 41:22, 43:16, 45:8, 46:25, 50:1, 50:2, 50:4, 54:17, 55:18, 58:3, 59:6
**ones** [2] - 25:14, 28:12
**oOo** [1] - 3:1
**open** [1] - 3:4
**opened** [1] - 57:14
**opening** [8] - 5:22, 19:11, 19:15, 40:24, 41:2, 41:3, 41:9, 41:17
**Operating** [1] - 14:5
**operation** [1] - 40:11
**opined** [1] - 8:10
**opinion** [1] - 13:11
**opinions** [4] - 7:16, 7:22, 11:13, 12:11
**opponents** [1] - 61:6
**opportunity** [8] - 26:3, 27:4, 28:1, 45:2, 45:12, 45:24, 53:23, 61:18
**oppose** [3] - 45:5, 45:9, 45:11

**opposed** [1] - 38:8
**opposing** [2] - 37:3, 58:10
**oral** [3] - 22:7, 22:25
**orally** [4] - 22:13, 22:14, 23:8, 23:9
**order** [20] - 4:11, 4:21, 10:10, 10:12, 22:3, 23:13, 24:1, 24:2, 33:9, 38:14, 39:3, 39:9, 39:12, 40:8, 40:12, 41:7, 42:5, 44:3, 54:8, 55:23
**ordered** [1] - 4:25
**original** [2] - 30:1, 37:16
**ostentatiously** [1] - 57:15
**otherwise** [3] - 30:21, 32:2, 32:19
**outlining** [1] - 62:25
**outside** [2] - 12:12, 57:1
**overlap** [1] - 18:7
**overlaps** [1] - 18:12
**own** [2] - 28:19, 48:3

**P**

**page** [3] - 4:20, 45:4, 50:3
**pages** [2] - 35:16, 60:3
**papers** [2] - 20:21, 27:9
**part** [10] - 21:2, 25:2, 25:5, 25:8, 26:22, 34:7, 42:7, 52:24, 54:2, 56:10
**particular** [5] - 12:15, 14:20, 17:18, 41:24, 53:14
**parties** [19] - 4:18, 9:12, 9:14, 19:13, 20:2, 20:7, 22:19, 23:16, 24:2, 29:23, 33:1, 35:1, 35:24, 38:20, 44:25, 46:16, 46:21, 49:8, 50:2
**partner** [1] - 15:5
**party** [5] - 24:7, 33:15, 33:24, 38:3, 43:13
**party's** [1] - 50:9
**passing** [1] - 48:23
**Patent** [1] - 50:23
**patent** [12] - 11:14, 24:14, 24:18, 24:23, 26:9, 26:20, 26:23, 30:16, 51:6, 51:9, 51:10, 51:14
**patents** [6] - 8:21, 24:16, 26:16, 41:1, 50:14, 51:3
**Patrick** [1] - 3:24
**PATRICK** [1] - 2:13
**Paul** [1] - 3:16
**PAUL** [1] - 2:3
**pause** [2] - 35:15, 50:5
**penalize** [1] - 34:4
**people** [6] - 15:2, 15:14, 15:17, 45:8, 48:9, 49:22
**per** [3] - 36:13, 46:16, 47:9
**peremptory** [1] - 48:22
**period** [1] - 61:9
**peripheral** [1] - 11:15
**permit** [1] - 51:7
**permitted** [2] - 33:12, 49:8
**person** [5] - 16:7, 17:10, 18:2, 18:3
**personal** [2] - 10:20, 41:25
**personally** [1] - 10:23
**perspective** [3] - 25:19, 32:5, 51:21
**Peters** [4] - 14:5, 18:5, 38:19, 39:7
**petty** [1] - 56:21
**Phase** [3] - 45:2, 45:23, 46:3
**phase** [1] - 46:6
**phases** [2] - 45:17, 46:9
**phrase** [1] - 8:7
**phrased** [1] - 55:20
**physical** [2] - 61:16, 62:12
**pieces** [1] - 7:7
**place** [2] - 5:1, 60:3
**places** [2] - 4:10, 60:3
**Plaintiff** [1] - 9:16
**plaintiff** [4] - 29:4, 46:13, 53:4, 58:2
**Plaintiffs** [2] - 1:6, 2:8
**plaintiffs** [6] - 3:11, 8:22, 29:3, 38:8, 38:11, 58:25
**plaintiffs'** [3] - 29:11, 37:13, 61:13
**plan** [3] - 11:21, 27:6, 39:19
**planning** [1] - 8:12
**play** [4] - 28:22, 35:16, 37:13, 39:21
**played** [1] - 39:4
**playing** [2] - 38:3, 39:14
**plays** [1] - 39:24
**pleadings** [1] - 27:18
**pleas** [1] - 3:9
**plenty** [1] - 49:22
**point** [9] - 13:4, 13:17, 29:11, 30:20, 31:9, 33:3, 33:6, 36:9, 38:21
**pointed** [1] - 60:25
**pointing** [1] - 38:2
**policy** [1] - 17:5
**pool** [3] - 47:23, 48:20, 49:21
**portions** [2] - 24:1, 35:11
**position** [4] - 6:24, 37:13, 51:4, 52:3
**positions** [1] - 28:23
**possibility** [2] - 15:22, 17:22
**possible** [1] - 58:16
**possibly** [1] - 12:1
**post** [4] - 9:3, 53:22, 54:3, 54:25
**post-trial** [4] - 9:3, 53:22, 54:3, 54:25
**potential** [1] - 48:20
**powerless** [1] - 14:16
**practice** [1] - 19:17
**precise** [1] - 19:20
**precisely** [1] - 23:4
**preempted** [1] - 51:5
**preemption** [1] - 50:21
**preference** [1] - 62:19
**prejudice** [4] - 7:15, 9:8, 14:23, 16:2
**prejudicial** [1] - 28:6
**preliminary** [5] - 49:25, 52:8, 52:14, 52:16, 52:18
**prepare** [1] - 17:10
**prepared** [1] - 54:4
**preparing** [1] - 21:20
**present** [6] - 20:9, 28:1, 29:8, 44:9, 44:15, 45:2
**presentation** [1] - 44:13
**presented** [2] - 20:10, 27:13
**preserve** [1] - 23:13
**President** [1] - 14:4
**president** [1] - 15:6
**press** [1] - 41:8
**presses** [1] - 29:5
**Pretrial** [2] - 1:12, 3:3
**pretrial** [20] - 4:3, 4:11, 4:21, 6:8, 6:11, 10:10, 10:12, 24:1, 24:2, 27:17, 33:9, 38:14, 39:3, 39:9, 39:12, 40:8, 40:11, 41:7, 42:5, 63:11
**pretty** [3] - 8:6, 25:25, 42:23
**prevail** [1] - 9:3
**previously** [2] - 8:25, 13:15
**printed** [1] - 60:5
**probative** [1] - 13:9
**problem** [9] - 5:13, 8:1, 17:21, 17:23, 21:19, 32:4, 32:7, 51:20, 62:4
**problematic** [1] - 28:8
**problems** [1] - 11:8
**procedurally** [1] - 61:14
**procedure** [1] - 22:11
**proceed** [2] - 4:8, 46:9
**proceeding** [2] - 21:11, 63:13
**process** [6] - 21:16, 39:11, 42:24, 43:17, 48:19, 60:24
**processes** [1] - 42:16
**product** [3] - 11:9, 61:25, 62:14
**products** [2] - 11:16, 50:10
**progression** [1] - 45:20
**prong** [1] - 20:6
**proof** [10] - 44:3, 44:9, 44:13, 44:15, 44:16, 44:24, 44:25, 45:3, 46:1, 46:3
**proper** [4] - 30:17, 32:8, 32:12, 32:14
**proposal** [10] - 22:21, 22:24, 23:19, 35:5, 36:3, 50:11, 50:19, 55:16, 55:21, 55:22
**proposals** [7] - 22:22, 22:25, 23:19, 35:2, 35:5, 36:3, 54:9
**propose** [3] - 23:7, 23:8, 50:13
**proposed** [10] - 4:21, 13:24, 17:24, 28:15, 29:18, 31:8, 35:6, 35:9, 42:24, 47:25
**proposes** [1] - 44:8
**proposing** [1] - 35:18
**proposition** [2] - 14:11, 14:13
**prospective** [1] - 25:11
**provide** [1] - 47:2
**provided** [1] - 40:21
**pulled** [2] - 4:8, 4:17
**punitive** [3] - 25:15, 51:8, 51:12
**purchasing** [1] - 50:9
**purely** [1] - 12:13
**purposely** [1] - 6:23
**purposes** [1] - 57:10
**pursuant** [1] - 21:16
**put** [5] - 3:8, 29:14, 31:14, 31:17, 36:2
**puts** [1] - 55:1

**Q**

**questions** [33] - 8:11, 22:5, 22:16, 23:20, 34:11, 34:20, 36:5, 36:18, 37:7, 37:21, 37:23, 40:4, 40:19, 42:21, 43:4, 43:23, 47:10, 47:24, 48:1, 48:5, 48:10, 48:11, 49:4, 53:3, 53:19, 53:20, 54:5, 54:13, 54:14, 54:24, 55:9, 55:19, 56:11
**quick** [2] - 29:15, 36:9
**quickly** [1] - 4:7
**quite** [4] - 4:19, 28:17, 50:15, 60:1

**R**

**raise** [2] - 4:14, 43:3
**raised** [2] - 9:9, 22:18
**raises** [1] - 43:14
**raising** [1] - 48:3
**randomly** [1] - 48:19
**rare** [1] - 42:14
**rather** [6] - 22:13, 24:21, 26:8, 26:14, 62:13, 62:15
**reach** [1] - 19:18
**read** [9] - 24:7, 24:11, 31:6, 37:13, 39:4, 39:21, 47:24, 48:1, 57:13
**reading** [2] - 35:22, 39:14
**ready** [2] - 53:1, 54:13
**realize** [1] - 31:12
**realized** [1] - 54:16
**reallocate** [1] - 43:18
**really** [13] - 11:4, 11:15, 15:2, 15:3, 25:12, 25:22, 27:16, 30:24, 31:2, 42:1, 44:21, 44:23, 47:8
**reason** [2] - 31:10, 57:21
**reasons** [2] - 44:21, 56:14
**REATH** [2] - 2:10, 2:12
**Reath** [1] - 3:22

**rebut** [4] - 11:22, 16:16, 44:16, 45:24
**rebuttal** [2] - 44:24, 45:2
**received** [5] - 5:6, 14:11, 15:2, 40:11, 61:22
**receiving** [1] - 63:9
**recent** [1] - 20:21
**recently** [3] - 6:20, 38:18, 40:22
**recess** [1] - 63:10
**recognize** [1] - 18:22
**recognized** [1] - 6:10
**recollection** [1] - 6:25
**record** [5] - 3:9, 8:4, 38:12, 48:9, 54:1
**recross** [1] - 36:11
**recurring** [1] - 34:24
**red** [3] - 60:25, 61:7, 62:7
**redesign** [1] - 61:4
**redirect** [2] - 35:12, 36:11
**references** [1] - 8:20
**referring** [1] - 29:1
**reflected** [1] - 52:14
**refused** [1] - 54:23
**regard** [3] - 10:18, 50:23, 51:10
**regarding** [4] - 9:15, 13:21, 33:9, 46:15
**regardless** [5] - 13:1, 39:22, 55:9, 55:17, 58:16
**Registered** [1] - 1:25
**related** [2] - 25:12, 25:15
**relates** [3] - 27:8, 30:6, 50:20
**relating** [1] - 12:16
**relief** [2] - 7:12, 31:13
**remain** [1] - 53:24
**remaining** [2] - 39:18, 55:9
**remedies** [2] - 51:6, 51:14
**remember** [1] - 60:22
**renew** [2] - 7:4, 9:3
**renewed** [2] - 8:18, 8:19
**renewing** [1] - 54:9
**reoccurring** [1] - 30:10
**replacement** [1] - 38:21
**reply** [1] - 8:5
**report** [11] - 5:5, 6:16, 7:10, 7:17, 7:21, 7:25, 8:8, 8:11, 8:13, 12:12, 13:13
**Reporter** [2] - 1:25, 63:15
**REPORTER'S** [1] - 3:3
**reports** [1] - 4:24
**representations** [1] - 9:7
**representative** [8] - 14:16, 14:25, 15:11, 15:15, 16:5, 17:10, 17:21, 18:4
**representatives** [4] - 13:24, 14:3, 14:8, 17:25
**represented** [1] - 17:7
**request** [2] - 8:15, 8:16
**requested** [4] - 21:2, 21:11, 21:14, 46:16
**require** [6] - 13:18, 16:3, 35:14, 55:8, 61:9, 61:14
**requires** [2] - 21:24, 50:24
**reserve** [5] - 9:1, 21:17, 32:11, 32:16, 34:3
**resolve** [7] - 26:4, 27:6, 47:18, 52:7, 52:13, 54:10, 63:1
**resolved** [1] - 42:12
**respect** [14] - 5:17, 9:13, 13:20, 24:6, 24:25, 25:9, 26:23, 30:19, 30:22, 32:25, 36:20, 40:24, 41:21, 50:22
**respond** [3] - 3:6, 17:11, 44:11
**responded** [2] - 5:23, 6:19
**response** [7] - 5:6, 6:19, 6:20, 7:1, 7:13, 14:11, 29:11
**responses** [1] - 45:20
**rest** [3] - 4:11, 43:19, 54:24
**rests** [1] - 23:4
**result** [4] - 5:2, 6:17, 16:25, 60:23
**review** [2] - 35:17, 35:19
**reviewed** [1] - 47:17
**revisit** [1] - 29:17
**rewritten** [1] - 29:19
**rights** [2] - 23:14, 61:11
**ringers** [1] - 57:11
**ripe** [1] - 11:4
**room** [2] - 49:18, 49:23
**roughly** [1] - 24:10
**Rule** [2] - 14:7, 14:19
**rule** [6] - 7:19, 9:1, 14:11, 17:15, 34:19, 55:4
**ruled** [2] - 41:13, 41:15
**rules** [1] - 17:16
**ruling** [6] - 18:23, 19:3, 37:24, 38:10, 39:19, 41:21
**rulings** [2] - 7:3, 39:22
**running** [1] - 39:24

## S

**S.A.S** [2] - 1:4, 2:8
**safe** [1] - 31:18
**satisfied** [1] - 60:6
**save** [1] - 32:13
**saw** [3] - 12:8, 13:8, 31:12
**schedule** [1] - 46:19
**scheduled** [2] - 4:4, 16:4
**SCHOELL** [3] - 2:10, 3:21, 4:1
**Schoell** [1] - 3:22
**Scholar** [1] - 3:12
**SCHOLER** [3] - 1:19, 2:3, 2:6
**scope** [4] - 6:13, 7:9, 8:8, 8:24
**SCOTT** [1] - 1:20
**Scott** [1] - 3:12
**screen** [5] - 59:7, 59:9, 59:14, 59:16, 59:18
**se** [1] - 47:9
**seat** [1] - 48:21
**seated** [1] - 47:23
**second** [6] - 18:19, 22:8, 28:8, 40:24, 44:22, 60:8
**see** [18] - 10:23, 13:11, 19:13, 26:12, 28:9, 29:10, 35:3, 37:5, 37:16, 47:17, 50:1, 52:2, 52:14, 53:11, 54:20, 57:14, 57:25, 59:6
**seeing** [3] - 37:19, 59:17, 63:9
**seek** [1] - 11:24
**seeking** [2] - 11:11, 45:6
**seeks** [1] - 28:10
**seem** [1] - 9:14
**selection** [6] - 19:24, 47:15, 47:20, 49:3, 49:14, 52:20
**selling** [2] - 61:2, 61:4
**send** [3] - 29:4, 48:8, 61:22
**sending** [2] - 29:2, 62:15
**sends** [1] - 42:8
**sense** [1] - 14:23
**sent** [3] - 6:11, 6:17, 27:25
**separate** [1] - 21:10
**September** [1] - 18:11
**sequester** [1] - 16:14
**sequestered** [7] - 9:14, 10:7, 10:14, 11:5, 13:19, 13:20, 19:10
**sequestering** [1] - 9:11
**sequestration** [2] - 19:7, 49:7
**serve** [6] - 5:6, 5:7, 5:8, 16:4, 18:3, 57:23
**session** [1] - 44:19
**set** [5] - 39:12, 51:6, 60:5, 60:14, 60:17
**sets** [1] - 60:19
**sheet** [4] - 32:24, 40:23, 55:15, 56:17
**shift** [1] - 34:5
**short** [2] - 54:7, 61:9
**show** [6] - 35:7, 38:5, 40:16, 42:7, 58:11, 60:13
**shown** [1] - 40:12
**side** [14] - 9:4, 14:12, 23:4, 24:9, 34:5, 42:6, 43:16, 45:21, 46:16, 48:8, 48:21, 56:23, 62:15
**side's** [1] - 33:22
**sidebar** [1] - 23:10
**sides** [8] - 45:12, 46:8, 48:12, 48:14, 53:25, 54:1, 59:24, 60:10
**silent** [1] - 47:16
**silently** [1] - 48:22
**similar** [3] - 30:15, 31:3, 56:1
**sit** [1] - 11:24
**sitting** [4] - 12:17, 13:1, 16:24, 23:9
**situation** [7] - 16:22, 17:18, 18:13, 31:25, 44:9, 44:24, 55:2
**six** [2] - 7:7, 8:20
**skimpy** [1] - 15:10
**smaller** [1] - 59:15
**sold** [1] - 61:8
**someone** [3] - 58:14, 61:22, 62:15
**sometimes** [3] - 35:25, 37:25
**somewhat** [2] - 6:12, 27:21
**somewhere** [1] - 49:21
**soon** [1] - 54:13
**sorry** [2] - 24:19, 50:6
**sort** [2] - 28:20, 34:2
**sounds** [2] - 27:23, 55:11
**sparse** [1] - 7:21
**speaking** [1] - 38:1
**special** [1] - 27:14
**specific** [5] - 23:12, 23:18, 28:4, 35:2, 55:21
**specifically** [1] - 36:4
**spell** [1] - 10:13
**spent** [1] - 25:21
**staff** [2] - 57:5, 59:13
**stand** [4] - 7:16, 17:1, 36:24, 43:10
**standing** [2] - 20:5, 48:3
**standpoint** [2] - 7:24, 31:4
**STARGATT** [1] - 1:17
**STARK** [1] - 1:14
**start** [2] - 4:10, 13:8
**started** [2] - 18:10, 45:4
**starts** [1] - 18:24
**state** [7] - 7:9, 8:7, 25:10, 25:12, 25:15, 50:22, 51:9
**statement** [5] - 19:11, 41:2, 41:3, 41:9, 41:17
**statements** [4] - 19:15, 36:14, 36:15, 40:25
**states** [1] - 50:24
**STATES** [1] - 1:1
**States** [3] - 10:16, 61:8, 62:14
**statute** [14] - 20:19, 30:6, 30:10, 30:18, 44:13, 51:11, 54:17, 54:20, 54:22, 54:23, 55:10, 56:2, 56:4, 56:10
**stay** [2] - 46:24
**stenographic** [1] - 63:13
**step** [1] - 45:5
**stick** [1] - 7:24
**sticking** [1] - 8:12
**still** [13] - 6:24, 7:6, 13:25, 18:11, 23:9, 38:19, 41:22, 48:20,

