## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-691-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ████████████ |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1138-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ████████████ |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1594-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ████████████ |
| Defendant. | |

## JOINT MOTION TO REDACT LIMITED PORTIONS OF THE SEALED FEBRUARY 27, 2024 TRIAL TRANSCRIPT (TRIAL DAY 2)

Plaintiffs Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (collectively, "Jazz") and Defendant Avadel CNS Pharmaceuticals, LLC ("Avadel," and together with Jazz, the "parties") respectfully move for an order redacting certain confidential portions of the transcript from the sealed February 27, 2024 Trial Transcript (Trial Day 2) (D.I. 596 in C.A. No. 21-691-GBW) ("the Transcript"). The proposed redactions are necessary to protect confidential, non-public information regarding the parties' financial information. The proposed redactions are narrowly tailored so that they cover only those portions of the Transcript that contain or relate to that confidential business and financial information, which if disclosed publicly would harm the parties' competitive standing in the marketplace.

The parties' proposed redactions are attached hereto as Exhibit A, which is a complete version of the Transcript with the proposed redactions marked with red boxes. A redacted version of the Transcript is attached as Exhibit B.

This Court has the authority to seal where confidential information may be disclosed to the public. In particular, Federal Rule of Civil Procedure 26(c) provides for the protection by courts of materials containing "trade secret[s] or other confidential research, development, or commercial information," upon motion by a party, to prevent harm to a litigant's competitive standing in the marketplace. Fed. R. Civ. P. 26(c)(1)(G); *see also Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 529 F. Supp. 866, 889–91 (E.D. Pa. 1981). As the Supreme Court has acknowledged, "courts have refused to permit their files to serve as . . . sources of business information that might harm a litigant's competitive standing." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).

"Every court has inherent supervisory power, and the Third Circuit has held that courts may exercise that power to deny access to judicial records, for example, 'where they are sources of business information that might harm a litigant's competitive standing.'" *MOSAID Techs. Inc.*

1

*v. LSI Corp.*, 878 F. Supp. 2d 503, 507 (D. Del. 2012) (quoting *Littlejohn v. BIC Corp.*, 851 F.2d 673, 678 (3d Cir. 1988)).  The party seeking to seal a portion of a judicial record bears the burden of showing that (1) the material is the kind of information that courts will protect, and (2) good cause exists to justify the redaction.

To establish "good cause," the party seeking redaction must show that the "disclosure will work a clearly defined and serious injury to [that party]."  *In re Cendent Corp.*, 260 F.3d 183, 194 (3d Cir. 2001).  The court's assessment of whether good cause exists "generally involves a balancing process, in which courts weigh the harm of disclosing information against the importance of disclosure to the public."  *MOSAID Techs.*, 878 F. Supp. 2d at 508 (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787 (3d Cir. 1994)).  The Third Circuit has identified a series of factors to consider in this balancing process, including: "(1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose; (3) whether disclosure will cause embarrassment to a party; (4) whether the information to be disclosed is important to public health and safety; (5) whether sharing the information among litigants will promote fairness and efficiency; (6) whether the party benefiting from the order is a public entity or official; and (7) whether the case involves issues important to the public."  *Id*. at 508 n.2 (citing *Pansy*, 23 F.3d at 787-91).

Here, the parties seek to redact certain portions of the Transcript that contain highly sensitive business and financial information. The proposed redactions, as reflected in Exhibits A and B, are narrowly tailored to redact information related to the parties' confidential financial information. For example, the Transcript includes sensitive sales and marketing information, profits and revenue amounts, forecasting, and royalty-related information.  Disclosing this information to the public would damage the parties' competitive standing in the marketplace

ME1 48620392v.1

because it would disclose specific dollar amounts and figures to competitors or other potential litigants who might seek to use this information against the parties in another matter.  The proposed redactions are narrowly tailored to prevent disclosure of just such information.

Further, there is no public interest in providing to the public the information that the parties request be redacted. This case involves private litigants —not public figures, and the information that the parties request be redacted concerns the parties' sensitive business and financial information. Under these circumstances, where there is no public interest in the information to be redacted that would outweigh the real and specific injury to the parties, and good cause exists to redact the Transcript. *See Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984) (good cause to seal "is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure"); *Pansy,* 23 F.3d at 788 (good cause to redact exists where litigation involves private litigants "and concerns matters of little legitimate public interest"). Additionally, the redactions are very limited, and the public retains the benefit of access to the remainder of the trial transcript, apart from these limited highly confidential portions.

Moreover, the proposed redactions would not cause prejudice to any party to this dispute. Indeed, the parties jointly seek the relief sought in this motion.

For the reasons set forth above, the parties jointly respectfully submit that good cause exists to redact the portions of the Transcript as reflected in the attached Exhibit B, and they request that the Court grant their Motion and enter an Order in the form attached hereto.

Dated: May 30, 2024

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP

*/s/ Jeremy A. Tigan*
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiffs*

McCARTER & ENGLISH, LLP

*/s/ Alexandra M. Joyce*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King St., 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Defendant*

4

ME1 48620392v.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-691-GBW |
| JAZZ PHARMACEUTICALS, INC., *et al.,* <br><br> Plaintiffs, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-1138-GBW |
| JAZZ PHARMACEUTICALS, INC., *et al.,* <br><br> Plaintiffs, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-1594-GBW |

**[PROPOSED] ORDER GRANTING JOINT MOTION TO REDACT LIMITED**
**PORTIONS OF THE FEBRUARY 27, 2024 TRIAL TRANSCRIPT (TRIAL DAY 2)**

WHEREAS, Plaintiffs Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (collectively, "Jazz") and Defendant Avadel CNS Pharmaceuticals, LLC ("Avadel," and together with Jazz, the "parties") having jointly moved to redact certain confidential portions of

1

the February 27, 2024 Trial Transcript (Trial Day 2) (the "Transcript"), and good cause having

been shown,

IT IS HEREBY ORDERED this ___ day of _____, 2024 that:

1.     The Motion is GRANTED; and

2.     Any publicly available copies of the February 27, 2024 Trial Transcript

(Trial Day 2) (D.I. 596 in C.A. No. 21-691-GBW) shall be the redacted version of the Transcript

attached as Exhibit B to the Motion.


                                        _____
                                        UNITED STATES DISTRICT JUDGE

ME1 48620392v.1

# EXHIBIT A

1

2                    IN THE UNITED STATES DISTRICT COURT

3                    IN AND FOR THE DISTRICT OF DELAWARE

4

     JAZZ PHARMACEUTICALS, INC.,              )
5            Plaintiffs,                       )   C.A. No.
     v.                                        )   21-691-GBW
6                                              )
     AVADEL CNS PHARMACEUTICALS, LLC,          )
7            Defendant                         )
     -------------------------------           )
8                                              )   C.A. No.
     JAZZ PHARMACEUTICALS, INC., et al.,       )   21-1138-GBW
9            Plaintiffs,                        )
     v.                                        )
10                                             )
     AVADEL CNS PHARMACEUTICALS, LLC,          )
11   Defendant.                                )
     -------------------------------           )
12                                             )
     JAZZ PHARMACEUTICALS, INC., et al.,       )
13           Plaintiffs,                        )   C.A. No.
     v.                                        )   21-1594-GBW
14                                             )
     AVADEL CNS PHARMACEUTICALS, LLC,          )
15           Defendant.                         )

16

17                            - - - -

18                       Wilmington, Delaware
                         Tuesday, February 27, 2024
19                       Trial Day 2

20                            - - - -

21

     BEFORE:  HONORABLE GREGORY B. WILLIAMS
22            UNITED STATES DISTRICT COURT JUDGE

23
                              - - - -
24

25
                              Michele L. Rolfe, RPR, CRR

297

1

2   APPEARANCES:

3      MORRIS, NICHOLS, ARSHT & TUNNELL LLP
       BY: JEREMY A. TIGAN, ESQ.
4
       -and-
5
       QUINN EMANUEL URQUHART & SULLIVAN, LLP
6      BY: F. DOMINIC CERRITO, ESQ.
          NICHOLAS CERRITO, ESQ.
7         FRANK C. CALVOSA, ESQ.
          JOSEPH PAUNOVICH, ESQ.
8         The Plaintiff

9

10     MCCARTER & ENGLISH, LLP
       BY: DANIEL M. SILVER, ESQ.
11
       -and-
12
       LATHAM & WATKINS LLP
13     BY: KENNETH G. SCHULER, ESQ.
          MARC N. ZUBICK, ESQ.
14        ALEX GRABOWSKI, ESQ.

15     MORRISON FOERSTER
       BY: DARALYN DURIE, ESQ.
16        KIRA DAVIS, ESQ.
          ADAM BRAUSA, ESQ.
17
       For the Defendant
18

19

20

21

22

23

24

25

298

1

2             - - - - -

3          P R O C E E D I N G S

4      (REPORTER'S NOTE:  The following jury trial was held
5  in Courtroom 6B beginning at 8:51 a.m.)

6          THE COURT:  Good morning.  You may be seated.

7          All right.  A couple of administrative things
8  before we get started.  I want to remind counsel that joint
9  submission is due each night by midnight, according to your
10 agreement.  It's important that we get it on time, you know,
11 our folks are staying up to work on it.  And so any
12 objection, argument not received by midnight going forward
13 is going to be waived.

14         I want to remind counsel to provide the Court
15 with two courtesy copies of any demonstratives or slides
16 used in your openings or with witnesses or that you use
17 during your closing.  So, you know, when you're going to
18 present the witness or, you know, typically for your
19 openings, you would have gave the Court two copies of the
20 demonstratives, along with the witness binders, but just
21 keep that in mind going forward.

22         I want to remind counsel to remember to -- I
23 hope you are meeting and conferring about the final proposed
24 jury instructions that -- the final joint submission on that
25 is due to the Court by noon tomorrow.  And that we'll be

299

1  having the charge conference on Thursday afternoon or
2  Thursday evening when we finish with the evidence.  We
3  should be finished with presentations, I hope, by end of day
4  on Thursday.

5          All right.  In terms of time, so yesterday Jazz
6  used 3 hours and 5 minutes.  Avadel used 3 hours and
7  2 minutes.  So Jazz has 9 hours and 25 minutes remaining:
8  Avadel, you have 9 hours, 28 minutes remaining.

9          All right.  So now getting to the issues that we
10 need to deal with this morning on the joint submissions.

11         First, let's deal with -- so it's Jazz's
12 objection to Dr. Corser.  So based on the submission, I
13 don't see a basis for this -- to sustain this objection at
14 this time.

15         I know -- I'm aware of the Court's ruling on
16 Jazz's motion in limine No. 1, Avadel's aware of that as
17 well.  Avadel represents to the Court that Mr. Corser is
18 going to respond to Mr. Honerkamp's testimony raised
19 yesterday, including talking about the sodium content of
20 Xyrem and Lumryz.

21         So if, you know, there comes a point where Jazz
22 thinks that he's evading into the territory that was
23 precluded by motion in limine No. 1, you'll make an
24 objection at that time and we'll consider that.

25         MR. CERRITO:  Your Honor, I appreciate that.  I

300

1  don't think they will, I don't think that's what this is
2  about.  I simply point out that the sodium content is not
3  infringing, by the way, which is not in dispute, I don't
4  think, is not relevant to any issue in this case.

5          THE COURT:  Okay.  Well, your witness testified
6  about it, so they get a chance to have somebody else
7  testify.

8          MR. CERRITO:  Fair enough.

9          THE COURT:  All right.  So moving on to JTX112,
10 so I reviewed this -- and this is a letter from the FDA
11 given to Jazz's counsel providing the FDA's finding on an
12 issue.

13         So let me hear from the parties on this, and
14 I'll hear from Jazz first.  And I also understand that
15 Avadel has made an offer to redact in part, so within the
16 confines of your arguments, I want to hear them on those
17 issues as well.

18         MR. JORGENSEN:  Yes, Your Honor.  Quentin
19 Jorgensen, Quinn Emanuel, Jazz.

20         So this document is littered with references to
21 Jazz's legal arguments set forth by Jazz's legal counsel,
22 who is also representing Jazz in the district of DC case
23 about Avadel's orphan drug exclusivity.  It's also filled
24 with legal conclusions made by the FDA that are related to
25 that litigation, so there's no way to really redact this

301

1  document in such a way that it can be entered into evidence
2  because it -- because it's filled with Jazz's arguments that
3  are relevant to the district of DC case.
4          THE COURT: Okay. All right. There's a finding
5  in this document, right, and I assume that's what Avadel is
6  really after, so if the legal arguments were redacted and
7  the finding was just set forth, how do you respond to that?
8          MR. JORGENSEN: There's other evidence of this
9  finding that doesn't include entering this document that --
10  it's -- that has all the legal conclusions inside of it. If
11  all of the legal arguments are redacted, perhaps, but we
12  just don't think that's possible.
13          THE COURT: Okay.
14          All right. Is that your -- all right. You
15  completed --
16          MR. JORGENSEN: And also, Your Honor, apologies,
17  this document was also hearsay and does not -- Avadel sets
18  forth that it's admissible under 8038 as a factual finding.
19          THE COURT: Public record, yes.
20          MR. JORGENSEN: Yeah. But we would -- we
21  disagree. We believe that this is set forth as legal
22  conclusions and setting forth legal analysis and not factual
23  findings by the FDA.
24          THE COURT: Okay. I understand.
25          MR. JORGENSEN: In the purview of the FDA's

302

1  duties.
2          THE COURT: All right. I understand your
3  argument. All right.
4          MR. PORTER: One final thing, Your Honor, we
5  will stipulate to that fact. We will stipulate to the fact
6  that the FDA found that Xyrem, the clinical superiority. If
7  that's what they want, if that's what they are looking for,
8  I think we can circumvent this by just -- Mr. Honerkamp
9  testified to that, so I don't know why we would need to get
10  this entire document in for that one discrete issue that the
11  FDA found clinical superiority based upon the once-nightly
12  dosage.
13          If that's what we want, okay, that -- that's
14  already in evidence.
15          THE COURT: All right. Let me hear from Avadel
16  on that. First about the stipulation.
17          MR. GRABOWSKI: Thank you, Your Honor. Alex
18  Grabowski for Avadel.
19          We are potentially open to a stipulation, but I
20  think that we are also open to a pretty heavy redaction. I
21  think we'd rather have the letter in. We are interested in
22  the finding. We also are interested --
23          THE COURT: Tell me what finding you're
24  interested in.
25          MR. GRABOWSKI: We're interested in the clinical

303

1  superiority finding, and specifically the fact that it
2  made -- that the FDA found that Lumryz made a meaningful
3  contribution to patient care.
4          And we're also specifically interested in the
5  fact that the FDA, in making that finding, considered sodium
6  which, as we've already talked about today, Jazz's witnesses
7  have discussed.
8          So I think we can find redactions that might
9  work I think it's -- actually possible we could also find a
10  stipulation, but this should, I think, come in.
11          And I can also address the hearsay issue, if
12  you'd like.
13          THE COURT: Okay. All right. So -- all right.
14  So, the Court -- it sounds like you guys, in terms of the
15  statements you've heard from him, are you willing to
16  stipulate to those -- enter a stipulation to those?
17          MR. PORTER: Yes, Your Honor.
18          MR. GRABOWSKI: Your Honor, can we -- before we
19  stipulate, can we propose a heavily redacted version to just
20  see --
21          MR. PORTER: No, we --
22          THE COURT: So let me -- let me -- so, listen, I
23  want the parties to either -- to reach a -- to either reach
24  a stipulation that both sides can agree upon, or it's going
25  to come in redacted, but heavily redacted. So to both

304

1  sides, talk and reach some agreement, one way or the other.
2          MR. PORTER: Yes, Your Honor.
3          THE COURT: But the -- the findings and the
4  statements that were made, those are going to come in one
5  way or the other. All right.
6          MR. PORTER: Thank you, Your Honor.
7          MR. GRABOWSKI: Thank you, Your Honor, we're
8  going to do that.
9          THE COURT: All right. So now, along those same
10  lines, let me -- let's deal with JTX75.
11          MR. GRABOWSKI: Your Honor, we've reached an
12  agreement on JTX75 and Mr. O'Brien says maybe -- I think we
13  agreed to drop all objections for both parties on this.
14          THE COURT: Okay. So that's coming in.
15          MR. GRABOWSKI: Yes.
16          THE COURT: Progress.
17          All right. So DTX916, DTX1232, those objections
18  are overruled. Those documents are relevant, they are
19  communications between parties.
20          Best I can tell, there are no remaining
21  objections with respect to JTX195 and JTX118? It seems like
22  those were probably -- they were crossed out in the
23  red-lined version we received, so I assume that means no
24  objections.
25          MR. BRIER: Correct, Your Honor.

305

1    THE COURT:  Same thing with respect to
2  DTX13.003, right, which was a -- which is an Avadel
3  demonstrative, same thing, was red-lined, was crossed out.
4    MR. BRIER:  Yes, correct, Your Honor.
5    THE COURT:  All right.  Didn't see any
6  objections to Jazz's demonstratives.
7    Moving to Jazz's objections to Avadel's
8  deposition designations.  The designation of Scott Bura,
9  65:22-23, and 66:03 to 66:03.  So this -- so Mr. Bura is a
10  named inventor.
11    Avadel, are these designations for counter --
12  for cross-examination purposes?
13    MR. SCHULER:  They are for cross-examination,
14  Your Honor.
15    THE COURT:  Okay.
16    MR. SCHULER:  And you're right, he is a named
17  inventor.
18    THE COURT:  All right.  He's going to be --
19  okay.  So he's going to be here testifying live, and these
20  are going to be used for cross-examination purposes.  So --
21    MR. BRIER:  Your Honor, just a second, Gabe
22  Brier for Plaintiffs.  He's going to be testifying via
23  deposition.  So this is a deposition designation that they
24  want to play affirmatively, not for cross purposes.  It's
25  their deposition designation, they are calling the witness,

306

1  they want to play this for the jury as part of their case.
2    MR. SCHULER:  If he was live, this would be part
3  of our cross-examination.
4    THE COURT:  They are calling him as a cross, but
5  just by video.
6    MR. BRIER:  As part of their case, yes, Your
7  Honor.
8    THE COURT:  All right.  So the objection about
9  lack of foundation, let me hear you on that.
10    MR. BRIER:  Your Honor, sorry, is that to Jazz
11  or Avadel?
12    THE COURT:  Huh?
13    MR. BRIER:  I'm sorry, to Jazz or Avadel?
14    THE COURT:  I'm now addressing your lack of
15  foundation --
16    MR. BRIER:  Okay.
17    THE COURT:  -- your lack of foundation
18  objection.  So I'm saying I understand you made a lack of
19  foundation objection, so I want to hear Avadel's response to
20  it.
21    MR. BRIER:  Thank you.
22    MR. SCHULER:  Two things, Your Honor, he's a
23  named inventor, he took the oath that he -- you know, and he
24  was communicating with the prosecutors.
25    Secondly, I don't think it's a secret.  I mean,

307

1  in opening, Mr. Cerrito said they were monitoring us, and
2  referred to our applications to make sure, I think the words
3  were, that we didn't get away with it.
4    And so we're entitled to ask the inventor
5  whether he took any actions in that vein.
6    So, I think he's got ample foundation as a named
7  inventor that obviously communicated with the prosecutors.
8    THE COURT:  All right.  Let me hear from Jazz.
9    MR. BRIER:  Your Honor, I mean, the -- any
10  communications with prosecutors -- prosecution counsel would
11  be privilege.  And they never established they had any
12  substantive involvement in the prosecution or had any
13  knowledge of whether the claims were copied or not copied.
14    So, you know, from their point of view, they are
15  accusing Jazz of doing wrong by copying names.  And to ask
16  this one loaded, accusatory question, did you take --
17    (Reporter asks for clarification.)
18    MR. BRIER:  I'm sorry.  To ask such a loaded,
19  accusatory question such as, Did you take any action to
20  attempt to stop Jazz from copying the Avadel claims without
21  laying any foundation first?
22    They are basically saying, Do you ever take any
23  action to stop doing wrong without establishing that
24  Mr. Bura did wrong in the first place?
25    He had no knowledge, substantive knowledge in

308

1  the prosecution, he wasn't involved, they never established
2  that.
3    THE COURT:  During the deposition, did somebody
4  object?
5    MR. BRIER:  We objected at the deposition, yes,
6  Your Honor.
7    THE COURT:  Okay.  And what was his answer?
8    MR. BRIER:  His answer, Your Honor, was, "I did
9  not," following an objection from Mr. Calvosa.
10    THE COURT:  His answer was what, I don't know?
11    MR. BRIER:  "I did not."
12    THE COURT:  Oh, "I did not," okay.
13    All right.  So I'm going to set that one aside
14  for the moment.
15    Moving on to the designations starting 115:02,
16  to 115:06, and 115:10.  Let me hear you, Jazz, on that.
17    MR. BRIER:  Sure.  So this, again, is one
18  question, one answer.  The question is, "Do you believe that
19  a person, another scientist could achieve a once-nightly
20  dosing for sodium oxybate, or any other oxybate, for a
21  sachet suspension product in water using the information as
22  it was set forth in your patent?"
23    That's enablement.  They are asking the
24  inventor, who is a lay witness, not an expert, whether the
25  patent has enablement.  And it's also asking for a legal

309

1   conclusion.  And it's just an improper question to ask a lay
2   witness like that.  And they are trying to seek expert
3   opinion for the jury from a lay witness.
4           And we cite cases in our brief that the legal
5   test for enablement or discretion is not -- does not inquire
6   into the subjective knowledge of the inventor.  So that's
7   what they are doing here, they are trying to inquire to the
8   subjective knowledge of the inventor to establish lack of
9   enablement, and that's improper under the *GenSight*
10  *Orthobiologics* case that we cited, which is citing *Durel*
11  *Corp. v. Orsam.*
12          THE COURT:  All right.  Let me hear from Avadel.
13          MR. SCHULER:  Your Honor, they opened the door
14  to this.  They extensively cross-examined Dr. Guillard about
15  the acids and whether his disclosure is adequate, is his
16  patent valid, I mean...
17          THE COURT:  Yeah, I recall that question
18  yesterday, and when he said "I don't know," and Mr. --
19          MR. SCHULER:  They pushed it.
20          MR. CALVOSA:  Yes, Your Honor.  And that was in
21  response to their questions.  But I'm happy to withdraw the
22  objection.  I think it goes both ways, it's fair for
23  everybody.
24          THE COURT:  All right.
25          MR. CALVOSA:  Thank you.

310

1           (Discussion held off the record.)
2           THE COURT:  So let's move on to Phillip,
3   Mr. McGarrigle testimony.  So here, from what I see in the
4   submission, this is something that -- I assume this is an
5   Avadel objection; is that right?
6           And I'm told that Jazz did not designate this
7   testimony and the counter-designations and did not identify
8   any testimony it contends is relevant.
9           So the question is, did Jazz -- is this even,
10  you know, something that you designate?
11          MR. BRIER:  For a portion of it, Avadel
12  designated initially the 150:16, to 150:2-24, that was an
13  Avadel designation.  And we assume they designated, they
14  would be fine with playing it.  And we think for
15  completeness, it makes sense to play that section.
16          The other section, the 154:8 to 155:24 --
17          (Reporter asks for clarification.)
18          MR. BRIER:  I'm sorry.  The other section, the
19  154:8 to 155:24, and 157:22 to 158:2, that is a Jazz
20  designation that we had in there.
21          THE COURT:  So you're saying you did designate
22  those.
23          MR. BRIER:  Jazz designated the second
24  designation, starting at 154.  The one starting at 150 was
25  an Avadel designation, but we assumed if they designated it,

311

1   they would be fine with playing it.  And we think, just
2   given all the other designations, for completeness's sake,
3   it makes sense to have it in there.
4           And then, again, this goes to the issue that
5   we've been talking about a lot, is the copying allegations.
6   And a lot of that, while we have the separate case on
7   inequitable conduct, there's a lot of inferences that they
8   are trying to get the jury to draw about Jazz allegedly not
9   being forthright with the Patent Office.
10          These two sections go to interviews with the
11  examiner by Mr. McGarrigle and others from Jazz where they
12  were discussing the materials.  And they were -- again, we
13  think this goes towards showing Jazz's forthright with the
14  Patent Office, Jazz is describing its inventions accurately.
15          And then the second designation, there just
16  wasn't -- the examiner -- that Avadel has a similar patent,
17  with claims similar to the Jazz patent, the examiner
18  considered that.  And then the examiner allowed Jazz's
19  patent, despite having knowledge they have a patent which
20  Avadel in this case claims invalidates Jazz's patents.
21          So we think that's strong evidence that Jazz is
22  forthright with the Patent Office.  And the Patent Office,
23  with full knowledge, granted Jazz's patent.
24          And also, just to go back to the Avadel
25  designation 150, the pretrial order in this case says you

312

1   can use the other party's designations.  So everyone has
2   been on notice of this 150 designation since we started this
3   process weeks, if not months, ago, and we don't see how
4   Avadel has any basis to complain at this juncture.
5           THE COURT:  Okay.  Let me hear from Avadel.
6           MR. GRABOWSKI:  Your Honor, the issue here is
7   that with respect to the first designation, the case has
8   been narrowed since we started this process weeks, if not
9   months, ago, and none of these designations are relevant now
10  to the issues before the Court.  The problem here is that
11  Avadel's copying defense is relevant to the '782 patent.
12  None of these designations were in the prosecution of the
13  '782 patent.  One of them wasn't even in the same family.
14          The patent that they're talking about the
15  disclosures for is unrelated to what we're saying Jazz
16  didn't disclose.  You can't say that it's relevant whether
17  we disclosed -- you can't come in and say, Well, we didn't
18  disclose X but we did disclose Y, so that matters, if Y is
19  related.
20          And I'll also just note for the record that the
21  patent that they did talk about disclosing, they -- we
22  discussed with Mr. McGarrigle in his deposition.  They
23  didn't disclose anything about the claims.  They didn't
24  discuss the claims.  They didn't discuss copying.  And,
25  again, it's not the same patent, even the Avadel patent or

313

1    the Jazz patent.  It was actually specifically one of the
2    patents they dropped out of this case.
3            MR. BRIER:  Your Honor, may I be heard briefly
4    in response?
5            THE COURT:  Yes.
6            MR. BRIER:  So for this patent, it's the related
7    patent.  It's the '079 patent that Mr. Grabowski is correct,
8    we did drop.  But that's a related patent to the '782, and
9    there's an overlapping element that deals with the sachet
10   element that Avadel is alleging Jazz copied that sachet
11   element from Avadel.  So in the '079 patent, the claim --
12   the claims that were at issue include sachet, and the '782
13   patent, the claim that is at issue, includes the sachet, and
14   this disclosure was to the Patent Office that Avadel has
15   that patent including the sachet element that we should get
16   a patent despite that existing because we have an earlier
17   filing date, and the Patent Office agreed.
18           So if they're -- if they are willing to drop
19   their copying allegation with respect to the sachet element,
20   we would drop this designation.  But if they're going to
21   allege that we copied the sachet element from them, then I
22   think it's relevant that we disclosed to the Patent Office
23   that Avadel had a patent with that sachet element in their
24   claim and the Patent Office granted a patent to Jazz
25   nonetheless.  We think that's -- that's very relevant to

314

1    this case, given the dispute about sachet.
2            THE COURT:  Go ahead.
3            MR. GRABOWSKI:  Your Honor, may I respond
4    briefly?
5            THE COURT:  You're up.
6            MR. GRABOWSKI:  This is going to be incredibly
7    confusing to the jury.  We're talking about a different
8    patent both for Avadel and for Jazz.  This is going to muddy
9    the waters --
10           THE COURT:  Yeah, but does it relate to the
11   sachet?
12           MR. GRABOWSKI:  The disclosure relates to the
13   sachet.  But --
14           THE COURT:  Okay.  So it's relevant.
15           MR. GRABOWSKI:  Not -- no, Your Honor, because
16   they dropped that patent out of the case.
17           MR. BRIER:  Your Honor, we also dropped Claim 19
18   of the '782 patent in January 2023, but we're -- they're
19   getting validity -- the validity of that claim in this case,
20   so I think given the overlap of the sachet, we should be
21   allowed to litigate this issue in front of the jury.
22           THE COURT:  Mr. McGarrigle is a Jazz employee.
23           MR. GRABOWSKI:  Your Honor, if I may make one
24   other --
25           THE COURT:  Let me finish reading.

315

1            (Pause.)
2            So tell me why the designation on -- from page
3    150, line 16, to 152, line 24, is relevant.
4            MR. BRIER:  Yes, Your Honor, that's the more --
5    this is the designation that Avadel initially included in
6    the designations.
7            THE COURT:  Okay.  But the case has changed, so
8    tell me why.
9            MR. BRIER:  Sure, and, I mean, I guess this one
10   goes more generally to Jazz, because they're talking about
11   Liang here, where Liang was one of the main pieces of prior
12   art that was up against the first Allphin/Pfeiffer patent
13   family, and we just believe that this is -- is showing when
14   Jazz met with the examiner, they were forthright with the
15   examiner in describing the invention and they weren't trying
16   to mislead the examiner, as Avadel has tried to suggest
17   repeatedly.
18           But, you know, I -- you know, I think we
19   would -- you know, the sachet element, we think, is
20   definitely squarely relevant because of the overlap in the
21   copying allegation on the sachet for sure.
22           THE COURT:  All right.  So you'd be willing to
23   give this one up?
24           MR. BRIER:  I would.
25           THE COURT:  All right.  So -- so I'm going to

316

1    allow page 154, line 8, to 155, line 24, but I'm not going
2    to allow 150:16, to 152 --
3            MR. BRIER:  Your Honor, with the 154
4    designation, it continues on.  That -- that same designation
5    is 157:21 to 158:2.  They go together.  That's also relevant
6    to the sachet point, that last little bit on 157-158.
7            THE COURT:  Okay.  We'll allow 154, line 8, to
8    155, line 24, and 157, line 22, to 158, line 2, but not
9    150:16 to 152:24.
10           MS. DURIE:  Your Honor, just a question.  I
11   understand there's going to be a brief introduction of each
12   witness.  Our concern is that the jury is going to be
13   mislead into thinking that the witness was talking about
14   this prosecution rather than a different one.  Could we in
15   the introduction just explain that that's talking about a
16   different prosecution and not the prosecution of the patent
17   at issue in this case?  Because I think otherwise it's just
18   going to be very confusing.
19           MR. BRIER:  Your Honor, just one point on that.
20   I think that, you know -- I think this is an attempt by
21   Avadel to make the jury think it's not relevant.  I think if
22   the instruction included the point that there's a sachet
23   element that overlapped the -- the testimony here and the --
24   the claim in suit, I think, you know, that would be
25   necessary to -- to not make the jury believe it's

317

1 irrelevant.

2 THE COURT: Well, both sides have to meet and

3 confer on the introductory statement so that both sides

4 are -- if the sides can't -- if you can't agree on an

5 introductory statement, there will be no introductory

6 statement.

7 MR. BRIER: Thank you, Your Honor.

8 MR. GRABOWSKI: Thank you, Your Honor.

9 THE COURT: All right. The objections about the

10 David O'Brien designations, 26, 13 --

11 MR. SILVER: Your Honor, sorry to interrupt.

12 Those are the ones that are resolved.

13 MR. GRABOWSKI: Yeah, those are part of the

14 JTX75 agreements. So --

15 THE COURT: Okay. All right. Oh, okay. So --

16 so I know the ones that started on page 80, that goes to

17 JTX75. The other ones go to JTX75 as well?

18 MR. GRABOWSKI: The -- all of them.

19 (Simultaneous speaking.)

20 THE COURT: All of them, okay. All right. So

21 that's...

22 (Pause.)

23 All right. So that deals with all of the

24 objections, right?

25 All right.

318

1 (Recess taken.)

2 MR. ZUBICK: Your Honor.

3 THE COURT: Yes.

4 MR. ZUBICK: Good morning. Can Dr. Guillard

5 take the stand before the jury comes in?

6 THE COURT: Yes.

7 (Whereupon, the jury entered the room.)

8 THE COURT: Good morning, ladies and gentlemen

9 of the jury.

10 JURORS: Good morning.

11 THE COURT: We're going to start day two. This

12 is the continuation of Dr. Guillard's redirect.

13 MR. ZUBICK: Good morning.

14 REDIRECT EXAMINATION

15 BY MR. ZUBICK:

16 Q. Good morning, Dr. Guillard.

17 A. Good morning.

18 Q. I'm going to be brief.

19 MR. ZUBICK: Could we please put up figure 1,

20 Exhibit JTX260 in evidence.

21 BY MR. ZUBICK:

22 Q. Dr. Guillard, could you walk us through what's shown

23 in figure 1 up on the screen?

24 A. Well, so on figure 1, you can see on the left a view

25 of a single particle of immediate-release microparticles.

319

1 So the images with microscopes are microparticles, so the

2 image on the left is a microparticle, so many of them are

3 tiny particles. You take a single one. You cut it in the

4 middle, and you can see its structure. So you have the

5 core, so the centermost portion of the particle, which is

6 inert or neutral, meaning that there is no drug in it, and

7 on top of it, you have what is called a drug layer, that

8 outer layer comprising or containing sodium oxybate, the

9 drug.

10 Q. Doctor --

11 A. And on the right, you take one microparticle of

12 modified release, so the other type. Again, you take just a

13 single one in the middle, and you will have -- you will see

14 its structure. And, again, the centermost portion is the

15 core, is the neutral core, so the same core as the

16 immediate release microparticle. On top of it, the same

17 drug layer, so meaning the layer containing the sodium

18 oxybate, and the final layer is the layer providing the

19 modified release, what we called the Micropump II.

20 Q. Dr. Guillard, how then, if at all, does the core of

21 the immediate-release microparticle on the left differ from

22 the core of the modified-release microparticle on the right?

23 A. They are the same.

24 MR. ZUBICK: Can we please turn to table 1b of

25 example 1, Mr. Jarrett.

320

1 BY MR. ZUBICK:

2 Q. And, Dr. Guillard, yesterday Jazz's counsel asked you

3 about the immediate-release microparticles and the function

4 that they perform. What did you mean by that?

5 A. In fact, what I meant is -- sort of immediate-release

6 microparticle function as the core: that is to say that they

7 are providing with the core, which is already inside of the

8 immediate-release microparticles.

9 Q. Can we please turn to Figure 6 of Exhibit JTX260.

10 Dr. Guillard, Jazz's counsel asked you some

11 questions about this DI water dissolution testing and the

12 comparison you made between FT218 and the example from

13 Jazz's patent application. Can you walk us through what's

14 shown on Figure 6, please.

15 A. So in Figure 6, you have so what is called a

16 dissolution profile. So very briefly, you have on the

17 vertical axis the amount of drug released from 0 percent to

18 100 percent, 100 percent of the drug is released, and versus

19 time on the horizontal axis. And you can see, in fact, the

20 release of the drug, the amount of release versus time.

21 So zero means the dissolution test starts and

22 you have, in fact, one curve, the one that starts at the

23 lower, around 20 percent, with -- it is the -- the

24 dissolution profile taken from the Jazz application. So it

25 starts around 20 percent, and after you have sustained

321

1  release over time up to 100 percent.

2  And we have tested FT218, so our formulation, in

3  the same test.  So we have half of the dose as immediate

4  release, so the dissolution starts at 50 percent, which is

5  released at once, and the second portion of the

6  microparticles will release the rest of the dose.  And you

7  can see there is something completely flat, steady during --

8  during the first four hours, and after there is a release up

9  to 100 percent, meaning that all the drug is released at the

10  end of the test.

11  Q.  Why does that difference matter for purposes of your

12  invention FT218, Dr. Guillard?

13  A.  Well, so the release is completely different.  In the

14  case of the Jazz curve, you have a release that is driven by

15  time.  That is to say it's not driven by the pH changes that

16  occur in the body.  But in our case, our formulation is

17  different.  We discussed yesterday that the release is

18  mainly driven by pH changes that occur in the body due to

19  the fact that the pH is not the same in the stomach as in

20  the intestine and we have a release mechanism that is --

21  that is different.

22  MR. ZUBICK:  Can we please put up Figure 8.

23  BY MR. ZUBICK:

24  Q.  Dr. Guillard, can you walk us through what's shown in

25  Figure 8 of your patent.

322

1  A.  So, again, a dissolution profile, the amount of drug

2  released versus time, and in that case, the dissolution

3  profile is performed in the dissolution --

4  MR. CALVOSA:  Sidebar, Your Honor.

5  (Whereupon, a discussion was held at sidebar as

6  follows:)

7  MR. CALVOSA:  Figure 8, pH 6.8, this is a claim

8  construction issue all over again.  It doesn't matter how it

9  releases in the pH 6.8.  The only thing --

10  (Simultaenous speaking.)

11  How it releases in deionized water.  This is a

12  buffered pH.

13  MR. ZUBICK:  I'm happy to address that.  I think

14  what Mr. Calvosa is referring to is the *Daubert* that Jazz

15  filed and that you granted on Dr. Klibanov and Dr. Traverso

16  and your ruling is they wouldn't be able to argue

17  noninfringement based on the appropriate dissolution testing

18  for purposes of the term "sustained release."

19  Dr. Traverso is in Boston, Dr. Klibanov is not

20  making that argument.  However, based on your ruling since

21  then, we think Dr. Guillard is allowed to explain his

22  invention.  The motivations for his invention, what we heard

23  yesterday, he copied the DI water.  He was asked about the

24  differences in DI water test and he -- now he's going to

25  explain how you test his product in a buffered solution.

323

1  He's here to explain his own invention story, where he got

2  the idea, how the product works.  He will not --

3  (Simultaenous speaking.)

4  We will not be making a noninfringement argument

5  on this.  It goes to enablement.  They are saying their

6  patent taught how to make our product.  He will be able to

7  learn to make something that's within -- the coating

8  dependent on the pH.  This is how our product works, I think

9  that's a completely discreet issue.

10  MR. CALVOSA:  That's not the argument at all.

11  The question is whether their product falls within the

12  claims and whether there's an element for our claims with

13  deionized water testing, not a buffer pH testing.

14  And the other thing is, when he's able to tell

15  his invention story, they are saying that they did what we

16  did first, we copied from them.  We're not saying we did

17  anything with buffered pH, that's not in our claims,

18  buffered pH had nothing to do with this.  This is what we've

19  fought about since October of 2022 when he first did the

20  claim construction hearing.

21  MR. CERRITO:  And the basis to keep it out of

22  the experts, now we're going to reintroduce it with this

23  witness.

24  MR. ZUBICK:  Mr. Allphin testified, among other

25  things, that he tested his products in DI water, and gastric

324

1  fluid that was put up on the screen and intestinal fluid

2  that is squarely at issue here, that's partly how the

3  product was invented.  You're not going to see a

4  noninfringement argument.  He's entitled to tell his

5  invention story, that is squarely at issue with the case.

6  MR. CALVOSA:  As long as we get an instruction

7  that doesn't go to the infringement of the patent.

8  (Simultaneous talking.)

9  THE COURT:  So you said as long it --

10  MR. CALVOSA:  There's an instruction that this

11  testing is irrelevant to whether they infringe our claims.

12  I'm fine with him telling his invention story, I just don't

13  want the jury to be confused.

14  THE COURT:  So that instruction -- because,

15  yeah, I -- if you want to elicit this testimony, that

16  instruction is a reasonable instruction.

17  MR. ZUBICK:  Can I hear what the instruction

18  would be?

19  MR. CALVOSA:  That this testing at the buffered

20  pH is irrelevant to whether Avadel infringes Jazz's patent

21  claims.

22  MR. CERRITO:  Which talks about DI water

23  testing.

24  MR. ZUBICK:  With Mr. Cerrito's addition, I'm

25  fine with that.  I think we need to clarify that it's

325

1  irrelevant to the DI water testing.  I think that's fair.
2  MR. CALVOSA:  Would you like us to write it down
3  for you?
4  THE COURT:  Write it out and we'll give the jury
5  that instruction.
6  MR. CALVOSA:  Okay.
7  (Whereupon, the discussion held at sidebar
8  concluded.)
9  MR. CALVOSA:  May I approach, Your Honor?
10  THE COURT:  Yes.  Okay.  Ladies and gentlemen of
11  the jury, I have to give you an instruction that relates to
12  this testimony, so...
13  This testing in buffered pH of 6.8 is irrelevant
14  to whether Avadel infringes Jazz's patent claims, which
15  require testing in deionized water.
16  All right.  You may continue, Mr. Zubick.
17  MR. ZUBICK:  Okay.
18  BY MR. ZUBICK:
19  Q.  Okay.  So Dr. Guillard, where we left off was I was
20  asking you, what is shown in Figure 8?
21  A.  It is a dissolution profile of FT218.  So, as I said,
22  you had the amount of the release versus time, and in that
23  case, the dissolution medium is pH 6.8 buffer, so we used,
24  typically, buffers for dissolution testing and pH 6.8 buffer
25  is used to roughly simulate the conditions in the intestine,

326

1  so in the stomach, the pH is acidic, we said.
2  And then when we switched to the intestine, it
3  increases the pH and the pH is more neutral.  And pH 6.8
4  shows as a dissolution medium to roughly mimic what could
5  happen when the microparticle are in such a medium, so when
6  we switch from the stomach to the intestine.  And so it
7  shows the results in that dissolution medium.  So you have
8  already the 50 percent immediate release, and the other
9  50 percent of the dose which are contained in the
10  modified-release microparticles, they release at once, the
11  drug, so you have all the drug 100 percent which is released
12  immediately.
13  MR. ZUBICK:  Thank you, Dr. Guillard, pass the
14  witness.
15  RECROSS-EXAMINATION
16  BY MR. CALVOSA:
17  Q.  Good morning, Dr. Guillard, I thank you for coming
18  back today.  I'll try to be as brief as I can.
19  MR. CALVOSA:  Can we pull back up JTX206,
20  please, Mr. Lewis.  I'd like to start at Figure 6.
21  BY MR. CALVOSA:
22  Q.  This comparison you made between the formulation that
23  you were working on and a particular formulation from Jazz's
24  patent, that particular formulation that you compared it to,
25  that did not contain an enteric pore former, right?

327

1  A.  No.
2  Q.  So it was not an apples-to-apples comparison, right?
3  A.  No.
4  Q.  Okay.  I'd like to now go back to -- you have two
5  binders up there in front of you, I'd like to keep you in
6  the one that Avadel's counsel and your counsel were using.
7  I'd like to go to DTX638.  And page 5, please.
8  Do you remember you talked about this slide with
9  your counsel yesterday?
10  A.  Yes.
11  Q.  And do you remember talking about the dosage amount 6
12  to 9 grams per night being the effective dosage amount?
13  A.  Yes.
14  Q.  And you said that's the reason you came up with the
15  idea to use the sachet?
16  A.  Yes.
17  Q.  You were not the person to come up with the 6- to
18  9-gram dosage amount of sodium oxybate, right?
19  A.  No, it comes from the dosage of Xyrem.
20  Q.  Okay.  That was Jazz that did that, right?
21  A.  Well, the dosage of the sodium oxybate formulation
22  that was on the market, yes.
23  Q.  And that was Jazz's?
24  A.  Yes.
25  Q.  Okay.  I'd like to turn to the next page, page 6 of

328

1  that slide.  And I'd like to go down to -- well, there's a
2  table there, there's Xyrem on the left.
3  That's Jazz's product, right?
4  A.  Yes.
5  Q.  And there's Flamel's proposition on the right?
6  A.  Yes.
7  Q.  And down at the bottom, is that Patent 8101209,
8  that's the Legrand patent you looked yesterday with your
9  counsel?
10  A.  Which one is it?  I'm sorry.
11  Q.  8101209.
12  A.  Yes, it's the patent we discussed yesterday about the
13  Micropump II technology that covers that technology.
14  Q.  And we'll get to that in just a minute.
15  On the left, there are a couple of other patents
16  including Patent No. 7262219.
17  Do you see that?
18  A.  Yes.
19  Q.  And that is the Jazz patent, right?
20  A.  Yes.
21  MR. CALVOSA:  May I approach, Your Honor?
22  THE COURT:  Yes.
23  MR. CALVOSA:  May I have one of those back?
24  Thank you very much.
25  BY MR. CALVOSA:

329

1   Q.      This is one of the Jazz patents that you reviewed
2   during the development of FT218, right?
3   A.      Yes.
4   Q.      And as we talked about yesterday, you didn't check
5   this patent to see what acids Jazz was already using, right?
6   A.      Yes.
7   Q.      And you didn't check this patent to see if Jazz was
8   already using a sachet with oxybate, right?
9   A.      Well, from my recollection, it was about a liquid
10  formulation, but that's what I remember from that
11  application.
12  Q.      You don't ever remember seeing a sachet in here?
13  A.      Well, as I look at -- when I look at the title,
14  it's -- it states, "Sound and stable solutions of sodium
15  oxybate."
16          So what I remember, I was looking at that
17  application -- that patent for -- covering Xyrem.
18          MR. CALVOSA:  And, Your Honor, at this time I'd
19  like to move DTX1 698 into evidence.
20          MR. ZUBICK:  No objection.
21          MR. CALVOSA:  And because I forget yesterday,
22  may I please move PTX60 into evidence also?
23          THE COURT:  All right.  Well, first, DTX1 698 is
24  admitted.
25          (Exhibit admitted.)

330

1           THE COURT:  And PTX670?
2           MR. CALVOSA:  60.
3           THE COURT:  PTX60, any objection?
4           MR. ZUBICK:  No objection.
5           THE COURT:  PTX60 is admitted.
6           (Exhibit admitted.)
7   BY MR. CALVOSA:
8   Q.      And my question was whether you remember whether
9   there was a sachet in here?
10  A.      No, I have no recollection.
11  Q.      Okay.  I'd like to go back to the Legrand patent now,
12  that is DTX750 already admitted into evidence.
13          And the Legrand patent, you said, provides a
14  description of the Micropump II technology that you used for
15  FT218?
16  A.      Yes.
17  Q.      And if you -- you went to column 10, lines 27-35 on
18  page 13 of that document.
19          MR. CALVOSA:  Can we pull that up, Mr. Lewis?
20  BY MR. CALVOSA:
21  Q.      And here you said that microcapsules means the same
22  thing as microparticles, right?
23  A.      Yes.
24  Q.      And here it's saying the microparticles can be the
25  form of a sachet or a tablet, right?

331

1   A.      Or a gelatin capsules, yes.
2   Q.      Sure.  So all three of those:  the sachet, the
3   capsule and the tablet?
4   A.      Yes, these are examples of final form, yes.
5   Q.      Of the microparticles, right?
6   A.      Yes.
7   Q.      Did you hear your counsel that Mr. Allphin was not in
8   possession of microparticles because he worked with tablets?
9   A.      Sorry.  Could you please repeat?
10  Q.      You were here during opening statements, right?
11  A.      Yes.
12  Q.      Did you hear your counsel suggest that Mr. Allphin
13  didn't work with microparticles because he was working with
14  tablets?
15  A.      Yes, I think it was -- it was said, yes.
16  Q.      Okay.  I'd like to now ask you, there's examples in
17  this patent in this patent, right?
18  A.      Yes.
19  Q.      None of the examples include putting microparticles
20  in a sachet, right?
21  A.      So, just let me check.  The examples are about the
22  microparticles and the different types of microparticles and
23  their dissolution testing, so raw material, there is no such
24  formulations.
25  Q.      There's no dosage form in the sachets?

332

1   A.      No.  As shown in the examples, there is no dosage
2   formulations because the dissolution profile is done
3   directly with the microparticles.
4   Q.      Okay.  And to you that's sufficient teaching of a
5   sachet dosage form, even though there's no examples of
6   actually putting the microparticles in the sachet, right?
7   A.      Yes, absolutely.
8   Q.      Now, these examples describe what you talked about
9   before, what you called the neutral core, the drug layer
10  that comes over that, and then the functional layering on
11  top, right?
12  A.      Yes, in some examples you can see that the drug layer
13  is deposited onto a neutral core, yes.
14  Q.      For all of these examples that are talking about
15  modified-release particles, the drug layer is deposited onto
16  what you call the neutral core, right?
17  A.      For -- when I look at example 1 and example 2, there
18  is a neutral core without drug, and the drug is layered onto
19  that neutral core.
20  Q.      So all the examples have that?
21  A.      Let me check.  Not example 3, because example 3,
22  you're talking about granules.  So in that case, the drug is
23  mixed with other ingredients.  And in that case, they are
24  used as a core, meaning that the drug is inside the core,
25  the core comprises the drug itself.

333

1    So there are two examples with a neutral core,
2 and on top of it is a layer, and one example of it granules
3 with a drug inside the core.
4 Q.    Now I'd like to go back to PTX2- -- I apologize,
5 JTX230, which is already in evidence.
6    Just before we do that, a couple of questions
7 back to the Legrand reference, DTX750, I apologize.  There's
8 inventors listed on the Legrand patent, right?
9 A.    Yes.
10 Q.    You were not one of the named inventors, correct?
11 A.    I was not at the company, right.
12 Q.    Dr. Mégret was not one of the inventors, right?
13 A.    You said Dr. Mégret?  No, she was not at the company
14 at that time.
15 Q.    And this document was dated 2012?
16 A.    Yes.
17 Q.    Okay.  And this was shortly before you began your
18 work with taking, what you say, the Micropump II technology
19 and putting it together with sodium oxybate, right?
20 A.    Yes.  In fact, it is much older because it was
21 granted in 2012, but it is much older.
22 Q.    But the actual words on the page we're looking at
23 only became public as of 2012, right?
24    MR. ZUBICK:  Objection, that's not right.
25    MR. CALVOSA:  On this page right here.

334

1    MR. ZUBICK:  Right.  You're referring to the
2 issuing date and not the publication date.
3    MR. CALVOSA:  There's nothing in evidence about
4 publication date.  Your Honor, there's nothing in evidence
5 about the publication date, this is what they've offered.
6    MS. DURIE:  It says prior publication data.
7 It's actually at the very bottom.
8    THE COURT:  So, let's -- the objection is
9 sustained.  You can rephrase the question.
10 BY MR. CALVOSA:
11 Q.    Okay.  So because there's a prior publication,
12 there's prior dates there, you would understand the
13 information in this reference as the same that was in the
14 previous ones?
15 A.    Well, it was a French application dated 2001.  I
16 don't know if the content is the same, but, well, it might
17 be.
18 Q.    But you don't know?
19 A.    In fact, it is -- the claims -- there is a French
20 application dated in 2001.  I can just say that.
21 Q.    But you don't know whether the content is the same?
22 A.    I don't know.
23 Q.    Okay.  And sodium oxybate is not mentioned in this
24 Legrand patent, right?
25 A.    No, it is described, in fact, the general technology

335

1 platform, and then it can be used from many drugs.
2 Q.    Okay.  But sodium oxybate is not called out as a drug
3 in this patent, right?
4 A.    No.
5 Q.    And oxybate, generally, isn't called as a drug in
6 this patent?
7 A.    No.
8 Q.    Neither is GHB?
9 A.    No.
10 Q.    Neither is gamma-hydroxybutyrate?
11 A.    No.
12 Q.    And I think you would agree with me, your testimony
13 is that you put the gamma-hydroxybutyrate, sodium oxybate
14 specifically, together with this Micropump technology
15 beginning in 2012, right?
16 A.    Yes, we started working in 2012, yes.
17 Q.    Okay.  Let's go back now to JTX230.
18    MR. CALVOSA:  And I'd like to go to page 38,
19 please.  And if we could blow up Figure 24.
20 BY MR. CALVOSA:
21 Q.    And we had talked about this yesterday, and you
22 correctly pointed out I missed some other ingredients in
23 there.  I just want to be clear about something.
24    The three ingredients under the Micropump II
25 layer, those are not the active ingredient, right?

336

1 A.    Those are active ingredients, yes.
2 Q.    Those are excipients?
3 A.    Ingredients, yes.
4 Q.    Excipients is another word for that?
5 A.    Well, excipients is the name that is used for
6 pharmaceutical ingredients, but they are an ingredient, yes.
7 Q.    Okay.  And they are pharmaceutically acceptable
8 excipients, right?
9 A.    Yes, because you have to have acceptable ingredients.
10 Q.    Okay.  And the 26 percent, 26.7 percent -- let me ask
11 you this, I'll make it easier.
12    The two on the bottom, the two EUDRAGIT, those
13 are what are known as polymethacrylates, right?
14 A.    Yes.
15 Q.    The one above that, the Lubritab, that's hydrogenated
16 vegetable oil, right?
17 A.    It is a hydrogenated cottonseed oil, yes.
18 Q.    Hydrogenated vegetable oil?
19 A.    Cottonseed oil.
20 Q.    Cottonseed oil.
21 A.    Yes.
22 Q.    The final formulation of FT218 uses hydrogenated
23 vegetable oil in the not hydrogenated cottonseed oil, right?
24 A.    Well, the final formulation for the modified-release
25 microparticles are this one.  So the ingredient used is

337

1    Lubritab, it is a commercial name.  And if my recollection
2    is right, it is a hydrogenated cottonseed oil.
3    **Q.**    You're correct, I apologize.
4            MR. CALVOSA:  May I just have one minute, Your
5    Honor?
6            THE COURT:  Yes.
7            MR. CALVOSA:  Will the Court permit a very brief
8    recess, Your Honor?
9            THE COURT:  For what purpose?
10           MR. CALVOSA:  I don't believe he's correct in
11   his testimony and I'd like to show him the document, I just
12   don't have that with me.  I didn't think that was going to
13   be...
14           THE COURT:  Okay.  So you -- are you -- is that
15   the only thing you have left?
16           MR. CALVOSA:  After that I'm done, it's a series
17   of questions off of that.
18           THE COURT:  All right.  Well, I mean, you can
19   have a recess, but it's going to count against you.
20           MR. CALVOSA:  That's fine, Your Honor.
21           THE COURT:  All right.
22           (Recess taken.)
23   BY MR. CALVOSA:
24   **Q.**    Lube -- sorry, let me start again.
25           Lubritab is a hydrogenated vegetable oil,

338

1    correct?
2    **A.**    Yes.
3    **Q.**    Okay.  Thank you.
4            So putting back up JTX230 at page 38, that
5    figure, so we have hydrogenated vegetable oil and the two
6    polymethacrylates, right?
7    **A.**    Yes.
8            MR. CALVOSA:  Your Honor, move to admit PTX807.
9            THE COURT:  807.
10           MR. ZUBICK:  Objection, Your Honor, lack of
11   foundation.  I'm not sure how he's going to use it with this
12   witness, but this appears to be a file history of the Jazz
13   patent.  This is a fact witness from a different company.
14           MR. CALVOSA:  Your Honor, this is a publicly
15   available document on the PTO's website, and it -- I could
16   explain what it shows if you want me to or I could --
17           THE COURT:  All right.  Let's come to sidebar.
18           (Whereupon, a discussion was held at sidebar as
19   follows:)
20           MR. CALVOSA:  Your Honor, he said he was
21   monitoring the Jazz filings, this was one of the publicly
22   available ones.  It demonstrates that as of March 24, 2011,
23   Jazz had a patent claim covering exactly what he says he
24   did.  And that March 24, 2011, is before the 2012 date he
25   started working on it.  So to the extent they are arguing

339

1    inventorship he invented it and Jazz didn't, this
2    directly refutes that.  And if he said he never saw it,
3    that's the point, he never checked this one.
4            MR. ZUBICK:  Okay.  So he absolutely testified
5    that he reviewed certain publicly available applications,
6    and Mr. Calvosa has showed them to him, showed him the
7    documents.  We don't dispute that.
8            This is a file history that may be publicly
9    available, I don't dispute that.  But going in and getting
10   the file history is a very different thing.  I have no idea
11   whether he did it or not, I don't think it should be in
12   evidence without establishing it first.
13           MR. SCHULER:  When was it published?
14           MR. CALVOSA:  When was it published?
15           MR. SCHULER:  Yes.
16           MR. CALVOSA:  He said he looked at the published
17   application.  This is the file history, it would have been
18   filed at the same time.
19           MR. SCHULER:  No, it may have been --
20           MR. CERRITO:  After --
21           (Simultaneous talking.)
22           MR. ZUBICK:  I think you need to establish with
23   the witness whether he's ever seen this before, before it
24   goes into evidence, otherwise lack of foundation.
25           THE COURT:  All right.  So, you know, you can

340

1    cross-exam him on it without it coming into evidence.  In
2    order for it to come into evidence, you got to establish
3    more, you got to get foundation.
4            MR. CALVOSA:  Understood, Your Honor, I'll ask
5    him the question, that's perfectly fine.
6            THE COURT:  All right.
7            (Whereupon, the discussion held at sidebar
8    concluded.)
9    BY MR. CALVOSA:
10   **Q.**    Dr. Guillard, you said that you monitored Jazz's
11   patent filings.  Did you go to the PTO's website and look on
12   the PTO's website for those patent filings?
13   **A.**    When I -- for these ones?  I don't know.  But
14   perhaps -- I don't know.
15   **Q.**    Okay.  Perhaps you missed some; is that fair?
16   **A.**    Yes, it's possible.
17   **Q.**    Okay.  Do you see on the document in front of you,
18   PTX807, on page 1, there's an applicant and it's
19   Mr. Allphin?
20   **A.**    Yes.
21   **Q.**    And if you go down, do you see -- or I apologize -- I
22   apologize, if you go up, it says application number, not yet
23   assigned?
24   **A.**    Yes.
25   **Q.**    And if you turn to page 17, second box down, do you

341

1  see application number there?

2  A.    You said page 17, yes.

3  Q.    And do you see it's Application No. 13/071,369?

4  A.    Yes.

5  Q.    And if you turn back to page 6 of that application,

6  you see there's a Claim 3 original here that was filed

7  March 24, 2011?

8  A.    Sorry, which page?

9  Q.    Page 6.

10  A.    Yes.

11  Q.    And do you see it says, "a controlled-release dosage

12  form there"?

13  A.    Yes.

14  Q.    And then the second element down, "a

15  controlled-release formulation comprising at least one

16  pharmaceutically active ingredient selected from GHB," and

17  then it continues?

18  A.    Yes.

19  Q.    And it also has "an immediate-release formulation

20  comprising one pharmaceutically active ingredient selected

21  from GHB," and then it continues?

22  A.    Yes.

23  Q.    And then if you go down to Claim 24, it depends from

24  Claim 23?

25  A.    Yes.

342

1  Q.    And Claim 25, then, depends from Claim 24?

2  A.    Yes.

3  Q.    So you understand that Claims 23-25 should be read as

4  including Claims 23 and 24?

5  A.    Yes.

6  Q.    And in Claim 25, in March 2011, Jazz claimed "the

7  controlled-release dosage form" with one -- "at least one

8  pharmaceutically acceptable excipient," and those included,

9  last line from the bottom, polymethacrylates, right?

10  A.    Yes.

11  Q.    And over to the right on that same line, continuing

12  on the next, hydrogenated vegetable oil, right?

13  A.    Yes.

14  Q.    And you can keep page 17 open with that application

15  number.

16        And JTX003 is the '488 patent that Jazz is suing

17  Avadel on here?

18  A.    I don't know the numbers of the patents, so I don't

19  know if it is this one.

20  Q.    You don't know if it's that one?

21  A.    No, I don't know.

22  Q.    In the related application data, do you see that same

23  '369 application number that you see on page 17 of PTX807?

24  A.    Sorry.  I'm confused.  Which --

25  Q.    On JTX003, the smaller one that I just gave you.

343

1  A.    Okay.

2  Q.    Do you see the same related -- in the related

3  application data, do you see the same application number on

4  page 17 of PTX807?

5        You see right there, number 63, related

6  application data, "continuation of Application

7  No. 13/071,369, filed on March 24, 2011"?

8  A.    Yes.

9  Q.    So when it came to a controlled-release dosage form

10  of sodium oxybate with polymethacrylates and hydrogenated

11  vegetable oil, you did that in 2012; Jazz did it first in

12  2011?

13  A.    Well, there are dates, so I don't -- I don't

14  understand your question.  I'm sorry.

15  Q.    Okay.  What you said you did in 2012, a controlled

16  release with the hydrogenated vegetable oil and the

17  polymethacrylates, that was already in Jazz's patent claim

18  in March of 2011, right?

19  A.    Well, we used specific kinds of polymethacrylates, as

20  you said, so very specific ones which are names -- which are

21  enteric polymers, so I assume that in the list it were -- it

22  was written "polymethacrylates," so I don't know if they are

23  the same because it is very generic.  So we were using some

24  we called the PAM -- I don't remember the name we used

25  yesterday -- and hydrogenated vegetable oil.

344

1        MR. CALVOSA:  Mr. Lewis, can you pull up the

2  transcript from yesterday, page 276, lines 20-24.

3        MR. ZUBICK:  Objection, Your Honor.  This is a

4  rough transcript, so I haven't seen it yet, but...

5        THE COURT:  So do you have a copy for them to

6  see?

7        MR. CALVOSA:  Yes.

8        THE COURT:  Take it down, please.

9        MR. CALVOSA:  May I approach the witness, then,

10  so he may see it?

11        THE COURT:  Yes.

12        MR. ZUBICK:  So, Your Honor, the objection is

13  this is a daily, so we have no problem with using it to

14  refresh the witness's recollection, but we don't think it

15  should come up, it hasn't been certified.  So it sounds like

16  that's all they're going to do.

17        MR. CALVOSA:  That's all I'm doing.

18        THE COURT:  Okay.

19  BY MR. CALVOSA:

20  Q.    Do you remember yesterday I asked you some questions

21  about whether you believed you were the inventor of certain

22  claims?

23  A.    Yes.

24  Q.    And do you remember you answered, "I am not a patent

25  engineer, so I can't give that answer"?

345

1   A.      Yes.

2   Q.      Okay.  A patent engineer is like a patent lawyer,

3   right?

4   A.      Well, I imagine, yes.

5   Q.      And you're confident you are not a patent engineer?

6   A.      Well, at that time, because I am here as a formulator

7   of FT218, I was a formulator, I was an R&D scientist.

8   Q.      Okay.

9           MR. CALVOSA:  May I approach, Your Honor?

10          THE COURT:  Yes.

11  BY MR. CALVOSA:

12  Q.      And what I have just handed you is a printout of

13  somebody's website biography from a company called

14  Regimbeau?  Did I say that right?

15  A.      Regimbeau.

16  Q.      Regimbeau.  I was very close.

17          And there's a picture of yourself there, right?

18  A.      Yes.

19  Q.      And there's your name right there, right?

20  A.      Yes.

21  Q.      And underneath it, your title is patent engineer,

22  right?

23  A.      Yes, that's my current position, yes.

24  Q.      And you said you weren't a patent engineer, right?

25  A.      Well, I'm here as a formulator, the formulator of

346

1   FT218, so now we have a different position.  At that time, I

2   was the formulator, so I changed my career.

3   Q.      Okay.

4           MR. CALVOSA:  And, Your Honor, we'd like to

5   enter this into evidence as a prior inconsistent statement.

6           MR. ZUBICK:  Yeah.  So, first of all, I'm not

7   sure it's inconsistent, Your Honor.  I also am seeing it for

8   the first time.  I don't know if this has been translated.

9   I find it hard to believe -- I'm not even going to try on

10  the company name -- published into English, so...

11  BY MR. CALVOSA:

12  Q.      Okay.  Dr. Guillard, you remember I took your

13  deposition, right?

14  A.      Yes.

15  Q.      And you testified truthfully at the deposition?

16  A.      Yes.

17          MR. CALVOSA:  And could we pull up page 10,

18  please, of the deposition.

19          MR. ZUBICK:  Give me the page number, please,

20  before you put it up.

21          MR. CALVOSA:  10.

22          MR. ZUBICK:  Okay.

23          MR. CALVOSA:  And I'm looking at line 12,

24  please.

25          MR. ZUBICK:  Your Honor, I think this is

347

1   improper as impeachment procedure.  I just got the page

2   number, the page number and the line number.

3           THE COURT:  So before you do that, let -- give

4   Mr. Zubick an opportunity.

5           MR. ZUBICK:  Yes.  Same ongoing objection, I

6   don't think this is inconsistent.

7           MR. CALVOSA:  It is absolutely inconsistent.  He

8   testified he's not a patent engineer.  He told me he was a

9   patent engineer.  He told me what a patent engineer does.

10          THE COURT:  Okay.  So you'll get a chance to

11  redirect.  He can ask the question in cross-examination.

12  BY MR. CALVOSA:

13  Q.      You work at the Regimbeau company as a patent

14  engineer, right?

15  A.      Currently, yes.

16  Q.      I didn't make up that website, right?

17  A.      Sorry.  You?

18  Q.      I didn't create that website on my own?

19  A.      No.  Of course not.

20  Q.      Okay.  And as a patent engineer, your

21  responsibilities include drafting patent applications?

22  A.      Now, yes.

23  Q.      And they include monitoring examination proceedings

24  in different countries where the applications are filed?

25  A.      Yes.

348

1   Q.      And they include being involved in litigation

2   proceedings, right?

3   A.      Yes.

4   Q.      And although you mentioned that you're here

5   testifying as a fact witness, Avadel is compensating you for

6   your testimony, right?

7   A.      Yes.

8           MR. ZUBICK:  Objection.

9           MR. CALVOSA:  Okay.  He answered.

10          I'll pass the witness, Your Honor.

11          THE COURT:  All right.  You can redirect.

12          REDIRECT EXAMINATION

13  BY MR. ZUBICK:

14  Q.      Dr. Guillard, very briefly, were you a patent

15  engineer at the time of your work on FT218?

16  A.      No, I was a formulator, R&D scientist.

17  Q.      Okay.  Thinking about today, are you a patent

18  engineer today?

19  A.      Yes, I changed my career, so now I am a patent

20  engineer.

21  Q.      Where are you a patent engineer?

22  A.      In this law firm, Regimbeau.

23  Q.      Where is Regimbeau?

24  A.      Well, my office is in Lyon, in France.

25  Q.      Do you specialize in U.S. patent law?

349

1   A.      No.

2           MR. ZUBICK:  No further questions.  Thank you,

3   Your Honor.

4           MR. CALVOSA:  Your Honor, brief recross, very,

5   very brief.

6           THE COURT:  All right.  I'll give you a brief

7   recross.

8               RECROSS-EXAMINATION

9   BY MR. CALVOSA:

10  Q.      Dr. Guillard, when I asked you the questions

11  yesterday and you said you weren't a patent engineer, you

12  were a patent engineer yesterday, right?

13  A.      Well, what I understood, I am here as a former -- a

14  formulator of FT218.  That's what I have understood.  And

15  I'm here to explain what I have done as a formulator.

16  Q.      And although your counsel asked you questions about

17  the United States and you said no, you have experience

18  prosecuting patent applications in the United States, right?

19  A.      No prosecution.  I began -- I'm just beginning my

20  career, so I am involved in proceedings such as responding

21  to office actions and things like that in the U.S., but I am

22  not -- certainly not a U.S. specialist.

23  Q.      The applications that you draft, those go into the

24  United States Patent Office, right?

25  A.      Yes.

350

1   Q.      Okay.  And you're familiar with what's called an

2   office action, and you participate in the prosecution of a

3   patent application in the United States, right?

4   A.      What do you call prosecution process?  I'm

5   misunderstanding.

6   Q.      The back-and-forth with the Patent Office.

7   A.      You mean now as a patent engineer or --

8   Q.      Yes.

9   A.      Yes, it happens.

10          MR. CALVOSA:  Thank you.  No more questions.

11          THE COURT:  All right.

12          MR. ZUBICK:  Nothing further, Your Honor.

13          THE COURT:  All right.  Dr. Guillard, you may

14  step down.  Thank you.

15          THE WITNESS:  Okay.  Thank you.

16          THE COURT:  All right.  Jazz, you may call your

17  next witness.

18          MR. LOCASTRO:  Jazz's next witness, Your Honor,

19  is going to be by deposition video, Dr. Thorsteinn

20  Thorsteinsson.

21          For the jury's benefit, Dr. Thorsteinsson is a

22  consultant with a company called Strivecta that previously

23  worked with Avadel.

24          If Your Honor would permit me to approach, I

25  have a very thin witness binder.

351

1           THE COURT:  You may.

2           MR. LOCASTRO:  And, Your Honor, since we'll be

3   publishing the exhibits to the jury with the deposition

4   video, I'd like to move two exhibits into evidence now, with

5   Your Honor's permission.

6           THE COURT:  Okay.  Tell us what the exhibits

7   are.

8           MR. LOCASTRO:  They are JTX031, which is one

9   Your Honor ruled on yesterday morning.  The other is JTX226,

10  and I don't believe there's any objection to that.

11          MR. SCHULER:  No objection.

12          THE COURT:  All right.  So JTX0031 and JTX226

13  are admitted.

14          (Exhibit admitted.)

15          MR. LOCASTRO:  Okay.  Thank you, Your Honor.

16          (Video deposition was played for the jury as

17  follows:)

18  Q.      Can you please state your full name for the record,

19  please?

20  A.      My name is Thorsteinn Thorsteinsson.

21  Q.      And am I correct that you're the founder of a

22  consulting company called Strivecta?

23  A.      I'm the founder of a company called Strivecta.

24  Q.      And when did you found Strivecta?

25  A.      In 2018.

352

1   Q.      And can you please tell me the general nature of the

2   consulting services that Strivecta provides?

3   A.      I provide consulting services to pharmaceutical

4   companies.

5   Q.      And can you be a little bit more specific as to what

6   exactly the nature of those consulting services are?

7   A.      It's, in most cases, related to development and

8   manufacturing of a drug product.

9   Q.      And am I correct that Avadel first engaged Strivecta

10  as a consultant around March of 2019?

11  A.      I am under the impression that I was approached in

12  February 2019.  It's a possibility that we didn't sign the

13  contract until March -- I don't recall the exact date --

14  Q.      Okay.

15  A.      -- when we signed the contract.

16  Q.      And around March or February of 2019 and even in

17  the -- you know, the first half of 2019, can you tell me

18  what consulting services Strivecta provided to Avadel?

19  A.      I was asked to assist Avadel with monitoring

20  activities in France, where they were closing down a

21  facility, to monitor the storage of the lab notebooks and

22  other documents to make sure they were shipped off to an

23  off-site storage.

24  Q.      Now, you've worked in the pharmaceutical industry in

25  the United States since around 2003: is that accurate?

353

1   A.      That is accurate.

2   Q.      In any of your prior -- in the course of any of your

3   prior employment, did you perform dissolution testing

4   yourself?

5   A.      I have performed dissolution testing myself.

6   Q.      In your experience in the pharmaceutical industry,

7   have you ever worked with the EUDRAGIT brand of polymers?

8   A.      Yes.

9   Q.      Have you ever performed something called an excipient

10  compatibility study?

11  A.      I have.

12  Q.      And what do you understand a excipient compatibility

13  study to be?

14  A.      My understanding is that you are comparing different

15  excipients to see the effect on the active component.

16  Q.      In your experience when developing drug products, are

17  excipient compatibility studies carried out during the

18  normal course of that drug development work?

19  A.      It is performed in many cases and in some cases not.

20  Q.      In which cases, why would you not carry out an

21  excipient compatibility study during the ordinary course of

22  pharmaceutical development work?

23  A.      That would be performed when that study had already

24  been performed before and published, then there's not a

25  reason to perform it again because you already have a

354

1   supporting document for it.

2   Q.      So if there was a study that had been already

3   performed before and published, how difficult, in your

4   experience, is it to then carry out experimentation designed

5   to assess the optimum amount of the excipient to include in

6   your drug formulation?

7   A.      That was a very long question.  Can you break it down

8   for me?

9   Q.      Yeah, of course.

10          So if there's information that's been published

11  that tells you, as a drug developer, that an excipient is

12  compatible with an active ingredient, in your experience,

13  how difficult would it be to determine the optimum amount of

14  the excipient to use in the final formulation?

15  A.      Yeah, I -- I -- I don't know.  I would -- in my

16  professional opinion, it would -- I would need to see more

17  supporting data to be able to draw any conclusion.

18  Q.      And what kinds of supporting data would you need?

19  A.      More tests regarding different amount of each

20  excipient.

21  Q.      Now, you have a PhD in pharmaceutical science from

22  the University of Iceland: is that correct?

23  A.      That is correct.

24  Q.      And when did you receive that degree?

25  A.      In 2003.

355

1   Q.      And what was the subject of your doctoral work?

2   A.      It was medicinal chemistry.

3   Q.      You're familiar with an Avadel product code named

4   FT218: is that correct?

5   A.      I have worked as a consultant on a project called

6   FT218.

7   Q.      And what do you understand FT218 to be?

8   A.      My understanding is that it is a sodium oxybate

9   extended-release product.

10  Q.      The next exhibit spans the Bates range AVDL_00775349

11  to 5371.  This will be PTX87.

12          Now, Doctor, do you see two e-mails on the first

13  page of Exhibit 87?

14  A.      I do see two e-mails on PTX87 page ending in 349.

15  Q.      Okay.  Now, at the bottom of the page, that appears

16  to be an e-mail that you sent Greg Divis on April 16th of

17  2019.

18          Would you agree with that?

19  A.      This does appear to be an e-mail that I sent to Greg

20  Divis on April 16, 2019.

21  Q.      And you understand that Greg Divis is currently the

22  CEO of Avadel: is that right?

23  A.      That is my understanding.

24  Q.      And at the time this e-mail was sent in April of

25  2019, Mr. Divis was the interim chief executive officer at

356

1   Avadel?

2   A.      That is my understanding.

3   Q.      Now in your e-mail to Mr. Divis, in the first line,

4   you state that you've finished the document review report

5   earlier than you expected and then you invited Mr. Divis to

6   share that report with others.

7           Do you see that?

8   A.      I do see that.

9   Q.      Now, the report that you refer to in your e-mail to

10  Mr. Divis, do you see that report attached to the e-mail

11  that's been marked as Exhibit 87?

12  A.      I do see, on page ending in 351, a report titled

13  "Avadel France Technical Review and Transfer Plan

14  Activities" prepared by me.

15  Q.      And the report indicates that it was prepared by you,

16  does that mean that you wrote this report?

17  A.      Yes, that means I wrote this report.

18  Q.      And you would have ensured that the statements and

19  information contained in this Exhibit 87 report were

20  accurate before sending them to Avadel's CEO, correct?

21  A.      The information I put in this report, to best of my

22  knowledge, are accurate based on what I did at the time.

23  Q.      Okay.  Can you turn to the page ending in 775354,

24  please.  And it's the fourth page of the report itself.

25  A.      (Complies.)

357

1    Okay.  I'm on page ending in 354.

2 **Q.**    And you see section 2.0 says, "Background

3 Information"?

4 **A.**    I do see 2.0, "Background Information."

5 **Q.**    And it says here in the last sentence of background

6 that, "The main purpose was to review documents relating to

7 Avadel's technology, ensuring everything pertaining to this

8 technology is preserved and easily accessible if the company

9 ever decides to revisit any of the programs or transfer them

10 to the USA."

11    Do you see that?

12 **A.**    I do see that.

13 **Q.**    And the technology that's being referred to here,

14 does that relate to all of the products that Avadel had

15 developed in the particular facility that you traveled to?

16 **A.**    I don't know if it's referring to all of the

17 products, but at least the one that I did look at.

18 **Q.**    And which one is that that you're referring to?

19 **A.**    I think that -- what I looked at is listed in this

20 report.

21 **Q.**    And is -- is FT218 one of the products that you

22 looked at as part of this technology review and transfer

23 project?

24 **A.**    Let me refresh my memory by glancing through this,

25 please.

358

1 **Q.**    Yeah, of course, please.

2 **A.**    So, yes, I do see in this report that FT218 was --

3 was mentioned here.

4 **Q.**    Now, in connection with putting this report together,

5 you physically traveled to France, right?

6 **A.**    That is correct.

7 **Q.**    And you visited a facility where the FT218 had been

8 developed, at least in part?

9 **A.**    I did visit a facility in France where at least part

10 of the FT218 was developed, and that was my understanding.

11 **Q.**    And when you were at that facility, you reviewed

12 laboratory records, physical records, related to the

13 development of FT218: is that correct?

14 **A.**    No, that is not correct.  I looked at lab notebooks,

15 but I couldn't read them because majority of them were in

16 French.

17 **Q.**    Did you review any documents that were in English

18 related to the development of FT218?

19 **A.**    I don't recall specific what documents I looked at

20 and whatnot.

21 **Q.**    You found that all of Avadel's development records

22 were well preserved: is that correct?

23 **A.**    So the ones that I did see and did look at were well

24 documented, and they were shipped off to an off-site

25 storage, so in my opinion, the documents that I saw and were

359

1 shipped were preserved.

2 **Q.**    Can you turn to page 6 of your report, which is the

3 Bates No. 775356.

4 **A.**    Okay.

5 **Q.**    And in section 3.4, it indicates here that you had

6 discussions with various Avadel staff members.

7    Do you see that?

8 **A.**    I do see that.

9 **Q.**    I'd like to direct your attention to the last several

10 lines of section 4.0.

11    And do you see about five lines up, there's a

12 sentence that starts with "the current..."

13    Do you see that?

14 **A.**    I do see that.

15 **Q.**    And here the report reads, "The current Avadel

16 scientists had to use a trial-and-error approach to develop

17 each project with no secret ingredient or trade secret used

18 in developing the projects.

19    Overall, there are no major concerns or hurdles

20 in transferring the technology to the USA and closing the

21 site in France earlier than expected."

22    Do you see that?

23 **A.**    I do see that.

24 **Q.**    Based on the records you saw, your opinion at the

25 time was that Avadel did not use any secret ingredient or

360

1 trade secret in any of its projects: is that correct?

2 **A.**    Yeah.  So like I said, based on what I saw and the

3 documents I reviewed and my discussion with Avadel

4 scientists, I did not see any secret ingredients being used.

5 **Q.**    So in this e-mail, you recommended to Mr. Divis that

6 he didn't need to retain any of the French employees who had

7 developed FT218 after the registration batches were

8 completed and their CMC reports for the NDA were written.

9    Is that a correct understanding?

10 **A.**    Like I said in this e-mail, regarding the team in

11 France, I did not see a reason to keep them beyond the

12 registration batches of FT218.

13 **Q.**    And one of the reasons why you were able to make that

14 recommendation was because the French employees didn't

15 possess any trade secret knowledge: is that correct?

16 **A.**    So like I said, my recommendation here in this e-mail

17 is I did not see a reason to keep them beyond the

18 registration batches of FT218.

19 **Q.**    And one of the reasons why is because those employees

20 didn't possess trade secret knowledge, right?

21 **A.**    So like I said, I did not see a reason to keep them

22 beyond the registration batches of FT218.

23 **Q.**    And for the record, PTX97 has just been marked, that

24 is a document that spans the Bates range AVDL_00044220

25 through AVDL_00044260.

361

1    Do you recognize PTX97 to be a portion of the

2  FT218 NDA?

3  A.    So I do recognize that PTX97 is labeled as section

4  3.2.P.2.2, and it appears to be part of the CMC section of a

5  regulatory filing, and I don't know if this is a draft or

6  the final version.

7  Q.    Is -- did you work on section 3.2.P.2.2 of the FT218

8  NDA?

9  A.    Yes, I did.

10  Q.    And what was your role with respect to working on

11  this particular section?

12  A.    Same as all -- all of the other sections.  I was

13  helping editing, drafting a section.

14  Q.    Now, one of the components of section 3.2.P.2.2 of

15  the FT218 NDA pertains to formulation development; is that

16  correct?

17  A.    This document is -- has the title "Pharmaceutical

18  Development."

19  Q.    Let's turn the page to 44237, please.

20    And do you see a heading on this page that

21  states "Malic Acid"?

22  A.    I do see a heading stating malic acid on page ending

23  237.

24  Q.    And in the second paragraph, part of the last

25  sentence here says that, "Malic acid was selected as it is

362

1  already present in the current sodium oxybate commercial

2  formulation (Xyrem)."

3    Do you see that?

4  A.    I do see that.

5    (End of video deposition.)

6    THE COURT:  All right.

7    MR. LoCASTRO:  Your Honor, if I may, the

8  Court -- Jazz calls its next witness, also by deposition

9  video, it's Dr. Jason Vaughn.  And if I may approach with

10  copies of the binders?

11    THE COURT:  You may.

12    MR. LoCASTRO:  And if I may move some documents

13  into evidence before the video is played, Your Honor.  I

14  believe PTX60 is already in, as PTX60 is shown.  Per the

15  parties' agreement, it will be moving in, just a truncated

16  portion of PTX109, which will be found in the binder, a

17  truncated portion of PTX0164.

18    And then in their entireties, I understand with

19  no objection, PTX0165, PTX2004, and PTX2006.

20    MR. SCHULER:  No objection.

21    THE COURT:  All right.  PTX60 -- well, PTX164,

22  PTX165, PTX2004, PTX2006 are admitted in their entirety.

23  PTX164 and PTX109 are admitted truncated.

24    MR. LoCASTRO:  That is correct, Your Honor, yes.

25  Thank you.

363

1    (Exhibits admitted.)

2    (Video deposition was played for the jury as

3  follows:)

4  Q.    Could you please state your full name for the record,

5  please?

6  A.    It's Jason Michael Vaughn.

7  Q.    And you're currently employed as the vice president

8  of technical operations at Avadel Pharmaceuticals; is that

9  correct?

10  A.    Yes, that's correct.

11  Q.    How long have you had that title, sir?

12  A.    I started as a full-time employee in October of 2019.

13  Q.    And during today's deposition, is it okay with you if

14  I refer to Avadel's extended-release sodium oxybate product

15  as FT218?

16  A.    Yes.

17  Q.    And do you understand FT218 to be sort of an internal

18  code name for Avadel's extended-release sodium oxybate

19  product?

20  A.    Yes.

21  Q.    And this is going to be PTX134.

22    Do you recognize PTX134 to be a declaration that

23  you signed and submitted during the prosecution of a patent

24  application numbered 16-419616?

25  A.    Yes, I do.

364

1  Q.    Is it okay with you if I refer to that patent

2  application as the '616 application, just for shorthand?

3  A.    Sure.

4  Q.    Is it your understanding that Avadel filed the '616

5  application?

6  A.    It appears to be, yes.

7  Q.    In the first paragraph of the declaration, you state

8  four lines down, "Although I am not an inventor of the

9  instant application, in my leadership role in technical

10  operations, I am deeply familiar with the '616 patent

11  application and the history underlying the development of

12  the claimed invention."

13    Do you see that?

14  A.    Yes.

15  Q.    Is that an accurate statement?

16  A.    At the time, yes.

17  Q.    All of the statements in your declaration to the

18  USPTO are accurate, correct?

19  A.    To the best of my knowledge.

20  Q.    And sitting here today, there isn't anything in the

21  declaration that you feel needs clarification or that needs

22  to be corrected, right?

23  A.    Not that I'm aware of, no.

24    MR. LOCASTRO:  Let's mark this as the next

25  exhibit, please, this will be 135.

365

1   BY MR. LOCASTRO:
2   Q.    The court reporter has just handed you PTX135.
3         And my question for you is, do you recognize
4   this document to be a patent application publication for the
5   '616 application?
6   A.    This is a patent application for that '616.
7   Q.    And you told the Patent Office in your declaration
8   that you are deeply familiar with the information that's in
9   the specification of this patent application; is that
10  correct?
11  A.    At the time --
12  Q.    I'd like to direct your attention to the examples,
13  please, which begin in paragraph 385.  And if it helps you,
14  that is on -- it says page 25 at the very top, once you get
15  past all the figures.
16        And the first sentence of paragraph 385 reads,
17  "Tables 1a to 1d provide the qualitative and quantitative
18  compositions of the sodium oxybate IR microparticles, MR
19  microparticles, and mixtures of IR and MR microparticles."
20        Do you see that?
21  A.    Yes, I see that.
22  Q.    Are you able to determine whether the composition of
23  the modified-release particles described in table 1b is the
24  same as the composition of the 4.5-gram dose of FT218?
25  A.    Yes.  The coating material levels are the same.

366

1   Q.    And according to table 1b, the immediate-release
2   particles are a component of the modified-release particles,
3   right?
4   A.    Correct.
5   Q.    And according to table 1b, the function of the
6   immediate-release microparticles is that they are the core
7   of the modified-release microparticles?
8   A.    It says they are the core, but there is a placebo
9   core that is used in the manufacturing of the -- of the IR
10  microparticles, and then that is just then taken forward to
11  make the MR microparticles.
12  Q.    The patent application doesn't say anything about a
13  placebo core in table 1b, does it?
14  A.    Not in 1b, but it does in 1a.
15  Q.    But in table 1b that describes the composition of the
16  MR microparticles, the core of the MR microparticles is the
17  IR microparticles, that's what Avadel told the Patent Office
18  in the '616 application, right?
19  A.    That's what it says, yes.  But our -- in our use of
20  the word "core," it's -- it's intended to be used as the
21  placebo core to make the IR.  And then the IR microparticles
22  are just the starting material to make the MR
23  microparticles.
24  Q.    But that explanation is not set forth in the patent,
25  is it?

367

1   A.    It is not.
2   Q.    Can you turn to paragraph 56 of PTX135, please?
3   A.    56?
4   Q.    Yes.  That's on the page with the little 5 at the
5   very top.
6         And paragraph 56 states that, "Figure 5 plots a
7   time-release dissolution profile of the finished formulation
8   of example 1 in deionized water."
9         Do you see that?
10  A.    I see where that says that, yes.
11  Q.    And then omitting the parentheticals, paragraph 57
12  right beneath, that says that, "Figure 6 plots a
13  time-release dissolution profile of the finished composition
14  of example 1 in deionized water overlaid against the
15  dissolution profile described in figure 2 of
16  USP 2012-007685."
17        Do you see that?
18  A.    Yes, I see that.
19  Q.    And as we saw earlier in the PTX100 PowerPoint, that
20  USP 2012/0076865, these a Jazz patent application
21  publication: is that correct?
22  A.    I would need to go back to that again.
23  Q.    Sure.
24  A.    I don't recall if that's the number or not.
25  Q.    I think it was slide 105 we were looking at in

368

1   PTX100.
2   A.    Yes.
3   Q.    Is it fair to say that Figure 6 of the '616
4   application publication compares the deionized water
5   dissolution profile of the finished composition of example 1
6   of Avadel's application to the formulation described in
7   figure 2 of Jazz's application?
8   A.    I guess the only assumption would be that that is an
9   actual Jazz -- I mean, it know it says it here, but --
10  whether that's an actual Jazz patent or not.
11  Q.    I guess setting aside any discrepancy as to whether
12  or not those numbers are really a Jazz application --
13  A.    Un-huh.
14  Q.    -- is it fair to say that what Figure 6 in the Avadel
15  application is doing is comparing the DI water profile of
16  example 1 of Avadel's application to figure 2 of whatever
17  that '865 application is?
18  A.    That's what this says here.
19  Q.    Can you please look at Figure 6 of the '616
20  application publication?  And that's on sheet 3 of 46 toward
21  the beginning of the document.
22        And what Figure 6 is comparing is the DI,
23  deionized water, dissolution profile of the two formulations
24  at various time points between zero and 8 hours, correct?
25  A.    It appears to be, yes.

369

1   Q.      And Avadel would agree that Figure 6 is showing that
2   both formulations have released nearly an identical amount
3   of sodium oxybate after 6 hours in deionized water, right?
4   A.      I mean, from the -- from the graph, it appears
5   they're very close together.
6   Q.      Did Avadel scientists document experiments related to
7   the development of FT218 in laboratory notebooks?
8   A.      Yes.
9   Q.      And during the development of FT218, did Avadel have
10  any policies in place regarding laboratory notebooks, such
11  as how they should be used and how they should be stored and
12  maintained?
13  A.      There were policies in place.
14  Q.      Did those policies require Avadel employees to
15  document all experiments related to the development of FT218
16  in laboratory notebooks?
17  A.      As far as I know, yes.
18  Q.      Did Avadel perform deionized water dissolution
19  testing with FT218?
20  A.      Yes.
21  Q.      Was the deionized water dissolution testing on FT218
22  carried out on only one occasion, to your knowledge?
23  A.      To my knowledge, yes.
24  Q.      This is a document that's been premarked PTX44.
25          And I will represent to you that PTX44 is a

370

1   certified translation of portions of an Avadel laboratory
2   notebook.  Those are the first several pages.  And then what
3   follows is the original French version.
4           Do you recognize PTX44 to contain portions of an
5   Avadel laboratory notebook documenting experimentation
6   performed during the development of FT218?
7   A.      Yes, it appears to be.
8   Q.      Can I ask you to turn to the page ending in 468, and
9   you can feel free to use the English or the French,
10  whichever you prefer.
11  A.      Okay.  Sorry, where is the 468, at the bottom?
12  Q.      Yes.
13  A.      Okay, I got it.
14  Q.      I'm looking at the English version, I assume you are
15  too.
16  A.      I am too.
17  Q.      Do you see the title here is "Dissolution in
18  Deionized Water According to the Jazz Patent," and then the
19  document continues?
20          Do you see where I'm looking at?
21  A.      Yes.
22  Q.      Does this page of the laboratory notebook, PTX44,
23  describe the dissolution testing of FT218 in deionized water
24  that Avadel carried out?
25  A.      Let me review it quick.

371

1           Yes, it appears to be.
2   Q.      Does the information in PTX44 tell you who carried
3   out this testing?
4   A.      There is a signature at the bottom of the person that
5   did the work.
6   Q.      And is that person Dr. Hervé Guillard?
7           I see his name on the page ending on 433, if
8   that helps.
9   A.      I mean, it doesn't appear that, no.
10  Q.      What is Avadel's knowledge as to who carried out the
11  testing, if not Dr. Guillard?
12  A.      It appears that it was -- again, I'm not an expert in
13  evaluating signatures, but it appears that that signature
14  matches Florian.
15  Q.      So Florian carried out the testing is Avadel's
16  knowledge.  Is it also Avadel's knowledge that Dr. Guillard
17  oversaw that testing?
18  A.      What do you mean by "oversaw"?  He is signed as
19  having reviewed this page.
20  Q.      And is it Avadel's knowledge that the person who
21  signs a lab notebook as the reviewer is the person who
22  oversaw the work; is that correct?
23  A.      Yeah.  I don't know if they were there in the room
24  when it was occurring, but what the signature shows here is
25  that they reviewed this documentation, and it doesn't

372

1   contain any laboratory errors, laboratory notebook errors.
2   Q.      You didn't review Dr. Guillard's deposition
3   transcript.  I think you told me that earlier, correct?
4   A.      No.
5   Q.      And you don't -- so you don't have any reason to
6   believe that Dr. Guillard was untruthful in his testimony,
7   do you?
8   A.      No, I haven't.
9   Q.      Take as much time as you need to look it over, but my
10  question for you is going to be:  Exhibit 4 is the study
11  report for study ETD 218-005:  yes?
12  A.      Yes.
13  Q.      Avadel submitted Exhibit 4 to the FDA in connection
14  with the Lumryz New Drug Application, correct?
15  A.      That's correct.
16  Q.      And Exhibit 4 is the study report that the FDA
17  reviewer is talking about on the bottom of page 12 of the
18  Biopharmaceutics Review in Exhibit 1, right?
19  A.      That's correct.
20  Q.      If you turn to page 3 of Exhibit 4, the Bates ends in
21  753.  There's an introductory section to the study report,
22  right?
23  A.      Yes.
24  Q.      And right there in the introduction, the very first
25  bullet talks about how Lumryz is composed of

373

1    immediate-release microparticles and, again,

2    controlled-release microparticles, right?

3    A.      Correct.

4    Q.      And the introduction talks about how the FT218

5    formulation has pH-dependent properties.  Do you see that

6    language?

7    A.      Yes.

8    Q.      FT218 is a code name that Avadel used for Lumryz

9    before Lumryz obtained FDA approval, right?

10   A.      That's correct.

11   Q.      And then there's some language here that talks about

12   how certain data indicate that at pH 6.8 the proposed

13   modified-release product has the potential to dump the dose

14   of sodium oxybate rapidly.  Do you see where I am?

15   A.      Yes.

16   Q.      And as a result of that potential, the FDA then asked

17   Avadel to explore the impact of beverages whose pH is

18   neutral or basic, correct?

19   A.      Yes.

20   Q.      So the FDA's concern was that if the Lumryz pellets

21   were mixed with water with a pH around or above 6.8, the

22   controlled-release pellets might actually start releasing

23   right there in the dosing cup; is that fair?

24   A.      Yes, that's what they were concerned about.

25   Q.      And if that happened, that would be a problem,

374

1    because then the patient should essentially be taking one

2    very large immediate-release dosage; fair?

3    A.      Yes.

4    Q.      And it would, of course, be dangerous if the patient

5    took the controlled-release and the immediate-release

6    portions at the same time, right?

7    A.      And they both released at the same time, yes.

8    Q.      And that safety concern is why Avadel carried out

9    study ETD 218-005, correct?

10   A.      Yes, that's why.

11   Q.      If you could please turn to page 7 of Exhibit 4.

12   What it indicates here is that Avadel evaluated in vitro

13   dissolution of Lumryz after mixing the Lumryz pellets with

14   different kinds of water; is that correct?

15   A.      Yes.

16   Q.      One type of water was a mineral water called Glacier

17   Isle; yes?

18   A.      Yes.

19   Q.      The second type of water we see here is a mineral

20   water called St-Yorre.  Do you see that?  Y-O-R-R-E for the

21   reporter.

22   A.      Mm-hmm.

23   Q.      And the third type of water is another mineral water

24   called Badoit, or Badoit, however you say that, correct?

25   A.      Yeah, mm-hmm.

375

1    Q.      And these three different mineral water types differ

2    in terms of their pH levels and their bicarbonate ion

3    concentrations, correct?

4    A.      Correct.

5    Q.      What is a bicarbonate ion?

6    A.      A bicarbonate ion is a buffering ion that can be used

7    to keep the pH at a specific pH.

8    Q.      And when you say a "buffering ion," what exactly does

9    that mean?

10   A.      It means that the -- you know, if other ions come

11   into the system or in the solution, those buffering ions

12   prevent the change in the pH.

13   Q.      The Glacier Isle water that was tested had a pH

14   of 8.5 and a -- it's indicated here -- a low bicarbonate ion

15   concentration; is that correct?

16   A.      Well, it says it wasn't indicated, but they -- at

17   least the people that drafted this report think it's low.

18   Q.      Do you agree with that?

19   A.      I have no reason to doubt that.

20   Q.      Okay.  The St-Yorre water had a pH of 6.4 but a

21   bicarbonate ion concentration of 4,263 milligrams per

22   litter, correct?

23   A.      Correct.

24   Q.      The Badoit water had a pH of 5.8 but a bicarbonate

25   ion count about four times lower than the St-Yorre water; is

376

1    that correct?

2    A.      Yeah, it appears that it's about a fourth of that.

3    Q.      Okay.  None of the water tested as indicated in

4    Exhibit 4 was deionized water; is that correct?

5    A.      That's correct.

6    Q.      But if you look a little further down on page 7, it

7    does indicate here that Avadel also evaluated in vitro

8    dissolution of Lumryz after mixing it with tap water,

9    correct?

10   A.      Yes.

11   Q.      And the tap water had a pH of 7.6.  You can see that

12   in the table at the bottom of the page, correct?

13   A.      Yes.

14   Q.      And if you look at the results that are shown in the

15   table at the very bottom of page 7, mixing Lumryz with tap

16   water, Glacier Isle water, or the Badoit water resulted in a

17   mixture with a pH of 5.7 or 5.8; is that correct?

18   A.      Yes.

19   Q.      That pH is below 6.5, right?

20   A.      Yes.

21   Q.      So that resulting pH that we see in the table on

22   page 7 is below the release trigger for the

23   controlled-release Lumryz pellets, correct?

24   A.      It is below that.

25   Q.      If you turn the page in Exhibit 4 to page 8, we see

377

1  here that the dissolution profiles of the Lumryz pellets
2  mixed with tap water, Glacier Isle water, or the Badoit
3  water, they appear to be equivalent, correct?
4  A.     Yeah, based on the graph, they seem to line up and be
5  equivalent.
6  Q.     So mixing Lumryz and water with a pH of 7.6, 8.5, or
7  5.8 doesn't appear to have any impact on the resulting
8  dissolution profile; is that correct?
9  A.     I mean, based on the time that it was in the presence
10 of that pH, it does not appear to have an effect.
11 Q.     And the data in Exhibit 4 show that regardless of
12 whether the water in Avadel's tests started with a pH
13 of 7.6, 8.5, or 5.8, once the Lumryz was added, the pH of
14 the resulting suspension became 5.7 or 5.8, correct?
15 A.     That's correct.
16 Q.     Mixing the Lumryz with the high-bicarbonate St-Yorre
17 water resulted in a mixture with a pH of 6.2, right?
18 A.     That's correct.
19 Q.     And is it correct that the bicarbonate ions in the
20 St-Yorre water raised the pH of the mixture?
21 A.     The bicarbonate ions really prevented the drop in the
22 pH.  They don't specifically raise the pH.
23 Q.     Can you explain how the science of that works; do you
24 know?
25 A.     Yes.  So the pH was 6.4.  When we added the Lumryz,

378

1  it only dropped it to 6.2, so the buffering ability of the
2  bicarbonate that I mentioned earlier prevents it from going
3  down further.
4  Q.     And Exhibit 6 is another portion of the drug approval
5  package for Lumryz, correct?
6  A.     Yes.
7  Q.     Can you please turn to the page where the Bates ends
8  in 3819?
9  A.     Okay.
10 Q.     And here on the page ending in 3819, it's the first
11 page of a memorandum from the FDA's Office of Medication
12 Error Prevention and Risk Management, correct?
13 A.     Yes.
14 Q.     The third sentence of that first full paragraph on
15 page 5 states that the Lumryz NDA is a 505(b)(2) application
16 that relies, in part, on the FDA's finding of safety and
17 effectiveness for Xyrem.
18        Do you see that?
19 A.     I see that, yes.
20 Q.     And what that means is that Avadel's New Drug
21 Application for Lumryz relied on safety and efficacy data
22 for the Xyrem product that Jazz had previously generated and
23 submitted to the FDA, correct?
24 A.     That's what the FDA has indicated here.
25 Q.     But the safety and efficacy studies that Jazz carried

379

1  out, that Avadel relied on, had Avadel not relied on Jazz's
2  data, it would have had to generate its own, correct?
3  A.     I'm not certain, you know, what the FDA would have
4  required had we not relied on that.  I would just say that
5  we conducted a Phase III clinical safety and efficacy study.
6  What, in addition to that, would have been completed if we
7  didn't rely on some of the information from the Xyrem NDAs,
8  I don't know what that would have been.
9  Q.     Had Avadel not relied on safety and efficacy data in
10 the Xyrem New Drug Application, it would have taken more
11 time and more money for Avadel to bring Lumryz to market,
12 correct?
13 A.     Yeah, I mean, kind of back to my previous answer, I
14 don't know what would have been required as to how much
15 time, more time or how much more money, if any, would have
16 been required.
17 Q.     And the reason why you don't know how much would have
18 been required is because you're not familiar with the FDA's
19 process for reviewing new drug applications; is that right?
20 A.     No, I mean, we don't know because we didn't take that
21 path.  So we don't know -- we don't know what would have
22 happened because we didn't do that path.  So we took a
23 different path and we know the outcome of that path, but we
24 don't know the path that we didn't take.
25 Q.     I see.

380

1        And the path that you did take was to rely on
2  Jazz's safety and efficacy data for Xyrem, at least in part,
3  correct?
4  A.     According to -- I mean, based on the information in
5  here, yes, this is the path we took.
6        (End of video deposition.)
7        MR. CERRITO:  Thank you, Your Honor.  Good
8  morning.
9        Jazz calls Dr. Steven Little.
10       THE COURT:  All right.  Dr. Little, please take
11 the stand.
12       STEVEN LITTLE, having been called on the part
13 and behalf of the Plaintiff as a witness, having first
14 affirmed to tell the truth, testified as follows:
15       MR. CERRITO:  May I approach, Your Honor?
16       THE COURT:  Yes.
17       DIRECT EXAMINATION
18 BY MR. CERRITO:
19 Q.     Still morning, good morning.  Sir, can you state your
20 name for the record?
21 A.     Hi.  Nice to meet you all.  My name is Steven R.
22 Little.
23 Q.     And where are you currently employed?
24 A.     At the University of Pittsburgh.
25 Q.     And have you prepared any slides to walk through with

381

1   the jury today about your roles at the university and

2   educational background?

3   A.      Yes.

4           MR. CERRITO:  Okay.  Mr. Lewis, can you put up

5   slides for Dr.'s -- excuse me, Dr. Little's slides.

6   BY MR. CERRITO:

7   Q.      Doctor, what are your current roles at the University

8   of Pittsburgh?

9   A.      I am a professor, and I am also the chair of the

10  department of chemical engineering at the University of

11  Pittsburgh.  I also hold a title that is called the William

12  Kepler Whiteford endowed professor, and that's in the

13  departments of chemical engineering, bioengineering,

14  pharmaceutical sciences, immunology, ophthalmology, and the

15  McGowan Institute for Regenerative Medicine.  I am also the

16  director of some research labs at the University of

17  Pittsburgh, and they're called Controlled Release and

18  Biomimetic Research Laboratories.

19  Q.      Doctor, what does it mean to be an endowed professor?

20  A.      Well, it's based on an endowment that's given from

21  distinguished alumni, and the most productive professors are

22  given those.  That endowment, then, continuously funds the

23  appointment.

24  Q.      And how long have you been at the University of

25  Pittsburgh?

382

1   A.      Oh, geez, I think it's been almost 20 years.

2   Q.      Let's talk a moment about your PhD.

3           What's your educational background?

4   A.      Yeah, so I've listed it here.  I have my degree in

5   chemical engineering from Youngstown State University, and I

6   had minors in chemistry and mathematics.

7           Then I went on to do my PhD work at MIT.  It's

8   the Massachusetts Institute of Technology.  I received my

9   PhD in chemical engineering working on pharmaceutical

10  formulations, and I have a minor in biology.

11  Q.      Can you tell the jury what a chemical engineer is.

12  A.      Yeah, sure.

13          So a chemical engineer focuses on the

14  interactions of things that are really small scale, so this

15  can be anything from molecules to things that are microns in

16  size like a cell, so small stuff, and the interactions

17  there.  What a chemical engineer does is looks at that and

18  then the process of understanding how that stuff that

19  happens at the small scale impacts what we care about here

20  in the big scale that we live in today.

21          So, for instance, you could say, at the small

22  scale, you have the degradation of a drug, right.  At the

23  large scale what we care about is drug product quality,

24  that's an example of what chemical engineers do.

25  Q.      And what was your focus during your research, your

383

1   PhD research at MIT?

2   A.      That was pharmaceutical formulations, designs,

3   manufacture, characterization, application of pharmaceutical

4   formulations.

5           During my PhD, I did a lot of work with the kind

6   of controlled-release systems that we're talking about, in

7   fact, even utilized the polymers that we're talking about

8   here in this case.

9   Q.      Other than the ones you mentioned a little earlier,

10  do you have any other titles at the University of

11  Pittsburgh?

12  A.      I do.  Last year, maybe the year before now, the

13  chancellor of the university gave me the title of

14  "distinguished professor."

15  Q.      And what does it mean to be a distinguished

16  professor?

17  A.      Yeah, so whereas endowed titles are given to the most

18  productive faculty, distinguished professors are limited to

19  only a very small member of the faculty at the university.

20  University calls the achievement of this, I think it's

21  extraordinary internationally recognized achievement in

22  scholarly work in my field.

23  Q.      Is there a particular field that you were given that

24  recognition for?

25  A.      That was for my work in pharmaceutical formulation.

384

1   Q.      And can you tell us about your lab and the research

2   you do at the University of Pittsburgh.

3   A.      Yes.  So I am the director of a lab that leads a

4   large number of people that work on these kinds of things

5   that we're talking about here in this case.  They include

6   postdoctoral researchers, research assistant professors, PhD

7   candidates that serve under my mentorship, technicians,

8   undergraduate students, all working on the kind of

9   formulations including extended-release and

10  controlled-release formulations.

11  Q.      Do you have any funding for you research?

12  A.      I do, at this point in my career, I'm fortunate

13  enough to have received a little over $50 million of

14  research in the fields that I work in.

15  Q.      And who provides that funding?

16  A.      Yeah.  We receive funding from the National

17  Institutes of Health to do our research; the National

18  Science Foundation; several branches of the Department of

19  Defense, including DARPA and the U.S. Army; we receive

20  funding from the United States Food and Drug Administration,

21  the FDA; we've received funding from institutes, so -- that

22  fund innovative research like the Wallace H. Coulter

23  Foundation, the Beckman Foundation.

24          (Reporter clarification.)

25          THE WITNESS:  Sure.

385

1    The Wallace H. Coulter Foundation, Beckman
2 Foundation, Camille and Henry Dreyfus Foundation. And then
3 we've also received grant funding from industry to work in
4 the field as well.
5 BY MR. CERRITO:
6 Q.   At that last point, from industry, have you received
7 any grant funding from Jazz or Avadel?
8 A.   I have not.
9 Q.   Do you hold any professional roles outside of the
10 university?
11 A.   I do. I have some things on the next slide for that.
12 Q.   Can you walk us through that, Doctor.
13 A.   Sure.
14    So I also am a founder of a couple of
15 pharmaceutical companies, this is listed up here at the top.
16    So the first is Orono Inc, it's a specialty
17 pharma company that currently is specializing in treatments
18 for head and neck cancer for patients, but that company
19 previously was actually formatted with some technology where
20 we were custom designing formulations for academic labs and
21 industry and actually even some agricultural companies for
22 release of fertilizers.
23    In addition, I'm the founder of Oraxis Inc.,
24 which is a startup company that is currently focused on
25 treatments for inflammatory diseases.

386

1    So example of those could be like transplant
2 rejection, contact dermatitis, chronic rhinosinusitis, the
3 application of the technology could be really for any
4 inflammatory disease.
5 Q.   Over the course of your career, Doctor, what types of
6 formulations do you have experience working with?
7 A.   Yeah, we have experience with a large number of
8 different types of formulations that are delivered by
9 different routes.
10    In this case, we're talking about oral dosage
11 forms delivered into the gastrointestinal tract but I work
12 on formulations that are delivered to the eye, through the
13 skin, through mucosal membranes, etc., and those
14 formulations take a variety of forms with different drugs.
15    They can be immediate release, which means that
16 the drug comes out really fast and then there's modified
17 release where you tune it to release the way that you want
18 in specific areas.
19 Q.   And do you understand the type of formulations at
20 issue in this case?
21 A.   Yeah, they are extended-release oral solid dosage
22 forms and also immediate-release oral dosage forms.
23 Q.   Have you worked with that type of formulations in the
24 past?
25 A.   Yes, I have.

387

1 Q.   And have you ever published --
2 A.   I have.
3 Q.   -- research?
4 A.   Yeah, I listed -- here we have over 100 peer-reviewed
5 publications in the field.
6 Q.   And you've applied for patents for the research?
7 A.   I have. We have, at this point, over 20 patents for
8 work in the area that are issued and/or pending.
9 Q.   And have you presented your research outside of the
10 university?
11 A.   I have. At this point, just over a hundred times, I
12 have been invited to give lectures on the work that I've
13 done in national and international conferences for work in
14 the field. And universities will invite you to give
15 seminars to the students and to the faculty and at companies
16 as well.
17 Q.   Have you held any roles in professional societies for
18 your research?
19 A.   I do, I have roles in many professional societies but
20 I just list a few here. The top two are ones where I have
21 held board of directors positions, where I have been elected
22 to be the board of directors of the society.
23    We have been talking about controlled-release a
24 lot here in this case. You may or may not believe it, but
25 there is an International Society For Controlled-Release, it

388

1 may not sound like a hoot to you, but it's a great society
2 that has many members, nationally and internationally.
3    I have served on the board of directors of that
4 society and also in -- actually, also, created a divisional
5 structure in that society that exists today.
6    And in 2020, I was asked by the board of
7 directors to lead the international meeting of the
8 Controlled-Release Society, so I designed and ran the
9 meeting that year.
10 Q.   Have you received any honors or awards for your work?
11 A.   I have, at this point in time in my career, I have
12 been fortunate to receive over 50 national and international
13 awards.
14 Q.   Any particular ones that you're proud of?
15 A.   I'll just list a handful. So very early on in my
16 career, I was given what the NIH calls their K award, which
17 is an award that is prestigious because what it does is it
18 makes it so that the NIH is actually paying my salary
19 instead of the university. That allows me to focus on
20 research rather than doing the other kind of things that
21 faculty members typically have to do. So I was able to take
22 some additional coursework and focus on my research.
23    Internally, at the university, I'm proud that
24 I'm the only faculty member in university history to receive
25 all three of the chancellor's distinguished awards.

389

1    Whenever you look outside of the university, I'm
2  a fellow of, I think, five or six now of the societies in
3  our field, which represents typically the top -- anywhere
4  between 1 and 5 percent of the membership in terms of the
5  scholarly attainment.
6    I will say that I was, last year, inducted into
7  the U.S. National Academy of Inventors, which is the U.S.'s
8  highest honor for inventors.  I have my own patents, so I am
9  also an inventor as well.
10  Q.    Doctor, the binder in front of you, can you turn to
11  PTX432.
12    Describe for me what that is.  In the binder,
13  sir, 432, PTX.
14  A.    Okay.
15  Q.    Can you tell me what that is?
16  A.    This appears to be my curriculum vitae.
17  Q.    Does this describe your background publications,
18  awards and accomplishments?
19  A.    Yes, at the time I submitted it.  Yes, last year.
20    MR. CERRITO:  I'd just move PTX432 into
21  evidence.
22    MR. SCHULER:  No objection, Your Honor.
23    THE COURT:  All right.  PTX432 is admitted.
24    (Exhibit admitted.)
25    MR. CERRITO:  At this time, Your Honor,

390

1  Plaintiffs move to qualify Dr. Steven Little as an expert
2  witness in the field of pharmaceutical sciences, including
3  drug formulation and drug delivery technologies.
4    MR. SCHULER:  No objection.
5    THE COURT:  All right.  Dr. Little may testify
6  in those areas.
7    MR. CERRITO:  Thank you, Your Honor.  Excuse me.
8  BY MR. CERRITO:
9  Q.    Dr. Little, have you been asked to offer certain of
10  your opinions today?
11  A.    Yes.
12  Q.    And did you prepare slides to help illustrate your
13  opinions for the jury?
14  A.    I did.
15  Q.    Okay.  And did you prepare a slide that summarizes
16  your opinions for this case?
17  A.    Yes, it should be slide 4 in my deck here, yeah.
18  Q.    Is this a summary slide you prepared?
19  A.    Yes, it is.
20  Q.    Can you briefly summarize what your opinions are.
21  A.    Yeah, so at a very high level, in summary, my
22  understanding is, is that -- in regard to infringement here
23  of Lumryz claims, asserted claims, there's two remaining
24  disputed claim limitations and I'll show those to you, but
25  I'm calling them, for short here, the core limitation and

391

1  the deionized water limitation.  And it's my opinion that
2  Lumryz does meet the claim elements of those two
3  limitations.
4  Q.    And for all the other limitations, you understand
5  that Avadel's admitted they infringed those claims or meet
6  those limitations?
7  A.    That's my understanding.
8  Q.    Can you describe for us briefly, what is the Avadel's
9  Lumryz product?
10  A.    Sure, I have a slide next to show this.  The Lumryz
11  product is essentially a powder or some pellets, and I'm
12  showing a sachet here, it could be contained in the sachet
13  and it can pour out.  And then if I break out what's in the
14  powder here for you, there's two different types of
15  particles that contain the drug in this case, which is
16  gamma-hydroxybutyrate, which is abbreviated as GHB here.
17  And you have the immediate-release particles and the
18  modified-release particles.  And those are there in a 50/50
19  ratio.
20    And then in addition to those particles, you
21  have on the outside of them the acid particles, and then
22  also particles of viscosity-enhancing agent.
23  Q.    How did you determine whether Lumryz meets the
24  elements of the asserted claims?
25  A.    I reviewed various pieces of evidence, which I have

392

1  on the next slide.  I could take the jury through.  These
2  were the five things that I relied on for the testimony
3  today.
4    The Lumryz New Drug Application submitted to the
5  FDA; Avadel's internal documents and the submission to the
6  Securities and Exchange Commission, or the U.S. SEC;
7  Avadel's employees' testimony; Avadel's patents; and
8  Avadel's responses to Jazz's requests for admissions in this
9  case.
10    I got the information of Lumryz from these
11  documents, and then I compared that to the asserted claims
12  and the claim limitations that I just showed you in order to
13  perform a infringement analysis.  And I did that through
14  what's called standing in the shoes of a person of ordinary
15  skill in the art.
16  Q.    Before we get too far, what is a person of ordinary
17  skill in the art?
18  A.    Yeah, there's a big, long definition of it here in
19  this case that I used, if we could pull it up.  And you
20  don't have to worry, I'm not going to read this to you, but
21  let me just give you a brief summary.
22    It's somebody who has a degree in the
23  pharmaceutical sciences or a related field to the
24  pharmaceutical sciences.  It can be an advanced degree, like
25  a PhD or a master's degree with a certain number of years'

393

1    experience, as listed here.  It could also be somebody with
2    lesser educational experience, like a bachelor's degree, but
3    then an increase in the number of hands-on experience.
4          And then if you read down, that individual is a
5    part of a team, so being as a part of that team, you are
6    able to derive complementary expertise from the other people
7    on that team.
8    Q.    Let's go into your binder again.  And please turn to
9    tab JTX03 in evidence.
10          And, Doctor, can you tell me what that document
11   is?
12   A.    This is the '488 patent that has the claims that
13   we're discussing.
14   Q.    And which claims, specifically?
15   A.    It is Claim 7 and Claim 11.
16   Q.    Generally, Doctor, what do the asserted claims in the
17   '488 patent cover?
18   A.    Yeah, so if I could pull up, I think it's on my next
19   slide, the claims here.  Again, there's a lot here, but I
20   think, fortunately for us here, most of the stuff has
21   already been worked out.
22          My understanding is that the only two disputed
23   claim terms left here are highlighted.  And you can see the
24   top one here, which I'll take you through in a little bit,
25   that's the core limitation, you see where it says "wherein,

394

1    the core..." that's the first one.
2          The second one is the deionized water
3    limitation, which is a dissolution experiment limitation
4    that I'll take you through later.  But overall what this
5    claim talks about is technology that can be used to sustain
6    the release of this oxybate drug, or GHB, that we've been
7    talking about here.
8          MR. CERRITO:  Before I get too far in this, Your
9    Honor, is this a good time for a morning break?
10          THE COURT:  Yes, it is.
11          All right.  Ladies and gentlemen of the jury,
12   we'll give you the morning break at this time.
13          (Whereupon, the jury left the courtroom.)
14          THE COURT:  All right.  We'll take 15 minutes.
15          MR. CERRITO:  Thank you, Your Honor.
16          (Break taken.)
17          THE COURT:  Be seated until the jury comes.
18          (Whereupon, the jury entered the room.)
19          MR. CERRITO:  Thank you, Your Honor.
20   BY MR. CERRITO:
21   Q.    So Dr. Little, right before the break we were talking
22   about the two elements of the claim that are in dispute.
23   Let's break this down a little bit.
24          So one at a time.  Let's start with the core.
25   In your opinion, does Lumryz meet the claim limitation of

395

1    the core with gamma-hydroxybutyrate or a pharmaceutically
2    acceptable salt of gamma-hydroxybutyrate?
3    A.    Yes, it does.
4    Q.    And would a POSA -- how would a POSA determine what
5    constitutes the core in the context of the asserted claims?
6    A.    Sure, so let's first start with the claim.  That's
7    what you have to start with here.
8          So if you go to the next slide -- I'm going to
9    try to keep what I read to you at a minimum, as you can see,
10   but I do think it's important to read at least the claim
11   limitations that we're comparing the product to, so I'm
12   going to do that now.
13          It says, "The sustained-release portion" --
14   that's what we're talking about now is the sustained-release
15   portion -- "comprises a functional coating and a core."  So
16   two things here, wherein the functional coating is deposited
17   over the core, wherein the core comprises at least, and then
18   you have your drug that comes afterwards, right.
19          So just from the standpoint of a person of
20   ordinary skill, when they read this, what they're seeing is
21   how this sustained-release formulation works.  It's got a
22   coating that, if you keep reading, it talks about what is in
23   it.  It's these polymers, these MAMM polymers.
24          That goes over top of what's underneath of it,
25   which is the core.  And the drug has got to be under there.

396

1    The reason why is if the drug is out here, the coating can't
2    control the release through mechanisms that I won't go
3    through.  But it's got to be inside.  So that's what a
4    person of ordinary skill in the art sees here.
5          So what you're doing is trying to see whether
6    you've got a functional coating over the top of a core, and
7    is the drug inside of that core or a part of that core, is
8    what you're looking at.
9    Q.    Thank you, Doctor.  What did you rely on to
10   determine --
11          MR. SCHULER:  Your Honor, can we have a sidebar?
12          (Whereupon, a discussion was held at sidebar as
13   follows:)
14          MR. SCHULER:  I don't think that was explicitly
15   an effort at trying to construe the term "core."  But, Your
16   Honor --
17          MR. CERRITO:  It wasn't even close, it was a
18   throwaway, I'm not going there.
19          MR. SCHULER:  Okay.
20          MR. CERRITO:  No, no.  It was not my intent at
21   all.
22          THE COURT:  Okay.  Already.
23          (Whereupon, the discussion held at sidebar
24   concluded.)
25   BY MR. CERRITO:

397

1   Q.    Now, Doctor, what did you rely upon in terms of what
2   comprises the core of Avadel's sustained-release portion?
3   A.    Yup, I included those things on the next slide.
4   These are the pieces of information that I considered.
5   There's Avadel's '062 product, which I will describe to you,
6   as to how it describes and characterizes the Lumryz product.
7   Then there's Avadel's NDA, which also describes Avadel's
8   Lumryz product.  And then there's Avadel's admissions to
9   Jazz in this case.
10         And then there's a presentation to the United
11  States Security and Exchange Commission that I also relied
12  upon as it describes Avadel in the way that Flamel did at
13  the time.
14  Q.    Okay.  We're pronouncing it different; Flamel and
15  Flamel are the same company?
16  A.    It is, yes.
17  Q.    Okay.  Sorry.
18         You mentioned Avadel's own patent.  Can you
19  please turn in your binder to JTX260, already in evidence.
20         Is this the Avadel patent you considered?
21  A.    Yes.  This is the '062 patent from Avadel.
22  Q.    And why is that accurate relevant to your analysis?
23  A.    Well, first of all, because it contains the
24  composition of Lumryz in it.
25         MR. CERRITO:  Mr. Lewis, can you call up

398

1   table 1b in JTX260, please.
2   BY MR. CERRITO:
3   Q.    Dr. Little, first let me ask you, is it your opinion
4   that Lumryz's sustained-release pellets are described in
5   table 1b of the '062 patent?
6   A.    It is.
7   Q.    What's that based upon?
8   A.    Yeah, so first let me just orient you to what this
9   table is.  You might have seen it before, but just from
10  context on how a person of ordinary skill in the art sees
11  this and looks at it.
12         Just for orientation, the top says composition
13  of MR particles.  Here in this patent, it's referring to
14  modified-release particles, that's what the MR stands for.
15  On the left-hand side, you're going to see components, these
16  are the pieces to this.
17         And then in the middle is the function, that's
18  what we call the qualitative composition portion of this,
19  it's what each of these things on the left are and what they
20  do.
21         And then on the right-hand side are the amounts,
22  so you see quantity per 4.5-gram dose.  And I'm going to
23  take you now next to the NDA to show that these match.
24         MR. CERRITO:  Your Honor, may I approach?
25         THE COURT:  Yes.

399

1         MR. CERRITO:  I am going to provide you with a
2   laser pointer, might be easier for you than pointing.
3         THE WITNESS:  Okay.
4   BY MR. CERRITO:
5   Q.    So just to do that, just quickly, again.  It's your
6   opinion Lumryz's sustained-release pellets are described in
7   table 1b, correct?
8   A.    They are.
9   Q.    And you walked the jury through it a second ago?
10  A.    Yes.
11  Q.    Okay.  Let's show the jury the comparison you were
12  talking about.
13         Can you please turn in your binder to JTX225.
14  And do you recognize this document?
15  A.    Yeah, this is the drug product from Avadel's NDA.
16         MR. CERRITO:  Your Honor, move JTX225 into
17  evidence.
18         THE COURT:  Any objection, JTX225?
19         MR. SCHULER:  I think it is in evidence.
20         MR. CERRITO:  If it is, great.  I'm sorry if it
21  isn't.
22         THE COURT:  It's already in evidence.
23         MR. SCHULER:  No objection.
24         THE COURT:  All right.  It's admitted.
25         MR. CERRITO:  Thank you, Your Honor.

400

1         (Exhibit admitted.)
2   BY MR. CERRITO:
3   Q.    Do you recognize this document, Doctor?
4   A.    Yeah, I do, it's drug product documentation for
5   Avadel's NDA.
6         MR. CERRITO:  And can you call up JTX225.2, Mr.
7   Lewis.
8   BY MR. CERRITO:
9   Q.    Dr. Little, does JTX225.2 show the composition of
10  Lumryz?
11  A.    Yes, it does.  It's a little different than what we
12  saw before, but I'm just going to point out this over here.
13  So this is the sodium oxybate controlled-release coated
14  pellets right here, okay.
15         So you can see these components underneath and
16  see the component up here, it's very similar, at least
17  quantitative composition, because you see here and then the
18  qualitative is here.  It's a little different in that this
19  is broken out in here, I'll show you that later in the
20  patent, but it's not included inside here.  But you can at
21  least check to see these amounts here to see that they
22  match.
23  Q.    And, Doctor, did you prepare a slide that compares
24  table 1b that we looked at just a moment ago from the '062
25  patent, Avadel's patent, with the composition of Lumryz from

401

1   225.2?

2   A.   I did.

3   Q.   Doctor, can you please walk the jury through the

4   information that you provided on the slide.

5   A.   Yeah.  So what I have over here on the left, if you

6   remember, was from the '062 patent, that's table 1b.  Over

7   on the right, although it's small, that's what we were just

8   looking at in the NDA.  And I have blown up the portion that

9   I was showing you here.  And then this portion is here.  The

10  only difference is there's some color here because I want to

11  match up the values for you.

12       So if you start with, for instance, just the

13  first piece which is -- actually it's the second here

14  because this one doesn't have the same top component, it

15  breaks it out differently.  But this one here is

16  hydrogenated vegetable oil, you can see that right here.

17  There's a little difference in that you see in parentheses

18  the name Lubritab, which is the brand-name for the kind they

19  used.  But these two ingredients are the same.

20       And if you go over, you can look and see that

21  the red guys match, so 0.716.  And you can do that for the

22  other ones as well, the names of the ingredients and the

23  amounts are essentially the name.

24  Q.   Are you aware, Doctor, whether Avadel has agreed in

25  this case that table 1b describes the composition of its

402

1   nonimmediate-release portion of Lumryz, or sustained-release

2   portion?

3   A.   My understanding is that they have admitted that,

4   yes.

5   Q.   Can you please turn in your binder to tab PTX726.

6        And, Doctor, can you tell me what that is?

7   A.   It says, "Avadel's Responses to Plaintiff's First

8   Sets of Request for Admission."

9        MR. CERRITO:  Plaintiff moves PTX726 into

10  evidence, Your Honor.

11       MR. SCHULER:  I think -- we don't have any

12  objection to the one or two that they are going to show, I

13  just don't know it is worthy of having the document go back

14  to the jury.

15       (Discussion held between counsel.)

16       THE COURT:  All right.  You don't get to admit

17  the whole document.

18       MR. CERRITO:  No, I'm just using one of the --

19       THE COURT:  Just one of the --

20       MR. CERRITO:  Yes, so maybe we can put the cover

21  page on it, that, and maybe a signature page.

22       THE COURT:  Okay.  So you guys will work it out.

23       MR. CERRITO:  We'll work that out.

24       THE COURT:  Okay.

25       MR. CERRITO:  With that caveat, Your Honor, it's

403

1   admitted.

2        THE COURT:  Yes, the truncated version to be

3   agreed upon by the parties is admitted.

4        (Exhibit admitted.)

5        MR. CERRITO:  Thank you.

6        Mr. Lewis, can you call up PTX726 at 0.31.

7   There we go.

8   BY MR. CERRITO:

9   Q.   Dr. Little, looking specifically at Avadel's response

10  to request 49, what is your understanding of this admission?

11  A.   Well, my understanding is that if you look at the

12  top, Avadel was requested here by Jazz to admit that the

13  "modified-release portion of example 1" -- of U.S. patent

14  number ending in '062, which is what we were just looking

15  at -- "the composition of which is provided in table 1b of

16  said patent" -- which is what we were just looking at --

17  "corresponds to the controlled-release portion of the

18  defendant, Avadel's" -- in this case -- "NDA product."

19       And then if you go down, there's some legal

20  stuff here, but then if you go down to the bottom, a little

21  further -- oh, yeah, there we go -- it says -- the whole

22  thing here at the end, it says Avadel admits this request.

23  Q.   Were you present for any testimony of Avadel's

24  witnesses related to table 1b of the '062 patent?

25  A.   I was.  It was Dr. Vaughn, I believe, that testified

404

1   that these two were the same.

2   Q.   I'm sorry.  Testified?

3   A.   Testified that Avadel's NDA product, the MR portion,

4   is represented in the '062 patent table 1b.

5   Q.   Does Avadel's use of different terms such as

6   "modified" or "controlled release" affect your opinions?

7   A.   It doesn't.  In fact, as we've heard, the term

8   throughout the NDA is used interchangeably.  So what you see

9   is sometimes it says "sustained release," sometimes it says

10  "modified release," sometimes it says "controlled release,"

11  and it's just used interchangeably throughout.

12       MR. CERRITO:  Mr. Lewis, can I have table 1b

13  back up, please.

14  BY MR. CERRITO:

15  Q.   Dr. Little, I understand it's your opinion that

16  table 1b corresponds to Lumryz, but how does it show that

17  Lumryz meets the disputed core limitation?

18  A.   Yeah, so just starting with this table, now I want to

19  talk about this other part up here that we didn't talk about

20  before, and it says -- there's a component here, which is

21  the IR microparticles.  In the '062 patent, there's another

22  table right above this that talks about those IR particles,

23  if we could then go and pull that up.

24       Okay, great.  All right.  So I've got it on the

25  right here, which I guess is fine.  This is going to go this

405

1    way.  But let's start with this guy.
2            So this is the IR microparticles, and what
3    you're doing is you're taking a -- microcrystalline
4    cellulose spheres, and in the NDA they're called Cellets,
5    but that's the brand name of the microcrystalline cellulose
6    spheres.  You're going to then spray on the drug substance
7    in a concentrated solution up at the top, okay.
8            This also is going to have a couple of other
9    things in it, like there are some solvents that go away
10   here, you dry it and those go away.  But overall, this is
11   the whole immediate-release microparticle.  And in the '062
12   patent, this is going to now go right here.  See that?  So
13   they're going to use this, and they're going to put over top
14   of it this functional coating.  So these other things down
15   here, that was in the rest of the claim that you guys saw
16   earlier.  That's the functional coating that goes over top
17   of this.
18           And what does it go over top of?  It's
19   characterizing that what goes over top of all of this is the
20   core, right?  This all is the core.  That includes the
21   microcrystalline cellulose spheres, the povidone here, and
22   the drug.  So all of this is characterized in Avadel's
23   product as the core of the MR microparticles.
24   Q.   Are you aware Dr. Klibanov, someone hired by Avadel,
25   disagrees on your opinion on whether Lumryz contains the

406

1    claimed core?
2    A.   I am aware of it.
3    Q.   What's your understanding of why Dr. Klibanov
4    disagrees?
5    A.   Yeah, so I'll do the best I can to explain what I
6    understand the disagreement to be.  What Dr. Klibanov does
7    is, at least from his reports, as I understand, he
8    recognizes that this stuff, all of this over here, is called
9    the "core" of the MR particles.  What he says is that the
10   specification uses the term inconsistently, so he says
11   although the drug's characterized as being in the core here,
12   when you look in other places, like the figures, for
13   instance, it's not considered to be a part of the core.  And
14   in addition to that, when you go to the NDA, which we talked
15   about before, it's not characterized there as being the core
16   of the MR particles.
17           So that's my understanding of the fundamental
18   basis of the disagreement here.
19   Q.   Okay.  And it's not your disagreement that you're --
20   it's not just your disagreement: it's what you understand a
21   POSA would disagree with?
22   A.   It is what I believe a POSA would disagree with, yes.
23   Q.   Thank you.
24           MR. CERRITO:  Mr. Lewis, can you go to JTX260 at
25   0.74, please.  Can you call up lines 55-67 of column 47,

407

1    please.
2    BY MR. CERRITO:
3    Q.   Dr. Little, what is your -- what's being depicted
4    here?  What's being shown from the patent?
5    A.   Well, first, if we could maybe just go down to 47 to
6    bring this up.
7    Q.   Yeah.  Lines 55 --
8    A.   Column 47 over on the left, this is what refers to
9    the -- yeah, this is where the tables are called out.  So
10   just for orientation, I'm going to show you a figure that
11   Dr. Klibanov relies on, and you actually saw it in the
12   opening statements and things like that with labeling with
13   the core being in the middle, but I want to provide some
14   context here before I show that.
15           So this is where the tables I just showed you
16   are called out.  And what it says is that those tables
17   provide the qualitative and quantitative compositions of the
18   sodium oxybate IR microparticles, which was table 1a, and
19   then modified-release particles, which was table 1b.  And if
20   you remember, that was the qualitative and quantitative
21   composition.  That's a term in the art that we use.  Right?
22           Then when you get down here to the bottom, it
23   refers to figure 1, okay, and it also says that it shows
24   now, it's depicting the qualitative and quantitative
25   composition.  So table 1a goes with figure 1a, and table 1b

408

1    goes with figure 1b.  So you have to show them together to
2    say what the POSA was literally instructed to do when they
3    see the figure.
4    Q.   Okay.  Let's do that, then.
5            MR. CERRITO:  Mr. Lewis, can you call up
6    figure 1 of JTX260, which is on page 260.5, and put that
7    side by side with tables 1a and 1b, please.
8    BY MR. CERRITO:
9    Q.   Dr. Little, how does figure 1 support your opinion?
10   A.   Sure.  So now I'm showing them both together again.
11   There's some color here.  The copies that I have are black
12   and white, but it still looks the same.  You've got 1a,
13   right?  That's figure 1a.  If you flip up to the beginning
14   of the patent, you can see it, it says 1a.  That paragraph
15   that I just showed you says that 1a goes with 1a, right?
16   This -- both depicting the qualitative and quantitative
17   composition.  This is 1b for a reason, because there's a
18   table that says 1b, okay.
19           So up here what's happening is that they say
20   "core," right?  And that's right there.  This is the IR
21   particle.  And this is drug layer that goes around it.  Now,
22   I agree that the core of this, right here, the IR particle,
23   is the microcrystalline cellulose sphere.  That's
24   characterized in Avadel's product as the core of the
25   microcrystalline cellulose sphere.

409

1    Now, on the right-hand side, what they're doing
2    in order to keep the orientation is they're just copying
3    this thing and moving it over, right?  This whole thing now
4    is going to be coated, which is consistent with what's in
5    here.  But when you moved this whole thing over and then you
6    put a coating on this whole thing, now what's your point of
7    reference?  It's the sustained-release or modified-release
8    portion.  And when you look in the claim, that's our point
9    of reference.  So what they refer to the core now of the
10   modified-release particles is the entire IR microparticle,
11   which includes the drug.
12   Q.   Just so we're clear, we have a colorized version, but
13   this is the same that appears -- the same description for 1a
14   and 1b in the pictures as appears in the '062 patent?
15   A.   Yes.
16   Q.   Does anything else support your opinion that the
17   sustained-release portion of Lumryz comprises the claimed
18   core?
19   A.   Yeah, so again, just for reference, I think one of
20   the disputes is that this -- Dr. Klibanov says this refers
21   to things inconsistently.  The issue is that this isn't the
22   only time that Avadel refers to this whole thing here, which
23   is all the drug, is the core, also refers to it in another
24   presentation that was made to the SEC.  But first, I want to
25   set the stage by making sure that the terminology is right

410

1    when you look at the SEC presentation, and we can do that by
2    bringing up the NDA, if you could for a second.
3    Q.   Yes, can you -- Doctor, it's in your binder at
4    JTX236.
5         Is this the NDA portion you were referring to?
6    A.   Yes, this is the pharmaceutical development report.
7         MR. CERRITO:  Your Honor, Plaintiffs move JTX236
8    into evidence.
9         MR. SCHULER:  No objection.
10        THE COURT:  JTX236 is admitted.
11        (Exhibit admitted.)
12        MR. CERRITO:  Mr. Lewis, can you put up
13   JTX236.6, please.
14   BY MR. CERRITO:
15   Q.   How does what's on the screen here affect your
16   opinion, Doctor?
17   A.   It might be easier if you zoom in on the part that
18   says -- yeah, okay.  So this top portion here talks about
19   the equipment that's used.  It's maybe a little less
20   relevant.  I don't know if you need to understand too much
21   here.  I mean, it is showing that what happens is you'd use
22   a fluid spray over top of these -- these pellets.  But I'll
23   start here reading "The Process is Achieved..."  so you can
24   understand how these are made.
25        What you do is you overcoat -- again, sodium

411

1    oxybate is your drug, right, and it's the IR pellet of
2    sodium oxybate, and you're coating that with what Avadel is
3    referring to here as Micropump, okay.  The Micropump,
4    Avadel's proprietary technology, is this stuff.  It's all
5    these polymers that you saw in the tables.  And, you know,
6    you see that in the claim a little bit later on, but it's
7    overcoating this with what they call Micropump.  That's the
8    functional coating.
9    Q.   Thank you, Doctor.
10        We looked at what -- Avadel's explanation of the
11   core to the United States Patent Office, the statement they
12   made under oath.  Are you aware of Avadel describing the
13   core used in its Micropump coating to any other government
14   agencies?
15   A.   Yeah, it's to the U.S. Securities and Exchange
16   Commission, the SEC.
17   Q.   Can you turn in your binder to PTX737, please, and
18   can you tell the jury what that document is.
19   A.   Yeah, this is the presentation.
20        MR. CERRITO:  Your Honor, Plaintiffs move PTX737
21   into evidence.
22        MR. SCHULER:  No objection.
23        THE COURT:  All right.  PTX737 is admitted.
24        (Exhibit admitted.)
25        MR. CERRITO:  Mr. Lewis, can you pull up 737.30,

412

1    please.
2    BY MR. CERRITO:
3    Q.   Dr. Little, can you please explain to the jury how
4    this slide affects your opinions?
5    A.   Yeah, okay.  So this is the presentation that was
6    made to characterize Avadel's product to the SEC.  And I'll
7    just point you to this particle that's right here, okay.
8    And you see two parts of the particle.  There's the blue
9    part here, which is labeled -- I don't know if you guys can
10   see it easily.  It says "polymer coating" there, and then on
11   the right-hand side in this green region that's underneath
12   of the coating -- it's almost like they took -- like,
13   flicked the coating off there so it's underneath of that
14   coating, and what it's labeled here as what's underneath the
15   coating is "drug," okay.
16        Now, the characterization's here, so if you see
17   coating, it points to the blue.  And underneath of
18   "coating," it's what you would expect the coating to say.
19   It's the Micropump technology, and it provides what we call
20   diffusion control and stuff like that.  All that stuff is
21   how it's controlling the release of the drug that's
22   underneath of it, okay.
23        Now, on the left-hand side, you see the arrow
24   that points to "drug" right here.  That says "core," and it
25   says, "core:  Active ingredient," and this is exactly the

413

1   same way that you saw it characterized in a different
2   location which was the '062 patent.  The core that is
3   underneath of this coating includes the drug.
4   Q.   Thank you, Doctor.
5        We'll look at another portion of Avadel's New
6   Drug Application.  Can you turn in your binder to JTX221,
7   please.
8        Did you review that document, sir?
9   A.   Yes, this is the description and composition of the
10  drug product for Avadel's NDA.
11       MR. CERRITO:  Your Honor, Plaintiffs move JTX221
12  into evidence.
13       MR. SCHULER:  No objection.
14       THE COURT:  JTX221 is admitted.
15       (Exhibit admitted.)
16       MR. CERRITO:  Mr. Lewis, can you do a call-up of
17  JTX221.3 and JTX221.4, please.
18       There we go.
19  BY MR. CERRITO:
20  Q.   Dr. Little, do you understand Dr. Klibanov relies on
21  this document to support his opinion?
22  A.   He does.
23  Q.   And do you agree with him?
24  A.   I disagree with how he relies on this.  And here's
25  why:  What he essentially asserts in his reports is that

414

1   because this document doesn't have the entire
2   immediate-release core characterized in the same way as in
3   the '062 patent, and then the SEC presentation, that that
4   shows that the core doesn't contain the drug.  But I'm going
5   to explain the difference here.
6        The difference is, is that in this document,
7   unlike the last ones that we saw, breaks this out
8   differently.  So this is the immediate-release pellet,
9   that's the same as what you saw before.  So you see neutral
10  core here.  Again, the core of the immediate-release pellet
11  is the neutral core, the microcrystalline cellulose sphere.
12       But what you don't see is presented in the same
13  way, all of this as one thing down here.  In fact, for the
14  sodium oxybate controlled-release coated pellets, you see
15  nothing.  It's just silent about what the core of that is.
16  So it's not broken out in the same way.
17       And what Dr. Klibanov does, is he says, Well, I
18  look at this and I don't see the same thing as the '062,
19  that's inconsistent, so I think that the core is this.  But,
20  again, this is the core for the immediate-release pellets.
21  Q.   Any other disagreements in your position and
22  Dr. Klibanov?
23  A.   Yeah, there was another.  So what Dr. Klibanov
24  believes is that putting drug inside of cores where it is
25  distributed everywhere in the core is something that you see

415

1   in things like tablets, or you see in capsules, but it's not
2   the case that you would see something like that in
3   particles.  I just disagree with that.
4        You know, there's documents that I put in my
5   report to show that that's not the case.  We refer to those
6   particles as being cores, whenever there's microcrystalline
7   cellulose sphere that's around the drug, make them not only
8   with microcrystalline cellulose but also with things like
9   sugar, little sugar spheres.
10       We also make particles all the time where the
11  drug is distributed throughout the whole thing.  So it's a
12  unit core rather than a layered core, but we call both of
13  them "cores" and so does the art.
14  Q.   And what is your opinion based on?
15  A.   It's just my experience working in the field and, you
16  know, my education experience and what I believe a person of
17  ordinary skill in the art's education experience would be.
18  Q.   Thank you, Doctor.
19       Based on all the evidence that you reviewed and
20  you just showed the jury, does Lumryz meet the disputed core
21  limitation?
22  A.   It does.
23  Q.   So let's discuss the second one, the second disputed
24  element.
25       What exactly does that disputed element require,

416

1   Doctor?
2   A.   Now, if you could pull that up now.  This is what I
3   called, for short, the deionized water limitation.  It's the
4   second and last one that we have to talk about.  Again, I'm
5   just going to read it because it's the claim.
6        "The sustained-release portion releases greater
7   than about 40 percent of its gamma-hydroxybutyrate by about
8   4 to about 6 hours when tested in a dissolution Apparatus 2
9   in deionized water at a temperature of 37 degrees celsius
10  and a paddle speed of 50 RPM."
11  Q.   In your opinion, Doctor, does Lumryz meet this claim
12  limitation?
13  A.   It does.
14  Q.   What did you rely to support your analysis on this
15  limitation?
16  A.   Those are on my next slide.  There is dissolution
17  data right underneath of the part we were looking at in the
18  '062 patent for those same examples that I rely upon, and
19  then there was Dr. Guillard's testimony and the dissolution
20  work that was in Avadel's lab -- testing lab notebook by
21  Dr. Guillard that matches that data.
22  Q.   Okay.  And we were talking about the claim before,
23  there's a part of the claim that -- a term that says, "by
24  about 4 to about 6 hours."
25       Do you recall that?

417

1    A.    I do.

2    Q.    Do you have an understanding of what that means?

3    A.    Yeah, my understanding is that the parties agreed on

4    what this means in this litigation.

5    Q.    Okay.  Can you turn your binder to PTX669.

6          MR. CERRITO:  Mr. Lewis, can you call up page 2,

7    please.

8    BY MR. CERRITO:

9    Q.    Is this what you're referencing?

10         MR. CERRITO:  Just one part, Mr. Lewis.

11   A.    Yes, it is.  At the very bottom, it says, "agreed

12   upon construction."

13   BY MR. CERRITO:

14   Q.    Can you just read that into the record, please?

15   A.    Sure.

16         It says, "Plain and ordinary meaning," which is,

17   "at any point prior to approximately 4 hours or at any point

18   prior to approximately 6 hours."

19   Q.    Okay.  Also, one other part.  What does it mean for

20   the sustained-release product to release its

21   gamma-hydroxybutyrate?

22   A.    Yeah, so in the claim here, it's what you're

23   comparing the claim to, which, in this case is the Lumryz

24   product.  It's the release of the drug, the sodium oxybate

25   from that.  And then it has to occur according to the

418

1    conditions that I read out to you in the claim.

2    Q.    Okay.  Thank you.

3          And how does this limitation relate to the

4    requirement of the presence of a sustained-release portion?

5    A.    Yeah, the sustained-release portion piece of it has

6    to follow the time points in a dissolution test that is met

7    by the conditions in the rest of the claim.

8    Q.    Do you have a slide that depicts your opinion here,

9    Doctor?

10   A.    Yeah, if you could go to the next slide, I try to

11   describe what this is in a pictorial way.

12         What you're seeing here is the setup that we use

13   for what's called a USP 2 Dissolution Test.  There's sort of

14   the characteristic shape of the vial, this round bottom,

15   there's a characteristic paddle that actually has all these

16   specifications laid out in a monograph that I won't go

17   through with you, USP 711, but this is the entire apparatus.

18         The stirrer is down in here with a certain

19   amount of DI water in this particular case, and then you put

20   your tablet in, it is at 37 degrees and maintained at

21   37 degrees and as this stirs, drug will release from this.

22         So at first you've got red, that's the

23   immediate-release system that's coming out at the beginning,

24   and then the blue here will stay at the bottom, and as this

25   keeps stirring, it will come out.  And then you're going to

419

1    sample this over a period of time to see how much came out.

2    The last piece this paddle maintains a stirring at 50

3    rotations per minute.

4    Q.    In your opinion, Doctor, does Lumryz meet this claim

5    of oxybate release profile in the experimental conditions?

6    A.    It does.

7    Q.    You mentioned that you considered Avadel's patent in

8    connection with this limitation.

9          MR. CERRITO:  Mr. Lewis, can you pull up JTX260

10   at 0.76, please, example 2.

11   BY MR. CERRITO:

12   Q.    Dr. Little, is this the portion of the patent you

13   were referring to?

14   A.    It is.

15   Q.    Can you walk me through how you relied upon this.

16   A.    Yes.  So I will say that this entire portion right

17   here is the same dissolution testing that we just looked at.

18   You can look, if you want, to find the numbers, there's

19   deionized water here, Apparatus 2, which is that paddle,

20   37 degrees, 50 RPM, okay, and you're going to release over a

21   period of time in the apparatus that I just showed you.

22         I will say, just for reference, this is example

23   2, so, again, this is the example where they performed the

24   dissolution test on the product of example 1, which I took

25   you through before.

420

1    Q.    And that's the testing conditions they used in

2    example 2, the ones you just described?

3    A.    It is.

4    Q.    Pretty specific conditions, right?

5    A.    Yes, they're the specific conditions that are laid

6    out in the claim.

7    Q.    Are you aware whether Avadel conducted dissolution

8    testing in these conditions?

9    A.    Yes, they did.

10   Q.    Are the results of that testing in the patent?

11   A.    Yes, they are right underneath of it, table 2d.

12   Q.    Where are the results of the dissolution testing

13   that -- and specifically you said 2d?

14   A.    2d, yeah.  So just to orient, this is the percent

15   drug, sodium oxybate released in deionized water.  That

16   refers to all the stuff that I just had up there above.  And

17   you see the time points that were taken, 0.25, that's

18   0.25 hours, so that's 15 minutes.  One, two, three, and it

19   continues on.

20         At each of these, you are seeing a percent,

21   that's the percent of what was put in there originally,

22   right.  So it's 53 percent and then as you go to it, it

23   ends, you see that it's almost 100 percent of what was put

24   in it in the beginning.

25   Q.    I'd like to walk through this specifically, at time

421

1    6 hours.
2          Can you tell me how much of the
3    gamma-hydroxybutyrate in the sustained-release portion of
4    Lumryz is released at the 6-hour point?
5    A.    Yeah, so this is a little bit of math required for
6    this.
7    Q.    Did you prepare that math?
8    A.    I did, yes.  In essence, I'll show you the slide, but
9    what -- what you need to realize is that what we're talking
10   about is the release from one of the portions, it's 50/50,
11   okay.  So the immediate-release comes out fast.  So if
12   you're looking at 6 hours, that's out, okay.
13         So whatever number you get above 50 percent,
14   that's coming from the other part and that's what we're
15   looking for here, right.  So whatever number I get, I have
16   to subtract 50 percent off at the beginning, because that's
17   coming from the immediate-release portion.
18         Because the scale is from the remainder 50 to
19   100 percent, okay, that's only half of the percent that
20   would be released from the whole thing.  So the number that
21   I get once I subtract 50, I have to multiply that by two and
22   then that's the total percent of what came out of that
23   portion, okay.  And I can give you an example.
24         So here it is at 6 hours, again, at this point
25   the I R is completely released, so let's take this 92, let's

422

1    subtract off the immediate-release portion, okay, that's
2    this red part, let's pull that out, and then the rest of
3    this here, okay, that is what's coming from the
4    sustained-release portion.
5          So I'm going to take that part, I'm going to
6    multiply it by 2 and I get 84 percent from the
7    sustained-release portion that came out.  Again, it was 92
8    here, but that's from the total.  So it's 84 percent from
9    the sustained-release portion.
10   Q.    Thanks, Doctor.
11         Did you review the documents underlying these
12   dissolution tests?
13   A.    I did.
14   Q.    And can you turn your binder to tab PTX60, please,
15   and did you rely on this document?
16   A.    Could you say name of the tab again for me?
17   Q.    I'm sorry PT -- PTX60?
18   A.    Yes, this is the lab notebook.
19   Q.    It's a lab notebook?
20   A.    Yes, it is.
21   Q.    And it's from who, whose lab notebook is it?
22   A.    This is the Flamel lab notebook that we were seeing
23   before that was signed by Dr. Guillard.
24   Q.    Mr. Lewis, can you call out PTX60.6.
25         Okay.  Dr. Guillard, looking at this page of the

423

1    notebook, are these the test runs of Avadel's '062 patent?
2    A.    They are.  I'll just say a couple of things here to
3    orient you, but some of this is going to look familiar so
4    you can see why it's the same.  So you see the sampling
5    points at the time, those are the things you just saw.
6    You're going to have some quantities dissolved, okay.  The
7    percents here are not going to be identical for this guy or
8    this one or this one, and the reason why is there were three
9    runs of this.  You're going to take each of these and you're
10   going to average them together.  And when you do that, you
11   get the same number as what you were looking at in the '062
12   patent for example two.
13         Okay.  And these three were done, and you can
14   see here is 86167401 FDS and that's these three, right, are
15   the same.  So you're averaging these three to get the
16   numbers that are in the '062 patent.
17   Q.    Doctor, what's your opinion whether the
18   sustained-release portion in Lumryz meets the dissolution
19   limitation?
20   A.    As I showed, it does.
21   Q.    Doctor, in your opinion, does Lumryz meet both the
22   claimed -- disputed claim limitations for Claim 7 and Claim
23   11 for the '488 patent?
24   A.    Yes, it does.
25         MR. CERRITO:  Pass the witness.

424

1          THE COURT:  All right.  Cross-examination.
2          MR. SCHULER:  Yes, Your Honor.  Permission to
3    approach the bench and the witness?
4          THE COURT:  You may.
5          MR. SCHULER:  We also ask for permission to put
6    up an easel.
7          THE COURT:  You may.
8          MR. SCHULER:  Would you be able to see this,
9    Doctor?
10         THE WITNESS:  I'm can't, I'm sorry.
11         (Discussion held off the record between
12   counsel.)
13         THE COURT:  So Plaintiff's counsel, you're free
14   to move if you'd like.
15         MR. CERRITO:  I would have to move to the jury.
16   I don't know if that's appropriate, Your Honor.
17         THE COURT:  So let's get a reasonable location,
18   let's see where everybody can agree.  Let's see.  Go ahead.
19         THE WITNESS:  Would you like me to move over
20   here?
21         MR. SCHULER:  I would say right here, Your
22   Honor.
23         (Discussion held off the record.)
24         THE COURT:  Mr. Cerrito, if you would like to
25   move over here.

425

1      MR. CERRITO:  Yes, Your Honor.

2      THE COURT:  You can do that.

3      MR. SCHULER:  Ladies and gentlemen, my name is

4  Ken Schuler and I also represent Avadel.  If you detect a

5  little bit of an accent, it's because I grew up in a small

6  town in Iowa.

7              CROSS-EXAMINATION

8  BY MR. SCHULER:

9  Q.   Good morning, Dr. Little.

10  A.   Good morning.

11  Q.   Do you need more water?

12  A.   I have one more here somewhere.

13  Q.   Okay.

14       Now, as I understand, you did your PhD work at

15  MIT?

16  A.   Yes.

17  Q.   And while you were at MIT, did you become acquainted

18  with Plaintiff's expert on noninfringement, Dr. Alexander

19  Klibanov?

20  A.   Yes.

21  Q.   How did you come to meet Dr. Klibanov at MIT?

22  A.   He was an old collaborator and a good friend of my

23  PhD advisor, Bob Langer.

24  Q.   Was he a professor at the time?

25  A.   He was.

426

1  Q.   So Dr. Klibanov was a professor at the time that you

2  were doing your graduate studies --

3  A.   Yes.

4  Q.   -- at MIT?

5       And what is your opinion of Dr. Klibanov in

6  terms of his abilities as a formulation scientist?

7  A.   I have a high degree of respect for Dr. Klibanov.

8  Q.   And in terms of -- by the way, you understand that

9  Dr. Klibanov disagrees -- I think you recited some of

10  them -- you two disagree in certain respects on issues

11  relating to infringement?

12  A.   Yes.

13  Q.   Okay.  And in terms of years of experience, would you

14  agree that Dr. Klibanov has more years of experience in

15  formulation science than you do?

16  A.   He would have more years' experience, yes.

17  Q.   Now, I'd like to put up your demonstrative 4.8.

18       MR. SILVER:  Your Honor, to the jury, we

19  apologize, we're having a technical issue, we can't connect

20  to the system.

21       THE COURT:  Okay.

22       MR. SCHULER:  Could you put up 4.8?

23       THE COURT:  Okay.

24       MR. SCHULER:  Perfect.

25  BY MR. SCHULER:

427

1  Q.   Dr. Little, if we look at your demonstrative, we can

2  agree that each claim of the '488 patent requires that there

3  be a sustained-release portion, that has a core, that

4  contains an active pharmaceutical ingredient that is

5  selected from the oxybate compounds, correct?

6  A.   I mean, I would say it the way the claim says it.

7  Q.   Well, the sustained-release portion is the one that

8  has the core, correct?

9  A.   The sustained-release portion, yes, comprises of

10  functional coating in a core.  Functional --

11  Q.   Where the core comprises --

12  A.   Yeah, I just -- when I did my analysis, I just stick

13  pretty tightly to the language in the claim.

14  Q.   Yeah.  What you highlighted is, "Wherein, the core

15  comprises at least one pharmaceutically actively ingredient

16  selected from..."  and I just said the oxybate compounds,

17  correct?

18  A.   Yeah, that's fair.

19  Q.   Okay.  And in the case of Lumryz, the active

20  ingredient is, of course, sodium oxybate, right?

21  A.   It is.

22  Q.   And so we can agree that if Lumryz has a core -- it's

23  the modified-release pellets -- if they have a core, that

24  that core does not contain sodium oxybate, then Lumryz

25  doesn't infringe, correct?

428

1  A.   I mean, if you hadn't -- if you didn't have drug

2  underneath of the core, it wouldn't work, so, yeah, it

3  wouldn't infringe.

4  Q.   Let me say it again:  In order to infringe, Lumryz

5  has to have a core, the modified-release pellets have to

6  have a core and that core has to include sodium oxybate in

7  it, correct?

8  A.   The core has to comprise the sodium oxybate that is

9  here, yes.

10  Q.   Okay.  And if the core does not include sodium

11  oxybate, then the Lumryz controlled-release pellets do not

12  infringe, correct?

13  A.   I mean, if the -- if the core that's underneath of

14  this didn't have the drug in it, it wouldn't infringe, it

15  wouldn't release, but it wouldn't infringe.

16  Q.   Okay.  Now, you put up some information from the '062

17  patent, let's look at JTX260.55.

18       Are we back?

19       (Discussion held off the record.)

20       THE COURT:  Are you using that?

21       MR. SCHULER:  Right after this.

22       THE COURT:  Right after this, okay.

23  BY MR. SCHULER:

24  Q.   And if you could bring up lines -- column 10, line

25  12.

429

1  And, sir, do you see that it says figure 1
2  depicts the qualitative and quantitative structure of the
3  immediate release IR and modified release MR microparticles
4  of gamma-hydroxybutyrate of example 1, correct?
5  A.  Yes, it does.
6  Q.  So figure 1 will tell us both qualitatively and
7  quantitatively the structure of those two sets of particles,
8  correct?
9  A.  Yeah, it's just the disagreement here is that this
10  doesn't go with table 1a and 1b, so you can't just look at
11  this and then say that's what is characterizing the drug
12  product.  I mean, table 1a and 1b goes with this, it's what
13  the patent says I -- I showed earlier.
14  Q.  Okay.  So now we have -- we have figure 1 in the
15  patent, we thought this was a little brighter and a little
16  bigger.  And we're going to start on the left, we have the
17  immediate-release microparticles, correct?
18  A.  Yes.
19  Q.  And in figure 1a we have a core showing, do you see
20  that?
21  A.  Yes.
22  Q.  And, in fact, the arrow from the word "core" is drawn
23  from the centermost dark portion of the particle, correct?
24  A.  Yes, that's the core of the immediate-release
25  portion.

430

1  Q.  Right.  And then surrounding it, that is a
2  microcrystalline cellulose sphere, correct?
3  A.  Surrounding it is the drug.
4  Q.  No, no, this centermost core is a microcrystalline
5  cellulose sphere?
6  A.  Centermost core of the immediately-released particle
7  is centermost microcrystalline.
8  Q.  And that contains no sodium oxybate, correct?
9  A.  In Avadel's product?
10  Q.  Yeah.
11  A.  Well, I mean, it's going to contain a little bit of
12  sodium oxybate because you're spraying concentrated solution
13  of drug on a porous material.
14  Q.  No, the core.
15  A.  But a little amount of sodium oxybate.
16  Q.  The core itself --
17  A.  Yeah.
18  Q.  -- is neutral?
19  A.  Yes, it is, but you're spraying concentrated drug on
20  it.  So it's like a ball of yarn, you're spraying
21  concentrated drug on it, right.  So when you do that, at
22  least a little -- I mean, they have a low swelling index, so
23  it's like 2 milliliters per gram or something, right, so
24  two --
25  MR. SCHULER:  Your Honor, I move to stop the

431

1  witness's answers.  This appears to be an undisclosed
2  theory.  His only theory is that this is the core.
3  MR. CERRITO:  You asked him the question, you
4  asked him if it was in the core.
5  MR. SCHULER:  I asked the question that
6  specifically said the core --
7  MR. CERRITO:  No, you asked --
8  MR. SCHULER:  I --
9  THE COURT:  Hold on, let's come to sidebar.
10  (Whereupon, the discussion held at sidebar
11  concluded.)
12  MR. SCHULER:  His theory in his expert reports
13  was simply that the core is the entirety of the IR --
14  MR. CERRITO:  Okay.
15  MR. SCHULER:  He never said, Oh, everyone,
16  there's also going to be some amount of drug on the core.
17  That was never disclosed as a theory.
18  MR. CERRITO:  He asked him -- he just asked him
19  the question, Is the drug in that core?
20  Is he not allowed to ask him that?
21  MR. SCHULER:  I said in the core.
22  MR. CERRITO:  You asked that question.
23  MR. SCHULER:  In the core.
24  MR. CERRITO:  We're not missing each other.  You
25  asked the question whether there was drug in the core.

432

1  MR. SCHULER:  I -- I said inside the core.
2  MR. CERRITO:  That's what he just said.
3  MR. SCHULER:  It can't be inside the core.
4  MR. CERRITO:  Of course it can.  That's his
5  opinion.  Of course it can.  When you --
6  (Simultaneous talking.)
7  These things are not smears, they are --
8  (Simultaneous talking.)
9  When you spray dry it, it goes in those little
10  holes, it gets in there.
11  MR. SCHULER:  If that was your theory.
12  MR. CERRITO:  I'm not saying he did -- you asked
13  the question, you asked him the question was there --
14  THE COURT:  Talk to me, talk to me.
15  MR. SCHULER:  I'm making a Rule 26 disclosure.
16  There's no disclosure in his reports that he has an opinion
17  that the -- there's an agglomeration around the core.  The
18  only opinion was, once it's been fully sprayed, it
19  becomes --
20  (Discussion held off the record.)
21  MR. SCHULER:  It becomes the core for next --
22  (Simultaneous talking.)
23  MR. CERRITO:  No opinion was rendered on direct,
24  I didn't bring that out.  He then asked, "Is there any drug
25  in the core?"  He answered.  Is he supposed to lie?

433

1      THE COURT:  So --

2      MR. SCHULER:  I said inside.

3      MR. CERRITO:  Yes, that's his response.

4      MR. SCHULER:  I said "inside."

5      MR. CERRITO:  That's what he just said.

6      MR. SCHULER:  My objection is unarticulated

7  theory of the infringement, I did not invite it, I asked the

8  question inside the core.

9      MR. CERRITO:  And he answered inside of the

10  core, Your Honor, that's exactly what he said.

11      MR. SCHULER:  I would suggest we tell the jury

12  to ignore the last answer and we'll move on.

13      MR. CERRITO:  I can't understand how he asked

14  the witness a question, he answered that question

15  truthfully, honestly, now it has to be stricken.  Absolutely

16  not, Your Honor.  That was -- he asked the question.

17      MR. SCHULER:  It's an --

18      MR. CERRITO:  Stop, please, one second.

19      THE COURT:  I'm going to give you an

20  opportunity, go ahead and finish.

21      MR. CERRITO:  I did not bring that on direct.  I

22  didn't ask him that question on direct.  I agree it's not an

23  opinion that he put in his report, but he asked the

24  question.  Is he supposed to lie?

25      THE COURT:  Okay.  So it's not in his report,

434

1  okay.

2      MR. SCHULER:  Nor did my question call for

3  anything like it.  I simply said inside, inside the core.

4      MR. CERRITO:  That's what he's saying.  You

5  don't listen to his answer.  That's exactly what he said.

6      THE COURT:  Talk to me.

7      (Discussion held off the record.)

8      MR. SCHULER:  Unless Counsel is going to say he

9  won't rely on that.

10      MR. CERRITO:  You asked the question.  I didn't

11  ask him.

12      THE COURT:  So it's clear that it's not in his

13  report, but you asked the question.

14      MR. CERRITO:  Should have stay away from it.

15      MR. SCHULER:  I --

16      THE COURT:  No, wait.  So it's an undisclosed

17  opinion.  All right.  So how about we just move on and I

18  don't give any instruction?

19      MR. CERRITO:  That's acceptable.

20      MR. SCHULER:  All right.  Your Honor, we're

21  having severe technology issues, so we may ask to break for

22  lunch early since we can't seem to get our testimony.

23      THE COURT:  All right.  So we were going to go

24  until 1:00.  Can you do --

25      MR. SCHULER:  I do --

435

1      THE COURT:  I can do some other stuff --

2      MR. SCHULER:  Yes.

3      THE COURT:  -- to fill up the time.

4      (Discussion held off the record between

5  counsel.)

6      THE COURT:  We'll do that and then --

7      MR. SCHULER:  I appreciate the accommodation.

8      THE COURT:  So we should be able to get to 1:00

9  and then we can address it during the lunch break.

10      (Whereupon, the discussion held at sidebar

11  concluded.)

12  BY MR. SCHULER:

13  Q.    All right.  So the IR microparticles utilize a

14  neutral core of microcrystalline cellulose, correct?

15      (Reporter clarification.)

16  BY MR. SCHULER:

17  Q.    Oh.  So the immediate release cores utilize a neutral

18  core of microcrystalline cellulose, correct?

19  A.    I think -- I think that's right.  It's -- it's -- I'm

20  trying to remember what it's called, but that's

21  approximately the characterization, yes.

22  Q.    And figure 1a shows that the core is coated with a

23  drug coating layer including sodium oxybate, right?

24  A.    Yes.

25  Q.    And the arrow from the word "core" is not drawn to

436

1  the drug layer, correct?

2  A.    It's not drawn to the "drug layer" that says

3  "85 percent drug," no.

4  Q.    And the drug layer has its own -- I'm sorry.  The

5  drug layer has its own arrow and description in figure 1a,

6  correct?

7  A.    Yes.

8  Q.    Now, in figure 1b, there's an arrow from the word

9  "core," and it's drawn to the centermost dark part of the

10  particle, correct?

11  A.    Yes.

12  Q.    And the outer layer is called the "modified-release

13  coating," correct?

14  A.    Yes.

15  Q.    In figure 1b, the drug layer, including the sodium

16  oxybate, is shown as being in between the core of the

17  modified-release coating, correct?

18  A.    On the figure there, you're seeing it between the

19  two, but in the table that goes with 1b, the entire thing,

20  including the drug, is literally characterized for the

21  Lumryz product as a core.

22  Q.    If you could just stay with my question, sir, I would

23  appreciate it.  I have limited time.

24      Now, once again, the drug layer has its own

25  arrow and description in 1b, right?

437

1    A.    It does.

2    Q.    And once again, the arrow from the word "core" is not
3    drawn to the drug layer, correct?

4    A.    It's drawn to the core of the immediate-release
5    particle, which is over here.

6    Q.    Right.  It's drawn to the same location, correct?

7    A.    Yeah, because this whole thing is just moved over.

8    Q.    Okay.  So you've played darts, haven't you?

9    A.    I don't play darts, no.

10   Q.    Never played darts?

11   A.    No.

12   Q.    Have you seen people play darts?

13   A.    I mean, I -- I mean, I know how -- I know generally
14   how the game is played.

15   Q.    Archery?

16   A.    No, sorry.

17   Q.    Okay.  We'll stick with darts.  You know what this
18   is?  This is a bull's-eye, right?  The centermost part, it's
19   a bull's-eye.

20   A.    It's a three-dimensional object, so this whole thing
21   is a pellet, right, and then on the inside of it, you have,
22   you know, the core.  So it's not two-dimensional.  It's a
23   cross-section.

24   Q.    Okay.  But if this were hung up on a wall, the
25   bull's-eye would be the centermost part, correct?

438

1    A.    I wouldn't characterize it that way, no.

2    Q.    All right.  And you'd get lesser points if you hit
3    the drug layer, right, because it's easier to hit the more
4    surface area, right?

5    A.    I mean, look, I -- I just don't think this is how we
6    characterize -- a person of ordinary skill characterize it.

7    Q.    And for the modified release, the bull's-eye would
8    still be the centermost part, right?  We didn't change the
9    scoring simply because we added another ring where you could
10   hit the dartboard, right?

11   A.    Yeah, I don't follow your analogy to the real-world
12   situation.

13   Q.    Well, if we were playing darts, would it be your
14   opinion that the bull's-eye for a board with the structure
15   of 1b would now include all of the drug layer area?

16   A.    Again, I -- I don't think this is like a bull's-eye.
17   That's not what a particle is.  I just don't agree with your
18   characterization.

19   Q.    Okay.  Now, sir, you reviewed the '062 patent in
20   connection with forming your opinions, correct?

21   A.    I did.

22   Q.    And am I right to assume that you reviewed it
23   carefully?

24   A.    Yes, I did.

25   Q.    And do you recall in column 40 that specification

439

1    describes in such embodiments the oxybate-containing layer
2    and the inert core are distinct elements of the
3    modified-release particles?

4    A.    I remember that portion of column 40, yes.

5    Q.    Now, let's bring that up, it's JTX260.

6          THE COURT:  Mr. Schuler, are you done that with
7    that?

8          MR. SCHULER:  I am done with that.

9          (Discussion held off the record.)

10   BY MR. SCHULER:

11   Q.    JTX260.70, column 40, lines 54-58.

12         All right.  And it says, "In one sub-embodiment,
13   the modified-release portion comprises particles comprising:
14   (a) an inert core; (b) a coating; and (c) a layer comprising
15   the gamma-hydroxybutyrate interposed between the core and
16   the coating."

17   A.    Yeah, I mean, you deleted the part whenever you cut
18   it out that says "in one sub-embodiment."

19   Q.    That -- I did not try to do that.  I read that,
20   believe me.

21         And -- okay.  Now we have it.  Right.

22         But in that sub-embodiment, those are three
23   distinct parts of the modified-release particle, correct?

24   A.    There is a general description there of what you
25   described, yes.

440

1    Q.    Now, you reviewed several portions of the Lumryz New
2    Drug Application, as you testified on direct examination,
3    correct?

4    A.    Yes.

5    Q.    And you would agree that it's important to be
6    accurate in submissions to the FDA?

7    A.    I think it's important to be accurate in regard to
8    what matters to the FDA making the decision on how to
9    regulate your drug product, yes.

10   Q.    And do you agree that it's important to be precise in
11   communications with the FDA?

12   A.    In regard to what matters to them on how you regulate
13   your drug product, yes, you do need to be precise.

14   Q.    And Avadel consistently told the FDA that the core of
15   the CR, or controlled-release, particles are inert
16   microcrystalline cellulose spheres, correct?

17   A.    Yeah, I disagree with that characterization.

18   Q.    Okay.  One of the documents that you testified about
19   today is JTX236: do you recall that?

20   A.    Yes.

21   Q.    And I think you put up information on page 6.  And
22   then if we turn to page 0.7, there's a schematic view of the
23   coating manufacturing process.

24         Do you see that?

25   A.    I do.

441

1  Q.    And that's something you talked about on the direct
2  examination, right?
3  A.    This guy right here, it looks like the same figure
4  from figure 1 of the patent we just looked at.  It's -- this
5  is a PDR, yeah, right.
6  Q.    Right.  I'm simply asking the manufacturing process
7  for the controlled-release pellets, that's one of the topics
8  you talked about on direct, right?
9  A.    Yes.
10  Q.    Okay.  And they pulled up the table that's beneath
11  that, and the table is entitled "Sodium Oxybate CR Pellets,"
12  correct?
13  A.    I can't see that.  Sorry.  Could you...
14  Q.    Is it on your screen in front of you?
15  A.    It's not.  I mean, there's the figure.  Is that what
16  you're referring to?
17        THE COURT:  Yes.
18  BY MR. SCHULER:
19  Q.    The box underneath.
20  A.    Yeah, that's what we were just looking at, yes.
21        MR. SCHULER:  Yeah, can we pull that up?
22        THE WITNESS:  That's the figure.
23  BY MR. SCHULER:
24  Q.    Yeah, okay.  And so now can you see that the title of
25  it is "Sodium Oxybate CR Pellets"?

442

1  A.    Yes.
2  Q.    And at the center is a neutral core, correct?
3  A.    It's labeled "neutral core" there, yes.
4  Q.    And there's an arrow going from the word "neutral
5  core" to the centermost part of the particle, correct?
6  A.    Yes.
7  Q.    And then there's also -- the figure also has the
8  words "drug-loaded layer" and an arrow pointing from that
9  wordage to the white part of the particle, correct?
10  A.    Yes.
11  Q.    And then finally, there's a drug layer coating,
12  correct?
13  A.    No.
14  Q.    I'm sorry.  There's a coating --
15  A.    It's not a drug layer, but --
16  Q.    I'm sorry.
17  A.    -- I think I know what you mean, yeah.
18  Q.    Yeah, there's a coating, all right.
19        And the drug layer is in between the drug-loaded
20  layer -- I'm sorry -- the drug-loaded layer is in between
21  the coating and the neutral core, correct?
22  A.    On the schematic, yes, the drug and the neutral core
23  are underneath of the coating.
24  Q.    And the drug layer has its own label and its own
25  arrow in this figure, correct?

443

1  A.    Sure, if you took a cross-section, it's just showing
2  where the pieces are.
3  Q.    Okay.  Now, if you would take a look in your binder
4  at JTX228.
5        Do you recognize this as another section of the
6  Lumryz New Drug Application?
7  A.    It is.
8  Q.    And it's a section with the title "Pharmaceutical
9  Development"?
10  A.    Yes.
11        MR. SCHULER:  Your Honor, I move for the
12  admission of JTX228.
13        MR. CERRITO:  No objection.
14        THE COURT:  JTX228 is admitted.
15        (Exhibit admitted.)
16  BY MR. SCHULER:
17  Q.    Now, if we could publish that, it's got a table of
18  contents so if we could move to JTX228.8.
19        And there's a figure 2, if we can bring that up.
20        Figure 2 has the title "Sodium Oxybate
21  Controlled-Release Coated Pellets Present in the Drug
22  Product."
23        Do you see that, sir?
24  A.    Yes.
25  Q.    And then beneath that is the title

444

1  "Controlled-Release Coated Pellets, correct?
2  A.    Yes.
3  Q.    And then there is a -- the words "neutral core" and
4  there's an arrow drawn to the centermost dark portion of the
5  particle, correct?
6  A.    Yes.
7  Q.    And then a drug-loaded layer is surrounding the
8  neutral core, correct?
9  A.    Yes.
10  Q.    And the drug layer is in between the coating and the
11  neutral core in this figure, correct?
12  A.    It's the same orientation that we just saw before.
13  Q.    And the drug layer has its own arrow and description
14  in this figure: true?
15  A.    Yes.
16  Q.    Now, Doctor, you reviewed various Jazz documents in
17  the course of your work; fair?
18  A.    Some, yes.
19  Q.    And did you review them to see the manner in which
20  Jazz personnel characterizes Lumryz controlled-release
21  pellets?
22  A.    Honestly, I can't recall from what you're referring
23  to.
24  Q.    And if you look in your binder at Exhibit DTX1275.
25  Do you recognize this as a Jazz presentation from July 17,

445

1    2018 concerning Project Zeta?

2    A.    It looks like a cover page presentation, Project

3    Zeta, I can't remember if this was something I would have

4    reviewed or not.

5    Q.    Okay.  And this is about 6 months after the

6    publication of the Avadel --

7          MR. CERRITO:  Objection, Your Honor, he can't

8    lay foundation for this document.  The witness just said he

9    never saw this before.

10         MR. SCHULER:  We have an agreement that as long

11   as the expert is testifying about the subject matter of

12   their opinions, we can move in business records of each

13   others' parties.

14         MR. CERRITO:  That would pertain to the NDA,

15   Your Honor, not random internal documents, it did --

16         MR. SCHULER:  That's not true.

17         MR. CERRITO:  It's an internal Jazz document, at

18   least that I can see.

19         THE COURT:  It's a Jazz document, isn't it?

20         MR. CERRITO:  I'm sorry?

21         THE COURT:  It's a Jazz document, isn't it?

22         MR. CERRITO:  Paragraph 66 says, "Every Jazz

23   document is a business record."

24         But we still have an individual use.  He's not a

25   Jazz employee, he's never seen this document before.  They

446

1    haven't laid a foundation for him to even look at it.  We

2    did not make an agreement with regard to Jazz documents,

3    only the NDA and related documents to that.  Absolutely, we

4    can show it to you.

5          MR. SCHULER:  I do not believe that's true.

6    It's any document by the parties within the scope of what

7    the expert's considering.  And, Your Honor, even if he

8    didn't look at it, that's also why I want to show it to him.

9          MR. CERRITO:  It's not in his expert report

10   either.

11         THE COURT:  Well, it -- if it's -- if he didn't

12   do something just like Jazz just asked Avadel's witness

13   about, did they do something?  And if he didn't do

14   something, that's -- isn't that relevant?

15         MR. CERRITO:  I'm sorry, Your Honor.  I missed

16   the last part of what you said.

17         THE COURT:  If there's a document that he did

18   not review, isn't that relevant, doesn't that go to

19   credibility?

20         MR. CERRITO:  I don't believe so, Your Honor, I

21   don't believe it forms a part of foundation here for him to

22   say, you didn't look at every document in Jazz's files, that

23   wasn't necessary.

24         THE COURT:  You'll get a chance to redirect.

25         MR. SCHULER:  May I proceed?

447

1          THE COURT:  You may proceed.

2    BY MR. SCHULER:

3    Q.    Can we publish JTX -- DTX1275.

4          Now, if we go to DTX page 1275.15, you see, sir,

5    that this is about FT218 once-nightly formulation.

6    A.    Okay.

7    Q.    And you understand that became Lumryz?

8    A.    I don't -- I don't know.

9    Q.    "FT218," you understand that was the code name before

10   they got the trade name, Lumryz?

11   A.    I don't remember that.  I'm sorry.

12   A.    Okay.

13   A.    Off the top of my head.

14   Q.    All right.  And if we turn to the next page,

15   DTX1275.16, at the bottom right, there is a depiction of the

16   controlled-release coated pellets, correct?

17   A.    Okay.

18   Q.    And this is a Jazz document, right?

19   A.    I don't know.  It says, "Data Room REST-ON

20   Investigators brochure," is where this is coming from, so...

21   Q.    In a Jazz presentation?

22   A.    It is -- appears to be in a Jazz presentation, yes.

23   Q.    Okay.  And we have the word neutral core at the upper

24   right with an arrow pointed to the centermost dark part of

25   the particle, correct?

448

1    A.    It looks like it's actually copied from what we were

2    just looking at before in the Avadel document, so...

3    Q.    Okay.  And, again, there is a drug-loaded layer with

4    an arrow, correct?

5    A.    Same format as what we saw before.  Yes.

6    Q.    And the drug-loaded layer has its own depiction and

7    arrow in this figure, correct?

8    A.    It has the same orientation as what we saw before.

9    Q.    All right.  Now let's turn up PTX737.30.  This is the

10   SEC presentation.

11         And, sir, the word Lumryz is not on this page,

12   correct?

13   A.    I don't see the word Lumryz on this page.

14   Q.    And the FT218 doesn't appear on this page, correct?

15   A.    Yeah, I don't see FT218 on this page.

16   Q.    Do you recall how many of Avadel's securities

17   presentations that you reviewed in connection with your work

18   on this case?

19   A.    I don't.

20   Q.    What actions did you take to ensure that you had a

21   fulsome view of what Avadel had been telling its investors?

22   A.    Well, I just remember having a conversation with

23   counsel and --

24   Q.    Don't tell me about conversations with counsel.

25   A.    Okay.

449

1    Q.    I want you to describe actions, okay?

2          What actions did you take to ensure that you had

3    a fulsome view of what Avadel was telling its investors?

4    A.    Well, I mean, it's -- the only way I would have

5    access to those documents, right, is under I think this

6    protective order which I would need to talk about with

7    JAzz's counsel, so I don't know how to answer the question

8    if I can't say that.

9    Q.    In terms of actions, you would have obtained them

10   from counsel for Jazz; is that fair?

11   A.    Well, if they are Avadel documents, right, I would

12   have obtained them through counsel for Jazz, so...

13   Q.    Okay.  Now, let's put up -- or look in your binder,

14   sorry, at DTX1254 in your binder.

15         Do you see that's a presentation by Avadel at

16   the Piper Jaffray Healthcare Conference?

17   A.    A presentation by Avadel, Piper Jaffray Healthcare

18   Conference, yes.

19   Q.    And is the date December 2019?

20   A.    Yes, it appears to be.

21   Q.    Okay.  That's a couple of years after the one that --

22   presentation that you talked about on direct examination?

23   A.    It might be, I don't remember the date off the top of

24   my head, I'm sorry.

25         MR. SCHULER:  Your Honor, I move for admission

450

1    of DTX1254.

2          MR. CERRITO:  No objection, Your Honor.

3          THE COURT:  DTX1254 is admitted.

4          (Exhibit admitted.)

5          MR. SCHULER:  So let's publish that.

6    BY MR. SCHULER:

7    Q.    If you look at the page, dot 03, do you see a safe

8    harbor statement?

9    A.    Okay.

10   Q.    And you understand the purpose of these safe harbor

11   statements, is that this is a company putting material out

12   that could be relied upon by investors or potential future

13   investors?

14   A.    I can't testify to that, I'm sorry.

15   Q.    Okay.  Let's look, then, at DTX1254 and turn to page

16   0.9.  And this slide is entitled, "Leveraging our

17   proprietary Micropump technology-delivering sodium oxybate

18   once-nightly."

19         So you know this is talking about the Lumryz

20   Micropump formulation, right?

21   A.    It didn't say "Lumryz" here and it doesn't say

22   "FT218," which is what you asked me to confirm in the last

23   slide.

24   Q.    Do you know of any other Avadel once-nightly sodium

25   oxybate product other than Lumryz?

451

1    A.    Yeah, it's Micropump, which was in the last

2    presentation that I showed when you asked me if it didn't

3    have those things in it, Micropump.

4    Q.    Micropump is not a product, Doctor.

5    A.    It's the coating here.

6    Q.    Right.  But for sodium oxybate --

7    A.    Sure.

8    Q.    -- you know of any other sodium oxybate product on

9    the market that has sodium oxybate with a Micropump

10   technology?

11   A.    Yeah, I mean, I can only presume that this is the

12   Lumryz product, but it doesn't say it.

13   Q.    Fair enough.

14         And there is a particle in the center, do you

15   see that?

16   A.    It -- there's a cross-section, a three-dimensional

17   cross-section I see.

18   Q.    Right, and at the very center and it's lighter this

19   time, is inner core, correct?

20   A.    Yes.

21   Q.    And then there's a separate set of words, drug layer,

22   and a different arrow going to a different part of the

23   particle, correct?

24   A.    Yes.

25   Q.    And then, finally, we have the controlled-release

452

1    coating on top, correct?

2    A.    Yes.

3    Q.    Now, do you have a recollection of whether this is

4    one of the securities presentations that you reviewed in

5    connection with forming your opinions?

6    A.    It might have been, the diagram here, it's

7    three-dimensional now, but it's sort of the same format as

8    we've seen in the other documents.

9    Q.    Now, sir, were you here for the video testimony of

10   Dr. Thorsteinsson?

11   A.    A part of it.

12   Q.    Okay.  And he talked about one document in the New

13   Drug Application?

14   A.    I don't remember if I was part -- here for that part,

15   I needed to use the restroom once.

16   Q.    Okay.  We'll see if you were or were not.  It's -- it

17   is JTX226.  And if we turn to page 0.4, figure 1,

18   "Controlled-release, CR, coated pellets."

19         Do you see that?

20   A.    Yes.

21   Q.    And, once again, there is an inner core with an arrow

22   drawn to the inert, centermost dark portion, correct?

23   A.    Yes.

24   Q.    Then there's a drug-loaded layer with a separate

25   description and a separate arrow, correct?

453

1  **A.**    Yes, as we've seen before.

2  **Q.**    CR coating, correct?

3  **A.**    Correct.

4         MR. SCHULER:  Pass the witness, Your Honor.

5         THE COURT:  All right.  We're going to break for

6  lunch at this time.

7         MR. CERRITO:  Brief redirect, Your Honor, or

8  we're going to wait until after?

9         THE COURT:  How long do you anticipate your

10  redirect being?

11         MR. CERRITO:  Might take a few minutes.

12         THE COURT:  Okay.  So we're going to take lunch,

13  all right.

14         (Whereupon, the jury left the courtroom.)

15         THE COURT:  Dr. Little, you're still under oath.

16  You are still under oath.

17         We're going to break for 50-minutes.  We'll come

18  back at 1:55.

19         (Recess taken.)

20         MS. THOMPSON:  We have been discussing with

21  Avadel the need to seal the courtroom for Dr. Rainey's

22  testimony, Jazz's damages expert.  And we've agreed that

23  would be appropriate because there are financial projections

24  that are not public and these are publically traded

25  companies, and then what we would propose to do is take a

454

1  copy of the rough transcript, redact the highly sensitive

2  information so that that can be public on the docket if

3  that's acceptable to Your Honor.

4         THE COURT:  That's fine.

5         (Whereupon, the jury entered the room.)

6         THE COURT:  All ready, Mr. Cerrito?

7         MR. CERRITO:  Thank you, Your Honor.  Just a

8  couple of question, Dr. Little.

9  BY MR. CERRITO:

10  **Q.**    Do you remember when Avadel's counsel asked you

11  questions, he kept referring to what he called the drug

12  layer over the neutral core, do you remember that?

13  **A.**    Yes.

14  **Q.**    Are you aware of any name for that structure a POSA

15  would understand?

16  **A.**    It's called a drug-layer core.

17  **Q.**    Thank you, Doctor.

18         Were you here when Dr. Guillard testified that

19  the Legrand Micropump patent described the drug layer core

20  structure, and the core structure where the drug is mixed in

21  with all the excipients.

22         Do you remember that?

23         MR. SCHULER:  I would object.  Beyond the scope.

24  It wasn't part of the direct examination, certainly wasn't

25  part of my cross.

455

1         MR. CERRITO:  Certainly talking about core, Your

2  Honor, exactly when he kept talking about the drug-covered

3  core.  And he just identified what a POSA would understand

4  that to mean and I'm just making the connection now.

5         THE COURT:  I'll allow it.

6  BY MR. CERRITO:

7  **Q.**    Do you remember that testimony, Doctor?

8  **A.**    I do.

9         MR. CERRITO:  Can we go back to PTX737.30, the

10  picture that we were talking about.

11  BY MR. CERRITO:

12  **Q.**    Can you tell the jury how both of those structures,

13  you just described from the testimony, both of those

14  structures are described on this slide?

15  **A.**    Yeah, sure, so one of the structures is the coating,

16  right, it's on the outside, that's described in the claim.

17  And in order for this thing to work, a drug has got to be

18  under it.  That's what a person of ordinary skill in the art

19  would understand, so what's under it is the core.

20         And what you see is pointing right to the drug.

21  You see crystal granulate.  And it says here layered core.

22  That's what it's called, a layered core.

23  **Q.**    Thank you, Doctor.  So all of the things you heard on

24  cross, all the pictures that he showed -- well, it was

25  actually the same picture over and over and over and over

456

1  again, having seen all that, did your opinion change at all

2  regarding whether or not Avadel meets the claim limitation

3  of core?

4  **A.**    No, they are just showing over and over again a

5  layered core.

6  **Q.**    Thank you, Doctor.

7         THE COURT:  All right.

8         Dr. Little, you may step down.  Thank you, sir.

9         MS. THOMPSON:  Ellyde Thompson, members of the

10  jury, on behalf of Jazz.  Jazz would call Shawn Mindus to

11  the stand.

12         THE COURT:  All right.  Please take the stand.

13         SHAWN MINDUS, having been called on the part and

14  behalf of the State as a witness, having first affirmed to

15  tell the truth, testified as follows:

16                DIRECT EXAMINATION

17  BY MS. THOMPSON:

18  **Q.**    Good afternoon, Mr. Mindus, could you please

19  introduce yourself to the jury.

20  **A.**    Shawn Mindus with Jazz Pharmaceuticals.

21  **Q.**    And where do you currently live?

22  **A.**    In Vancouver, British Columbia.

23  **Q.**    And how long have you worked at Jazz?

24  **A.**    Since May of 2004.

25  **Q.**    Why have you stayed at Jazz for so long?

457

1   **A.**   I enjoy the work, I've learned a lot.  I feel like
2   we're doing good things for patients.  And I really enjoy
3   the culture of the company.
4   **Q.**   And what work do you do at Jazz?
5   **A.**   Largely working in finance and strategy.
6   **Q.**   And what do you do within those finance and strategy
7   organizations, what are they responsible for?
8   **A.**   The finance organization that I have been involved in
9   is largely everything forward-looking, so budgets, planning,
10   analysis of what's happening in the future.
11   **Q.**   Okay.  And forward-looking, is that sometimes called
12   forecasting?
13   **A.**   It is.
14   **Q.**   And what is forecasting?
15   **A.**   So forecasting is really projecting out the
16   financials that you expect to happen in the future.
17   **Q.**   And how long have you been working on forecasting at
18   Jazz?
19   **A.**   Largely, in some form or another, since I started at
20   Jazz.  Early days was actually doing forecast, and later
21   days more of the reviewing and advising on the forecast.
22            MS. THOMPSON:  Your Honor, at this point in time
23   I'd like to move into evidence Exhibits JTX151 and JTX151a.
24   I understand there's no objection.
25            MR. SILVER:  No objection, Your Honor.

458

1            THE COURT:  Okay.  JTX151 and JTX151a are
2   admitted.
3            (Exhibits admitted.)
4            MS. THOMPSON:  Thank you, Your Honor.
5   BY MS. THOMPSON:
6   **Q.**   Are you familiar with something called an oxybate
7   contribution sheet?
8   **A.**   Yes, I am.
9   **Q.**   And what is an oxybate contribution sheet at Jazz?
10   **A.**   An oxybate contribution sheet looks at the
11   contribution of the profits of that product line for our
12   business.
13   **Q.**   And why is it called a contribution sheet?
14   **A.**   The contribution would be the component of our
15   profit, so all of the contributions together would add up to
16   the full profit of the company.
17   **Q.**   Okay.
18            MS. THOMPSON:  If we can go ahead and put up
19   JTX151a.  And maybe if we can show the whole thing on the
20   screen.
21            And we can put up 151a, if that's easier, but
22   this is fine, if that -- if that works.
23   BY MS. THOMPSON:
24   **Q.**   What we were just -- what we're seeing -- thank you
25   so much.

459

1            What is this, Mr. Mindus?
2   **A.**   This is our United States oxybate contribution
3   statement.
4   **Q.**   And what period does it cover?
5   **A.**   From 2014 to the first half of 2023.
6   **Q.**   Okay.  And is this a document that Jazz prepares in
7   the normal course of doing business?
8   **A.**   Yes, it is.
9   **Q.**   And how would one use this contribution sheet to
10   determine profitability of Jazz's oxybate business?
11   **A.**   Right.  So if you -- I know the numbers are small,
12   but on the left-hand side, you see the individual rows, and
13   it starts off with revenue at the top, and then it works its
14   way.  And COGS is costs of goods sold, so how much it costs
15   to manufacture the products and sell them.  Commercial OPEX
16   is the commercial expenses.  R&D expenses.  And then you
17   subtract all of those out, you end up with a contribution in
18   row 22.
19   **Q.**   Okay.
20            MS. THOMPSON:  If we could just go up to the top
21   here in line 2.
22   BY MS. THOMPSON:
23   **Q.**   It says "amounts displayed in thousands," what does
24   that mean?
25   **A.**   That means that all of the numbers on here are

460

1   divided by 1,000.  In order to get to the actual number,
2   take the first number, first column, the 777525, that would
3   be 777,525 in U.S. dollars.
4   **Q.**   Okay.
5            MS. THOMPSON:  We can take that down, thank you.
6   BY MS. THOMPSON:
7   **Q.**   Let's go back to forecasting, why does Jazz do
8   forecasts for its products?
9   **A.**   So forecasting for us is important to understand the
10   business going forward, and so really being able to plan and
11   make decisions for the business, knowing how much that we
12   can invest in things like R&D, being able to communicate to
13   the street what we anticipate our profitability is going to
14   be and our cash flows are going to be.
15   **Q.**   And how does Jazz generally put together a forecast
16   for its products?
17   **A.**   So the forecasts are based on a lot of assumptions,
18   some of them fairly straightforward, like the number of
19   patients in the United States, the number of people in the
20   United States.  Some of them are a little harder to get to,
21   which would involve doing direct market research, which
22   means reaching out to physicians, and putting in front of
23   them product profiles and asking them were they to
24   anticipate -- or how they would anticipate using the
25   products in the future.

461

1    Q.     And how often are these forecasts done at Jazz?
2    A.     So forecasting at Jazz is -- it's a continuous
3    process.  However, we -- there's at least four formalized
4    processes -- formalized periods throughout the year.  So
5    every three months or every quarter you do an update, and
6    one of those results in the budget for the following year.
7         MS. THOMPSON:  Your Honor, at this point in time
8    I would offer into evidence Exhibits JTX147 and PTX2011.  I
9    understand there's no objections.
10        MR. SILVER:  Correct, Your Honor, no objection.
11        THE COURT:  All right.  JTX147, PTX2011 are
12   admitted.
13        (Exhibits admitted.)
14        MS. THOMPSON:  Thank you, Your Honor.
15        Could we show, please, JTX147, the financial
16   forecast, Tom?
17   BY MS. THOMPSON:
18   Q.     Mr. Mindus, do you recognize this document?
19   A.     Yes, I do.
20   Q.     And what is it?
21   A.     It is one of the Excel models that we use for
22   forecasting.
23   Q.     And what products are covered by this forecast?
24   A.     So this is -- this covers the oxybate, the narcolepsy
25   oxybate forecast for Jazz.

462

1    Q.     Okay.  And is this forecast prepared by Jazz in it's
2    normal course of business?
3    A.     Yes, it is.
4    Q.     And just looking at the Excel here, are you able to
5    tell when the specific forecast is from?
6    A.     Not based on what's on the screen, I'd have to see
7    the file name and location of where it came from.
8    Q.     Okay.
9         MS. THOMPSON:  So could we please pull up
10   PTX2011.
11   BY MS. THOMPSON:
12   Q.     And this is called the metadata for Exhibit JTX147.
13   Does this help you tell when the forecast document we were
14   just looking at is from?
15   A.     Yes, it does.  This gives me enough information to
16   say when this was done.  The two most important lines for me
17   are the original file path and the file name.  The file path
18   is where it was being held on the computer, Jacob Mills is
19   one of our forecasters in the company.
20        And then where it says forecast 2 LRP May 2023,
21   that means it was the second forecast of the year, which is
22   done in the May, June timeframe.  And the LRP is the
23   long-range plan for May of 2023.
24        The file name itself, narc, is short for
25   narcolepsy, so it's the narcolepsy forecast.  And LRP based,

463

1    so it would be a midpoint forecast.
2    Q.     And just looking at this, I think you may have
3    already said it, but Plaintiff's Excel we were just looking
4    at, from what time period?
5    A.     So it would be in the June timeframe.  I know the
6    master date says June 26th at exactly midnight.  The exactly
7    midnight is probably due to a backup on the system.
8    Q.     And when -- if you know, when did the FDA issue final
9    approve for Lumryz, Avadel's product?
10   A.     I think it was May 1st, but I'm not 100 percent sure.
11   Q.     Okay.  And how quickly after Jazz learned of the
12   FDA's approval would Jazz have updated its forecast?
13   A.     Generally it would be updated within days.  We're
14   aware of main events for the forecast when they happen,
15   we'll update almost immediately.
16   Q.     Okay.  And we talked about -- related to the document
17   that was just up, it said "narc" at the beginning.  Could
18   you just explain again what that refers to?
19   A.     That refers to that this was the narcolepsy forecast.
20   We have multiple indications for the oxybate products.
21   Narcolepsy is one of them, and this forecast only covers the
22   narcolepsy component.
23   Q.     Okay.  So it doesn't cover revenue for other uses of
24   Jazz's oxybate products?
25   A.     It does not.

464

1    Q.     Okay.  I wanted to talk briefly about the base.  I
2    think you touched on that.  Can you just explain a little
3    more what base means?
4    A.     When we're doing our long-range planning, we're
5    really looking at multiple scenarios, so we'll usually have
6    an upside scenario or upside scenarios and downside
7    scenarios, and this represents the base or generally a
8    midpoint forecast.
9    Q.     And what's an example of an upside scenario?
10   A.     So an upside scenario could be where we've
11   anticipated some negative events for the business,
12   competitive launches and things like that, and then we would
13   model what would happen if those did not occur, and our
14   revenues would be higher and that would result in a higher
15   forecast.
16   Q.     Okay.  And so what is the opposite of that?
17   A.     So a downside scenario, probably a good example of
18   that would be COVID.  When that first started to happen,
19   looking at what could happen to the pharmaceutical market,
20   how could people be using products in the future, and
21   building that into a scenario.
22   Q.     Okay.  Now, how far into the future does the forecast
23   go?
24   A.     Generally we're forecasting out 20 years.
25   Q.     Okay.  So let's go back to the document we were

465

1 looking at, JTX147.  And that financial forecast tab, what
2 is that tab?
3 A.     So the financial forecast tab really is a summary of
4 all of the -- all of the assumptions within that workbook,
5 so there's multiple tabs in the workbook.  The forecast tab
6 has all of the information in it.  It's in a summary format,
7 right down to what are the final revenues that we use.
8 Q.     Okay.  So why don't we just go ahead and switch to
9 some slides to make this a little easier than the Excel.
10 Can we go to PDX5.2, please.
11         And then can you explain what it's showing here
12 in row 441?
13 A.     So this is the -- as I said, in the forecast tab,
14 this gets down to what are the actual revenues that we're
15 forecasting.  In this it has the net revenue and then the
16 revenue streams that Jazz has for its oxybate products in
17 narcolepsy, being Xyrem and Xywav and royalties from AG, and
18 AG is an authorized generic.
19 Q.     Okay.  Let's go ahead to PDX5.3, please.
20         Okay.  What is this showing, Mr. Mindus?
21 A.     This is from another tab on the workbook, and that
22 tab is competitor launch events, and what we have in this
23 tab are events that affect the forecast.  The model is a
24 live model, so if you do something on this tab, it will
25 reflect on the forecast tab.

466

1         This is Event No. 8.  All of our events are
2 sequential, so what happens in one event impacts the one
3 after it.  And this event, this specific event is the launch
4 of FT218, FT218 being Avadel's Lumryz product.  The event
5 date is when that event happens on the right-hand side,
6 which is June of 2023.  And then on the left-hand side, it
7 says, "applied event."  There's a drop-down there.  "Yes"
8 means that event is turned on and it affects it.  "No" means
9 that that event doesn't happen and does not affect the
10 forecast.
11 Q.     And you said the event date is June of 2023.  Did
12 Lumryz actually launch in June of 2023?
13 A.     That's my understanding, yes.
14 Q.     Okay.  Going down here to the bottom few rows, it
15 says, "pre-event peak share," "post-event peak share."  What
16 is the meaning of peak?
17 A.     So I can explain those two lines.  So peak is when we
18 anticipate the maximum impact of this event.  So in this
19 case, it goes out three years, and the impact grows up to
20 that three-year point.
21         The pre-event peak there is what happens if this
22 event is turned off.  So if you don't -- if this event
23 doesn't happen, this is what share you would have.  The
24 post-event peak share is if you turn that event to "yes,"
25 then the post-event peak share line is -- is being used and

467

1 the event has happened.
2 Q.     Okay.  And when we talk about "share," you're talking
3 about market share?
4 A.     That is correct.
5 Q.     And I see here -- this is sort of in that first
6 column there, "all other."  What is the market that's being
7 referenced here?
8 A.     So when we forecast we're forecasting the entire
9 narcolepsy market, so all patients that are diagnosed and
10 treated are included, and then we pick -- we include all of
11 the oxybate products, plus some other products that are
12 branded, and then we have an "all other" bucket for the
13 patients that are not on one of the products we're
14 forecasting.
15 Q.     Okay.  And is there a place in this spreadsheet where
16 it shows a comparison between the post-event peak share and
17 the pre-event peak share?
18 A.     Yes, the three numbers you see on the bottom row
19 under Xyrem, Xywav, and AG, or authorized generic, that
20 indicates the percentage drop that we have.  So for Xyrem
21 pre-event, so if Lumryz did not launch, we'd have a
22 3.8 percent share of that market.  Post-event, so if Lumryz
23 does launch, we'd have a 2.7 percent share, and the 28.8 is
24 a 28.8 percent reduction in the share that we capture in
25 that market.

468

1 Q.     And, again, the event that you're referring to here
2 is the launch of Lumryz in June of 2023?
3 A.     That's correct.
4 Q.     Okay.  Over here where it says "apply event" and it
5 has a little toggle "yes" or "no," what does that mean?
6 A.     Okay.  That means that the event was turned on and
7 the impact of Lumryz was captured on the forecast tab.
8 Q.     Okay.  And this is, I think you said, linked back to
9 that financial forecast tab.
10 A.     It is.
11 Q.     All right.  Let's go ahead to the next slide, PDX5.4.
12 And can you tell the jury what Competitor Event No. 7 is?
13 A.     So competitor event 7 and competitor event 8 are
14 always used together in this model.  Event 7 says if a
15 competitive product launches, in this case Lumryz, the
16 market grows a little bit.  Because you've got a little bit
17 more activity in the market, more marketing to physicians,
18 that market will grow a little bit because of that.  And
19 we're growing the oxybate market because it's another
20 oxybate product.  So there's a small growth in the market.
21 You can kind of think of that as the size of the pie is
22 getting a little bit bigger because there's another product
23 there that's marketing.
24 Q.     Okay.  And is that size of the pie -- that increase
25 in the size of the pie already included in the numbers we

469

1    Q.    looked at related to competitor launch event 8?
2    A.    Yes, it is.  As I said, these events are sequential,
3    so step 7 happens and then what happens in 7 impacts 8.
4    Q.    Okay.  And so if I'm understanding you correctly,
5    when events 7/8 are turned on, that shows what would happen
6    if Lumryz launched as in June of 2023.  Is there a way to
7    show Jazz's forecast for revenue if Lumryz did not launch in
8    June of 2023?
9    A.    Yes, in this model, if you turn both events 7/8 to
10   "no," they're not turned on, Lumryz does not launch in this
11   model, and you see a different forecast for our products
12   without Lumryz on the market.
13   Q.    Okay.  So let's go ahead to the next slide, PDX5.5.
14         And it says here with events 7/8 on -- I just
15   want to direct your attention to row 441.  Can you say --
16   can you just tell the jury what this is showing on this
17   slide in row 441?
18   A.    So row 441 is the total revenues that Jazz gets from
19   our oxybate products in narcolepsy and it's by month, so
20   each cell is a month.
21   Q.    Okay.  And the fact that events 7/8 are on for this,
22   what does that mean?
23   A.    That means that Lumryz has launched in this scenario.
24   Q.    So let's just look at an example here.  Maybe let's
25   pick six months from now.  Under this base case, what was

470

1    Jazz's expected revenue for August 2024 with Lumryz on the
2    market?
3    A.    So for August 2024 with Lumryz on the market, we
4    anticipated that our revenues from our oxybate products in
5    narcolepsy to be $138 million.
6    Q.    Okay.  So let's go ahead and look at this with
7    events 7/8 off, where Lumryz has not launched, if we could
8    go to the next slide PDX5.6.
9    A.    So similar setup for this.  Both events are off, it
10   means that Lumryz does not launch.  Our revenues for
11   narcolepsy and oxybate would be $148 million in August of
12   2024.
13   Q.    Okay.  And so probably don't need to be a finance guy
14   to do this math, but for August of 2024, how much less in
15   revenue is Jazz receiving for its oxybate products with
16   Lumryz on the market as opposed to without Lumryz on the
17   market?
18   A.    With Lumryz on the market, it would be about
19   $10 million less.
20   Q.    And that's a monthly impact?
21   A.    That's correct.
22   Q.    Okay.  Now, would you be able to see the difference
23   for each month running through those comparisons in this
24   forecasted document?
25   A.    Yes, you would.

471

1    Q.    Okay.  And we're looking at six months from now,
2    August 2024.  What is the impact on Jazz's oxybate revenue
3    if you go further out in time?
4    A.    So the forecast -- the peak share would happen in
5    roughly three years, so you would expect the impact, and the
6    impact does increase over time.
7    Q.    And this is the forecast from the May/June 2023 time
8    period.  As of that time period, does this reflect what Jazz
9    was forecasting on a monthly basis that the launch of Lumryz
10   would have on the revenue for its oxybate products in the
11   narcolepsy space?
12   A.    Yes, it does.
13   Q.    And does this forecast, this base case forecast,
14   reflect Jazz's best thinking during that timeframe?
15   A.    Based upon the information we had at the time, that
16   would be our best thinking.
17   Q.    And was there anything that we discussed today that
18   was made for the purposes of litigation in that forecast?
19   A.    No.
20   Q.    Thank you, Mr. Mindus.
21         MS. THOMPSON:  I have no further questions.
22         MR. SILVER:  Your Honor, we have no questions
23   for this witness.
24         THE COURT:  All right.  No cross-examination.
25   You may step down.  Thank you, sir.

472

1          MR. PORTER:  Your Honor, Jazz calls Mr. Divis,
2    Mr. Greg Divis.
3          THE COURT:  All right.  Mr. Divis, please take
4    the stand.
5          GREGORY J. DIVIS, having been called on the part
6    and behalf of the Plaintiff as a witness, having first
7    affirmed to tell the truth, testified as follows:
8          DIRECT EXAMINATION
9          MR. PORTER:  May it please the Court.  Your
10   Honor, before we get started, I'd like to introduce JTX0085,
11   JTX0086, and PTX1901.  I don't believe there are any
12   objections to those documents.
13         MS. DURIE:  No objection.
14         THE COURT:  All right.  JTX0085, JTX0086, and
15   PTX1901 are admitted.
16         (Exhibits admitted.)
17         MR. PORTER:  Thank you, Your Honor.
18   BY MR. PORTER:
19   Q.    Good afternoon.
20   A.    Good afternoon.
21   Q.    How are you today?
22   A.    Doing well, thank you.
23   Q.    Please tell the jury your name.
24   A.    My name is Greg Divis.
25   Q.    And where do you work, sir?

473

1    A.    I work at Avadel Pharmaceuticals.

2    Q.    Now, Mr. Divis, during the course of this lawsuit,

3    you were deposed; is that correct?

4    A.    Yes, that's correct.

5    Q.    I believe my partner, Frank Calvosa, deposed you; is

6    that correct?

7    A.    Yes, he did.

8    Q.    And we have a copy of your deposition today just in

9    case we need to refer back to it, it should be in the back

10   of your binder.

11   A.    Thank you.

12   Q.    Okay.  All right.  Now, Mr. Divis, you joined Avadel

13   in 2017: true?

14   A.    Yes, that's true.

15   Q.    And you were hired as the chief commercial officer;

16   yes?

17   A.    Yes.

18   Q.    And you held that role until spring 2018, correct?

19   A.    Yes.

20   Q.    And you were then made the chief operating officer,

21   correct?

22   A.    Yes.

23   Q.    And you held that role until January 2019; yes?

24   A.    Yes.

25   Q.    Then you were named interim CEO, correct?

474

1    A.    Yes.

2    Q.    You held that role until May 2019; yes?

3    A.    Yes.

4    Q.    So an interim CEO is someone who leads a company for

5    a temporary time, correct?

6    A.    Yes.

7    Q.    And then in May, Avadel decided that your role was

8    not going to be temporary and they made you the full-time

9    CEO: true?

10   A.    Yes, that's true.

11   Q.    And that's the role that you currently have today;

12   yes?

13   A.    Yes.

14   Q.    Okay.  And now, although you're the CEO of a

15   pharmaceutical company, you don't have any degrees or formal

16   training in science or medicine, correct?

17   A.    Yes, that's correct.

18   Q.    Okay.  And you're not a medical doctor, right?

19   A.    I am not.

20   Q.    Okay.  And your degree is in communications: true?

21   A.    Yes.

22   Q.    And you came to Avadel from a private equity firm;

23   true?

24   A.    Yes, that's true.

25   Q.    Okay.  And now this trial, as you know, involves an

475

1    Avadel drug called Lumryz, correct?

2    A.    Yes.

3    Q.    And you, yourself, did not formulate Avadel's Lumryz

4    product: true?

5    A.    No, I did not formulate it.

6    Q.    Okay.  And before January 2019, when you became

7    interim CEO, you had zero responsibilities with respect to

8    the formulation of Avadel's Lumryz product, correct?

9    A.    That is correct.

10   Q.    Okay.  And since you became CEO in January of 2019,

11   first on an interim basis and then permanent, there are

12   still others who are more knowledgeable about Avadel's

13   Lumryz formulation than you: true?

14   A.    Yes, that's true.

15   Q.    All right.  Now, Flamel and Avadel are two companies

16   that merged into a single company called Avadel, right?

17   A.    Not technically.

18   Q.    Okay.  Flamel -- Flamel was the original company,

19   right?

20   A.    Yeah, Flamel was a French-based company.

21   Q.    Right, and then Avadel came and acquired that

22   company?

23   A.    No, that's not what happened.

24   Q.    Okay.

25   A.    What happened was Flamel was based in France and as a

476

1    publicly traded company, there are certain governance

2    requirements that you need to match up with NASDAQ.

3    Q.    Okay.

4    A.    And they were beginning to kind of run afoul between

5    NASDAQ and the French Stock Exchange, if you will.  So the

6    company did what was called a cross-border merger, which was

7    really just moving the company's corporate entity, if you

8    will, from France to Ireland.

9    Q.    Okay.  So it was getting in trouble in France so it

10   moved to Ireland?

11   A.    No, it wasn't in trouble in France.

12   Q.    Well, okay, you said it was having some issues with

13   the French regulatory, but regardless, when we say "Flamel,"

14   that's Avadel today, correct?

15         MS. DAVIS:  Objection, that counsel is not

16   permitting him to answer the question.

17         MR. PORTER:  Your Honor, I think I actually let

18   him go on.  I didn't stop him when he went beyond the scope

19   of my original question, I think I'm being very courteous.

20         THE COURT:  Okay.  Let's see.  There was a

21   question posed that -- your last question he didn't get a

22   chance to answer.  He said -- the question was:  "Well, you

23   said it was having some issues with French regulatory, but

24   regardless, when we say --

25         MR. PORTER:  Right.

477

1    THE COURT:  -- "Flamel," that's Avadel.

2    MR. PORTER:  Right, because my question was,

3  they got in trouble with the French government?  He said no,

4  that's not true, and so that's when I moved on.

5    THE COURT:  He didn't get a chance to answer

6  that before you jumped in, so just be sensitive to that.

7    MR. PORTER:  Yes, Your Honor.

8    THE COURT:  Ask the witness a question, give him

9  a chance to answer it.

10    MR. PORTER:  Yes, Your Honor.

11  BY MR. PORTER:

12  Q.    Now, you have no first-hand knowledge of anything

13  that occurred at Avadel or Flamel before you joined the

14  company in 2017, correct?

15  A.    Yeah, that's correct.

16  Q.    Okay.  Now, as CEO of Avadel, your base salary is a

17  little over $600,000 a year, correct?

18  A.    That is correct.

19  Q.    And then on top of that, you are paid something

20  called a "target bonus"; true?

21  A.    That is true.

22  Q.    And a target bonus is an incentive bonus that

23  executives can get if they meet certain performance

24  criteria, right?

25  A.    Yes, that's true.

478

1  Q.    And your target bonus is about $360,000, correct?

2  A.    Yes.

3  Q.    So that's on top of your $600,000 base, correct?

4  A.    Yes.

5  Q.    And you own approximately 149,100 shares of Avadel's

6  shock; true?

7  A.    Yes.

8  Q.    And outside of those shares, one of the perks of your

9  job is that if Avadel's shares increase to a certain price,

10  you have the option to buy even more stock, correct?

11  A.    Yes.

12  Q.    Okay.  So you have an incentive for Avadel's share

13  price to rise; true?

14  A.    Yeah, that's true.

15  Q.    Okay.  And also, currently, part of your compensation

16  is based on the success of Avadel's Lumryz product; true?

17  A.    Yes, that's true.

18  Q.    Okay.  And your compensation going forward, including

19  in terms of stock, is also tied to the success of Avadel's

20  Lumryz product; right?

21  A.    Yes, in a meaningful part, yes.

22  Q.    Okay.  All right.  Let's talk some now about Lumryz.

23    Now, Mr. Divis, Avadel's only commercial product

24  as of today is Lumryz; true?

25  A.    Yes, that's true.

479

1  Q.    But at one point Avadel had seven other commercial

2  products on the market; true?

3  A.    Yeah, that's true as well.

4  Q.    And when you became interim CEO in 2019, there was a

5  decision made to sell off all of those commercial products;

6  true?

7  A.    Yes, that decision was really centered around --

8  Q.    Mr. Divis, that was my question, and you answered it.

9  A.    Okay.

10  Q.    Your counsel can redirect you on that.

11  A.    Okay, thank you.

12  Q.    Okay.  So it's very, very important to Avadel that

13  Lumryz succeed, right?

14  A.    Yes.

15  Q.    Okay.  Now, before the Lumryz product had that name,

16  I think we -- you've been sitting here this entire time in

17  trial, right?

18  A.    I have.

19  Q.    Yeah, okay.

20    And so you know that Avadel originally referred

21  to Lumryz as "FT218," correct?

22  A.    Yes.

23  Q.    Okay.  And to be clear, Jazz did not have any input

24  into Avadel's decision to focus singularly on what was FT218

25  during the time period beginning in January 2019, correct?

480

1  A.    Not directly, no.

2  Q.    Okay.  And that was Avadel's decision, right?

3  A.    It was, yes.

4  Q.    Okay.  And Avadel in 2018 through the early part of

5  2019, had explored the opportunity to actually partner with

6  Jazz on the development and commercialization of FT218,

7  right?

8  A.    Yeah -- yes, we did.

9  Q.    Okay.  And those discussions had a nickname, correct,

10  we've seen it here?

11  A.    Yes.

12  Q.    Project Zeta?

13  A.    Yes.

14  Q.    Okay.  But Jazz wasn't the only company Avadel looked

15  to potentially partner with during that time; true?

16  A.    That's true.  We talked with Jazz for a number of

17  months and then we reached out to other parties.

18  Q.    Well, in fact, Avadel's bankers, Jefferies -- you

19  know who Jefferies is, right?

20  A.    I do.

21  Q.    It's an investment bank, correct?

22  A.    Yes, they are.

23  Q.    Okay.  And it's an investment bank that Avadel

24  retained, right?

25  A.    Yes, we did.

481

1  Q.    Okay.  And Jefferies, on behalf of Avadel, approached

2  43 different companies about partnering on FT218, didn't it?

3  A.    Yes, they did.

4  Q.    Okay.  And Avadel kept contact logs of this process,

5  correct?

6  A.    Jefferies kept them, but they shared them with us,

7  yes.

8  Q.    Well, Avadel kept the logs that were shared by

9  Jefferies, correct?

10 A.    Yes, yes.

11 Q.    Okay, because, again, Jefferies was out there on

12 Avadel's behalf shopping Lumryz; true?

13 A.    Yes, they were.

14 Q.    Okay.  Now, if you could go with me, sir, it is -- it

15 should -- in your binder PTX338.

16       MR. PORTER:  And, Your Honor, I would now move

17 to enter that exhibit into evidence.  I don't believe

18 there's an objection.

19       MS. DAVIS:  No objection.

20       THE COURT:  All right.  PTX338 is admitted.

21       (Exhibit admitted.)

22 BY MR. PORTER:

23 Q.    And you see, sir, this is for -- it says -- it's

24 January 2019, "Project Zeta, update on buyer outreach and

25 interest."

482

1        Do you see that, sir?

2  A.    Yes, I do.

3  Q.    Okay.  And in the bottom left-hand corner, it says,

4  "Jefferies LLC," correct?

5  A.    Yes.

6  Q.    Okay.  So this is one of those logs that we were just

7  talking about, right?

8  A.    Yes.

9  Q.    Okay.  Now, if we could go to the next page, please.

10 I'm sorry 0.3.  338.3.  Great.

11       Just to kind of orient everyone, buyers, when

12 we're talking about buyers, that's talking about the

13 companies that Jefferies approached on behalf of Avadel

14 regarding Lumryz, right, regarding the potential to partner

15 up on Lumryz, correct?

16 A.    Yes.

17 Q.    Okay.  And Project Zeta, although it started as the

18 code name for the engagement with Jazz, again, eventually

19 became the code name for the consideration with these other

20 companies, too, right?

21 A.    I believe so, yes.

22 Q.    Okay.  So you see, sir, the -- where it says, "the

23 process update"?

24 A.    Yes.

25 Q.    Okay.  If we could go up just one, just one more,

483

1  Derreck.

2        MR. PORTER:  Let's go ahead and grab all this,

3  yeah.

4  BY MR. PORTER:

5  Q.    So it says, "Jefferies, in consultation with

6  management, developed a list of potential buyers and drafted

7  non-confidential marketing materials."

8        Correct?

9  A.    Yes.

10 Q.    And then it notes that Jefferies began a targeted

11 outreach buyer -- a targeted buyer outreach process in

12 October 2018 with additional parties contacted in

13 January 2019 aimed at companies with a focus on CNS, sleep,

14 Orphan, or specialty products, correct?

15 A.    Yeah, at that point we thought perhaps --

16 Q.    I just -- did I read that correctly?

17 A.    Oh, yes, you did.

18 Q.    Okay.  Now, it also notes that Jefferies contacted 43

19 potential buyers to date, all of whom were offered

20 introductory calls with Jeffries to provide an overview of

21 the opportunity, correct?

22 A.    Yes.

23 Q.    Okay.  So, again, right now this is, this is the 43

24 buyers that we've talked about, the potential buyers that

25 Jefferies --

484

1  A.    Targeted.

2  Q.    -- targeted, right?

3        So, again, it was not just Jazz: true?

4  A.    No, it was just Jazz until October.

5  Q.    Okay.  And then we see -- could you pull it back out.

6  You could see where it says, "15 parties are still reviewing

7  the opportunity"?

8  A.    Oh, yes.

9  Q.    Okay.

10 A.    Yes.

11 Q.    And then it notes that 24 parties have declined,

12 correct?

13 A.    Yes, they did.

14 Q.    Okay.  So -- so as of January 2019, 24 companies said

15 no, thank you, right?

16 A.    Yeah, 24 passed.

17 Q.    All right.  Now, on the next page, 338.4, it's titled

18 Summary of Buyer Outreach and Interest, and then this is the

19 chart of these different companies, right?

20 A.    Yes, yes, it is.

21 Q.    Okay.  And just to be clear, the market leader here,

22 there's only one we have, and that's Jazz Pharmaceuticals,

23 right?

24 A.    Yes, that's right.

25 Q.    Okay.  And then we have the other folks in different

485

1  categories.  But the market leader in sleep is Jazz
2  Pharmaceuticals, true?
3  A.    Yeah, that's how we thought about it at the time,
4  yes.
5  Q.    That's how you thought about it, all right.
6        Now, coming back to our discussion about
7  Avadel's outreach to Jazz, those discussions never got
8  beyond the term sheet, correct?
9  A.    No, they didn't.
10 Q.    Okay.  And essentially, sir, in business, a term
11 sheet, it's basically a nonbinding agreement that sets forth
12 the basic terms and conditions of an investment, true?
13 A.    You negotiate that back and forth --
14 Q.    Right.
15 A.    -- to see if you can come to agreement on the terms.
16 Q.    Correct.  Okay.  So I'd like to talk for just a
17 moment about the Project Zeta term sheet.
18       So the scope of the contemplated work included
19 completing the development work on FT218, correct?
20 A.    Yes, that's correct.
21 Q.    Okay.  So, again, translated, that means that Jazz
22 and Avadel were discussing working together on Lumryz; true?
23 A.    Yes, that's true.
24 Q.    Okay.  At that time, when these discussions were
25 going on, there was something called a clinical efficacy

486

1  trial that FT218 went through, correct?
2  A.    Yes.
3  Q.    Okay.  And basically a clinical efficacy trial is a
4  trial to see if a drug works, right?
5  A.    If it's safe and effective and meets the standard of
6  the FDA.
7  Q.    Right.  And the first round of clinical efficacy
8  trial for Lumryz was called REST-ON, correct?
9  A.    Yes.
10 Q.    Okay.  And Project Zeta was so early in Lumryz's
11 development that at the time of the term sheet, there'd been
12 no data from Avadel's REST-ON study yet, correct?
13 A.    Yeah, the study had not completed at that point.
14 Q.    Okay.  And, in fact, at the time of the term sheet,
15 Avadel had not even filed any New Drug Application to the
16 FDA or food, drug administration for FT218, correct?
17 A.    Yeah, that's correct as well.
18 Q.    Okay.  And there had been no FDA approval for FT218
19 at that time: is that right?
20 A.    That's right.
21 Q.    Yeah.  And, in fact, at the time of the term sheets,
22 Avadel didn't even have any of the issued patents that it
23 now claims covers Lumryz; true?
24 A.    I do believe that's true as well.
25 Q.    Okay.  Now, you know that there's a FDA publication

487

1  called the Orange Book; true?
2  A.    Yes.
3  Q.    Okay.  And, basically, the Orange Book, it's kind of
4  like -- well, it used to be a book but now it's like an FDA
5  website where it kind of -- and it has -- it used to have an
6  orange cover, right?
7  A.    Yes.
8  Q.    Okay.  And it contains lots of information about
9  drugs, including a list of patents that cover the drugs
10 approved by the FDA: true?
11 A.    Yeah, that's true.
12 Q.    Okay.  But Project Zeta was so early in the
13 development of FT218 that Avadel didn't even have its first
14 Orange Book patent yet, did it?
15 A.    You cannot have that until you have an FDA approval.
16 Q.    Exactly.  Okay.  So let's move now and talk a little
17 bit about Avadel's actual -- putting Lumryz on the market:
18 is that okay, sir?
19 A.    Sure.
20 Q.    Okay.  Now, Avadel did eventually develop FT218 or --
21 you know FT218 is Lumryz, we can call it interchangable,
22 right?
23 A.    Yes.
24 Q.    All right.  And it did ultimately file a New Drug
25 Application or NDA with the FDA, correct?

488

1  A.    Yes, we did.
2  Q.    Okay.  I'm trying to keep all my Ds and As straight.
3  A.    Understood.
4  Q.    All right.  But the type of application that Avadel
5  filed for Lumryz is what's known as a 505(b)(2) New Drug
6  Application: true?
7  A.    Yes, we did, that's the pathway.
8  Q.    Okay.  And that 505(b)(2) NDA that Avadel used is one
9  in which a company says that its drug is similar to a
10 reference-listed drug that the FDA has already approved:
11 true?
12 A.    Yeah, it's a pathway the FDA has created for our
13 industry, yes.
14 Q.    Right.  And so as part of its 505(b)(2) application,
15 Avadel actually relied on certain studies done for Jazz's
16 Xyrem product, true?
17 A.    Yes, we did, we relied on preclinical data and some
18 of the safety data, yes.
19 Q.    Okay.  And because Jazz's Xyrem was the
20 reference-listed drug that Avadel referenced in its New Drug
21 Application, right?
22 A.    Yes, that's correct.
23 Q.    Okay.  And because Avadel relied on those studies
24 done for Jazz's Xyrem product, the clinical study work that
25 Avadel had to do to actually get approval for Lumryz, it was

489

1  less than would have otherwise been required: true?
2  A.    Yeah, I think that's true if you took the b)(1)
3  pathway.
4  Q.    Okay.  Right.  So this was a benefit to Avadel,
5  right?
6  A.    Yeah, it's a pathway the FDA allows companies to
7  take.
8  Q.    Okay.  All right.  So early in the process of making
9  Lumryz, Avadel tried to get Jazz to help, and then it relied
10 on Jazz's clinical work for Xyrem to ultimately bring Lumryz
11 to the market, true?
12 A.    Well, we looked at exploring the partnership with
13 Jazz for sure.
14 Q.    Right.
15 A.    And the decision to file a 505(b)(2) was well in
16 advance of ever discussing it --
17 Q.    Right.  But, again, you still received the benefit of
18 using Jazz's drug Xyrem in your drug application, true?
19 A.    Some of the data in that -- in their NDA, yes.
20 Q.    Okay.  Let's talk a little bit more about Lumryz.  So
21 Avadel's Lumryz product, you know, sir, that it has the same
22 sodium content as Jazz's Xyrem product; true?
23 A.    Yes, that's true.
24 Q.    And, again, you know that Jazz has a -- you've been
25 sitting here, so you know that Jazz has another narcolepsy

490

1  drug called Xywav, right?
2  A.    Yes.
3  Q.    Okay.  And you understand that a difference between
4  Jazz's Xyrem product and Jazz's Xywav product is that Xywav
5  has 92 percent less sodium than Xyrem, true?
6  A.    That's true.
7  Q.    Okay.  And you know, sir, that the FDA determined
8  that Jazz's Xywav product is clinically superior to Xyrem
9  because it has significantly less sodium, right?
10 A.    I'm aware they got orphan exclusivity, yes.
11 Q.    Right.  And -- and, well, just to be clear, I think
12 you threw in some words.  I just want to be clear, you know
13 that the FDA determined that Xywav is clinically superior to
14 Xyrem because it has significantly less sodium: you know
15 that, right?
16 A.    Yeah, under the orphan exclusivity provisions, yes,
17 that was the standard.
18 Q.    Okay.  I know you want to throw in some words.  But
19 do you -- setting aside orphan exclusivity, would you agree
20 with me, just yes or no, that the FDA determined that Xywav
21 was clinically superior to Xyrem because it has
22 significantly less sodium, do you agree with that?
23 A.    It is a yes, I do agree with that --
24 Q.    Okay.
25 A.    -- under the orphan provision, that's -- was the

491

1  granting of it, under the orphan drugs.
2  Q.    Okay.  Now -- so that's a comparison between Xywav
3  and Xyrem, right?
4  A.    Yes.
5  Q.    Okay.  And Xyrem has the same amount of sodium as
6  Lumryz, doesn't it?
7  A.    Yes, it does.
8  Q.    Okay.  And, sir, to be clear for the jury, you're not
9  aware of any head-to-head safety study between Avadel's
10 Lumryz product and Xywav, correct?
11 A.    No, I -- no safety studies, no.
12 Q.    Okay.  And the FDA has never determined that Avadel's
13 Lumryz product has greater safety than either of Jazz's
14 Xyrem or Xywav products, correct?
15 A.    No, the FDA determined clinical superiority on a
16 major contribution to patient care.
17 Q.    Okay.  And my -- okay.  And I just want to be clear.
18 The FDA has never determined that Avadel's Lumryz product
19 has greater safety than either of Jazz's Xyrem or Xywav
20 products: true?
21 A.    Yeah, that's correct.
22 Q.    Okay.  And the FDA also has never determined that
23 Avadel's Lumryz product has greater efficacy than Jazz's
24 Xyrem or Xywav products, true?
25 A.    That's correct as well.

492

1  Q.    Okay.  And so in layman's terms, that means that the
2  FDA has never determined that Xyrem works better -- I'm
3  sorry, has never determined that Lumryz works better than
4  Xyrem and Xywav, correct?
5  A.    Not based on safety or efficacy, correct.
6  Q.    Okay.  Now, if you could turn with me to what's tab
7  number -- I'm sorry, JTX142 in your notebook, sir.
8         MR. PORTER:  And, Your Honor, I'd move to admit
9  JTX142 into evidence.  I don't believe that there's any
10 objection.
11        MS. DAVIS:  No objection.
12        THE COURT:  JTX142 is admitted.
13        (Exhibit admitted.)
14 BY MR. PORTER:
15 Q.    And if we go -- Mr. Divis, if you could go to -- you
16 see the little points there, like .1, .2, if you go to
17 142.34.
18 A.    .34?
19 Q.    Yes, sir.
20 A.    Yes.
21 Q.    Okay.  So we -- we see here, sir, that the FDA issued
22 a finding, as you noted, of clinical superiority for
23 Avadel's Lumryz product because it made a major contribution
24 to patient care over Jazz's Xyrem and Xywav products: is
25 that right?

493

1    A.    Yes, the FDA determined it to be clinically superior

2    to both Xyrem and Xywav on that basis of major contribution

3    to patient care.

4    Q.    Right, major contribution to patient care.

5          And that major contribution is that Lumryz, as a

6    once-nightly treatment, eliminates the need for patients to

7    have a nocturnal or a forced nighttime awakening to take a

8    second dose of oxybate, correct?

9    A.    Yes, that's what they said.

10   Q.    Right.  And -- and Jazz's Xyrem and Xywav are not

11   once-nightly treatments for symptoms of narcolepsy, correct?

12   A.    Correct, they're not.

13   Q.    Okay.  And to be clear, Lumryz is a once-at-bedtime?

14   A.    Yeah, once at bedtime.

15   Q.    Once at bedtime.  Okay.

16         Now, Avadel is able to achieve the

17   once-at-bedtime treatment of the symptoms of narcolepsy

18   through a combination of immediate-release and

19   controlled-release products in the Lumryz product, correct?

20   A.    Yeah, the microparticles, yes.

21   Q.    Okay.  And so in Avadel's view, because that helps

22   you to -- in other words, immediate release is you quickly

23   go to sleep, right?

24   A.    Yes, that's correct.

25   Q.    And then at some point later in the night, it's

494

1    triggered and more of it gets released, correct?

2    A.    Correct.

3    Q.    To help you stay asleep, correct?  To help patients

4    stay asleep, right?

5    A.    I think really deliver the full therapeutic dose --

6    A.    Yeah, yeah.

7    A.    -- in one administration --

8    Q.    Correct.

9    A.    -- which is to --

10         (Reporter clarification.)

11   BY MR. PORTER:

12   Q.    So in Avadel's view, Lumryz does not cause insomnia,

13   right?

14   A.    Yes, Lumryz does not cause insomnia.

15   Q.    Right.  And just to be clear, insomnia basically is

16   another way to say inability to sleep, right?

17   A.    Correct.

18   Q.    Okay.  Because if Lumryz did cause insomnia, that

19   would be the exact opposite of sleeping through the night,

20   right?

21   A.    Yes.

22   Q.    Okay.  But as the CEO of Avadel, you, sir, are

23   familiar with the adverse events for Lumryz; true?

24   A.    Yeah.

25   Q.    Okay.

495

1    A.    Generally, I am, yes.

2    Q.    And adverse events are undesirable side effects,

3    right?

4    A.    Yeah, they can be drug related or not, but, yeah,

5    they are adverse events, yes.

6    Q.    And you're aware that the FDA keeps a publicly

7    available database of reported adverse events for Lumryz,

8    correct?

9    A.    I am.

10   Q.    Okay.  And Lumryz hit the market in June 2023,

11   correct?

12   A.    Yes.

13         MS. DAVIS:  Objection, Your Honor, quick

14   sidebar.

15         (Whereupon, a discussion was held at sidebar as

16   follows:)

17         MS. DAVIS:  The objection is 403, yes, Your

18   Honor.  The discussion whether or not Lumryz is a good

19   product is not relevant to the -- the side effects of the

20   product, the adverse effects have not been raised as an

21   issue in this case.

22         MS. DURIE:  And obviously it doesn't have

23   anything to do with patent infringement.

24         MR. CERRITO:  Of course they are going to come

25   in and tell you how great the product is.  It's exactly why

496

1    you objected to him.  Once he's in, then we never -- the

2    witness right here, same information.

3          MR. PORTER:  It's very limited and I'll be quick

4    about it, Your Honor, and so...

5          THE COURT:  Okay.  Dr. Corser, he is going to

6    testify about Lumryz and the good effects and all that, so

7    it's relevant.

8          MR. CERRITO:  Thank you, Your Honor.

9          (Whereupon, the discussion held at sidebar

10   concluded.)

11   BY MR. PORTER:

12   Q.    Okay.  So, Mr. Divis, we left off that Lumryz hit the

13   market in June 2023, true?

14   A.    Yes.

15   Q.    Okay.  And in 2023, there were roughly 1,000 patients

16   on Lumryz, correct?

17   A.    Could you repeat that date?

18   Q.    In 2023, so once it hit the market.

19   A.    Yeah, really as we -- as we exited, I guess, 2023, we

20   had initiated therapy, I think, on a little greater than

21   1,000 patients.

22   Q.    Okay.  And that -- in 2023, just last year, you know,

23   sir, that there were 293 adverse events reported, correct?

24   A.    I don't know the exact number, but...

25   Q.    Sound about right?

497

1   A.      I don't -- I have no basis to dispute it.

2   Q.      Okay.  And, again, that's out of about 1,000

3   patients?

4   A.      Yeah, an "adverse event" is a fairly broad term in

5   terms of what one could or couldn't be --

6   Q.      Okay.

7   A.      -- but we take the position to err on the side of

8   over reporting.

9   Q.      Okay.  Now, do you know that over 160 of those 293

10  reports of adverse events included insomnia as the adverse

11  event?

12  A.      Again, patients will report what their adverse event

13  was.  The data I referred to was in our packaging, sort of

14  our label, but, yeah, I don't know the details, but I

15  believe you.

16  Q.      Okay.  So, again, that's the -- well...

17          Having -- taking a once-at-bedtime drug, that

18  was the clinical -- that was the purpose for the clinical

19  superiority finding from the FDA that we just saw, right,

20  that the FDA found for Lumryz over Xyrem and Xywav, right?

21  A.      By eliminating the middle-of-the-night dosing --

22  Q.      Yeah.

23  A.      -- you eliminated having to forcibly awaken in the

24  middle of the night in a fairly precise window to take the

25  second dose, yes.

498

1   Q.      Right.  But if you're staying up all night, that's

2   not a good thing, is it?

3   A.      No, it wouldn't be.

4   Q.      Okay.  But Avadel doesn't include insomnia as an

5   adverse event on its Lumryz drug label, correct?

6   A.      That's correct, because our pivotal trial did not

7   show that --

8   Q.      Right.

9   A.      -- we caused insomnia.

10  Q.      Right.  But in the real world, you're seeing

11  insomnia, there are reports of insomnia?

12  A.      Yeah.

13  Q.      Okay.

14  A.      Apparently, yes.

15  Q.      All right.  Now, let's look at what Lumryz -- I'm

16  sorry.  Let's look at what Avadel does say about Lumryz.

17          Now, some drugs, sir, you know, come with a

18  package insert, right, and that's the piece of information

19  in the box that gives you information on the medicine and

20  how to use it, right?

21  A.      Yes.

22  Q.      Okay.  If you could turn with me to JTX87 in your

23  binder.

24          MR. PORTER:  And, Your Honor, I would move to

25  admit JTX87 into evidence.  I don't believe there's an

499

1   objection.

2           MS. DAVIS:  No objection.

3           THE COURT:  JTX87 is admitted.

4           (Exhibit admitted.)

5   BY MR. PORTER:

6   Q.      Now, Mr. Divis, you are familiar with this -- you're

7   familiar with this package insert; is that correct?

8   A.      Yes.

9   Q.      Okay.  This is -- this is the package insert for

10  Lumryz, right?

11  A.      Yeah, FDA approved, yes.  After it was FDA

12  approved --

13  Q.      Right.

14  A.      -- it came with our approval, yes.

15  Q.      Okay.  And to your knowledge, this is the most

16  up-to-date pack- -- insert for Lumryz, correct?

17  A.      To my knowledge, yes.

18  Q.      Right.  And this package insert has instructions --

19  even on this insert, it actually has instructions on how

20  doctors can switch patients from twice-nightly oxybate to

21  Avadel's once-nightly Lumryz oxybate product, correct?

22  A.      Yeah, the FDA approved and included that language,

23  just to be clear, if someone was going to switch, this is

24  how they would recommend you do it.

25  Q.      The FDA added that language or Avadel --

500

1   A.      Well, the FDA approved that language.

2   Q.      But to be clear, the FDA didn't add that language;

3   that's Avadel's language.

4   A.      Yeah, I'm pretty sure we included it initially.

5   Q.      Right.

6   A.      Yes.

7   Q.      Okay.  And if we go to section 2.3 on this insert,

8   and that's on 87.3.

9           Okay.  And right here we see, "Switching

10  Patients from Immediate-Release Sodium Oxybate."

11          You see that?

12  A.      Yes.

13  Q.      Okay.  And, again, these are instructions that you

14  have right there for doctors to use, correct?

15  A.      Yeah, it's in our --

16  Q.      Okay.

17  A.      -- prescribing information.

18  Q.      Now, there are -- you know in your role that there

19  are roughly 16,000 patients on twice-nightly oxybate

20  products, true?

21  A.      Yeah, that's how we estimate it.  Yes.

22  Q.      Okay.  And I'm sorry, Mr. Divis.  Were you done?

23  A.      Yes.

24  Q.      Okay.  And -- because if I ever talk over you, I

25  don't mean to.  I'm just trying to -- I'm -- even though I'm

501

1    A.    from Houston, I talk fast.

2    A.    No worries.

3    Q.    Okay.  Now, switching patients from twice-nightly
4    oxybate product to Avadel's once-nightly oxybate product is,
5    in your words, certainly a goal for Avadel, isn't it?

6    A.    Yes, it's one of our primary goals and strategies,
7    amongst a few.

8    Q.    Right.  Because according to you, sir, it would be in
9    Avadel's financial benefit to switch as many of those
10   roughly 16,000 patients who are currently on twice-nightly
11   oxybate to once-nightly oxybate, correct?

12   A.    It certainly would, but, you know, ultimately that
13   decision is with the patient and physician, yes.

14   Q.    Right.  Right.  But the decision that would be made
15   would benefit Avadel financially, correct?

16   A.    Yes.

17   Q.    And also you personally, correct, because of the
18   bonus and the stocks?

19   A.    Yes.

20   Q.    Okay.  Now, Mr. Divis, one of the patient populations
21   Avadel targets, it's people who have never taken an oxybate,
22   right?

23   A.    Yes, that's correct.

24   Q.    Okay.  And another category would be people who tried
25   twice-nightly oxybates but stopped using them, correct?

502

1    A.    Yeah, that's another pretty large cohort of patients,
2    yes.

3    Q.    Right.  But Avadel really puts a lot of focus on
4    taking current Jazz Xyrem/Xywav patients and switching them
5    over, trying to switch them over to Lumryz, right?

6    A.    Well, I think we focus on all three of those patient
7    groups, and that's really a physician decision as to when
8    they want to think about initiating a patient on Lumryz, but
9    all three are important from our standpoint.

10   Q.    Okay.  Now, Mr. Divis, you're familiar with Avadel's
11   Lumryz commercial day presentation, correct?

12   A.    Yes.

13   Q.    Okay.  And you remember the event when Avadel had a
14   couple of doctors actually come and speak to investors?

15   A.    Yes.

16   Q.    Okay.  And this was an event that Avadel had in
17   connection with its launch of Lumryz, correct?

18   A.    Yeah, it was about three weeks later.

19   Q.    Okay.

20   A.    Yes.

21   Q.    And it was called Investor Day, true?

22   A.    Yes.

23   Q.    Okay.  And it was called Investor Day because this
24   was the day that Avadel was telling investors how much money
25   Avadel thought it was going to make off of Lumryz, correct?

503

1    A.    Not exactly.  If I may, it was really a day where we
2    had -- we hadn't in the past really described all the kind
3    of insights that we had learned over the previous couple of
4    years as we were waiting to get an FDA approval, and so we
5    really wanted to share with investors how we thought about
6    the markets and the patients and the opportunity for Lumryz,
7    but also allow them to hear from two really expert thought
8    leaders in the space and also from a patient who actually
9    had been in our trial and had some real-world experience of
10   Lumryz.

11   Q.    Okay.  Well, let's look at PTX300 and that's in your
12   notebook, sir.

13         MR. PORTER:  Your Honor, I move to admit PTX300
14   into evidence.  I don't believe there's any objection.

15         MS. DAVIS:  No objection.

16         THE COURT:  All right, PTX300 is admitted.

17         (Exhibit admitted.)

18   BY MR. PORTER:

19   Q.    Mr. Divis, you can use your notebook or the screen.

20   A.    Yeah, it's seems to work better on the screen, I'm
21   just trying to stay on that.

22   Q.    Thank you, sir.

23         Just to be clear for the jury, this is the slide
24   deck that Avadel used during its Investor Day on June 29,
25   2023, correct?

504

1    A.    Yeah, it -- yes, definitely appears to be so.

2    Q.    Okay.  And if you would go with me to PTX300.7.  One
3    of the things that Avadel was talking about to investors at
4    this day was "addressing clear and indisputable unmet need,"
5    correct?

6    A.    That's correct.

7    Q.    Okay.  And the "unmet need" is the opportunity for
8    patients to not have to awaken in the middle of the night to
9    take a second dose of oxybate to get their full course of
10   treatment, right?

11   A.    In simple terms, yes, we're really referencing some
12   data and two different sources of data.

13   Q.    Fair enough.  And I'm not trying to fuss with you,
14   I'm just -- that's just -- that's what it is, right?

15   A.    It is, generally correct.

16   Q.    That's what Avadel says, right?

17   A.    Yes.

18   Q.    Okay.  And Avadel believes that its Lumryz product
19   addresses that unmet need, correct?

20   A.    We do.

21   Q.    Okay.  And part of Avadel's commercial strategy is to
22   drive demand for Lumryz with current high-volume oxybate
23   prescribers, true?

24   A.    Yeah, that's true.

25   Q.    Okay.  And so those are the doctors that Avadel was

505

1    Q.    going to prioritize going after, right?

2    A.    Yeah, we prioritized those physicians who are

3    experienced with oxybates.

4    Q.    Okay.  And those current high-volume oxybate

5    prescribers would be prescribers of Jazz's twice-nightly

6    oxybate products or the authorized generic version of

7    twice-nightly oxybate that's also made by Jazz, right?

8    A.    Yes, they would be.

9    Q.    Okay.

10   A.    And they were also the major sources of those who

11   previously discontinued.  Who had discontinued the oxybates,

12   we know that roughly half discontinued after starting within

13   the first year.

14   Q.    Right.

15   A.    And then that's where new patents really start as

16   well.

17   Q.    Okay.  Now if you could go with me to 300.100.  Okay.

18         Now, we see here that Avadel is telling

19   investors that even if generics for first generation

20   twice-nightly sodium oxybate enters in 2026, Lumryz expects

21   continued growth, right?

22   A.    We do think over the long-term, we will continue to

23   grow, yes.

24   Q.    Okay.  And, in fact, some of the sales

25   representatives that Avadel hired to sell its Lumryz product

506

1    even previously worked for Jazz, right?

2    A.    I do believe there are three of them.

3    Q.    Okay.

4    A.    Yes.

5    Q.    And if we could -- if you could go with me to

6    PTX300.108.

7          Okay.  And you see where -- this is basically

8    their kind of "in summary" page.  And it says that -- this

9    is what you're telling investors again, right, the money

10   people, right?

11   A.    Yeah, those --

12   Q.    Yeah.

13   A.    -- our investors.

14   Q.    Right.

15   A.    Potential investors, yes.

16   Q.    Right.

17         So investors would be either people who have

18   given you money or potential investors would be people, you

19   want their money, right?

20   A.    Well, as a publicly traded company --

21   Q.    Yeah.

22   A.    -- we don't necessarily get their money unless, you

23   know --

24   Q.    Yeah, not fussing with you, just asking.

25   A.    I understand.

507

1    Q.    Okay.  Now it states here that, "Lumryz is off to a

2    strong start," right?

3    A.    Yes.

4    Q.    Okay.  And Avadel says that, "Lumryz has the

5    potential to become the leading oxybate in narcolepsy and

6    exceed $1 billion in annual sales," correct?

7    A.    Yeah, that's what our research tells us.

8    Q.    Yeah.

9    A.    And we think that potential is there for us.

10   Q.    Right.  And this is what you're telling the people

11   who either you have their money or you want their money?

12   A.    Investors, yeah.

13   Q.    Yeah, there you go.

14         Now let's go back for a second to when Lumryz

15   was first approved by the FDA, I believe you -- again, you

16   were here yesterday and you recall seeing the document, the

17   May 1st, the May 1st, 2023 --

18         MR. PORTER:  I'm sorry, this is already in

19   evidence, Your Honor, we'll just pull it up, the press

20   release.

21   A.    Yes.

22   BY MR. PORTER:

23   Q.    Okay.  And Avadel sent out a press release that day

24   talking about Lumryz, right?

25   A.    Yes.

508

1    Q.    And Avadel also hosted a conference call that day as

2    well, didn't it?

3    A.    Yes, we did.

4    Q.    And you were on that call, right?

5    A.    I was.

6    Q.    Okay.  I'm going to ask you turn to JTX118 in your

7    binder.  And just -- I'm not going to publish this so I'm

8    going to need you to --

9    A.    I need to find it, did you say JTX118?

10   Q.    Yes, sir, JTX118, I know these are a little hard to

11   follow.

12   A.    I have it.

13   Q.    Oh, you have it?

14   A.    I have it here, yes.

15   Q.    Okay.  Excellent.

16         Okay.  Could you go with me to JTX118.3.

17   A.    Yes, I'm here.

18   Q.    Okay.  And do you see about -- if you start at the

19   bottom, you see the, "Thank you, again, for joining us"?

20   A.    Yes.  Yes, I see that.

21   Q.    Okay.  If you go up a couple -- or, actually three,

22   you see the paragraph that starts with, "Until today..."?

23   A.    Yes, I see that.

24   Q.    Okay.  In that paragraph, you note that, "We believe

25   that Lumryz can positively impact the treatment experience

509

1  for all eligible treated patients, increasing oxybate
2  utilization overall and importantly so, helping even more
3  patients in the $3 billion plus once-at-bedtime oxybate
4  market."
5          Did I read that correctly, sir?
6  A.    Yes.
7  Q.    That's what you said, right?
8  A.    That's what I said, yes.
9  Q.    Okay.  And now you know, you know who Mr. Richard Kim
10  is, as well, correct?
11  A.    I do.
12  Q.    He is Avadel's chief operating officer?
13  A.    He's our chief commercial officer.
14  Q.    Chief commercial officer, okay.
15          And Mr. Kim spoke at this as well, didn't he?
16  A.    Yes, he did.
17  Q.    Okay.  And we're going to go to -- if you go with me
18  to 118.6.
19  A.    Okay.
20  Q.    If you see the fourth paragraph down starting
21  with, "Before I move on..."
22  A.    Yes.
23  Q.    Okay.  And do you see where Mr. Kim in that last
24  sentence he says, "We are pricing Lumryz on a per-gram basis
25  at parity with a branded twice-nightly mixed salt product to

510

1  be at $64.67 per gram"?
2  A.    Yes.
3  Q.    Okay.  And "by parity," he meant the same price per
4  gram, right?
5  A.    Yes.
6  Q.    Okay.  And so -- and the twice-nightly mixed salt
7  product he was referring to is owned by Jazz, right?
8  A.    Yes, it's Xywav.
9  Q.    Xywav, that's what he's talking about?
10  A.    Yes.
11  Q.    Okay.  So he's pricing Lumryz, which you take
12  once-nightly, the same as Xywav, which is the lower sodium
13  product -- Lumryz, you take once at bedtime; Xywav, which
14  you take twice, correct?
15  A.    Yes, that's correct.
16  Q.    Okay.  And Avadel also posted investor slides for the
17  May 1, 2023 call, correct?
18  A.    Yes.
19  Q.    Okay.
20  A.    We did.
21  Q.    If you'll go with me to PTX295.
22          MR. PORTER:  Your Honor, that may be in
23  evidence, but I move to admit now if not, and I don't think
24  there's an objection to that.
25          MS. DAVIS:  No objection.

511

1          THE COURT:  All right.  PTX295 is admitted to
2  the extent it hasn't been previously admitted.
3          (Exhibit admitted.)
4  BY MR. PORTER:
5  Q.    Whenever you're ready, Mr. Divis.
6  A.    I can see it on the screen as well, thank you.
7  Q.    So, Mr. Divis, these are the slides, right, that we
8  were just talking about?
9  A.    From?
10  Q.    From the May 1st -- the investor slides from the
11  May 1, 2023 call?
12  A.    We didn't have slides for the May 1st Investor Day,
13  we just had speaking points, if you will.  This would have
14  been -- I can help you -- tell you what this is if that's
15  beneficial.
16  Q.    Well, I just want to make sure that I have -- that I
17  have this right, because if I don't, that's okay, but, let
18  me see... okay.
19          Mr. Divis, you recall at your deposition when
20  you were asked about this slide and the question was:  "What
21  is a corporate deck or company deck?"
22          And your answer was, "It would be known that
23  deck that summarizes for our investors our company at that
24  point time, when this was pro, when this was, you know, as
25  of May 2023."

512

1          Does that -- do you recall that?
2  A.    Yeah, this is a deck that's -- if you will, is an
3  enduring document that gets updated occasionally and sits on
4  our website --
5  Q.    Okay.
6  A.    -- permanently.
7  Q.    Okay.
8  A.    Okay.
9  Q.    But this deck was updated at or around the time of
10  the May 1st call, right?
11  A.    It got updated after the approval because now it
12  references the approval, yes.
13  Q.    Okay.
14  A.    It was not used on the call.
15  Q.    Right, it wasn't used on the call but it came after
16  the call?
17  A.    That's correct.
18  Q.    Gotcha.
19          Now if we could go to slide 15, which is 295.15.
20  A.    .15?
21  Q.    Yes, sir, .15 or .15.
22          And in this slide, Avadel set forth what it
23  believed was Lumryz's market opportunity, correct?
24  A.    Yeah, at that time, that was how we kind of segmented
25  it, by patients, right.

513

1  Q.   Right.  And the blue box here on the left refers to a
2  greater than $3 billion opportunity, market opportunity for
3  Lumryz, right?
4  A.   Yeah, this is taking the number of patients, right --
5  Q.   Fair enough.
6  A.   -- and multiplying it by current pricing.
7  Q.   Fair enough but --
8  A.   That's correct.
9  Q.   This is -- this is all we have, right?
10 A.   Yeah, that's correct.
11 Q.   Okay.  So based upon this, what you were putting out
12 there for investors, was this is a greater than $3 billion
13 opportunity, correct?
14 A.   Yeah, I would think about that as the whole pie.
15 Q.   Okay.
16 A.   The whole pie, right, in terms of, you know --
17 Q.   Well you want that pie, don't you?
18 A.   Well, sure --
19 Q.   Yeah.
20 A.   -- but, I mean, recognizing --
21 Q.   We all like pie.
22 A.   Yeah, so...
23 Q.   Okay.  Now, $3 billion, sir, that represents a lot of
24 money for Lumryz, that market opportunity, that represents a
25 lot, a lot of pie, doesn't it?

514

1  A.   For both us and Jazz, yes.
2  Q.   Well, but this isn't Jazz, this is yours, just to be
3  clear?
4  A.   No, I get -- that's for sure.
5  Q.   Okay.
6  A.   There's certain patients in that group that aren't
7  really likely -- some are Jazz patients, right, so...
8  Q.   Right.  Yeah.
9        Now, in addition to being CEO of Avadel and an
10 investor in Avadel yourself, you're also on Avadel's board
11 of directors, correct?
12 A.   Yes, I am.
13 Q.   And you attend board of directors meetings, correct?
14 A.   I do.
15 Q.   And those meetings sometimes have slideshow
16 presentations, correct?
17 A.   Yes, they do.
18 Q.   Okay.  And slides for a board of directors meeting,
19 they are provided ahead of time: true?
20 A.   Yes, they are.
21 Q.   Okay.  And if you could go with me to JTX119.  And I
22 don't believe that there's any --
23      MR. PORTER:  I'd like to move for entry of
24 JTX119 into evidence, I don't believe there's any objection.
25      MS. DAVIS:  No objection.

515

1        THE COURT:  JTX119 is admitted.
2        (Exhibit admitted.)
3  BY MR. PORTER:
4  Q.   Okay.  And Mr. Divis, you recognize this document?
5  A.   I do, yes.
6  Q.   Okay.  Avadel board of directors meeting, May 3rd,
7  2023?
8  A.   Yes.
9  Q.   Okay.  Now if you would go with me to JTX119.133.
10       It's on your screen, too.
11 A.   No, I got it, yeah.
12 Q.   Okay.  And so you see here, sir, that the -- as part
13 of the launch plan, the launch -- the Lumryz launch plan
14 overview, at this time Avadel had a reason to believe that
15 the overall body of evidence from market research and data
16 analytics and more supports that Lumryz will become a market
17 leader in a growing narcolepsy oxybate market, correct?
18 A.   Yes.
19 Q.   Okay.  That's what was told to the Board?
20 A.   Yes, it was.
21 Q.   Okay.  And if we could go to 119.137.  And the Board
22 was also provided with the results of market research
23 studies, right?
24 A.   Yes, they were.
25 Q.   Okay.  And the market research studies were conducted

516

1  from 2020 through 2023, I believe.
2  A.   Yes, that's correct.
3  Q.   Okay.  And they show that in May 2023, Avadel
4  expected Lumryz to capture 50 to 61 percent of oxybate
5  sales, correct?
6  A.   Well, the research at all these points in times were
7  done to present the product profile to physicians and then
8  ask them what their intentions were.  So, yes, that's
9  what -- that's a share of the market based upon
10 physician-stated intent to use Lumryz.
11 Q.   I think you kind of answered, but you had some
12 qualifications.
13 A.   Oh, I'm sorry.
14 Q.   No, no, it's fine.
15       So I just want to ask it again.
16 A.   Okay.
17 Q.   What we're looking at right here, as of -- what was
18 being presented in May of 2023, is that Avadel expected
19 Lumryz to capture 50 to 61 percent of oxybate sales: true?
20 A.   Well, of the -- of oxybate-treated patients based
21 upon physician feedback, yes, but...
22 Q.   Yeah.
23 A.   Yeah.
24 Q.   Of the people who would purchase the medicine, you
25 wanted 50 to 60 -- you expected to get 50 to 61 percent of

517

1 them?

2 **A.**     May I answer just -- answer just slightly different,
3 which is of -- of the patients that physicians were going to
4 put on a oxybate product in the future, the estimation
5 across those four or five different research projects was
6 they would expect Lumryz to get somewhere between 50 and
7 60 percent, and that the use of oxybates would grow
8 according to the bottom.

9 **Q.**     Now, Lumryz is currently FDA approved to treat -- I'm
10 sorry.  Again, Lumryz is currently approved for
11 once-nightly, correct -- once at bedtime?

12 **A.**     Yeah.  Interchangable, but once at bedtime, yes, sir.

13 **Q.**     Okay.  And it's currently FDA approved for the
14 treatment of cataplexy or excessive daytime sleepiness in
15 adults with narcolepsy, right?

16 **A.**     Yes, that's correct.

17 **Q.**     All right.  But currently, Lumryz does not have an
18 indication for treatment of narcolepsy in pediatric
19 patients, true?

20 **A.**     No, it doesn't, not yet.

21 **Q.**     Okay.  But Avadel is seeking a pediatric indication
22 now, isn't it?

23 **A.**     Yeah, we have filed our application with the FDA.

24 **Q.**     Okay.  And if you go with me to 119.63.

25        Whenever you're ready.

518

1 **A.**     Yes.

2 **Q.**     Okay.  And you see this is -- this slide is titled
3 Lumryz Pediatrics?

4 **A.**     Yes.

5 **Q.**     Okay.  You notice that twice-nightly oxybate are both
6 approved for under 7 -- or 7 years or older, weight-based?

7 **A.**     Yes.

8 **Q.**     Okay.  And that would be Xyrem and Xywav, correct?

9 **A.**     Correct.

10 **Q.**     Okay.  Because Lumryz is not, again, approved for
11 pediatrics, right?

12 **A.**     No, it's not.

13 **Q.**     Okay.  And -- but it -- I think, as you may have --
14 you may have alluded to this, Lumryz is -- I'm sorry, Avadel
15 is seeking approval for the pediatric market: is that right?

16 **A.**     Yeah, that is correct.

17 **Q.**     Okay.  Okay.

18        But as reported to the board of directors --
19 well, let's look here.  It says, "Response on proposed
20 pediatric study request, clinical studies of Lumryz, FT218,
21 in pediatric patients with narcolepsy may not be needed,"
22 right?

23 **A.**     Correct.

24 **Q.**     "Because Xyrem studies confirm safety/efficacy in
25 pediatrics," right?

519

1 **A.**     Yes.

2 **Q.**     Okay.  And Lumryz's efficacy and safety confirmed
3 efficacy in adults and PK study establish a bridge between
4 Lumryz and Xyrem, right?

5 **A.**     Yes.

6 **Q.**     So in other words, you're telling the Board
7 that it's possible that Lumryz might not have to do clinical
8 studies in pediatric patients because of the studies that
9 Jazz had already conducted on its Xyrem product, right?

10 **A.**     Yes, that's correct.

11 **Q.**     So just as Avadel uses -- used Jazz's studies
12 to get Lumryz approved for adults, it's also contemplating
13 using Jazz's studies to get Lumryz approved for pediatrics,
14 right?

15 **A.**     Yeah, we are.

16 **Q.**     Yeah, okay.

17        Now, Avadel is also pursuing an indication to
18 treat idiopathic hypersomnia for Lumryz, correct?

19 **A.**     Yeah, we are.

20 **Q.**     Okay.  And there are approximately 45,000 patients
21 who have been diagnosed with idiopathic hypersomnia, right?

22 **A.**     I think the numbers move around a little bit, but,
23 you know, that's a general diagnosis number, from what I can
24 recall, yes.

25 **Q.**     Okay.  And -- and Avadel's board was told that having

520

1 an idiopathic hypersomnia indication for Lumryz would expand
2 the patient population that could be prescribed Lumryz,
3 correct?

4 **A.**     Yeah, that's correct.

5 **Q.**     Okay.  And you know, sir, that, as we sit here today
6 in this courtroom, there's only one drug currently approved
7 to treat idiopathic hypersomnia, correct?

8 **A.**     Yeah, that's Xywav.

9 **Q.**     Jazz's Xywav, true?

10 **A.**     Yes, that's correct.

11 **Q.**     Okay.  Now...

12        We're almost done.

13 **A.**     Okay.

14 **Q.**     All right.  Now, so we have been discussing the sales
15 Avadel hoped to make, and we're going to discuss the sales
16 that Avadel, in fact, made, but first I'd like to give the
17 jury some foundational information about how Avadel tracks
18 its sales: is that okay?

19 **A.**     Sure.

20 **Q.**     Okay.  Now, do you have, in your binder, PTX486?

21        And it's a native, so we're going to have to put
22 it up on the screen.

23 **A.**     Hold on.  Okay.  It's not in here.

24 **Q.**     Yeah.  Okay, we're going to put it up.

25        MR. PORTER:  Well, Your Honor, I'd like to move

521

1   PTX486 into evidence.  I don't believe that there's any
2   objection.
3           MS. DAVIS:  No objection, Your Honor.
4           THE COURT:  PTX486 is admitted.
5           (Exhibit admitted.)
6           MR. PORTER:  And I'd also like to move for
7   admission of JTX259.  And I don't believe there's any
8   objection.
9           (Reporter asks for clarification.)
10          MR. PORTER:  259, please.
11          MS. DAVIS:  No objection.
12          THE COURT:  Okay.  JTX259 is admitted.
13          (Exhibit admitted.)
14  BY MR. PORTER:
15  Q.      So if we could look at PTX486, I know that may be a
16  little bit difficult to see, but do you recognize this as a
17  weekly sales report, sir?
18  A.      Yes, I do.
19  Q.      Okay.  Now, just to be clear, Avadel doesn't sell
20  Lumryz directly to corner pharmacies like Walgreens, right?
21  A.      No, we don't.
22  Q.      Okay.  It instead sells it to a handful of specialty
23  pharmacies, correct?
24  A.      Yes, that's correct --
25  Q.      Okay.

522

1   A.      -- three of them.
2   Q.      I'm sorry?
3   A.      Three of them, yes.
4   Q.      Okay.  And to keep track of those sales, Avadel puts
5   together sales reports for Lumryz on a weekly basis, right?
6   A.      Yes, we do.
7   Q.      Okay.  And, again, those are called the weekly sales
8   report?
9   A.      Yes.
10  Q.      Okay.  And the weekly sales report tracks the gross
11  sales of Lumryz to the specialty pharmacies, right?
12  A.      Yes.
13  Q.      Okay.
14          MR. PORTER:  So if we could go to JTX259,
15  please, Derreck.
16  BY MR. PORTER:
17  Q.      So -- okay.  So, for example, this is a -- this is a
18  sales report from January of 2024, correct?
19  A.      Yeah, it looks like.
20  Q.      Okay.  And this report includes the most accurate
21  data that the company had at the time it was compiled,
22  correct?
23  A.      Yeah, I'm sure it is.
24  Q.      Okay.  Now, before we were discussing the board of
25  directors meeting from right after Lumryz received approval

523

1   from the FDA on May 1st, do you recall?
2   A.      Yes.
3   Q.      Okay.  And Avadel had another board of directors
4   meeting in August 2023, correct?
5   A.      Yes.
6   Q.      Okay.  And if you could go with me to JTX122 in your
7   notebook.
8           MR. PORTER:  And, Your Honor, I move for
9   admission of JTX122 into evidence.  I don't believe there's
10  an objection.
11          MS. DAVIS:  No objection.
12          THE COURT:  Okay.  JTX122 is admitted.
13          (Exhibit admitted.)
14          MR. PORTER:  Thank you.
15          If we could publish that.
16  BY MR. PORTER:
17  Q.      Okay.  You see this is Avadel board of directors
18  meeting, August 1st through 2nd, 2023, sir?
19  A.      Yes.
20  Q.      Okay.  So this is a copy of the slides from the
21  meeting we were just talking about, the August meeting?
22  A.      Yes.
23  Q.      Okay.  And this sets forth some data as of July 2023,
24  correct?
25  A.      Yes.

524

1   Q.      Okay.
2           MR. PORTER:  And if we could go to slide 43,
3   which is 122.43.
4   BY MR. PORTER:
5   Q.      Okay.  And, again, that's all data as of July 23rd,
6   except reach/frequency July 24th, right?
7   A.      Yes.
8   Q.      Okay.  Now, do you see a Lumryz source of business
9   row here?
10  A.      Yes, I do.
11  Q.      Okay.  And that tracks whether the patient switched
12  from twice-nightly oxybate, whether there was a
13  discontinuation patient, or whether the patient had never
14  taken oxybate before, correct?
15  A.      Yeah, that is correct.
16  Q.      Okay.  And at this point, I think that it -- right
17  here, sorry for -- it says that there's a 74 percent switch,
18  so 74 percent of Lumryz's patient enrollment were patients
19  that switched from other oxybate products, correct?
20  A.      That is correct.
21  Q.      Okay.  Now, as we've seen, Avadel was seeking to take
22  those patients from Jazz and switch them on to Lumryz,
23  correct?
24  A.      Well, it was a primary goal to target physicians to
25  educate them about possibly switching, but that's often a

525

1   physician and patient decision.

2   **Q.**   Right, but as we've established a little -- a long,

3   long time ago when we first started, you want to get as many

4   of the -- the patients who often take Jazz's products to use

5   Lumryz's product, that's just -- yeah.

6   **A.**   Yeah.

7   **Q.**   Okay.

8   **A.**   For eligible patients that a doctor --

9   **Q.**   Sure.

10  **A.**   -- decides is -- warrants the switch --

11  **Q.**   Right.

12  **A.**   -- yeah.

13  **Q.**   Yeah.  You don't want to give it to anybody who

14  doesn't need it.

15  **A.**   That is correct.

16  **Q.**   Right.  Now, moving forward in time, Avadel updated

17  its investor slides in early January 2024, correct?

18  **A.**   Yes.

19  **Q.**   Okay.  And if we could go to PTX1899, please.

20          MR. PORTER:  And, Your Honor, I'd like to move

21  to admit PTX1899 into evidence.

22          MS. DAVIS:  No objection.

23          THE COURT:  PTX1899 is admitted.

24          (Exhibit admitted.)

25  BY MR. PORTER:

526

1   **Q.**   And whenever you're ready, sir.

2   **A.**   Sure.

3   **Q.**   Okay.  Ready?

4   **A.**   Yes.

5   **Q.**   And this is the January -- this is January 2024,

6   correct?

7   **A.**   Yes.

8   **Q.**   Okay.  So just last month?

9   **A.**   Just last month, yes.

10  **Q.**   Okay.  And this document is a -- Avadel's

11  January 2024 investor slides, correct?

12  **A.**   Yes.

13  **Q.**   Okay.  And Avadel is, at this time -- well, let's

14  just go -- if you could go with me to 1899.7, yeah.

15          So Avadel is still reporting a greater than

16  $1 billion opportunity for Lumryz in the U.S., right?

17  **A.**   Yeah, same slides from the commercial day earlier --

18  **Q.**   Right.

19  **A.**   -- in June of 2023.

20  **Q.**   Right.  And -- but if something was off or wrong

21  about previous slides, you would update them.  You wouldn't

22  put incorrect information -- or keep incorrect information

23  in a slide deck, right?

24  **A.**   No, that's correct.

25  **Q.**   Okay.

527

1   **A.**   Yeah.

2   **Q.**   And Avadel also reported that based on market

3   research of healthcare professionals, it expects

4   50-60 percent share of oxybate sales, correct?

5   **A.**   Of patients being treated, right?  So that's how --

6   that's how share is captured --

7   **Q.**   Well, we --

8   **A.**   -- the same topic we discussed.

9   **Q.**   The market is the -- the market is the market, right?

10  **A.**   Correct.

11  **Q.**   And of that market, Avadel expected to get

12  50-60 percent.  That's -- I know you -- I'm just saying of

13  the market.

14  **A.**   Of the treated patient pool.

15  **Q.**   Right, but that's -- that's the market, right?

16  **A.**   So -- well, you have the big pie.

17  **Q.**   Okay.

18  **A.**   And then you have the treated pie.

19  **Q.**   Okay.

20  **A.**   And then amongst the treated pie, you have share

21  amongst the treated pie.

22  **Q.**   And so of the treated pie of the market, you want

23  50-60 -- you're expecting 50-60 percent?

24  **A.**   That's what our ATP reported market share said in

25  our -- in our research.

528

1          (Reporter clarification.)

2          THE WITNESS:  That's what physicians reported in

3   the research projects that we conducted.

4   BY MR. PORTER:

5   **Q.**   Okay.  If we could go to PTX1899.8, and this is

6   "Success of Lumryz in Narcolepsy Offers Opportunity to

7   Further Expand Franchise," right?

8   **A.**   Yes.

9   **Q.**   Okay.  Because you're looking at Lumryz as a

10  franchise, right?

11  **A.**   Yes, the opportunity --

12  **Q.**   Yeah.

13  **A.**   -- to get more patients.

14  **Q.**   Okay.

15  **A.**   Treat more patients.

16  **Q.**   Okay.

17  **A.**   Help more patients.

18  **Q.**   So at this point, Avadel is stating that the success

19  of Lumryz in narcolepsy offers -- I'm sorry -- offers

20  opportunity, again, to further expand that franchise, as we

21  said, right?

22  **A.**   And the company at large, yes.

23  **Q.**   Well, that's not -- it just says expand the

24  franchise.  That's what the title says.

25  **A.**   Yeah.  You see Wave 3, business development.  That's

529

1    when we talk about the company.

2    Q.    And remember how Avadel said that it might be able to

3    use Jazz's clinical studies to get its own drug approved for

4    pediatric use, you saw that?

5    A.    Yeah, under that 505(b)(2) pathway.

6    Q.    And do you see that -- you see wave 2 right here?

7    A.    Yes.

8    Q.    And it says that -- it says that Avadel's pediatric

9    New Drug Application has, in fact, been accepted by the FDA?

10   A.    Yes.

11   Q.    And "approval decision expected in September 2024"?

12   A.    Yes.

13   Q.    Okay.  And remember how we discussed that Jazz's

14   Xywav was the only drug approved to treat idiopathic

15   hypersomnia?

16   A.    Yes.

17   Q.    And then you see where the presentation notes

18   "idiopathic hypersomnia: plan to initiate study in 2024"?

19   A.    Yeah, we've had a lot of interest from physicians for

20   both IH and pediatric, yes.

21   Q.    So you see that?

22   A.    Yes.

23   Q.    Yeah.  And remember how we discussed that Xywav was

24   Jazz's low-sodium oxybate?

25   A.    Yes.  Yes.

530

1    Q.    Okay.  And do you see where it says that Avadel wants

2    to make a no-to-low-sodium once-at-bedtime?

3    A.    Yeah, we've been working, you know, on different

4    prototypes and formulations to see if we could offer a

5    once-at-bedtime option for those patients potentially as

6    well.

7    Q.    Okay.  So in addition to using Jazz's clinical work,

8    Avadel also uses Jazz's playbook too, right?

9    A.    Well, if you based the playbook on feedback from

10   physicians who say, When are you going to get pediatrics,

11   when were you going to study it in IH, when are you going to

12   do a low or no sodium for those -- you know, I think that

13   our customers help shape that as well.

14   Q.    But as does Jazz, because it's right here in your

15   presentation, right?

16   A.    They certainly have all of that, right.

17   Q.    And have helped Avadel along the way, right?

18   A.    Through the regulatory pathways --

19   Q.    Sure.

20   A.    -- that the FDA allows us to do, yes.

21   Q.    Yeah.  Okay.

22         Now, if we could go to 1899.22.  And do you see

23   where it talks about Lumryz market opportunity is greater

24   than 50,000 patients and is extremely well positioned in all

25   3 patient segments?

531

1    A.    Yes.

2    Q.    Okay.  And that would be patient segments for

3    narcolepsy, right?

4    A.    Yeah, these are patients who would -- who are

5    narcolepsy patients, people with narcolepsy.

6    Q.    Right.  Right.  Now, on January 8th, 2024, Avadel

7    issued a press release with some 2023 highlights, correct?

8    A.    Yes, we did.

9    Q.    Okay.  And if we could go to in your notebook

10   PTX1901.

11         MR. PORTER:  And, Your Honor, I'd like to now

12   move that into evidence.  I don't believe there's an

13   objection.

14         MS. DAVIS:  No objection, Your Honor.

15         THE COURT:  All right.  PTX1901 is admitted.

16         (Exhibit admitted.)

17         MR. PORTER:  And if we could blow that up there,

18   that would be great.

19   BY MR. PORTER:

20   Q.    And you see this is January 8th, 2024, and this is

21   the press release, sir?

22   A.    Yes, it is.

23   Q.    Okay.  And it has some -- some words here, that --

24   you know, that it's putting forth to the public, right?

25   A.    Yes.

532

1    Q.    It talks about more than 1,000 patients initiating

2    therapy through December 31st?

3    A.    Yes.

4    Q.    And that's December 31st of 2023, right, because this

5    is a look-back?

6    A.    Yes, it is.  Yeah.

7    Q.    Okay.  And Avadel also reported that "the majority of

8    Ryzup" -- R-Y-Z-U-P, or Ryzup, I'll call it -- "enrollments

9    and patients currently being treated with Lumryz are

10   patients who switched from first-generation oxybates,"

11   correct?

12   A.    Yeah, the majority of those patients enrolled and who

13   have initiated therapy have been switched patients.

14   Q.    Okay.  And, again, the "first-generation oxybate"

15   refers to Jazz's Xyrem and Xywav products, correct?

16   A.    And the authorized generic.

17   Q.    Okay.  And the press release also reports on certain

18   contracts being in place, correct?

19         MR. PORTER:  Your Honor, I think one of the

20   jurors needs a break.

21         THE COURT:  Okay.  All right.  We'll take a

22   break.  Let the jury use the bathroom.

23         Let's take a 10-minute break at this time.

24         All right.  We'll come back at 3:40 p.m.

25         (Recess taken.)

533

1      (Whereupon, the jury entered the room.)
2      MR. PORTER:  May it please the Court?
3      THE COURT:  Yes.
4      MR. PORTER:  Thank you, Your Honor.
5      If we could pull back up, I think we were on
6  PTX1901, Derreck.
7  BY MR. PORTER:
8  Q.    So, Mr. Divis, where -- we left off talking about
9  RYZUP and on the same page of this press release from
10  January, it also reports on certain contracts being in
11  place, correct?
12  A.    Yes, it does.
13      MR PORTER:  Okay.  If you could pull those up,
14  and scroll -- the sign.  There we go.  Perfect.
15  BY MR PORTER:
16  Q.    So there are terms here like GPO entities or
17  including, you know, Emisar that may be unfamiliar to some
18  people, but basically this means that Avadel has gotten
19  contracts in place relating to getting Lumryz covered by
20  insurance, right?
21  A.    Yeah, I would think of it as the entity above, kind
22  of the contracting entity, that, then, you have to work down
23  through that entity to try to get actual coverage, but the
24  contract is first.
25  Q.    Right.  Okay.

534

1      So, again, this is just further showing Avadel's
2  plan to move forward towards that potential greater than
3  $1 billion market?
4  A.    I would define that as fairly ordinary coursework
5  that everyone in the industry does to try to get your drug
6  reimbursed by insurance companies.
7  Q.    But when you get reimbursed by a insurance company,
8  you're making revenue for Avadel, correct?
9  A.    That's correct.
10  Q.    That's money into the company, correct?
11  A.    Yes, it is.
12  Q.    And that's going to be money that will help you to
13  reach the goal of getting to over a billion dollars,
14  correct, in sales, that's just -- I'm not trying to dispute
15  where the money comes from but that is something that will
16  help you get to that target, right?
17  A.    It's a step in the process to build Lumryz.
18  Q.    Great.  All right.  Let's finish up on the
19  relationship between Jazz.
20      So at the end of the day, Mr. Divis, as we've
21  talk about over the course of the last hour or so, Avadel
22  admits that it did in fact try to get Jazz's help to work
23  with and develop Lumryz, right?
24  A.    Well, we entered into a mutual discussion to see if
25  there was a potential collaboration that we talked about

535

1  with each other for quite some time.
2  Q.    Okay.  You admit Avadel relied on Jazz's clinical
3  work to get FDA approval for adult use of Lumryz, right, we
4  talked about?
5  A.    It was really nonclinical work that we relied on.
6  Q.    But you relied on Jazz's work?
7  A.    Some of their data to help --
8  Q.    Okay.  And -- and --
9      THE COURT:  Mr. Porter --
10  BY MR. PORTER:
11  Q.    I'm sorry, were you --
12  A.    No.  We, certainly, under the 505(b)(2) pathway --
13  Q.    Yeah.
14  A.    -- that the FDA allows us to do that.  Yes.
15  Q.    Correct.
16      And Avadel admitted it further considered
17  relying on Jazz's clinical work as we just saw to get FDA
18  approval for pediatric use of Lumryz, right?
19  A.    Yeah, under that same 505(b)(2) pathway the FDA
20  allows us to.
21  Q.    And as we've seen, Avadel has a business plan that
22  involves taking patients from Jazz and switching them to
23  Lumryz, correct?
24  A.    Well, I don't view us as taking patients, I view us
25  as educating physicians but switch patient are a large --

536

1  you know, almost half of our kind of pie, so to speak, and
2  ultimately it's up to the physician of the patient to do
3  what's right for that patient.
4  Q.    And as we saw from your, I think chief commercial
5  officer or chief operating officer, Avadel simply used the
6  same price per gram as Jazz's drug Xywav to come up with its
7  price for Lumryz, right?
8  A.    We made a decision to price at parity to Xywav and
9  less than Xyrem, yes.
10  Q.    Yeah, okay.
11      Thank you, sir.
12      MR. PORTER:  Pass the witness.
13      MS. DAVIS:  Permission to approach with binders,
14  Your Honor?
15      THE COURT:  Okay.
16      MS. DAVIS:  May I proceed, Your Honor?
17      THE COURT:  You may.
18      DIRECT-EXAMINATION
19  BY MS. DAVIS:
20  Q.    Good afternoon, my name is Kira Davis and I represent
21  Avadel.
22      Mr. Divis, to cover background, where are the
23  main Avadel offices?
24  A.    The main offices are just outside of St. Louis,
25  Missouri, in a little suburb called Chesterfield, Missouri.

537

1  Q.      And you got asked a little bit ago about the company
2  in France, did the company get in trouble in France?
3  A.      No, the company didn't.  The company was actually
4  just ensuring that we continued to do the right thing with
5  regards to our requisite governance-related matters.
6  Q.      You were asked about your compensation; do you
7  remember that?
8  A.      Yes.
9  Q.      Do you know how much the Jazz CEO makes?
10 A.      Today, I don't know.
11         MR. PORTER:  Your Honor, I'm going to object,
12 this is not -- it's not -- 403, not relevant to anything,
13 not in evidence.
14         THE COURT:  Overruled.  You asked the question.
15         THE WITNESS:  I do believe his total
16 compensation in 2022 was over $17 million.
17 BY MS. DAVIS:
18 Q.      Take a step back, where did you go to college?
19 A.      I went to college on a full athletic scholarship to
20 play football at the University of Iowa in the Big 10.
21 Q.      And what position did you play?
22 A.      I was an offensive lineman, primarily center and a
23 little bit of guard.
24 Q.      Any memorable achievements?
25 A.      A whole lot of memories but probably being part of a

538

1  Big 10 championship and playing in the Rose Bowl was pretty
2  memorable.
3  Q.      When did you join Avadel, can you remind us?
4  A.      I joined in January of 2017.
5  Q.      Why did you join Avadel?
6  A.      Well, I had been speaking to the prior CEO for the
7  better part of a year, I've known -- I knew him and do know
8  him for quite some time and he was seeking -- seeing if I
9  would come join him.  And then as I got to learn more about
10 what they were doing and the work on FT218 and, you know,
11 the potential benefit for patients and the opportunity to
12 offer a new option where, you know, patients who suffer from
13 a sleep disorder, who have to wake up to take their medicine
14 in the middle of the night and the ability to maybe solve
15 that for a drug in sodium oxybate, that's -- could be life
16 changing for patients, it was really an opportunity, I
17 thought, I had to pursue.
18 Q.      When you started at Avadel in 2017, where in the
19 development process was Lumryz?
20 A.      So it had just started the main study, right, this
21 main study that we described as REST-ON, which is the
22 requirement from the FDA to demonstrate that Lumryz was safe
23 and effective and it was one of the largest studies done in
24 narcolepsy and that literally was a month -- had just
25 started the last month in December of 2016.

539

1  Q.      So I want to ask you now about Project Zeta.
2          Were you personally involved in Project Zeta?
3  A.      Yeah, I was, I was actually the person on Avadel's
4  side engaging with the counterparties at Jazz.
5  Q.      When did Project Zeta start?
6  A.      It really started, I would say, in earnest in -- in
7  June of 2018.
8  Q.      Did you reach out to Jazz to initiate Project Zeta?
9  A.      I didn't.  I actually had someone who knew me and who
10 knew the CEO of Jazz, he was one of these investment bankers
11 kind of like the Jefferies example that was used earlier,
12 but not part of Jefferies, who contacted me and said, if we
13 could -- you know, if I could broker a discussion with the
14 CEO of Jazz, would you be willing to have that?
15         I wasn't the CEO at the time so I had to go to
16 my CEO and ask if he wanted me to consider -- have that
17 discussion.  And so we said yes, and therein kind of started
18 the initial discussions.
19         MS. DAVIS:  Your Honor, at this time I would
20 offer into evidence DTX1232, DTX916, JTX200 and JTX202, and
21 I believe all objections have been ruled on or resolved.
22         THE COURT:  All right.
23         MR. PORTER:  Correct.  No objection, Your Honor.
24         THE COURT:  All right.  DTX1232, DTX916, JTX200
25 and JTX202 are admitted.

540

1          (Exhibit admitted.)
2          MR. PORTER:  JTX112 is the --
3          (Discussion held off the record.)
4  BY MS. DAVIS:
5  Q.      What are we looking at?
6  A.      You're looking at a slide from a slide deck that was
7  sent to me on an e-mail that was designed to really just lay
8  out kind of the framework of a potential collaboration that
9  Jazz sent to me.
10 Q.      Under "license and collaboration," can you explain
11 the second bullet.
12 A.      That second bullet that says, "Jazz to acquire global
13 rights to FT218, and the rights to Zeta's Micropump
14 technology and intellectual property, that what it's saying
15 is that Jazz was looking to acquire what was or is Lumryz or
16 FT218, the technology that is Lumryz and FT218 and then any
17 patents that were around that.
18 Q.      Okay.
19         MS. DAVIS:  Let's take that down.  And Mr.
20 Jarrett, can we have DTX916 in evidence at page 1, the
21 e-mail in the middle.
22 BY MS. DAVIS:
23 Q.      Okay.  So Mr. Divis, in this e-mail from you, what is
24 the concern you're expressing?
25 A.      Yeah, one of our concerns is we entered into this

541

1   discussion knowing that Jazz had a number of programs, both

2   in the -- you know, selling them in the market at that

3   point, I think they only had Xyrem and they were working on

4   Xywav, that they -- that if we did a collaboration with them

5   that they wouldn't, in essence, deprioritize Lumryz or, you

6   know, shelve it for their other programs and that was an

7   important consideration for us as we entered into these

8   decisions.

9   Q.    Let's get the e-mail at the top.

10         Mr. Divis, what was the response to your

11  concern?

12  A.    Yeah, I think, here, Mr. Dougherty replied to us

13  basically stating in the e-mail that they're committed to

14  prioritizing FT218 and that they believed in their view a

15  potential collaboration was the fastest way for providing

16  patients with a potential once at bedtime oxybate or here,

17  once-nightly oxybate.

18  Q.    So can we have JTX200 in evidence at page 2.

19         All right.  Mr. Divis, can you explain to the

20  jury what this is, and what the date is?

21  A.    The date is July 25, 2018.  And what this is, is an

22  initial non-binding term sheet which was meant to lay out

23  Jazz's proposal to us, their first proposal to us, on -- on

24  both kind of responsibilities and the financial terms of a

25  potential collaboration.

542

1   Q.    Can we go to page 4, the economic terms at the

2   bottom.

3         Can you explain briefly to the jury the

4   different types of payments that are referenced in this

5   section.

6   A.    Yeah, in this section, there are really two types of

7   payments:  One is an up-front payment, so upon agreement

8   signing, Jazz would make a payment to Avadel, you know, it's

9   kind of buying into the collaboration, so to speak, a lot of

10  work had been done and then some contingent payments in the

11  form of milestones.

12         So "contingent" being that the milestone had to

13  be achieved for the payment to actually be paid.  So from

14  finishing and successfully finishing that main study that we

15  talked about, all the way up through securing an FDA

16  approval of FT218 at this time or Lumryz.

17  Q.    And we don't have to get into it with the document,

18  were there other types of payments contained in this term

19  sheet?

20  A.    There were.  There were financial payments tied to

21  sales and there were some royalty, royalties, and sales

22  milestone that if they were achieved, then there would be

23  more, again, financial -- more economics paid to Avadel,

24  again, depending upon the sales and how successful they

25  were.

543

1   Q.    Okay.

2         MS. DAVIS:  Mr. Jarrett, you can take that down.

3   BY MS. DAVIS:

4   Q.    Mr. Divis, what, if anything, did Jazz propose about

5   patents in this term sheet?

6   A.    Only that they would be seeking to acquire a license

7   and acquire our patents, nothing else.

8   Q.    Did you take this first offer from Jazz?

9   A.    No, we didn't.

10  Q.    What happened next?

11  A.    What happened next was really, I would say, a series

12  of negotiations, we provided a counteroffer that we thought

13  was more appropriate to how we viewed the value of Lumryz

14  for us and for Jazz.  And they didn't accept that and they

15  made another counter.

16         And then we didn't accept that and we made

17  another counter and that went on for a number of months.

18  And we made our final proposal that we made on November 14th

19  of 2018.

20  Q.    Okay.

21         MS. DAVIS:  Mr. Jarrett, can we have JTX202 in

22  evidence at page 13 at the bottom, the economic terms.

23  BY MS. DAVIS:

24  Q.    All right.  And, Mr. Divis, what are we looking at?

25  A.    After we made our first proposal, Jazz made a

544

1   counterproposal back to us, and this represents their

2   counterproposal.  It, in essence, is all the same as the

3   prior one with the exception they increase their up-front

4   payment from 50 million to 75 million.

5   Q.    Did you take this Jazz counterproposal?

6   A.    No, we didn't.  We didn't take it.

7   Q.    Can you explain why not?

8   A.    Yeah, again, an increase of $25 million just didn't

9   reflect what we believed was the fair value, the investment

10  we made in Lumryz up until that point in time.  And so we --

11  we did not accept it, but we proposed another counter to

12  Jazz.

13  Q.    During those negotiations, did you think you were

14  going to be able to come to agreement with Jazz?

15  A.    We certainly thought it was advancing in a positive

16  way and it's really one of the reasons why we engaged some

17  other -- we reached out to other parties because we do have

18  a fiduciary duty to our shareholders to, you know, conduct,

19  if you will, a market check, if anyone else was interested

20  and, therefore, that's really, in October of 2018, why we

21  started that process.

22         We had spent the previous four months working on

23  it, a transaction potentially with Jazz, so, yeah, we

24  thought it was moving in the right direction, it was

25  advancing and back and forths were happening.

545

1  Q.    Did a deal happen?

2  A.    No, we made our last proposal, again, on

3  November 14th of 2018.  And then it kind of went a little

4  quiet, not how it had been going, but it was kind of quiet

5  from them, so when we reached out in December and we asked

6  them for a meeting, to have a discussion, that meeting took

7  place in early January and at that point, the company was

8  really coming to a fork in the road for us, for lack of a

9  better word.  We needed an answer if they wanted to continue

10  to proceed in a potential collaboration or not because we

11  had to decide which pathway the company was going to go,

12  were we going to partner Lumryz or FT218 or were we really

13  going focus for the company only on the clinical program of

14  Lumryz and seeking FDA approval, which was going to require

15  a major shift in the company.

16         And so we asked for a decision by the end of

17  January.  And at the end of January, they contacted us and

18  said, we can't -- we're not -- we're not going to provide a

19  counter, we're going pencils down, we've got too much going

20  on right now, they did have a drug launch coming, they did

21  have a data readout coming, so they said, we're not

22  advancing and that was the end of the negotiation.

23  Q.    January of what year?

24  A.    Oh, my apologies.  2019.

25  Q.    Did Jazz give you any other reason for their answer?

546

1  A.    That was the only reason at the time, yeah.

2  Q.    Where did this leave Lumryz in January 2019?

3  A.    Well, we were, at that point, 2 years into the study,

4  but the study was going slow from an enrollment standpoint,

5  so we made the decision to, you know, put some new people on

6  the team and just do it ourselves.

7  Q.    Can you say a little bit more about the decisions you

8  made in this time period following the end of the Project

9  Zeta negotiations with Jazz?

10  A.    Well, the company only had so much, for lack of a

11  better word, runway of how much cash we had on-hand as a

12  company to operate and we needed to make sure we had enough

13  money to get us through the clinical study and we needed to

14  really bolster the team working on the clinical study, so we

15  had to make a lot of tough decisions.

16         We stopped selling -- we took some businesses

17  and sold them to other people.  We shutdown some facilities.

18  We, unfortunately, had to eliminate some positions.

19  Never -- never an easy decision to do, but it was what we

20  had to do to ensure that we could take the necessary steps

21  to bring the first once-at-night option for people with

22  narcolepsy, and so those are the decisions we had to make.

23  Q.    When Project Zeta ended, did Jazz tell you that you

24  would need a license to its patents if you didn't do the

25  deal with them?

547

1  A.    No, no.  Never.

2  Q.    During Project Zeta, did Jazz ever say anything about

3  having any patents that might apply to the formulation of

4  Lumryz?

5  A.    No, never.

6  Q.    Before this lawsuit started, was Avadel doing any

7  monitoring of Jazz patents?

8  A.    Yeah, I -- yeah, I think it's fairly standard in our

9  industry that people monitor what's going on in their

10  respective areas.

11  Q.    The '782 patent, when did you find out that Jazz had

12  the claims that are in that patent?

13  A.    I believe we found out when they sued us on that

14  patent.

15  Q.    Why didn't you find out earlier?

16  A.    As I understand, that patent was filed

17  confidentially, there's -- so not visible to the public.

18  There's -- you know, that's a pathway you could take, so we

19  had no idea.

20  Q.    What about the other patent, the '488 patent, did

21  Jazz ever mention that patent to you?

22  A.    No, they didn't.

23  Q.    So Project Zeta ends, what happened with the Lumryz

24  clinical trials after you made the decision to focus on

25  Lumryz?

548

1  A.    Yeah, the new team we brought in did an excellent job

2  and actually finished the study earlier than anyone had

3  expected.  And it was incredibly positive in terms of its --

4  what it demonstrated and from a safety and efficacy

5  standpoint.  And that enabled us to go down the pathway of

6  filing our application to the FDA in December of 2020.

7  Q.    Did the FDA ultimately approve Lumryz?

8  A.    It did on May 1st, 2023.

9  Q.    Do you recall that Jazz's counsel asked you, "Jazz

10  has helped Avadel along the way"; do you remember that?

11  A.    Yes.

12  Q.    When did you file for approval for Lumryz?

13  A.    We filed on December 15th, I think, of 2020.

14  Q.    When did you get approval for Lumryz?

15  A.    May 1st of 2023.

16  Q.    When were you originally expecting to get approval of

17  Lumryz?

18         MR. PORTER:  Your Honor, sidebar.

19         (Whereupon, the discussion held at sidebar

20  concluded.)

21         MR. CALVOSA:  Your Honor, this is going directly

22  towards delisting issue, when they filed, when they got

23  approval, how long it took, why it took so long.

24         MS. DURIE:  So --

25         MR. CALVOSA:  Don't put your hand up at me.

549

1      THE COURT: Let's be civil.

2      MS. DURIE: Sorry, I was not -- I was just --

3      THE COURT: I know.

4      MR. PORTER: This is a civil trial.

5      MS. DURIE: So Mr. Divis was asked in his

6   cross-examination by counsel about using the 505(b)(2)

7   whatever is regular pathway and asked whether it was faster,

8   whether he got advantages from having used Jazz data. That

9   pathway has two aspects, one they used Jazz's data, the

10  other had to do with the Orange Book listing issues that

11  resulted in the listing fight, I'll put it that way.

12      All we want to establish is that using that

13  regulatory pathway did not accelerate things, it actually

14  slowed things down in the end. We're not going to ask why.

15  These are very careful questions. We're not going to ask

16  why. We're simply going to say, When did you get -- when

17  did you file, when did you expect to get approval, when did

18  you get approval, and did Jazz accelerate your approval

19  process?

20      To which the answer is no.

21      THE COURT: Okay.

22      MS. DURIE: That's all we intend to do.

23      MR. CERRITO: The --

24      THE COURT: All right. So, why are those

25  questions--

550

1      MR. CALVOSA: Those --

2      MR. CERRITO: Yeah, I mean, they said they chose

3   505(b)(2) pathway abbreviated new drug has nothing to do

4   with Orange Book listing. They could have filed.

5      THE COURT: She --

6      MR. CERRITO: She said tied to our Orange book

7   listing. They could have gone 505(b)(1), they didn't have

8   to bother with us, they didn't have to use our stuff. They

9   chose -- took into consideration, it came with the

10  ramifications.

11      THE COURT: The questions and answers I heard

12  didn't say Orange Book.

13      MR. CERRITO: Counsel made the argument based on

14  that. You said they go hand in hand.

15      MS. DURIE: What I was trying to provide --

16      MR. CERRITO: Maybe I misheard you.

17      MS. DURIE: -- context for the Court that the

18  selection of that regulatory pathway from Avadel's point of

19  view had pluses and minuses. He was asked about the pluses,

20  and the implication was they got an advantage.

21      All we want to do is establish there was no

22  advantage gotten, we actually wound up getting approval on

23  this later than we expected.

24      MR. PORTER: Judge he admitted --

25      THE COURT: So, let me -- so the question -- the

551

1   point that you're trying to make is that it actually delayed

2   the approval but you're not going to mention --

3      MR. CERRITO: He already testified --

4      MR. PORTER: Your Honor --

5      THE COURT: Let me talk. All right. Please.

6   You're not going to mention Orange Book.

7      MS. DURIE: Correct.

8      THE COURT: And I didn't hear any questions

9   about Orange Book.

10      MS. DURIE: That's right.

11      THE COURT: So I don't find anything improper,

12  objectionable about the questions and the answers that

13  Ms. Durie has told me.

14      MR. CERRITO: He already testified that it was

15  to his advantage, that he benefited from it, that they went

16  quicker.

17      MR. PORTER: Several times.

18      MR. CERRITO: So the question is redirect so

19  they get a chance to ask them -- that's why we all jumped up

20  because that question -- the only --

21      THE COURT: But I don't hear Orange Book, I

22  haven't heard Orange Book.

23      MR. CERRITO: For some reason --

24      THE COURT: And you're not going to make an

25  argument about Orange book.

552

1      MS. DURIE: No, we're not during --

2      (Whereupon, the discussion held at sidebar

3   concluded.)

4   BY MS. DAVIS:

5   Q.   Mr. Divis, remind us, when did you get approval for

6   Lumryz?

7   A.   May 1st, 2023.

8   Q.   Can you give me the date, what date, when were you

9   originally expecting approval for Lumryz?

10  A.   October 15th of 2021.

11  Q.   Did relying on the 505(b) pathway -- yes or no, did

12  relying on the 505(b) pathway get you approval faster?

13  A.   No.

14  Q.   The 505(b) pathway, is there anything wrong with

15  pursuing that pathway for approval?

16  A.   No, it's a very standard pathway that the FDA allows.

17  Q.   Are there -- is there any requirement that you

18  compensate the company whose data you're referencing for the

19  505(b) pathway?

20  A.   No, there's not.

21  Q.   You were also asked about some adverse events with

22  Lumryz, do you remember that?

23  A.   Yes.

24  Q.   Has FDA raised any concerns post-launch about the

25  adverse events you were asked about on direct examination?

553

1   A.   No, not at all.

2   Q.   So you were asked about the FDA's clinical

3   superiority finding, do you remember that?

4   A.   Yes.

5   Q.   Okay.

6        MS. DAVIS:  So at this time, Your Honor, we move

7   into evidence a redacted copy of JTX112.  The final

8   redactions are under review.  We'll be very cautious in what

9   we display, but I would move it into evidence.

10       THE COURT:  All right.

11       MR. PORTER:  No objection, Your Honor.

12       THE COURT:  All right.

13       MR. PORTER:  To the redacted.

14       THE COURT:  The redacted copy of JTX112 is

15  admitted.  The parties will agree to the redactions.

16       MS. DAVIS:  And Mr. Jarrett, can we have just

17  the one page, so JTX112, page 33.33.

18  BY MS. DAVIS:

19  Q.   Mr. Divis, what are we looking at?

20  A.   You're looking at part of a document that was sent to

21  us, to our regulatory person who represents us with the FDA.

22  That was a document that was actually sent to Jazz that

23  outlined a lot of information, but outlined the granting of

24  FDA's orphan drug exclusivity, which meant they determined

25  that FDA (sic) was clinically superior to Xyrem and Xywav.

554

1   Q.   So this is a lot of text, so I'm going to ask you if

2   you can read for us, on the first line, the sentence that

3   begins at the end, starting "for narcolepsy patients."

4        Can you read that part?

5   A.   Read just the sentence?

6   Q.   Yes, read that sentence.

7   A.   "For narcolepsy patients who are not sensitive to

8   sodium intake, OOPD" -- which is the office of orphan

9   products, they are the office that makes this determination

10  at the FDA -- "concludes that a once-nightly dosed oxybate

11  drug will provide a significant therapeutic advantage."

12  Q.   Can you go on and read through to the sentence that

13  ends with the footnote 210?

14  A.   "It is true that patients who are not sensitive to

15  sodium could also benefit from a reduction in sodium, but we

16  consider the benefit offered by once-nightly dosing to

17  outweigh the risk of increased sodium intake in such

18  patients, because having to wake up to take a second dose is

19  antithetical to oxybate's goal of improving sleep.

20       "Disrupting sleep contributes to chronic sleep

21  loss, which is well known to cause reduced performance,

22  increased risk for accidents and death, and detrimental

23  effects on both psychological and physical health.  And

24  there are other ways such patients may reduce sodium in

25  their diet."

555

1   Q.   Okay.  And then in the next section, we don't have to

2   have you keep reading, but do you know what the next -- the

3   next portion of the text on this screen is about?

4   A.   The next portion of the screen really talks about

5   those who are sensitive to sodium, and whether or not -- you

6   know, the benefit of Lumryz relative to those who have

7   certain sodium sensitivity.

8   Q.   And what did the FDA conclude?

9   A.   The FDA concluded that Lumryz was clinically superior

10  to Xywav and Xyrem, and gave us that on the basis of its

11  contribution to patient care on the basis that having to

12  wake up, again, remains antithetical, and that the benefit

13  offered by once-nightly dosing would outweigh the risk of

14  increased sodium intake.

15  Q.   Okay.

16       MS. DAVIS:  You can take that down.

17  BY MS. DAVIS:

18  Q.   Switching topics.  In May of 2023, was Avadel making

19  money?

20  A.   No, Avadel wasn't making money in May of 2023.  And

21  it's still not making money today.

22  Q.   Is Avadel spending money today on Lumryz development?

23  A.   Yeah, we're investing in all of our activities to try

24  to educate and support patients who may go on our therapy.

25  And also, we're doing clinical work on opportunities such as

556

1   idiopathic hypersomnia and to expand potential patients who

2   may want to try the benefit from a once-at-bedtime dose.

3   Q.   When Lumryz was approved last year, what was your

4   reaction?

5   A.   Well, you know, I think it -- for -- it was -- you

6   know, it was an amazing reaction.  I know exactly where I

7   was, what we were doing on May 1st, and it was celebratory

8   for what had been over a decade of work and a lot of people

9   who had put in a lot of work over a number of years to get

10  to that point in time.  And, you know, I think we celebrated

11  for a few hours and then realized there was a whole lot of

12  work to be done.

13       MS. DAVIS:  No further questions, Your Honor.

14       MR. PORTER:  Just a few questions, Your Honor.

15       THE COURT:  Okay.  Recross.

16       RECROSS-EXAMINATION

17  BY MR. PORTER:

18  Q.   Mr. Divis, you testified --

19       MR. PORTER:  May it please the Court?

20       THE COURT:  I'm sorry?

21       MR. PORTER:  May I proceed?  Thank you, Your

22  Honor.

23  BY MR. PORTER:

24  Q.   Mr. Divis, you testified that your -- Avadel isn't

25  making money, correct?

557

1  A.    Correct.

2  Q.    Okay.  But, again, you still are making about a

3  million dollars a year from the company that's not making

4  money, correct?

5  A.    That's my target compensation, yes.

6  Q.    Right.  And then you have the 150,000 approximate

7  shares of stock, correct?

8  A.    Yes, most of which I bought, yes.

9  Q.    Right, just -- okay.  And you testified about the

10  compensation of Jazz's CEO, correct?

11  A.    I did.

12  Q.    Okay.  Are you aware that Jazz has more than one

13  product that it has in the market?

14  A.    Yes.

15  Q.    And it has, frankly, a number of products that it has

16  in the market that span different areas for different types

17  of patients?

18  A.    Yes.

19  Q.    Okay.  And, again, you have with your company one

20  product, correct?

21  A.    Correct.

22  Q.    That's Lumryz, correct?

23  A.    Correct.

24  Q.    The only thing you got to focus on, right?

25  A.    Correct.

558

1  Q.    Yeah.  And, again, your compensation -- your

2  compensation is directly tied to the success of that one

3  product, isn't it, as you just testified to earlier?

4  A.    Yes, as a major component, yes.

5  Q.    Major component, thank you.

6        Now, you were asked a question about -- I

7  believe you were asked about the benefit -- that it took

8  just as long or longer even with the 505(b)(2): do you

9  remember that?

10  A.    Yes.

11  Q.    Okay.  But, again, you did testify with me earlier

12  that you all, Avadel, saw a benefit to using -- to being

13  able to use the 505(b)(2) using Xyrem as the reference

14  listed drug?  You testified to that, didn't you?

15  A.    I wasn't here when that decision was made, but

16  clearly that was one of the reasons why they would have

17  chosen the (b)(2) pathway.

18  Q.    And you -- but you testified that it was a benefit to

19  Avadel, correct?

20  A.    Yes, that we could reference --

21  Q.    Okay.

22  A.    -- some of the other data.

23  Q.    Yeah, okay.  I just wanted to make sure that you're

24  not -- you're not changing that with your lawyer.

25        Also, could we pull up JTX112.31.

559

1  A.    May I -- is that in your binder or the other binder?

2  Q.    It's in the binder your attorney gave you.

3  A.    Okay, okay.  Just in case I need to...

4        (Discussion held between counsel off the

5  record.)

6  BY MR. PORTER:

7  Q.    Okay.  And I just wanted to read something that your

8  lawyer didn't read with you about sodium, if we could go

9  down just a little bit.  Okay.  Go down.

10        MS. DAVIS:  Your Honor, they're just -- they're

11  displaying items they requested that -- to be redacted.

12        MR. PORTER:  No.

13        MS. DAVIS:  Yes.

14        THE COURT:  Take it down, please.  Take it down

15  and let's...

16        (Discussion held between counsel off the

17  record.)

18        MS. DURIE:  Your Honor, the reason we didn't

19  show it is because they asked us not to.

20        THE COURT:  So we had a discussion about this

21  document being redacted, and let's make sure we're only

22  displaying the parts that have not been redacted.

23        MR. PORTER:  Right.  The part that I was

24  looking -- was reading in wasn't -- we agreed that that

25  could come in.

560

1        (Discussion held between counsel off the

2  record.)

3        MR. PORTER:  I just want to make sure I'm not

4  running afoul of our agreement.

5        THE COURT:  Both sides agree that this part is

6  not redacted?

7        MS. DAVIS:  The portion he just showed me is not

8  redacted.

9        THE COURT:  Okay.  All right.

10        MR. PORTER:  And that was the portion that was

11  up on the screen.

12        THE COURT:  Okay.  All right.  So we're fine.

13  All right.

14        MR. PORTER:  Not sure why it was objected to,

15  but...

16        MS. DAVIS:  That's not the redacted.  They made

17  a request to redact all of the footnotes.  Every single

18  footnote is supposed to be redacted.  It's their request,

19  so...

20        THE COURT:  Okay.

21        MR. PORTER:  I will read -- do you see on your

22  page, you could -- yeah, if we could just go through with

23  that.  Okay.

24  BY MR. PORTER:

25  Q.    Do you see, sir, this portion of the document?

561

1   A.    I do, yes.

2   Q.    Okay. Because you were -- you were testifying about
3 sodium and why you got greater, you know -- why the FDA
4 found -- gave you the finding on the clinical data that we
5 talked about, right?

6   A.    Yes, the clinical superiority, yes.

7   Q.    Okay. But in that exact same document, the FDA did
8 note, "Given the differences in sodium content between Xywav
9 and Xyrem, Xywav is safer and thus clinically superior to
10 Xyrem in the following: All patients with narcolepsy" --
11 all patients with narcolepsy, correct?

12   A.    That's what it says.

13   Q.    Okay. And I just want to be clear that that's based
14 upon the difference in sodium between Xywav and Xyrem,
15 right?

16   A.    Yes.

17   Q.    Okay. And "the substantial portion of the narcolepsy
18 population that is salt-sensitive, i.e., individuals who
19 have greater changes in blood pressure with changes in salt
20 intake than those who are not salt-sensitive," right?

21   A.    Yes, that's what it --

22   Q.    And then it goes on to --

23   A.    Yeah.

24   Q.    So it's basically just saying lower sodium is better
25 for all narcoleptic patients, right?

562

1   A.    That's what it says, but it does go on and --
2 further.

3   Q.    And so -- and to be clear, again, if we're saying for
4 all patients with narcolepsy that Xywav is safer and
5 clinically superior due to the lower sodium, sir, Lumryz has
6 the exact same sodium as Xyrem, doesn't it, sir?

7   A.    It does.

8   Q.    And Lumryz has a warning on it due to its high sodium
9 content, correct?

10   A.    Yes, to monitor those who are salt-sensitive.

11   Q.    Right. And that's one of the reasons why you all,
12 being Avadel, are trying to create a lower sodium, a
13 low-sodium oxybate product for the market, correct?

14   A.    For those who are salt-sensitive.

15   Q.    Well, but that -- that says "all patients with
16 narcolepsy," right? That's the -- that's the FDA. That's
17 not --

18   A.    Yeah.

19   Q.    -- that's not Jazz, right?

20   A.    Yeah.

21   Q.    Okay.

22   A.    The FDA who granted us orphan exclusivity and --

23   Q.    Okay.

24   A.    -- give us our clinical superiority.

25   Q.    Okay. But not based upon safety, right?

563

1   A.    That's correct.

2   Q.    And not based upon efficacy, correct?

3   A.    That's correct.

4   Q.    Okay. Because when we're looking at safety, it's
5 saying that Xywav is safer, thus clinically superior, for
6 all patients with narcolepsy because of the sensitivities
7 that they have to sodium, right?

8   A.    I believe it says it's "safer and thus clinically
9 superior to Xyrem" --

10   Q.    Right.

11   A.    -- in those following patients.

12   Q.    Because of the lower sodium, right?

13   A.    I believe so.

14   Q.    Well, that's what it -- I mean, that's what it says.

15   A.    Yeah.

16   Q.    Okay. And, again, Lumryz has the exact same sodium
17 content as Xyrem, true?

18   A.    Yeah, and FDA made a conclusion --

19         MR. PORTER: Okay. That's it. Thank you.

20 Pass the witness.

21         MS. DAVIS: Nothing further, Your Honor.

22         THE COURT: All right. All right.

23         THE WITNESS: May I be excused?

24         THE COURT: Mr. Divis, you may be excused.

25 Thank you.

564

1         All right. Jazz, you may call your next
2 witness.

3         MS. THOMPSON: One moment, Your Honor. We're
4 going to make something clear with Avadel.

5         THE COURT: Okay.

6         MS. THOMPSON: Thank you.

7         (Pause.)

8         Your Honor, Jazz is going to call Dr. Mark
9 Rainey. As you recall, he's the witness for whom we need to
10 seal the courtroom, so we're going to try to end the day
11 with him --

12         THE COURT: Okay.

13         MS. THOMPSON: -- for the convenience of --

14         THE COURT: All right. All right. So anyone --
15 so we need anyone who is not a corporate representative to
16 exit the room.

17         MS. THOMPSON: It's anyone who is not subject to
18 the -- the parameters of the protective order. So, for
19 instance, there are some documents that are attorneys' eyes
20 only, and so, for instance, if Mr. Mindus were still here,
21 he would need to leave.

22         THE COURT: Okay. So --

23         MS. DAVIS: We're generally in alignment with
24 that, just one clarification. When Mr. Divis gets back, he
25 will be -- he's a corporate representative, so he will be

565

1 permitted to be in despite otherwise not qualifying.

2 THE COURT: All right. Corporate -- right. A

3 party can -- has the right to stay.

4 MS. THOMPSON: Yes, Your Honor.

5 THE COURT: He's a corporate representative, so

6 he can stay.

7 So anyone who is not a party representative or

8 is not allowed to see documents that have been designated as

9 confidential under the stipulated confidentiality agreements

10 needs to leave the courtroom at this time.

11 MS. THOMPSON: Thank you, Your Honor.

12 (Whereupon, the courtroom was sealed and

13 testimony was reported but not transcribed.) (Whereupon, the

14 courtroom was sealed and testimony was as follows:)

15 MARK RAINEY, having been called on the part and

16 behalf of the Plaintiff as a witness, having first affirmed

17 to tell the truth, testified as follows:

18 DIRECT EXAMINATION

19 THE COURT: Are there any demonstratives for

20 this witness?

21 MS. THOMPSON: Yes, Your Honor, there are

22 demonstratives. We have two copies of those.

23 THE COURT: All right.

24 MS. THOMPSON: Thank you, Your Honor.

25 BY MS. THOMPSON:

566

1 Q. Good afternoon, Dr. Rainey. Could you please

2 introduce yourself to the jury.

3 A. Good afternoon. I'm Mark Rainey.

4 Q. And what is your profession?

5 A. I'm an economist.

6 Q. How long have you been an economist?

7 A. Over 20 years.

8 Q. Could you briefly describe your educational

9 background.

10 A. I have an undergraduate degree in economics from

11 Stanford University and a PhD in economics from MIT.

12 Q. And at what point in time did you start working as an

13 economist?

14 A. My first job as professional economist was before I

15 finished my PhD. I took a year off from grad school to go

16 work at the Council of Economic Advisers, which is a

17 government agency that advises the White House on economic

18 policy.

19 Q. And as a general matter, what kind of work do you do

20 as an economist?

21 A. You know, I've worked for companies, law firms. I'm

22 asked to do economic analysis on the types of issues that

23 come up in cases such as this one.

24 Q. And where did you work after you finished your PhD?

25 A. I worked at economic consulting firms.

567

1 Q. And you're Jazz's damages expert in this case?

2 A. Yes.

3 Q. What were you asked to do with respect to this

4 lawsuit?

5 A. I was asked to calculate past damages for Avadel's

6 infringement of Jazz's patents.

7 Q. And how many times in your professional carrier have

8 you provided economic analysis for health or pharmaceutical

9 matters?

10 A. Over 20 times.

11 MS. THOMPSON: Your Honor, at this time I'd move

12 to qualify Dr. Rainey as an expert in economics and

13 determination of patent damages.

14 MS. THOMPSON: No objection.

15 THE COURT: All right. Dr. Rainey may testify

16 as an expert in economics and patent damages.

17 MS. THOMPSON: Thank you, Your Honor.

18 And I would also, at this time, like to move

19 into evidence, for efficiency sake, some exhibits that are

20 used in Dr. Rainey's slides.

21 If I could move into evidence Exhibit JTX129,

22 JTX130, JTX63, JTX132, JTX133, JTX135, JTX136, JTX137,

23 JTX138, JTX140, JTX142 and JTX266.

24 MS. THOMPSON: No objection.

25 THE COURT: All right. JTX129, 130, JTX63, 132,

568

1 133, 135, 136, 137, 138, 140, 142 and 266 are admitted.

2 (Exhibit admitted.)

3 MS. THOMPSON: Thank you, Your Honor.

4 BY MS. THOMPSON:

5 Q. Dr. Rainey, did you form an opinion as to the

6 appropriate amount of past damages that the jury should

7 award Jazz even if Avadel's found to have infringed?

8 A. Yes, I did.

9 Q. And did you prepare anything today to help the jury

10 understand your opinion.

11 A. Yes, I prepared some slides.

12 Q. Okay. Well, let's take a look at the first slide,

13 it's PDX2.

14 And what was your opinion as to the appropriate

15 royalty rate for past damages?

16 A. It's shown there, it's 27 percent.

17 Q. And how do you convert that royalty rate into a

18 monetary figure?

19 A. In order to convert that into damages, you apply the

20 royalty rate to what's called a royalty base and here, I

21 determined that the appropriate royalty base was the net

22 sales of Lumryz since launch which is shown there is

23 about -- I calculated to be about $32.5 million.

24 Q. And so using that royalty rate and royalty base, what

25 is your opinion as to the value of past damages?

569

1    A.    Yes, you multiply those two numbers together and you
2    get about $8.8 million.
3    Q.    Now, what is a reasonable royalty?
4    A.    You know, it's kind of those things with a reasonable
5    royalty as the royalty that a willing licensor and a willing
6    licensee would agree to for a license to patents if they got
7    together and negotiated about it.
8    Q.    And what exactly is a license?
9    A.    A license is when, if you own a patent, you grant
10   someone else the right to use that patent.
11   Q.    And why did you look at reasonable royalty in
12   assessing damages in this instance?
13   A.    Because the law surrounding patent damages says that
14   it's appropriate to look at a reasonable royalty.
15   Q.    Okay.  Let's go ahead to your next slide here.
16         Is this one of the laws you're talking about?
17   A.    Yes.
18   Q.    And why did you underline here "for the use made of
19   the invention by the infringer"?
20   A.    It's just because, you know, we've heard some
21   testimony in the past couple of days about how Jazz does not
22   have a once-nightly product or uses these patents.  But
23   really focuses on the use made of the invention by the
24   infringer and the alleged infringer here is Avadel, which is
25   accused of using the patents.

570

1    Q.    And what is the framework by which you assess what a
2    reasonable royalty would be?
3    A.    I use a framework called a hypothetical negotiation.
4    Q.    Okay.  And what is a hypothetical negotiation as a
5    general matter?
6    A.    Yeah, so a hypothetical negotiation is, you get the
7    patent owner, the accused infringer, you assume that they
8    got together at the time of first infringement and
9    negotiated a license to the patents-in-suit.
10   Q.    Okay.  Let's go to your next slide.
11         For the hypothetical negotiation you looked at
12   here, who are the parties to the negotiation?
13   A.    Yeah, the two parties are Jazz, which is the patent
14   owner, and Avadel, which is the accused infringer.
15   Q.    And what was the timing of the negotiation?
16   A.    It's at or about the time of first infringement,
17   which in this case is, you know, somewhere around late May,
18   early June of 2023.
19   Q.    And what do the parties assume at the time of the
20   hypothetical negotiation as to validity and infringement?
21   A.    Both parties would assume that the patents-in-suit
22   are valid, infringed and enforceable.
23   Q.    And what type of royalty did you consider in the
24   context of the hypothetical negotiation?
25   A.    Yeah, I determined that the parties would end up

571

1    negotiating what's called a running royalty, which, as we
2    saw in my first slide, it means that you have a royalty rate
3    that's applied to a royalty base.
4    Q.    So whatever is paid under the royalty, would depend
5    upon what those revenues are for the sale?
6    A.    Yeah, and one of the reasons I determined it was
7    appropriate is because that helps the parties share the risk
8    about, you know, what will happen in future sales of Lumryz.
9    If for some reason Lumryz sales happen to be lower than
10   expected, then the royalty payment would be lower too.
11   Q.    And how did you determine what information to
12   consider in conducting your hypothetical negotiation
13   analysis?
14   A.    I also considered, you know, past -- the law
15   surrounding reasonable royalties and it talks about certain
16   factors that may be appropriate to consider in determining
17   reasonable royalty.
18   Q.    What did you determine about the relevance of all
19   those various factors?
20   A.    I determined that some of them were relevant
21   or highly relevant, some of them, given the circumstances of
22   this case, weren't as important.
23   Q.    Now we talked about licenses, can you explain what a
24   licensing program is?
25   A.    Licensing program would be if, for example, you're a

572

1    company that has patents but doesn't sell products, you
2    might want to go out and find companies that you could
3    license your patents to to make some money.  So that would
4    be a licensing program.
5    Q.    And does Jazz have a licensing program?
6    A.    No, we heard, I think it was Mr. Honerkamp,
7    yesterday, talk about that.  They're focussed on selling
8    their own products, developing and selling their own
9    products, not licensing patents.
10   Q.    And how does the fact that Jazz does not have a
11   licensing program affect the reasonable royalty analysis?
12   A.    That tends to affect the reasonable royalty.
13   Q.    And did you consider the nature and scope of the
14   license the parties would agree to as part of your
15   hypothetical negotiation analysis?
16   A.    Yes.
17   Q.    And what did you determine?
18   A.    I determined it would be -- the license that they
19   would negotiate would be exclusive as to third parties and
20   all that means is that Jazz would grant Avadel a right to
21   use the patents, Jazz would retain the right to use those
22   patents itself, but then no other parties would be allowed
23   to use those patents.
24   Q.    Are you aware of any customary royalty rate for
25   technologies like the patents we're talking about in this

573

1   case?

2   **A.**      No.

3   **Q.**      Did you review any licenses that would establish what

4   the royalty would be for the patents we're talking about

5   here?

6   **A.**      No, I didn't.

7   **Q.**      Why not?

8   **A.**      Because, you know, Jazz doesn't have a licensing

9   program, so they haven't licenses the patents-in-suit.

10  **Q.**      And in forming your opinion, did you review any Jazz

11  licenses at all?

12  **A.**      I did.

13  **Q.**      And what's an example of a license Jazz might have

14  given that it doesn't have a licensing program?

15  **A.**      So when you have litigation about patents, similar

16  like this, that can lead to settlement agreements which lead

17  to licenses, so Jazz has some of those.  You also can have

18  licenses between different divisions of the same company and

19  Jazz also has some of those.

20  **Q.**      And what did you determine about whether those

21  licenses are comparable to the license that would result

22  from a hypothetical negotiation?

23  **A.**      I determined they wouldn't be comparable.

24  **Q.**      And why not?

25  **A.**      And for a couple of reasons.  You know, one is just

574

1   that the intellectual property that was licensed is very

2   different.  As I said before, the patents-in-suit haven't

3   been licensed before.

4            Another reason is that the circumstances

5   regarding the negotiation of a license are different,

6   quote/unquote, that they would at the "hypothetical

7   negotiation."

8   **Q.**      And what about for any intercompany licenses that you

9   looked at?

10  **A.**      Yeah, there are big differences in the nature of the

11  relationship between the two parties to the license.  If

12  they are the divisions of the same company, they are working

13  together, they are cooperating.

14           Here, as we've heard, Jazz and Avadel are

15  competitors so that's a very different competitive

16  relationship.

17  **Q.**      And did you ever review any Avadel licenses in

18  forming your opinion?

19  **A.**      Yes, I did.

20  **Q.**      And what did you determine about whether any Avadel

21  licenses were comparable to the license that would result

22  from a hypothetical negotiation?

23  **A.**      I determined they weren't comparable.

24  **Q.**      Okay.  Did you hear any testimony today or

25  throughout -- or yesterday, I guess, about Project Zeta?

575

1   **A.**      Yes, I think both days probably.

2   **Q.**      Did you look at Project Zeta in conducting your

3   analysis?

4   **A.**      Yeah, I considered it.

5   **Q.**      And what did you determine about the relevance of the

6   Project Zeta in negotiations to the reasonable royalty rate?

7   **A.**      Yeah, it didn't establish a royalty rate for the

8   patents-in-suit, you know, not comparable.

9   **Q.**      And if you heard or know, when did those Project Zeta

10  negotiations occur?

11  **A.**      Those occurred in 2018, so about 5 years prior to the

12  date of the hypothetical negotiation.

13  **Q.**      And in that negotiation, what was the proposed

14  relationship between Jazz and Avadel as opposed to their

15  relation in a hypothetical negotiation?

16  **A.**      Yeah, as we just heard Mr. Divis testify, it was more

17  of a partnership that they were considered in Project Zeta,

18  whereas, a hypothetical negotiation, the two companies would

19  be viewing each other as competitors: they'd be selling

20  competing products if a license were granted.

21  **Q.**      Okay.  Let me ask you about competing products.

22           In your opinion, what's the commercial

23  relationship between Jazz and Avadel?

24  **A.**      They are direct competitors.

25  **Q.**      And what are the facts that led you to conclude that?

576

1   **A.**      You know, information from Avadel, third parties, you

2   know, information we've heard testimony about the past

3   couple of days as well is all the type of information we've

4   considered.

5            MS. THOMPSON:  Your Honor, at this point in time

6   I would like to move into evidence Exhibit JTX113.

7            MS. DAVIS:  No objection.

8            THE COURT:  JTX113 is admitted.

9            (Exhibit admitted.)

10  BY MS. THOMPSON:

11  **Q.**      And, Dr. Rainey, what is this document?

12  **A.**      This is a document Avadel filed with the Securities

13  and Exchange Commission.

14  **Q.**      So it's a financial document filed with the

15  government?

16  **A.**      Yes, it has financial and business information.

17  **Q.**      And did you consider this document in forming your

18  opinion here?

19  **A.**      Yes.

20  **Q.**      All right.  Let's look at the date.  Can we go to

21  page 113.182, please.

22           And what is the date that Avadel submitted this

23  to the SEC?

24  **A.**      Yeah, the date of the signature there is March 29,

25  2023, so just a couple of months before the hypothetical

577

1    negotiation.

2    Q.    Okay.  And let's jump back to page 113.11.

3            And looking at that italicized heading at the

4    top there, what did Avadel tell the U.S. government in that

5    filing?

6    A.    It's -- they are telling the government that if

7    Lumryz is granted final FDA approval, it will compete with

8    the currently approved twice-nightly oxybate formulations,

9    which we know are Jazz's products, Xyrem and Xywav.

10            Later on in that paragraph, it says that they

11    are also -- it also would compete with the authorized

12    generic version of Xyrem, which is, again, another Jazz

13    product, Mr. Mindus talked about it, Avadel, I'll call it

14    Xyrem HE for short.

15    Q.    Okay.  And was Lumryz, in fact, approved before the

16    hypothetical negotiation?

17    A.    Yes.  Yeah, as we've heard, it was approved May 1st

18    of 2023.

19            MS. THOMPSON:  We can take that down, thank you.

20    BY MS. THOMPSON:

21    Q.    Did you consider any industry research reports from

22    the relevant time period discussing whether Jazz and Avadel

23    are direct competitors?

24    A.    Yes.

25    Q.    And what did those industry research reports say?

578

1    A.    They said the same thing as what Avadel was telling

2    the government, that Lumryz would be competing with Xyrem

3    and Xywav, Xyrem AG.

4    Q.    And how does the fact that Jazz and Avadel are direct

5    competitors affect the reasonable royalty?

6    A.    It tends to increase the reasonable royalty.

7    Q.    All right.  Did you consider Avadel's forecast for

8    Lumryz in forming your opinion as to the reasonable?

9    A.    Yes, I did.

10            MS. THOMPSON:  Let's go ahead and pull up PTX5.

11    BY MS. THOMPSON:

12    Q.    And this is a slide from Exhibit JTX129, Avadel's

13    May 2023 Lumryz forecast.

14            On this slide, what does conversion in this

15    context refer to?

16    A.    Yeah, so conversion is essentially -- we heard

17    Mr. Divis talked about switching, so patients being switched

18    from Jazz products to Lumryz.  That's what this conversion

19    category represents.

20    Q.    All right.

21            MS. THOMPSON:  Let's go to the next slide.

22    BY MS. THOMPSON:

23    Q.    Is this a chart you made based on Avadel's forecast

24    that -- on JTX129?

25    A.    Yes.

579

1    Q.    Okay.  And what does the conversion percent row in

2    this chart show?

3    A.    It just indicates of the total Lumryz patients in

4    their forecast from 2023 to '28, you know, what's the share

5    of total Lumryz patients that are conversion or switch

6    patients.

7    Q.    Okay.  And what is that percent?

8    A.    So it starts off at about 54 percent in 2023, and

9    then by 2028, it's about 40 percent.

10    Q.    Now, what is the relevance to the hypothetical

11    negotiation of the fact that Avadel was forecasting patients

12    would be switching from Xyrem and Xywav to Lumryz?

13    A.    It just indicates that there was extensive

14    competition between Avadel to Jazz because Lumryz was taking

15    a big chunk of its patients from Jazz's products.

16    Q.    Did you consider any other information showing

17    Avadel's targeting of switching patients from Xyrem and

18    Xywav?

19    A.    Yes.

20    Q.    All right.

21            MS. THOMPSON:  Let's go to the next slide.

22    BY MS. THOMPSON:

23    Q.    This is a slide from Exhibit PTX295, Avadel's May 1

24    Investor Day presentation from 2023.

25            Did you rely on this document in your analysis?

580

1    A.    Yes, I did.

2    Q.    And what does it show that Avadel was telling

3    investors at the time?

4    A.    Yeah, so these are the three patient segments again,

5    we just heard Mr. Divis talk about.  Again, this category

6    here, current twice-nightly oxybate patients, those are

7    switched patients because they are currently taking Jazz

8    products.

9    Q.    Okay.  And what do the parties know at the time of

10    the hypothetical negotiation about Avadel's strategy with

11    healthcare providers or doctors?

12    A.    That Avadel's strategy was to target highly -- big

13    prescribers of Jazz products, twice-nightly oxybates.

14    Q.    Okay.  Let's go ahead to your next slide.

15            This is showing Exhibits JTX138, JTX140, and

16    PTX300.  Did you rely on these documents in your analysis?

17    A.    Yes, I did.

18    Q.    And what was the overall strategy Avadel had with

19    regard to healthcare professionals?

20    A.    It was to focus on existing high-volume oxybate

21    prescribers, that is doctors who were prescribing Jazz

22    products.

23    Q.    And how would the fact that Avadel was targeting

24    Jazz's patients affect what Jazz would accept as a

25    reasonable royalty in the hypothetical negotiation?

581

1   A.      It would mean that at the hypothetical negotiation,
2   Jazz would be concerned that by granting a license to
3   Avadel, it would be losing patients and losing money because
4   of granting that license.
5   Q.      And did you analyze any benefits that Avadel was
6   promoting that Lumryz had over Jazz's twice-nightly oxybate
7   drugs?
8   A.      Yes.
9   Q.      And what was the relevance of how Avadel was
10  promoting Lumryz in comparison to Jazz's twice-nightly
11  oxybate products?
12  A.      Yeah, it showed that the once-nightly formulation is
13  something that Avadel viewed as really the key to success of
14  Lumryz.
15  Q.      Okay.  And what is your understanding about the
16  relationship between the patents at issue in this lawsuit
17  and the once-nightly formulation of Lumryz?
18  A.      Yeah, my understanding is that the patents at issue
19  here allow for the once-nightly formulation of Lumryz.
20  Q.      And did you consider Avadel documents in reaching
21  that conclusion?
22  A.      Yes, I did.
23  Q.      Let's take a look at a few examples.
24          MS. THOMPSON:  We could go on to the next slide.
25  BY MS. THOMPSON:

582

1   Q.      Did you rely on the documents shown here, Exhibits
2   JTX132, JTX133, and PTX262 in your analysis?
3   A.      Yes.
4   Q.      And what is cited on this slide?
5   A.      So these are some research studies, you know, they
6   are performed by or funded by Avadel, about preferences
7   among oxybates and what drives physician and patient
8   preference.
9   Q.      And what was the conclusion of these research studies
10  that Avadel funded about the importance of the once-nightly
11  formulation?
12  A.      Yeah, so really two conclusions:  One is that, among
13  both doctors and patients, they found that dosing frequency
14  is the most important attribute for product choice.  Second
15  conclusion was that once-nightly was preferred to
16  twice-nightly.
17  Q.      Okay.  Let's go to your next slide, PTX10.  This is
18  from the Investor Day presentation, again, Exhibit PTX295.
19          How did Avadel use the information that doctors
20  and patients prefer the once-nightly formulation with
21  investors?
22  A.      They used it to -- they were telling investors that
23  because people preferred this once-nightly formulation, this
24  would mean that Lumryz would be successful, essentially.
25  Q.      And what is your understanding of the FDA's

583

1   consideration of the once-nightly formulation of Lumryz?
2   A.      Yeah, so the FDA, we've heard some testimony about
3   that as well, I think it's the major contribution to patient
4   care, and that's, again, related to the once-nightly
5   formulation.
6   Q.      Okay.  Let's look at your next slide, PTX11.  This is
7   citing Exhibits JTX138, JTX140, and PTX300.  You -- did you
8   rely on those documents in your analysis?
9   A.      Yes.
10  Q.      And what was Avadel saying with regard to how the FDA
11  viewed the fact that Lumryz is a once-nightly product?
12  A.      Yeah, so it's really -- they're talking about how the
13  once-at-bedtime Lumryz dosing is a major contribution to
14  patient care, according to the FDA.
15  Q.      Okay.  Let's go to your next slide.  This slide shows
16  Exhibits JTX135, JTX136, and JTX142.  Did you rely on these
17  documents in your analysis?
18  A.      Yes, I did.
19  Q.      What does this show about how Avadel promotes Lumryz
20  to patients?
21  A.      Yeah, so here -- these are examples of promotion both
22  to patients, I think there's some physician promotion as
23  well, showing that really the key attribute that Avadel is
24  focusing on is the once-nightly part, you know, once at
25  bedtime for your daytime, that's really the key -- key

584

1   message they want to get across, both to patients and
2   physicians.
3   Q.      And in your opinion, how would the fact that Avadel
4   emphasizes Lumryz's once-nightly formulation inform the
5   parties' thinking in the hypothetical negotiation?
6   A.      You know, it would mean that -- it would tend to
7   increase the reasonable royalty.
8   Q.      Okay.
9           MS. THOMPSON:  Let's go to the next slide here,
10  PTX13.
11  BY MS. THOMPSON:
12  Q.      This is citing Exhibit JTX63.  Did you rely on this
13  document in your analysis?
14  A.      Yes, I did.
15  Q.      And what connection has Avadel made between the
16  formulation and the once-nightly attribute of Lumryz?
17  A.      This is Avadel saying that it's the blend of
18  immediate-release and controlled-release particles that
19  allows for the single bedtime dose of Lumryz.
20  Q.      And how did the advantages that Avadel has associated
21  with the formulation affect the reasonable royalty?
22  A.      It increases the reasonable royalty.
23  Q.      In your opinion, how did Jazz and Avadel perceive the
24  value of the patents at the hypothetical negotiation?
25  A.      They thought the patents were valuable because,

585

1  again, they are assumed to be valid and infringed.  And it's
2  also, again, my understanding that the patents are what
3  allow for that once-nightly formulation, which we've seen
4  is viewed as the key to success of Lumryz.
5  Q.    And what's your understanding of whether the value
6  that Jazz's patents-in-suit contribute to Lumryz can be
7  separated from the value of Lumryz as a whole?
8  A.    Yeah, I don't think it's really possible to do that
9  because my understanding is that the patents cover the
10  formulation of Lumryz as a whole.  So the only product that
11  exists that's FDA approved is the whole formulation of
12  Lumryz, it's not like Lumryz is a cell phone where you can
13  think about there being different components that you could
14  sell or put together, like a processor or a screen or a
15  camera, right, that goes onto your cell phone.
16        With Lumryz, it's just the whole formulation and
17  that's what is FDA approved.
18  Q.    Okay.  What would the parties have understood about
19  the likely success of Lumryz at the time the hypothetical
20  negotiation took place?
21  A.    They would expect -- they were expecting it to be a
22  successful profitable product at the time.
23  Q.    And why did Avadel think there would be a demand for
24  Lumryz, in your opinion?
25  A.    This relates to something we heard Mr. Divis talk

586

1  about, which is the unmet need that Avadel viewed Lumryz
2  fulfilling.
3  Q.    Okay.
4        MS. THOMPSON:  Let's go to the next slide, 14.
5  BY MS. THOMPSON:
6  Q.    This is showing excerpts from Exhibits PTX295 and
7  JTX137.  Did you rely on these documents in forming your
8  opinion?
9  A.    Yes.
10  Q.    And what does this show about Avadel's statements
11  regarding Lumryz addressing an unmet need?
12  A.    Yes, this is Avadel talking about there being a
13  serious unmet need for once-nightly dosing of sodium
14  oxybate.
15  Q.    And what was Avadel telling people --
16        MS. THOMPSON:  If we could go to the next slide.
17  BY MS. THOMPSON:
18  Q.    -- about the expected sales of Lumryz around the time
19  of the hypothetical negotiation?
20  A.    Yeah, as we've heard, they were telling investors
21  that the peak sales opportunity was over $1 billion a year.
22        MS. THOMPSON:  Can we go ahead to the next
23  slide, and this is showing excerpts of Exhibits JTX119 and
24  PTX300.
25  BY MS. THOMPSON:

587

1  Q.    What was Avadel saying at the time of the
2  hypothetical negotiation about the expected market share of
3  Lumryz?
4  A.    They were saying that they were expecting Lumryz to
5  become the market leader with a market share in the range of
6  50-60 percent.
7  Q.    What about Avadel's financial models with respect to
8  Lumryz's likely success?  Did you consider those?
9  A.    Yes.
10        MS. THOMPSON:  All right.  Let's go ahead and
11  look at Exhibit -- let's go to the next slide, I guess,
12  PDX17.
13  BY MS. THOMPSON:
14  Q.    And this is from Exhibit JTX130, and at the top, it
15  says, "May 2023 Avadel Financial Model."
16        Is that what that exhibit is?
17  A.    Yes.
18  Q.    Okay.  And what's Avadel forecasting here?
19  A.    They're forecasting revenues and various measures of
20  profit for Lumryz for the period that's shown here, which is
21  2023-2036.
22  Q.    As of May 2023, what was Avadel forecasting in that
23  revenue for Lumryz?
24  A.    They are forecasting net revenue to start off at
25  █████████████ in the launch year 2023, but significant

588

1  growth ████████████████ this year, 2024, and
2  increasing to ████████████
3  Q.    And just -- can you just explain, what is net revenue
4  as compared to gross revenue?
5  A.    Oh, sure, yeah.  So net revenue -- the difference
6  between gross revenue to net revenue is essentially
7  discounts and rebates.  So you can think about gross revenue
8  representing the list price, sticker price, but then after
9  discounts and rebates, you get net revenue, which is the
10  money actually coming into the door at Avadel.
11  Q.    Okay.  And as of May 2023, when was Avadel
12  forecasting that it would turn a profit?
13  A.    ████████████
14  Q.    And what's your understanding of whether after Lumryz
15  launched, Lumryz has been performing as Avadel expected?
16  A.    Yeah, my understanding is that things are going
17  according to plan.  You know, they're still telling people,
18  as we've just heard from Mr. Divis, that peak sales
19  opportunity of over a billion dollars is still -- still part
20  of the plan.
21  Q.    And how does an expected profitability and success of
22  Lumryz affect the reasonable royalty?
23  A.    It tends to increase the reasonable royalty.
24  Q.    Now, in forming your opinions, did you consider
25  whether, instead of launching Lumryz, Avadel had any

589

1 noninfringing alternative?

2 A.     Yes, I did.

3 Q.     And what is meant in this context by a noninfringing

4 alternative?

5 A.     So in this context, a noninfringing alternative would

6 be another product that Avadel could sell, instead of

7 Lumryz, that had the same attributes as Lumryz.  It was

8 available for Avadel to sell, and it did not infringe Jazz's

9 patents.  Those are the characteristics.

10 Q.     And did Avadel and does Avadel have any noninfringing

11 alternative?

12 A.     No, they don't.

13 Q.     And what is the significance of Avadel not having a

14 noninfringing alternative?

15 A.     It means that at the hypothetical negotiation, they'd

16 be in a relatively weak bargaining position.

17 Q.     Aside from switching patients from Jazz's products to

18 Lumryz, what's your understanding of how Avadel plans to

19 benefit from Lumryz?

20 A.     Right, so there are the other patient segments we've

21 heard about -- discounted patients, patients who have never

22 taken oxybates -- and in addition, there's expanding the

23 patient population for Lumryz.

24 Q.     Okay.  Can we just look quickly at Exhibit PTX300, at

25 page 300.112.

590

1       And you were here when Mr. Divis just testified?

2 A.     Yes.

3 Q.     Did you hear him talk about this slide here?

4 A.     Yes, I did.

5 Q.     And in your opinion, how does Avadel's plan and use

6 for Lumryz affect the reasonable royalty?

7 A.     Yeah, this means that there's -- there would have

8 been -- they -- Avadel would have viewed there'd be an

9 additional value in the future from this, which, again,

10 would tend to increase the reasonable royalty.

11 Q.     Okay.  Let's go back to your slides.

12       Based on your analysis, did you conclude what a

13 reasonable royalty would be?

14 A.     Yes.

15 Q.     Okay.  Can we go to slide 18, please.

16       And what does this slide show?

17 A.     This shows the royalty rates that I determined would

18 be the outcome of the hypothetical negotiation.

19 Q.     Okay.  And why are there three different royalty

20 rates?

21 A.     There's three different royalty rates for the three

22 different periods, and the three different periods differ in

23 their competitive conditions, and just the basic idea here

24 is in economics, competitive conditions affect royalty

25 rates.

591

1 Q.     Okay.  And it says here, 27 percent for the time

2 period 2023-2025, 13 percent for the time period 2026 to

3 2032, and 3.5 percent for the time period 2033 to 2036.

4       Is that the opinion that you reached?

5 A.     Yes.

6 Q.     And which of these royalty rates applies to past

7 damages for infringement at issue in this lawsuit?

8 A.     Yeah, that first one there, so -- so right now we're

9 just talking about 2023 and part of 2024, so 27 percent is

10 the relevant rate.

11 Q.     And what would be the full duration of the license

12 that was negotiated during the hypothetical negotiation?

13 A.     It would go to the expiration of the last valid

14 infringed patent claim.

15 Q.     In your opinion, why would Jazz agree to the royalty

16 rates we just discussed in that hypothetical negotiation?

17 A.     Because these royalty rates wouldn't make Jazz worse

18 off by entering into a license at those royalty rates.

19       MS. THOMPSON:  All right.  Can we go to the next

20 slide, 19.

21 BY MS. THOMPSON:

22 Q.     And what is the source of information for this slide?

23 A.     This is based off of Jazz's narcolepsy forecast

24 model, which we heard Mr. Mindus testify about earlier this

25 afternoon.

592

1 Q.     And what does this slide show?

2 A.     So, you know, as we heard Mr. Mindus say, you can use

3 Jazz's narcolepsy forecast model to forecast the revenue for

4 Jazz's products with Lumryz and without Lumryz.

5       So using that information and also the profit

6 information that Mr. Mindus also talked about, I'm

7 calculating the amount of money that Jazz expected to lose

8 if Lumryz launched.

9 Q.     Okay.  And what is column G here on this slide?

10 A.     Yeah, that's the amount of money that Jazz expected

11 to lose due to Lumryz's launch.

12 Q.     Okay.  What is column H?

13 A.     That's a forecast of Lumryz's net revenues that is

14 derived from Jazz's narcolepsy forecast model.

15 Q.     Okay.  And what is column I showing in that final

16 column?

17 A.     So that's showing on a year-by-year basis the royalty

18 rate you'd have to apply to forecast Lumryz's net revenues

19 in order to keep Jazz from being made worse off.

20 Q.     And why is it relevant to the hypothetical

21 negotiation to consider the revenue Jazz loses from its

22 twice-nightly products by licensing the patent to Lumryz's

23 once-nightly product?

24 A.     Because Jazz's losses are really tied very closely to

25 the incremental value of Jazz's patents, and that's because

593

1  Jazz's patents allow for the once-nightly formulation of
2  Lumryz.  And if you think about why Lumryz's entry is
3  causing Jazz to lose money, it is because of that, the
4  benefits of once-nightly, that Lumryz has and Jazz doesn't.
5  Q.    If we look at this average royalty rate calculation
6  at the bottom here, what is that?
7  A.    So, again, I'm -- those are those three periods with
8  the three different competitive conditions -- and I'm
9  calculating the average of the royalty rates in column I
10  across those three periods.
11  Q.    Now, why didn't you use a royalty rate of, say,
12  3.5 percent for the whole term of the license?
13  A.    It would be economically irrational for Jazz to enter
14  into such a license.
15  Q.    Economically irrational, you said?
16  A.    Irrational.
17        MS. THOMPSON:  Okay.  Can we go to the next
18  slide.
19  BY MS. THOMPSON:
20  Q.    Is this one of your calculations?
21  A.    Yes.
22  [redacted]

594

8  Q.    Okay.  Let's look at this from Avadel's perspective.
9        MS. THOMPSON:  Can we go to the next slide,
10  please.
11  BY MS. THOMPSON:
12  Q.    And this is citing to Exhibit JTX129.
13        Did you rely on that document in conducting your
14  analysis?
15  A.    Yes.
16  Q.    Okay.  And what is this showing here?
17  A.    So this is looking at things from Avadel's
18  perspective at the time of the hypothetical negotiation.  In
19  column B there, I have Avadel's forecast of Lumryz's
20  revenues during the licensing -- licensing period.  And then
21  column C is the royalty Avadel would expect to pay at my
22  reasonable royalty rates.
23  Q.    Okay.  And what is the -- how much revenue was Avadel
24  forecasting from Lumryz through the start of 2036 as of the
25  date of this forecast?

595

1  A.    Yeah, the total -- total forecast of Lumryz's revenue
2  is at the bottom of column B there, so that's a little over
3  [redacted]
4  Q.    Okay.  And how much revenue would Avadel expect to
5  keep if it agreed to the royalty structure that resulted
6  from your analysis?
7  A.    So, yeah, to get that, you take the [redacted] and
8  subtract the amount it would have expected to pay in
9  royalties, and that -- that amount, expected to pay in
10  royalties, is in column C, and that's just [redacted]
11  [redacted]
12  [redacted]  That's the bottom of column D.
13  Q.    Okay.  So that's Avadel revenue net of royalty, how
14  much they would keep if they paid for the license to the
15  patents resulting from the hypothetical negotiation.
16  A.    Yeah, how much of the revenue they would keep after
17  the royalty.
18  Q.    And what does the analysis show about how much Avadel
19  will be compensated for any contributions it made to Lumryz?
20  A.    Yeah, well, I mean, let's -- I mean, first of all,
21  let's keep in mind that, you know -- my understanding is
22  that the patents cover this once-nightly formulation which
23  is -- Avadel viewed as key to the success of Lumryz.
24  Avadel -- if it covers the formulation, Avadel doesn't have
25  a noninfringing alternative, but it -- nevertheless, they

596

1  are still getting -- expecting to get, as a result of this
2  license, [redacted] net of royalty.
3  Q.    Okay.  And do your opinions on the reasonable royalty
4  rate change depending on which of the asserted patent claims
5  we're talking about?
6  A.    No, they don't.
7  Q.    And why not?
8  A.    Because those fundamental economic considerations I
9  just mentioned -- the lack of noninfringing alternative, the
10  fact that the patents cover the once-nightly formulation,
11  the fact that it's key to the success of Lumryz -- those
12  don't change depending on which of the claims are valid and
13  infringed.
14  Q.    Okay.  Did you assess whether Avadel would be better
15  off agreeing to the royalty and therefore willing to
16  enter into the agreement at the royalty rates that you've
17  concluded would be appropriate?
18  A.    Yes, I did.
19  Q.    Let's go to your next slide.  What does that number
20  on the left-hand side there show?
21  A.    So this is Avadel's market capitalization near the
22  time of the hypothetical negotiations, so that's --
23  essentially it's stock market value.  And economically, you
24  can think about that as being kind of a conservative measure
25  of the present value of expected future profits for Avadel.

597

1  So it's going to take into account the market's expectations
2  of future revenues, you know, future costs, future tax
3  payments, future interest payments.  It will take all of
4  those into account.
5  Q.      Okay.  And what is that number on the right-hand
6  side?
7  A.      The number on the right-hand side is -- it's a
8  calculation of the present value of expected royalty
9  payments based on a market derived forecast of Lumryz's
10 revenues.
11 Q.      Okay.  And so this is an apples-to-apples comparison
12 based on public data?
13 A.      Yes, based on market data is the way I would describe
14 it.
15 Q.      Okay.  And what does the comparison between these two
16 numbers tell you?
17 A.      Right, so the thing to keep in mind is that, you
18 know, because there's no noninfringing alternative, because
19 the patents are key to the success of Lumryz, in the absence
20 of a license, Avadel's profits would be zero.
21         So to determine whether the deal makes Avadel
22 better off, you just have to compare these two numbers,
23 because by launching Lumryz, it has the present value of
24 expected profits, it's about ██████, but you also have
25 to take into account that Avadel would be expecting to pay

598

1  royalties based on that 27 percent, 13 percent, 3.5 percent
2  royalty structure.
3         And the present value of those royalty payments
4  is the ██████ so since ██████
   ██████ in royalty payments, they are ██████
7  deal.
8  Q.      All right.  You mentioned market capitalization takes
9  into account ongoing expenses.
10        What about past expenses?
11 A.      No, it's a -- market capitalization, like a lot of
12 economic concepts, is fundamentally forward-looking.  So it
13 takes into account the markets expectations of Avadel's
14 future expenses but not things like some costs, which would
15 be costs that Avadel incurred in the past and can't recover.
16 Q.      And did you consider sunk costs in your hypothetical
17 negotiation?
18 A.      Yeah, I mean, I considered them, but I determined
19 that they are not appropriate to take into account at the
20 hypothetical negotiation, you know, neither Avadel's sunk
21 cost, nor Jazz's sunk costs, you know, they are both, in
22 some sense, "water under the bridge," and, hence, not
23 economically relevant.
24 Q.      Okay.  Let's go to the next slide.
25        So we looked at this slide earlier and we've

599

1  talked about how you came up with the past royalty, let's
2  talk about, then, the net sales number.
3         What are the sources of information used to
4  calculate the royalty base here?
5  A.      I used a couple of sources of information from
6  Avadel.
7  Q.      Okay.
8         MS. THOMPSON:  Your Honor, if I could move into
9  evidence Exhibit PTX618.
10        MS. DAVIS:  No objection.
11        THE COURT:  All right.  PTX618 is admitted.
12        (Exhibit admitted.)
13        MS. THOMPSON:  And if we could show that.
14 BY MS. THOMPSON:
15 Q.      And, Dr. Rainey, what is this document?
16 A.      This is another Avadel SEC filing, this is a Form
17 10-Q for the period ended September 30th, 2023.
18 Q.      And did you rely on that document in calculating
19 royalty base?
20 A.      Yes.
21 Q.      And what else did you rely on in calculating the
22 royalty base?
23 A.      I also relied on one of Avadel's weekly sales reports
24 for Lumryz, as I think Mr. Divis testified about those just
25 previously.

600

1  Q.      Okay.  And if we could go back to the slide we were
2  looking at.
3         What did you determine, between that SEC filing
4  and the weekly sales report, the royalty base would be?
5  A.      That $32.5 million number.
6  Q.      Okay.  And applying that 27 percent for past damages,
7  what is the total amount of past damages?
8  A.      $8,780,223.
9         MS. THOMPSON:  I have no further questions.
10 Thank you, Dr. Rainey.
11        THE COURT:  All right.
12        MS. DAVIS:  May we approach with binders, Your
13 Honor?
14        THE COURT:  Yes.
15        MS. DAVIS:  May I proceed, Your Honor?
16        THE COURT:  Yes.
17                 CROSS-EXAMINATION
18 BY MS. DAVIS:
19 Q.      Good afternoon, Dr. Rainey, as you may remember, my
20 name is Kira Davis and I represent Avadel.
21         In giving your opinions, you made certain
22 assumptions, correct?
23 A.      Yes.
24 Q.      You, yourself, do not have any opinions about
25 infringement and you also don't have any opinions about

601

1  validity, correct?

2  **A.**   Right, I just assume that the patents are valid and

3  infringe, but I don't have opinions on that.

4  **Q.**   It is your understanding that, "although patents are

5  presumed valid, the validity of many patents is challenged

6  in court," correct?

7  **A.**   That is -- you know, that happens, yes.

8  **Q.**   And not all of the patents that are challenged in

9  court survive that challenge, correct?

10  **A.**   That's true.

11  **Q.**   Some patents get invalidated?

12  **A.**   That's true.

13  **Q.**   If Avadel wins in this case, there are no damages,

14  correct?

15           MS. THOMPSON:  Objection, Your Honor, that calls

16  for a legal conclusion.

17           MS. DAVIS:  He had the patent statute up on a

18  slide, Your Honor.

19           THE COURT:  Right.  That's overruled.  He can

20  answer it.

21           THE WITNESS:  You know, I'm not a lawyer, my

22  understanding is if -- if validity and infringement are

23  proved, then there wouldn't be damages, but hey, I'm not a

24  lawyer.

25  BY MS. DAVIS:

602

1  **Q.**   So when Jazz's lawyer was asking you questions, you

2  talked about patients who were going to switch from Xyrem

3  and Xywav to Lumryz.

4           Do you recall that testimony?

5  **A.**   Yes.

6  **Q.**   Now, you agree that Lumryz is being used with

7  patients who would not otherwise be taking Xyrem or Xywav,

8  correct?

9  **A.**   That's part of the Lumryz patient population.

10  **Q.**   Avadel has the only once-nightly oxybate product for

11  narcolepsy available today, correct?

12  **A.**   That's correct.

13  **Q.**   So now let's talk about what Jazz has.

14           You agree that Jazz to date has not

15  commercialized a once-nightly oxybate product, correct?

16  **A.**   Yes, and I accounted for that in my analysis.

17  **Q.**   You used Jazz internal projections to come up with

18  your opinions; is that correct?

19  **A.**   Yeah, and then I checked them against, you know, for

20  instance, Avadel's projections as well.

21  **Q.**   The Jazz's projections were created by Jazz, correct?

22  **A.**   Yes, in their ordinary course of business, yes.

23  **Q.**   You assumed that Jazz tried to be accurate?

24  **A.**   Yes.

25  **Q.**   The projections you were using from Jazz, those were

603

1  created after this lawsuit began, correct?

2  **A.**   I don't recall off the top of my head when this --

3  **Q.**   ███████████████████████████████████████████████

   ███████████████████████████████████████████████████

   ███████████████████████████████████████████████████

7  **Q.**   Now, you are of the view that the parties at the

8  hypothetical negotiation would agree to three different

9  royalty rates for three different periods of time; is that

10  right?

11  **A.**   Yes.

12  **Q.**   The trigger for the second period is the entry of

13  multisource generic Xyrem, correct?

14  **A.**   Yes, that's the change in competitive conditions.

15  **Q.**   "Multisource generics" means not just the authorized

16  generic that is actually a product made by Jazz, but also

17  generics made by companies other than Jazz; is that right?

18  **A.**   Yes.

19  **Q.**   ██████████████████████████████████████████████████

   ██████████████████████████████████████████████████████

   ██████████████████████████████████████████████

22  **Q.**   And your royalty rate for that third period of time

23  is 3.5 percent, correct?

24  **A.**   Yes.

25  **Q.**   Now, you're not saying that the reason that the rate

604

1  drops to 3.5 percent for that third period is because of one

2  of Jazz's patents in this case has expired or anything like

3  that, correct?

4  **A.**   No.

5  **Q.**   That is correct?

6  **A.**   That is -- I'm not saying that.

7  **Q.**   The value changes depending on who else is competing

8  with Jazz for sales besides Avadel, correct?

9  **A.**   Yes, it depends on the competitive conditions, you

10  know, among narcolepsy treatments.

11  **Q.**   You understand that a reasonable royalty must be

12  based on the incremental value that the patented invention

13  adds to the end product, correct?

14  **A.**   Yes.

15  **Q.**   So I want to talk to you about what you didn't take

16  into account.

17           So you didn't think it is relevant how the

18  patents were invented; fair?

19  **A.**   Yeah, for my purposes, in damages, what mattered to

20  me was what -- what patent issued.

21  **Q.**   And so it's correct that you don't think that it's

22  relevant how the patents were invented?

23  **A.**   I mean, it's not relevant to my damages analysis.

24  **Q.**   So you're aware that one of the patents has claims

25  that required the use of a sachet; yes?

605

1  A.     Yes, I have heard testimony about that.

2  Q.     Okay.  So let's put that claim up.

3         MS. DAVIS:  So, Mr. Jared, can I have JTX6,

4  already in evidence, at Claim 24 which is on page 19.

5         MS. THOMPSON:  Your Honor, I'm happy for counsel

6  to ask these questions.  I would just note, of course, that

7  Dr. Rainey is not a technical expert and so we'll see where

8  this goes but I think any technical questions may be outside

9  his purview.

10        THE COURT:  I understand.

11 BY MS. DAVIS:

12 Q.     So let's have Claim 14 and Claim 24.

13        All right.  So Dr. Rainey, you don't know where

14 Jazz got the specific claim language that is in this patent,

15 correct?

16 A.     That's correct.

17 Q.     And you didn't try to figure out how much value is

18 added by the drug formulation being packaged in a sachet or

19 not being packaged in a sachet, did you?

20 A.     No, I focused on the formulation of Lumryz as a

21 whole.

22 Q.     So if we look at Claim 14, which is a part of

23 Claim 24, do you see at the end that it requires the

24 viscosity-enhancing agent and the acid are separate from

25 the immediate release particles and the modified --

606

1         MS. DAVIS:  Could we get a little bit more of

2  Claim 14 and then I'll re-ask the question.

3         Scroll down just a little bit more, there we go.

4         Okay.  You can just leave that.

5  BY MS. DAVIS:

6  Q.     All right.  Let me try again.

7         Dr. Rainey, so you see at the end, it requires

8  the viscosity-enhancing agent and the acid are separate from

9  the immediate-release particles and the modified-release

10 particles, the last clause.

11        Do you see that?

12 A.     I see that language.

13 Q.     So you didn't try to figure out how much value there

14 is in having those things be separate as opposed to

15 together, correct?

16 A.     No, I focused on, you know, the formulation of

17 Lumryz.

18 Q.     You looked at Project Zeta documents, correct?

19 A.     I have looked at some, yes.

20        MS. DAVIS:  You can take that down.

21 BY MS. DAVIS:

22 Q.     I want to ask you about the relationship between Jazz

23 and Avadel during Project Zeta, that is something you

24 considered, correct?

25 A.     Yes.

607

1  Q.     In your opinion, the relationship between Jazz and

2  Avadel proposed in the Project Zeta negotiations, was that

3  of innovator -- sorry, let me -- let me just start over.

4         In your opinion, Dr. Rainey, the relationship

5  between Jazz and Avadel proposed in the Project Zeta

6  negotiations, was that of inventor and promotor in that

7  Avadel would be responsible for the development of FT-218

8  through the end of Phase III clinical trial, Avadel is the

9  inventor, while Jazz would then take over responsibility for

10 submitting the NDA for FT-218 and commercializing FT-218

11 making Jazz the promoter, correct?

12 A.     Yeah, I mean, it was proposed as a, you know,

13 partnership, collaboration development agreement.

14 Q.     So in your opinion for Project Zeta, Avadel is the

15 inventor and Jazz is the promoter?

16 A.     I mean, they have an inventor/promotor relationship

17 as opposed to a competitor relationship.

18        MS. DAVIS:  No further questions, Your Honor.

19        THE COURT:  All right.  Redirect?

20        MS. THOMPSON:  Just very briefly, Your Honor.

21        REDIRECT EXAMINATION

22 BY MS. THOMPSON:

23 Q.     You heard some questions about the patents at issue

24 in certain different claims there.

25        I just want to be clear, at the time of the

608

1  hypothetical negotiation, what are the parties required to

2  assume about the validity and infringement of the patents at

3  issue?

4  A.     Yeah, so this is one of -- I think one of my first

5  slides, I described what the hypothetical negotiation looks

6  like.  And there's an assumption that both parties agree

7  that the patents are valid and infringed.

8  Q.     And in the answer to those questions, you talked

9  about the once-nightly formulation.  Why is it the case that

10 if any of the patent claims at issue here are found to be

11 infringed, that the -- your reasonable royalty doesn't

12 change?

13 A.     As I think I mentioned, it's because the fundamental

14 economic considerations don't depend on which particular

15 claims, you know, are found valid and infringed.

16 Q.     All right.  And you were asked a little bit about

17 Project Zeta and the inventor/promoter relationship.  I just

18 want to be clear about when that negotiation took place.

19 What year was that?

20 A.     2018.

21 Q.     And what did you understand about whether patents

22 that may have -- that may have been issued by this point in

23 time of this trial all had been issued as of the time of

24 2018?

25 A.     So my understanding -- my recollection is that the

609

1  patents, Jazz's two patents here, issued in 2020 and 2021, I
2  believe.  And so, hence, in 2018, they had not issued yet.
3  **Q.**  Okay.
4       (Whereupon, the sealed portion concluded.)
5       MS. THOMPSON:  Your Honor, I have no further
6  questions for Dr. Rainey.
7       THE COURT:  All right.  Dr. Rainey, you may step
8  down, sir.  Thank you.
9       MS. THOMPSON:  If I could address one
10  housekeeping matter very briefly.  We had used
11  Exhibit JTX147 with Mr. Mindus and with Dr. Rainey.  We
12  avoided the need to seal the courtroom for Mr. Mindus's
13  testimony, but we would ask that that exhibit be maintained
14  as confidential, Exhibit JTX147.
15       MR. SILVER:  Your Honor, Dan Silver, we have no
16  objection to that.  There were a number of objections, I
17  think, of ours -- a number of exhibits of ours that were
18  entered in that we would want to place under seal as well.
19  So if it's okay with Your Honor, we'll confer with counsel
20  overnight and submit a list in the morning.
21       THE COURT:  That's fine.
22       MR. SILVER:  And also, Your Honor, we'd like the
23  transcript from the sealed portion be placed under seal,
24  pending the parties's opportunity to submit redactions,
25  thank you.

610

1       THE COURT:  That's fine.  I want to remind the
2  parties that -- to be as efficient as possible with sealing
3  confidentiality, there was -- the witness -- we sealed the
4  courtroom for the entire testimony.  Certainly, there was
5  stuff in there that didn't need to be sealed.
6       So remember, the public has a right to hear
7  things.  And the Court is sensitive to confidential and
8  proprietary business information, but I have to balance that
9  against the public's right to know as well.
10       MS. THOMPSON:  Yes, absolutely, Your Honor.  I
11  think Avadel was concerned that Dr. Rainey would say a piece
12  of confidential information, which they didn't want him to,
13  even say it, even if we didn't show the document, so that
14  was what necessitated it.  My apologies.
15       THE COURT:  Understood.  Going forward, both
16  sides be sensitive to that.
17       MS. DAVIS:  Understood, Your Honor.
18       MS. THOMPSON:  Thank you, Your Honor.
19       THE COURT:  All right.  So ladies and gentlemen
20  of the jury, that's going to complete day 2.  So let me
21  remind you the same thing I reminded you last night:  No
22  independent research, don't talk to anyone about the case,
23  keep an open mind, leave your juror notebooks in the juror
24  room.
25       See you tomorrow morning between 9:10 and 9:30.

611

1       (Whereupon, the jury left the courtroom.)
2       THE COURT:  All right.  You may be seated.
3       MS. DURIE:  Your Honor, I just wanted to provide
4  an update with respect to Dr. Meyer, who is our damages
5  expert.  We spoke with her today but she was still not
6  certain whether she would be able to testify, but we are
7  hopeful that we will able to make that happen as late in the
8  case as possible.
9       And so I just wanted to alert the Court to that,
10  that's still a live issue, we're still working on it.
11       THE COURT:  Okay.  And will that be remote --
12       MS. DURIE:  Yeah, it would definitely be remote
13  for sure.
14       THE COURT:  All right.  So you'll coordinate
15  with IT.
16       MR. CERRITO:  Again, not to be insensitive, do
17  we have any idea when this is going to happen?
18       THE COURT:  Well, she said she's still
19  coordinating so she'll provide updates.
20       MR. CERRITO:  We're running out of days, Your
21  Honor, that's why I'm asking.
22       THE COURT:  I don't think she can give you
23  anything more than that.
24       MS. DURIE:  If not tomorrow, and I don't -- I
25  don't know whether the end of the day Thursday is going to

612

1  be a possibility or not.
2       MR. CERRITO:  So the end of Friday, after both
3  cases are complete?
4       THE COURT:  Well, Avadel is going to -- is on
5  the clock just like you're on the clock, so it's going to
6  have to happen, you know, at some point before the time runs
7  out.
8       MR. CERRITO:  Understood, Your Honor.  But, you
9  know, obviously, we don't want our rebuttal case to end with
10  their witness.  That's what it's looking like.
11       THE COURT:  So, Avadel, do the best you can to
12  not have that witness go into Jazz's rebuttal case.
13       MS. DURIE:  I --
14       THE COURT:  Let me hear you.
15       MS. DURIE:  I was going to say, I think as a
16  practical matter, if she can testify, that's likely to
17  happen.  I mean, there's no chance of tomorrow.  We're
18  working to see whether Thursday is going to be a
19  possibility, it's not clear.
20       I think -- well, I don't want to put details of
21  her health conditions on the record.  I could do it -- we
22  could do it at sidebar if we had to.  But we have every
23  interest in getting her up here -- up there on the screen as
24  quickly and efficiently as we can.
25       THE COURT:  Okay.  But I understand the issue,

613

1  but I also understand Jazz's concern, so give us an update

2  tomorrow morning some time, and then we'll revisit the issue

3  in the event -- you know, the Court will think about some

4  possible ways to address Jazz's concerns, in the event it

5  happens.  Maybe giving Jazz, you know, some additional --

6  giving additional time to present its damages expert and

7  rebuttal or something so that Jazz gets the last word to the

8  jury, as would be normally the case.

9         MS. DURIE:  And I think, Your Honor, as a

10  practical matter, I don't -- I don't have any expectation

11  that Jazz intends to recall its damages expert.  They put on

12  their damages expert, we'll put on Dr. Meyer.  I think in

13  the normal course, that would be it.

14         So I think it's just a timing issue that they

15  don't want the case to end with our damages expert.

16  Frankly, I don't want the case to end with our damages

17  expert either, but I'm trying to avoid a situation where she

18  can't come at all.

19         THE COURT:  I understand, but normally Jazz

20  would get the last word in their rebuttal case.

21         MS. DURIE:  On --

22         MR. CERRITO:  Your Honor, they can play the

23  videotape, that would be -- if the witness is unavailable to

24  them, play the video.  We're fine with that.  But this -- we

25  can't prejudice -- my client should not be prejudiced

614

1  because this witness, who now is unavailable to them, not to

2  be heartless, but...

3         THE COURT:  But it's an emergency situation.

4         MS. DURIE:  It is.

5         THE COURT:  It's not --

6         MR. CERRITO:  24 hours seems to me -- you know,

7  if she can do it Thursday --

8         THE COURT:  We'll --

9         MR. CERRITO:  -- or Friday morning, Thursday

10  afternoon.

11         THE COURT:  Think about the worst-case scenario

12  has to happen.  Give me some suggestions on how you think

13  you would work -- Jazz would need to address whatever

14  concern you have in terms of what I assume is you want sort

15  of the opportunity to present last.

16         MR. CERRITO:  Understood, Your Honor.

17         THE COURT:  All right.  We're adjourned for the

18  night.  Let me remind the parties about getting the joint

19  submission in on time.  And everything else that I reminded

20  you about this morning.  So we'll see you in the morning.

21         (Recess taken.)

22         (Whereupon, the following proceeding concluded

23  at 5:27 p.m.)

24         I hereby certify the foregoing is a true

25  and accurate transcript from my stenographic notes in the

615

1  proceeding.

2         /s/ Michele L. Rolfe, RPR, CRR

   U.S. District Court

# EXHIBIT B

1

2                    IN THE UNITED STATES DISTRICT COURT

3                    IN AND FOR THE DISTRICT OF DELAWARE

4
     JAZZ PHARMACEUTICALS, INC.,           )
5             Plaintiffs,                  )   C.A. No.
     v.                                    )   21-691-GBW
6                                          )
     AVADEL CNS PHARMACEUTICALS, LLC,      )
7             Defendant                    )
     -------------------------------       )
8                                          )   C.A. No.
     JAZZ PHARMACEUTICALS, INC., et al.,   )   21-1138-GBW
9             Plaintiffs,                  )
     v.                                    )
10                                         )
     AVADEL CNS PHARMACEUTICALS, LLC,      )
11   Defendant.                            )
     -------------------------------       )
12                                         )
     JAZZ PHARMACEUTICALS, INC., et al.,   )
13            Plaintiffs,                  )   C.A. No.
     v.                                    )   21-1594-GBW
14                                         )
     AVADEL CNS PHARMACEUTICALS, LLC,      )
15            Defendant.                   )

16

17                            - - - -

18                       Wilmington, Delaware
                         Tuesday, February 27, 2024
19                       Trial Day 2

20                            - - - -

21

       BEFORE:   HONORABLE GREGORY B. WILLIAMS
22               UNITED STATES DISTRICT COURT JUDGE

23
                              - - - -
24

25
                            Michele L. Rolfe, RPR, CRR

297

1  

2  APPEARANCES:

3  MORRIS, NICHOLS, ARSHT & TUNNELL LLP
   BY: JEREMY A. TIGAN, ESQ.

4  
      -and-

5  
   QUINN EMANUEL URQUHART & SULLIVAN, LLP

6  BY: F. DOMINIC CERRITO, ESQ.
      NICHOLAS CERRITO, ESQ.

7     FRANK C. CALVOSA, ESQ.
      JOSEPH PAUNOVICH, ESQ.

8     The Plaintiff

9  

10 MCCARTER & ENGLISH, LLP
   BY: DANIEL M. SILVER, ESQ.

11 
      -and-

12 
   LATHAM & WATKINS LLP

13 BY: KENNETH G. SCHULER, ESQ.
      MARC N. ZUBICK, ESQ.

14    ALEX GRABOWSKI, ESQ.

15 MORRISON FOERSTER
   BY: DARALYN DURIE, ESQ.

16    KIRA DAVIS, ESQ.
      ADAM BRAUSA, ESQ.

17 
      For the Defendant

18 

19 

20 

21 

22 

23 

24 

25 

298

1  

2                - - - - -

3         P R O C E E D I N G S

4      (REPORTER'S NOTE:  The following jury trial was held

5  in Courtroom 6B beginning at 8:51 a.m.)

6      THE COURT:  Good morning.  You may be seated.

7      All right.  A couple of administrative things

8  before we get started.  I want to remind counsel that joint

9  submission is due each night by midnight, according to your

10 agreement.  It's important that we get it on time, you know,

11 our folks are staying up to work on it.  And so any

12 objection, argument not received by midnight going forward

13 is going to be waived.

14     I want to remind counsel to provide the Court

15 with two courtesy copies of any demonstratives or slides

16 used in your openings or with witnesses or that you use

17 during your closing.  So, you know, when you're going to

18 present the witness or, you know, typically for your

19 openings, you would have gave the Court two copies of the

20 demonstratives, along with the witness binders, but just

21 keep that in mind going forward.

22     I want to remind counsel to remember to -- I

23 hope you are meeting and conferring about the final proposed

24 jury instructions that -- the final joint submission on that

25 is due to the Court by noon tomorrow.  And that we'll be

299

1  having the charge conference on Thursday afternoon or

2  Thursday evening when we finish with the evidence.  We

3  should be finished with presentations, I hope, by end of day

4  on Thursday.

5      All right.  In terms of time, so yesterday Jazz

6  used 3 hours and 5 minutes.  Avadel used 3 hours and

7  2 minutes.  So Jazz has 9 hours and 25 minutes remaining:

8  Avadel, you have 9 hours, 28 minutes remaining.

9      All right.  So now getting to the issues that we

10 need to deal with this morning on the joint submissions.

11     First, let's deal with -- so it's Jazz's

12 objection to Dr. Corser.  So based on the submission, I

13 don't see a basis for this -- to sustain this objection at

14 this time.

15     I know -- I'm aware of the Court's ruling on

16 Jazz's motion in limine No. 1, Avadel's aware of that as

17 well.  Avadel represents to the Court that Mr. Corser is

18 going to respond to Mr. Honerkamp's testimony raised

19 yesterday, including talking about the sodium content of

20 Xyrem and Lumryz.

21     So if, you know, there comes a point where Jazz

22 thinks that he's evading into the territory that was

23 precluded by motion in limine No. 1, you'll make an

24 objection at that time and we'll consider that.

25     MR. CERRITO:  Your Honor, I appreciate that.  I

300

1  don't think they will, I don't think that's what this is

2  about.  I simply point out that the sodium content is not

3  infringing, by the way, which is not in dispute, I don't

4  think, is not relevant to any issue in this case.

5      THE COURT:  Okay.  Well, your witness testified

6  about it, so they get a chance to have somebody else

7  testify.

8      MR. CERRITO:  Fair enough.

9      THE COURT:  All right.  So moving on to JTX112,

10 so I reviewed this -- and this is a letter from the FDA

11 given to Jazz's counsel providing the FDA's finding on an

12 issue.

13     So let me hear from the parties on this, and

14 I'll hear from Jazz first.  And I also understand that

15 Avadel has made an offer to redact in part, so within the

16 confines of your arguments, I want to hear them on those

17 issues as well.

18     MR. JORGENSEN:  Yes, Your Honor.  Quentin

19 Jorgensen, Quinn Emanuel, Jazz.

20     So this document is littered with references to

21 Jazz's legal arguments set forth by Jazz's legal counsel,

22 who is also representing Jazz in the district of DC case

23 about Avadel's orphan drug exclusivity.  It's also filled

24 with legal conclusions made by the FDA that are related to

25 that litigation, so there's no way to really redact this

301

1  document in such a way that it can be entered into evidence
2  because it -- because it's filled with Jazz's arguments that
3  are relevant to the district of DC case.
4         THE COURT:  Okay.  All right.  There's a finding
5  in this document, right, and I assume that's what Avadel is
6  really after, so if the legal arguments were redacted and
7  the finding was just set forth, how do you respond to that?
8         MR. JORGENSEN:  There's other evidence of this
9  finding that doesn't include entering this document that --
10  it's -- that has all the legal conclusions inside of it.  If
11  all of the legal arguments are redacted, perhaps, but we
12  just don't think that's possible.
13        THE COURT:  Okay.
14        All right.  Is that your -- all right.  You
15  completed --
16        MR. JORGENSEN:  And also, Your Honor, apologies,
17  this document was also hearsay and does not -- Avadel sets
18  forth that it's admissible under 8038 as a factual finding.
19        THE COURT:  Public record, yes.
20        MR. JORGENSEN:  Yeah.  But we would -- we
21  disagree.  We believe that this is set forth as legal
22  conclusions and setting forth legal analysis and not factual
23  findings by the FDA.
24        THE COURT:  Okay.  I understand.
25        MR. JORGENSEN:  In the purview of the FDA's

302

1  duties.
2         THE COURT:  All right.  I understand your
3  argument.  All right.
4         MR. PORTER:  One final thing, Your Honor, we
5  will stipulate to that fact.  We will stipulate to the fact
6  that the FDA found that Xyrem, the clinical superiority.  If
7  that's what they want, if that's what they are looking for,
8  I think we can circumvent this by just -- Mr. Honerkamp
9  testified to that, so I don't know why we would need to get
10  this entire document in for that one discrete issue that the
11  FDA found clinical superiority based upon the once-nightly
12  dosage.
13        If that's what we want, okay, that -- that's
14  already in evidence.
15        THE COURT:  All right.  Let me hear from Avadel
16  on that.  First about the stipulation.
17        MR. GRABOWSKI:  Thank you, Your Honor.  Alex
18  Grabowski for Avadel.
19        We are potentially open to a stipulation, but I
20  think that we are also open to a pretty heavy redaction.  I
21  think we'd rather have the letter in.  We are interested in
22  the finding.  We also are interested --
23        THE COURT:  Tell me what finding you're
24  interested in.
25        MR. GRABOWSKI:  We're interested in the clinical

303

1  superiority finding, and specifically the fact that it
2  made -- that the FDA found that Lumryz made a meaningful
3  contribution to patient care.
4         And we're also specifically interested in the
5  fact that the FDA, in making that finding, considered sodium
6  which, as we've already talked about today, Jazz's witnesses
7  have discussed.
8         So I think we can find redactions that might
9  work I think it's -- actually possible we could also find a
10  stipulation, but this should, I think, come in.
11        And I can also address the hearsay issue, if
12  you'd like.
13        THE COURT:  Okay.  All right.  So -- all right.
14  So, the Court -- it sounds like you guys, in terms of the
15  statements you've heard from him, are you willing to
16  stipulate to those -- enter a stipulation to those?
17        MR. PORTER:  Yes, Your Honor.
18        MR. GRABOWSKI:  Your Honor, can we -- before we
19  stipulate, can we propose a heavily redacted version to just
20  see --
21        MR. PORTER:  No, we --
22        THE COURT:  So let me -- let me -- so, listen, I
23  want the parties to either -- to reach a -- to either reach
24  a stipulation that both sides can agree upon, or it's going
25  to come in redacted, but heavily redacted.  So to both

304

1  sides, talk and reach some agreement, one way or the other.
2         MR. PORTER:  Yes, Your Honor.
3         THE COURT:  But the -- the findings and the
4  statements that were made, those are going to come in one
5  way or the other.  All right.
6         MR. PORTER:  Thank you, Your Honor.
7         MR. GRABOWSKI:  Thank you, Your Honor, we're
8  going to do that.
9         THE COURT:  All right.  So now, along those same
10  lines, let me -- let's deal with JTX75.
11        MR. GRABOWSKI:  Your Honor, we've reached an
12  agreement on JTX75 and Mr. O'Brien says maybe -- I think we
13  agreed to drop all objections for both parties on this.
14        THE COURT:  Okay.  So that's coming in.
15        MR. GRABOWSKI:  Yes.
16        THE COURT:  Progress.
17        All right.  So DTX916, DTX1232, those objections
18  are overruled.  Those documents are relevant, they are
19  communications between parties.
20        Best I can tell, there are no remaining
21  objections with respect to JTX195 and JTX118?  It seems like
22  those were probably -- they were crossed out in the
23  red-lined version we received, so I assume that means no
24  objections.
25        MR. BRIER:  Correct, Your Honor.

305

1    THE COURT:  Same thing with respect to
2  DTX13.003, right, which was a -- which is an Avadel
3  demonstrative, same thing, was red-lined, was crossed out.
4    MR. BRIER:  Yes, correct, Your Honor.
5    THE COURT:  All right.  Didn't see any
6  objections to Jazz's demonstratives.
7    Moving to Jazz's objections to Avadel's
8  deposition designations.  The designation of Scott Bura,
9  65:22-23, and 66:03 to 66:03.  So this -- so Mr. Bura is a
10  named inventor.
11    Avadel, are these designations for counter --
12  for cross-examination purposes?
13    MR. SCHULER:  They are for cross-examination,
14  Your Honor.
15    THE COURT:  Okay.
16    MR. SCHULER:  And you're right, he is a named
17  inventor.
18    THE COURT:  All right.  He's going to be --
19  okay.  So he's going to be here testifying live, and these
20  are going to be used for cross-examination purposes.  So --
21    MR. BRIER:  Your Honor, just a second, Gabe
22  Brier for Plaintiffs.  He's going to be testifying via
23  deposition.  So this is a deposition designation that they
24  want to play affirmatively, not for cross purposes.  It's
25  their deposition designation, they are calling the witness,

306

1  they want to play this for the jury as part of their case.
2    MR. SCHULER:  If he was live, this would be part
3  of our cross-examination.
4    THE COURT:  They are calling him as a cross, but
5  just by video.
6    MR. BRIER:  As part of their case, yes, Your
7  Honor.
8    THE COURT:  All right.  So the objection about
9  lack of foundation, let me hear you on that.
10    MR. BRIER:  Your Honor, sorry, is that to Jazz
11  or Avadel?
12    THE COURT:  Huh?
13    MR. BRIER:  I'm sorry, to Jazz or Avadel?
14    THE COURT:  I'm now addressing your lack of
15  foundation --
16    MR. BRIER:  Okay.
17    THE COURT:  -- your lack of foundation
18  objection.  So I'm saying I understand you made a lack of
19  foundation objection, so I want to hear Avadel's response to
20  it.
21    MR. BRIER:  Thank you.
22    MR. SCHULER:  Two things, Your Honor, he's a
23  named inventor, he took the oath that he -- you know, and he
24  was communicating with the prosecutors.
25    Secondly, I don't think it's a secret.  I mean,

307

1  in opening, Mr. Cerrito said they were monitoring us, and
2  referred to our applications to make sure, I think the words
3  were, that we didn't get away with it.
4    And so we're entitled to ask the inventor
5  whether he took any actions in that vein.
6    So, I think he's got ample foundation as a named
7  inventor that obviously communicated with the prosecutors.
8    THE COURT:  All right.  Let me hear from Jazz.
9    MR. BRIER:  Your Honor, I mean, the -- any
10  communications with prosecutors -- prosecution counsel would
11  be privilege.  And they never established they had any
12  substantive involvement in the prosecution or had any
13  knowledge of whether the claims were copied or not copied.
14    So, you know, from their point of view, they are
15  accusing Jazz of doing wrong by copying names.  And to ask
16  this one loaded, accusatory question, did you take --
17    (Reporter asks for clarification.)
18    MR. BRIER:  I'm sorry.  To ask such a loaded,
19  accusatory question such as, Did you take any action to
20  attempt to stop Jazz from copying the Avadel claims without
21  laying any foundation first?
22    They are basically saying, Do you ever take any
23  action to stop doing wrong without establishing that
24  Mr. Bura did wrong in the first place?
25    He had no knowledge, substantive knowledge in

308

1  the prosecution, he wasn't involved, they never established
2  that.
3    THE COURT:  During the deposition, did somebody
4  object?
5    MR. BRIER:  We objected at the deposition, yes,
6  Your Honor.
7    THE COURT:  Okay.  And what was his answer?
8    MR. BRIER:  His answer, Your Honor, was, "I did
9  not," following an objection from Mr. Calvosa.
10    THE COURT:  His answer was what, I don't know?
11    MR. BRIER:  "I did not."
12    THE COURT:  Oh, "I did not," okay.
13    All right.  So I'm going to set that one aside
14  for the moment.
15    Moving on to the designations starting 115:02,
16  to 115:06, and 115:10.  Let me hear you, Jazz, on that.
17    MR. BRIER:  Sure.  So this, again, is one
18  question, one answer.  The question is, "Do you believe that
19  a person, another scientist could achieve a once-nightly
20  dosing for sodium oxybate, or any other oxybate, for a
21  sachet suspension product in water using the information as
22  it was set forth in your patent?"
23    That's enablement.  They are asking the
24  inventor, who is a lay witness, not an expert, whether the
25  patent has enablement.  And it's also asking for a legal

309

1  conclusion.  And it's just an improper question to ask a lay
2  witness like that.  And they are trying to seek expert
3  opinion for the jury from a lay witness.
4       And we cite cases in our brief that the legal
5  test for enablement or discretion is not -- does not inquire
6  into the subjective knowledge of the inventor.  So that's
7  what they are doing here, they are trying to inquire to the
8  subjective knowledge of the inventor to establish lack of
9  enablement, and that's improper under the *GenSight*
10  *Orthobiologics* case that we cited, which is citing *Durel*
11  *Corp. v. Orsam.*
12       THE COURT:  All right.  Let me hear from Avadel.
13       MR. SCHULER:  Your Honor, they opened the door
14  to this.  They extensively cross-examined Dr. Guillard about
15  the acids and whether his disclosure is adequate, is his
16  patent valid, I mean...
17       THE COURT:  Yeah, I recall that question
18  yesterday, and when he said "I don't know," and Mr. --
19       MR. SCHULER:  They pushed it.
20       MR. CALVOSA:  Yes, Your Honor.  And that was in
21  response to their questions.  But I'm happy to withdraw the
22  objection.  I think it goes both ways, it's fair for
23  everybody.
24       THE COURT:  All right.
25       MR. CALVOSA:  Thank you.

310

1       (Discussion held off the record.)
2       THE COURT:  So let's move on to Phillip,
3  Mr. McGarrigle testimony.  So here, from what I see in the
4  submission, this is something that -- I assume this is an
5  Avadel objection; is that right?
6       And I'm told that Jazz did not designate this
7  testimony and the counter-designations and did not identify
8  any testimony it contends is relevant.
9       So the question is, did Jazz -- is this even,
10  you know, something that you designate?
11       MR. BRIER:  For a portion of it, Avadel
12  designated initially the 150:16, to 150:2-24, that was an
13  Avadel designation.  And we assume they designated, they
14  would be fine with playing it.  And we think for
15  completeness, it makes sense to play that section.
16       The other section, the 154:8 to 155:24 --
17       (Reporter asks for clarification.)
18       MR. BRIER:  I'm sorry.  The other section, the
19  154:8 to 155:24, and 157:22 to 158:2, that is a Jazz
20  designation that we had in there.
21       THE COURT:  So you're saying you did designate
22  those.
23       MR. BRIER:  Jazz designated the second
24  designation, starting at 154.  The one starting at 150 was
25  an Avadel designation, but we assumed if they designated it,

311

1  they would be fine with playing it.  And we think, just
2  given all the other designations, for completeness's sake,
3  it makes sense to have it in there.
4       And then, again, this goes to the issue that
5  we've been talking about a lot, is the copying allegations.
6  And a lot of that, while we have the separate case on
7  inequitable conduct, there's a lot of inferences that they
8  are trying to get the jury to draw about Jazz allegedly not
9  being forthright with the Patent Office.
10       These two sections go to interviews with the
11  examiner by Mr. McGarrigle and others from Jazz where they
12  were discussing the materials.  And they were -- again, we
13  think this goes towards showing Jazz's forthright with the
14  Patent Office, Jazz is describing its inventions accurately.
15       And then the second designation, there just
16  wasn't -- the examiner -- that Avadel has a similar patent,
17  with claims similar to the Jazz patent, the examiner
18  considered that.  And then the examiner allowed Jazz's
19  patent, despite having knowledge they have a patent which
20  Avadel in this case claims invalidates Jazz's patents.
21       So we think that's strong evidence that Jazz is
22  forthright with the Patent Office.  And the Patent Office,
23  with full knowledge, granted Jazz's patent.
24       And also, just to go back to the Avadel
25  designation 150, the pretrial order in this case says you

312

1  can use the other party's designations.  So everyone has
2  been on notice of this 150 designation since we started this
3  process weeks, if not months, ago, and we don't see how
4  Avadel has any basis to complain at this juncture.
5       THE COURT:  Okay.  Let me hear from Avadel.
6       MR. GRABOWSKI:  Your Honor, the issue here is
7  that with respect to the first designation, the case has
8  been narrowed since we started this process weeks, if not
9  months, ago, and none of these designations are relevant now
10  to the issues before the Court.  The problem here is that
11  Avadel's copying defense is relevant to the '782 patent.
12  None of these designations were in the prosecution of the
13  '782 patent.  One of them wasn't even in the same family.
14       The patent that they're talking about the
15  disclosures for is unrelated to what we're saying Jazz
16  didn't disclose.  You can't say that it's relevant whether
17  we disclosed -- you can't come in and say, Well, we didn't
18  disclose X but we did disclose Y, so that matters, if Y is
19  related.
20       And I'll also just note for the record that the
21  patent that they did talk about disclosing, they -- we
22  discussed with Mr. McGarrigle in his deposition.  They
23  didn't disclose anything about the claims.  They didn't
24  discuss the claims.  They didn't discuss copying.  And,
25  again, it's not the same patent, even the Avadel patent or

313

1  the Jazz patent.  It was actually specifically one of the
2  patents they dropped out of this case.
3         MR. BRIER:  Your Honor, may I be heard briefly
4  in response?
5         THE COURT:  Yes.
6         MR. BRIER:  So for this patent, it's the related
7  patent.  It's the '079 patent that Mr. Grabowski is correct,
8  we did drop.  But that's a related patent to the '782, and
9  there's an overlapping element that deals with the sachet
10 element that Avadel is alleging Jazz copied that sachet
11 element from Avadel.  So in the '079 patent, the claim --
12 the claims that were at issue include sachet, and the '782
13 patent, the claim that is at issue, includes the sachet, and
14 this disclosure was to the Patent Office that Avadel has
15 that patent including the sachet element that we should get
16 a patent despite that existing because we have an earlier
17 filing date, and the Patent Office agreed.
18        So if they're -- if they are willing to drop
19 their copying allegation with respect to the sachet element,
20 we would drop this designation.  But if they're going to
21 allege that we copied the sachet element from them, then I
22 think it's relevant that we disclosed to the Patent Office
23 that Avadel had a patent with that sachet element in their
24 claim and the Patent Office granted a patent to Jazz
25 nonetheless.  We think that's -- that's very relevant to

314

1  this case, given the dispute about sachet.
2         THE COURT:  Go ahead.
3         MR. GRABOWSKI:  Your Honor, may I respond
4  briefly?
5         THE COURT:  You're up.
6         MR. GRABOWSKI:  This is going to be incredibly
7  confusing to the jury.  We're talking about a different
8  patent both for Avadel and for Jazz.  This is going to muddy
9  the waters --
10        THE COURT:  Yeah, but does it relate to the
11 sachet?
12        MR. GRABOWSKI:  The disclosure relates to the
13 sachet.  But --
14        THE COURT:  Okay.  So it's relevant.
15        MR. GRABOWSKI:  Not -- no, Your Honor, because
16 they dropped that patent out of the case.
17        MR. BRIER:  Your Honor, we also dropped Claim 19
18 of the '782 patent in January 2023, but we're -- they're
19 getting validity -- the validity of that claim in this case,
20 so I think given the overlap of the sachet, we should be
21 allowed to litigate this issue in front of the jury.
22        THE COURT:  Mr. McGarrigle is a Jazz employee.
23        MR. GRABOWSKI:  Your Honor, if I may make one
24 other --
25        THE COURT:  Let me finish reading.

315

1         (Pause.)
2         So tell me why the designation on -- from page
3  150, line 16, to 152, line 24, is relevant.
4         MR. BRIER:  Yes, Your Honor, that's the more --
5  this is the designation that Avadel initially included in
6  the designations.
7         THE COURT:  Okay.  But the case has changed, so
8  tell me why.
9         MR. BRIER:  Sure, and, I mean, I guess this one
10 goes more generally to Jazz, because they're talking about
11 Liang here, where Liang was one of the main pieces of prior
12 art that was up against the first Allphin/Pfeiffer patent
13 family, and we just believe that this is -- is showing when
14 Jazz met with the examiner, they were forthright with the
15 examiner in describing the invention and they weren't trying
16 to mislead the examiner, as Avadel has tried to suggest
17 repeatedly.
18        But, you know, I -- you know, I think we
19 would -- you know, the sachet element, we think, is
20 definitely squarely relevant because of the overlap in the
21 copying allegation on the sachet for sure.
22        THE COURT:  All right.  So you'd be willing to
23 give this one up?
24        MR. BRIER:  I would.
25        THE COURT:  All right.  So -- so I'm going to

316

1  allow page 154, line 8, to 155, line 24, but I'm not going
2  to allow 150:16, to 152 --
3         MR. BRIER:  Your Honor, with the 154
4  designation, it continues on.  That -- that same designation
5  is 157:21 to 158:2.  They go together.  That's also relevant
6  to the sachet point, that last little bit on 157-158.
7         THE COURT:  Okay.  We'll allow 154, line 8, to
8  155, line 24, and 157, line 22, to 158, line 2, but not
9  150:16 to 152:24.
10        MS. DURIE:  Your Honor, just a question.  I
11 understand there's going to be a brief introduction of each
12 witness.  Our concern is that the jury is going to be
13 mislead into thinking that the witness was talking about
14 this prosecution rather than a different one.  Could we in
15 the introduction just explain that that's talking about a
16 different prosecution and not the prosecution of the patent
17 at issue in this case?  Because I think otherwise it's just
18 going to be very confusing.
19        MR. BRIER:  Your Honor, just one point on that.
20 I think that, you know -- I think this is an attempt by
21 Avadel to make the jury think it's not relevant.  I think if
22 the instruction included the point that there's a sachet
23 element that overlapped the -- the testimony here and the --
24 the claim in suit, I think, you know, that would be --
25 necessary to -- to not make the jury believe it's

317

1    irrelevant.

2           THE COURT:  Well, both sides have to meet and

3    confer on the introductory statement so that both sides

4    are -- if the sides can't -- if you can't agree on an

5    introductory statement, there will be no introductory

6    statement.

7           MR. BRIER:  Thank you, Your Honor.

8           MR. GRABOWSKI:  Thank you, Your Honor.

9           THE COURT:  All right.  The objections about the

10   David O'Brien designations, 26, 13 --

11          MR. SILVER:  Your Honor, sorry to interrupt.

12   Those are the ones that are resolved.

13          MR. GRABOWSKI:  Yeah, those are part of the

14   JTX75 agreements.  So --

15          THE COURT:  Okay.  All right.  Oh, okay.  So --

16   so I know the ones that started on page 80, that goes to

17   JTX75.  The other ones go to JTX75 as well?

18          MR. GRABOWSKI:  The -- all of them.

19          (Simultaneous speaking.)

20          THE COURT:  All of them, okay.  All right.  So

21   that's...

22          (Pause.)

23          All right.  So that deals with all of the

24   objections, right?

25          All right.

318

1           (Recess taken.)

2           MR. ZUBICK:  Your Honor.

3           THE COURT:  Yes.

4           MR. ZUBICK:  Good morning.  Can Dr. Guillard

5    take the stand before the jury comes in?

6           THE COURT:  Yes.

7           (Whereupon, the jury entered the room.)

8           THE COURT:  Good morning, ladies and gentlemen

9    of the jury.

10          JURORS:  Good morning.

11          THE COURT:  We're going to start day two.  This

12   is the continuation of Dr. Guillard's redirect.

13          MR. ZUBICK:  Good morning.

14                 REDIRECT EXAMINATION

15   BY MR. ZUBICK:

16   Q.     Good morning, Dr. Guillard.

17   A.     Good morning.

18   Q.     I'm going to be brief.

19          MR. ZUBICK:  Could we please put up figure 1,

20   Exhibit JTX260 in evidence.

21   BY MR. ZUBICK:

22   Q.     Dr. Guillard, could you walk us through what's shown

23   in figure 1 up on the screen?

24   A.     Well, so on figure 1, you can see on the left a view

25   of a single particle of immediate-release microparticles.

319

1    So the images with microscopes are microparticles, so the

2    image on the left is a microparticle, so many of them are

3    tiny particles.  You take a single one.  You cut it in the

4    middle, and you can see its structure.  So you have the

5    core, so the centermost portion of the particle, which is

6    inert or neutral, meaning that there is no drug in it, and

7    on top of it, you have what is called a drug layer with

8    outer layer comprising or containing sodium oxybate, the

9    drug.

10   Q.     Doctor --

11   A.     And on the right, you take one microparticle of

12   modified release, so the other type.  Again, you take just a

13   single one in the middle, and you will have -- you will see

14   its structure.  And, again, the centermost portion is the

15   inert core, is the neutral core, so the same core as the

16   immediate release microparticle.  On top of it, the same

17   drug layer, so meaning the layer containing the sodium

18   oxybate, and the final layer is the layer providing the

19   modified release, what we called the Micropump I I.

20   Q.     Dr. Guillard, how then, if at all, does the core of

21   the immediate-release microparticle on the left differ from

22   the core of the modified-release microparticle on the right?

23   A.     They are the same.

24          MR. ZUBICK:  Can we please turn to table 1b of

25   example 1, Mr. Jarrett.

320

1    BY MR. ZUBICK:

2    Q.     And, Dr. Guillard, yesterday Jazz's counsel asked you

3    about the immediate-release microparticles and the function

4    that they perform.  What did you mean by that?

5    A.     In fact, what I meant is -- sort of immediate-release

6    microparticle function as the core:  that is to say that they

7    are providing with the core, which is already inside of the

8    immediate-release microparticles.

9    Q.     Can we please turn to Figure 6 of Exhibit JTX260.

10          Dr. Guillard, Jazz's counsel asked you some

11   questions about this DI water dissolution testing and the

12   comparison you made between FT218 and the example from

13   Jazz's patent application.  Can you walk us through what's

14   shown on Figure 6, please.

15   A.     So in Figure 6, you have so what is called a

16   dissolution profile.  So very briefly, you have on the

17   vertical axis the amount of drug released from 0 percent to

18   100 percent, 100 percent of the drug is released, and versus

19   time on the horizontal axis.  And you can see, in fact, the

20   release of the drug, the amount of release versus time.

21          So zero means the dissolution test starts and

22   you have, in fact, one curve, the one that starts at the

23   lower, around 20 percent, with -- it is the -- the

24   dissolution profile taken from the Jazz application.  So it

25   starts around 20 percent, and after you have sustained

321

1   release over time up to 100 percent.

2           And we have tested FT218, so our formulation, in

3   the same test.  So we have half of the dose as immediate

4   release, so the dissolution starts at 50 percent, which is

5   released at once, and the second portion of the

6   microparticles will release the rest of the dose.  And you

7   can see there is something completely flat, steady during --

8   during the first four hours, and after there is a release up

9   to 100 percent, meaning that all the drug is released at the

10  end of the test.

11  Q.   Why does that difference matter for purposes of your

12  invention FT218, Dr. Guillard?

13  A.   Well, so the release is completely different.  In the

14  case of the Jazz curve, you have a release that is driven by

15  time.  That is to say it's not driven by the pH changes that

16  occur in the body.  But in our case, our formulation is

17  different.  We discussed yesterday that the release is

18  mainly driven by pH changes that occur in the body due to

19  the fact that the pH is not the same in the stomach as in

20  the intestine and we have a release mechanism that is --

21  that is different.

22          MR. ZUBICK:  Can we please put up Figure 8.

23  BY MR. ZUBICK:

24  Q.   Dr. Guillard, can you walk us through what's shown in

25  Figure 8 of your patent.

322

1   A.   So, again, a dissolution profile, the amount of drug

2   released versus time, and in that case, the dissolution

3   profile is performed in the dissolution --

4           MR. CALVOSA:  Sidebar, Your Honor.

5           (Whereupon, a discussion was held at sidebar as

6   follows:)

7           MR. CALVOSA:  Figure 8, pH 6.8, this is a claim

8   construction issue all over again.  It doesn't matter how it

9   releases in the pH 6.8.  The only thing --

10          (Simultaenous speaking.)

11          How it releases in deionized water.  This is a

12  buffered pH.

13          MR. ZUBICK:  I'm happy to address that.  I think

14  what Mr. Calvosa is referring to is the *Daubert* that Jazz

15  filed and that you granted on Dr. Klibanov and Dr. Traverso

16  and your ruling is they wouldn't be able to argue

17  noninfringement based on the appropriate dissolution testing

18  for purposes of the term "sustained release."

19          Dr. Traverso is in Boston, Dr. Klibanov is not

20  making that argument.  However, based on your ruling since

21  then, we think Dr. Guillard is allowed to explain his

22  invention.  The motivations for his invention, what we heard

23  yesterday, he copied the DI water.  He was asked about the

24  differences in DI water test and he -- now he's going to

25  explain how you test his product in a buffered solution.

323

1   He's here to explain his own invention story, where he got

2   the idea, how the product works.  He will not --

3           (Simultaenous speaking.)

4           We will not be making a noninfringement argument

5   on this.  It goes to enablement.  They are saying their

6   patent taught how to make our product.  He will be able to

7   learn to make something that's within -- the coating

8   dependent on the pH.  This is how our product works, I think

9   that's a completely discreet issue.

10          MR. CALVOSA:  That's not the argument at all.

11  The question is whether their product falls within the

12  claims and whether there's an element for our claims with

13  deionized water testing, not a buffer pH testing.

14          And the other thing is, when he's able to tell

15  his invention story, they are saying that they did what we

16  did first, we copied from them.  We're not saying we did

17  anything with buffered pH, that's not in our claims,

18  buffered pH had nothing to do with this.  This is what we've

19  fought about since October of 2022 when he first did the

20  claim construction hearing.

21          MR. CERRITO:  And the basis to keep it out of

22  the experts, now we're going to reintroduce it with this

23  witness.

24          MR. ZUBICK:  Mr. Allphin testified, among other

25  things, that he tested his products in DI water, and gastric

324

1   fluid that was put up on the screen and intestinal fluid

2   that is squarely at issue here, that's partly how the

3   product was invented.  You're not going to see a

4   noninfringement argument.  He's entitled to tell his

5   invention story, that is squarely at issue with the case.

6           MR. CALVOSA:  As long as we get an instruction

7   that doesn't go to the infringement of the patent.

8           (Simultaneous talking.)

9           THE COURT:  So you said as long it --

10          MR. CALVOSA:  There's an instruction that this

11  testing is irrelevant to whether they infringe our claims.

12  I'm fine with him telling his invention story, I just don't

13  want the jury to be confused.

14          THE COURT:  So that instruction -- because,

15  yeah, I -- if you want to elicit this testimony, that

16  instruction is a reasonable instruction.

17          MR. ZUBICK:  Can I hear what the instruction

18  would be?

19          MR. CALVOSA:  That this testing at the buffered

20  pH is irrelevant to whether Avadel infringes Jazz's patent

21  claims.

22          MR. CERRITO:  Which talks about DI water

23  testing.

24          MR. ZUBICK:  With Mr. Cerrito's addition, I'm

25  fine with that.  I think we need to clarify that it's

325

1    irrelevant to the DI water testing.  I think that's fair.

2            MR. CALVOSA:  Would you like us to write it down

3    for you?

4            THE COURT:  Write it out and we'll give the jury

5    that instruction.

6            MR. CALVOSA:  Okay.

7            (Whereupon, the discussion held at sidebar

8    concluded.)

9            MR. CALVOSA:  May I approach, Your Honor?

10           THE COURT:  Yes.  Okay.  Ladies and gentlemen of

11   the jury, I have to give you an instruction that relates to

12   this testimony, so...

13           This testing in buffered pH of 6.8 is irrelevant

14   to whether Avadel infringes Jazz's patent claims, which

15   require testing in deionized water.

16           All right.  You may continue, Mr. Zubick.

17           MR. ZUBICK:  Okay.

18   BY MR. ZUBICK:

19   Q.     Okay.  So Dr. Guillard, where we left off was I was

20   asking you, what is shown in Figure 8?

21   A.     It is a dissolution profile of FT218.  So, as I said,

22   you had the amount of the release versus time, and in that

23   case, the dissolution medium is pH 6.8 buffer, so we used,

24   typically, buffers for dissolution testing and pH 6.8 buffer

25   is used to roughly simulate the conditions in the intestine,

326

1    so in the stomach, the pH is acidic, we said.

2            And then when we switched to the intestine, it

3    increases the pH and the pH is more neutral.  And pH 6.8

4    shows as a dissolution medium to roughly mimic what could

5    happen when the microparticle is such a medium, so when

6    we switch from the stomach to the intestine.  And so it

7    shows the results in that dissolution medium.  So you have

8    already the 50 percent immediate release, and the other

9    50 percent of the dose which are contained in the

10   modified-release microparticles, they release at once, the

11   drug, so you have all the drug 100 percent which is released

12   immediately.

13           MR. ZUBICK:  Thank you, Dr. Guillard, pass the

14   witness.

15           RECROSS-EXAMINATION

16   BY MR. CALVOSA:

17   Q.     Good morning, Dr. Guillard, I thank you for coming

18   back today.  I'll try to be as brief as I can.

19           MR. CALVOSA:  Can we pull back up JTX206,

20   please, Mr. Lewis.  I'd like to start at Figure 6.

21   BY MR. CALVOSA:

22   Q.     This comparison you made between the formulation that

23   you were working on and a particular formulation from Jazz's

24   patent, that particular formulation that you compared it to,

25   that did not contain an enteric pore former, right?

327

1    A.     No.

2    Q.     So it was not an apples-to-apples comparison, right?

3    A.     No.

4    Q.     Okay.  I'd like to now go back to -- you have two

5    binders up there in front of you, I'd like to keep you in

6    the one that Avadel's counsel and your counsel were using.

7    I'd like to go to DTX638.  And page 5, please.

8            Do you remember you talked about this slide with

9    your counsel yesterday?

10   A.     Yes.

11   Q.     And do you remember talking about the dosage amount 6

12   to 9 grams per night being the effective dosage amount?

13   A.     Yes.

14   Q.     And you said that's the reason you came up with the

15   idea to use the sachet?

16   A.     Yes.

17   Q.     You were not the person to come up with the 6- to

18   9-gram dosage amount of sodium oxybate, right?

19   A.     No, it comes from the dosage of Xyrem.

20   Q.     Okay.  That was Jazz that did that, right?

21   A.     Well, the dosage of the sodium oxybate formulation

22   that was on the market, yes.

23   Q.     And that was Jazz's?

24   A.     Yes.

25   Q.     Okay.  I'd like to turn to the next page, page 6 of

328

1    that slide.  And I'd like to go down to -- well, there's a

2    table there, there's Xyrem on the left.

3            That's Jazz's product, right?

4    A.     Yes.

5    Q.     And there's Flamel's proposition on the right?

6    A.     Yes.

7    Q.     And down at the bottom, is that Patent 8101209,

8    that's the Legrand patent you looked yesterday with your

9    counsel?

10   A.     Which one is it?  I'm sorry.

11   Q.     8101209.

12   A.     Yes, it's the patent we discussed yesterday about the

13   Micropump II technology that covers that technology.

14   Q.     And we'll get to that in just a minute.

15           On the left, there are a couple of other patents

16   including Patent No. 7262219.

17           Do you see that?

18   A.     Yes.

19   Q.     And that is the Jazz patent, right?

20   A.     Yes.

21           MR. CALVOSA:  May I approach, Your Honor?

22           THE COURT:  Yes.

23           MR. CALVOSA:  May I have one of those back?

24   Thank you very much.

25   BY MR. CALVOSA:

329

1 Q.     This is one of the Jazz patents that you reviewed
2 during the development of FT218, right?
3 A.     Yes.
4 Q.     And as we talked about yesterday, you didn't check
5 this patent to see what acids Jazz was already using, right?
6 A.     Yes.
7 Q.     And you didn't check this patent to see if Jazz was
8 already using a sachet with oxybate, right?
9 A.     Well, from my recollection, it was about a liquid
10 formulation, but that's what I remember from that
11 application.
12 Q.     You don't ever remember seeing a sachet in here?
13 A.     Well, as I look at -- when I look at the title,
14 it's -- it states, "Sound and stable solutions of sodium
15 oxybate."
16         So what I remember, I was looking at that
17 application -- that patent for -- covering Xyrem.
18         MR. CALVOSA:  And, Your Honor, at this time I'd
19 like to move DTX1 698 into evidence.
20         MR. ZUBICK:  No objection.
21         MR. CALVOSA:  And because I forget yesterday,
22 may I please move PTX60 into evidence also?
23         THE COURT:  All right.  Well, first, DTX1 698 is
24 admitted.
25         (Exhibit admitted.)

330

1         THE COURT:  And PTX670?
2         MR. CALVOSA:  60.
3         THE COURT:  PTX60, any objection?
4         MR. ZUBICK:  No objection.
5         THE COURT:  PTX60 is admitted.
6         (Exhibit admitted.)
7 BY MR. CALVOSA:
8 Q.     And my question was whether you remember whether
9 there was a sachet in here?
10 A.     No, I have no recollection.
11 Q.     Okay.  I'd like to go back to the Legrand patent now,
12 that is DTX750 already admitted into evidence.
13         And the Legrand patent, you said, provides a
14 description of the Micropump II technology that you used for
15 FT218?
16 A.     Yes.
17 Q.     And if you -- you went to column 10, lines 27-35 on
18 page 13 of that document.
19         MR. CALVOSA:  Can we pull that up, Mr. Lewis?
20 BY MR. CALVOSA:
21 Q.     And here you said that microcapsules means the same
22 thing as microparticles, right?
23 A.     Yes.
24 Q.     And here it's saying the microparticles can be the
25 form of a sachet or a tablet, right?

331

1 A.     Or a gelatin capsules, yes.
2 Q.     Sure.  So all three of those:  the sachet, the
3 capsule and the tablet?
4 A.     Yes, these are examples of final form, yes.
5 Q.     Of the microparticles, right?
6 A.     Yes.
7 Q.     Did you hear your counsel that Mr. Allphin was not in
8 possession of microparticles because he worked with tablets?
9 A.     Sorry.  Could you please repeat?
10 Q.     You were here during opening statements, right?
11 A.     Yes.
12 Q.     Did you hear your counsel suggest that Mr. Allphin
13 didn't work with microparticles because he was working with
14 tablets?
15 A.     Yes, I think it was -- it was said, yes.
16 Q.     Okay.  I'd like to now ask you, there's examples in
17 this patent in this patent, right?
18 A.     Yes.
19 Q.     None of the examples include putting microparticles
20 in a sachet, right?
21 A.     So, just let me check.  The examples are about the
22 microparticles and the different types of microparticles and
23 their dissolution testing, so raw material, there is no such
24 formulations.
25 Q.     There's no dosage form in the sachets?

332

1 A.     No.  As shown in the examples, there is no dosage
2 formulations because the dissolution profile is done
3 directly with the microparticles.
4 Q.     Okay.  And to you that's sufficient teaching of a
5 sachet dosage form, even though there's no examples of
6 actually putting the microparticles in the sachet, right?
7 A.     Yes, absolutely.
8 Q.     Now, these examples describe what you talked about
9 before, what you called the neutral core, the drug layer
10 that comes over that, and then the functional layering on
11 top, right?
12 A.     Yes, in some examples you can see that the drug layer
13 is deposited onto a neutral core, yes.
14 Q.     For all of these examples that are talking about
15 modified-release particles, the drug layer is deposited onto
16 what you call the neutral core, right?
17 A.     For -- when I look at example 1 and example 2, there
18 is a neutral core without drug, and the drug is layered onto
19 that neutral core.
20 Q.     So all the examples have that?
21 A.     Let me check.  Not example 3, because example 3,
22 you're talking about granules.  So in that case, the drug is
23 mixed with other ingredients.  And in that case, they are
24 used as a core, meaning that the drug is inside the core,
25 the core comprises the drug itself.

333

1    So there are two examples with a neutral core,
2    and on top of it is a layer, and one example of it granules
3    with a drug inside the core.
4    Q.    Now I'd like to go back to PTX2- -- I apologize,
5    JTX230, which is already in evidence.
6          Just before we do that, a couple of questions
7    back to the Legrand reference, DTX750, I apologize.  There's
8    inventors listed on the Legrand patent, right?
9    A.    Yes.
10   Q.    You were not one of the named inventors, correct?
11   A.    I was not at the company, right.
12   Q.    Dr. Mégret was not one of the inventors, right?
13   A.    You said Dr. Mégret?  No, she was not at the company
14   at that time.
15   Q.    And this document was dated 2012?
16   A.    Yes.
17   Q.    Okay.  And this was shortly before you began your
18   work with taking, what you say, the Micropump II technology
19   and putting it together with sodium oxybate, right?
20   A.    Yes.  In fact, it is much older because it was
21   granted in 2012, but it is much older.
22   Q.    But the actual words on the page we're looking at
23   only became public as of 2012, right?
24         MR. ZUBICK:  Objection, that's not right.
25         MR. CALVOSA:  On this page right here.

334

1          MR. ZUBICK:  Right.  You're referring to the
2    issuing date and not the publication date.
3          MR. CALVOSA:  There's nothing in evidence about
4    publication date.  Your Honor, there's nothing in evidence
5    about the publication date, this is what they've offered.
6          MS. DURIE:  It says prior publication data.
7    It's actually at the very bottom.
8          THE COURT:  So, let's -- the objection is
9    sustained.  You can rephrase the question.
10   BY MR. CALVOSA:
11   Q.    Okay.  So because there's a prior publication,
12   there's prior dates there, you would understand the
13   information in this reference as the same that was in the
14   previous ones?
15   A.    Well, it was a French application dated 2001.  I
16   don't know if the content is the same, but, well, it might
17   be.
18   Q.    But you don't know?
19   A.    In fact, it is -- the claims -- there is a French
20   application dated in 2001.  I can just say that.
21   Q.    But you don't know whether the content is the same?
22   A.    I don't know.
23   Q.    Okay.  And sodium oxybate is not mentioned in this
24   Legrand patent, right?
25   A.    No, it is described, in fact, the general technology

335

1    platform, and then it can be used from many drugs.
2    Q.    Okay.  But sodium oxybate is not called out as a drug
3    in this patent, right?
4    A.    No.
5    Q.    And oxybate, generally, isn't called as a drug in
6    this patent?
7    A.    No.
8    Q.    Neither is GHB?
9    A.    No.
10   Q.    Neither is gamma-hydroxybutyrate?
11   A.    No.
12   Q.    And I think you would agree with me, your testimony
13   is that you put the gamma-hydroxybutyrate, sodium oxybate
14   specifically, together with this Micropump technology
15   beginning in 2012, right?
16   A.    Yes, we started working in 2012, yes.
17   Q.    Okay.  Let's go back now to JTX230.
18         MR. CALVOSA:  And I'd like to go to page 38,
19   please.  And if we could blow up Figure 24.
20   BY MR. CALVOSA:
21   Q.    And we had talked about this yesterday, and you
22   correctly pointed out I missed some other ingredients in
23   there.  I just want to be clear about something.
24         The three ingredients under the Micropump II
25   layer, those are not the active ingredient, right?

336

1    A.    Those are active ingredients, yes.
2    Q.    Those are excipients?
3    A.    Ingredients, yes.
4    Q.    Excipients is another word for that?
5    A.    Well, excipients is the name that is used for
6    pharmaceutical ingredients, but they are an ingredient, yes.
7    Q.    Okay.  And they are pharmaceutically acceptable
8    excipients, right?
9    A.    Yes, because you have to have acceptable ingredients.
10   Q.    Okay.  And the 26 percent, 26.7 percent -- let me ask
11   you this, I'll make it easier.
12         The two on the bottom, the two EUDRAGIT, those
13   are what are known as polymethacrylates, right?
14   A.    Yes.
15   Q.    The one above that, the Lubritab, that's hydrogenated
16   vegetable oil, right?
17   A.    It is a hydrogenated cottonseed oil, yes.
18   Q.    Hydrogenated vegetable oil?
19   A.    Cottonseed oil.
20   Q.    Cottonseed oil.
21   A.    Yes.
22   Q.    The final formulation of FT218 uses hydrogenated
23   vegetable oil in the not hydrogenated cottonseed oil, right?
24   A.    Well, the final formulation for the modified-release
25   microparticles are this one.  So the ingredient used is

**337**

1 Lubritab, it is a commercial name. And if my recollection
2 is right, it is a hydrogenated cottonseed oil.
3 **Q.**   You're correct, I apologize.
4        MR. CALVOSA:  May I just have one minute, Your
5 Honor?
6        THE COURT:  Yes.
7        MR. CALVOSA:  Will the Court permit a very brief
8 recess, Your Honor?
9        THE COURT:  For what purpose?
10        MR. CALVOSA:  I don't believe he's correct in
11 his testimony and I'd like to show him the document, I just
12 don't have that with me.  I didn't think that was going to
13 be...
14        THE COURT:  Okay.  So you -- are you -- is that
15 the only thing you have left?
16        MR. CALVOSA:  After that I'm done, it's a series
17 of questions off of that.
18        THE COURT:  All right.  Well, I mean, you can
19 have a recess, but it's going to count against you.
20        MR. CALVOSA:  That's fine, Your Honor.
21        THE COURT:  All right.
22        (Recess taken.)
23 BY MR. CALVOSA:
24 **Q.**   Lube -- sorry, let me start again.
25        Lubritab is a hydrogenated vegetable oil,

**338**

1 correct?
2 **A.**   Yes.
3 **Q.**   Okay.  Thank you.
4        So putting back up JTX230 at page 38, that
5 figure, so we have hydrogenated vegetable oil and the two
6 polymethacrylates, right?
7 **A.**   Yes.
8        MR. CALVOSA:  Your Honor, move to admit PTX807.
9        THE COURT:  807.
10        MR. ZUBICK:  Objection, Your Honor, lack of
11 foundation.  I'm not sure how he's going to use it with this
12 witness, but this appears to be a file history of the Jazz
13 patent.  This is a fact witness from a different company.
14        MR. CALVOSA:  Your Honor, this is a publicly
15 available document on the PTO's website, and it -- I could
16 explain what it shows if you want me to or I could --
17        THE COURT:  All right.  Let's come to sidebar.
18        (Whereupon, a discussion was held at sidebar as
19 follows:)
20        MR. CALVOSA:  Your Honor, he said he was
21 monitoring the Jazz filings, this was one of the publicly
22 available ones.  It demonstrates that as of March 24, 2011,
23 Jazz had a patent claim covering exactly what he says he
24 did.  And that March 24, 2011, is before the 2012 date he
25 started working on it.  So to the extent they are arguing

**339**

1 inventorship and he invented it and Jazz didn't, this
2 directly refutes that.  And if he said he never saw it,
3 that's the point, he never checked this one.
4        MR. ZUBICK:  Okay.  So he absolutely testified
5 that he reviewed certain publicly available applications,
6 and Mr. Calvosa has showed them to him, showed him the
7 documents.  We don't dispute that.
8        This is a file history that may be publicly
9 available, I don't dispute that.  But going in and getting
10 the file history is a very different thing.  I have no idea
11 whether he did it or not, I don't think it should be in
12 evidence without establishing it first.
13        MR. SCHULER:  When was it published?
14        MR. CALVOSA:  When was it published?
15        MR. SCHULER:  Yes.
16        MR. CALVOSA:  He said he looked at the published
17 application.  This is the file history, it would have been
18 filed at the same time.
19        MR. SCHULER:  No, it may have been --
20        MR. CERRITO:  After --
21        (Simultaneous talking.)
22        MR. ZUBICK:  I think you need to establish with
23 the witness whether he's ever seen this before, before it
24 goes into evidence, otherwise lack of foundation.
25        THE COURT:  All right.  So, you know, you can

**340**

1 cross-exam him on it without it coming into evidence.  In
2 order for it to come into evidence, you got to establish
3 more, you got to get foundation.
4        MR. CALVOSA:  Understood, Your Honor, I'll ask
5 him the question, that's perfectly fine.
6        THE COURT:  All right.
7        (Whereupon, the discussion held at sidebar
8 concluded.)
9 BY MR. CALVOSA:
10 **Q.**   Dr. Guillard, you said that you monitored Jazz's
11 patent filings.  Did you go to the PTO's website and look on
12 the PTO's website for those patent filings?
13 **A.**   When I -- for these ones?  I don't know.  But
14 perhaps I -- I don't know.
15 **Q.**   Okay.  Perhaps you missed some; is that fair?
16 **A.**   Yes, it's possible.
17 **Q.**   Okay.  Do you see on the document in front of you,
18 PTX807, on page 1, there's an applicant and it's
19 Mr. Allphin?
20 **A.**   Yes.
21 **Q.**   And if you go down, do you see -- or I apologize -- I
22 apologize, if you go up, it says application number, not yet
23 assigned?
24 **A.**   Yes.
25 **Q.**   And if you turn to page 17, second box down, do you

341

1   see application number there?

2   **A.**   You said page 17, yes.

3   **Q.**   And do you see it's Application No. 13/071,369?

4   **A.**   Yes.

5   **Q.**   And if you turn back to page 6 of that application,

6   you see there's a Claim 3 original here that was filed

7   March 24, 2011?

8   **A.**   Sorry, which page?

9   **Q.**   Page 6.

10  **A.**   Yes.

11  **Q.**   And do you see it says, "a controlled-release dosage

12  form there"?

13  **A.**   Yes.

14  **Q.**   And then the second element down, "a

15  controlled-release formulation comprising at least one

16  pharmaceutically active ingredient selected from GHB," and

17  then it continues?

18  **A.**   Yes.

19  **Q.**   And it also has "an immediate-release formulation

20  comprising one pharmaceutically active ingredient selected

21  from GHB," and then it continues?

22  **A.**   Yes.

23  **Q.**   And then if you go down to Claim 24, it depends from

24  Claim 23?

25  **A.**   Yes.

342

1   **Q.**   And Claim 25, then, depends from Claim 24?

2   **A.**   Yes.

3   **Q.**   So you understand that Claims 23-25 should be read as

4   including Claims 23 and 24?

5   **A.**   Yes.

6   **Q.**   And in Claim 25, in March 2011, Jazz claimed "the

7   controlled-release dosage form" with one -- "at least one

8   pharmaceutically acceptable excipient," and those included,

9   last line from the bottom, polymethacrylates, right?

10  **A.**   Yes.

11  **Q.**   And over to the right on that same line, continuing

12  on the next, hydrogenated vegetable oil, right?

13  **A.**   Yes.

14  **Q.**   And you can keep page 17 open with that application

15  number.

16        And JTX003 is the '488 patent that Jazz is suing

17  Avadel on here?

18  **A.**   I don't know the numbers of the patents, so I don't

19  know if it is this one.

20  **Q.**   You don't know if it's that one?

21  **A.**   No, I don't know.

22  **Q.**   In the related application data, do you see that same

23  '369 application number that you see on page 17 of PTX807?

24  **A.**   Sorry. I'm confused. Which --

25  **Q.**   On JTX003, the smaller one that I just gave you.

343

1   **A.**   Okay.

2   **Q.**   Do you see the same related -- in the related

3   application data, do you see the same application number on

4   page 17 of PTX807?

5        You see right there, number 63, related

6   application data, "continuation of Application

7   No. 13/071,369, filed on March 24, 2011"?

8   **A.**   Yes.

9   **Q.**   So when it came to a controlled-release dosage form

10  of sodium oxybate with polymethacrylates and hydrogenated

11  vegetable oil, you did that in 2012; Jazz did it first in

12  2011?

13  **A.**   Well, there are dates, so I don't -- I don't

14  understand your question. I'm sorry.

15  **Q.**   Okay. What you said you did in 2012, a controlled

16  release with the hydrogenated vegetable oil and the

17  polymethacrylates, that was already in Jazz's patent claim

18  in March of 2011, right?

19  **A.**   Well, we used specific kinds of polymethacrylates, as

20  you said, so very specific ones which are names -- which are

21  enteric polymers, so I assume that in the list it were -- it

22  was written "polymethacrylates," so I don't know if they are

23  the same because it is very generic. So we were using some

24  we called the PAM -- I don't remember the name we used

25  yesterday -- and hydrogenated vegetable oil.

344

1        MR. CALVOSA: Mr. Lewis, can you pull up the

2   transcript from yesterday, page 276, lines 20-24.

3        MR. ZUBICK: Objection, Your Honor. This is a

4   rough transcript, so I haven't seen it yet, but...

5        THE COURT: So do you have a copy for them to

6   see?

7        MR. CALVOSA: Yes.

8        THE COURT: Take it down, please.

9        MR. CALVOSA: May I approach the witness, then,

10  so he may see it?

11       THE COURT: Yes.

12       MR. ZUBICK: So, Your Honor, the objection is

13  this is a daily, so we have no problem with using it to

14  refresh the witness's recollection, but we don't think it

15  should come up, it hasn't been certified. So it sounds like

16  that's all they're going to do.

17       MR. CALVOSA: That's all I'm doing.

18       THE COURT: Okay.

19  BY MR. CALVOSA:

20  **Q.**   Do you remember yesterday I asked you some questions

21  about whether you believed you were the inventor of certain

22  claims?

23  **A.**   Yes.

24  **Q.**   And do you remember you answered, "I am not a patent

25  engineer, so I can't give that answer"?

345

1   A.      Yes.
2   Q.      Okay.  A patent engineer is like a patent lawyer,
3   right?
4   A.      Well, I imagine, yes.
5   Q.      And you're confident you are not a patent engineer?
6   A.      Well, at that time, because I am here as a formulator
7   of FT218, I was a formulator, I was an R&D scientist.
8   Q.      Okay.
9           MR. CALVOSA:  May I approach, Your Honor?
10          THE COURT:  Yes.
11  BY MR. CALVOSA:
12  Q.      And what I have just handed you is a printout of
13  somebody's website biography from a company called
14  Regimbeau?  Did I say that right?
15  A.      Regimbeau.
16  Q.      Regimbeau.  I was very close.
17          And there's a picture of yourself there, right?
18  A.      Yes.
19  Q.      And there's your name right there, right?
20  A.      Yes.
21  Q.      And underneath it, your title is patent engineer,
22  right?
23  A.      Yes, that's my current position, yes.
24  Q.      And you said you weren't a patent engineer, right?
25  A.      Well, I'm here as a formulator, the formulator of

346

1   FT218, so now we have a different position.  At that time, I
2   was the formulator, so I changed my career.
3   Q.      Okay.
4           MR. CALVOSA:  And, Your Honor, we'd like to
5   enter this into evidence as a prior inconsistent statement.
6           MR. ZUBICK:  Yeah.  So, first of all, I'm not
7   sure it's inconsistent, Your Honor.  I also am seeing it for
8   the first time.  I don't know if this has been translated.
9   I find it hard to believe -- I'm not even going to try on
10  the company name -- published into English, so...
11  BY MR. CALVOSA:
12  Q.      Okay.  Dr. Guillard, you remember I took your
13  deposition, right?
14  A.      Yes.
15  Q.      And you testified truthfully at the deposition?
16  A.      Yes.
17          MR. CALVOSA:  And could we pull up page 10,
18  please, of the deposition.
19          MR. ZUBICK:  Give me the page number, please,
20  before you put it up.
21          MR. CALVOSA:  10.
22          MR. ZUBICK:  Okay.
23          MR. CALVOSA:  And I'm looking at line 12,
24  please.
25          MR. ZUBICK:  Your Honor, I think this is

347

1   improper as impeachment procedure.  I just got the page
2   number, the page number and the line number.
3           THE COURT:  So before you do that, let -- give
4   Mr. Zubick an opportunity.
5           MR. ZUBICK:  Yes.  Same ongoing objection, I
6   don't think this is inconsistent.
7           MR. CALVOSA:  It is absolutely inconsistent.  He
8   testified he's not a patent engineer.  He told me he was a
9   patent engineer.  He told me what a patent engineer does.
10          THE COURT:  Okay.  So you'll get a chance to
11  redirect.  He can ask the question in cross-examination.
12  BY MR. CALVOSA:
13  Q.      You work at the Regimbeau company as a patent
14  engineer, right?
15  A.      Currently, yes.
16  Q.      I didn't make up that website, right?
17  A.      Sorry.  You?
18  Q.      I didn't create that website on my own?
19  A.      No.  Of course not.
20  Q.      Okay.  And as a patent engineer, your
21  responsibilities include drafting patent applications?
22  A.      Now, yes.
23  Q.      And they include monitoring examination proceedings
24  in different countries where the applications are filed?
25  A.      Yes.

348

1   Q.      And they include being involved in litigation
2   proceedings, right?
3   A.      Yes.
4   Q.      And although you mentioned that you're here
5   testifying as a fact witness, Avadel is compensating you for
6   your testimony, right?
7   A.      Yes.
8           MR. ZUBICK:  Objection.
9           MR. CALVOSA:  Okay.  He answered.
10          I'll pass the witness, Your Honor.
11          THE COURT:  All right.  You can redirect.
12              REDIRECT EXAMINATION
13  BY MR. ZUBICK:
14  Q.      Dr. Guillard, very briefly, were you a patent
15  engineer at the time of your work on FT218?
16  A.      No, I was a formulator, R&D scientist.
17  Q.      Okay.  Thinking about today, are you a patent
18  engineer today?
19  A.      Yes, I changed my career, so now I am a patent
20  engineer.
21  Q.      Where are you a patent engineer?
22  A.      In this law firm, Regimbeau.
23  Q.      Where is Regimbeau?
24  A.      Well, my office is in Lyon, in France.
25  Q.      Do you specialize in U.S. patent law?

349

1  A.    No.

2         MR. ZUBICK:  No further questions.  Thank you,

3  Your Honor.

4         MR. CALVOSA:  Your Honor, brief recross, very,

5  very brief.

6         THE COURT:  All right.  I'll give you a brief

7  recross.

8              RECROSS-EXAMINATION

9  BY MR. CALVOSA:

10  Q.    Dr. Guillard, when I asked you the questions

11  yesterday and you said you weren't a patent engineer, you

12  were a patent engineer yesterday, right?

13  A.    Well, what I understood, I am here as a former -- a

14  formulator of FT218.  That's what I have understood.  And

15  I'm here to explain what I have done as a formulator.

16  Q.    And although your counsel asked you questions about

17  the United States and you said no, you have experience

18  prosecuting patent applications in the United States, right?

19  A.    No prosecution.  I began -- I'm just beginning my

20  career, so I am involved in proceedings such as responding

21  to office actions and things like that in the U.S., but I am

22  not -- certainly not a U.S. specialist.

23  Q.    The applications that you draft, those go into the

24  United States Patent Office, right?

25  A.    Yes.

350

1  Q.    Okay.  And you're familiar with what's called an

2  office action, and you participate in the prosecution of a

3  patent application in the United States, right?

4  A.    What do you call prosecution process?  I'm

5  misunderstanding.

6  Q.    The back-and-forth with the Patent Office.

7  A.    You mean now as a patent engineer or --

8  Q.    Yes.

9  A.    Yes, it happens.

10         MR. CALVOSA:  Thank you.  No more questions.

11         THE COURT:  All right.

12         MR. ZUBICK:  Nothing further, Your Honor.

13         THE COURT:  All right.  Dr. Guillard, you may

14  step down.  Thank you.

15         THE WITNESS:  Okay.  Thank you.

16         THE COURT:  All right.  Jazz, you may call your

17  next witness.

18         MR. LOCASTRO:  Jazz's next witness, Your Honor,

19  is going to be by deposition video, Dr. Thorsteinn

20  Thorsteinsson.

21         For the jury's benefit, Dr. Thorsteinsson is a

22  consultant with a company called Strivecta that previously

23  worked with Avadel.

24         If Your Honor would permit me to approach, I

25  have a very thin witness binder.

351

1         THE COURT:  You may.

2         MR. LOCASTRO:  And, Your Honor, since we'll be

3  publishing the exhibits to the jury with the deposition

4  video, I'd like to move two exhibits into evidence now, with

5  Your Honor's permission.

6         THE COURT:  Okay.  Tell us what the exhibits

7  are.

8         MR. LOCASTRO:  They are JTX031, which is one

9  Your Honor ruled on yesterday morning.  The other is JTX226,

10  and I don't believe there's any objection to that.

11         MR. SCHULER:  No objection.

12         THE COURT:  All right.  So JTX0031 and JTX226

13  are admitted.

14         (Exhibit admitted.)

15         MR. LOCASTRO:  Okay.  Thank you, Your Honor.

16         (Video deposition was played for the jury as

17  follows:)

18  Q.    Can you please state your full name for the record,

19  please?

20  A.    My name is Thorsteinn Thorsteinsson.

21  Q.    And am I correct that you're the founder of a

22  consulting company called Strivecta?

23  A.    I'm the founder of a company called Strivecta.

24  Q.    And when did you found Strivecta?

25  A.    In 2018.

352

1  Q.    And can you please tell me the general nature of the

2  consulting services that Strivecta provides?

3  A.    I provide consulting services to pharmaceutical

4  companies.

5  Q.    And can you be a little bit more specific as to what

6  exactly the nature of those consulting services are?

7  A.    It's, in most cases, related to development and

8  manufacturing of a drug product.

9  Q.    And am I correct that Avadel first engaged Strivecta

10  as a consultant around March of 2019?

11  A.    I am under the impression that I was approached in

12  February 2019.  It's a possibility that we didn't sign the

13  contract until March -- I don't recall the exact date --

14  Q.    Okay.

15  A.    -- when we signed the contract.

16  Q.    And around March or February of 2019 and even in

17  the -- you know, the first half of 2019, can you tell me

18  what consulting services Strivecta provided to Avadel?

19  A.    I was asked to assist Avadel with monitoring

20  activities in France, where they were closing down a

21  facility, to monitor the storage of the lab notebooks and

22  other documents to make sure they were shipped off to an

23  off-site storage.

24  Q.    Now, you've worked in the pharmaceutical industry in

25  the United States since around 2003; is that accurate?

353

1   A.      That is accurate.

2   Q.      In any of your prior -- in the course of any of your

3   prior employment, did you perform dissolution testing

4   yourself?

5   A.      I have performed dissolution testing myself.

6   Q.      In your experience in the pharmaceutical industry,

7   have you ever worked with the EUDRAGIT brand of polymers?

8   A.      Yes.

9   Q.      Have you ever performed something called an excipient

10  compatibility study?

11  A.      I have.

12  Q.      And what do you understand a excipient compatibility

13  study to be?

14  A.      My understanding is that you are comparing different

15  excipients to see the effect on the active component.

16  Q.      In your experience when developing drug products, are

17  excipient compatibility studies carried out during the

18  normal course of that drug development work?

19  A.      It is performed in many cases and in some cases not.

20  Q.      In which cases, why would you not carry out an

21  excipient compatibility study during the ordinary course of

22  pharmaceutical development work?

23  A.      That would be performed when that study had already

24  been performed before and published, then there's not a

25  reason to perform it again because you already have a

354

1   supporting document for it.

2   Q.      So if there was a study that had been already

3   performed before and published, how difficult, in your

4   experience, is it to then carry out experimentation designed

5   to assess the optimum amount of the excipient to include in

6   your drug formulation?

7   A.      That was a very long question.  Can you break it down

8   for me?

9   Q.      Yeah, of course.

10          So if there's information that's been published

11  that tells you, as a drug developer, that an excipient is

12  compatible with an active ingredient, in your experience,

13  how difficult would it be to determine the optimum amount of

14  the excipient to use in the final formulation?

15  A.      Yeah, I -- I -- I don't know.  I would -- in my

16  professional opinion, it would -- I would need to see more

17  supporting data to be able to draw any conclusion.

18  Q.      And what kinds of supporting data would you need?

19  A.      More tests regarding different amount of each

20  excipient.

21  Q.      Now, you have a PhD in pharmaceutical science from

22  the University of Iceland; is that correct?

23  A.      That is correct.

24  Q.      And when did you receive that degree?

25  A.      In 2003.

355

1   Q.      And what was the subject of your doctoral work?

2   A.      It was medicinal chemistry.

3   Q.      You're familiar with an Avadel product code named

4   FT218; is that correct?

5   A.      I have worked as a consultant on a project called

6   FT218.

7   Q.      And what do you understand FT218 to be?

8   A.      My understanding is that it is a sodium oxybate

9   extended-release product.

10  Q.      The next exhibit spans the Bates range AVDL_00775349

11  to 5371.  This will be PTX87.

12          Now, Doctor, do you see two e-mails on the first

13  page of Exhibit 87?

14  A.      I do see two e-mails on PTX87 page ending in 349.

15  Q.      Okay.  Now, at the bottom of the page, that appears

16  to be an e-mail that you sent Greg Divis on April 16th of

17  2019.

18          Would you agree with that?

19  A.      This does appear to be an e-mail that I sent to Greg

20  Divis on April 16, 2019.

21  Q.      And you understand that Greg Divis is currently the

22  CEO of Avadel: is that right?

23  A.      That is my understanding.

24  Q.      And at the time this e-mail was sent in April of

25  2019, Mr. Divis was the interim chief executive officer at

356

1   Avadel?

2   A.      That is my understanding.

3   Q.      Now in your e-mail to Mr. Divis, in the first line,

4   you state that you've finished the document review report

5   earlier than you expected and then you invited Mr. Divis to

6   share that report with others.

7           Do you see that?

8   A.      I do see that.

9   Q.      Now, the report that you refer to in your e-mail to

10  Mr. Divis, do you see that report attached to the e-mail

11  that's been marked as Exhibit 87?

12  A.      I do see, on page ending in 351, a report titled

13  "Avadel France Technical Review and Transfer Plan

14  Activities" prepared by me.

15  Q.      And the report indicates that it was prepared by you,

16  does that mean that you wrote this report?

17  A.      Yes, that means I wrote this report.

18  Q.      And you would have ensured that the statements and

19  information contained in this Exhibit 87 report were

20  accurate before sending them to Avadel's CEO, correct?

21  A.      The information I put in this report, to best of my

22  knowledge, are accurate based on what I did at the time.

23  Q.      Okay.  Can you turn to the page ending in 775354,

24  please.  And it's the fourth page of the report itself.

25  A.      (Complies.)

357

1    Okay.  I'm on page ending in 354.

2    **Q.**    And you see section 2.0 says, "Background

3    Information"?

4    **A.**    I do see 2.0, "Background Information."

5    **Q.**    And it says here in the last sentence of background

6    that, "The main purpose was to review documents relating to

7    Avadel's technology, ensuring everything pertaining to this

8    technology is preserved and easily accessible if the company

9    ever decides to revisit any of the programs or transfer them

10   to the USA."

11          Do you see that?

12   **A.**    I do see that.

13   **Q.**    And the technology that's being referred to here,

14   does that relate to all of the products that Avadel had

15   developed in the particular facility that you traveled to?

16   **A.**    I don't know if it's referring to all of the

17   products, but at least the one that I did look at.

18   **Q.**    And which one is that that you're referring to?

19   **A.**    I think that -- what I looked at is listed in this

20   report.

21   **Q.**    And is -- is FT218 one of the products that you

22   looked at as part of this technology review and transfer

23   project?

24   **A.**    Let me refresh my memory by glancing through this,

25   please.

358

1    **Q.**    Yeah, of course, please.

2    **A.**    So, yes, I do see in this report that FT218 was --

3    was mentioned here.

4    **Q.**    Now, in connection with putting this report together,

5    you physically traveled to France, right?

6    **A.**    That is correct.

7    **Q.**    And you visited a facility where the FT218 had been

8    developed, at least in part?

9    **A.**    I did visit a facility in France where at least part

10   of the FT218 was developed, and that was my understanding.

11   **Q.**    And when you were at that facility, you reviewed

12   laboratory records, physical records, related to the

13   development of FT218: is that correct?

14   **A.**    No, that is not correct.  I looked at lab notebooks,

15   but I couldn't read them because majority of them were in

16   French.

17   **Q.**    Did you review any documents that were in English

18   related to the development of FT218?

19   **A.**    I don't recall specific what documents I looked at

20   and whatnot.

21   **Q.**    You found that all of Avadel's development records

22   were well preserved: is that correct?

23   **A.**    So the ones that I did see and did look at were well

24   documented, and they were shipped off to an off-site

25   storage, so in my opinion, the documents that I saw and were

359

1    shipped were preserved.

2    **Q.**    Can you turn to page 6 of your report, which is the

3    Bates No. 775356.

4    **A.**    Okay.

5    **Q.**    And in section 3.4, it indicates here that you had

6    discussions with various Avadel staff members.

7          Do you see that?

8    **A.**    I do see that.

9    **Q.**    I'd like to direct your attention to the last several

10   lines of section 4.0.

11          And do you see about five lines up, there's a

12   sentence that starts with "the current..."

13          Do you see that?

14   **A.**    I do see that.

15   **Q.**    And here the report reads, "The current Avadel

16   scientists had to use a trial-and-error approach to develop

17   each project with no secret ingredient or trade secret used

18   in developing the projects.

19          Overall, there are no major concerns or hurdles

20   in transferring the technology to the USA and closing the

21   site in France earlier than expected."

22          Do you see that?

23   **A.**    I do see that.

24   **Q.**    Based on the records you saw, your opinion at the

25   time was that Avadel did not use any secret ingredient or

360

1    trade secret in any of its projects: is that correct?

2    **A.**    Yeah.  So like I said, based on what I saw and the

3    documents I reviewed and my discussion with Avadel

4    scientists, I did not see any secret ingredients being used.

5    **Q.**    So in this e-mail, you recommended to Mr. Divis that

6    he didn't need to retain any of the French employees who had

7    developed FT218 after the registration batches were

8    completed and their CMC reports for the NDA were written.

9          Is that a correct understanding?

10   **A.**    Like I said in this e-mail, regarding the team in

11   France, I did not see a reason to keep them beyond the

12   registration batches of FT218.

13   **Q.**    And one of the reasons why you were able to make that

14   recommendation was because the French employees didn't

15   possess any trade secret knowledge: is that correct?

16   **A.**    So like I said, my recommendation here in this e-mail

17   is I did not see a reason to keep them beyond the

18   registration batches of FT218.

19   **Q.**    And one of the reasons why is because those employees

20   didn't possess trade secret knowledge, right?

21   **A.**    So like I said, I did not see a reason to keep them

22   beyond the registration batches of FT218.

23   **Q.**    And for the record, PTX97 has just been marked, that

24   is a document that spans the Bates range AVDL_00044220

25   through AVDL_00044260.

361

1      Do you recognize PTX97 to be a portion of the
2  FT218 NDA?
3  A.    So I do recognize that PTX97 is labeled as section
4  3.2.P.2.2, and it appears to be part of the CMC section of a
5  regulatory filing, and I don't know if this is a draft or
6  the final version.
7  Q.    Is -- did you work on section 3.2.P.2.2 of the FT218
8  NDA?
9  A.    Yes, I did.
10 Q.    And what was your role with respect to working on
11 this particular section?
12 A.    Same as all -- all of the other sections.  I was
13 helping editing, drafting a section.
14 Q.    Now, one of the components of section 3.2.P.2.2 of
15 the FT218 NDA pertains to formulation development: is that
16 correct?
17 A.    This document is -- has the title "Pharmaceutical
18 Development."
19 Q.    Let's turn the page to 44237, please.
20     And do you see a heading on this page that
21 states "Malic Acid"?
22 A.    I do see a heading stating malic acid on page ending
23 237.
24 Q.    And in the second paragraph, part of the last
25 sentence here says that, "Malic acid was selected as it is

362

1  already present in the current sodium oxybate commercial
2  formulation (Xyrem)."
3      Do you see that?
4  A.    I do see that.
5      (End of video deposition.)
6      THE COURT:  All right.
7      MR. LoCASTRO:  Your Honor, if I may, the
8  Court -- Jazz calls its next witness, also by deposition
9  video, it's Dr. Jason Vaughn.  And if I may approach with
10 copies of the binders?
11     THE COURT:  You may.
12     MR. LoCASTRO:  And if I may move some documents
13 into evidence before the video is played, Your Honor.  I
14 believe PTX60 is already in, that will be shown.  Per the
15 parties' agreement, it will be moving in, just a truncated
16 portion of PTX109, which will be found in the binder, a
17 truncated portion of PTX0164.
18     And then in their entireties, I understand with
19 no objection, PTX0165, PTX2004, and PTX2006.
20     MR. SCHULER:  No objection.
21     THE COURT:  All right.  PTX60 -- well, PTX164,
22 PTX165, PTX2004, PTX2006 are admitted in their entirety.
23 PTX164 and PTX109 are admitted truncated.
24     MR. LoCASTRO:  That is correct, Your Honor, yes.
25 Thank you.

363

1      (Exhibits admitted.)
2      (Video deposition was played for the jury as
3  follows:)
4  Q.    Could you please state your full name for the record,
5  please?
6  A.    It's Jason Michael Vaughn.
7  Q.    And you're currently employed as the vice president
8  of technical operations at Avadel Pharmaceuticals: is that
9  correct?
10 A.    Yes, that's correct.
11 Q.    How long have you had that title, sir?
12 A.    I started as a full-time employee in October of 2019.
13 Q.    And during today's deposition, is it okay with you if
14 I refer to Avadel's extended-release sodium oxybate product
15 as FT218?
16 A.    Yes.
17 Q.    And do you understand FT218 to be sort of an internal
18 code name for Avadel's extended-release sodium oxybate
19 product?
20 A.    Yes.
21 Q.    And this is going to be PTX134.
22     Do you recognize PTX134 to be a declaration that
23 you signed and submitted during the prosecution of a patent
24 application numbered 16-419616?
25 A.    Yes, I do.

364

1  Q.    Is it okay with you if I refer to that patent
2  application as the '616 application, just for shorthand?
3  A.    Sure.
4  Q.    Is it your understanding that Avadel filed the '616
5  application?
6  A.    It appears to be, yes.
7  Q.    In the first paragraph of the declaration, you state
8  four lines down, "Although I am not an inventor of the
9  instant application, in my leadership role in technical
10 operations, I am deeply familiar with the '616 patent
11 application and the history underlying the development of
12 the claimed invention."
13     Do you see that?
14 A.    Yes.
15 Q.    Is that an accurate statement?
16 A.    At the time, yes.
17 Q.    All of the statements in your declaration to the
18 USPTO are accurate, correct?
19 A.    To the best of my knowledge.
20 Q.    And sitting here today, there isn't anything in the
21 declaration that you feel needs clarification or that needs
22 to be corrected, right?
23 A.    Not that I'm aware of, no.
24     MR. LOCASTRO:  Let's mark this as the next
25 exhibit, please, this will be 135.

365

1  BY MR. LOCASTRO:
2  Q.    The court reporter has just handed you PTX135.
3        And my question for you is, do you recognize
4  this document to be a patent application publication for the
5  '616 application?
6  A.    This is a patent application for that '616.
7  Q.    And you told the Patent Office in your declaration
8  that you are deeply familiar with the information that's in
9  the specification of this patent application; is that
10 correct?
11 A.    At the time --
12 Q.    I'd like to direct your attention to the examples,
13 please, which begin in paragraph 385.  And if it helps you,
14 that is on -- it says page 25 at the very top, once you get
15 past all the figures.
16       And the first sentence of paragraph 385 reads,
17 "Tables 1a to 1d provide the qualitative and quantitative
18 compositions of the sodium oxybate IR microparticles, MR
19 microparticles, and mixtures of IR and MR microparticles."
20       Do you see that?
21 A.    Yes, I see that.
22 Q.    Are you able to determine whether the composition of
23 the modified-release particles described in table 1b is the
24 same as the composition of the 4.5-gram dose of FT218?
25 A.    Yes.  The coating material levels are the same.

366

1  Q.    And according to table 1b, the immediate-release
2  particles are a component of the modified-release particles,
3  right?
4  A.    Correct.
5  Q.    And according to table 1b, the function of the
6  immediate-release microparticles is that they are the core
7  of the modified-release microparticles?
8  A.    It says they are the core, but there is a placebo
9  core that is used in the manufacturing of the -- of the IR
10 microparticles, and then that is just then taken forward to
11 make the MR microparticles.
12 Q.    The patent application doesn't say anything about a
13 placebo core in table 1b, does it?
14 A.    Not in 1b, but it does in 1a.
15 Q.    But in table 1b that describes the composition of the
16 MR microparticles, the core of the MR microparticles is the
17 IR microparticles, that's what Avadel told the Patent Office
18 in the '616 application, right?
19 A.    That's what it says, yes.  But our -- in our use of
20 the word "core," it's -- it's intended to be used as the
21 placebo core to make the IR.  And then the IR microparticles
22 are just the starting material to make the MR
23 microparticles.
24 Q.    But that explanation is not set forth in the patent,
25 is it?

367

1  A.    It is not.
2  Q.    Can you turn to paragraph 56 of PTX135, please?
3  A.    56?
4  Q.    Yes.  That's on the page with the little 5 at the
5  very top.
6        And paragraph 56 states that, "Figure 5 plots a
7  time-release dissolution profile of the finished formulation
8  of example 1 in deionized water."
9        Do you see that?
10 A.    I see where that says that, yes.
11 Q.    And then omitting the parentheticals, paragraph 57
12 right beneath, that says that, "Figure 6 plots a
13 time-release dissolution profile of the finished composition
14 of example 1 in deionized water overlaid against the
15 dissolution profile described in figure 2 of
16 USP 2012-007685."
17       Do you see that?
18 A.    Yes, I see that.
19 Q.    And as we saw earlier in the PTX100 PowerPoint, that
20 USP 2012/0076865, these a Jazz patent application
21 publication: is that correct?
22 A.    I would need to go back to that again.
23 Q.    Sure.
24 A.    I don't recall if that's the number or not.
25 Q.    I think it was slide 105 we were looking at in

368

1  PTX100.
2  A.    Yes.
3  Q.    Is it fair to say that Figure 6 of the '616
4  application publication compares the deionized water
5  dissolution profile of the finished composition of example 1
6  of Avadel's application to the formulation described in
7  figure 2 of Jazz's application?
8  A.    I guess the only assumption would be that that is an
9  actual Jazz -- I mean, it know it says it here, but --
10 whether that's an actual Jazz patent or not.
11 Q.    I guess setting aside any discrepancy as to whether
12 or not those numbers are really a Jazz application --
13 A.    Un-huh.
14 Q.    -- is it fair to say that what Figure 6 in the Avadel
15 application is doing is comparing the DI water profile of
16 example 1 of Avadel's application to figure 2 of whatever
17 that '865 application is?
18 A.    That's what this says here.
19 Q.    Can you please look at Figure 6 of the '616
20 application publication?  And that's on sheet 3 of 46 toward
21 the beginning of the document.
22       And what Figure 6 is comparing is the DI,
23 deionized water, dissolution profile of the two formulations
24 at various time points between zero and 8 hours, correct?
25 A.    It appears to be, yes.

369

1  Q.     And Avadel would agree that Figure 6 is showing that

2  both formulations have released nearly an identical amount

3  of sodium oxybate after 6 hours in deionized water, right?

4  A.     I mean, from the -- from the graph, it appears

5  they're very close together.

6  Q.     Did Avadel scientists document experiments related to

7  the development of FT218 in laboratory notebooks?

8  A.     Yes.

9  Q.     And during the development of FT218, did Avadel have

10  any policies in place regarding laboratory notebooks, such

11  as how they should be used and how they should be stored and

12  maintained?

13  A.     There were policies in place.

14  Q.     Did those policies require Avadel employees to

15  document all experiments related to the development of FT218

16  in laboratory notebooks?

17  A.     As far as I know, yes.

18  Q.     Did Avadel perform deionized water dissolution

19  testing with FT218?

20  A.     Yes.

21  Q.     Was the deionized water dissolution testing on FT218

22  carried out on only one occasion, to your knowledge?

23  A.     To my knowledge, yes.

24  Q.     This is a document that's been premarked PTX44.

25         And I will represent to you that PTX44 is a

370

1  certified translation of portions of an Avadel laboratory

2  notebook. Those are the first several pages. And then what

3  follows is the original French version.

4         Do you recognize PTX44 to contain portions of an

5  Avadel laboratory notebook documenting experimentation

6  performed during the development of FT218?

7  A.     Yes, it appears to be.

8  Q.     Can I ask you to turn to the page ending in 468, and

9  you can feel free to use the English or the French,

10  whichever you prefer.

11  A.     Okay. Sorry, where is the 468, at the bottom?

12  Q.     Yes.

13  A.     Okay, I got it.

14  Q.     I'm looking at the English version, I assume you are

15  too.

16  A.     I am too.

17  Q.     Do you see the title here is "Dissolution in

18  Deionized Water According to the Jazz Patent," and then the

19  document continues?

20         Do you see where I'm looking at?

21  A.     Yes.

22  Q.     Does this page of the laboratory notebook, PTX44,

23  describe the dissolution testing of FT218 in deionized water

24  that Avadel carried out?

25  A.     Let me review it quick.

371

1         Yes, it appears to be.

2  Q.     Does the information in PTX44 tell you who carried

3  out this testing?

4  A.     There is a signature at the bottom of the person that

5  did the work.

6  Q.     And is that person Dr. Hervé Guillard?

7         I see his name on the page ending on 433, if

8  that helps.

9  A.     I mean, it doesn't appear that, no.

10  Q.     What is Avadel's knowledge as to who carried out the

11  testing, if not Dr. Guillard?

12  A.     It appears that it was -- again, I'm not an expert in

13  evaluating signatures, but it appears that that signature

14  matches Florian.

15  Q.     So Florian carried out the testing is Avadel's

16  knowledge. Is it also Avadel's knowledge that Dr. Guillard

17  oversaw that testing?

18  A.     What do you mean by "oversaw"? He is signed as

19  having reviewed this page.

20  Q.     And is it Avadel's knowledge that the person who

21  signs a lab notebook as the reviewer is the person who

22  oversaw the work; is that correct?

23  A.     Yeah. I don't know if they were there in the room

24  when it was occurring, but what the signature shows here is

25  that they reviewed this documentation, and it doesn't

372

1  contain any laboratory errors, laboratory notebook errors.

2  Q.     You didn't review Dr. Guillard's deposition

3  transcript. I think you told me that earlier, correct?

4  A.     No.

5  Q.     And you don't -- so you don't have any reason to

6  believe that Dr. Guillard was untruthful in his testimony,

7  do you?

8  A.     No, I haven't.

9  Q.     Take as much time as you need to look it over, but my

10  question for you is going to be: Exhibit 4 is the study

11  report for study ETD 218-005: yes?

12  A.     Yes.

13  Q.     Avadel submitted Exhibit 4 to the FDA in connection

14  with the Lumryz New Drug Application, correct?

15  A.     That's correct.

16  Q.     And Exhibit 4 is the study report that the FDA

17  reviewer is talking about on the bottom of page 12 of the

18  Biopharmaceutics Review in Exhibit 1, right?

19  A.     That's correct.

20  Q.     If you turn to page 3 of Exhibit 4, the Bates ends in

21  753. There's an introductory section to the study report,

22  right?

23  A.     Yes.

24  Q.     And right there in the introduction, the very first

25  bullet talks about how Lumryz is composed of

373

1    immediate-release microparticles and, again,

2    controlled-release microparticles, right?

3    A.    Correct.

4    Q.    And the introduction talks about how the FT218

5    formulation has pH-dependent properties.  Do you see that

6    language?

7    A.    Yes.

8    Q.    FT218 is a code name that Avadel used for Lumryz

9    before Lumryz obtained FDA approval, right?

10   A.    That's correct.

11   Q.    And then there's some language here that talks about

12   how certain data indicate that at pH 6.8 the proposed

13   modified-release product has the potential to dump the dose

14   of sodium oxybate rapidly.  Do you see where I am?

15   A.    Yes.

16   Q.    And as a result of that potential, the FDA then asked

17   Avadel to explore the impact of beverages whose pH is

18   neutral or basic, correct?

19   A.    Yes.

20   Q.    So the FDA's concern was that if the Lumryz pellets

21   were mixed with water with a pH around or above 6.8, the

22   controlled-release pellets might actually start releasing

23   right there in the dosing cup; is that fair?

24   A.    Yes, that's what they were concerned about.

25   Q.    And if that happened, that would be a problem,

374

1    because then the patient should essentially be taking one

2    very large immediate-release dosage; fair?

3    A.    Yes.

4    Q.    And it would, of course, be dangerous if the patient

5    took the controlled-release and the immediate-release

6    portions at the same time, right?

7    A.    And they both released at the same time, yes.

8    Q.    And that safety concern is why Avadel carried out

9    study ETD 218-005, correct?

10   A.    Yes, that's why.

11   Q.    If you could please turn to page 7 of Exhibit 4.

12   What it indicates here is that Avadel evaluated in vitro

13   dissolution of Lumryz after mixing the Lumryz pellets with

14   different kinds of water; is that correct?

15   A.    Yes.

16   Q.    One type of water was a mineral water called Glacier

17   Isle; yes?

18   A.    Yes.

19   Q.    The second type of water we see here is a mineral

20   water called St-Yorre.  Do you see that?  Y-O-R-R-E for the

21   reporter.

22   A.    Mm-hmm.

23   Q.    And the third type of water is another mineral water

24   called Badoit, or Badoit, however you say that, correct?

25   A.    Yeah, mm-hmm.

375

1    Q.    And these three different mineral water types differ

2    in terms of their pH levels and their bicarbonate ion

3    concentrations, correct?

4    A.    Correct.

5    Q.    What is a bicarbonate ion?

6    A.    A bicarbonate ion is a buffering ion that can be used

7    to keep the pH at a specific pH.

8    Q.    And when you say a "buffering ion," what exactly does

9    that mean?

10   A.    It means that the -- you know, if other ions come

11   into the system or in the solution, those buffering ions

12   prevent the change in the pH.

13   Q.    The Glacier Isle water that was tested had a pH

14   of 8.5 and a -- it's indicated here -- a low bicarbonate ion

15   concentration; is that correct?

16   A.    Well, it says it wasn't indicated, but they -- at

17   least the people that drafted this report think it's low.

18   Q.    Do you agree with that?

19   A.    I have no reason to doubt that.

20   Q.    Okay.  The St-Yorre water had a pH of 6.4 but a

21   bicarbonate ion concentration of 4,263 milligrams per

22   litter, correct?

23   A.    Correct.

24   Q.    The Badoit water had a pH of 5.8 but a bicarbonate

25   ion count about four times lower than the St-Yorre water; is

376

1    that correct?

2    A.    Yeah, it appears that it's about a fourth of that.

3    Q.    Okay.  None of the water tested as indicated in

4    Exhibit 4 was deionized water; is that correct?

5    A.    That's correct.

6    Q.    But if you look a little further down on page 7, it

7    does indicate here that Avadel also evaluated in vitro

8    dissolution of Lumryz after mixing it with tap water,

9    correct?

10   A.    Yes.

11   Q.    And the tap water had a pH of 7.6.  You can see that

12   in the table at the bottom of the page, correct?

13   A.    Yes.

14   Q.    And if you look at the results that are shown in the

15   table at the very bottom of page 7, mixing Lumryz with tap

16   water, Glacier Isle water, or the Badoit water resulted in a

17   mixture with a pH of 5.7 or 5.8; is that correct?

18   A.    Yes.

19   Q.    That pH is below 6.5, right?

20   A.    Yes.

21   Q.    So that resulting pH that we see in the table on

22   page 7 is below the release trigger for the

23   controlled-release Lumryz pellets, correct?

24   A.    It is below that.

25   Q.    If you turn the page in Exhibit 4 to page 8, we see

377

1 here that the dissolution profiles of the Lumryz pellets
2 mixed with tap water, Glacier Isle water, or the Badoit
3 water, they appear to be equivalent, correct?
4 A.      Yeah, based on the graph, they seem to line up and be
5 equivalent.
6 Q.      So mixing Lumryz and water with a pH of 7.6, 8.5, or
7 5.8 doesn't appear to have any impact on the resulting
8 dissolution profile; is that correct?
9 A.      I mean, based on the time that it was in the presence
10 of that pH, it does not appear to have an effect.
11 Q.      And the data in Exhibit 4 show that regardless of
12 whether the water in Avadel's tests started with a pH
13 of 7.6, 8.5, or 5.8, once the Lumryz was added, the pH of
14 the resulting suspension became 5.7 or 5.8, correct?
15 A.      That's correct.
16 Q.      Mixing the Lumryz with the high-bicarbonate St-Yorre
17 water resulted in a mixture with a pH of 6.2, right?
18 A.      That's correct.
19 Q.      And is it correct that the bicarbonate ions in the
20 St-Yorre water raised the pH of the mixture?
21 A.      The bicarbonate ions really prevented the drop in the
22 pH.  They don't specifically raise the pH.
23 Q.      Can you explain how the science of that works: do you
24 know?
25 A.      Yes.  So the pH was 6.4.  When we added the Lumryz,

378

1 it only dropped it to 6.2, so the buffering ability of the
2 bicarbonate that I mentioned earlier prevents it from going
3 down further.
4 Q.      And Exhibit 6 is another portion of the drug approval
5 package for Lumryz, correct?
6 A.      Yes.
7 Q.      Can you please turn to the page where the Bates ends
8 in 3819?
9 A.      Okay.
10 Q.      And here on the page ending in 3819, it's the first
11 page of a memorandum from the FDA's Office of Medication
12 Error Prevention and Risk Management, correct?
13 A.      Yes.
14 Q.      The third sentence of that first full paragraph on
15 page 5 states that the Lumryz NDA is a 505(b)(2) application
16 that relies, in part, on the FDA's finding of safety and
17 effectiveness for Xyrem.
18         Do you see that?
19 A.      I see that, yes.
20 Q.      And what that means is that Avadel's New Drug
21 Application for Lumryz relied on safety and efficacy data
22 for the Xyrem product that Jazz had previously generated and
23 submitted to the FDA, correct?
24 A.      That's what the FDA has indicated here.
25 Q.      But the safety and efficacy studies that Jazz carried

379

1 out, that Avadel relied on, had Avadel not relied on Jazz's
2 data, it would have had to generate its own, correct?
3 A.      I'm not certain, you know, what the FDA would have
4 required had we not relied on that.  I would just say that
5 we conducted a Phase III clinical safety and efficacy study.
6 What, in addition to that, would have been completed if we
7 didn't rely on some of the information from the Xyrem NDAs,
8 I don't know what that would have been.
9 Q.      Had Avadel not relied on safety and efficacy data in
10 the Xyrem New Drug Application, it would have taken more
11 time and more money for Avadel to bring Lumryz to market,
12 correct?
13 A.      Yeah, I mean, kind of back to my previous answer, I
14 don't know what would have been required as to how much
15 time, more time or how much more money, if any, would have
16 been required.
17 Q.      And the reason why you don't know how much would have
18 been required is because you're not familiar with the FDA's
19 process for reviewing new drug applications; is that right?
20 A.      No, I mean, we don't know because we didn't take that
21 path.  So we don't know -- we don't know what would have
22 happened because we didn't do that path.  So we took a
23 different path and we know the outcome of that path, but we
24 don't know the path that we didn't take.
25 Q.      I see.

380

1         And the path that you did take was to rely on
2 Jazz's safety and efficacy data for Xyrem, at least in part,
3 correct?
4 A.      According to -- I mean, based on the information in
5 here, yes, this is the path we took.
6         (End of video deposition.)
7         MR. CERRITO:  Thank you, Your Honor.  Good
8 morning.
9         Jazz calls Dr. Steven Little.
10        THE COURT:  All right.  Dr. Little, please take
11 the stand.
12        STEVEN LITTLE, having been called on the part
13 and behalf of the Plaintiff as a witness, having first
14 affirmed to tell the truth, testified as follows:
15        MR. CERRITO:  May I approach, Your Honor?
16        THE COURT:  Yes.
17        DIRECT EXAMINATION
18 BY MR. CERRITO:
19 Q.      Still morning, good morning.  Sir, can you state your
20 name for the record?
21 A.      Hi.  Nice to meet you all.  My name is Steven R.
22 Little.
23 Q.      And where are you currently employed?
24 A.      At the University of Pittsburgh.
25 Q.      And have you prepared any slides to walk through with

381

1  the jury today about your roles at the university and
2  educational background?
3  A.     Yes.
4         MR. CERRITO:  Okay.  Mr. Lewis, can you put up
5  slides for Dr.'s -- excuse me, Dr. Little's slides.
6  BY MR. CERRITO:
7  Q.     Doctor, what are your current roles at the University
8  of Pittsburgh?
9  A.     I am a professor, and I am also the chair of the
10 department of chemical engineering at the University of
11 Pittsburgh.  I also hold a title that is called the William
12 Kepler Whiteford endowed professor, and that's in the
13 departments of chemical engineering, bioengineering,
14 pharmaceutical sciences, immunology, ophthalmology, and the
15 McGowan Institute for Regenerative Medicine.  I am also the
16 director of some research labs at the University of
17 Pittsburgh, and they're called Controlled Release and
18 Biomimetic Research Laboratories.
19 Q.     Doctor, what does it mean to be an endowed professor?
20 A.     Well, it's based on an endowment that's given from
21 distinguished alumni, and the most productive professors are
22 given those.  That endowment, then, continuously funds the
23 appointment.
24 Q.     And how long have you been at the University of
25 Pittsburgh?

382

1  A.     Oh, geez, I think it's been almost 20 years.
2  Q.     Let's talk a moment about your PhD.
3         What's your educational background?
4  A.     Yeah, so I've listed it here.  I have my degree in
5  chemical engineering from Youngstown State University, and I
6  had minors in chemistry and mathematics.
7         Then I went on to do my PhD work at MIT.  It's
8  the Massachusetts Institute of Technology.  I received my
9  PhD in chemical engineering working on pharmaceutical
10 formulations, and I have a minor in biology.
11 Q.     Can you tell the jury what a chemical engineer is.
12 A.     Yeah, sure.
13        So a chemical engineer focuses on the
14 interactions of things that are really small scale, so this
15 can be anything from molecules to things that are microns in
16 size like a cell, so small stuff, and the interactions
17 there.  What a chemical engineer does is looks at that and
18 then the process of understanding how that stuff that
19 happens at the small scale impacts what we care about here
20 in the big scale that we live in today.
21        So, for instance, you could say, at the small
22 scale, you have the degradation of a drug, right.  At the
23 large scale what we care about is drug product quality,
24 that's an example of what chemical engineers do.
25 Q.     And what was your focus during your research, your

383

1  PhD research at MIT?
2  A.     That was pharmaceutical formulations, designs,
3  manufacture, characterization, application of pharmaceutical
4  formulations.
5         During my PhD, I did a lot of work with the kind
6  of controlled-release systems that we're talking about, in
7  fact, even utilized the polymers that we're talking about
8  here in this case.
9  Q.     Other than the ones you mentioned a little earlier,
10 do you have any other titles at the University of
11 Pittsburgh?
12 A.     I do.  Last year, maybe the year before now, the
13 chancellor of the university gave me the title of
14 "distinguished professor."
15 Q.     And what does it mean to be a distinguished
16 professor?
17 A.     Yeah, so whereas endowed titles are given to the most
18 productive faculty, distinguished professors are limited to
19 only a very small member of the faculty at the university.
20 University calls the achievement of this, I think it's
21 extraordinary internationally recognized achievement in
22 scholarly work in my field.
23 Q.     Is there a particular field that you were given that
24 recognition for?
25 A.     That was for my work in pharmaceutical formulation.

384

1  Q.     And can you tell us about your lab and the research
2  you do at the University of Pittsburgh.
3  A.     Yes.  So I am the director of a lab that leads a
4  large number of people that work on these kinds of things
5  that we're talking about here in this case.  They include
6  postdoctoral researchers, research assistant professors, PhD
7  candidates that serve under my mentorship, technicians,
8  undergraduate students, all working on the kind of
9  formulations including extended-release and
10 controlled-release formulations.
11 Q.     Do you have any funding for you research?
12 A.     I do, at this point in my career, I'm fortunate
13 enough to have received a little over $50 million of
14 research in the fields that I work in.
15 Q.     And who provides that funding?
16 A.     Yeah.  We receive funding from the National
17 Institutes of Health to do our research; the National
18 Science Foundation; several branches of the Department of
19 Defense, including DARPA and the U.S. Army; we receive
20 funding from the United States Food and Drug Administration,
21 the FDA; we've received funding from institutes, so -- that
22 fund innovative research like the Wallace H. Coulter
23 Foundation, the Beckman Foundation.
24        (Reporter clarification.)
25        THE WITNESS:  Sure.

385

1    The Wallace H. Coulter Foundation, Beckman
2    Foundation, Camille and Henry Dreyfus Foundation.  And then
3    we've also received grant funding from industry to work in
4    the field as well.
5    BY MR. CERRITO:
6    Q.    At that last point, from industry, have you received
7    any grant funding from Jazz or Avadel?
8    A.    I have not.
9    Q.    Do you hold any professional roles outside of the
10   university?
11   A.    I do.  I have some things on the next slide for that.
12   Q.    Can you walk us through that, Doctor.
13   A.    Sure.
14          So I also am a founder of a couple of
15   pharmaceutical companies, this is listed up here at the top.
16          So the first is Orono Inc, it's a specialty
17   pharma company that currently is specializing in treatments
18   for head and neck cancer for patients, but that company
19   previously was actually formatted with some technology where
20   we were custom designing formulations for academic labs and
21   industry and actually even some agricultural companies for
22   release of fertilizers.
23          In addition, I'm the founder of Oraxis Inc.,
24   which is a startup company that is currently focused on
25   treatments for inflammatory diseases.

386

1          So example of those could be like transplant
2    rejection, contact dermatitis, chronic rhinosinusitis, the
3    application of the technology could be really for any
4    inflammatory disease.
5    Q.    Over the course of your career, Doctor, what types of
6    formulations do you have experience working with?
7    A.    Yeah, we have experience with a large number of
8    different types of formulations that are delivered by
9    different routes.
10          In this case, we're talking about oral dosage
11   forms delivered into the gastrointestinal tract but I work
12   on formulations that are delivered to the eye, through the
13   skin, through mucosal membranes, etc., and those
14   formulations take a variety of forms with different drugs.
15          They can be immediate release, which means that
16   the drug comes out really fast and then there's modified
17   release where you tune it to release the way that you want
18   in specific areas.
19   Q.    And do you understand the type of formulations at
20   issue in this case?
21   A.    Yeah, they are extended-release oral solid dosage
22   forms and also immediate-release oral dosage forms.
23   Q.    Have you worked with that type of formulations in the
24   past?
25   A.    Yes, I have.

387

1    Q.    And have you ever published --
2    A.    I have.
3    Q.    -- research?
4    A.    Yeah, I listed -- here we have over 100 peer-reviewed
5    publications in the field.
6    Q.    And you've applied for patents for the research?
7    A.    I have.  We have, at this point, over 20 patents for
8    work in the area that are issued and/or pending.
9    Q.    And have you presented your research outside of the
10   university?
11   A.    I have.  At this point, just over a hundred times, I
12   have been invited to give lectures on the work that I've
13   done in national and international conferences for work in
14   the field.  And universities will invite you to give
15   seminars to the students and to the faculty and at companies
16   as well.
17   Q.    Have you held any roles in professional societies for
18   your research?
19   A.    I do, I have roles in many professional societies but
20   I just list a few here.  The top two are ones where I have
21   held board of directors positions, where I have been elected
22   to be the board of directors of the society.
23          We have been talking about controlled-release a
24   lot here in this case.  You may or may not believe it, but
25   there is an International Society For Controlled-Release, it

388

1    may not sound like a hoot to you, but it's a great society
2    that has many members, nationally and internationally.
3          I have served on the board of directors of that
4    society and also in -- actually, also, created a divisional
5    structure in that society that exists today.
6          And in 2020, I was asked by the board of
7    directors to lead the international meeting of the
8    Controlled-Release Society, so I designed and ran the
9    meeting that year.
10   Q.    Have you received any honors or awards for your work?
11   A.    I have, at this point in time in my career, I have
12   been fortunate to receive over 50 national and international
13   awards.
14   Q.    Any particular ones that you're proud of?
15   A.    I'll just list a handful.  So very early on in my
16   career, I was given what the NIH calls their K award, which
17   is an award that is prestigious because what it does is it
18   makes it so that the NIH is actually paying my salary
19   instead of the university.  That allows me to focus on
20   research rather than doing the other kind of things that
21   faculty members typically have to do.  So I was able to take
22   some additional coursework and focus on my research.
23          Internally, at the university, I'm proud that
24   I'm the only faculty member in university history to receive
25   all three of the chancellor's distinguished awards.

389

1     Whenever you look outside of the university, I'm
2   a fellow of, I think, five or six now of the societies in
3   our field, which represents typically the top -- anywhere
4   between 1 and 5 percent of the membership in terms of the
5   scholarly attainment.
6     I will say that I was, last year, inducted into
7   the U.S. National Academy of Inventors, which is the U.S.'s
8   highest honor for inventors.  I have my own patents, so I am
9   also an inventor as well.
10  Q.    Doctor, the binder in front of you, can you turn to
11  PTX432.
12            Describe for me what that is.  In the binder,
13  sir, 432, PTX.
14  A.    Okay.
15  Q.    Can you tell me what that is?
16  A.    This appears to be my curriculum vitae.
17  Q.    Does this describe your background publications,
18  awards and accomplishments?
19  A.    Yes, at the time I submitted it.  Yes, last year.
20            MR. CERRITO:  I'd just move PTX432 into
21  evidence.
22            MR. SCHULER:  No objection, Your Honor.
23            THE COURT:  All right.  PTX432 is admitted.
24            (Exhibit admitted.)
25            MR. CERRITO:  At this time, Your Honor,

390

1   Plaintiffs move to qualify Dr. Steven Little as an expert
2   witness in the field of pharmaceutical sciences, including
3   drug formulation and drug delivery technologies.
4            MR. SCHULER:  No objection.
5            THE COURT:  All right.  Dr. Little may testify
6   in those areas.
7            MR. CERRITO:  Thank you, Your Honor.  Excuse me.
8   BY MR. CERRITO:
9   Q.    Dr. Little, have you been asked to offer certain of
10  your opinions today?
11  A.    Yes.
12  Q.    And did you prepare slides to help illustrate your
13  opinions for the jury?
14  A.    I did.
15  Q.    Okay.  And did you prepare a slide that summarizes
16  your opinions for this case?
17  A.    Yes, it should be slide 4 in my deck here, yeah.
18  Q.    Is this a summary slide you prepared?
19  A.    Yes, it is.
20  Q.    Can you briefly summarize what your opinions are.
21  A.    Yeah, so at a very high level, in summary, my
22  understanding is, is that -- in regard to infringement here
23  of Lumryz claims, asserted claims, there's two remaining
24  disputed claim limitations and I'll show those to you, but
25  I'm calling them, for short here, the core limitation and

391

1   the deionized water limitation.  And it's my opinion that
2   Lumryz does meet the claim elements of those two
3   limitations.
4   Q.    And for all the other limitations, you understand
5   that Avadel's admitted they infringed those claims or meet
6   those limitations?
7   A.    That's my understanding.
8   Q.    Can you describe for us briefly, what is the Avadel's
9   Lumryz product?
10  A.    Sure, I have a slide next to show this.  The Lumryz
11  product is essentially a powder or some pellets, and I'm
12  showing a sachet here, it could be contained in the sachet
13  and it can pour out.  And then if I break out what's in the
14  powder here for you, there's two different types of
15  particles that contain the drug in this case, which is
16  gamma-hydroxybutyrate, which is abbreviated as GHB here.
17  And you have the immediate-release particles and the
18  modified-release particles.  And those are there in a 50/50
19  ratio.
20            And then in addition to those particles, you
21  have on the outside of them the acid particles, and then
22  also particles of viscosity-enhancing agent.
23  Q.    How did you determine whether Lumryz meets the
24  elements of the asserted claims?
25  A.    I reviewed various pieces of evidence, which I have

392

1   on the next slide.  I could take the jury through.  These
2   were the five things that I relied on for the testimony
3   today.
4            The Lumryz New Drug Application submitted to the
5   FDA; Avadel's internal documents and the submission to the
6   Securities and Exchange Commission, or the U.S. SEC;
7   Avadel's employees' testimony; Avadel's patents; and
8   Avadel's responses to Jazz's requests for admissions in this
9   case.
10            I got the information of Lumryz from these
11  documents, and then I compared that to the asserted claims
12  and the claim limitations that I just showed you in order to
13  perform a infringement analysis.  And I did that through
14  what's called standing in the shoes of a person of ordinary
15  skill in the art.
16  Q.    Before we get too far, what is a person of ordinary
17  skill in the art?
18  A.    Yeah, there's a big, long definition of it here in
19  this case that I used, if we could pull it up.  And you
20  don't have to worry, I'm not going to read this to you, but
21  let me just give you a brief summary.
22            It's somebody who has a degree in the
23  pharmaceutical sciences or a related field to the
24  pharmaceutical sciences.  It can be an advanced degree, like
25  a PhD or a master's degree with a certain number of years'

393

1    experience, as listed here.  It could also be somebody with
2    lesser educational experience, like a bachelor's degree, but
3    then an increase in the number of hands-on experience.
4            And then if you read down, that individual is a
5    part of a team, so being as a part of that team, you are
6    able to derive complementary expertise from the other people
7    on that team.
8    Q.   Let's go into your binder again.  And please turn to
9    tab JTX03 in evidence.
10           And, Doctor, can you tell me what that document
11   is?
12   A.   This is the '488 patent that has the claims that
13   we're discussing.
14   Q.   And which claims, specifically?
15   A.   It is Claim 7 and Claim 11.
16   Q.   Generally, Doctor, what do the asserted claims in the
17   '488 patent cover?
18   A.   Yeah, so if I could pull up, I think it's on my next
19   slide, the claims here.  Again, there's a lot here, but I
20   think, fortunately for us here, most of the stuff has
21   already been worked out.
22           My understanding is that the only two disputed
23   claim terms left here are highlighted.  And you can see the
24   top one here, which I'll take you through in a little bit,
25   that's the core limitation, you see where it says "wherein,

394

1    the core..." that's the first one.
2            The second one is the deionized water
3    limitation, which is a dissolution experiment limitation
4    that I'll take you through later.  But overall what this
5    claim talks about is technology that can be used to sustain
6    the release of this oxybate drug, or GHB, that we've been
7    talking about here.
8            MR. CERRITO:  Before I get too far in this, Your
9    Honor, is this a good time for a morning break?
10           THE COURT:  Yes, it is.
11           All right.  Ladies and gentlemen of the jury,
12   we'll give you the morning break at this time.
13           (Whereupon, the jury left the courtroom.)
14           THE COURT:  All right.  We'll take 15 minutes.
15           MR. CERRITO:  Thank you, Your Honor.
16           (Break taken.)
17           THE COURT:  Be seated until the jury comes.
18           (Whereupon, the jury entered the room.)
19           MR. CERRITO:  Thank you, Your Honor.
20   BY MR. CERRITO:
21   Q.   So Dr. Little, right before the break we were talking
22   about the two elements of the claim that are in dispute.
23   Let's break this down a little bit.
24           So one at a time.  Let's start with the core.
25   In your opinion, does Lumryz meet the claim limitation of

395

1    the core with gamma-hydroxybutyrate or a pharmaceutically
2    acceptable salt of gamma-hydroxybutyrate?
3    A.   Yes, it does.
4    Q.   And would a POSA -- how would a POSA determine what
5    constitutes the core in the context of the asserted claims?
6    A.   Sure, so let's first start with the claim.  That's
7    what you have to start with here.
8            So if you go to the next slide -- I'm going to
9    try to keep what I read to you at a minimum, as you can see,
10   but I do think it's important to read at least the claim
11   limitations that we're comparing the product to, so I'm
12   going to do that now.
13           It says, "The sustained-release portion" --
14   that's what we're talking about now is the sustained-release
15   portion -- "comprises a functional coating and a core."  So
16   two things here, wherein the functional coating is deposited
17   over the core, wherein the core comprises at least, and then
18   you have your drug that comes afterwards, right.
19           So just from the standpoint of a person of
20   ordinary skill, when they read this, what they're seeing is
21   how this sustained-release formulation works.  It's got a
22   coating that, if you keep reading, it talks about what is in
23   it.  It's these polymers, these MAMM polymers.
24           That goes over top of what's underneath of it,
25   which is the core.  And the drug has got to be under there.

396

1    The reason why is if the drug is out here, the coating can't
2    control the release through mechanisms that I won't go
3    through.  But it's got to be inside.  So that's what a
4    person of ordinary skill in the art sees here.
5            So what you're doing is trying to see whether
6    you've got a functional coating over the top of a core, and
7    is the drug inside of that core or a part of that core, is
8    what you're looking at.
9    Q.   Thank you, Doctor.  What did you rely on to
10   determine --
11           MR. SCHULER:  Your Honor, can we have a sidebar?
12           (Whereupon, a discussion was held at sidebar as
13   follows:)
14           MR. SCHULER:  I don't think that was explicitly
15   an effort at trying to construe the term "core."  But, Your
16   Honor --
17           MR. CERRITO:  It wasn't even close, it was a
18   throwaway, I'm not going there.
19           MR. SCHULER:  Okay.
20           MR. CERRITO:  No, no.  It was not my intent at
21   all.
22           THE COURT:  Okay.  Already.
23           (Whereupon, the discussion held at sidebar
24   concluded.)
25   BY MR. CERRITO:

397

1    Q.    Now, Doctor, what did you rely upon in terms of what
2    comprises the core of Avadel's sustained-release portion?
3    A.    Yup, I included those things on the next slide.
4    These are the pieces of information that I considered.
5    There's Avadel's '062 product, which I will describe to you,
6    as to how it describes and characterizes the Lumryz product.
7    Then there's Avadel's NDA, which also describes Avadel's
8    Lumryz product.  And then there's Avadel's admissions to
9    Jazz in this case.
10          And then there's a presentation to the United
11   States Security and Exchange Commission that I also relied
12   upon as it describes Avadel in the way that Flamel did at
13   the time.
14   Q.    Okay.  We're pronouncing it different; Flamel and
15   Flamel are the same company?
16   A.    It is, yes.
17   Q.    Okay.  Sorry.
18          You mentioned Avadel's own patent.  Can you
19   please turn in your binder to JTX260, already in evidence.
20          Is this the Avadel patent you considered?
21   A.    Yes.  This is the '062 patent from Avadel.
22   Q.    And why is that accurate relevant to your analysis?
23   A.    Well, first of all, because it contains the
24   composition of Lumryz in it.
25          MR. CERRITO:  Mr. Lewis, can you call up

398

1    table 1b in JTX260, please.
2    BY MR. CERRITO:
3    Q.    Dr. Little, first let me ask you, is it your opinion
4    that Lumryz's sustained-release pellets are described in
5    table 1b of the '062 patent?
6    A.    It is.
7    Q.    What's that based upon?
8    A.    Yeah, so first let me just orient you to what this
9    table is.  You might have seen it before, but just from
10   context on how a person of ordinary skill in the art sees
11   this and looks at it.
12          Just for orientation, the top says composition
13   of MR particles.  Here in this patent, it's referring to
14   modified-release particles, that's what the MR stands for.
15   On the left-hand side, you're going to see components, these
16   are the pieces to this.
17          And then in the middle is the function, that's
18   what we call the qualitative composition portion of this,
19   it's what each of these things on the left are and what they
20   do.
21          And then on the right-hand side is the amounts,
22   so you see quantity per 4.5-gram dose.  And I'm going to
23   take you now next to the NDA to show that these match.
24          MR. CERRITO:  Your Honor, may I approach?
25          THE COURT:  Yes.

399

1          MR. CERRITO:  I am going to provide you with a
2    laser pointer, might be easier for you than pointing.
3          THE WITNESS:  Okay.
4    BY MR. CERRITO:
5    Q.    So just to do that, just quickly, again.  It's your
6    opinion Lumryz's sustained-release pellets are described in
7    table 1b, correct?
8    A.    They are.
9    Q.    And you walked the jury through it a second ago?
10   A.    Yes.
11   Q.    Okay.  Let's show the jury the comparison you were
12   talking about.
13          Can you please turn in your binder to JTX225.
14   And do you recognize this document?
15   A.    Yeah, this is the drug product from Avadel's NDA.
16          MR. CERRITO:  Your Honor, move JTX225 into
17   evidence.
18          THE COURT:  Any objection, JTX225?
19          MR. SCHULER:  I think it is in evidence.
20          MR. CERRITO:  If it is, great.  I'm sorry if it
21   isn't.
22          THE COURT:  It's already in evidence.
23          MR. SCHULER:  No objection.
24          THE COURT:  All right.  It's admitted.
25          MR. CERRITO:  Thank you, Your Honor.

400

1          (Exhibit admitted.)
2    BY MR. CERRITO:
3    Q.    Do you recognize this document, Doctor?
4    A.    Yeah, I do, it's drug product documentation for
5    Avadel's NDA.
6          MR. CERRITO:  And can you call up JTX225.2, Mr.
7    Lewis.
8    BY MR. CERRITO:
9    Q.    Dr. Little, does JTX225.2 show the composition of
10   Lumryz?
11   A.    Yes, it does.  It's a little different than what we
12   saw before, but I'm just going to point out this over here.
13   So this is the sodium oxybate controlled-release coated
14   pellets right here, okay.
15          So you can see these components underneath and
16   see the component up here, it's very similar, at least
17   quantitative composition, because you see here and then the
18   qualitative is here.  It's a little different in that this
19   is broken out in here, I'll show you that later in the
20   patent, but it's not included inside here.  But you can at
21   least check to see these amounts here to see that they
22   match.
23   Q.    And, Doctor, did you prepare a slide that compares
24   table 1b that we looked at just a moment ago from the '062
25   patent, Avadel's patent, with the composition of Lumryz from

401

1  225.2?

2  A.   I did.

3  Q.   Doctor, can you please walk the jury through the

4  information that you provided on the slide.

5  A.   Yeah.  So what I have over here on the left, if you

6  remember, was from the '062 patent, that's table 1b.  Over

7  on the right, although it's small, that's what we were just

8  looking at in the NDA.  And I have blown up the portion that

9  I was showing you here.  And then this portion is here.  The

10  only difference is there's some color here because I want to

11  match up the values for you.

12       So if you start with, for instance, just the

13  first piece which is -- actually it's the second here

14  because this one doesn't have the same top component, it

15  breaks it out differently.  But this one here is

16  hydrogenated vegetable oil, you can see that right here.

17  There's a little difference in that you see in parentheses

18  the name Lubritab, which is the brand-name for the kind they

19  used.  But these two ingredients are the same.

20       And if you go over, you can look and see that

21  the red guys match, so 0.716.  And you can do that for the

22  other ones as well, the names of the ingredients and the

23  amounts are essentially the name.

24  Q.   Are you aware, Doctor, whether Avadel has agreed in

25  this case that table 1b describes the composition of its

402

1  nonimmediate-release portion of Lumryz, or sustained-release

2  portion?

3  A.   My understanding is that they have admitted that,

4  yes.

5  Q.   Can you please turn in your binder to tab PTX726.

6       And, Doctor, can you tell me what that is?

7  A.   It says, "Avadel's Responses to Plaintiff's First

8  Sets of Request for Admission."

9       MR. CERRITO:  Plaintiff moves PTX726 into

10  evidence, Your Honor.

11       MR. SCHULER:  I think -- we don't have any

12  objection to the one or two that they are going to show, I

13  just don't know it is worthy of having the document go back

14  to the jury.

15       (Discussion held between counsel.)

16       THE COURT:  All right.  You don't get to admit

17  the whole document.

18       MR. CERRITO:  No, I'm just using one of the --

19       THE COURT:  Just one of the --

20       MR. CERRITO:  Yes, so maybe we can put the cover

21  page on it, that, and maybe a signature page.

22       THE COURT:  Okay.  So you guys will work it out.

23       MR. CERRITO:  We'll work that out.

24       THE COURT:  Okay.

25       MR. CERRITO:  With that caveat, Your Honor, it's

403

1  admitted.

2       THE COURT:  Yes, the truncated version to be

3  agreed upon by the parties is admitted.

4       (Exhibit admitted.)

5       MR. CERRITO:  Thank you.

6       Mr. Lewis, can you call up PTX726 at 0.31.

7  There we go.

8  BY MR. CERRITO:

9  Q.   Dr. Little, looking specifically at Avadel's response

10  to request 49, what is your understanding of this admission?

11  A.   Well, my understanding is that if you look at the

12  top, Avadel was requested here by Jazz to admit that the

13  "modified-release portion of example 1" -- of U.S. patent

14  number ending in '062, which is what we were just looking

15  at -- "the composition of which is provided in table 1b of

16  said patent" -- which is what we were just looking at --

17  "corresponds to the controlled-release portion of the

18  defendant, Avadel's" -- in this case -- "NDA product."

19       And then if you go down, there's some legal

20  stuff here, but then if you go down to the bottom, a little

21  further -- oh, yeah, there we go -- it says -- the whole

22  thing here at the end, it says Avadel admits this request.

23  Q.   Were you present for any testimony of Avadel's

24  witnesses related to table 1b of the '062 patent?

25  A.   I was.  It was Dr. Vaughn, I believe, that testified

404

1  that these two were the same.

2  Q.   I'm sorry.  Testified?

3  A.   Testified that Avadel's NDA product, the MR portion,

4  is represented in the '062 patent table 1b.

5  Q.   Does Avadel's use of different terms such as

6  "modified" or "controlled release" affect your opinions?

7  A.   It doesn't.  In fact, as we've heard, the term

8  throughout the NDA is used interchangeably.  So what you see

9  is sometimes it says "sustained release," sometimes it says

10  "modified release," sometimes it says "controlled release,"

11  and it's just used interchangeably throughout.

12       MR. CERRITO:  Mr. Lewis, can I have table 1b

13  back up, please.

14  BY MR. CERRITO:

15  Q.   Dr. Little, I understand it's your opinion that

16  table 1b corresponds to Lumryz, but how does it show that

17  Lumryz meets the disputed core limitation?

18  A.   Yeah, so just starting with this table, now I want to

19  talk about this other part up here that we didn't talk about

20  before, and it says -- there's a component here, which is

21  the IR microparticles.  In the '062 patent, there's another

22  table right above this that talks about those IR particles,

23  if we could then go and pull that up.

24       Okay, great.  All right.  So I've got it on the

25  right here, which I guess is fine.  This is going to go this

405

1 way.  But let's start with this guy.

2          So this is the IR microparticles, and what

3 you're doing is you're taking a -- microcrystalline

4 cellulose spheres, and in the NDA they're called Cellets,

5 but that's the brand name of the microcrystalline cellulose

6 spheres.  You're going to then spray on the drug substance

7 in a concentrated solution up at the top, okay.

8          This also is going to have a couple of other

9 things in it, like there are some solvents that go away

10 here, you dry it and those go away.  But overall, this is

11 the whole immediate-release microparticle.  And in the '062

12 patent, this is going to now go right here.  See that?  So

13 they're going to use this, and they're going to put over top

14 of it this functional coating.  So these other things down

15 here, that was in the rest of the claim that you guys saw

16 earlier.  That's the functional coating that goes over top

17 of this.

18          And what does it go over top of?  It's

19 characterizing that what goes over top of all of this is the

20 core, right?  This all is the core.  That includes the

21 microcrystalline cellulose spheres, the povidone here, and

22 the drug.  So all of this is characterized in Avadel's

23 product as the core of the MR microparticles.

24 Q.    Are you aware Dr. Klibanov, someone hired by Avadel,

25 disagrees on your opinion on whether Lumryz contains the

406

1 claimed core?

2 A.    I am aware of it.

3 Q.    What's your understanding of why Dr. Klibanov

4 disagrees?

5 A.    Yeah, so I'll do the best I can to explain what I

6 understand the disagreement to be.  What Dr. Klibanov does

7 is, at least from his reports, as I understand, he

8 recognizes that this stuff, all of this over here, is called

9 the "core" of the MR particles.  What he says is that the

10 specification uses the term inconsistently, so he says

11 although the drug's characterized as being in the core here,

12 when you look in other places, like the figures, for

13 instance, it's not considered to be a part of the core.  And

14 in addition to that, when you go to the NDA, which we talked

15 about before, it's not characterized there as being the core

16 of the MR particles.

17          So that's my understanding of the fundamental

18 basis of the disagreement here.

19 Q.    Okay.  And it's not your disagreement that you're --

20 it's not just your disagreement; it's what you understand a

21 POSA would disagree with?

22 A.    It is what I believe a POSA would disagree with, yes.

23 Q.    Thank you.

24          MR. CERRITO:  Mr. Lewis, can you go to JTX260 at

25 0.74, please.  Can you call up lines 55-67 of column 47,

407

1 please.

2 BY MR. CERRITO:

3 Q.    Dr. Little, what is your -- what's being depicted

4 here?  What's being shown from the patent?

5 A.    Well, first, if we could maybe just go down to 47 to

6 bring this up.

7 Q.    Yeah.  Lines 55 --

8 A.    Column 47 over on the left, this is what refers to

9 the -- yeah, this is where the tables are called out.  So

10 just for orientation, I'm going to show you a figure that

11 Dr. Klibanov relies on, and you actually saw it in the

12 opening statements and things like that with labeling with

13 the core being in the middle, but I want to provide some

14 context here before I show that.

15          So this is where the tables I just showed you

16 are called out.  And what it says is that those tables

17 provide the qualitative and quantitative compositions of the

18 sodium oxybate IR microparticles, which was table 1a, and

19 then modified-release particles, which was table 1b.  And if

20 you remember, that was the qualitative and quantitative

21 composition.  That's a term in the art that we use.  Right?

22          Then when you get down here to the bottom, it

23 refers to figure 1, okay, and it also says that it shows

24 now, it's depicting the qualitative and quantitative

25 composition.  So table 1a goes with figure 1a, and table 1b

408

1 goes with figure 1b.  So you have to show them together to

2 say what the POSA was literally instructed to do when they

3 see the figure.

4 Q.    Okay.  Let's do that, then.

5          MR. CERRITO:  Mr. Lewis, can you call up

6 figure 1 of JTX260, which is on page 260.5, and put that

7 side by side with tables 1a and 1b, please.

8 BY MR. CERRITO:

9 Q.    Dr. Little, how does figure 1 support your opinion?

10 A.    Sure.  So now I'm showing them both together again.

11 There's some color here.  The copies that I have are black

12 and white, but it still looks the same.  You've got 1a,

13 right?  That's figure 1a.  If you flip up to the beginning

14 of the patent, you can see it, it says 1a.  That paragraph

15 that I just showed you says that 1a goes with 1a, right?

16 This -- both depicting the qualitative and quantitative

17 composition.  This is 1b for a reason, because there's a

18 table that says 1b, okay.

19          So up here what's happening is that they say

20 "core," right?  And that's right there.  This is the IR

21 particle.  And this is drug layer that goes around it.  Now,

22 I agree that the core of this, right here, the IR particle,

23 is the microcrystalline cellulose sphere.  That's

24 characterized in Avadel's product as the core of the

25 microcrystalline cellulose sphere.

409

1    Now, on the right-hand side, what they're doing
2  in order to keep the orientation is they're just copying
3  this thing and moving it over, right?  This whole thing now
4  is going to be coated, which is consistent with what's in
5  here.  But when you moved this whole thing over and then you
6  put a coating on this whole thing, now what's your point of
7  reference?  It's the sustained-release or modified-release
8  portion.  And when you look in the claim, that's our point
9  of reference.  So what they refer to the core now of the
10  modified-release particles is the entire IR microparticle,
11  which includes the drug.
12  Q.    Just so we're clear, we have a colorized version, but
13  this is the same that appears -- the same description for 1a
14  and 1b in the pictures as appears in the '062 patent?
15  A.    Yes.
16  Q.    Does anything else support your opinion that the
17  sustained-release portion of Lumryz comprises the claimed
18  core?
19  A.    Yeah, so again, just for reference, I think one of
20  the disputes is that this -- Dr. Klibanov says this refers
21  to things inconsistently.  The issue is that this isn't the
22  only time that Avadel refers to this whole thing here, which
23  is all the drug, is the core, also refers to it in another
24  presentation that was made to the SEC.  But first, I want to
25  set the stage by making sure that the terminology is right

410

1  when you look at the SEC presentation, and we can do that by
2  bringing up the NDA, if you could for a second.
3  Q.    Yes, can you -- Doctor, it's in your binder at
4  JTX236.
5    Is this the NDA portion you were referring to?
6  A.    Yes, this is the pharmaceutical development report.
7    MR. CERRITO:  Your Honor, Plaintiffs move JTX236
8  into evidence.
9    MR. SCHULER:  No objection.
10    THE COURT:  JTX236 is admitted.
11    (Exhibit admitted.)
12    MR. CERRITO:  Mr. Lewis, can you put up
13  JTX236.6, please.
14  BY MR. CERRITO:
15  Q.    How does what's on the screen here affect your
16  opinion, Doctor?
17  A.    It might be easier if you zoom in on the part that
18  says -- yeah, okay.  So this top portion here talks about
19  the equipment that's used.  It's maybe a little less
20  relevant.  I don't know if you need to understand too much
21  here.  I mean, it is showing that what happens is you'd use
22  a fluid spray over top of these -- these pellets.  But I'll
23  start here reading "The Process is Achieved..."  so you can
24  understand how these are made.
25    What you do is you overcoat -- again, sodium

411

1  oxybate is your drug, right, and it's the IR pellet of
2  sodium oxybate, and you're coating that with what Avadel is
3  referring to here as Micropump, okay.  The Micropump,
4  Avadel's proprietary technology, is this stuff.  It's all
5  these polymers that you saw in the tables.  And, you know,
6  you see that in the claim a little bit later on, but it's
7  overcoating this with what they call Micropump.  That's the
8  functional coating.
9  Q.    Thank you, Doctor.
10    We looked at what -- Avadel's explanation of the
11  core to the United States Patent Office, the statement they
12  made under oath.  Are you aware of Avadel describing the
13  core used in its Micropump coating to any other government
14  agencies?
15  A.    Yeah, it's to the U.S. Securities and Exchange
16  Commission, the SEC.
17  Q.    Can you turn in your binder to PTX737, please, and
18  can you tell the jury what that document is.
19  A.    Yeah, this is the presentation.
20    MR. CERRITO:  Your Honor, Plaintiffs move PTX737
21  into evidence.
22    MR. SCHULER:  No objection.
23    THE COURT:  All right.  PTX737 is admitted.
24    (Exhibit admitted.)
25    MR. CERRITO:  Mr. Lewis, can you pull up 737.30,

412

1  please.
2  BY MR. CERRITO:
3  Q.    Dr. Little, can you please explain to the jury how
4  this slide affects your opinions?
5  A.    Yeah, okay.  So this is the presentation that was
6  made to characterize Avadel's product to the SEC.  And I'll
7  just point you to this particle that's right here, okay.
8  And you see two parts of the particle.  There's the blue
9  part here, which is labeled -- I don't know if you guys can
10  see it easily.  It says "polymer coating" there, and then on
11  the right-hand side in this green region that's underneath
12  of the coating -- it's almost like they took -- like,
13  flicked the coating off there so it's underneath of that
14  coating, and what it's labeled here as what's underneath the
15  coating is "drug," okay.
16    Now, the characterization's here, so if you see
17  coating, it points to the blue.  And underneath of
18  "coating," it's what you would expect the coating to say.
19  It's the Micropump technology, and it provides what we call
20  diffusion control and stuff like that.  All that stuff is
21  how it's controlling the release of the drug that's
22  underneath of it, okay.
23    Now, on the left-hand side, you see the arrow
24  that points to "drug" right here?  That says "core," and it
25  says, "core:  Active ingredient," and this is exactly the

413

1  same way that you saw it characterized in a different
2  location which was the '062 patent.  The core that is
3  underneath of this coating includes the drug.
4  Q.    Thank you, Doctor.
5        We'll look at another portion of Avadel's New
6  Drug Application.  Can you turn in your binder to JTX221,
7  please.
8        Did you review that document, sir?
9  A.    Yes, this is the description and composition of the
10 drug product for Avadel's NDA.
11       MR. CERRITO:  Your Honor, Plaintiffs move JTX221
12 into evidence.
13       MR. SCHULER:  No objection.
14       THE COURT:  JTX221 is admitted.
15       (Exhibit admitted.)
16       MR. CERRITO:  Mr. Lewis, can you do a call-up of
17 JTX221.3 and JTX221.4, please.
18       There we go.
19 BY MR. CERRITO:
20 Q.    Dr. Little, do you understand Dr. Klibanov relies on
21 this document to support his opinion?
22 A.    He does.
23 Q.    And do you agree with him?
24 A.    I disagree with how he relies on this.  And here's
25 why:  What he essentially asserts in his reports is that

414

1  because this document doesn't have the entire
2  immediate-release core characterized in the same way as in
3  the '062 patent, and then the SEC presentation, that that
4  shows that the core doesn't contain the drug.  But I'm going
5  to explain the difference here.
6        The difference is, is that in this document,
7  unlike the last ones that we saw, breaks this out
8  differently.  So this is the immediate-release pellet,
9  that's the same as what you saw before.  So you see neutral
10 core here.  Again, the core of the immediate-release pellet
11 is the neutral core, the microcrystalline cellulose sphere.
12       But what you don't see is presented in the same
13 way, all of this as one thing down here.  In fact, for the
14 sodium oxybate controlled-release coated pellets, you see
15 nothing.  It's just silent about what the core of that is.
16 So it's not broken out in the same way.
17       And what Dr. Klibanov does, is he says, Well, I
18 look at this and I don't see the same thing as the '062,
19 that's inconsistent, so I think that the core is this.  But,
20 again, this is the core for the immediate-release pellets.
21 Q.    Any other disagreements in your position and
22 Dr. Klibanov?
23 A.    Yeah, there was another.  So what Dr. Klibanov
24 believes is that putting drug inside of cores where it is
25 distributed everywhere in the core is something that you see

415

1  in things like tablets, or you see in capsules, but it's not
2  the case that you would see something like that in
3  particles.  I just disagree with that.
4        You know, there's documents that I put in my
5  report to show that that's not the case.  We refer to those
6  particles as being cores, whenever there's microcrystalline
7  cellulose sphere that's around the drug, make them not only
8  with microcrystalline cellulose but also with things like
9  sugar, little sugar spheres.
10       We also make particles all the time where the
11 drug is distributed throughout the whole thing.  So it's a
12 unit core rather than a layered core, but we call both of
13 them "cores" and so does the art.
14 Q.    And what is your opinion based on?
15 A.    It's just my experience working in the field and, you
16 know, my education experience and what I believe a person of
17 ordinary skill in the art's education experience would be.
18 Q.    Thank you, Doctor.
19       Based on all the evidence that you reviewed and
20 you just showed the jury, does Lumryz meet the disputed core
21 limitation?
22 A.    It does.
23 Q.    So let's discuss the second one, the second disputed
24 element.
25       What exactly does that disputed element require,

416

1  Doctor?
2  A.    Now, if you could pull that up now.  This is what I
3  called, for short, the deionized water limitation.  It's the
4  second and last one that we have to talk about.  Again, I'm
5  just going to read it because it's the claim.
6        "The sustained-release portion releases greater
7  than about 40 percent of its gamma-hydroxybutyrate by about
8  4 to about 6 hours when tested in a dissolution Apparatus 2
9  in deionized water at a temperature of 37 degrees celsius
10 and a paddle speed of 50 RPM."
11 Q.    In your opinion, Doctor, does Lumryz meet this claim
12 limitation?
13 A.    It does.
14 Q.    What did you rely to support your analysis on this
15 limitation?
16 A.    Those are on my next slide.  There is dissolution
17 data right underneath of the part we were looking at in the
18 '062 patent for those same examples that I rely upon, and
19 then there was Dr. Guillard's testimony and the dissolution
20 work that was in Avadel's lab -- testing lab notebook by
21 Dr. Guillard that matches that data.
22 Q.    Okay.  And we were talking about the claim before,
23 there's a part of the claim that -- a term that says, "by
24 about 4 to about 6 hours."
25       Do you recall that?

417

1   A.   I do.

2   Q.   Do you have an understanding of what that means?

3   A.   Yeah, my understanding is that the parties agreed on

4   what this means in this litigation.

5   Q.   Okay.  Can you turn your binder to PTX669.

6        MR. CERRITO:  Mr. Lewis, can you call up page 2,

7   please.

8   BY MR. CERRITO:

9   Q.   Is this what you're referencing?

10       MR. CERRITO:  Just one part, Mr. Lewis.

11  A.   Yes, it is.  At the very bottom, it says, "agreed

12  upon construction."

13  BY MR. CERRITO:

14  Q.   Can you just read that into the record, please?

15  A.   Sure.

16       It says, "Plain and ordinary meaning," which is,

17  "at any point prior to approximately 4 hours or at any point

18  prior to approximately 6 hours."

19  Q.   Okay.  Also, one other part.  What does it mean for

20  the sustained-release product to release its

21  gamma-hydroxybutyrate?

22  A.   Yeah, so in the claim here, it's what you're

23  comparing the claim to, which, in this case is the Lumryz

24  product.  It's the release of the drug, the sodium oxybate

25  from that.  And then it has to occur according to the

418

1   conditions that I read out to you in the claim.

2   Q.   Okay.  Thank you.

3        And how does this limitation relate to the

4   requirement of the presence of a sustained-release portion?

5   A.   Yeah, the sustained-release portion piece of it has

6   to follow the time points in a dissolution test that is met

7   by the conditions in the rest of the claim.

8   Q.   Do you have a slide that depicts your opinion here,

9   Doctor?

10  A.   Yeah, if you could go to the next slide, I try to

11  describe what this is in a pictorial way.

12       What you're seeing here is the setup that we use

13  for what's called a USP 2 Dissolution Test.  There's sort of

14  the characteristic shape of the vial, this round bottom,

15  there's a characteristic paddle that actually has all these

16  specifications laid out in a monograph that I won't go

17  through with you, USP 711, but this is the entire apparatus.

18       The stirrer is down in here with a certain

19  amount of DI water in this particular case, and then you put

20  your tablet in, it is at 37 degrees and maintained at

21  37 degrees and as this stirs, drug will release from this.

22       So at first you've got red, that's the

23  immediate-release system that's coming out at the beginning,

24  and then the blue here will stay at the bottom, and as this

25  keeps stirring, it will come out.  And then you're going to

419

1   sample this over a period of time to see how much came out.

2   The last piece this paddle maintains a stirring at 50

3   rotations per minute.

4   Q.   In your opinion, Doctor, does Lumryz meet this claim

5   of oxybate release profile in the experimental conditions?

6   A.   It does.

7   Q.   You mentioned that you considered Avadel's patent in

8   connection with this limitation.

9        MR. CERRITO:  Mr. Lewis, can you pull up JTX260

10  at 0.76, please, example 2.

11  BY MR. CERRITO:

12  Q.   Dr. Little, is this the portion of the patent you

13  were referring to?

14  A.   It is.

15  Q.   Can you walk me through how you relied upon this.

16  A.   Yes.  So I will say that this entire portion right

17  here is the same dissolution testing that we just looked at.

18  You can look, if you want, to find the numbers, there's

19  deionized water here, Apparatus 2, which is that paddle,

20  37 degrees, 50 RPM, okay, and you're going to release over a

21  period of time in the apparatus that I just showed you.

22       I will say, just for reference, this is example

23  2, so, again, this is the example where they performed the

24  dissolution test on the product of example 1, which I took

25  you through before.

420

1   Q.   And that's the testing conditions they used in

2   example 2, the ones you just described?

3   A.   It is.

4   Q.   Pretty specific conditions, right?

5   A.   Yes, they're the specific conditions that are laid

6   out in the claim.

7   Q.   Are you aware whether Avadel conducted dissolution

8   testing in these conditions?

9   A.   Yes, they did.

10  Q.   Are the results of that testing in the patent?

11  A.   Yes, they are right underneath of it, table 2d.

12  Q.   Where are the results of the dissolution testing

13  that -- and specifically you said 2d?

14  A.   2d, yeah.  So just to orient, this is the percent

15  drug, sodium oxybate released in deionized water.  That

16  refers to all the stuff that I just had up there above.  And

17  you see the time points that were taken, 0.25, that's

18  0.25 hours, so that's 15 minutes.  One, two, three, and it

19  continues on.

20       At each of these, you are seeing a percent,

21  that's the percent of what was put in there originally,

22  right.  So it's 53 percent and then as you go to it, it

23  ends, you see that it's almost 100 percent of what was put

24  in it in the beginning.

25  Q.   I'd like to walk through this specifically, at time

421

1  6 hours.

2        Can you tell me how much of the

3  gamma-hydroxybutyrate in the sustained-release portion of

4  Lumryz is released at the 6-hour point?

5  A.     Yeah, so this is a little bit of math required for

6  this.

7  Q.     Did you prepare that math?

8  A.     I did, yes.  In essence, I'll show you the slide, but

9  what -- what you need to realize is that what we're talking

10 about is the release from one of the portions, it's 50/50,

11 okay.  So the immediate-release comes out fast.  So if

12 you're looking at 6 hours, that's out, okay.

13       So whatever number you get above 50 percent,

14 that's coming from the other part and that's what we're

15 looking for here, right.  So whatever number I get, I have

16 to subtract 50 percent off at the beginning, because that's

17 coming from the immediate-release portion.

18       Because the scale is from the remainder 50 to

19 100 percent, okay, that's only half of the percent that

20 would be released from the whole thing.  So the number that

21 I get once I subtract 50, I have to multiply that by two and

22 then that's the total percent of what came out of that

23 portion, okay.  And I can give you an example.

24       So here it is at 6 hours, again, at this point

25 the IR is completely released, so let's take this 92, let's

422

1  subtract off the immediate-release portion, okay, that's

2  this red part, let's pull that out, and then the rest of

3  this here, okay, that is what's coming from the

4  sustained-release portion.

5        So I'm going to take that part, I'm going to

6  multiply it by 2 and I get 84 percent from the

7  sustained-release portion that came out.  Again, it was 92

8  here, but that's from the total.  So it's 84 percent from

9  the sustained-release portion.

10 Q.     Thanks, Doctor.

11       Did you review the documents underlying these

12 dissolution tests?

13 A.     I did.

14 Q.     And can you turn your binder to tab PTX60, please,

15 and did you rely on this document?

16 A.     Could you say name of the tab again for me?

17 Q.     I'm sorry PT -- PTX60?

18 A.     Yes, this is the lab notebook.

19 Q.     It's a lab notebook?

20 A.     Yes, it is.

21 Q.     And it's from who, whose lab notebook is it?

22 A.     This is the Flamel lab notebook that we were seeing

23 before that was signed by Dr. Guillard.

24 Q.     Mr. Lewis, can you call out PTX60.6.

25       Okay.  Dr. Guillard, looking at this page of the

423

1  notebook, are these the test runs of Avadel's '062 patent?

2  A.     They are.  I'll just say a couple of things here to

3  orient you, but some of this is going to look familiar so

4  you can see why it's the same.  So you see the sampling

5  points at the time, those are the things you just saw.

6  You're going to have some quantities dissolved, okay.  The

7  percents here are not going to be identical for this guy or

8  this one or this one, and the reason why is there were three

9  runs of this.  You're going to take each of these and you're

10 going to average them together.  And when you do that, you

11 get the same number as what you were looking at in the '062

12 patent for example two.

13       Okay.  And these three were done, and you can

14 see here is 86167401 FDS and that's these three, right, are

15 the same.  So you're averaging these three to get the

16 numbers that are in the '062 patent.

17 Q.     Doctor, what's your opinion whether the

18 sustained-release portion in Lumryz meets the dissolution

19 limitation?

20 A.     As I showed, it does.

21 Q.     Doctor, in your opinion, does Lumryz meet both the

22 claimed -- disputed claim limitations for Claim 7 and Claim

23 11 for the '488 patent?

24 A.     Yes, it does.

25       MR. CERRITO:  Pass the witness.

424

1        THE COURT:  All right.  Cross-examination.

2        MR. SCHULER:  Yes, Your Honor.  Permission to

3  approach the bench and the witness?

4        THE COURT:  You may.

5        MR. SCHULER:  We also ask for permission to put

6  up an easel.

7        THE COURT:  You may.

8        MR. SCHULER:  Would you be able to see this,

9  Doctor?

10       THE WITNESS:  I'm can't, I'm sorry.

11       (Discussion held off the record between

12 counsel.)

13       THE COURT:  So Plaintiff's counsel, you're free

14 to move if you'd like.

15       MR. CERRITO:  I would have to move to the jury.

16 I don't know if that's appropriate, Your Honor.

17       THE COURT:  So let's get a reasonable location,

18 let's see where everybody can agree.  Let's see.  Go ahead.

19       THE WITNESS:  Would you like me to move over

20 here?

21       MR. SCHULER:  I would say right here, Your

22 Honor.

23       (Discussion held off the record.)

24       THE COURT:  Mr. Cerrito, if you would like to

25 move over here.

425

1      MR. CERRITO:  Yes, Your Honor.

2      THE COURT:  You can do that.

3      MR. SCHULER:  Ladies and gentlemen, my name is

4  Ken Schuler and I also represent Avadel.  If you detect a

5  little bit of an accent, it's because I grew up in a small

6  town in Iowa.

7           CROSS-EXAMINATION

8  BY MR. SCHULER:

9  Q.    Good morning, Dr. Little.

10 A.    Good morning.

11 Q.    Do you need more water?

12 A.    I have one more here somewhere.

13 Q.    Okay.

14       Now, as I understand, you did your PhD work at

15 MIT?

16 A.    Yes.

17 Q.    And while you were at MIT, did you become acquainted

18 with Plaintiff's expert on noninfringement, Dr. Alexander

19 Klibanov?

20 A.    Yes.

21 Q.    How did you come to meet Dr. Klibanov at MIT?

22 A.    He was an old collaborator and a good friend of my

23 PhD advisor, Bob Langer.

24 Q.    Was he a professor at the time?

25 A.    He was.

426

1  Q.    So Dr. Klibanov was a professor at the time that you

2  were doing your graduate studies --

3  A.    Yes.

4  Q.    -- at MIT?

5        And what is your opinion of Dr. Klibanov in

6  terms of his abilities as a formulation scientist?

7  A.    I have a high degree of respect for Dr. Klibanov.

8  Q.    And in terms of -- by the way, you understand that

9  Dr. Klibanov disagrees -- I think you recited some of

10 them -- you two disagree in certain respects on issues

11 relating to infringement?

12 A.    Yes.

13 Q.    Okay.  And in terms of years of experience, would you

14 agree that Dr. Klibanov has more years of experience in

15 formulation science than you do?

16 A.    He would have more years' experience, yes.

17 Q.    Now, I'd like to put up your demonstrative 4.8.

18       MR. SILVER:  Your Honor, to the jury, we

19 apologize, we're having a technical issue, we can't connect

20 to the system.

21       THE COURT:  Okay.

22       MR. SCHULER:  Could you put up 4.8?

23       THE COURT:  Okay.

24       MR. SCHULER:  Perfect.

25 BY MR. SCHULER:

427

1  Q.    Dr. Little, if we look at your demonstrative, we can

2  agree that each claim of the '488 patent requires that there

3  be a sustained-release portion, that has a core, that

4  contains an active pharmaceutical ingredient that is

5  selected from the oxybate compounds, correct?

6  A.    I mean, I would say it the way the claim says it.

7  Q.    Well, the sustained-release portion is the one that

8  has the core, correct?

9  A.    The sustained-release portion, yes, comprises of

10 functional coating in a core.  Functional --

11 Q.    Where the core comprises --

12 A.    Yeah, I just -- when I did my analysis, I just stick

13 pretty tightly to the language in the claim.

14 Q.    Yeah.  What you highlighted is, "Wherein, the core

15 comprises at least one pharmaceutically actively ingredient

16 selected from..."  and I just said the oxybate compounds,

17 correct?

18 A.    Yeah, that's fair.

19 Q.    Okay.  And in the case of Lumryz, the active

20 ingredient is, of course, sodium oxybate, right?

21 A.    It is.

22 Q.    And so we can agree that if Lumryz has a core -- it's

23 the modified-release pellets -- if they have a core, that

24 that core does not contain sodium oxybate, then Lumryz

25 doesn't infringe, correct?

428

1  A.    I mean, if you hadn't -- if you didn't have drug

2  underneath of the core, it wouldn't work, so, yeah, it

3  wouldn't infringe.

4  Q.    Let me say it again:  In order to infringe, Lumryz

5  has to have a core, the modified-release pellets have to

6  have a core and that core has to include sodium oxybate in

7  it, correct?

8  A.    The core has to comprise the sodium oxybate that is

9  here, yes.

10 Q.    Okay.  And if the core does not include sodium

11 oxybate, then the Lumryz controlled-release pellets do not

12 infringe, correct?

13 A.    I mean, if the -- if the core that's underneath of

14 this didn't have the drug in it, it wouldn't infringe, it

15 wouldn't release, but it wouldn't infringe.

16 Q.    Okay.  Now, you put up some information from the '062

17 patent, let's look at JTX260.55.

18       Are we back?

19       (Discussion held off the record.)

20       THE COURT:  Are you using that?

21       MR. SCHULER:  Right after this.

22       THE COURT:  Right after this, okay.

23 BY MR. SCHULER:

24 Q.    And if you could bring up lines -- column 10, line

25 12.

429

1        And, sir, do you see that it says figure 1
2   depicts the qualitative and quantitative structure of the
3   immediate release IR and modified release MR microparticles
4   of gamma-hydroxybutyrate of example 1, correct?
5   A.    Yes, it does.
6   Q.    So figure 1 will tell us both qualitatively and
7   quantitatively the structure of those two sets of particles,
8   correct?
9   A.    Yeah, it's just the disagreement here is that this
10  doesn't go with table 1a and 1b, so you can't just look at
11  this and then say that's what is characterizing the drug
12  product. I mean, table 1a and 1b goes with this, it's what
13  the patent says I -- I showed earlier.
14  Q.    Okay. So now we have -- we have figure 1 in the
15  patent, we thought this was a little brighter and a little
16  bigger. And we're going to start on the left, we have the
17  immediate-release microparticles, correct?
18  A.    Yes.
19  Q.    And in figure 1a we have a core showing, do you see
20  that?
21  A.    Yes.
22  Q.    And, in fact, the arrow from the word "core" is drawn
23  from the centermost dark portion of the particle, correct?
24  A.    Yes, that's the core of the immediate-release
25  portion.

430

1   Q.    Right. And then surrounding it, that is a
2   microcrystalline cellulose sphere, correct?
3   A.    Surrounding it is the drug.
4   Q.    No, no, this centermost core is a microcrystalline
5   cellulose sphere?
6   A.    Centermost core of the immediately-released particle
7   is centermost microcrystalline.
8   Q.    And that contains no sodium oxybate, correct?
9   A.    In Avadel's product?
10  Q.    Yeah.
11  A.    Well, I mean, it's going to contain a little bit of
12  sodium oxybate because you're spraying concentrated solution
13  of drug on a porous material.
14  Q.    No, the core.
15  A.    But a little amount of sodium oxybate.
16  Q.    The core itself --
17  A.    Yeah.
18  Q.    -- is neutral?
19  A.    Yes, it is, but you're spraying concentrated drug on
20  it. So it's like a ball of yarn, you're spraying
21  concentrated drug on it, right. So when you do that, at
22  least a little -- I mean, they have a low swelling index, so
23  it's like 2 milliliters per gram or something, right, so
24  two --
25         MR. SCHULER: Your Honor, I move to stop the

431

1   witness's answers. This appears to be an undisclosed
2   theory. His only theory is that this is the core.
3         MR. CERRITO: You asked him the question, you
4   asked him if it was in the core.
5         MR. SCHULER: I asked the question that
6   specifically said the core --
7         MR. CERRITO: No, you asked --
8         MR. SCHULER: I --
9         THE COURT: Hold on, let's come to sidebar.
10        (Whereupon, the discussion held at sidebar
11  concluded.)
12        MR. SCHULER: His theory in his expert reports
13  was simply that the core is the entirety of the IR --
14        MR. CERRITO: Okay.
15        MR. SCHULER: He never said, Oh, everyone,
16  there's also going to be some amount of drug on the core.
17  That was never disclosed as a theory.
18        MR. CERRITO: He asked him -- he just asked him
19  the question, Is the drug in that core?
20        Is he not allowed to ask him that?
21        MR. SCHULER: I said in the core.
22        MR. CERRITO: You asked that question.
23        MR. SCHULER: In the core.
24        MR. CERRITO: We're not missing each other. You
25  asked the question whether there was drug in the core.

432

1         MR. SCHULER: I -- I said inside the core.
2         MR. CERRITO: That's what he just said.
3         MR. SCHULER: It can't be inside the core.
4         MR. CERRITO: Of course it can. That's his
5   opinion. Of course it can. When you --
6         (Simultaneous talking.)
7         These things are not smears, they are --
8         (Simultaneous talking.)
9         When you spray dry it, it goes in those little
10  holes, it gets in there.
11        MR. SCHULER: If that was your theory.
12        MR. CERRITO: I'm not saying he did -- you asked
13  the question, you asked him the question was there --
14        THE COURT: Talk to me, talk to me.
15        MR. SCHULER: I'm making a Rule 26 disclosure.
16  There's no disclosure in his reports that he has an opinion
17  that the -- there's an agglomeration around the core. The
18  only opinion was, once it's been fully sprayed, it
19  becomes --
20        (Discussion held off the record.)
21        MR. SCHULER: It becomes the core for next --
22        (Simultaneous talking.)
23        MR. CERRITO: No opinion was rendered on direct,
24  I didn't bring that out. He then asked, "Is there any drug
25  in the core?" He answered. Is he supposed to lie?

433

1        THE COURT:  So --

2        MR. SCHULER:  I said inside.

3        MR. CERRITO:  Yes, that's his response.

4        MR. SCHULER:  I said "inside."

5        MR. CERRITO:  That's what he just said.

6        MR. SCHULER:  My objection is unarticulated

7   theory of the infringement, I did not invite it, I asked the

8   question inside the core.

9        MR. CERRITO:  And he answered inside of the

10  core, Your Honor, that's exactly what he said.

11       MR. SCHULER:  I would suggest we tell the jury

12  to ignore the last answer and we'll move on.

13       MR. CERRITO:  I can't understand how he asked

14  the witness a question, he answered that question

15  truthfully, honestly, now it has to be stricken.  Absolutely

16  not, Your Honor.  That was -- he asked the question.

17       MR. SCHULER:  It's an --

18       MR. CERRITO:  Stop, please, one second.

19       THE COURT:  I'm going to give you an

20  opportunity, go ahead and finish.

21       MR. CERRITO:  I did not bring that on direct.  I

22  didn't ask him that question on direct.  I agree it's not an

23  opinion that he put in his report, but he asked the

24  question.  Is he supposed to lie?

25       THE COURT:  Okay.  So it's not in his report,

434

1   okay.

2        MR. SCHULER:  Nor did my question call for

3   anything like it.  I simply said inside, inside the core.

4        MR. CERRITO:  That's what he's saying.  You

5   don't listen to his answer.  That's exactly what he said.

6        THE COURT:  Talk to me.

7        (Discussion held off the record.)

8        MR. SCHULER:  Unless Counsel is going to say he

9   won't rely on that.

10       MR. CERRITO:  You asked the question.  I didn't

11  ask him.

12       THE COURT:  So it's clear that it's not in his

13  report, but you asked the question.

14       MR. CERRITO:  Should have stay away from it.

15       MR. SCHULER:  I --

16       THE COURT:  No, wait.  So it's an undisclosed

17  opinion.  All right.  So how about we just move on and I

18  don't give any instruction?

19       MR. CERRITO:  That's acceptable.

20       MR. SCHULER:  All right.  Your Honor, we're

21  having severe technology issues, so we may ask to break for

22  lunch early since we can't seem to get our testimony.

23       THE COURT:  All right.  So we were going to go

24  until 1:00.  Can you do --

25       MR. SCHULER:  I do --

435

1        THE COURT:  I can do some other stuff --

2        MR. SCHULER:  Yes.

3        THE COURT:  -- to fill up the time.

4        (Discussion held off the record between

5   counsel.)

6        THE COURT:  We'll do that and then --

7        MR. SCHULER:  I appreciate the accommodation.

8        THE COURT:  So we should be able to get to 1:00

9   and then we can address it during the lunch break.

10       (Whereupon, the discussion held at sidebar

11  concluded.)

12  BY MR. SCHULER:

13  Q.    All right.  So the IR microparticles utilize a

14  neutral core of microcrystalline cellulose, correct?

15       (Reporter clarification.)

16  BY MR. SCHULER:

17  Q.    Oh.  So the immediate release cores utilize a neutral

18  core of microcrystalline cellulose, correct?

19  A.    I think -- I think that's right.  It's -- it's -- I'm

20  trying to remember what it's called, but that's

21  approximately the characterization, yes.

22  Q.    And figure 1a shows that the core is coated with a

23  drug coating layer including sodium oxybate, right?

24  A.    Yes.

25  Q.    And the arrow from the word "core" is not drawn to

436

1   the drug layer, correct?

2   A.    It's not drawn to the "drug layer" that says

3   "85 percent drug," no.

4   Q.    And the drug layer has its own -- I'm sorry.  The

5   drug layer has its own arrow and description in figure 1a,

6   correct?

7   A.    Yes.

8   Q.    Now, in figure 1b, there's an arrow from the word

9   "core," and it's drawn to the centermost dark part of the

10  particle, correct?

11  A.    Yes.

12  Q.    And the outer layer is called the "modified-release

13  coating," correct?

14  A.    Yes.

15  Q.    In figure 1b, the drug layer, including the sodium

16  oxybate, is shown as being in between the core of the

17  modified-release coating, correct?

18  A.    On the figure there, you're seeing it between the

19  two, but in the table that goes with 1b, the entire thing,

20  including the drug, is literally characterized for the

21  Lumryz product as a core.

22  Q.    If you could just stay with my question, sir, I would

23  appreciate it.  I have limited time.

24       Now, once again, the drug layer has its own

25  arrow and description in 1b, right?

437

1  A.    It does.

2  Q.    And once again, the arrow from the word "core" is not

3  drawn to the drug layer, correct?

4  A.    It's drawn to the core of the immediate-release

5  particle, which is over here.

6  Q.    Right. It's drawn to the same location, correct?

7  A.    Yeah, because this whole thing is just moved over.

8  Q.    Okay. So you've played darts, haven't you?

9  A.    I don't play darts, no.

10  Q.    Never played darts?

11  A.    No.

12  Q.    Have you seen people play darts?

13  A.    I mean, I -- I mean, I know how -- I know generally

14  how the game is played.

15  Q.    Archery?

16  A.    No, sorry.

17  Q.    Okay. We'll stick with darts. You know what this

18  is? This is a bull's-eye, right? The centermost part, it's

19  a bull's-eye.

20  A.    It's a three-dimensional object, so this whole thing

21  is a pellet, right, and then on the inside of it, you have,

22  you know, the core. So it's not two-dimensional. It's a

23  cross-section.

24  Q.    Okay. But if this were hung up on a wall, the

25  bull's-eye would be the centermost part, correct?

438

1  A.    I wouldn't characterize it that way, no.

2  Q.    All right. And you'd get lesser points if you hit

3  the drug layer, right, because it's easier to hit the more

4  surface area, right?

5  A.    I mean, look, I -- I just don't think this is how we

6  characterize -- a person of ordinary skill characterize it.

7  Q.    And for the modified release, the bull's-eye would

8  still be the centermost part, right? We didn't change the

9  scoring simply because we added another ring where you could

10  hit the dartboard, right?

11  A.    Yeah, I don't follow your analogy to the real-world

12  situation.

13  Q.    Well, if we were playing darts, would it be your

14  opinion that the bull's-eye for a board with the structure

15  of 1b would now include all of the drug layer area?

16  A.    Again, I -- I don't think this is like a bull's-eye.

17  That's not what a particle is. I just don't agree with your

18  characterization.

19  Q.    Okay. Now, sir, you reviewed the '062 patent in

20  connection with forming your opinions, correct?

21  A.    I did.

22  Q.    And am I right to assume that you reviewed it

23  carefully?

24  A.    Yes, I did.

25  Q.    And do you recall in column 40 that specification

439

1  describes in such embodiments the oxybate-containing layer

2  and the inert core are distinct elements of the

3  modified-release particles?

4  A.    I remember that portion of column 40, yes.

5  Q.    Now, let's bring that up, it's JTX260.

6        THE COURT: Mr. Schuler, are you done that with

7  that?

8        MR. SCHULER: I am done with that.

9        (Discussion held off the record.)

10  BY MR. SCHULER:

11  Q.    JTX260.70, column 40, lines 54-58.

12        All right. And it says, "In one sub-embodiment,

13  the modified-release portion comprises particles comprising:

14  (a) an inert core; (b) a coating; and (c) a layer comprising

15  the gamma-hydroxybutyrate interposed between the core and

16  the coating."

17  A.    Yeah, I mean, you deleted the part whenever you cut

18  it out that says "in one sub-embodiment."

19  Q.    That -- I did not try to do that. I read that,

20  believe me.

21        And -- okay. Now we have it. Right.

22        But in that sub-embodiment, those are three

23  distinct parts of the modified-release particle, correct?

24  A.    There is a general description there of what you

25  described, yes.

440

1  Q.    Now, you reviewed several portions of the Lumryz New

2  Drug Application, as you testified on direct examination,

3  correct?

4  A.    Yes.

5  Q.    And you would agree that it's important to be

6  accurate in submissions to the FDA?

7  A.    I think it's important to be accurate in regard to

8  what matters to the FDA making the decision on how to

9  regulate your drug product, yes.

10  Q.    And do you agree that it's important to be precise in

11  communications with the FDA?

12  A.    In regard to what matters to them on how you regulate

13  your drug product, yes, you do need to be precise.

14  Q.    And Avadel consistently told the FDA that the core of

15  the CR, or controlled-release, particles are inert

16  microcrystalline cellulose spheres, correct?

17  A.    Yeah, I disagree with that characterization.

18  Q.    Okay. One of the documents that you testified about

19  today is JTX236: do you recall that?

20  A.    Yes.

21  Q.    And I think you put up information on page 6. And

22  then if we turn to page 0.7, there's a schematic view of the

23  coating manufacturing process.

24        Do you see that?

25  A.    I do.

441

1    Q.    And that's something you talked about on the direct
2    examination, right?
3    A.    This guy right here, it looks like the same figure
4    from figure 1 of the patent we just looked at. It's -- this
5    is a PDR, yeah, right.
6    Q.    Right. I'm simply asking the manufacturing process
7    for the controlled-release pellets, that's one of the topics
8    you talked about on direct, right?
9    A.    Yes.
10   Q.    Okay. And they pulled up the table that's beneath
11   that, and the table is entitled "Sodium Oxybate CR Pellets,"
12   correct?
13   A.    I can't see that. Sorry. Could you...
14   Q.    Is it on your screen in front of you?
15   A.    It's not. I mean, there's the figure. Is that what
16   you're referring to?
17         THE COURT:  Yes.
18   BY MR. SCHULER:
19   Q.    The box underneath.
20   A.    Yeah, that's what we were just looking at, yes.
21         MR. SCHULER:  Yeah, can we pull that up?
22         THE WITNESS:  That's the figure.
23   BY MR. SCHULER:
24   Q.    Yeah, okay. And so now can you see that the title of
25   it is "Sodium Oxybate CR Pellets"?

442

1    A.    Yes.
2    Q.    And at the center is a neutral core, correct?
3    A.    It's labeled "neutral core" there, yes.
4    Q.    And there's an arrow going from the word "neutral
5    core" to the centermost part of the particle, correct?
6    A.    Yes.
7    Q.    And then there's also -- the figure also has the
8    words "drug-loaded layer" and an arrow pointing from that
9    wordage to the white part of the particle, correct?
10   A.    Yes.
11   Q.    And then finally, there's a drug layer coating,
12   correct?
13   A.    No.
14   Q.    I'm sorry. There's a coating --
15   A.    It's not a drug layer, but --
16   Q.    I'm sorry.
17   A.    -- I think I know what you mean, yeah.
18   Q.    Yeah, there's a coating, all right.
19         And the drug layer is in between the drug-loaded
20   layer -- I'm sorry -- the drug-loaded layer is in between
21   the coating and the neutral core, correct?
22   A.    On the schematic, yes, the drug and the neutral core
23   are underneath of the coating.
24   Q.    And the drug layer has its own label and its own
25   arrow in this figure, correct?

443

1    A.    Sure, if you took a cross-section, it's just showing
2    where the pieces are.
3    Q.    Okay. Now, if you would take a look in your binder
4    at JTX228.
5          Do you recognize this as another section of the
6    Lumryz New Drug Application?
7    A.    It is.
8    Q.    And it's a section with the title "Pharmaceutical
9    Development"?
10   A.    Yes.
11         MR. SCHULER:  Your Honor, I move for the
12   admission of JTX228.
13         MR. CERRITO:  No objection.
14         THE COURT:  JTX228 is admitted.
15         (Exhibit admitted.)
16   BY MR. SCHULER:
17   Q.    Now, if we could publish that, it's got a table of
18   contents so if we could move to JTX228.8.
19         And there's a figure 2, if we can bring that up.
20         Figure 2 has the title "Sodium Oxybate
21   Controlled-Release Coated Pellets Present in the Drug
22   Product."
23         Do you see that, sir?
24   A.    Yes.
25   Q.    And then beneath that is the title

444

1    "Controlled-Release Coated Pellets, correct?
2    A.    Yes.
3    Q.    And then there is a -- the words "neutral core" and
4    there's an arrow drawn to the centermost dark portion of the
5    particle, correct?
6    A.    Yes.
7    Q.    And then a drug-loaded layer is surrounding the
8    neutral core, correct?
9    A.    Yes.
10   Q.    And the drug layer is in between the coating and the
11   neutral core in this figure, correct?
12   A.    It's the same orientation that we just saw before.
13   Q.    And the drug layer has its own arrow and description
14   in this figure: true?
15   A.    Yes.
16   Q.    Now, Doctor, you reviewed various Jazz documents in
17   the course of your work; fair?
18   A.    Some, yes.
19   Q.    And did you review them to see the manner in which
20   Jazz personnel characterizes Lumryz controlled-release
21   pellets?
22   A.    Honestly, I can't recall from what you're referring
23   to.
24   Q.    And if you look in your binder at Exhibit DTX1275.
25   Do you recognize this as a Jazz presentation from July 17,

445

1  2018 concerning Project Zeta?

2  **A.**    It looks like a cover page presentation, Project

3  Zeta, I can't remember if this was something I would have

4  reviewed or not.

5  **Q.**    Okay.  And this is about 6 months after the

6  publication of the Avadel --

7        MR. CERRITO:  Objection, Your Honor, he can't

8  lay foundation for this document.  The witness just said he

9  never saw this before.

10       MR. SCHULER:  We have an agreement that as long

11  as the expert is testifying about the subject matter of

12  their opinions, we can move in business records of each

13  others' parties.

14       MR. CERRITO:  That would pertain to the NDA,

15  Your Honor, not random internal documents, it did --

16       MR. SCHULER:  That's not true.

17       MR. CERRITO:  It's an internal Jazz document, at

18  least that I can see.

19       THE COURT:  It's a Jazz document, isn't it?

20       MR. CERRITO:  I'm sorry?

21       THE COURT:  It's a Jazz document, isn't it?

22       MR. CERRITO:  Paragraph 66 says, "Every Jazz

23  document is a business record."

24       But we still have an individual use.  He's not a

25  Jazz employee, he's never seen this document before.  They

446

1  haven't laid a foundation for him to even look at it.  We

2  did not make an agreement with regard to Jazz documents,

3  only the NDA and related documents to that.  Absolutely, we

4  can show it to you.

5        MR. SCHULER:  I do not believe that's true.

6  It's any document by the parties within the scope of what

7  the expert's considering.  And, Your Honor, even if he

8  didn't look at it, that's also why I want to show it to him.

9        MR. CERRITO:  It's not in his expert report

10  either.

11       THE COURT:  Well, it -- if it's -- if he didn't

12  do something just like Jazz just asked Avadel's witness

13  about, did they do something?  And if he didn't do

14  something, that's -- isn't that relevant?

15       MR. CERRITO:  I'm sorry, Your Honor.  I missed

16  the last part of what you said.

17       THE COURT:  If there's a document that he did

18  not review, isn't that relevant, doesn't that go to

19  credibility?

20       MR. CERRITO:  I don't believe so, Your Honor, I

21  don't believe it forms a part of foundation here for him to

22  say, you didn't look at every document in Jazz's files, that

23  wasn't necessary.

24       THE COURT:  You'll get a chance to redirect.

25       MR. SCHULER:  May I proceed?

447

1        THE COURT:  You may proceed.

2  BY MR. SCHULER:

3  **Q.**    Can we publish JTX -- DTX1275.

4        Now, if we go to DTX page 1275.15, you see, sir,

5  that this is about FT218 once-nightly formulation.

6  **A.**    Okay.

7  **Q.**    And you understand that became Lumryz?

8  **A.**    I don't -- I don't know.

9  **Q.**    "FT218," you understand that was the code name before

10  they got the trade name, Lumryz?

11  **A.**    I don't remember that.  I'm sorry.

12  **Q.**    Okay.

13  **A.**    Off the top of my head.

14  **Q.**    All right.  And if we turn to the next page,

15  DTX1275.16, at the bottom right, there is a depiction of the

16  controlled-release coated pellets, correct?

17  **A.**    Okay.

18  **Q.**    And this is a Jazz document, right?

19  **A.**    I don't know.  It says, "Data Room REST-ON

20  Investigators brochure," is where this is coming from, so...

21  **Q.**    In a Jazz presentation?

22  **A.**    It is -- appears to be in a Jazz presentation, yes.

23  **Q.**    Okay.  And we have the word neutral core at the upper

24  right with an arrow pointed to the centermost dark part of

25  the particle, correct?

448

1  **A.**    It looks like it's actually copied from what we were

2  just looking at before in the Avadel document, so...

3  **Q.**    Okay.  And, again, there is a drug-loaded layer with

4  an arrow, correct?

5  **A.**    Same format as what we saw before.  Yes.

6  **Q.**    And the drug-loaded layer has its own depiction and

7  arrow in this figure, correct?

8  **A.**    It has the same orientation as what we saw before.

9  **Q.**    All right.  Now let's turn up PTX737.30.  This is the

10  SEC presentation.

11       And, sir, the word Lumryz is not on this page,

12  correct?

13  **A.**    I don't see the word Lumryz on this page.

14  **Q.**    And the FT218 doesn't appear on this page, correct?

15  **A.**    Yeah, I don't see FT218 on this page.

16  **Q.**    Do you recall how many of Avadel's securities

17  presentations that you reviewed in connection with your work

18  on this case?

19  **A.**    I don't.

20  **Q.**    What actions did you take to ensure that you had a

21  fulsome view of what Avadel had been telling its investors?

22  **A.**    Well, I just remember having a conversation with

23  counsel and --

24  **Q.**    Don't tell me about conversations with counsel.

25  **A.**    Okay.

449

1    Q.      I want you to describe actions, okay?

2            What actions did you take to ensure that you had

3    a fulsome view of what Avadel was telling its investors?

4    A.      Well, I mean, it's -- the only way I would have

5    access to those documents, right, is under I think this

6    protective order which I would need to talk about with

7    JAzz's counsel, so I don't know how to answer the question

8    if I can't say that.

9    Q.      In terms of actions, you would have obtained them

10   from counsel for Jazz; is that fair?

11   A.      Well, if they are Avadel documents, right, I would

12   have obtained them through counsel for Jazz, so...

13   Q.      Okay.  Now, let's put up -- or look in your binder,

14   sorry, at DTX1254 in your binder.

15           Do you see that's a presentation by Avadel at

16   the Piper Jaffray Healthcare Conference?

17   A.      A presentation by Avadel, Piper Jaffray Healthcare

18   Conference, yes.

19   Q.      And is the date December 2019?

20   A.      Yes, it appears to be.

21   Q.      Okay.  That's a couple of years after the one that --

22   presentation that you talked about on direct examination?

23   A.      It might be, I don't remember the date off the top of

24   my head, I'm sorry.

25           MR. SCHULER:  Your Honor, I move for admission

450

1    of DTX1254.

2            MR. CERRITO:  No objection, Your Honor.

3            THE COURT:  DTX1254 is admitted.

4            (Exhibit admitted.)

5            MR. SCHULER:  So let's publish that.

6    BY MR. SCHULER:

7    Q.      If you look at the page, dot 03, do you see a safe

8    harbor statement?

9    A.      Okay.

10   Q.      And you understand the purpose of these safe harbor

11   statements, is that this is a company putting material out

12   that could be relied upon by investors or potential future

13   investors?

14   A.      I can't testify to that, I'm sorry.

15   Q.      Okay.  Let's look, then, at DTX1254 and turn to page

16   0.9.  And this slide is entitled, "Leveraging our

17   proprietary Micropump technology-delivering sodium oxybate

18   once-nightly."

19           So you know this is talking about the Lumryz

20   Micropump formulation, right?

21   A.      It didn't say "Lumryz" here and it doesn't say

22   "FT218," which is what you asked me to confirm in the last

23   slide.

24   Q.      Do you know of any other Avadel once-nightly sodium

25   oxybate product other than Lumryz?

451

1    A.      Yeah, it's Micropump, which was in the last

2    presentation that I showed when you asked me if it didn't

3    have those things in it, Micropump.

4    Q.      Micropump is not a product, Doctor.

5    A.      It's the coating here.

6    Q.      Right.  But for sodium oxybate --

7    A.      Sure.

8    Q.      -- you know of any other sodium oxybate product on

9    the market that has sodium oxybate with a Micropump

10   technology?

11   A.      Yeah, I mean, I can only presume that this is the

12   Lumryz product, but it doesn't say it.

13   Q.      Fair enough.

14           And there is a particle in the center, do you

15   see that?

16   A.      It -- there's a cross-section, a three-dimensional

17   cross-section I see.

18   Q.      Right, and at the very center and it's lighter this

19   time, is inner core, correct?

20   A.      Yes.

21   Q.      And then there's a separate set of words, drug layer,

22   and a different arrow going to a different part of the

23   particle, correct?

24   A.      Yes.

25   Q.      And then, finally, we have the controlled-release

452

1    coating on top, correct?

2    A.      Yes.

3    Q.      Now, do you have a recollection of whether this is

4    one of the securities presentations that you reviewed in

5    connection with forming your opinions?

6    A.      It might have been, the diagram here, it's

7    three-dimensional now, but it's sort of the same format as

8    we've seen in the other documents.

9    Q.      Now, sir, were you here for the video testimony of

10   Dr. Thorsteinsson?

11   A.      A part of it.

12   Q.      Okay.  And he talked about one document in the New

13   Drug Application?

14   A.      I don't remember if I was part -- here for that part,

15   I needed to use the restroom once.

16   Q.      Okay.  We'll see if you were or were not.  It's -- it

17   is JTX226.  And if we turn to page 0.4, figure 1,

18   "Controlled-release, CR, coated pellets."

19           Do you see that?

20   A.      Yes.

21   Q.      And, once again, there is an inner core with an arrow

22   drawn to the inert, centermost dark portion, correct?

23   A.      Yes.

24   Q.      Then there's a drug-loaded layer with a separate

25   description and a separate arrow, correct?

453

1  A.    Yes, as we've seen before.

2  Q.    CR coating, correct?

3  A.    Correct.

4        MR. SCHULER:  Pass the witness, Your Honor.

5        THE COURT:  All right.  We're going to break for

6  lunch at this time.

7        MR. CERRITO:  Brief redirect, Your Honor, or

8  we're going to wait until after?

9        THE COURT:  How long do you anticipate your

10 redirect being?

11       MR. CERRITO:  Might take a few minutes.

12       THE COURT:  Okay.  So we're going to take lunch,

13 all right.

14       (Whereupon, the jury left the courtroom.)

15       THE COURT:  Dr. Little, you're still under oath.

16 You are still under oath.

17       We're going to break for 50-minutes.  We'll come

18 back at 1:55.

19       (Recess taken.)

20       MS. THOMPSON:  We have been discussing with

21 Avadel the need to seal the courtroom for Dr. Rainey's

22 testimony, Jazz's damages expert.  And we've agreed that

23 would be appropriate because there are financial projections

24 that are not public and these are publically traded

25 companies, and then what we would propose to do is take a

454

1  copy of the rough transcript, redact the highly sensitive

2  information so that that can be public on the docket if

3  that's acceptable to Your Honor.

4        THE COURT:  That's fine.

5        (Whereupon, the jury entered the room.)

6        THE COURT:  All ready, Mr. Cerrito?

7        MR. CERRITO:  Thank you, Your Honor.  Just a

8  couple of question, Dr. Little.

9  BY MR. CERRITO:

10 Q.    Do you remember when Avadel's counsel asked you

11 questions, he kept referring to what he called the drug

12 layer over the neutral core, do you remember that?

13 A.    Yes.

14 Q.    Are you aware of any name for that structure a POSA

15 would understand?

16 A.    It's called a drug-layer core.

17 Q.    Thank you, Doctor.

18       Were you here when Dr. Guillard testified that

19 the Legrand Micropump patent described the drug layer core

20 structure, and the core structure where the drug is mixed in

21 with all the excipients.

22       Do you remember that?

23       MR. SCHULER:  I would object.  Beyond the scope.

24 It wasn't part of the direct examination, certainly wasn't

25 part of my cross.

455

1        MR. CERRITO:  Certainly talking about core, Your

2  Honor, exactly when he kept talking about the drug-covered

3  core.  And he just identified what a POSA would understand

4  that to mean and I'm just making the connection now.

5        THE COURT:  I'll allow it.

6  BY MR. CERRITO:

7  Q.    Do you remember that testimony, Doctor?

8  A.    I do.

9        MR. CERRITO:  Can we go back to PTX737.30, the

10 picture that we were talking about.

11 BY MR. CERRITO:

12 Q.    Can you tell the jury how both of those structures,

13 you just described from the testimony, both of those

14 structures are described on this slide?

15 A.    Yeah, sure, so one of the structures is the coating,

16 right, it's on the outside, that's described in the claim.

17 And in order for this thing to work, a drug has got to be

18 under it.  That's what a person of ordinary skill in the art

19 would understand, so what's under it is the core.

20       And what you see is pointing right to the drug.

21 You see crystal granulate.  And it says here layered core.

22 That's what it's called, a layered core.

23 Q.    Thank you, Doctor.  So all of the things you heard on

24 cross, all the pictures that he showed -- well, it was

25 actually the same picture over and over and over and over

456

1  again, having seen all that, did your opinion change at all

2  regarding whether or not Avadel meets the claim limitation

3  of core?

4  A.    No, they are just showing over and over again a

5  layered core.

6  Q.    Thank you, Doctor.

7        THE COURT:  All right.

8        Dr. Little, you may step down.  Thank you, sir.

9        MS. THOMPSON:  Ellyde Thompson, members of the

10 jury, on behalf of Jazz.  Jazz would call Shawn Mindus to

11 the stand.

12       THE COURT:  All right.  Please take the stand.

13       SHAWN MINDUS, having been called on the part and

14 behalf of the State as a witness, having first affirmed to

15 tell the truth, testified as follows:

16       DIRECT EXAMINATION

17 BY MS. THOMPSON:

18 Q.    Good afternoon, Mr. Mindus, could you please

19 introduce yourself to the jury.

20 A.    Shawn Mindus with Jazz Pharmaceuticals.

21 Q.    And where do you currently live?

22 A.    In Vancouver, British Columbia.

23 Q.    And how long have you worked at Jazz?

24 A.    Since May of 2004.

25 Q.    Why have you stayed at Jazz for so long?

457

1   **A.**    I enjoy the work, I've learned a lot.  I feel like

2 we're doing good things for patients.  And I really enjoy

3 the culture of the company.

4   **Q.**    And what work do you do at Jazz?

5   **A.**    Largely working in finance and strategy.

6   **Q.**    And what do you do within those finance and strategy

7 organizations, what are they responsible for?

8   **A.**    The finance organization that I have been involved in

9 is largely everything forward-looking, so budgets, planning,

10 analysis of what's happening in the future.

11   **Q.**    Okay.  And forward-looking, is that sometimes called

12 forecasting?

13   **A.**    It is.

14   **Q.**    And what is forecasting?

15   **A.**    So forecasting is really projecting out the

16 financials that you expect to happen in the future.

17   **Q.**    And how long have you been working on forecasting at

18 Jazz?

19   **A.**    Largely, in some form or another, since I started at

20 Jazz.  Early days was actually doing forecast, and later

21 days more of the reviewing and advising on the forecast.

22            MS. THOMPSON:  Your Honor, at this point in time

23 I'd like to move into evidence Exhibits JTX151 and JTX151a.

24 I understand there's no objection.

25            MR. SILVER:  No objection, Your Honor.

458

1            THE COURT:  Okay.  JTX151 and JTX151a are

2 admitted.

3            (Exhibits admitted.)

4            MS. THOMPSON:  Thank you, Your Honor.

5 BY MS. THOMPSON:

6   **Q.**    Are you familiar with something called an oxybate

7 contribution sheet?

8   **A.**    Yes, I am.

9   **Q.**    And what is an oxybate contribution sheet at Jazz?

10   **A.**    An oxybate contribution sheet looks at the

11 contribution of the profits of that product line for our

12 business.

13   **Q.**    And why is it called a contribution sheet?

14   **A.**    The contribution would be the component of our

15 profit, so all of the contributions together would add up to

16 the full profit of the company.

17   **Q.**    Okay.

18            MS. THOMPSON:  If we can go ahead and put up

19 JTX151a.  And maybe if we can show the whole thing on the

20 screen.

21            And we can put up 151a, if that's easier, but

22 this is fine, if that -- if that works.

23 BY MS. THOMPSON:

24   **Q.**    What we were just -- what we're seeing -- thank you

25 so much.

459

1            What is this, Mr. Mindus?

2   **A.**    This is our United States oxybate contribution

3 statement.

4   **Q.**    And what period does it cover?

5   **A.**    From 2014 to the first half of 2023.

6   **Q.**    Okay.  And is this a document that Jazz prepares in

7 the normal course of doing business?

8   **A.**    Yes, it is.

9   **Q.**    And how would one use this contribution sheet to

10 determine profitability of Jazz's oxybate business?

11   **A.**    Right.  So if you -- I know the numbers are small,

12 but on the left-hand side, you see the individual rows, and

13 it starts off with revenue at the top, and then it works its

14 way.  And COGS is costs of goods sold, so how much it costs

15 to manufacture the products and sell them.  Commercial OPEX

16 is the commercial expenses.  R&D expenses.  And then you

17 subtract all of those out, you end up with a contribution in

18 row 22.

19   **Q.**    Okay.

20            MS. THOMPSON:  If we could just go up to the top

21 here in line 2.

22 BY MS. THOMPSON:

23   **Q.**    It says "amounts displayed in thousands," what does

24 that mean?

25   **A.**    That means that all of the numbers on here are

460

1 divided by 1,000.  In order to get to the actual number,

2 take the first number, first column, the 777525, that would

3 be 777,525 in U.S. dollars.

4   **Q.**    Okay.

5            MS. THOMPSON:  We can take that down, thank you.

6 BY MS. THOMPSON:

7   **Q.**    Let's go back to forecasting, why does Jazz do

8 forecasts for its products?

9   **A.**    So forecasting for us is important to understand the

10 business going forward, and so really being able to plan and

11 make decisions for the business, knowing how much that we

12 can invest in things like R&D, being able to communicate to

13 the street what we anticipate our profitability is going to

14 be and our cash flows are going to be.

15   **Q.**    And how does Jazz generally put together a forecast

16 for its products?

17   **A.**    So the forecasts are based on a lot of assumptions,

18 some of them fairly straightforward, like the number of

19 patients in the United States, the number of people in the

20 United States.  Some of them are a little harder to get to,

21 which would involve doing direct market research, which

22 means reaching out to physicians, and putting in front of

23 them product profiles and asking them were they to

24 anticipate -- or how they would anticipate using the

25 products in the future.

461

1  Q.      And how often are these forecasts done at Jazz?

2  A.      So forecasting at Jazz is -- it's a continuous

3  process.  However, we -- there's at least four formalized

4  processes -- formalized periods throughout the year.  So

5  every three months or every quarter you do an update, and

6  one of those results in the budget for the following year.

7          MS. THOMPSON:  Your Honor, at this point in time

8  I would offer into evidence Exhibits JTX147 and PTX2011.  I

9  understand there's no objections.

10         MR. SILVER:  Correct, Your Honor, no objection.

11         THE COURT:  All right.  JTX147, PTX2011 are

12 admitted.

13         (Exhibits admitted.)

14         MS. THOMPSON:  Thank you, Your Honor.

15         Could we show, please, JTX147, the financial

16 forecast, Tom?

17 BY MS. THOMPSON:

18 Q.      Mr. Mindus, do you recognize this document?

19 A.      Yes, I do.

20 Q.      And what is it?

21 A.      It is one of the Excel models that we use for

22 forecasting.

23 Q.      And what products are covered by this forecast?

24 A.      So this is -- this covers the oxybate, the narcolepsy

25 oxybate forecast for Jazz.

462

1  Q.      Okay.  And is this forecast prepared by Jazz in it's

2  normal course of business?

3  A.      Yes, it is.

4  Q.      And just looking at the Excel here, are you able to

5  tell when the specific forecast is from?

6  A.      Not based on what's on the screen, I'd have to see

7  the file name and location of where it came from.

8  Q.      Okay.

9          MS. THOMPSON:  So could we please pull up

10 PTX2011.

11 BY MS. THOMPSON:

12 Q.      And this is called the metadata for Exhibit JTX147.

13 Does this help you tell when the forecast document we were

14 just looking at is from?

15 A.      Yes, it does.  This gives me enough information to

16 say when this was done.  The two most important lines for me

17 are the original file path and the file name.  The file path

18 is where it was being held on the computer, Jacob Mills is

19 one of our forecasters in the company.

20         And then where it says forecast 2 LRP May 2023,

21 that means it was the second forecast of the year, which is

22 done in the May, June timeframe.  And the LRP is the

23 long-range plan for May of 2023.

24         The file itself, narc, is short for

25 narcolepsy, so it's the narcolepsy forecast.  And LRP based,

463

1  so it would be a midpoint forecast.

2  Q.      And just looking at this, I think you may have

3  already said it, but Plaintiff's Excel we were just looking

4  at, from what time period?

5  A.      So it would be in the June timeframe.  I know the

6  master date says June 26th at exactly midnight.  The exactly

7  midnight is probably due to a backup on the system.

8  Q.      And when -- if you know, when did the FDA issue final

9  approve for Lumryz, Avadel's product?

10 A.      I think it was May 1st, but I'm not 100 percent sure.

11 Q.      Okay.  And how quickly after Jazz learned of the

12 FDA's approval would Jazz have updated its forecast?

13 A.      Generally it would be updated within days.  We're

14 aware of main events for the forecast when they happen,

15 we'll update almost immediately.

16 Q.      Okay.  And we talked about -- related to the document

17 that was just up, it said "narc" at the beginning.  Could

18 you just explain again what that refers to?

19 A.      That refers to that this was the narcolepsy forecast.

20 We have multiple indications for the oxybate products.

21 Narcolepsy is one of them, and this forecast only covers the

22 narcolepsy component.

23 Q.      Okay.  So it doesn't cover revenue for other uses of

24 Jazz's oxybate products?

25 A.      It does not.

464

1  Q.      Okay.  I wanted to talk briefly about the base.  I

2  think you touched on that.  Can you just explain a little

3  more what base means?

4  A.      When we're doing our long-range planning, we're

5  really looking at multiple scenarios, so we'll usually have

6  an upside scenario or upside scenarios and downside

7  scenarios, and this represents the base or generally a

8  midpoint forecast.

9  Q.      And what's an example of an upside scenario?

10 A.      So an upside scenario could be where we've

11 anticipated some negative events for the business,

12 competitive launches and things like that, and then we would

13 model what would happen if those did not occur, and our

14 revenues would be higher and that would result in a higher

15 forecast.

16 Q.      Okay.  And so what is the opposite of that?

17 A.      So a downside scenario, probably a good example of

18 that would be COVID.  When that first started to happen,

19 looking at what could happen to the pharmaceutical market,

20 how could people be using products in the future, and

21 building that into a scenario.

22 Q.      Okay.  Now, how far into the future does the forecast

23 go?

24 A.      Generally we're forecasting out 20 years.

25 Q.      Okay.  So let's go back to the document we were

465

1 looking at, JTX147. And that financial forecast tab, what
2 is that tab?
3 A. So the financial forecast tab really is a summary of
4 all of the -- all of the assumptions within that workbook,
5 so there's multiple tabs in the workbook. The forecast tab
6 has all of the information in it. It's in a summary format,
7 right down to what are the final revenues that we use.
8 Q. Okay. So why don't we just go ahead and switch to
9 some slides to make this a little easier than the Excel.
10 Can we go to PDX5.2, please.
11     And then can you explain what it's showing here
12 in row 441?
13 A. So this is the -- as I said, in the forecast tab,
14 this gets down to what are the actual revenues that we're
15 forecasting. In this it has the net revenue and then the
16 revenue streams that Jazz has for its oxybate products in
17 narcolepsy, being Xyrem and Xywav and royalties from AG, and
18 AG is an authorized generic.
19 Q. Okay. Let's go ahead to PDX5.3, please.
20     Okay. What is this showing, Mr. Mindus?
21 A. This is from another tab on the workbook, and that
22 tab is competitor launch events, and what we have in this
23 tab are events that affect the forecast. The model is a
24 live model, so if you do something on this tab, it will
25 reflect on the forecast tab.

466

1     This is Event No. 8. All of our events are
2 sequential, so what happens in one event impacts the one
3 after it. And this event, this specific event is the launch
4 of FT218, FT218 being Avadel's Lumryz product. The event
5 date is when that event happens on the right-hand side,
6 which is June of 2023. And then on the left-hand side, it
7 says, "applied event." There's a drop-down there. "Yes"
8 means that event is turned on and it affects it. "No" means
9 that that event doesn't happen and does not affect the
10 forecast.
11 Q. And you said the event date is June of 2023. Did
12 Lumryz actually launch in June of 2023?
13 A. That's my understanding, yes.
14 Q. Going down here to the bottom few rows, it
15 says, "pre-event peak share," "post-event peak share." What
16 is the meaning of peak?
17 A. So I can explain those two lines. So peak is when we
18 anticipate the maximum impact of this event. So in this
19 case, it goes out three years, and the impact grows up to
20 that three-year point.
21     The pre-event peak there is what happens if this
22 event is turned off. So if you don't -- if this event
23 doesn't happen, this is what share you would have. The
24 post-event peak share is if you turn that event to "yes,"
25 then the post-event peak share line is -- is being used and

467

1 the event has happened.
2 Q. Okay. And when we talk about "share," you're talking
3 about market share?
4 A. That is correct.
5 Q. And I see here -- this is sort of in that first
6 column there, "all other." What is the market that's being
7 referenced here?
8 A. So when we forecast we're forecasting the entire
9 narcolepsy market, so all patients that are diagnosed and
10 treated are included, and then we pick -- we include all of
11 the oxybate products, plus some other products that are
12 branded, and then we have an "all other" bucket for the
13 patients that are not on one of the products we're
14 forecasting.
15 Q. Okay. And is there a place in this spreadsheet where
16 it shows a comparison between the post-event peak share and
17 the pre-event peak share?
18 A. Yes, the three numbers you see on the bottom row
19 under Xyrem, Xywav, and AG, or authorized generic, that
20 indicates the percentage drop that we have. So for Xyrem
21 pre-event, so if Lumryz did not launch, we'd have a
22 3.8 percent share of that market. Post-event, so if Lumryz
23 does launch, we'd have a 2.7 percent share, and the 28.8 is
24 a 28.8 percent reduction in the share that we capture in
25 that market.

468

1 Q. And, again, the event that you're referring to here
2 is the launch of Lumryz in June of 2023?
3 A. That's correct.
4 Q. Okay. Over here where it says "apply event" and it
5 has a little toggle "yes" or "no," what does that mean?
6 A. Okay. That means that the event was turned on and
7 the impact of Lumryz was captured on the forecast tab.
8 Q. Okay. And this is, I think you said, linked back to
9 that financial forecast tab.
10 A. It is.
11 Q. All right. Let's go ahead to the next slide, PDX5.4.
12 And can you tell the jury what Competitor Event No. 7 is?
13 A. So competitor event 7 and competitor event 8 are
14 always used together in this model. Event 7 says if a
15 competitive product launches, in this case Lumryz, the
16 market grows a little bit. Because you've got a little bit
17 more activity in the market, more marketing to physicians,
18 that market will grow a little bit because of that. And
19 we're growing the oxybate market because it's another
20 oxybate product. So there's a small growth in the market.
21 You can kind of think of that as the size of the pie is
22 getting a little bit bigger because there's another product
23 there that's marketing.
24 Q. Okay. And is that size of the pie -- that increase
25 in the size of the pie already included in the numbers we

469

1  looked at related to competitor launch event 8?

2  A.    Yes, it is.  As I said, these events are sequential,

3  so step 7 happens and then what happens in 7 impacts 8.

4  Q.    Okay.  And so if I'm understanding you correctly,

5  when events 7/8 are turned on, that shows what would happen

6  if Lumryz launched as in June of 2023.  Is there a way to

7  show Jazz's forecast for revenue if Lumryz did not launch in

8  June of 2023?

9  A.    Yes, in this model, if you turn both events 7/8 to

10  "no," they're not turned on, Lumryz does not launch in this

11  model, and you see a different forecast for our products

12  without Lumryz on the market.

13  Q.    Okay.  So let's go ahead to the next slide, PDX5.5.

14         And it says here with events 7/8 on -- I just

15  want to direct your attention to row 441.  Can you say --

16  can you just tell the jury what this is showing on this

17  slide in row 441?

18  A.    So row 441 is the total revenues that Jazz gets from

19  our oxybate products in narcolepsy and it's by month, so

20  each cell is a month.

21  Q.    Okay.  And the fact that events 7/8 are on for this,

22  what does that mean?

23  A.    That means that Lumryz has launched in this scenario.

24  Q.    So let's just look at an example here.  Maybe let's

25  pick six months from now.  Under this base case, what was

470

1  Jazz's expected revenue for August 2024 with Lumryz on the

2  market?

3  A.    So for August 2024 with Lumryz on the market, we

4  anticipated that our revenues from our oxybate products in

5  narcolepsy to be $138 million.

6  Q.    Okay.  So let's go ahead and look at this with

7  events 7/8 off, where Lumryz has not launched, if we could

8  go to the next slide PDX5.6.

9  A.    So similar setup for this.  Both events are off, it

10  means that Lumryz does not launch.  Our revenues for

11  narcolepsy and oxybate would be $148 million in August of

12  2024.

13  Q.    Okay.  And so probably don't need to be a finance guy

14  to do this math, but for August of 2024, how much less in

15  revenue is Jazz receiving for its oxybate products with

16  Lumryz on the market as opposed to without Lumryz on the

17  market?

18  A.    With Lumryz on the market, it would be about

19  $10 million less.

20  Q.    And that's a monthly impact?

21  A.    That's correct.

22  Q.    Okay.  Now, would you be able to see the difference

23  for each month running through those comparisons in this

24  forecasted document?

25  A.    Yes, you would.

471

1  Q.    Okay.  And we're looking at six months from now,

2  August 2024.  What is the impact on Jazz's oxybate revenue

3  if you go further out in time?

4  A.    So the forecast -- the peak share would happen in

5  roughly three years, so you would expect the impact, and the

6  impact does increase over time.

7  Q.    And this is the forecast from the May/June 2023 time

8  period.  As of that time period, does this reflect what Jazz

9  was forecasting on a monthly basis that the launch of Lumryz

10  would have on the revenue for its oxybate products in the

11  narcolepsy space?

12  A.    Yes, it does.

13  Q.    And does this forecast, this base case forecast,

14  reflect Jazz's best thinking during that timeframe?

15  A.    Based upon the information we had at the time, that

16  would be our best thinking.

17  Q.    And was there anything that we discussed today that

18  was made for the purposes of litigation in that forecast?

19  A.    No.

20  Q.    Thank you, Mr. Mindus.

21         MS. THOMPSON:  I have no further questions.

22         MR. SILVER:  Your Honor, we have no questions

23  for this witness.

24         THE COURT:  All right.  No cross-examination.

25  You may step down.  Thank you, sir.

472

1         MR. PORTER:  Your Honor, Jazz calls Mr. Divis,

2  Mr. Greg Divis.

3         THE COURT:  All right.  Mr. Divis, please take

4  the stand.

5         GREGORY J. DIVIS, having been called on the part

6  and behalf of the Plaintiff as a witness, having first

7  affirmed to tell the truth, testified as follows:

8         DIRECT EXAMINATION

9         MR. PORTER:  May it please the Court.  Your

10  Honor, before we get started, I'd like to introduce JTX0085,

11  JTX0086, and PTX1901.  I don't believe there are any

12  objections to those documents.

13         MS. DURIE:  No objection.

14         THE COURT:  All right.  JTX0085, JTX0086, and

15  PTX1901 are admitted.

16         (Exhibits admitted.)

17         MR. PORTER:  Thank you, Your Honor.

18  BY MR. PORTER:

19  Q.    Good afternoon.

20  A.    Good afternoon.

21  Q.    How are you today?

22  A.    Doing well, thank you.

23  Q.    Please tell the jury your name.

24  A.    My name is Greg Divis.

25  Q.    And where do you work, sir?

473

1    A.    I work at Avadel Pharmaceuticals.

2    Q.    Now, Mr. Divis, during the course of this lawsuit,
3    you were deposed; is that correct?

4    A.    Yes, that's correct.

5    Q.    I believe my partner, Frank Calvosa, deposed you; is
6    that correct?

7    A.    Yes, he did.

8    Q.    And we have a copy of your deposition today just in
9    case we need to refer back to it, it should be in the back
10   of your binder.

11   A.    Thank you.

12   Q.    Okay.  All right.  Now, Mr. Divis, you joined Avadel
13   in 2017: true?

14   A.    Yes, that's true.

15   Q.    And you were hired as the chief commercial officer;
16   yes?

17   A.    Yes.

18   Q.    And you held that role until spring 2018, correct?

19   A.    Yes.

20   Q.    And you were then made the chief operating officer,
21   correct?

22   A.    Yes.

23   Q.    And you held that role until January 2019; yes?

24   A.    Yes.

25   Q.    Then you were named interim CEO, correct?

474

1    A.    Yes.

2    Q.    You held that role until May 2019; yes?

3    A.    Yes.

4    Q.    So an interim CEO is someone who leads a company for
5    a temporary time, correct?

6    A.    Yes.

7    Q.    And then in May, Avadel decided that your role was
8    not going to be temporary and they made you the full-time
9    CEO: true?

10   A.    Yes, that's true.

11   Q.    And that's the role that you currently have today;
12   yes?

13   A.    Yes.

14   Q.    Okay.  And now, although you're the CEO of a
15   pharmaceutical company, you don't have any degrees or formal
16   training in science or medicine, correct?

17   A.    Yes, that's correct.

18   Q.    Okay.  And you're not a medical doctor, right?

19   A.    I am not.

20   Q.    Okay.  And your degree is in communications: true?

21   A.    Yes.

22   Q.    And you came to Avadel from a private equity firm;
23   true?

24   A.    Yes, that's true.

25   Q.    Okay.  And now this trial, as you know, involves an

475

1    Avadel drug called Lumryz, correct?

2    A.    Yes.

3    Q.    And you, yourself, did not formulate Avadel's Lumryz
4    product: true?

5    A.    No, I did not formulate it.

6    Q.    Okay.  And before January 2019, when you became
7    interim CEO, you had zero responsibilities with respect to
8    the formulation of Avadel's Lumryz product, correct?

9    A.    That is correct.

10   Q.    Okay.  And since you became CEO in January of 2019,
11   first on an interim basis and then permanent, there are
12   still others who are more knowledgeable about Avadel's
13   Lumryz formulation than you: true?

14   A.    Yes, that's true.

15   Q.    All right.  Now, Flamel and Avadel are two companies
16   that merged into a single company called Avadel, right?

17   A.    Not technically.

18   Q.    Okay.  Flamel -- Flamel was the original company,
19   right?

20   A.    Yeah, Flamel was a French-based company.

21   Q.    Right, and then Avadel came and acquired that
22   company?

23   A.    No, that's not what happened.

24   Q.    Okay.

25   A.    What happened was Flamel was based in France and as a

476

1    publicly traded company, there are certain governance
2    requirements that you need to match up with NASDAQ.

3    Q.    Okay.

4    A.    And they were beginning to kind of run afoul between
5    NASDAQ and the French Stock Exchange, if you will.  So the
6    company did what was called a cross-border merger, which was
7    really just moving the company's corporate entity, if you
8    will, from France to Ireland.

9    Q.    Okay.  So it was getting in trouble in France so it
10   moved to Ireland?

11   A.    No, it wasn't in trouble in France.

12   Q.    Well, okay, you said it was having some issues with
13   the French regulatory, but regardless, when we say "Flamel,"
14   that's Avadel today, correct?

15         MS. DAVIS:  Objection, that counsel is not
16   permitting him to answer the question.

17         MR. PORTER:  Your Honor, I think I actually let
18   him go on.  I didn't stop him when he went beyond the scope
19   of my original question, I think I'm being very courteous.

20         THE COURT:  Okay.  Let's see.  There was a
21   question posed that -- your last question he didn't get a
22   chance to answer.  He said -- the question was:  "Well, you
23   said it was having some issues with French regulatory, but
24   regardless, when we say --

25         MR. PORTER:  Right.

477

1    THE COURT:  -- "Flamel," that's Avadel.

2    MR. PORTER:  Right, because my question was,

3    they got in trouble with the French government?  He said no,

4    that's not true, and so that's when I moved on.

5    THE COURT:  He didn't get a chance to answer

6    that before you jumped in, so just be sensitive to that.

7    MR. PORTER:  Yes, Your Honor.

8    THE COURT:  Ask the witness a question, give him

9    a chance to answer it.

10    MR. PORTER:  Yes, Your Honor.

11   BY MR. PORTER:

12   Q.    Now, you have no first-hand knowledge of anything

13   that occurred at Avadel or Flamel before you joined the

14   company in 2017, correct?

15   A.    Yeah, that's correct.

16   Q.    Okay.  Now, as CEO of Avadel, your base salary is a

17   little over $600,000 a year, correct?

18   A.    That is correct.

19   Q.    And then on top of that, you are paid something

20   called a "target bonus"; true?

21   A.    That is true.

22   Q.    And a target bonus is an incentive bonus that

23   executives can get if they meet certain performance

24   criteria, right?

25   A.    Yes, that's true.

478

1    Q.    And your target bonus is about $360,000, correct?

2    A.    Yes.

3    Q.    So that's on top of your $600,000 base, correct?

4    A.    Yes.

5    Q.    And you own approximately 149,100 shares of Avadel's

6    shock; true?

7    A.    Yes.

8    Q.    And outside of those shares, one of the perks of your

9    job is that if Avadel's shares increase to a certain price,

10   you have the option to buy even more stock, correct?

11   A.    Yes.

12   Q.    Okay.  So you have an incentive for Avadel's share

13   price to rise; true?

14   A.    Yeah, that's true.

15   Q.    Okay.  And also, currently, part of your compensation

16   is based on the success of Avadel's Lumryz product; true?

17   A.    Yes, that's true.

18   Q.    Okay.  And your compensation going forward, including

19   in terms of stock, is also tied to the success of Avadel's

20   Lumryz product; right?

21   A.    Yes, in a meaningful part, yes.

22   Q.    Okay.  All right.  Let's talk some now about Lumryz.

23        Now, Mr. Divis, Avadel's only commercial product

24   as of today is Lumryz; true?

25   A.    Yes, that's true.

479

1    Q.    But at one point Avadel had seven other commercial

2    products on the market; true?

3    A.    Yeah, that's true as well.

4    Q.    And when you became interim CEO in 2019, there was a

5    decision made to sell off all of those commercial products;

6    true?

7    A.    Yes, that decision was really centered around --

8    Q.    Mr. Divis, that was my question, and you answered it.

9    A.    Okay.

10   Q.    Your counsel can redirect you on that.

11   A.    Okay, thank you.

12   Q.    Okay.  So it's very, very important to Avadel that

13   Lumryz succeed, right?

14   A.    Yes.

15   Q.    Okay.  Now, before the Lumryz product had that name,

16   I think we -- you've been sitting here this entire time in

17   trial, right?

18   A.    I have.

19   Q.    Yeah, okay.

20        And so you know that Avadel originally referred

21   to Lumryz as "FT218," correct?

22   A.    Yes.

23   Q.    Okay.  And to be clear, Jazz did not have any input

24   into Avadel's decision to focus singularly on what was FT218

25   during the time period beginning in January 2019, correct?

480

1    A.    Not directly, no.

2    Q.    Okay.  And that was Avadel's decision, right?

3    A.    It was, yes.

4    Q.    Okay.  And Avadel in 2018 through the early part of

5    2019, had explored the opportunity to actually partner with

6    Jazz on the development and commercialization of FT218,

7    right?

8    A.    Yeah -- yes, we did.

9    Q.    Okay.  And those discussions had a nickname, correct,

10   we've seen it here?

11   A.    Yes.

12   Q.    Project Zeta?

13   A.    Yes.

14   Q.    Okay.  But Jazz wasn't the only company Avadel looked

15   to potentially partner with during that time; true?

16   A.    That's true.  We talked with Jazz for a number of

17   months and then we reached out to other parties.

18   Q.    Well, in fact, Avadel's bankers, Jefferies -- you

19   know who Jefferies is, right?

20   A.    I do.

21   Q.    It's an investment bank, correct?

22   A.    Yes, they are.

23   Q.    Okay.  And it's an investment bank that Avadel

24   retained, right?

25   A.    Yes, we did.

481

1    Q.    Okay.  And Jefferies, on behalf of Avadel, approached
2    43 different companies about partnering on FT218, didn't it?
3    A.    Yes, they did.
4    Q.    Okay.  And Avadel kept contact logs of this process,
5    correct?
6    A.    Jefferies kept them, but they shared them with us,
7    yes.
8    Q.    Well, Avadel kept the logs that were shared by
9    Jefferies, correct?
10   A.    Yes, yes.
11   Q.    Okay, because, again, Jefferies was out there on
12   Avadel's behalf shopping Lumryz; true?
13   A.    Yes, they were.
14   Q.    Okay.  Now, if you could go with me, sir, it is -- it
15   should -- in your binder PTX338.
16          MR. PORTER:  And, Your Honor, I would now move
17   to enter that exhibit into evidence.  I don't believe
18   there's an objection.
19          MS. DAVIS:  No objection.
20          THE COURT:  All right.  PTX338 is admitted.
21          (Exhibit admitted.)
22   BY MR. PORTER:
23   Q.    And you see, sir, this is for -- it says -- it's
24   January 2019, "Project Zeta, update on buyer outreach and
25   interest."

482

1          Do you see that, sir?
2    A.    Yes, I do.
3    Q.    Okay.  And in the bottom left-hand corner, it says,
4    "Jefferies LLC," correct?
5    A.    Yes.
6    Q.    Okay.  So this is one of those logs that we were just
7    talking about, right?
8    A.    Yes.
9    Q.    Okay.  Now, if we could go to the next page, please.
10   I'm sorry 0.3.  338.3.  Great.
11          Just to kind of orient everyone, buyers, when
12   we're talking about buyers, that's talking about the
13   companies that Jefferies approached on behalf of Avadel
14   regarding Lumryz, right, regarding the potential to partner
15   up on Lumryz, correct?
16   A.    Yes.
17   Q.    Okay.  And Project Zeta, although it started as the
18   code name for the engagement with Jazz, again, eventually
19   became the code name for the consideration with these other
20   companies, too, right?
21   A.    I believe so, yes.
22   Q.    Okay.  So you see, sir, the -- where it says, "the
23   process update"?
24   A.    Yes.
25   Q.    Okay.  If we could go up just one, just one more,

483

1    Derreck.
2          MR. PORTER:  Let's go ahead and grab all this,
3    yeah.
4    BY MR. PORTER:
5    Q.    So it says, "Jefferies, in consultation with
6    management, developed a list of potential buyers and drafted
7    non-confidential marketing materials."
8          Correct?
9    A.    Yes.
10   Q.    And then it notes that Jefferies began a targeted
11   outreach buyer -- a targeted buyer outreach process in
12   October 2018 with additional parties contacted in
13   January 2019 aimed at companies with a focus on CNS, sleep,
14   Orphan, or specialty products, correct?
15   A.    Yeah, at that point we thought perhaps --
16   Q.    I just -- did I read that correctly?
17   A.    Oh, yes, you did.
18   Q.    Okay.  Now, it also notes that Jefferies contacted 43
19   potential buyers to date, all of whom were offered
20   introductory calls with Jeffries to provide an overview of
21   the opportunity, correct?
22   A.    Yes.
23   Q.    Okay.  So, again, right now this is, this is the 43
24   buyers that we've talked about, the potential buyers that
25   Jefferies --

484

1    A.    Targeted.
2    Q.    -- targeted, right?
3          So, again, it was not just Jazz; true?
4    A.    No, it was just Jazz until October.
5    Q.    Okay.  And then we see -- could you pull it back out.
6    You could see where it says, "15 parties are still reviewing
7    the opportunity"?
8    A.    Oh, yes.
9    Q.    Okay.
10   A.    Yes.
11   Q.    And then it notes that 24 parties have declined,
12   correct?
13   A.    Yes, they did.
14   Q.    Okay.  So -- so as of January 2019, 24 companies said
15   no, thank you, right?
16   A.    Yeah, 24 passed.
17   Q.    All right.  Now, on the next page, 338.4, it's titled
18   Summary of Buyer Outreach and Interest, and then this is the
19   chart of these different companies, right?
20   A.    Yes, yes, it is.
21   Q.    Okay.  And just to be clear, the market leader here,
22   there's only one we have, and that's Jazz Pharmaceuticals,
23   right?
24   A.    Yes, that's right.
25   Q.    Okay.  And then we have the other folks in different

485

1   categories.  But the market leader in sleep is Jazz
2   Pharmaceuticals, true?
3   A.    Yeah, that's how we thought about it at the time,
4   yes.
5   Q.    That's how you thought about it, all right.
6         Now, coming back to our discussion about
7   Avadel's outreach to Jazz, those discussions never got
8   beyond the term sheet, correct?
9   A.    No, they didn't.
10  Q.    Okay.  And essentially, sir, in business, a term
11  sheet, it's basically a nonbinding agreement that sets forth
12  the basic terms and conditions of an investment, true?
13  A.    You negotiate that back and forth --
14  Q.    Right.
15  A.    -- to see if you can come to agreement on the terms.
16  Q.    Correct.  Okay.  So I'd like to talk for just a
17  moment about the Project Zeta term sheet.
18        So the scope of the contemplated work included
19  completing the development work on FT218, correct?
20  A.    Yes, that's correct.
21  Q.    Okay.  So, again, translated, that means that Jazz
22  and Avadel were discussing working together on Lumryz; true?
23  A.    Yes, that's true.
24  Q.    Okay.  At that time, when these discussions were
25  going on, there was something called a clinical efficacy

486

1   trial that FT218 went through, correct?
2   A.    Yes.
3   Q.    Okay.  And basically a clinical efficacy trial is a
4   trial to see if a drug works, right?
5   A.    If it's safe and effective and meets the standard of
6   the FDA.
7   Q.    Right.  And the first round of clinical efficacy
8   trial for Lumryz was called REST-ON, correct?
9   A.    Yes.
10  Q.    Okay.  And Project Zeta was so early in Lumryz's
11  development that at the time of the term sheet, there'd been
12  no data from Avadel's REST-ON study yet, correct?
13  A.    Yeah, the study had not completed at that point.
14  Q.    Okay.  And, in fact, at the time of the term sheet,
15  Avadel had not even filed any New Drug Application to the
16  FDA or food, drug administration for FT218, correct?
17  A.    Yeah, that's correct as well.
18  Q.    Okay.  And there had been no FDA approval for FT218
19  at that time: is that right?
20  A.    That's right.
21  Q.    Yeah.  And, in fact, at the time of the term sheets,
22  Avadel didn't even have any of the issued patents that it
23  now claims covers Lumryz; true?
24  A.    I do believe that's true as well.
25  Q.    Okay.  Now, you know that there's a FDA publication

487

1   called the Orange Book; true?
2   A.    Yes.
3   Q.    Okay.  And, basically, the Orange Book, it's kind of
4   like -- well, it used to be a book but now it's like an FDA
5   website where it kind of -- and it has -- it used to have an
6   orange cover, right?
7   A.    Yes.
8   Q.    Okay.  And it contains lots of information about
9   drugs, including a list of patents that cover the drugs
10  approved by the FDA: true?
11  A.    Yeah, that's true.
12  Q.    Okay.  But Project Zeta was so early in the
13  development of FT218 that Avadel didn't even have its first
14  Orange Book patent yet, did it?
15  A.    You cannot have that until you have an FDA approval.
16  Q.    Exactly.  Okay.  So let's move now and talk a little
17  bit about Avadel's actual -- putting Lumryz on the market:
18  is that okay, sir?
19  A.    Sure.
20  Q.    Okay.  Now, Avadel did eventually develop FT218 or --
21  you know FT218 is Lumryz, we can call it interchangable,
22  right?
23  A.    Yes.
24  Q.    All right.  And it did ultimately file a New Drug
25  Application or NDA with the FDA, correct?

488

1   A.    Yes, we did.
2   Q.    Okay.  I'm trying to keep all my Ds and As straight.
3   A.    Understood.
4   Q.    All right.  But the type of application that Avadel
5   filed for Lumryz is what's known as a 505(b)(2) New Drug
6   Application: true?
7   A.    Yes, we did, that's the pathway.
8   Q.    Okay.  And that 505(b)(2) NDA that Avadel used is one
9   in which a company says that its drug is similar to a
10  reference-listed drug that the FDA has already approved;
11  true?
12  A.    Yeah, it's a pathway the FDA has created for our
13  industry, yes.
14  Q.    Right.  And so as part of its 505(b)(2) application,
15  Avadel actually relied on certain studies done for Jazz's
16  Xyrem product, true?
17  A.    Yes, we did, we relied on preclinical data and some
18  of the safety data, yes.
19  Q.    Okay.  And because Jazz's Xyrem was the
20  reference-listed drug that Avadel referenced in its New Drug
21  Application, right?
22  A.    Yes, that's correct.
23  Q.    Okay.  And because Avadel relied on those studies
24  done for Jazz's Xyrem product, the clinical study work that
25  Avadel had to do to actually get approval for Lumryz, it was

489

1   less than would have otherwise been required; true?

2   A.     Yeah, I think that's true if you took the b)(1)
3   pathway.

4   Q.     Okay.  Right.  So this was a benefit to Avadel,
5   right?

6   A.     Yeah, it's a pathway the FDA allows companies to
7   take.

8   Q.     Okay.  All right.  So early in the process of making
9   Lumryz, Avadel tried to get Jazz to help, and then it relied
10  on Jazz's clinical work for Xyrem to ultimately bring Lumryz
11  to the market, right?

12  A.     Well, we looked at exploring the partnership with
13  Jazz for sure.

14  Q.     Right.

15  A.     And the decision to file a 505(b)(2) was well in
16  advance of ever discussing it --

17  Q.     Right.  But, again, you still received the benefit of
18  using Jazz's drug Xyrem in your drug application, true?

19  A.     Some of the data in that -- in their NDA, yes.

20  Q.     Okay.  Let's talk a little bit more about Lumryz.  So
21  Avadel's Lumryz product, you know, sir, that it has the same
22  sodium content as Jazz's Xyrem product; true?

23  A.     Yes, that's true.

24  Q.     And, again, you know that Jazz has a -- you've been
25  sitting here, so you know that Jazz has another narcolepsy

490

1   drug called Xywav, right?

2   A.     Yes.

3   Q.     Okay.  And you understand that a difference between
4   Jazz's Xyrem product and Jazz's Xywav product is that Xywav
5   has 92 percent less sodium than Xyrem, true?

6   A.     That's true.

7   Q.     Okay.  And you know, sir, that the FDA determined
8   that Jazz's Xywav product is clinically superior to Xyrem
9   because it has significantly less sodium, right?

10  A.     I'm aware they got orphan exclusivity, yes.

11  Q.     Right.  And -- and, well, just to be clear, I think
12  you threw in some words.  I just want to be clear, you know
13  that the FDA determined that Xywav is clinically superior to
14  Xyrem because it has significantly less sodium: you know
15  that, right?

16  A.     Yeah, under the orphan exclusivity provisions, yes,
17  that was the standard.

18  Q.     Okay.  I know you want to throw in some words.  But
19  do you -- setting aside orphan exclusivity, would you agree
20  with me, just yes or no, that the FDA determined that Xywav
21  was clinically superior to Xyrem because it has
22  significantly less sodium, do you agree with that?

23  A.     It is a yes, I do agree with that --

24  Q.     Okay.

25  A.     -- under the orphan provision, that's -- was the

491

1   granting of it, under the orphan drugs.

2   Q.     Okay.  Now -- so that's a comparison between Xywav
3   and Xyrem, right?

4   A.     Yes.

5   Q.     Okay.  And Xyrem has the same amount of sodium as
6   Lumryz, doesn't it?

7   A.     Yes, it does.

8   Q.     Okay.  And, sir, to be clear for the jury, you're not
9   aware of any head-to-head safety study between Avadel's
10  Lumryz product and Xywav, correct?

11  A.     No, I -- no safety studies, no.

12  Q.     Okay.  And the FDA has never determined that Avadel's
13  Lumryz product has greater safety than either of Jazz's
14  Xyrem or Xywav products, correct?

15  A.     No, the FDA determined clinical superiority on a
16  major contribution to patient care.

17  Q.     Okay.  And my -- okay.  And I just want to be clear.
18  The FDA has never determined that Avadel's Lumryz product
19  has greater safety than either of Jazz's Xyrem or Xywav
20  products: true?

21  A.     Yeah, that's correct.

22  Q.     Okay.  And the FDA also has never determined that
23  Avadel's Lumryz product has greater efficacy than Jazz's
24  Xyrem or Xywav products, true?

25  A.     That's correct as well.

492

1   Q.     Okay.  And so in layman's terms, that means that the
2   FDA has never determined that Xyrem works better -- I'm
3   sorry, has never determined that Lumryz works better than
4   Xyrem and Xywav, correct?

5   A.     Not based on safety or efficacy, correct.

6   Q.     Okay.  Now, if you could turn with me to what's tab
7   number -- I'm sorry, JTX142 in your notebook, sir.

8          MR. PORTER:  And, Your Honor, I'd move to admit
9   JTX142 into evidence.  I don't believe that there's any
10  objection.

11         MS. DAVIS:  No objection.

12         THE COURT:  JTX142 is admitted.

13         (Exhibit admitted.)

14  BY MR. PORTER:

15  Q.     And if we go -- Mr. Divis, if you could go to -- you
16  see the little points there, like .1, .2, if you go to
17  142.34.

18  A.     .34?

19  Q.     Yes, sir.

20  A.     Yes.

21  Q.     Okay.  So we -- we see here, sir, that the FDA issued
22  a finding, as you noted, of clinical superiority for
23  Avadel's Lumryz product because it made a major contribution
24  to patient care over Jazz's Xyrem and Xywav products: is
25  that right?

493

1  A.   Yes, the FDA determined it to be clinically superior
2  to both Xyrem and Xywav on that basis of major contribution
3  to patient care.
4  Q.   Right, major contribution to patient care.
5       And that major contribution is that Lumryz, as a
6  once-nightly treatment, eliminates the need for patients to
7  have a nocturnal or a forced nighttime awakening to take a
8  second dose of oxybate, correct?
9  A.   Yes, that's what they said.
10  Q.  Right.  And -- and Jazz's Xyrem and Xywav are not
11  once-nightly treatments for symptoms of narcolepsy, correct?
12  A.  Correct, they're not.
13  Q.  Okay.  And to be clear, Lumryz is a once-at-bedtime?
14  A.  Yeah, once at bedtime.
15  Q.  Once at bedtime.  Okay.
16       Now, Avadel is able to achieve the
17  once-at-bedtime treatment of the symptoms of narcolepsy
18  through a combination of immediate-release and
19  controlled-release products in the Lumryz product, correct?
20  A.  Yeah, the microparticles, yes.
21  Q.  Okay.  And so in Avadel's view, because that helps
22  you to -- in other words, immediate release is you quickly
23  go to sleep, right?
24  A.  Yes, that's correct.
25  Q.  And then at some point later in the night, it's

494

1  triggered and more of it gets released, correct?
2  A.  Correct.
3  Q.  To help you stay asleep, correct?  To help patients
4  stay asleep, right?
5  A.  I think really deliver the full therapeutic dose --
6  Q.  Yeah, yeah.
7  A.  -- in one administration --
8  Q.  Correct.
9  A.  -- which is to --
10     (Reporter clarification.)
11 BY MR. PORTER:
12 Q.  So in Avadel's view, Lumryz does not cause insomnia,
13 right?
14 A.  Yes, Lumryz does not cause insomnia.
15 Q.  Right.  And just to be clear, insomnia basically is
16 another way to say inability to sleep, right?
17 A.  Correct.
18 Q.  Okay.  Because if Lumryz did cause insomnia, that
19 would be the exact opposite of sleeping through the night,
20 right?
21 A.  Yes.
22 Q.  Okay.  But as the CEO of Avadel, you, sir, are
23 familiar with the adverse events for Lumryz; true?
24 A.  Yeah.
25 Q.  Okay.

495

1  A.  Generally, I am, yes.
2  Q.  And adverse events are undesirable side effects,
3  right?
4  A.  Yeah, they can be drug related or not, but, yeah,
5  they are adverse events, yes.
6  Q.  And you're aware that the FDA keeps a publicly
7  available database of reported adverse events for Lumryz,
8  correct?
9  A.  I am.
10 Q.  Okay.  And Lumryz hit the market in June 2023,
11 correct?
12 A.  Yes.
13     MS. DAVIS:  Objection, Your Honor, quick
14 sidebar.
15     (Whereupon, a discussion was held at sidebar as
16 follows:)
17     MS. DAVIS:  The objection is 403, yes, Your
18 Honor.  The discussion whether or not Lumryz is a good
19 product is not relevant to the -- the side effects of the
20 product, adverse effects have not been raised as an
21 issue in this case.
22     MS. DURIE:  And obviously it doesn't have
23 anything to do with patent infringement.
24     MR. CERRITO:  Of course they are going to come
25 in and tell you how great the product is.  It's exactly why

496

1  you objected to him.  Once he's in, then we never -- the
2  witness right here, same information.
3      MR. PORTER:  It's very limited and I'll be quick
4  about it, Your Honor, and so...
5      THE COURT:  Okay.  Dr. Corser, he is going to
6  testify about Lumryz and the good effects and all that, so
7  it's relevant.
8      MR. CERRITO:  Thank you, Your Honor.
9      (Whereupon, the discussion held at sidebar
10 concluded.)
11 BY MR. PORTER:
12 Q.  Okay.  So, Mr. Divis, we left off that Lumryz hit the
13 market in June 2023, true?
14 A.  Yes.
15 Q.  Okay.  And in 2023, there were roughly 1,000 patients
16 on Lumryz, correct?
17 A.  Could you repeat that date?
18 Q.  In 2023, so once it hit the market.
19 A.  Yeah, really as we -- as we exited, I guess, 2023, we
20 had initiated therapy, I think, on a little greater than
21 1,000 patients.
22 Q.  Okay.  And that -- in 2023, just last year, you know,
23 sir, that there were 293 adverse events reported, correct?
24 A.  I don't know the exact number, but...
25 Q.  Sound about right?

497

1   A.      I don't -- I have no basis to dispute it.

2   Q.      Okay.  And, again, that's out of about 1,000

3   patients?

4   A.      Yeah, an "adverse event" is a fairly broad term in

5   terms of what one could or couldn't be --

6   Q.      Okay.

7   A.      -- but we take the position to err on the side of

8   over reporting.

9   Q.      Okay.  Now, do you know that over 160 of those 293

10  reports of adverse events included insomnia as the adverse

11  event?

12  A.      Again, patients will report what their adverse event

13  was.  The data I referred to was in our packaging, sort of

14  our label, but, yeah, I don't know the details, but I

15  believe you.

16  Q.      Okay.  So, again, that's the -- well...

17          Having -- taking a once-at-bedtime drug, that

18  was the clinical -- that was the purpose for the clinical

19  superiority finding from the FDA that we just saw, right,

20  that the FDA found for Lumryz over Xyrem and Xywav, right?

21  A.      By eliminating the middle-of-the-night dosing --

22  Q.      Yeah.

23  A.      -- you eliminated having to forcibly awaken in the

24  middle of the night in a fairly precise window to take the

25  second dose, yes.

498

1   Q.      Right.  But if you're staying up all night, that's

2   not a good thing, is it?

3   A.      No, it wouldn't be.

4   Q.      Okay.  But Avadel doesn't include insomnia as an

5   adverse event on its Lumryz drug label, correct?

6   A.      That's correct, because our pivotal trial did not

7   show that --

8   Q.      Right.

9   A.      -- we caused insomnia.

10  Q.      Right.  But in the real world, you're seeing

11  insomnia, there are reports of insomnia?

12  A.      Yeah.

13  Q.      Okay.

14  A.      Apparently, yes.

15  Q.      All right.  Now, let's look at what Lumryz -- I'm

16  sorry.  Let's look at what Avadel does say about Lumryz.

17          Now, some drugs, sir, you know, come with a

18  package insert, right, and that's the piece of information

19  in the box that gives you information on the medicine and

20  how to use it, right?

21  A.      Yes.

22  Q.      Okay.  If you could turn with me to JTX87 in your

23  binder.

24          MR. PORTER:  And, Your Honor, I would move to

25  admit JTX87 into evidence.  I don't believe there's an

499

1   objection.

2           MS. DAVIS:  No objection.

3           THE COURT:  JTX87 is admitted.

4           (Exhibit admitted.)

5   BY MR. PORTER:

6   Q.      Now, Mr. Divis, you are familiar with this -- you're

7   familiar with this package insert; is that correct?

8   A.      Yes.

9   Q.      Okay.  This is -- this is the package insert for

10  Lumryz, right?

11  A.      Yeah, FDA approved, yes.  After it was FDA

12  approved --

13  Q.      Right.

14  A.      -- it came with our approval, yes.

15  Q.      Okay.  And to your knowledge, this is the most

16  up-to-date pack- -- insert for Lumryz, correct?

17  A.      To my knowledge, yes.

18  Q.      Right.  And this package insert has instructions --

19  even on this insert, it actually has instructions on how

20  doctors can switch patients from twice-nightly oxybate to

21  Avadel's once-nightly Lumryz oxybate product, correct?

22  A.      Yeah, the FDA approved and included that language,

23  just to be clear, if someone was going to switch, this is

24  how they would recommend you do it.

25  Q.      The FDA added that language or Avadel --

500

1   A.      Well, the FDA approved that language.

2   Q.      But to be clear, the FDA didn't add that language;

3   that's Avadel's language.

4   A.      Yeah, I'm pretty sure we included it initially.

5   Q.      Right.

6   A.      Yes.

7   Q.      Okay.  And if we go to section 2.3 on this insert,

8   and that's on 87.3.

9           Okay.  And right here we see, "Switching

10  Patients from Immediate-Release Sodium Oxybate."

11          You see that?

12  A.      Yes.

13  Q.      Okay.  And, again, these are instructions that you

14  have right there for doctors to use, correct?

15  A.      Yeah, it's in our --

16  Q.      Okay.

17  A.      -- prescribing information.

18  Q.      Now, there are -- you know in your role that there

19  are roughly 16,000 patients on twice-nightly oxybate

20  products, true?

21  A.      Yeah, that's how we estimate it.  Yes.

22  Q.      Okay.  And I'm sorry, Mr. Divis.  Were you done?

23  A.      Yes.

24  Q.      Okay.  And -- because if I ever talk over you, I

25  don't mean to.  I'm just trying to -- I'm -- even though I'm

501

1  A.     from Houston, I talk fast.

2  A.     No worries.

3  Q.     Okay.  Now, switching patients from twice-nightly

4  oxybate product to Avadel's once-nightly oxybate product is,

5  in your words, certainly a goal for Avadel, isn't it?

6  A.     Yes, it's one of our primary goals and strategies,

7  amongst a few.

8  Q.     Right.  Because according to you, sir, it would be in

9  Avadel's financial benefit to switch as many of those

10  roughly 16,000 patients who are currently on twice-nightly

11  oxybate to once-nightly oxybate, correct?

12  A.     It certainly would, but, you know, ultimately that

13  decision is with the patient and physician, yes.

14  Q.     Right.  Right.  But the decision that would be made

15  would benefit Avadel financially, correct?

16  A.     Yes.

17  Q.     And also you personally, correct, because of the

18  bonus and the stocks?

19  A.     Yes.

20  Q.     Okay.  Now, Mr. Divis, one of the patient populations

21  Avadel targets, it's people who have never taken an oxybate,

22  right?

23  A.     Yes, that's correct.

24  Q.     Okay.  And another category would be people who tried

25  twice-nightly oxybates but stopped using them, correct?

502

1  A.     Yeah, that's another pretty large cohort of patients,

2  yes.

3  Q.     Right.  But Avadel really puts a lot of focus on

4  taking current Jazz Xyrem/Xywav patients and switching them

5  over, trying to switch them over to Lumryz, right?

6  A.     Well, I think we focus on all three of those patient

7  groups, and that's really a physician decision as to when

8  they want to think about initiating a patient on Lumryz, but

9  all three are important from our standpoint.

10  Q.     Okay.  Now, Mr. Divis, you're familiar with Avadel's

11  Lumryz commercial day presentation, correct?

12  A.     Yes.

13  Q.     Okay.  And you remember the event when Avadel had a

14  couple of doctors actually come and speak to investors?

15  A.     Yes.

16  Q.     Okay.  And this was an event that Avadel had in

17  connection with its launch of Lumryz, correct?

18  A.     Yeah, it was about three weeks later.

19  Q.     Okay.

20  A.     Yes.

21  Q.     And it was called Investor Day, true?

22  A.     Yes.

23  Q.     Okay.  And it was called Investor Day because this

24  was the day that Avadel was telling investors how much money

25  Avadel thought it was going to make off of Lumryz, correct?

503

1  A.     Not exactly.  If I may, it was really a day where we

2  had -- we hadn't in the past really described all the kind

3  of insights that we had learned over the previous couple of

4  years as we were waiting to get an FDA approval, and so we

5  really wanted to share with investors how we thought about

6  the markets and the patients and the opportunity for Lumryz,

7  but also allow them to hear from two really expert thought

8  leaders in the space and also from a patient who actually

9  had been in our trial and had some real-world experience of

10  Lumryz.

11  Q.     Okay.  Well, let's look at PTX300 and that's in your

12  notebook, sir.

13          MR. PORTER:  Your Honor, I move to admit PTX300

14  into evidence.  I don't believe there's any objection.

15          MS. DAVIS:  No objection.

16          THE COURT:  All right, PTX300 is admitted.

17          (Exhibit admitted.)

18  BY MR. PORTER:

19  Q.     Mr. Divis, you can use your notebook or the screen.

20  A.     Yeah, it's seems to work better on the screen, I'm

21  just trying to stay on that.

22  Q.     Thank you, sir.

23          Just to be clear for the jury, this is the slide

24  deck that Avadel used during its Investor Day on June 29,

25  2023, correct?

504

1  A.     Yeah, it -- yes, definitely appears to be so.

2  Q.     Okay.  And if you would go with me to PTX300.7.  One

3  of the things that Avadel was talking about to investors at

4  this day was "addressing clear and indisputable unmet need,"

5  correct?

6  A.     That's correct.

7  Q.     Okay.  And the "unmet need" is the opportunity for

8  patients to not have to awaken in the middle of the night to

9  take a second dose of oxybate to get their full course of

10  treatment, right?

11  A.     In simple terms, yes, we're really referencing some

12  data and two different sources of data.

13  Q.     Fair enough.  And I'm not trying to fuss with you,

14  I'm just -- that's just -- that's what it is, right?

15  A.     It is, generally correct.

16  Q.     That's what Avadel says, right?

17  A.     Yes.

18  Q.     Okay.  And Avadel believes that its Lumryz product

19  addresses that unmet need, correct?

20  A.     We do.

21  Q.     Okay.  And part of Avadel's commercial strategy is to

22  drive demand for Lumryz with current high-volume oxybate

23  prescribers, true?

24  A.     Yeah, that's true.

25  Q.     Okay.  And so those are the doctors that Avadel was

505

1  going to prioritize going after, right?

2  A.    Yeah, we prioritized those physicians who are

3  experienced with oxybates.

4  Q.    Okay.  And those current high-volume oxybate

5  prescribers would be prescribers of Jazz's twice-nightly

6  oxybate products or the authorized generic version of

7  twice-nightly oxybate that's also made by Jazz, right?

8  A.    Yes, they would be.

9  Q.    Okay.

10  A.    And they were also the major sources of those who

11  previously discontinued.  Who had discontinued the oxybates,

12  we know that roughly half discontinued after starting within

13  the first year.

14  Q.    Right.

15  A.    And then that's where new patents really start as

16  well.

17  Q.    Okay.  Now if you could go with me to 300.100.  Okay.

18        Now, we see here that Avadel is telling

19  investors that even if generics for first generation

20  twice-nightly sodium oxybate enters in 2026, Lumryz expects

21  continued growth, right?

22  A.    We do think over the long-term, we will continue to

23  grow, yes.

24  Q.    Okay.  And, in fact, some of the sales

25  representatives that Avadel hired to sell its Lumryz product

506

1  even previously worked for Jazz, right?

2  A.    I do believe there are three of them.

3  Q.    Okay.

4  A.    Yes.

5  Q.    And if we could -- if you could go with me to

6  PTX300.108.

7        Okay.  And you see where -- this is basically

8  their kind of "in summary" page.  And it says that -- this

9  is what you're telling investors again, right, the money

10  people, right?

11  A.    Yeah, those --

12  Q.    Yeah.

13  A.    -- our investors.

14  Q.    Right.

15  A.    Potential investors, yes.

16  Q.    Right.

17        So investors would be either people who have

18  given you money or potential investors would be people, you

19  want their money, right?

20  A.    Well, as a publicly traded company --

21  Q.    Yeah.

22  A.    -- we don't necessarily get their money unless, you

23  know --

24  Q.    Yeah, not fussing with you, just asking.

25  A.    I understand.

507

1  Q.    Okay.  Now it states here that, "Lumryz is off to a

2  strong start," right?

3  A.    Yes.

4  Q.    Okay.  And Avadel says that, "Lumryz has the

5  potential to become the leading oxybate in narcolepsy and

6  exceed $1 billion in annual sales," correct?

7  A.    Yeah, that's what our research tells us.

8  Q.    Yeah.

9  A.    And we think that potential is there for us.

10  Q.    Right.  And this is what you're telling the people

11  who either you have their money or you want their money?

12  A.    Investors, yeah.

13  Q.    Yeah, there you go.

14        Now let's go back for a second to when Lumryz

15  was first approved by the FDA, I believe you -- again, you

16  were here yesterday and you recall seeing the document, the

17  May 1st, the May 1st, 2023 --

18        MR. PORTER:  I'm sorry, this is already in

19  evidence, Your Honor, we'll just pull it up, the press

20  release.

21  A.    Yes.

22  BY MR. PORTER:

23  Q.    Okay.  And Avadel sent out a press release that day

24  talking about Lumryz, right?

25  A.    Yes.

508

1  Q.    And Avadel also hosted a conference call that day as

2  well, didn't it?

3  A.    Yes, we did.

4  Q.    And you were on that call, right?

5  A.    I was.

6  Q.    Okay.  I'm going to ask you turn to JTX118 in your

7  binder.  And just -- I'm not going to publish this so I'm

8  going to need you to --

9  A.    I need to find it, did you say JTX118?

10  Q.    Yes, sir, JTX118, I know these are a little hard to

11  follow.

12  A.    I have it.

13  Q.    Oh, you have it?

14  A.    I have it here, yes.

15  Q.    Okay.  Excellent.

16        Okay.  Could you go with me to JTX118.3.

17  A.    Yes, I'm here.

18  Q.    Okay.  And do you see about -- if you start at the

19  bottom, you see the, "Thank you, again, for joining us"?

20  A.    Yes.  Yes, I see that.

21  Q.    Okay.  If you go up a couple -- or, actually three,

22  you see the paragraph that starts with, "Until today..."?

23  A.    Yes, I see that.

24  Q.    Okay.  In that paragraph, you note that, "We believe

25  that Lumryz can positively impact the treatment experience

509

1  for all eligible treated patients, increasing oxybate

2  utilization overall and importantly so, helping even more

3  patients in the $3 billion plus once-at-bedtime oxybate

4  market."

5          Did I read that correctly, sir?

6  A.     Yes.

7  Q.     That's what you said, right?

8  A.     That's what I said, yes.

9  Q.     Okay.  And now you know, you know who Mr. Richard Kim

10  is, as well, correct?

11  A.     I do.

12  Q.     He is Avadel's chief operating officer?

13  A.     He's our chief commercial officer.

14  Q.     Chief commercial officer, okay.

15          And Mr. Kim spoke at this as well, didn't he?

16  A.     Yes, he did.

17  Q.     Okay.  And we're going to go to -- if you go with me

18  to 118.6.

19  A.     Okay.

20  Q.     If you see the fourth paragraph down starting

21  with, "Before I move on..."

22  A.     Yes.

23  Q.     Okay.  And do you see where Mr. Kim in that last

24  sentence he says, "We are pricing Lumryz on a per-gram basis

25  at parity with a branded twice-nightly mixed salt product to

510

1  be at $64.67 per gram"?

2  A.     Yes.

3  Q.     Okay.  And "by parity," he meant the same price per

4  gram, right?

5  A.     Yes.

6  Q.     Okay.  And so -- and the twice-nightly mixed salt

7  product he was referring to is owned by Jazz, right?

8  A.     Yes, it's Xywav.

9  Q.     Xywav, that's what he's talking about?

10  A.     Yes.

11  Q.     Okay.  So he's pricing Lumryz, which you take

12  once-nightly, the same as Xywav, which is the lower sodium

13  product -- Lumryz, you take once at bedtime; Xywav, which

14  you take twice, correct?

15  A.     Yes, that's correct.

16  Q.     Okay.  And Avadel also posted investor slides for the

17  May 1, 2023 call, correct?

18  A.     Yes.

19  Q.     Okay.

20  A.     We did.

21  Q.     If you'll go with me to PTX295.

22          MR. PORTER:  Your Honor, that may be in

23  evidence, but I move to admit now if not, and I don't think

24  there's an objection to that.

25          MS. DAVIS:  No objection.

511

1          THE COURT:  All right.  PTX295 is admitted to

2  the extent it hasn't been previously admitted.

3          (Exhibit admitted.)

4  BY MR. PORTER:

5  Q.     Whenever you're ready, Mr. Divis.

6  A.     I can see it on the screen as well, thank you.

7  Q.     So, Mr. Divis, these are the slides, right, that we

8  were just talking about?

9  A.     From?

10  Q.     From the May 1st -- the investor slides from the

11  May 1, 2023 call?

12  A.     We didn't have slides for the May 1st Investor Day,

13  we just had speaking points, if you will.  This would have

14  been -- I can help you -- tell you what this is if that's

15  beneficial.

16  Q.     Well, I just want to make sure that I have -- that I

17  have this right, because if I don't, that's okay, but, let

18  me see... okay.

19          Mr. Divis, you recall at your deposition when

20  you were asked about this slide and the question was:  "What

21  is a corporate deck or company deck?"

22          And your answer was, "It would be known that

23  deck that summarizes for our investors our company at that

24  point time, when this was pro, when this was, you know, as

25  of May 2023."

512

1          Does that -- do you recall that?

2  A.     Yeah, this is a deck that's -- if you will, is an

3  enduring document that gets updated occasionally and sits on

4  our website --

5  Q.     Okay.

6  A.     -- permanently.

7  Q.     Okay.

8  A.     Okay.

9  Q.     But this deck was updated at or around the time of

10  the May 1st call, right?

11  A.     It got updated after the approval because now it

12  references the approval, yes.

13  Q.     Okay.

14  A.     It was not used on the call.

15  Q.     Right, it wasn't used on the call but it came after

16  the call?

17  A.     That's correct.

18  Q.     Gotcha.

19          Now if we could go to slide 15, which is 295.15.

20  A.     .15?

21  Q.     Yes, sir, .15 or .15.

22          And in this slide, Avadel set forth what it

23  believed was Lumryz's market opportunity, correct?

24  A.     Yeah, at that time, that was how we kind of segmented

25  it, by patients, right.

513

1    Q.    Right.  And the blue box here on the left refers to a
2    greater than $3 billion opportunity, market opportunity for
3    Lumryz, right?
4    A.    Yeah, this is taking the number of patients, right --
5    Q.    Fair enough.
6    A.    -- and multiplying it by current pricing.
7    Q.    Fair enough but --
8    A.    That's correct.
9    Q.    This is -- this is all we have, right?
10   A.    Yeah, that's correct.
11   Q.    Okay.  So based upon this, what you were putting out
12   there for investors, was this is a greater than $3 billion
13   opportunity, correct?
14   A.    Yeah, I would think about that as the whole pie.
15   Q.    Okay.
16   A.    The whole pie, right, in terms of, you know --
17   Q.    Well you want that pie, don't you?
18   A.    Well, sure --
19   Q.    Yeah.
20   A.    -- but, I mean, recognizing --
21   Q.    We all like pie.
22   A.    Yeah, so...
23   Q.    Okay.  Now, $3 billion, sir, that represents a lot of
24   money for Lumryz, that market opportunity, that represents a
25   lot, a lot of pie, doesn't it?

514

1    A.    For both us and Jazz, yes.
2    Q.    Well, but this isn't Jazz, this is yours, just to be
3    clear?
4    A.    No, I get -- that's for sure.
5    Q.    Okay.
6    A.    There's certain patients in that group that aren't
7    really likely -- some are Jazz patients, right, so...
8    Q.    Right.  Yeah.
9          Now, in addition to being CEO of Avadel and an
10   investor in Avadel yourself, you're also on Avadel's board
11   of directors, correct?
12   A.    Yes, I am.
13   Q.    And you attend board of directors meetings, correct?
14   A.    I do.
15   Q.    And those meetings sometimes have slideshow
16   presentations, correct?
17   A.    Yes, they do.
18   Q.    Okay.  And slides for a board of directors meeting,
19   they are provided ahead of time: true?
20   A.    Yes, they are.
21   Q.    Okay.  And if you could go with me to JTX119.  And I
22   don't believe that there's any --
23         MR. PORTER:  I'd like to move for entry of
24   JTX119 into evidence, I don't believe there's any objection.
25         MS. DAVIS:  No objection.

515

1          THE COURT:  JTX119 is admitted.
2          (Exhibit admitted.)
3    BY MR. PORTER:
4    Q.    Okay.  And Mr. Divis, you recognize this document?
5    A.    I do, yes.
6    Q.    Okay.  Avadel board of directors meeting, May 3rd,
7    2023?
8    A.    Yes.
9    Q.    Okay.  Now if you would go with me to JTX119.133.
10         It's on your screen, too.
11   A.    No, I got it, yeah.
12   Q.    Okay.  And so you see here, sir, that the -- as part
13   of the launch plan, the launch -- the Lumryz launch plan
14   overview, at this time Avadel had a reason to believe that
15   the overall body of evidence from market research and data
16   analytics and more supports that Lumryz will become a market
17   leader in a growing narcolepsy oxybate market, correct?
18   A.    Yes.
19   Q.    Okay.  That's what was told to the Board?
20   A.    Yes, it was.
21   Q.    Okay.  And if we could go to 119.137.  And the Board
22   was also provided with the results of market research
23   studies, right?
24   A.    Yes, they were.
25   Q.    Okay.  And the market research studies were conducted

516

1    from 2020 through 2023, I believe.
2    A.    Yes, that's correct.
3    Q.    Okay.  And they show that in May 2023, Avadel
4    expected Lumryz to capture 50 to 61 percent of oxybate
5    sales, correct?
6    A.    Well, the research at all these points in times were
7    done to present the product profile to physicians and then
8    ask them what their intentions were.  So, yes, that's
9    what -- that's a share of the market based upon
10   physician-stated intent to use Lumryz.
11   Q.    I think you kind of answered, but you had some
12   qualifications.
13   A.    Oh, I'm sorry.
14   Q.    No, no, it's fine.
15         So I just want to ask it again.
16   A.    Okay.
17   Q.    What we're looking at right here, as of -- what was
18   being presented in May of 2023, is that Avadel expected
19   Lumryz to capture 50 to 61 percent of oxybate sales: true?
20   A.    Well, of the -- of oxybate-treated patients based
21   upon physician feedback, yes, but...
22   Q.    Yeah.
23   Q.    Yeah.
24   Q.    Of the people who would purchase the medicine, you
25   wanted 50 to 60 -- you expected to get 50 to 61 percent of

517

1   them?

2   **A.**     May I answer just -- answer just slightly different,

3   which is of -- of the patients that physicians were going to

4   put on a oxybate product in the future, the estimation

5   across those four or five different research projects was

6   they would expect Lumryz to get somewhere between 50 and

7   60 percent, and that the use of oxybates would grow

8   according to the bottom.

9   **Q.**     Now, Lumryz is currently FDA approved to treat -- I'm

10  sorry.  Again, Lumryz is currently approved for

11  once-nightly, correct -- once at bedtime?

12  **A.**     Yeah.  Interchangable, but once at bedtime, yes, sir.

13  **Q.**     Okay.  And it's currently FDA approved for the

14  treatment of cataplexy or excessive daytime sleepiness in

15  adults with narcolepsy, right?

16  **A.**     Yes, that's correct.

17  **Q.**     All right.  But currently, Lumryz does not have an

18  indication for treatment of narcolepsy in pediatric

19  patients, true?

20  **A.**     No, it doesn't, not yet.

21  **Q.**     Okay.  But Avadel is seeking a pediatric indication

22  now, isn't it?

23  **A.**     Yeah, we have filed our application with the FDA.

24  **Q.**     Okay.  And if you go with me to 119.63.

25              Whenever you're ready.

518

1   **A.**     Yes.

2   **Q.**     Okay.  And you see this is -- this slide is titled

3   Lumryz Pediatrics?

4   **A.**     Yes.

5   **Q.**     Okay.  You notice that twice-nightly oxybate are both

6   approved for under 7 -- or 7 years or older, weight-based?

7   **A.**     Yes.

8   **Q.**     Okay.  And that would be Xyrem and Xywav, correct?

9   **A.**     Correct.

10  **Q.**     Okay.  Because Lumryz is not, again, approved for

11  pediatrics, right?

12  **A.**     No, it's not.

13  **Q.**     Okay.  And -- but it -- I think, as you may have --

14  you may have alluded to this, Lumryz is -- I'm sorry, Avadel

15  is seeking approval for the pediatric market; is that right?

16  **A.**     Yeah, that is correct.

17  **Q.**     Okay.  Okay.

18              But as reported to the board of directors --

19  well, let's look here.  It says, "Response on proposed

20  pediatric study request, clinical studies of Lumryz, FT218,

21  in pediatric patients with narcolepsy may not be needed,"

22  right?

23  **A.**     Correct.

24  **Q.**     "Because Xyrem studies confirm safety/efficacy in

25  pediatrics," right?

519

1   **A.**     Yes.

2   **Q.**     Okay.  And Lumryz's efficacy and safety confirmed

3   efficacy in adults and PK study establish a bridge between

4   Lumryz and Xyrem, right?

5   **A.**     Yes.

6   **Q.**     So in other words, you're telling the Board

7   that it's possible that Lumryz might not have to do clinical

8   studies in pediatric patients because of the studies that

9   Jazz had already conducted on its Xyrem product, right?

10  **A.**     Yes, that's correct.

11  **Q.**     Okay.  So just as Avadel uses -- used Jazz's studies

12  to get Lumryz approved for adults, it's also contemplating

13  using Jazz's studies to get Lumryz approved for pediatrics,

14  right?

15  **A.**     Yeah, we are.

16  **Q.**     Yeah, okay.

17              Now, Avadel is also pursuing an indication to

18  treat idiopathic hypersomnia for Lumryz, correct?

19  **A.**     Yeah, we are.

20  **Q.**     Okay.  And there are approximately 45,000 patients

21  who have been diagnosed with idiopathic hypersomnia, right?

22  **A.**     I think the numbers move around a little bit, but,

23  you know, that's a general diagnosis number, from what I can

24  recall, yes.

25  **Q.**     Okay.  And -- and Avadel's board was told that having

520

1   an idiopathic hypersomnia indication for Lumryz would expand

2   the patient population that could be prescribed Lumryz,

3   correct?

4   **A.**     Yeah, that's correct.

5   **Q.**     Okay.  And you know, sir, that, as we sit here today

6   in this courtroom, there's only one drug currently approved

7   to treat idiopathic hypersomnia, correct?

8   **A.**     Yeah, that's Xywav.

9   **Q.**     Jazz's Xywav, true?

10  **A.**     Yes, that's correct.

11  **Q.**     Okay.  Now...

12              We're almost done.

13  **A.**     Okay.

14  **Q.**     All right.  Now, so we have been discussing the sales

15  Avadel hoped to make, and we're going to discuss the sales

16  that Avadel, in fact, made, but first I'd like to give the

17  jury some foundational information about how Avadel tracks

18  its sales: is that okay?

19  **A.**     Sure.

20  **Q.**     Okay.  Now, do you have, in your binder, PTX486?

21              And it's a native, so we're going to have to put

22  it up on the screen.

23  **A.**     Hold on.  Okay.  It's not in here.

24  **Q.**     Yeah.  Okay, we're going to put it up.

25              MR. PORTER:  Well, Your Honor, I'd like to move

521

1  PTX486 into evidence.  I don't believe that there's any
2  objection.
3          MS. DAVIS:  No objection, Your Honor.
4          THE COURT:  PTX486 is admitted.
5          (Exhibit admitted.)
6          MR. PORTER:  And I'd also like to move for
7  admission of JTX259.  And I don't believe there's any
8  objection.
9          (Reporter asks for clarification.)
10         MR. PORTER:  259, please.
11         MS. DAVIS:  No objection.
12         THE COURT:  Okay.  JTX259 is admitted.
13         (Exhibit admitted.)
14 BY MR. PORTER:
15 Q.     So if we could look at PTX486, I know that may be a
16 little bit difficult to see, but do you recognize this as a
17 weekly sales report, sir?
18 A.     Yes, I do.
19 Q.     Okay.  Now, just to be clear, Avadel doesn't sell
20 Lumryz directly to corner pharmacies like Walgreens, right?
21 A.     No, we don't.
22 Q.     Okay.  It instead sells it to a handful of specialty
23 pharmacies, correct?
24 A.     Yes, that's correct --
25 Q.     Okay.

522

1  A.     -- three of them.
2  Q.     I'm sorry?
3  A.     Three of them, yes.
4  Q.     Okay.  And to keep track of those sales, Avadel puts
5  together sales reports for Lumryz on a weekly basis, right?
6  A.     Yes, we do.
7  Q.     Okay.  And, again, those are called the weekly sales
8  report?
9  A.     Yes.
10 Q.     Okay.  And the weekly sales report tracks the gross
11 sales of Lumryz to the specialty pharmacies, right?
12 A.     Yes.
13 Q.     Okay.
14         MR. PORTER:  So if we could go to JTX259,
15 please, Derreck.
16 BY MR. PORTER:
17 Q.     So -- okay.  So, for example, this is a -- this is a
18 sales report from January of 2024, correct?
19 A.     Yeah, it looks like.
20 Q.     Okay.  And this report includes the most accurate
21 data that the company had at the time it was compiled,
22 correct?
23 A.     Yeah, I'm sure it is.
24 Q.     Okay.  Now, before we were discussing the board of
25 directors meeting from right after Lumryz received approval

523

1  from the FDA on May 1st, do you recall?
2  A.     Yes.
3  Q.     Okay.  And Avadel had another board of directors
4  meeting in August 2023, correct?
5  A.     Yes.
6  Q.     Okay.  And if you could go with me to JTX122 in your
7  notebook.
8          MR. PORTER:  And, Your Honor, I move for
9  admission of JTX122 into evidence.  I don't believe there's
10 an objection.
11         MS. DAVIS:  No objection.
12         THE COURT:  Okay.  JTX122 is admitted.
13         (Exhibit admitted.)
14         MR. PORTER:  Thank you.
15         If we could publish that.
16 BY MR. PORTER:
17 Q.     Okay.  You see this is Avadel board of directors
18 meeting, August 1st through 2nd, 2023, sir?
19 A.     Yes.
20 Q.     Okay.  So this is a copy of the slides from the
21 meeting we were just talking about, the August meeting?
22 A.     Yes.
23 Q.     Okay.  And this sets forth some data as of July 2023,
24 correct?
25 A.     Yes.

524

1  Q.     Okay.
2          MR. PORTER:  And if we could go to slide 43,
3  which is 122.43.
4  BY MR. PORTER:
5  Q.     Okay.  And, again, that's all data as of July 23rd,
6  except reach/frequency July 24th, right?
7  A.     Yes.
8  Q.     Okay.  Now, do you see a Lumryz source of business
9  row here?
10 A.     Yes, I do.
11 Q.     Okay.  And that tracks whether the patient switched
12 from twice-nightly oxybate, whether there was a
13 discontinuation patient, or whether the patient had never
14 taken oxybate before, correct?
15 A.     Yeah, that is correct.
16 Q.     Okay.  And at this point, I think that it -- right
17 here, sorry for -- it says that there's a 74 percent switch,
18 so 74 percent of Lumryz's patient enrollment were patients
19 that switched from other oxybate products, correct?
20 A.     That is correct.
21 Q.     Okay.  Now, as we've seen, Avadel was seeking to take
22 those patients from Jazz and switch them on to Lumryz,
23 correct?
24 A.     Well, it was a primary goal to target physicians to
25 educate them about possibly switching, but that's often a

525

1   physician and patient decision.

2   **Q.**    Right, but as we've established a little -- a long,

3   long time ago when we first started, you want to get as many

4   of the -- the patients who often take Jazz's products to use

5   Lumryz's product, that's just -- yeah.

6   **A.**    Yeah.

7   **Q.**    Okay.

8   **A.**    For eligible patients that a doctor --

9   **Q.**    Sure.

10  **A.**    -- decides is -- warrants the switch --

11  **Q.**    Right.

12  **A.**    -- yeah.

13  **Q.**    Yeah.  You don't want to give it to anybody who

14  doesn't need it.

15  **A.**    That is correct.

16  **Q.**    Right.  Now, moving forward in time, Avadel updated

17  its investor slides in early January 2024, correct?

18  **A.**    Yes.

19  **Q.**    Okay.  And if we could go to PTX1899, please.

20         MR. PORTER:  And, Your Honor, I'd like to move

21  to admit PTX1899 into evidence.

22         MS. DAVIS:  No objection.

23         THE COURT:  PTX1899 is admitted.

24         (Exhibit admitted.)

25  BY MR. PORTER:

526

1   **Q.**    And whenever you're ready, sir.

2   **A.**    Sure.

3   **Q.**    Okay.  Ready?

4   **A.**    Yes.

5   **Q.**    And this is the January -- this is January 2024,

6   correct?

7   **A.**    Yes.

8   **Q.**    Okay.  So just last month?

9   **A.**    Just last month, yes.

10  **Q.**    Okay.  And this document is a -- Avadel's

11  January 2024 investor slides, correct?

12  **A.**    Yes.

13  **Q.**    Okay.  And Avadel is, at this time -- well, let's

14  just go -- if you could go with me to 1899.7, yeah.

15         So Avadel is still reporting a greater than

16  $1 billion opportunity for Lumryz in the U.S., right?

17  **A.**    Yeah, same slides from the commercial day earlier --

18  **Q.**    Right.

19  **A.**    -- in June of 2023.

20  **Q.**    Right.  And -- but if something was off or wrong

21  about previous slides, you would update them.  You wouldn't

22  put incorrect information -- or keep incorrect information

23  in a slide deck, right?

24  **A.**    No, that's correct.

25  **Q.**    Okay.

527

1   **A.**    Yeah.

2   **Q.**    And Avadel also reported that based on market

3   research of healthcare professionals, it expects

4   50-60 percent share of oxybate sales, correct?

5   **A.**    Of patients being treated, right?  So that's how --

6   that's how share is captured --

7   **Q.**    Well, we --

8   **A.**    -- the same topic we discussed.

9   **Q.**    The market is the -- the market is the market, right?

10  **A.**    Correct.

11  **Q.**    And of that market, Avadel expected to get

12  50-60 percent.  That's -- I know you -- I'm just saying of

13  the market.

14  **A.**    Of the treated patient pool.

15  **Q.**    Right, but that's -- that's the market, right?

16  **A.**    So -- well, you have the big pie.

17  **Q.**    Okay.

18  **A.**    And then you have the treated pie.

19  **Q.**    Okay.

20  **A.**    And then amongst the treated pie, you have share

21  amongst the treated pie.

22  **Q.**    And so of the treated pie of the market, you want

23  50-60 -- you're expecting 50-60 percent?

24  **A.**    That's what our ATP reported market share said in

25  our -- in our research.

528

1         (Reporter clarification.)

2         THE WITNESS:  That's what physicians reported in

3   the research projects that we conducted.

4   BY MR. PORTER:

5   **Q.**    Okay.  If we could go to PTX1899.8, and this is

6   "Success of Lumryz in Narcolepsy Offers Opportunity to

7   Further Expand Franchise," right?

8   **A.**    Yes.

9   **Q.**    Okay.  Because you're looking at Lumryz as a

10  franchise, right?

11  **A.**    Yes, the opportunity --

12  **Q.**    Yeah.

13  **A.**    -- to get more patients.

14  **Q.**    Okay.

15  **A.**    Treat more patients.

16  **Q.**    Okay.

17  **A.**    Help more patients.

18  **Q.**    So at this point, Avadel is stating that the success

19  of Lumryz in narcolepsy offers -- I'm sorry -- offers

20  opportunity, again, to further expand that franchise, as we

21  said, right?

22  **A.**    And the company at large, yes.

23  **Q.**    Well, that's not -- it just says expand the

24  franchise.  That's what the title says.

25  **A.**    Yeah.  You see Wave 3, business development.  That's

529

1  when we talk about the company.

2  Q.   And remember how Avadel said that it might be able to

3  use Jazz's clinical studies to get its own drug approved for

4  pediatric use, you saw that?

5  A.   Yeah, under that 505(b)(2) pathway.

6  Q.   And do you see that -- you see wave 2 right here?

7  A.   Yes.

8  Q.   And it says that -- it says that Avadel's pediatric

9  New Drug Application has, in fact, been accepted by the FDA?

10  A.   Yes.

11  Q.   And "approval decision expected in September 2024"?

12  A.   Yes.

13  Q.   Okay.  And remember how we discussed that Jazz's

14  Xywav was the only drug approved to treat idiopathic

15  hypersomnia?

16  A.   Yes.

17  Q.   And then you see where the presentation notes

18  "idiopathic hypersomnia: plan to initiate study in 2024"?

19  A.   Yeah, we've had a lot of interest from physicians for

20  both IH and pediatric, yes.

21  Q.   So you see that?

22  A.   Yes.

23  Q.   Yeah.  And remember how we discussed that Xywav was

24  Jazz's low-sodium oxybate?

25  A.   Yes.  Yes.

530

1  Q.   Okay.  And do you see where it says that Avadel wants

2  to make a no-to-low-sodium once-at-bedtime?

3  A.   Yeah, we've been working, you know, on different

4  prototypes and formulations to see if we could offer a

5  once-at-bedtime option for those patients potentially as

6  well.

7  Q.   Okay.  So in addition to using Jazz's clinical work,

8  Avadel also uses Jazz's playbook too, right?

9  A.   Well, if you based the playbook on feedback from

10  physicians who say, When are you going to get pediatrics,

11  when were you going to study it in IH, when are you going to

12  do a low or no sodium for those -- you know, I think that

13  our customers help shape that as well.

14  Q.   But as does Jazz, because it's right here in your

15  presentation, right?

16  A.   They certainly have all of that, right.

17  Q.   And have helped Avadel along the way, right?

18  A.   Through the regulatory pathways --

19  Q.   Sure.

20  A.   -- that the FDA allows us to do, yes.

21  Q.   Yeah.  Okay.

22      Now, if we could go to 1899.22.  And do you see

23  where it talks about Lumryz market opportunity is greater

24  than 50,000 patients and is extremely well positioned in all

25  3 patient segments?

531

1  A.   Yes.

2  Q.   Okay.  And that would be patient segments for

3  narcolepsy, right?

4  A.   Yeah, these are patients who would -- who are

5  narcolepsy patients, people with narcolepsy.

6  Q.   Right.  Right.  Now, on January 8th, 2024, Avadel

7  issued a press release with some 2023 highlights, correct?

8  A.   Yes, we did.

9  Q.   Okay.  And if we could go to in your notebook

10  PTX1901.

11      MR. PORTER:  And, Your Honor, I'd like to now

12  move that into evidence.  I don't believe there's an

13  objection.

14      MS. DAVIS:  No objection, Your Honor.

15      THE COURT:  All right.  PTX1901 is admitted.

16      (Exhibit admitted.)

17      MR. PORTER:  And if we could blow that up there,

18  that would be great.

19  BY MR. PORTER:

20  Q.   And you see this is January 8th, 2024, and this is

21  the press release, sir?

22  A.   Yes, it is.

23  Q.   Okay.  And it has some -- some words here, that --

24  you know, that it's putting forth to the public, right?

25  A.   Yes.

532

1  Q.   It talks about more than 1,000 patients initiating

2  therapy through December 31st?

3  A.   Yes.

4  Q.   And that's December 31st of 2023, right, because this

5  is a look-back?

6  A.   Yes, it is.  Yeah.

7  Q.   Okay.  And Avadel also reported that "the majority of

8  Ryzup" -- R-Y-Z-U-P, or Ryzup, I'll call it -- "enrollments

9  and patients currently being treated with Lumryz are

10  patients who switched from first-generation oxybates,"

11  correct?

12  A.   Yeah, the majority of those patients enrolled and who

13  have initiated therapy have been switched patients.

14  Q.   Okay.  And, again, the "first-generation oxybate"

15  refers to Jazz's Xyrem and Xywav products, correct?

16  A.   And the authorized generic.

17  Q.   Okay.  And the press release also reports on certain

18  contracts being in place, correct?

19      MR. PORTER:  Your Honor, I think one of the

20  jurors needs a break.

21      THE COURT:  Okay.  All right.  We'll take a

22  break.  Let the jury use the bathroom.

23      Let's take a 10-minute break at this time.

24      All right.  We'll come back at 3:40 p.m.

25      (Recess taken.)

533

1    (Whereupon, the jury entered the room.)
2    MR. PORTER:  May it please the Court?
3    THE COURT:  Yes.
4    MR. PORTER:  Thank you, Your Honor.
5    If we could pull back up, I think we were on
6    PTX1901, Derreck.
7    BY MR. PORTER:
8    Q.    So, Mr. Divis, where -- we left off talking about
9    RYZUP and on the same page of this press release from
10   January, it also reports on certain contracts being in
11   place, correct?
12   A.    Yes, it does.
13   MR PORTER:  Okay.  If you could pull those up,
14   and scroll -- the sign.  There we go.  Perfect.
15   BY MR PORTER:
16   Q.    So there are terms here like GPO entities or
17   including, you know, Emisar that may be unfamiliar to some
18   people, but basically this means that Avadel has gotten
19   contracts in place relating to getting Lumryz covered by
20   insurance, right?
21   A.    Yeah, I would think of it as the entity above, kind
22   of the contracting entity, that, then, you have to work down
23   through that entity to try to get actual coverage, but the
24   contract is first.
25   Q.    Right.  Okay.

534

1    So, again, this is just further showing Avadel's
2    plan to move forward towards that potential greater than
3    $1 billion market?
4    A.    I would define that as fairly ordinary coursework
5    that everyone in the industry does to try to get your drug
6    reimbursed by insurance companies.
7    Q.    But when you get reimbursed by a insurance company,
8    you're making revenue for Avadel, correct?
9    A.    That's correct.
10   Q.    That's money into the company, correct?
11   A.    Yes, it is.
12   Q.    And that's going to be money that will help you to
13   reach the goal of getting to over a billion dollars,
14   correct, in sales, that's just -- I'm not trying to dispute
15   where the money comes from but that is something that will
16   help you get to that target, right?
17   A.    It's a step in the process to build Lumryz.
18   Q.    Great.  All right.  Let's finish up on the
19   relationship between Jazz.
20   So at the end of the day, Mr. Divis, as we've
21   talk about over the course of the last hour or so, Avadel
22   admits that it did in fact try to get Jazz's help to work
23   with and develop Lumryz, right?
24   A.    Well, we entered into a mutual discussion to see if
25   there was a potential collaboration that we talked about

535

1    with each other for quite some time.
2    Q.    Okay.  You admit Avadel relied on Jazz's clinical
3    work to get FDA approval for adult use of Lumryz, right, we
4    talked about?
5    A.    It was really nonclinical work that we relied on.
6    Q.    But you relied on Jazz's work?
7    A.    Some of their data to help --
8    Q.    Okay.  And -- and --
9    THE COURT:  Mr. Porter --
10   BY MR. PORTER:
11   Q.    I'm sorry, were you --
12   No.  We, certainly, under the 505(b)(2) pathway --
13   Q.    Yeah.
14   A.    -- that the FDA allows us to do that.  Yes.
15   Q.    Correct.
16   And Avadel admitted it further considered
17   relying on Jazz's clinical work as we just saw to get FDA
18   approval for pediatric use of Lumryz, right?
19   A.    Yeah, under that same 505(b)(2) pathway the FDA
20   allows us to.
21   Q.    And as we've seen, Avadel has a business plan that
22   involves taking patients from Jazz and switching them to
23   Lumryz, correct?
24   A.    Well, I don't view us as taking patients, I view us
25   as educating physicians but switch patient are a large --

536

1    you know, almost half of our kind of pie, so to speak, and
2    ultimately it's up to the physician of the patient to do
3    what's right for that patient.
4    Q.    And as we saw from your, I think chief commercial
5    officer or chief operating officer, Avadel simply used the
6    same price per gram as Jazz's drug Xywav to come up with its
7    price for Lumryz, right?
8    A.    We made a decision to price at parity to Xywav and
9    less than Xyrem, yes.
10   Q.    Yeah, okay.
11   Thank you, sir.
12   MR. PORTER:  Pass the witness.
13   MS. DAVIS:  Permission to approach with binders,
14   Your Honor?
15   THE COURT:  Okay.
16   MS. DAVIS:  May I proceed, Your Honor?
17   THE COURT:  You may.
18   DIRECT-EXAMINATION
19   BY MS. DAVIS:
20   Q.    Good afternoon, my name is Kira Davis and I represent
21   Avadel.
22   Mr. Divis, to cover background, where are the
23   main Avadel offices?
24   A.    The main offices are just outside of St. Louis,
25   Missouri, in a little suburb called Chesterfield, Missouri.

537

1  Q.      And you got asked a little bit ago about the company
2  in France, did the company get in trouble in France?
3  A.      No, the company didn't.  The company was actually
4  just ensuring that we continued to do the right thing with
5  regards to our requisite governance-related matters.
6  Q.      You were asked about your compensation; do you
7  remember that?
8  A.      Yes.
9  Q.      Do you know how much the Jazz CEO makes?
10 A.      Today, I don't know.
11         MR. PORTER:  Your Honor, I'm going to object,
12 this is not -- it's not -- 403, not relevant to anything,
13 not in evidence.
14         THE COURT:  Overruled.  You asked the question.
15         THE WITNESS:  I do believe his total
16 compensation in 2022 was over $17 million.
17 BY MS. DAVIS:
18 Q.      Take a step back, where did you go to college?
19 A.      I went to college on a full athletic scholarship to
20 play football at the University of Iowa in the Big 10.
21 Q.      And what position did you play?
22 A.      I was an offensive lineman, primarily center and a
23 little bit of guard.
24 Q.      Any memorable achievements?
25 A.      A whole lot of memories but probably being part of a

538

1  Big 10 championship and playing in the Rose Bowl was pretty
2  memorable.
3  Q.      When did you join Avadel, can you remind us?
4  A.      I joined in January of 2017.
5  Q.      Why did you join Avadel?
6  A.      Well, I had been speaking to the prior CEO for the
7  better part of a year, I've known -- I knew him and do know
8  him for quite some time and he was seeking -- seeing if I
9  would come join him.  And then as I got to learn more about
10 what they were doing and the work on FT218 and, you know,
11 the potential benefit for patients and the opportunity to
12 offer a new option where, you know, patients who suffer from
13 a sleep disorder, who have to wake up to take their medicine
14 in the middle of the night and the ability to maybe solve
15 that for a drug in sodium oxybate, that's -- could be life
16 changing for patients, it was really an opportunity, I
17 thought, I had to pursue.
18 Q.      When you started at Avadel in 2017, where in the
19 development process was Lumryz?
20 A.      So it had just started the main study, right, this
21 main study that we described as REST-ON, which is the
22 requirement from the FDA to demonstrate that Lumryz was safe
23 and effective and it was one of the largest studies done in
24 narcolepsy and that literally was a month -- had just
25 started the last month in December of 2016.

539

1  Q.      So I want to ask you now about Project Zeta.
2          Were you personally involved in Project Zeta?
3  A.      Yeah, I was, I was actually the person on Avadel's
4  side engaging with the counterparties at Jazz.
5  Q.      When did Project Zeta start?
6  A.      It really started, I would say, in earnest in -- in
7  June of 2018.
8  Q.      Did you reach out to Jazz to initiate Project Zeta?
9  A.      I didn't.  I actually had someone who knew me and who
10 knew the CEO of Jazz, he was one of these investment bankers
11 kind of like the Jefferies example that was used earlier,
12 but not part of Jefferies, who contacted me and said, if we
13 could -- you know, if I could broker a discussion with the
14 CEO of Jazz, would you be willing to have that?
15         I wasn't the CEO at the time so I had to go to
16 my CEO and ask if he wanted me to consider -- have that
17 discussion.  And so we said yes, and therein kind of started
18 the initial discussions.
19         MS. DAVIS:  Your Honor, at this time I would
20 offer into evidence DTX1232, DTX916, JTX200 and JTX202, and
21 I believe all objections have been ruled on or resolved.
22         THE COURT:  All right.
23         MR. PORTER:  Correct.  No objection, Your Honor.
24         THE COURT:  All right.  DTX1232, DTX916, JTX200
25 and JTX202 are admitted.

540

1          (Exhibit admitted.)
2          MR. PORTER:  JTX112 is the --
3          (Discussion held off the record.)
4  BY MS. DAVIS:
5  Q.      What are we looking at?
6  A.      You're looking at a slide from a slide deck that was
7  sent to me on an e-mail that was designed to really just lay
8  out kind of the framework of a potential collaboration that
9  Jazz sent to me.
10 Q.      Under "license and collaboration," can you explain
11 the second bullet.
12 A.      That second bullet that says, "Jazz to acquire global
13 rights to FT218, and the rights to Zeta's Micropump
14 technology and intellectual property, that what it's saying
15 is that Jazz was looking to acquire what was or is Lumryz or
16 FT218, the technology that is Lumryz and FT218 and then any
17 patents that were around that.
18 Q.      Okay.
19         MS. DAVIS:  Let's take that down.  And Mr.
20 Jarrett, can we have DTX916 in evidence at page 1, the
21 e-mail in the middle.
22 BY MS. DAVIS:
23 Q.      Okay.  So Mr. Divis, in this e-mail from you, what is
24 the concern you're expressing?
25 A.      Yeah, one of our concerns is we entered into this

541

1  discussion knowing that Jazz had a number of programs, both
2  in the -- you know, selling them in the market at that
3  point, I think they only had Xyrem and they were working on
4  Xywav, that they -- that if we did a collaboration with them
5  that they wouldn't, in essence, deprioritize Lumryz or, you
6  know, shelve it for their other programs and that was an
7  important consideration for us as we entered into these
8  decisions.
9  Q.     Let's get the e-mail at the top.
10        Mr. Divis, what was the response to your
11 concern?
12 A.     Yeah, I think, here, Mr. Dougherty replied to us
13 basically stating in the e-mail that they're committed to
14 prioritizing FT218 and that they believed in their view a
15 potential collaboration was the fastest way for providing
16 patients with a potential once at bedtime oxybate or here,
17 once-nightly oxybate.
18 Q.     So can we have JTX200 in evidence at page 2.
19        All right.  Mr. Divis, can you explain to the
20 jury what this is, and what the date is?
21 A.     The date is July 25, 2018.  And what this is, is an
22 initial non-binding term sheet which was meant to lay out
23 Jazz's proposal to us, their first proposal to us, on -- on
24 both kind of responsibilities and the financial terms of a
25 potential collaboration.

542

1  Q.     Can we go to page 4, the economic terms at the
2  bottom.
3         Can you explain briefly to the jury the
4  different types of payments that are referenced in this
5  section.
6  A.     Yeah, in this section, there are really two types of
7  payments:  One is an up-front payment, so upon agreement
8  signing, Jazz would make a payment to Avadel, you know, it's
9  kind of buying into the collaboration, so to speak, a lot of
10 work had been done and then some contingent payments in the
11 form of milestones.
12        So "contingent" being that the milestone had to
13 be achieved for the payment to actually be paid.  So from
14 finishing and successfully finishing that main study that we
15 talked about, all the way up through securing an FDA
16 approval of FT218 at this time or Lumryz.
17 Q.     And we don't have to get into it with the document,
18 were there other types of payments contained in this term
19 sheet?
20 A.     There were.  There were financial payments tied to
21 sales and there were some royalty, royalties, and sales
22 milestone that if they were achieved, then there would be
23 more, again, financial -- more economics paid to Avadel,
24 again, depending upon the sales and how successful they
25 were.

543

1  Q.     Okay.
2         MS. DAVIS:  Mr. Jarrett, you can take that down.
3  BY MS. DAVIS:
4  Q.     Mr. Divis, what, if anything, did Jazz propose about
5  patents in this term sheet?
6  A.     Only that they would be seeking to acquire a license
7  and acquire our patents, nothing else.
8  Q.     Did you take this first offer from Jazz?
9  A.     No, we didn't.
10 Q.     What happened next?
11 A.     What happened next was really, I would say, a series
12 of negotiations, we provided a counteroffer that we thought
13 was more appropriate to how we viewed the value of Lumryz
14 for us and for Jazz.  And they didn't accept that and they
15 made another counter.
16        And then we didn't accept that and we made
17 another counter and that went on for a number of months.
18 And we made our final proposal that we made on November 14th
19 of 2018.
20 Q.     Okay.
21        MS. DAVIS:  Mr. Jarrett, can we have JTX202 in
22 evidence at page 13 at the bottom, the economic terms.
23 BY MS. DAVIS:
24 Q.     All right.  And, Mr. Divis, what are we looking at?
25 A.     After we made our first proposal, Jazz made a

544

1  counterproposal back to us, and this represents their
2  counterproposal.  It, in essence, is all the same as the
3  prior one with the exception they increase their up-front
4  payment from 50 million to 75 million.
5  Q.     Did you take this Jazz counterproposal?
6  A.     No, we didn't.  We didn't take it.
7  Q.     Can you explain why not?
8  A.     Yeah, again, an increase of $25 million just didn't
9  reflect what we believed was the fair value, the investment
10 we made in Lumryz up until that point in time.  And so we --
11 we did not accept it, but we proposed another counter to
12 Jazz.
13 Q.     During those negotiations, did you think you were
14 going to be able to come to agreement with Jazz?
15 A.     We certainly thought it was advancing in a positive
16 way and it's really one of the reasons why we engaged some
17 other -- we reached out to other parties because we do have
18 a fiduciary duty to our shareholders to, you know, conduct,
19 if you will, a market check, if anyone else was interested
20 and, therefore, that's really, in October of 2018, why we
21 started that process.
22        We had spent the previous four months working on
23 it, a transaction potentially with Jazz, so, yeah, we
24 thought it was moving in the right direction, it was
25 advancing and back and forths were happening.

545

1   Q.   Did a deal happen?

2   A.   No, we made our last proposal, again, on

3   November 14th of 2018.  And then it kind of went a little

4   quiet, not how it had been going, but it was kind of quiet

5   from them, so when we reached out in December and we asked

6   them for a meeting, to have a discussion, that meeting took

7   place in early January and at that point, the company was

8   really coming to a fork in the road for us, for lack of a

9   better word.  We needed an answer if they wanted to continue

10  to proceed in a potential collaboration or not because we

11  had to decide which pathway the company was going to go,

12  were we going to partner Lumryz or FT218 or were we really

13  going focus for the company only on the clinical program of

14  Lumryz and seeking FDA approval, which was going to require

15  a major shift in the company.

16          And so we asked for a decision by the end of

17  January.  And at the end of January, they contacted us and

18  said, we can't -- we're not -- we're not going to provide a

19  counter, we're going pencils down, we've got too much going

20  on right now, they did have a drug launch coming, they did

21  have a data readout coming, so they said, we're not

22  advancing and that was the end of the negotiation.

23  Q.   January of what year?

24  A.   Oh, my apologies.  2019.

25  Q.   Did Jazz give you any other reason for their answer?

546

1   A.   That was the only reason at the time, yeah.

2   Q.   Where did this leave Lumryz in January 2019?

3   A.   Well, we were, at that point, 2 years into the study,

4   but the study was going slow from an enrollment standpoint,

5   so we made the decision to, you know, put some new people on

6   the team and just do it ourselves.

7   Q.   Can you say a little bit more about the decisions you

8   made in this time period following the end of the Project

9   Zeta negotiations with Jazz?

10  A.   Well, the company only had so much, for lack of a

11  better word, runway of how much cash we had on-hand as a

12  company to operate and we needed to make sure we had enough

13  money to get us through the clinical study and we needed to

14  really bolster the team working on the clinical study, so we

15  had to make a lot of tough decisions.

16          We stopped selling -- we took some businesses

17  and sold them to other people.  We shutdown some facilities.

18  We, unfortunately, had to eliminate some positions.

19  Never -- never an easy decision to do, but it was what we

20  had to do to ensure that we could take the necessary steps

21  to bring the first once-at-night option for people with

22  narcolepsy, and so those are the decisions we had to make.

23  Q.   When Project Zeta ended, did Jazz tell you that you

24  would need a license to its patents if you didn't do the

25  deal with them?

547

1   A.   No, no.  Never.

2   Q.   During Project Zeta, did Jazz ever say anything about

3   having any patents that might apply to the formulation of

4   Lumryz?

5   A.   No, never.

6   Q.   Before this lawsuit started, was Avadel doing any

7   monitoring of Jazz patents?

8   A.   Yeah, I -- yeah, I think it's fairly standard in our

9   industry that people monitor what's going on in their

10  respective areas.

11  Q.   The '782 patent, when did you find out that Jazz had

12  the claims that are in that patent?

13  A.   I believe we found out when they sued us on that

14  patent.

15  Q.   Why didn't you find out earlier?

16  A.   As I understand, that patent was filed

17  confidentially, there's -- so not visible to the public.

18  There's -- you know, that's a pathway you could take, so we

19  had no idea.

20  Q.   What about the other patent, the '488 patent, did

21  Jazz ever mention that patent to you?

22  A.   No, they didn't.

23  Q.   So Project Zeta ends, what happened with the Lumryz

24  clinical trials after you made the decision to focus on

25  Lumryz?

548

1   A.   Yeah, the new team we brought in did an excellent job

2   and actually finished the study earlier than anyone had

3   expected.  And it was incredibly positive in terms of its --

4   what it demonstrated and from a safety and efficacy

5   standpoint.  And that enabled us to go down the pathway of

6   filing our application to the FDA in December of 2020.

7   Q.   Did the FDA ultimately approve Lumryz?

8   A.   It did on May 1st, 2023.

9   Q.   Do you recall that Jazz's counsel asked you, "Jazz

10  has helped Avadel along the way"; do you remember that?

11  A.   Yes.

12  Q.   When did you file for approval for Lumryz?

13  A.   We filed on December 15th, I think, of 2020.

14  Q.   When did you get approval for Lumryz?

15  A.   May 1st of 2023.

16  Q.   When were you originally expecting to get approval of

17  Lumryz?

18          MR. PORTER:  Your Honor, sidebar.

19          (Whereupon, the discussion held at sidebar

20  concluded.)

21          MR. CALVOSA:  Your Honor, this is going directly

22  towards delisting issue, when they filed, when they got

23  approval, how long it took, why it took so long.

24          MS. DURIE:  So --

25          MR. CALVOSA:  Don't put your hand up at me.

549

1     THE COURT:  Let's be civil.

2     MS. DURIE:  Sorry, I was not -- I was just --

3     THE COURT:  I know.

4     MR. PORTER:  This is a civil trial.

5     MS. DURIE:  So Mr. Divis was asked in his

6  cross-examination by counsel about using the 505(b)(2)

7  whatever is regular pathway and asked whether it was faster,

8  whether he got advantages from having used Jazz data.  That

9  pathway has two aspects, one they used Jazz's data, the

10 other had to do with the Orange Book listing issues that

11 resulted in the listing fight, I'll put it that way.

12     All we want to establish is that using that

13 regulatory pathway did not accelerate things, it actually

14 slowed things down in the end.  We're not going to ask why.

15 These are very careful questions.  We're not going to ask

16 why.  We're simply going to say, When did you get -- when

17 did you file, when did you expect to get approval, when did

18 you get approval, and did Jazz accelerate your approval

19 process?

20     To which the answer is no.

21     THE COURT:  Okay.

22     MS. DURIE:  That's all we intend to do.

23     MR. CERRITO:  The --

24     THE COURT:  All right.  So, why are those

25 questions--

550

1     MR. CALVOSA:  Those --

2     MR. CERRITO:  Yeah, I mean, they said they chose

3  505(b)(2) pathway abbreviated new drug has nothing to do

4  with Orange Book listing.  They could have filed.

5     THE COURT:  She --

6     MR. CERRITO:  She said tied to our Orange book

7  listing.  They could have gone 505(b)(1), they didn't have

8  to bother with us, they didn't have to use our stuff.  They

9  chose -- took into consideration, it came with the

10 ramifications.

11     THE COURT:  The questions and answers I heard

12 didn't say Orange Book.

13     MR. CERRITO:  Counsel made the argument based on

14 that.  You said they go hand in hand.

15     MS. DURIE:  What I was trying to provide --

16     MR. CERRITO:  Maybe I misheard you.

17     MS. DURIE:  -- context for the Court that the

18 selection of that regulatory pathway from Avadel's point of

19 view had pluses and minuses.  He was asked about the pluses,

20 and the implication was they got an advantage.

21     All we want to do is establish there was no

22 advantage gotten, we actually wound up getting approval on

23 this later than we expected.

24     MR. PORTER:  Judge he admitted --

25     THE COURT:  So, let me -- so the question -- the

551

1  point that you're trying to make is that it actually delayed

2  the approval but you're not going to mention --

3     MR. CERRITO:  He already testified --

4     MR. PORTER:  Your Honor --

5     THE COURT:  Let me talk.  All right.  Please.

6  You're not going to mention Orange Book.

7     MS. DURIE:  Correct.

8     THE COURT:  And I didn't hear any questions

9  about Orange Book.

10    MS. DURIE:  That's right.

11    THE COURT:  So I don't find anything improper,

12 objectionable about the questions and the answers that

13 Ms. Durie has told me.

14    MR. CERRITO:  He already testified that it was

15 to his advantage, that he benefited from it, that they went

16 quicker.

17    MR. PORTER:  Several times.

18    MR. CERRITO:  So the question is redirect so

19 they get a chance to ask them -- that's why we all jumped up

20 because that question -- the only --

21    THE COURT:  But I don't hear Orange Book, I

22 haven't heard Orange Book.

23    MR. CERRITO:  For some reason --

24    THE COURT:  And you're not going to make an

25 argument about Orange book.

552

1     MS. DURIE:  No, we're not during --

2     (Whereupon, the discussion held at sidebar

3  concluded.)

4  BY MS. DAVIS:

5  Q.    Mr. Divis, remind us, when did you get approval for

6  Lumryz?

7  A.    May 1st, 2023.

8  Q.    Can you give me the date, what date, when were you

9  originally expecting approval for Lumryz?

10 A.    October 15th of 2021.

11 Q.    Did relying on the 505(b) pathway -- yes or no, did

12 relying on the 505(b) pathway get you approval faster?

13 A.    No.

14 Q.    The 505(b) pathway, is there anything wrong with

15 pursuing that pathway for approval?

16 A.    No, it's a very standard pathway that the FDA allows.

17 Q.    Are there -- is there any requirement that you

18 compensate the company whose data you're referencing for the

19 505(b) pathway?

20 A.    No, there's not.

21 Q.    You were also asked about some adverse events with

22 Lumryz, do you remember that?

23 A.    Yes.

24 Q.    Has FDA raised any concerns post-launch about the

25 adverse events you were asked about on direct examination?

553

1   A.   No, not at all.

2   Q.   So you were asked about the FDA's clinical

3   superiority finding, do you remember that?

4   A.   Yes.

5   Q.   Okay.

6        MS. DAVIS:  So at this time, Your Honor, we move

7   into evidence a redacted copy of JTX112.  The final

8   redactions are under review.  We'll be very cautious in what

9   we display, but I would move it into evidence.

10       THE COURT:  All right.

11       MR. PORTER:  No objection, Your Honor.

12       THE COURT:  All right.

13       MR. PORTER:  To the redacted.

14       THE COURT:  The redacted copy of JTX112 is

15  admitted.  The parties will agree to the redactions.

16       MS. DAVIS:  And Mr. Jarrett, can we have just

17  the one page, so JTX112, page 33.33.

18  BY MS. DAVIS:

19  Q.   Mr. Divis, what are we looking at?

20  A.   You're looking at part of a document that was sent to

21  us, to our regulatory person who represents us with the FDA.

22  That was a document that was actually sent to Jazz that

23  outlined a lot of information, but outlined the granting of

24  FDA's orphan drug exclusivity, which meant they determined

25  that FDA (sic) was clinically superior to Xyrem and Xywav.

554

1   Q.   So this is a lot of text, so I'm going to ask you if

2   you can read for us, on the first line, the sentence that

3   begins at the end, starting "for narcolepsy patients."

4        Can you read that part?

5   A.   Read just the sentence?

6   Q.   Yes, read that sentence.

7   A.   "For narcolepsy patients who are not sensitive to

8   sodium intake, OOPD" -- which is the office of orphan

9   products, they are the office that makes this determination

10  at the FDA -- "concludes that a once-nightly dosed oxybate

11  drug will provide a significant therapeutic advantage."

12  Q.   Can you go on and read through to the sentence that

13  ends with the footnote 210?

14  A.   "It is true that patients who are not sensitive to

15  sodium could also benefit from a reduction in sodium, but we

16  consider the benefit offered by once-nightly dosing to

17  outweigh the risk of increased sodium intake in such

18  patients, because having to wake up to take a second dose is

19  antithetical to oxybate's goal of improving sleep.

20       "Disrupting sleep contributes to chronic sleep

21  loss, which is well known to cause reduced performance,

22  increased risk for accidents and death, and detrimental

23  effects on both psychological and physical health.  And

24  there are other ways such patients may reduce sodium in

25  their diet."

555

1   Q.   Okay.  And then in the next section, we don't have to

2   have you keep reading, but do you know what the next -- the

3   next portion of the text on this screen is about?

4   A.   The next portion of the screen really talks about

5   those who are sensitive to sodium, and whether or not -- you

6   know, the benefit of Lumryz relative to those who have

7   certain sodium sensitivity.

8   Q.   And what did the FDA conclude?

9   A.   The FDA concluded that Lumryz was clinically superior

10  to Xywav and Xyrem, and gave us that on the basis of its

11  contribution to patient care on the basis that having to

12  wake up, again, remains antithetical, and that the benefit

13  offered by once-nightly dosing would outweigh the risk of

14  increased sodium intake.

15  Q.   Okay.

16       MS. DAVIS:  You can take that down.

17  BY MS. DAVIS:

18  Q.   Switching topics.  In May of 2023, was Avadel making

19  money?

20  A.   No, Avadel wasn't making money in May of 2023.  And

21  it's still not making money today.

22  Q.   Is Avadel spending money today on Lumryz development?

23  A.   Yeah, we're investing in all of our activities to try

24  to educate and support patients who may go on our therapy.

25  And also, we're doing clinical work on opportunities such as

556

1   idiopathic hypersomnia and to expand potential patients who

2   may want to try the benefit from a once-at-bedtime dose.

3   Q.   When Lumryz was approved last year, what was your

4   reaction?

5   A.   Well, you know, I think it -- for -- it was -- you

6   know, it was an amazing reaction.  I know exactly where I

7   was, what we were doing on May 1st, and it was celebratory

8   for what had been over a decade of work and a lot of people

9   who had put in a lot of work over a number of years to get

10  to that point in time.  And, you know, I think we celebrated

11  for a few hours and then realized there was a whole lot of

12  work to be done.

13       MS. DAVIS:  No further questions, Your Honor.

14       MR. PORTER:  Just a few questions, Your Honor.

15       THE COURT:  Okay.  Recross.

16            RECROSS-EXAMINATION

17  BY MR. PORTER:

18  Q.   Mr. Divis, you testified --

19       MR. PORTER:  May it please the Court?

20       THE COURT:  I'm sorry?

21       MR. PORTER:  May I proceed?  Thank you, Your

22  Honor.

23  BY MR. PORTER:

24  Q.   Mr. Divis, you testified that your -- Avadel isn't

25  making money, correct?

557

1    A.    Correct.

2    Q.    Okay.  But, again, you still are making about a

3    million dollars a year from the company that's not making

4    money, correct?

5    A.    That's my target compensation, yes.

6    Q.    Right.  And then you have the 150,000 approximate

7    shares of stock, correct?

8    A.    Yes, most of which I bought, yes.

9    Q.    Right, just -- okay.  And you testified about the

10   compensation of Jazz's CEO, correct?

11   A.    I did.

12   Q.    Okay.  Are you aware that Jazz has more than one

13   product that it has in the market?

14   A.    Yes.

15   Q.    And it has, frankly, a number of products that it has

16   in the market that span different areas for different types

17   of patients?

18   A.    Yes.

19   Q.    Okay.  And, again, you have with your company one

20   product, correct?

21   A.    Correct.

22   Q.    That's Lumryz, correct?

23   A.    Correct.

24   Q.    The only thing you got to focus on, right?

25   A.    Correct.

558

1    Q.    Yeah.  And, again, your compensation -- your

2    compensation is directly tied to the success of that one

3    product, isn't it, as you just testified to earlier?

4    A.    Yes, as a major component, yes.

5    Q.    Major component, thank you.

6          Now, you were asked a question about -- I

7    believe you were asked about the benefit -- that it took

8    just as long or longer even with the 505(b)(2): do you

9    remember that?

10   A.    Yes.

11   Q.    Okay.  But, again, you did testify with me earlier

12   that you all, Avadel, saw a benefit to using -- to being

13   able to use the 505(b)(2) using Xyrem as the reference

14   listed drug?  You testified to that, didn't you?

15   A.    I wasn't here when that decision was made, but

16   clearly that was one of the reasons why they would have

17   chosen the (b)(2) pathway.

18   Q.    And you -- but you testified that it was a benefit to

19   Avadel, correct?

20   A.    Yes, that we could reference --

21   Q.    Okay.

22   A.    -- some of the other data.

23   Q.    Yeah, okay.  I just wanted to make sure that you're

24   not -- you're not changing that with your lawyer.

25         Also, could we pull up JTX112.31.

559

1    A.    May I -- is that in your binder or the other binder?

2    Q.    It's in the binder your attorney gave you.

3    A.    Okay, okay.  Just in case I need to...

4          (Discussion held between counsel off the

5    record.)

6    BY MR. PORTER:

7    Q.    Okay.  And I just wanted to read something that your

8    lawyer didn't read with you about sodium, if we could go

9    down just a little bit.  Okay.  Go down.

10         MS. DAVIS:  Your Honor, they're just -- they're

11   displaying items they requested that -- to be redacted.

12         MR. PORTER:  No.

13         MS. DAVIS:  Yes.

14         THE COURT:  Take it down, please.  Take it down

15   and let's...

16         (Discussion held between counsel off the

17   record.)

18         MS. DURIE:  Your Honor, the reason we didn't

19   show it is because they asked us not to.

20         THE COURT:  So we had a discussion about this

21   document being redacted, and let's make sure we're only

22   displaying the parts that have not been redacted.

23         MR. PORTER:  Right.  The part that I was

24   looking -- was reading in wasn't -- we agreed that that

25   could come in.

560

1          (Discussion held between counsel off the

2    record.)

3          MR. PORTER:  I just want to make sure I'm not

4    running afoul of our agreement.

5          THE COURT:  Both sides agree that this part is

6    not redacted?

7          MS. DAVIS:  The portion he just showed me is not

8    redacted.

9          THE COURT:  Okay.  All right.

10         MR. PORTER:  And that was the portion that was

11   up on the screen.

12         THE COURT:  Okay.  All right.  So we're fine.

13   All right.

14         MR. PORTER:  Not sure why it was objected to,

15   but...

16         MS. DAVIS:  That's not the redacted.  They made

17   a request to redact all of the footnotes.  Every single

18   footnote is supposed to be redacted.  It's their request,

19   so...

20         THE COURT:  Okay.

21         MR. PORTER:  I will read -- do you see on your

22   page, you could -- yeah, if we could just go through with

23   that.  Okay.

24   BY MR. PORTER:

25   Q.    Do you see, sir, this portion of the document?

561

1  A.    I do, yes.

2  Q.    Okay.  Because you were -- you were testifying about

3  sodium and why you got greater, you know -- why the FDA

4  found -- gave you the finding on the clinical data that we

5  talked about, right?

6  A.    Yes, the clinical superiority, yes.

7  Q.    Okay.  But in that exact same document, the FDA did

8  note, "Given the differences in sodium content between Xywav

9  and Xyrem, Xywav is safer and thus clinically superior to

10  Xyrem in the following:  All patients with narcolepsy" --

11  all patients with narcolepsy, correct?

12  A.    That's what it says.

13  Q.    Okay.  And I just want to be clear that that's based

14  upon the difference in sodium between Xywav and Xyrem,

15  right?

16  A.    Yes.

17  Q.    Okay.  And "the substantial portion of the narcolepsy

18  population that is salt-sensitive, i.e., individuals who

19  have greater changes in blood pressure with changes in salt

20  intake than those who are not salt-sensitive," right?

21  A.    Yes, that's what it --

22  Q.    And then it goes on to --

23  A.    Yeah.

24  Q.    So it's basically just saying lower sodium is better

25  for all narcoleptic patients, right?

562

1  A.    That's what it says, but it does go on and --

2  further.

3  Q.    And so -- and to be clear, again, if we're saying for

4  all patients with narcolepsy that Xywav is safer and

5  clinically superior due to the lower sodium, sir, Lumryz has

6  the exact same sodium as Xyrem, doesn't it, sir?

7  A.    It does.

8  Q.    And Lumryz has a warning on it due to its high sodium

9  content, correct?

10  A.    Yes, to monitor those who are salt-sensitive.

11  Q.    Right.  And that's one of the reasons why you all,

12  being Avadel, are trying to create a lower sodium, a

13  low-sodium oxybate product for the market, correct?

14  A.    For those who are salt-sensitive.

15  Q.    Well, but that -- that says "all patients with

16  narcolepsy," right?  That's the -- that's the FDA.  That's

17  not --

18  A.    Yeah.

19  Q.    -- that's not Jazz, right?

20  A.    Yeah.

21  Q.    Okay.

22  A.    The FDA who granted us orphan exclusivity and --

23  Q.    Okay.

24  A.    -- give us our clinical superiority.

25  Q.    Okay.  But not based upon safety, right?

563

1  A.    That's correct.

2  Q.    And not based upon efficacy, correct?

3  A.    That's correct.

4  Q.    Okay.  Because when we're looking at safety, it's

5  saying that Xywav is safer, thus clinically superior, for

6  all patients with narcolepsy because of the sensitivities

7  that they have to sodium, right?

8  A.    I believe it says it's "safer and thus clinically

9  superior to Xyrem" --

10  Q.    Right.

11  A.    -- in those following patients.

12  Q.    Because of the lower sodium, right?

13  A.    I believe so.

14  Q.    Well, that's what it -- I mean, that's what it says.

15  A.    Yeah.

16  Q.    Okay.  And, again, Lumryz has the exact same sodium

17  content as Xyrem, true?

18  A.    Yeah, and FDA made a conclusion --

19        MR. PORTER:  Okay.  That's it.  Thank you.

20        Pass the witness.

21        MS. DAVIS:  Nothing further, Your Honor.

22        THE COURT:  All right.  All right.

23        THE WITNESS:  May I be excused?

24        THE COURT:  Mr. Divis, you may be excused.

25  Thank you.

564

1        All right.  Jazz, you may call your next

2  witness.

3        MS. THOMPSON:  One moment, Your Honor.  We're

4  going to make something clear with Avadel.

5        THE COURT:  Okay.

6        MS. THOMPSON:  Thank you.

7        (Pause.)

8        Your Honor, Jazz is going to call Dr. Mark

9  Rainey.  As you recall, he's the witness for whom we need to

10  seal the courtroom, so we're going to try to end the day

11  with him --

12        THE COURT:  Okay.

13        MS. THOMPSON:  -- for the convenience of --

14        THE COURT:  All right.  All right.  So anyone --

15  so we need anyone who is not a corporate representative to

16  exit the room.

17        MS. THOMPSON:  It's anyone who is not subject to

18  the -- the parameters of the protective order.  So, for

19  instance, there are some documents that are attorneys' eyes

20  only, and so, for instance, if Mr. Mindus were still here,

21  he would need to leave.

22        THE COURT:  Okay.  So --

23        MS. DAVIS:  We're generally in alignment with

24  that, just one clarification.  When Mr. Divis gets back, he

25  will be -- he's a corporate representative, so he will be

565

1    permitted to be in despite otherwise not qualifying.

2         THE COURT:  All right.  Corporate -- right.  A

3    party can -- has the right to stay.

4         MS. THOMPSON:  Yes, Your Honor.

5         THE COURT:  He's a corporate representative, so

6    he can stay.

7         So anyone who is not a party representative or

8    is not allowed to see documents that have been designated as

9    confidential under the stipulated confidentiality agreements

10   needs to leave the courtroom at this time.

11        MS. THOMPSON:  Thank you, Your Honor.

12        (Whereupon, the courtroom was sealed and

13   testimony was reported but not transcribed.) (Whereupon, the

14   courtroom was sealed and testimony was as follows:)

15        MARK RAINEY, having been called on the part and

16   behalf of the Plaintiff as a witness, having first affirmed

17   to tell the truth, testified as follows:

18             DIRECT EXAMINATION

19        THE COURT:  Are there any demonstratives for

20   this witness?

21        MS. THOMPSON:  Yes, Your Honor, there are

22   demonstratives.  We have two copies of those.

23        THE COURT:  All right.

24        MS. THOMPSON:  Thank you, Your Honor.

25   BY MS. THOMPSON:

566

1    Q.    Good afternoon, Dr. Rainey.  Could you please

2    introduce yourself to the jury.

3    A.    Good afternoon.  I'm Mark Rainey.

4    Q.    And what is your profession?

5    A.    I'm an economist.

6    Q.    How long have you been an economist?

7    A.    Over 20 years.

8    Q.    Could you briefly describe your educational

9    background.

10   A.    I have an undergraduate degree in economics from

11   Stanford University and a PhD in economics from MIT.

12   Q.    And at what point in time did you start working as an

13   economist?

14   A.    My first job as professional economist was before I

15   finished my PhD.  I took a year off from grad school to go

16   work at the Council of Economic Advisers, which is a

17   government agency that advises the White House on economic

18   policy.

19   Q.    And as a general matter, what kind of work do you do

20   as an economist?

21   A.    You know, I've worked for companies, law firms.  I'm

22   asked to do economic analysis on the types of issues that

23   come up in cases such as this one.

24   Q.    And where did you work after you finished your PhD?

25   A.    I worked at economic consulting firms.

567

1    Q.    And you're Jazz's damages expert in this case?

2    A.    Yes.

3    Q.    What were you asked to do with respect to this

4    lawsuit?

5    A.    I was asked to calculate past damages for Avadel's

6    infringement of Jazz's patents.

7    Q.    And how many times in your professional carrier have

8    you provided economic analysis for health or pharmaceutical

9    matters?

10   A.    Over 20 times.

11        MS. THOMPSON:  Your Honor, at this time I'd move

12   to qualify Dr. Rainey as an expert in economics and

13   determination of patent damages.

14        MS. THOMPSON:  No objection.

15        THE COURT:  All right.  Dr. Rainey may testify

16   as an expert in economics and patent damages.

17        MS. THOMPSON:  Thank you, Your Honor.

18        And I would also, at this time, like to move

19   into evidence, for efficiency sake, some exhibits that are

20   used in Dr. Rainey's slides.

21        If I could move into evidence Exhibit JTX129,

22   JTX130, JTX63, JTX132, JTX133, JTX135, JTX136, JTX137,

23   JTX138, JTX140, JTX142 and JTX266.

24        MS. THOMPSON:  No objection.

25        THE COURT:  All right.  JTX129, 130, JTX63, 132,

568

1    133, 135, 136, 137, 138, 140, 142 and 266 are admitted.

2         (Exhibit admitted.)

3         MS. THOMPSON:  Thank you, Your Honor.

4    BY MS. THOMPSON:

5    Q.    Dr. Rainey, did you form an opinion as to the

6    appropriate amount of past damages that the jury should

7    award Jazz even if Avadel's found to have infringed?

8    A.    Yes, I did.

9    Q.    And did you prepare anything today to help the jury

10   understand your opinion.

11   A.    Yes, I prepared some slides.

12   Q.    Okay.  Well, let's take a look at the first slide,

13   it's PDX2.

14        And what was your opinion as to the appropriate

15   royalty rate for past damages?

16   A.    It's shown there, it's 27 percent.

17   Q.    And how do you convert that royalty rate into a

18   monetary figure?

19   A.    In order to convert that into damages, you apply the

20   royalty rate to what's called a royalty base and here, I

21   determined that the appropriate royalty base was the net

22   sales of Lumryz since launch which is shown there is

23   about -- I calculated to be about $32.5 million.

24   Q.    And so using that royalty rate and royalty base, what

25   is your opinion as to the value of past damages?

569

1  A.     Yes, you multiply those two numbers together and you
2  get about $8.8 million.
3  Q.     Now, what is a reasonable royalty?
4  A.     You know, it's kind of those things with a reasonable
5  royalty as the royalty that a willing licensor and a willing
6  licensee would agree to for a license to patents if they got
7  together and negotiated about it.
8  Q.     And what exactly is a license?
9  A.     A license is when, if you own a patent, you grant
10  someone else the right to use that patent.
11  Q.     And why did you look at reasonable royalty in
12  assessing damages in this instance?
13  A.     Because the law surrounding patent damages says that
14  it's appropriate to look at a reasonable royalty.
15  Q.     Okay.  Let's go ahead to your next slide here.
16         Is this one of the laws you're talking about?
17  A.     Yes.
18  Q.     And why did you underline here "for the use made of
19  the invention by the infringer"?
20  A.     It's just because, you know, we've heard some
21  testimony in the past couple of days about how Jazz does not
22  have a once-nightly product or uses these patents.  But
23  really focuses on the use made of the invention by the
24  infringer and the alleged infringer here is Avadel, which is
25  accused of using the patents.

570

1  Q.     And what is the framework by which you assess what a
2  reasonable royalty would be?
3  A.     I use a framework called a hypothetical negotiation.
4  Q.     Okay.  And what is a hypothetical negotiation as a
5  general matter?
6  A.     Yeah, so a hypothetical negotiation is, you get the
7  patent owner, the accused infringer, you assume that they
8  got together at the time of first infringement and
9  negotiated a license to the patents-in-suit.
10  Q.     Okay.  Let's go to your next slide.
11         For the hypothetical negotiation you looked at
12  here, who are the parties to the negotiation?
13  A.     Yeah, the two parties are Jazz, which is the patent
14  owner, and Avadel, which is the accused infringer.
15  Q.     And what was the timing of the negotiation?
16  A.     It's at or about the time of first infringement,
17  which in this case is, you know, somewhere around late May,
18  early June of 2023.
19  Q.     And what do the parties assume at the time of the
20  hypothetical negotiation as to validity and infringement?
21  A.     Both parties would assume that the patents-in-suit
22  are valid, infringed and enforceable.
23  Q.     And what type of royalty did you consider in the
24  context of the hypothetical negotiation?
25  A.     Yeah, I determined that the parties would end up

571

1  negotiating what's called a running royalty, which, as we
2  saw in my first slide, it means that you have a royalty rate
3  that's applied to a royalty base.
4  Q.     So whatever is paid under the royalty, would depend
5  upon what those revenues are for the sale?
6  A.     Yeah, and one of the reasons I determined it was
7  appropriate is because that helps the parties share the risk
8  about, you know, what will happen in future sales of Lumryz.
9  If for some reason Lumryz sales happen to be lower than
10  expected, then the royalty payment would be lower too.
11  Q.     And how did you determine what information to
12  consider in conducting your hypothetical negotiation
13  analysis?
14  A.     I also considered, you know, past -- the law
15  surrounding reasonable royalties and it talks about certain
16  factors that may be appropriate to consider in determining
17  reasonable royalty.
18  Q.     What did you determine about the relevance of all
19  those various factors?
20  A.     I determined that some of them were relevant
21  or highly relevant, some of them, given the circumstances of
22  this case, weren't as important.
23  Q.     Now we talked about licenses, can you explain what a
24  licensing program is?
25  A.     Licensing program would be if, for example, you're a

572

1  company that has patents but doesn't sell products, you
2  might want to go out and find companies that you could
3  license your patents to to make some money.  So that would
4  be a licensing program.
5  Q.     And does Jazz have a licensing program?
6  A.     No, we heard, I think it was Mr. Honerkamp,
7  yesterday, talk about that.  They're focussed on selling
8  their own products, developing and selling their own
9  products, not licensing patents.
10  Q.     And how does the fact that Jazz does not have a
11  licensing program affect the reasonable royalty analysis?
12  A.     That tends to affect the reasonable royalty.
13  Q.     And did you consider the nature and scope of the
14  license the parties would agree to as part of your
15  hypothetical negotiation analysis?
16  A.     Yes.
17  Q.     And what did you determine?
18  A.     I determined it would be -- the license that they
19  would negotiate would be exclusive as to third parties and
20  all that means is that Jazz would grant Avadel a right to
21  use the patents, Jazz would retain the right to use those
22  patents itself, but then no other parties would be allowed
23  to use those patents.
24  Q.     Are you aware of any customary royalty rate for
25  technologies like the patents we're talking about in this

573

1  case?

2  **A.**    No.

3  **Q.**    Did you review any licenses that would establish what

4  the royalty would be for the patents we're talking about

5  here?

6  **A.**    No, I didn't.

7  **Q.**    Why not?

8  **A.**    Because, you know, Jazz doesn't have a licensing

9  program, so they haven't licenses the patents-in-suit.

10  **Q.**    And in forming your opinion, did you review any Jazz

11  licenses at all?

12  **A.**    I did.

13  **Q.**    And what's an example of a license Jazz might have

14  given that it doesn't have a licensing program?

15  **A.**    So when you have litigation about patents, similar

16  like this, that can lead to settlement agreements which lead

17  to licenses, so Jazz has some of those.  You also can have

18  licenses between different divisions of the same company and

19  Jazz also has some of those.

20  **Q.**    And what did you determine about whether those

21  licenses are comparable to the license that would result

22  from a hypothetical negotiation?

23  **A.**    I determined they wouldn't be comparable.

24  **Q.**    And why not?

25  **A.**    And for a couple of reasons.  You know, one is just

574

1  that the intellectual property that was licensed is very

2  different.  As I said before, the patents-in-suit haven't

3  been licensed before.

4          Another reason is that the circumstances

5  regarding the negotiation of a license are different,

6  quote/unquote, that they would at the "hypothetical

7  negotiation."

8  **Q.**    And what about for any intercompany licenses that you

9  looked at?

10  **A.**    Yeah, there are big differences in the nature of the

11  relationship between the two parties to the license.  If

12  they are the divisions of the same company, they are working

13  together, they are cooperating.

14          Here, as we've heard, Jazz and Avadel are

15  competitors so that's a very different competitive

16  relationship.

17  **Q.**    And did you ever review any Avadel licenses in

18  forming your opinion?

19  **A.**    Yes, I did.

20  **Q.**    And what did you determine about whether any Avadel

21  licenses were comparable to the license that would result

22  from a hypothetical negotiation?

23  **A.**    I determined that they weren't comparable.

24  **Q.**    Okay.  Did you hear any testimony today or

25  throughout -- or yesterday, I guess, about Project Zeta?

575

1  **A.**    Yes, I think both days probably.

2  **Q.**    Did you look at Project Zeta in conducting your

3  analysis?

4  **A.**    Yeah, I considered it.

5  **Q.**    And what did you determine about the relevance of the

6  Project Zeta in negotiations to the reasonable royalty rate?

7  **A.**    Yeah, it didn't establish a royalty rate for the

8  patents-in-suit, you know, not comparable.

9  **Q.**    And if you heard or know, when did those Project Zeta

10  negotiations occur?

11  **A.**    Those occurred in 2018, so about 5 years prior to the

12  date of the hypothetical negotiation.

13  **Q.**    And in that negotiation, what was the proposed

14  relationship between Jazz and Avadel as opposed to their

15  relation in a hypothetical negotiation?

16  **A.**    Yeah, as we just heard Mr. Divis testify, it was more

17  of a partnership that they were considered in Project Zeta,

18  whereas, a hypothetical negotiation, the two companies would

19  be viewing each other as competitors: they'd be selling

20  competing products if a license were granted.

21  **Q.**    Okay.  Let me ask you about competing products.

22          In your opinion, what's the commercial

23  relationship between Jazz and Avadel?

24  **A.**    They are direct competitors.

25  **Q.**    And what are the facts that led you to conclude that?

576

1  **A.**    You know, information from Avadel, third parties, you

2  know, information we've heard testimony about the past

3  couple of days as well is all the type of information we've

4  considered.

5          MS. THOMPSON:  Your Honor, at this point in time

6  I would like to move into evidence Exhibit JTX113.

7          MS. DAVIS:  No objection.

8          THE COURT:  JTX113 is admitted.

9          (Exhibit admitted.)

10  BY MS. THOMPSON:

11  **Q.**    And, Dr. Rainey, what is this document?

12  **A.**    This is a document Avadel filed with the Securities

13  and Exchange Commission.

14  **Q.**    So it's a financial document filed with the

15  government?

16  **A.**    Yes, it has financial and business information.

17  **Q.**    And did you consider this document in forming your

18  opinion here?

19  **A.**    Yes.

20  **Q.**    All right.  Let's look at the date.  Can we go to

21  page 113.182, please.

22          And what is the date that Avadel submitted this

23  to the SEC?

24  **A.**    Yeah, the date of the signature there is March 29,

25  2023, so just a couple of months before the hypothetical

577

1  negotiation.

2  Q.     Okay.  And let's jump back to page 113.11.

3         And looking at that italicized heading at the

4  top there, what did Avadel tell the U.S. government in that

5  filing?

6  A.     It's -- they are telling the government that if

7  Lumryz is granted final FDA approval, it will compete with

8  the currently approved twice-nightly oxybate formulations,

9  which we know are Jazz's products, Xyrem and Xywav.

10        Later on in that paragraph, it says that they

11 are also -- it also would compete with the authorized

12 generic version of Xyrem, which is, again, another Jazz

13 product, Mr. Mindus talked about it, Avadel, I'll call it

14 Xyrem HE for short.

15 Q.     Okay.  And was Lumryz, in fact, approved before the

16 hypothetical negotiation?

17 A.     Yes.  Yeah, as we've heard, it was approved May 1st

18 of 2023.

19        MS. THOMPSON:  We can take that down, thank you.

20 BY MS. THOMPSON:

21 Q.     Did you consider any industry research reports from

22 the relevant time period discussing whether Jazz and Avadel

23 are direct competitors?

24 A.     Yes.

25 Q.     And what did those industry research reports say?

578

1  A.     They said the same thing as what Avadel was telling

2  the government, that Lumryz would be competing with Xyrem

3  and Xywav, Xyrem AG.

4  Q.     And how does the fact that Jazz and Avadel are direct

5  competitors affect the reasonable royalty?

6  A.     It tends to increase the reasonable royalty.

7  Q.     All right.  Did you consider Avadel's forecast for

8  Lumryz in forming your opinion as to the reasonable?

9  A.     Yes, I did.

10        MS. THOMPSON:  Let's go ahead and pull up PTX5.

11 BY MS. THOMPSON:

12 Q.     And this is a slide from Exhibit JTX129, Avadel's

13 May 2023 Lumryz forecast.

14        On this slide, what does conversion in this

15 context refer to?

16 A.     Yeah, so conversion is essentially -- we heard

17 Mr. Divis talked about switching, so patients being switched

18 from Jazz products to Lumryz.  That's what this conversion

19 category represents.

20 Q.     All right.

21        MS. THOMPSON:  Let's go to the next slide.

22 BY MS. THOMPSON:

23 Q.     Is this a chart you made based on Avadel's forecast

24 that -- on JTX129?

25 A.     Yes.

579

1  Q.     Okay.  And what does the conversion percent row in

2  this chart show?

3  A.     It just indicates of the total Lumryz patients in

4  their forecast from 2023 to '28, you know, what's the share

5  of total Lumryz patients that are conversion or switch

6  patients.

7  Q.     Okay.  And what is that percent?

8  A.     So it starts off at about 54 percent in 2023, and

9  then by 2028, it's about 40 percent.

10 Q.     Now, what is the relevance to the hypothetical

11 negotiation of the fact that Avadel was forecasting patients

12 would be switching from Xyrem and Xywav to Lumryz?

13 A.     It just indicates that there was extensive

14 competition between Avadel to Jazz because Lumryz was taking

15 a big chunk of its patients from Jazz's products.

16 Q.     Did you consider any other information showing

17 Avadel's targeting of switching patients from Xyrem and

18 Xywav?

19 A.     Yes.

20 Q.     All right.

21        MS. THOMPSON:  Let's go to the next slide.

22 BY MS. THOMPSON:

23 Q.     This is a slide from Exhibit PTX295, Avadel's May 1

24 Investor Day presentation from 2023.

25        Did you rely on this document in your analysis?

580

1  A.     Yes, I did.

2  Q.     And what does it show that Avadel was telling

3  investors at the time?

4  A.     Yeah, so these are the three patient segments again,

5  we just heard Mr. Divis talk about.  Again, this category

6  here, current twice-nightly oxybate patients, those are

7  switched patients because they are currently taking Jazz

8  products.

9  Q.     Okay.  And what do the parties know at the time of

10 the hypothetical negotiation about Avadel's strategy with

11 healthcare providers or doctors?

12 A.     That Avadel's strategy was to target highly -- big

13 prescribers of Jazz products, twice-nightly oxybates.

14 Q.     Okay.  Let's go ahead to your next slide.

15        This is showing Exhibits JTX138, JTX140, and

16 PTX300.  Did you rely on these documents in your analysis?

17 A.     Yes, I did.

18 Q.     And what was the overall strategy Avadel had with

19 regard to healthcare professionals?

20 A.     It was to focus on existing high-volume oxybate

21 prescribers, that is doctors who were prescribing Jazz

22 products.

23 Q.     And how would the fact that Avadel was targeting

24 Jazz's patients affect what Jazz would accept as a

25 reasonable royalty in the hypothetical negotiation?

581

1    A.      It would mean that at the hypothetical negotiation,
2    Jazz would be concerned that by granting a license to
3    Avadel, it would be losing patients and losing money because
4    of granting that license.
5    Q.      And did you analyze any benefits that Avadel was
6    promoting that Lumryz had over Jazz's twice-nightly oxybate
7    drugs?
8    A.      Yes.
9    Q.      And what was the relevance of how Avadel was
10   promoting Lumryz in comparison to Jazz's twice-nightly
11   oxybate products?
12   A.      Yeah, it showed that the once-nightly formulation is
13   something that Avadel viewed as really the key to success of
14   Lumryz.
15   Q.      Okay.  And what is your understanding about the
16   relationship between the patents at issue in this lawsuit
17   and the once-nightly formulation of Lumryz?
18   A.      Yeah, my understanding is that the patents at issue
19   here allow for the once-nightly formulation of Lumryz.
20   Q.      And did you consider Avadel documents in reaching
21   that conclusion?
22   A.      Yes, I did.
23   Q.      Let's take a look at a few examples.
24           MS. THOMPSON:  We could go on to the next slide.
25   BY MS. THOMPSON:

582

1    Q.      Did you rely on the documents shown here, Exhibits
2    JTX132, JTX133, and PTX262 in your analysis?
3    A.      Yes.
4    Q.      And what is cited on this slide?
5    A.      So these are some research studies, you know, they
6    are performed by or funded by Avadel, about preferences
7    among oxybates and what drives physician and patient
8    preference.
9    Q.      And what was the conclusion of these research studies
10   that Avadel funded about the importance of the once-nightly
11   formulation?
12   A.      Yeah, so really two conclusions:  One is that, among
13   both doctors and patients, they found that dosing frequency
14   is the most important attribute for product choice.  Second
15   conclusion was that once-nightly was preferred to
16   twice-nightly.
17   Q.      Okay.  Let's go to your next slide, PTX10.  This is
18   from the Investor Day presentation, again, Exhibit PTX295.
19           How did Avadel use the information that doctors
20   and patients prefer the once-nightly formulation with
21   investors?
22   A.      They used it to -- they were telling investors that
23   because people preferred this once-nightly formulation, this
24   would mean that Lumryz would be successful, essentially.
25   Q.      And what is your understanding of the FDA's

583

1    consideration of the once-nightly formulation of Lumryz?
2    A.      Yeah, so the FDA, we've heard some testimony about
3    that as well, I think it's the major contribution to patient
4    care, and that's, again, related to the once-nightly
5    formulation.
6    Q.      Okay.  Let's look at your next slide, PTX11.  This is
7    citing Exhibits JTX138, JTX140, and PTX300.  You -- did you
8    rely on those documents in your analysis?
9    A.      Yes.
10   Q.      And what was Avadel saying with regard to how the FDA
11   viewed the fact that Lumryz is a once-nightly product?
12   A.      Yeah, so it's really -- they're talking about how the
13   once-at-bedtime Lumryz dosing is a major contribution to
14   patient care, according to the FDA.
15   Q.      Okay.  Let's go to your next slide.  This slide shows
16   Exhibits JTX135, JTX136, and JTX142.  Did you rely on these
17   documents in your analysis?
18   A.      Yes, I did.
19   Q.      What does this show about how Avadel promotes Lumryz
20   to patients?
21   A.      Yeah, so here -- these are examples of promotion both
22   to patients, I think there's some physician promotion as
23   well, showing that really the key attribute that Avadel is
24   focusing on is the once-nightly part, you know, once at
25   bedtime for your daytime, that's really the key -- key

584

1    message they want to get across, both to patients and
2    physicians.
3    Q.      And in your opinion, how would the fact that Avadel
4    emphasizes Lumryz's once-nightly formulation inform the
5    parties' thinking in the hypothetical negotiation?
6    A.      You know, it would mean that -- it would tend to
7    increase the reasonable royalty.
8    Q.      Okay.
9            MS. THOMPSON:  Let's go to the next slide here,
10   PTX13.
11   BY MS. THOMPSON:
12   Q.      This is citing Exhibit JTX63.  Did you rely on this
13   document in your analysis?
14   A.      Yes, I did.
15   Q.      And what connection has Avadel made between the
16   formulation and the once-nightly attribute of Lumryz?
17   A.      This is Avadel saying that it's the blend of
18   immediate-release and controlled-release particles that
19   allows for the single bedtime dose of Lumryz.
20   Q.      And how did the advantages that Avadel has associated
21   with the formulation affect the reasonable royalty?
22   A.      It increases the reasonable royalty.
23   Q.      In your opinion, how did Jazz and Avadel perceive the
24   value of the patents at the hypothetical negotiation?
25   A.      They thought the patents were valuable because,

585

1  again, they are assumed to be valid and infringed.  And it's
2  also, again, my understanding that the patents are what
3  allow for that once-nightly formulation, which we've seen
4  is viewed as the key to success of Lumryz.
5  Q.   And what's your understanding of whether the value
6  that Jazz's patents-in-suit contribute to Lumryz can be
7  separated from the value of Lumryz as a whole?
8  A.   Yeah, I don't think it's really possible to do that
9  because my understanding is that the patents cover the
10  formulation of Lumryz as a whole.  So the only product that
11  exists that's FDA approved is the whole formulation of
12  Lumryz, it's not like Lumryz is a cell phone where you can
13  think about there being different components that you could
14  sell or put together, like a processor or a screen or a
15  camera, right, that goes onto your cell phone.
16      With Lumryz, it's just the whole formulation and
17  that's what is FDA approved.
18  Q.   Okay.  What would the parties have understood about
19  the likely success of Lumryz at the time the hypothetical
20  negotiation took place?
21  A.   They would expect -- they were expecting it to be a
22  successful profitable product at the time.
23  Q.   And why did Avadel think there would be a demand for
24  Lumryz, in your opinion?
25  A.   This relates to something we heard Mr. Divis talk

586

1  about, which is the unmet need that Avadel viewed Lumryz
2  fulfilling.
3  Q.   Okay.
4      MS. THOMPSON:  Let's go to the next slide, 14.
5  BY MS. THOMPSON:
6  Q.   This is showing excerpts from Exhibits PTX295 and
7  JTX137.  Did you rely on these documents in forming your
8  opinion?
9  A.   Yes.
10  Q.   And what does this show about Avadel's statements
11  regarding Lumryz addressing an unmet need?
12  A.   Yes, this is Avadel talking about there being a
13  serious unmet need for once-nightly dosing of sodium
14  oxybate.
15  Q.   And what was Avadel telling people --
16      MS. THOMPSON:  If we could go to the next slide.
17  BY MS. THOMPSON:
18  Q.   -- about the expected sales of Lumryz around the time
19  of the hypothetical negotiation?
20  A.   Yeah, as we've heard, they were telling investors
21  that the peak sales opportunity was over $1 billion a year.
22      MS. THOMPSON:  Can we go ahead to the next
23  slide, and this is showing excerpts of Exhibits JTX119 and
24  PTX300.
25  BY MS. THOMPSON:

587

1  Q.   What was Avadel saying at the time of the
2  hypothetical negotiation about the expected market share of
3  Lumryz?
4  A.   They were saying that they were expecting Lumryz to
5  become the market leader with a market share in the range of
6  50-60 percent.
7  Q.   What about Avadel's financial models with respect to
8  Lumryz's likely success?  Did you consider those?
9  A.   Yes.
10      MS. THOMPSON:  All right.  Let's go ahead and
11  look at Exhibit -- let's go to the next slide, I guess,
12  PDX17.
13  BY MS. THOMPSON:
14  Q.   And this is from Exhibit JTX130, and at the top, it
15  says, "May 2023 Avadel Financial Model."
16      Is that what that exhibit is?
17  A.   Yes.
18  Q.   Okay.  And what's Avadel forecasting here?
19  A.   They're forecasting revenues and various measures of
20  profit for Lumryz for the period that's shown here, which is
21  2023-2036.
22  Q.   As of May 2023, what was Avadel forecasting in that
23  revenue for Lumryz?
24  A.   They are forecasting net revenue to start off at
25  ████████████ in the launch year 2023, but significant

588

1  growth ████████████████ this year, 2024, and
2  increasing to ██████████
3  Q.   And just -- can you just explain, what is net revenue
4  as compared to gross revenue?
5  A.   Oh, sure, yeah.  So net revenue -- the difference
6  between gross revenue to net revenue is essentially
7  discounts and rebates.  So you can think about gross revenue
8  representing the list price, sticker price, but then after
9  discounts and rebates, you get net revenue, which is the
10  money actually coming into the door at Avadel.
11  Q.   Okay.  And as of May 2023, when was Avadel
12  forecasting that it would turn a profit?
13  A.   ██████████
14  Q.   And what's your understanding of whether after Lumryz
15  launched, Lumryz has been performing as Avadel expected?
16  A.   Yeah, my understanding is that things are going
17  according to plan.  You know, they're still telling people,
18  as we've just heard from Mr. Divis, that that peak sales
19  opportunity of over a billion dollars is still -- still part
20  of the plan.
21  Q.   And how does an expected profitability and success of
22  Lumryz affect the reasonable royalty?
23  A.   It tends to increase the reasonable royalty.
24  Q.   Now, in forming your opinions, did you consider
25  whether, instead of launching Lumryz, Avadel had any

589

1  noninfringing alternative?

2  A.    Yes, I did.

3  Q.    And what is meant in this context by a noninfringing

4  alternative?

5  A.    So in this context, a noninfringing alternative would

6  be another product that Avadel could sell, instead of

7  Lumryz, that had the same attributes as Lumryz.  It was

8  available for Avadel to sell, and it did not infringe Jazz's

9  patents.  Those are the characteristics.

10 Q.    And did Avadel and does Avadel have any noninfringing

11 alternative?

12 A.    No, they don't.

13 Q.    And what is the significance of Avadel not having a

14 noninfringing alternative?

15 A.    It means that at the hypothetical negotiation, they'd

16 be in a relatively weak bargaining position.

17 Q.    Aside from switching patients from Jazz's products to

18 Lumryz, what's your understanding of how Avadel plans to

19 benefit from Lumryz?

20 A.    Right, so there are the other patient segments we've

21 heard about -- discounted patients, patients who have never

22 taken oxybates -- and in addition, there's expanding the

23 patient population for Lumryz.

24 Q.    Okay.  Can we just look quickly at Exhibit PTX300, at

25 page 300.112.

590

1        And you were here when Mr. Divis just testified?

2  A.    Yes.

3  Q.    Did you hear him talk about this slide here?

4  A.    Yes, I did.

5  Q.    And in your opinion, how does Avadel's plan and use

6  for Lumryz affect the reasonable royalty?

7  A.    Yeah, this means that there's -- there would have

8  been -- they -- Avadel would have viewed there'd be an

9  additional value in the future from this, which, again,

10 would tend to increase the reasonable royalty.

11 Q.    Okay.  Let's go back to your slides.

12       Based on your analysis, did you conclude what a

13 reasonable royalty would be?

14 A.    Yes.

15 Q.    Okay.  Can we go to slide 18, please.

16       And what does this slide show?

17 A.    This shows the royalty rates that I determined would

18 be the outcome of the hypothetical negotiation.

19 Q.    Okay.  And why are there three different royalty

20 rates?

21 A.    There's three different royalty rates for the three

22 different periods, and the three different periods differ in

23 their competitive conditions, and just the basic idea here

24 is in economics, competitive conditions affect royalty

25 rates.

591

1  Q.    Okay.  And it says here, 27 percent for the time

2  period 2023-2025, 13 percent for the time period 2026 to

3  2032, and 3.5 percent for the time period 2033 to 2036.

4        Is that the opinion that you reached?

5  A.    Yes.

6  Q.    And which of these royalty rates applies to past

7  damages for infringement at issue in this lawsuit?

8  A.    Yeah, that first one there, so -- so right now we're

9  just talking about 2023 and part of 2024, so 27 percent is

10 the relevant rate.

11 Q.    And what would be the full duration of the license

12 that was negotiated during the hypothetical negotiation?

13 A.    It would go to the expiration of the last valid

14 infringed patent claim.

15 Q.    In your opinion, why would Jazz agree to the royalty

16 rates we just discussed in that hypothetical negotiation?

17 A.    Because these royalty rates wouldn't make Jazz worse

18 off by entering into a license at those royalty rates.

19       MS. THOMPSON:  All right.  Can we go to the next

20 slide, 19.

21 BY MS. THOMPSON:

22 Q.    And what is the source of information for this slide?

23 A.    This is based off of Jazz's narcolepsy forecast

24 model, which we heard Mr. Mindus testify about earlier this

25 afternoon.

592

1  Q.    And what does this slide show?

2  A.    So, you know, as we heard Mr. Mindus say, you can use

3  Jazz's narcolepsy forecast model to forecast the revenue for

4  Jazz's products with Lumryz and without Lumryz.

5        So using that information and also the profit

6  information that Mr. Mindus also talked about, I'm

7  calculating the amount of money that Jazz expected to lose

8  if Lumryz launched.

9  Q.    Okay.  And what is column G here on this slide?

10 A.    Yeah, that's the amount of money that Jazz expected

11 to lose due to Lumryz's launch.

12 Q.    Okay.  What is column H?

13 A.    That's a forecast of Lumryz's net revenues that is

14 derived from Jazz's narcolepsy forecast model.

15 Q.    Okay.  And what is column I showing in that final

16 column?

17 A.    So that's showing on a year-by-year basis the royalty

18 rate you'd have to apply to forecast Lumryz's net revenues

19 in order to keep Jazz from being made worse off.

20 Q.    And why is it relevant to the hypothetical

21 negotiation to consider the revenue Jazz loses from its

22 twice-nightly products by licensing the patent to Lumryz's

23 once-nightly product?

24 A.    Because Jazz's losses are really tied very closely to

25 the incremental value of Jazz's patents, and that's because

593

1    Jazz's patents allow for the once-nightly formulation of
2    Lumryz.  And if you think about why Lumryz's entry is
3    causing Jazz to lose money, it is because of that, the
4    benefits of once-nightly, that Lumryz has and Jazz doesn't.
5    Q.       If we look at this average royalty rate calculation
6    at the bottom here, what is that?
7    A.       So, again, I'm -- those are those three periods with
8    the three different competitive conditions -- and I'm
9    calculating the average of the royalty rates in column I
10   across those three periods.
11   Q.       Now, why didn't you use a royalty rate of, say,
12   3.5 percent for the whole term of the license?
13   A.       It would be economically irrational for Jazz to enter
14   into such a license.
15   Q.       Economically irrational, you said?
16   A.       Irrational.
17             MS. THOMPSON:  Okay.  Can we go to the next
18   slide.
19   BY MS. THOMPSON:
20   Q.       Is this one of your calculations?
21   A.       Yes.
22   ██████████████████████████████████
██   ████████████████████████
██   ██████████████
██

594

██
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████
█████████████████████████████████
██
8    Q.       Okay.  Let's look at this from Avadel's perspective.
9             MS. THOMPSON:  Can we go to the next slide,
10   please.
11   BY MS. THOMPSON:
12   Q.       And this is citing to Exhibit JTX129.
13             Did you rely on that document in conducting your
14   analysis?
15   A.       Yes.
16   Q.       Okay.  And what is this showing here?
17   A.       So this is looking at things from Avadel's
18   perspective at the time of the hypothetical negotiation.  In
19   column B there, I have Avadel's forecast of Lumryz's
20   revenues during the licensing -- licensing period.  And then
21   column C is the royalty Avadel would expect to pay at my
22   reasonable royalty rates.
23   Q.       Okay.  And what is the -- how much revenue was Avadel
24   forecasting from Lumryz through the start of 2036 as of the
25   date of this forecast?

595

1    A.       Yeah, the total -- total forecast of Lumryz's revenue
2    is at the bottom of column B there, so that's a little over
3    ██████████
4    Q.       Okay.  And how much revenue would Avadel expect to
5    keep if it agreed to the royalty structure that resulted
6    from your analysis?
7    A.       So, yeah, to get that, you take the ████████ and
8    subtract the amount it would have expected to pay in
9    royalties, and that -- that amount, expected to pay in
10   royalties, is in column C, and that's just ████████
11   ████████████████████████████████  That's the bottom of column D.
12   ██████████████
13   Q.       Okay.  So that's Avadel revenue net of royalty, how
14   much they would keep if they paid for the license to the
15   patents resulting from the hypothetical negotiation.
16   A.       Yeah, how much of the revenue they would keep after
17   the royalty.
18   Q.       And what does the analysis show about how much Avadel
19   will be compensated for any contributions it made to Lumryz?
20   A.       Yeah, well, I mean, let's -- I mean, first of all,
21   let's keep in mind that, you know -- my understanding is
22   that the patents cover this once-nightly formulation which
23   is -- Avadel viewed as key to the success of Lumryz.
24   Avadel -- if it covers the formulation, Avadel doesn't have
25   a noninfringing alternative, but it -- nevertheless, they

596

1    are still getting -- expecting to get, as a result of this
2    license, ████████████████ net of royalty.
3    Q.       Okay.  And do your opinions on the reasonable royalty
4    rate change depending on which of the asserted patent claims
5    we're talking about?
6    A.       No, they don't.
7    Q.       And why not?
8    A.       Because those fundamental economic considerations I
9    just mentioned -- the lack of noninfringing alternative, the
10   fact that the patents cover the once-nightly formulation,
11   the fact that it's key to the success of Lumryz -- those
12   don't change depending on which of the claims are valid and
13   infringed.
14   Q.       Okay.  Did you assess whether Avadel would be better
15   off agreeing to the royalty and therefore willing to
16   enter into the agreement at the royalty rates that you've
17   concluded would be appropriate?
18   A.       Yes, I did.
19   Q.       Let's go to your next slide.  What does that number
20   on the left-hand side there show?
21   A.       So this is Avadel's market capitalization near the
22   time of the hypothetical negotiations, so that's --
23   essentially it's stock market value.  And economically, you
24   can think about that as being kind of a conservative measure
25   of the present value of expected future profits for Avadel.

**597**

1  So it's going to take into account the market's expectations
2  of future revenues, you know, future costs, future tax
3  payments, future interest payments.  It will take all of
4  those into account.
5  Q.      Okay.  And what is that number on the right-hand
6  side?
7  A.      The number on the right-hand side is -- it's a
8  calculation of the present value of expected royalty
9  payments based on a market derived forecast of Lumryz's
10  revenues.
11  Q.      Okay.  And so this is an apples-to-apples comparison
12  based on public data?
13  A.      Yes, based on market data is the way I would describe
14  it.
15  Q.      Okay.  And what does the comparison between these two
16  numbers tell you?
17  A.      Right, so the thing to keep in mind is that, you
18  know, because there's no noninfringing alternative, because
19  the patents are key to the success of Lumryz, in the absence
20  of a license, Avadel's profits would be zero.
21         So to determine whether the deal makes Avadel
22  better off, you just have to compare these two numbers,
23  because by launching Lumryz, it has the present value of
24  expected profits, it's about ▓▓▓▓▓, but you also have
25  to take into account that Avadel would be expecting to pay

**598**

1  royalties based on that 27 percent, 13 percent, 3.5 percent
2  royalty structure.
3         And the present value of those royalty payments
4  is the ▓▓▓▓▓ so since ▓▓▓▓▓▓▓▓▓
5  ▓▓▓▓▓▓▓ in royalty payments, they are ▓▓▓▓▓
6  ▓▓▓▓▓▓▓ better off by entering into this
7  deal.
8  Q.      All right.  You mentioned market capitalization takes
9  into account ongoing expenses.
10         What about past expenses?
11  A.      No, it's a -- market capitalization, like a lot of
12  economic concepts, is fundamentally forward-looking.  So it
13  takes into account the markets expectations of Avadel's
14  future expenses but not things like some costs, which would
15  be costs that Avadel incurred in the past and can't recover.
16  Q.      And did you consider sunk costs in your hypothetical
17  negotiation?
18  A.      Yeah, I mean, I considered them, but I determined
19  that they are not appropriate to take into account at the
20  hypothetical negotiation, you know, neither Avadel's sunk
21  cost, nor Jazz's sunk costs, you know, they are both, in
22  some sense, "water under the bridge," and, hence, not
23  economically relevant.
24  Q.      Okay.  Let's go to the next slide.
25         So we looked at this slide earlier and we've

**599**

1  talked about how you came up with the past royalty, let's
2  talk about, then, the net sales number.
3         What are the sources of information used to
4  calculate the royalty base here?
5  A.      I used a couple of sources of information from
6  Avadel.
7  Q.      Okay.
8         MS. THOMPSON:  Your Honor, if I could move into
9  evidence Exhibit PTX618.
10         MS. DAVIS:  No objection.
11         THE COURT:  All right.  PTX618 is admitted.
12         (Exhibit admitted.)
13         MS. THOMPSON:  And if we could show that.
14  BY MS. THOMPSON:
15  Q.      And, Dr. Rainey, what is this document?
16  A.      This is another Avadel SEC filing, this is a Form
17  10-Q for the period ended September 30th, 2023.
18  Q.      And did you rely on that document in calculating
19  royalty base?
20  A.      Yes.
21  Q.      And what else did you rely on in calculating the
22  royalty base?
23  A.      I also relied on one of Avadel's weekly sales reports
24  for Lumryz, as I think Mr. Divis testified about those just
25  previously.

**600**

1  Q.      Okay.  And if we could go back to the slide we were
2  looking at.
3         What did you determine, between that SEC filing
4  and the weekly sales report, the royalty base would be?
5  A.      That $32.5 million number.
6  Q.      Okay.  And applying that 27 percent for past damages,
7  what is the total amount of past damages?
8  A.      $8,780,223.
9         MS. THOMPSON:  I have no further questions.
10  Thank you, Dr. Rainey.
11         THE COURT:  All right.
12         MS. DAVIS:  May we approach with binders, Your
13  Honor?
14         THE COURT:  Yes.
15         MS. DAVIS:  May I proceed, Your Honor?
16         THE COURT:  Yes.
17                CROSS-EXAMINATION
18  BY MS. DAVIS:
19  Q.      Good afternoon, Dr. Rainey, as you may remember, my
20  name is Kira Davis and I represent Avadel.
21         In giving your opinions, you made certain
22  assumptions, correct?
23  A.      Yes.
24  Q.      You, yourself, do not have any opinions about
25  infringement and you also don't have any opinions about

601

1  validity, correct?

2  A.     Right, I just assume that the patents are valid and

3  infringe, but I don't have opinions on that.

4  Q.     It is your understanding that, "although patents are

5  presumed valid, the validity of many patents is challenged

6  in court," correct?

7  A.     That is -- you know, that happens, yes.

8  Q.     And not all of the patents that are challenged in

9  court survive that challenge, correct?

10  A.     That's true.

11  Q.     Some patents get invalidated?

12  A.     That's true.

13  Q.     If Avadel wins in this case, there are no damages,

14  correct?

15         MS. THOMPSON:  Objection, Your Honor, that calls

16  for a legal conclusion.

17         MS. DAVIS:  He had the patent statute up on a

18  slide, Your Honor.

19         THE COURT:  Right.  That's overruled.  He can

20  answer it.

21         THE WITNESS:  You know, I'm not a lawyer, my

22  understanding is if -- if validity and infringement are

23  proved, then there wouldn't be damages, but hey, I'm not a

24  lawyer.

25  BY MS. DAVIS:

602

1  Q.     So when Jazz's lawyer was asking you questions, you

2  talked about patients who were going to switch from Xyrem

3  and Xywav to Lumryz.

4         Do you recall that testimony?

5  A.     Yes.

6  Q.     Now, you agree that Lumryz is being used with

7  patients who would not otherwise be taking Xyrem or Xywav,

8  correct?

9  A.     That's part of the Lumryz patient population.

10  Q.     Avadel has the only once-nightly oxybate product for

11  narcolepsy available today, correct?

12  A.     That's correct.

13  Q.     So now let's talk about what Jazz has.

14         You agree that Jazz to date has not

15  commercialized a once-nightly oxybate product, correct?

16  A.     Yes, and I accounted for that in my analysis.

17  Q.     You used Jazz internal projections to come up with

18  your opinions; is that correct?

19  A.     Yeah, and then I checked them against, you know, for

20  instance, Avadel's projections as well.

21  Q.     The Jazz's projections were created by Jazz, correct?

22  A.     Yes, in their ordinary course of business, yes.

23  Q.     You assumed that Jazz tried to be accurate?

24  A.     Yes.

25  Q.     The projections you were using from Jazz, those were

603

1  created after this lawsuit began, correct?

2  A.     I don't recall off the top of my head when this --

3  Q.     ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████████

7  Q.     Now, you are of the view that the parties at the

8  hypothetical negotiation would agree to three different

9  royalty rates for three different periods of time; is that

10  right?

11  A.     Yes.

12  Q.     The trigger for the second period is the entry of

13  multisource generic Xyrem, correct?

14  A.     Yes, that's the change in competitive conditions.

15  Q.     "Multisource generics" means not just the authorized

16  generic that is actually a product made by Jazz, but also

17  generics made by companies other than Jazz; is that right?

18  A.     Yes.

19  Q.     ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████████

22  Q.     And your royalty rate for that third period of time

23  is 3.5 percent, correct?

24  A.     Yes.

25  Q.     Now, you're not saying that the reason that the rate

604

1  drops to 3.5 percent for that third period is because of one

2  of Jazz's patents in this case has expired or anything like

3  that, correct?

4  A.     No.

5  Q.     That is correct?

6  A.     That is -- I'm not saying that.

7  Q.     The value changes depending on who else is competing

8  with Jazz for sales besides Avadel, correct?

9  A.     Yes, it depends on the competitive conditions, you

10  know, among narcolepsy treatments.

11  Q.     You understand that a reasonable royalty must be

12  based on the incremental value that the patented invention

13  adds to the end product, correct?

14  A.     Yes.

15  Q.     So I want to talk to you about what you didn't take

16  into account.

17         So you didn't think it is relevant how the

18  patents were invented; fair?

19  A.     Yeah, for my purposes, in damages, what mattered to

20  me was what -- what patent issued.

21  Q.     And so it's correct that you don't think that it's

22  relevant how the patents were invented?

23  A.     I mean, it's not relevant to my damages analysis.

24  Q.     So you're aware that one of the patents has claims

25  that required the use of a sachet; yes?

605

1    A.      Yes, I have heard testimony about that.

2    Q.      Okay.  So let's put that claim up.

3            MS. DAVIS:  So, Mr. Jared, can I have JTX6,

4    already in evidence, at Claim 24 which is on page 19.

5            MS. THOMPSON:  Your Honor, I'm happy for counsel

6    to ask these questions.  I would just note, of course, that

7    Dr. Rainey is not a technical expert and so we'll see where

8    this goes but I think any technical questions may be outside

9    his purview.

10           THE COURT:  I understand.

11   BY MS. DAVIS:

12   Q.      So let's have Claim 14 and Claim 24.

13           All right.  So Dr. Rainey, you don't know where

14   Jazz got the specific claim language that is in this patent,

15   correct?

16   A.      That's correct.

17   Q.      And you didn't try to figure out how much value is

18   added by the drug formulation being packaged in a sachet or

19   not being packaged in a sachet, did you?

20   A.      No, I focused on the formulation of Lumryz as a

21   whole.

22   Q.      So if we look at Claim 14, which is a part of

23   Claim 24, do you see at the end that it requires the

24   viscosity-enhancing agent and the acid are separate from

25   the immediate release particles and the modified --

606

1            MS. DAVIS:  Could we get a little bit more of

2    Claim 14 and then I'll re-ask the question.

3            Scroll down just a little bit more, there we go.

4            Okay.  You can just leave that.

5    BY MS. DAVIS:

6    Q.      All right.  Let me try again.

7            Dr. Rainey, so you see at the end, it requires

8    the viscosity-enhancing agent and the acid are separate from

9    the immediate-release particles and the modified-release

10   particles, the last clause.

11           Do you see that?

12   A.      I see that language.

13   Q.      So you didn't try to figure out how much value there

14   is in having those things be separate as opposed to

15   together, correct?

16   A.      No, I focused on, you know, the formulation of

17   Lumryz.

18   Q.      You looked at Project Zeta documents, correct?

19   A.      I have looked at some, yes.

20           MS. DAVIS:  You can take that down.

21   BY MS. DAVIS:

22   Q.      I want to ask you about the relationship between Jazz

23   and Avadel during Project Zeta, that is something you

24   considered, correct?

25   A.      Yes.

607

1    Q.      In your opinion, the relationship between Jazz and

2    Avadel proposed in the Project Zeta negotiations, was that

3    of innovator -- sorry, let me -- let me just start over.

4            In your opinion, Dr. Rainey, the relationship

5    between Jazz and Avadel proposed in the Project Zeta

6    negotiations, was that of inventor and promotor in that

7    Avadel would be responsible for the development of FT-218

8    through the end of Phase III clinical trial, Avadel is the

9    inventor, while Jazz would then take over responsibility for

10   submitting the NDA for FT-218 and commercializing FT-218

11   making Jazz the promoter, correct?

12   A.      Yeah, I mean, it was proposed as a, you know,

13   partnership, collaboration development agreement.

14   Q.      So in your opinion for Project Zeta, Avadel is the

15   inventor and Jazz is the promoter?

16   A.      I mean, they have an inventor/promotor relationship

17   as opposed to a competitor relationship.

18           MS. DAVIS:  No further questions, Your Honor.

19           THE COURT:  All right.  Redirect?

20           MS. THOMPSON:  Just very briefly, Your Honor.

21               REDIRECT EXAMINATION

22   BY MS. THOMPSON:

23   Q.      You heard some questions about the patents at issue

24   in certain different claims there.

25           I just want to be clear, at the time of the

608

1    hypothetical negotiation, what are the parties required to

2    assume about the validity and infringement of the patents at

3    issue?

4    A.      Yeah, so this is one of -- I think one of my first

5    slides, I described what the hypothetical negotiation looks

6    like.  And there's an assumption that both parties agree

7    that the patents are valid and infringed.

8    Q.      And in the answer to those questions, you talked

9    about the once-nightly formulation.  Why is it the case that

10   if any of the patent claims at issue here are found to be

11   infringed, that the -- your reasonable royalty doesn't

12   change?

13   A.      As I think I mentioned, it's because the fundamental

14   economic considerations don't depend on which particular

15   claims, you know, are found valid and infringed.

16   Q.      All right.  And you were asked a little bit about

17   Project Zeta and the inventor/promoter relationship.  I just

18   want to be clear about when that negotiation took place.

19   What year was that?

20   A.      2018.

21   Q.      And what did you understand about whether patents

22   that may have -- that may have been issued by this point in

23   time of this trial all had been issued as of the time of

24   2018?

25   A.      So my understanding -- my recollection is that the

609

1  patents, Jazz's two patents here, issued in 2020 and 2021, I
2  believe.  And so, hence, in 2018, they had not issued yet.
3  **Q.**    Okay.
4          (Whereupon, the sealed portion concluded.)
5          MS. THOMPSON:  Your Honor, I have no further
6  questions for Dr. Rainey.
7          THE COURT:  All right.  Dr. Rainey, you may step
8  down, sir.  Thank you.
9          MS. THOMPSON:  If I could address one
10  housekeeping matter very briefly.  We had used
11  Exhibit JTX147 with Mr. Mindus and with Dr. Rainey.  We
12  avoided the need to seal the courtroom for Mr. Mindus's
13  testimony, but we would ask that that exhibit be maintained
14  as confidential, Exhibit JTX147.
15          MR. SILVER:  Your Honor, Dan Silver, we have no
16  objection to that.  There were a number of objections, I
17  think, of ours -- a number of exhibits of ours that were
18  entered in that we would want to place under seal as well.
19  So if it's okay with Your Honor, we'll confer with counsel
20  overnight and submit a list in the morning.
21          THE COURT:  That's fine.
22          MR. SILVER:  And also, Your Honor, we'd like the
23  transcript from the sealed portion be placed under seal,
24  pending the parties's opportunity to submit redactions,
25  thank you.

610

1          THE COURT:  That's fine.  I want to remind the
2  parties that -- to be as efficient as possible with sealing
3  confidentiality, there was -- the witness -- we sealed the
4  courtroom for the entire testimony.  Certainly, there was
5  stuff in there that didn't need to be sealed.
6          So remember, the public has a right to hear
7  things.  And the Court is sensitive to confidential and
8  proprietary business information, but I have to balance that
9  against the public's right to know as well.
10          MS. THOMPSON:  Yes, absolutely, Your Honor.  I
11  think Avadel was concerned that Dr. Rainey would say a piece
12  of confidential information, which they didn't want him to,
13  even say it, even if we didn't show the document, so that
14  was what necessitated it.  My apologies.
15          THE COURT:  Understood.  Going forward, both
16  sides be sensitive to that.
17          MS. DAVIS:  Understood, Your Honor.
18          MS. THOMPSON:  Thank you, Your Honor.
19          THE COURT:  All right.  So ladies and gentlemen
20  of the jury, that's going to complete day 2.  So let me
21  remind you the same thing I reminded you last night:  No
22  independent research, don't talk to anyone about the case,
23  keep an open mind, leave your juror notebooks in the juror
24  room.
25          See you tomorrow morning between 9:10 and 9:30.

611

1          (Whereupon, the jury left the courtroom.)
2          THE COURT:  All right.  You may be seated.
3          MS. DURIE:  Your Honor, I just wanted to provide
4  an update with respect to Dr. Meyer, who is our damages
5  expert.  We spoke with her today but she was still not
6  certain whether she would be able to testify, but we are
7  hopeful that we will able to make that happen as late in the
8  case as possible.
9          And so I just wanted to alert the Court to that,
10  that's still a live issue, we're still working on it.
11          THE COURT:  Okay.  And will that be remote --
12          MS. DURIE:  Yeah, it would definitely be remote
13  for sure.
14          THE COURT:  All right.  So you'll coordinate
15  with IT.
16          MR. CERRITO:  Again, not to be insensitive, do
17  we have any idea when this is going to happen?
18          THE COURT:  Well, she said she's still
19  coordinating so she'll provide updates.
20          MR. CERRITO:  We're running out of days, Your
21  Honor, that's why I'm asking.
22          THE COURT:  I don't think she can give you
23  anything more than that.
24          MS. DURIE:  If not tomorrow, and I don't -- I
25  don't know whether the end of the day Thursday is going to

612

1  be a possibility or not.
2          MR. CERRITO:  So the end of Friday, after both
3  cases are complete?
4          THE COURT:  Well, Avadel is going to -- is on
5  the clock just like you're on the clock, so it's going to
6  have to happen, you know, at some point before the time runs
7  out.
8          MR. CERRITO:  Understood, Your Honor.  But, you
9  know, obviously, we don't want our rebuttal case to end with
10  their witness.  That's what it's looking like.
11          THE COURT:  So, Avadel, do the best you can to
12  not have that witness go into Jazz's rebuttal case.
13          MS. DURIE:  I --
14          THE COURT:  Let me hear you.
15          MS. DURIE:  I was going to say, I think as a
16  practical matter, if she can testify, that's likely to
17  happen.  I mean, there's no chance of tomorrow.  We're
18  working to see whether Thursday is going to be a
19  possibility, it's not clear.
20          I think -- well, I don't want to put details of
21  her health conditions on the record.  I could do it -- we
22  could do it at sidebar if we had to.  But we have every
23  interest in getting her up here -- up there on the screen as
24  quickly and efficiently as we can.
25          THE COURT:  Okay.  But I understand the issue,

613

1  but I also understand Jazz's concern, so give us an update
2  tomorrow morning some time, and then we'll revisit the issue
3  in the event -- you know, the Court will think about some
4  possible ways to address Jazz's concerns, in the event it
5  happens.  Maybe giving Jazz, you know, some additional --
6  giving additional time to present its damages expert and
7  rebuttal or something so that Jazz gets the last word to the
8  jury, as would be normally the case.
9          MS. DURIE:  And I think, Your Honor, as a
10 practical matter, I don't -- I don't have any expectation
11 that Jazz intends to recall its damages expert.  They put on
12 their damages expert, we'll put on Dr. Meyer.  I think in
13 the normal course, that would be it.
14         So I think it's just a timing issue that they
15 don't want the case to end with our damages expert.
16 Frankly, I don't want the case to end with our damages
17 expert either, but I'm trying to avoid a situation where she
18 can't come at all.
19         THE COURT:  I understand, but normally Jazz
20 would get the last word in their rebuttal case.
21         MS. DURIE:  On --
22         MR. CERRITO:  Your Honor, they can play the
23 videotape, that would be -- if the witness is unavailable to
24 them, play the video.  We're fine with that.  But this -- we
25 can't prejudice -- my client should not be prejudiced

614

1  because this witness, who now is unavailable to them, not to
2  be heartless, but...
3          THE COURT:  But it's an emergency situation.
4          MS. DURIE:  It is.
5          THE COURT:  It's not --
6          MR. CERRITO:  24 hours seems to me -- you know,
7  if she can do it Thursday --
8          THE COURT:  We'll --
9          MR. CERRITO:  -- or Friday morning, Thursday
10 afternoon.
11         THE COURT:  Think about the worst-case scenario
12 has to happen.  Give me some suggestions on how you think
13 you would work -- Jazz would need to address whatever
14 concern you have in terms of what I assume is you want sort
15 of the opportunity to present last.
16         MR. CERRITO:  Understood, Your Honor.
17         THE COURT:  All right.  We're adjourned for the
18 night.  Let me remind the parties about getting the joint
19 submission in on time.  And everything else that I reminded
20 you about this morning.  So we'll see you in the morning.
21         (Recess taken.)
22         (Whereupon, the following proceeding concluded
23 at 5:27 p.m.)
24         I hereby certify the foregoing is a true
25 and accurate transcript from my stenographic notes in the

615

1  proceeding.
2                    /s/ Michele L. Rolfe, RPR, CRR
                     U.S. District Court
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on May 30, 2024 on the following counsel in the manner indicated below.

### <u>VIA EMAIL:</u>

Jack B. Blumenfeld
Jeremy Tigan
Cameron Clark
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Catherine T. Mattes
Abigail DeMasi
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
evangelineshih@quinnemanuel.com
andrewchalson@quinnemanuel.com
gabrielbrier@quinnemanuel.com
frankcalvosa@quinnemanuel.com
catherinemattes@quinnemanuel.com
Abigaildemasi@quinnemanuel.com

*Attorneys for Plaintiffs*

Dated:  May 30, 2024                    */s/ Alexandra M. Joyce*
                                        Alexandra M. Joyce (#6423)

ME1 48431672v.1