49:1, 49:17, 59:17, 61:11
**story** [1] - 11:22
**straight** [2] - 58:10, 58:16
**strike** [1] - 48:14
**strikes** [1] - 48:22
**struck** [1] - 47:16
**stuff** [1] - 57:12
**submission** [4] - 22:20, 22:21, 23:2, 57:22
**submissions** [3] - 57:19, 57:20, 63:9
**submitted** [2] - 60:16, 61:1
**substantive** [3] - 42:1, 56:3, 56:9
**succeeding** [1] - 56:11
**suck** [1] - 56:24
**suddenly** [2] - 13:13, 20:22
**Sunday** [2] - 5:7, 5:9
**sunglasses** [1] - 57:15
**supplemental** [2] - 4:24, 5:5
**supplementation** [1] - 38:23
**support** [1] - 14:12
**Supreme** [1] - 14:19
**surprises** [1] - 7:23
**synonym** [1] - 8:8
**SYSTEMS** [1] - 1:4
**Systems** [1] - 2:8

**T**

**tainted** [1] - 16:19
**TAYLOR** [1] - 1:17
**telephone** [1] - 61:20
**ten** [5] - 11:21, 21:2, 21:11, 43:12, 46:16
**tends** [1] - 36:16
**terms** [9] - 24:13, 27:2, 38:13, 39:4, 40:7, 46:19, 47:15, 53:22, 55:20
**testify** [2] - 16:19, 33:13
**testifying** [9] - 9:15, 13:8, 13:14, 15:9, 18:9, 19:10, 20:11, 33:10, 36:16
**testimony** [27] - 8:24, 10:22, 10:24, 11:20, 11:25, 12:1, 12:3, 12:4, 12:7, 12:18, 12:24, 13:20, 16:13, 16:16, 16:20, 17:2, 17:23, 18:7, 18:11, 18:12, 34:19, 34:25, 35:7, 39:14, 39:15, 42:16
**THE** [154] - 1:1, 1:2, 3:5, 3:8, 3:19, 3:25, 4:2, 5:3, 5:8, 5:11, 5:14, 5:17, 5:24, 6:20, 6:25, 8:2, 8:14, 9:18, 9:24, 10:4, 10:8, 10:11, 10:24, 11:4, 11:11, 12:6, 12:21, 13:3, 14:14, 14:21, 15:13, 15:19, 15:21, 15:24, 16:2, 16:9, 17:5, 17:24, 18:14, 18:16, 18:19, 18:21, 19:5, 19:8, 19:12, 19:22, 20:17, 20:25, 21:5, 21:10, 21:13, 21:21, 22:8, 22:14, 22:18, 23:23, 23:25, 24:20, 24:23, 25:17, 25:24, 26:2, 26:10, 26:15, 26:21, 26:25, 27:2, 27:11, 29:1, 29:7, 29:10, 30:19, 31:6, 31:21, 32:4, 32:15, 32:17, 33:5, 33:8, 34:16, 34:18, 34:22, 34:24, 36:7, 36:9, 36:23, 37:1, 37:10, 37:23, 38:7, 38:10, 38:22, 38:25, 39:2, 40:7, 41:4, 41:11, 41:15, 41:19, 42:3, 42:20, 42:23, 44:1, 44:3, 44:7, 45:1, 45:11, 45:14, 45:22, 46:5, 47:13, 47:15, 49:6, 49:10, 49:18, 49:21, 49:25, 50:11, 50:18, 51:17, 51:20, 51:24, 52:6, 52:12, 53:9, 53:13, 53:19, 53:21, 55:6, 55:13, 55:21, 55:25, 56:16, 56:21, 58:8, 58:12, 58:15, 58:22, 59:3, 59:5, 59:8, 59:12, 59:21, 60:8, 60:10, 61:13, 62:3, 62:8, 62:13, 62:18, 62:22, 62:24, 63:5, 63:7
**themselves** [1] - 60:1
**theories** [1] - 51:2
**therefore** [1] - 7:5
**thinking** [2] - 46:10, 57:18
**thinks** [1] - 32:2
**third** [3] - 9:10, 28:13, 30:13
**thoughts** [1] - 33:11
**three** [5] - 18:23, 46:11, 47:22, 48:8, 48:22
**Thursday** [4] - 22:20, 23:19, 35:2, 36:2
**timing** [1] - 23:1
**today** [4] - 3:12, 9:7, 62:25, 63:8
**together** [2] - 7:2, 36:2
**tolled** [1] - 31:20
**tolling** [12] - 20:22, 21:9, 27:15, 28:10, 30:14, 30:20, 31:9, 32:23, 33:1, 54:18, 55:1, 56:13
**tolls** [1] - 30:11
**tomorrow** [1] - 42:10
**took** [1] - 29:25
**tort** [1] - 50:22
**tortious** [2] - 50:22, 51:16
**total** [1] - 30:24
**touch** [1] - 4:16
**touched** [1] - 4:15
**towards** [1] - 39:25
**track** [4] - 43:14, 46:17, 48:2, 48:4
**trade** [8] - 11:14, 24:24, 25:9, 25:12, 30:16, 44:10, 44:11, 51:2
**transcript** [1] - 63:13
**transcripts** [1] - 35:22
**transition** [1] - 36:14
**translated** [1] - 37:15
**translation** [2] - 33:21, 33:25
**translator** [6] - 33:12, 33:13, 33:14, 33:18, 33:23, 34:7
**translators** [1] - 33:10
**trap** [1] - 62:9
**treat** [2] - 12:14, 24:7
**trial** [51] - 4:4, 5:18, 9:3, 9:4, 9:5, 11:7, 13:9, 15:3, 17:12, 19:1, 19:2, 21:15, 21:20, 22:1, 25:3, 25:6, 25:8, 26:22, 27:5, 32:14, 35:3, 36:1, 36:4, 39:11, 41:9, 44:3, 45:18, 46:7, 46:15, 46:19, 47:9, 52:24, 53:7, 53:10, 53:22, 54:3, 54:25, 55:2, 55:5, 55:25, 57:11, 57:17, 57:18, 57:22, 58:17, 59:10, 59:14, 60:15, 61:7, 63:9
**trials** [4] - 23:16, 45:8, 58:4, 58:20
**tried** [2] - 20:3, 24:13
**trouble** [1] - 59:17
**true** [1] - 63:13
**truly** [1] - 58:14
**truth** [1] - 16:19
**try** [8] - 16:16, 31:14, 33:17, 43:7, 43:14, 47:3, 47:4, 54:10
**trying** [1] - 62:9
**Tuesday** [1] - 53:15
**turn** [5] - 4:21, 11:16, 48:14, 57:11, 60:16
**turnaround** [1] - 54:7
**turned** [1] - 56:4
**turns** [1] - 54:24
**twist** [1] - 28:23
**two** [13] - 8:21, 11:21, 14:3, 16:22, 17:24, 17:25, 24:16, 27:12, 29:13, 29:23, 39:13, 58:20, 60:19
**type** [5] - 11:17, 16:20, 17:2, 30:10, 45:12
**typical** [1] - 44:8
**typically** [2] - 34:25, 37:2

**U**

**U.S** [4] - 15:5, 40:25, 61:5, 63:16
**U.S.D.C.J** [1] - 1:14
**ultimately** [2] - 20:20, 20:23
**unanimously** [1] - 46:23
**unclear** [2] - 4:18, 25:2
**uncontested** [2] - 24:6, 24:8
**under** [5] - 14:7, 34:19, 42:5, 51:8, 59:13
**underlie** [1] - 27:22
**underlying** [1] - 51:21
**understood** [1] - 31:7
**unfair** [3] - 9:8, 24:24, 25:10
**unfairness** [1] - 34:3
**unfettered** [1] - 14:15
**unintended** [1] - 60:11
**UNITED** [1] - 1:1
**United** [3] - 10:16, 61:8, 62:14
**universe** [3] - 38:15, 40:8, 51:14
**unless** [3] - 49:18, 52:17, 57:20
**untimely** [4] - 6:24, 7:5, 7:6, 32:18
**up** [29] - 4:10, 4:20, 7:2, 7:16, 13:11, 13:25, 14:24, 16:18, 17:1, 20:22, 21:8, 26:18, 27:16, 28:7, 34:9, 39:24, 42:15, 43:9, 44:11, 44:19, 45:8, 48:3, 48:12, 49:15, 50:7, 51:17, 55:5, 56:13
**USA** [5] - 1:8, 2:15, 14:5, 15:6, 15:17
**ut** [1] - 28:5

**V**

**various** [2] - 22:12, 25:14
**verdict** [16] - 26:12, 27:15, 28:15, 31:17, 31:19, 32:23, 52:21, 53:1, 53:7, 54:5, 54:9, 54:14, 54:21, 55:15, 55:19, 56:17
**video** [2] - 35:20, 39:24
**view** [7] - 10:11, 14:14, 14:22, 40:7, 45:15, 55:9, 61:13
**views** [4] - 23:12, 23:17, 56:7, 56:11
**voir** [5] - 47:17, 47:19, 48:1, 49:9, 49:10

**W**

**wait** [2] - 52:3, 61:17
**waiting** [1] - 38:19
**waived** [1] - 43:8
**waiver** [1] - 20:4
**walk** [1] - 37:4
**wants** [2] - 21:25, 44:18
**Washington** [1] - 2:4
**water** [1] - 57:8
**ways** [1] - 35:24
**wear** [2] - 57:13, 57:15
**Wednesday** [1] - 27:12
**week** [6] - 16:8, 25:21, 29:16, 46:7, 62:25, 63:9
**weekend** [1] - 57:22
**weeks** [2] - 5:6, 61:1
**welcome** [2] - 3:19, 3:25

**whereas** [1] - 51:10
**whereby** [1] - 48:19
**whole** [3] - 16:24,
   34:7, 34:8
**willful** [2] - 20:6, 24:16
**willy** [1] - 51:7
**willy-nilly** [1] - 51:7
**Wilmington** [1] - 1:11
**winning** [1] - 43:15
**wish** [6] - 4:16, 14:15,
   24:12, 50:2, 53:23,
   53:24
**witness** [42] - 9:13,
   9:21, 9:22, 9:25,
   10:14, 10:15, 10:21,
   12:13, 12:15, 13:4,
   13:6, 13:14, 16:4,
   18:2, 33:11, 33:19,
   33:23, 33:24, 34:10,
   35:8, 35:17, 36:13,
   36:16, 36:21, 36:23,
   38:18, 39:19, 39:23,
   39:25, 40:12, 40:17,
   41:24, 42:7, 42:14,
   42:25, 43:9, 60:6,
   60:18, 61:20
**Witness** [1] - 42:9
**witness's** [2] - 39:14
**witnesses** [34] - 9:11,
   9:15, 11:7, 12:5,
   12:18, 13:2, 13:21,
   14:10, 15:18, 16:14,
   16:18, 16:23, 16:25,
   17:3, 18:8, 19:9,
   19:10, 20:11, 20:18,
   33:9, 33:10, 36:10,
   36:19, 37:8, 37:25,
   43:5, 49:8, 49:17,
   49:19, 57:3, 58:4,
   58:9, 58:10
**witnesses'** [1] - 17:23
**word** [1] - 46:2
**works** [3] - 9:23,
   11:19, 61:4
**world** [2] - 10:23, 11:8
**worldwide** [1] - 61:5
**writing** [5] - 22:1,
   22:3, 22:7, 23:1
**written** [8] - 21:14,
   21:18, 23:2, 24:17,
   24:22, 35:22, 57:20,
   57:22
**wrongful** [2] - 50:25,
   51:1
**wrote** [1] - 14:19

## Y

**years** [6] - 11:21,
   13:25, 15:7, 18:23,
   31:20, 47:22

**yesterday** [1] - 56:1
**York** [2] - 1:21
**YOUNG** [1] - 1:17
**Young** [1] - 3:11

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

ATELIERS DE LA HAUTE-GARONNE (French Corporation) and F2C2 SYSTEMS S.A.S. (French Corporation), : CIVIL ACTION

Plaintiffs,

v.

BROETJE AUTOMATION-USA INC. (Delaware Corporation), BROETJE AUTOMATION GMBH (German Corporation), : NO. 09-598-LPS

Defendants.

- - -

Wilmington, Delaware
Monday, September 19, 2011
*Pretrial Conference*

- - -

BEFORE: HONORABLE **LEONARD P. STARK**, U.S.D.C.J.

- - -

APPEARANCES:

YOUNG CONAWAY STARGATT & TAYLOR, LLP
BY: MELANIE K. SHARP, ESQ., and
MONTE T. SQUIRE, ESQ.

and

KAYE SCHOLER, LLP
BY: SCOTT G. LINDVALL, ESQ., and
SARAH WELBORNE SAUNDERS, ESQ.
(New York, New York)

Counsel for Plaintiffs Ateliers De La Haute-Garonne and F2C2 Systems S.A.S.

Brian P. Gaffigan
Registered Merit Reporter

APPEARANCES: (Continued)

DRINKER BIDDLE & REATH,, LLP
BY: TODD C. SCHILTZ, ESQ., and
KAREN V. SULLIVAN, ESQ.

and

DRINKER BIDDLE & REATH,, LLP
BY: PATRICK J. KELLEHER, ESQ.,
DARREN S. CAHR, ESQ., and
CARRIE A. BEYER, ESQ.
(Chicago, Illinois)

Counsel for Broetje Automation-USA Inc. and Broetje Automation GmbH

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE: Pretrial conference was held in open court, beginning at 1:31 p.m.)

THE COURT: Good afternoon, everyone.

(The attorneys respond, "Good afternoon.)

THE COURT: Let's start by having you note your appearances on the record, please.

MR. LINDVALL: Your Honor, my name is Scott Lindvall. I'm counsel for the plaintiffs, AHG and F2C2. With me is Sarah Saunders, Melanie Sharp and Monte Squire.

THE COURT: Okay. Thank you very much.

MR. SCHILTZ: Your Honor, Todd Schiltz of Drinker, Biddle & Reath. With me is Patrick Kelleher, Darren Cahr, and Carrie Beyer.

THE COURT: Okay.

MR. SCHILTZ: Thank you, your Honor.

THE COURT: Thank you very much. Welcome to all of you.

So we're here for the pretrial conference for the trial that will begin next Monday. Let me tell you how we'll proceed today.

First, I will want to hear brief argument on the pending motions in limine. I will give each side 15 minutes to address whatever motions they wish in whatever order they wish. After that, I'm going to hear argument on the other pending motions. I believe there are ten of them. And I'll give each side up to a half hour, again, to address any of those ten in with whichever order they choose.

After we get through all of that, we'll go through the proposed pretrial order and I'll tell you some things about what the trial is going to look like. And,

Finally, I will give an opportunity for each side to raise any additional issues that they wish to raise. So that's our agenda for today.

Let's begin with the motions in limine. We'll hear from the plaintiffs first to address whichever of the

motions in limine they wish. I'll give you a total of 15 minutes, as I said.

MR. LINDVALL: Good afternoon, your Honor.

THE COURT: Good afternoon.

MR. LINDVALL: I'm going to address the Motion in Limine No. 1 for the plaintiffs which is shown in their pretrial order as Exhibit 15. In this one, this motion in limine addresses an issue which I think actually overrides or touches on some other issues in other briefing, and this has to do with foreign law.

What Broetje would like to do is to introduce in front of the jury the German decision that was done in this case; which is on appeal, by the way; a French decision on this case; which, again, is on appeal; and also Dr. Budach's opinion on a European patent.

In each one of these situations, these decisions, the German decision, the French decision and Dr. Budach's opinion, rely on foreign law; and they want to rely on this foreign law to show that they have, at least on a subjective basis, a good faith basis to continue to manufacture this product, which we believe is infringing our patents.

The problem we have here is the jury is going to have to get some understanding about what the differences are between German law, French law and, with respect to

Dr. Budach's opinion, also German law or whatever law he did apply. We're not quite sure. Otherwise, they're not going to have a firm grasp of what the significance of these opinions are. All they're going to hear is that -- and you can be guaranteed they'll get Broetje to say we have one in Germany, we have one in France, and we have this opinion from Dr. Budach. And it's on these European patents which are going to say they are the same patents.

The problem we have here is we have a different patent that all of these cases rely on, different claim language. It's not even the same claim language. There are differences in the claim language; but, most importantly, we have different law.

THE COURT: It seems to me that not withstanding all of that, which you will be free to argue to the jury, that it's minimally relevant, and that the risk of confusion can be addressed through proper instruction. It's minimally relevant at least to willfulness, which leads me to the question which I have about a number of these motions.

I'm afraid with the willfulness allegation that that is going to allow a lot of things to get in that perhaps both sides don't really want this case to become about. Have you considered whether you wish instead to have a separate trial on willfulness?

MR. LINDVALL: Your Honor, we would rather have

one trial. Our client is one of limited means and to have a second trial is expensive.

THE COURT: Okay. Then I think this foreign law is going to come in. You can continue to argue if you want, but I'm pretty sure I'm going to deny the motion.

MR. LINDVALL: Your Honor, if you were to deny the motion, we would request that we have an opportunity to present some type of jury instruction so that the jury would understand just because a German court has found in their favor doesn't necessarily mean that that is binding on there or somehow is estopped.

THE COURT: No, I think it will be proper to give such an instruction, so you certainly should feel free to propose one.

MR. LINDVALL: I don't have anything else to say.

There will be one difficulty. It will require attorney argument. Neither party has presented any type of witness who is going to discuss the differences between German and French and U.S. law.

THE COURT: Certainly, you can't argue anything that is not in evidence.

MR. LINDVALL: Okay. Thank you, your Honor.

THE COURT: All right.

MS. SHARP: Good afternoon, your Honor. Just a

few more comments in our motions in limine and a request for clarification.

In the 15 minutes that we were allocated, did your Honor intend we would also be responding?

THE COURT: Yes. You have a total of 15 minutes. You can address all seven; you can go first on theirs, if you want; or you can reserve your time.

MS. SHARP: Okay. Then my preference would be to reserve a bit of time and address very briefly our Motion in Limine 2 on fault documents and motion in limine 3 on round tubes.

On the fault documents, the issue is pretty straightforward, but perhaps this is another thing that your Honor had in mind in your earlier comments. There are certain documents that deal with a very limited number, one to two percentage rate of failure of AHG products, and the defense wishes to go into those. We wish to preclude them.

The argument and issues are very similar to an issue that was raised in Braun in connection with FDA needle sticks. If the Court has any questions on those issues, I am be happy to answer those.

THE COURT: I do. I do think it is similar. My concern is this trial becoming about you all have a history. There is a relationship. There were good days, there were bad days. You think it ended because they copied. They

think it ended or at least say they think it ended because your product wasn't any good.

It seems to me all of that is just a big distraction from what this case really should be about, but if I'm going to let one side get into their area of the past relationship and the breakup, I don't know how I can keep the other side from getting into it.

One way I thought of solving that was putting all those issues aside for a separate trial. But if that is not what the plaintiff wants, I'm not going to force you into a separate trial. So I'm open to any suggestions you have other than let you tell your side of the story and don't let them tell theirs.

MS. SHARP: Understood, your Honor. If I may then, I'd like to move on to our Motion in Limine 3 regarding round tubes.

This is at Exhibit 17 to the pretrial order. The papers I think fully set forth our position. The difficulty here is their 30(b)(6) witness on June 24th claimed he did not investigate and had no knowledge to talk about round tubes. Now, we're charged with not having followed up on that, but there was nothing to follow-up on because the witness said he didn't look into the issue of round tubes.

The first time then that the round tube issue

arises is in exhibits to Dr. Langenfeld's report on the 19th. His corrected report.

The only support for the round tube argument, which is a new argument, is two demonstratives. One is a sheet that was prepared only for the German litigation. It has HC Technologies noted on the cover of it. It's not authenticated. We don't know the author, the date, or the origin.

The second piece of evidence that they claim to use in support of the round tubes is the summary sheet that your Honor may be familiar with from the motions to compel. There was a summary sheet that we characterized as essentially demonstrative where Broetje did certain kinds of searches, and they kept changing that sheet, changing that sheet through the time essentially from January to the final rulings to compel in June.

They, after the close of discovery, and only in connection with Langenfeld, added to that sheet in August round tubes and purported to back out a third of the damages on a certain element related to round tubes.

So for those reasons, we think the round tube evidence is incompetent and late and should be excluded.

THE COURT: Is it undisputed that some of Broetje's accused products or some of Broetje's products have round tubes?

MS. SHARP: I don't think that that undisputed at all. Langenfeld says -- and, again, this is another prong of the evidence that they rely on. Langenfeld claims alone to have gone to a facility, and even though he is not competent to make any kind of expert opinion about what the tubes were, he said he saw them. And on that visit, he was unaccompanied. But there is no evidence anywhere that there are round tubes produced and put into sale by Broetje.

THE COURT: Is it undisputed that if they do manufacture round tubes that those round tubes would not be infringing?

MS. SHARP: Yes, and I think that arises in the expert discovery. But the problem is that the round tube evidence was never disclosed.

THE COURT: All right. And you have a separate argument on the substantially equal argument?

MS. SHARP: The substantially equal argument I think is subsumed in what I have already said. The only evidence that they provided is also in demonstratives.

THE COURT: And the relief you seek is that they should not be able to argue in any way the substantially equal point?

MS. SHARP: Yes.

THE COURT: Did you want to reserve your time on the other motion in limines in limine or did you wish to add

anything else before we hear from Broetje?

MS. SHARP: We wish to reserve to respond to what they say in their motions.

THE COURT: That's fine. You will have six minutes left.

We'll hear from Broetje.

MR. KELLEHER: Hello, your Honor. I may as well go in reverse order, since we're talking about round tubes a moment ago.

The assertion was made that we never told them that we have cassettes with round tubes. I have here in my hand -- May I hand this up, your Honor?

THE COURT: You may.

(Documents passed forward.)

MR. KELLEHER: These are technical drawings for the tubes that exist in our cassettes that we sell in the United States. We produced this a year ago. You can see the very low Bates number.

The very last two pages of this is a grid identifying what the documents in front of it are, that they relate to the technical drawings for these tubes. About the first half of the tubes, you can see by looking at them, are pentagons.

Where the tab is, your Honor, at page 3747, that is where you start seeing round tube after round tube after

round tube. We told them about this more than a year ago, and they just didn't follow-up on it.

THE COURT: And the last two pages you say are what? You say sales data?

MR. KELLEHER: No, your Honor. They're codes where the identical drawings numbers are.

THE COURT: Did you tell them that you manufactured and sold round tubes?

MR. KELLEHER: At the deposition of Dr. Peters, our 30(b)(6) representative, the question was asked:

"Question: Broetje has on sold one cassettes that have a pentagon-shaped tube?

"Answer: No.

"Question: What else? What other?

"Answer: Rectangular or just a round shape.

"Question: By round shape, do you mean a cylindrical shape?

"Answer: Yes.

"Question: Does it sell those for rivets -- for rivets?

"Answer: For rivets, yes. It may also be collars."

So that is the testimony for the 30(b)(6) deposition. I simply didn't follow up.

THE COURT: What page?

MR. KELLEHER: I'm sorry. 172.

THE COURT: And that is Mr. Peters?

MR. KELLEHER: Yes.

THE COURT: Is there a different argument on the substantially equal point?

MR. KELLEHER: Yes, your Honor. As we pointed out in our briefing, in response to their motion in limine, the page that they're complaining about supposedly not being produced had been produced three times by us in discovery in different forms; and those copies are attached to our motion in limine opposition. It's authenticated. It's referred to in Dr. Peters declaration in support of our -- I believe our motion for summary judgment papers.

THE COURT: You pick where to go next.

MR. KELLEHER: Yes, your Honor. Concerning the fault returns, it's not similar to the B. Braun case where you are dealing with the issue of needle sticks. The cassettes are not unsafe. People don't get hurt because they shut down and they stop the line. Customers get angry. That's the problem. We're not talking about a safety issue.

It was not just two percent of the cassettes. You saw in their papers, they said there were fewer than ten fault reports over 11 years. And we have shown you there were actually more than 50 over the span of just three years.

THE COURT: What kind of percentage is that?

MR. KELLEHER: I would have to run the number.

THE COURT: Fifty in three years?

MR. KELLEHER: But, for example, you can look at it this way. We're having a problem with them on average every three to four weeks with the machines they're supplying to us, and the customers are yelling at us.

THE COURT: What can you do to allay my concerns that, I guess it's not as inflammatory as the safety involved in sticking a needle in somebody, but that this is going to devolve into a trial where you say bad things about them and they say bad things about you, and it's just a big distraction?

MR. KELLEHER: It's not to say bad things about them. It's merely to explain why, in 2003, my client made a decision to design their own system.

THE COURT: And why is that relevant?

MR. KELLEHER: Because they're accusing us of willful infringement and copying, and they want punitive damages under their competition theories.

And I would point out, your Honor, in their opposition to our Motion in Limine No. 1, they're saying the foregoing history between parties is relevant to infringement, willful infringement and copying. If it's relevant for them, it's relevant for us.

THE COURT: Okay.

MR. KELLEHER: Last, your Honor, on the issue of foreign law, Dr. Budach's opinion looked at the United States patents and the Canadian patent as well as the European patent. It's not confined merely to German law as they represented.

Concerning the difference in law, I asked them at interrogatory. Interrogatory No. 4: Please identify in full what differences, if any, exist between the scope of the claims of the U.S. patents, '339, '216 on the one hand and the claims of the European patent '685 on the other hand?

And their answer was: Neither AHG, nor its counsel, are versed in European law of claim construction and cannot offer information regarding the scope of the claims of the European patent. As such, AHG cannot offer any information regarding the differences in the scope.

So we heard a lot of statements that the law is different, but in interrogatory answer they told me that they can't say how the law is different.

I have no problem with the jury instruction that this Court, of course, is not bound by something that happened in Germany, but I don't think we're going to get into a complex discussion of what German law is, what European law is versus what American law is because they

have already said they don't know anything about it.

THE COURT: But the law is different, isn't it?

MR. KELLEHER: I'm not aware, your Honor, on this issue of infringement whether there is any material difference between European law and United States law. There are differences among the countries, for example, on examples of prior art. What is prior art in one country may not be in another. That is different.

THE COURT: So if I permit you to do this, tell me what you are going to do with the foreign law. What will the jury see and learn about foreign law?

MR. KELLEHER: I don't think that they are going to learn anything about foreign law.

THE COURT: Well, they're going to hear about these three pieces of evidence that you want to put in; correct?

MR. KELLEHER: They're going to hear that they sued us for infringement in Germany and the Court determined that several claim limitations were not present in our product. We're going to say those same claim limitations, you can look at the plain English of the United States claims and they're there. Therefore, a company could reasonably believe that it's not infringing the patent and there is not a subjectively high likelihood that they are infringing the patent if the words are right there in the claims. We don't

need to understand German law to point that out to the jury.

THE COURT: Are you trying to use that evidence to defend against infringement or just willful infringement?

MR. KELLEHER: Only wilfulness, your Honor.

THE COURT: And the nonpatent claims as well, I gather, or not?

MR. KELLEHER: The nonpatent ... I have to think about that, your Honor. As to state of mind, I suppose perhaps it is relevant as to punitives.

THE COURT: Okay. Thank you. Is there anything else on their motions?

MR. KELLEHER: No, your Honor.

THE COURT: Okay. You can address your motions, if you wish.

MR. KELLEHER: To turning to ours. There are three of the motions that they actually said were moot; and I think actually that is not exactly right. I think an order granting the unopposed motions would be the appropriate way to go.

First, they say that they will not say the phrase "Chinese copy" in the courtroom, which we appreciate, but we would like it memorialized in an order so their clients understand the gravity of it.

The lawyers have never said this, your Honor. This is not an attack on the lawyers. The witnesses appear

to be going through this on purpose in a studied fashion and trying to get this into the transcripts.

Next, your Honor, on the issue of the supposed breach of the supposed '94 contract. They said they won't say the word "breach," which is all fine and well. But then in the same paper they filed with the Court, they accuse us of ceasing to honor our obligations and nonperformance.

Well, that is what breach is. And they already sued us in France on the supposed 1994 exclusive distributor contract and Broetje won. The Court held that we did not breach any contract. We didn't breach any confidentiality obligation, we didn't improperly terminate any contract, and there is no reason for us to have to relitigate that in this court with them saying we breached some contract. Then we will get into satellite litigation about what a French court said.

THE COURT: If I'm going to let you put in your German and French judgments on infringement, and I'm going to let you put in fault reports, I understand they're saying they're not going to argue breach. Why don't I tell them they can argue breach and let's just have it all out?

MR. KELLEHER: Because that has been resolved. They can't sue us for breach on the French contract here because they have already lost on it. There was a judgment that we didn't infringe the contract.

It obviously really is not relevant, your Honor, to anything I can think of. It's not relevant really to our state of mind. I don't know why their state of mind is especially relevant.

THE COURT: All right. So you want an order that says they can't refer to breach or any implication of breach.

MR. KELLEHER: Correct, your Honor.

THE COURT: Can they say that there was a contract?

MR. KELLEHER: They can assert there is, your Honor, and we'll dispute that. The parties do dispute that. We say it wasn't properly signed.

Concerning, your Honor, whether or not they should be allowed to air discovery disputes in front of the jury. They say at one point in their briefing that is moot because they say they won't do so for any improper purpose, but then they go on to say they think there are improper purposes for which they should be allowed to raise those issues.

I point out first, telling the jury that the defendant has not complied with the discovery obligation is one of the sanctions that is listed in Rule 37; and we have never been sanctioned in this case, and there is no motion to do so.

Then the two examples they give, what they want to tell the jury, are that we never told them in discovery about round tubes, which I have shown isn't correct, and that Dr. Langenfeld, our damages expert, supposedly only worked for us for 12 days.

In the briefing, your Honor, I have given you the confidentiality undertaking he signed last January. And I have given you the e-mail where I sent that, disclosing him on April 1st to my opponents. So neither of the things they want to point out is accurate, and I don't see why we should waste trial time with us having to defend against charges that we violated our discovery obligations when we didn't.

THE COURT: Even if I disagree with that, what about they are evidently concerned that their expert may be at some disadvantage because he or she only saw some of your stuff very recently and a number of experts have put in several reports and modified their opinions over time. Are you trying to preclude the jury finding out that there were multiple reports or recent changes in opinion and that sort of thing?

MR. KELLEHER: No, your Honor. I think that probably always comes in as to credibility as to us.

THE COURT: Okay. So that is not part of at what is at issue in your motion?

MR. KELLEHER: Right. In other words, we don't want to be accused of violating our obligation on discovery obligations.

Next, your Honor, we ask that they not be permitted to use your claim construction and Markman opinion to attack our witnesses with regard to their belief that they didn't infringe because this goes to willfulness. And the reason here, your Honor, is that the patents expired seven months after this case was filed and your claim construction opinion didn't come to exist until February of this year, long after the patents had expired. There was never a point in time where that document could be relevant to whether or not there was an objectively high likelihood of infringement or whether or not there was subjective recklessness in not going back and redoing the opinion.

They also pointed out we are not able to cite a case with these exact facts. That is true but neither can they. We think this is a matter of first impression after the Seagate decision has changed the law on this.

And my colleague Mr. Cahr will be arguing the last motion.

THE COURT: Okay. That's fine. Thank you.

Mr. Cahr, you have four minutes, if you want.

MR. CAHR: I'll be very brief.

Your Honor, I'm here to talk about the motion in

limine on foreign confusion or on priority. There really are three different issues here:

One is the issue of whether or not use in another country can be used to establish priority.

The second is whether or not confusion in another country can be used to establish likelihood of confusion. And,

The third is whether or not the actual incident at issue here is actually confusion.

But the first issue is very simple. Priority of use can never be established through use in another country.

They intend to use a single installation back in 1991 in Britain to indicate that they have established priority.

I can assure that I have personal experience with this. I'm on the U.S. Legislation Subcommittee of the International Trademark Association. We've been struggling for the past several years, working on rewrites for the Lanham Act, because even the famous marks that were first used abroad and have not used here have no protection, let alone a common trademark that has no fame. There is not a single case that holds otherwise, and that, quite frankly, is black letter law at this point.

The other issue has to do with confusion. The confusion in another country really is not relevant to

confusion here. They cite two District Court cases in another Circuit which are really cases that are dealing with, in many respects, the opposite situation. That's a situation where a defendant was seeking to use lack of confusion outside of the country as a way of actually establishing that there was no likelihood of confusion.

Even those two cases, in those very limited circumstances, have not been followed. It is not a case, in this or any other Circuit, where any appellate court has actually ruled that confusion in another country actually can be used as part of a likelihood of confusion test. And,

Then, finally, just as a matter of evidence, the specific incident that they seek to use is a single hearsay missed return. Somebody purportedly returned to AHG for repair a Broetje cassette.

We do not have any evidence from the people who apparently did this. We don't know whether or not it was an accident. We have no idea whether or not it had any relevant whatsoever to source designation. In fact, it was a post-sale issue. It wasn't even something which was a pre-sale confusion as to designation or source of origin as contemplated by the Lanham Act or any of the state law claims.

So just as a matter of evidence, this is hearsay. It's unsupported, undocumented. And even if it

were documented, and even if it were hearsay, Third Circuit law is I think pretty clear that this is not actually enough to constitute confusion.

THE COURT: Okay. Thank you very much.

Six minutes left for the plaintiffs.

MR. LINDVALL: Just a couple comments. Ms. Sharp is going to have some comments, too, in rebuttal.

THE COURT: Okay.

MR. LINDVALL: With respect to the breach argument, their initial argument that we do not use the word "breach," if you look at it, it's very clear.

And then we said we won't use the word "breach," but we said it is part of the story we have to talk about. We are going to talk about faults or whatever. The story is as follows:

There is a 1994 agreement. There is a signature, a German signature to it. And then we went forward, and it went for almost ten years these products were sold to Broetje, and Broetje sold them to their customers.

In 2003, Broetje decided to sell their own. We think the evidence will establish they just copied our product. All along this period of time, we were giving them technical information at their request. We believe that technical information should have been held confidential.

I agree this is not going to be a dispute about whether they breached the contract or not. In fact, I can almost guarantee our witnesses are not going to say there was a breach of contract, but our witnesses will say that they believed that Broetje was under certain obligations.

To tell you the truth, your Honor, they don't know exactly what Broetje did because these documents are confidential, and our witnesses have not seen them, so they won't be able to say I have seen what Broetje's documents are so they're in breach. They are just going to say what their relationship was between the two parties. It's a part of the story that has to be told.

And this contractual relationship, what is the jury going to think when we are selling them -- we sold them over 2,000 cassettes during this time frame. What is the jury going to think? There was no contractual relationship? We were just selling them. There was no binding obligation there? Of course, there was a contractual relationship. And this was a contractual relationship the parties were entering under.

And it's very highly relevant. Copying is a very important aspect in this case for two reasons. One is secondary considerations on obviousness and second is with respect to the unfair competition claims. That is one of the factors that a jury can look at.

With respect, Chinese copying, we are not going to say anything about Chinese copying. We'll make sure the witnesses are instructed. We have nothing to do with that. That's the witnesses.

The French court, they made a comment about the French court made a ruling on the contract. That is the whole issue. They want to be able to use that decision in the French court. That is on appeal.

If you look at that decision, it's a little bit uncertain to see what the Court held. And to say you are now estopped by that decision I think is improper. So to the extent they want to use it and try to bring in French law, I guess they can do that, but otherwise we don't think it's relevant.

The claim construction opinion. To be honest with you, it's very doubtful we would use that, but there is no reason we can't attack the opinion, the reasonableness of the opinion by showing what the Court's claim construction is. Whether it will get in front of the jury and try to convince them or try to get them to understand what a claim construction is and how that is an opinion is another story, but I think that should be left open.

Your Honor, I'll let Ms. Sharp address the remaining issue.

THE COURT: That's fine. Thank you.

MS. SHARP: I apologize for the delay, your Honor.

THE COURT: That's okay.

MS. SHARP: One thing they read to you was from the Peters transcript. That they stopped short of what we rely on which is at Exhibit C to DI 180. Mr. Lindvall asks, and this is at page 172, line 23:

"Question: How often do you -- do you -- does Broetje used a round shaped tube?"

The answer given by this 30(b)(6) witness was:

"Answer: I haven't looked it up.

"Question: You haven't looked at that?

"Answer: No.

"Question: Is it very often?

"Answer: No.

"Question: The shape that is typically used in a cassette sold by Broetje is the pentagon shape?

"Answer: For rivets, yes."

So their own 30(b)(6) witness, in the end of June, had virtually nothing to say and was not prepared by them to say anything about round tubes.

THE COURT: But I don't have a discovery dispute right now. I have your effort to get me to stop them from putting on any evidence of round tubes when you just confirmed they told you they had some round tubes, just

not often, and then you did nothing further.

MS. SHARP: Well, they also didn't say that those round tubes were used with rivets, and this is a rivet case. They say that --

THE COURT: Did you ask them that?

MS. SHARP: There weren't further questions on that, but this witness said that he had not looked into the round tube issue.

THE COURT: We certainly had enough discovery disputes in this case but I don't recall one where you came and said they had an unprepared 30(b)(6) witness on this point.

MS. SHARP: We did not do that, your Honor. But we believed at that time that had round tubes been any kind of issue, the witness would have been prepared and would have testified about it. The round tube issue did not come up in any other context. It wasn't even in their expert report.

The first time this round tube issue is mentioned and pushed is only after discovery closes and into the month of August. The documents that they talked about today that show drawings of round tubes, they're a series that were produced. Drawings that are alleged to be round tubes, those were never referred to, relied on, referred to by their expert. They were never explained by any witness.

The documents themselves don't say who authored them, when they were authored, what they purport to show.

THE COURT: They were produced, though.

MS. SHARP: They were produced. Or that they purport to show everything that is in the cross-section. That is, any detail that would show any details in the cross-section, they were never addressed or relied on.

On the issue of substantially equal, DI 209 has Exhibit 36, which is the exhibit that is at issue. And that is the exhibit that shows HT Technologies. At least, HT Technologies is mentioned.

That exhibit is an untranslated German document. That was not produced, contrary to what they say. We addressed this in a footnote at the second page of our opposition. They produced random pages of that document, I believe 1, 2 and 7. But whatever we said in the motion is what is correct. Not the entire document.

And we don't know the date, the origin. It is, as I said, in German. And it wasn't relied on by anybody previously. It was prepared, according to their witness, for use in the German litigation. It's not a corporate document. Mr. Budach made that clear.

THE COURT: Okay. Thank you. Your time is up. Thank you very much.

We will come back to motion in limines before we

break for the day.

But at this point, I do want to hear argument on the pending motions. There are at least a handful filed by each side. We could do this either as we just did and let plaintiffs address whichever ones they want first and then defendants. In fact, let's do that.

So, plaintiffs, you can use any portion of your half hour that you want. On the table, on the agenda right now is not only your motions but also Broetje's motions. If you only want to address some and save the rest of your time to address and respond, that's fine, but you have a total of a half hour.

MS. SAUNDERS: Your Honor, good morning. Good afternoon.

THE COURT: Good afternoon. Right.

MS. SAUNDERS: I'm going to address AHG's motion for summary judgment and invalidity. And this is a pretty straightforward motion.

Broetje has to prove by clear and convincing evidence that patents in suit are invalid as anticipated. AHG's motion is based on the fact that their expert admitted during deposition that four of the anticipatory references do not disclose the requisite element of the claims of the patents in suit, of the asserted claims. They can't meet the standard. Our expert testimony is unrebutted. One of

the references was considered before -- was before the Patent Office and considered by two patent examiners, and the patents in suit were allowed to issue in view of that patent reference.

For those reasons, they can't meet their clear and convincing evidence standard and summary judgment of no invalidity with respect to anticipation should be granted.

THE COURT: Now, anticipation, is that one of the defenses that you all assert came too late anyway?

MS. SAUNDERS: In part.

THE COURT: In part.

MS. SAUNDERS: The references that are the subject of the summary judgment motion are not part of that.

THE COURT: The motion you are addressing now is the motion for partial summary judgment on invalidity defenses. You are not challenging those particular defenses as untimely.

MS. SAUNDERS: Exactly.

THE COURT: Okay. Thank you.

MS. SAUNDERS: And just one more comment on indefiniteness.

With respect to indefiniteness, the only evidence in the record is the testimony of the inventor. The case law is both from this Court and from the Federal Circuit that an inventor's subjective belief with respect to

what a claim term means cannot form the basis of an indefiniteness defense. For that reason, summary judgment on indefiniteness, no indefinite, should win.

THE COURT: And help me. There is a lot to keep track of you put in front of us.

MS. SAUNDERS: Sure.

THE COURT: Indefiniteness, at least in part, is one you assert is late, but is also there also a portion of the indefiniteness that you accept is not late?

MS. SAUNDERS: No, your Honor. Indefiniteness was a late asserted invalidity defense.

THE COURT: Thank you.

MR. LINDVALL: Your Honor, the first one I would like to address is the one outstanding Daubert motion, and that is Mr. Lawrence, Broetje's technical expert.

We seek the Daubert opinions. And I can tell you right to the heart of it. I took his deposition, and I asked him -- for example, he admitted he gave opinions on invalidity, both anticipation and obviousness.

I asked him, okay, what burden of proof did you rely on, did you use in coming up with your conclusion, your opinion? Did you use clear and convincing evidence? Preponderance of the evidence? What?

He didn't even know what I was talking about. He didn't even know what the burden of proof was or how he

was to apply it.

That begs the question how could an expert give an opinion on whether or not certain prior art is sufficient or not to invalidate opinion when he doesn't understand what burden of proof he is to apply at a particular point in time.

THE COURT: Well, as long as I limit him from opining on that final issue as to whether it's invalid based on the applicable standard of proof, why can't he not at least be limited to the opinions that he did express?

MR. LINDVALL: Because, your Honor, even the opinions, for example, on anticipation, his opinion that a particular prior art reference discloses an element of the patent claim, that is his opinion. And there will be disagreement on whether that prior art discloses that element.

Whether that element is disclosed or not, it's a burden of proof issue. Is it shown by clear and convincing evidence that reference A shows element C of claim 1 of the patent? Whether or not it shows or discloses that element, they have to show -- they have a burden of proof to show by clear and convincing evidence that that element is shown in that reference by clear and convincing evidence.

THE COURT: But the party has the burden and as part of establishing the burden, they bring in someone who they say has the requisite expertise, and he says I think it's there. The element is there. Therefore, that's part

of the evidence that the party will point to for the jury, which will then decide if that amounts to clear and convincing evidence, isn't it?

MR. LINDVALL: Yes, your Honor. Maybe I will move on a little bit on this whole issue because it's really a totality with them. Not only did he not understand the burden of proof, but when I asked him, for example, if he understood what anticipation was or what inherency was, anticipation, which he gives an opinion on, he didn't understand what it was. He didn't understand what anticipation was.

He said that certain elements were inherent in prior art. In other words, it means it's not expressly disclosed in the art, but he believes it is inherent. And inherency is a pretty difficult area, but an expert has to understand what the law is to give a proper opinion, a reliable opinion to the jury.

He didn't understand what secondary considerations were. He never gave a definition of who one skilled in the art was. Today, we still don't know what his definition of what one skilled in the art is. He has to have given that definition under the Graham factors for obviousness. The first starting point for an obviousness determination is how would one in skill in the art define combining these particular pieces of art.

He never once gave the opinion what one skilled in the art was, so how can his opinion be reliable in combining art.

He never gave an opinion on the scope and context of the prior art, which today is a very important issue. We're going to assert that some of the art is not analysis art. It shouldn't even be in the scope of the prior art. He never gave an opinion on it. How can he again give an opinion on obviousness?

Probably one of the most important things he didn't do in the obviousness, he never gave a reason why you combine two references. KSR eliminated the requirement for a motivation that the Federal Circuit had, but it made it very clear that the expert or the opinion has to give some reason why you combine art, because it recognized that any patent, it's usually a combination of old things.

So any expert can get up there and say here is reference A, and here is reference B. I combine the two. Aha. The patent claim is invalid.

It is very dangerous for the jury in that situation because the jury is going to say, okay, we looked at those two references. They have all the references. Therefore, the patent is invalid.

The jury has got to understand there has to be testimony from him that there was a reason to combine the

references, and he never gave a reason. He never did that.

So if you put this totality in perspective, it really draws into question the reliability of Mr. Lawrence's opinions.

THE COURT: In a way that you're not adequately protected by cross-examining him on all those things you just listed?

MR. LINDVALL: To tell the truth, your Honor, what I am concerned about, and we may be addressing this later on, is when Mr. Lawrence guess up there and, all of a sudden, he starts, for example, giving a reason why he would combine two pieces of prior art. And I look at his expert report, there is nothing there, and I have to make an objection.

And I'm concerned. I don't know if you had a chance to look at Mr. Lawrence's report, but they're very, very scant. I'm concerned that we're going to be fighting this disclosure issue throughout the courtroom. I am sure you would agree it's maybe a better technique to deal with this beforehand so we don't have to fight about what was disclosed in the expert report.

THE COURT: Well, I plan on expert reports to comply with the practice I used in the past, which would be that you would note that objection that an expert is going to go beyond the scope of the expert report, not actually

rule on it at trial, save it for post-trial motions. Then if you prevail on a post-trial motion, the fact he went outside his expert report, there would need to be a new trial, and then Broetje would get to pay for all of that, including your costs.

Does that in any way give you any greater comfort on this issue?

MR. LINDVALL: Yes. It's a Judge Farnan rule.

THE COURT: Yes, it's a Judge Farnan rule. I don't claim ownership or authorship of it.

MR. LINDVALL: Yes. No, no. That would give me comfort. It's causing me some headache because we would not rather have to go through that twice. Our client is a small client, and I would prefer that not to happen, but we really think Mr. Lawrence's expert report are totally deficient from that standpoint.

Now, let me move to a completely different subject. This has to do with Broetje's motion for summary judgment relating to standing. And I want to draw your Honor's attention to a couple aspects of that.

This focus, in particular, which I think is most important, is this: They say F2C2 lacks standing on the patent claims because they are not an exclusive licensee between AHG and F2C2.

And as you probably saw from the declarations of

the parties who were the signatures to the written agreement that we're looking at today, their clear intent was always for it to be an exclusive license.

Remember, AHG and F2C2 are a closely held, family run business. They're not publicly held. They have a limited amount of employees. F2C2 I think only has three employees. AHG has maybe 100 employees. So this is a family run, closely held company. They formed F2C2 to basically -- well, not basically. They formed F2C2 to take advantage of the patents and to make and sell the products which are in dispute today. That was the reason for that. And we submitted declarations to the Court to show that.

Now, what I would like to do, which I'm not sure if it was clear in the papers, if we looked at, in DI 164, which is Broetje's appendix for all their motions for summary judgment, it's DI 164, there is the English translation of the written agreement that is in dispute.

It seems to be their principal argument that, on the second page of that agreement, this is Exhibit 23 to DI 164, second page, there is four percentages of ownership. They say those four percentages of ownership mean that the exclusive license agreement was only directed to the European patent, not the U.S. patents.

The agreement on itself just says patents. So they are looking at that and saying, ah, you just mean

European patents. If you look at that language, though, carefully, it says, for example, Mr. Jean-Marc Auriol up to a maximum of 45 percent. In each one of those instances, they went up to a maximum.

This takes care of the situation where maybe one of the individuals would not have any interest, for example, in U.S. patents. So to make an assertion that this automatically would come to a conclusion that this only -- this agreement only applied to European patents is wrong.

The other indication that this is an exclusive license agreement -- and it's clear. The case law is clear you don't have to use the word exclusive to be an exclusive license agreement.

They say, for example: Beginning on May 1st, 2001, F2C2 system, the undersigned, on the other hand, was entrusted by the parties on the firsthand with the direct business use and development of the patents.

Entrusted basically means like a trust. We're giving you the right to now exploit these patents.

The subsequent conduct of the parties as reflected in the declarations was that they always treated them as an exclusive license. They were the only people who were able to make or use anything of these licenses. So they told to Broetje, Germany, F2C2, and that is the way it was done the whole period of time.

AHG never went out to license anybody else. F2C2 is a closely held subsidiary of AHG. Again, a family run business. In fact, the person who ran F2C2 was the son-in-law of the person who owned AHG, so there was always an intent to keep this as an exclusive arrangement.

One thing that has been interjected into this is that we cited law where you can look at the parties' conduct, you can get implied license and what have you. They interjected the French law does not allow that, and they say there is no written agreement.

Well, there is a written agreement. We just showed you. And that written agreement to construe whether it's an exclusive license agreement, if we do consider French law, French law is one of the few countries in the world which, unlike the U.S., allows subjective intent to almost -- to supersede expressed terms of agreement. We're not saying that we're contrary to the expressed terms of the agreement, but we cited French law in there. I don't know if this Court wants to go in and make that interpretation.

We moved to strike their reference to French law because if we get French law, they had notice under Federal Rule of Civil Procedure 44.1. They had to give this Court notice. This Court has to have adequate time and resources to decide on what the French law is, to make that determination. If they didn't give adequate notice, they

don't get the right to bring in French law.

We say even if this Court decides to bring in French law, the French law supports our position with respect to that position.

THE COURT: On the whole issue of standing, if I'm not in a position to resolve it before trial, would you anticipate presenting any evidence as to assignments and French law and issues like that?

MR. LINDVALL: Yes, your Honor. We would present all of that. It's obviously our burden of proof to show that F2C2 had a right to recover lost profits. So as part of our burden, we will present evidence about what the parties' intent were and the assignments and the license and the subsequent conduct. All of that would be brought into evidence. And we anticipate doing that because, again, it's our burden.

THE COURT: Thank you.

MR. LINDVALL: The whole reason they're coming after F2C2. Now, there is a whole question mark here. There is case law out there that says if we want to go ahead and come up with a new agreement now, we can do a new agreement now and make it clear it's an exclusive license agreement, and they have the opportunity to cover lost profits because this isn't a constitutional standing issue. And we could do that, if we wanted to.

We didn't think it was necessary. We didn't even go that route. And we say in both of our declarations, both of our witnesses offered to do that if that is necessary, but we didn't believe it was necessary because we think the agreements are sufficient on their face.

We would like to reserve the rest of the time, your Honor.

THE COURT: Okay. Thank you. Then we'll hear from --

MR. LINDVALL: Just a second. I don't want to shortchange myself.

THE COURT: Yes.

(Pause.)

MR. LINDVALL: That's it, your Honor. Thank you.

THE COURT: That's fine. You all have 15 minutes left.

We'll hear from Broetje then.

MR. KELLEHER: Yes, your Honor. I may as well start where Mr. Lindvall ended, on this issue of whether or not F2C2 is an exclusive licensee.

The document that they point to, the only document they're saying is the exclusive license, it has percentages, and it says the ownership, whatever patents that aren't named, whatever they are, from Mr. Phillippe

Bornes, up to a maximum up to five percent ownership. For AHG, the company, up to a maximum of 2.5 percent ownership.

The United States patents were owned one-third each by Phillippe Bornes, Jean-Marc Auriol, and AHG. So those patents are not covered by these because this tops out at five percent possible ownership. It can't apply to a patent that Mr. Bornes owned 33 percent of. It's the only document they pointed to as being exclusive license and it clearly doesn't cover United States patents.

THE COURT: And what about, do you agree that they could go ahead and execute something before trial next week?

MR. KELLEHER: No, the patents are expired so they can't be an exclusive licensees of expired patents, and you can't retroactively make them a licensee, because they have to have the right to exclude other people, when the sales are going on. You can't go back and punish us and give them profits for lost sales that were not being made when there was no exclusive licensee.

I think no reasonable juror could find that this piece of paper covers the United States patents. I really believe there is no genuine dispute on that, and it is their burden of proof.

THE COURT: And if I don't rule on it, you agree the burden is on them, and they will have to put this in

front of the jury?

MR. KELLEHER: The burden is on them, but I think the question is for you, your Honor, as a matter of standing to decide, not really the jury.

THE COURT: And what about their effort to strike the reference to French law?

MR. KELLEHER: Your Honor, we looked at their documents, and we filed our motions saying look at all the papers. It doesn't appear they're an exclusive licensee. They came in and for the very first time said, oh, no. We have an oral or an implied license.

We had to reply to that. Whatever contracts they have amongst themselves are going to be governed by French law, and it happens that licenses have to be in writing in France. So we thought that was a very fair reply to them for the first time raising this issue, whether they could have an oral or implied license.

THE COURT: How does the Federal Rule of Civil Procedure requiring a notice fit into that?

MR. KELLEHER: They should have given us notice they were raising an issue of French law.

So, your Honor, I'll just run through a few of the motions. And if you have any questions, if you have them, obviously, this is for you, not for us.

THE COURT: Sure.

 MR. KELLEHER: Our 12(b)(1) motion to dismiss claim, the first claim for relief related to the so-called '339 patent, obviously, it's all been briefed for you.

I would just say that the questions that are overriding are where is the check? Where is the check that they actually paid the issued fee to the United States Government? And where is the check showing they paid the late fee? Because the late fee also had to be paid. And where is the granted petition to rely that they filed after the Patent Office said it was being withdrawn from issue?

THE COURT: And so your position is the burden is on them, ultimately, but this is a motion to dismiss; right?

MR. KELLEHER: It's a 12(b)(1).

THE COURT: So they can't meet their burden without producing those three documents.

MR. KELLEHER: The law says that all business of the Patent Office has to be done in writing. There is no way there was some phone call saying, oh, no, I'm sorry. I missed the check. I'll send it to you. This would have had to have been recorded.

THE COURT: It's undisputed that the Patent Office believes that the patent existed; correct?

MR. KELLEHER: I don't know about that, your Honor. We know they accepted maintenance fees. That

doesn't necessarily mean that when the check came in, they went and checked to see what the file history said.

THE COURT: In the time period when the patent was arguably valid, you could find it on the PTO records, could you not?

MR. KELLEHER: You could find every patent, you know, ever, your Honor. You could find every single application, you know, they prepare publicly. So that doesn't say this is really a patent. That there is a statute saying that it became abandoned.

THE COURT: If I were to agree with you on the lack of subject matter jurisdiction, could I nonetheless invalidate the patent which you asked for?

MR. KELLEHER: No, you would not have subject matter jurisdiction to rule on whether or not the claims that appear on the page are invalid or not.

Concerning our Motion No. 6 on best mode, your Honor, we moved on two grounds. One, we said that Mr. Bornes had a best mode in his mind of using five groups. We also said that Mr. Auriol had a best mode in his mind, which is that you cannot -- you have to use an odd number of groups. You can't use an even number of groups.

They responded with some evidence concerning the five groove best mode of Mr. Bornes. They gave no response whatsoever to what we said about Mr. Auriol's best mode. We

think that has been conceded by their silence, your Honor, and summary judgment ought to be granted of invalidity.

THE COURT: I think you called this a motion for partial summary judgment, but what is partial about it?

MR. KELLEHER: It doesn't end the whole case. It would end two claims.

THE COURT: Meaning it ends the patent case completely; correct?

MR. KELLEHER: It does, your Honor.

THE COURT: But it doesn't end the nonpatent case.

MR. KELLEHER: Right. This could very well be the last case ever where a patent is invalidated under the best mode requirement, since the statute that was passed last week eliminates that as a litigation issue for cases going forward.

THE COURT: Was it well known in the art that an odd number of grooves would prevent jamming?

MR. KELLEHER: I don't think so. Mr. Auriol testified from the very beginning he appreciated that he saw a problem with rivets tilting in some way or another if only an even number of grooves were used. I'm not exactly sure I can say why he felt that, but since it is a subjective requirement, he has to disclose that.

THE COURT: Now, your best mode defense is not

in anybody's expert report; correct?

MR. KELLEHER: No, your Honor. It's based purely on testimony from the other side. I'm not sure that an expert would have been competent to say about what is in someone else's mind.

THE COURT: If the best mode defense goes forward at trial, you have no expert that you would offer.

MR. KELLEHER: No, your Honor.

THE COURT: And what is your view as to, or if your expert had testified to this, as to how many embodiments were disclosed or are disclosed in the patents?

MR. KELLEHER: There are a number of embodiments disclosed, your Honor.

THE COURT: Are they all an odd number of grooves?

MR. KELLEHER: No, your Honor. There are even numbers in there, your Honor, even though Mr. Auriol said he doesn't believe that works.

THE COURT: Some of them are odd numbered.

MR. KELLEHER: Some of them are. The law requires adequate disclosure of the best mode, so you can't hide that the inventor thinks that if you use this actual thing I'm telling you can use, you are actually going to get jamming.

THE COURT: Don't you need to show some sort of

concealment, though?

MR. KELLEHER: It's merely that it's not on a printed page. That's the concealment.

THE COURT: If it's not on a printed page, it follows as a matter of law, in your view, that it's concealed.

MR. KELLEHER: Right. You don't need that intent, if that is the question. It's not like an inequitable conduct case where you have to prove intent to mislead.

Concerning the statute of limitations motion, your Honor -- I am sorry. I believe you ruled on that on Friday. I will pass over that one.

THE COURT: Okay. Thank you.

MR. KELLEHER: Also with regard to the standing issue, we say F2C2 has no standing to sue us for patent infringement because they're not an exclusive licensee.

We also say there is a defect in jurisdiction with regard to AHG because it wasn't until just before this lawsuit that Mr. Bornes and Mr. Auriol signed over, assigned all their remaining rights in the two U.S. patents to AHG.

The problem is there is a hundred plus year old U.S. Supreme Court case law, there are some magic words that have to be in there. We have to assign the right to past damages. Otherwise, that right remains with the assignee,

the party that are signing away their rights.

In other words -- and every one of them has the right to sue. So we could resolve this case with AHG, and as soon as it's done, Mr. Auriol and Mr. Bornes can sue us for the same lost sales. The Federal Circuit says that's a matter of prudential standing, and it hasn't been corrected in any way, and I don't know that it can be.

What it means is that there are damages. Their damage recovery could only begin as of the date of the assignment. There is no prudential jurisdiction with regard to everything before that because there are three owners.

THE COURT: And this last issue that you just mentioned of prudential standing, that comes up in your motion for partial summary judgment regarding lack of standing, that you were addressing the French aspect of it earlier; correct?

MR. KELLEHER: Yes, your Honor. So turning to the prior art motions, your Honor.

So with regard to anticipation, we basically made the argument that the claim construction that they asked you for with regard to what "longitudinal passageway and groove" means. And they got the claim construction of "any hollow shape that goes down the wall of the tube that air flows through."

Grammatically, that covers any open space even in a round tube. Every one of those is still any hollow

shape. I can drawn any number of any hollow shapes.

As you know, your Honor, we respectfully asked you to adopt a different claim construction. We think under that formulation, all kinds of prior art is covered by those claim terms, and you are not allowed to have a patent claim that reads on the prior art.

With regard to obviousness, your Honor, KSR did away with the strict teaching motivation test. It does say that identifying a reason to combine can be important but there are other ways with KSR where things have been found to be invalid.

First, I have to say my expert Mr. Lawrence does identify a reason to combine his expert reports. Referring to the Minbiole prior art which shows cut grooves in the wall of the conduit, the Minbiole patent says that one of the advantage of those grooves is that it enhances direct examinational control of what is passing through the conduit. And my expert opined that that enhancement of directional control would be a reason to put the grooves of the Minbiole conduit into a rivet feeding tube.

THE COURT: Do you have offhand the paragraphs in which he discusses that?

MR. KELLEHER: I confess I do not, your Honor. I'm very sorry.

THE COURT: It's in your briefing.

MR. KELLEHER: Yes. It would be in his opening report.

THE COURT: Okay.

MR. KELLEHER: So it's very clear, your Honor, that fasteners have been fed through tubes for decades. There have been cassettes out there. The Brosene patent that we showed you was a cassette from 1965.

The Komaki/Shinjo British patent application which, yes, was looked at by the examiners, it shows a coiled tube filled with fasteners and the shape of the tube is square.

They say, your Honor, that the claims cover a pentagon. I don't -- because each of the five points is a groove for longitudinal passageway. I don't see how Shinjo would mean a square, wouldn't have at least four grooves and longitudinal passageways under their construction and be an anticipating reference.

Respectfully, your Honor, I think the examiners had a different view of what groove and longitudinal passageway meant and, therefore, didn't look at Shinjo in that way. But if that is the construction that is going to be given to those terms, they read on the prior art and render the claims invalid.

With regard to indefiniteness, your Honor, we cite testimony of three people in opposition to their motion

for summary judgment: both the inventors, plus their expert, Dr. Kytomaa. The three of them are all over the place with regard to how "peripheral guiding" as you have construed it could be given a concrete meaning such that people out there in the real world can know that they're not infringing.

THE COURT: The Federal Circuit has suggested, hasn't it, that inventor testimony at least, which you say is a big part of this, is not really that strong.

MR. KELLEHER: Right. And I didn't ask them their subjective understanding of that term. I said can you please tell me. I've got a tube, and inside of it I've got a rivet. I say the rivet is pretty close to the wall. Okay. We'll say that is peripherally guiding.

Let's say I keep making the rivet smaller and smaller and smaller. How will I know when I no longer have peripheral guiding such that I'm not infringing the patent? And they all give answers all over the place. So that is not asking for their subjective understanding. It's helping them give us guidance so we can understand how not to infringe their patent.

THE COURT: Did Broetje argue in claim construction that the term was indefinite?

MR. KELLEHER: We think if you had adopted what we had proposed, it would be definite.

THE COURT: But then I thought indefiniteness was something akin to insolubly ambiguousness cannot be construed.

MR. KELLEHER: I would say 99 percent of the time it is, your Honor. We cited a case, the Haliburton case and another case from Judge Farnan specifically dealing with even if a judge can be defining with words and, from those words as defined, the construction, someone out there in the industry would still not be able to get a concrete understanding of what would or wouldn't infringe, then it is indefinite even though the Court was able to reduce it to words.

Concerning our expert, Mr. Lawrence. He has been in the rivet-feeding field for about 20 years. He is a former employee of Boeing. He went out on his own as a consultant about 10 years ago. Boeing continues to hire him even though they have to pay him more. He is involved in the repair and upkeep of the Broetje machines at the Boeing Long Beach facility, some of which have our systems, some of which have F2C2 systems. He is intimately familiar with the machines. He has taken them both apart, I can't count the number of times.

He is not a Ph.D. in mechanical engineering from MIT like their expert is. He is a guys who gets his hands dirty, but he knows this technology, and that is how he is

able to testify about what a person of ordinary skill in the art, which, of course, is just a hypothetical construct, he is able to testify what he believes a person of ordinary skill in this art would be able to do.

Would we be faulted for not having a definition of what Mr. PHOSITA is in terms of credentials? We looked. We're looking instead, your Honor, at what skills would have to have been in the tool bag of this person of ordinary skills. The only skills that would have had to have been in tool bag would have been the ability to take a bunch of rivets and drop them into a square Shinjo tube or be able to carve grooves into a wall of something like Brosene.

I think it is undeniable that back in 1988, those two incredibly easy skills were within the level of skill of the art, regardless of whether or not we're able to define by prudentials who such a person was.

THE COURT: And what about all of the criticism that he doesn't understand the law?

MR. KELLEHER: He doesn't -- he doesn't have to understand the law, your Honor. First of all, on inherency, he does.

On the question on inherency, your Honor, is whether on the Brosene patent, which shows a cassette filled with coiled tube that is filled with rivets, and the patent says it's supposed to be, it's a storage means and it's

supposed to be sold as an article of commerce, per se.

He says even though stock members are not illustrated at the ends of the tubes, he says they have to be there. In order to sell this thing, if you didn't want your customer to open it up, have a box with an empty tube and a bunch of loose rivets, you, of course, have to have stop members at the end. So he understands that inherency means it has to be there.

I think in his deposition, his statement was how else could they do it? That really is what inherency is. Whether or not he can recite it the way all of us who went to law school, he can't, but he understands the concept of inherency.

I agree your Honor about the burden of proof issue. It's really not his issue to testify about the burden of proof. He can say I'm looking at it in black and white on the piece of paper, and the jury can determine whether that is clear and convincing evidence.

Concerning the motion to strike, your Honor. That is still out there, the cross motion to strike. It's a late dispositive motion. It's asking you to dispose of a number of our defenses, and it was filed I believe 10 days after the deadline for dispositive motions. If it is looked at as a discovery motion, they didn't follow the procedure you ordered in this case for discovery motions.

Both parties have continued to supplement, your Honor, over the last couple of months. We gave them a supplemental interrogatory answer four business days after we took the depositions of their two inventors, and we disclosed the defenses that we had learned through taking their depositions.

The same day they serve a supplemental interrogatory answer, too, a few hours after us, changing, adding to their definition of what their trade dress is. But they want our interrogatory to be untimely where apparently theirs is timely. I think it's a motion for a double standard.

We have supplemented. Both parties produced new documents when their damages experts gave the reports. Both parties have handed over a few documents here and there.

This apparent letter from the dead lawyer, Mr. Dutton was never produced in discovery until they used it to try to find against our 12(b)(1) motion.

Last week, as we were finalizing the exhibit list, they were still producing new translations to us that they did last July.

THE COURT: Isn't what you did an order of magnitude different? I mean you brought in three wholly brand new invalidity defenses and all you point to is that you broadly cited the statute in your answer.

MR. KELLEHER: Your Honor, discovery is still open. You extended discovery for us. We took the depositions. We had noticed them a full month earlier, but they said they weren't available, and it's based only on their testimony. So I think that is fair.

Also, I wouldn't say that's true, your Honor. By that, they're including the 12(b)(1) grounds. That is not a simple defense. To the extent it's subject matter jurisdiction, it can't be waived.

THE COURT: I'm talking about indefiniteness.

MR. KELLEHER: Yes, indefinite and best mode. Best mode or the other two.

THE COURT: And then you have anticipation defenses I think that are new, or at least that is my understanding of their argument.

MR. KELLEHER: I think what they said, your Honor, was that there were maybe obviousness combinations that they felt --

THE COURT: Certainly, they didn't say that also.

MR. KELLEHER: Yes. And they said there was some art that we produced late. But as we pointed out, the Mauer (phonetic) reference, for example, we actually produced all the way last year in the form of the European counterpart.

 THE COURT: Well, that means you didn't produce it.

MR. KELLEHER: It's the same content, your Honor. We went and found the United States patent. It really is the same content.

THE COURT: But you concede that you never produced the U.S. Mauer patent; correct?

MR. KELLEHER: We did. No, your Honor. We do not concede it. We did produce it during the discovery period.

THE COURT: In its European form?

MR. KELLEHER: Both -- when we produced the United States patent, discovery was still open. There has never been a deadline set in this case for disclosing prior art or disposing invalidity contentions and the statute said we didn't have to disclose prior art until 30 days before trial. We did it well before that.

That's it for my, your Honor, unless you have any questions.

THE COURT: Bear with me one second.

No, no further questions.

MR. KELLEHER: Thank you.

THE COURT: Thank you.

MR. LINDVALL: I'll try to respond to those even though all these weren't my assignments.

With respect to late disclosed prior art. They produced over 75 patents and what have you in discovery. And they did produce 75. I don't know if the patent they're talking about was disclosed or not. The fact is their expert came out with the expert report and used certain references and disclosed those, and that gave us notice, and our expert could rebut that.

After all of that was done, all the expert discovery was done, after fact discovery was done, then they disclose that they're going to rely on these. And that is our issue. Our expert, if they get any testimony, for example, on these pieces of prior art, does that mean our expert can't rebut it because there is no opinion relating to it in his expert report, in his rebuttal expert report? I don't know but it puts us in an awkward situation.

The first time we saw any notice of that prior art was when they used that in the deposition of our inventors, which was technically at the close of discovery.

THE COURT: Well, assume that they can't elicit expert testimony on it because they haven't produced an expert report on it, but that their view is they don't need an expert. I take it, your view is you may need an expert to rebut it; is that correct?

MR. LINDVALL: That's correct, your Honor. For example, if they were to call one of the inventors to the

stand as a hostile witness and try to elicit testimony to show that the patent is invalid, even though the inventor doesn't speak English and the inventor doesn't know anything about the claim construction decision, then we may want to use our expert in rebuttal to say that, no, that is not true for the following reasons.

THE COURT: So if we get to that point, what would be your request that I do? Should I give you the chance to file an expert report this week before trial or should we just see what happens at trial?

MR. LINDVALL: Actually, your Honor, I try to anticipate that, and I know that our expert this week is busy on another matter, so he wouldn't be able to do that in some time between the two separations of the trials, if he could do it at all.

Obviously, he wouldn't know what to rebut until he hears the testimony of the inventors; and I don't know if they plan on calling the inventors as hostile witnesses or not because they're not on the will call list. They're on the may call list. So I don't know what they're planning on doing.

This all goes to the Rule 26 disclosures on something like this. We're supposed to get fair notice about how to respond to something like this. And fair notice is not when you hear for the first time the inventor

is going to be put up as a hostile witness and they're going to use reference A for the first time as an anticipatory witness, and our expert on the same day may have to get up there and disagree with what the inventor said. This is the whole idea around fair notice of prior art.

They gave us 75 pieces of prior art. I think they have 30 some odd different combinations and anticipatory arguments even in the disclosed arguments. And we obviously are going to refer to that, your Honor, when we're talking about the pretrial order about limiting them to what they're going to come to trial with rather than let us guess which one of the 30 arguments they're going to use and give us something definite.

So that is my response on the late disclosed.

THE COURT: What about the argument that I never set a discovery deadline or at least in terms of disclosing prior art, they had up until the statutory limit to do it.

MR. LINDVALL: I think the scheduling order is clear. The end of discovery is the end of Rule 26 expert disclosures. That is when you have to disclose it.

And if you say that you can now present other prior art after the close of discovery and then use it at trial, it's a way of circumventing the whole Rule 26 expert disclosures rules. Because obviously anybody who is going to give any testimony on this prior art is going to be

necessarily opinion testimony. Even the inventor, if they call the inventor as a hostile witness, you can be guaranteed we are going to be doing objections. They're going to be doing lay opinions or opinion lay testimony. It's improper.

Now, let me touch on other areas. The Shinju reference that Mr. Kelleher was referring to. Keep in mind, two separate patent examiners both reviewed the Shinju reference and allowed the patent over it. It's specifically discussed in the U.S. patent, expressly talked about in there and distinguished from our invention. So we think from that standpoint, it shouldn't be looked at --

Mr. Kelleher made a reference, saying, well, the examiners may have used a different claim construction. The patent examiners by the patent rules have to use the broadest possible construction that they can come up in determining whether or not the patent claims should be issued or not. That's the rules in the Patent Office. They have to use the broadest possible construction, which is usually broader than any Court's construction.

THE COURT: But maybe in this case it isn't. I mean how do we know?

MR. LINDVALL: No, we wouldn't know because we are not allowed to call them. We have to assume they followed the rules, and the rules are they have to follow

the broadest possible construction.

With respect to the standing issue -- switch gears again -- Mr. Auriol and Bornes, again, in their declaration, made a specific comment in both of their declarations that they would be willing to -- this is with respect to AHG having standing on past damages -- would be willing, if necessary, to execute an agreement to allow AHG to collect for past damages s. It's express. It's signed. It's a declaration. That would alleviate any type of worries that they would have.

In any event, we could still put together and agreement today and give it to them, and that would give them the right to past damages. And we will contemplate doing that. We didn't think it was necessary. We thought the agreements are clear on its face.

THE COURT: Their position is it wouldn't make a difference at all because the patent is expired. How can you assign something that doesn't exist?

MR. LINDVALL: No. It's just -- for example, you can enforce a patent that has expired. That is exactly what we have done. You can still get damages six years back by the statute. You have lost some damages. For example, if a patent is expired and you sue a year later, you lost a year of damages. You can only go five years behind the issuance, but you still enforce it for the period of time it

was enforceable.

With respect to the motion to dismiss on the '339 patent. And this has to do with whether the Patent Office abandoned the patent or not. What we did actually today, we got on the Patent Office website and we found a patent that had been abandoned or withdrawn. They say withdrawn.

If I may, your Honor. May I approach?

THE COURT: You may.

(Documents passed forward.)

MR. LINDVALL: This is what the Patent Office does if the patent has been abandoned or withdrawn. It doesn't even show the patent anymore. It just uses the word "withdrawn." You can't even access it anymore.

The idea is it's clear that this patent has been in the patent database the whole time. We have been paying maintenance fees. They haven't been returned. There is no indication at all that this patent has been abandoned.

THE COURT: So where is the check?

MR. LINDVALL: The check, unfortunately, the U.S. Attorney who prosecuted this patent died about six or seven years ago. His files are gone. The only evidence we can find was a letter that was sent by that attorney to our client and our client still has that. He actually had a copy. His files are gone, the entire file. We tried to

find them. Again, he is passed away and nobody knows what happened to his files, so we don't have this file anymore.

THE COURT: I should find that you therefore have satisfied your burden?

MR. LINDVALL: You can satisfy the burden by showing that the Patent Office basis still has it an enforceable patent on its website. And if the Patent Office believes the patent is abandoned or withdrawn, they will put notice on the website by doing this. That is an official record of the U.S. government, and there is no reason to question why the U.S. government is wrong in this situation.

One other aspect of this is that a party -- we cite a federal case in there. I can't recall the name. What was it?

MS. SAUNDERS: Aristocrat.

MR. LINDVALL: Aristocat -- Aristocrat. Aristocrat said it is improper to attack the validity of the patent by talking about technicalities of the Patent Office. What they're doing is an end-around with Aristocrat. What they're trying to do is find the Patent Office did something wrong or something is improper. Then instead of finding the patent is invalid, saying I don't have jurisdiction. Well, you do have jurisdiction over this no matter what. It's a patent action. And they're asking you to decide this issue whether the Patent Office is correct or whether this patent

is abandoned or not.

Whether it's abandoned or not, it doesn't go to the Court's subject matter jurisdiction. Aristocrat specifically said the Court should not be hearing these type of defenses because there is no statutes that allow for the Court to hear these type of defenses. What they have done is cleverly turn this into a subject matter jurisdiction when, in fact, it is their way of trying to defend against the patent infringement litigation.

The last thing is, you know, best mode. I'm going to let Ms. Sharp finish up the last conversation. How much time do we have?

THE COURT: You still have six minutes.

MS. SHARP: Your Honor, first, just one thing to add to what Mr. Lindvall said in response to one of your Honor's questions. You asked if there was any information about deadlines that the Court imposed. In addition to the scheduling order, in late July, when we had another conference about production of the defense damages exhibits, your Honor directed us to confer and submit a scheduling order.

And one of the issues we discussed at that time was that defendants had not asked for depositions until right towards -- right at the end of what would have been the discovery cutoff; and as a result, they were asking for

a time period when our witnesses were unavailable.

Concerning about the prospect of having things thrown in late, we asked your Honor if your Honor was reopening discovery for all purposes. Your Honor ruled towards the end of the transcript in the last couple of pages -- and I'm sorry I don't have that cite -- that you were not reopening discovery. That the only thing we would be doing is finishing up what had not yet been completed. And that is really what leads to the concern that we have that gave rise to the motion, the original motion to strike which was done as a cross motion, and then the motions to strike that relate to issues that were raised for the first time in the replies.

But turning then to the issue of best mode. Broetje has the burden of proof to prove best mode by clear and convincing evidence both that the inventors possessed the knowledge about best mode and concealed it. The deposition testimony on which they relied is inadequate to prove any of that and certainly far inadequate to prove it to this clear and convincing standard.

The questioning taken individually and then the testimony taken as a whole, the questioning doesn't address time frames with any sufficient specificity to understand the time frames that the witnesses were talking about.

What their declarations make clear is they

did not know the best mode, which is five grooves, until the invention was commercialized, and that was years and years after the patent applications. At the time of the applications, they were using three and two and four grooves, I believe.

THE COURT: I have some questions for you on best mode.

MS. SHARP: Oh. I think, if I may, your Honor. I think your Honor already noted that there was such a disclosure in the patent, but figure 2 in the patent shows three grooves, if your Honor wishes that I hand it up.

THE COURT: That's fine. It's not necessary.

On best mode, do you agree that a single inventor's subjective personal view regarding best mode, if concealed, would be a sufficient basis for invalidity?

MS. SHARP: No, not a single inventors.

THE COURT: How about two inventors?

MS. SHARP: If two inventors had a subjective belief regarding the best mode as opposed to preferred modes, yes.

THE COURT: And why not one single inventor of a double inventor invention?

MS. SHARP: Because the inventors have to believe that and reach a meeting of the minds on it. They could have had a difference, and here may well have had a

difference of opinion, but what the record really shows is that they were using all different numbers of grooves at the time to try to determine what the correct number was, and that they had not finally determined the correct number.

THE COURT: And your contention is that a careful reading of the deposition transcript would show ambiguity as to when the two inventors determined that the best mode was five or an odd number.

MS. SHARP: Correct. Because the questioning doesn't deal, and the answers don't deal with time frames. What the inventors say is that over a very long period of time, they were doing various things to try to figure out how many grooves to use and the follow-up questioning, even the initial questioning wasn't about specific time frames.

THE COURT: And how about, there is the motion to strike. I guess it's not necessarily what you are up to address, but it seems to me that the best mode defense is procedurally somewhat different than some of the others and that they couldn't have had a basis for it until after they deposed the inventors. Is that a fair way to distinguish some of these late asserted defenses?

MS. SHARP: Well, if that distinction obtained all the way through, it would be a fair distinction, I think, your Honor, but the reality is that the case has been pending a long time. Had they been serious about a best

mode defense, they could have noticed and taken those depositions long ago, long before, well after the close of discovery.

THE COURT: And what about -- and if you want to kick this to one of your colleagues, feel free. The motion to strike itself seems like it was fairly untimely, coming in well after the deadline the Court did set for dispositive motions and coming several weeks after they updated their contention interrogatories to tell you they did want to add at least the best mode defense.

MS. SHARP: First, on the issue of whether or not it was a case dispositive motion. Because the issues weren't timely in the case, we did not regard it as a case dispositive motion, and, optimally, we wish we filed it earlier, but, your Honor, we were trying to get the pretrial order ready and other things ready at the same time and thought that the place that that fit most properly was in response to the motion to dismiss which wasn't brought until August.

THE COURT: Okay. Fine. The plaintiffs' time is up. Thank you very much.

Defense do have a few more minutes, if you wish.

MR. KELLEHER: Your Honor, on page 44 of Mr. Auriol's deposition, I asked him:

"Question: Do you remember when you learned

that you needed an odd number of grooves?

"Answer: We realized that from the very beginning," was the answer.

So I did ask about timing. That's the answer that he gave.

THE COURT: And your contention is that the only reasonable reading of that is at the very beginning, at least predates the application?

MR. KELLEHER: Yes, your Honor. He testified that they spent a few months before they had a patent application ready, and that is how I would read that.

THE COURT: Okay.

MR. KELLEHER: With regard to Dr. Kytomaa and the Mauer reference or the indefiniteness issue, I think, your Honor, they don't even need to do a new expert report. As we all know, if you open in the door at an expert's deposition and he gives you opinions, they are allowed to testify about that at trial. I did ask Dr. Kytomaa about the Mauer reference and he said it is covered by the claims. I asked about peripheral guiding, and he gave his view on it. So he is able to testify about that at trial because I already opened the door.

THE COURT: They're concerned that they don't know which defenses you are going to assert, assuming I allow you to, particularly which references you are citing

as anticipatory, which combinations are obvious. Are you prepared to tell us all today which ones?

MR. KELLEHER: Your Honor, I'm not sure I am prepared to give any up, but I can tell you if they want some guidance as to what I'm going to argue as to invalidity, all they have to do is look at the summary judgment papers. I put in there what we felt was the strongest case.

THE COURT: And help me understand why some of what you put in in August, it seems, or thereabouts isn't in violation of the scheduling order and my ruling that you were not to treat discovery as completely open-ended in July.

MR. KELLEHER: I think June is actually when they were produced, your Honor, perhaps I'm incorrect about that, but expert discovery and invalidity discovery was still open. I didn't take Dr. Kytomaa's deposition until August 19th.

THE COURT: Is there anything else?

MR. KELLEHER: Concerning the Aristocrat case, your Honor. It doesn't apply here. Aristocrat holds when the Patent Office revives an application, you can't then say that the revival is improper, therefore, the patent is invalid.

Here, the application was abandoned as a matter

of statute, section 151, and it was never revived, so we're not arguing invalidity based on improper revival, which was the actual holding of Aristocrat.

The case to look at is the Chinsammy case that we cite in our papers. That was a Federal Circuit case decided this year where someone sued someone for "patent infringement" and what they said was the patent was actually an abandoned application. The Federal Circuit said there was no subject matter jurisdiction, and a 12(b)(1) motion is properly granted. We think that is very similar to our case, your Honor.

And with regard to best mode, your Honor, each individual inventor has to disclose what he or she thinks is the best mode. You don't only have to disclose what there is a meeting of the minds on. There is an individual requirement for every single inventor.

THE COURT: Okay. Thank you very much.

We're going to take a recess. And when we come back, we'll go through a number of other issues.

(Brief recess taken.)

THE COURT: All right. Let me --

MR. LINDVALL: Your Honor?

THE COURT: Yes.

MR. LINDVALL: Your suggestion, about severing willfulness that you made earlier in the hearing, I've had a

chance now to discuss it and think about it.

There is one suggestion I could make without our client incurring a lot of costs. We could sever willfulness but do it so if the jury finds there is infringement, then we have like an extra day after that. So it's a continuum rather than have to be a separate trial a month later, two months later or three months later.

THE COURT: Thank you. I had considered that prior to you saying no to separate trials, but in this case, I have decided not to do that. I'm going to have a single trial of all of the claims that remain as of the time of the trial which will be next Monday.

One problem with the latest suggestion is I still would have to decide whether to sever off your nonpatent claims because some of the same concerns I have with willfulness, I also have with the nonpatent claims. And if I did sever those, I'm not sure that we could get it all done in one day, and I don't want to put the jury in a position where they think they're done and then they're not done. So we will have a single trial, to the extent there is anything left to try, after the Court rules on all of the motions, if indeed I do rule on all of the motions before trial.

But what I can give you now is my rulings on the motions in limine, at least all but one of the motions in

limine, and I will go through them in order, first with AHG's motion.

AHG's Motion No. 1 to preclude reference to foreign law or foreign limitations.

That motion is denied. The Court does believe, as was indicated in the argument, that the foreign law that defendant wishes to cite does have at least some limited relevance. The jury will decide how much weight to give to that evidence, and the Court will, if asked, instruct the jury on the non-binding nature of the foreign law.

The relevance, though minimal, relates to the willfulness claim, and defendant has represented it does not intend to assert, and nor will it be allowed to argue, that there is any relevance to the infringement claim, any relevance of the foreign law to the infringement claim.

Next is AHG's Motion in Limine No. 2 to preclude reference to the fault reports.

This motion is denied. While in the Court's view the fault reports do not appear to be very relevant, the Court is not prepared to say that they are entirely irrelevant. What they are relevant to is the whole underlying relationship between the parties, which included the time in which AHG was a supplier to Broetje, and then Broetje's development of its own product and the termination of that relationship. So both parties are going to be

permitted to tell that story, and the fault reports are part of the story from the perspective of the defendants.

So while not highly relevant in the Court's view, the Court, again, does not find them wholly irrelevant; and under 403, the Court believes it can manage this trial in a manner such that the risk of confusion and prejudice that may result from the fault reports coming into evidence will not substantially outweigh the probative value. So, again, that motion is denied.

AHG Motion No. 3 is one that the Court is reserving ruling on.

That takes us to Broetje's motions. First, Motion No. 1 to preclude reference to breach of the 1994 contract between the parties.

This motion is granted in that there will be no reference to "a breach of an agreement." Nor will there be any implication of a breach. Nonetheless, plaintiff will, consistent with what I already said, be permitted to tell its side of the story, which will include, if plaintiff wishes, its witnesses saying what they thought the defendant's obligations were and what the defendant, in their view, did. The Court understands the parties will dispute whether or not there was a contractual agreement.

All of this, again, is minimally relevant in the Court's view, but the Court believes it can manage the trial

in a way such that relevance is not substantially outweighed by the unfair prejudice and on confusion.

Next is Broetje's Motion No. 2 to preclude references to Broetje's product as Chinese copy.

This motion is granted. There would be no legitimate purpose to using that phrase. The parties are instructed not to use it, and counsel is instructed to direct their witnesses not to use that phrase either.

Broetje Motion No. 3, to preclude reference to extraterritorial confusion or use of trade dress outside the U.S.

This motion is granted. What may have occurred in another country or countries has, at best, minimal relevance to what folks here would think under our own laws, with potentially different culture and different responses to the same type of trade address. Whatever minimal relevance there may be is far outweighed by the risk of confusion and the potential for wasting a great deal of time at trial. There may also be a hearsay problem, so the Court is granted that motion and precluding that evidence.

Next is Broetje Motion No. 4 to preclude the use of the Court's claim construction opinion as the basis to question or undermine Broetje's reliance on its advice of counsel.

This is granted as well. The Court's Markman

opinion, of course, postdates the time that the patents were in effect. Obviously, it is impossible therefore for the Court's Markman opinion to have factored into the decision of the defendant whether or not to proceed with developing and marketing its product. And it would be unfairly prejudicial to Broetje and confusing to the jury to question Broetje's witnesses on whether they considered certain arguments that the Court, on a particular day in a particular case, found persuasive. Therefore, that motion is granted. And,

Finally, Broetje Motion No. 5 to preclude reference to discovery disputes and purported discovery failings.

This motion too is granted. The Court agrees with Broetje that trial is not the time to resolve discovery disputes. There is no relevance whatsoever to the issues at trial as to whether Broetje was slow or deficient in some way in regards to discovery.

The Court notes that what Broetje is attempting to exclude here is any accusation in front of the jury that it did not comply with its discovery obligations. Broetje is not trying to preclude the plaintiff from getting into the facts of here is what was produced, here is when it was produced, here is what your expert said on such-and-such a date, and here is what they said in a subsequent report or a subsequent date. Therefore, that is the limited relief that

Broetje is seeking, and that is the relief that the Court is granting by granting Motion No. 5.

The Court will take under advisement the other motions that have been argued here today as well as the one motion in limine that I noted that I was not ruling on.

Let's turn now to the proposed pretrial order. I'm going to go through many of the sections with you and say some things about where you have certain disputes. If I don't comment on something that is in the proposed order and there is no dispute on it, then it is acceptable to the Court and it is binding on the parties going forward.

First, the uncontested facts. The Court will read those to the jury after opening statements before the first witness testifies.

And I should say on some of these, I will need some input from you all. For instance, on the factual issues to be tried, putting aside that there are motions that might affect that, other than what is pending in the motions, it did not seem that there is a dispute as to what is in dispute.

Is that correct from the plaintiffs' perspective?

MR. LINDVALL: I believe so, your Honor. But in most cases, I think that is true. It's because the different motions gave us different perspectives.

THE COURT: From the defendant's perspective, is

that correct?

MR. KELLEHER: The only one difference I can think of, your Honor, I think they say the issue of marking under the patent marking statute is not at issue in the case. We believe it is because they never marked a patent number on their cassettes. It is our position that they never actually accused us of infringing United States patents before this lawsuit was filed, so they could only begin to get damages as of the date they sued us.

THE COURT: Mr. Lindvall, is marking an issue?

MR. LINDVALL: Your Honor, I think this is the first time they brought it up, but I guess if they believe it's an issue, it's an issue. But I don't believe it's an issue for a number of reasons. One is we gave them a letter in 2005 which said they're infringing the patents, and we're going to seek relief in the court in every one of those instances.

Second, it's a French corporation, located in France, providing these to Germany. There is no obligation for them to mark. If Broetje happens to send those to the U.S., everything is still fine. So it's really a nonissue. But it is -- it was the first time they brought it to light. It's not in any of their responses to interrogatories or what you have.

THE COURT: Okay. Mr. Kelleher, do you want to

respond to that?

MR. KELLEHER: I don't think so, your Honor. It's an issue.

THE COURT: Okay. If you all think you need to present evidence on it, you may do so.

There is a notice that there are some affirmative defenses, laches waiver and equitable estoppel. Do the parties anticipate presenting evidence on those at trial?

MR. KELLEHER: We do, your Honor. We believe they sat on their hands ever since 2005, before suing us in 2009, when they knew these products were being sold in the United States.

THE COURT: So those are matters that won't be argued to the jury, but you will present the evidence.

MR. KELLEHER: They are viewed as that, yes.

THE COURT: And, Mr. Lindvall, you understand that that is what the defendant is going to do at trial?

MR. LINDVALL: Yes. Yes, your Honor. I understand that. Although I would say that they're evidence within the six-year presumption, so they would have a very difficult time during the proof, but I understand the Court would have to decide that separately from the jury.

There is one issue. There are a number of pieces of evidence which has no relevancy separate for

laches and equitable estoppel. Does your Honor still want to hear, have the jury hear that evidence? It has to do with trade dress. Laches and equitable estoppel are part of our patent.

THE COURT: It's all going to go in front of the jury. The jury will be instructed obviously on what it needs to decide and not on things it doesn't need to decide.

Next, turning to legal issues.

Again, put aside that there is a lot of motions still pending, but it looked as if you are all in agreement as to what legal issues are going to be in this trial. Of course, we'll discuss those further when we get to jury instructions.

Is there anything either of you wish to say on legal issues at this point? Mr. Lindvall?

MR. LINDVALL: No, your Honor.

THE COURT: Mr. Kelleher?

MR. KELLEHER: No, your Honor.

THE COURT: On expert reports, we'll follow the Judge Farnan rule which was described earlier. Do either of you have any questions about that? Mr. Lindvall?

MR. LINDVALL: No, your Honor.

THE COURT: Mr. Kelleher?

MR. KELLEHER: No, your Honor.

THE COURT: Okay. I'm now up to other

witnesses. I think, let's see, within your witnesses section, at page 6. We're within VIII, at page 6. The Court adopts Broetje's proposal that notice of the witnesses to be called will be due by 3:00 p.m. one calender day before.

And then witnesses called by deposition, in section 9, pages 7 to 8, the proposal here for the timing of letters to the Court identifying the testimony that's in dispute, that is acceptable to the Court. You can certainly follow that procedure.

The Court also adopts Broetje's additional proposal in paragraph 5 that you will delete additional and redundant portions from the deposition.

The Court allows direct, cross and redirect. No recross examination is permitted.

I require there to be only one attorney questioning each witness, and only one attorney at the podium at a time.

If you are going to be using equipment, then either the equipment need to be directed by somebody not at the podium or it has to be directed by somebody at the podium who is the one asking questions. I don't want to see multiple people at the podium.

You need to ask for leave to approach a witness once per witness. Once you ask one time per witness, it

will be granted and you can freely approach that witness thereafter.

Turning then to exhibits, your section XI. Your timing of disclosure of exhibits that you intend to use is acceptable.

Further, at paragraph 2, the Court adopts Broetje's proposal, I'm on page 9, that if there is no objection, you do not need to elicit additional foundation testimony in order to admit the evidence. However, the document must be shown to a witness and you must move for its admission.

At paragraph 5, the Court adopts Broetje's proposal that physical exhibits will be exchanged by September 24th unless the parties agree otherwise.

At paragraph 8, the Court adopts AHG's proposal that demonstratives will be exchanged by 7:00 p.m. the night before they are used unless otherwise agreed.

At paragraph 8, the Court adopts Broetje's proposal that demonstratives to be used in the closing arguments will be exchanged by 7:00 a.m. unless alternative arrangements are made.

The Court adopts the additional proposal by Broetje in paragraph 10 regarding printed publications, and paragraph 13 regarding certified translations, and the Court also adopts AHG's proposal in paragraph 11 regarding

photocopies.

At section 11, paragraph 3, at page 9, there is a dispute which I think boils down to whether or not exhibits to be used only on cross-examination need to be listed. I want to hear from the parties whether that remains in dispute and what your positions are. There are two competing proposals.

Mr. Lindvall.

MR. LINDVALL: My understanding was your Honor's practice was that all exhibits to be used at the trial had to be on the exhibit list, whether it's going to be used for impeachment purposes or for any other purpose.

THE COURT: I certainly have done that on occasion. I don't always do that. Is it your request that I would do that at this point?

MR. LINDVALL: Yes, your Honor.

THE COURT: And the defendant?

MR. KELLEHER: We don't object to that, your Honor.

THE COURT: Do not?

MR. KELLEHER: We do not.

THE COURT: Okay. Well, then that proposal is adopted.

Some miscellaneous issues.

MR. KELLEHER: Your Honor?

THE COURT: Yes.

MR. KELLEHER: I apologize. We weren't sure exactly which paragraph.

THE COURT: I'm sorry. It's paragraph 3 of XI at page 9.

MR. KELLEHER: Thank you.

THE COURT: All right. A few miscellaneous things at my end.

The trial, of course, is timed. We'll talk in a moment about how much time.

At the end of each trial day, at least one trial member -- I'm sorry. Do you have an issue?

MR. SCHILTZ: Your Honor, I apologize.

In paragraph 3, section 11, on page 9, there are two proposals, one by AHG and one by Broetje. We weren't clear if your Honor had ruled on which of those two were to be accepted or neither.

THE COURT: I meant to adopt what Mr. Lindvall proposed here on-the-fly on his feet. And I understood that not to be objected to. Correct?

MR. SCHILTZ: Thank you, your Honor, for the clarification.

THE COURT: Whether these words do it or not, I'll have to leave to you all.

All right. I was talking about the timing of the

trial. At the end of each trial day, at least one member of each side should meet with my deputy to cross-check and get a rough calculation as to what the time used has been and also to cross-check what has been admitted in evidence.

In the morning, we will give you the official amount of time used by each side. And if you find at any point that you have failed to move the admission of something and it's a clerical error, we will give you an opportunity. As long as you raise it with me before the close of evidence, we'll give you an opportunity to correct that.

I encourage transition statements, particularly in a patent case, particularly when the burden is going to be shifting throughout the trial. The jury tends to find it helpful if before you, or even as you are introducing the witness, if you give one or two sentences, non-argumentive, just to tell the jury who the person is and how they fit into the case.

I think you probably all know how we keep track of time. Basically, if you are on your feet, the time is counting against you. And we'll look to you to give us, with respect to depositions, what the breakdown is for how much time is allocated to each side.

Are there any questions about how we time the trial? Mr. Lindvall?

MR. LINDVALL: No, your Honor.

THE COURT: And Mr. Kelleher?

MR. KELLEHER: What about sidebars, your Honor?

THE COURT: Right. Initially, the sidebars are charged to the party who is examining the witness at that time, but if we find that it's being abused, then we reserve the right to reallocate that time.

That takes me next to the miscellaneous issues raised by the parties.

Evidently, there is a dispute as to whether to play the Intro to the Patent System video produced by the FJC. As I understand it, AHG does not want it played and Broetje does. Is that correct, Mr. Lindvall?

MR. LINDVALL: Yes, your Honor.

THE COURT: And why don't you want it played?

MR. LINDVALL: Yes, your Honor. Actually, I haven't looked at it in the last year or so, I haven't watched it, but my understanding is the Patent Office procedures have slowly changed, and we're not certain about the accuracy of the video anymore. It was made about nine-ten years ago.

Second, it's our belief that it's slanted towards the defendant's type view that the Patent Office is overworked and, as a result, may not do their job quite as adequately as should be doing.

THE COURT: Okay. Does the defense want to

respond?

MR. KELLEHER: Your Honor, I'm not aware of any errors that have crept into it over time. I think it's a pretty fair video. I have played them on the plaintiff's side and the defense side.

THE COURT: Okay. We're going to play the video. I have played it at each of my of other patent trials and jurors invariably say they find it useful.

I will also be instructing in the preliminary instructions some background about the patent system. And while there is some redundancy between that and the video, the jurors generally say that they like that because they come in knowing nothing about patent law, and it's complex, and they appreciate seeing it in video form and hearing it in the instructions.

In terms of some other miscellaneous issues that you all raised in your papers, the Court finds acceptable and adopts AHG's proposals regarding translated depositions. Mr. Neugebauer's time for testifying. The point about the substitution of expert. That witnesses will generally be sequestered.

We'll talk about Mr. Lawrence in a second.

And with respect to translated exhibits, I do want to hear from the parties on whether Mr. Lawrence should be sequestered. And also on the remaining issues raised by

AHG with respect to whether Mr. Peters should have a translator, whether those 214 exhibits on Broetje's exhibit list should be deleted, and Proposal No. 9 about additional facts.

So let me hear first from AHG on each of those issues, please.

MR. LINDVALL: Your Honor, with respect to Mr. Lawrence, as you heard Mr. Kelleher say, Mr. Lawrence has been in this industry for a long time, and Mr. Lawrence is in a unique situation when I took his deposition. He works at the Long Beach facility of Boeing which makes airplanes, and at that facility, there are three Broetje riveting machines. Two of these machines use AHG riveting feeding systems and one uses the Broetje feeding system, which we say is an infringement.

Mr. Lawrence testified at his deposition about the faults that he had experienced with AHG's rivet feeding system. He had been using those systems for over 10 years. They're the original systems that had been there for 10 years, and I elicited testimony from him about how few faults had come from those riveting machines.

As a result, he turned into a fact witness on that particular standpoint for us. A very important fact witness, in fact, because we anticipate, especially after your Honor's ruling on the MIL, that they're going to elicit

testimony from, for example, Mr. Neugebauer about all the faults that they experienced in our riveting machines.

This will be used as rebuttal testimony. We anticipate calling Mr. Lawrence not in our case-in-chief but as a rebuttal witness, if they do decide to present the evidence on faults, because he really is a very key witness here, very important testimony for us. That's why we would ask for him to be sequestered.

There is an alternative, I think that we can do this, because he is an expert. I understand there may be the need to hear expert testimony. To the extent one of their witnesses is going to talk about faults, we ask him to be sequestered at that particular time. And if the witness is talking about something else other than faults, we would have no problem with Mr. Lawrence attending that testimony. To the extent a witness is discussing faults they had with AHG systems, in that situation Mr. Lawrence should be sequestered.

THE COURT: Are you going to present any testimony about faults in your case-in-chief?

MR. LINDVALL: Your Honor, we may have some because we may talk about, the witnesses, what faults they had experienced and why they experienced them. In that case, I would have no problem with Mr. Lawrence not being sequestered, in that situation. It would only be when the

Broetje witnesses are testifying.

THE COURT: So your request boils down to only requesting that he be sequestered when Broetje witnesses are testifying about faults?

MR. LINDVALL: Yes, your Honor.

THE COURT: Okay.

MR. LINDVALL: I think that would -- that helps limit any prejudice to Broetje, if at all, so it follows the reasons for the rule and would not cause Mr. Lawrence to somehow tilt his testimony because of what he hears a Broetje witness saying.

The other thing that is important here, your Honor. Mr. Lawrence does business with Broetje. In fact, right after he was retained as an expert witness, he signed a contract, a $10,000 contract with Broetje to do work for them. So he not only is an expert, he also is a customer and does business with Broetje, so we wouldn't want him to do anything to tilt his views on that.

Your Honor, the other was Mr. Peters or Dr. Peters is a Broetje witness. I took his deposition and it was all in English. I think he did refer once or twice to an interpreter, but it is our request that Dr. Peters could testify in English. I think he is very comfortable. He said he was comfortable, and he testified throughout virtually the whole two days of deposition in English.

THE COURT: But evidently he is more comfortable with a translator, so what is the reason to force him to do it in a second language?

MR. LINDVALL: Well, I have no problem if they want to have a translator onboard, if he wants to have a translator. I think what will end up happening is like what happened. They had a translator ready and he just decided not to use the translator.

THE COURT: Meaning you wouldn't object to having a translator available for him, but you want him to try to testify in English?

MR. LINDVALL: Yes, your Honor.

One issue on Mr. Neugebauer. I know you did ask about him. We want to make sure it's clear that on Wednesday, September 28th, when his testimony is going to come out, that it's us selecting when he is going to be pegged in and not him. We wouldn't want to have him thrown in between two of our witnesses in our case in chief.

THE COURT: That is, it's definitely going to be some time Wednesday afternoon, but you will figure out when on Wednesday afternoon.

MR. LINDVALL: Yes, your Honor.

I think the last issue, your Honor, was the late exhibits presented by Broetje.

THE COURT: Right.

MR. LINDVALL: What happened there was, I think it was about -- it was 2:20 a.m., I see it right there, the day before the exhibit lists were due, we received in excess of 200 new exhibits from Broetje. And, again, this is the day we needed to finalize things to get it to your Honor.

These were never listed before. And the problem we really had with them, many of them were just -- they were, for example, the summary judgment motion of AHG relating to infringement and all the exhibits. That would be an exhibit. So they would have the briefings, the declarations of all the exhibits and everything piled in this one trial exhibit, and they went through the whole, all six summary judgment motions, and then the other two summary judgment motions that AHG brought, and then even some of the motions to strike and other things like that. All of that was put on to their exhibit list plus additional items.

We called up instantly and said we can't -- you can't do this. First of all, we don't have any opportunity to put together objections on this in this short period of time, and this is way too late to add this many exhibits.

I can understand that both parties would want to add some exhibits near the end. It always happens at the last minute. There is a couple you forget about. They want four or five, we want ten or something like that, but to dump 200 on us at the last minute was something that really

created a situation for us that we couldn't handle.

Even today, there is still briefs. They did eliminate it down to about 100, a little over 100 now at our request, and even now we're still seeing briefs and things like that on the trial exhibit list. We still haven't had an opportunity to object to them yet. Depending on your Honor's ruling on that, we will set forth any objections we need to on those. But the point is to do this last minute dump is unfair to us on all these exhibits.

THE COURT: On some of these, though, they didn't exist any earlier, I assume. Like the briefs, for instance.

MR. LINDVALL: Well, no. When they filed the summary judgment brief, they could have filed it then. They waited until everything was briefed and even a time period after everything was fully briefed and waited until the night -- well, not the night but early morning when everything was dune. Not a couple days before but hours before we wanted to get everything finished up.

THE COURT: The other thing I raised was you had a proposal for additional facts. I don't know if that is a ripe dispute yet given I haven't ruled on the motions.

MR. LINDVALL: Yes, I think that is correct, your Honor. That is somewhat motion specific, and depending on how you rule on the motions, we can revisit that.

THE COURT: Okay. Thank you.

Let me hear from Broetje on these issues, please.

MR. KELLEHER: Thank you, your Honor.

Concerning Mr. Lawrence, the particular suggestion that was just made isn't exactly what was in the miscellaneous issues. I'm thinking through it for the very first time.

It relates only to asking that Michael Lawrence be sequestered when we have a Broetje witness on the stand talking about fault issues. And the idea was because he has factual experience with working some of the cassettes, his testimony might be tainted.

I don't think, your Honor, we would be offering much testimony about things that happened at Boeing Long Beach. That seems to be an area where their argument might have some merit.

THE COURT: Well, do you want some time to consider their proposal?

MR. KELLEHER: If I could have that, your Honor, please.

THE COURT: That's fine. This is one that we can defer ruling on until the morning of trial begins since obviously there won't be any testimony until then. So if this remains in dispute as of the start of trial, raise it with me that morning, please.

MR. KELLEHER: Thank you, your Honor.

Dr. Peters. He did testify almost exclusively in English. He is almost fluent in English. He used to live in the United States. I have every reason and every intent to put him on with as much English as possible. I just hate the idea of an order that he has to testify in English. He will definitely have to have an interpreter standing nearby because even at the deposition, he had to occasionally do so, and he did make a couple of errors in using words that sound the same in English and German but mean different things, so he will need to have an interpreter to turn to. I expect he will only do so only once every 20 questions or so.

THE COURT: Well, as I understand, there is no objection to him having a translator nearby, so I'm not ordering him to testify in English. Certain, it's preferable from everyone's perspective if he does. And the time of his direct testimony and redirect will be charged obviously to Broetje.

MR. KELLEHER: For Mr. Neugebauer, we don't have a problem with them being able to elect when it is we put him on, if we put him on out of order.

Then the last issue, your Honor, is the exhibit list.

Now, one thing I suppose I should tell you

first, the document that is attached as Exhibit No. 14 to the pretrial order, it does not include the final exhibit list that we sent to the plaintiffs. They instead chopped that document up, put part it in, and then put parts of an earlier exhibit list that we sent them that did not include many of our objections. So the document that is in your hands right now does not have all the objections that we served on the other side the afternoon of the day before these things were filed. And I contacted counsel for the plaintiffs last Thursday to try to get this resolved, and as of yet, it has not been.

The exhibits that were added -- so this was a little bit after midnight, I believe, maybe 1:00 o'clock the night before, we served a new exhibit list and there were 200 new exhibits. They basically fell into two categories. One, the documents that came from recent depositions and basically their court filings which we consider to be statements of a party opponent, because if things are not on the exhibit list, we can't even use them for impeachment.

Out of an abundance of caution, if a witness on the stand says something contrary to what the lawyers said in the court papers, we would like to consider whether we would like to impeach them with that. That is why those things are on the list.

With regard to the deposition exhibits, at 6:00

o'clock at night, so 18 hours after we gave them the new exhibits, they served a new exhibit list on us that had about 50 new exhibits. I sat down and went through in two hours, we got them the objections back, and those were many of the same exhibits that we added on. They were things that had been put in, in the new depositions that had been taken.

So, your Honor, we have basically, both sides, just had a supplemental addition to the exhibit list. We don't object to theirs. We don't think ours is objectionable.

THE COURT: Okay. Thank you. Did you want to say anything further on that last issue?

MR. LINDVALL: Sure. Just briefly, your Honor.

There are about 35 exhibits we added which were from the late depositions. We had Dr. Budach's deposition was very late so we had to add. We both added some on those. Those are individual exhibits that are easily, you can decide with objections.

What is difficult is when you have a brief with all the exhibits as one trial exhibit, it makes it very difficult to think what kind of objection you want except you just list every objection you can possibly think of. You don't have an idea which part of the brief they're going to use or the exhibits to the brief. So it's really an unfair situation to have this brief with all of the attachments and exhibits support labeled as one exhibit, and we just think

it's an improper characterization. And there is many of these. There are over 100 of these. Thank you.

THE COURT: Thank you. I'm certainly troubled that a lot of things are happening late in this case, and a lot of that is subject to motions that I have taken under advisement and haven't ruled on.

But on the specific issue I have in front of me right now, I'm going to allow the exhibits to stay on the exhibit list. That is not to say this was done in an ideal manner, but at this point, there is still yet another week until trial, and I'm confident that the plaintiffs have time to understand what the defendant has put into the exhibit list. So I'm not going to order them to be stricken from the exhibit list at this point.

Let me go through a few more things before I turn it to you to see if there is anything else you want to raise.

Well, first, let me confirm, I believe I dealt with everything on Broetje's miscellaneous list. Mr. Kelleher, is there anything else you had listed as a miscellaneous issue?

MR. KELLEHER: I guess, your Honor, we should work out getting into the final pretrial order our actual exhibit list with all of our objections.

THE COURT: Yes, and we'll talk in a moment about what I'm going to need in terms of further submission

of a proposed pretrial order from you.

In terms of trial, so we're beginning trial on Monday, I'll meet with counsel at 8:30 Monday morning, and we'll have the jury pool come up around 9:30. In your proposed pretrial order, both sides were requesting 10 hours of trial time. I understand that to be the maximum you are seeking if the case continues to look just as it looks at the moment; is that correct? And is that still your request as an adequate amount of time, Mr. Lindvall?

MR. LINDVALL: Yes, your Honor.

THE COURT: Okay. Mr. Kelleher?

MR. KELLEHER: Yes, your Honor.

THE COURT: Well, the Court agrees that 10 hours per side would be adequate given the scope of the case as it is now.

If the case is narrowed due to any rulings between now and Monday, the Court may reduce the amount of time and would certainly let you know that.

I will be letting the jury go at 4:30 each day. After at first day, we will begin at 9:00 instead of 9:30. I'll be giving them a 15-minute morning break and a 15-minute afternoon break.

We are able to provide lunch to the jury every day after the first day, so the first day we would probably give them 45 minutes to an hour for lunch. After that,

we'll probably try to keep them to more like a half hour for lunch since we will be providing lunch for them.

The proposed voir dire, the Court has reviewed it. I will file the final voir dire some time before the jury comes in, so you will have a chance to see it. I expect it will be shorter than what the parties had proposed.

Broetje had proposed a number of proposals that AHG did not agree to. I'll give you a couple of minutes if you wish to make the case for some or all of them.

MR. CAHR: Thank you, your Honor. There were a few of these that we think are important to add.

In particular, we think that having a question specifically directed to whether or not they or a close relative has ever worked with any of the relevant companies. Dassault has, for example, a facility within the District, and especially given some of the allegations that are likely to be involved in this action.

The kind of prejudice that might exist if someone actually worked for a Gemco or an Electro-Impact or a Kuka, it would be substantial. It's one question. I don't think it's something which would be --

THE COURT: And which number would that be?

MR. CAHR: That would be Question No. 26.

THE COURT: Okay.

MR. CAHR: The questions about degrees are

relevant here. Obviously, these are -- this is a sophisticated issue whenever you are dealing with patent cases, whenever you are dealing with issues that involve technology; and I think it's useful for both parties, quite frankly, to know what the educational experience of the parties involved. If I turns out there are people who are mechanical engineers, that would be useful for both sides, quite frankly.

The question about whether or not anyone has ever invented anything. Obviously, this is a patent case.

Whether or not someone is an inventor or feels like they were, for example, a thwarted inventor, those are things that would be quite relevant in determining whether someone might be an objectionable juror. And,

Then, finally, just a question about relevant experience with the actual technology. This is a case involving the aerospace industry. It involves making sure airplanes are put together properly so they don't fall out of the sky. It's an important issue. If people have experience in this industry and have experience dealing with these issues, both sides, quite frankly, should know that.

THE COURT: Do you want to respond, Mr. Lindvall?

MR. LINDVALL: Your Honor, I don't have any problem with No. 26.

Twenty-seven and 28, one is where do you live

and do you own a residence? I think that is a bit -- there is a problem with relevancy, plus it could be very embarrassing for a potential juror, so I think it's an inappropriate question to ask a juror.

Are you a member of any support organization or club? It's the same thing. It could put a potential juror in an awkward situation, and I really think the relevancy of this case, to put any kind of organizations they belong to is not very important.

I think with respect to college degrees, I think that would be embarrassing the way it's worded. How many members of the panel have college degrees, that causes people to raise their hand and make them feel improper.

I think the better way of doing it, your Honor could ask is there anyone who has a degree in engineering or a degree in maybe science. A degree in engineering may be the better way to do it. That way, the jurors won't feel uncomfortable with that type of question.

Just if you have a college degree or not, if someone has a college degree, something like the history of art -- I'm not downgrading the history of art, but it really doesn't -- it's not really relating to rivets or anything, but mechanical engineering I agree has some relevancy and we would all want to know that.

The same thing goes with No. 30, the master's

degree and the doctoral degree. Again, it goes to -- you can ask it in a way that it is relevant. Does anybody have an engineering degree or advanced degree in engineering?

No. 31. Has any member of the panel, relative or close friend ever started their own business? I don't understand why that is relevant, and I don't know why you want to ask jurors that.

Thirty-second is the one that asked for, does any member of the panel or relative or close friend have experience with or knowledge of rivets in airplanes or manufacturing?

I don't have a strong objection to that. I'm just not quite sure where that is going to go.

Have you or a relative, close friend, worked for a government agency or served in the military?

I don't know what the relevance of that is. If they worked for the government or not, it doesn't make any difference to me. It's an invasion into the jurors' privacy.

Thirty-four and five are somewhat redundant. It's a bit argumentive, too, where they said they felt they invented something new, connotating that just because you felt that way doesn't necessarily mean it's new. I think if the instruction or the question was asked, it should be very, very objective.

We have I think a fairly similar question in

ours, so I think they can be combined. That's all.

THE COURT: Okay. Thank you very much. That's all I need to here on the voir dire.

Next, moving to the preliminary jury instructions. I would have wished that the parties had agreed on more of this. It was surprising that you have disputes over so many of the preliminary instructions.

I will file, before trial begins, what I intend to read to the jury. It will look more like the plaintiffs' proposal than the defendant's, as the plaintiffs have been more consistent with what I have done in prior patent trials.

Let me ask this: If the Court were to not rule on the standing related motion prior to trial, one difference we noticed in the proposals was how the plaintiff is referred to or plaintiffs. Do you have a modified proposal if the case, if that motion is still pending a week from now?

MR. KELLEHER: One is not occurring to me right now, your Honor. We can give it some thought.

THE COURT: Okay.

MR. KELLEHER: One is not occurring to me.

THE COURT: Let's give it some thought. And if that remains an issue, we'll address it next Monday morning before I instruct the jury.

The verdict form, I will get that finalized and

filed before trial begins as well. I give the verdict form to the jury at the beginning of the trial, and I read it to them as part of my preliminary instructions so they know what they're going to be asked to decide at the trial.

In that regard, I guess I should ask you, your verdict forms look very different. If you would like to be heard on why yours is better than theirs, I'm willing to listen. Plaintiffs.

MR. LINDVALL: Your Honor, a couple comments.

We try to be simple and keep the question simple and consistent. We do have one change we will have to make because we do agree that with respect to the unfair competition and trade dress claims, nonpatent claims, there can only be one recovery under any of those particular claims, so we have to make sure in the jury verdict form that the jury realizes if they find for the plaintiffs under any of the nonpatent claims or damages, the jury has to understand that if they find one, they just write one damages for any. They can find all but still just one number. So ours will have to be modified slightly.

THE COURT: I will talk to you about making a submission.

MR. LINDVALL: Okay, your Honor.

The specific objection we have with Broetje is two, I think. One is they separated out damages for Broetje

Automation USA and then Broetje Automation, GmbH, Germany and U.S., and we don't think there is any need for that. The U.S. arm is basically an arm of Germany. It's a small arm. They act together. They do things together. To try to separate them out creates confusion for the jury.

In general, in all the depositions, in fact, in all the briefings, I think, there has never been a distinction made between Broetje USA and Broetje Germany for any substantive reason, and I don't think that is necessary. It makes it a lengthier forum, and it causes the jury to try to figure out what the difference is between Broetje USA and Broetje Automation.

The other thing I would like to draw your Honor's attention to. If you look at their proposed jury verdict form, from 7 through 16, these are all the ones -- I'm sorry, not 16. Seven through, I think it's 17. They're very long questions.

And, for example, let me give you, No. 7 says: Has AHG proven by a preponderance of the evidence that a third party infringed the claims of the '339 patent listed below, that Broetje Automation USA took action that actually induced that infringement of the third party, that Broetje Automation USA was aware of the '339 patent, and that Broetje Automation USA knew or should have known that taking such action would induce direct infringement.

Your Honor's jury instructions will tell the jury what they need to show for inducement. It doesn't need to be this lengthy with all the different elements in there to go yes or no.

It's interesting, because if you go to their invalidity questions, for example, obviousness, all they say, rather than go through all the factors of obviousness, they say have the Broetje parties proven by clear and convincing evidence that the following claims of the '339 patent are invalid as obvious based on the prior art?

So when it's on their side, their very, very simple and to the point, but when it's talking about infringement, they make it -- they go through all the different points. And I think, your Honor, the thing to do is to do it consistent throughout, and we've provided a consistent, simple way of doing, and it's consistent with Your Honor's and other courts verdict forms.

THE COURT: Okay. Thank you.

Defendants.

MR. CAHR: Thank you, your Honor. Just to go backwards a little bit.

Actually, Mr. Lindvall's point about the length of 7, 8 and 9, and things like that, that is actually maybe more in accord with the obviousness and invalidity ones. That is actually not a problem we would have. We would be --

THE COURT: You would be willing to simplify that.

MR. CAHR: We would be willing to simplify that.

In terms of objections to our verdict form, AHG fails to identify all of Broetje's grounds for invalidity. That is obviously something that we think is absolutely necessary in the verdict form.

We disagree with Mr. Lindvall's statement that Broetje USA and Broetje GmbH should probably be mushed together because, quite frankly, it is conceivable they could be liable for different things. They're doing different things. They're engaging in different actions. Broetje USA is, for example, selling spare cassettes. They're not selling the entire system. And so it's just, it is easy to imagine a scenario where they are liable for for different counts and different amounts of money.

AHG fails to require the -- if fails to identify the trade dress at issue. It is I think really important in a case like this that the jury understand what exactly is being asked to rule on, and being explicit about it, identifying what the trade dress is; and then going through and saying, well, is that infringed? I think that is important, and I think it is valuable. It serves a valuable purpose for the jury because otherwise it's enormously confusing.

The patent and trade dress instructions are obviously -- you know, we have issues that you already made reference to, your Honor, in terms of standing issues about which plaintiff is actually proper for which kind of count.

I suspect that will be resolved before trial, but if it's not, obviously, it does present an issue for us, because from our perspective, F2C2 is the only organization that has developed any rights in the trade dress, for example, because you can only develop rights in unregistered trade dress through use, and AHG has not used the trademark in the United States -- trade dress in the United States. And so it seems basic to us that the correct plaintiff be identified for the correct count.

We also think that to a certain extent the verdict form is inconsistent with the relief that they're sieging as described in their motions for summary judgment. We think that in the end, this should be an accurate reflection of the specific relief that they're entitled to.

We think that the statute of limitations is absolutely something that needs to be in the verdict form. We understand your Honor's ruling on that. It has ruled it is something for the jury to determine. The jury needs to determine the discovery rule, and that's fine. That is the position the Court has taken, and so the jury should actually be in a position to make those decisions.

There is also the inclusion of actual damages as a separate claim in the trade dress interrogatory, and AHG has specifically said that it's only seeking lost profits on that claim, so it's just inconsistent.

Oh. And then, finally, AHG fails to, on the trade dress claims, which are obviously the central part of the nonpatent claims, they fail to show -- they fail to go through the fact you first have to show that the patents are nonfunctional. I mean, I'm sorry, that the trade dress is nonfunctional. That's an acquired secondary meaning and it's likely to confuse consumers.

You need to have an independent finding on this things because if you don't, on appeal, it will be hard to parse out because, obviously, each of those independent ground, this is unregistered trade dress, so each of those independent grounds are necessary to actually reach the point of being able to make an infringement determination.

I think that's it.

THE COURT: Thank you. Let me tell you what I'm looking for.

I'm ordering that the parties meet and confer and submit to me by Thursday the revised proposal of a proposed verdict form, to do so through ECF, and to submit by WordPerfect.

I'm hoping that -- and I'm going to give you

some comments in a moment. I'm hoping, from what you said today and what I'm about to say, that you can, if not agree entirely on a single form, at least narrow your disputes in a way that you can get me a single document so that I can go through and easily turn it into the document that the jury will see. So I'm looking for a single submission on behalf of both of you.

Starting with, the defendant, as I understand it, is pretty much conceding that they're willing to reduce the verbiage in their proposal. And one of my reactions to the defense proposal was that it did seem to overly incorporate jury instructions into the verdict form. So the verdict form that I ultimately come up with should be one that is not attempting to instruct the jury but is just attempting to get the answers from the jury knowing that they will use the jury instructions in conjunction with the verdict form to figure out what they need to figure out.

My hope is that you all can figure out a way in terms of who the plaintiffs are and who the defendants are, figure out a way that you can agree that we use some simple terminology on the verdict sheet so as not to confuse the jury but make it clear on the record here that nobody is waiving their rights to argue that perhaps some of the recovery against the defendants might only be against one defendant as opposed to the other, and if I haven't ruled on

the standing, that the defendant isn't waiving its right to continue to press its challenge to standing, even if we see a particular plaintiff's name on the verdict form or on the instructions. So I'm looking to you all to figure out a way to make this simple for the jury, and I'm not asking you to waive any substantive rights in order to do that.

All of the invalidity defenses that are on the table as of now should be accounted for in the verdict sheet; and I'm hopeful you will do it in a way that if I do rule some of those invalidity defenses out before Monday, it will be easy and obvious to me as to how to delete certain portions of the verdict form.

And with respect to trade dress and breaking out the various elements, I'm inclined to agree with the defendants but that's not a ruling. I'm just hopeful that you will be able to agree on how to handle that.

The only other thing for me to say is, in terms of the pretrial order, get me, let's say by Thursday as well, a revised form of the pretrial order that encompasses specific rulings I have made today and also attaches the updated exhibits, including the exhibit list, which is an exhibit. And the Court will sign the proposed pretrial order that you submit later this week to indicate that it is adopted, and that pretrial order is the one that will control the subsequent course of these actions unless

modified by the Court to prevent manifest injustice.

With that, I will turn it back to you to see if there are any issues that you wish to raise that we haven't gotten to. Mr. Lindvall.

MR. LINDVALL: There is an issue, your Honor, that we talked about earlier. And this is we believe we have some right to have proper notice of what their invalidity defenses are going to be walking into trial. Right now, the best we have is that they think that the best defenses are in the summary judgment motions, but there is no committal. Right now, we're lost to what they're going to come in to court with. And if you could somehow give them some type of guidance order or whatever.

THE COURT: I'm going to give them a deadline. It won't be today, but what do you propose?

MR. LINDVALL: Your Honor, I don't mean to squeeze them, but maybe we can -- Wednesday?

THE COURT: Okay. Mr. Kelleher?

MR. KELLEHER: I can do Wednesday, your Honor.

THE COURT: Okay. So by 5:00 p.m. Wednesday, Eastern time, defense will advise plaintiff as to which invalidity defenses, including the specific combinations of prior art references for the obviousness defense, which ones are going to be the subject of this trial, subject to further ruling of the Court.

Does that satisfy the concern, Mr. Lindvall?

MR. LINDVALL: Yes, your Honor. As long as the list we get isn't exactly the 30 different -- I mean the ones they're actually going to try at trial.

THE COURT: The Wednesday list cannot be any larger than what they have given you to date. And if you feel on Wednesday the list you get is still too long, then you will need to reach out to us and we will take up the issue after we hear from you.

MR. LINDVALL: Because today we have 30 different arguments.

THE COURT: I'd understand that. Thirty seems like too much to me, but I'm hopeful that Mr. Kelleher will be reasonable. But if he isn't, he is going to have to be unreasonable by Wednesday at 5:00, and you will have to let me know.

MR. LINDVALL: Thank you, your Honor.

THE COURT: Is there anything else from you Mr. Lindvall?

MR. LINDVALL: No, your Honor.

THE COURT: Okay. Mr. Kelleher.

MR. KELLEHER: Just a few curiosities, your Honor.

On sequestering witnesses. I would ask what about our corporate representatives who will be here in the

courtroom? There is one for Broetje Germany, one for Broetje USA that will probably both be witnesses at some point.

THE COURT: Are you requesting that the corporate representatives be sequestered?

MR. LINDVALL: Well, if they're not testifying, no, your Honor.

THE COURT: Well, evidently, they may be testifying; right?

MR. KELLEHER: Correct. Most likely, they will be Dr. Peters for Broetje Germany and Mr. Benczkowski for Broetje USA. He is the CEO of the company.

THE COURT: And you expect to call both of them to testify?

MR. KELLEHER: I do, your Honor. They were our 30(b)(6) witnesses.

THE COURT: Does Broetje USA and Germany not have other people that can be the representative?

MR. KELLEHER: I think Broetje USA does not. It's a very small operation, your Honor. Broetje Germany, the problem there, everyone who is coming over is going to be a witness. There is no nontestifying.

THE COURT: Both of the entities do have other employees; correct?

MR. KELLEHER: Broetje USA does have other

employees, known as managerial.

THE COURT: Let me see if there is an objection.

MR. LINDVALL: Your Honor, both of these witnesses are very key witnesses. In fact, they'll probably be -- they're two of the witnesses on the will call list out of four witnesses, five witnesses. These are key witnesses. If they get to sit through all the testimony, it obviously gives them a huge advantage over -- with respect to the hearing the testimony.

It's the whole reason for the rule is for major witnesses like this. If they get to sit through the testimony, for example, hear the testimony from AHG, which a lot of it is going to be confidential information, by the way, which we're going to have some concern with. The jury, we're not going to be concerned with. Having the principals who make, the business decision makers to be sitting through this testimony, listening to this, they are going to know exactly how they're going to testify when they get up there to rebut what they heard. It's the absolute reason for this rule.

THE COURT: Okay. Mr. Kelleher.

MR. KELLEHER: Let's say, the rule is Rule 615, and it says this rule does not authorize exclusion of ... an officer or employee of a party which is not a natural person designated as representative by its attorney. They would be

our representatives.

We don't object to the idea of, for example, Mr. Auriol sitting in the courtroom for the entire time. After all, it may be he is the first witness in their case, but we may call him later on. If he has been sitting there listening to all the other witnesses, then the same argument applies to him that have been argued to Mr. Peters and Mr. Benczkowski. We don't object to that, but we also would like to have our corporate representatives here.

MR. LINDVALL: I agree with the rule. But the rule doesn't say -- it says an officer. They can bring an officer here or they can bring somebody here, but these are keep witnesses they plan using at trial. They're going to sit through the AHG testimony and know what the witnesses say and know exactly how to respond when they get up here.

THE COURT: Here is what we're going to do. Since I'm hearing from you all on Thursday anyway, you're going to let me know if this remains a dispute as of Thursday, in which case I will make a ruling.

I'll tell you my inclination, which I think is what I have done in the past, is I am inclined to make Broetje bring somebody else if they wish to have a corporate representative sit through the entirety of trial. And they do, as I understand it, have other at least employees who could be a representative.

I'm inclined to order them to sequester anybody who is a testifying witness at trial, even if that means you need to bring somebody else as a representative, but I'm not making that a final ruling now. You will let me know Thursday if I need to make an actual determination on that issue.

MR. KELLEHER: Clarification, your Honor. If you were to do that; after they have testified, Dr. Peters and Mr. Benczkowski, could they remain in the courtroom or would they have to leave and not be able to watch the rest of the trial?

THE COURT: I think it would depend upon if they were subject to being called again.

MR. LINDVALL: Yes. I think the rule is, automatically, if they finish testifying and we're not going to call them back, then, yes, they can sit in the courtroom.

THE COURT: So, basically, if they remain after they testified, that means they're effectively disqualified from testifying further. So depending on where we were in the trial and who it was, you might have to confer with counsel on the other side to make sure they have no intention of calling the person.

MR. KELLEHER: Okay. I have seen in some of your other pretrial conference transcripts, your Honor, that you sequence the order of proof at trial. The plaintiff

goes first, then the defendant, then plaintiff again to respond to what we have put in, for example, our invalidity case, and then the defendant gets the last word. Is that the way you do it here?

THE COURT: I appreciate you raising it. I think you all addressed that in your proposed order. I don't remember what you put in, but it seemed you were in agreement and it was fine to me.

Is there any difference as to how you want to sequence this case?

MR. KELLEHER: I actually don't recall. May I confer for a moment?

MR. LINDVALL: Ms. Sharp is going to look for that. I think generally in trials, it just naturally comes out. I don't think it will end up being a big dispute. Let's see if there is some kind of --

THE COURT: Basically, what I can tell you is if you all agree on how you want to do it, that will be fine by me. And I know we're going to be interrupted by testimony of one witness on Wednesday in any respect. So if you all agree on the order of presentation, I'll be fine with it. If it turns out you don't agree and there is a dispute, and I didn't see one in the proposed pretrial order, then let me know in your submission on Thursday.

Is there anything else, Mr. Kelleher?

MR. KELLEHER: I know sometimes you have said no written motions without asking permission first. Would that be the rule for here, too?

THE COURT: Did you want that rule?

MR. CAHR: I think I would want that rule.

THE COURT: Any objection to that rule, no written motions during the course of the trial without asking for leave first?

MR. LINDVALL: Your Honor, I think that maybe with the JMOL, or something like that, you may.

We can still ask for leave. We have no problem with that.

THE COURT: Okay. So there will be no written motions from the beginning to the end of the trial unless you ask for leave to file a written motion.

MR. KELLEHER: Your Honor, how many peremptories do you give the parties?

THE COURT: We're going to end up with a jury of eight.

(Court and deputy clerk confer.)

We'll give you five per side, so we'll have 18 in the jury box and end up with a jury of eight.

MR. KELLEHER: I know, your Honor, you will use a method where people go back to chambers with an individual member of the voir dire. Do you have a limit on the number

of people from the team that go back to chambers with you?

THE COURT: We have room for two per team. I don't know if we can accommodate more than that. We'll have to let you know that Monday.

MR. KELLEHER: I think that is everything I have, your Honor.

THE COURT: Okay. Great.

MR. SCHILTZ: Your Honor, I apologize. How would you like the exhibits submitted and when?

THE COURT: I'm sorry?

MR. SCHILTZ: When would you like the exhibits submitted?

THE COURT: Talk to Mr. Looby with that after the hearing. Okay?

And that's it?

All right. Well, thank you all very much. We'll see you next Monday.

(Pretrial conference ends at 4:27 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s Brian P. Gaffigan
Official Court Reporter
U.S. District Court

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on February 25, 2024 on the following counsel in the manner indicated below.

**VIA EMAIL:**

Jack B. Blumenfeld
Jeremy Tigan
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Catherine T. Mattes
Abigail DeMasi
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
evangelineshih@quinnemanuel.com
andrewchalson@quinnemanuel.com
gabrielbrier@quinnemanuel.com
frankcalvosa@quinnemanuel.com
catherinemattes@quinnemanuel.com
Abigaildemasi@quinnemanuel.com

*Attorneys for Plaintiffs*

Dated: February 25, 2024

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)